**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| McCARTER & ENGLISH, LLP ) | |
| ) | |
| *Plaintiff,* ) | Civil Action No.:  3:19-cv-01124 |
| ) | (MPS) |
| vs. ) | |
| ) | |
| JARROW FORMULAS, INC. ) | |
| ) | |
| *Defendant.* ) | |

_____

**MCCARTER & ENGLISH, LLP'S COMPLIANCE WITH PJR SCHEDULING ORDER**
**(DN 32)**

## I.     INTRODUCTION

This case concerns five unpaid invoices issued by McCarter & English, LLP ("McCarter") to Jarrow Formulas, Inc. ("Jarrow") between April 17 and August 19, 2019.  After 6½ years of litigation culminating in McCarter's defense of a 3½ week jury trial in the United States District Court for the District of Kentucky (the "Kentucky Litigation"), and a verdict against Jarrow for $2,427,605 for willful and malicious trade secret misappropriation, Jarrow's President and Chairman apparently decided that responsibility for the verdict should be borne by McCarter.

Jarrow religiously paid 70 prior invoices for McCarter's defense of the Kentucky Litigation, not to mention scores of invoices on other matters over a 16-year relationship with McCarter, all without question or concern.  During the trial, Jarrow's President and Chairman, as well as its General Counsel, praised the performance of the McCarter trial team.  But now Jarrow is unhappy with the outcome (now the subject of post-trial motions).  Outcomes, however, are not guaranteed by trial lawyers in cases where payment is based on a multiple of time devoted

and hourly rates.  Jarrow's unhappiness is no reason to disavow or renege on its contractual obligations.

There is probable cause that McCarter will prove the following at trial (i) a long-term institutional attorney-client relationship between McCarter and Jarrow; (ii) that Jarrow retained McCarter to represent Jarrow in the Kentucky Litigation in accordance with that long-term relationship; (iii) that McCarter provided substantial services in connection with the Kentucky Litigation for which it rendered 75 invoices in accordance with its standard practices and its institutional relationship with Jarrow; (iv) that Jarrow paid 70 of those invoices and did so regularly without ever questioning the hourly rates or the appropriateness of the time-charges; (v) that McCarter did the work reflected on the final five unpaid invoices issued in connection with the Kentucky Litigation; (vi) that Jarrow now refuses to pay the final invoices despite its obligation and agreement to do so; and (vii) that Jarrow, on the advice of its counsel, is withholding payment of $57,227.43 for legal services rendered to, and disbursements made for the benefit of, Jarrow in connection with 36 other matters, despite its written assurance on July 22, 2019, that it would make payment within thirty days.

In order to secure a likely judgment in McCarter's favor, this Court should enter a prejudgment remedy in the amount of $1,980,397.94 for the Kentucky Litigation, plus $57,227.43 for unpaid legal services with respect to thirty-six other matters, plus $407,525.00 in prejudgment interest under Conn. Gen. Stat. §37-3a (calculated @ 10% over a 2 year period).

## II.   FACTUAL CLAIMS SUPPORTING ISSUANCE OF A PREJUDGMENT REMEDY

McCarter will prove the following in accordance with the probable cause standard applicable to prejudgment remedies:

McCarter became counsel to Jarrow in 2003 upon the merger of Cummings & Lockwood, LLC into McCarter.  Attorney Mark D. Giarratana was already representing Jarrow for seven years, dating to 1996 when he was at McCormick, Paulding & Huber, LLP.  The original engagement at McCormick was reduced to writing and Jarrow was advised of Attorney Giarratana's move from McCormick to Cummings to McCarter.  Indeed, Mr. Rogovin specifically requested and approved of the continued representation, and the attorney-client relationship was institutionalized over those many years.

Since the merger in 2003, McCarter has represented Jarrow in connection with intellectual property matters (including patent and trademark prosecution), litigation matters (including patent, trademark, trade secret, contract, insurance coverage and class action disputes), and various contract drafting and negotiation matters.  McCarter opened over 400 Jarrow matters, and it issued and Jarrow paid hundreds of invoices.

From the beginning of its attorney-client relationship with Jarrow, McCarter routinely issued monthly invoices in arrears for legal services rendered and disbursements incurred during the prior month.  McCarter billed Jarrow on a time-devoted basis (at hourly rates in increments of one-tenth of an hour) plus out-of-pocket costs or disbursements.  McCarter's invoices to Jarrow always included a clear description of the specific tasks performed, the identity of each lawyer, paralegal or project clerk performing the task or tasks, the date on which the task or tasks were performed, the time devoted by each timekeeper to each task or tasks, the hourly rate charged with respect to each timekeeper, and the total fees and disbursements due for the immediately preceding month.  Over 16 years, McCarter issued hundreds of invoices and Jarrow paid every single one of them, albeit, at times, with an agreed upon discount at or near McCarter's fiscal year end.  McCarter agreed to these discounts in recognition of its long-

standing relationship with Jarrow and the volume of work Jarrow entrusted to the firm.  Never once was there a dispute over a bill.

Beginning in August 2011, McCarter was engaged by Jarrow to represent Jarrow and its new contract consultant, Kean Ashurst, in connection with claims made by Caudill Seed & Warehouse Company, Inc. ("Caudill Seed") against Mr. Ashurst.  Caudill Seed's claims arose out of Jarrow's contractual relationship with Mr. Ashurst, a former food-processing engineer with a significant background in chemistry who had worked at Caudill Seed.  Caudill Seed sued Mr. Ashurst in the Jefferson Circuit Court in Louisville, Kentucky.  McCarter obtained a complete dismissal with prejudice of all claims in that state court action for no consideration, which resulted in the benefit of partial issue preclusion in the Kentucky Litigation.

In late January 2013, McCarter, through a subscription service that monitors and reports when and where its clients are sued, became aware of a lawsuit brought by Caudill Seed against Jarrow – the Kentucky Litigation.  The claims against Jarrow included:  tortious interference; mail/wire fraud – theft by deception; unjust enrichment; extortion – violation of the Hobbs Act; fraud – outrageous conduct; and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1861-1864.  Caudill Seed claimed compensatory damages in the amount of $12 Million plus treble damages and attorneys' fees.  Caudill Seed subsequently amended its complaint to include a claim for violation of the Kentucky Uniform Trade Secrets Act, KRS § 365.880 *et. seq.*

McCarter brought the Complaint to Jarrow's attention and Jarrow requested McCarter to defend the company.  Jarrow, through McCarter, mounted a vigorous defense to all of Caudill Seed's claims against Jarrow.  McCarter developed and implemented the necessary strategy,

which was largely successful; it obtained a dismissal of all claims made by Caudill Seed against Jarrow except for the trade secrets claim.

Beginning on June 3, 2019, that sole remaining claim was tried before a jury in the United States District Court for the Western District of Kentucky.  Attorney Giarratana, together with Attorneys Eric E. Grondahl and Thomas J. Rechen, all of McCarter's Hartford Office, relocated to Louisville for a period of more than four straight weeks to try the case.  They were joined by local Louisville, Kentucky counsel, Attorney Joel T. Beres of Stites & Harbison, PLLC. Attorney John Cordani, also of McCarter's Hartford office, spent substantial time in Louisville assisting in trial preparation and the trial as well.  On June 26, 2019, the jury returned a verdict in favor of Caudill Seed finding that (i) Jarrow misappropriated four of six categories of alleged trade secrets; (ii) Caudill Seed failed to prove that it possessed a trade secret and/or that Jarrow misappropriated two of the six categories of alleged trade secrets; (iii) Caudill Seed was entitled to damages on one category of the misappropriated trade secrets, but was entitled to zero damages on the other three categories of misappropriated trade secrets; and (iii) Jarrow willfully and maliciously misappropriated one category of trade secrets. (Exhibit 103)  Although Caudill Seed claimed nearly $10 million in compensatory damages, the jury awarded only $2,427,605 – one quarter of the amount claimed.  That verdict is now the subject of post-trial motions filed by both parties.  Local counsel, Joel Beres, and his partner, Michael Risley, continue to represent Jarrow in the Kentucky Litigation.

Before trial began, Attorney Giarratana requested that Jarrow bring its account receivable balance current for the Kentucky Litigation.  To that point Jarrow had paid 67 prior invoices without a question.  In response to Attorney Giarratana's request, Jarrow's accounts payable clerk, Mary Grace Reyes, requested a 15% discount in order to pay the then outstanding balance

of $1,345,141.22.   These discussions continued as the trial began.   McCarter offered a 5%

reduction and Jarrow, through Ms. Reyes, countered with a request that the parties meet in the

middle at 10%.   McCarter could not agree in light of the nature of the work performed and the

substantially discounted hourly rates Jarrow already enjoyed.   Ignoring McCarter's offer of 5%

in return for payment of all outstanding invoices, Jarrow took the 5% reduction and retired only

three of the five then outstanding invoices, leaving $675,092 unpaid.   At no time, however, did

Jarrow ever quibble with the appropriateness of the work performed as reflected on the invoices,

the time charges, or the hourly rates.

After trial, during the trial, Attorney Rechen had at least two face-to-face discussions with

Jarrow's General Counsel, Jonathan Leventhal, regarding Jarrow's partial payment and the size

of the remaining receivable, particularly in light of the commitments made by the team (both

professional and personal) and the substantial outlay of resources made and being made by

McCarter on Jarrow's behalf.   Mr. Leventhal agreed that McCarter deserved to be paid in full,

agreed that McCarter was providing and Jarrow was receiving a very high level of professional

service, and indicated that he had requested Ben Khowong, Jarrow's Chief Executive and

Financial Officer, to immediately address the matter.   Again, at no time did the company's

General Counsel ever express any concern or reservation about the appropriateness of the

outstanding balance, the hourly rates, or any of the individual time charges as reflected in the

bills.

After trial, on July 10, 2019, Attorney Rechen sent an e-mail to Messrs. Rogovin,

Khowong and Leventhal and Ms. Reyes advising that the outstanding balance owed to McCarter

was $1,239,306.82, of which $1,201,366.45 related to the Kentucky Litigation (a further invoice

had issued on June 21, 2019 (for trial preparation time devoted in May) in the amount of

$526,274.43). The balance at that time included three invoices issued on April 17, May 16 and June 21, 2019. In addition, Attorney Rechen's e-mail forwarded McCarter's new invoice dated July 10, 2019 in the amount of $760,780.80 for fees and disbursements incurred during the month of June in connection with the trial. As to the outstanding balance, McCarter requested that Jarrow make arrangements for immediate payment. As to the new invoice, McCarter requested that it be paid promptly and, in all events, within thirty days.

Jarrow failed to respond to Attorney Rechen's e-mail. Further, from the date of the jury verdict to July 22, 2019, Jarrow's Chairman and its General Counsel failed and refused to respond to numerous e-mails and telephone calls, including voicemails specifically requesting a return call. On or about July 15, 2019, Attorney Giarratana received, via Federal Express, a letter dated July 12, 2019 from Attorney Carol Brophy of the Steptoe & Johnson LLP law firm in San Francisco, California, purporting to terminate the attorney-client relationship between Jarrow and McCarter and directing the disposition of McCarter's client files relating to Jarrow. The letter made no mention of Attorney Rechen's July 10, 2019 e-mail and no mention or indication of Jarrow's intent regarding its outstanding balance with McCarter.

On July 17, 2019, Attorney Giarratana responded to Attorney Brophy's July 12, 2019 letter. He requested that Jarrow confirm in writing, signed by a duly authorized representative of Jarrow, that Jarrow (i) authorized the transfer of files as directed in Attorney Brophy's letter, (ii) was terminating the attorney-client relationship between McCarter and Jarrow, and (iii) was directing McCarter to file motions to withdraw as counsel in the Kentucky Litigation.

On July 18, 2019, Attorney Giarratana received, via e-mail, a letter from Jarrow's General Counsel, Jonathan Leventhal, confirming Jarrow's termination of the attorney-client relationship between Jarrow and McCarter and directing the disposition of McCarter's client files

relating to Jarrow.  Again, the letter made no mention of Attorney Rechen's July 10, 2019 e-mail and no indication of Jarrow's intent regarding its outstanding balance with McCarter.

On July 19, 2019, in a letter to Attorney Brophy, Attorney Giarratana responded to the letters received from Attorneys Brophy and Leventhal.  In his letter, Attorney Giarratana again addressed the outstanding attorneys' fees and costs owed to McCarter and requested that Jarrow "advise immediately what steps have been taken to satisfy Jarrow Formulas obligations to McCarter & English, LLP and when payment may be expected."  Mr. Rogovin finally responded via e-mail on July 22, 2019.  For the first time he reported that he was unwilling to pay McCarter's outstanding invoices for fees and disbursements relating to the Kentucky Litigation; expressing his disappointment with the adverse verdict; and second-guessing some of the trial strategies employed by McCarter.  He took no issue, however, with the hourly rates charged by McCarter, nor did he dispute any of the time charges related to the work performed.  In that e-mail, he promised that Jarrow would pay within a month only the outstanding McCarter invoices unrelated to the Kentucky Litigation.

Mr. Rogovin's dissatisfaction was with the jury's verdict, not with the representation or the fees, even if he sometimes disagreed with certain of his lawyers' trial strategies.  As late as Friday evening, June 21, 2019, during the expert testimony of the final witness to testify, Mr. Rogovin left a voicemail telling Attorney Giarratana:  "Anyway, you guys are doing a fantastic job.  Thank you.  Big hugs."  Likewise, after Attorney Rechen's closing argument four days later, he complimented the quality, organization and persuasiveness of the presentation, contrasting it to the plaintiff's closing, which he regarded as boring, disjointed and poor.  Jarrow's General Counsel, Jonathan Leventhal, who sat at counsel's table throughout the trial, made similar

comments, including, on separate occasions:  "It is an honor to be a part of the trial team" and "It is a pleasure to watch you guys work in the courtroom."

But Mr. Rogovin apparently had a change of heart when the verdict, which was only a quarter of what Caudill Seed sought, was not what he or his counsel at McCarter had hoped for. Although Mr. Rogovin kept Stites and Harbison on board to handle post-trial motions even though Attorney Beres was a part of the trial team and a full partner in all trial decisions and strategies, he fired McCarter and now refuses to pay.  And, ironically, the man who has for years railed against perceived abuses of the litigation system by lawyers, now threatens spurious excessive billing and malpractice claims in an attempt to stave off fiscal responsibility for the legal services he liberally employed and which benefitted his company.

McCarter is now owed the following for the Kentucky Litigation:

| Inv. Date | Invoice No. | Invoice Fees | Invoice Disb | Pmts/Adj | Balance Due |
|---|---|---|---|---|---|
| 4/17/19 | 8239257 | $258,539.50 | $41,293.33 | $0.00 | $299,832.83 |
| 5/16/19 | 8244495 | $340,986.00 | $34,273.19 | $0.00 | $375,259.19 |
| 6/21/19 | 8251339 | $440,536.00 | $85,738.43 | $0.00 | $526,274.43 |
| 7/10/19 | 8254947 | $582,713.00 | $178,067.80 | $0.00 | $760,780.80 |
| 8/19/19 | 8264196 | $11,128.00 | $7,122.69 | $0.00 | $18,250.69 |
| **Grand Total** | | $1,633,902.50 | $346,495.44 | $0.00 | $1,980,397.94 |

The time charges are reasonable for the work performed; billed in accordance with long-standing and favorable hourly rates paid without question by Jarrow in connection with the Kentucky Litigation and every other matter over the course of many years.  Indeed, for the Kentucky Litigation, the hourly rates for Attorneys Giarratana and Grondahl ($535 and $485 respectively)

had been constant since the inception of the matter in January 2013, and the hourly rate for Attorney Rechen ($520) had been in place since November 1, 2016.

The Kentucky Litigation was long and the trial arduous and complex for many reasons, including that Mr. Rogovin made it so by his many demands, novel theories and strategies, and his propensity for lengthy telephone calls and e-mails, excessive rants, unwillingness to properly prepare for proceedings requiring his testimony, and need for extraordinary client hand-holding and management.  Consistent with its professional obligation, McCarter accepted and dealt with all of it, and was pleased to do so for the benefit of its client.  But it is entitled to be paid for that work.  In light of all that went on in this litigation, including the fully acknowledged but now forgotten quality trial presentation and results which may yet yield victory, there is no good reason for payment to be refused.

## III.   LEGAL ARGUMENT SUPPORTING ISSUANCE OF A PREJUDGMENT REMEDY

### A.   Standards for a prejudgment remedy

"Under Connecticut law, a prejudgment remedy is appropriate if the court, upon consideration of the facts before it taking into account any defenses, counterclaims or setoffs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought[.]"  *Roberts v. TriPlanet Partners, LLC,* 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (internal quotation marks omitted) (quoting Conn. Gen. Stat. §52-278d(a)).

"Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 137, 943 A.2d 406 (2008) (citation omitted). Connecticut courts have defined "probable cause"

as a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. *Three S. Development Co. v. Santore*, 474 A.2d 795 (Conn. 1984) (citation omitted). Thus, the plaintiff does not have to prove its case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of the claim. *New England Land Co., Ltd. v. De Markey*, 569 A.2d 1098 (Conn. 1990).

*Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 249 (D. Conn. 2002) (internal quotation marks omitted).  "A probable cause hearing for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. Rather, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." *Roberts*, 950 F. Supp. 2d at 421 (internal citations and quotation marks omitted).

> ### B.     Whether express or implied-in-fact, McCarter's relationship with Jarrow is defined by contract

The longstanding contractual relationship at issue in this case began while Attorney Giarratana was with McCormick, Paulding and Huber, LLP in 1996 (Exhibit 101) and it continued through Attorney Giarratana's written notification to Jarrow that Attorney Giarratana was merging his law practice at Cummings & Lockwood into McCarter (Exhibit 102).  Jarrow approved the initial representation at McCarter and he approved the continued representation at McCarter.  Further, from the outset at McCormick, payment for services was on a time-devoted basis at stated hourly rates.  This arrangement never changed at Cummings or McCarter.  Jarrow received regular monthly invoices for the various matters entrusted to Attorney Giarratana, those invoices clearly identified the lawyers and other professionals who provided services and their hourly rates, and they clearly identified the tasks performed.  At McCarter alone over 400 matters were opened for Jarrow over a 16 year period.  This did not happen accidentally.  With each new legal need, Jarrow's Chairman, Mr. Rogovin, requested that McCarter, through

Attorney Giarratana, work with the company to address the need.  Attorney Giarratana did so

each and every time and, as a result, McCarter issued and Jarrow received monthly invoices on

each of over 400 matters until those matters were concluded.  Attorney-client relationships of

this nature between counsel and sophisticated corporate entities are considered institutional, and

hourly billings for time devoted are understood and considered standard.  *See Home Depot USA,*

*Inc. v. Cytec Indus., Inc.*, CV-08-5009085S, 2013 WL 4779549, at *5 (Conn. Super. Ct. Aug. 14,

2013) ("[a]n hourly billing arrangement is the standard for handling commercial litigation for a

corporate client"); CONNECTICUT R. PROF'L CONDUCT 1.5 cmt. (2019) ("[w]hen the lawyer has

regularly represented a client, they ordinarily will have evolved an understanding concerning the

basis or rate of the fee and the expenses for which the client will be responsible").[1]

     McCarter's representation of Jarrow in the Kentucky Litigation arose in the context of

this well-developed, well-understood institutional attorney-client relationship.  Jarrow was sued,

McCarter became aware of the suit and brought it to its client's attention, and Jarrow requested

that McCarter mount a vigorous defense just as it had done when it requested McCarter to defend

Mr. Ashurst.  McCarter did as it was requested.

     To form a valid and binding contract in Connecticut, there must be a mutual

understanding of the terms that are definite and certain between the parties . . . .  As then Judge

Ecker stated in *Cohan v. Minicozzi*, CV-15-6052856, 2016 WL 5798900, at *1 (Conn. Super. Ct.

Sept. 2, 2016), an action for collection of an attorney's fee, "[t]here must be a meeting of the

minds, and agreement, as to all essential terms, and those terms must be sufficiently definite and

certain that a court is able to ascertain the intention of the parties and enforce their

agreement."  If the agreement is shown by the direct words of the parties, whether spoken or

---

[1] All unreported decisions cited herein are attached as Exhibit A.

written, the contract is an express one. *Janusauskas v. Fichman,* 264 Conn. 796, 804–05, 826 A.2d 1066 (2003); *Boland v. Catalano,* 202 Conn. 333, 338–39, 521 A.2d 142 (1987). Where assent is manifested by conduct, there exists an implied-in-fact contract. *Cohan*, 2016 WL 5798900, at *1.

In *Cohan*, counsel performed substantial legal work on a single matter in the absence of any written agreement based on a reasonable expectation that he would be paid for his work. *Id.* The court found that counsel undertook the representation with the understanding that he would be compensated for his services, and the client authorized the work and benefitted from it with the understanding that counsel would be paid for doing it. *Id.* The court was "convinced . . . that the parties were in fact operating under a contractual agreement, whether express or implied-in-fact [and] the parties each understood that [the plaintiff] would need to be paid for his time at the end of the representation." *Id.* at *2. The absence of a writing, otherwise required by the ethical rule governing lawyers (Rule 1.5), presented no obstacle for the court because it is well-established that "violations of the Rules of Professional Conduct do not, *ipso facto*, create a presumption that the attorney is precluded from collecting otherwise payable fees and disbursements." *Rucci v. Stuart*, CV-09-5012543S, 2016 WL 5108046, at *17 (Conn. Super. Ct. Aug. 12, 2016); *see Cohan*, 2016 WL 5798900, at *4.

*Cohan* is instructive, and the facts here are considerably more compelling. Jarrow's contract with McCarter stems from an early writing defining the relationship with Attorney Giarratana while he was with another firm. While the hourly rates certainly changed over the ensuing 23 years, all other terms of the attorney-client relationship remained constant as the relationship grew, and all payment terms – including hourly rates – were always known and fully disclosed on McCarter's invoices. Setting aside all of the other 400+ matters for which Jarrow

was routinely billed and made payment, Jarrow engaged McCarter in the Kentucky Litigation fully expecting to pay for McCarter's services under its long-standing institutional arrangement, and it did so seventy times without objection before the Jury handed down its verdict.  Surely there was a contract, implied-in-fact if not in writing.

### C.     Jarrow breached its contract with McCarter by failing to pay the final five invoices

The prejudgment remedy hearing before this Court concerns five unpaid invoices.  It should be so limited.  McCarter unquestionably did the work reflected on the invoices and billed for that work in accordance with its long-standing institutional relationship with Jarrow, and there is no good reason for non-payment.  By refusing to pay them, Jarrow breached its contract. Since there is probable cause to sustain the validity of McCarter's breach of contract claim, this Court should award a prejudgment remedy in the amount of $2,445,150.37 as follows:

- For the five outstanding invoices (Exhibits 105, 106, 107, 108 and 109) issued in connection with the Kentucky Litigation - $1,980,397.94

- For sums due on 36 other matters unrelated to the Kentucky Litigation (Exhibit 116) - $57,227.43[2]

- For prejudgment interest under Conn. Gen. Stat. §37-3a (@ 10% over a 2 year period) - $407,525.00

### D.     This Court should not entertain challenges to invoices long ago issued, never objected to, and long since fully paid by Jarrow

It is far too late in the day for Jarrow to claim that McCarter's fee-billings for more than six years with respect to the Kentucky Litigation were unreasonable in any way.  Jarrow received and paid 70 successive invoices without any objection. This Court should regard those prior

---

[2] A further invoice for time devoted to matters unrelated to the Kentucky Litigation is likely to be issued between now and the date of the prejudgment remedy hearing.  If so, McCarter requests that the amount invoiced be added to the requested prejudgment remedy.

invoices, and the payment thereof by Jarrow, as beyond question at this probable cause hearing under an account stated theory of liability.

"An account stated is an agreement between persons who have had previous transactions, fixing the amount due in respect [to] such transactions and promising payment." *Zacarino v. Pallotti,* 49 Conn. 36, 38 (1881) (citation omitted).  "The delivery by the [creditor] to the [debtor] of each statement of the latter's account, with the [documentation] upon which the charges against [the debtor's account] were based, [is] a rendition of the account so that retention thereof for an unreasonable time constitute[s] an account stated which is prima facie evidence of the correctness of the account." *General Petroleum Products, Inc. v. Merchants' Trust Co.*, 115 Conn. 50, 56, 160 A. 296 (1932); *see also Osagie v. U.S. Equities Corp.*, No. 3:16-CV-01311 (VAB), 2017 WL 3668590, at *10 (D. Conn. Aug. 24, 2017).  "The essential and controlling factor upon which the obligation arises is an agreement between the parties that items of indebtedness, before open to dispute, are true and amount to a particular sum agreed upon as due from the defendant to the plaintiff."  *Dunnett v. Thornton*, 73 Conn. 1, 15-16, 46 A. 158 (1900). "An account stated claim arises when a creditor delivers a debtor a statement of the debtor's account with canceled checks for the charges, and the debtor then retains for an unreasonable time the statement without disputing those charges."  *Aesthetic & Reconstructive Breast Ctr., LLC v. United HealthCare Grp., Inc.*, 367 F. Supp. 3d 1, 10 (D. Conn. 2019).

While an account stated can be opened or impeached upon proof of mistake or fraud, "the [debtor's] silence as to the correctness of the account rendered puts upon it the burden of proving that the account, as stated, was the result of such fraud or mistake." *General Petroleum Products,* 115 Conn. at 56 (depositor, silent as to correctness of account rendered by bank, had burden of proving that account as stated was result of fraud or mistake).  Account stated is a theory of

recovery "in which, by contract, the debtor has a reasonable period of time in which to question all or part of the indebtedness." *Am. Exp. Centurion Bank* v. *Eldridge*, CV-11-6020750S, 2012 WL 3666512, at *3-4 (Conn. Super. Ct. Aug. 2, 2012) (citation omitted) (collecting cases).

The account stated doctrine is equally applicable to claims for attorneys' fees. *See Rosenblit v. Dade Realty Co.*, CV-12-6030654S, 2013 WL 1189368, at *2 (Conn. Super. Ct. Feb. 22, 2013) (granting plaintiff's motion for summary judgment on theory of account stated in action for unpaid attorney fees); *Carey v. Mui-Hin Lau*, 140 F. Supp. 2d 291, 298 (S.D.N.Y. 2001) (awarding unpaid legal fees set forth in invoices rendered over a five to fourteen year period as a matter of law under an account stated theory of liability because: (1) the first time an objection was made to the reasonableness of the fees was in response to the lawyer's complaint; and (2) defendants made partial payments on the account); *O'Connell and Aronowitz v. Gullo*, 229 A.D.2d 637, 644 N.Y.S.2d 870, 871–72 (N.Y. App. Div. 1996) (holding that attorney's claim for account stated was established where client did not object to statement of account until attorney commenced proceeding to recover legal fees); *see also, Bresler v. Hostage*, 696 F. Supp. 46, 49 (S.D.N.Y. 1988) ("[u]nder New York law, the making of such payments have been viewed as an acknowledgment of the correctness of the account" (citation omitted)).

Here, Jarrow not only received 70 prior invoices, registered no objection, and expressed no concern; it paid them. Those 70 invoices, the services rendered as reflected in them, and the hourly rates on which the charges were based, should all be beyond the scope of this probable cause hearing. Likewise, it should be too late in the day to complain about the hourly rates charged in any of the invoices, including the five unpaid invoices, for the same reason. Jarrow accepted those rates long ago. This Court should confine this hearing to the five invoices,

whether the work reflected was performed, and whether they should be paid in accordance with McCarter's long-standing contractual relationship with Jarrow.

### E. In the alternative, there is probable cause to sustain McCarter's unjust enrichment/quantum meruit claim

Unjust enrichment lies when the plaintiff proves "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefit, and (3) that the failure of payment was to the plaintiffs' detriment. . . ." *Ayotte Bros. Const. Co. v. Finney*, 42 Conn. App. 578, 580–81, 680 A.2d 330 (1996) (citation omitted). Recovery for unjust enrichment is appropriate when a defendant retains a benefit that has come to him at the expense of another. *Polverari v. Peatt,* 29 Conn. App. 191, 200-01, 614 A.2d 484, *cert. denied*, 224 Conn. 913, 617 A.2d 166 (1992); *see also National CSS, Inc. v. Stamford,* 195 Conn. 587, 597, 489 A.2d 1034 (1985). Quantum meruit is applicable when the benefit received was for work, labor or services. *Burns v. Koellmer,* 11 Conn. App. 375, 383-84, 527 A.2d 1210 (1987). Recovery "does not depend upon the existence of a contract, either express or implied in fact"; it arises "out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement." *Gagne v. Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001). The doctrine rests on fundamental fairness; *i.e.,* "that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." *Id.* And it is equally applicable to claims for legal services rendered. *David M. Somers & Associates, P.C. v. Busch,* 283 Conn. 396, 406–11, 927 A.2d 832 (2007); *Gagne*, 255 Conn. at 401 (in the absence of a written contingent fee agreement, lawyer entitled to a reasonable fee for services rendered on behalf of his former client under quantum meruit or unjust enrichment).

McCarter provided substantial services in the crucible of trial preparation and a trial. Jarrow benefitted from those services and it would be contrary to equity and fairness for Jarrow to retain that benefit (which cannot now be undone or returned) in the absence of payment.

At minimum, and only in the alternative, McCarter is entitled to a prejudgment remedy because there is probable cause that it will prove a right of recovery in unjust enrichment/quantum meruit.

## IV.   MCCARTER'S WITNESSES

### A.   Mark D. Giarratana

Attorney Giarratana will testify to the following:  (i) the history of his representation of Jarrow at McCormick, Paulding & Huber, LLP, Cummings & Lockwood, LLC, and McCarter; (ii) McCarter's regular billing practices with regard to the Jarrow account; (iii) Jarrow's request for McCarter to represent it in the Kentucky Litigation; (iv) the development of the Kentucky Litigation and the billing and invoicing practices of McCarter with respect to the matter, including Jarrow's payment of seventy prior invoices without objection; (v) McCarter's staffing of the Kentucky Litigation and the trial; (vi) the trial in the Kentucky Litigation, including the strategy of the trial; (vi) the particular challenges presented by the preparation for trial, the trial itself, and the management of the client; (vii) Mr. Rogovin's unwillingness to prepare himself to testify and his unwillingness to work productively and constructively with the trial team; (viii) his conversations with Rory Lipsky, President of Jarrow Industries, and Clay DuBose, Vice President of Sales for Jarrow Formulas, concerning Mr. Rogovin's fitness to testify; (ix) the verdict and the planned post-verdict strategy; (x) McCarter's five outstanding invoices related to the Kentucky Litigation, including the work performed as reflected therein; (xi) his efforts to bring the account current before and during the trial of the Kentucky Litigation, including his

communications with representatives of Jarrow; (xii) his post-trial efforts to communicate with Jarrow, including Mr. Rogovin; (xiii) Jarrow's termination of McCarter, including the correspondence and communications related thereto; and (xiv) the current status of Jarrow's account with McCarter, including the sums due on 36 matters unrelated to the Kentucky Litigation.

### B.      Thomas J. Rechen

Attorney Rechen will testify to the following:  (i) his role and involvement in the Kentucky Litigation; (ii) the strategy of the defense; (iii) the comments made by Mr. Rogovin, Rory Lipsky, Clay DuBose and Jonathan Leventhal during the trial concerning the trial presentation and the performance of the trial team; (iv) the pre-trial efforts made to prepare Mr. Rogovin to testify; (v) the mock jury focus groups conducted in advance of trial to evaluate the strengths and weaknesses of the case; (vi) the decision for Mr. Rogovin not to testify and the pros and cons surrounding that decision; and (vii) his conversations with Jarrow's General Counsel during the trial concerning payment of the outstanding invoices.

## V.      CONCLUSION

There is probable cause to sustain the validity of McCarter & English, LLP's claims against Jarrow Formulas, Inc.  This Court should enter a prejudgment remedy in the amount of $2,037,625.37, plus prejudgment interest in the amount of $407,525.00, against the Defendant and order a full disclosure of the Defendant's assets.

Dated:  September 10, 2019          RESPECTFULLY SUBMITTED,


                                   PLAINTIFF
                                   McCARTER & ENGLISH, LLP


                               By: *_/s/ Louis R. Pepe_*
                                    Louis R. Pepe
                                    Federal Bar No. CT04319
                                    McElroy, Deutsch, Mulvaney
                                       & Carpenter LLP
                                    One State Street, 14th Floor
                                    Hartford, CT 06103
                                    Phone:  860-522-5175
                                    Fax:  860-522-2796
                                    Email: lpepe@mdmc-law.com
                                    Its Attorneys

## **CERTIFICATION**

I hereby certify that on September 10, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electric filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.


*/s/ Louis R. Pepe*
Louis R. Pepe