UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------x
                            :
MCCARTER AND ENGLISH LLP    :    Civ. No. 3:19CV01124(MPS)
                            :
v.                          :
                            :
JARROW FORMULAS, INC.       :    March 3, 2020
                            :
----------------------------x
```

**RULING ON MOTION FOR PREJUDGMENT REMEDY [Doc. #8]**

Pending before the Court is a Motion for Prejudgment Remedy filed by plaintiff McCarter and English LLP ("plaintiff" or "M&E"). [Doc. #8]. For the reasons set forth below, the Court finds that plaintiff's Motion for Prejudgment Remedy is **GRANTED, in part.**

I.   **BACKGROUND**

M&E brings this action against defendant Jarrow Formulas, Inc. ("defendant" or "Jarrow") seeking payment of legal fees. The Complaint asserts three claims: (1) breach of contract; (2) account stated; and (3) unjust enrichment/quantum meruit. See Doc. #1 at 8. This case arises out of a 23-year relationship between attorney Mark Giarratana, a current partner at plaintiff law firm, and Jarrow Rogovin, defendant's Chairman and President ("Rogovin"). See Doc. #1 at 2; see also Doc. #38 at 1. Although Attorney Giarratana has changed law firms over the past 23 years, until recently, Jarrow has remained a client. See Doc. #1

1

at 2-3; see also Doc. #38 at 1-2. Each time Attorney Giarratana joined a new law firm, including when he joined M&E, Jarrow was advised of the change and elected to continue to be represented by Attorney Giarratana at his current firm. See Doc. #1 at 3; see also Doc. #38 at 2. M&E represented Jarrow from 2003 through 2019. See Doc. #1 at 3; see also Doc. #38 at 2.

Beginning in August 2011, M&E represented Jarrow and its consultant, Kean Ashurst, in state court litigation in Louisville, Kentucky, against Caudill Seed & Warehouse Company ("Caudill Seed"). See Doc. #1 at 4; see also Doc. #38 at 3. After M&E obtained dismissal of the state court litigation, Caudill Seed sued Jarrow in the U.S. District Court for the Western District of Kentucky ("the WDKY Litigation"). See Doc. #1 at 4; see also Doc. #38 at 3; Doc. #69 at 45, 49. In the WDKY Litigation, M&E "obtained a dismissal of all claims against [defendant] Jarrow except for the trade secrets claim." Doc. #1 at 4; see also Doc. #38 at 3. The trade secrets claim against Jarrow was tried in June 2019. See Doc. #1 at 4-5; see also Doc. #38 at 3-4. On June 26, 2019, the jury returned a verdict in favor of Caudill Seed for $2,427,605. See Doc. #1 at 5; see also Doc. #38 at 4. The jury also found willful and malicious misappropriation of trade secrets by Jarrow. See Doc. #1 at 5; see also Doc. #38 at 4.

On July 10, 2019, Attorney Thomas Rechen, a partner at M&E
and a member of the WDKY Litigation trial team, sent an email to
Rogovin, Ben Khowong (defendant's chief executive officer and
chief financial officer), Jonathan Leventhal (defendant's in-
house counsel), and Mary Grace Reyes (an employee in defendant's
accounts payable department). See Doc. #1 at 5; see also Doc.
#38 at 4; Doc. #69 at 113-15; Ex. 110. Attorney Rechen's email
informed Jarrow "that there was an outstanding balance owed to
[plaintiff] McCarter in the amount of $1,239,306.82, of which
$1,201.366.45 related to the Kentucky litigation." Doc. #1 at 5.
"The outstanding balance was for legal services dating back to
April 17, 2019." Doc. #1 at 5. In addition, Attorney Rechen's
email included a "new invoice in the amount of $760,780.80 for
fees and disbursements incurred during the month of June in
connection with the Kentucky Jury Trial." Doc. #1 at 5. Rogovin
never responded to Attorney Rechen's July 10, 2019, email. See
Doc. #1 at 5.

On July 12, 2019, M&E received a letter from Attorney Carol
Brophy, an attorney at Steptoe & Johnson LLP in San Francisco,
California, "purporting to terminate the attorney-client
relationship between Jarrow and McCarter and directing the
disposition of McCarter's client files relating to Jarrow." Doc.
#1 at 5-6; see also Doc. #38 at 5; Doc. #69 at 92; Ex. 111. M&E
requested that Jarrow "confirm in a writing signed by a duly

authorized representative" that Jarrow authorized this transfer and was terminating the attorney-client relationship between M&E and Jarrow. Doc. #1 at 6; see also Doc. #38 at 5; Doc. #69 at 94; Ex. 112. Attorney Leventhal, in his role as Jarrow's in-house counsel, subsequently confirmed the termination of the attorney-client relationship and directed the transfer of Jarrow's client files. See Doc. #1 at 6; see also Doc. #38 at 5; Doc. #69 at 96; Ex. 113.

Since Attorney Rechen's July 10, 2019, email to Jarrow, M&E "has further invoiced Jarrow Formulas for $11,204.86 in attorneys' fees and disbursements incurred during June 2019 in connection with various intellectual property matters handled by McCarter for Jarrow prior to receiving the July 12, 2019, letter from Attorney Brophy." Doc. #1 at 7. The parties agree that the outstanding invoices are #8239257, #8244495, #8251339, #8254947, and #8264196. See Doc. #38 at 6. M&E asserts that as of the date of the Complaint, "the sum of $1,962,147.20 is due and owing to McCarter for legal services rendered and disbursements (whether advanced or due and payable) by McCarter for the benefit of Jarrow in the Kentucky Litigation from April 17, 2019, through June 30, 2019." Doc. #1 at 7; see also Doc. #38 at 6.

On July 23, 2019, M&E filed a Motion for Prejudgment Remedy ("PJR"). [Doc. #8]. At the time the motion was filed, M&E sought a prejudgment remedy in the sum of $2,000,000, "plus the sum of

any additional invoices from expert witnesses, court reporters, and others, who provided services to McCarter during the Kentucky litigation[.]" Doc. #8 at 1. On September 10, 2019, Jarrow filed its Memorandum in Opposition to Plaintiff's Application for a Prejudgment Remedy. [Doc. #40]. In this memorandum, Jarrow discussed its intention to proceed on defenses and counterclaims asserting that M&E "grossly overbilled and breached its fiduciary duties" to Jarrow. Doc. #40 at 2. Jarrow also stated its intention to file counterclaims for unfair trade practices and legal malpractice. See Doc. #40 at 2.

On October 4, 2019, Jarrow filed its Answer, including affirmative defenses, and counterclaims against M&E. See Doc. #64. On October 30, 2019, defendant filed an Answer, with Amended Counterclaims. See Doc. #91. Defendant asserts counterclaims for: (1) Excessive Billing; Overpayment and Recoupment; (2) Unjust Enrichment; (3) Breach of Fiduciary Duty; (4) Legal Malpractice; (5) Negligent Misrepresentation; (6) Intentional Misrepresentation; (7) Unfair Trade Practices; and (8) Setoff. See Doc. #91 at 31-36. These counterclaims reflect defendant's intentions stated in its Memorandum in Opposition to Plaintiff's Application for a Prejudgment Remedy. See Doc. #40.

The Court conducted evidentiary hearings on the PJR on September 24, 2019, October 10, 2019, and October 11, 2019. See

5

Docs. #56, #68, #72 (minute entries); Docs. #69, #83, #86 (transcripts).

## II.  __LEGAL STANDARD__

"Although the Federal Rules of Civil Procedure govern the conduct of an action in federal court, state law determines when and how a provisional remedy is obtained." SS & C Techs., Inc. v. Providence Inv. Mgmt., 582 F. Supp. 2d 255, 257 (D. Conn. 2008); see also Fed. R. Civ. P. 64; Bahrain Telecomm. Co. v. DiscoveryTel, Inc., 476 F. Supp. 2d 176, 183 (D. Conn. 2007). Federal courts in Connecticut "utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action." Edelstein v. Lucas Brand Equity, LLC, No. 3:16CV01353(WWE), 2017 WL 2399583, at *4 (D. Conn. June 2, 2017) (citing Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 436 n.10 & 437 (1974); Dill v. Ron's Golf Car Rental, Inc., No. 3:12CV00137(JBA)(JGM), 2013 WL 275690, at *8 (D. Conn. Jan. 24, 2013)).

> Under Connecticut law, a prejudgment remedy is appropriate if the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or setoffs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought.

Roberts v. TriPlanet Partners, LLC, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (quotation marks omitted) (quoting Conn. Gen. Stat. §52-278d(a)). Connecticut courts have defined "probable cause" in this context

> as 'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.' Three S. Development Co. v. Santore, 193 Conn. 174, 175, 474 A.2d 795 (1984) (citation omitted). Thus, the plaintiff does not have to prove its case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of the claim. New England Land Co., Ltd. v. De Markey, 213 Conn. 612, 620, 569 A.2d 1098 (1990).

Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 249 (D. Conn. 2002). Probable cause "is less demanding than standards which require findings to be made based on a preponderance of the evidence or even a likelihood of success." Cendant Corp. v. Shelton, No. 3:06CV00854(JCH), 2007 WL 1245310, at *3 (D. Conn. Apr. 30, 2007); see also State v. Bacon Const. Co., 15 A.3d 147, 151 (Conn. 2011) ("[A] probable cause determination rests on a low level of proof[.]").[1]

---

[1] Jarrow argues that because it has asserted that M&E breached a fiduciary duty to Jarrow, a higher standard of "clear and convincing evidence" applies. Doc. #93 at 5. Assuming, without deciding, that such a standard would apply at trial, that is not the standard for a prejudgment remedy. "Where the plaintiff's burden at trial is proof by clear and convincing evidence, the task for the trial court in ruling on a prejudgment remedy is to determine whether, in the exercise of ordinary caution, prudence and judgment, it believes, based on the evidence presented, that the plaintiff can meet that burden at trial. Put another way,

"A probable cause hearing for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. Rather, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." Roberts, 950 F. Supp. 2d at 421 (citations and quotation marks omitted); see also TES Franchising, LLC v. Feldman, 943 A.2d 406, 411 (Conn. 2008). "The trial court has broad discretion to determine the plaintiff's probable success at a trial on the merits of its case." TES Franchising, LLC, 943 A.2d at 414.

For the Court to issue a prejudgment remedy, "[p]laintiff need not establish probable cause to believe that it will succeed on all claims; it need only establish its probability for success on a single claim." Sec. Ins. Co. of Hartford v. Trustmark Ins. Co., No. 3:00CV01247(PCD), 2002 WL 32506290, at *2 (D. Conn. Aug. 12, 2002); see also McGovern Capital, LLC v. Papic, No. CV06-0190931-S, 2003 WL 21267436, at *2 (Conn. Super.

---

although the plaintiff does not have to prove its case by clear and convincing evidence at the prejudgment remedy hearing, it, nonetheless, must present sufficient evidence to lead the court to conclude that it could do so at trial." ASPIC, LLC v. Poitier, 181 A.3d 593, 600 (Conn. App. 2018). It is the Court's finding herein that M&E has established probable cause that it would prevail at trial on two of its claims, under either a preponderance of the evidence or a clear and convincing evidence standard.

Ct. May 21, 2003) ("In order to sustain an application for a prejudgment remedy, the applicants must show there is probable cause one or more of their claims will succeed[.]").

"At a probable cause hearing on prejudgment remedy, a trial court may properly consider all evidence presented, including testimony of witnesses, documentary evidence, and affidavits." Fleet Bank of Connecticut v. Dowling, 610 A.2d 707, 710 (Conn. App. Ct. 1992) (citation omitted). The party seeking the prejudgment remedy must establish probable cause not only regarding its claims, but also as to "the amount of remedy sought." TES Franchising, LLC, 943 A.2d at 416.

## III. **ANALYSIS**

Plaintiff M&E

> seeks an order from this Court directing that a prejudgment remedy be granted to secure the sum of $2,000,000, plus the sum of any additional invoices from expert witnesses, court reporters, and others, who provided services to McCarter during the Kentucky Litigation ... plus any sums unpaid by Jarrow that are unrelated to the Kentucky Litigation ... plus prejudgment interest at the statutory rate of 10% pursuant to Conn. Gen. Stat. § 37-3a for the wrongful detention of money after it has become due and payable, or such other sum as the Court directs[.]

Doc. #8 at 1-2. In M&E's post-hearing briefing, it contends that "[n]ow at issue is whether McCarter proved, after 'taking into account any defenses, counterclaims or settofs,' probable cause for the issuance of a $2.5 million prejudgment remedy." Doc. #92

at 1. Jarrow also filed post-hearing briefing, contending that a prejudgment remedy should not issue. See Doc. #93.

The Court first considers whether M&E has met its burden of establishing probable cause for issuance of a PJR.[2] The Court next turns to whether Jarrow has provided evidence of defenses, counterclaims or set-offs that would undermine any such showing of probable cause.[3] Finally, the Court addresses the question of the appropriate amount of a prejudgment remedy in this case.

## A.   **Plaintiff's Claims**

### 1.   **Breach of Contract**

The Court finds that plaintiff has established probable cause that it will succeed at trial on its breach of contract claim. See Doc. #1 at 8. "In Connecticut, [t]he elements of a breach of contract claim are [1] formation of an agreement, [2] performance by one party, [3] breach by the other party, and [4] damages." Nwachukwu v. Liberty Bank, 257 F. Supp. 3d 280, 293

---

[2] The Court notes that the findings made in this ruling are made based solely on the evidence received to date.

[3] The Court has considered all defenses, counterclaims, and setoffs advanced by Jarrow. The evidence at the hearing related almost exclusively to Jarrow's claim that M&E committed malpractice, and thus the Court primarily considers that counterclaim in its ruling. The Court has considered all of the evidence presented, and concludes that the evidence offered by Jarrow -- viewed through the lens of any of the proffered counterclaims, defenses, or set-offs -- does not undermine the probable cause established by M&E that it will prevail on at least some of its claims at trial.

(D. Conn. 2017) (citing Meyers v. Livingston, Adler, Pulda,

Meiklejohn & Kelly, P.C., 87 A.3d 534, 540 (Conn. 2014)).

"In whatever form, a contract comes into existence only

when certain prerequisites are met." Cohan v. Minicozzi, No.

CV15-6052856, 2016 WL 5798900, at *2 (Conn. Super. Ct. Sept. 2,

2016). "To form a valid and binding contract in Connecticut,

there must be a mutual understanding of the terms that are

definite and certain between parties[.]" Senco, Inc. v. Fox-Rich

Textiles, Inc., 816 A.2d 654, 656 (Conn. App. Ct. 2003), cert.

denied, 821 A. 2d 916 (Conn. 2003) (citation and quotation marks

omitted). Contract law applies to cases involving the collection

of attorney's fees. See, e.g., Cohan, 2016 WL 5798900, at *2.

"Whether [a] contract is styled express or implied involves

no difference in legal effect, but lies merely in the mode of

manifesting assent." Janusauskas v. Fichman, 826 A.2d 1066,

1072-73 (Conn. 2003) (citation and quotation marks omitted).

"[A]n express contract is one in which the parties arrive at

their agreement and express it in words, either oral or

written." McKinstry v. Sheriden Woods Health Care Ctr., Inc.,

994 F. Supp. 2d 259, 264 (D. Conn. 2014) (citation and quotation

marks omitted). "[A]n implied contract is one in which some or

all of the terms are inferred from the conduct of the parties

and the circumstances of the case[.]" Schreiber v. Connecticut

Surgical Grp., P.C., 901 A.2d 1277, 1281 (Conn. App. Ct. 2006).

> To establish the existence of an implied in fact
> contract, the plaintiff must prove that it rendered
> services with the reasonable expectation that the
> defendant would pay for the services and that the
> defendant accepted those services in a manner that
> reasonably would lead the plaintiff to believe that the
> defendant intended to pay for the services.

Connecticut Light & Power Co. v. Proctor, 118 A.3d 702, 707

(Conn. App. 2015), aff'd, 152 A.3d 470 (Conn. 2016); see also

Janusauskas, 826 A.2d at 1073 ("Such a contract arises where a

plaintiff, without being requested to do so, renders services

under circumstances indicating that he expects to be paid

therefor, and the defendant, knowing such circumstances, avails

himself of the benefit of those services. In such a case, the

law implies from the circumstances, a promise by the defendant

to pay the plaintiff what those services are reasonably

worth."). "It is not fatal to a finding of an implied contract

that there were no express manifestations of mutual assent if

the parties, by their conduct, recognized the existence of

contractual obligations." Rahmati v. Mehri, 452 A.2d 638, 640

(Conn. 1982).

"It is common ground that, to establish a right to recover

unpaid professional fees on a claim of implied contract, the

plaintiff needed to provide an evidentiary foundation of

reasonableness for the fees that it charged." St. Onge, Stewart,

Johnson & Reens, LLC v. Media Grp., Inc., 851 A.2d 1242, 1244

(Conn. App. Ct. 2004). "Assessment of the reasonableness of

12

attorney's fees traditionally has been guided by several factors." Id. at 1245. "These factors include the time and labor required, the novelty and difficulty of the questions involved, and the fee customarily charged in the locality for similar legal services." Sorrentino v. All Seasons Services, Inc., 717 A.2d 150, 159 (Conn. 1998); see also Connecticut R. Prof'l Conduct 1.5(a) (2019) (listing the reasonableness factors). Further, "[a]n hourly billing arrangement is the standard for handling commercial litigation for a corporate client[.]" Home Depot USA, Inc. v. Cytec Indus., Inc., No. FST-CV08-5009085-S, 2013 WL 4779549, at *5 (Conn. Super. Ct. Aug. 14, 2013); see also Connecticut R. Prof'l Conduct 1.5 cmt. (2019) ("When the lawyer has regularly represented a client, they ordinarily will have evolved an understanding concerning the basis or rate of the fee and the expenses for which the client will be responsible[.]").

The testimony at the hearing, and the submissions filed, provide evidence regarding the lengthy legal relationship among Attorney Giarratana, M&E, and Jarrow. However, M&E seeks payment for only five outstanding invoices, all issued in 2019. See Exs. 105, 106, 107, 108, and 109; Doc. #69 at 103-12.

As noted, the Court need only find probable cause, a low standard, that plaintiff will succeed on the breach of contract claim. When evaluating whether an express contract existed in

this case, the Court looks to the 1996 engagement letter between Attorney Giarratana and Jarrow. See Ex. 101; Doc. #69 at 15. This letter was signed by both Attorney Giarratana and Rogovin, as CEO of Jarrow. See Ex. 101 at 3; Doc. #69 at 17. The presence of the signatures of both individuals on the engagement letter supports a finding that an agreement was formed. The engagement letter set out the parameters of the legal relationship between Attorney Giarratana and Jarrow, including that the billing relationship would involve Attorney Giarratana "render[ing] statements to Jarrow Formulas on a monthly basis." Ex. 101 at 1. The agreement also stated that "[o]ur statements are due and payable 30 days after receipt and Jarrow Formulas agrees to pay each monthly statement within 30 days after receipt." Ex. 101 at 2. Jarrow and Attorney Giarratana maintained a 23-year legal relationship, during which Attorney Giarratana continuously represented Jarrow. This representation continued even when Attorney Giarratana changed firms, including when he moved to M&E. See Ex. 102; Doc. #69 at 23-24. Attorney Giarratana continued throughout his 23-year legal relationship with Jarrow to bill defendant on a monthly basis. See, e.g., Exs. 105, 106, 107, 108, and 109; see also Doc. #69 at 16, 19. Attorney Giarratana testified that until the five invoices at issue, Jarrow paid the legal bills "[w]ithout even a hint of objection. Never a complaint, never an objection, never anything of the

14

like." Doc. #69 at 19.

M&E has established probable cause that it will establish
at trial that it performed its obligations under the contract,
by representing Jarrow in the WDKY Litigation. While Jarrow was
dissatisfied with the outcome of that litigation, it has not
submitted sufficient evidence to undermine M&E's showing of
probable cause that M&E in fact performed under the contract.
When Jarrow refused to pay the five outstanding monthly
invoices, Jarrow breached the contract. M&E suffered damages,
because it was not paid for the services rendered that are
reflected in the disputed invoices. In sum, the Court finds
probable cause that plaintiff will succeed on its breach of
express contract claim.

In the alternative, the Court finds probable cause that M&E
will prevail on a claim of breach of an implied contract. An
implied contract exists based on conduct, rather than express
words. See Schreiber, 901 A.2d at 1281. The evidence presented
reveals conduct of the parties supporting the existence of an
implied contract for the provision of legal services. As noted,
over the course of a 23-year relationship, Attorney Giarratana
represented Jarrow; Attorney Giarratana invoiced Jarrow monthly;
and Jarrow paid the (sometimes discounted) invoices. See Doc.
#69 at 16, 19, 32-33, 35-36, 66, 141-42, 160, 165. Even while
the WDKY Litigation was underway, Jarrow paid every invoice

15

issued by M&E other than the five issued beginning in April 2019 that underlie the claims in this case. See Doc. #69 at 145. Attorney Giarratana testified that 540 matters were opened and handled for Jarrow throughout the 23-year relationship. See Doc. #69 at 23-24. While often there were discounts applied to the bills, such that Jarrow may not have paid the full price indicated on the bill, the monthly statements were a consistent part of the legal relationship. See Doc. #69 at 142; see also, e.g., Ex. 531.

An implied contract existed between the parties. When Jarrow refused to pay the five outstanding monthly invoices, Jarrow breached that implied contract. M&E suffered damages, because it was not paid for the services rendered that are reflected on the disputed invoices. In sum, the Court finds probable cause that plaintiff will succeed on its breach of implied contract claim.

### 2.   Unjust Enrichment/Quantum Meruit

As noted above, the Court need only find probable cause to believe that a plaintiff will prevail on any one claim for a prejudgment remedy to issue. See Sec. Ins. Co. of Hartford, 2002 WL 32506290, at *2. The Court nevertheless briefly considers M&E's claim for unjust enrichment/quantum meruit against Jarrow, and finds probable cause to believe that M&E will prevail on this claim as well. See Doc. #1 at 8. "The elements of unjust

enrichment are well established. Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefit, and (3) that the failure of payment was to the plaintiffs' detriment." Ayotte Bros. Const. Co. v. Finney, 680 A.2d 330, 332 (Conn. App. Ct. 1996) (citation and quotation marks omitted). "The right of recovery for unjust enrichment is equitable, its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff." Polverari v. Peatt, 614 A.2d 484, 489 (Conn. App. 1992) (citations and quotation marks omitted).

"Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact." Gagne v. Vaccaro, 766 A.2d 416, 423 (Conn. 2001). "Quantum meruit ... has been utilized when the benefit received was the work, labor, or services of the party seeking" relief. Burns v. Koellmer, 527 A.2d 1210, 1216 (Conn. App. Ct. 1987). An attorney may bring a quantum meruit claim to recover unpaid attorney's fees. See, e.g., David M. Somers & Assocs., P.C. v. Busch, 927 A.2d 832, 840 (Conn. 2007). Recovery for legal fees under the legal theory of quantum meruit is based on "the reasonable value of the services to the client[.]"

<u>McCullough v. Waterside Assoc.</u>, 925 A.2d 352, 357 (Conn. App. Ct. 2007).

The Court finds that there is probable cause that M&E will succeed on the unjust enrichment claim. In this case, the benefit received by Jarrow was in the form of legal services. It is not disputed that M&E represented Jarrow during the WDKY Litigation. <u>See</u> Doc. #1 at 4; <u>see also</u> Doc. #38 at 3; Doc. #69 at 38, 44-47. Jarrow, dissatisfied with the outcome of that litigation, did not pay M&E for some of these legal services. Jarrow effectively contends that its refusal to pay was not "unjust" because the services provided were deficient, and the fees charged excessive. As discussed in more detail below, the Court does not find the evidence offered by Jarrow's experts persuasive, and finds that there is probable cause that M&E will succeed in establishing at trial that Jarrow's refusal to pay was unjust, satisfying that element of the unjust enrichment claim. Jarrow's failure to pay M&E was clearly to M&E's detriment. Accordingly, the Court finds probable cause that M&E will succeed on the unjust enrichment/quantum meruit claim.

### 3.   Account Stated

The Court finds probable cause that M&E will prevail at trial on its breach of contract and unjust enrichment/quantum meruit claims. Accordingly, the Court need not reach M&E's account stated claim.

**B.   Jarrow's Counterclaims**

Jarrow has asserted a variety of counterclaims; the primary argument advanced at the hearing is that M&E committed legal malpractice in its handling of the WDKY Litigation.[4]

### 1.   Legal Standard

"[I]t is well settled that, in determining whether to grant a prejudgment remedy, the trial court must evaluate both parties' evidence as well as any defenses, counterclaims and setoffs." TES Franchising, LLC, 943 A.2d at 413. "Such consideration is significant because a valid defense has the ability to defeat a finding of probable cause." Id.; see also Roberts v. Caton, 619 A.2d 844, 846 n.4 (Conn. 1993). A claim of legal malpractice, however, is not, in this context, a defense to a claim for legal fees. Jarrow's counterclaim does not have "the ability to defeat a finding of probable cause" on M&E's claims for lack of payment; indeed, it is possible for an attorney to prevail in a fee collection action against a client for his work on a case, while the client also prevails in a legal malpractice action against the attorney for his failures in that case. See Kregos v. Stone, 872 A.2d 901, 907 (Conn. App.

---

[4] Jarrow has also asserted that the invoices presented, and not paid, were excessive, which the Court construes as a partial defense to M&E's claims for payment. The Court has taken this evidence into account when evaluating the strength of M&E's claims, but also considers this defense in more detail below, in its assessment of the amount of the PJR to be ordered.

Ct. 2005). The counterclaim for malpractice -- and the evidence
offered in relation to it -- is considered by the Court here in
evaluating the question of whether M&E can establish probable
cause that it will prevail on its claims. In particular, the
Court considers the evidence offered in support of the
malpractice claim in evaluating whether M&E performed its duties
under its contract with Jarrow, an element of the breach of
contract claim, and in determining what the value of M&E's
services were, an element of the quantum meruit claim.

Before considering the counterclaims and defenses, the
Court pauses to address the following question: "What is the
standard of proof for a defense of a prejudgment remedy
application?" Fusaro v. Malik, No. FST-CV08-5008479-S, 2011 WL
4716278, at *1 (Conn. Super. Ct. Sept. 16, 2011). In what it
viewed as a case of first impression, the Connecticut Superior
Court observed that the relevant "statute is silent as to the
standard of proof for a defense of a PJR application." Id. at
*4. After analysis and review of a number of Connecticut
Appellate and Supreme Court decisions, the Fusaro Court
concluded: "From the cases previously cited, the court finds
that the standard of proof for a defendant in proving 'defenses,
counterclaims or set-offs' under Gen. Stat. §52-278d(a)(1) is
the preponderance of the evidence standard, the ordinary civil
standard of proof." Id. Fusaro relied in particular on an

Appellate Court decision finding that a defendant opposing entry of a PJR "did not meet his burden of proof that adequate insurance existed to cover a judgment against him." Socci v. Pasiak, 978 A.2d 96, 99 (Conn. App. 2009).

This approach is flawed. It would allow a defendant to defeat an application for prejudgment remedy -- which requires plaintiff to meet only the minimal probable cause standard -- with a defense established only by a preponderance of the evidence. The Court is not persuaded that such an approach honors the "extremely limited" role of a court in considering a prejudgment remedy, that is, "to determine probable successes by weighing probabilities." William Beazley Co. v. Bus. Park Assocs., Inc., 643 A.2d 1298, 1301 (Conn. App. Ct. 1994) (citation and quotation marks omitted). The Court need not resolve this question, however. The Court finds that Jarrow has failed to establish its malpractice claim by a preponderance of the evidence. Jarrow has not produced evidence that, considered by any standard, would undermine a finding of probable cause in favor of M&E.[5]

---

[5] Indeed, the Court finds that, based on the evidence presented in connection with this PJR application, Jarrow has failed to establish even probable cause that it would prevail on its malpractice counterclaim.

21

## 2.    Analysis of Malpractice Counterclaim

"Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services[.]" Updike, Kelly & Spellacy, P.C. v. Beckett, 850 A.2d 145, 169 (Conn. 2004) (citation and quotation marks omitted). "In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." Grimm v. Fox, 33 A.3d 205, 211 (Conn. 2012) (citation and quotation marks omitted); see also Palmer v. Sena, 474 F. Supp. 2d 347, 350 (D. Conn. 2007).

> In legal malpractice actions arising from prior litigation, the [party asserting malpractice] typically proves that the ... attorney's professional negligence caused injury to the [party asserting malpractice] by presenting evidence of what would have happened in the underlying action had the [attorney] not been negligent. This traditional method of presenting the merits of the underlying action is often called the case-within-a-case .... More specifically, the [party asserting malpractice] must prove that, in the absence of the alleged breach of duty by her attorney, the [party asserting malpractice] would have prevailed [in] the underlying cause of action and would have been entitled to judgment .... To meet this burden, the [party asserting malpractice] must produce evidence explaining the legal significance of the attorney's failure and the impact this had on the underlying action.

Bozelko v. Papastavros, 147 A.3d 1023, 1029 (Conn. 2016)
(citations and quotation marks omitted).

"Connecticut Appellate, Superior, and U.S. District courts
have transferred the requirement of expert testimony in medical
malpractice actions to legal malpractice actions." Palmer v.
Sena, 474 F. Supp. 2d 347, 350 (D. Conn. 2007). Therefore, "a
[party] alleging attorney malpractice must establish through
expert testimony that the attorney's conduct legally caused his
claimed injury." Ordon v. Karpie, 425 F. Supp. 2d 276, 280 (D.
Conn.), adhered to on reconsideration, 543 F. Supp. 2d 124 (D.
Conn. 2006), and aff'd, 273 F. App'x 27 (2d Cir. 2008) (citation
and quotation marks omitted).[6]

Jarrow presented testimony from several witnesses,
including two experts, in support of its malpractice claim.
Expert David Paige conducted an evaluation of all invoices
issued by M&E to Jarrow from August 2011 through April 2019,
concluding that those invoices overbilled Jarrow by
approximately 43%. See Exs. 528, 528-2, 528-3, 528-4. Paige's

---

[6] There is an exception to the rule requiring expert testimony
"where there is present such an obvious and gross want of care
and skill that the neglect is clear even to a layperson." Tatum
v. Oberg, 804 F. Supp. 2d 88, 95 (D. Conn. 2011) (citation and
quotation marks omitted). "These limited circumstances typically
involve attorneys who have failed to follow basic rules of
procedure or have incurred default judgments for their failure
to attend court hearings." Id. (citation and quotation marks
omitted). That exception does not apply here.

report and testimony did not conclude that M&E was not entitled
to bill Jarrow for its services; rather, Paige opined that the
amount M&E had charged Jarrow over a span of eight-plus years
was excessive. The Court thus considers the Paige Opinion in
connection with the <u>amount</u> of remedy, rather than the propriety
of awarding any remedy at all.

Expert Elisabeth Grey ("Attorney Grey") testified based on
her experience as a Litigation Partner in Louisville, Kentucky,
where the WDKY Litigation was conducted, that M&E "acted
negligently in its representation of Jarrow" and failed "to meet
the applicable standard of care[,]" causing Jarrow harm. Ex. 529
at 4; <u>see also</u> Doc. #69 at 182-232. As discussed above, even a
successful malpractice action does not constitute a complete
defense to a claim for attorney's fees. The Court considers the
Grey Opinion, however, in determining whether M&E can establish
probable cause that it will prevail on its breach of contract
and quantum meruit claims.

When Attorney Grey prepared her report, and when she
offered her testimony, she of course did not have the benefit of
all of the exhibits before the Court. She was not able to
formulate her opinion after observing the testimony of key
witnesses at the hearing, particularly Rogovin and Kean Ashurst.
Attorney Grey considered "the trial record from the underlying
[WDKY Litigation], some pleadings prior to trial, also some

correspondence or anything else that I felt I needed[.]" Doc. #69 at 183. Additionally, Attorney Grey testified that she reviewed the transcript of the trial, interviewed Kean Ashurst and Rogovin, and "had conversations with Mr. Leventhal." Doc. #69 at 183. She further testified that she did not review all of the pleadings in the WDKY Litigation, nor did she interview local counsel Joel Beres before preparing her report. Doc. #69 at 199, 202.

In evaluating Attorney Grey's report and testimony, the Court bears in mind that attorneys are entitled to make strategic decisions about the management of a trial:

> The decision to call witnesses and the potential effectiveness of such witness' testimony is a trial strategy decision. Although there are basic rights that the attorney cannot waive without the fully informed and publically acknowledged consent of the client, the lawyer has — and must have — the full authority to manage the conduct of the trial. To allow a defendant's desire to call witnesses in contravention of an attorney's expert decision would create an atmosphere of disruption for the defendant, the state and the fact finder during the trial.

State v. Silva, 141 A.3d 916, 929 (Conn. App. Ct. 2016) (quotation marks and citations omitted).[7]

---

[7] The Court in Silva was quoting, with approval, a decision of a trial court in another matter, which had in turn been quoted by the Appellate Court reviewing that trial court's decision. See Silva, 141 A.3d at 929 (citing State v. Flanagan, 82 A.3d 1191, cert. denied, 99 A.3d 1170 (2014)).

The Court construes Attorney Grey's report, with which her hearing testimony was largely consistent, as asserting five grounds on which M&E failed to provide "competent legal representation" or to "meet the standard of care" applicable. Ex. 529 at 4, 6. The Court reviews each in turn.

1.   Attorney Grey asserts that M&E "did not reasonably consult with Jarrow[.]" Ex. 529 at 5; see also Doc. #69 at 232. The evidence at the hearing established that M&E was in virtually constant contact with Rogovin before and during the trial. See Doc. #69 at 61[8], 80, 95-96;[9] Doc. #86 at 26-27, 30-32. Evidence showed that Rogovin sent emails to the trial team at all hours of the day and night, and was present throughout the trial. See Doc. #83 at 111-13 (Rogovin testimony regarding emails (Exs. 152, 153, 154, 156, and 157) he sent to his trial team at M&E);[10] Doc. #83 at 118 (Rogovin testimony regarding Exs.

---

[8] During the hearing, Attorney Giarrtana testified that "[o]ver the 23-year period, I spoke to him more than any other client. My practice, frequently, I would call him on my way home. The phone call would last through my drive, it would last into my kitchen, it would last when I went upstairs." Doc. #69 at 61.

[9] "I can't tell you how many nights, weekends, road trips with my family where I've been on the phone with [Rogovin], helping him through whatever problem he's facing at that time." Doc. #69 at 96 (Attorney Giarratana discussing his relationship with Jarrow Rogovin).

[10] The Court notes that Exs. 152, 153, 154, 156, and 157 are emails between Rogovin and M&E lawyers. These emails were sent at all hours of the day, including one sent from Rogovin to his lawyers at 2:23 a.m. ET, see Ex. 157.

510 and 511, which were emails from Rogovin to his trial team
and jury consultants sent at approximately 9 p.m.); Doc. #86 at
45 (Rogovin testimony regarding an email (Ex. 144) he sent to
his trial team at 5:36 a.m.); Doc. #86 at 53-54, 57 (Rogovin
testimony about sending emails (Exs. 149, 150, 161, 162) to his
trial team at M&E at 2:22 a.m., 2:53 a.m., 1:01 a.m., and 3:42
a.m.); see also Doc. #69 at 74; Doc. #83 at 125; Doc. #83 at 130
(Rogovin testimony that he was in the courtroom during the
Kentucky Litigation); Ex. 529 at 7 ("Rogovin was in the
courtroom during the trial[.]"). Attorney Grey further asserts
that M&E "ignored" "clear instructions" from Rogovin, presumably
as to trial strategy, but also that Jarrow "did not have
sufficient information to participate intelligently in
decisions" about the case. Ex. 529 at 7; see also Doc. #69 at
62-65 (Attorney Giarratana testimony regarding Rogovin's
involvement in WDKY Litigation strategy and decision-making).
The evidence at the hearing did not support these assertions.

   2.   Attorney Grey asserts that M&E "failed to exercise
appropriate care" by failing to call Kean Ashurst as a witness.
Id. at 6; Doc. #69 at 193 (testifying, in reference to Kean
Ashurst's potential testimony: "I think it would have been
helpful to the jury."); Doc. #69 at 218. Ashurst testified at
the hearing, contending that he would have provided a "road map"
to the jury, had he been permitted to testify. Doc. #69 at 245,

27

249-250. The Court, having observed Ashurst's testimony at the hearing, does not find that Jarrow has established that the failure to call him as a witness at the trial of the WDKY Litigation constituted malpractice or a failure to exercise appropriate professional care.

3.    Attorney Grey opines that M&E failed to "adequately rebut the testimony of Caudill's damages expert[.]" Ex. 529 at 6; see also Doc. #69 at 191. Attorney Grey's testimony, which was largely unsupported, on this issue was insufficient to undermine the probable cause shown by M&E that it will prevail on its claims. Furthermore, this claim appears to relate only to the damages awarded at the trial, rather than to the liability of Jarrow. Thus, even if M&E's representation in this regard fell below the applicable standard of care, such a failing would not constitute a "but for" reason for the result of the trial.

4.    Attorney Grey contends that the decision not to call Rogovin as a live witness "deviated from the standard of care[.]" Ex. 529 at 7; see also Doc. #69 at 188, 222. Ample evidence was introduced that M&E made a carefully considered strategic decision not to call Rogovin as a live witness. Having reviewed that evidence, and observed Rogovin's testimony at the hearing, the Court does not find that Jarrow has established that the failure to call him as a witness at the trial of the WDKY Litigation constituted malpractice.

5.   Attorney Grey concludes that M&E "charged unreasonable fees." Ex. 529 at 8. This conclusion appears to be based solely on her understanding that one M&E attorney "applied a billing rate of $520," which Attorney Grey avers "is not a fee customarily charged in this locality for similar legal services." Id. at 9. The Court presumes that Attorney Grey was not informed, prior to preparing her report, that after it discharged M&E, Jarrow retained a local attorney, Joel Beres, at the rate of $545 per hour. See Doc. #86 at 80, 194. The Court finds that Jarrow has not established that the rate charged by M&E supports a finding of malpractice, or otherwise undermines the probable cause for finding that M&E is likely to prevail on its claims at trial.

It appears that Attorney Grey did not have complete information at the time she rendered her opinions, and the Court does not find her report, or her testimony, persuasive. In sum, the Court does not find that Attorney Grey's report and testimony received to date is sufficient to establish that M&E committed malpractice. The Court further finds that this evidence does not undermine the finding of probable cause that M&E will prevail on its breach of contract and quantum meruit claims at trial.

C.    **Remedy Amount**

The Court next addresses the amount of remedy sought. M&E seeks a prejudgment remedy in the amount of "$2.5 million[.]" Doc. #92 at 1. M&E calculated the total claimed fees, plus prejudgment interest, at $2,445,150.37 at the time it filed its post-hearing brief, in November 2019. See id. at 15. The entire amount claimed (pre-interest) arises out of unpaid legal fees and costs; thus, the Court now more closely considers the report and testimony of Jarrow's expert David Paige, who opined that M&E's fees were excessive. See Exs. 528, 528-1, 528-2, 528-3, 528-4; see also Doc. #86 at 132, 136, 164-65.

Paige did not limit his analysis to the five disputed invoices, or even to invoices issued in 2019; rather, he analyzed all invoices issued by M&E to Jarrow from August 2011 through April 2019. See Ex. 528 at 7. Paige concluded that M&E's billing was excessive, and should be discounted by approximately 43%. See id. In reaching this conclusion, Paige evaluated the billing rates, billing practices, and substance of tasks billed for by M&E. See Doc. #86 at 143.

The first difficulty in crediting Paige's report and testimony is that it does not specifically analyze any alleged over-billing in the invoices actually at issue. Paige's conclusions are based an eight-year time period. Application of those conclusions to the disputed invoices is problematic for a

30

variety of reasons, most notably because what may be reasonable billing practices while counsel is defending a complex matter in an out-of-state federal trial may not be reasonable at some other point in time. See Doc. #86 at 160-61, 193. It is thus unclear what value (if any) this analysis has when considering the particular invoices at issue.

Next, the Court considers one particular significant opinion offered by Paige. Paige recommended a 20% reduction in the total fees based on his conclusion that M&E's billing rates were excessive as compared to the mean rates reported in the industry for each year analyzed.[11] See Ex. 528 at 13, 14; Doc. #86 at 169. This 20% recommendation apparently is based on the differential between M&E's billing rates and "mean" rates over all eight years studied, taken collectively. However, the differentials vary significantly across that time line, from as low as $46.67 per hour to as high as $133.33 per hour, for partners. See id. The differential for partner billing rates in 2018 and 2019 was only $56.33 per hour. See id. Again, the lack

---

[11] Paige suggests, in a footnote, see Ex. 528 at 14 n.18, that the rates charged were even more excessive for Kentucky, as opposed to Connecticut. But it was Jarrow's choice to retain a Connecticut firm, and Jarrow cannot now complain that a Kentucky firm would have been cheaper. Cf. Simmons v. New York City Transit Auth., 575 F.3d 170, 177 (2d Cir. 2009) (party who voluntarily selects more expensive out-of-district counsel cannot pass the excess cost onto other party in fee-shifting case).

of separate analysis of the disputed time frame undermines the value of the report. More significantly, it is hard to accept a conclusion that the rates charged by M&E were excessive; the highest rate charged by M&E in the disputed invoices is $535 per hour for Attorney Giarratana; Attorney Grondahl was billed at $485 per hour and Attorney Rechen was billed at $520 per hour. See Ex. 105 at 40. After discharging M&E, Jarrow chose to retain Attorney Beres at a higher rate of $545 per hour. See Doc. #86 at 80, 194.

Paige concluded that the attorney's fees charged by M&E should have been reduced by approximately 43%. See Ex. 528 at 35. As noted, the Court finds Paige's analysis as to hourly rates unpersuasive, and thus finds that the 20% reduction attributable to that analysis should be disregarded. The Court further finds that Paige's failure to distinguish between the time frame covered by the disputed invoices and the other eight years of invoices analyzed substantially undermines the value and credibility of his analysis as to other potential reductions in the overall billing. The Court declines to parse the details of each invoice analyzed by Paige and recalculate the impact of each of his other recommended discounts on only the relevant invoices. However, the Court agrees that some of the issues identified by Paige undermine M&E's contention that it will prevail at trial in the full amount demanded.

M&E contends in its post-hearing briefing that it is entitled to a total remedy of $2,445,150.37, representing the total of the disputed invoices ($2,037,625.37) plus prejudgment interest ($407,525.00). See Doc. #92 at 15. "[I]n an application for a prejudgment remedy, the amount of damages need not be determined with mathematical precision." Rafferty v. Noto Bros. Const., LLC, 795 A.2d 1274, 1279 (Conn. App. Ct. 2002). Rather, the Court must arrive at a "fair and reasonable estimate[]" based on the evidence presented. Roberts v. TriPlanet Partners, LLC, 950 F. Supp. 2d 418, 424 (D. Conn. 2013) (citation and quotation marks omitted).

Prejudgment interest may be included in the calculation of a prejudgment remedy. See New England Health Care Employees Welfare Fund v. iCare Mgmt., LLC, 792 F. Supp. 2d 269, 287 (D. Conn. 2011). The moving party must establish probable cause that it will receive an award of prejudgment interest in order for that interest to be included in the prejudgment remedy. See Garnet Analytics, Inc. v. Diversified Sols., Inc., No. 3:12CV00716(WWE)(HBF), 2013 WL 6511940, at *8 (D. Conn. Dec. 12, 2013).

"When the court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law." Brandewiede v. Emery Worldwide, 890 F. Supp. 79, 82 (D. Conn. 1994). Prejudgment interest may be awarded, under Connecticut

33

law, "as damages for the detention of money after it becomes
payable." Conn. Gen. Stat. §37-3(a).

> Whether such interest is awarded is primarily an
> equitable determination and a matter within the
> discretion of the trial court. The courts have construed
> the statute to make the allowance of interest depend
> upon whether the detention of the money is or is not
> wrongful under the circumstances. Other factors to be
> considered include whether the sum recovered was a
> liquidated amount, and whether the party seeking
> prejudgment interest has diligently presented the claim
> throughout the course of the proceedings.

Prime Mgmt. Co. v. Steinegger, 904 F.2d 811, 817 (2d Cir. 1990)
(citations and quotation marks omitted). The Court finds that
M&E has established probable cause that prejudgment interest
will be awarded on any amount recovered.

However, M&E has offered no support for its claim that
prejudgment interest would be awarded in the amount of
$407,525.00, which amounts to 20% of the amount allegedly owed.
The invoices at issue here were issued less than one year ago,
and prejudgment interest under Connecticut law is limited to no
more than ten percent per year. The Scheduling Order
contemplates that dispositive motions or a joint trial
memorandum will be filed in May or June 2020, approximately one
year after the disputed invoices were issued. See Doc. #119 at
2. The Court therefore finds probable cause to believe that
prejudgment interest in the amount of $203,762.54 -- ten percent

of the disputed invoices -- will be awarded, bringing the total amount, before reductions, to $2,241,287.91.

After considering the concerns identified and reductions advocated by Paige, the Court finds probable cause that M&E will prevail at trial in securing a total award, including prejudgment interest, of approximately $1,850,000.00. The Court therefore awards a prejudgment remedy in that amount.

## IV.  CONCLUSION

For the reasons stated herein, plaintiff's Motion for Prejudgment Remedy **[Doc. #8]** is **GRANTED**, **in part,** in the amount of **$1,850,000.00**.

Two matters remain to be addressed.

### A.  Bond Pursuant to Conn. Gen. Stat. §52-278d(a)(4)

At the hearing, Jarrow reserved its right to present evidence in support of its contention that "the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy[.]" Conn. Gen. Stat. §52-278d(a)(4); see also Doc. #83 at 76-79;[12] Doc. #86 at 5-7. If Jarrow wishes to pursue such a bond, an appropriate

---

[12] When this issue was raised at the hearing, the Court proposed delaying resolution of the bond issue until after a ruling had issued on the PJR application: "[I]if the Court elects to grant a PJR, then upon such granting, defendant would be permitted to submit their statement or their evidence regarding allegations that it would be detrimental to the company and the question of a bond[.]" Doc. #83 at 78-79.

motion may be filed on or before **March 24, 2020**. Any response shall be filed on or before **April 7, 2020**. The Court expects that an additional hearing with live testimony will not be necessary to resolve this issue, but the parties may present, in their submissions, any views or arguments as to the need for testimony on this issue.

### B.   Motion for Disclosure of Property and Assets

M&E has filed a "Motion for Disclosure of Property and Assets," as an exhibit to its PJR Motion. See Doc. #8-5.[13] "The court may, on motion of a party, order an appearing defendant to disclose property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy. The existence, location and extent of the defendant's interest in such property or debts shall be subject to disclosure." Conn. Gen. Stat. §52-278n(a). The Court has granted plaintiff's motion for a prejudgment remedy. "Generally, under Connecticut law, a disclosure of assets is ordered if a prejudgment remedy is ordered." Wachovia Bank, N.A. v. Cummings, No. 3:09CV00957(SRU), 2010 WL 466160, at *9 (D. Conn. Feb. 8, 2010).

However, a "defendant, in lieu of disclosing assets pursuant to subsection (a) of this section, may move the court

---

[13] Because this motion was docketed as an attachment, rather than as an independent motion on the docket, the Court treats it as a request made in connection with the application for prejudgment remedy, rather than an independent motion.

for substitution either of a bond with surety ... or of other sufficient security." Conn. Gen. Stat. §52-278n(d); see also Tucker v. Journal Register E., No. 3:06CV00307(SRU), 2009 WL 426460, at *1 (D. Conn. Feb. 20, 2009) ("The defendant may, if it so chooses, satisfy the prejudgment remedy and avoid disclosure of assets by posting a bond in the amount of" the prejudgment remedy.); Weber v. FujiFilm Med. Sys. U.S.A., Inc., No. 3:10CV00401(JBA), 2013 WL 6592592, at *7 (D. Conn. Dec. 16, 2013) (allowing defendant to "avoid disclosure of assets by posting a bond[]" sufficient to satisfy the prejudgment remedy).

Jarrow must disclose the existence, location and extent of any property in which it has an interest or debts owing to it sufficient to satisfy the prejudgment remedy, on or before **April 2, 2020**. In the alternative, Jarrow may post a bond or other suitable security in compliance with Conn. Gen. Stat. §52-278n(d), on or before **March 26, 2020**.

It is so ordered at New Haven, Connecticut, this 3rd day of March, 2020.

      /s/

HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE
