UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| _____ ) | | |
| McCARTER & ENGLISH, LLP | ) | |
| | ) | CIVIL ACTION CASE NO. |
| Plaintiff, | ) | 3:19-CV-01124 (MPS) |
| | ) | |
| VS. | ) | |
| | ) | |
| JARROW FORMULAS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | AUGUST 27, 2020 |

**DEFENDANT JARROW FORMULAS, INC.'s ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND *AMENDED* COUNTERCLAIMS**

**ANSWER**

Defendant Jarrow Formulas, Inc. ("Jarrow") as and for its Answer to the allegations of plaintiff McCarter & English, LLP's ("M&E") Second Amended Complaint, states as follows:

**NATURE OF PROCEEDINGS**

1.   Admit that this is an action for collection of attorneys' fees and disbursements; deny that any amount is due and owing.

2.   Admit.

3.   Admit.

4.   Admit.

5.   Admit that the Court has personal jurisdiction over Jarrow. As to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

6.   Admit that venue is proper in this district. As to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

7.   Admit, except that as to the allegations that Jarrow "regularly turned to McCormick, Paulding & Huber, and, in particular,                    Attorney    Giarratana,    for    legal

representation, including litigation and patent and trademark matters," Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

8.   Jarrow neither admits nor denies the allegations of Paragraph 8, but leaves M&E to its proof.

9.   Admit that Jarrow was advised of a merger involving Attorney Giarratana. As to the remaining allegations, Jarrow neither admits nor denies such allegations, but leaves M&E to its proof.

10.   Jarrow neither admits nor denies the allegations of Paragraph 10, but leaves M&E to its proof.

11.   Admit that Jarrow paid M&E's invoices periodically and that certain invoices were claimed to be discounted. As to the remaining factual allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

12.   Jarrow admits that M&E represented Kean Ashurst in connection with claims made by Caudill Seed & Warehouse Company, Inc. ("Caudill"). As to the allegation that Jarrow "retained" M&E, the terms of any such retention, and the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

13.   Jarrow admits that Caudill sued Ashurst in the Jefferson Circuit Court in Louisville, Kentucky and that the lawsuit was dismissed with prejudice. As to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves the M&E to its proof.

14.   Admit.

15.   Admit.

16.   Admit, except state that the trade secrets claim included claims for compensatory damages, treble damages, and attorneys' fees.

17.   Admit.

18.   Deny and assert that judgment on the jury's verdicts entered pursuant to an Order of the federal district court for the Western District of Kentucky (Simpson, J.) dated August 11, 2019 [D.N. 487] which states: "Judgment is hereby entered in accordance with the aforesaid verdicts."

19.   Admit that Attorney Rechen sent an e-mail as alleged in Paragraph 19. As to the substance of the e-mail, which speaks for itself and as to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves the M&E to its proof.

20.   Deny and state that Jarrow Rogovin communicated with M&E by text message following the jury's verdict and thereafter Jarrow responded through counsel. As to the allegation of "numerous" e-mails and telephone calls and any remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

21.   Admit that Jarrow's counsel, Attorney Carol Brophy, sent a letter dated July 12, 2019 to M&E notifying M&E that the attorney-client relationship had terminated. As to the allegations concerning the date of receipt of the letter, or purporting to restate the contents of the letter, which speaks for itself, and any remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

22.   Admit that Attorney Giarratana sent a letter dated July 17, 2019. Jarrow neither admits nor denies the allegations purporting to restate the contents of the letter, which speaks for itself, but leaves M&E to its proof.

23.   Admit that Jonathan Leventhal sent a letter to M&E on or about July 18, 2019. As to the allegations concerning the date of M&E's receipt of the letter and allegations purporting to restate the contents of the letter, which speaks for itself, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

24.  Admit that Attorneys Giarratana, Grondahl, Rechen and Hornat filed motions to withdraw their appearances on July 19, 2019 which were granted on July 25, 2019. As to the remaining allegations, Jarrow neither admits nor denies such allegations, but leaves M&E to its proof.

25.  Admit that Attorney Giarratana sent a letter dated July 19, 2019 to Attorney Brophy. Jarrow neither admits nor denies allegations purporting to restate the contents of the letter, which speaks for itself, but leaves M&E to its proof.

26.  Admit that Jarrow Rogovin sent an e-mail dated July 22, 2019. Jarrow neither admits nor denies allegations purporting to restate the contents of the e-mail, which speaks for itself, but leaves M&E to its proof.

27.  Admit that M&E invoiced Jarrow on the dates and in the amounts alleged.  As to the allegations concerning the time period, services and disbursements which the invoices cover, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.  Jarrow denies that any sum is due and owing.

28.  Deny M&E's allegation as to the sum M&E claims to be "due and owing" to M&E. As to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

29.  Deny that any sums are "presently owed" by Jarrow to M&E. Admit that Jarrow has not provided assurances it will pay the sum M&E claims to be owed.  Deny that Jarrow has "reneged" on a promise to pay and assert that Jarrow has properly interposed defenses and counterclaims which more than offset any alleged payment obligation.

## COUNT I

30.  Jarrow repeats and realleges its responses to paragraphs 1-29 as if fully set forth.

31.  Deny.

32.  Deny.

33.    Admit there was a communication between Jarrow Rogovin and another officer of Jarrow which included, in part, the quoted words, which are taken out of context and whose meaning is distorted in the remaining allegations of this paragraph.  Deny that any such statement or alleged "instruction" had any impact on payment to M&E, as Jarrow just made a substantial payment to M&E which brought its account current as of June 1, 2019.  Deny that Jarrow had any intent not to pay M&E's bills.  As to the remaining allegations, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

34.  Deny.

35.  Deny.

36.  Deny.

37.  Deny.

38.  Deny that Mr. Rogovin made the statements alleged "[r]ecognizing the foregoing realities" and deny that the foregoing were "realities."  As to when and whether Mr. Rogovin ever used words quoted in this allegation in any context, Jarrow neither admits nor denies the allegations, but leaves M&E to its proof.

39.  Jarrow neither admits nor denies the allegations of this paragraph, which does not identify the speaker as to each of the quoted phrases and which includes the vague assertion that there were "similar words" spoken, and leaves M&E to its proof as to all such allegations.

40.  Deny.

41.  Deny the allegation as stated.  Admit that at some point Jarrow's General Counsel gave instructions to limit contact with M&E.

42.  Deny, except admit that Jarrow requested information as to pending deadlines.

43. Deny.

44. Deny.

**COUNT II**

45 .    Jarrow repeats and realleges its responses to paragraphs 1-29
as if fully set forth.

46.    Deny.

47.    Deny

**COUNT III**

48.    Jarrow repeats and realleges its responses to paragraphs 1-29 as if fully set forth.

49.    Admit that Jarrow received legal representation and related services. As to the
allegations that the services had "substantial value," and all remaining allegations, Jarrow neither
admits nor denies such allegations, but leaves M&E to its proof.

50.    To the extent that the reference in this paragraph to "the aforedescribed  legal
representation and related services" incorporates the allegations of paragraph 49, Jarrow repeats and
realleges its response to paragraph 49.  As to the remaining allegations, including the existence and
the terms of any alleged agreement to pay for legal representation and related services, Jarrow
neither admits nor denies such allegations, but leaves M&E to its proof.

51.    Deny.

52.    Deny and state that the proper standard of harm or recovery (which harm and
right of recovery are denied) is not alleged harm to M&E.

53.    Deny and state that alleged damage (which damage is denied) to McCarter is
not the proper standard of harm or recovery.

**PRAYER FOR RELIEF**

Jarrow denies that M&E is entitled to any of the relief, legal or equitable, requested in its Complaint, denies each paragraph of the Prayer for Relief and requests that M&E's action be dismissed in its entirety.

**AFFIRMATIVE DEFENSES**

As and for its Affirmative Defenses to M&E's claims, Jarrow alleges as follows:

**Failure to State a Claim**

To the extent that M&E purports to state a claim based upon alleged harm to M&E and to the extent that M&E purports to state a claim for breach of contract, M&E has failed to state a claim upon which relief may be granted.

**Unclean Hands**

Jarrow asserts that M&E is barred from seeking equitable relief by the doctrine of unclean hands and its own inequitable conduct.

**Setoff and Recoupment**

Jarrow asserts a setoff as to the amounts claimed by M&E to be due and recoupment based upon its prior payments which exceed the value of M&E's services.

**Illegality**

Jarrow asserts that there is no legally enforceable contract between M&E and Jarrow for M&E's services in the matter referred to in the Complaint as the Kentucky Litigation, in that M&E failed to comply with the requirements for a contract for legal services. M&E failed to provide a written fee agreement or notice before or within a reasonable time after commencing the representation setting forth the scope of the representation, the basis or rate of the fee and expenses

for which Jarrow would be responsible and M&E failed further to notify Jarrow in writing in advance of changes in the basis or rate of the fee or expenses before the fees or expenses to be billed at the higher rates were actually incurred.

**Misrepresentation**

Jarrow asserts that M&E made material misrepresentations in the course of the parties' relationship concerning its bills for legal fees and services and the basis or rate which M&E charges for legal fees and services.

## AMENDED COUNTERCLAIMS

As and for its Counterclaims against McCarter & English, LLP ("M&E"), Jarrow Formulas, Inc. ("Jarrow") asserts as follows:

### Common Allegations
### Parties

1. The parties to these counterclaims are the counterclaim-defendant, M&E, a limited liability partnership organized and existing under the laws of the State of New Jersey, with offices at various locations in the northeast, including Hartford, Connecticut and the counterclaim-plaintiff, Jarrow, whose state of incorporation and principal place of business are in California.

### Jurisdiction and Venue

2. This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. The counterclaims also are within the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.

3.   The Court has personal jurisdiction over the parties based upon the presence of M&E

within the State of Connecticut and its filing of this action in this district and based upon Jarrow

having been properly served with legal process and its business activities within or connected to

the State of Connecticut.

4.   Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that a substantial part

of the events or omissions giving rise to the counterclaims occurred within this district.

**General Allegations**

5.   Jarrow asserts that the billings rendered by M&E are excessive and unreasonable and

asserts a setoff and counterclaims to recover excessive sums it has paid to M&E or which are

claimed by M&E as due and owing. Jarrow asserts further that there is no legally enforceable

contract between M&E and Jarrow. Jarrow also asserts that M&E breached its fiduciary duties to

Jarrow. Jarrow also asserts that M&E's billing and collection practices violated the Connecticut

Unfair Trade Practices Act. Jarrow also asserts that M&E repeatedly made material

misrepresentations to Jarrow. Jarrow also asserts that M&E failed to meet the standard of

reasonably competent attorneys in it representation of Jarrow in the litigation brought against

Jarrow by Caudill Seed & Warehouse Company ("Caudill") in the United States District Court for

the Western District of Kentucky.

6.   M&E has no retainer agreement with Jarrow for the Kentucky federal case.

7.   In fact, over the course of 23 years during which Attorney Giarratana was involved in

providing provided legal services to Jarrow, the only engagement letter or fee agreement which

appears to exist is a letter dated December 5, 1996, attached as Exhibit A to the Complaint

(hereinafter, the "McCormick Engagement Letter") entered into between Jarrow and the law firm of

McCormick, Paulding & Huber LLP ("McCormick") the law firm with which Attorney Giarratana was associated on that date.

8.    The McCormick Engagement Letter was not a general retention or open-ended retainer of either McCormick or Attorney Giarratana. Rather, it states specifically that the subject matter of the engagement of McCormick in 1996 was a then-pending litigation matter specifically referenced in the McCormick Engagement Letter.

9.    Attorney Giarratana's billing rate as set forth in the McCormick Engagement Letter was $210 per hour. There were no billing rates set forth in the McCormick Engagement letter for the other M&E attorneys who have provided services to Jarrow, as they were not associated with McCormick. The McCormick engagement letter states in part: "Our experience has shown that our relationship will be better served if we begin with a clear understanding of our assignment and our methods of operating, including fees and payment."

10.   Despite this fact, when McCormick was hired for additional legal matters, as well as when Attorney Giarratana changed law firms, repeatedly raised his billing rates or the rates of others providing services to Jarrow were raised, neither Attorney Giarratana nor his new law firms entered into a retainer agreement with respect to such matters, nor did they provide notice in writing to Jarrow in advance of providing services at higher rates.

11.   In or about August, 1988, Attorney Giarratana left McCormick to join the law firm of Cummings & Lockwood in Hartford, Connecticut.

12.   On information and belief, when Attorney Giarratana left McCormick to join the law firm of Cummings & Lockwood, the litigation which had been the subject of the McCormick Engagement Letter had terminated, but McCormick represented Jarrow in various other matters

which were not the subject of any fee agreement or retainer letter.

13. In or about August 1988, the various matters in which McCormick represented Jarrow were transferred from McCormick to Cummings & Lockwood.

14. On information and belief, neither Attorney Giarratana nor Cummings & Lockwood entered into a fee agreement or retainer letter with Jarrow for legal services to be provided by that firm.

15. On information and belief, in or about September 2003, certain Cummings & Lockwood attorneys, including Attorney Giarratana merged with M&E.

16. At that time, the various pending matters in which Cummings & Lockwood represented Jarrow, none of which was the subject of a fee agreement or engagement letter, were transferred from Cummings & Lockwood to M&E.

17. Neither Attorney Giarratana nor M&E entered into a fee agreement or retainer letter with Jarrow for legal services to be provided by that firm.

18. Over the course of time between the time that pending matters were transferred to M&E in 2003, to the date of termination of M&E's representation of Jarrow in legal matters in 2019, Attorney Giarratana's billing rates and the identities and billing rates of the persons providing legal services to Jarrow changed on multiple occasions.

19. At no time did Attorney Giarratana or M&E enter into a fee agreement or retainer letter with Jarrow for legal services.

20. When M&E was asked from time to time by Jarrow's auditors to confirm the nature of its relationship with Jarrow, M&E disclaimed a role as Jarrow's general counsel or as its counsel pursuant to a general retainer and stating that, while M&E represented Jarrow on a

regular basis, its engagement by Jarrow was limited to specific matters as to which M&E was consulted by Jarrow.

21.   On information and belief, there are no retainer agreements or engagement letters between M&E and Jarrow which identify any such specific matter for which M&E had been retained as counsel to Jarrow, describe the matter for which M&E was retained, and set forth the basis or rate of the fees to be charged for M&E's services.

22.   In particular, there is no retainer agreement or engagement letter between M&E and Jarrow which sets forth the basis or rate for the legal fees to be charged to Jarrow, the disbursements for which it will be responsible, the identities of the attorneys and other professionals who will provide services to Jarrow, their billing rates, or any other material terms of the engagement for M&E's representation of Kean Ashurst in the matter of *Caudill Seed and Warehouse Company, Inc. v. Kean H. Ashurst,* Jefferson Circuit Court, Case No. 11-CI-03438 (the "Kentucky state court case").

23.   At the time M&E undertook the defense of Ashurst in the Kentucky state court case beginning in or about July 2011 in July 2011, Attorney Giarratana's hourly rate was $405 per hour, which was almost double his hourly rate of $210 in 1996 as stated in the McCormick Engagement Letter.

24.   Similarly, in January 2013, when M&E undertook to represent Jarrow in the closely related federal court case of *Caudill Seed & Warehouse Company, Inc. v. Jarrow Formulas, Inc.* Civil Action No. 3:13-CV-82-CRS (the "Kentucky federal case") there was no retainer agreement or engagement letter between M&E and Jarrow which identified the matter for which M&E had been engaged M&E to Jarrow which sets forth the basis or rate for the legal fees to be charged to Jarrow, the disbursements for which it will be responsible, the identities of the

attorneys and other professionals who will provide services to Jarrow, their billing rates, or any other material terms of the engagement.

25.   At the time M&E undertook the defense of Ashurst in the Kentucky federal case in January 2013, Attorney Giarratana' hourly rate was $405 per hour, which represented approximately a 95% increase from his hourly rate of $210 per hour set forth in the McCormick Engagement Letter in 1996. In addition, Attorney Grondahl worked on the matter at a rate of $395 per hour and Attorney Robinson worked on the matter at a rate of $215 per hour.

26.   During the course of the Kentucky federal case, the hourly rates charged to Jarrow for the services of Attorneys Giarratana, Grondahl, and Robinson increased and the hourly rates of other timekeepers who worked on the Kentucky federal case also increased from their initial rates at the inception of the litigation.

27.   At no time during the course of M&E's representation of Jarrow in the Kentucky federal case did M&E provide notice in writing of such changes in advance of providing services at higher rates.

28.   In or about the middle of 2013, the hourly rates charged to Jarrow for the services of Attorneys Giarratana, Grondahl, and Robinson in the Kentucky federal case increased substantially, but the hourly rates charged to Jarrow for their services in the closely related Kentucky state court case remained at their lower initial rate.

29.   In fact, there was an extended period between the middle of 2013 and early 2015 during which Jarrow was billed at widely disparate rates for services provided by the same attorneys in the Kentucky state court case and the Kentucky federal case, with no fee agreement covering either matter.

30.   Jarrow has caused a forensic audit of M&E's legal fees charged in these cases to be

performed, the results of which establish that M&E engaged in inappropriate billing practices which resulted in excessive billing rendered to Jarrow, in an amount which exceeds the amount of M&E's claims against Jarrow in this case.

31.   As a fiduciary relationship exists between Jarrow and M&E, M&E must prove, by clear and convincing evidence, that it has dealt fairly with Jarrow and acted at all times in Jarrow's best interests, including with regard to its management and supervision of the matters in which it provided services to Jarrow, the reasonableness of its legal fees and other charges, and with respect to its billing and collection practices.

32.   In or about February 2011, M&E forwarded the Complaint filed in the Kentucky federal case to several insurance companies, seeking to determine whether Jarrow would be provided a defense by such insurers. One of the insurers was Liberty Insurance Underwriters, Inc. ("Liberty").

33.   On or about February 22, 2013, M&E rendered an invoice for professional services, Invoice #97728, to Jarrow, describing legal services M&E provided in both the Kentucky state court case and the Kentucky federal case.

34.   Invoice #97728 reflects multiple time entries for Attorneys Giarratana and Grondahl, as well as for other M&E timekeepers for services including their review and analysis of the Complaint filed by Caudill against Jarrow in the Kentucky federal case.

35.   At that time, Attorney Giarratana's billing rate, as reflected on Invoice #97728, was $405 per hour and Attorney Grondahl's billing rate was $385 per hour. These rates were being charged to Jarrow for both the Kentucky state court case and the Kentucky federal court case.

36.   Jarrow paid Invoice 097728 on or about May 8, 2013.

37.   M&E rendered invoices in March and April 2013, which continued to combine the

services provided in the Kentucky state court case and the Kentucky federal court case,

charging the same billing rates for both matters.

38.   Jarrow paid the M&E invoice dated April 15, 2013 on June 24, 2013.

39.   On or about March 6, 2013, M&E received a letter from Liberty which it

considered an acknowledgment of defense letter, pursuant to which Liberty agreed to provide a

defense to Jarrow in the federal case under a reservation of rights.

40.   On March 6, 2013, Attorney Giarratana reviewed the Liberty billing guidelines and

prepared internal correspondence to others at M&E with instructions for proceeding in

accordance with such guidelines with respect to billing for the Kentucky federal court litigation.

41.   On or about March 21, 2013, Attorney Giarratana spoke by telephone with Ms. Lin

of Liberty regarding Liberty providing coverage under a reservation of rights and the information

Liberty needed to proceed to approve the retention of M&E.

42.   On or about April 19, 2013, Attorney Giarratana provided by e-mail a list

of attorneys and billing rates to Ms. Lin, which reflected the following hourly rates:

- Mark Giarratana - $535 per hour
- Eric Grondahl - $485 per hour
- Shaw Smith - $285 per hour
- Abraham Robinson - $245 per hour

43. Attorney Giarratana did not disclose to Ms. Lin that Jarrow had not in fact been

billed at the above rates and that the rates which had actually been billed to Jarrow and paid by

Jarrow for services provided in connection with the Kentucky federal case for three of the four

attorneys listed had been substantially lower, as follows:

- Mark Giarratana - $405 per hour
- Eric Grondahl - $395 per hour
- Abraham Robinson - $215 per hour

44. The terms of the Liberty insurance policy, with respect to claims within the scope of the coverage provided, establish Liberty's right to consent to the insured's retention of counsel to defend the claim and Liberty's duty to pay counsel to defend any such claim.

45. On April 24, 2013, Liberty sent an e-mail to Attorney Giarratana consenting to the retention of M&E at the higher rates reflected in Attorney Giarratana's April 19, 2013 e-mail, subject to M&E's compliance with Liberty's billing guidelines.

46. Upon Liberty's approval of M&E's retention, is was the expectation of M&E and Jarrow that M&E would send Liberty bills for services and that Liberty would pay bills services rendered to Jarrow in the Kentucky federal case.

47. In fact, McCarter did send its invoices to Liberty for payment for a period of approximately six months.

48. Liberty also requested additional information from M&E concerning the fees which had been billed to date in the Kentucky federal court case and requested an estimated budget for the case through and including a motion for summary judgment.

49. Attorney Giarratana responded to this request by e-mail on August 7, 2013, purporting to send Liberty copies of invoices for January 2013 through June 2013 and an estimated budget, as requested.

50. The M&E budget, which covered the phases of "Case Initiation," "Fact Discovery," "Expert Discovery," and "Summary Judgment," showed a budget range for legal fees through and including the Summary Judgment phase of $527,411.50 to $848,171.50.

51.  M&E's actual legal fees billed through and including summary judgment exceeded the budget amount by more than $1 million.

52.  The January and February invoices which Attorney Giarratana sent to Liberty had been altered in several material respects from the actual invoices which had been sent to and paid by Jarrow.

53.  First, they had been redacted to eliminate descriptions of services and billing charges relating to the Kentucky state court case, which had been combined in the actual billing with the time and billing charges for the Kentucky federal court case. Attorney Giarratana's August 7, 2013 e-mail forwarding the invoices alerted Liberty to these changes, which were clearly marked as redactions of billing descriptions marked in black and reductions of time charges marked in red.

54.  However, there was another type of alteration which was not marked and was not disclosed to Liberty. On the timekeepers' summary page of each bill, the billing rates were altered to correspond with higher rates Liberty had approved <u>after</u> the bills had been both rendered to Jarrow and paid by Jarrow at lower rates.

55.  Thus, the bills sent to Liberty showed Attorney Giarratana's hourly rate as $535, Attorney Grondahl's hourly rate as $485 per hour and Attorney Robinson's hourly rate as $245 per hour when in reality, bills for the same services had been sent to Jarrow and paid by Jarrow at hourly rates for each of the attorneys of $405, $395 and $215 per hour respectively. Thus, M&E sought to be paid by Liberty at higher rates for services which had been rendered, billed and paid for by Jarrow at lower rates.

56.  Attorney Giarratana's August 7, 2013 e-mail to Liberty also enclosed an Invoice dated July 11, 2013, which purported to be the invoice rendered to Jarrow for time

entries in March 2013.

57.   In reality, the bill for M&E's March 2013 time had been issued to Jarrow on April 15, 2013 and paid by Jarrow on June 24, 2013, once again at the lower initial rates charged by M&E for the Kentucky federal court litigation.

58.   The July 11, 2013 invoice sent to Liberty reflecting time charges for March 2013 at higher rates was in reality a "rebill" of the already paid April 15, 2013 invoice to Jarrow. Thus, once again, M&E was seeking payment from Liberty at rates higher than the rates at which the same services had been billed to Jarrow and actually paid by Jarrow.

59.   This deceptive conduct has continued and M&E has continued to seek to obscure and to distort the history of its billing for the Kentucky federal case and the altered billing and rebilling issued to Liberty.

60.   In furtherance of this effort, M&E initially objected to consideration by Jarrow's retained legal billing auditor, David Paige, of M&E's billing for the Kentucky state court case, claiming in a court filing that it was "an entirely different and separate suit in state court."

61.   Eventually, Attorney Giarratana admitted in sworn testimony that the Kentucky state court case and the Kentucky federal case were "closely related" and, for that reason M&E billed the two matters together, at the same hourly rates, for a period of months prior to Liberty's approval of McCarter's retention at higher rates for the Kentucky federal case in April 2013.

62.   McCarter continues to maintain the fiction that it never raised its hourly rates for the Kentucky federal case, other than the hourly rate for Attorney Rechen.

63.   In addition, M&E's Controller, Jacqueline Bosma executed a sworn statement asserting that the April 15, 2013 invoice rendered to Jarrow had been billed "in error" at reduced

rates.

64.   The claim that the April 15, 2013 bill was rendered "in error" is false. The bill was rendered at the same rates as invoices previously rendered to Jarrow in combined billing for the Kentucky state court case and in the Kentucky federal court case from the inception of the latter case in January 2013.

65.   Ms. Bosma's sworn statement also falsely asserts that the April 15, 2013 invoice rendered to Jarrow and paid by it on June 24, 2013 was the "initial invoice" to Jarrow for the Kentucky federal case.

66.   In fact, Jarrow had received and paid invoices in February and March for legal services rendered in the Kentucky federal case at the same lower hourly rate as the April 2013 invoice.

67.   Similarly, the spreadsheet prepared by Ms. Bosma and attached to her sworn statement purports to reflect, for each timekeeper, the "Initial Date" that they first billed time to the Kentucky federal court litigation, their "Initial Rate" and the total hours billed by each timekeeper.

68.   However, the spreadsheet does not in fact reflect the initial first date that certain of the listed timekeepers billed Jarrow for services in the Kentucky federal court litigation, nor does it reflect the initial hourly rates for at least three of the attorneys listed, including Attorney Giarratana, Attorney Grondahl and Attorney Robinson.

69.   For example, the spreadsheet reflects March 8, 2013 as the "Initial Date" worked by Attorney Giarratana, at an "Initial Rate" of $535 per hour; March 21, 2013 as the "Initial Date" worked by Attorney Grondahl at an "Initial Rate" of $485 per hour; and March 14, 2013 as the "Initial Date" worked by Attorney Robinson at an "Initial Rate" of $245 per hour.

70.   In reality, the invoices sent to Jarrow show that Attorneys Giarratana, Grondahl and Robinson each billed for services related to the Kentucky federal case beginning on January 28, 2013, when each of them reviewed, analyzed and discussed the Complaint filed in that matter, billing at rates of $405, $395 and $215 per hour, respectively.

71.   In short, Ms. Bosma's sworn statement and her spreadsheet analysis perpetuate the fiction that the hourly rates charged by Attorneys Giarratana, Grondahl and Robinson at the inception of the Kentucky federal case were the higher hourly rates approved by Liberty in April 2013 and that they never raised their hourly rates during the course of the case.

72.   Ms. Bosma's spreadsheet also reflects that hourly rates of ten timekeepers other than Attorneys Giarratana, Grondahl and Robinson increased from their hourly rates at the inception of the Kentucky federal court litigation, all without any written notice in advance to Jarrow.

73.   When M&E increased its billing rates for the Kentucky federal court litigation in mid-2013, it did so under the premise that the higher rates would be paid by Liberty relieving Jarrow of that burden.

74.   During the second half of 2013, M&E sent its invoices to Liberty with the request that Liberty pay the invoices pursuant to its duty under the policy it issued to pay for Jarrow's defense.

75.   On or about December 9, 2013, Liberty advised M&E that it had given further consideration to its coverage position and issued a denial of coverage. As a result, Liberty never paid any of M&E's invoices for the Kentucky federal case.

76.   After Liberty declined coverage for Jarrow's claim, M&E did not change its rates back to the lower level which Jarrow had been paying and at which it continued to be billed for the closely related Kentucky state court litigation. Rather, M&E sent its bills at the higher rates

which Liberty had approved and demanded that they be paid.

77.   M&E continued to bill Jarrow at the higher rates accepted by Liberty when it approved M&E's engagement through the termination of M&E's services in July 2019.

78.   Near the end of May 2019, with the trial of the Kentucky federal court litigation scheduled to begin in the first week in June, Attorney Giarratana began to apply pressure on Jarrow to bring its account current.

79.   Attorney Giarratana corresponded with Jarrow's accounts payable professional, Mary Grace Reyes, on May 24, 2019, attaching a list of then-outstanding invoices from M&E to Jarrow, requesting that they be paid prior to the scheduled June 3, 2019 start of the trial.

80.   On May 24, 2019, Attorney Giarratana responded to Jarrow's request for a discount of M&E's fees, a practice which had occurred on a regular basis in September of each year, near the end of M&E's fiscal year.

81.   On this occasion, Attorney Giarratana responded to Ms. Reyes request for a 15% discount as follows:

> With respect to the requested discount, please note that Jarrow Formulas is already receiving a 38% discount off of our standard rates.... [and] in light of that, we have significant restraints on our ability to further discount our rates. We have discussed the matter with our firm's chief financial officer, and the maximum additional discount we are permitted to offer is 5%, provided Jarrow Formulas pays its outstanding invoices and is current heading into trial on June 3.

82.   On May 31, 2019, Attorney Giarratana reiterated to Mary Grace that "we are not permitted to provide a further discount beyond the 5%" and stated: "With the additional 5% discount, Jarrow Formulas is receiving a 43% discount which is both substantial and highly unusual." He also reminded her that "it is important that we bring the AR current as we head into trial June 3," which was the following Monday.

83.  Attorney Grondahl was copied on both the May 26 and the May 31 e-mails, but failed to point out Attorney Giarratana's obvious misstatement regarding the magnitude of the purported "discount" being offered to Jarrow.

84.  In prior years, Attorney Giarratana or his accounts receivable staff had proffered the excuse that the firm's "executive committee," its "finance" or "financial committee" or its "executive committee" had denied his request for a greater discount.

85.  M&E also had represented to Jarrow that discounts often percent were approved "only for a very select group of clients, of which Jarrow is one."

86.  In fact, this was a cynical game played by M&E and Attorney Giarratana, as M&E's internal communications on the subject clearly show. For example, in 2014, M&E's collections analyst wrote in an internal e-mail to Attorney Giarratana:

> "They [Jarrow] do this every year. I'm going to pretend to ask you and then say no, the finance committee won't let you. Like I do every year."

87.  Over the years, M&E even made jokes about their deception. For example, in 2008, an M&E's collections analyst responded to a question from Attorney Giarratana concerning what discount had been granted the prior year by stating:

> ". . . we did a lot of back and forth where I had to ask the 'EC', if you recall, we made Eric Grondahl an honorary member."

She stated further that she was going to wait until the following day to respond to Mary Grace, "so that she knows we had to work for it."

88.  Thus, the statements that the collections analyst asked Attorney Giarratana to approve Jarrow's discount requests, or that Attorney Giarratana consulted with the "EC," the

"financial committee" or others above him were false.

89.  In fact, at all relevant times, Attorney Giarratana had the authority to grant a 10% discount, as clearly stated in the billing policy printed on each of M&E's draft invoices, or pre-bills.

90.  When Mary Grace was pressed in late May 2019 to bring Jarrow's account current and was misled regarding the magnitude of the "substantial" and "unusual" discounts of 38% and 43% being offered to Jarrow, she ultimately obtained permission to pay the invoices and responded by stating that she would cut the check and send it by FedEx overnight.

91.  Mary Grace in fact sent a check for nearly $700,000 to M&E following the May 2019 e-mail exchanges.

92.  Upon receipt of the check, Attorney Giarratana complained that it merely brought Jarrow's account current, but did not fully pay off the entire balance, which was approximately twice as much as the nearly $700,000 payment.

93.  In response, Ben Khowong, Jarrow's CEO/CFO wrote to Attorney Giarratana asking that he deal directly with him with respect to billing in the future and stated that Mr. Rogovin had wanted to send a check for only $100,000. Mr. Khowong stated further that he did not have authority to send more funds without Mr. Rogovin's instruction to do so.

94.  Attorney Giarratana's statements concerning a 38% or a 43% discount were false and were made, together with his reminders of the imminently impending start of trial, intentionally to induce Jarrow to pay the outstanding invoices on false pretenses.

95.  Attorney Giarratana has testified under oath that "it was very important to me that I bill them [Jarrow] fairly... I took that part of my role very seriously and I gave it very careful attention." He also stated that he "carefully scrutinized every bill" and that he "wanted to make

sure that the company knew, and I believe that they did, that we were taking care of them and that we were being fair."

96.   In contrast to Attorney Giarratana's claims of large discounts, Ms. Bosma's sworn statement and spreadsheet reflect that Jarrow was billed at "standard rates" for Attorneys Giarratana and Grondahl and at a rate $115 per hour above Attorney Rechen's initial "standard rate."

97.   As of May 2019, the majority of the timekeepers listed on the spreadsheet were being billed at a rate above their initial "standard rate." The spreadsheet analysis shows an overall realization rate of 86% from "standard rates" (actually 89% if write-offs, which are not properly considered a "discount" are not deducted in the calculation of the realization rate) and a realization rate of 97% from "matter rates" (*i.e.* the rates that were actually billed).

98.   The spreadsheet analysis thus shows that Jarrow had received at most an 11% discount from M&E's so-called "standard rates."

99.   In fact, M&E's "standard rates" are essentially another fiction: they are internal to M&E; they were never disclosed to nor agreed to by Jarrow; and they have no proper role in an evaluation of the reasonableness of M&E's bills.

100.   Nowhere is there any basis to support Attorney Giarratana's claim made to Jarrow that M&E's billings represented either a 38% or a 43% discount from "standard rates." If $535 per hour represents a 38% discount from his "standard" rate, then Attorney Giarratana's undiscounted hourly rate would be $863 per hour ($863 x .62 = $535.06), a rate Attorney Giarratana has never claimed to be his hourly billing rate.

101.   After his repeated assertions regarding the great care that he took with his billing and the importance of treating Jarrow fairly, Attorney Giarratana responded to the fact

that his May 2019 e-mails grossly overstated the alleged discount given to Jarrow by giving the excuses that "this was May 31;" "we were busy preparing for trial;" and "I took Jackie's [Bosma] word for it. I did not go and calculate it myself."

102.    In fact, these also are misleading statements. May 31, 2019 was not the first or only occasion on which Attorney Giarratana misrepresented the discount being given to Jarrow. Attorney Giarratana had begun a dialogue with Mary Grace concerning a year-end discount in the middle of May 2019 and first made the assertion in writing that Jarrow was receiving a 38% discount on May 24, 2019, at which time he specifically represented that he had "discussed the matter with our firm's chief financial officer. and the maximum additional discount we are permitted to offer is 5%."

103.    Attorney Giarratana repeated essentially the same statement six days later, on May 31, 2019, adding that the "additional" 5% discount being offered would bring the discount to 43%, which is "both substantial and highly unusual."

104.    Attorney Giarratana also represented that this substantial and highly unusual discount was the result of special consideration given to Jarrow as a "long-standing" client and "because over time we have not increased our rates in accordance with the market in order to lessen the blow of the Caudill Seed litigation on Jarrow Formulas."

105.   Omitted from these statements are the highly salient facts that: Attorney Giarratana had authority to grant a 10% discount without the approval of a committee; M&E had increased its rates for Attorney's Giarratana, Grondahl and Robinson by approximately 30% from their hourly rates at the inception of the Kentucky federal case litigation; and M&E increased its rates for most of the timekeepers who worked on the Kentucky federal case.

106.   M&E also failed to provide competent legal services to Jarrow in the Kentucky federal case.

107.   During the course of the Kentucky federal case, M&E also failed to take steps needed to properly represent and defend Jarrow as to both liability and damages issues in the Kentucky Litigation which would have been taken by reasonably prudent and competent counsel in similar circumstances. M&E did not retain an appropriate damages expert and provide him with information needed to effectively attack Caudill's grossly inflated damages claims.

108.   M&E also failed to secure and provide documentation from Caudill as well as from third parties who possessed relevant information, which would have permitted Jarrow or its retained expert to prove Caudill's actual research and development costs were a small fraction of the millions of dollars Caudill claimed as damages and was awarded by the jury in the Kentucky federal case.

109.   M&E also refused repeatedly to communicate properly with and listen to the client's concerns and failed follow or to consider appropriately the advice and instructions of Jarrow's principal, Jarrow Rogovin, including his repeated requests that they formulate an alternative damage analysis and that he be permitted to testify at trial.

110.  Prior to and during the trial, Mr. Rogovin made it known to the M&E attorneys that he felt they ignored him, that they talked over him when he spoke, and that they treated him in a disrespectful and overbearing manner. At one point during the trial, one of M&E attorney's actually taunted Mr. Rogovin, stating: "What are you going to do, fire us?" At another point, Attorney Giarratana admitted to Jonathan Leventhal, Jarrow's General Counsel, that he was not reading emails being sent by to him by Mr. Rogovin regarding issues relating to the trial because he claimed he was "too busy."

111.  During the trial, the Court decided that it would permit a key Caudill witness to provide both fact and opinion testimony and allowed the M&E attorneys to depose the witness in the evening after court closed. M&E did not permit Mr. Rogovin to attend the deposition. As a result, Mr. Rogovin was not able to hear, analyze and assess the testimony and fully assist in providing information for cross-examination of the witness when court resumed. To the extent that Jarrow did provide a suggestion as to how the witness could be effectively cross-examined, it was not followed.

112.  The M&E lawyers also failed and refused to make use of a video deposition of a key Caudill witness, obtained at great expense, through which it could have been established that Caudill had never done testing research and development employing the parameters used by Jarrow and that Caudill had failed to timely turn over the evidence supporting this conclusion.

113.  M&E attorney Tom Rechen also promised, in the opening statement he delivered to the jury, that Mr. Rogovin would testify. M&E failed to deliver on the promise, despite the fact that there were critical issues only Mr. Rogovin could effectively address.

114.  Because he did not testify, except through a pre-trial deposition at which M&E attorneys asked no questions, critical documents which corroborate Mr. Rogovin's position that he did not rely upon any of Caudill's trade secrets, made conscious efforts to avoid misappropriation of trade secrets, and certainly did not engage in willful or malicious misappropriation, were not admitted at trial.

115.  In addition, although the M&E attorneys regarded Mr. Rogovin at the start of the trial as a critical witness whose testimony was central to Jarrow's defense and specifically told the jurors in opening statement that they would hear from Mr. Rogovin, the attorneys later forcefully advised Mr. Rogovin and insisted that he must not testify and they ignored his requests to testify as the trial progressed.

116.   As a result, Mr. Rogovin was not given the opportunity to provide testimony as to his knowledge of the manner in which Jarrow independently developed its processes and products, and the manner in which Jarrow's products and processes differed in fundamental respects from Caudill's products and processes.

117.   The jurors thus saw Mr. Rogovin in court each day, but were not given the opportunity to look him in the eye and hear him testify in person as to key issues, including the critical element of his intentions and state of mind to rebut Caudill's claim of willful and malicious misappropriation of trade secrets.

118.   It was critical that, as the founder and principal owner of Jarrow, Mr. Rogovin be given the opportunity to face the jury and explain that he did not intentionally misappropriate any trade secrets, and took affirmative steps to avoid infringement and directed his staff to do the same. In addition, as a result of the decision not to allow Mr. Rogovin to testify, several key documents in which he expressed his desire and efforts to avoid infringement directly to Caudill's counsel in 2011 were not admitted in evidence.

119.   M&E lawyers insisted that they had a "plan" and that they were going to follow it regardless of Mr. Rogovin's wishes, instructions or directions.

120.   The underlying Kentucky Litigation was conducted with three M&E partners, local Kentucky counsel and Jarrow's General Counsel all sitting at counsel table and, for most of the trial an M&E associate (billing at $400 per hour) in the gallery or working at the local counsel's office.

121.   Jarrow's local counsel, Joel Beres, is a highly qualified intellectual property attorney with an undergraduate degree in economics and more than 25 years of experience practicing law in the field of intellectual property. Nevertheless, the M&E attorneys did not permit Attorney Beres to play any meaningful role at the trial.

122.   When Jarrow's General Counsel asked M&E lawyers what he and Attorney Beres could do to help, he was told: "Keep Jarrow [Rogovin] away from us."

123.   The combined billing rates of the three M&E partners, M&E associate and local counsel totaled nearly $2,500 per hour. M&E's billed fees for the month of June 2019 alone were $582,713.00 (not including disbursements of $178,00.00)—nearly $20,000 in legal fees per day for each and every day of the thirty days in the month of June.

124.   M&E's bills for legal fees rendered to Jarrow for the Kentucky Litigation exceeded $6.7 million and were more than 50% higher than the $4.2 million in fees charged by *winning* team representing Caudill.

125.   M&E engaged in several types of inappropriate billing practices, including excessive bills that were the product of overstaffing, inefficiency, inappropriate timekeepers, inappropriate billing rates, inappropriate disbursements, and other objectionable billing practices which caused M&E's bills to exceed the reasonable value of their services to Jarrow and require substantial reductions in M&E's billings, such that the amount of M&E's excessive billings exceeds the amount claimed by M&E as due and owing in this case.

126.  One example regarding disbursements involves expenses for meals. After a particularly expensive dinner with the trial team, Jarrow's General Counsel was assured that Jarrow would not be charged for the dinner. Yet M&E's June bill reflects a $1,300 charge for this dinner; as well as more than $6,700 in meal charges for the month of June alone.

127.   Although M&E retained a damages expert, it had become evident from the expert's deposition the expert did not have appropriate experience and was not provided nor asked to examine appropriate source documents to undermine the factual basis for Caudill's damages claims. Jarrow's retained damages expert was not called to testify at trial and the jury was not presented with an

alternative calculation to Caudill's inflated calculation of its alleged damages.

128.   Caudill's damages claim for research and development costs was predicated largely on research and development line items shown on tax returns and financial statements companywide, over a span of many years, in a company that had six divisions, in a trade secrets case in which Caudill claimed six trade secrets, and prevailed in recovering damages as to only one. The jury never heard a breakdown or allocation of the research and development costs and never was presented with an alternative calculation. M&E's damages expert never investigated the allocation or breakdown of Caudill's alleged research and development costs and did not use source documents to verify the numbers on the tax returns and financial statements.

129.   M&E also admitted that they erroneously believed the jury would not decide the issue of willful and malicious misappropriation. This fact was revealed when M&E made its motion for judgment as a matter of law and omitted a discussion of willful and malicious misappropriation in their brief and in oral argument on the motion. When asked by the trial judge whether he wished to address the issue, Attorney Giarratana stated that it was his understanding that the jury would not decide this issue.

130.   M&E thus failed to structure its trial presentation during the plaintiff's case to properly address this issue. Indeed, even after the trial judge pointed out M&E's oversight regarding this issue, they failed to structure the presentation of the defense case to properly address this critical issue—which the jury decided against Jarrow.

131.   Because of the manner in which M&E decided to present Jarrow's defense, at the end of the trial Caudill's counsel was able to tell the jury that Jarrow Rogovin had been in the courtroom every day and had never taken the stand to tell them he did not misappropriate Caudill's trade secrets

and did not act willfully, maliciously and deceptively to Caudill and was able to characterize the denials presented by Jarrow's counsel as "just the lawyer talking."

132.  As to damages, Caudill's counsel was able to state in closing that Jarrow did not put on evidence of how long it would have taken Jarrow to develop its products and processes by proper means and to state further, without fear of contradiction, that there was no evidence providing an alternative to Caudill's research and development damages calculation.

133.  On June 26, 2019, the jury rendered its verdict in the Kentucky Litigation, finding Jarrow liable for compensatory damages in the amount of $2,427,605 and finding Jarrow liable for willful and malicious misappropriation of Caudill's trade secrets, which permits Caudill to seek an award of treble damages and attorney's fees from the court.

134.  On July 18, 2019, Caudill filed its motion for exemplary damages in the Kentucky Litigation, seeking $4,855,210 in punitive damages (2 X the compensatory award), $4,203,201 in attorney's fees, and $1,873,903 in interest (plus *per diem* interest of $410.72 for each day after June 26, 2019), for a total award of more than $13 million.

**Count One** - Excessive Billing; Overpayment and Recoupment

1-134.  The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135.  The bills rendered by M&E in this matter for fees and expenses are excessive and unreasonable.

136.  If M&E's bills are reduced to reasonable charges, Jarrow has previously paid M&E more than M&E is owed for such services.

137.  As a consequence, M&E is not entitled to recover any amount on its claims against

Jarrow and Jarrow is owed a substantial refund, in an amount to be proven at trial, based upon the sums it has paid to date.

**Count Two** - Unjust Enrichment

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135.   Jarrow has paid M&E more than the reasonable value of its services.

136.   As a result, M&E has received a benefit which in equity and good conscience it must not be permitted to retain.

137.   As a consequence, M&E is not entitled to recover any amount on its claims against Jarrow and M&E should be ordered to disgorge and return to Jarrow the amount that M&E unjustly retained.

**Count Three** - Breach of Fiduciary Duty

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135.   As legal counsel and advisor to Jarrow over an extended period of time, Attorney Giarratana and M&E stood in a fiduciary relationship of trust and confidence with Jarrow and owed to Jarrow the obligation to act in its best interests at all times, to keep Jarrow fully informed as to all matters which maybe of importance, and to meet the highest standards of honesty, full disclosure and loyalty.

136.   By its overbilling and other improper billing practices, including its failures to properly communicate with Jarrow concerning matters of importance and its failures to honestly and fully disclose matters relating to billing, M&E breached its fiduciary duties to Jarrow.

137.   As a consequence, Jarrow has suffered financial harm in that it has been billed

excessively, has overpaid for services and has been required to defend this action seeking to collect additional sums that are unwarranted and are not properly due and payable; Jarrow has been required to expend sums for attorneys and consultants to defend this action; and Jarrow has incurred other expenses and harm to its business, including damage to its relationship with its primary lender.

**Count Four** - Legal Malpractice

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135. In its legal representation of Jarrow in the Kentucky Litigation, M&E owed Jarrow a duty of care to act as reasonably competent and diligent attorneys and to use the skill and knowledge ordinarily possessed by attorneys under similar circumstanced and to exercise a reasonable degree of skill and care in providing professional legal services.

136. M&E was negligent and failed to take the steps required to provide Jarrow with reasonably diligent and competent legal advice and representation, failed to act as reasonably prudent and competent attorneys and committed acts and omissions which constituted legal malpractice, as set forth above, including: the failure to recognize that Jarrow Rogovin was a critical witness who must testify as to a number of key points; the failure to adequately consult and communicate with the client; the failure to retain an appropriate damages expert and engage in adequate discovery to obtain evidence regarding Caudill's actual research and development costs and provide an alternative damages calculation; the failure to meet the standard of care in rebutting the damages testimony of Caudill's damages expert; the failure to present testimony and evidence to show that Jarrow did not willfully and maliciously misappropriate any trade secrets.

137. As a result of M&E's breaches of their duty of care and professional negligence,

Jarrow has suffered damages.

**Count Five -** Negligent Misrepresentation

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135. During the course of its representation of Jarrow, M&E made numerous misrepresentations of material facts relating to its representation of Jarrow, including matters relating to billing rates, billings, and discounts.

136. M&E had a duty to Jarrow to communicate correct information and to take reasonable steps to ensure that its representations to Jarrow were correct.

137. Jarrow and its principals trusted M&E implicitly as a fiduciary and counsel of long-standing and reasonably expected that all of the representations made by the M&E attorneys and its staff were true and correct and were made after a reasonable investigation of the facts.

138. Jarrow reasonably relied on M&E's misrepresentations.

139. As a consequence, M&E has suffered damage.

**Count Six -** Intentional Misrepresentation

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135. During the course of its representation of Jarrow, M&E made numerous misrepresentations of material facts relating to its representation of Jarrow, including matters relating to its billing rates, billings, and discounts.

136. Jarrow trusted M&E implicitly as a fiduciary and counsel of long-standing and

reasonably expected that all of the representations made by the M&E attorneys and its staff were true and correct.

137. Jarrow reasonably relied on M&E's misrepresentations.
138. As a consequence, M&E has suffered damage.

**Count Seven** – Unfair Trade Practices

1-152. The allegations of paragraphs 1-134 of Count One, paragraphs 135-137 of Count Two, paragraphs 135-137 of Count Three, paragraphs 135-137 of Count Four, paragraphs 135-139 of Count Five and paragraphs 135-138 of Count Six are repeated and realleged as if fully set forth herein.

153. At all relevant times, M&E has been engaged in the trade or business of providing legal services.

154. M&E's acts and practices involving billing and collection of fees for its services and disbursements constitute the entrepreneurial aspects of the practice of law.

155. M&E's billing and collection practices as alleged herein constitute unfair and deceptive acts and practices involving the entrepreneurial aspects of the practice of law in that: M&E failed to provide Jarrow with written retainer agreements; M&E failed to provide written notifications of changes in the basis or rates for services in advance of providing services at a higher rate; M&E billed for excessive and inappropriate disbursements; M&E billed for services other than legal services and for disbursements that were not reasonable, and were not agreed to be and were not properly reimbursable; M&E billed at widely differing rates for the same attorneys, in the same time frame, in related matters; M&E made misrepresentations regarding billing rates and discounts; M&E unilaterally raised its billing rates during the course of the engagement without taking appropriate steps to ensure that such rate increases were properly communicated, accepted

and were fair to Jarrow; M&E raised its rates based upon the expectation that the charges would be reimbursed by insurance and would be subject to the billing rules of the insurance company and continued to charge such higher rates when the insurer declined to cover and pay the charges, while ignoring the billing rules upon which such rates were predicated; and M&E rendered excessive bills that were the product of inappropriate billing and collection practices, including all of the foregoing, as well as overstaffing, inefficiency, inappropriate timekeepers, inappropriate billing rates and inappropriate disbursements.

156. M&E has made use of confidential information which it learned during the course of representing Jarrow as its counsel and in a fiduciary capacity, as well as the financial stress and pressure caused by M&E's excessive billing and its failures to render competent legal services, in order to apply pressure and exert leverage on Jarrow to pay the sums M&E claims to be due and owing, when such sums are not in fact properly due and owing.

157. As a result of M&E's unfair trade practices, Jarrow has suffered an ascertainable loss and damages.

**Count Eight** – Setoff

1-134. The allegations of paragraphs 1-134 are repeated and realleged as if fully set forth herein.

135. To the extent that M&E proves it is entitled to a recovery on its claims, which Jarrow expressly denies, any sum awarded to M&E is subject to a set-off in the amount of any recovery by Jarrow on its counterclaims, including any recovery of compensatory damages, punitive damages, attorney's fees and costs.

**<u>Prayer for Relief</u>**

**WHEREFORE,** Jarrow demands:

1.  Compensatory damages.

2.  A setoff against the amounts claimed by the plaintiff. 2.

Disgorgement of benefits constituting an unjust enrichment.

3.  Interest.

5.  Punitive Damages, attorney's fees and costs pursuant to Connecticut General Statutes § 42-110g.

6.  Such other and further relief as in law or equity may appertain.

**DEFENDANT/COUNTERCLAIM-PLAINTIFF JARROW FORMULAS, INC.**

/s/ Jeffrey J. Tinley (ct00765)

By: _____
Jeffrey J. Tinley
Tinley, Renehan & Dost, LLP
255 Bank Street ~ Suite 2-A
Waterbury, CT 06702
Telephone: 203-596-9030
Facsimile: 203-596-9036
Federal Bar No.: ct00765
E-Mail: jtinley@tnrdlaw.com

**DEFENDANT/COUNTERCLAIM PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL CLAIMS DEFENSES AND COUNTERCLAIMS SO TRIABLE.**

**CERTIFICATION**

I hereby certify that on this 27th day of August, 2020, a copy of the foregoing Answer to Second Amended Complaint, Affirmative Defenses and Amended Counterclaims was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

By:   /s/ Jeffrey J. Tinley (ct00765)

Jeffrey J. Tinley
Tinley, Renehan & Dost, LLP
255 Bank Street ~ Suite 2-A
Waterbury, CT 06702
Telephone: 203-596-9030
Facsimile: 203-596-9036
Federal Bar No.: ct00765
E-Mail: jtinley@tnrdlaw.com