**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

McCARTER & ENGLISH, LLP,

     *Plaintiff*,

     v.

JARROW FORMULAS, INC,

     *Defendant*.

No. 3:19-cv-01124 (MPS)

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In this heated dispute, a law firm has sued its former client for outstanding legal fees, and the former client has counter-claimed, alleging that the law firm committed malpractice and overbilled it in connection with a recent trial in Kentucky that resulted in a multi-million dollar verdict against it. The parties have filed cross-motions for summary judgment. Specifically, the plaintiff law firm, McCarter & English, LLP ("McCarter"), seeks summary judgment on its claim for breach of contract, and on the counterclaims of its former client, Defendant Jarrow Formulas, Inc. ("Jarrow"), for legal malpractice, breach of fiduciary duty, negligent and intentional misrepresentation, and unfair trade practices. Jarrow seeks summary judgment as to its counterclaims for breach of fiduciary duty, negligent and intentional misrepresentation, and unfair trade practices. For the following reasons, I grant in part and deny in part McCarter's motion for summary judgment as to the breach of contract claim and the malpractice counterclaim, and deny both parties' motions for summary judgment as to the fiduciary duty, misrepresentation, and unfair trade practice counterclaims.

## II. PROCEDURAL BACKGROUND

McCarter represented Jarrow in a jury trial in the United States District Court for the Western District of Kentucky ("the Kentucky Litigation") in which Caudill Seed & Warehouse

1

Company sued Jarrow for violation of the Kentucky Uniform Trade Secrets Act, KY. REV. STAT. ANN. §§ 365.880-365.900 (West 2020), and other claims. ECF No. 174 ¶ 14.  The jury returned a verdict against Jarrow in the amount of $2,427,605, finding willful and malicious misappropriation of trade secrets by Jarrow. *Id.* ¶ 17.[1]  Shortly thereafter, Jarrow terminated its relationship with McCarter and McCarter brought this action for breach of contract, account stated, and unjust enrichment/quantum meruit to recover outstanding legal fees in the amount of $2,044,686.77. ECF No. 174 ¶ 28.  McCarter filed a motion for prejudgment remedy and, after an evidentiary hearing (the "PJR hearing"), secured a prejudgment remedy in the amount $1,850,000. ECF Nos. 8, 56, 68; ECF No. 124 at 35.

In the meantime, Jarrow asserted eight counterclaims against McCarter, ECF No. 91, including, as pertinent to the summary judgment motions, claims for breach of fiduciary duty, negligent/intentional misrepresentation, unfair trade practices, and legal malpractice. Specifically, Jarrow alleges that McCarter, in spite of the fiduciary duties it owed to Jarrow as its counsel, "made numerous misrepresentations of material facts relating to its representation of Jarrow, including matters relating to billing rates, billings, and discounts." ECF No. 184 at 32 Count Three ¶ 135; *id.* at 34 Count Five ¶ 135.  For example, Jarrow alleges that McCarter billed Jarrow's insurer at higher hourly rates, but when the insurer declined coverage, McCarter billed Jarrow at those higher hourly rates without notifying Jarrow of the increase. *Id.* at ¶¶ 55, 75, 76. Jarrow also alleges that McCarter applied pressure on Jarrow to bring its account current and told Jarrow that it was receiving discounts that it was not in fact receiving. *Id.* ¶¶ 78, 88, 94.  Jarrow's counterclaim for legal malpractice alleges that McCarter made decisions during the Kentucky

---

[1] In a recent ruling, the district judge presiding over the Kentucky Litigation awarded Caudill Seed an additional $1,000,000 in punitive damages and $3,254,303.50 in attorney's fees. *See Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.* No. 3:13-cv-82-CRS, 2021 WL 863203, at *14, *21 (W.D. Ken. Mar. 8, 2021).

Litigation that failed to meet the standard of care for an attorney. It alleges that McCarter should have called as a live witness Jarrow Rogovin, Jarrow's Chairman and President, should have called a damages expert to rebut Caudill's damages evidence, should have presented an alternative damages calculation, and should have presented evidence to rebut the claim of willful and malicious misappropriation. It also alleges that McCarter failed to "adequately consult and communicate with the client." *Id.* at 33, Count Four ¶ 136.

III.    **FACTS**

The following facts are taken from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

A.    **The Beginning of the Representation**

In 1996, the law firm McCormick, Paulding & Huber, LLP ("MPH") entered into a written agreement with Jarrow (the "1996 Engagement Letter") that provided for legal representation. ECF No. 179 at 2 ¶ 1. The agreement is titled "Engagement Letter" and references "International Nutrition Co. v. Jarrow Formulas, Inc. et al (Our File No. 5575-01)". ECF No. 38-1 at 2. It was addressed to Mr. Jarrow Rogovin, signed by Attorney Mark Giarratana of MPH, and counter-signed by Rogovin. The letter "sets forth the terms of Jarrow's [] retention of [MPH]". *Id.* It states in relevant part, "We understand that you wish us to assume the legal representation of Jarrow [] in the above-identified intellectual property litigation … currently pending in the United States District Court for the District of Connecticut." *Id.* Regarding payment for MPH's legal services, the letter states that "[d]uring the pendency of this matter, [MPH] will render statements to Jarrow [] on a monthly basis," that "[o]ur bills will reflect the hourly charge rate multiplied by the amount of time devoted to the matter by lawyers, legal assistants and other employees of the firm during the preceding calendar month as well as regular charges and disbursements recorded on our books during that month," that "[o]ur

statements are due and payable 30 days after receipt and Jarrow [] agrees to pay each monthly statement within 30 days", and that base hourly rates for attorneys, legal assistants, and staff members "vary depending upon the experience and expertise of the person rendering services" and "may change from time to time." *Id.* at 2-3.  The letter sets forth the then-applicable hourly rates of Giarratana and another MPH partner and notes that"[o]ther partners may likewise assist in this matter, if necessary, at their respective hourly rates". *Id.* at 3.  The letter concludes by stating, "We look forward to representing you and your Company in connection with this intellectual property matter, and will do our best to work toward developing a long and mutually-satisfying relationship." *Id.* at 4.

In 1998, Giarratana left MPH and joined Cummings & Lockwood LLC; he then left that firm to join McCarter in 2003, where he has remained as a partner for sixteen years. ECF No. 179 at 3 ¶ 3; ECF No. 38 ¶¶ 4-5.  On September 26, 2003, Giarratana sent a letter to Rogovin informing him that Cummings & Lockwood's Hartford office and lawyers from other offices would be merging with McCarter. ECF No. 175-42 at 2.  "Accordingly, we plan to transfer your files to McCarter [] at the time of the merger, and to continue to provide you with intellectual property advice and services as we have in the past." *Id.*  "At each of the foregoing law firms, Giarratana, and others working under his direction, continued to provide substantial legal services to Jarrow in intellectual property, litigation and insurance coverage matters." ECF No. 179 at 3 ¶ 4; ECF No. 38 ¶¶ 4-5.  Giarratana testified that "throughout the 23-year relationship" with Jarrow, he "continue[d] to bill[] for [his] services and those of the people in [his] firm" and "continue[d] to bill in the same manner … described in the [1996 Engagement Letter] regarding monthly bills and on a time-devoted basis[.]" ECF No. 69 at 19. "During its attorney-client relationship with Jarrow, McCarter opened over 400 matter files, all of which were handled by

Giarratana and other lawyers, primarily out of McCarter's Hartford, Connecticut office."  ECF

No. 38 ¶ 5; *see also* ECF No. 180-42 at 20-21.

**B.      Hourly Rates for Legal Services in the Kentucky Litigation**

The rate at which Giarratana billed Jarrow for the "hundreds of legal matters" he worked

on started at $200 per hour in 1996, ECF No. 180-5 at 3, ECF 38-1 at 3, and increased over time.

ECF No. 177 at 3 ¶ 9.  The parties dispute how high the hourly rate reached, with Jarrow

asserting that Giarratana billed Jarrow "from the middle of 2013 through early 2015 … at widely

disparate rates for services provided by the same attorneys in the closely related [] state court

case brought against Jarrow consultant Kean Ashurst (the "Ashurst Litigation") and the

Kentucky [] Litigation…." ECF No. 177 at 3-4 ¶ 9.  Giarratana testified that he believed his rate

remained at $405 per hour in the Ashurst Litigation in 2013, 2014, and 2015, ECF No. 180-6 at

7, and the parties agree that his rate increased to at least $535 per hour for the Kentucky

litigation, although Jarrow contends that it was "over $535 per hour." See ECF No. 177 ¶ 8; ECF

No. 175-4 at 19.  Asked if he gave notice to Jarrow when the rate was being increased,

Giarratana responded,

> We – it depends on the situation.  We didn't have a written notice that went out before
> the bill went out.  When we sent the bill, the bill, of course, had a notice in it before they
> paid it.  The bill indicated in several places what the rates were.  There was an hourly rate
> indicated at the end of each matter on the bill for each of the timekeepers that appeared
> on that respective matter.
>
> And also there was a – the time entries we billed on a time-devoted basis would indicate
> the amount of hours or portions of an hour and the dollar value; and it was simple
> arithmetic to determine the rate from that.

ECF No. 69 at 36.  Rogovin testified that "[t]here was no notice[] of billing increases." ECF No.

180-19 at 3.

In 2013, "Rogovin specifically requested that McCarter represent Jarrow in the Kentucky Litigation." ECF No. 179 at 4 ¶ 8; ECF No. 38 at 3 ¶ 9. There was no "written retainer agreement entered into between Jarrow and [McCarter]" specifically "for [] Jarrow's representation in the Kentucky [] Litigation." ECF No. 177 at 1 ¶ 4. Giarratana testified that he informed Rogovin during a phone conversation that McCarter had been charging "very old rates" that "were out-of-date" for the Ashurst Litigation and that it was "going to be charging [] current rates in connection with this federal matter [the Kentucky Litigation]." ECF No. 175-4 at 7-8. "I distinctly recall discussing with him and telling him that we were going to be charging him the rates that we were going to be charging and him being fine with it." *Id.* at 8. According to Giarratana, his rate at that time was $535 per hour and he had been charging Jarrow $405 per hour. *Id.* at 19. "[I]t was a huge, huge discount, and we needed to increase our rates by that point in time" because "we were not going to embark on a significant case at those lower rates." *Id.* As noted, Rogovin denies having received any notice of rate increases. ECF No. 180-19 at 3.

Jarrow was sued in the Kentucky Litigation in January 2013, at which time Giarratana brought the suit to Rogovin's attention, and he and McCarter were engaged to represent Jarrow. ECF No. 69 at 38. "Initially … we were billing our time on [the Kentucky Litigation] to the Ashurst [L]itigation because they were so closely related, and it wasn't clear to us where that case was going to go." *Id.* In February 2013, McCarter contacted Jarrow's insurance broker regarding coverage for the Kentucky Litigation, and Giarratana eventually corresponded with Linda Lin of Liberty International, an insurer, about this. ECF No. 177 at 4 ¶ 10. He sent Lin biographies of the attorneys who would be working on the Kentucky Litigation, identifying the following rates for these attorneys:

Mark Giarratana - $535 per hour
Eric Grondahl - $485 per hour

6

       Shawn Smith - $285 per hour
       Abraham Robinson - $245 per hour

ECF No. 180-8 at 2.  Lin responded, "Liberty consents to the retention of your firm and local

[counsel] with the attorney rates outlined below.… We will need a copy of all invoices on this

matter." *Id.*  On August 7, 2013, Giarratana emailed Matthew Abreu at Liberty attaching copies

of the invoices issued to Jarrow and listing the following invoices and amounts:

       Invoice No. 7836539 (January): $13,013.00
       Invoice No. 7839405 (February): $12,433.68
       Invoice No. 7860852 (March): $62,858.89
       Invoice No. 7858074 (April): $26,966.02
       Invoice No. 7858070 (May): $31,900.40
       Invoice No. 7862598 (June): $3,362.97

ECF No. 180-9 at 2.  On November 4, 2013, Liberty denied coverage, and never paid any of the

invoices that McCarter had billed Jarrow. ECF No. 177 at 10 ¶¶ 22, 23.

      Jarrow asserts that on July 11, 2013, McCarter rescinded the April invoice it had

submitted to Jarrow and rebilled it with the higher billing rates that Liberty had approved for

Giarratana and Grondahl. ECF No. 177 at 8 ¶ 16.  McCarter responds that, "[o]n June 25, 2013,

Giarratana realized that the April and May invoices were billed at the wrong rates" for him and

Grondahl, and so he "reversed the April and May invoices previously sent at the incorrect partner

rates, and sent Jarrow the corrected April and May invoices"; on July 11, he did the same for the

March invoice.  *Id.*; ECF No. 175-13 at 2.

      Jarrow views McCarter's dealings with Liberty and subsequent dealings with it as

chicanery.  Rogovin testified:  "We were billed at a certain rate, the insurance company at

another rate, and then the insurance company – and we're not informed of that, and then we were

billed at the insurance company's rate, and we were not informed of that other than, you know,

digging into – I never received the insurance company billings until this case." ECF No. 180-38 at 3.

The parties also dispute whether Jarrow received a "special discount approved only for a select group of clients." ECF No. 177 at 10-11 ¶ 24 (internal quotation marks omitted).  Jarrow asserts that it "was told that in order to obtain approval for these discounts, Giarratana had gone to bat for Jarrow with the firm's executive committee … when in fact no such discussions had taken place." *Id.* (quotation marks omitted); ECF No. 180-16.  Emails between Catherine Adipietro, McCarter's Accounts Receivable and Collections Analyst, and Mary Reyes, Jarrow's Accounts Payable representative, reflect that Ms. Adipietro asked "[Giarratana] to ask the executive committee" about discounts and that Giarratana told Adipietro to tell Reyes that "we already discounted the 90+ at 10%, we cannot apply another 12.5% discount to that, but in light of the volume of work etc. mentioned in the email below, the finance committee will provide another 2.5% on the 90+…." ECF No. 180-16 at 3-4.  One email from Adipietro to Giarratana states, "They do this every year.  I'm going to pretend to ask you and then say no, the finance committee won't let you.  Like I do every year." ECF No. 180-17 at 2.

McCarter asserts that the discounts given to Jarrow "were special and given only to select clients." ECF No. 177 at 11 ¶ 24.  Specifically, Giarratana testified:

> [Jarrow] was, by the way, getting a very special deal.  [Jarrow] was getting a substantial discount and got substantial discounts every year.  And for example, as the [Kentucky Litigation] went on over time, [Jarrow] got better and better discounts every year because we held the rates, at least for the partners, okay.  And so the client was receiving substantial discounts at year end.  It was a special deal, okay, and there's, you know, no way I would think otherwise.… [W]e went through that exercise at least once a year at year end, where we tried to – where the client would consistently ask us for a discount; we typically could not give the discount the client would ask for; there would be a negotiation back and forth between – typically between Cathy Adipietro and Mary Grace Reyes.  We would do our best to try and accommodate the client within reason and we'd come to an agreement.

ECF No. 175-4 at 30-31.  Giarratana denied he was "playing a game with the client…. I'm almost certain I would have discussed the Jarrow [Accounts Receivable issue] with that committee at fiscal year-end or with the representative on that committee, which is in effect speaking to the committee." *Id.* at 29.  Adipietro also testified that "[Jarrow] got the biggest discount." ECF No. 175-23 at 9.

Jarrow asserts that on two separate occasions in May 2019, McCarter falsely stated that Jarrow was receiving a discount that it was not in fact receiving – a 38% discount and a 43% discount – and that Jarrow relied on those allegedly false representations. ECF No. 177 at 12 ¶¶ 26, 27.  Giarratana sent two emails to Reyes, the first stating that "Jarrow [was] already receiving a 38% discount off of our standard rates", and the second that "Jarrow is receiving a 43% discount which is both substantial and highly unusual." ECF 180-18 at 7-8.  Jarrow's General Counsel, Jonathan Leventhal, avers that Giarratana "represented to me that [Jarrow] was given very substantial discounts by [McCarter].  I specifically recall his statement that [Jarrow] was given a 43% discount, which was highly unusual, and which was granted because of the special and long-standing relationship with [Jarrow]." ECF No. 180-39 at 3 ¶ 5.

McCarter asserts that Giarratana made a mistake as to the size of the discount, but not as to whether Jarrow was receiving a discount. ECF No. 177 at 12 ¶¶ 26, 27.  Giarratana testified that Jacqueline Kay Bosma, Controller for McCarter, "advised [him] of the 38% discount." ECF No. 175-12 at 44.  Bosma explained when she testified that she "[could] understand how [Giarratana's] mistake would be made" because 38% was listed in a column on a document as the "actual profit margin." ECF No. 175-24 at 13.  A McCarter profitability report related to Jarrow through May 2019 reflects an "Actual Profit Margin %" of 38.1%. ECF No. 175-25 at 2. According to Bosma, Jarrow was already receiving a 25% discount, and that percentage is

reflected in the profitability report. ECF No. 175-24 at 15; ECF No. 175-25 at 2. On May 31, 2019 Jarrow paid McCarter more than $500,000. The parties dispute the exact amount that Jarrow paid; Jarrow asserts that it sent one check for more than $570,000 and McCarter asserts that Jarrow sent three checks totaling $617,481.81. ECF No. 177 at 13 ¶ 29.

## C.   The Trial in the Kentucky Litigation

The Kentucky Litigation proceeded to a jury trial on June 3, 2019 and on June 26, 2019, the jury returned a verdict against Jarrow in the amount of $2,427,605 and found willful and malicious misappropriation by Jarrow. ECF No. 177 at 2 ¶¶ 5-6. As noted above, Jarrow's malpractice counterclaim challenges several decisions McCarter made during the trial.

### 1.   *The Decision Not to Call Rogovin as a Live Witness*

According to Joel T. Beres, a partner with the law firm of Stites & Harbison, PLLC, Jarrow's local counsel in the Ashurst and Kentucky Litigations, "[f]rom the beginning of the trial of the Kentucky Litigation, the [McCarter] lawyers stated it was the plan that [] Rogovin … would testify as a live witness and that his testimony was extremely critical to the success of the case." ECF No. 180-49 ¶¶ 2-3, 13. In preparation for trial, McCarter's attorneys met with Rogovin "to try to prepare him for his testimony." ECF No. 179 at 6 ¶ 18. Part of the preparation "included a videotaped examination of him presented to mock jury focus groups…." ECF No. 179 at 6 ¶ 19.

The mock jurors' reactions to Jarrow's videotaped examination were discussed during the PJR hearing. Mock jurors had been asked, "What is your opinion as to the testimony given by Rogovin?" ECF No. 86 at 35-36. One deemed him "somewhat credible"; another commented "[Rogovin] is a piece of work. He only answered questions that wouldn't damage him. He did his best to skirt the hard question…."; a third stated, "I believe he is not telling the whole truth.

He knew before he hired him … that he had pertinent information available for having a trade secret…."; and a fourth stated, "Contrary, sarcastic, combative, ridiculously vague regarding what should be known fact…." ECF No. 86 at 36-37, 40; ECF No. 180-53 at 9.  Beres testified that Rogovin's mock jury testimony, was "not compelling" and that he "would need a lot of work to get prepared … for trial." ECF No. 166-9 at 34.  He noted that his recollection of the mock jury questionnaires was that they were "in many ways overwhelmingly negative." *Id.*

Some mock jurors, on the other hand, had a more favorable impression of Rogovin's videotaped examination. For example, two deemed him to have been "very credible" and one stated that "[h]e seem[ed] to have a quick response to questions asked of him." ECF No. 180-53 at 16, 54.  Attorney Thomas Rechen of McCarter, lead trial counsel for Jarrow in the Kentucky Litigation, sent an email to Rogovin on February 27, 2019 expressing the trial team's concerns regarding the mock juror reactions and the prospect of Jarrow testifying at trial. ECF No. 179 at 7 ¶ 23; ECF No. 166-16 at 2-5.  When asked about the email at the PJR hearing, Rogovin testified, "I, at that time, I would agree that it was a well-founded letter." ECF No. 179 at 7-8 ¶ 24; ECF No. 86 at 47.  Rogovin agreed that the issue of whether he would testify at trial was under consideration for a long time and that the trial team met with him repeatedly to prepare him to testify.  ECF No. 86 at 26.

During opening statements in the Kentucky Litigation, Rechen told the jury that Rogovin would testify and "described in detail the subjects that he would cover in his testimony.…" ECF No. 180-49 ¶ 15.  That decision "changed during the trial", according to Beres. ECF No. 166-9 at 58.  Beres testified that the trial team's decision as to whether to call Rogovin as a live witness was impacted by Caudill's decision to play Rogovin's deposition, rather than call him as a live witness, during its case-in-chief.  The risk of Rogovin being called as a live witness by Caudill

"did not occur in eventuality and instead it was portions of the video." *Id.* at 59; ECF No. 179 ¶ 31.  In the portions of the video deposition played by Caudill, Rogovin "testified that he had instructed Ashurst that anything that was proprietary manufacturing to Caudill was not to be duplicated." ECF No. 179 at 8 ¶ 28.

About two weeks into the trial, after Caudill had rested its case, Rechen decided that Rogovin would not testify. ECF No. 180-49 ¶ 23.  Beres acknowledged that if McCarter had called Rogovin "as a live witness, they, Caudill Seed, on cross examination could explore those areas of the deposition or otherwise that could be harmful and get evidence that was not in the record at that time[]."  ECF No. 180-54 at 20-21.  He also testified that "at the end there is one guy having to make the decision as to what was going to happen, and that was [Rechen].  He was the lead trial counsel." ECF No. 180-54 at 18.

Beres agreed that a "consensus emerge[d] that Rogovin should not be called live[]", adding, "I don't recall … anybody, including myself, advocating for Jarrow to go on the stand…." ECF No. 166-9 at 69.  On the other hand, Rory Lipsky, CEO of Jarrow, testified that "there really was no discussion.  There was a … dominance by Rechen, and it was his … his assertion that only he was qualified to make the decision." ECF No. 180-58 at 8.  Lipsky testified that Rechen said to him, "if we lose this case it will be because we didn't have [] Rogovin testify and we'll never hear the end of it." ECF No. 180-58 at 8.

McCarter argues that the decision not to call Rogovin as a live witness kept "damning emails – and the cross-examination of him on those emails – out of evidence." ECF No. 162 at 22.  According to McCarter, those emails, illustrated Rogovin's ill will toward Dan Caudill, Caudill Seed, and its counsel. ECF No. 179 at 8 ¶ 25.  Rogovin wrote, in part,

Alleging that Jarrow received lab notes or a computer thumb drive having anything to do with Caudill is as an untruth as vilely filthy as your client's crapper of a facility – listeria,

> salmonella, irradiation and all.  Not only did we never receive these items – you two
> pathological liars should take note – NOT ONLY DID JARROW NEVER RECEIVE
> THESE ITEMS, and you have no evidence whatsoever that we received them.

ECF No. 166-17 at 3.  Rogovin described Caudill Seed's complaint as "delusional" and its

counsel as "truly an utter, laughable, incompetent fool", and stated that he "did not want to do

business with a scumbag who ran a filthy, contaminated, law-breaking cesspool." *Id.* at 2-3.

McCarter points to an email sent four days after the decision not to call Rogovin as a live

witness as evidence of his reaction. ECF No. 179 at 11 ¶ 37.  The email, from Rogovin to

Giarratana, Rechen, Beres, and Lipsky, among others, lists the order in which Rogovin wanted

witnesses called, but Rogovin's name is not on the list and the email does not say that Rogovin

wanted to be called as a witness. ECF No. 166-20 at 2.

*2.      Consultation with Jarrow*

It is undisputed that Leventhal, Jarrow's General Counsel, "sat at counsel's table every

day [during the Kentucky Litigation]." ECF No. 179 at 11 ¶ 39.  He also attended "daily post-

trial meetings" during which "the entire trial team would retire to Beres' offices for a

'postmortem' or download…." ECF No. 179 at 11-12 ¶¶ 39-42.  Leventhal testified that Rogovin

"attended a number of them.  I don't know if he was at all of them."  ECF No. 86 at 108-09.  The

purpose of the meetings, according to Leventhal, was to review the evidence and the proceedings

of that day, to evaluate what went well, and to decide on the plan and strategy for the case

moving forward. *Id.* at 109.  Leventhal testified that Rogovin "was not bashful" at making his

opinions known on these issues at the meetings.  *Id.*  He also testified that after the meetings, he

was asked to take Rogovin to dinner while the trial lawyers were preparing for the next trial day.

He added that, "I was also asked to keep him away during lunches on off days, try to keep him

away as much as possible." *Id.* at 110.

Beres testified that Rogovin was present for "some" of the trial preparation and that "he commented on lots of things during the trial prep." ECF No. 166-9 at 40.  In his affidavit, however, Beres stated that "Rogovin was excluded from discussions at various times and that he repeatedly expressed his feelings that, while his views may have been solicited, he was not being listened to and his views were being ignored by the [McCarter] lawyers." ECF No. 180-49 ¶ 26.

Beres also testified that at the end of each trial day, the team would go back to one large conference room and all sit around the table, and then go around the table and ask each person what they thought of what happened in the courtroom that day.  Rogovin was there frequently, "[t]he majority of the time", but Beres didn't know if he was there "every single time." ECF No. 166-9 at 47-49.

3.        *The Decisions Regarding Damages Testimony and an Alternative Damages Calculation*

Another witness McCarter chose not to call was the damages expert it had retained. ECF No. 179 at 13 ¶ 45.  Earlier, McCarter had moved for summary judgment on grounds that there was no credible damages evidence on which a reasonable jury could rely to render a plaintiff's verdict. ECF No. 179 at 14 ¶ 47 (internal quotation marks omitted); ECF No. 86 at 208.  After that motion was denied, McCarter "filed and the court granted Jarrow's motion to compel ordering supplementation by Caudill Seed of its response to Request for Production No. 22, and related damages documentation." ECF No. 179 at 14 ¶ 48 (internal quotation marks omitted). McCarter also filed a motion in limine to exclude the testimony of Caudill's damages expert, William Wingate, which the court denied. ECF No. 179 at 14-15 ¶ 51; ECF No. 86 at 209.

Rechen cross-examined Wingate at trial.  During the PJR hearing, Rogovin admitted having said that "[Rechen's] trial work deserves to be a made-for-TV movie.  He became courthouse buzz with law interns coming in to watch him operate without anesthesia[.]"  ECF

No. 86 at 71.  After testifying that Rechen's cross-examination was "very well done," Rogovin

added, "I shouldn't say that was very well done.  Well, aspects of it were tremendously well

done.  The fact that we – [McCarter] didn't have a counter economic expert." *Id.*  After

Wingate's examination, McCarter moved to strike Wingate's testimony; the court denied the

motion. ECF No. 179 at 15 ¶ 54; ECF No. 86 at 209.  Beres testified that everyone on the trial

team concluded that there was no evidence that was introduced to support a finding of

misappropriation of trade secrets and that calling Jarrow's own damages expert could give

credence to Caudill's liability case. ECF No. 166-9 at 13, 18.

4.    *Payment for Legal Services Rendered in the Kentucky Litigation*

Over the course of the Kentucky Litigation, "[s]eventy-five invoices were rendered by

McCarter to Jarrow", seventy of which Jarrow paid. ECF No. 179 at 4 ¶¶ 9, 11; ECF No. 166-12.

The remaining five invoices, totaling $1,980,397.94 "have not been paid and Jarrow refuses to

pay them." ECF No. 179 at 5 ¶ 13; ECF No. 166-12.  McCarter also billed Jarrow $346,495.44

in disbursements related to the Kentucky Litigation. ECF No. 38 ¶ 22.  An additional $57,227.43

has been billed by McCarter to Jarrow for legal fees and costs incurred in matters unrelated to

the Kentucky Litigation and Jarrow refuses to pay them. ECF No. 179 at 5 ¶ 14; ECF No. 166-14

at 8.

## IV.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.*

*Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In

reviewing the summary judgment record, a court must "construe the facts in the light most

favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## V.     DISCUSSION

### A.     McCarter's Claim for Breach of Contract (Count One)

McCarter asserts that it is entitled to summary judgment for breach of contract because the "contractual relationship with Jarrow was at least implied-in-fact if not express based on" the 1996 Engagement Letter. ECF No. 162 at 16.  I find that the undisputed facts in the record show that, although the 1996 Engagement Letter does not constitute an express contract for representation in the Kentucky Litigation, it is part of a twenty-three-year course of dealing that makes clear that Jarrow contracted with McCarter for representation in the Kentucky Litigation.

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.*" Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014) (citations omitted).  Express contracts are distinguishable from implied in fact contracts "merely in the mode of manifesting assent." *Janusauskas v. Fichman*, 826 A.2d 1066, 1072 (Conn. 2003) (citation and quotation marks omitted).  "If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one.  But if such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter

16

and of the surrounding circumstances, then the contract is an implied one." *Boland v. Catalano*, 521 A.2d 142, 144 (Conn. 1987) (citations and quotation marks omitted).

1.      *The 1996 Engagement Letter*

Although I find that the 1996 Engagement Letter is evidence of Jarrow's and Giarratana's course of dealing in a relationship that began in 1996 and lasted over twenty-three years, it is not an express contract for representation in the Kentucky Litigation, or, at best for McCarter, there are genuine disputes of material fact on that issue. The 1996 Engagement Letter states that the engagement is for "legal representation" in the "currently pending" "intellectual property litigation" involving International Nutrition Co. and Jarrow, a matter long since concluded and about which there is no evidence of a connection to the Kentucky Litigation. Further, the 1996 Engagement Letter states that it is between Jarrow and *MPH*. Specifically, the letter sets out the terms of Jarrow's retention of *MPH* and indicates that although Kentoffio and Giarratana would primarily handle the matter, "[o]ther partners may likewise assist in this matter." ECF No. 38-1 at 2-3. It also states that if Jarrow fails to pay in full, *MPH* "may withdraw as counsel of record" and if new counsel is substituted, *MPH* will be paid. *Id* at 2. On the basis of those terms, a reasonable juror could conclude that the agreement was between MPH and Jarrow, rather than McCarter and Jarrow, and that the agreement was limited to that single matter. For these reasons, I cannot conclude, as a matter of law, that the 1996 Engagement Letter was an express agreement for legal services in the Kentucky Litigation.

2.      *Agreement Concerning the Kentucky Litigation*

I agree with McCarter, however, that the parties, through their course of dealing, verbal expressions, and manifestations of assent, entered into a contract for legal representation in the Kentucky Litigation. "[P]rior course of dealings between the parties [can] determine the parties'

contractual intent." *See New Moon Shipping Co., Ltd. V. MAN B & W Diesel AG*, 121 F.3d 24, 30-31 (2d Cir. 1997) citing Restatement (Second) of Contracts § 223 (1979) ("(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.  (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement."); *see also Shelton Yacht & Cabana Club, Inc. v. Suto*, 188 A.2d 493, 497 (Conn. 1963) (where one party "knew of the work being done by [the other,] accepted all of the benefits" and "received bills for the work and paid them," the court approved of trial court's conclusion that "there were verbal negotiations amounting to an oral contract and a course of dealing resulting in an implied contract…..") (citations omitted).

It is undisputed that Giarratana had a long history of representing Jarrow, including in hundreds of matters during his tenure at McCarter, and that, throughout the relationship, Jarrow had been billed as described in the 1996 Engagement Letter – on a monthly basis, at hourly rates, and for expenses incurred by the firm during that month. ECF No. 38-1 at 2-3; ECF No. 38 ¶ 5. Giarratana notified Jarrow in 2003 that he would be moving to McCarter, and there is no dispute that he handled many of Jarrow's matters out of McCarter's Hartford office. ECF No. 175-42 at 2; ECF No. 38 ¶ 5.

It is also undisputed that Jarrow expressly requested that McCarter represent Jarrow in the Kentucky Litigation, that McCarter provided legal services in the Kentucky Litigation, and that Jarrow received seventy-five invoices and paid seventy of them for that work. ECF No. 179 ¶¶ 8, 9, 11; ECF No. 166-12.  Jarrow has not offered any evidence to suggest that the parties ever entered into written agreements, other than the 1996 Engagement Letter, and so the manner in which the parties entered into the agreement concerning the Kentucky Litigation was consistent

with the unbroken, twenty-three year course of dealing between Giarratana and Jarrow, sixteen years of which occurred while Giarratana was a partner at McCarter.  Nor has Jarrow offered any evidence that McCarter regularly advised Jarrow of the hourly rates it would charge prior to commencing representation.  It is also undisputed that Giarratana's rate and that of other attorneys assigned to work on Jarrow's matters increased since Giarratana's relationship with Jarrow began in 1996, when he charged $200 per hour. ECF No. 38-1 at 3.  The undisputed evidence in the record makes clear that the agreement for the Kentucky Litigation was consistent with the parties' longstanding course of dealing.

I need not decide whether these undisputed facts constitute an express verbal contract for legal representation – because of Rogovin's specific request and McCarter's sending of written invoices, *Janasauskas*, 826 A.2d at 1073 (an express contract arises out of "[a]n express manifestation of mutual assent"), or an implied in fact contract, *id.* (an implied in fact contract "arises where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services.").  Under either theory, the parties agreed that McCarter would represent Jarrow in the Kentucky Litigation and Jarrow would pay for those services.  *See Cohen v. Minicozzi*, No. NNH-CV-156052856, 2016 WL 5798900, at *1 (Conn. Sup. Ct. Sept. 2, 2016) (finding that "the parties were in fact operating under a contractual agreement, whether express or implied-in-fact because … both [were] experienced lawyers … [and] the parties each understood that [the attorney providing representation] would need to be paid for his time at the end of the presentation.").

It is true that, whether an agreement is express or implied in fact, it must be "definite and certain as to its terms and requirements". *See Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 942-43

(Conn. 2005) (citations omitted).  Here, the undisputed evidence in the record shows that the parties' course of dealing, which includes the 1996 Engagement Letter, as well as the initial invoice for the Kentucky Litigation received and paid by Jarrow, supply the essential terms of the agreement.  In the 1996 Engagement Letter, Jarrow agreed that Giarratana and the lawyers working with him would provide legal services, would charge for those services on an hourly basis at then-applicable rates, and would send bills monthly that would include charges for the expenses incurred. ECF No. 38-1 at 2-3.  Jarrow has failed to point specifically to any evidence rebutting Giarratana's testimony that those terms continued to apply to every engagement over the twenty-three-year relationship, in more than 400 matters at McCarter alone, including in the Kentucky Litigation. ECF No. 69 at 19.[2]

　　　　Nor has Jarrow pointed to any evidence rebutting the evidence in the record showing that, *at a minimum*, Jarrow agreed to pay McCarter for the Kentucky Litigation at the hourly rates shown on the first invoice and, consistent with the parties' longstanding course of conduct, for expenses incurred by McCarter during the representation.  Jarrow began to pay for legal services

---

[2] The evidence that Jarrow cites does not contradict Giarratana's testimony that, at each firm at which he represented Jarrow, including McCarter, Jarrow was billed monthly on an hourly basis, at then-prevailing rates, and for expenses incurred, all as described in the 1996 Engagement Letter.  Even Rogovin's testimony that "[t]here was no fee arrangement," ECF No. 180-42 at 20, does not rebut the evidence that Jarrow received monthly invoices, was billed on the basis of hours worked at then-prevailing rates, and agreed to reimburse McCarter's expenses, for two reasons. First, it is too conclusory to raise a genuine dispute about the evidence of the parties' longstanding course of conduct.  Second, it is irrelevant to the extent it reflects Rogovin's subjective view about whether there was a contract, a view belied by his own conduct, including his signing and "okaying" each invoice before Jarrow paid it. ECF No. 116-13 at 2-3, ECF No. 175-30 at 3-5; *see* Williston on Contracts, §. 4.1 ("It is customarily said that mutual assent is essential to the formation of informal contracts, but it must be noted that the mutual assent must be manifested by one party to the other, and except as so manifested, is unimportant.  In some branches of the law, most notably in the criminal law, a person's subjective or secret intent is important.  In the formation of contracts, however, it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." (footnotes omitted)). Construed in the light most favorable to Jarrow, Rogovin's testimony, together with other evidence in the record discussed below concerning McCarter's fee increase during the Kentucky Litigation, suggests only that Rogovin did not agree to the rates McCarter charged for the Kentucky Litigation after the initial invoice.  Even Jarrow concedes that the rates in the initial invoice were "consistent with the rates for the Ashurst Litigation and other matters at that time." ECF No. 179 Statement of Additional Facts ¶ 19.

relating to the Kentucky Litigation in February of 2013. ECF No. 180-11 at 2-4.  An invoice

dated February 22, 2013 for "Professional Services Recorded Through 1/31/2013" describes the

legal services provided by McCarter as, in part, discussing the "federal complaint, the relevant

evidence, and the strategy for proceeding"—all work done in connection with the Kentucky

Litigation. *Id.* at 3.  At that time, McCarter submitted an invoice to Jarrow for the following

hourly rates:

| | | |
|---|---|---|
| Giarratana | - $405.00 per hour (partner) | |
| Grondahl | - $395.00 per hour (partner) | |
| Smith | - $285.00 per hour (associate) | |
| Robinson | - $245.00 per hour (associate) | |
| Gaffey | - $195.00 per hour (paralegal) | |

*Id.* at 4.  Jarrow paid this invoice and concedes that these rates were "consistent with the rates for

the Ashurst Litigation and other matters at that time." ECF No. 179 Statement of Additional

Facts ¶ 19; ECF No. 179 at 4 ¶¶ 10-11.  On this record, no reasonable juror could find that

Jarrow did not manifest its assent to an agreement that McCarter represent it in the Kentucky

Litigation for at least the hourly rates set forth in the February 22, 2013 invoice.  *See* note 2,

*supra*.  Whether Jarrow further agreed to pay McCarter at the later-increased rates for the

Kentucky Litigation is a matter I address below under the subheading "damages."

    Jarrow argues that McCarter cannot pursue an implied contract claim "under Count One

where [McCarter] has alleged an implied contract separately in Count Three but has not moved

for summary judgment on that count." ECF No. 178 at 20.  Count One of McCarter's Complaint

alleges breach of contract and Count Three alleges unjust enrichment/quantum meruit.  But this

does not prevent McCarter from seeking summary judgment for breach of an implied in fact

contract under Count One, because an implied in fact contract is distinct from unjust

enrichment/quantum meruit, which is sometimes called an implied in law contract. *See Vertex,*

*Inc. v. Waterbury*, 898 A.2d 178, 190 (Conn. 2006) ("An implied in fact contract is the same as

an express contract, except that assent is not expressed in words, but is implied from the conduct

of the parties.…  On the other hand, an implied in law contract is not a contract, but an obligation

which the law creates out of the circumstances present, even though a party did not assume the

obligation.  It is based on equitable principles to operate whenever justice requires compensation

to be made.") (citations, internal quotation marks, and alterations omitted); *see also id.* at 191

("[Q]uantum meruit is an equitable theory of recovery that does not depend upon the existence of

a contract, either express or implied in fact." (internal quotation marks omitted)); *see also Gagne

v. Vaccaro,* 766 A.2d 416, 423 (Conn. 2001) ("[Q]uantum meruit arises out of the need to avoid

unjust enrichment to a party, even in the absence of an actual agreement.") (citation omitted).

Jarrow's argument misses the distinction between an implied in fact and an implied in law

contract. *See* ECF No. 178 at 20-21.

Jarrow also argues that the "highly sophisticated attorneys" of McCarter, by failing to

enter into a written agreement with Jarrow for the Kentucky Litigation, "chose to conduct their

business in a manner which flouted … the ethical standards governing attorney-client

engagements and rate increases." ECF No. 178 at 6.  But the Connecticut Rules of Professional

Conduct do not require "that a fee agreement be in writing when an attorney is charging a

regularly represented client." *Caciopoli v. Howell*, 5 A.3d 509, 512 (Conn. App. 2010) ("The

plain language of Rule 1.5 of the Rules of Professional Conduct allows for an exception to the

requirement that a fee agreement be in writing when an attorney is charging a regularly

represented client.").  The commentary to the rule explains:  "When the lawyer has regularly

represented a client, the lawyer and the client ordinarily will have evolved an understanding

concerning the basis or rate of the fee and the expenses for which the client will be responsible."

Conn. R. Prof. Conduct 1.5, Commentary.  There is no dispute that Jarrow was a regularly represented client, and that, therefore, McCarter did not violate Rule 1.5(b) by not obtaining a signed written fee agreement from Jarrow, although it likely would have spared itself a great deal of time and expense had it done so.  In any event,  a violation of the Rules of Professional Conduct would not … "void[] [Jarrow's] obligation to pay legal fees to [] [P]laintiff." *See Rucci v. Stuart*, No. FST-CV-09-5012543-S, 2016 WL 5108046, at *20-21 (Conn. Sp. Ct. Aug. 12, 2016) (agreeing with *Ankerman v. Mancuso*, 830 A.2d 388, 391 (Conn. App. 2003), *aff'd by* 860 A.2d 244, 249 (Conn. 2004) (concluding that a violation of the Rules of Professional Conduct was not "legally sufficient to preclude the enforcement" of a note and mortgage on a property)); *see also Gagne*, 766 A.2d at 424-25 ("Violation of a Rule [of Professional Conduct] should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached…. [The Rules] are not designed to be a basis for civil liability." (quoting Conn. R. Prof. Conduct, Scope)).

In short, Jarrow has failed to raise a genuine dispute of material fact about the existence of a contract for legal representation in the Kentucky Litigation.  Nor has it raised a genuine dispute of material fact about its own breach of that contract; indeed, Jarrow admits that it has refused to pay five invoices totaling $1,980,397.94 related to the Kentucky Litigation.  ECF No. 179 at 5 ¶ 13.

I do not reach the same conclusion, however, with respect to McCarter's claim that Jarrow breached an agreement "for legal fees and costs incurred in matters *unrelated* to the Kentucky Litigation." *Id.* at 5 ¶ 14 (emphasis added).  McCarter has not offered enough evidence regarding these other matters to support its assertion that an express or an implied in fact contract exists for legal services not related to the Kentucky Litigation.  Instead, McCarter lumps the

obligations together and relies exclusively on the conduct surrounding the Kentucky Litigation to support its argument that Jarrow's failure to pay for these unrelated matters constitutes a breach of contract.  Although the parties' course of dealing strongly suggests that any work McCarter undertook for Jarrow would, by agreement of the parties, be billed and paid for on the basis of McCarter's hourly rates, there is simply not enough evidence in the record regarding these other matters for the Court to reach a conclusion about the terms of the work governing them.  In the absence of such evidence, summary judgment is not appropriate.  I therefore deny McCarter's motion for summary judgment as to the additional amount billed for matters unrelated to the Kentucky Litigation, $57,227.43.

*3.      Damages*

Having concluded that Jarrow breached its contractual obligations to compensate McCarter for the legal services provided in the Kentucky Litigation, I must determine damages. The award of damages should put McCarter in the same position it would have been in but for the breach. *See Russell v. Russell*, 882 A.2d 98, 114 (Conn. App. 2005) ("It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed.…") (citation and quotation marks omitted).  McCarter asserts that it is entitled to receive payment in full of the five unpaid invoices, amounting to $1,633,902.5 in hourly fees and $346,495.44 in disbursements for a total of $1,980,397.94. ECF No. 38 ¶ 22.[3]  Jarrow, on the other hand, raises several arguments that call into question whether McCarter is entitled to that amount.  The arguments sound in fraud, negligent and intentional misrepresentation, and breach of fiduciary

---

[3] The parties agree that the outstanding invoices are #8239257, #8244495, #8251339, #8254947, and #8264196. *See* ECF No. 38 ¶ 22.
.

duty, and are raised in Jarrow's counterclaims, but they all arise out of Jarrow's underlying allegation that McCarter improperly increased its hourly rates.

I have already found, as a matter of law, that the parties had a contract concerning the Kentucky Litigation under which Jarrow would pay at least the rates set forth in the February 22, 2013 invoice, which are set forth above.  But soon after the February 22, 2013 invoice, McCarter increased its hourly rates for the Kentucky Litigation. ECF No. 180-11 at 6.  For example, an invoice dated July 11, 2013 lists the hourly rate for Giarratana as $535.00 (an increase of $130.00 per hour above the rate shown in the February 22, 2013 invoice), and the hourly rate for Grondahl as $485.00 (an increase of $90.00 per hour). ECF No. 180-11 at 19-31.  When the record is construed in the light most favorable to Jarrow, it appears that the first time these higher rates were mentioned was in an email exchange between Giarratana and Liberty, in which Liberty approved the higher rates. ECF No. 180-8 at 2.  But no one from Jarrow was copied on those emails and Rogovin claims that he had no notice of the rates conveyed to Liberty until after this litigation began. ECF No. 180-38 at 3. ECF No. 180-11 at 19, 31.  Jarrow asserts that, after Liberty approved the rates but then denied coverage, McCarter unilaterally imposed the rates on Jarrow without notice.

McCarter's account of the rate increase diverges from Jarrow's.  McCarter asserts that Giarratana told Rogovin that the rates in the Kentucky Litigation would be higher, ECF No. 175-4 at 7-8, and that Jarrow had notice of the rates because they were listed on the invoices that Rogovin approved and paid without complaint. ECF No. 162 at 38; ECF No. 179 at 19-20 ¶ 70. McCarter asserts that it needed to re-bill invoices at the higher rates simply to correct an error. According to Giarratana, the first invoices were issued at an incorrect rate, and once the mistake was realized, the invoices were corrected and billed at the rate that the parties had agreed to—the

higher rates. ECF No. 175-4 at 9.  Jarrow never disputed the rates over the six years that Jarrow

paid the invoices for McCarter's representation, until Rogovin fired McCarter in 2019 and

refused to pay the last five of the seventy-five invoices that McCarter issued. ECF No. 162 at 7;

ECF No. 179 at 19-20 ¶ 70.

      McCarter argues that the negotiations regarding discounts were just that – negotiations in

which Jarrow would ask for a discount but McCarter had no obligation to agree. ECF No. 179 at

20 ¶ 71.  McCarter asserts that when Jarrow requested an additional ten percent discount on the

eve of trial in 2019, Giarratana made a mistake when he looked at the financial report. ECF No.

177 at 12 ¶¶ 26, 27.  He told Jarrow it was already receiving a 38% discount because he relied on

Bosma's "word", an understandable mistake, according to Bosma, because the pertinent

document listed 38% as the profit margin. ECF No. 83 at 74; ECF No. 175-24 at 12-13.  In

reality, Jarrow was receiving only a 25% discount. ECF No. 175-24 at 15.  Nevertheless,

McCarter offered an additional five percent discount as an incentive for Jarrow to make payment

on past due invoices. *Id.* at 15-16.

      Jarrow paints a different picture.  According to Jarrow, McCarter misled Liberty to

convince it to approve higher billing rates and then imposed those higher rates on Jarrow when

Liberty denied coverage. ECF No. 164-1 at 10.  McCarter altered and rebilled invoices to charge

Jarrow the higher rates that Liberty had approved. ECF No. 178 at 8; ECF No. 180-10 at 5 ¶ 11.

McCarter's conduct increased the total billings over the life of the case by nearly $1.2 million.

ECF No. 178 at 9-10.  In addition, McCarter made false representations on an annual basis to

convince Jarrow to bring its account current. ECF No. 178 at 12.  McCarter would tell Jarrow

that it was receiving a special discount approved by a committee—all falsehoods to obtain

payment. ECF No. 180-17 at 2; ECF No. 83 at 74.  Giarratana falsely told Jarrow that it was

receiving a 38% discount and that with an additional 5% it would be receiving a 43% discount—another falsehood to obtain payment.

McCarter's alleged failure to provide advance notice of the higher rates, by itself, does not preclude McCarter from receiving those higher rates for the services rendered.  First, although the "attorney-client relationship imposes a fiduciary duty on the attorney", *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 717 A.2d 724, 730 (Conn. 1998), it does not prevent attorneys and clients from entering into agreements, so long as they are entered into fairly. *DiFrancesco v. Goldman*, 16 A.2d 828, 831 (Conn. 1940) ("[W]here the parties are free to contract, their agreement should not be set aside or the agreed compensation withheld unless fraud has been perpetrated, undue influence exerted, material facts affecting the subject matter misrepresented or suppressed, or advantage taken of a position of confidence and trust to obtain an unconscionable advantage over the party.").  Any agreement that is reached between an attorney and the client during an existing attorney-client relationship, however, is "scrutinize[d] … with great care and if there are doubts, they will be resolved in favor of the client." *Weinstein v. Stuart*, No. CV020816030, 2006 WL 3041976, at *2 (Conn. Sup. Ct. Oct. 12, 2006) citing *DiFrancesco,* 16 A.2d at 830-31.

Second, as discussed above, although Rule 1.5(b) of the Connecticut Rules of Professional Conduct requires attorneys to communicate rate increases in writing before billing at higher rates, a failure to comply with the rule does not preclude parties from reaching an agreement for higher rates, nor does it relieve a contracting party of its payment obligation if such an agreement is reached.[4] *See Rucci*, 2016 WL 5108046, at *17 (concluding that the client

---

[4] Rule 1.5(b) provides in relevant part: "Any changes in the basis or rate of the fee or expenses shall also be communicated to the client in writing before the fees or expenses to be billed at higher rates are actually incurred."

waived right to assert a violation of Rule 1.5(b) for raising rates because it had discovered the rate increase, was fully aware of the increase, reached a compromise regarding the terms, and benefited from that compromise.); *see also Gagne*, 766 A.2d at 424-25 ("Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached.").

I nonetheless conclude that there are genuine disputes of material fact about whether Jarrow agreed to pay the higher rates at which McCarter began to bill shortly after the commencement of the Kentucky Litigation.  When the record is construed in the light most favorable to Jarrow and through the lens of the parties' fiduciary relationship, with "doubts … resolved in favor of the client," *Weinstein,* 2006 WL 3041976, at *2, it shows that McCarter failed to disclose to Jarrow that it had sought to have higher rates approved by the insurer and then, when the insurer refused to pay, unilaterally imposed those higher rates on Jarrow.  Further, although Rogovin signed and "okayed" and Jarrow paid many invoices at those higher rates, the parties' annual dance around discounts (ECF No. 177 at 11 (referring to "year-end discounts that M&E provided to Jarrow")), and the inaccurate representations McCarter made about discounts (e.g., that Jarrow was receiving a 38% discount that was then increased to a 43% discount), makes it difficult to pinpoint exactly what any agreement on rates – above and beyond those reflected in the February 22, 2013 invoice – actually was.  If the agreed-upon rates were higher than those February 22, 2013 rates, were they the higher rates McCarter asserts, or were they instead some discount off those rates – 43%, 38%, 30%, 25%, or 10% are all mentioned in the record at various times as being the actual or represented discounts in the Kentucky Litigation? *See, e.g.,* ECF No. 177 at 10-13 (in 2013, Jarrow negotiated ten percent discount off invoices and then paid them; in 2019, Jarrow was receiving a 25% discount and then a 30% discount but was

28

told that it was receiving a 38% discount and then a 43% discount). There is evidence in the record that Jarrow asked for a discount each year and would not pay its bills until McCarter granted one (*see id.; see also* ECF No. 69 at 141-42); so should the discounts – represented or actual – be factored into the agreed-upon rate? These are questions only a jury can decide because there is conflicting evidence on each side.

Therefore, summary judgment as to the breach of contract claim related to the Kentucky Litigation is appropriate only as to lower rates reflected in the February 22, 2013 invoice. At a minimum, that would entitle McCarter to damages in the amount of $633,956.00 (Giarratana 811.8 hours at $405/hour + Grondahl 772.6 hours at $395/hour). Giarratana and Grondahl are the only two timekeepers whose hourly rates are listed on both the February 22, 2013 invoice and the five unpaid invoices. It is unclear, and the parties have not briefed, how to establish the hourly rate for the timekeepers who were not listed on the first invoice but are listed on the unpaid invoices because they were added to the litigation later at varying hourly rates. For example, Rechen appears on all of the outstanding invoices at a rate of $520 per hour, but does not appear on the February 2013 invoice. Therefore, I will not award fees for those rates at this time.

McCarter is also entitled to the disbursements in the amount of $346,495.44 because the course of dealing between the parties makes clear that the parties' agreement, as reflected in hundreds of matters stretching back to the 1996 Engagement Letter, contemplated that Jarrow would reimburse McCarter for expenses it incurred. Therefore, I award damages to McCarter on

summary judgment of $980,451.44.  Whether it is entitled to more will be a question for the jury.[5]

## B.    Breach of Fiduciary Duty (Counterclaim Three)

Jarrow has alleged that McCarter breached its fiduciary duty to Jarrow by "overbilling and other improper billing practices, including its failures to properly communicate with Jarrow concerning matters of importance and its failures to honestly and fully disclose matters relating to billing."  ECF No. 184 at 32, Count Three ¶ 136.  The parties have filed cross motions for summary judgment on the breach of fiduciary duty claim. ECF No. 162 at 37; ECF No. 164-1 at 29.

As discussed, the parties' attorney-client relationship imposed on McCarter special duties related to any fee increase or other changes in the terms of their agreement.  For the same reasons that there is a genuine dispute as to whether there was an agreement to pay for legal services at the increased rates, there is a genuine dispute as to whether McCarter complied with its fiduciary duties in imposing unannounced higher rates on its client and making misstatements about the discounts it was affording that client.   As noted, only a jury can resolve those disputes and, therefore, summary judgment is not appropriate.

McCarter also asserts that it is entitled to summary judgment on Jarrow's counterclaim for breach of fiduciary duty because all of the allegations regarding billing in 2013 are barred by the three-year statute of limitations in Conn. Gen. Stat. § 52-577.[6] ECF No. 162 at 38.  Jarrow

---

[5] I also do not foreclose the possibility that McCarter could be entitled to less.  Jarrow has asserted a setoff defense in its Answer, ECF No. 184 at 7, although the parties have not briefed the effect of that defense on McCarter's breach of contract claim.  If Jarrow can prove that it never agreed to pay rates higher than those reflected in the February 22, 2013 invoice, it may be that, through a set-off or other defense, Jarrow will be entitled to some refund. All this remains to be seen at trial.

[6] Connecticut General Statute § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complaint of."

argues that the statute of limitations was tolled by the continuous course of conduct doctrine because McCarter owed a continuing duty to Jarrow and engaged in tortious conduct that violated its duty. ECF No. 178 at 37-38.

"The continuing course of conduct doctrine often is implicated when a fiduciary relationship exists between the parties." *Tunick v. Tunick*, 242 A.3d 1011, 1028 (Conn. App. 2020) (collecting cases).  It "may toll the statute of limitations" when there is "evidence of a breach of a duty that remained in existence after commission of the original wrong related thereto.  That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." *Nardi v. AA Electronic Sec. Eng., Inc.*, 628 A.2d 991, 994-95 (Conn. App. 1993) (citation and quotation marks omitted).  "The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Martinelli v. Fusi*, 963 A.2d 640, 644 (Conn. 2009) (citation and quotation marks omitted).  The determination that any of the elements of the continuing course of conduct doctrine exists is "conspicuously fact-bound." *Blanchette v. Barrett*, 640 A.2d 74, 85 (Conn. 1994) *overruled on other grounds by Grey v. Stamford Health System, Inc.*, 924 A.2d 831, 839 (Conn. 2007).

There is no dispute that McCarter and Jarrow had a special relationship that gave rise to a fiduciary duty, that the relationship regarding the Kentucky Litigation continued until the jury trial concluded in 2019, the same year in which McCarter filed this lawsuit, and that Jarrow asserted its Counterclaim for breach of fiduciary duty a year later, in 2020. ECF No. 184.  There is a dispute between the parties, however, as to *when* Jarrow became aware of the McCarter's rate increase.  Rogovin testified that he was unaware of the communications with Liberty in 2013 in which Liberty agreed to pay rates higher than those in the first invoice McCarter sent to

Jarrow. ECF No. 180-38 at 3.  Rogovin also denies that Giarratana discussed the rate increases

with him.  ECF No. 180-42 at 10-11, 18.  McCarter asserts Rogovin must have known about, and

approved of, the higher rates because he received invoices clearly listing the higher hourly rates.

ECF No. 69 at 36.  When asked whether he reviewed, initialed, and approved the bills by putting

his "initials on the front page", "without any idea what the fee arrangement was[]", Rogovin

responded, "Yes." ECF No. 180-42 at 21-22.  Rogovin testified that he did not review the bills

that McCarter sent monthly, but that instead he "looked at the total amount of money, often

sighed, and signed." *Id.* at 3.

If a jury were to credit Jarrow's account that it was unaware of the increase until this

litigation began in 2019, it could find that a continuous course of conduct tolled the statute of

limitations.  If, on the other hand, a jury were to credit McCarter's account that Jarrow was

aware of the rate increase, it could find that the statute of limitations had not been tolled.

Summary judgment, therefore, is inappropriate on the statute of limitations ground because there

is a dispute as to whether Jarrow knew of the alleged breach.

### C.    Negligent and Intentional Misrepresentation (Counterclaims Five and Six)

Jarrow alleges in its Counterclaim that McCarter "made numerous misrepresentations of

material facts relating to its representation of Jarrow, including matters relating to billing rates,

billings, and discounts." ECF No. 184 at 34 Count Five ¶ 135, Count Six ¶ 135.

"[A]n action for negligent misrepresentation requires the plaintiff  to establish (1) that the

defendant made a misrepresentation of fact (2) that the defendant knew or should have known

was false, and (3) that the plaintiff  reasonably relied on the misrepresentation, and (4) suffered

pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 213 (Conn. 2006)

(citation omitted).  "The essential elements of an action in common law fraud … are that: (1) a

false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury.... Under a fraud claim of this type, the party to whom the false representation was made claims to have relied on that representation and to have suffered harm as a result of the reliance." *Sturm v. Harb Dev., LLC*, 2 A.3d 859, 872 (Conn. 2010) (citation and quotation marks omitted).

Here, under either theory of liability, genuine disputes of material fact exist as to the circumstances surrounding McCarter's representations concerning the billing rates, billings, and discounts. As noted, for example, McCarter contends that Giarratana's statements concerning discounts of 38% and 43% were understandable mistakes, while Jarrow contends they were knowing falsehoods on which Jarrow relied in making payment. Again, summary judgment is inappropriate as only a finder of fact can resolve these disputes.

### D.  CUTPA (Counterclaim Seven)

Count Seven of Jarrow's Counterclaim alleges that McCarter violated Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 et seq. ("CUTPA"), by failing to provide written retainer agreements, failing to provide written notices of hourly rate increases, billing excessive amounts, and misrepresenting billing rates, among other allegations related to McCarter's alleged billing practices. ECF No. 184 at 35 Count Seven ¶ 155.

McCarter claims it is entitled to summary judgment on Jarrow's CUTPA counterclaim because the allegations include "matters arising out of the non-entrepreneurial and professional aspects of legal practice, which are not actionable under CUTPA, as well as acts and events that occurred before October 4, 2016, and therefore are time-barred under CUTPA's three-year statute of limitations." ECF No. 162 at 41.

1.      *Entrepreneurial and Professional Aspects of Legal Practice*

"CUTPA prohibits unfair methods of competition and unfair or deceptive acts or

practices in the conduct of trade or commerce." *Metcalf v. Fitzgerald*, 214 A.3d 361, 379 (Conn.

2019).

> It is well settled that in determining whether a practice violates CUTPA we have adopted
> the criteria set out in the cigarette rule by the federal trade commission for determining
> whether a practice is unfair: (1) [w]hether the practice, without necessarily having been
> previously considered unlawful, offends public policy as it has been established by
> statutes, the common law, or otherwise—in other words, it is within at least the penumbra
> of some common law, statutory or other established concepts of unfairness; (2) whether it
> is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial
> injury to consumers. ... All three criteria do not need to be satisfied to support a finding of
> unfairness. A practice may be unfair because of the degree to which it meets one of the
> criteria or because to a lesser extent it meets all three.

*Ramirez v. Health Net of the Northeast, Inc.*, 938 A.2d 576, 589 (Conn. 2008).   "[T]he

entrepreneurial aspects of the practice of law … remain well within the scope of CUTPA."

*Updike, Kelly & Spellacy, P.C. v. Beckett*, 850 A.2d 145, 173 (Conn. 2004). In *Updike*, the

Connecticut Supreme Court concluded that "the conduct of a law firm in obtaining business and

negotiating fee contracts" falls within the "entrepreneurial aspects of the practice of law." *Id.*

The Connecticut Appellate Court has stated that "a challenge to the content of a [fee] agreement

and the firm's billing practices" "arguably fall[s] under the entrepreneurial aspect of practicing

law." *Anderson v. Schoenhorn*, 874 A.2d 798, 804 (Conn. App. 2005).

There is a genuine dispute of material fact as to whether McCarter's conduct regarding

billing practices constitutes an unfair or deceptive trade practice for the same reasons that there

are genuine disputes of material fact regarding the claims for breach of fiduciary duty, negligent

misrepresentation, and fraud.  Only a jury can decide whether McCarter's billing practices,

including its representations about discounts, were unfair or deceptive within the meaning of

CUTPA.  Consequently, summary judgment is not appropriate.

2.      *Statute of Limitations*

McCarter also invokes CUTPA's statute of limitations in support of its argument for

summary judgment as to this claim.  That statute of limitations is three years and is "triggered

upon the occurrence of the alleged violation, not the discovery of the alleged practice." *See*

Conn. Gen. Stat. § 42-110g(f); *Izzarelli v. R.J. Reynolds Tobacco. Co.*, 117 F. Supp. 2d 167, 177

(D. Conn. 2000) citing *Fichera v. Mine Hill Corp.*, 541 A.2d 472 (Conn. 1988).

> Nonetheless, when the wrong sued upon consists of a continuing course of conduct, the
> statute does not begin to run until that course of conduct is completed ... In order to
> support a finding of continuing course of conduct that may toll the statute of limitations
> there must be evidence of the breach of a duty that remained in existence after
> commission of the original wrong related thereto. That duty must not have terminated
> prior to commencement of the period allowed for bringing an action for such wrong ...
> Where our Supreme Court has upheld a finding that a duty continued to exist after the
> cessation of the act or omission relied upon, there has been evidence of either a special
> relationship between the parties giving rise to such a continuing duty or some later
> wrongful conduct of a defendant related to the prior act ...

*Szynkowicz v. Bonauito-O'Hara*, 154 A.3d 61, 71 (Conn. App. 2017) (finding no special

relationship or timely subsequent wrong to toll CUTPA statute of limitations).

McCarter asserts that the three-year statute of limitations for CUTPA cannot be tolled by

the continuing course of conduct doctrine. ECF No. 175 at 30.  McCarter relies on the

Connecticut Appellate Court's decision in *Flannery v. Singer Asset Finance Co.*, LLC, 17 A.3d

509, 514-15 (Conn. App. 2011) *aff'd*, 94 A.3d 553 (Conn. 2014), which states that, "as to the

plaintiff's CUTPA claim, our Supreme Court has stated that the continuing course of conduct

doctrine does not toll the three year statute of limitations set forth in [Section] 42-110g(f)." *Id.*

(citing *Fichera*, 541 A.2d 472).  I find McCarter's reliance on *Flannery* misplaced for two

reasons.  First, the above-quoted statement was *dicta* because the Appellate Court found that the

plaintiff in *Flannery* "did not invoke [the continuing course of conduct] doctrine either in his

complaint or in his pleading in avoidance." 17 A.3d at 513.  Second, with due respect to the

35

Appellate Court,[7] I disagree with its apparent conclusion that the Connecticut Supreme Court has

held that the continuing course of conduct doctrine cannot toll the CUTPA statute of limitations.

In *Fichera*, the Connecticut Supreme Court held that the CUTPA statute of limitations set forth

in Section 42-110g(f), which provides that a CUTPA claim "may not be brought more than three

years after the occurrence of a violation of" CUTPA, should be construed in the same manner as

Connecticut's general tort statute of limitations, Conn. Gen. Stat. § 52-577, which "precludes any

construction [of the statute] delaying the start of the limitation period until the cause of action

has accrued or the injury has occurred." *Id.* at 476.  Thus, "[u]nlike the statutes of limitation of

some other states applicable to unfair trade practices legislation analogous to our CUTPA,"

CUTPA does not allow a "period following the discovery of the deceptive practice for

commencing suit." *Id.* at 475.  But while *Fichera* found no basis for tolling the CUTPA statute

of limitations based on a failure to discover the existence of the cause of action, it did not

foreclose tolling of the statute of limitations based on a continuing course of conduct.  To the

contrary, before reaching the statutory analysis quoted above, the *Fichera* court analyzed

whether the facts in that case supported the application of the continuing course of conduct

doctrine.  Specifically, the court noted that "[w]here we have upheld a finding that a duty

continued to exist after the cessation of the 'act or omission' relied upon, there has been evidence

of either a special relationship between the parties giving rise to such a continuing duty or some

later wrongful conduct of a defendant related to the prior act," *id.* at 474, and ultimately

---

[7] Federal courts "are bound … to apply [state] law as interpreted by [a state's] intermediate appellate courts … unless [they] find persuasive evidence that the [state's highest court], which has not ruled on this issue, would reach a different conclusion."  *Pahuta v. Massey-Ferguson, Inc.*, 170 F3d 125, 134 (2d Cir. 1999).  Here, I find that there is such "persuasive evidence" for the reasons identified in the text – principally, that the Connecticut Supreme Court's decision in *Fichera* does not stand for the proposition for which it was cited by the Appellate Court in *Flannery*.

concluded that neither factual predicate was present.  *Id.* at 475 (noting that "[t]he plaintiffs do not claim any relationship with the defendants that would create a duty continuing after the purchase of the lots …" and that the only subsequent acts at issue were not wrongful).  Such a discussion would have been superfluous if the court had found that the CUTPA statute of limitations foreclosed continuous course of conduct tolling.[8]

As already discussed, there is a genuine dispute of material fact as to whether the continuous course of conduct doctrine applies and thus as to whether the statute of limitations for Jarrow's CUTPA counterclaim was tolled.  Therefore, I deny McCarter's motion for summary judgment as to the CUTPA claim on the statute of limitations ground.

**E.      Legal Malpractice (Counterclaim Four)**

Jarrow claims that McCarter committed legal malpractice by failing to call Rogovin to testify, failing to consult with Jarrow, failing to address damages issues, and failing to offer evidence that Jarrow did not act willfully or maliciously. ECF No. 91 at 33 ¶ 136.  Jarrow has submitted expert testimony that raises a genuine dispute of material fact as to whether these trial strategy decisions by McCarter caused Jarrow to suffer a jury verdict against it with a higher damages award than it would have suffered in the absence of McCarter's alleged negligence.  Jarrow has failed to offer any evidence, however, from which a reasonable juror could infer that McCarter failed to consult with Jarrow adequately or that any such failure caused Jarrow any injury.

---

[8] In addition, in a decision postdating *Flannery*, the Appellate Court applied the continuing course of conduct doctrine to assess a tolling argument with respect to the CUTPA statute of limitations. *Szynkowicz*, , 154 A.3d at 71 (finding no special relationship or other basis for tolling).  Again, this would have been unnecessary if the *Flannery* court's statement that "the continuing course of conduct doctrine does not toll the three[-]year statute of limitations set forth in [Section] 42-110g(f)" was correct.

Under Connecticut law, malpractice is defined as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." *Bozelko v. Papastavros*, 147 A.3d 1023, 1028 (Conn. 2016) (citation, alteration, and quotation marks omitted). Generally, the party asserting a claim for attorney malpractice must establish the following elements: "(1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." *Grimm v. Fox*, 33 A.3d 205, 211 (Conn. 2012) (citation and quotation marks omitted).

"The essential element of causation has two components. The first component, causation in fact, requires [a] determin[ation as to] whether the injury would have occurred but for the [attorney's] conduct.  The second component, proximate causation, requires [the court] to determine whether the [attorney's] conduct is a substantial factor in bringing about the plaintiff's injuries. That is, there must be an unbroken sequence of events that tied the [claimant's] injuries to the [attorney's] conduct.  This causal connection must be based on more than conjecture and surmise." *Stuart* v. *Freiberg*, 116 A.3d 1195, 1210 (Conn. 2015)." (citations, alterations, and quotation marks omitted).

"[A]lthough there will be exceptions in obvious cases," expert testimony generally is required to establish both the standard of care and causation in legal malpractice cases. *Bozelko*, 147 A.3d at 1029.  In legal malpractice claims arising from prior litigation, an expert establishes causation by presenting evidence of what would have happened in the underlying action if the attorney had not been negligent—often referred to as the "case-within-a-case." *Id.* at 1029. "More specifically, the [claimant] must prove that, in the absence of the alleged breach of duty

by [the] attorney, the [claimant] would have prevailed in the underlying cause of action and would have been entitled to judgment.… To meet this burden, the plaintiff must produce evidence explaining the legal significance of the attorney's failure and the impact this had on the underlying action." *Id.* (citation, alterations, and quotation marks omitted).

McCarter first argues that it is entitled to summary judgment because Jarrow's experts have failed to opine that "any one" act by McCarter constituted malpractice or caused the adverse jury verdict but have, instead, opined that "everything has to be taken in the totality." ECF No. 162 at 18-19. McCarter asserts that attorney "errors [must be] analyzed individually to determine whether each error falls short of the requisite standard of care." *Id.* at 19 (internal quotation marks omitted). McCarter cites two New York cases in support of its position. *Id.* Those cases, of course, are not binding on me, because, as McCarter points out, the "parties have consistently assumed Connecticut law controls in this litigation." ECF No. 186 at 10 n. 9; ECF No. 183 at 11.

I have not found, nor has McCarter pointed to, any decisions by Connecticut courts holding that multiple acts cannot be considered collectively to determine whether the defendant has committed malpractice. It is at least plausible that the Connecticut Supreme Court, if faced with the issue, would conclude that multiple acts of a lawyer in handling a trial, when taken together, constituted negligence even though no individual act, standing alone, departed from the standard of care. *Travelers Ins. Co. v. 633 Third Assoc.*, 14 F.3d 114, 119 (2d Cir. 1994) (In diversity cases, "[w]here the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity.") (citation omitted). While there appears to be a dearth of case law on point in Connecticut, Connecticut courts have, in the admittedly different context of

tolling of the statute of limitations in medical malpractice cases, referred to a distinction between "single act" malpractice and "course of treatment" malpractice. *Giambozi v. Peters*, 16 A2.d 833, 835 (Conn. 1940) ("The term malpractice itself may be applied to a single act of a physician or surgeon or, again, to a course of treatment."), *overruled in part on other grounds*, *Foran v. Carangelo*, 216 A.2d 638 (Conn. 1966); *see also Zielinski v. Kotsoris*, 901 A.2d 1207, 1214 (Conn. 2006) ("[U]nder the continuous treatment doctrine [a tolling doctrine], the term malpractice itself may be applied to a single act of a physician or surgeon or, again, to a course of treatment."). And the Connecticut Appellate Court has noted that "[t]here is a marked resemblance between the continuous treatment of a patient's condition by a physician and the continuous representation of a client by an attorney." *Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 795 A.2d 572, 580 (Conn. App. 2002) (citation omitted) (adopting continuous representation tolling doctrine in legal malpractice cases). To be sure, the issue at hand does not relate to the tolling of the statute limitations (an issue addressed elsewhere in this opinion); but the manner in which these cases discuss ongoing professional relationships between doctor and patient and between lawyer and client suggest that the Connecticut Supreme Court would likely not adopt the "single act" rule that McCarter urges and would, instead, consider McCarter's handling of the trial as a whole. *Giambozi*, 16 A.2d 835 ("When … the injurious consequences *arise from a course of treatment*, the statute does not begin to run until the treatment is terminated." (emphasis added)); *Rosenfield*, 795 A.2d at 580 (noting that "during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied") (internal quotation marks and alteration omitted). Such a holistic approach seems particularly apt here, where the alleged trial strategy errors by McCarter are related to each other. For example, the failure to call Rogovin as a live

witness was deemed, by one of Jarrow's experts, to be part of McCarter's alleged negligence in handling the damages case and the issue of whether Jarrow had acted willfully and maliciously. *See, e.g.,* ECF No. 180-61 at 10 ("I think calling Mr. Rogovin would have likely had a positive impact on the willful and malicious finding, especially, which is what will be the cause of, looks like, additional damages."); *id.* at 11 ("I think it's likely to have had no willful and malicious finding [had Rogovin been called as a live witness]").  It is not difficult to imagine that a series of missteps in a trial might cross the line between reasonably competent trial advocacy and malpractice even though any one of those missteps, standing alone, would not.  Thus, at least on this record, I cannot find, as a matter of law, that any failure by Jarrow's experts to opine that a single act deviated from the standard of care and caused the adverse verdict is fatal to the malpractice claim.

McCarter also argues that the causation element requires Jarrow to establish that it would have won a defendant's verdict in the Kentucky Litigation, not just that the jury would have rendered a lower damages award in the absence of the alleged malpractice.  In *Bozelko*, the Connecticut Supreme Court stated that "the plaintiff must prove that, in the absence of the alleged breach of duty by her attorney, the plaintiff would have *prevailed in the underlying cause of action and would have been entitled to judgment*." *Bozelko*, 147 A.3d at 1029 (internal quotation marks omitted; emphasis added).  While that language does support McCarter's position, it was not part of the holding in *Bozelko*, which did not address the issue of whether a legal malpractice plaintiff must prove that she would have won a total victory in the absence of the asserted malpractice.  The claim of malpractice in *Bozelko* arose from an underlying criminal case, *id.* at 1025-26, and there was thus no need for the court to consider the question of whether an allegation that an underlying civil trial would have resulted in lower damages against a

malpractice plaintiff absent its attorney's negligence was sufficient to state a claim for malpractice.

Further, other language in *Bozelko* is suggestive of a broader approach. The court described malpractice as involving "injury, loss, or damage" from services rendered. *Bozelko*, 147 A.3d at 1028. And rather than specifying a particular outcome, the court described the plaintiff's task in proving how the attorney's negligence caused "*injury*" as establishing "*what would have happened* in the underlying litigation" in the absence of the alleged breach. *Id.* (quoting *Margolin v. Klevan & Samor, P.C.*, 882 A.2d 653, 661 n. 9 (Conn. 2005); emphasis added). *Bozelko* also cites the Mallen & Smith treatise on legal malpractice, which likewise suggests that a plaintiff need not go so far as to demonstrate that the deviation from the standard of care reversed the outcome: "The traditional means of resolving what should have happened is to recreate the underlying case. When analyzing for causation-in-fact, then, the client must prove that but for the lawyer's error, there should have been *a better result*." R. Mallen & J. Smith, 4 Legal Malpractice § 33:7 (2021 ed.) (emphasis added); *see Bozelko*, 147 A.3d at 1029.

In other contexts, the Connecticut Supreme Court has suggested that economic injury from the failure to obtain a *better* result may be sufficient for a legal malpractice claim and has not limited malpractice to an all or nothing proposition. For example, in *Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, the court refused to adopt a rule that would bar a client who enters into a settlement agreement from recovering against her attorney for malpractice if "the settlement agreement was the product of the attorney's negligence." 646 A.2d 195, 201 (Conn. 1994). And although the plaintiff had already gained something from the divorce settlement negotiated by her lawyer, the court affirmed the jury's malpractice award of $1,500,000 for the attorney's failure to properly value the marital estate. *Id.* at 203. To establish causation, then, I

42

conclude that Jarrow need establish only that it would have achieved a better result – not necessarily that it would have won a defendant's verdict – in the absence of the alleged malpractice.

At the summary judgment phase, Jarrow has introduced sufficient expert testimony to create a genuine dispute of material fact under this standard.  Jarrow's expert, Gray, testified that "calling [] Rogovin would have likely had a positive impact on the willful and malicious finding … which is what [was] the cause of … additional damages." ECF No. 180-61 at 10.  When asked, "And there would have been no willful and malicious finding had he been called?", Gray responded, "I think it's likely to have had no willful and malicious finding." ECF No. 180-61 at 11.  When asked how the jury verdict would have been different, Gray responded, "I think it would have been lower." *Id.* at 12.  Gray also testified that McCarter failed to elicit testimony from Kean Ashurst showing that Jarrow had not acted in a willful or malicious manner. *Id.* at 31. While some of this testimony was conclusory, Gray testified in more detail about how McCarter's failure to call its damages expert at the trial affected the jury's damages calculation. She said that, because Caudill's expert, Wingate, pointed out areas of agreement between himself and McCarter's expert, McCarter's failure to call that expert as a witness left "the jury … with no alternative but to believe that Jarrow's expert endorsed [] Wingate.  They would also reach that conclusion because Jarrow never provided any kind of counterpart." ECF No. 180-61 at 17; *see also id.* at 11 ("And had the jury had some kind of alternative to what the un-rebutted damages expert called by Caudill, I think it would likely have been different, yes.").  While the portions of Gray's testimony to which Jarrow points do not offer detailed descriptions of the

standard of care or causation, I find that they are sufficient to create a genuine dispute of fact as to both issues.[9]

Jarrow has failed to raise a genuine dispute of material fact, however, with regard to its claim that McCarter failed adequately to communicate with its client. ECF No. 186 at 13. It is undisputed that Jarrow's General Counsel, Leventhal, sat at counsel's table every day during the trial in the Kentucky Litigation. ECF No. 179 at 11 ¶ 39. In addition, both Leventhal and Rogovin attending daily-post trial briefing meetings, where the issues arising during the trial were discussed. ECF No. 179 at 12-13 ¶¶ 42, 43; ECF No. 180-50 at 111-12 (Leventhal testified that he attended "probably all" of the post-trial briefings and that Rogovin attended "a number of them" and "was not bashful at all about making known his opinions" on the issues). Rogovin also communicated via email with McCarter's attorneys. ECF No. 166-20 at 2. Further, Rechen's lengthy email to Rogovin about whether Rogovin should testify contains a detailed summary of that issue and about Jarrow's prospects at the trial. ECF No. 166-16.

To be sure, Rogovin and others at Jarrow may not have agreed with McCarter's calls on trial strategy and may have felt, at times, that their views were not being taken seriously. ECF No. 179 at 11 ¶ 36. But decisions on trial strategy are ultimately up to lawyers, not their clients, *see State v. Davis*, 506 A.2d 86, 89 (1986) ("[D]ecisions concerning matters of trial strategy and tactics rest with the lawyer…."), and disagreeing with one's client on a matter of trial strategy is distinct from failing to consult and does not, in any event, deviate from any standard of care. *Cf. Malone v. Secretary, Florida Dept. of Corrections*, No. 8:06-cv-720-T-27MAP, 2009 WL 2579216, at *10 (Aug. 20, 2009 M.D. Fla.) ("Disagreements by a defendant with counsel's

---

[9] As I noted in my ruling on McCarter's motion in limine, however, it remains to be seen whether Gray's opinions will be admissible at trial. ECF No. 173.

tactics or strategies will not support a claim of ineffective assistance of counsel.").  In short, on this record, it is hard to see how any reasonable juror could conclude that McCarter failed to consult with its client.

And Jarrow points to no evidence that would create a triable issue as to its failure to consult claim.  Although it cites Gray's testimony, her testimony on this point (or at least so much of it that Jarrow points to in compliance with Local Rule 56)[10] was entirely conclusory. Gray's testimony does not explain her conclusion that McCarter failed to consult with Jarrow or point to any facts showing how McCarter's level of communication with its client deviated from any relevant standard of care or that more or different communication would have resulted in a better result for Jarrow in the Kentucky Litigation. *See* ECF No. 180-61 at 6, 7, 9, 12-13 ("It's all part of a failure to consult, a failure to communicate with the client." "I mean, that was all part and parcel of this failure to consult.  I don't know what else to tell you." "[B]ut for involving [] Rogovin and communicating with [] Rogovin" the jury verdict would have been different. "That was part of his not being consulted and involved in the trial.").  Jarrow does not point to any opinion by Gray, for example, that McCarter had to ensure that Rogovin attended every post-trial meeting or that McCarter had to show more interest in or deference to Rogovin's views about

---

[10] "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement … and each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial…. The 'specific citation' obligation of this Local Rule requires parties to cite to specific paragraphs when citing to affidavits … and to cite to specific pages when citing to deposition or other transcripts or documents longer than a single page in length." D. Conn. L. R. 56(a)3.  Jarrow largely ignores this rule when citing the expert opinions it has introduced into the record.  The only material expert opinions Jarrow specifically cites in compliance with the rule are Gray's opinions referenced in a footnote in Jarrow's opposition brief.  ECF No. 178 at 29 n.8.  On other occasions, Jarrow simply refers the Court to its experts reports as a whole – which does not comply with the rule.  *Id.* at 25-26.  I am not required to consider such blanket references to evidence in adjudicating a summary judgment motion. *See New York State Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005).

how the case should be tried.[11]  Gray herself offers no explanation for her conclusory assertions

about "this failure to consult," and those assertions appear to be divorced from the ample

evidence of McCarter's frequent communications with Jarrow during the trial.  Her opinion on

this issue is thus not admissible evidence that can be used to resist summary judgment. *General*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules

of Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the ipse dixit of the expert.").  Gray has not demonstrated how McCarter's

communications with Jarrow were unreasonable (standard of care) or how Jarrow would have

suffered less injury but for McCarter's failure to communicate more or differently (causation).

*See Miller v. Barber*, No. 455605, 2005 WL 1633996, at \*6 (Conn. Sup. Ct. May 20, 2005)

(granting directed verdict on legal malpractice action in part because the plaintiff failed to

produce evidence as to how the attorney's alleged failure to communicate and consult "would

have altered the result of [plaintiff's] appeal" in the underlying case.).  Accordingly, I grant

summary judgment to McCarter as to the "failure to consult" portion of Jarrow's malpractice

counterclaim.

## VI.    CONCLUSION

For the reasons set forth above, I hereby GRANT in part and DENY in part McCarter's

motion for summary judgment and DENY Jarrow's motion for summary judgment.  I grant

McCarter's motion for summary judgment on breach of contract as to liability and as to damages

---

[11] At one point in her deposition, Gray suggests that Rogovin's non-attendance at a deposition of another witness amounted to "his not being consulted and involved in the trial," ECF No. 180-61 at 12-13, but she does not explain why this is so.  Later, she suggests that, had Rogovin "been permitted to attend the deposition … I think likely the *deposition* would have turned out differently." *Id.* at 14 (emphasis added).  Of course, it does not matter whether the deposition would have turned out differently; the issue is whether Rogovin's absence from the deposition affected the jury's verdict, and Jarrow points to no evidence that it did.

in part, and on legal malpractice as to the failure to consult claim.  I deny summary judgment as
to all other issues.


IT IS SO ORDERED.


                                                                      _____/s/_____
                                                                      Michael P. Shea, U.S.D.J.

Dated:              Hartford, Connecticut
                    March 22, 2021