UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP                No. 3:19-CV-1124 (MPS)

vs.                                    JULY 6, 2023

JARROW FORMULAS, INC.                  JURY TRIAL

- - - - - - - - - - - - - - - - x

EXCERPT FROM THE TESTIMONY OF MARK GIARATANNA

450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
             One State Street, 14th Floor
             Hartford, Connecticut 06103
        BY:  LOUIS R. PEPE, ESQUIRE
             JAMES G. GREEN, JR., ESQUIRE
             JAMES A. BUDINETZ, ESQUIRE
             DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

        BARTON LLP
             100 Wilshire Boulevard, Suite 1300
             Santa Monica, California 90401
        BY:  BERNARD M. RESSER, ESQUIRE

        BARTON LLP
             711 Third Avenue, 14th Floor
             New York, New York 10017
        BY:  JAMES E. HEAVEY, ESQUIRE
        BY:  MICHAEL C. WARD, ESQUIRE

(Excerpt from the direct examination of Mark Giaratanna:)

                    *    *    *    *    *

Q   (By Mr. Pepe) Exhibit 113, sir, is calling your attention to -- that is a December 29, 2013, e-mail from Mr. Rogovin to Mr. Rechen and to you and to Mr. Grondahl.  Do you see that?

A   Yes.

Q   And he states in the subject is:  "Letter from Liberty's Duane Morris counsel re:  non-coverage."  What was that referring to?

A   That's referring to the letter that was received from Liberty International's outside attorneys, Duane Morris, denying coverage.

Q   He states, quote, "It appears to be a dead issue."

It goes down further.  Instead -- and the next paragraph says, "This is basically what the matter is and certainly I do not see a court seeing it any other way," period, end quote.

Is that e-mail the -- reflect the decision you testified Mr. Rogovin made about not pursuing this further?

A   Yes.

Q   And did you follow his instructions and drop it?

A   We did.

Q   Those five invoices we just looked at, you testified earlier you said to Mr. Rogovin, as the client, "If the insurance company ultimately doesn't pay, you're responsible

Q for this." Was that --

A That's correct.

Q Did I hear your testimony correct?

A Yes.

Q Did JFI pay those five invoices?

A Yes.

Q At what rate?

A The rates on the invoices.

Q 535 an hour for you?

A Yes.

Q And 485 for Mr. Grondahl?

A Yes.

Q Any objection?

A No.

Q Any challenge?

A No.

Q You testified it was your policy for clients like Jarrow Rogovin in litigation matters that go typically several years to hold the partner rates constant. Do you remember that?

A Yes.

Q Not change them during the course of the litigation.

A Yes.

Q That applied, I think you said, just to partners; right?

A Yes.

Q Not associates.

A   Yes.

Q   Did you follow that policy with respect to the Kentucky -- did you follow with respect to the state court action against Ashurst?

A   We did.

Q   And what were the rates then as you recollect?  You said, I think, it was 410 an hour for you.

A   Mine was 405.  The rates basically went back to 2009 or so, but we maintained those in the state court case until it terminated.

Q   Once these new rates were set in the Kentucky Federal Court litigation -- and I'm going to use the shorthand to say 535 per hour for you.

A   Yes.

Q   Please understand I mean the higher rate for Mr. Grondahl also.

A   Yes.

Q   Okay?  Once the new rates, higher rates, were set with Liberty and Mr. Rogovin at the same time --

A   Yes.

Q   -- did you hold those new rates constant for the Kentucky federal litigation?

A   Yes, throughout the entire litigation, until --

Q   Six years.

A   We did.

Q   Again, because of your policy?

A   Yes.

Q   During that time, 2013 to 2019, did your standard rate, as you described that term, fixed every October 1 I think you said, usually every October 1; correct?

A   Yes.

Q   During that time of early 2013 through June of 2019, did your hourly billing rate, standard hourly billing rate, at McCarter & English increase?

A   It did.

          MR. RESSER:  Objection.

          THE COURT:  Grounds?

          MR. RESSER:  Sidebar.

          THE COURT:  No, I'm going to overrule the objection. He answered yes.  That's fine.  I'm going to overrule it.

Q   (By Mr. Pepe) Did the hourly standard billing rate for Mr. Grondahl change over that time period?

A   Yes.

          MR. RESSER:  Objection.

          THE COURT:  One second.  There's an objection.  All right.  I'll see you at sidebar real quickly.

     (At sidebar off the record.)

          THE COURT:  Give us a sec, Ladies and Gentlemen. Hopefully we'll get this resolved quickly.

     (Pause.)

THE COURT: Tell you what, Mr. Pepe, why don't we pursue a different line or the next line. We'll come back to this in five minutes. I assume whatever is being searched for can be found by then. So let's skip that particular question and come back to it, Mr. Pepe.

MR. PEPE: Sure. I understand, Your Honor.

Q   (By Mr. Pepe) When you testified that Jarrow Formulas, Inc. paid those five statements, did it pay full face value, or did it pay with a discount?

A   It paid with a discount.

Q   Why?

A   My understanding -- well, every year at our fiscal year-end we would offer Jarrow Formulas a discount to pay its invoices that it otherwise would not pay by that date. If they would pay them by that date, we would offer them a discount. So it was a mutual benefit. We would receive the invoices by September 30th. They would receive a discount by paying them by September 30th.

As time evolved, Jarrow Formulas would sometimes let the bills pile up a bit. So instead of not paying just -- so the discount would include not just time for September and August but also time for July and June.

THE COURT: Let's get another question, Mr. Pepe.

Q   (By Mr. Pepe) Okay. And how did those discounts -- how was that discount determined?

A    So we would offer a discount in exchange for payment by the 30th.  And Jarrow Formulas would come back and ask for a larger discount.

Q    Were you personally involved in those discount negotiations?

A    The negotiations, no, no.

Q    Was Jarrow Rogovin personally involved in those discount negotiations?

A    No.

Q    Who then was doing this and why?

A    The two persons conducting the negotiations were Cathy Adipietro on McCarter & English's side.  She was our accounts receivable specialist, meaning her job was to collect invoices.  And on Jarrow Formulas' side it was a woman named Mary Grace Reyes, and she was an accounts payable clerk.  And the two of them would be the persons to communicate with one another in connection with this negotiation every fiscal year-end.

Q    Would Cathy Adipietro keep you advised?

A    She would.

Q    Okay.  And so did you know generally what was going on in those negotiations even though you were not personally involved?

A    Yes.

Q    Okay.  And was there some times -- question withdrawn.

       Is there a structure -- was there then, in 2011, 2012,

'13, '14, and is there now, a structure at the law firm of McCarter & English that regulates, that controls, that monitors the discount of outstanding bills?

A    Yes.

Q    What is that structure?

A    We have, as a general rule, if we're providing a discounted rate, if we're charging standard rates for that year, the partner is entitled to discount up to 10 percent without seeking approval.  If we're charging less than standard rates, we're supposed to get approval before we do so.

Q    Again, are you using the term "standard rate" the way you described it earlier?

A    I am.

Q    The rate that gets fixed every October 1 for each --

A    Yes.

Q    Okay.  And did sometimes, in these negotiations, of which you were kept advised, Jarrow Rogovin seek more of a discount than you were in a position to give?

A    Yes.

Q    And what would you do in that situation?

A    Uh, we would typically -- first of all, we had a committee, the Finance Committee.  It was generally a group of partners that were responsible for communicating with the partners that were obligated to collect outstanding invoices by fiscal year-end.  And so I was in regular communication with my

representative on the Finance Committee every September.

They would say, Mark, where do we stand on collections?  How's it look?  Are you going to collect the Jarrow money?

I would let them know where we were.  We would communicate on that.

Q   And how would that relate, if at all, to what was going on between Cathy Adipietro and Mary -- on the McCarter side, and Mary Grace Reyes on the Jarrow Formulas side?

A   So the two of them would sort of posture and negotiate.  Cathy would typically indicate, "I don't know.  Mark will go ask the Finance Committee.  We'll see if we can get it.  I'm not sure they're going to do it," that kind of thing.

Mary Grace would posture and say, you know, um, "If you," uh -- as one example, "If you, um, give us bigger discounts, Ben," meaning Ben Khowong, the CEO, "might think a little faster about paying you."

THE COURT:  Let me stop you for a second, Mr. Pepe.

Mr. Resser, have you found or not found whatever --

MR. RESSER:  Yes, Your Honor.

THE COURT:  Can you just confer with Mr. Pepe and let him know the situation?  I want Mr. Resser to confer with you so you can discuss what we were discussing at sidebar.

MR. PEPE:  Mr. Resser advises me the objection is withdrawn.

THE COURT:  Is that right, Mr. Resser?

MR. RESSER:  Yes, Your Honor.

THE COURT:  All right.  So, Ladies and Gentlemen, we're going to go back.

If you want to go back to those items, you can.

MR. PEPE:  Perhaps may I finish this line of questioning and then go back?

THE COURT:  Yes, you may, as you wish.

Q   (By Mr. Pepe) So -- and so when Cathy Adipietro, as you described it, said to Mary Grace Reyes, "Mark will go to the Executive Committee and see if he can get more," under some circumstances did you or did you not?  How did that work?

A   Well, we -- we -- we referred to the committee in part as a mechanism to avoid a direct conflict with Ben Khowong.  Ben was asking for a bigger discount than we were willing to give.  These were -- this was work that was done.  They owed the money.  From our perspective, they were not entitled to any discount.  I didn't want to be in a position of me saying, "No, Ben, I reject your request."

So what we would say was, "The Finance Committee won't let us do it," which was true.  The firm didn't want to offer a penny more than what we were willing to agree to.

Q   And so what would Mr. -- Ms. Adipietro, under this situation you just described, what would she say to Mary Grace Reyes?

A    She would convey that message to Mary Grace.

Q    And in some cases you had not gone back to the Executive Committee?

A    No, because it would have been pointless.  I knew I was beyond where I could be already.

Q    Now, if I may go back to the testimony you were giving before I asked you about discounts --

A    Yes.

Q    -- and holding, holding the rate standard -- excuse me -- the rates constant.  Do you remember that?

A    Yes.

Q    So your testimony is once those higher rates, 535 per hour for you, higher rate for Mr. Grondahl, higher than was being paid, once those were fixed, you said you held them constant for the six years of the litigation.

A    We did.

Q    As was your policy.

A    Yes.

Q    You also testified that during those six years of litigation, the beginning of 2013 to June of 2019, your standard rate fixed every -- typically fixed every October 1 beginning the fiscal year went up.

A    Every year it went up.

Q    Same with Mr. Grondahl?

A    Yes.

Q   Same with Mr. Rechen.

A   Yes.

Q   Did you hold Mr. Rechen's rate constant also?

A   Yes.

Q   How about the associates, the Mr. Cordani and Mr. Robinson, the names we've seen?  Did you hold those constant or --

A   Uh, we didn't -- at one point I believe we held them constant, did not increase them.

Q   Now, I'm going to ask -- I'm going to ask you about the three partners.  Have you worked with me to -- question withdrawn.

Does the billing system in McCarter & English store billing rates and related information to bills over a period of time?

A   It does.

Q   And could you, working through your CFO, have access to that information?

A   Yes.

Q   And did you and your CFO work with me to access the information relating to your standard rates over the six years of the Kentucky federal litigation?

A   Yes, we did.

Q   And were you able to work with me to prepare a demonstrative that illustrates the difference between the standard rates and the fixed rate at the beginning of the

litigation over the course of those six years?

A    Yes.

Q    And would that demonstrative be helpful to you in explaining that difference?

A    It would be.

MR. PEPE:  I believe there's no objection now, Your Honor, so I'm going to ask Mr. Wyzik first to call up Mr. Giarratana's rates, which would be Demonstrative Exhibit No. 7.

THE COURT:  All right.  That's fine.  You may publish.

Q    (By Mr. Pepe) Tell us, Mr. Giarratana, what is shown there.

A    So this shows the difference between my -- the rate that I was charging Jarrow Formulas during the Kentucky litigation as opposed to my standard rate each year.

Q    All right.  What is shown on the Y axis, at the risk of stating the obvious, let's establish that.  What is shown on the Y axis?

A    The Y, or the vertical axis, shows the dollar value; and the X, or the horizontal axis, shows the timeline.

Q    All right.

A    Go ahead, Mr. Pepe.  I apologize.

Q    And what does the red line labeled "535" show?

A    So the red line shows the time period during which we maintained the rate for me for Jarrow Formulas fixed at 535.

Q    And what does that step line above it show?

A    The step line shows the difference between my fixed rate

that we had fixed for Jarrow Formulas and my standard rate during each respective year. So as we can see, the rate goes up each year, so it shows the difference each year between my standard rate and the rate that was being charged Jarrow Formulas.

Q So in 2019 is the correct reading of this graphic to say that, in the Kentucky litigation, you were billing Jarrow Formulas at $535 per hour for your time; is that correct?

A Yes.

Q But that you were billing other clients $650 per hour.

A Yes.

Q How about other Jarrow Formula matters, not the Kentucky litigation?

A I believe the Jarrow Formulas matters at that time we were also billing at 535.

Q The other Jarrow matters.

A Yes.

Q Now, if Mr. Wyzik could call up Demonstrative Exhibit 5, please.

What is shown -- obviously, that has the same format, the same appearance, as the one we just looked at. May we draw the same conclusion as to the information shown except it's for Mr. Grondahl?

A Yes.

Q And so -- and the red line shows the hourly rates you say

were agreed to by Liberty and by Jarrow, in this case for Mr. Grondahl, 485 an hour.

A    Yes.

Q    And does the step function, the step graph above that, show Mr. Grondahl's hourly increase?  I'm sorry.  Increase in his hourly rate at the start of each fiscal year?

A    It shows his standard rate during each time period indicated on that chart, and it shows how his standard rate increased from year to year and the amount.

Q    And, now, if Mr. Wyzik would call up Demonstrative Exhibit 6, please.  This one is labeled "Tom Rechen," but this looks different from yours and Mr. Grondahl's.  Am I reading it correctly?

A    Yes.

Q    And if I'm reading it correctly, I see Mr. Rechen's red line does not stay constant over six years.  It goes up.

A    Yes.

Q    Starts at 405 and goes up to 520.

A    Yes.

Q    What's happening there?

A    Our system had Tom Rechen in the case at his rate from, I think, 2008.  And it wasn't changed for Jarrow Formulas.

Q    Why not?

A    Go ahead.

Q    Why not?

A   Because our system had set the rate that way for him for Jarrow Formulas and not increased it year to year. And I didn't notice it.

Tom was not as heavily involved in the beginning of the case. It was primarily Eric Grondahl and me. He started to get much more heavily involved in 2016. At that point I noticed that his rate was very old, hugely discounted. And so we adjusted his rate to be in between Eric Grondahl and mine in 2016.

Q   When you raised it to $520 per hour, did you hold it then constant for the rest of the Kentucky federal litigation?

A   We did.

Q   You mentioned earlier, when you described your review of the draft bills every month, take them home and review them, you mentioned one of the modifications you would typically make is a write-off or a write-down.

A   Yes.

Q   Did I hear that correctly? And I think you related it to unfairness, associates spending too much time on an issue.

A   Yes. If I felt that, you know, an associate really missed the point, I didn't believe it was the client's obligation to pay for training, and so -- as a general matter. And so I would at times write down the associate time if I felt that it was unfair to the client.

Q   And did you do that with respect to the bills in the --

rendered to Jarrow Formulas in connection with the Kentucky Federal Court litigation?

A   Yes, I did.

Q   I don't mean every single bill.  But did you go through that write-down process for those bills?

A   Yes, every month.

Q   You described just a moment ago holding the hourly billing rate constant over the course of the litigation.  You have that in mind?

A   Yes.

Q   And then you described also the year-end discounts.

A   Yes.

Q   And the negotiation process that went on there.

A   Yes.

Q   Right?

And you just described the write-downs.

A   Yes.

Q   Does the computer system and the software -- question withdrawn.

Does McCarter & English have a computerized system for capturing the time spent by its lawyers and paralegals and others and using that to create the bills you've seen here?

A   It does.

Q   Was that computerized system in effect during the Kentucky federal litigation?

A    Yes, it was.

Q    What other information is captured in that computerized system at McCarter & English relating to billing?  For example, would it reflect standard rates and so on?

A    Yeah.  It's a database system.  So it reflects all of the basic information.  So it shows -- it reflects the timekeeper, the amount of time billed by that timekeeper, every entry.  It shows the hourly rate that the firm billed, actually billed the client for that timekeeper for that entry.  And it also shows the standard rate if different from the hourly rate actually billed from that timekeeper.  And, of course, this database is able to -- and this may be going beyond my expertise.

THE COURT:  I tell you what.  Let's get another question.

Q    (By Mr. Pepe) Are you able to access that database to extract information --

A    Yes.

Q    -- concerning billing?

And did you and your CFO do that with respect to the billings in this case?

A    Yes.

Q    And more particularly, with respect to the effect of the discounts you've described?

A    Yes.

Q    And did you and your CFO, working with me, were you able to

capture that information for the three categories of discounts you described just a moment ago that were applied in the billings in this case?

A   Yes.

Q   And have we prepared a demonstrative that summarizes that information and presents it in a way that would aid your testimony in -- with respect to the total effect of those discounts?

A   Yes.

Q   And would it be an aid to the jury in understanding that?

A   I believe so.

MR. PEPE:  I believe there's no longer an objection to this, Your Honor.

THE COURT:  Okay.

MR. PEPE:  I'd ask --

THE COURT:  He'd like to see it.

MR. PEPE:  Oh, I'm sorry.

THE COURT:  Go ahead.

You can bring it up.

MR. PEPE:  I'm sorry, Mr. Wyzik.  This is Demonstrative Exhibit No. 8.  8.

Q   (By Mr. Pepe) All right.  Referring to this demonstrative, Mr. Giarratana, would you explain to the jury what's shown there in -- first of all, quite obviously on the left-hand axis is each year involved here in the litigation; correct?

A    Yes.

Q    The Kentucky litigation.

Explain to the jury what else is shown and how it relates, if it does, to your testimony about these three categories of discounts.

A    Okay, so this shows the fee discounts that were granted to Jarrow Formulas by our firm.  There are three categories.  Each category is a respective column.  The first column is the discount based on the standard rate versus the rate that Jarrow Formulas was billed at.

Q    Now I'm going to interrupt you.  Would that relate to the three graphics you showed in holding the rate constant for you, Mr. Grondahl, and Mr. Rechen?

A    Yes.

Q    Okay.  Go ahead.  So --

A    This --

Q    Go ahead.  Explain that.

A    This summarizes -- you remember the graph had a horizontal line showing the rate fixed, and then it had a step curve about that showing how the rate increased every year.  This column summarzies that delta, that difference, between the rate that was billed and the standard rate every year.  And as time went on, that discount became bigger as the step curve moved up.

Q    And what was the total dollar value of -- to Jarrow Rogovin, Jarrow Formulas, as a result of holding those hourly

rates constant for the partners?

A That's shown at the bottom of the first column. It shows that the total discount there over the six years of the matter was $919,694.10.

Q In the second column it has the heading "Year-end Discounts for Payments," end quote.

A Yes.

Q What does that mean?

A As I mentioned previously, at every -- at every fiscal year-end, we would offer a discount for early payment so that we received the money by fiscal year-end, but also at times Jarrow Formulas would hold off on paying earlier bills. And so we would agree to a discount on whatever bills were outstanding every September 30th. And so this reflects the discount off the amount actually billed and paid on September 30th of each year.

Q And I notice a footnote on the last number in the second column, $26,768. Do you see that?

A Yes.

Q And the Footnote 4 says, "Discount provided in May of 2019," end quote. You said your fiscal year was September 30.

A Yeah, so I wasn't completely accurate. Would you like me to explain that? I was not completely accurate in my description. Shall I explain that?

Q One of them is not September 30.

A   That's right.

Q   I'll come back to that.  Okay?

A   Okay.

Q   And then the third column is headed, "Write-downs of Recorded Time."  Is that simply what you just described a moment ago --

A   Yes.

Q   -- about correcting the associate wasted time?

A   These are -- this is time written off the bill before the bill is sent out.  Typically the client does not see.  So if an associate spent 10 hours or 15 hours doing the wrong thing that we decided to write off, we didn't feel it was fair to bill, this reflects that kind of a write-off before the bill goes out the door.

Q   And the total of those three categories, or buckets of discounts, if you will, over the course of the Kentucky Federal Court litigation for Jarrow -- for Jarrow Formulas is how much?

A   Yeah, the total was $1,507,788.15.

Q   Now I'll come back to that footnote, if you will.  This says that that discount was provided in May of 2019.  Did there come a time, in the course of the Kentucky litigation, where a discount was sought and granted not at the end of the fiscal year?

A   Yes.

Q   And was that in May of 2019?

A    Yes.

Q    Tell us again when the trial started.

A    May of 2019.

Q    Explain how that came about; that is, why was there a discount in May instead of September, the end of September?

A    We were heading into trial, and our bills were piling up. Jarrow Formulas, I believe, owed us roughly $1.5 million at that point in time, and we were getting concerned.  And so we asked Jarrow Formulas to pay the invoice, or the outstanding invoices, because we were going to be heading into trial. There was going to be a tremendous amount of work and outstanding disbursements during trial, and we didn't want to dig too deep of a hole.  We wanted them to pay the outstanding invoices at that time.

Q    Okay.  Who -- again, how was it handled?  The same way with the people you described before?  Even though we're not in September, was it a Cathy Adipietro, Mary Grace Reyes situation again?

A    In part.

Q    In part.  Did this also -- okay.  Go ahead.

        THE COURT:  No.  Ask another question.

Q    (By Mr. Pepe) Tell us the "in part."

A    Okay, so Cathy Adipietro was doing her job of trying to collect receivables that should have been paid and communicating with her counterpart, Mary Grace Reyes of Jarrow

Formulas. And Mary Grace had said, "Well, can you discount these bills by 15 percent?" They owed 1.5 million. It was May. They asked for a 15-percent discount.

I saw that, and so I felt I would step in and respond. And I did.

Q Did you do so?

A Yes.

Q Okay. What did you do when you saw that request for 15 percent?

A Well, I was very concerned. They owed a lot of money.

THE COURT: Wait. The question was, What did you do? I don't need to know how concerned you were. What did you do?

THE WITNESS: Well, I called -- I called our controller or CFO slash controller, Jackie Bosma, that day. I wanted to find out what discount Jarrow Formulas was receiving already, because I wanted to explain to them that they were already receiving a substantial discount and that we weren't in a position to give them a further discount on these bills that had already been rendered.

Q (By Mr. Pepe) I want to interrupt you. I'm sorry.

A Yeah.

Q When you're using the term "discount," already getting a substantial discount, substantial discount for what? For the standard versus held frozen rates? year-end discounts? write-downs? When you use that term now, I want you to tell me

what it includes, if you can.

A   It was referring to the discount based on the difference between the rates that we were billing and the standard rates and also the write-downs that we were -- that we were giving them as we reviewed the bills every month.

Q   When -- did the system, the computerized system and its database you described a moment ago --

A   Yes.

Q   -- at McCarter & English, allow a knowledgeable person who knows the system to determine the answer to that question?

A   Yes.

Q   And did you -- did you discuss that with your controller/CFO Jackie Bosma I think you said?

A   Yeah, Jackie Bosma, our controller or CFO, she is such a knowledgeable person.  And I obtained the information I needed from her.

Q   And what did you do with that information?

A   I put it in an e-mail to Jarrow Formulas.

Q   And what -- were you able to advise Jarrow Formulas what the discount currently was from the categories you described?

A   I was.

Q   And what was that discount?

A   38 percent.

Q   To whom did you -- you said it went to Jarrow Formulas. Did it go to Jarrow Rogovin or someone else?

A   Uh, I was responding -- if I recall correctly, I was responding to an e-mail from Mary Grace Reyes asking for a 15-percent discount on behalf of Ben Khowong, who was their CEO.

MR. PEPE:  Your Honor, may I offer as a full exhibit PTX 120 to which there is no objection?

THE COURT:  Yes.  That will be full.  You can publish. 120 is full.

(Plaintiff's Exhibit 120, received in evidence.)

Q   (By Mr. Pepe) This is an e-mail string, Mr. Giarratana. You could see it.  At the top it ends on May 24.  But I'm going to start earlier in the e-mail string.  And I'm going to ask Mr. Wyzik to go to the third page that contains an e-mail from Mary Grace Reyes to Catherine Adipietro on May 13.

And I wonder if Mr. Wyzik could call up that.

Thank you so much.

Cathy Adipietro, on -- or excuse me.  Mary Grace Reyes writes Cathy Adipietro on May 13 and says, quote, One more request.  We have these old invoices of yours that we have not paid yet.  Can we get a discount if we have to pay the balance of the January and February invoices in full, question mark, end quote.

Did you get -- did Catherine Adipietro send you a copy of this?

                    *     *     *     *     *

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937