UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP            No. 3:19-CV-1124 (MPS)

vs.                               JULY 7, 2023

JARROW FORMULAS, INC.             JURY TRIAL

- - - - - - - - - - - - - - - - x


EXCERPTS FROM THE TESTIMONY OF MARK GIARATANNA


450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript
produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

          McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
                One State Street, 14th Floor
                Hartford, Connecticut 06103
          BY:  LOUIS R. PEPE, ESQUIRE
               JAMES G. GREEN, JR., ESQUIRE
               JAMES A. BUDINETZ, ESQUIRE
               DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

          BARTON LLP
                100 Wilshire Boulevard, Suite 1300
                Santa Monica, California 90401
          BY:  BERNARD M. RESSER, ESQUIRE

          BARTON LLP
                711 Third Avenue, 14th Floor
                New York, New York 10017
          BY:  JAMES E. HEAVEY, ESQUIRE
          BY:  MICHAEL C. WARD, ESQUIRE

3

(Excerpts from the testimony of Mark Giaratanna)

(Direct Examination and Cross-examination by Mr. Resser:)

\*   \*   \*   \*   \*

Q   And Jarrow Formulas paid McCarter & English at the higher rates on 70 bills and invoices from 2013 to 2019; correct?

A   When you say the "higher rates" --

Q   The higher rates that went up, the 535 for you and 485 for Mr. Grondahl.

A   Back in 2013.

Q   Right.

A   Yes, it did.  It paid 70 bills at that rate over the life of the litigation.  I believe 70.

Q   That change in your rate, from 405 to 535, was not communicated to Jarrow Formulas in writing before the fees were actually billed at the higher rate; correct?

A   Well, it was during the life of the litigation.  They received the bill 70 times.  It showed the rate on the bill. And then we proceeded to continue to work at that rate during the following month and the following month and the following month.  And every month during that period, it received a preceding bill that had the rate on it.

          MR. RESSER:  I move to strike that answer as nonresponsive.

          THE COURT:  Yeah, sir, I don't think you really

answered the question. Why don't you answer the question again or, if you would like, I'll read it back for you.

MR. RESSER: If you would, please.

THE COURT: So the question is, That change in your rate from 405 to 535 was not communicated to Jarrow Formulas in writing before the fees were actually billed at the higher rate; correct?

THE WITNESS: It wasn't communicated before the first bill, but it was before the next bills.

Q    (By Mr. Resser) And so what you claim is that you told Mr. Rogovin verbally in 2013 that M&E's hourly rate for the Caudill case was being increased; correct?

A    Yes.

Q    And you told the jury yesterday that you verbally advised Mr. Rogovin that you were increasing the billing rate for you and Mr. Grondahl. Do you have that subject in mind?

A    Yes.

Q    And you told the jury possible dates that happened; right?

A    Yes.

Q    And you said it was most likely either April 4 or April 19, 2013.

A    Yes.

Q    You gave a deposition in this case in 2020; correct?

A    Yes.

Q    And at that deposition, you weren't sure when you

supposedly told Mr. Rogovin your hourly billing rates were going up. Isn't that true?

A That's true.

Q And that was about three years ago you gave your deposition when you weren't sure what the dates were; correct?

A At that point in time I wasn't, that's correct.

Q But yesterday you were sure what the dates were; correct?

A Well, to the best of my recollection, having gone back and corroborated or looked at the materials and refreshed my recollection.

Q And one of the materials that you looked at to refresh your recollection was your bills, your time entries on your bills?

A Yes.

Q You told the jury yesterday that you noted your supposed call with Mr. Rogovin regarding increased hourly rates in your time entries for April 4 and April 19; correct?

A Could you -- I'm sorry. Could you read that again?

Q You told the jury yesterday that you noted your supposed call with Mr. Rogovin regarding increased hourly rates in your time entries for April 4 and April 19; correct?

A Yes.

MR. RESSER: I would like, Mr. Campos, to bring up PTX 15, which I believe is in evidence. If not, we offer it.

THE COURT: Any objection to 15?

MR. PEPE: No objection, Your Honor.

THE COURT: All right. Very well. That can be full, published.

(Plaintiff's Exhibit 15, received in evidence.)

Q (By Mr. Resser) Mr. Campos, if you can take us to the page on PTX 15 that shows the entry for 4/4/13. It's point 2 entry. It says, "Conference with Mr. Rogovin re: the status of the case, next steps, and the strategy for proceeding."

Do I have that right --

A You do.

Q -- Mr. Giarratana?

Is that the time entry that you refreshed your recollection from that tells you that you had a conversation with Mr. Rogovin about billing rates that day?

A That's right.

Q Let's take a look at the time entry on that same bill for April 19, 2013. It's a point 6 entry.

This entry says, "Conferences with Mr. Rogovin re: the motion to dismiss slash strike, Caudill's arguments, the likely rulings, the affirmative defenses available to JFI, the further action items to address in connection with such defenses, and the strategy for proceeding."

Did I have that right?

A That's right.

Q And this is the other time entry that refreshed your recollection that you had a conversation that day with Mr.

Rogovin about increasing your billing rates; is that correct?

A   That's correct.

Q   There's no mention in those time entries of a communication about billing rates, is there?

A   Yeah, I won't expect it to be there.  We don't bill for billing.

MR. RESSER:  I'll move to strike everything after the answer "yeah."

THE COURT:  Well, I'll allow it.  I got your point, Mr. Resser.  Keep going.

Q   (By Mr. Resser) It wouldn't have been hard to add the entry "And increased billing rates," would it?

A   It wouldn't have been hard, but I wouldn't have done it.

Q   You billed Jarrow Formulas for those conversations; correct?

A   I billed Jarrow Formulas for the conversations to the extent they related to the legal services.  To the extent we discussed billing, I did not bill Jarrow Formulas for that time, nor -- I would not do that.

Q   You also mentioned yesterday that March 21 may have been a date that you discussed increased hourly rates with Mr. Rogovin; correct?

A   I'm not sure I testified to that.  I know on March 21 I had a conversation with him and we discussed the insurance.  I'm not sure I said that was the date that we had the conversation.

I just -- I don't recall that specifically right now.

Q   Well, let's take a look at PTX 14, which is in evidence, I believe.  If not, we offer it.

THE COURT:  Any objection to 14?

MR. PEPE:  No objection, Your Honor.

THE COURT:  Okay.  That will be full.  It can be published.

(Plaintiff's Exhibit 14, received in evidence.)

Q   (By Mr. Resser) Let's take a look at the 3/21/13 entry on that bill.

This is the entry regarding your conference with Mr. Rogovin on that date; correct, sir?

A   It is.

Q   It says, "Conference with Mr. Rogovin re:  issues in case, counts in the amended complaint, deficiencies in the amended complaint, strategy for preparing motion to dismiss, and strategy for proceeding"; correct?

A   Yes.

Q   And you're saying that that doesn't remind you of a specific conversation you had with Mr. Rogovin about billing; correct?

A   I believe -- my recollection is that the conversation was more likely during one of the April phone calls rather than this phone call.  This day on the 21st was the date that I first received the letter from the insurance company.

Q    And you're still not sure of the exact date then; right?

A    I believe it was either the 14th or the 19th of April -- or the 4th or the 19th.  I apologize.  But it's fair.  I don't recall the exact date.  I distinctly recall the conversation. I don't recall the exact date.

Q    Now, in your entries about conversations with Mr. Rogovin, you use the term "conference"; correct?

A    I do.

Q    And you use that term whether it's an in-person conversation or a telephone conversation; correct?

A    Um, I believe -- I believe that is correct in certain circumstances.  Sometimes I would say "meeting with Mr. Rogovin."  But I may have also described a personal meeting as a conference.

Q    A conference in this -- in these three instances that we've gone through were phone conferences though; correct?

A    Yes.

Q    And there's no way of -- well, withdrawn.

        There are dozens, if not hundreds, of calls with Mr. Rogovin during the six years of the Kentucky case; right?

A    I believe that's fair.

Q    And when you had a phone conversation with Mr. Rogovin about the Kentucky case, you would refer to it in your billing records as a conference with Mr. Rogovin as we've seen on these three instances; correct?

A    Every time entry is unique.  But generally if I spoke to Mr. Rogovin on the phone, generally I would describe it as a conference concerning whatever we discussed or whatever -- you know, whatever the services were that were performed.

Q    And the communications you say you had with Mr. Rogovin on the phone about increased rates, those communications were not in writing; correct?

A    Correct.

Q    It isn't hard to confirm a conversation you had about the hourly billing rates, is it, in writing?

A    I don't believe so.

Q    If you had confirmed any of those conversations in writing, we would have that evidence today, aside from your memory alone; correct?

A    Presumably so.

Q    Had you confirmed that conversation about a billing rate increase in writing, we would know today the exact date of that supposed conversation; right?

A    It would all depend on the evidence, but presumably so.

Q    But you didn't do that, did you?

A    I think I answered, yeah, I did not record that conversation in writing.

Q    And had you added on your billing entries, and increased billing rates as one of the subjects of your conversation with Mr. Rogovin, that would have been a simple way to document in

writing that those conversations took place on those days; right?

A   It would not have been.  It's not -- that would not have been a simple resolution.  We don't bill clients for billing.  We don't bill clients for discussions about billing.  And so, no, it would not have been a simple solution.

Q   You reflect on your bills, though, time that you spend and not charged -- correct? -- as no charged time.

A   Very, very rarely.

Q   And in one of those rare situations you could have put on the bill, "and increased billing rates, no charge"; correct?

A   It's not a simple matter at all.

                     *     *     *     *     *




                     *     *     *     *     *

Q   You never informed Jarrow Formulas in writing that it withdrew bills sent earlier in 2013 and reissued them at higher rates in the federal case; correct?

A   We sent them in writing the reissued bills.  We did not -- I don't recall there being a communication in advance of doing that in writing.

                     *     *     *     *     *

\* \* \* \* \*

Q   And there's no document in existence that shows that McCarter & English informed Jarrow Formulas that it was rebilling the time that had already been billed in the Caudill case with that July 11 bill; correct?

A   I'm not sure if that's fair.

Q   Well, is there or isn't there a document that informs Jarrow Formulas, Hey, we sent you this bill back in April. We're rebilling it now in July because we made an error in the billing rates.

Correct?

A   There's not a communication that says that.

\* \* \* \* \*

\* \* \* \* \*

Q   (By Mr. Resser) Now, before sending PTX 50, the bill with Mr. Rechen's higher rate going up from 405 to 520, there was no rate change notification sent in writing to Jarrow Formulas on that rate change, was there?

A   I believe that's correct.

Q   And there were -- there wasn't a rate change notification sent to Jarrow Formulas in writing for any of the hourly rate increases throughout the Kentucky litigation.  Isn't that right?

A   Other than the preceding month's bill?  No.  In writing.

Q   So you're claiming that the written rate change notification came in the bills themselves; correct?

A   Yes.

              *     *     *     *     *


              *     *     *     *     *

Q   Now, let's take a look at the bills that supposedly provided this notification to Jarrow Formulas.  For example, Mr. Pepe showed you yesterday PTX 084.  Do you have 084 ready?

          THE COURT:  So this is in already, I take it.

          MR. RESSER:  This is in already.

          THE COURT:  Thank you.

Q   (By Mr. Resser) Now, on the first page of Exhibit 084, it has the total fees and total disbursements, but nowhere on the first page of the bill does it show the billing rates; correct?

A   That's correct.

Q   Now, let's turn to the next page.  Now, these are the time entries for February 1.  There's one very lengthy one that's almost two-thirds of the page, something like that.  And then there's another, a second one, and then the beginning of a third entry.

          And on those entries it gives the attorney number and initials.  And in the second to last column, and in the far right column, it gives the total number of hours billed on the services described in the description; correct?

A    Yeah.  In that respective description, yes.

Q    And nowhere in this section of the bill where all the descriptions are can anyone see what the hourly billing rate applied to those hours is; correct?

A    Yeah, not on this page.

Q    Now, on the Elite software, you could have the dollar value of those 9.3 hours reflected right there on the description, can't you?

A    I don't know.  Maybe.

Q    But that's not shown anywhere in the description section of the bill, the amount -- the value of those hours; correct?

A    Well, on the page where we --

Q    I'm just asking about these descriptions.

A    It's not on this page.

Q    Mr. Campos, if you could then page through the bill one by one for the rest of the descriptions.

That's true of all these descriptions.  There's no dollar value assigned to the time in this portion of the bill; correct?

A    Yeah, that's right.  There's only a column -- there's no column for that here.

Q    Now if we can go to -- I think we have to go to page thirty -- all the way down to 31.  And that's -- and then 32, if you can bring up 32.

So 32 is where the end of the descriptions occur and

then the total hours are totaled up after that last description; correct? Near the top. There we are.

A    Yeah, on the same page -- on the same page you have the last description. You have the totals, the total dollar values. And then below that, you have, you know --

Q    The total fees and the total disbursements and the bill total.

A    Yeah.

Q    And that's the same information, the total fees, total disbursements, and total invoice, that's the same information that's on the front of the bill; right?

A    I believe it is, yeah.

Q    And then and only then on page 32 you have the billing rates; right? The actual billing rates applied.

A    Yeah, these are the billing rates. These show -- well, it shows the -- it shows the code. It shows the attorney, the title, the hours, and the rate so that they can correspond to what's shown above, so they can interpret -- so they can understand that the code for the attorney up above, for example, where it shows up above EEG 3056, this shows that that's Eric Grondahl. It shows the number of hours Eric Grondahl billed and it shows his hourly rate and the value at that hourly rate.

Q    So it's not until this bill, it's not till page 32 of the bill there's a list of timekeepers, lawyers and paralegals with

their hourly rates; correct?

A    Yeah.  There's a very long bill.  There was a lot of work that month.

Q    And in this section of the bill, there was never an indication on any of the bills sent to Jarrow Formulas about a rate increase from the rates that were charged in January of 2013; correct?

A    Yeah, this bill is 2019, so that's right.  There's no reference to a change in 2013.

Q    And there's no --

A    Seventy odd some bills later.

Q    And there's no reference to any of the bills sent in 2013 that show that there was a rate change on the bill.

A    Well, it shows the new rate.

Q    It shows the new rate.

A    That's right.

Q    We agree on that.

A    Yeah.

Q    But it doesn't show new rate.  Remember, this is a new rate.  The old rate was X; the new rate is Y.  Nothing like that.

A    It didn't say that.

                    *    *    *    *    *

* * * * *

Q   Let's take a look again at PTX 107, which is in evidence, please. Mr. Campos.

Now, this is your communication with Liberty Underwriters of the billing rates you planned to charge Caudill in the -- withdrawn.

This is the communication with Liberty Underwriters of the billing rates you planned to charge in the Caudill federal case in Kentucky; correct?

A   Among other information, yes.

Q   And that shows your rate at 535, not 405; correct?

A   Correct.

Q   And it shows Mr. Grondahl's rate at 485, not 395; correct?

A   Correct. Excuse me, correct.

Q   And that was sent to Liberty Underwriters Company; correct?

A   Yeah, it was sent to Liberty. I don't recall the exact name. But it's Liberty.

Q   PTX 107 was never sent to Jarrow Formulas, Mr. Giarratana, was it?

A   I don't believe so.

* * * * *


* * * * *

Q   Isn't it true, Mr. Giarratana, that the redacted bills that you sent to Liberty were never sent to Jarrow Formulas?

A   I believe that's correct.  I don't believe we sent those redacted bills to Jarrow Formulas.

Q   And M&E never disclosed to Jarrow Formulas that it sought to have higher rates approved by Liberty than those that had already been billed for January and February.  Isn't that correct?

A   No, that's not correct, absolutely not.  We were always in communication with them about seeking reimbursement at the agreed rates.

Q   Isn't it true that M&E never disclosed to Jarrow Formula -- well, withdrawn.

I thought you said earlier that you never sent the e-mail to Jarrow Formulas that you had sent to Ms. Lin regarding the rates that you intended to charge Liberty.

A   That's correct.  I never sent that specific e-mail, but it doesn't mean that I didn't have a number of conversations with Mr. Rogovin letting him know that we were seeking reimbursement from the insurance company.

Q   And that number of conversations were the conversations you testified about that was either the 4th or the 19th of April most likely; right?

A   That was the conversation where we discussed the agreed-upon rates.

Q   Besides not sending your communications, either of the two communications, to Liberty, the first one with your rates and

the second one with the redacted bills, you never put in writing that you had sent, put in writing to Jarrow Formulas, that you had sent redacted bills to Liberty Underwriters; correct? The only evidence of that is your testimony that you discussed it with Mr. Rogovin; right?

A Yeah. I don't -- I think, as I said, I don't recall forwarding an e-mail to Jarrow Formulas with the redacted bills.

Q And Exhibit 636, the August 7 e-mail to Liberty Underwriters, in which you said, "Enclosed are the bills issued to Jarrow Formulas," you didn't BCC that e-mail to Jarrow Formulas either, did you?

A No, I did not. I just -- actually, Mr. Rogovin was just visiting with me for a week before that. We discussed this, among other things.

                    *    *    *    *    *


                    *    *    *    *    *

Q (By Mr. Resser) And before those bills were reissued in July, some before --

A June and July.

Q End of June, just before the holiday, and July, just after the holiday, only Liberty Underwriters at that point had been informed in writing of those higher hourly rates; correct?

A In writing, yeah.

Q   And then M&E rebilled Jarrow Formulas at those new rates; correct?

A   Well, you say "and then."  In the context of your questioning, we had already billed them.

                    *    *    *    *    *


                    *    *    *    *    *

Q   Now, there's nothing on Exhibit PTX 17 that shows that those rates, 535 and 485, are different from the rates shown on the bill that was issued in April; correct?

A   Other than that the rates are clearly different.

Q   Well, you'd have to have the two next to each other to see that they were different; right?

A   Maybe.

Q   And, again, there was nothing sent to Jarrow Formulas in writing explaining that these bills were reissued and why they were reissued and what the differences were; correct?

A   I believe I answered that there was no writing to the effect of what you just said.

                    *    *    *    *    *


                    *    *    *    *    *

Q   (By Mr. Resser) Do you think rebilling Jarrow Formulas at higher hourly rates without first notifying them in writing that you were doing that was entirely correct?

A    Yes.

Q    And you're telling this jury that rebilling Jarrow Formulas at higher hourly rates without informing them in writing was in line with your communications to the client?

A    Yes.

Q    Jarrow Formulas paid 68 invoices out of 70 at the higher hourly rates that you adjusted after Liberty Underwriters came into the picture; correct?

A    Yes, Jarrow Formulas paid all those invoices.

Q    And if the jury decides it was wrong for McCarter & English to raise those rates without written notice and agreement of Jarrow Formulas, M&E will owe Jarrow Formulas a refund.  Isn't that right?

A    Well, I disagree that there was no agreement of Jarrow Formulas, that's for sure.  And whether the jury -- whether the jury decides there's a refund that Jarrow Formulas could be entitled to, I don't know.  But I certainly disagree with the premise of your question.

Q    Well, if there was no agreement, then there would be a difference between the fees paid at the higher rates and the fees earned at the lower rates; right?

A    If there was no agreement as to the higher rates, which I believe there clearly was.

                    *    *    *    *    *

* * * * *

Q   Is it your testimony that at no time did Jarrow Formulas have to be told of and agree to a rate increase for a rate increase to be effective?

A   I don't believe it was a requirement to send a notice in advance in writing of a rate change, if that's the question.

Q   You're not aware of any ethical rules that require that?

MR. PEPE:  Your Honor --

THE COURT:  You can answer yes or no.

THE WITNESS:  I'm aware of ethical rules that pertain to the issue.  I'm not aware of one that would be implicated here that would indicate we did anything unethical.

* * * * *

* * * * *

Q   (By Mr. Resser) Mr. Giarratana, are you familiar with Connecticut Rule of Professional Conduct 1.5(b) which states, "Any changes in the basis or rate of the fee or expenses shall also be communicated to the client in writing before the fees or expenses to be billed at the higher rates are actually incurred"?

A   I'm familiar with that.  I'm also familiar with the commentary to the rule, which you're not reading.

* * * * *

*     *     *     *     *

When you first sent bills to Jarrow Formulas at the higher rates, which you say Jarrow Formulas reviewed and approved and therefore agreed to --

A   Yes.

Q   -- those bills were sent after the rates were incurred; correct?  After the fees were incurred; correct?

A   For the first bill, yes.

Q   Does Exhibit 95 -- Exhibit 95 is the only written engagement agreement you or one of your law firms has ever entered into with Jarrow Formulas; is that correct?

A   It's the first engagement letter.  We did have a letter that we introduced yesterday when there was a transition, I believe, maybe from Cummings & Lockwood to McCarter & English, which dealt with the continuing engagement of the company.

Q   And that was PTX 96 that we looked at?

A   I don't recall the number, but it's sent on Cummings & Lockwood letterhead.

MR. RESSER:  Let's put that up just to make sure that we're tracking, Mr. Campos.

THE WITNESS:  Yeah, this was the letter I was referring to.

Q   (By Mr. Resser) And there was nothing in that letter about fees or the terms of payment or hourly rates or anything like that; correct?

A    This doesn't -- this doesn't explicitly reference hourly rates.

                    *      *      *      *      *

              (Further examination by Mr. Pepe:)

                    *      *      *      *      *

Q    I'd like to go back to the original retention letter in December of 1996, if Mr. Wyzik could call up PTX 095.

        You remember that, of course, is the first engagement letter when Mr. Rogovin came to you in 1996.  You recall that, of course.

A    I do.

Q    And if we could go to the second page, Mr. Wyzik, if you would, please.  We've seen this before, of course, but it was raised on your cross.  Second paragraph that begins, "Charges and disbursements," if you could call that out, please.

        And could you highlight the sentence that begins, "These base rates may change from time to time."

        You testified, Mr. Giarratana, over the 23 years of this relationship, you and your colleagues at the three different firms you were at over those 23 years handled more than 540 legal matters for Jarrow Formulas, Inc.; correct?

A    That's correct.

Q    And you testified everyone was on a time-devoted basis; correct?

A    That's correct.

Q    Everyone had monthly invoices; correct?

A    Correct.

Q    An estimate of the invoices that were sent to Mr. Jarrow Rogovin over 23 years and 540 matters would be many, many hundreds, if not thousands.  Is that a fair statement?

A    It is fair.

Q    Many matters, a monthly invoice in every matter; correct?

A    Yes.

Q    And over those 23 years, did, in fact, the base rates you quoted and charged in 1996 change for you and the lawyers working for you?

A    Yes.  As we -- we could tell that here the base rates were -- I was $200 an hour.  By 2008, 2009, I was roughly twice that at 405.

Q    And each -- and you testified typically and usually the rates would be reviewed and typically increased at the end of the -- at the beginning of the new fiscal year on October 1; correct?

A    Yes.

Q    And that was generally the pattern over those -- certainly over the years at McCarter & English and likewise at your previous firms?

A    That's correct.

Q    Okay.  Did you -- and as the billing partner and the

responsible partner, when those rates went up for you and the other lawyers working on the matter, did you send a letter to Jarrow Rogovin saying, Look, Jarrow, I'm increasing my rates effective October 1 and going forward?

A   No.

Q   Ever?

A   No.

Q   Did you show the new rate change in the bills effective after October 1 using that as the beginning of the fiscal year?

A   Yes.

Q   Did you ever receive a complaint from Jarrow Rogovin that he was unaware of or did not get notice about the rate changes that occurred typically every year?

A   No.

Q   Never a complaint?

A   Not once.  Not once.

Q   Did anyone else at JFI, Ben Khowong or anyone else, ever complain?

A   Never, absolutely never.

Q   And until this litigation and until the last five bills, did they pay those invoices month after month, year after year, for the services you rendered?  Did they pay them without objection and without complaint subject to a requested discount?

A   Absolutely.

\*     \*     \*     \*     \*

(Further examination by Mr. Resser:)

\*     \*     \*     \*     \*

Q   (By Mr. Resser) Mr. Giarratana, any of the rate changes that you just spoke with Mr. Pepe about during the 23-year relationship, were any of those rate changes the subject of a written notification before time was incurred at the new higher rates?

A   Not before the first time.  Not before the first bill.

Q   So the answer's no.

A   Yes.

        MR. RESSER:  Thank you.

\*     \*     \*     \*     \*

CERTIFICATE

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)


I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937