UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP                No. 3:19-CV-1124 (MPS)

vs.                                    JULY 6, 2023

JARROW FORMULAS, INC.                  JURY TRIAL

- - - - - - - - - - - - - - - - x


<u>EXCERPTS FROM THE TESTIMONY OF MARK GIARATANNA</u>


450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY


COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:

FOR THE PLAINTIFF:

    McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
       One State Street, 14th Floor
       Hartford, Connecticut 06103
    BY:  LOUIS R. PEPE, ESQUIRE
       JAMES G. GREEN, JR., ESQUIRE
       JAMES A. BUDINETZ, ESQUIRE
       DAVID W. CASE, ESQUIRE

FOR THE DEFENDANT:

    BARTON LLP
       100 Wilshire Boulevard, Suite 1300
       Santa Monica, California 90401
    BY:  BERNARD M. RESSER, ESQUIRE

    BARTON LLP
       711 Third Avenue, 14th Floor
       New York, New York 10017
    BY:  JAMES E. HEAVEY, ESQUIRE
    BY:  MICHAEL C. WARD, ESQUIRE

(Excerpts of testimony of Mark Giaratanna)

Direct examination by Mr. Pepe:

*    *    *    *    *

Q   Were these rates in this exhibit, $535 per hour for you, $485 per hour for Mr. Grondahl, were those the hourly rates you were charging Jarrow Formulas, Inc. for the defense of Kean Ashurst in the state court litigation?  I'll ask it in two parts.

A   For Attorney Grondahl and I, no.

Q   Okay.  Were those hourly rates, $535 per hour for you and 485 for Mr. Grondahl, the hourly rates that you were charging JFI for the defense in the Kentucky Federal Court litigation?

A   Not as of yet.

Q   Do you remember what the rates were you were charging for you and Mr. Grondahl in the state court litigation Ashurst?

A   Uh, they went back to -- we had held our rates firm since, I believe, 2009 or so.  So I believe my hourly rate as of then was 405.  And we had held them firm in the Kentucky state case through -- for the partners throughout the duration of that case.  We did not increase them every year along with our standard rates.

Q   Why not?

A   Because that was something that we did for Jarrow Formulas when it would get involved in -- as it was a long-standing client, it was a good client, and for me and Attorney Grondahl,

our practice was not to increase the partners' rates during a litigation like that.

Q   What -- what was the status in the firm of Shawn Smith and Abraham Robinson?  Partner?  Associate?  What was their status?

A   They were associates.

Q   Did you do the same for Mr. Smith and Mr. Robinson, that is, hold their rates firm over the life of the Ashurst litigation and into the federal court litigation?

A   No.

Q   Why not?

A   They were associates, and we would increase those with their -- with their -- with their annual increases as a general matter.

Q   So at this point in time, before -- at this point in time on April 19, 2013, you were charging an hourly rate in the Ashurst in federal court litigation of how much for you, as best you recollect?

A   I think it was 405.  It was from roughly 2009 about four or five years earlier.

Q   You had held that for some two or three years?

A   More than that.

Q   More than that.

A   Yeah.

Q   And the rate, as you recollect, being charged for Mr. Grondahl?

A    The same thing.

Q    Okay.  And if yours was 405 --

A    I don't recall his.  But the rates had been held firm for the same amount of time.  We wouldn't have -- we held both the partners' rates firm.

Q    Why did you quote a different rate to Ms. Linda Lin of Liberty?

A    Because we were starting a new litigation.  I had realized -- when we had looked at the rate information, I had realized that the rates we were charging Jarrow Formulas were extremely old and it was receiving a huge discount.  Those rates went back to -- for Eric Grondahl and I -- went roughly back to 2009.

Q    Were these rates acceptable to Linda Lin?

A    Yes.

Q    Did you, at or about this time, have any discussions with Jarrow Rogovin about increasing the rate from one that had been held for some three years to a higher rate?

A    I did.  I did.  I spoke with him -- I had two conversations with him, actually three conversations with him, one on March 21 when I first received the letter from Liberty Insurance.  I had another conversation with him on April 4th and then another conversation with him on this day that I sent this e-mail out on April 19th.

          THE COURT:  Let's get another question now.

Q    (By Mr. Pepe) Yup.  How do you remember those dates?

A    Because I -- they're recorded in my time entries.

Q    Okay.  In any one of those three conversations, were they by person or by telephone?

A    They were by telephone.

Q    In any one of those three conversations, did you discuss with Mr. Rogovin the increase in the rates as you've just described?

A    I did.

Q    When -- when was that, as best you recollect?

A    As best I recollect, it occurred either on April 4th or on April 19th when I had those two phone conversations with him.

Q    And as best you recollect, what did you say to him and what did he say to you concerning this issue?

A    I had indicated to him that Jarrow Formulas had been receiving a substantial discount.  We hadn't changed our partner rates since several years prior.  I believe they went back to 2009, that we were embarking on this, you know, this litigation.  We couldn't hold our rates, keep our rates down at that low level, and we needed to increase them and we were going to charge our standard rates.

I also indicated to him that if the insurance company does not reimburse, Jarrow Formulas will be responsible for paying these -- for paying our bills because the insurance company took the case on a reservation of rights and that we

would be billing both Jarrow Formulas and the insurance company.  In the event that the insurance company didn't pay the bills, Jarrow Formulas would be responsible for the bills.

Q   In either one of those conversations, did you tell him what the new rates would be?

A   Yes.

Q   Okay.  535 per hour for you and 485 for Mr. Grondahl?

A   Yes.

Q   What, if anything, did Mr. Rogovin say in response?

A   He indicated it was fine.

                    *     *     *     *     *


                    *     *     *     *     *

A   Yeah, so this -- this is for time in April.  So I had asked my billing coordinator to reissue the bill that went out at the wrong rates for Attorney Grondahl and me at the agreed-upon rates with the insurance company and Mr. Rogovin.  So this is the reissuance of that bill.  So we reissued the April bill in June.

Q   And there's two bills here in Exhibit PTX 109?

A   Yes.  I believe so.

Q   Yeah --

A   It's hard with the screen, but, yeah, I believe so.

Q   And both were rebilled and reissued?

A    I believe so, yeah.

MR. PEPE:  Now I'm, if I may, Your Honor, call up PTX 110 to which there's no objection.

THE COURT:  Yes, you may.  That may be full.  You may publish.

(Plaintiff's Exhibit 110, received in evidence.)

Q    (By Mr. Pepe) Turning your attention to this bill, is this one of the bills you testified was issued at the incorrect rate, corrected and reissued?

A    Yeah.  So this is -- yes.

Q    And I direct your attention to the second page in the date column.  You can tell us what time -- what -- the month in which these services were rendered covered by this bill.

A    This was the rebill of the bill from March time at the corrected rates.  It didn't go out until July.

                    *    *    *    *    *


                    *    *    *    *    *

Q    All right.  Then I'm going to direct your attention, let's see if we can wrap this up, direct your attention to the second page, if Mr. Wyzik can blow this up, the e-mail from Mr. Giarratana to Shawn Smith.

And in that e-mail -- no, it should be -- I'm sorry. I misspoke.  It's the third page in the document with the No. 33826 lower right-hand corner -- I apologize -- and begins with

an e-mail or there's an e-mail in the middle of the page from Mr. Giarratana to Mr. Smith. Thank you.

Take a look at that, please.

A Yes.

Q Does that e-mail concern, the e-mail from you to Mr. Smith, concern the rebilling process you just described?

A It does.

Q It says, "On pages 11 and 23 can you make the numbers for Eric's and my hourly rates a little bigger so they don't look different than the other numbers? Call me if you'd like to discuss," end quote.

What's going on there?

A So we were tasked with giving the insurance company the billings at the rates they had agreed to. The rate that we were charging Jarrow Formulas, the discounted rate that went back to 2009 or so, was client confidential information, not something that we're allowed to disclose to any third parties, including the insurance company. The insurance company merely wanted to know what it was required to reimburse, so we were giving them the amount they were required to reimburse at the agreed-upon rates.

And so we didn't want to draw attention to the fact that the number was different. We wanted -- we didn't want to create an issue there with the insurance company and just simply wanted to give them the information that they needed to

know to reimburse at the agreed-upon rates.

Q   And the page before that, because the e-mail string goes backwards obviously, on the page before that there's an e-mail at the bottom from Shawn Smith to Mr. Giarratana.  Could you call that out, Mr. Wyzik?

And the first paragraph.  Can you call out further or highlight that first sentence, please?  It begins, "As requested."

And the next sentence too, if you would, please.

Thank you.

Take a look at that, sir.

A   Yes.

Q   Is that Mr. Smith complying with your request?

A   Yes, yes.

Q   If I understand correctly now, the five invoices that we looked at, the redacted ones, two in number, the other three after the new matter number was opened and therefore contained no redactions, your testimony is you sent the redacted ones to JFI initially; correct?

A   Yes.

Q   But did not send the redacted ones back to him.

A   No.

Q   The other three without the redactions with the new matter number it's your testimony you sent both -- all of those to Linda Lin as well as the redacted ones, all five to Linda Lin.

A    Yes.

* * * * *

* * * * *

Q    And if I'm reading it correctly, I see Mr. Rechen's red line does not stay constant over six years.  It goes up.

A    Yes.

Q    Starts at 405 and goes up to 520.

A    Yes.

Q    What's happening there?

A    Our system had Tom Rechen in the case at his rate from, I think, 2008.  And it wasn't changed for Jarrow Formulas.

Q    Why not?

A    Go ahead.

Q    Why not?

A    Because our system had set the rate that way for him for Jarrow Formulas and not increased it year to year.  And I didn't notice it.

Tom was not as heavily involved in the beginning of the case.  It was primarily Eric Grondahl and me.  He started to get much more heavily involved in 2016.  At that point I noticed that his rate was very old, hugely discounted.  And so we adjusted his rate to be in between Eric Grondahl and mine in 2016.

Q    When you raised it to $520 per hour, did you hold it then

constant for the rest of the Kentucky federal litigation?

A    We did.

                    *    *    *    *    *

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)


I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937