UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP            No. 3:19-CV-1124 (MPS)

vs.                               JULY 10, 2023

JARROW FORMULAS, INC.             JURY TRIAL

- - - - - - - - - - - - - - - - x


EXCERPTS FROM THE TESTIMONY OF

JACQUELINE BOSMA AND JARROW ROGOVIN


450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY


COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:

FOR THE PLAINTIFF:

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
                One State Street, 14th Floor
                Hartford, Connecticut 06103
        BY:  LOUIS R. PEPE, ESQUIRE
             JAMES G. GREEN, JR., ESQUIRE
             JAMES A. BUDINETZ, ESQUIRE
             DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

        BARTON LLP
                100 Wilshire Boulevard, Suite 1300
                Santa Monica, California 90401
        BY:  BERNARD M. RESSER, ESQUIRE

        BARTON LLP
                711 Third Avenue, 14th Floor
                New York, New York 10017
        BY:  JAMES E. HEAVEY, ESQUIRE
        BY:  MICHAEL C. WARD, ESQUIRE

Testimony of Jacqueline Bosma

(Cross-examination by Mr. Heavey:)

&ast; &ast; &ast; &ast; &ast;

Q   (Mr. Heavey) Now, before we leave this exhibit, ma'am, I understand you didn't review the line items.  But you would agree with me that the hourly rates for Mr. Giarratana in this bill that references the federal matter in February of 2013 was $405 an hour; correct?

A   I didn't want to conclude on whether it references the federal matter based on the narratives, but I can see that the rates are 405 or 395.

Q   Well, any reference to the federal matter was in this bill, and the rates that were applied to this bill were $405 an hour for Mr. Giarratana; correct?

A   It does show 405 for Giarratana.

Q   And with respect to Mr. Grondahl, it shows his hourly rate at $395 an hour; correct?

A   It does.

&ast; &ast; &ast; &ast; &ast;


&ast; &ast; &ast; &ast; &ast;

Q   (Mr. Heavey) Now, do you have an understanding why there are red lines on the invoice to the right and nothing on the invoice to the left?

A   I do at this time, yes.

Q   And that's because this invoice was rebilled; correct?

A   It was edited, yes.

Q   It was edited, all right.

                    *     *     *     *     *


                    *     *     *     *     *

Q   But that increase that's reflected here once again was never provided to the client in writing before the increase occurred; correct?

          MR. GREEN:  Objection.

          THE COURT:  It's overruled.

          THE WITNESS:  It was provided on the bills.

Q   (By Mr. Heavey) Ma'am, ma'am --

A   I know --

Q   Let's not split hairs here.  I'm questioning very specifically.

          Prior to this rate increase -- I know you testified the last time that there wasn't any, but prior to this rate increase reflected here, do you have any evidence that Jarrow Formulas received written notice of that rate increase before this occurred?

A   I don't think I have all the dates quite pinned down just from looking at this screen, no.

                    *     *     *     *     *

* * * * *

Q   Prior to this rate increase, in writing, prior to it, in writing, before the client received this bill, did he get any notice that this rate increase was occurring?

A   Not in writing but I heard Mr. Giarratana --

Q   That's all I asked you.

* * * * *

* * * * *

Q   No.  Did anyone you know explain what percentage discount Jarrow Formulas was actually receiving at the time that they were requesting the additional discount?

A   Like in detail, like that it was rates and write-downs, etc.?  I'm unaware of whether that conversation took place.

* * * * *

* * * * *

Q   And so my question for you is, did Mr. Giarratana or anyone on the Jarrow Formulas matter request in writing from the Executive Committee authorization to go beneath the standard discount?

A   Not that I'm aware, but I don't know.

* * * * *

* * * * *

Q   So you -- are you saying that they paid the original bill and then they paid for the reverse bill as well at the higher rate?

A   Well, we reversed the payment.

Q   Did that reversal -- was the client ever informed that he had that payment reversed?

A   I don't know.  I wasn't there at the time.

Q   Were you -- you're the CPA who was auditing this file.  Did you ever go back and determine that the client was provided information that those bills were reversed?

A   I did not go back to confirm that, no.

Q   And when you say they were reversed, you didn't refund that money to the client; correct?

A   We held it on an account and applied it to a future bill.

Q   And did you have any evidence that that was ever communicated to the client?

          MR. GREEN:  Objection, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  I don't have evidence of that.

Q   (By Mr. Heavey) So how was he supposed to know, the client, I'm sorry, Jarrow Formulas supposed to know, that you negated the bill, you reversed it, and you're going to apply it to a future amount owed by Jarrow Formula if it wasn't communicated to the client?

A   It could have been communicated.  I was not here at that time.  I can't speak to that, unfortunately.

Q   And so if Mr. Rogovin testifies that it was not communicated to him, how would a client know that?

A   It would have to be communicated.

                    *     *     *     *     *


                    *     *     *     *     *

Q   Yeah, and specifically with respect to reversing the bills, there was no evidence and no testimony that you'd seen any e-mails regarding notification of the client that McCarter & English was reversing those bills.

A   I have not seen those e-mails, no.

                    *     *     *     *     *


                    *     *     *     *     *

Q   (By Mr. Heavey) There's no evidence of a written rate increase or notice of the reversal prior to it happening that was provided to my client, was there?

A   I heard testimony to a verbal discussion about the rate change.

Q   And that's why I referenced the writing.  There is no written evidence; correct?

A   Not that I'm aware of.

                    *     *     *     *     *

* * * * *

Q (By Mr. Heavey) Nowhere in your summaries of all the amounts due that you've testified, due to McCarter & English that you've testified to, did you input any of the lower rates to reflect those payments made?

A I believe that's correct.

* * * * *

* * * * *

Q Nowhere in your summaries do you provide the alternative valuation of the lesser agreed-upon rates because the Court's decided that those rates --

A I do not, yeah.

Q And if you did, your numbers that you provided to the Court would be significantly less; correct?

A They would be different, yeah. Significance is relative, but ...

* * * * *

* * * * *

Q (Mr. Heavey) You didn't bother to determine why those bills were reversed, did you?

A I did not seek out why those bills were reversed, no.

Q And it was because you would have had to identify the fact that my client was paying --

A    That's not why.

Q    Let me finish my question, ma'am, please.  Because it would have identified the fact that my client was paying a lower rate in this litigation matter; correct?

A    That is not why I didn't do it.

Q    But it would have identified that fact, would it have not?

A    Yes.

\*    \*    \*    \*    \*

Testimony of Jarrow Rogovin

(Cross-examination by Mr. Heavey)

\*    \*    \*    \*    \*

Q    And why can you be so sure about the fact that Mr. Giarratana never told you about a 30-percent rate increase?

A    For one, if it were three times and it would be -- what's the point of bringing it up to me three times?  If it were three times, I would certainly remember it.

\*    \*    \*    \*    \*

\*    \*    \*    \*    \*

Q    Did Mr. Giarratana ever tell you that Mr. Grondahl's rate was going to be increasing on the same matters as well?

A    No, and it's come out that Mr. Grondahl didn't even know his rate came up -- went up.

Q    Mr. Rogovin, you heard testimony regarding standard rates

and the rate increases that McCarter & English seek at the beginning of the fiscal year. Did you ever have any conversations with Mr. Giarratana about his standard rates or rate increases that he would be seeking at the beginning of fiscal years?

A    The term "standard rate" in the 26 years was never used once. Nor was "discount."

Q    If Mr. Giarratana in fact had a conversation with you in 2013 that his litigation rates would go up over 30 percent, would you have agreed to it?

A    No.

                    *    *    *    *    *


                    *    *    *    *    *

Q    And so the only matter, the only litigation matter, that McCarter & English was raising its rates on in 2013 at this time was the one that Liberty Insurance agreed to pay for; correct?

A    Correct.

                    *    *    *    *    *


                    *    *    *    *    *

Q    You never had any agreement, whether it be in writing or verbally, whereby you consented to the higher rates being billed to Liberty Insurance, did you?

A   No.

                    *     *     *     *     *



                    *     *     *     *     *

Q   (By Mr. Heavey) When you state in the voicemail to the Ashursts, quote, "Because they didn't put in, they found willful and malicious," what were you referring to as they didn't put that in?

A   McCarter English didn't put in my response written to Tom O'Brien 21 days after O'Brien had written me.

                    *     *     *     *     *



                    *     *     *     *     *

Q   And when you go on to say, quote, "They found willful and malicious," what did you mean by "They found willful and malicious" in that communication?

A   That the jury found it because there was no evidence to the contrary ever put in to my intention to cause no harm to Caudill.

Q   And at that point were the statements that you're making to the Ashursts, you're angry; correct?

A   Yes.

Q   And when you state, "As far as I'm concerned, they can pay the damages," who were you referring to?

A   McCarter English.

Q   And what damages were you referring to?

A   The verdict and what would be the award in the lawsuit.

Q   And why would they have to be paying that on your behalf?

A   As far as I was concerned, they committed malpractice, and that word is in the call.

*     *     *     *     *


*     *     *     *     *

Q   Now, did you want to speak to your attorneys once the verdict was rendered?

A   Yes.  I stood at the rail.  I waited in the attorney room. It was 45 minutes I was still there.

Q   Did you ever speak to any of your legal counsel -- withdrawn.

Did you ever speak to any of the attorneys from McCarter & English on the date that the verdict was rendered?

A   You mean after the verdict?

Q   Yes, sir.

A   No.

*     *     *     *     *


*     *     *     *     *

Q   (By Mr. Heavey) After retaining Mr. Tinley, there came a time when you determined that you would not pay any of the outstanding invoices for McCarter & English at that point;

correct?

A    Well, it was on Mr. Tinley's advice, yes.

Q    And why?

THE COURT:  No, no.  No, no.  Next question.  Unless you can rephrase that.  You can't ask it that way.

Q    (By Mr. Heavey) Was there any indication as to why it is you determined, after speaking to Mr. Tinley, that you weren't going to pay all the bills?

THE COURT:  That's sustained.

MR. PEPE:  Objection.

Q    (By Mr. Heavey) Why is it that you didn't pay the bills?

MR. PEPE:  Objection.

THE COURT:  Well, you can't refer to counsel's advice, but otherwise you can answer the question.

THE WITNESS:  I considered what they did malpractice.  Came to that very firm conclusion.

                    *    *    *    *    *

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937