UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP          No. 3:19-CV-1124 (MPS)

vs.                              JULY 11, 2023

JARROW FORMULAS, INC.           JURY TRIAL

- - - - - - - - - - - - - - - - - x


EXCERPTS FROM THE TESTIMONY OF JARROW ROGOVIN


450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY


COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
One State Street, 14th Floor
Hartford, Connecticut 06103
BY: LOUIS R. PEPE, ESQUIRE
JAMES G. GREEN, JR., ESQUIRE
JAMES A. BUDINETZ, ESQUIRE
DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

BARTON LLP
100 Wilshire Boulevard, Suite 1300
Santa Monica, California 90401
BY: BERNARD M. RESSER, ESQUIRE

BARTON LLP
711 Third Avenue, 14th Floor
New York, New York 10017
BY: JAMES E. HEAVEY, ESQUIRE
BY: MICHAEL C. WARD, ESQUIRE

Testimony of Jarrow Rogovin

(Cross-examination by Mr. Heavey:)

\*    \*    \*    \*    \*

Q   And I'd like to direct your attention to Plaintiff's Exhibit 706.

THE COURT:  And that's in evidence, Mr. Heavey?

MR. HEAVEY:  That is in evidence.

MR. RESSER:  Defendant's?

MR. HEAVEY:  I'm sorry.  Defendant's Exhibit 706.

THE COURT:  Very well.  That can be put up.

Q   (Mr. Heavey) The first page of that exhibit, Mr. Rogovin --

A   Yes.

Q   -- you'll see that there are multiple matter numbers assigned to the first page; correct?

A   Yes, multiple matters.

Q   And under the matter number and names, how many matters were consolidated into this billing, this billing invoice?

A   Four.

\*    \*    \*    \*    \*


\*    \*    \*    \*    \*

Q   (Mr. Heavey) Now, Mr. Rogovin, we just looked at the June 19th, 2013, bill where litigation was -- litigation was referenced on the front page and it was a consolidated bill. Directing your attention to October 15th, 2013, invoice there,

is this another example of the type of billing you'd be receiving in 2013 from McCarter & English?

A   Yes.

Q   And how many matters are referenced in this bill?

A   Um, six.

Q   And is there any litigation in any of those matter numbers that's referenced in this bill?

A   No, sir.

Q   And directing your attention to page 15 of this invoice of October 15th, 2013, with respect to Mr. Giarratana's rate, what was -- what was the rate at that time?

A   Ten months into the underlying litigation, the rate for these matters is $405.

Q   And with respect to Mr. Grondahl's?

A   395 an hour.

Q   And at the time that you received this -- and going back to the first page in this invoice, is there any indication that this invoice was paid by you?

A   Um, yes.

Q   And when was it approved for payment?

A   November 25.

Q   At the time of this consolidated billing with multiple matters, did you ever turn to the page where the hourly rates were referenced and determine what the hourly rates of Mr. Giarratana and Mr. Rechen were charging you at that point in

2013?

A    No.

Q    And why not?

A    I trusted my attorneys.

                    *    *    *    *    *


                    *    *    *    *    *

Q    And in any of invoices where those rates were increased, did you ever turn to the page where the hourly rate for the attorneys were listed and review those rates?

A    No.

Q    And did there come a time at any point in June -- at any point in 2013 that you identified or noticed that change in the rates of Mr. Grondahl and Mr. Giarratana by looking at the bills?

A    No.

Q    Did you identify that rate change in any way during 2013 during the course of the representation of the matters for McCarter & English?

A    No.

Q    Did you ever identify at any point in 2013 that there are any rate differences by any of the attorneys that were representing you from McCarter & English as demonstrated through the invoices?

A    No.

\* \* \* \* \*

\* \* \* \* \*

Q   Was there any other reasons why there would be a delay in any of the issuance of McCarter & English's bills at this point in 2019?

A   Only cash flow.

Q   When you say "only cash flow," what do you mean by that?

A   Um, the company was having financial distress.

Q   As a result of what?

A   Um, huge litigation bills.

Q   Were there any other issues that were affecting the company's performance in or about April of 2019?

A   Yes.

Q   What was that?

A   Um, third-party contract manufacturers were slow in getting finished product back in to us.

Q   And how does that affect cash flow for Jarrow Formulas?

A   If we didn't have product to sell, we weren't going to be able to sell and bring in revenue.

Q   I want to be clear.  Did you ever have any communications with Mr. Giarratana about the cash flow issues that Jarrow Formulas were involved with in or about April of 2019?

A   Yes.

\* \* \* \* \*

* * * * *

Q   And you stated, after remitting $700,000 to McCarter & English roughly the day before to Mr. Khowong, that you wanted to put off the lawyer bills; correct?

A   Correct.

Q   Now, what did you mean by "put off the lawyer bills"?

A   Delay, delay the bills until we had money.

Q   I want to be very specific too.  When you reference the lawyer bills, what lawyer bills are you referencing?

A   All of them, any firm.  It was just every law firm that we used.

* * * * *

* * * * *

Q   So the first part of that question is, What exactly were you putting off and when?

A   We were putting off the label -- the lawyer bills until we had money to pay them again.

* * * * *

* * * * *

Q   And, ultimately, what was the decision with respect to the outstanding McCarter & English invoices before the trial started?

A   Um, well, the 700,000 was sent, which was the money I was

told to send. And it brought the account current.

Q Did you approve that?

A Yes.

* * * * *

* * * * *

Q And following the jury, there was testimony regarding requests from Jonathan Leventhal to Mr. Giarratana and McCarter & English regarding an appeal issue; correct?

A Yes.

Q Do you specifically know what Jonathan Leventhal was requesting?

A Um, simply the deadlines for filing the notices, that's it, not for issues, not for any work to be done on it, just what do the Federal Rules of Civil Procedure require.

Q Did you have any communications with Mr. Leventhal regarding those requests to McCarter & English at the time?

A None.

* * * * *

* * * * *

Q Directing your attention to Defendant's Exhibit 590, please.

July 2nd, Tuesday, 2019. The e-mail starting Ben Khowong to Lot Ramos and Mary Grace Reyes at 3:06 a.m.

A    Yes.

Q    Does that reflect your recollection of what instructions you gave to Mr. Khowong at the executive meeting on July 1st?

A    Yes.

Q    And notwithstanding the typo in it, it states:  In the e-mail from Ben to your employees of Jarrow Formulas that Jarrow does not want to send any checks to them until further notice.  And in the re:  subject, it's McCarter & English.

Is that an indication of your specific instructions to Mr. Khowong at the time?

A    Yes.

Q    And when you stated to him that you didn't want any checks to them until further notice, what did that mean?

A    Not until further notice that, um, there was going to have to be some legal investigation, legal discussion, and decide what to do from there.  But at that point it was suspended.

Q    And your testimony -- withdrawn.

And did, in fact, you start exploring those legal issues from July 2nd on with respect to McCarter & English's performance at the trial?

A    Yes.  The whole case, yes.

Q    And at this point you already made the decision not to pay the Caudill Seed litigation bill, as per your butt dial testimony; correct?

A    Yes.

Q   On July 2nd, 2019, you would agree with me there's still outstanding intellectual property invoices for McCarter & English; correct?

A   Yes.

Q   And does this e-mail indicate that you had made a decision at this time with respect to whether or not you were going to pay those IP invoices, aside from the Caudill Seed litigation?

A   No.

Q   And at this point, July 2nd, 2019, did you make a decision whether or not you were going to be paying the intellectual property invoices that were outstanding at McCarter & English?

A   No.

Q   I'd like to direct your attention, if I may, to Plaintiff's Exhibit 103.

THE COURT:  Which is?

MR. HEAVEY:  Which is admitted, Your Honor.

THE COURT:  Okay.

Q   (By Mr. Heavey) Now, you testified regarding this e-mail yesterday.  Do you recall that testimony, Mr. Rogovin?

A   Yes.

Q   And specifically on July 22nd now, 20 days after the decision to review McCarter & English's performance and consult with counsel, did you come to a decision -- actually, withdrawn, Your Honor.

On July 22, 20 days after instructing Mr. Khowong to

hold up on the transmission of any of the outstanding fees, did you make a determination with respect to the outstanding IP invoices for McCarter & English?

A   Yes.

Q   Now, at this point was there any -- no, withdrawn.

What was the decision with respect to the miscellaneous IP bills that were outstanding for McCarter & English?

A   Pardon me?

Q   What was your decision with respect to the payments --

A   Oh.  As of July 20, to pay them.

Q   Was anything significant on July 22nd besides your decision and the e-mail conveyed to Mr. Giarratana to remit payment on the outstanding IP matters?

A   I'm sorry.  Was anything significant?

Q   Was anything significant on that day that you recall besides --

A   Oh, yes.

Q   -- the decision?

What's that?

A   McCarter & English filed suit against Jarrow Formulas.

Q   Did you actually know that on July 22nd at 4:11 a.m. when you responded to Mr. Giarratana that you'd be agreeing to pay the IP bills?

A   No.  It's 4:00 in the morning, so no.

Q   And with respect to that decision, we heard testimony regarding it, after July 22nd, 2019, what occurred that changed your mind with respect to the outstanding IP invoices and the payments that you agreed to make?

A   We -- I had discussions with the late Jeff Tinley, who was our attorney at the time.

Q   And as a result of those discussions, what decision did you make?

A   Um, after discussing it back and forth with him, and it was a real discussion, I took Mr. Tinley's advice not to pay it.

Q   Now, Mr. Rogovin, there was testimony that I elicited today regarding your review of the bills -- withdrawn.

You testified --

THE COURT:  I'm sorry, Mr. Heavey.  Let me interrupt for a second.  So, Ladies and Gentlemen, the witness just testified that he didn't pay the IP bills based on advice he received from a lawyer.  So you may consider that testimony as to whether any failure by Mr. Rogovin or his company to pay those bills was willful and malicious.  That's the only purpose for which you may consider that testimony.  And so that's it. Thank you.

Go ahead, Mr. Heavey.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) Now, I want to be clear regarding your review and your lack of knowledge of the rate increase.  In

2013 I asked you if you ever compared any of the singular line items that delineate what the hourly rate was for Mr. Grondahl and Mr. Giarratana on the one page that's listed in the invoices for McCarter & English. Do you recall that testimony?

A    Yes.

Q    And do you recall you testified that you never compared them in 2013 to notice -- any of the invoices to notice that there was a rate increase; correct?

A    Correct.

Q    Taking out the limitation of 2013. At any point, at any time during the representation in the federal matter, did you ever compare invoices at the singular line item that shows the hourly rate and determine that Mr. Giarratana's or Mr. Grondahl's rate went up?

A    No.

Q    Did you ever compare any of the invoices, any of the invoices during any part of the litigation, to identify the fact that Mr. Rechen's hourly rate went up during the course of the litigation?

A    No.

                    *    *    *    *    *


                    (Examination by Mr. Pepe:)

                    *    *    *    *    *

Q    And then if we go to Exhibit 129 to get the chronology

right, we have the payments -- I'll put up 129.  Thank you.

We looked at the payments on May 31 in the door to McCarter & English.  Now we go to 129.  That's June 1 e-mail.

Would you call that out, please, the whole top part?

That's your e-mail to Ben Khowong on June 1, the next day after the payments were received; correct?

A    Um, yes.

Q    And we go down below the stars.  There's your instruction.

Can you highlight that, Mr. Wyzik?

"Put off the lawyer bills"; correct?

A    Yes.

Q    So the payments were made, according to Mr. Khowong, notwithstanding your instructions.  On May 31 you put the hold on the lawyer bills the next day after the payments were made. You missed by one day holding those payments, did you not?

A    I missed?  I missed?  I missed?

Q    Yes.

A    No, sir.  After I approved 700 going out and Ben told me we had no money to pay vendors now, I said, "Put off the bills."

*    *    *    *    *

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____

Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937