UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

No. 3:19-CV-1124 (MPS)

McCARTER & ENGLISH, LLP

JULY 5, 2023

vs.

2:15 P.M.

JARROW FORMULAS, INC.

JURY TRIAL

- - - - - - - - - - - - - - - - x

Volume I, pages 1 - 39

450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

   McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
     One State Street, 14th Floor
     Hartford, Connecticut 06103
   BY: LOUIS R. PEPE, ESQUIRE
     JAMES G. GREEN, JR., ESQUIRE
     JAMES A. BUDINETZ, ESQUIRE
     DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

   BARTON LLP
     100 Wilshire Boulevard, Suite 1300
     Santa Monica, California 90401
   BY: BERNARD M. RESSER, ESQUIRE

   BARTON LLP
     711 Third Avenue, 14th Floor
     New York, New York 10017
   BY: JAMES E. HEAVEY, ESQUIRE
   BY: MICHAEL C. WARD, ESQUIRE

(2:15 p.m.)

THE COURT: All right. Before my courtroom deputy comes in, why don't we use the time. I may interrupt this again. We were talking about those two exhibits this morning. One was an updated version of another. And, Mr. Green, I was asking you about those two exhibits.

MR. GREEN: Yes, Your Honor.

THE COURT: And we established that they're all the same except for two numbers, that different people prepared them, that the earlier one was filed on the docket November 4, 2019, and was apparently either used or filed in connection with the PJR hearing. The second one is new, and my understanding is that Mr. Paige had something to do with preparing that document. He may not have prepared it, but he had something to do with preparing it.

MR. GREEN: Yes, Your Honor.

THE COURT: Go ahead.

MR. GREEN: And I want to make sure that we don't conflate, or I don't conflate, the two arguments in the MIL, the first being Mr. Paige. You struck him as a witness. He never gave an opinion on this.

THE COURT: Right.

MR. GREEN: We never got to ask him questions about it at his deposition. So it's unfair for him to be listed as a witness today.

THE COURT: Okay. What's the second argument?

MR. GREEN: The second one is the 35 percent, 43, percent, 25 percent issue, you know, the discount calculation, the extra damages, the 63,000 and the 89,000.

Those calculations were never quantified in the entire four-year history of the case until June 5, 2023.

THE COURT: Sorry to interrupt. I'm sorry to interrupt you. Are they ready?

Go ahead.

MR. GREEN: So that's truly a late disclosure issue in the fullest sense of the word.

THE COURT: But let me stop you. How are -- are those discount percentages you just rattled off, are those reflected in these two documents, or are we talking --

MR. GREEN: No, no. Exhibit 534 does not reflect that. There's two separate calculations going on, Your Honor. Mr. Paige, in Exhibit 534, has to do with rate increase overcharges.

THE COURT: Right.

MR. GREEN: And the 38 versus 25 percent calculation has to do with whether, when Mark promised, Mr. Giarratana, Mark Giarratana, promised a discount in May of 2019, whether he misstated it.

THE COURT: And on that issue, those calculations are not reflected in either of these two documents?

MR. GREEN: There's a footnote for the very first time itemizing that calculation --

THE COURT: Well, neither of these documents has a footnote.

MR. GREEN: No, it's not in either 534, Your Honor, or the old version of it. 534 and 534A do not contain that calculation.

THE COURT: So let's just talk about 534 then. What is the prejudice to your side if they call Mr. Paige and Mr. Paige just testifies about where these numbers come from and what the calculations were? I guess -- I get that you did not ask him those questions at the deposition. I understand that.

MR. GREEN: Right.

THE COURT: But, but, you've had virtually the same document for four years, almost four years. And you could have asked somebody about the earlier version of the document, which, as I say, is virtually the same. So why not -- what's the prejudice to you if all Mr. Paige says is, these are where the numbers come from, this is the math I did, this is the product, end of story?

MR. GREEN: So, first, Your Honor, we have the same theory you have that it will bleed over into the many other opinions he expressed. Second, Your Honor, he made many, many calculations --

THE COURT: Right.

MR. GREEN: -- in his expert disclosure, none of which was this.

THE COURT: Okay.

MR. GREEN: So we thought we would get the opportunity to question on this document when it first occurred, but Mr. Paige did not address it. And no other witness addressed it either.

We did not expect that Mr. Tinley would put his paralegal on the stand to testify to her calculations.

THE COURT: Hold on one second. Are they ready? Yes? All right. Let's bring in the jurors then. We'll continue this another time.

(The jury entered the courtroom at 2:19 p.m.)

THE COURT: Folks, first, let me apologize about the drip. I did not know about it until about ten minutes ago. The people who take care of this building are going to be here right after you leave today, and I won't make promises about what they can accomplish because I'm not them, but I'm going to be on them. Let's put it that way. Okay?

Second, okay, I'm going to ask you all now to stand and raise your right hands so you can take the oath as jurors.

(Jury sworn.)

THE COURT: Thank you. Please take your seats.

Now that you have been sworn in, I'm going to launch

right in. To begin, I will give you some preliminary instructions to guide you in your important function as jurors in this case. What I say now will not be a substitute for the instruction on the law that I will give to you at the conclusion of the case but is simply designed to give you an overview before you begin hearing the evidence.

It will be your duty to listen to and consider the evidence and to decide what the evidence shows. You, and you alone, are the judges of the facts in this case. You will then have to apply to those facts the law as I will give it to you at the end of the case. You must follow that law whether you agree with it or not.

You must not take anything I may say or do during the trial as indicating what your verdict should be. Don't be influenced if I'm to take notes or anything else I might do during the trial. You will make your judgment based solely on the evidence that you see or hear in court.

You may hear references to "the Court." When someone refers to "the Court," they generally mean the judge presiding over the case, in this case me.

You also will hear the words "instruct" or "instruction." This is a direction or order from me that you must follow. It is your duty to find the facts, having considered all of the evidence in the case. The evidence from which you are to determine what the facts are consists of the

following things: any exhibits received into evidence, any facts to which the attorneys have agreed or stipulated, and the sworn testimony of witnesses on both direct and cross-examination, regardless of who called the witness.

Some of the testimony you will hear may be in the form of a deposition. A deposition is like an interview in which a lawyer questions a witness typically in the lawyer's office. When a witness is unavailable for trial because, for example, he or she is beyond the subpoena power of the court, the parties are entitled to take the individual's deposition and then present all or some of this deposition to the jury.

During a deposition, the witness is placed under oath and questioned by the attorneys in the same manner as if the witness were here in this courtroom under oath. Deposition testimony constitutes evidence just like live witness testimony.

Certain things are not evidence and must not be treated as evidence by you. I will list them for you now. All statements, arguments, and questions by lawyers and questions that I may ask are not evidence. Obviously, answers to questions by witnesses are evidence. Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe evidence should not be admitted under the rules of evidence.

You should not be influenced by the objection or by

the Court's ruling on it. You should not show any prejudice against an attorney or his or her client because the attorney objected to the admission of evidence or the phrasing of a question or asked the Court to rule on an objection or the propriety of a question.

If an objection is sustained, this means the objection is correct, and you must ignore the question that was asked and any answer that may have been given.

If the objection is overruled or I say "The question is allowed" or "I'll allow it," this means the objection is not proper, and you should treat the answer to the question like any other answer.

If you are instructed by me that some item of evidence is received for a limited purpose only, you must follow that instruction and consider that evidence only for the specified purpose.

If I rule that an answer is stricken, that means that you must ignore the answer because it is not evidence.

On occasion when the lawyers object, I may ask you to leave the courtroom so they can give me the reasons for their objections outside of your hearing. We're all going to work hard to try to keep your departures to a minimum by taking up such objections during your breaks or at sidebar. But you should understand that some of these interruptions may be necessary.

Testimony that the Court has excluded or told you to disregard or ignore is not evidence and must not be considered.

Anything that you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of a witness about what the witness saw or heard or did. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist, even though there was no direct proof of those other facts.

The word "infer," or the expression "to draw an inference," means to find a fact exists even though it has not been proven directly.

Let me give you an example. If a witness testifies that he woke up in the morning and saw that the streets and sidewalks were wet, you may find that it rained during the night even if no one testified that he saw the rain. In other words, the fact of rain is an inference that could be drawn from circumstantial evidence, the testimony of the presence of water on the street and sidewalk.

Direct evidence of rain, on the other hand, would be someone testifying that she actually observed raindrops coming down from the sky.

I will give you further instructions on these matters at the end of the case. But keep in mind that you may consider circumstantial evidence as well as direct evidence, and it is for you to decide how much weight, if any, to give to either type of evidence.

You may hear references to "inferences" or to "inferring" certain facts. An inference may be drawn only if it is reasonable and logical, not if it is speculative. You are allowed to draw logical inferences from facts that you find to have been proven, but you may not go outside of the evidence to find the facts, nor may you resort to guesswork or conjecture.

To aid you in better understanding this, in the rain example I used a moment ago, although you could infer from evidence of the wet ground that it had rained, you could not also infer that there had been a thunderstorm, at least without additional evidence. In other words, you must avoid resorting to speculation, conjecture, or guesswork to determine critical facts in this case.

The jury alone decides the credibility of the witnesses and the weight to be given their testimony. In considering the weight and value of the testimony of any witness, you may take into consideration the appearance, attitude, and behavior of the witness; the interest of the witness in the outcome of the case, if any; the inclination of

the witness to speak truthfully or not; the probability or improbability of the witness's statements; and all other facts and circumstances in evidence.

You should test the evidence the witnesses give by your own knowledge of human nature and of the motives that influence and control human action. In short, you are to assess a witness's testimony using the same considerations and the same sound judgments and common sense you apply to the questions of truth and veracity that present themselves in your daily lives.

It will be up to you to decide which witness to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you further guidelines for determining the credibility of witnesses at the end of the case.

As I told you earlier, this is a civil action, a civil lawsuit. In a civil lawsuit, the plaintiff has the burden of proving its claims by a preponderance of the evidence.

In this civil lawsuit -- in this civil lawsuit, in a sense, there are two plaintiffs. First there is McCarter & English, which filed the lawsuit and brings claims against Jarrow Formulas. Second, Jarrow, although a defendant as to McCarter's claims, has also asserted its own claims, which we call "counterclaims," against McCarter. So in this case, McCarter must prove its claims by a preponderance of the

evidence, and Jarrow must prove its counterclaims by a preponderance of the evidence.

What does a "preponderance of the evidence" mean? I will tell you first what it does not mean. Those of you who have sat as jurors on criminal cases or perhaps from TV will have heard of "proof beyond a reasonable doubt." That requirement does not apply to a civil case, and you should put it entirely out of your mind.

In civil cases, the burden is different, and it is called "proof by the preponderance of the evidence." A burden of proof by a preponderance of the evidence means that McCarter has to prove -- excuse me -- that McCarter has to produce evidence that leads you to believe that its claims are more likely true than not. For McCarter to prevail on its claims in this civil case, it must prove all the essential elements of its claims by the greater weight of the evidence. The same is true for Jarrow. It must produce evidence that leads you to believe that its counterclaims are more likely true than not and must prove all essential elements of its counterclaims by the greater weight of the evidence in order to prevail.

This does not mean that the party who calls the most witnesses or offers the most exhibits prevails. Rather, it means that the party who offers the evidence that you find most persuasive prevails.

It might be helpful to visualize a pair of balanced

scales. Imagine that you put on one scale the evidence you find credible, relevant, and supportive on a particular issue as to which -- excuse me -- find credible, relevant, and supportive of McCarter on a particular issue as to which it has the burden of proof and place on the other scale you find -- excuse me -- and place on the other scale the evidence you find credible, relevant, and supportive of Jarrow on the same issue. If the scales tip in favor of Jarrow on that issue, even a little bit, or if the scales are evenly balanced, then McCarter has not sustained its burden of proof on that issue. But if the scales tip in favor of McCarter on that issue, even a little bit, then on that issue it will have sustained its burden of proof.

You should, of course, reverse what I just said in deciding whether Jarrow has sustained its burden of proof on its counterclaims.

With regard to one of the claims in this case, McCarter's claim that Jarrow breached the contract between them, I have already decided part of that claim. And you will have to decide only the remaining part. More specifically, I have already decided that McCarter and Jarrow had a contract; that Jarrow breached the contract; and that Jarrow owes McCarter a particular amount of money for that breach. I have also decided, however, that the question of whether or not Jarrow owes McCarter any additional amounts for the breach of

contract, or if Jarrow is owed a refund by McCarter, is a question that only you, the jury, can decide.

I will give you more instructions about this later. For now, just keep it in mind that McCarter's burden on the breach of contract claim will be to prove that Jarrow owes it the additional amounts that McCarter says it does.

With respect to some issues in the case, the parties may have to satisfy a higher burden of proof than the preponderance of the evidence.  Later, I will give you specific instructions about which issues require a higher burden of proof and what that burden of proof is.

Finally, either side may argue what is called an "affirmative defense."  Affirmative defense is a series of facts that, if proven, would shield the party asserting the defense from liability for the other side's claims or counterclaims.  In the case of affirmative defenses, the party that is asserting the defense bears the burden of proving it by a preponderance of the evidence.

Now I will outline some of the responsibilities that attend your being a juror in this case.  It is important that you obey these instructions.

First, do not communicate with each other about this case or about anyone who has anything to do with it until the end of the case when you go to the jury room to decide on your verdict.  You may certainly talk between yourself during breaks

and the like. Just be sure your conversations are not about anything having to do with the case.

Second, do not communicate with anyone else about the case or about anyone who has anything to do with it until the trial has ended and you have been discharged as jurors. "Anyone else" includes members of your family and your friends, among others. You may tell them you are a juror in a case, but don't tell them anything else about it until after you have been discharged by me at the end of the case.

Additionally, do not communicate electronically or post on the internet any information about your service as a juror or any information about this case, for example, on Facebook, Twitter, Instagram, Snapchat, TikTok, a blog, or any other web or internet service or social media.

Third, do not let anyone talk to or communicate with you about the case or about anyone who has anything to do with it. If someone should try to talk or communicate with you, please report it to me immediately. While serving on this jury, please do not communicate with any of the parties or their attorneys or any witness or with me, either about the case or about any other subject. The attorneys are similarly instructed not to communicate with any of you.

So in the event that you run into any of the attorneys or me or a witness inside or outside the courthouse, please do not construe our behavior as rudeness or discourteousness. We

are just following the rules.  And that's the only way that all of the parties can be assured of the absolute impartiality they are entitled to expect from you as jurors.

If, however, you have a question to pose to me or any other message, please write out the question or message and give it to the clerk, Ms. Johnson, or to a court security officer, who will bring it to my attention.  I will try to respond promptly.

Fourth, do not read any news stories or articles or listen to any radio or television or internet reports about the case or about anyone who has anything to do with it, if there are such stories.

Fifth, do not do any research or any investigation about the case on your own.  Do not do any internet research. Even running a simple search on Google or any other search engine about this case or about anyone involved in this case would violate this duty.  All the information you should consider during the course of the case will be presented to you in this courtroom.  Do not look elsewhere for any other information.

Sixth, although you may bring your cell phones with you into the courthouse, they must be turned off while you are in the courtroom.  And that goes for everyone else in the courtroom who has my permission to bring in cell phones.

Also, be forewarned that you will not be allowed to

have your cell phone with you during actual deliberations of the jury. Deliberations will not take place until all the evidence has been presented and I have instructed you on the law. And we will have someone collect your cell phones right before deliberations begin and, of course, return them to you at any breaks.

Finally, you may take notes during the course of the trial. If you do, these notes must be left in the jury room during all recesses and should not be brought home at night or at the conclusion of the case. Any notes that you take should be used only as memory aids. Do not rely on your notes if they conflict with your independent recollection of the evidence.

If you do not take notes, you should rely on your own recollection of the proceedings and should not be unduly influenced by the notes of other jurors.

The reason for these rules is fairly simple. The parties are entitled to have you personally render a verdict in this case solely on the basis of your independent evaluation of the evidence presented here in the courtroom after your deliberations with the other jurors. Obviously, communicating with others, including your family and friends, outside of the deliberation process or exposing yourself to evidence or information outside the courtroom would compromise your service and fairness to the parties.

Finally, I'd like to summarize the stages of the trial

for you.  First, each side may, but does not have to, make an opening statement.  An opening statement is neither evidence nor argument.  It is an outline of what that side intends to prove.  And it is offered to help you follow the evidence. Each side will have 30 minutes for its opening statement.

Next, the plaintiff will present witnesses, and the defendant may cross-examine them.  Then the defendant will present witnesses, and the plaintiff may cross-examine them. Possibly I will permit either side to present additional witnesses to rebut the other side's evidence.  Then I will give you instructions on the law.  And after that, the attorneys will make their closing arguments to summarize and give you their interpretations of the evidence.  Like opening statements, the closing arguments are not evidence.  After closings, I will give you some final instructions, and you will retire to deliberate on your verdict.

Do not make up your mind about what the verdict should be until after I've instructed you on the law at the end of the case and you have gone to the jury room and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.  All parties deserve, and the law requires, that you give them an opportunity to be heard fully.

These preliminary instructions are, as I previously stated, intended simply to help orient you to hear the evidence.  Later, before you begin deliberations, I will

instruct you again in greater detail. I'm sure you will keep these principles in mind and will keep an open mind until you have heard all the evidence and my formal instructions.

Now, ordinarily we would start the opening statements now, but we're not going to do that for two reasons: one, it would break my promise to get you out of here at 3:30 because each side gets a half an hour; second, the "drip drip" is like Chinese water torture, and I want to do something about it. So I'm going to call maintenance down and try to have something done.

I'm going to send you home now. If you need to go back to the room with Ms. Johnson, you should do that. If you have any belongings there, you want to collect them, that's fine.

Now, you'll hear me say this again and again during this trial. All those instructions I just gave you, no outside research, no talking to other people about the case, I'm going to -- I'm going to use a shorthand to refer to that lengthy instruction that I just gave you. And that shorthand's going to be this: Don't discuss the case. Don't let anyone discuss it with you. And keep an open mind. Okay? That will be my mantra. Okay? But you'll remember everything that goes with that. No Google searches about people in the case, no doing any investigation on the case, no looking elsewhere for other information, etc. Everything I just said you're going to

remember that.

Okay. Now, I'm going to send you home. Have a pleasant evening. We'll see you back in the jury room no later than 8:45. I can only run the trains on time unless all the pass -- I can only run the trains on time if all the passengers are here, and that includes you. So please do your best to get here on time. We'll start at 9:00 sharp. And as I said, tomorrow afternoon you'll leave at 3:30 just like every other afternoon.

So, again, thank you for your service. I'm going to send you out with Ms. Johnson now. And keep an open mind. Don't discuss the case. Don't let anyone discuss it with you. Thank you very much.

(The jury left the courtroom at 2:47 p.m.)

THE COURT: Have a seat people. Anybody who doesn't want to stay doesn't have to stay, you can go, but I do have to talk to the lawyers a little bit more.

Okay, Mr. Green, sorry about the interruption, but let's get back to our discussion.

So I guess what I want to understand is I don't quite see how what you've described as the discount issue, the different percentages, I don't quite see what that has to do with these two documents I'm holding in my hand, again, old Exhibit 534, as I understand it, and new Exhibit 534.

MR. GREEN: It doesn't, Your Honor. It's a separate

issue, two issues raised in the Motion in Limine.

THE COURT: Okay. Fine. So that's that issue. I tell you what: As to the issue we just discussed, whether 534 can be used, I'm going to allow it, and I'm going to allow them to call Mr. Paige to do it. But, let me be very clear, what he's going to testify to is just what I said. It's going to be very short.

It's going to be: This is Exhibit 534, what I'm holding up now, what was given to me, the table. It's one, two, three, four, five, six -- three, six, seven, eight, nine, ten, eleven, twelve rows and one, two, three, four, five, six columns. It's got some numbers in it. He can explain the source of the numbers. When I say "explain," he can identify the source of the numbers. He can explain the arithmetic that resulted in the numbers in the right-hand column. He can explain the arithmetic that resulted in the total.

That's all he can say. Okay? That's Mr. Paige. That can be presented with regard to Exhibit 534. Let's talk about the next issue, the discount issue.

MR. GREEN: Quick question, Your Honor. Will they have to do a foundation?

THE COURT: Yeah, they will. They will have to lay a foundation that he had some involvement with the exhibit, yes.

Okay. So tell me about this second issue. I read the papers, but it's been a long day.

MR. GREEN: Okay, Your Honor. That calculation was never made until June 5th.

THE COURT: And when you say "that calculation."

MR. GREEN: Yes, the difference -- the claimed difference between a discount rate of 25 percent and a discount rate of 38 percent. That calculation was simply never made or disclosed, ever. It was always to be determined. The first time a number was put on it was on June 5, 2023, $63,000. The second time a number was put on it was June 28, 2023, $89,000.

THE COURT: And that's in some document I don't have right now.

MR. GREEN: That's in the supplemental damage analysis of the defendants.

THE COURT: Is there an exhibit number?

MR. GREEN: I don't believe it was filed except perhaps as an exhibit to the papers.

MR. RESSER: It was a supplemental disclosure to Rule 26, Your Honor.

THE COURT: Okay. So it's a disclosure, very good.

MR. GREEN: And the original disclosure, Your Honor, of course, was due on January 13th, 2020. And so it's been three and a half years that the calculation from January 13th, 2020, was undisturbed. It wasn't until June 5th that this calculation appeared for the first time.

THE COURT: And on June 5th it said 60,000 and change,

and on June 29th it said 80,000.

MR. GREEN: Yes, Your Honor.

THE COURT: Got it.

So, Mr. Resser, let me ask you to speak to that second issue then.

MR. RESSER: Thank you, Your Honor. These numbers are all numbers that come from McCarter & English. Their own document is what shows how much was paid on May 31st, 2019, that was subject to Mr. Giarratana's promise that 38 or 43 percent discount had been given on that payment.

Mr. Tinley I think by saying "to be determined" -- and, again, I don't know what was in Mr. Tinley's mind, but these are numbers that come from McCarter & English. And the proof as to what the exact percentages were are still subject to testimony and trial.

As I said earlier, document Exhibit 514 shows a 24.88 percent discount year-to-date through May 2019.

THE COURT: And 514 is a McCarter document?

MR. RESSER: It's -- we're proffering that exhibit, Your Honor, but it's a McCarter document.

THE COURT: Right. I got that. I got that.

MR. RESSER: And it shows both the discounts and the profit that was earned on the payments made through the end of May 2019.

There's another document --

THE COURT: But let me ask you this, Mr. Resser: It sounds to me, from what Mr. Green is saying, if I understand him correctly, the problem is no one ever put -- during the discovery period, during a time when a disclosure would have been timely, no one ever put any meat on the bones of the theory of, Hey, you owe us the difference between discount at X percentage and discount at Y percentage.

That's what I understood him to be saying. Is that true?

MR. RESSER: That is true, Your Honor.

THE COURT: All right. Well, if that's true, I don't think I can allow it.

I get it. We're not talking about big numbers here. I get the latest thing is you're just correcting an error. But, you know, if you were in their shoes, I mean I think you would think -- I think I would think, if I was in their shoes, Well, geez, we thought somebody would come up with that, but nobody ever did. So maybe they're not pursuing that. Because we would like to ask some questions about how they did that at a deposition. And they didn't get the opportunity to do that.

So I'm not going to allow that second piece. I don't know how you were going to present that, but it doesn't matter because I'm not going to allow it. Okay? So that's my ruling on that.

So the gist of it is you can present 534, because, as

I understand it, 534 has nothing to do with this discount issue. But as to the 63,000, 83,000 difference in the percentage of discounts, no. That's my ruling.

MR. PEPE: Your Honor, may I be heard on the consequences of that?

THE COURT: Okay. Tell me what they are. Tell me what you think the consequences of that are.

MR. PEPE: There are -- that is one of the acts of negligent misrepresentation, intentional misrepresentation, breach of fiduciary duty, and CUTPA, unfair trade practices. Now there are no damages for that act. Then, therefore, there can't be testimony on it because there's no --

THE COURT: Well, can I interrupt you, Mr. Pepe? Isn't it also a defense to the breach of counterclaim -- not a defense, but the argument is, We never had an agreement to do the higher rates. Why? Because you tricked us, among other things. And you, you know, said we were getting a certain discount. We agreed -- we agreed to pay based on a certain discount. In fact, it was a very different discount. We never would have agreed that. Therefore, we did not have a meeting of the minds.

Why isn't that fair game then under that argument?

MR. PEPE: But that doesn't make it negligent misrepresentation.

THE COURT: No, it may not make it negligent

misrepresentation. But, remember, they're defending against the breach of contract claim too under a general denial I presume. Maybe they have affirmative defenses too. But under a general denial against the breach of contract, part of what you have to prove for breach of contract is, Was there actually an agreement reached as to the higher rates that I left open on summary judgment?

And what if they were to say to the ladies and gentlemen of the jury: Hey, we don't think there ever was such an agreement because, among other things, our paying some of those bills was premised on the notion that we were getting a 43-percent discount, or whatever Mr. Giarratana told us. And, in fact, we were only given a 30-percent discount. Therefore, we want our money back.

MR. PEPE: Except that's not the argument, Your Honor. There's no dispute that the balance -- the five bills of what the balance was due have been stipulated to. And the argument that they have made is, "You" -- "You misled us" -- that's misrepresentation --

THE COURT: Yeah.

MR. RESSER: -- and "what we want now is the discount we would have gotten if you were telling the truth."

Now, that discount can't be quantified. So evidence as to the claim for the discount can't come in because there's no damages.

THE COURT: Right. But I guess doesn't -- maybe I'm missing something. But, okay, let's accept your proposition, that they can't prove the discounts, or the discount theory I'll call it, they can't prove damages to a reasonable certainty. And, therefore, those claims go out; right? Let's assume that's correct for a moment; right?

But why couldn't they still get into essentially the same evidence for the reason I just stated, namely, Judge, we don't think there was ever an agreement as to the higher rates? And there's lots of reasons for that, Judge, lots of reasons for that, Ladies and Gentlemen, but one of them is we -- to the extent we paid invoices, we thought we were getting 43 percent. In fact, we weren't getting 43 percent, and that was part of our agreement. And so if the parties don't actually have a meeting of the minds on that, well, then there's no agreement.

MR. PEPE: Yeah, but except that's not what -- that's not the way the facts played out, Your Honor. The argument about this discount that they thought they were getting was not a defense to the payment of the bills.

THE COURT: Well, I mean, you know, under a general denial, they don't have to reveal all their arguments, do they? I mean, you know, maybe they have affirmative defenses as well. I'm not even talking about those. But they've also denied liability on the breach of contract claim. Go ahead.

MR. PEPE: No, no. I didn't mean to interrupt the

Court.

THE COURT: No, I was just saying they also denied liability on the breach of contract claim, so I don't understand why they're not able to make any argument under the sun, whether you knew about it or not before, that is relevant to a denial of liability on the breach of contract claim.

MR. PEPE: And in answer to that, Your Honor, I would point to the Court's Motion on Summary Judgment in which the Court said the only issue remaining then is whether there was an agreement that the higher rates, the only issue.

THE COURT: Yes.

MR. PEPE: And that's how we proceeded. The Court did not say, Well, there might be another issue here that it's whether they were entitled to a discount. That was never asserted in summary --

THE COURT: Yeah, I hear you. But maybe I'm misunderstanding the facts. It wouldn't be the first time. Help me out though.

Isn't the question of whether they were getting the discount they alleged that they were promised, isn't that question pertinent, relevant to whether they agreed to the higher rates?

In other words, let's say, for example, the facts come in as follows: Let's say you've got evidence that, in fact, they paid bills at the higher rates and, in fact, Mr. Rogovin

wrote "OK" on every single invoice that they paid and, therefore, Ladies and Gentlemen, they agreed to this. But then Mr. Rogovin testifies, or somebody on his side testifies: Yeah, sure, because we thought -- because they promised us they could not discount anymore. They were giving us an unusually steep discount. They were hurting. And so we said, Okay, we'll pay the bill. But if that's not true, and we think it wasn't, then there's no meeting of the minds because we only paid on the premise that they were, you know, digging as deep as they could for us.

Why isn't that something he can raise?

MR. PEPE: I can answer that, Your Honor.

THE COURT: Go ahead.

MR. PEPE: The question of whether there was an agreement to a higher fees came in March of 2013 when Liberty assumed the defense. That is the fulcrum of the higher rate issue. Mr. Giarratana has testified, and the evidence that was presented on summary judgment, was that he informed Liberty at that time what the rates would be. Liberty accepted it. And he informed Mr. Rogovin at the same time, and Mr. Rogovin agreed. That's fair dispute.

THE COURT: Yup.

MR. PEPE: The issue of the 25 percent, 38 percent doesn't come until May of 2019.

THE COURT: Okay.

MR. PEPE: The month before the trial. So that issue, that issue, had nothing to do with the higher rate increase. That issue arose only when a month before trial McCarter was trying to get the outstanding accounts paid and McCarter and JFI requested, required, demanded a discount.

THE COURT: Okay.

MR. PEPE: That colloquy happened in May of 2019, had nothing to do with the rates.

THE COURT: All right.

MR. PEPE: The rates had been paid, had been paid, from January -- from March of 2013 through May of 2019, and indeed to the end, to the last bill that was paid.

So this issue does not relate to or affect in any way whether there was an agreement to the higher rates, the issue Your Honor teed up in the Motion for Summary Judgment.

THE COURT: Yup.

MR. PEPE: Entirely separate and entirely different six years later.

THE COURT: Got it.

Let me hear you on that, Mr. Resser.

MR. RESSER: Your Honor, I agree with you with respect to the relevance of the breach of contract claim.

THE COURT: But then can you address the argument Mr. Pepe just made, which is: Judge, six years apart.

MR. RESSER: Your Honor, there was a course of conduct

from the beginning of the relationship where discounts were discussed pretty much every year, and there's testimony where the witnesses for McCarter & English say, We go through this every year with this client.

THE COURT: Right.

MR. RESSER: And that is a discussion of getting bills paid and offering a discount in order to encourage that.

THE COURT: Right.

MR. RESSER: And there -- the evidence will show, Your Honor, that there was a course of conduct and a failure of the duty of candor in addition to the failure of duty of candor in connection with jacking up the rates with Liberty Mutual and not telling the client and then each year negotiating contracts and saying to the client, saying, I'm going to go to the Executive Committee. I'm going to act like I'm going to the Executive Committee and ask for more, and then I'm going to tell them we can't do it.

This happened year after year after year. So the 38 percent and the 43 percent is part of a course of conduct by McCarter & English in failing to tell complete facts to their client. It's a lawyer's duty to do that. And I don't think we necessarily have to show -- pardon me, Your Honor. I don't think we necessarily have to show damage for that. We can show there was a breach of fiduciary duty around that, and the jury can decide that that deserves some form of exemplary damages.

THE COURT: Well, putting your issues of the counterclaims aside for a minute, how is it relevant to the actual breach of contract claim that McCarter's made against your client?

MR. RESSER: I think exactly as you've described it. Part of -- part and parcel of this whole relationship --

THE COURT: Right.

MR. RESSER: -- is the idea that Mr. Rogovin agreed to a 32-percent increase in, for example, Mr. Giarratana's billing rate without trying to negotiate that down.

THE COURT: Right.

MR. RESSER: And yet the entire history of this relationship involved Jarrow Formulas attempting to get a break on the fees.

THE COURT: I got you.

Mr. Pepe, what's your response to that? As I understand what Mr. Resser's saying, he's saying: Judge, this wasn't just one point in time, the original thing with the insurance company. The issue is they would talk about the rates every year. They would talk about the bills every year. It was an ongoing discussion. And so the premise of their continuing to pay the bills was that, you know, they're getting this steep discount when, in fact, they were not getting that.

What's your response?

MR. PEPE: This is the response, Your Honor: There

was not a characterization about rates every year. The rate that was agreed to in March of 2013 was the rate that the three partners held constant for the entire six years.

THE COURT: Right, I got you on that. The rate didn't -- itself didn't change. No, I think you're right about that. I don't disagree with that.

But essentially, as I understand their argument, yeah, okay, the rate didn't change, but we were pushing for lower bills one way or the other. And they kept telling us, No, that rate, that flat rate that stayed the same for six years, that now reflects a 43-percent discount. So we kind of were out of aces at that point because 43 percent they told us was really unusual. If they told said, Hey, we're giving you 10 percent, that's all we can do, we would have pushed harder. We wouldn't have agreed to it. We would have asked for a lower rate.

Why can't they make that argument by way of a general denial?

MR. PEPE: Because the discussions just described about the discount had nothing to do ever at any time with the setting of rates. The discussion on discounts was for outstanding bills pending. There was no rate discussion. It was nothing more than an incentive to get paid accounts receivables that were outstanding.

THE COURT: Yeah, I hear you. I hear you on that, Mr. Pepe. But as a practical matter, it's a little bit form over

substance; right? Because a 43-percent break on the rates equals a 43-percent break on the bill because of the way lawyers charge their time. So it's hard to draw -- the wall between those two things doesn't seem very thick to me. So I -- you know, it's hard for me to see why they can't make these arguments by way of a general denial.

Now, it may be that, you know, the jury doesn't find them persuasive. I don't know what the jury's going to do. Maybe that, you know, you're able to argue they can't make up their mind. They got one theory. They got another theory. They have all kinds of theories. Those are just excuses to not pay their bills.

That's all for you to argue. But I can't see why they can't make the argument.

MR. PEPE: Because the line is a bright line, Your Honor. There was never a discussion, Well, we're giving you a 43-percent discount and so that justifies our higher rates. There was never a discussion that we'll give you 10 percent if we can increase our rates. The two issues could not be more distinct and separate.

One discussion on increasing the rates in March of 2013, then the discussions at the end of the fiscal year, and again for this one, 25 percent, the month before trial started, separate and apart from rate -- there were no rate increases. So rates never entered into it. What it was was JFI looking

for the greatest discount it could get on a payment of the outstanding accounts.  Fair business deal.  No rate discussions, no rate adjustments.

THE COURT:  All right.  I got it.  I'm going to think about this and get you a ruling as soon as I can.  I don't know if I'll have a ruling before your openings tomorrow.  That's all.  We'll be in recess.

Mr. Resser, very briefly.

MR. RESSER:  There is an objection that the Court withheld ruling on with respect to the admissibility of Mr. Rechen's opening statement in the Kentucky trial.  That's Exhibit 565.  And it would be helpful to have that ruling before --

THE COURT:  Oh, yeah.  I'll just instruct them they can't consider it for truth.  I thought I said that.  But, yeah, you can.

MR. RESSER:  As to what Mr. Rechen said.

THE COURT:  Yeah, you can, absolutely.  That's absolutely --

MR. RESSER:  Your Honor, one last thing.

THE COURT:  Yeah.

MR. RESSER:  And, again --

THE COURT:  Just to be clear, 565 can be admitted. I'll give a limiting instruction when it comes in they're not to consider it for truth.  This is just to evaluate what was

said.

MR. RESSER: Thank you, Your Honor.

Having heard Your Honor's preliminary instruction --

THE COURT: Yes.

MR. RESSER: -- and Your Honor's comments that the only issue on the breach of contract --

THE COURT: Yup.

MR. RESSER: -- that McCarter & English has pled in this case is whether Jarrow Formulas agreed to the higher rates --

THE COURT: Yup.

MR. RESSER: -- I think the failure of the Court to instruct the jury on clear and convincing evidence with respect to that claim is a problem.

THE COURT: Well, we discussed this previously, Mr. Resser.

MR. RESSER: I know that, Your Honor.

THE COURT: You didn't raise this previously. We went over the preliminary instructions, frankly, more than I've gone over preliminary instructions in any other case. Frankly, I disagree with you. I'm not going to go back at this point.

MR. HEAVEY: Your Honor, one more housekeeping, Your Honor.

THE COURT: No. We're in recess.

MR. HEAVEY: It deals with the security.

(Proceedings concluded at 3:08 p.m.)

**I N D E X**

                                                                    Page

Judge's Preliminary Instructions........................... 6

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____

Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937