UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

                 No. 3:19-CV-1124 (MPS)

McCARTER & ENGLISH, LLP

                 JULY 6, 2023

vs.

                 8:45 A.M.

JARROW FORMULAS, INC.

                 JURY TRIAL

- - - - - - - - - - - - - - - - x

Volume II, pages 40 - 273

450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

      McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
          One State Street, 14th Floor
          Hartford, Connecticut 06103
      BY:  LOUIS R. PEPE, ESQUIRE
          JAMES G. GREEN, JR., ESQUIRE
          JAMES A. BUDINETZ, ESQUIRE
          DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

      BARTON LLP
          100 Wilshire Boulevard, Suite 1300
          Santa Monica, California 90401
      BY:  BERNARD M. RESSER, ESQUIRE

      BARTON LLP
          711 Third Avenue, 14th Floor
          New York, New York 10017
      BY:  JAMES E. HEAVEY, ESQUIRE
      BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:45 a.m.)

THE COURT: All right. We're here for trial in McCarter versus Jarrow, 19-CV-1124.

Can I have appearances, please?

MR. PEPE: Good morning, Your Honor. May it please the Court. For the plaintiff, McCarter & English, LLP, Attorney Louis Pepe. With me is Attorney James Green, Attorney James Budinetz, and Attorney David Case.

THE COURT: Good morning.

MR. RESSER: Good morning, Your Honor. Bernard Resser, Barton LLP, for defendant and counterclaim plaintiff Jarrow Formulas. With me is James Heavey and Michael Ward. Good morning.

THE COURT: All right. Good morning. So let's continue the conversation we were having yesterday about what Mr. Pepe described as the consequences for my ruling with regard to the -- what I'll call the discount damages theory. And, specifically, I believe I ruled that the dollar amounts disclosed with that, in connection with that theory for damages, were not timely disclosed and, therefore, that the evidence with regard to those dollar amounts could not be introduced.

Mr. Pepe rose to say, "Judge, there are some consequences that follow from that," and we had a discussion.

And, Mr. Pepe, I take it -- I just want to make sure

I'm clear what we're arguing about. I take it at least one of those consequences from your understanding is you take it the evidence regarding discounts. So, for example, the e-mails back and forth principally within McCarter between Mr. Giarratana or Ms. Bosma, for example, or Ms. Adipietro -- I can't remember which one -- that those would not be admissible anymore. Is that one of the points that you were making yesterday?

MR. PEPE: It was even further, Your Honor. The notion that I propose was that because there are now damages flowing from the discount claims, then that evidence should not come in at all. And --

THE COURT: Yeah, that's what I just said. In other words, what you were getting at was the evidence is -- associated with the discount claim is inadmissible.

MR. PEPE: Irrelevant.

THE COURT: All right. Let's talk about that.

So I think -- I thought about this overnight and mulled it over with my law clerk a little bit, and I think that I misspoke yesterday when I said that -- well, you know, you made the point that, Judge, the discounts related to essentially AR, outstanding AR, and not the rates.

And I said, Well, but they're kind of the same thing.

And I think I misspoke. I think I agree with you that they're not, now that I've gone back and looked.

However, however, it strikes me that they would be relevant, or I'm wondering still whether they would be relevant, based on the fiduciary duty that Mr. Resser has raised, for example, in his trial brief, and before that even sort of suggested in the Court's summary judgment ruling, that even with regard to your breach of contract claim, the jury, and I think you acknowledged this in your trial brief, will have to decide whether there was a fiduciary relationship with respect to billing. In other words, that's a factual question for the jury to decide. Was there a fiduciary relationship with respect to billing between the parties?

Now, if they do decide that there was a fiduciary relationship, again a question for them, then they would, given the allegations in this case, which I do believe include allegations of, in effect, self-dealing and fraud or misrepresentation, if they do decide that there's a fiduciary relationship, then I believe under the law the burden would shift to McCarter to prove by clear and convincing evidence fair dealing in all respects.

And the key point is -- now let me get to it. The key point is that burden would shift with respect to McCarter's proof on his breach of contract claim, which is why I think Mr. Resser said yesterday, "Judge, I think you should also instruct the jury that clear and convincing evidence should apply on the contract."

I think he's still correct about that. I still don't see a need to get into that in the preliminary instructions in light of what language I will include in my final instructions, which says basically: If I said anything different from my preliminary instructions now, please ignore my preliminary instructions.

But coming back to the point, which is, why isn't the evidence regarding the discounts relevant to the question of, Well, did they prove fair dealing in all respects, if the jury finds that they were a fiduciary?

MR. PEPE: I think the answer to that, Your Honor, is because even if we have that burden, what damages are being claimed? The answer is none. So why do -- why is that issue put before the jury if, in fact, no damages flow from it?

THE COURT: Well, but I guess the question is whether it's part of your burden of proof on the breach of contract claim.

MR. PEPE: There -- I think we part company there, Your Honor, if I may say so.

THE COURT: Sure. Why is that though? Because if I understand the law correctly, if the jury finds that, with respect to billing issues, there was a fiduciary relationship between the parties -- we don't know if they'll find that. But if they do find it, then in order to collect your bill, McCarter's bill, in other words, in order to prove the breach

of contract claim, you would have to prove not just that they owed the money but that under all the circumstances the dealings were fair, and you would have to prove that by clear and convincing evidence.

MR. PEPE: I'll accept that premise.

THE COURT: Okay.

MR. PEPE: To answer Your Honor's question --

THE COURT: Yeah.

MR. PEPE: -- and to assume we still have that burden --

THE COURT: Yes.

MR. PEPE: -- it still relates only to the events in March of 2013 when that agreement was made. Even assuming we carry that heightened burden and we have to demonstrate that their dealings were fair, reasonable, satisfying the fiduciary duty, it would go to what transpired in March of 2013 when that fee agreement for the higher wages, the higher fees, was reached.

The evidence with respect to the discount, and I'm talking now about the 25 and 38 percent, is six years later, as indicated yesterday. And if we look at the defendant's counterclaim, Your Honor, if I may, document 184 at page 21, it speaks to that issue without regard to the formation of the contract Your Honor has found. It identifies in five paragraphs at page 21 of document 184 what the wrongdoing is

and does not make any claim that it relates to the formation or the breach of the contract in question.

THE COURT: Right. But I hear what you're saying, which is you're saying, Judge, even we have the heightened burden, it only applies in that limited time frame. Okay?

But I'm not sure that's the law. In other words, it seems to me once you're a fiduciary -- you take a trustee of a family estate; right? The highest burden, the trustee of a fiduciary, clear and convincing evidence. The trustee has to prove fair dealing in all dealings with the beneficiary, even if the particular dealing that led to a financial harm in the first instance was fair. If before releasing the money, even though whatever they did they -- I don't know. I'm trying to come up with an example. But early on there was some dealing between the trustee and the beneficiary that the beneficiary was challenging, say that was unfair. The trustee bears its burden on that. You know, clear and convincing evidence.

But later on, before actually disbursing the money, the trustee does something that's not quite so fair, maybe can't sustain its burden on that. That seems to be what I imagine Mr. Resser's going to argue. Because, remember, the e-mails that have at least been proposed as exhibits are not just from May 2019. They're basically the annual discount negotiations. They go back to -- I found some yesterday from 2013, 2014.

In fact, I think it was in 2013 that there's this e-mail where, which I'm sure Mr. Resser likes as a piece of evidence and that you don't like, which has -- I can't remember whether it's Ms. Bosma or Ms. Adipietro corresponding by e-mail with Mr. Giarratana. And I'm going to get the quote wrong, but I'm sure you know which e-mail I'm talking about.

Okay, I'll pretend that I asked you to go to the Financial Committee, and then I'll say no.

Okay, that's much earlier on. And so, so, you know, they're going to argue: Geez, that's unfair dealing behind our back. We had no idea these kind of machinations were going on. And this was a continuing thing that they would do and that culminating in Mr. Giarratana's statement in 2013. So it was an annual thing. So all along -- you know, this is what they're going to argue -- they're jerking us around on the discounts. They're playing games with us on the discounts, unbeknownst to us, when we're doing these annual negotiations in good faith. And, you know, even if, you know, they can prove that, you know, we signed onto the rate back in March of 2013, that's not fair dealing.

Why don't you have to overcome that in order to collect the rate?

MR. PEPE: Because we appreciate the burden a fiduciary carries. But the fiduciary has to respond to specific wrongdoing. It's not a floating obligation. It has

to come to rest on a particular alleged wrongdoing. And here the alleged wrongdoings are quite separate and distinct. In fact, there's three.

Your Honor referenced to those year-end e-mails about getting a discount and going to the Executive Committee or saying "We went to the Executive Committee" and actually not going. That is, in fact, separate from the 25 and 38 percent discount, which happened at a different time.

THE COURT: Yes.

MR. PEPE: So it seems to me that the fact -- and let's assume, let's assume for purposes of a discussion that those acts failed to meet the fiduciary duty that's required. It doesn't poison the contract formation five or six years earlier.

THE COURT: But why not? Because it's the same money at the end of the day. I mean, in other words, yes, I accept what you were you saying yesterday is, "Judge, the rate's different from the AR." I accept that. I think I was wrong; you were right.

But at the end of the day, it's the rate that generated the AR, so I agree they're separate. I agree you can't just say that's the same contract term. I agree with that. But at the end of the day, when trying to prove fair dealing, it's about collecting this money. So, first, there has to be a fair rate or a rate that's agreed to; second, that

in carrying out the relationship, when it comes to collecting the money owed based on that rate, you have to be fair there too. Why isn't that your burden?

MR. PEPE: It is except in this context, Your Honor, we're talking about a discount which is not part of the fee arrangement. It is not included --

THE COURT: I do understand that.

MR. PEPE: And so that becomes a separate negotiation every end of the fiscal year --

THE COURT: Yup.

MR. PEPE: -- separate and apart from the contract that exists, to which the client has no right and has admitted it has no right. It's a separate negotiation. The CFO has testified that he understood there was no right to a discount. It's a matter of negotiation.

THE COURT: Yes.

MR. PEPE: I ask; they give. So that's separate -- and, again, separate and apart from the formation of the contract and the performance of the contract, which Your Honor has already found and found it was breached.

So let's assume, again, arguendo that there was an obligation by a fiduciary not to say you went to the Executive Committee if you did not. Let's assume that.

THE COURT: Yeah.

MR. PEPE: That doesn't in any manner or to any extent

affect what was due under the contract which was formed in 2013 because the discount is not part of the fee arrangement and nobody claims that.

THE COURT: All right. I hear your argument.

Mr. Resser?

MR. RESSER: Your Honor, I think you get it entirely. This is part of a course of conduct of failing to abide by the duty of loyalty and the duty of full disclosure as well as actually misstating facts to the client about the fees owing and the business relationship part of the --

THE COURT: What do you say --

MR. RESSER: -- attorney-client relationship.

THE COURT: What do you say, though, to Mr. Pepe's last argument, which is that the Court needs to assess the different alleged breaches separately? In other words, he's saying that, as I understand it, you've got the question of whether there's an agreement as to the rate. Certainly that's a question for the jury to decide. And then you've got this separate question about discounts with regard to AR already incurred at a particular rate, as to which he's right, your client had no right to a discount. It's not part of the contract.

What do you say that the Court or the finder of fact would need to evaluate those separately and determine with regard to McCarter's burden of proof, determine separately

whether McCarter had met a burden of proof with respect to those distinct issues?

MR. RESSER: The evidence will show, Your Honor, that Mr. Giarratana -- the only evidence of a rate increase being disclosed to Jarrow Formulas was a conversation between Mr. Giarratana --

THE COURT: Right, I'm aware of that.

MR. RESSER: -- and Mr. Rogovin.

THE COURT: Yes. Although my understanding is Mr. Rogovin also initialed each invoice, but ...

MR. RESSER: Right.

THE COURT: Anyway, I don't need to get into that. That's a jury question.

MR. RESSER: So the issue there is, did -- was there an agreement --

THE COURT: Yes.

MR. RESSER: Was there -- was, in fact -- did this conversation ever even take place?

THE COURT: Yes.

MR. RESSER: That goes to the credibility of the lawyer and the lawyer's credibility with respect to other communications with the client on the same subject matter, which is billing and fees I think is part of this course of conduct. And we --

THE COURT: So, in other words, Mr. Giarratana, for

example, had made a misrepresentation -- just in theory, okay, just a hypothetical. He made a misrepresentation to Mr. Rogovin about an entirely different subject although still related to the underlying case, said -- for example, let's say Mr. Rechen had said -- and again, I'm just making this up. I'm not casting dispersions. It's just what's coming to mind, so please don't take anything.

Let's say Mr. Rechen said, I don't want Mr. Rogovin there for my opening statement. I don't want him there, so tell him the trial starts on a Thursday instead of a Wednesday. He can come and watch the evidence.

So Mr. Giarratana made such a statement, a knowing misrepresentation, to Mr. Rogovin to avoid him showing up and bothering Mr. Rechen. All right. Let's suppose that happened.

Would that be a basis to avoid the contractual obligation to pay the bill?

MR. RESSER: That is not directly related to the billing and the fees, but I think it's part of a course of conduct of how you're being not straight with the client.

THE COURT: But what do you think the answer to my question is though?

MR. RESSER: I think it would be a closer call. But I think when you're talking about something that is directly on point to the billing process, you know, you have these e-mails, as Your Honor points out, and it's 534D, I believe.

THE COURT: Yup, I've seen it.

MR. RESSER: In defendant's exhibits from September 2013. That's within only a couple of months of when the alleged conversations took place with Mr. Rogovin. And they're talking about telling Jarrow Formulas that we went to the Executive Committee to get discounts.

The jury's going to have to decide whether it's reasonable to think that Mr. Rogovin agreed to a 32-percent increase of Mr. Giarratana's hourly billing rate and just accepted it without negotiating or trying to get a better rate. And within two months of that, they're negotiating and trying to get a low -- a discount on the AR that included the jacked-up rates.

THE COURT: Okay. I got your argument.

MR. RESSER: Thank you.

THE COURT: So, Devorah, do we think they're here? Let's get them. So I'm going to take it under advisement. Thank you, Counsel. That was helpful, and I'll get a ruling out as soon as I can. I don't know yet what I'm going to do on that, just to be clear.

MR. RESSER: Your Honor, I have a couple of housekeeping matters.

THE COURT: Make them quick.

MR. RESSER: Mr. Paige isn't going to be available after tomorrow. He's going to be out of the country for two

weeks.  He's returning -- he would first be able to testify after that on the 25th.

I've spoken with Mr. Pepe about it.  He's not excited about taking him out of order tomorrow.  He would be available to come in by Zoom in the intervening two weeks.  I'm hoping we'll finish the trial before he returns from out of the country.

THE COURT:  Oh, really?  You think so?

MR. RESSER:  I don't know that we will.

THE COURT:  Yeah, I don't either.

MR. RESSER:  But I don't -- you know, we can reserve that and you'll decide on the Zoom if that's the only -- you know, if you're finishing up the trial.

THE COURT:  Any objection to the Zoom if we have to do that?

MR. PEPE:  No.  I think that's better than interrupting.

THE COURT:  I do too.  So I'm going to assume then that if for some reason we're not going on the 25th, he'll testify over Zoom.

MR. RESSER:  One other thing.

THE COURT:  Yes.

MR. RESSER:  I would like in the opening statement to refer to a Rule of Professional Conduct.  I have a request for judicial notice of Rule of Professional Conduct 1.5.  I think

it is evidence of a standard applicable to attorneys. I didn't want to file it without telling Your Honor that.

THE COURT: I actually looked at the cases on Rule of Professional Conduct. So I'm going to make that simple. No, you can't refer to the Rules of Professional Conduct in your opening statement. And barring something unexpected, I'm not letting in any evidence about that, so no. Okay, there we are.

We're ready, Devorah.

(The jury entered the courtroom at 9:01 a.m.)

THE COURT: Please take your seats everyone. All right, Ladies and Gentlemen, I hope you had a nice evening. So as I said when we left off yesterday, we're now going to move into opening statements. And just bear with me one second.

We're going to hear opening statements from each side. As I said earlier, as I said yesterday, what the lawyers say in their openings is not evidence. Rather, it is a prediction or a roadmap of what the lawyers expect the evidence will be. You should not decide anything about this case on the basis of the opening statements, which, like these preliminary instructions, are intended merely to orient you to the case. Each side will have 30 minutes. We'll begin with the plaintiff's counsel.

Mr. Pepe.

MR. PEPE: Yes, Your Honor.

May it please the Court.

Members of the Jury, my name is Lou Pepe, and with my

colleagues sitting at counsel table, Attorney James Green, Attorney James Budinetz, and Attorney David Case, we represent the plaintiff in this matter, the McCarter & English law firm.

This case is actually two cases. The first one you heard His Honor refer to in his preliminary instructions yesterday afternoon when he advised you that, in proceedings before this trial began, he had found that there was a contract between the McCarter law firm and Jarrow Formulas, Inc., or JFI, that JFI had breached that contract, and that as a result of that breach, JFI owed McCarter money.

The contract in question was the retention by JFI of the McCarter law firm to represent JFI in a lawsuit brought against JFI in Kentucky Federal Court.

JFI agreed to pay McCarter for that work on a so-called time-devoted basis and did pay the first 70 monthly invoices but failed and refused to pay the last five. The Court has already awarded some of that. Whether we're entitled to the remainder will be for you to decide.

The second case is about what JFI and its chairman, Jarrow Rogovin, did when McCarter was forced to bring this lawsuit in this court to collect those fees.

Every trial is an attempt to turn back the clock to recreate in the courtroom events that happened years ago. In this case, we must turn back the clock 27 years to 1996.

At that time Mark Giarratana was a lawyer practicing

here in Hartford. Before that, he graduated from an engineering school and worked as a mechanical engineer in the industry, then went to law school, graduated, and began a private practice concentrating his practice in the area of intellectual property law, trademarks, and copyrights and patents and trade secrets.

Mr. Giarratana is now a partner in the McCarter & English law firm. He is here today. He is going to testify in this case, and I would like him to stand and to be introduced to you.

Mr. Giarratana, would you please stand.

Thank you.

On that fateful day in 1996, Jarrow Rogovin, the chairman of JFI, came to Mark Giarratana in his office in Hartford and asked him to represent Jarrow Formulas, Inc., in a lawsuit that had been brought against Jarrow Formulas here in Connecticut. Jarrow Formulas, Inc., was a manufacturer and distributor and seller of nutritional food supplements located in Los Angeles. And Jarrow Rogovin was the founder and president of that company.

Mr. Giarratana undertook the representation, and it was quite successful. And that was the beginning of a 23-year-long relationship, a mutually beneficial relationship that started out as attorney-client but grew into more than that. It grew into a genuine friendship.

During the 23 years following that first case, Mr. Rogovin turned to Mr. Giarratana for almost all his trademark and patent and intellectual property matters. Mr. Giarratana subsequently moved from the law firm where they first met to another law firm here in Hartford and then some years after that moved from that law firm to the Hartford office of McCarter & English. Each time he moved his practice, Jarrow Rogovin followed him with his business, his legal business. Over the 23 years following that first case in 1996, Attorney Giarratana and the attorneys working with him handled more than 540 legal matters for Jarrow Formulas, Inc., 540 different legal matters.

The beginning of the end of that mutually beneficial relationship came in 2013. Two years earlier, Jarrow Rogovin had hired away Kean Ashurst from a competitor and supplier, the Caudill Seed and Warehouse Company. Kean Ashurst was a director of research and development for Caudill Seed. But he also had a covenant not to compete, a non-disclosure agreement, and a secrecy agreement with his employer Caudill Seed.

Worse than that, before and after Kean Ashurst was working with JFI, he secretly transmitted to JFI and to Jarrow Rogovin personally proprietary and confidential documents which Caudill Seed claimed contained trade secrets revealing its research on a broccoli-based food supplement. JFI was also developing at that time a broccoli-based food supplement. When

Caudill Seed learned of this, it sued Jarrow Formulas, Inc., in Kentucky Federal Court for $12 million.

The evidence will show that Jarrow Rogovin was personally affronted, offended, indeed livid, outraged by that lawsuit that he and his company were being accused of stealing trade secrets. So he did, as so often he had done in the past, turned to his counselor, his trusted counselor, Mark Giarratana, to defend the lawsuit in Kentucky.

Mr. Giarratana warned Mr. Rogovin it was a difficult case and might have to be won on appeal, but Mr. Rogovin made clear from the beginning that this was to be a fight to the death. There would be no settlement, none. Mr. McCarter -- McCarter was to over-engineer the defense, his words, over-engineer the defense, because McCarter was to win completely so that JFI, Jarrow Formulas, could collect its legal fees back from Caudill.

Mr. Giarratana reached out to two of his partners for help in defending that case. He recruited partner in the McCarter Hartford law office Eric Grondahl. Now, Eric Grondahl, like Mr. Giarratana, was also a graduate of engineering school and worked in the industry as a chemical engineer before going to law school and getting his law degree. And then when he started his practice, he too, like Mr. Giarratana, concentrated in intellectual property law using, of course, his engineering training in that area of the law.

Mr. Grondahl is now retired from the McCarter & English law firm, but he is here today. And he will testify in this matter. And I'd like him to stand and be introduced to you.

Thank you, Mr. Grondahl.

Mr. Giarratana then sought out another partner in the McCarter office, Tom Rechen, who was a litigator concentrating his trial practice in the area of intellectual property disputes. Mr. Rechen is still a partner in the McCarter & English law firm in the Hartford office. He will testify in this matter. He is here today. And I would ask him to stand and be introduced to you.

Mr. Rechen?

Thank you.

They then sued, after that team was put together, six very long, difficult, debilitating, and very, very expensive years of litigation in the Kentucky Federal Court with the filing of many motions and pleadings and the exchange of documents and the taking of depositions and everything that goes into a complicated commercial lawsuit like the one brought by Caudill Seed.

For its representation in that Kentucky lawsuit, McCarter billed Jarrow Formulas, Inc., on the same fee arrangement basis as it had used and had been agreed to in every one of those 540 other legal matters handled over the 23

years, the same fee arrangement, the so-called time-devoted fee arrangement, which very simply means that the attorneys and the paralegals working in the matter every day carefully record their time and description of what they are doing, and then at the end of the month, all those entries are collected and the hourly rate for that attorney or that paralegal is multiplied against a number of hours to produce a dollar result. All of it is totaled up and set forth in great, great detail in a monthly invoice showing the entry for every lawyer, every paralegal, the time spent and what they were doing, and the hourly rate for every single lawyer and paralegal.

Jarrow Formulas paid the first 70 of those monthly invoices, the first 70 without question, without dispute, without challenge of any kind, usually within 30 to 60 days, and always with the request for a discount to bring the accounts receivable current, as McCarter's fiscal year-end came on September 30.

Jarrow Rogovin, the chairman, reviewed and proofed, the evidence will show, every single invoice before it was paid, every single one.

As I stated at the beginning of my remarks, Jarrow Formulas never paid the last five. First 70 paid without question. The last five monthly invoices, never paid, because two days before the trial started down in Kentucky, Jarrow Rogovin sent an e-mail to his CFO, chief financial officer,

saying, "Put off the legal bills." Put off the legal bills. Never told McCarter. Never told them.

So there was an amount outstanding as the trial approached; and, of course, it got much larger as the trial proceeded through the month of June. The trial started in Kentucky after six years of pretrial litigation in June of 2019. Mr. Giarratana, Mr. Grondahl, Mr. Rechen, and some associates they had working with them went to Kentucky, and they had also on their trial team down there a local attorney in Louisville, Kentucky, who also practiced in the area of intellectual property law by the name of Joel Beres. Mr. Beres you will hear from by video deposition in this case.

Caudill Seed was the plaintiff and went first. It presented to the jury what had happened, what Jarrow Rogovin has admitted was a, quote, horrible narrative, his words, horrible narrative of hiring away Kean Ashurst and secretly receiving those confidential and proprietary documents before and after Kean Ashurst went to work for Jarrow Formulas.

The McCarter team put forth the defense it had developed over the preceding six years in close collaboration with and with the agreement of Jarrow Rogovin.

McCarter could not argue to the jury in Kentucky that Jarrow Formulas never received those confidential and proprietary documents which Caudill Seed claimed constituted trade secrets because they did. They had received them.

Instead what McCarter could do, and did do, was argue to that jury in Kentucky that the information in those confidential and proprietary documents did not meet the legal definition of a trade secret because that information was in what they call the public domain, meaning it was available to the public and could not be a trade secret.

But even if it was, McCarter could and did argue Jarrow Formulas never used it, and so Caudill Seed had no damages it could prove.

The McCarter trial team did what every trial lawyer does during trial, worked all day in the courtroom, retired to the offices of Joel Beres in Louisville, Kentucky, at the end of the trial day, reviewed the evidence and the decisions that had been made that day and how it affected their strategy, and then went to work well into the night getting ready for the next day. Debilitating and exhaustive effort, of course, but it appeared to be working because, as the cross-examination and examinations went on in the courtroom, Jarrow Rogovin acknowledged that it appeared to be working.

By the same token, the ordeal of the trial took its toll on everyone, especially Mr. Rogovin. Never an easy client to work with, he described himself as, quote, a constant crowd control issue, probably about the most difficult client you've ever had or ever will.

Became more difficult and the mood swings became more

apparent as the trial progressed, as evidenced by the many, many, many e-mails he sent to Mr. Giarratana and the trial team during the trial, many of which will be entered into evidence in this case and which, unfortunately, contain very strong profanities which I will have to read to you and for which I apologize in advance.

But as the Kentucky trial proceeded and came to a conclusion, Mr. Rogovin was upbeat, optimistic, and laudatory of McCarter's efforts. He reported to his executives back in Los Angeles that McCarter was, quote, dominating the courtroom, end quote, his words. He sent his friend an e-mail, as the trial came to a close, telling him, quote, We are winning, end quote, his words. And he left a message for McCarter lawyers that they were, quote, Doing a fantastic job. Thank you. Big hugs, end quote.

On June 26, 2019, when the jury in Kentucky returned its verdict, it was discovered that McCarter's defense of Jarrow Formulas was only partly successful. Caudill by that time was claiming $9.7 million and six trade secrets that had been stolen. The jury found there were only five trade secrets, four of them had been misappropriated, stolen by Jarrow Formulas, Inc., but awarded damages on only one of those trade secrets, the research and development costs going into this broccoli food -- broccoli-based food supplement. Didn't award $9.7 million, but it awarded $2.4 million.

But the jury also found that the misappropriation of those trade secrets was done willfully and maliciously and under the trade secret law that then allowed the judge in the Kentucky case to subsequently award punitive damages and attorney's fees, which he did.

After the verdict was returned, Jarrow Rogovin left the courtroom without saying a word to Mr. Giarratana or Mr. Grondahl, Mr. Rechen. He never spoke to them again.

Instead, that night he met with Kean Ashurst, who had been hired away in 2011, met with Kean Ashurst and told him that verdict was the result of McCarter's malpractice and that McCarter would pay the damages that the jury had awarded. His hiring away of Kean Ashurst he claimed was not the reason for that verdict. His receiving those confidential and proprietary documents was not the reason for that verdict. That verdict was McCarter's fault. And he decided that night to fire the McCarter & English law firm but did not tell them, did not tell them.

McCarter & English flew back to Hartford that very weekend and began working that weekend, in fact on the plane, on a motion to set aside that partially adverse verdict which they believed was wrong. And while they were working on that motion here in Hartford, the in-house attorney for Jarrow Formulas, Jonathan Leventhal, who will testify in this matter, sent them e-mails asking them questions about the appeal

procedure and the deadlines that have to be met and the steps that would have to be taken and also for an analysis of the damages that the jury had awarded in that case, all of which McCarter went to work to answer.

It sent back to Jarrow Formulas the motion and the brief to set aside that partially adverse verdict. It sent back the answers to all the questions that had been asked. And then, and only then, after Jarrow Formulas had received all that information, did it notify McCarter it was fired. And it did so by having another one of JFI's lawyers send a letter to Mr. Giarratana thereby ending that 23-year relationship, attorney/client and friend. Except we know it's not the end because we are here today. Not only was McCarter fired when it was fired, there were outstanding and due and owing the moneys in those five last monthly invoices about which I spoke, totaling some $2 million.

McCarter had no choice but to bring suit in this court, in this action, to collect the $2 million and another $57,000 which was due and owing on several intellectual property matters McCarter was handling for JFI unrelated to the Kentucky litigation, had nothing to do with it, but there was money due and owing. Mr. Rogovin said he would pay that and then did not.

As I stated at the outset, this Court has already decided there was a contract and that it was breached, but

there are still some parts of McCarter's claim left for you, the jury, to decide, more particularly what hourly rates were agreed to between Mr. Giarratana and Mr. Rogovin to be charged in that Kentucky litigation when it began in 2013. And also for you to decide is whether that breach of contract, as McCarter claimed, was in bad faith, willful, and reckless and in total disregard of McCarter's rights.

When that suit, this suit, was brought, as I indicated to you, McCarter -- JFI brought its counterclaim. And in that counterclaim, it accused these three lawyers in the McCarter law firm, all of whom the evidence will show enjoy impeccable reputations at the bar, of engaging in misrepresentations and breach of fiduciary duty and unfair trade practices.

Those serious allegations arise from two events: one, the negotiation or the agreement on the hourly rates to be charged in the Kentucky litigation when it started in 2013; and, two, the negotiations surrounding a discount that Jarrow Formulas, Inc., would ask for its outstanding invoices at the end of Jarrow Formulas' fiscal -- excuse me -- McCarter's fiscal year in order to bring its account current before the fiscal year ended, a discount the evidence will show it was not under the agreement but which they negotiated at the end of every fiscal year.

The hourly rate increase, as I indicated, happened at the beginning of the Kentucky litigation when JFI's insurer

said it would pay for the defense in the Caudill lawsuit under what's called a reservation of rights, which means they reserve their right to change their mind later on. But they asked McCarter, Mr. Giarratana, for the hourly rates that would be charged in the defense of that litigation in Kentucky, and Mr. Giarratana advised Liberty Insurance Company what its rates would be for him and the other partners, and Liberty agreed, no problem.

Mr. Giarratana also advised Jarrow Rogovin at the same time that these new rates would be applied in the Kentucky litigation, and if the insurance companies subsequently did not pay, of course, Jarrow Formulas as the client would remain responsible.

He advised, the evidence will show, Mr. Rogovin that the hourly rates that had been in place up to that time were well over two years old and had been increased for all other matters, for all other clients, and would have to be increased in this case. And Jarrow Rogovin, the evidence will show, agreed.

That hourly rate for each one of the -- the new hourly rate for each one of the partners and paralegals in the monthly invoices that were submitted thereafter, all 75 over the next six years, showed that hourly rate for each lawyer, each paralegal, clearly, distinctly, every single bill.

Jarrow Rogovin, the evidence will show, personally

reviewed and proofed every single bill. Only now Mr. Rogovin claims he was never told about that rate increase and never knew about it.

The discount issue arises because at the end of every fiscal year, as I indicated to you, there would be negotiations over whether and to what extent a discount would be paid -- would be given to JFI so that it would bring its account current. JFI now claims, in the course of those negotiations, McCarter misled it. But the evidence will show that JFI in every case ended up with a substantial discount simply for paying its outstanding bills, a discount that it was never entitled to under the fee arrangement.

That is it. That is all that is involved in JFI's claims of breach of fiduciary duty and misrepresentations and unfair trade practices.

Finally, in that counterclaim, in response to McCarter's suit to collect its fees, this suit, Jarrow Rogovin and Jarrow Formulas claimed that McCarter committed legal malpractice.

THE COURT: Mr. Pepe, you have five minutes.

MR. PEPE: How? By not calling Jarrow Rogovin to testify as a live witness in the Kentucky trial but instead using his video deposition, which the rules permit. That decision, one of the hundreds and hundreds that was made by McCarter during the course of its litigation, was one made in

close collaboration with the JFI team. In fact, the decision was not made until the end of the evidence being provided by Caudill Seed when McCarter was getting ready to put on its defense that night.

There was a meeting in the offices of Joel Beres, attended by the JFI executives who had flown in to Kentucky to testify in this matter. And there was a meeting in that office room where everyone went around the table, the executives, the McCarter team, the jury consultants, and everyone agreed that the smart, the best strategy here was to use that video deposition instead of the live testimony of Jarrow Rogovin, thereby eliminating the chance for him to be cross-examined. Everyone agreed.

And when Jarrow Rogovin was advised of that decision, he too agreed. He agreed. When McCarter brought this lawsuit, that decision became malpractice.

So I end where I began. Every single lawyer at trial has a winner and a loser. The evidence will show that McCarter did everything it could to make JFI prevail in that Kentucky litigation, but it could not overcome that horrible narrative of the stealing of the confidential and proprietary documents.

Jarrow Rogovin hired away Kean Ashurst and received those documents and never returned them. The jury condemned that action, and they deemed it willful and malicious. The evidence will show that Jarrow Rogovin could not accept that

condemnation, and that is why we are here.

Thank you very much for your attention.

THE COURT: Thank you, Attorney Pepe.

Now we're going to hear from Mr. Resser on behalf of Jarrow Formulas, and he'll also have 30 minutes.

Mr. Resser.

MR. RESSER: Thank you, Your Honor. May it please the Court.

Thank you for your service.

My name is Bernie Resser, and I am privileged to represent Jarrow Formulas in this case.

Now, you may wonder, how can I say that after what you just heard from Mr. Pepe? But Mr. Pepe didn't tell you some things in this case that I think you will find important to your decision.

Mr. Pepe didn't tell you that from the beginning of the Caudill case in January 2013, McCarter & English billed Jarrow Formulas at contract rates that were substantially less than what they're asking for here. And they didn't bill Jarrow Formulas at higher rates until over five months into the case and then reissued bills at the higher rates when Liberty Insurance agreed to those higher rates, without being told what the actual rates Jarrow Formulas had already been billed and already paid some of those bills.

Mr. Pepe also didn't tell you that McCarter & English

continued to bill Jarrow Formulas on all other matters they were handling for the company at those original rates. And those are the rates that the Court has applied on the decisions that have already been made in this case, not the higher rates.

Mr. Pepe also didn't tell you that at the trial in Kentucky, Mr. Rechen, the trial attorney who was introduced to you earlier, promised the jury in Kentucky three times that Mr. Rogovin would testify at trial, that he was in the courtroom and he was available to testify live.

Mr. Pepe also didn't tell you that when everyone agreed that Mr. Rogovin wouldn't testify, they were told, "You will lose this case if Jarrow Rogovin gets on the witness stand." And you know what, Ladies and Gentlemen? Because Mr. Rogovin didn't get on the witness stand and only his deposition was played, key evidence didn't come in at trial in Kentucky. And in particular what you will hear referred to as the O'Brien letter.

Mr. O'Brien was a lawyer for Caudill Seed, and before they sued Jarrow Formulas, they sent a letter. And Mr. Rogovin responded to it explaining, "I have no intention of taking any trade secrets. Please tell me what you're talking about and we'll make sure to stay away from it." That critical evidence never, never came before the jury in Kentucky.

Now, with respect to the alleged rate increases, Mr. Giarratana raised his rates several months into the Kentucky

case from $405 an hour to $535 an hour. That's over a 30-percent increase in his hourly rate. There isn't a single document informing Jarrow Formulas that the rates were going to be increased before the increase was made.

McCarter & English never sent its communications to Liberty Insurance about the increased rates to Jarrow Formulas. There's no letter, there's no e-mail, there's no memo to file that refers to any conversation between Mr. Rogovin and Mr. Giarratana about increasing the hourly rates.

You will hear more about these issues later, but I wanted you to know that what you heard from Mr. Pepe was a carefully crafted version of the facts by an extremely skilled lawyer. But I think you will hear evidence and some of those points that I just made were left out. And I think they're very important for your decision in this case.

You also heard Judge Shea's preliminary instruction on breach of contract. And that didn't sound very good for Jarrow Formulas either. But that ruling was based on McCarter & English's original rates, the Giarratana $405 an hour, not the 535 an hour. And that's because Judge Shea did not decide there was an agreement to increase the rates. As Judge Shea told you yesterday, that is what you are here to decide.

So why are we here? This trial is about whether it was agreed that McCarter & English could raise its hourly billing rates without advanced notice, without a binding

contract, and whether it was fair to the client to whom they owe a higher duty as a fiduciary. It's not like a contract. It's not like a relationship between any business and any customer. This is an attorney-client relationship that requires a higher level of candor.

Now, the evidence will show that McCarter & English was paid over $5 million in legal fees for the Kentucky trial, and the evidence will show that out of that $5 million, nearly a million dollars was based on those increased rates for which there is not a single notice to Jarrow Formulas that their rates were going up. Nothing in writing.

In addition, this case is about how McCarter & English fell down on the job, in particular, not having Mr. Rogovin defend his reputation, not having Mr. Rogovin explain after promising the jury they would hear from him live. And there's no dispute in this case that Mr. Rogovin did not testify live in the Kentucky trial.

This case is about lawyers serving lawyers, not the client. You will see the inside of the Kentucky trial, the part that jurors usually don't see, kind of how the sausage is made when it comes to the attorney-client relationship in trying a lawsuit. And you will see some e-mails between the lawyer and the client that will usually never see the light of day. And as Mr. Pepe said, some of them have strong language. Some of them are critical of opposing lawyers and even the

judge.

And what you heard from Mr. Pepe is McCarter & English is still ducking responsibility for what they did wrong in billing, and they're making excuses and blaming Mr. Rogovin, blaming Mr. Rogovin, for the fact that he didn't testify.

Now, you heard Mr. Pepe indicate that they're suing not just for the legal fees that they claim are still owing, but they're claiming that it was willful and malicious for Jarrow Formulas to pay 70 bills of about $5 million and then not pay the rest.

First of all, the instruction to slow down on the payment to the lawyers, the evidence will show that Jarrow Formulas was in a financial crunch at the time. The evidence will also show that on May 31st they paid nearly $500,000 -- May 31st 2019, just before the trial started in Kentucky on June 4th, paid nearly $500,000 in legal fees on some old bills. So they didn't stop paying. They slowed down paying.

And then after the trial, Mr. Rogovin had that conversation -- after the trial was lost, Mr. Rogovin had that conversation with Mr. Ashurst that you just heard about. Well, how do we know about that conversation? We know about that conversation because Mr. Rogovin made a butt call. He inadvertently dialed Mr. Giarratana's phone while he was speaking to Mr. Ashurst about the outcome of the litigation. And in that butt call, he said, They didn't do S-H-blank-blank

to cut off my damages.  And he also mentioned the O'Brien letter.  And they didn't have him testify.

So we know that Mr. Rogovin's decision not to pay the McCarter bill isn't something made up months later, years later, as I'm standing here today.  The night the verdict came in is when he expressed his concern about the fact that he felt McCarter & English didn't cut off the damages and they didn't have him testify at trial and that that was a large part of why there was a $2.4 million jury verdict and why the willful and malicious finding on the trade secret case resulted in a $4.2 million damage verdict against Jarrow Formulas.

And, in fact, Jarrow Formulas has already paid Caudill over $6.7 million on that judgment in addition to the nearly $5 million they've already paid McCarter & English.  So when Mr. Pepe says it was a partial win or only a partial loss and they were seeking 12 million, well, guess what.  Jarrow Formulas already paid $12 million between the legal fees and the judgment in this case.  Is that a win?

Now, I want to introduce to you Mr. Rogovin.  Mr. Rogovin is in the front of the courtroom.  He is the former chairman of Jarrow Formulas.  He's the founder of Jarrow Formulas.  His first name is Jarrow.  The company bears his name.  Because of that shared name, I'll refer to the company as "Jarrow Formulas" and Mr. Rogovin as "Mr. Rogovin."

And let me tell you about Mr. Rogovin.  He's not a

perfect person. He's passionate, though, about his good name and his company's good name. He expresses himself in unvarnished ways. He sometimes yells. He uses swear words, dropping F-bombs, and colorful sometimes insulting nicknames.

But one thing Mr. Rogovin is not, and you'll get a chance to hear from him, is he's not a phony. His often naked expressions of anger and frustration that you will hear and read stem from his passionate defense of himself and his company.

He was accused of being a thief. He was accused of a criminal enterprise by Caudill Seed. Those were racketeering charges made by Caudill Seed against him that were dismissed in the Kentucky case. His outrage stemmed from frustration with those accusations as well as frustrations with his own lawyers who let accusations fly by sometimes unchallenged in the Kentucky trial.

M&E was concerned -- I sometimes refer to McCarter & English as "M&E." I'm sorry. It's a shorthand I've used.

M&E and was concerned that the jury would confuse Mr. Rogovin's upset and ill will towards Caudill because he was accused of being a criminal with whether he intended to take trade secrets and use them. And the evidence will show, for example, that with the customer list he got from Mr. Ashurst, he used it as a do-not-call list. And he never -- there is no evidence that he ever solicited business from any of Caudill's

customers. McCarter & English didn't trust the Kentucky jury to see the difference. You will here from Mr. Rogovin in this case, and he will get his day in court finally.

Jonathan Leventhal, who's also here in the courtroom, was present during the Kentucky trial. And he will testify on some of the fee billing matters, including the decision that Mr. Rogovin wouldn't testify and the context in which that decision was made when they were told, "You will lose if he testifies."

You heard about Mr. Ashurst. He won't testify here because he can't be compelled to come to Kentucky. He still lives in Kentucky.

He was known to Jarrow Formulas for years, for several years before he came to work with Jarrow Formulas as a consultant. He told Mr. Rogovin he was unhappy at Caudill. And in 2011 there was a shortage of a particular ingredient called quercetin that Jarrow Formulas used for some of its products. And Mr. Rogovin thought Mr. Ashurst could help with formulating that ingredient for their products.

Mr. Ashurst worked in Kentucky. He did not move to Los Angeles where Jarrow Formulas is located. And he was engaged to work on the quercetin ingredient.

Jarrow Formulas was also buying an ingredient for a broccoli supplement derived from broccoli seeds from Caudill Seed at the time. And Mr. Rogovin was concerned that Caudill's

ingredient was contaminated and irradiated, among other problems. So that's why Jarrow Formulas was also looking to replace that source of that ingredient to its broccoli supplement product. I guess we probably would all like to take a pill to get our broccoli rather than to eat the broccoli, and that's what that product is about.

He asked Mr. Ashurst to help with the broccoli supplement as well, and he later found out that Mr. Ashurst was trying some of the same methods that were tried at Caudill. And Mr. Rogovin instructed Mr. Ashurst to stop. And he insisted on assurances that Mr. Ashurst use a different method. And that -- those different methods resulted in a patent awarded to Jarrow Formulas. And the product that Jarrow Formulas developed from that is called BroccoMax.

The other party to this case is McCarter & English, a law firm of over 300 lawyers with 12 offices located primarily between Boston and Washington, D.C. Their website says they "Perform with Integrity. To solidify our clients' trust, we never compromise on ethics."

Mr. Giarratana is an intellectual property lawyer who represented Jarrow Formulas for nearly 23 years. And they didn't win every matter they did for Jarrow Formulas. But he still got paid, until the Kentucky trial.

Mr. Rechen is an experienced trial lawyer at McCarter & English, and he was the lead trial attorney in the Kentucky

trial.

Mr. Grondahl is another IP lawyer, intellectual property lawyer, at McCarter & English, and he had the science and technical background and was tasked with the issues regarding the trade secrets and why Jarrow Formulas was not using Caudill's technology. One thing Mr. Pepe didn't tell you is Mr. Grondahl didn't even know his billing rate was increased. His billing rate was increased six months into the case by over 20 percent.

Another person you'll hear from in this trial is Attorney Michael Berman. Michael Berman is a seasoned trial lawyer here in Hartford. He has practiced over 50 years, and he's serving as an independent expert. And he will testify about the mistake that he concluded caused the jury in the Caudill Kentucky trial to find that Jarrow Formulas had willfully and maliciously misappropriated trade secrets.

Attorney James Shearin is the expert witness for McCarter & English. He will be called to counter Mr. Berman's testimony. But Mr. Shearin, who has been at hundreds of depositions, testified in this case that Mr. Rogovin's deposition, the only thing that they showed to the jury in Kentucky, was the worst deposition he's ever seen. So in deciding not to have Mr. Rogovin testify, they instead showed the jury the deposition that their own expert said was the worst deposition he'd ever seen. The evidence will show that

Mr. Rogovin had very little sleep for that deposition, and that was what was shown to the jury instead of having him testify live at trial.

The rest of our team includes Mr. James Heavey, Mr. Michael Ward, our crack paralegal Aishwarya Prabhu.

The underlying case was explained to you. It was a federal court case. And the $2.4 million in -- I'm sorry -- in compensatory damages that were awarded included over $2 million in what's called research and development expenses. That was the main part of the damages that McCarter -- that Jarrow Formulas had entered against them. Those are the damages that Mr. Rogovin in the butt call referred to as M&E never adequately investigated and didn't cut off with evidence that could have been uncovered.

And then, in addition, because of the finding of willful and malicious, the judge added -- the judge added a million dollars in exemplary damages and awarded Caudill its attorney fees of over $3.2 million.

The compensatory and willful and malicious damages add up to almost 6.7 million; and, with interest, that has been paid. Over 6.7 million has been paid with the fees billed and paid for by Jarrow Formulas to McCarter & English. The total comes to $11.7 million that that loss cost Jarrow Formulas, more than the $10 million they were sued for originally.

And here McCarter & English wants $2 million more at

the higher hourly rates, and they want punitive damages for willful and malicious breach. And Jarrow Formulas was sued less than a month after the trial was lost. And that includes the hourly rates that M&E raised without telling Jarrow Formulas first.

We expect the evidence will show that Jarrow Formulas never agreed to this massive rate increase, and the evidence will show, as Mr. Pepe told you, that Jarrow Formulas negotiated discounts on the fees basically every year. And you will have to decide whether Mr. Rogovin agreed to 30 and 20 percent increases in hourly rates while being a client who every year tried to negotiate the fees that were owed.

Mr. Rogovin is the type of person who complains if he thinks something is wrong or unreasonable. And the suggestion that Mr. Rogovin was told verbally about the rate increase or must have noticed it in M&E's bills but did not complain or try to negotiate that increase, you will decide whether that makes any sense.

The evidence will show that there is no written contract allowing M&E to raise its rates without the agreement of Jarrow Formulas. And the way that McCarter & English raised its rates is even worse. They took the opportunity to raise rates by asking Liberty, the insurer for Jarrow Formulas, to pay higher rates than Jarrow Formulas was paying at the time. And M&E didn't tell Liberty the rates that Jarrow Formulas was

paying and had paid for the first few months of the Kentucky case.

THE COURT: Mr. Resser, you have five minutes.

MR. RESSER: M&E did not send its e-mails to Liberty to Jarrow Formulas, and Liberty agreed to the jacked-up rates without knowing Jarrow Formulas was actually paying lower rates. And then when Liberty decided it was not obligated to pay for Jarrow Formulas' defense, M&E then sent those same altered jacked-up rate bills to Jarrow Formulas without pointing out the 20 to 30 percent increase in the hourly rates for Mr. Giarratana and Mr. Grondahl.

But one other thing Mr. Pepe didn't tell you, he didn't tell you that Mr. Rechen's rate didn't go up until 2016, and there's no evidence that there was any conversation or agreement to that increase from $405 an hour to $520 an hour. So the three people who did the most work on the Kentucky case, Mr. Giarratana, Mr. Grondahl, and Mr. Rechen, all had their rates increased by 20 to 30 percent, and that's the unit price for their work for the client.

And that increased rate was applied to every bill for nearly six years. And the amount of money that McCarter & English is asking for in this case includes over $200,000 at the jacked-up rates, and the evidence will show that nearly a million dollars has already been paid. Out of that 5 million, almost a million dollars is already paid at the jacked-up

rates. And we're here to ask you to return that to Jarrow Formulas.

Now I want to discuss the finding of willful and malicious. And that involved the opening statement where Mr. Rechen promised the jury: Mr. Rogovin will testify. Mr. Rogovin will testify as to why he contracted with Kean Ashurst. He will tell you his good faith. He will defend his baby. He is available to testify live. He told the jury three times Mr. Rogovin would testify. That never happened.

Mr. Rogovin was in the trial for three weeks almost every day in front of the jury, but he was rendered mute. He was not permitted to respond and defend his baby.

Now, you heard Mr. Pepe say that five out of six, five out of six trade secrets did not result in damages. But the jury was never to apportion, never asked to apportion, the damages and didn't have any evidence to apportion the damages between the various trade secrets. And, again, Jarrow Formulas has paid almost $12 million, out almost $12 million in a case they were sued originally for 10 million. Is that a win? Is that a partial victory? Is that only a partial loss?

So at the end of this case, I'm going to ask you to award Jarrow Formulas a refund of the amount it overpaid, which is almost a million dollars based upon the jacked-up rates for which there is no written document showing they were advised in advance that the fees would be raised and there's no

enforceable contract and no fair agreement that supports the increased rates.

Why should you care? This is just a big law firm and a corporation. But you know what? Jarrow Formulas is in a position that very few clients are in. Very few clients can fight a big law firm like this. And Jarrow Formulas is here because it was overcharged by its lawyers, and it wants to set things straight.

I will ask you for a verdict that shows lawyers shouldn't jack up their rates without advanced notice to their clients, without the client's agreement. And I would ask you for a verdict that ensures that lawyers serve clients, that lawyers don't serve lawyers. Thank you very much.

THE COURT: All right. Thank you, Counsel.

All right. Now we're going to begin the evidence, Ladies and Gentlemen. So I'm going to ask Mr. Pepe to call his first witness.

MR. PEPE: Thank you, Your Honor.

Your Honor, the plaintiff, McCarter & English, would call Mr. Mark Giarratana.

THE COURT: Very well. Mr. Giarratana.

All right, sir, if you would stand, raise your right hand and face our courtroom deputy, please.

M A R K   G I A R R A T A N A,

having been duly sworn by the Clerk, testified

under oath as follows:

THE CLERK:  Please be seated.  State your name, city, and state that you work.  Spell your last name for the record.

THE WITNESS:  Good morning.  My name is Mark Giarratana.  I live in Glastonbury, Connecticut.  My name is spelled G-I-A-R-R-A-T-A-N-A.

THE COURT:  Go ahead, Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PEPE:

Q   Good morning, Mr. Giarratana.

A   Good morning.

Q   You are, of course, the same Mark Giarratana that's been discussed in these opening statements?

A   That I am.

Q   Okay.  And you are a partner in the plaintiff law firm McCarter & English.

A   I am.

Q   Located here in the Hartford office?

A   Yes.

Q   Tell us about yourself.  You have a family, Mr. Giarratana?

A    I do.  I have a wife and three daughters.  We live in Glastonbury, Connecticut.  Actually, my daughters do not any longer.  They're all products of the Glastonbury school system.  Now they are out of the home and it's just my wife and I.

Q    You were an engineer in your prior life.

A    I was.  I graduated from the Catholic University of America in Washington, D.C., with a degree in mechanical engineering, and I worked as a mechanical engineer for a company called Machlett Laboratories, which is located, or was located, in Stamford, Connecticut.  At the time it was owned by Raytheon.  We made medical x-ray tubes, and I think my title was x-ray engineer.

Q    Did there come a time that you decided to take a different career path and go to law school?

A    That's correct.  After a couple years of working as an engineer, I decided that I would, um, go back to law school.  My dad was a patent attorney.  I thought it sounded interesting, and so I went back to law school to become an intellectual property lawyer.

Q    And where did you go to law school?

A    I went to law school here in Hartford, Connecticut.  I graduated from the University of Connecticut School of Law, which I think had just at that time moved to the Hartford campus where it is now over on -- um, over near the West End.

Q    And when did you graduate from law school?

A    In 1987.

Q    Take the bar exam and pass?

A    I did.

Q    Okay.  And how did you become employed after that?

A    So I took the New York bar and the Connecticut bar.  I also took the Patent Office bar exam.  We call it a bar exam, but it allows you to practice in front of the U.S. Patent and Trademark Office.

Q    Was that your plan?

A    It was.  I did that before I graduated, and then following graduation I took the New York and Connecticut bars.

     And I worked for a law firm in New York City when I graduated school, a firm by the name of Kenyon & Kenyon.  They were a firm that did nothing but intellectual property law.  Back at that time they were one of the two biggest firms in the country, and so I practiced there for about five years as an intellectual property lawyer sort of learning the ropes.

Q    Could you give us a workable definition of intellectual property law?  What does that include, and what type of work does it require?

A    Yeah, sure.  So, um, intellectual property law generally -- and I'll be very brief.  It generally comprised of patent law, trade secret law, trademark law, and copyright law.  Patent law generally involves advancements in the sciences, engineering, what they call the useful arts.

And a patent is essentially a contract with the U.S. government where an inventor agrees to disclose how to make and use his or her invention. And the government in turn grants the inventor a monopoly on that invention for 20 years from the filing date. Essentially you agree to disclose your invention. You add to the knowledge that the public can learn from it. In exchange you get a monopoly on an exclusive right to practice that invention. And that's why many times engineers like myself and Mr. Grondahl, we become patent lawyers because we're able to work with the engineers and the scientists, understand what they're talking about, and then act as their lawyers in front of the patent office or in front of a court like this.

Trade secrets, on the other hand, a trade secret is essentially anything that has value and is secret. So in contrast to a patent where it's published, a trade secret is secret. So by definition a trade secret cannot be in a patent because once something's in a patent, it's no longer secret.

Trademarks are something everybody sees every day. A trademark identifies a brand, and it identifies the source of goods or services. Very famous trademarks are things like McDonald's, Coca-Cola. When you see that trademark, you know where the product came from. It identifies a source of the goods or services.

And a copyright, very briefly, copyrights protect what we call literal expression, not the underlying idea. So as an

example, think about your website or your company's website. The copyright protects what's written on the website and protects perhaps the images on the website and it prevents -- it's intended to prevent third parties from copying that literal expression.

Q   Is that the kind of law you practiced with the Kenyon law firm in New York?

A   It is.  It is.  When I was at Kenyon & Kenyon, I did primarily patent law and trade secret law.  And then afterwards I became also a trademark lawyer.  And always I've done some copyright law but not as much as the other three.

Q   Did there come a time when you left the Kenyon law firm in New York and moved to Connecticut?

A   There did.  In 1992.  Um, I was raised in Connecticut.  My father's from Hartford.  I was raised down in southern Connecticut.  I always wanted to come back to Connecticut.  I didn't want to raise a family in New York City.  I was planning on getting married.  So after five years, in about 1992, I decided I'm going to move back to Connecticut and get a job here.

        And ultimately I ended up at the McCormick, Paulding & Huber firm in Hartford, Connecticut.  I knew the attorneys over there because when I was in law school at UConn, I worked there part time.  And so they were my friends.  They offered me a job when I came back, and I worked there in 19, roughly, 94.

Q   And when you joined the McCormick law firm, did you continue in the area of intellectual property law?

A   I did.

Q   Is that the nature of the practice of the McCormick?

A   Yeah.  McCormick, Paulding & Huber it's still in existence today.  They do nothing but intellectual property law.

Q   Did there come a time when you left that firm and went to another law firm?

A   Yeah.  I became a partner in McCormick, Paulding & Huber, and a very good friend of mine at the time was also a partner there.  We had both worked there while we were in law school together.  And, um, I received a call from a friend of mine who was running the intellectual property practice at a firm called Cummings & Lockwood.  Cummings & Lockwood was a large Connecticut firm.  They had an office in Hartford, but they had no intellectual property lawyers.  And so they were starting to start an intellectual property practice in their Hartford office.

So my partner and I, Joe Kentoffio, my partner Joe Kentoffio and I, we moved over to Cummings & Lockwood, and we started the intellectual property practice in the Cummings & Lockwood Hartford office.

Q   And again doing the same kind of work you had done at McCormick?

A   Yes.  You know, by this point in time -- that was in 1998.

So now I was out of law school for 11 years.  You know, as a lawyer, you gain more experience; you get involved in more things; my practice expanded.  And by that point in time I was doing more than I was earlier, but, yeah, always nothing but intellectual property law.

Q    And using in that effort your engineering degree and training?

A    Yes, yes.

Q    You left at some point the Cummings & Lockwood firm and joined McCarter.

A    We did.

Q    Tell us about that.

A    Yeah, so in 2003 the -- in 2003 the Cummings & Lockwood firm more or less split up, and we had our Stamford office merged into McCarter & English at that time.  And so I've been in the same office since 1998, but in 2003 we simply put a new name on the door.  Our firm merged into McCarter & English.  Cummings & Lockwood became McCarter & English, and I became a partner at McCarter & English at that time and have been ever since 2003.

Q    And McCarter & English is a national or regional or local firm?  How would you describe it?

A    Uh, we're -- we're largely regional.  We've expanded a bit in the last few years.  But I always say if you take an Amtrak between Washington, D.C., and Boston, get off at virtually any

stop, you're going to find one of our office.  We're between Washington, D.C., and Boston.  We've also got an office now in Miami, and we have one in Indianapolis.  But we're largely a regional firm, Northeast.

Q   And you are still there today practicing intellectual property law?

A   I am.

Q   Here in the Hartford office.

A   Yes.

Q   Sir, have you been involved in the organized bar as it relates to your area of the practice of law, the Connecticut Bar Association?

A   Yes.

Q   Could you tell us a little bit about that, please.

A   Sure.  So I'm, of course, a member of the Connecticut Bar Association.  I served as a past chairman of the Intellectual Property Law Section of the Connecticut Bar Association.  Um, I'm also active in the Connecticut Intellectual Property Law Association.  For about ten years I've been --

Q   What is that?

A   The Connecticut Intellectual Property Law Association?

Q   Yeah.

A   That's an association of only intellectual property lawyers in Connecticut.  There's not a whole lot of us, so it's not a very big organization.  But it's -- it's, you know, all -- just

about every intellectual property lawyer in the state belongs.

And I'm active in that organization.  I've served on the Membership Committee probably for about ten years now. Essentially anybody who applies for membership at what we call the CIPLA, the Connecticut Intellectual Property Law Association, I review their application and sign off on it.

Q   Is there something in your profession called the World Trademark Review?

A   Yeah.  I'm -- um, I'm ranked in what's called the World Trademark Review.  It's a ranking of the -- it's a ranking of the top --

(Beeping noise.)

THE COURT:  Just turn it off, Josh.

Go ahead, Mr. Pepe.  You're fine.

A   So the World Trademark Review is a ranking of the top trademark attorneys in the world, the top 1000, and they rank you after conducting, you know, research and investigation with respect to your practice, your experience, the kind of cases you've handled.  They interview your clients.  And if they consider you to pass muster, then they will rank you as part of the WTR 1000.  And they're trademark lawyers from every country, not every country, but virtually every country in the world.

Q   And are you involved in the International Trademark Association also?

A    Yeah, I'm involved in the -- I'm a member of the International Trademark Association.  I'm a member of the American Intellectual Property Law Association, which is the intellectual property lawyers association for the entire country.

I'm a member of the Federal Circuit Bar Association. So if you're a patent attorney like I am and if you litigate matters in a federal court like this, the case, if it's going to be appealed, goes to a different appellate court than most other cases.  Our appellate court for patent cases is the Court of Appeals for the Federal Circuit in Washington, D.C.  Those are the judges that write the patent law.  And so I'm a part of the Federal Circuit Bar Association and their organization.

I think I'm also in the, you know, Best Lawyers in America ranking.

Q    Well, what is that reference?  What is *The Best Lawyers in America* publication?  Tell us about that.

A    It's a national publication that ranks lawyers.

Q    In what area of the law are you recognized in that publication?

A    I believe it's intellectual property law.  I hope it's not something else because ... that's what I do.

Q    Have you spoken to others in the profession on the -- in the area of intellectual property law?

A    Yeah, sure.  Over the years I've, you know, engaged in

various, you know, speaking engagements generally on intellectual property issues, so speaking to the local bar association. Or in Connecticut, like many other states, lawyers have what's called CLE, or continuing legal obligation -- continuing legal education obligations. We call it CLE. And we need to take a certain number of credits every year. And I've spoken on CLE topics to other lawyers where they'll get credit for listening to me speak about intellectual property law as continuing legal education.

Q    Okay. Now I want to bring you back to 1996. You were there in the McCormick law firm at that time?

A    I was.

Q    And is that where you first met Jarrow Rogovin?

A    Yes, it was. Mr. Rogovin, his company Jarrow Formulas at that time was sued for patent infringement in this court, in the district court here in Hartford. And he was represented by a different firm that time, a firm that was representing a number of parties together, and he was looking for representation for his company. He had been referred to me by another attorney here in Hartford who I knew who doesn't do litigation but he knew I do litigation.

And so my partner that I mentioned to you, Joe Kentoffio, who I used to work very closely with, he and I met with Mr. Rogovin I believe on a Saturday, late fall, early winter, back in 1996, where he came to Hartford with another

lawyer of his, a gentleman named Scott Polisky, who I think was an FDA lawyer for him at the time. And Mr. Rogovin and Mr. Polisky came to Hartford, met with us over in CityPlace in Hartford on a Saturday afternoon, and we met each other and interviewed one another. And following that meeting, he had hired my firm McCormick, Paulding & Huber to represent his company in that federal patent litigation in this court.

Q    Did you memorialize that retention with a written letter agreement?

A    We did.

MR. PEPE:  Your Honor, I'm going to offer Plaintiff's Exhibit 95. There's no objection.

THE COURT:  All right. That will be admitted as a full exhibit. That's Plaintiff's 95; is that right?

MR. PEPE:  095.

THE COURT:  Thank you. 95 will be full.

MR. PEPE:  Thank you, Your Honor.

(Plaintiff's Exhibit 95, received in evidence.)

MR. PEPE:  Does that appear on your screen now, Mr. Giarratana?

THE WITNESS:  It does not.

MR. PEPE:  It does not.

THE WITNESS:  Is there a button I need to hit?

THE COURT:  No. Just give us a second. There we go.

Is it there now, Mr. Giarratana?

THE WITNESS:  It is, Your Honor.  It's a bit small.
Is it possible to --

THE COURT:  That might be up to -- there you go.

THE WITNESS:  If I get close, I think I can.

Q   (By Mr. Pepe) You can see it now, Mr. --

A   I can.

Q   Okay.  Great.  Is that, in fact, the retention agreement
between your then firm McCormick Paulding and Jarrow Formulas,
Inc., for the litigation you described back that took place in
1996?

A   Yeah.  As you can see in the "re" line -- we call that the
"re" line where it says R-E colon right underneath the address
to Mr. Rogovin.  It's called an engagement letter where we
spell out the terms of our engagement by the company.

Q   And is that the purpose of this letter?

A   It is.

Q   I want to see if I can direct your attention to the third
paragraph, and perhaps Mr. Wiznik could call that paragraph out
beginning -- there we go.  Thank you so much.

Can you see that, Mr. Giarratana?

A   I can.

Q   Explain to the jury what's involved there.

A   So this describes the manner in which law firms, and our
law firm, would bill the client.  We bill the client in what's
called a time-devoted basis.

And so the way a law firm generates revenue is it bills its attorneys out and its paralegals out at hourly rates. And they bill based on the amount of time they spend working on a matter. And those revenues are received by the law firm, and they're used to pay all of the expenses of the firm: the salaries, the rent, the overhead, etc. That's how they generate revenue.

And so this explains that during the pendency of this matter, we will render statements to Jarrow Formulas on a monthly basis, which is what we do. We bill on a monthly basis.

And the bill goes out, and it indicates who worked on your matter, or matters, the preceding month. It indicates the day, the time spent -- it could be more than one entry on that day -- the timekeeper, meaning the lawyer or the paralegal. And then usually either on that same page they'll indicate the amount that is owed for that particular entry or at the last page will indicate the amount that's owed, and they'll also indicate on that page the hourly rate. And so the bill is basically each timekeeper's hourly rate times, the time that timekeeper spent on that matter during that month. And --

Q No, no, I didn't mean to interrupt you. Finish please.

A And, you know, as lawyers and as paralegals in law firms, you're trained to keep track of every minute of your day. It's funny. When people retire, they say, "I'm relieved I don't

have to write down every minute of the day anymore." Every day we go through, we track what we do all day long, and we bill it to a particular client or matter, if we're working on that particular client and matter. And we describe it as clearly as we can so the client, when he or she receives the bill, they can read it, they can understand what was done, and they know what they're paying for.

Q  I'm going to ask Mr. Wyzik -- the paragraph continues on to the next page, if Mr. Wyzik can call out the rest of that paragraph.

Does that part of the paragraph speak to the payment terms, sir?

A  It does. And it speaks to two things. It speaks to both the fee, as I described for you what we call fees, which are fees for services rendered. We also include disbursements on our client's behalf. That's included on the first page.

So every bill will indicate the disbursements, meaning the moneys we spent on behalf of the client. And for disbursements we simply pass those through to the client. We expend the money on the client's behalf. We put the disbursements on the bill and ask them to reimburse us for the moneys we spent on the client's behalf. And then --

Q  I'm sorry. Go ahead.

A  And here this indicates the terms of payment. Our statements are due and payable 30 days after receipt, and

Jarrow Formulas agrees to pay each monthly statement within 30 days after receipt.

Q   Now I'm going to ask Mr. Wyzik to call out the next paragraph.  And explain, if you would, to the jury about the hourly rates that are referenced in that next paragraph.

Can you do that for me, Mr. Wyzik?  Thank you.

Go ahead, sir.

A   So this paragraph speaks initially in the first sentence about disbursements.  It says, "If we incur a disbursement that's over $500, we reserve the right to actually ask you to pay that disbursement."

I'm not sure whether that ever happened here, but we reserve that right because the firm never wants to spend too much out-of-pocket moneys on behalf of a client.  If a disbursement's very large, we may ask the client to pay it directly.

We go on the second sentence to say, Our hourly -- "Our base hourly rates for attorneys, legal assistants and certain staff members vary depending upon the experience and expertise of the person rendering services.

"These base rates may change from time to time. Joseph Kentoffio and I will be primarily handling this matter for you.  My current hourly rate is $200 per hour, and Mr. Kentoffio's hourly rate is currently $200 per hour.  This is back in 1996.

"Other partners may likewise assist in this matter if necessary at their respective hourly rates."  One or more associates -- "One or more of our associates will likewise be assisting in this matter at their respective hourly rates, which are currently generally within the range of approximately 125 to 175 dollars per hour."

Q   I want to go back to the sentence that says, "These base rates may change from time to time."  Did your hourly billing rate over the course of the next year, as you continued to practice intellectual property law, did your hourly base rate change?

A   It did, and they change for any of a number of factors.  I mean, here we indicate that the rates vary depending upon the experience and expertise of the person rendering the services.

So as attorneys gain more experience, they gain more knowledge, their hourly rate generally goes up.  They learn how to do things more efficiently.  They tend to get involved in things that are higher value.  The client is effectively getting more per hour from somebody with more experience than somebody who is brand new and still learning the ropes.

So they also change based on marketplace conditions. You know, very rarely do rates go down in the marketplace. They tend to go up every year.  Just the market value, the market rates for a lawyer year after year go up for any number of factors, inflation being one of them.  You know,

everything's gone up in the last couple years.  Lawyer rates have as well.

And so over time the rates go up.  They periodically go up.  Our firm -- and most firms do it this way -- we increase the rates generally once a year at the beginning of what we call our fiscal year.

I'm sure, if you work for a company, your company has a fiscal year.  For our firm at McCarter & English, our fiscal year runs from September 30th to September 30th.  So every September -- every October 1 is a brand new fiscal year.  Our firm tends to increase rates on October 1 of every year.

Q   Does this letter agreement sort of speak to the event that the client might not pay and what rights you have in that event?

A   It does.

Q   I'm going to ask Mr. Wyzik to call out the paragraph, second paragraph in the bottom, begins with, "It is understood."

Does that paragraph speak to that issue, sir?

A   It does.

Q   Would you please explain.

A   Sure.  It says:  It is understood and agreed that, should Jarrow Formulas fail to pay a monthly statement in full within the agreed pay period, the firm may at its option request Jarrow Formulas to appoint and retain substitute counsel and in

such an event Jarrow Formulas hereby agrees to use its best efforts to find and retain substitute counsel, or to otherwise promptly reach an agreement whereby McCormick Paulding, the firm at the time I was part of, may withdraw as counsel of record if and when new counsel is to be substituted for McCormick, Paulding & Huber, the firm at that time, Jarrow Formulas agrees that we will be paid, by the time of such substitution for all services and charges up to the time of such substitution.

So lawyers always have to be concerned because if a client doesn't pay us and we're involved --

MR. RESSER:  Objection.

THE COURT:  Sustained.

Ask another question, Mr. Pepe.

Q   (By Mr. Pepe) So did you ever have to exercise that right in your relationship with Jarrow Formulas?

A   Not until, as you referenced in your opening statement, not until, you know, 2019, 23 years later.

Q   Now, sir, I'm going to direct your attention to the third page and ask Mr. Wyzik to call -- to call up the second paragraph from the bottom, begins with the words, "If you have."

And tell us -- tell us why you put that paragraph in there, sir.  You don't have to read it, I don't think, but tell us why that paragraph is in the letter.

A    This paragraph is important.  We indicate to the client, If you have any questions about any aspect of what we're doing of our representations for you, please raise them with us.  It's important that we proceed on a clear and satisfactory basis in our work for you.

Again, if the client has an issue with our bill or how we're billing, we want to know about it.  We want to deal with it.  We don't want to keep going and find out five, six years later there was an issue.

Q    Now, sir, is that your signature at the bottom right-hand side?

A    It is.

Q    And do you recognize the signature below yours on the left-hand side?

A    It is.  It's Mr. Rogovin's.

Q    Did you subsequently, after the execution of this letter agreement, undertake the representation described therein in the case called International Nutrition Company vs. Jarrow Formulas, Inc.?

A    We did.

Q    And without getting into any of the details, how was it resolved?

A    Ultimately it was resolved successful on behalf of Jarrow Formulas.  The case was dismissed.

Q    Did that lead to further request by Jarrow Rogovin for your

legal services?

A    Yes.

Q    Explain.

A    So once we were retained by Jarrow Formulas, you know, as intellectual property counsel, we tend to try to develop long, you know, mutually satisfying relationships with our clients where we don't just handle one matter.  Our clients make an investment in us.  We make an investment with them.  We get to know their technologies.  We get to know their business and we tend to handle all of their intellectual property work.

So for a company like Jarrow Formulas, we got to know their business quite well and became engaged to do other intellectual property matters as they arose.  So, for example, we would handle trademark matters.  We would handle agreement matters.  We would handle other patent matters.

And so while at the McCormick firm, our practice and our work for the Jarrow Formulas company continued to grow where we can continue to handle other intellectual property matters.

Q    You told us earlier you left, at some point left the McCormick firm and joined the law firm of Cummings & Lockwood; correct?

A    That's correct.

Q    What, if anything, happened to the relationship between you and Jarrow Rogovin and Jarrow Formulas, Inc., when you left

McCormick to go to Cummings & Lockwood?

A    We notified Mr. Rogovin, and we continued in our relationship with Jarrow Formulas at the Cummings & Lockwood firm.  All of the files that we had started working on at McCormick, Paulding & Huber were transferred over to Cummings & Lockwood, and we continued to work for Jarrow Formulas in the same way that we had worked for Jarrow Formulas at McCormick, Paulding & Huber.  But the relationship continued to grow even further where we continued to handle more matters because their company started to grow, and we were there to provide services for them on intellectual property matters.

THE COURT:  All right, Mr. Pepe, I'm going to interrupt.  We've reached our morning break.

So, Ladies and Gentlemen, I'll have you retire to the room you were in this morning.  Of course, remember my instructions.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that.  Thank you very much for your attention this morning, if you would follow Ms. Johnson to the jury room, please.

(The jury left the courtroom at 10:29 a.m.)

THE COURT:  All right, folks, we'll take our recess.

Mr. Giarratana, when we come back, if you won't mind being in your seat when the jury comes in, that will move things faster.  All right.  Thank you.  We'll be in recess.

(Recess from 10:30 a.m. to 10:44 a.m.)

(The jury entered the courtroom at 10:45 a.m.)

THE COURT:  Please be seated everyone.

Mr. Pepe, whenever you're ready.

MR. PEPE:  Thank you, Your Honor.  May I?

THE COURT:  You may.

Q   (By Mr. Pepe) Mr. Giarratana, before the recess, you were testifying that you left the McCormick law firm and moved to Cummings & Lockwood.  And you testified, as I recollect, JFI, Jarrow Formulas, followed with its business; is that correct?

A   That's correct.

Q   Now, tell us, did there come a time when you left Cummings & Lockwood and went to the McCarter law firm?

A   Yeah.  I believe I may have explained this, but very quickly, in 2003, um, Cummings & Lockwood, its -- Cummings & Lockwood is a large Connecticut firm.  And we had offices in Stamford and Hartford.  And the Hartford and Stamford offices of Cummings & Lockwood merged into McCarter & English.  And so we became part of McCarter & English.  And I've been in the same office since 1998.

It's just that in 2003 the name of the firm changed. We no longer were Cummings & Lockwood.  We then became McCarter & English.  And I became a partner in McCarter & English effective as of that merger.

Q   What, if anything, happened to your relationship with Jarrow Formulas, Inc., when you merged with McCarter?

A    We continued to work with Jarrow Formulas, Inc., on all of the same matters, on the same -- on the same basis.  And the relationship continued to expand and grow.  Jarrow Formulas was growing at the time.  It had increasing needs for intellectual property services, and we continued to do work for them even more so.

Q    You clearly came to understand and know the business of Jarrow Formulas, Inc., as this representation went on?

A    We did.  We did.

Q    Tell us what that business was as you came to learn it as its counsel.

A    Sure.  Jarrow Formulas is a nutritional supplement company, and it manufactures and sells nutritional supplements.  If you go to Whole Foods as an example, you'll see several aisles devoted to nutritional supplements.  And we, as intellectual property lawyers, were involved with the business in the sense that, as an example, for every product they would introduce, they would give it a new trademark, not for every product but for most or many.

And so we would clear those trademarks, meaning we would conduct searches, we would assess whether or not they would create a conflict if they were to adopt that trademark, and then we would clear the trademark for use, the main goal being we want to keep the company out of litigation.  We don't want them to get sued for using a trademark that someone else

thinks they don't have the right to use.  And so we would also register their trademarks.

We also did patent work for them.  They had some inventions, and particularly my partner Eric Grondahl, who has a chemical engineering background, would work on those patent applications.

And then we would have intellectual property disputes.  As you can imagine, in the nutritional supplements space, there are many companies, and those companies bump up against one another and have disputes.  And we would represent the company in connection with those disputes.

So an example, if someone claimed that Jarrow Formulas was infringing their trademark, we would defend Jarrow Formulas.  Or if we believe that someone else was infringing a trademark in conflict with one of Jarrow Formula's trademarks, we would address that with the opposing party.  Those are just examples.

But as the company continued to grow and the number of products continued to grow, the work continued to expand such that over time we had opened up what we call 540 new matters, meaning every trademark is a new matter, every dispute's a new matter, every litigation's a new matter.  There was a fair amount of work over the years.

Q   I assume, is it fair to say, that you came to know the management and executives of Jarrow Formulas as a result of

your legal representation over the years?

A   Yes.  I --

Q   And have you helped to work with me to prepare an organizational chart that would illustrate the people, the executives with whom you worked, and where they were in the company?

A   Yes.

Q   Okay.  And before I -- before I make reference to that, was there, in addition to Jarrow Formulas, Inc., a related company for which you and your team provided legal services?

A   Yes.

Q   And what was the name of that related company?

A   The related company was called Jarrow Industries Inc.  And it was roughly in 2000 where Mr. Rogovin had decided that he wanted to have his own manufacturing capability.  Prior to that, the company was a bit smaller.  My understanding was that they were using third-party manufacturers to make their products.  He wanted to develop his own manufacturing capability, and that company became known as Jarrow Industries Inc.  And we did some work for them as well.

        MR. PEPE:  Your Honor, there's no objection to this demonstrative, but would the Court prefer to see it first?

        THE COURT:  No.  If there's no objection, then you can put it on the --

        MR. RESSER:  Excuse, Mr. Pepe.  This is the

demonstrative on the org chart?  Okay.  No objection.

THE COURT:  You may publish it.

MR. PEPE:  Thank you, Your Honor.

Q   (By Mr. Pepe) So we have now this demonstrative exhibit, Mr. Giarratana, which you said would illustrate the organization and the people within it with whom you worked. Could you please explain that to the jury.

A   Sure.  So there's an upper portion and a lower portion to this chart.  In the upper portion it shows the corporate organization of Jarrow Formulas.  In the lower portion it shows the corporate organization of Jarrow Industries.

You can see Jarrow Rogovin is president and chairman of the board.  Mr. Rogovin was the founder of the company, along with Mr. Khowong.  That's spelled K-H-O-W-O-N-G.  I believe it's pronounced "Khowong."  Mr. Khowong was a co-founder of the company.  He was really more of a finance guy, but his label title was CEO/CFO.

Clay DuBose was a long-time employee of the company. He was the vice president of sales.

Jonathan Leventhal was -- who's in the courtroom today, Jonathan was hired as general counsel probably about two months before the Kentucky trial.  So he was hired in early 2019.

So we -- I worked extensively with Mr. Rogovin.  By far and away, you know, my work was almost exclusively with Mr.

Rogovin.  He was very much involved in everything we did.  And I was always in communication with him and worked most extensively with him.  But I got to know the other members of the team for -- because sometimes they might be involved in a matter we're working on, but we also, um, would go out and visit the company or visit the company at least two times a year.

The company had -- would participate in a trade show in Anaheim, California, in March of every year called Expo West, and it was the biggest industry trade show.  We would fly out there on our own dime, myself and maybe some of the members of our team, and we would go and meet with Mr. Rogovin and other members of management to, you know, visit with them, to talk about what business we might have going on at the time and also walk the trade show floor so we would get to know their industry better, all part of, you know, them making an investment in us and us making an investment in them.  The more we knew about their industry, the more we felt value we could add in our day-to-day services for them.

We would also visit with them another time once a year at the industry trade show on the East Coast, which was called Expo East, and the company would attend that trade show.  We would do the same thing.  We would go down, visit with them, talk business, but also get to know their business better and their industry better.

And, you know, through these visits -- and those were just some of them. I was otherwise frequently out there. Mr. Rogovin was frequently flying through the East Coast. We would get together. So through these various visits, you know, over the 23 years, we got to know everybody, including -- including these people.

Q   Now, sir, you said you, over those 23 years, you and the colleagues working with you at McCormick, Cummings, and McCarter, I think I heard you say, handled more than 540 different legal matters for JFI, or Jarrow Formulas. Did I get that correct?

A   That's correct.

Q   Explain to us what fee arrangement, if any, you had with JFI on those 540 different matters.

A   It was the exact same fee arrangement that we described earlier today. It was a time-devoted basis fee arrangement where the attorneys and paralegals would bill at their respective hourly rate based on the amount of time they expended, exact same manner every matter, every bill.

Q   Did you -- were you in these matters what can be referred to as the responsible partner or the billing partner in your law firm?

A   I was.

Q   For JFI matters?

A   I was.

Q   And did that involve -- require anything for you in terms of the review and submittal of those invoices?

A   Sure, yeah.

Q   Please explain what that was.

A   Yeah, so we sent -- as we indicated previously, we send out our bills on a monthly basis.  And so at the end of every month, everybody has to get all their time in, and then we close out the books and we generate draft bills.  And then it's up to the responsible billing partner, in this case me.

I would take home on a weekend, in the beginning of every month, the bills for all clients that I was responsible for the preceding month.  And I would -- generally it was a pile of bills.  And I would carefully review them.  I always felt that bills were one of the most important pieces of correspondence that we send to our clients.  We always say if there's one piece of correspondence we think our client's going to read, it's going to be the bill.

And so it's important because it shows everything we did, explains what we did.  And I would review those bills with respect to accuracy.  I would also review them with respect to fairness.

So as an example, you know, we frequently have younger associates that are just learning how to become lawyers, and sometimes they may not get things right.  They may go off in a wrong direction and just goof something up.  And when that

occurs, it was generally my practice to write that off.  I didn't feel that that was something I could properly charge the client.

Q   What does "write-off" mean as you use the term?

A   Write-off means is we would take it off the bill.  And the client would not pay for it.  Okay?  Again, we're -- we were always geared towards the long-term relationship.

MR. RESSER:  Your Honor, objection.

THE COURT:  Sustained.

Q   (By Mr. Pepe) Go ahead.

THE COURT:  New question, Mr. Pepe.

Q   (By Mr. Pepe) In addition to reviewing the bill for write-offs, what else did you do in the review of the bills as the billing partner, if anything?

A   Well, we -- not just -- we would review them for write-offs if we felt the billing wasn't fair, but we would also review them for accuracy to make sure that they read properly.  You know, it was a fairly extensive job.  It would take me the better part of a day once a month to get that done, if not a day and a half.

Q   Is that a description of what you did with all clients' bills or with JFI or both?

A   All clients' bills.

Q   Including JFI.

A   Including JFI.

Q   Okay.  And over the 23 years and 540 matters, you said each one was typically and usually billed monthly.  Were hundreds of monthly invoices sent, maybe thousands?

A   Easily.

Q   Easily thousands.

A   Yes.  Every month.  Every month on a number of different matters.

Q   All those thousands of invoices, over 540 matters over 23 years, before this case, did you have any dispute, disagreement, objection from Mr. Rogovin or anyone else at JFI about any of those bills before this lawsuit?

A   Absolutely not.

Q   None?

A   Never a peep.

Q   You described your visits to the trade shows and to California and so on as part of the relationship.  Did you, over the course of time, develop, in addition to the attorney-client relationship, a personal relationship with Jarrow Rogovin?

A   Yeah, we did.

Q   Explain please.

A   So it clearly started out as a -- as a business relationship.  Like with any client, we develop a business relationship where, as lawyers, we're trusted counselors, and we, you know, work carefully together on legal matters, legal

disputes.

For Jarrow Formulas I can say without question that I communicated with Mr. Rogovin by far and away more than I did with any other client. He always would call, um, and we would have extensive phone calls. There were clients that I -- that were larger clients; there were clients that I've had for longer periods of time. But by far and away, Mr. Rogovin I spoke with more than any other.

THE COURT: Let's ask another question, Mr. Pepe.

Q   (By Mr. Pepe) Did you interact socially and personally?

A   Yes, we did. We did. So we would -- as I indicated previously, we would get together every March at the Anaheim West Trade Show. There were company dinners every night. There was a meeting at the trade show and walking the trade show booth.

Mr. Rogovin would have a party every -- every year until the more recent years at his house. We would frequently go meet at his house in West Hollywood, which is right near the company in LA. He liked to meet there. And so we would meet -- do the same thing in Baltimore once a year.

And as I indicated previously, uh, he would frequently fly through the East Coast, for example, if he was visiting suppliers in Europe, and frequently make a point to stop in New York, and we would visit him there. We would go down to New York City. We would have lunch or dinner. We would maybe meet

in our office down there.

I've been to his house many, many times, many, many times. He's been to my house where I had him over for dinner with my wife and some other members from the firm. And so, yeah, we developed not just a business relationship but I felt a good strong friendship.

Q   Did the Kentucky litigation have any effect on that friendship?

A   Yes, significantly.

Q   We'll come back to that.

A   Okay.

Q   I want to direct your attention now to what I referred to earlier as the Kentucky litigation. When I use that term, sir, I'll be referring to the lawsuit brought in Federal Court District Court in Louisville, Kentucky, by Caudill Seed and Warehouse against Jarrow Formulas, Inc. Do you have that in mind?

A   Yes.

Q   Okay. You were involved in that litigation?

A   I was.

Q   Did it start with the lawsuit against JFI, or did it have a predecessor that affected that litigation?

A   There was a predecessor litigation.

Q   Explain what you -- were you involved in the predecessor?

A   We were.

Q    Representing JFI?

A    No.

Q    Representing whom?

A    Kean Ashurst.

Q    And who paid for your representation of Kean Ashurst?

A    Jarrow Formulas.

Q    Tell us what you learned about the litigation in your representation of Kean Ashurst, which I understand preceded the Caudill, Caudill Seed case against JFI; correct?

A    Yes.

Q    Explain what you learned.

A    Okay.  So on May 1st of 2011, Jarrow Formulas hired as an independent consultant, but essentially a full-time consultant, a man named Kean Ashurst.  Kean Ashurst had worked for Caudill Seed and Warehouse Company, and he was head of their research and development work.  He was working on developing a new broccoli-based supplement ingredient while he was working at Caudill Seed.  And, in fact, he was making sales calls to Jarrow Formulas on behalf of Caudill Seed concerning that product.

       Jarrow Formulas hired him away on May 1 of 2011. About two weeks after he was hired away, Caudill Seed sued Mr. Ashurst in state court in Kentucky for trade secret misappropriation.

Q    Let me interrupt you there, sir.  Was Jarrow Formulas,

Inc., sued at the same time in that lawsuit?

A   It was not.

Q   Just Mr. Ashurst.

A   Just Mr. Ashurst.

Q   Go ahead.

A   So we found out about this -- I think the lawsuit was filed in May, maybe June of 2011.  We got involved, I think, in July of 2011.

I received a call from Mr. Rogovin.  He had explained to me what had happened.  And at that time he wanted us just to assist.  Mr. Ashurst had hired his own attorneys in Louisville to defend him.  But they didn't have an intellectual property expertise.  And so Mr. Rogovin wanted us to assist his lawyers.  And so we did assist his lawyers.  And we came to understand what had occurred.

Ultimately, we ended up taking over for the lawyers that were representing Mr. Ashurst and represented Mr. Ashurst in the state court case in Louisville.  It was primarily my partner Eric Grondahl, who's here today, and myself.

We, um -- Mr. Ashurst was accused of trade secret misappropriation because, prior to leaving his employer, he sent documents over to Jarrow Formulas by e-mail from his personal e-mail account marked "Confidential."  He sent some of those documents to Mr. Rogovin.  Mr. Rogovin received those documents.

He met with the Jarrow Formulas team at Mr. Rogovin's home prior to joining Jarrow Formulas. He was hired away, came over to Jarrow Formulas. And after he joined Jarrow Formulas, he sent more e-mails from his home account with more documents from his prior employer marked "Confidential."

So by the time we got involved in the case, we had seen that this individual had come to Jarrow Formulas, had e-mailed documents marked "Confidential" to several employees of Jarrow Formulas, and Jarrow Formulas had received them.

Q   Let me interrupt you there, if I may, sir. Did you come to learn -- in the representation of Kean Ashurst, did you come to learn that Mr. Ashurst was subject to any contractual restrictions at Caudill Seed?

A   We did.

Q   And what did you learn in that regard?

A   Well, he had -- he had signed three confidentiality agreements with his employer: a non-disclosure agreement, a secrecy agreement, and another one called a non-competition agreement.

Q   All right. May I interrupt you, sir?

MR. PEPE: Your Honor, PTX 398 is no objection.

THE COURT: PTX 398 may be a full exhibit. It may be published.

(Plaintiff's Exhibit 398, received in evidence.)

MR. PEPE: Thank you, Your Honor. May I ask Mr. Wyzik

to call it.

Mr. Wyzik, can you call out the title and the first paragraph?

Q   (By Mr. Pepe) Is that one of the agreements?  Can you see that all right?

A   It is, Mr. Pepe.  This is the Employee Non-disclosure Agreement that was signed by Kean Ashurst with his former employer, Caudill Seed and Warehouse Company.

Q   And just the essence as you came to understand the essence of that agreement.  I don't want to walk through page by page.

A   The essence of the agreement was I'm going to agree to keep the company's confidential information confidential and not use it for any purpose before or after I'm employed by the company.

MR. PEPE:  And, Your Honor, PTX 399 is no objection and if I may publish it to the jury?

THE COURT:  Yes.  That will be a full exhibit.  399 is full.  You may publish.

(Plaintiff's Exhibit 399, received in evidence.)

MR. PEPE:  Thank you, Your Honor.

Mr. Wyzik, can you call out again the title and first paragraph on that document?

Q   (By Mr. Pepe) And, Mr. Giarratana, can you tell us what that is and again the substance.  I'm not going to walk through the pages of the agreement.  Tell us what you came to

understand that document provided.

A    This was a non-disclosure and non-competition agreement that Mr. Ashurst signed with his former employer Caudill Seed and Warehouse Company.  And this one, in addition to prohibiting him from disclosing company confidential information outside the company, it also had non-competition provisions in it where he couldn't -- where he couldn't compete in certain ways with the company following his termination of employment.

Q    At this time in 2011, was Caudill Seed in any way or to any extent a competitor of Jarrow Formulas, Inc.?

A    There were -- they were not while -- no.  They were a supplier to Jarrow Formulas, Inc.

        MR. PEPE:  Okay.  And next exhibit, Your Honor, PTX 400 there's no objection, if I may publish it.

        THE COURT:  You may.  It's a full exhibit.  This is Plaintiff's 400, full.

    (Plaintiff's Exhibit 400, received in evidence.)

        MR. PEPE:  Mr. Wyzik, can you call up -- can you put up PTX 400 and also once again call out that first paragraph. There you go.

Q    (By Mr. Pepe) And, Mr. Giarratana, can you identify that as another one of the contractual restrictions Mr. Ashurst had with Caudill Seed?

A    Yeah, this is another agreement, somewhat duplicative to

the non-disclosure agreement.  It's a secrecy agreement where Mr. Ashurst agreed to keep secrets secret essentially.

Q   Now, you said you came to learn, when you undertook the defense of Mr. Ashurst at Mr. Rogovin's request, you came to learn that documents had been sent by Mr. Ashurst to JFI and to Jarrow Rogovin; correct?

A   Yes.

Q   Do you have in mind how many of those documents the way you described it?

A   There were a fair number.  Over time we would find about more -- find out about more.  But there were a fair number.

Q   Okay.  I'm going to -- I'm going to call your attention to PTX 418.

MR. PEPE:  With the Court's permission, there's no objection, Your Honor, if I may publish.

THE COURT:  Plaintiff's 418 will be full.  You may publish.

(Plaintiff's Exhibit 418, received in evidence.)

MR. PEPE:  Mr. Wyzik, can you please call that up, and then can you call out the top four or five lines, please.

Q   (By Mr. Pepe) Is this one of the documents you were describing in your earlier testimony, sir?

A   Yes.

Q   And then I don't know if you had a chance to look at the rest of it.  Maybe I could ask Mr. Wyzik, can you also call out

or call out in lieu of this the full paragraph below.

Get a chance to look at that, sir?  Take your time and read that, if you would, please.

A    Yes.

Q    Can you explain to the jury what you came to learn was involved here in this document, which, as I read it, goes from Kean Ashurst -- is that his personal e-mail address?

A    Yeah.  If we -- sir, if we could put the title.

Q    The previous?

A    The previous.  The current blowup's blocking the -- yeah, the title block.

So, yeah, we can see here that this is an e-mail sent from Kean Ashurst where it says Kean, from Kean.  And that's his home address -- home e-mail, not the company e-mail at Caudill Seed.  The date is Sunday, April 10th.  He was still employed by Caudill Seed at that time.  Didn't leave Caudill Seed till May 1.

The "To" line reads, "jlrjfi@aol.com."  That's Jarrow L. Rogovin at JFI, which is Jarrow Formulas, Inc., at aol.com.  Mr. Jarrow has always used his AOL account for the past --

Q    The next line?

A    The next like is Jarrow Rogovin -- sorry, Mr. Pepe.

Q    The next line shows a copy to Eva.

A    Eva is Mr. Rogovin's -- or was Mr. Rogovin's assistant.  And then it says, "Subject:  Confidential information BPP plus

Caudill."

So apparently -- so right away that's a big flag to us because it shows that it's confidential information of BPP and Caudill. BPP is another company in the industry. It's an acronym for Brassica Protection Products. Brassica is a scientific name for broccoli. Broccoli is a form of brassica. So BPP is another company in the industry. Caudill is Mr. Ashurst's employer. And the subject is Confidential information of BPP and Caudill.

He then states below, he describes generally what's there. And, um, this includes information that was later claimed by Caudill Seed to be trade secrets. Number one --

THE COURT: Wait. I tell you what. Let's get another question, Mr. Pepe.

Q   (By Mr. Pepe) Okay. And did you come to understand whether this was one of the documents that Caudill Seed claimed violated his trade secret protection?

A   Yes, yes.

Q   Okay. The last sentence in that e-mail says, quote, "The next e-mail will contain confidential information as well."

Was there additional information that Kean Ashurst sent to JFI?

A   There was. There was.

Q   And that Caudill Seed considered confidential and proprietary?

A    Yeah.  And, unfortunately, apparently Mr. Ashurst considered it confidential as well because he says it here, which -- which -- which --

THE COURT:  All right.  I think you've answered.

Mr. Pepe.

Q   (By Mr. Pepe) All right.  Mr. Giarratana, I'm going to direct your attention to PTX 438.

MR. PEPE:  There's no objection, Your Honor.

THE COURT:  All right.  438, Plaintiff's 438 will be full.  It may be published.

(Plaintiff's Exhibit 438, received in evidence.)

MR. PEPE:  Mr. Wyzik, can you first call out the top part that shows the document, who the document is from and to whom it's addressed.

Q   (By Mr. Pepe) Explain the people there, would you please, Mr. Giarratana.  Just tell us who they are and what role, if any, they had at JFI.

A    Yeah.  The "From" is Dallas Clouatre, C-L-O-U-A-T-R-E. Dallas was -- he's passed away.  But he was a scientific writer for Jarrow Formulas.  He was another independent contractor for the company.  My understanding was that Dallas was assigned to interact with Mr. Ashurst with the work that Mr. Ashurst was doing.

The "To" line -- and this is dated May 16th of 2011. So this is now roughly two weeks after Mr. Ashurst has been

hired by Jarrow Formulas.

The "To" line is to Benmit ca.rr.com -- that's Ben Khowong, the CEO/CFO of Jarrow Formulas; Peilin Guo, G-u-o -- Peilin was also another managerial employee of Jarrow Formulas; Clay DuBose also at Jarrow Formulas. Clay I think was on the previous slide. He was the VP for sales for Jarrow Formulas for a number of years.

And this e-mail has to do with a timeline for what's called the Broccoli Project.

MR. PEPE: I'm going to ask Mr. Wyzik if he can drop down to the next part of this to call out where this e-mail originates. You can go right below the line.

Q   (By Mr. Pepe) Okay. Does that show the origin of this e-mail and where it came from?

A   Yeah. It's Mr. -- Mr. Ashurst. It's his same home e-mail address that we saw on the earlier e-mail that was sent before he left Caudill's employment.

Q   Okay. And it references a timeline. I'm going to ask you to explain, but let me put up the third and fourth pages of that, if Mr. Wyzik could do that, so you can explain the reference to the timeline. Simply in laymen's language, if you would, what's involved there.

Could you call up the third -- thank you.

MR. PEPE: Your Honor?

THE COURT: Yes, sir.

MR. PEPE:  I failed to point out that these are subject to the Kentucky sealing order.

THE COURT:  All right.

MR. PEPE:  And Your Honor's already addressed that.

THE COURT:  That's right.  Yes, great.  I think we just took care of it.  So do you still have it on your screen?

THE WITNESS:  I do not, Your Honor.

MR. PEPE:  I think the only issue --

THE COURT:  Hold on one second.

(Pause.)

(At sidebar off the record.)

THE COURT:  Ladies and Gentlemen, while they're working on that, let me just explain one thing, and this relates really to all the exhibits that may come in in the case.

You may see some documents, and in some cases some transcripts of testimony, that contain what we call redactions, which just means things are blacked out or crossed out.  And some of these may be marked "Confidential."  Some may be marked "Attorneys Eyes Only" or similar notations like that.  I don't believe we've actually seen any yet, but you're going to see some.

These markings and I don't mean -- just to be clear, I'm not talking about what's in a re line of an e-mail.  I'm talking there's a stamp on a document that says "Confidential"

or "Attorneys Eyes Only."  These markings relate to procedures for addressing privacy and secrecy concerns of parties as well as people.

Can I just ask, do you guys have it on your screen now?  Great.  So we did it.

You've got it also, Mr. Giarratana?

THE WITNESS:  I do, Your Honor.

THE COURT:  All right.  So we succeeded in doing what we wanted to do.

But let me just finish my instruction.  The markings I just talked about relate to procedures for addressing privacy and secrecy concerns of parties as well as people or companies that are not involved in this case.  So these redactions, these markings, do not mean that I, this Court, have ruled that any of this material is, in fact, private or secret or confidential or attorneys eyes only or anything like that.  I did not place those stamps or markings on the document, and I have not made any ruling that those stamps or markings are accurate.  It just so happens we got the documents that way.  Okay?

So I just want to point out to you that these redaction, these markings, have nothing to do with whether you should give a document any weight in your deliberations or, if so, how much weight.  At the end of the day, you should attach no significance to these redactions or markings.  Okay?  So just keep that in mind.

Go ahead, Mr. Pepe.

MR. PEPE: Thank you.

Q (By Mr. Pepe) So now we have Exhibit 438, Mr. Giarratana. And the reference was timeline. And you understood you've seen this document and worked with it in the Ashurst's litigation?

A Yes.

Q Okay. Explain to the jury in laymen's language, if you would, what is contained here and Caudill Seed's claim as to this, if you would.

A Sure. So you had previously seen the cover page which said Broccoli Project Timeline. There were several pages attached. This is part of one of the pages.

Caudill Seed claim -- and there was essentially a description of the actions and the processes that would form this broccoli project. And it included processing information. It included who the suppliers would be, how much they would charge, what the pricing would be and other information on -- and what the timing would be. So it included essentially information on how to make this new broccoli product that Mr. Ashurst had been working on at Caudill Seed at Jarrow Formulas.

Q And what, if any, position did Caudill Seed take in your litigation with respect to this document and its confidentiality?

A Yeah, Caudill Seed's position was that this was all confidential information. This was a summary in essence of

their 23 years of research and development on how to take what they called two broccoli products from seed to shelf. That was their words. This showed how to go from seed to putting it on the shelf.

Q   And if Mr. Wyzik could go back to the first page and the "From" and "To" section, which is below the line, if he can call that up.

Thank you.

Here it shows from Kean Ashurst that you said his personal address to D. Clouatre?

A   Clouatre.

Q   And I think you said that was a consultant to JFI?

A   Yes.

MR. PEPE:  Exhibit 575, Your Honor, there's no objection if that may be admitted as a full exhibit and I may publish it.

THE COURT:  Yes, it may.  575 is full.

MR. PEPE:  Thank you.

(Plaintiff's Exhibit 575, received in evidence.)

THE COURT:  And I guess -- same thing?

MR. PEPE:  Your Honor, subject to sealing order.

THE COURT:  Very well.

Q   (By Mr. Pepe) I've shown you now, sir, Exhibit 575.  Can you explain -- is this one of the documents with which you were confronted in the Kean Ashurst litigation you just described?

A    Yes.

Q    And did you come to understand what was contained there and what Caudill Seed's position was with respect to it?

A    Yes.

Q    Would you explain that to the jury.

A    Yes.  This is an e-mail dated May 1 of 2011.  So if you recall, that was the day that Kean Ashurst terminated his employment with Caudill Seed and was hired by Jarrow Formulas.  Again, it's another e-mail from his home address.  It's to Mr. Rogovin at Jarrow Formulas, and it carbon copies Mr. Rogovin's assistant at the time, Eva.  It attaches a fairly voluminous group of documents.

Q    What did they concern with respect to this broccoli product, if anything?

A    They had -- some of it was basically research articles about broccoli.  But I'm reasonably confident that the last item in the attachment line, which reads, FW Caudill Seed and Warehouse Co, underscore, Inc., underscore, sulforaphaneproduc.zip was a -- I believe that's the provisional patent application.  A provisional patent application is a -- is a patent application.  It's filed with the U.S. Patent and Trademark Office, and it's confidential generally.  And it was Caudill Seed's position that it was confidential and it was a patent application disclosing a process for the product that was at issue, ultimately this

broccoli, this new form of broccoli supplement.

Q   If I can ask Mr. Wyzik to call up in that same document same exhibit PTX 575 the page Bates numbered in the lower right-hand corner 3470.  Can you do that for us, sir, 3470?

This is part of the same exhibit, Mr. Giarratana.  Can you read that?

A   Barely.  I should have brought my reading glasses.

Q   Maybe Mr. Wyzik can blow up.

A   I think I can read it.  I'm good now.  Thank you.  Thank you.

The e-mail's dated March 11th and it's to -- it's an e-mail to Mr. Caudill, Dan Caudill of Caudill Seed Warehouse Company, and Mr. Ashurst.  And it's from Scott Conley, who was their patent attorney at Frost Brown and Todd, which is a large firm down in Louisville, and he's enclosing a copy of the U.S. provisional patent application that was filed on behalf of Caudill Seed in the U.S. Patent and Trademark Office.  Caudill Seed's position was that this was confidential trade secret information that Mr. Ashurst should never have sent to Mr. Rogovin.

Q   I've shown you four of those documents transferred by Mr. Ashurst to others at JFI, including Jarrow Rogovin.  Were there more than that that you came to discover during this time period when Mr. Ashurst, the months before he was hired by JFI and in the weeks after, were there more such documents that

Caudill Seed claimed were confidential, proprietary, and trade secret?

A   Yes, there were.

Q   Okay.  I'm not going to go through all of them, but there were more.

A   There were more.  There were more.

Q   You and Mr. Grondahl undertook the defense of Kean Ashurst, and I think you said that suit was in state court in Kentucky, not federal court; correct?

A   I did, yes.

Q   Okay.  And were you successful in the defense?

A   Yes.  Yes, we ultimately obtained a dismissal with prejudice, which means we got the case dismissed with prejudice such that Caudill Seed could not bring that same case again, so we felt that to be a success.

MR. PEPE:  And, Your Honor, PTX 356, there's no objection if that may be marked a full exhibit.  And may I publish it?

THE COURT:  Yes, you may.  Plaintiff's 356 will be full.

(Plaintiff's Exhibit 356, received in evidence.)

Q   (By Mr. Pepe) Can you tell us what that is, Mr. Giarratana?

A   Yeah.  That is the stipulation of dismissal that was filed. You can see the case heading there:  Caudill Seed Warehouse

Company vs. Kean Ashurst.  And it's labeled "Stipulation of Dismissal."

Significantly it reads, "The parties agree that this stipulation of dismissal with prejudice bars plaintiff or any entity affiliated with plaintiff from bringing a new action based on any claims brought or that could have been brought against defendant in this action but would not bar plaintiff from bringing a new cause of action that might arise after the entry of stipulation."

So we wanted -- we wanted to be sure that, when we filed this, that we got a solid dismissal, that this was -- we were hoping this would be -- this would put the entire dispute to rest and it would be behind Mr. Ashurst and Jarrow Formulas.

Q   That didn't happen though, did it?

A   It did not.  Despite efforts, it did not.

Q   Before we get to that --

A   Yeah.

Q   -- you testified that Mr. Rogovin hired you and your firm to represent Mr. Ashurst and paid you; correct?

A   Yes.

Q   What fee arrangement did you have with JFI, Jarrow Rogovin, in the state court action against Ashurst which you said was dismissed?

A   The same fee arrangement we had for all the other matters.

We billed them on a time-devoted basis.

Q   Was there any objection to or challenge to the rates you charged in that?

A   No.

Q   Were they the same as the rates that you listed in that 1996 letter when you were at the McCormick firm?

A   No.  They were at least two times that.

Q   Do you recall --

A   They were roughly --

Q   Do you recall what they were at that time, if you recall?

A   Yeah, roughly 405 for me.  And I think our rate in '96 was 200, if I remember correctly, 210.

Q   I want to interrupt myself and ask you, in every one of these 540 matters you handled over 23 years, did you send to Mr. Rogovin, and did he sign, a letter -- if we could put back up 0395, Mr. Wyzik -- like the letter you sent in December of 1996?  Are there 540 of these retention letters that you testified about a moment ago?

A   No.  There's only one engagement letter.

Q   Only one.  Why?

        THE COURT:  Be careful.  Very careful about opening doors.

        MR. PEPE:  I'll be careful, Your Honor.

        THE COURT:  All right.

        THE WITNESS:  We had a pattern and practice.

Q    (By Mr. Pepe) All right.  So this is the only retention letter we'll see for the 540 matters.

A    Yes.

Q    All right.  While -- while the state court action you described --

A    I should add there was a letter -- I apologize for interrupting, but there was a letter for Cummings & Lockwood where we asked, Would you like to continue on with us?  And if we don't hear otherwise, we will.

It's not an engagement letter of that nature, but it has to do with the continued retention.

MR. RESSER:  Excuse me.  We're not getting display of the nonsealed documents.

THE COURT:  Right.  That was -- you're going to have to -- let's do it this way:  Let's assume that everything goes up everywhere unless the lawyer says it's subject to the seal.

MR. RESSER:  Thank you, Your Honor.

MR. PEPE:  I appreciate that.

Q    (By Mr. Pepe) I'm going to go back to -- excuse me.  I'm going to go back to what you just said.  And you said when you moved to Cummings & Lockwood, you sent a letter advising Mr. Rogovin of the move; correct?

A    Yeah.  I can't recall whether it was to Cummings or from Cummings to McCarter.  I can't recall specifically.  I know there was another letter that dealt with that issue.

MR. PEPE: PTX 096 is no objection. May that be a full exhibit?

THE COURT: Yes, and that's going to go up everywhere. Just a second, please.

MR. RESSER: Thank you, Your Honor.

Q (By Mr. Pepe) PTX 096 --

THE COURT: Wait. Wait one second. Okay. There you go. Go ahead. That's full. And you may go ahead.

(Plaintiff's Exhibit 96, received in evidence.)

Q (By Mr. Pepe) PTX 096 is a letter dated September 26, 2003, from you to Mr. Rogovin. Is that the letter you had in mind?

A It is.

Q And just very briefly, what was the purpose of that letter?

A So this was dated September 26 of 2003. I think I had indicated that on October 1 of 2003, our firm, we had merged into McCarter & English. And so we were sending a notice letter to Mr. Rogovin indicating that we were going to merge into McCarter & English. And we were giving him the option to continue to work with us or not.

And we say down in the second to last paragraph --

Q Let me ask Mr. Wyzik to blow that up. Could you do that? Thank you, Mr. Wyzik.

Go ahead.

A We say, "Of course, it is up to you to select the lawyer or law firm that you wish to handle your matters. If for some

reason you wish to have another law firm handle the matters that we are currently handling, please let us know.  If we do not receive instruction from you, we will transfer your files with us to McCarter & English on October 1, 2003, and will continue to represent you on the matters that we currently represent you on."

And we sent that to Mr. Rogovin, of course continued to work with Jarrow Formulas in the same manner we had before sending that letter.

Q   All right.  Now, I want to come forward again to 2013.

A   Okay.

Q   You just testified that you were successful in getting the state court action against Ashurst dismissed with prejudice. At that time when this dismissal was entered, was there already a separate action by Caudill Seed pending?

A   Yes, there was.

Q   Okay.  Let's take this in pieces now.  Tell us what that action was and when it was first instituted, as best you recollect.

A   So the -- the stipulation of dismissal of the state case that we just looked at, I believe that was in January of 2014. I think it was early 2014 anyway.

In January of 2013, Caudill Seed had sued Jarrow Formulas for, if I recall correctly, either six or nine different what we call causes of action.

Q    And what court was that brought in?

A    That was brought in the federal court in Kentucky.

Q    At that time that suit was started, was the state court action against Kean Ashurst still pending?

A    It was still pending.

Q    Were -- what, if anything, was your involvement in the federal court action?

A    So I became aware of the federal court action through a service we subscribe to where we are notified if clients of ours are sued.  And I forwarded the complaint, which is the first document a party files in a lawsuit, and I forwarded it to Mr. Rogovin, let him know about it.  And he retained us to represent the company to defend Jarrow Formulas in that lawsuit.

Q    Okay.  And did you, in fact, undertake the representation of JFI in the federal court action?

A    We did.

Q    And you said in that case Caudill Seed was again the plaintiff?

A    It was.

Q    Were the allegations or the claims the same as in state court action against Ashurst, or were they different when the suit was brought against JFI?

A    Yes and no.

Q    I'm sorry?

A    Yes and no.

Q    Some the same, some not.

A    Yeah.  The factual allegations, the wrongdoing complaint of all arose out of Mr. Ashurst's sending of the confidential information, the alleged confidential information, to Mr. Rogovin and others at Jarrow Formulas.  The claims that were brought were not for trade secret misappropriation.  They were brought for other alleged violations of law.

They claimed, for example, that Jarrow Formulas engaged in conversion, which is common law basically of stealing something, engaged in extortion, engaged in racketeer, racketeering, influence, and corrupt organization activities or, as you've probably heard, RICO.  And there were other counts in there as well for, like, what we call common law claims.  They all arose out of the alleged wrongdoing of Jarrow -- of Mr. Ashurst sending confidential information over to Jarrow Formulas and others at Jarrow Formulas and Jarrow Formulas receiving that information.

Q    This same information you've described in your testimony about the state court action?

A    Yes.

Q    Did you undertake the defense?

A    We did.

Q    Who was working with you on that?

A    At the time --

Q    At the beginning of the lawsuit.

A    Yeah, at the time when we received the complaint, I was working on it, along with my partner Eric Grondahl, and we had two associates working with us.

Q    Okay.  And were you successful in eliminating any of the claims in the federal court action?

A    Yeah, we were.  We, um -- when we received the complaint in I believe January, late January of 2013, we immediately jumped on it.  And we researched all these different counts, and we filed what's called a motion to dismiss, meaning we essentially argued to the court that Caudill Seed had failed to adequately state claims for these alleged violations and shouldn't be allowed to bring these claims because they just don't adequately state them as a matter of law.

Q    What was the result of that effort?

A    The result of that was that the motion was granted in part and then was denied in part.

      So we got some of the counts dismissed for failure to stay the claim, like the RICO count, and I can't recall specifically which others were dismissed.  But we were whittling away at it.  We got some of them dismissed but not all of them.

Q    And did the suit proceed with the remaining counts?

A    It did.  We -- at some point, if I may, Caudill Seed amended their complaint.  We call -- the complaint's the

original document.  They amended it to now add a count for trade secret misappropriation under what's called the Kentucky Uniform Trade Secrets Act.  So now we had a complaint for trade secret misappropriation and a few counts that were remaining that we could not get dismissed from the original complaint.

Q   Okay.  And did you continue your defense of the remaining count?

A   We did.

Q   You mentioned the Kentucky Uniform Trade Secret Act.

A   Yes.

Q   Were you familiar with that?

A   I became familiar with it.

Q   Okay.  And tell us what's involved in -- very briefly, tell us what's involved.

A   Sure.

        THE COURT:  What's involved with the statute?  You want him to get into that?

Q   (By Mr. Pepe) No.  What does the Trade Secret -- Uniform Trade Secret Act prohibit or provide a remedy for?

A   Yeah.  It defines the Kentucky Uniform Trade Secrets Act, or KUTSA, defines what a trade secret is.  And it says that essentially that misappropriation of a trade secret means either improperly acquiring, improperly disclosing, or improperly using a trade secret, essentially something that's confidential and has value.

Q    Okay.  And do you remember what the damages were being claimed by Caudill Seed in that complaint?

A    Yeah.  I believe they were claiming -- when they filed the complaint, they were claiming I think in the neighborhood of $12 million in damages, and they were also claiming that the misappropriation was willful and malicious.

Q    What did you understand that to mean and what effect it had, if any?

A    Yeah, so willful and malicious misappropriation, my understanding anyway, is that it means misappropriation that is done with malice or ill will, without regard for the rights of the person whom you've afflicted the misappropriation on.

And so under the Kentucky Uniform Trade Secrets Act, if there is a finding of willful and malicious misappropriation, the damages can be enhanced up to three times.  So if they were seeking $12 million and if there was a finding of misappropriation and there was a finding of $12 million in damages and if it was all willful and malicious, the court could triple that to, you know, roughly 36 million and could also award attorney's fees.

Q    Were you aware of that exposure from the very beginning?

A    We were.

Q    What was Mr. Rogovin's reaction to this lawsuit as expressed to you?

A    He was outraged.  He was -- he was -- he more so than in

any other case, the fact that they had accused -- he considered it, as expressed to me, as though they were accusing him personally of violating RICO and him personally stealing the trade secrets.  And he was outraged and just vehement over this, over this case.

Q   Did he ever acknowledge to you -- question withdrawn.

Did you express to him your evaluation of the case against the facts as you then understood them?  And if I understand correctly -- and please correct me if I'm wrong -- the facts you learned in the Kean Ashurst state court action were the same facts being alleged by Caudill Seed in the federal court action.  Is that a fair statement?

A   Yes.

Q   Okay.  Did Mr. Rogovin ever acknowledge to you his evaluation of those facts or how he reacted or what effect those facts would have?

A   Yeah.  When he would focus on those facts, he -- I think his words were, "This is a horrible narrative."  He expressed to us the understanding that these were terrible facts where you have an employee, before he's hired, sending over information marked "Confidential," and you have the chairman of the company receiving the information that's marked "Confidential" and you never have the information being sent back.

And Mr. Ashurst sent over a fair amount of

information.  And so those were tough facts, or as Mr. Rogovin called them, a horrible narrative.

MR. PEPE:  If I may offer, Your Honor, as a full exhibit PTX 160, one six zero, to which there's no objection.

THE COURT:  All right.  160 will be full.

(Plaintiff's Exhibit 160, received in evidence.)

MR. PEPE:  And may I publish it?

THE COURT:  Yes.

MR. PEPE:  Mr. Wyzik, can you pull up 160?

Can you see that, Mr. Giarratana?

Let me ask Mr. Wyzik to call out the "To" and "From" section so we can orient ourselves.

THE WITNESS:  Is there a question?  I'm sorry.  I'll wait.

Q   (By Mr. Pepe) You can see the "To" and "From" section now?

A   Yes.  It's an e-mail from Mr. Rogovin to myself, Eric Grondahl, and Tom Rechen.

Q   And others?  Mr. Ashurst and others?

A   They CCed Mr. Ashurst, and he blind copied three other outside lawyers, Scott Polisky, if you recall, I had indicated --

Q   We don't need to get into that.  That's okay.  These other outside lawyers?

A   Yeah.

Q   And this is dated October 17th, 2018.  So we're well into

the litigation you said?

A    Yeah.  We're now less than a year away from trial.  Trial is scheduled in Kentucky in May of 2019, and this is October of 2018.

Q    If I ask Mr. Wyzik to go to this last page of this e-mail, PTX 160, and blow up the fourth page from the bottom that begins, "There is a massive amount."

We're on the fourth page of this exhibit, sir.  And is that where Mr. Rogovin uses the term "horrible narrative"?

A    Yeah.  He states, "There is a massive amount of facts in this case.  There is a horrible narrative to this case thanks to Kean's compulsively e-mailing everything he shouldn't have and my incredibly stupidly ignoring it.  This is asking the jury to hack their way through a labyrinth narrative that I lose.  The technical argument -- tons of published info -- finishes them off.  Their 23 years becomes bluff and bluster."

Q    Referring there, as you understood it, to whom and to what?

A    He's referring to Caudill Seed.

Q    And the paragraph right above, Mr. Wyzik, can I think blow that up or call it out.  I'm sorry.

The one above that begins, "I am sick of this," the immediate paragraph above the one we just looked at.

He says -- Mr. Rogovin says in this e-mail:  Quote, I am sick of this.  This is a technical case but I do not mean it is legally technical because DeadBrain hates our legal

technicalities and he's shoved them back down our throat repeatedly, period, end quote.

What was your understanding of to whom he was referring with the DeadBrain?

A   He referred to the judge, Judge Simpson, the senior judge in Kentucky, federal court in Kentucky as, in his words, Judge DeadBrain.  He didn't like the decision that he had handed down on summary judgment.  And following that --

Q   Can you keep your voice up, please?

A   Yeah.  And following that decision, he would refer to the judge as Judge DeadBrain.

Q   It goes on to say, quote, He, meaning the judge, does not give a G-d flying F about our legal technicalities.

What did you understand his complaint to be there?

A   Um, well, he's expressing his view that the judge didn't care in -- you know, about the legal issues, about the legal technicalities.  He was just frustrated and angry with the judge and the process.

Q   On the preceding page of the same exhibit, the same e-mail, the second full paragraph below the asterisk begins, "No, we can't."

THE COURT:  Want him to call that out for you?

MR. PEPE:  Yes.

Q   (By Mr. Pepe) Mr. Rogovin refers there to denials of RFAs. What did you understand that to be?

THE COURT: There we go.

A   Yeah.  So he states here:  No, we can't prove that Caudill's denials of RFAs, 21/23 are false.  Especially after this C-R-A-P.  Now it can be argued that anything goes.  And don't tell me that's not so.  It is!!!!!!!

Q   Referring to RFAs, is that request for admissions?

A   Yeah.

Q   I don't want to get into the legal technicalities, but is this typical of Mr. Rogovin's involvement in the particulars of the lawsuit?

A   Yeah, very much so.  He was very much involved in every issue in the case and very much involved in understanding the legal issues, the factual issues, what our approach was going to be, what our strategy was going to be, and was intimately involved in every step of the way.  I indicated I spoke with him more than any other client, and in large part it was conversations dealing with issues like this.

He had very strong feelings as a general matter about how he wanted to approach things.  Sometimes we could work with him; sometimes we couldn't.  We did our best to try to steer him appropriately, listening to what he would say, but steer him appropriately within the confines, you know, of the rules of court and the law.

THE COURT: I tell you what.  Let's get another question.

THE WITNESS:  Yeah.

Q   (By Mr. Pepe) Now, Mr. Giarratana, did you ever express to Mr. Rogovin your concerns about this case and its defense?

A   Yes.

Q   Explain in general what you said.

A   Well, at this time -- actually, this was I think in October of 2017.  And my partner, Tom Rechen, in November of -- I'm sorry.  This was in 2018.  In November of 2018 he had to go down or he went down to Kentucky to watch Judge Simpson in another trade secret case.  Judge Simpson was the judge that Mr. Rogovin had been referring to in this e-mail who was our judge.

And we had -- Tom had met the opposing lawyer and had discussed the possibility of settlement, whether that might be possible.  And we raised that with Mr. Rogovin.  Do you want to think about settling this case?  It may behoove you to settle this case.

And ultimately, in no uncertain terms, he completely rejected those efforts.

MR. PEPE:  I'm going to offer as a full exhibit, if I may, Your Honor, PTX 145.  There's no objection.

THE COURT:  I'm sorry.  Give me the number again, please.

MR. PEPE:  145.

THE COURT:  All right.  That will be full.

(Plaintiff's Exhibit 145, received in evidence.)

MR. PEPE:  And if I may publish it, Your Honor?

THE COURT:  Yes, yes.

MR. PEPE:  And, Mr. Wyzik, can you call up the "To" and "From" parts so we can orient ourselves?

Q   (By Mr. Pepe) This is an e-mail, Mr. Giarratana, if you can see that, from Mr. Rogovin to you in November of 2018?

A    Yes.

Q    Okay.  And you said the trial was scheduled for the following year; correct?

A    Yes.

Q    And in that -- and then if Mr. Wyzik can blow up the next paragraph?

"November 30 - settlement conference.  Pimp DeadBrain" -- referring to Judge Simpson?

A    Yeah, it was either DeadBrain or Pimp DeadBrain.

Q    -- "with his whoring for them, including holding over my head sanctions from the counterclaim, and incredibly mindless comments and rulings has made any sort of settlement attempt pointless," period.

Then I want to drop down three lines, quote, begins "The only."  Maybe Mr. Wyzik can highlight that.  "The only thing."

A    Yes.

Q    "The only thing I'd agree to is a walk away, that I won't

go after him for fees, but I think he feels" -- who's he referring to, as you understood it, when he refers to "he" in that sentence?

A    It would be Dan Caudill of Caudill Seed.

Q    Was he the principal or president?

A    Yes.

Q    It goes on:  Quote, But I think he feels immune and I would have no doubt that even after a verdict for JFI, that piece of crap would order JFI to pay for the counterclaim, end quote.

Is that statement there, "The only thing I would agree to is a walk away," is that typical or consistent with the instructions that he gave you throughout this case about settlement?

A    Yes, very much so.  Every step of the way.  As a matter of fact, a couple days before --

THE COURT:  Okay, another question.

Q    (By Mr. Pepe) Did that position about no settlement extend to Mr. Rogovin's position on the recovery of legal fees?

A    Yes.

Q    Explain that and how it would be, how it would come about.

A    Sure.  So under the Kentucky Uniform Trade Secrets Act, if a defendant and Jarrow Formulas was in the place of the defendant, if the defendant can win, meaning finding -- obtain a finding of no trade secret misappropriation, and if the defendant can demonstrate that the plaintiff pursued the case

in bad faith, then the defendant has the opportunity to seek its attorney fees to get paid by the plaintiff. But you have to first win, obtain a finding of no trade secret misappropriation, and then you have to demonstrate that the plaintiff brought the case in bad faith.

Mr. Rogovin, his goal, was to try to win and try to get a finding that they pursued the case in bad faith so he could recover his attorney fees.

MR. PEPE: If I may offer Your Honor as a full exhibit PTX 142 for which there is no objection.

THE COURT: All right. Yes, you may publish. That's full. 142 is full.

(Plaintiff's Exhibit 142, received in evidence.)

MR. PEPE: If I may publish it, Your Honor.

And, Mr. Wyzik, can you call out the top there? Thank you so much.

Q    (By Mr. Pepe) I have before you, sir, an e-mail from Mr. Rogovin to Mr. Khowong, Mr. DuBose, Ramos. Who was Ramos?

A    Bear with me, please. Lot Ramos.

Q    Yes.

A    Lot's an employee of the company. I can't remember exactly what Lot did.

Q    With a copy to you; correct?

A    Yes.

MR. PEPE: I would ask Mr. Wyzik to call out the

paragraph, two paragraphs above the signature that begins with "Unlikely."

MR. WYZIK:  Can you repeat that?

MR. PEPE:  Yes.  The two paragraphs above the signature that begins with "Unlikely."

Q   (By Mr. Pepe) That says there:  Unlikely with this judge, but I want to try to have a finding that this is a, quote, exceptional case, end quote, and we can get our attorney fees.

Is that the terminology referring to what you just said?

A   Yeah.  He's mixing a little bit of patent law and trade secret law here.  In patent law it's called an exceptional case.  My understanding was he was referring to the provision in the trade secret law that says if the plaintiff brings the case in bad faith and loses, then in his words it's exceptional and you can obtain your attorney fees.

Q   Did you understand Mr. Rogovin's objective in this Kentucky litigation?

A   Absolutely.

Q   Did you undertake to implement his objectives?

A   Absolutely.

Q   You testified earlier that you had -- that you had started in the Ashurst state court litigation with you and Mr. Grondahl and some associates.  Do you remember that?

A   Yes.

Q   Did you enhance your trial team for the federal court litigation?

A   We did.

Q   And tell us what you did in that regard.

A   So the case was pending for six years, meaning it started in 2013 and ultimately went to trial in 2019.  Over time, associates may leave the firm.  Primarily we brought on Tom Rechen.  Tom is our partner.  Tom is -- you know, has extensive experience litigating cases to juries, like you here.

Q   And were there others that became part of your trial team as you --

A   Yes.

Q   -- proceeded in litigation?

A   Yeah, so it was Tom --

Q   Have you helped -- worked with me to prepare a demonstrative that illustration shows the members of the trial team and what they did?

A   Yes.

Q   And is it an accurate reflection of what --

A   It is.

Q   And would it help the jury with understanding of your trial team?

A   I believe so.

        MR. PEPE:  There's no objection, but I'll show it to counsel.

THE COURT: All right. That's fine.

So, Ladies and Gentlemen, you've heard the lawyers talk about demonstratives, these charts that they've put up. Those are not admitted as full exhibits. I'll explain that more later. But essentially they're just put up for you to help understand what the witness is saying.

Go ahead, Mr. Pepe.

MR. PEPE: Thank you, Your Honor. May I publish this?

THE COURT: You may.

Q   (By Mr. Pepe) So this is two pages. I'm going to direct your attention to the first page, if I may, Mr. Giarratana. Can you explain to the jury who and what is shown there? And I think very succinctly explain the role that each of these persons played.

A   Sure. So left-hand column is the McCarter & English attorneys. The right-hand column is Stites & Harbison. I think, as was previously indicated, we had what we call a local counsel.

So as intellectual property attorneys, we do work really all around the country. But if we're going to appear in a federal court somewhere else in the country, we need to obtain local counsel who admits us into that court to work side by side with them in that federal court wherever it might be.

So in this particular case we had as local counsel the Stites & Harbison firm in Louisville, Kentucky.

Q    That would be Mr. Beres on the right-hand side?

A    Yeah.  Joel Beres was a partner there.  He's an intellectual property attorney.  And he was our local counsel. As a matter of fact, he was involved also in the Ashurst case. We had his firm retained for that as well.  And then when the case was filed against Jarrow Formulas, they continued on as our local counsel.

Q    Go ahead.

A    Yeah, so just to wrap up on the local counsel, heading into trial we had Joel Beres who was the partner, and Cortland Joyce was the paralegal.  Cortland Joyce was our paralegal during the trial.  He was there every day working 15-plus-hour days.

          Below that is Jonathan Leventhal.  Jonathan, I explained previously Jonathan was new to Jarrow Formulas.  He was there.  Throughout the trial he sat at our table, counsel table, every day and participated in our meetings after the day to talk about what happened that day and what we would do the next day.

Q    And if you go to the left-hand column, I think you already explained Mr. Rechen, yourself, and Mr. Grondahl, but I don't think I heard you say anything about Mr. John Cordani?

A    No.  John Cordani was our senior associate at the time. And he was, you know, integrally involved in pretrial activities, and also he attended trial as well, you know, handling primarily brief drafting at that point.  Lawyers have

to file briefs and argue issues to the court even during a trial.

Q   The lower part of that page identifies certain people under the heading "Dancel Multimedia."  Explain what that was and who these people are and what they did.

A   Yes.  So Dancel Multimedia is -- they're jury trial consultants.  There are consultants that specialize in assisting law firms in investigating how juries might perceive their case and helps lawyers figure out what issues are important, what issues are not important, how to better present the issues.

And Dancel, we actually conducted two what we call mock jury exercises before the Caudill case, to get a read on how a mock jury, this case down in Louisville, would perceive the issues in the case and help us better prepare the case for trial.

Q   And were they involved before and during the trial?

A   They were.  And Jimmy, on the far right, the youngest in the group, he was our courtroom technician.  So he was in court every day, you know, managing the computer, putting up the exhibits, and working closely with the trial team at court every day.

Q   Now, you testified that the trial or -- excuse me -- the federal court litigation was instituted in early 2013; is that correct?

A    Yes.

Q    And you testified it went to trial in June of 2019; is that correct?

A    Yes.

Q    Okay.  So during those six years, were you and this trial team involved over the course of that litigation?

A    We were.  The trial team evolved.  Mr. Rechen became involved later in 2014.  And Mr. Cordani got involved in, I think, 2018.

Q    But you personally were involved from the first day to the last day.

A    Yeah, as was Eric Grondahl.

Q    Okay.  And I'm not going to ask you to retry those six years.  But have you prepared a graphic or demonstrative that illustrates the major points and major milestones in those six years of litigation?

A    Yes.

Q    And would it be an aid to you in describing that litigation succinctly and briefly?

A    It would.

Q    And would it be an aid in the jury's understanding of the overview of that litigation?

A    I believe it would.

        MR. PEPE:  There's no objection to this, but I'll show it to counsel, if I may, Your Honor.

THE COURT:  That would be fine.

You may publish it, Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.

Mr. Wyzik, can you call up 38?  Thank you.

Q   (By Mr. Pepe) Should have on your screen, Mr. Giarratana, a demonstrative that -- graphic -- that shows the milestones. Again, not going to walk through everything in six years.  But I want you to explain to the jury how the litigation progressed over those six years.  And before you do that, before you do that, I want to ask you, you said you understood Jarrow Rogovin's objectives with respect to this litigation.

A   Yes.

Q   You testified you worked to implement those objectives.

A   Yes.

Q   Okay.  Before we get into this, explain to the jury what, if any, defense you and your trial team developed, given those instructions by Mr. Rogovin and the facts that you were confronting.

A   Yes.

Q   Succinctly explain to the jury what you developed.

A   Okay.  So Caudill Seed claimed that Jarrow Formulas had misappropriated six categories of trade secrets:  research and development, a general process --

Q   Keep your voice up please, sir.

A   Research and development, 26 years of research and

development to take two products from seed to shelf, a general process for making the product, a more specific process for making the product, vendor information, customer information, and a laboratory notebook and computer hard drive. Okay? Those are the six categories.

And they claimed that all this information was misappropriated by Mr. Ashurst and given to Jarrow Formulas and in turn used by Jarrow Formulas.

So our strategy was to either establish that Jarrow Formulas didn't acquire the information -- that was hard, but there was one trade secret where Jarrow Formulas, we believed, did not acquire it, which was No. 6, the computer hard drive and the notebook.

For the other trade secrets, we proceeded to demonstrate that either they were not trade secrets at all or that Jarrow Formulas did not use the trade secret. Early on in the Ashurst case, we had advised Jarrow Formulas: Don't use anything from Caudill Seed. Develop your own process. Do something different.

We ultimately patented the process that they developed.

Q   For the broccoli food supplement?

A   They developed a new process and product for this broccoli supplement that we were able to patent.

THE COURT:  Mr. Pepe, maybe you could ask another

question now?

THE WITNESS:  Okay.

Q    (By Mr. Pepe) Okay.  And so tell us the elements of that defense, sir, that you --

A    Yeah, so the strategy was either to show that Jarrow Formulas did not acquire the trade secret or did not use the trade secret.  If we could show that Jarrow Formulas did not use the trade secret, then Caudill Seed would have no basis -- well, I left something out.  I apologize.

Jarrow Formulas did not acquire the trade secret or it was not a trade secret or Jarrow Formulas did not use the alleged trade secret.  If we could demonstrate that Jarrow Formulas did not use the alleged trade secret, then there would be no damages.  And ultimately the issue here was preventing in a damage award.

Q    What, if any, involvement did Mr. Rogovin have in the development of that defense strategy?

A    Extensive involvement.  You saw an exemplary e-mail but extensive involvement over the six-year period.

Q    Was there any disagreement between your trial team and Mr. Rogovin on that defense strategy you just described?

A    No.

Q    Okay.  Now, with that in mind, would you go to the demonstrative on screen and explain, give us an overview of how that litigation proceeded.

A   Yeah, if we move from left to right, and I've already described what's shown in the lower half of the screen, which is the Caudill Seed v. Ashurst case, so I don't think I need to cover that again.

On the upper half of the screen, that's a timeline of the federal case in Louisville. I already described the complaint was filed in January of 2013. McCarter, we were able to eliminate some of our claims on our motion to dismiss by August of 2013.

We then filed a motion for summary judgment, which means that we argued to the court: There is no dispute, disputed issue of fact, Your Honor. You can decide as a matter of law that Jarrow Formulas did not misappropriate a trade secret.

The basis for that was that --

Q   Was that successful?

A   It was -- it was partially successful.

Q   Go ahead.

A   As a result of that motion for summary judgment, we were able to get rid of the few remaining claims that were in the original complaint. And the only remaining claim as following that motion for summary judgment was a claim for trade secret misappropriation, and it was -- there was a subtlety to it. Because we had dismissed the claim for trade secrets against Mr. Ashurst, the judge found that Jarrow Formulas could only be

liable for its own independent acts of misappropriation.

Q   Explain that.  What do you mean by that?

A   Well --

Q   How did you understand that?

A   If Jarrow Formulas independently committed an act of misappropriation, so if Jarrow Formulas independently acquired, disclosed, or used a trade secret, Jarrow Formulas could be held liable.  But Jarrow Formulas could not be held liable if Mr. Ashurst independently -- for Mr. Ashurst's actions in independently acquiring, using, or disclosing a trade secret.

So we went to trial on that basis, attempting to demonstrate that Jarrow Formulas did not either:  number one, the trade secret was not a trade secret; or, number two, Jarrow Formulas did not independently acquire or use the trade secret.

Q   All right.  What's the next milestone, and how did it relate to your defense?

A   So, well, we then proceeded to, um, to conduct discovery, initial discovery, which formally ended on December 22nd of 2014.  We had a very extensive period of discovery.  I think in a matter of about a month, there was over 25 depositions. Depositions are where lawyers interview witnesses under oath about the issues in the case.  So there was a tremendous amount of work in there, from our perspective, trying to understand their trade secrets, formulating our defenses.

The parties then filed what we call -- again, filed more motions for summary judgment.  The goal was to try to get rid of this case on the papers so we did not have to go to trial.  So we filed a motion for summary judgment immediately following discovery in early 2015 basically of arguing to the court that Caudill Seed failed to sufficiently identify their trade secrets, was not entitled to damages.  There were a few other grounds.

We received an order on that.  Our motion for summary judgment was ultimately denied.  And following -- that was the second motion for summary judgment.  Following that motion for summary judgment, because so much time had passed, the court allowed the parties to engage in additional discovery where they would supplement what they had produced previously.

And so it says here that we completed document discovery on January 12th of 2018.  Okay?  So we went through really more or less more discovery.  And now in January of 2018 we're getting ready for trial starting in May of 2019.

Q   So if I understand you, you said your goal was to, to use your terms, get rid of this on the papers.

A   Yeah.

Q   I think you referred to the summary judgment motions?

A   Yeah.  And we filed -- we filed -- we filed two summary judgment motions early in the case; and then again in very close consultation with Mr. Rogovin, we filed two more motions

for summary judgment prior to 2019.

I won't get into what the details were, but essentially we argued to the Court that because of certain developments, Caudill Seed could not prove its claims as a matter of law. Again, the goal from Mr. Rogovin's perspective was to get rid of the case, or at least whittle it down before we got to trial. So we did that. But we were not successful. The judge, Judge Simpson, denied our motions.

Q   And so then do I understand you had to get ready for trial?

A   We had to get ready for trial at the end of 2018.

Q   All right. And when did the trial begin?

A   The trial began on May 26th of 2019.

Q   Actually --

A   Oh, wait, I'm sorry. I got the wrong -- sorry. June 3rd. It began on June 3rd of 2019 the trial began.

Q   And the demonstrative we looked at a moment before with all the different players in that, were they there for the trial on June 3 -- June 3, 2019?

A   Yes, they were. We went down a week ahead of time, you know, and worked out of our local counsel's office so that we could prepare for the trial the next week. And we were down there for another, you know, roughly three to four weeks of trial. It was a long trial. It was about three to four weeks.

Q   And was Mr. Beres, Attorney Beres, the local attorney

involved in this trial also?

A    He was.

Q    And you told us already Mr. Leventhal sat at the table with you; correct?

A    Yeah, and so did Mr. Beres.  And --

Q    All right.  And who was doing the questioning and the examination, the cross-examinations in the trial?

A    So Attorney Rechen was.  We believed in what we called this one voice strategy where we thought that -- we thought that Tom Rechen, you know, would speak with one voice on behalf of Jarrow Formulas to the jury.  And so Tom handled the witness examinations.  The rest of the team handled the other aspects of the trial.  So we would help him prepare the work for examining the witnesses.  I would argue the motions to the court when the jury wasn't present.  Eric Grondahl did some of that as well.  And, you know, it was, you know, five weeks of very heavy work of, you know, a minimum 15-hour days, working weekends, to prepare every day for a very complex trial on six trade secrets.

Q    And the jury -- the case ultimately went to the jury?

A    It did.

Q    And the jury returned a verdict.

A    It did.

Q    I'm going to come back to that because I don't have my exhibit here now, the jury verdict.

But explain to us what was -- what the jury -- what was before the jury and what the jury decided, if you would.

A    Yes.  So as I previously explained, there were -- the jury had to decide whether there were six trade secrets, whether Jarrow Formulas misappropriated those six trade secrets, and, if so, what the damages were for those six trade -- for any trade secrets that were misappropriated.  The defense was partially successful and partially unsuccessful.

Q    I'm going to interrupt you there, sir.

A    Yes.

MR. PEPE:  And, Your Honor, I'm going to move for the full admission of Exhibit, Plaintiff's Exhibit 094, to which there is no objection.

THE COURT:  94 is full.

(Plaintiff's Exhibit 94, received in evidence.)

MR. PEPE:  Thank you, Your Honor.  And if I may publish?

THE COURT:  Yes.

MR. PEPE:  Maybe I can take this one down, ask you to come back up, if I may.

Q    (By Mr. Pepe) On the screen now before you and the jurors, Mr. Giarratana, should be -- do you recognize that document?

A    I do.  This is the jury verdict form.  So every jury is given a verdict form.  The jury here was given a verdict form. And this is something they need to fill out when they reach

their verdict.  And it essentially reflects the findings of the jury.

Q   And you started to explain the findings with respect to the six different trade secrets you earlier identified.  Do you remember that?

A   I did.

Q   Okay.

A   I do.

Q   And is that reflected on the first page of Exhibit 094?

A   It is.

Q   Can you explain that, please?

A   I'm just trying to read it.

I -- okay.  So we can see here there's six lines at the bottom.  Those identify the six categories of trade secrets that we had to defend against.  The first was research and development.  The second was the general process.  The third was a specific process.  The fourth was vendor information.  The fifth was customer information, and the sixth was a lab notebook and hard drive.

So here we were partially successful in that the jury found that the second trade secret was not a trade secret, that the information was not a trade secret.  But it did find that the other five were trade secrets.

Q   All right.  And then the jury had more to do after that finding?

A    It did, yes.

Q    I'm going to ask Mr. Wyzik to pull up the second page, if he would, please.

And can you explain the jury's findings as reflected in that page of the jury verdict and as you understood it in June of 2019?

A    Yeah.  So this -- this is where the jury found that Jarrow Formulas had misappropriated four of the six trade secrets.  So, again, partially successful in that the jury found that Jarrow Formulas did not misappropriate the laboratory notebook and hard drive at the bottom and that the general process was not a trade secret.  So we went from six down to four, but the jury nevertheless found that Jarrow Formulas did misappropriate four of the six.

Q    All right.  And then if I could ask Mr. Wyzik to pull up page 3 of Exhibit 094, and if you would explain to -- the jury's findings there, as you understood them, when the jury returned its verdict in June of 2019.

A    Yeah.

Could you blow up the --

Q    Yes.  Go ahead.

A    That's great.  Thank you.

So this is the jury's finding of damages that were owed.  So this shows that we were partially successful in that the jury found zero damages with respect to five of the six

trade secrets.  That was the goal ultimately.  It was to get zero damages on a trade secret.

Q   I'm going to interrupt you, if I may, because I want to -- then I'll let you continue.

On that same page in the lower right-hand corner, there's something in parentheses, and maybe Mr. Wyzik can highlight that.

A   Yeah.

Q   And what did you understand that signified on this jury verdict form as it went to the jury in Kentucky?

A   So the maximum damages that the jury was allowed to award was $9,716,705, so roughly $9.7 million in damages.  That was the maximum they were allowed to award.

Q   I thought you said earlier Caudill sued for $12 million.

A   Through our pretrial motion practice, we were able to whittle down the damages claim from 12 million down to roughly 9.7 before we went to trial.

Q   Go ahead.

A   And so the jury awarded, unfortunately awarded, damages on one of the trade secrets, the R&D.  They found that was misappropriated.  They found that Caudill Seed suffered actual losses of 2,023,000, and they also found that Jarrow Formulas was unjustly enriched under the Unjust Enrichment column in the amount of $404,605.

Q   What did you understand that signified?

A    So the actual loss was the damage actually suffered by Caudill Seed.  So the jury found that Caudill Seed suffered actual damage in the amount of roughly 2 million; and the 404,000, the jury found that Jarrow Formulas unjustly or unfairly received the benefit of what it shouldn't have received of -- received in the amount of 404,000.

So the total damages that were awarded on the one trade secret where they awarded damages was $2.4 million.

Q    You testified earlier that you were aware of Caudill Seed's claim in this lawsuit for willful and malicious misappropriation of trade secrets under the uniform trade secret act.  Do you remember that?

A    Yes.

Q    Was the jury asked to make a finding on that?

A    Yes.

Q    And did they do so?

A    It did.

Q    And may I direct your attention to the last page of that same exhibit, 094.  And could you point out to the jury where that appears.

A    Yeah.  So this page shows that the jury found that --

Q    Excuse me.  Maybe Mr. Wyzik could highlight the paragraph that begins with "Yes."

Is that it, Mr. --

A    Yeah.  So this page shows that the jury found that Jarrow

Formulas had willfully and maliciously misappropriated one trade secret. And that was the 26 years of research and development.

Q   All right. I'm going to come back to that a little later. All right?

A   Okay.

Q   Now I want to direct your attention to your payment for the services you just described.

A   Yes.

Q   What was the fee arrangement, if any, you had with JFI for the services to be rendered in the Kentucky federal court litigation? You've already told us what it was in the Kean Ashurst state court litigation. Do you remember that?

A   Yes.

Q   What was the fee arrangement, if any, in the Kentucky federal court litigation?

A   It was a time-devoted fee basis.

Q   The same as Kean Ashurst's.

A   Yes, the same as all our matters.

Q   Okay. And you testified earlier that the time-devoted fee arrangement led to monthly invoices which you reviewed before they went out and saw. You remember that?

A   That's correct.

Q   All right. And was that followed with respect to the Kentucky litigation? That is, did you bill monthly for the

services rendered on the basis you just described, time devoted?

A    Every month.

Q    And to whom did you send those bills?

A    Mr. Rogovin.

Q    Let's take a look at one of those bills and see what the information is contained therein.

        MR. PEPE:  I'm going to offer as a full exhibit, Your Honor, PTX 084 to which there is no exhibit.

        THE COURT:  All right.  084 is full.  You may publish.

    (Plaintiff's Exhibit 84, received in evidence.)

Q    (By Mr. Pepe) Mr. Giarratana, can you recognize and identify this as one of the monthly bills you submitted to Jarrow Rogovin at JFI for its legal services rendered in the Kentucky federal court litigation?

A    It is.

Q    And I'm directing your attention to the upper right-hand corner where the date appears.  Can you tell us, it's March 12, 2019, how that -- where that would come in the timeline you've already described?

A    Yeah.  So this was a bill that was sent out on March 12th of 2019, meaning it would be for the services we performed in February, the preceding month.  As you can see, it takes us a little time to review the bill and to get it out after the end of the month.  So we got this bill out an March 12th, and this

is for service and disbursements for February of 2019.  During that period, we were -- it's a pretty -- it's a pretty heavy bill.  We were very actively preparing for trial, very actively preparing for trial.  There was a tremendous amount of work leading up to trial.

Q   And is there -- is there a statement of the total amount due on the front page?  And does that appear right at the middle there?

A   Yeah.  This shows that the total fees were $276,223 and the total disbursements were 69,893.71.  So as I indicated before, we disburse money on behalf of our client and put that on the bill and ask our client to reimburse us for the money we spent.

So here this $69,000 was probably travel expenses.  You know, we had to fly places to take depositions.  But I also believe that it included our local counsel's bill.  Our local counsel in Kentucky was sending us their bill.  We would pay it and then ask Jarrow Formulas for reimbursement.

Q   Let's take a look at the next page.  There's some handwriting and stamps there.  I'm going to come back to that.

A   Okay.

Q   But let me direct your attention to the next page, page 2, of that bill.  Can you explain what information is set forth there and how it got -- how it is accumulated and put on the bill?  Do you understand my question?

A   Yeah.  So this is typical of what our bills look like.

This first time entry -- I call that a time entry, which means it's an entry by me because it says -- under the Attorney column, it has my attorney number, 3055, and my initials, MDG. And it shows that on February 1 I worked 9.3 hours for Jarrow Formulas. And this entry describes the work that I performed during those 9.3 hours.

Q   And let's be clear. At the top of the page, it says, "Caudill Seed vs. JFI." This indicates this bill is in the Kentucky litigation?

A   Yeah, this is a bill in the Kentucky litigation. This is a description -- these are the pages that describe the professional services that we rendered to the client that month.

So what we do every day when we work is we write down what we do, we submit that time and the amount of time we spent to our billing system. At the end of the month, that information is then put on to a draft bill, which shows the timekeeper, the work that was done, the amount of hours that were spent. And then I review it before it goes out the door. I read every one of these entries, evaluate them, maybe make adjustments, maybe edit them, you know, depending, you know. Sometimes they're sloppy, there are typos, things are wrong with them, I need to make them clear. And so that's the process we go through.

Q   The next entry on the same date, is that for you or someone

else?  And how can we tell?

A   So on the same date, February 1 of 2019, Eric Grondahl, his initials are EEG, worked 8.8 hours on this matter.  And that's the work that he performed during those 8.8 hours.

Q   And if we go to the next page, we see similar entries, but I want to direct your attention, if I may, to the second one on 2/1.  Is that for yet another attorney working on this matter?

A   Yeah.  So on 2 -- on February 1 the same day, that's Tom Rechen's entry.  And Tom had worked 9.8 hours on the case.  And you can see there we were drafting editing demonstratives for a mock jury.  I had mentioned before we had conducted mock jury exercises.  And so this was Tom doing work in connection with that mock jury exercise, all things that we had discussed with the client, you know, and planned to do.

Q   There appear thereafter other entries with different initials.  Does that identify the attorney -- or you used the word "timekeeper" -- working on this matter and what he or she did?

A   It does.  It indicates their initial, but we'll probably get to it down below.  But down below it shows who the initials -- what the names -- what the initials correspond to.  If the client doesn't know whose initials they are, down below it will show that.

          MR. PEPE:  I'm going to ask, Mr. Wyzik, can you please flip through this exhibit.  I'm not going to stop at every

page.  In fact, I'm not going to stop till we get to the end. But please go through the pages, if you would.  This bill is some 41 pages long.  Can you just go through those, Mr. Wyzik?

Q   (By Mr. Pepe) Mr. Giarratana, if you see something that's different or adds information to what you already testified to, please call it out.  I don't want to have you repeat the testimony for everything.  But if you see something here that's different from what you've already explained, you call it out. I'm going to ask Mr. -- if you would, please.  I'm going to ask Mr. Wyzik to continue to go through.

And when he gets to page 32, I'm going to ask Mr. Wyzik, if I may, to stop, unless you stop him before that.

As we go through this, Mr. Giarratana, is it fair to say your description of those first several entries, in terms of what they showed and what information was provided, would apply to these other entries?

A   Yes.  Yeah, this bill is typical of the bills that we would send out every month.  This one's a little different in the sense that it's 32 pages long because there was so much work we had to do.  This was in February.  We were going to trial in March.  We were doing a mock jury.  We were traveling back and forth to Louisville.  We were working very hard, and there's a lot of time reflected on this bill and a lot of entries.

Q   All right.  I've asked Mr. Wyzik to stop at page 32, but I'm going to ask him if he would please to go to page 33 first.

And I see a page there with the heading "Disbursements." Do you see that in the upper left-hand corner?

A   Yes.

Q   And then if Mr. Wyzik could just flip through the pages behind that heading. And could you explain to the jury, if they were inclined to read every one of those entries, what kind of information would be shown there?

A   Yeah. I mean, it's things like photocopy charges, travel expenses. We reimburse our travel expense, you know, at whatever the cost is to the client. And then as we get down below, we see that there are -- there are bills from Stites & Harbison, which was our local counsel. I saw it somewhere. It's not on that page right now.

Yeah, if we look at this page, we can see --

Q   Can you give the page number?

A   It's Jarrow hyphen 562 page 35 of the bill. We can see there are services from Stites & Harbison, our local counsel, that we paid the local counsel, and now we're asking the client to reimburse what we paid the local counsel.

Q   If I go to page 41, I see a total there on page 41 in the upper right-hand corner. And what does that response, $69,893?

A   That's the total disbursements, meaning the out-of-pocket moneys.

Q   Should that total what's on the first page?

A   It's the same number on the first page where we show

disbursements.

Q   Can we go back to the first page?  So a reader of this would understand the total fees and total disbursements on the first page, and the detail would be on the subsequent pages. Is that accurate?

A   That's accurate.

Q   Now I'm going to ask you to go back to page 32.  That has a different format.  I'd like you to explain what is shown on this page, the last page before the disbursements.

A   Yeah.  So at the end of the fees, we've now -- by the time we get to this page, we've now described all of the fees.  Fees are for the professional services as opposed to disbursements. Those are described in the next pages.

          And so at the bottom of the fees, we show what the total fees are.  In this bill it was $276,223.

          Now, it also shows the total disbursements, which it describes on the ensuing pages.  But if we can look below that --

Q   What is that information under the heading "Payment due upon receipt"?  What is shown there?

          Can you blow -- can you call that out, Mr. Wyzik, please?

          Thank you so much.

A   Yeah.  So this appears on every one of our bills, and it appears on this page of the bills where we show the attorney

number.  If you recall, every time -- every time entry has an attorney number and his or her initials following that number.  So this page shows the attorney number, the full name of the attorney, what their title is.

So you've got Eric Grondahl.  It shows his number.  It shows he's a partner.  It shows that month he billed 154.5 hours, which is all described above in detail.

It then shows that his rate at which he was billed was $485 per hour, and it shows the total value of what was billed on behalf of Eric Grondahl.  Services is essentially his hourly rate, which is shown there times the hours that he billed.

Same thing for me.  Same thing for everybody else.

Q   Is that column, which shows the hourly rate, was it included on every one of the 75 monthly bills issued by McCarter to Jarrow Formulas in the Kentucky litigation?

A   Every one.

Q   No question in your mind about that?

A   Absolutely not.  This -- this is what our system prints out, every bill.

Q   If you would go back to the front page of Exhibit 084.  There appears in the upper half of the page a handwritten notation.  Do you see that?

A   I do.

Q   It says, "OK, 3-16-2019."  And below that there are initials.  Do you recognize those initials?

A    I do.

Q    Do you recognize that handwriting?

A    I do.

Q    Whose is it?

A    Mr. Rogovin's.  I know his handwriting quite well.

Q    If you would drop down on that page, if we go back to the front page, Mr. Wyzik, below the -- right to the right of the heading says, "Payment due upon receipt."  Do you see that?

A    Yes.

Q    There appears further handwriting.  It says, "Less 5 percent discount" and then the number "13,811.15."  Do you recognize that handwriting?

A    That I don't.  I'm not sure whose handwriting that was.

Q    Fair enough.  Do you understand what the 5-percent discount meant in the context of this bill?

A    Yes, I do.

Q    And I'm going to come back to that too.

A    Okay.

Q    So you recognize the "OK" by Mr. Rogovin?

A    I definitely recognize that.  I'm not sure whether the other --

        THE COURT:  If you don't know, you don't know.

        Go ahead, Mr. Pepe.  Another question.

Q    (By Mr. Pepe) Now there appears a paid -- you see below that there's a paid stamp?

A    Yes.

Q    Was it your understanding this bill was paid?

A    Yes.

Q    Any dispute about this bill?

A    No.  No, absolutely not.

Q    Okay.  You want to go back to the beginning of the litigation in 2013, the early part of January, February, March 2013.  You have that in mind?

A    I do.

Q    Okay.  What was the status of the state court litigation against Ashurst then and the status of the federal court litigation -- my question is, did they overlap in those early months of 2013, the state court -- before the state court actually was dismissed, did it overlap with the federal court action?

A    They overlapped.

Q    Okay.  I'm in that time period now.  Did there come a time then that the insurance that JFI had came into play on the defense costs for this litigation, the federal court litigation?

A    Yes.

Q    Explain what happened, if you would, please.

A    Okay.  So when we received the complaint in the federal action, I had explained that there were roughly six or nine counts for things like conversion, RICO, etc.

Q   You have to keep your voice up.

A   Yeah, for things like conversion, RICO, etc.  And after -- when we received the complaint at the end of January, we worked very heavily during the month of February to prepare the motion to dismiss.  Filing a motion to dismiss six counts is an extensive amount of work.  It pretty much consumed us during February, that among other things we were doing.

When March approached, Mr. Rechen and I went out to California.  As I indicated previously, every March there's a trade show, the biggest trade show in the nutritional supplement industry.  It's called Expo West.  We would go out and visit with Jarrow Formulas.

Attorney Rechen and I also had a patent case on behalf of Jarrow Formulas where we had a bench trial, meaning it was a trial just in front of a court, not in front of a jury, immediately following that trade show.  So we went out for two reasons.  We went out for the trade show to visit with the company like we normally did, but also we would work through the weekend and conduct the bench trial the following week.

While we were out there, we had discussions with the client about the possibility that we thought there might be insurance coverage for the claims that were brought against it.

Q   You and Mr. Rechen and you say with the client.  With whom, please?

A    Mr. Rogovin.

Q    Go ahead.

A    And we had asked them to get copies of their insurance policies and so that we could take a look at them with them and we could evaluate whether or not they might have insurance coverage.

THE COURT:  Let's get another question, Mr. Pepe.

Q    (By Mr. Pepe) And as a result of that, did you come to understand that there might be insurance coverage?

A    Yes, yeah.

Q    And did you pursue that for Mr. Rogovin or JFI?

A    We pursued it for the company.

THE COURT:  You answered.  Next question.

MR. PEPE:  I'm sorry, Your Honor?

THE COURT:  He's answered the question.  Please ask another question.

Q    (By Mr. Pepe) And so as a result of your effort, what happened with respect to the insurance coverage issue?

A    So initially the insurance company denied.  And this is when we were out in California.  And we took a further look at it.  And I remember actually being in the car with Tom, thinking about, it talking about it, thinking, "Gee, I think they're wrong."

And so we ended up going back and explaining to the insurance company we thought they were wrong.  And they then

came back after we had returned home from California and indicated that they were going to provide a defense under what we call a reservation of rights.  So we more or less appealed.  They had changed their mind.  They then indicated they would provide insurance coverage.

Q   Did they, the insurer, confirm that in writing?

A   They did.

MR. PEPE:  If I may, Your Honor, offer PTX 106 as a full exhibit.  There's no objection.

THE COURT:  Yes, that can come in.  You can publish.  106, full.

(Plaintiff's Exhibit 106, received in evidence.)

Q   (By Mr. Pepe) And, Mr. Wyzik -- this exhibit starts with an e-mail from Eva.  You testified earlier was Mr. Rogovin's assistant; correct?

A   Yes.

Q   To you on March 11.  I'm going to now go beyond that cover e-mail to the next page and see if you could identify that as a letter you say confirmed the insurance company's coverage.

A   Yes.

Q   Is that it?

A   Yeah.  It's dated March 6, and it's from Liberty International Underwriters.

MR. PEPE:  And if I could ask Mr. Wyzik to go forward to page 5 of that letter and call out the second to the last

paragraph beginning with "Pending," under the "heading Reservation of Rights," if you could call that out also, please. On page 5. Can you get the heading right above that, please?

Thank you, sir.

Q (By Mr. Pepe) That section of the letter is headed "Reservation of Rights." Just tell us very briefly what you understood that meant as it pertained to the insurance carrier's coverage of the defense costs.

A Yeah, so as I understood this, the insurance company had agreed to defend Jarrow Formulas but did so under a reservation of rights, meaning, based upon further investigation, they may decide to withdraw the insurance coverage and to not provide insurance coverage.

Q What, if anything, happened next with respect to implementing the insurance coverage that is reflected in the exhibit we just looked at?

A Okay.

Q What did you do?

A So this e-mail was dated on March 11th. And on March 11th I was actually, I'm reasonably confident, in California. We were conducting the bench trial in the patent case in California.

I -- Mr. Rechen and I came back from California, and I received an e-mail from him, if I recall, on March 21st. Tom

said, "Did you see this?"  And he was attaching the reservation of rights letter.  So -- and my recollection is that's when we got back from California and now we're focusing on other things.

Q   What, if anything, did you do?

A   When I -- when I received the letter, we then -- I -- obviously, I read it, digested it, discussed it with my partners.  And I believe that day I called the woman who signed the letter, Linda Lin, to let her know we got it and to discuss with her, you know, the status of the case and how we would proceed.  So I informed her on the status of the case.

I also had a conversation with Mr. Rogovin that day.

THE COURT:  All right.  Mr. Pepe, I'm going to interrupt you.  It's time for our lunch break.

Ladies and Gentlemen, we'll take a 45-minute lunch break.  We'll resume at 1:30.  Again, don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  Thank you very much.  Retire to the jury room.

(The jury left the courtroom at 12:45 p.m.)

THE COURT:  Great.  Please be seated for a moment.  Please be seated.

Anything before we recess, Counsel, to deal with?

Mr. Resser, anything?  We're all set?

MR. RESSER:  Well, Your Honor, you know, if I objected to every question that Mr. Giarratana went beyond the scope of

the question, I would be standing up every question.  So I would ask that perhaps the witness be admonished regarding that.

THE COURT:  Yeah, I hear you.  I mean some of it so far has been essentially background, and it does move things along.

MR. RESSER:  Yes.

THE COURT:  You're right, I have, as you noted, interrupted several times.  I think as we get into more disputed testimony, I think it would be appropriate for you to object, and then those kinds of admonitions may come if the witness doesn't comply.

MR. RESSER:  I think forcing me to object to every question --

THE COURT:  That's not what I said, Mr. Resser.  I said when we get to critical testimony.  And you know what that is.

MR. RESSER:  Got it.

THE COURT:  I'm not forcing you to object to every question.  And as I said, I have interrupted the witness at times --

MR. RESSER:  Yes.

THE COURT:  -- at times when I thought appropriate and given appropriate instructions.

MR. RESSER:  Thank you, Your Honor.  I appreciate

that.

THE COURT: Very well. We'll be in recess. Thank you.

(Recess from 12:47 p.m. to 1:26 p.m.)

THE COURT: Mr. Pepe, how much longer do you expect to be on the direct do you think? Just an estimate.

MR. PEPE: I said to Mr. Resser I don't believe I will finish it today, the witness today, I do not believe.

THE COURT: All right.

(The jury entered the courtroom at 1:27 p.m.)

THE COURT: Mr. Giarratana.

Mr. Pepe, you may continue with your examination.

MR. PEPE: Thank you, Your Honor.

Q   (By Mr. Pepe) Mr. Giarratana, before the recess, you testified you had conversations with Linda Lin of Liberty concerning the coverage for the defense costs in the Kentucky litigation. Do you remember that?

A   Yes.

Q   As a result of those conversations with Linda Lin, what happened?

A   Ms. Lin -- we -- we put together information requested by the insurance company relating to the attorneys that were working on the litigation and their hourly rates and their bios.

Q   Excuse me. Did you send that to Linda Lin?

A    I did.

Q    Why?

A    Because that was a requirement of the insurance company.

         MR. PEPE:  Your Honor, may I offer as a full exhibit PTX 107 to which there is no objection?

         THE COURT:  Yes.  And you may publish.  107 will be full.

    (Plaintiff's Exhibit 107, received in evidence.)

Q    (By Mr. Pepe) You should have on your screen, sir, an e-mail string several pages long, but the first page is an e-mail exchange between you and Linda Lin.  Do you see that?

A    It is.

Q    And is she, in fact, the same Linda Lin at Liberty Insurance Company?

A    Yes.

Q    All right.  And starting at the middle of that page, there's an e-mail on Friday, April 19, 2013.  Do you see that?

A    Yes.

Q    All right.  And it's to Linda Lin.  Explain to the jury what is set forth there.

A    Yeah, if you could remove the blowup.

         MR. PEPE:  And highlight the paragraph under -- or call out the paragraph under "Dear Linda," please.

         We're in the middle of the page, paragraph in the -- marked Giarratana e-mail under -- got it.  That's it.  Thank

you so much.

Q   (By Mr. Pepe) Mr. Giarratana.

A   Yeah, so I was informing Ms. Lin at Liberty International, "As attached, please find the biographies of the attorneys who will be involved in defending Jarrow Formulas, Inc., in connection with the above referenced matter" -- the above referenced matter is the federal litigation in Kentucky -- "along with an overview of our firm's services.  The hourly rates for the attorneys involved are as follows."  And then it lists the attorneys and their hourly rates, and those were our firm's standard hourly rates as of that date for those attorneys.

Q   What is the meaning of the term "firm's standard rates"?

A   As I indicated previously, every October 1, at the beginning of every fiscal year, our firm sets standard hourly rates for each of the timekeepers at the firm.  Those are the rates that the attorneys are expected to bill at or the paralegals are expected to bill at.  And so as of the date of this, April of 2019, these were the standard rates for these particular attorneys.

Q   Were those acceptable to Ms. Linda Lin?

A   Yes.

Q   No objection?

A   None.

Q   Were those hourly rates shown there for you and Mr.

Grondahl and Shawn Smith and Abraham Robinson, were those the rates, hourly rates -- question withdrawn.  I'm sorry.

We're in April of 2019.  Had the state court Ashurst litigation been dismissed by that time?

A    This is April 19th of 2013?

Q    2013.

A    No, no, the state court litigation was still going on.

Q    Was the federal court litigation, Caudill Seed against JFI, instituted by this time?

A    Yes, it was.

Q    Were these rates in this exhibit, $535 per hour for you, $485 per hour for Mr. Grondahl, were those the hourly rates you were charging Jarrow Formulas, Inc., for the defense of Kean Ashurst in the state court litigation?  I'll ask it in two parts.

A    For Attorney Grondahl and I, no.

Q    Okay.  Were those hourly rates, $535 per hour for you and 485 for Mr. Grondahl, the hourly rates that you were charging JFI for the defense in the Kentucky federal court litigation?

A    Not as of yet.

Q    Do you remember what the rates were you were charging for you and Mr. Grondahl in the state court litigation Ashurst?

A    Uh, they went back to -- we had held our rates firm since, I believe, 2009 or so.  So I believe my hourly rate as of then was 405.  And we had held them firm in the Kentucky state case

through -- for the partners throughout the duration of that case. We did not increase them every year along with our standard rates.

Q   Why not?

A   Because that was something that we did for Jarrow Formulas when it would get involved in -- as it was a long-standing client, it was a good client, and for me and Attorney Grondahl, our practice was not to increase the partners' rates during a litigation like that.

Q   What -- what was the status in the firm of Shawn Smith and Abraham Robinson? Partner? Associate? What was their status?

A   They were associates.

Q   Did you do the same for Mr. Smith and Mr. Robinson, that is, hold their rates firm over the life of the Ashurst litigation and into the federal court litigation?

A   No.

Q   Why not?

A   They were associates, and we would increase those with their -- with their -- with their annual increases as a general matter.

Q   So at this point in time, before -- at this point in time on April 19, 2013, you were charging an hourly rate in the Ashurst in federal court litigation of how much for you, as best you recollect?

A   I think it was 405. It was from roughly 2009 about four or

five years earlier.

Q    You had held that for some two or three years?

A    More than that.

Q    More than that.

A    Yeah.

Q    And the rate, as you recollect, being charged for Mr. Grondahl?

A    The same thing.

Q    Okay.  And if yours was 405 --

A    I don't recall his.  But the rates had been held firm for the same amount of time.  We wouldn't have -- we held both the partners' rates firm.

Q    Why did you quote a different rate to Ms. Linda Lin of Liberty?

A    Because we were starting a new litigation.  I had realized -- when we had looked at the rate information, I had realized that the rates we were charging Jarrow Formulas were extremely old and it was receiving a huge discount.  Those rates went back to -- for Eric Grondahl and I -- went roughly back to 2009.

Q    Were these rates acceptable to Linda Lin?

A    Yes.

Q    Did you, at or about this time, have any discussions with Jarrow Rogovin about increasing the rate from one that had been held for some three years to a higher rate?

A   I did.  I did.  I spoke with him -- I had two conversations with him, actually three conversations with him, one on March 21 when I first received the letter from Liberty Insurance.  I had another conversation with him on April 4th and then another conversation with him on this day that I sent this e-mail out on April 19th.

THE COURT:  Let's get another question now.

Q   (By Mr. Pepe) Yup.  How do you remember those dates?

A   Because I -- they're recorded in my time entries.

Q   Okay.  In any one of those three conversations, were they by person or by telephone?

A   They were by telephone.

Q   In any one of those three conversations, did you discuss with Mr. Rogovin the increase in the rates as you've just described?

A   I did.

Q   When -- when was that, as best you recollect?

A   As best I recollect, it occurred either on April 4th or on April 19th when I had those two phone conversations with him.

Q   And as best you recollect, what did you say to him and what did he say to you concerning this issue?

A   I had indicated to him that Jarrow Formulas had been receiving a substantial discount.  We hadn't changed our partner rates since several years prior.  I believe they went back to 2009, that we were embarking on this, you know, this

litigation.  We couldn't hold our rates, keep our rates down at that low level, and we needed to increase them and we were going to charge our standard rates.

I also indicated to him that if the insurance company does not reimburse, Jarrow Formulas will be responsible for paying these -- for paying our bills because the insurance company took the case on a reservation of rights and that we would be billing both Jarrow Formulas and the insurance company.  In the event that the insurance company didn't pay the bills, Jarrow Formulas would be responsible for the bills.

Q   In either one of those conversations, did you tell him what the new rates would be?

A   Yes.

Q   Okay.  535 per hour for you and 485 for Mr. Grondahl?

A   Yes.

Q   What, if anything, did Mr. Rogovin say in response?

A   He indicated it was fine.

Q   I'm still on Exhibit PTX 107, and I've asked Mr. Wyzik to call out on the first e-mail at the top of the page from Linda Lin, the first two -- first three paragraphs.  Can you call those out, Mr. Wyzik.

Ms. Lin says to you, "Thank you Mark.  Liberty consents to the retention of your firm and local."  What do you understand the word and "local" mean?

A   That was our local counsel.  I think I had indicated to her in the e-mail below that Joel Beres, who I had explained previously was our local counsel, and indicated what his hourly rates were, and she had indicated that our local, Joel Beres' firm, was acceptable.

Q   It goes on to say, quote, "With the attorney rates outlined below, attached are Liberty's litigation guidelines."

Is there an attachment to this e-mail which I will not direct your attention now, but is there an attachment that fits that description "Litigation Guidelines"?

A   Yes, there was.

Q   Very briefly, what did that mean, and how did it affect you?

A   Insurance companies have guidelines that they would like you to follow with respect to billing.  And we do our best to try to follow them if an insurance company is involved.

Q   She goes on to say:  We will need a copy of all invoices on this matter, period.  You can send the invoices directly to my attention via e-mail, period, end quote.

Did you comply with that request?

A   We did.

Q   Tell us what you did to comply with that request, bearing in mind now that, if I understood you correctly, the state court litigation is not yet dismissed and the federal court litigation is ongoing.

A    Yeah, I had asked our associate, Shawn Smith, who was working on the case, to collect the information on the bills that had been sent out and to otherwise put together the information she had requested.

Q    In your system or your billing system, is there any significance to the term "matter" or "matter number"?

A    Yes.

Q    Explain what that means.

A    So when a new -- when we're working on a new and different litigation, we typically open up a new matter, meaning that it's given a new number and a new file.  A number represents a file.

And so for the Kentucky state litigation against --

THE COURT:  You've answered the question.

Go ahead.  You can ask another question.

Q    (By Mr. Pepe) At this point in time, now I'm in April of -- April 19th of 2013.  Did you have two separate matters opened, one for the Ashurst state court litigation and one for the Caudill federal court litigation?

A    We did.

Q    At this time?

A    We did.  We opened up a matter for the federal case in March.

Q    Did any of the bills that were sent out to Jarrow Formulas, were they sent before there was two separate matters?

A    Yes, there were.

Q    Why?

A    Because, as I indicated previously, when we received the complaint in January of 2013, at the end of January we had to act very quickly to file the motion to dismiss those roughly six counts.  And so we were very busy handling that.  And we did not get an opportunity to open a new matter that month in February.  So we billed our time working on the motion to dismiss to the Ashurst state case matter.

          THE COURT:  And you've answered it.  You can ask another question.

Q    (By Mr. Pepe) Did there come a time after that that you did open a separate matter for the federal court litigation?

A    We did, in March.

Q    Okay.

A    Of 2013.

Q    All right.  Now, did the invoices Ms. Lin requested cover that time period where there were two matters, where there was one single matter for both cases and then two matters for two cases?

A    It did.

Q    All right.  Tell the jury what you did to, in that case, to comply with the request for all invoices on this matter.

A    Yeah, so we needed to provide Liberty International with the billings.  But because the billings in January and February

involved work also on the state case, there was one invoice each month that included work on both the federal case and the state case.  Because it involved work on two cases, we had to black out the work that related to the state case because that's attorney-client privileged information that we couldn't convey to the insurance company.  We could only give them the information that related to the federal case that was done at that time.

MR. PEPE:  Your Honor, may I offer as a full exhibit PTX 104 to which there is no objection.

THE COURT:  Yes, and you may publish.  104 is full.

(Plaintiff's Exhibit 104, received in evidence.)

MR. PEPE:  Mr. Wyzik, can you call up PTX 104.

Q   (By Mr. Pepe) Can you see this, Mr. Giarratana?

A   I can.

Q   Is that one of the bills you sent to Ms. Lin in response to her request?

A   Yeah, this was for January 2013, and you can see that we blocked out the entries that were relevant to the state case but not the federal.

Q   I also see in the right-hand column red lining of the number of hours.  Do you see that?

A   Yes.

Q   Why was that done?

A   Because those hours did not relate to the matter that the

insurance company had agreed to pay the bills for.

Q   Okay.  I'm going to ask Mr. Wyzik to flip through this bill until we come to a page, page 7.

Here we see, sir, some entries are redacted and some are not.  Why?

A   For the same reason I mentioned above.  The redacted entries are entries that relate to the state case.  The entries that are not redacted relate to the federal case.  So you can see the first entry there is on January 28th, and that relates to reviewing the complaint, which is the first action you take in any case.  You look at the complaint that was filed.  So you can see we started work on the federal case on January 28th, and those entries relating to the federal case are not redacted.

Q   I go to the last entry on that page on 1/28/13.  I see redaction of part of it and part of it not redacted.  And I see some red lining in the right-hand column.  What does that represent and why?

A   So Shawn Smith, the associate that was helping here, what he did was there were some entries where, for example, this is an entry for Shawn's where part of the entry describes work on the federal case, part of the entry describes work on the state case.  So he redacted out the work that was performed on the state case because, again, that's client confidential attorney-client privileged information we can't give to the

insurance company. But he left in the work on the federal case. And then he adjusted the time entry to indicate the amount of time that was in that entry that was billed to the federal case.

Q I may not have made this clear, and I'll do so now. Mr. Giarratana, was there any time any representation by Liberty that it would cover the defense costs in the state court action?

A No.

Q Just the federal court action.

A That's correct.

Q If I can ask Mr. Wyzik to go forward to page 12 of the same exhibit.

And tell us what is set forth there, sir.

A So this shows the hours in red that were billed to the federal case on that invoice at the hourly rates that were agreed to by the insurance company, and then it shows in the right-hand column the amount owed by the insurance company for the work on the federal case, essentially the number of hours times the rates agreed to.

Q Did you send that to Linda Lin?

A Yes.

Q Were there any other bills that came under the same situation, that is, the state court litigation and the federal court litigation, billed to one single matter?

A   Yes.  For the next month.

MR. PEPE:  I would offer as a full Exhibit PTX 105, to which there's no objection.

THE COURT:  That may be full.  You can publish.  105 is full.

(Plaintiff's Exhibit 105, received in evidence.)

Q   (By Mr. Pepe) Directing your attention to Exhibit 105, a bill that is dated in the about a third of the way down, February 28, 2013, do you see that?

A   Yes.

Q   Okay.  Is that the other bill you referenced?

A   Yes.

Q   And if we went to this bill page by page, would we again see the redactions and the red lining that we saw on the other bill?

A   Yes.  We processed this bill in the exact same manner.

Q   And the red lining in the redaction would be for the same reason you just explained?

A   Yes.

Q   If I can direct your attention to page 19 of Exhibit PTX 105.  Does there appear then the same summary we saw?

A   Yes.

Q   And the hourly rates shown for you, Mr. Giarratana, and Mr. Grondahl?

A   Yes.

Q   If I went back to that e-mail to Linda Lin, would those be the rates shown there?

A   Yes.

Q   How about for Shawn Smith and Abraham Robinson, who are indicated as associates, or the IP assistant, Gail Pear?

A   Pajer.

Q   Pajer?

A   For Shawn Smith and Abraham Robinson they were the same rates.  I can't recall whether we included the rates for Gail Pajer on that e-mail to Linda Lin.  I just don't recall that right now.

Q   At the time Ms. Lin asked you for a copy of all invoices on this matter, were there invoices outstanding -- question withdrawn.

On the two invoices we just looked at, PTX 104 and 105 with the redactions --

A   Yeah.

Q   -- had those been sent to Jarrow Formulas at or about the time they were prepared in January and February?

A   Yeah, but without the changes.

Q   Without the redactions.

A   Yeah.

Q   When Ms. Lin asked for the copy of all invoices, were there invoices that had been sent by McCarter to JFI that came after the two separate matter numbers were created?

A   Yes.

Q   And what did you do with those invoices?  Did you send those to Ms. Lin also?

A   We did, but we needed to -- there was an error in the invoices originally.  They weren't billed at the correct rates. We needed to --

THE COURT:  Okay, okay.  Another question.

Q   (By Mr. Pepe) And when you say -- I'm talking now about the invoices that were based on the new matter number; correct?

A   Yes.

Q   All right.  What did you mean the rates were not billed at the correct number?

A   They were -- I discovered in June of 2013 that we had sent bills out to Jarrow Formulas on the new matter number with the old rates, not the new rates that were agreed to and reflected in the insurance company correspondence in my discussion with Mr. Rogovin.

Q   Now, let me interrupt you.  But I think you said you discussed this with Mr. Rogovin and he agreed to the higher rates, I think you said, in April.

A   Yes.

Q   Correct?

A   Yes.

Q   You gave two dates; correct?

A   Yes, April 4th or 19th.

Q    But now is your testimony those agreed-upon new rates, 535 for you, 485 for Grondahl, did not get included in the bill?

A    They did not, not until after June.

Q    Explain what happened.

A    So I explained that we were in California on a patent case. We were there in April. We had -- I'm sorry -- in May, came back in April, then had to go back and complete that trial in June. So we were extremely busy during that period from March through June. Sometimes when that occurs -- I was also extremely busy on other matters. Sometimes when that occurs, the administrative work for clients gets pushed to the side because ultimately we're a client service business. We need to handle the client services first.

When I got back from that trip in June, I had realized, when I was looking at the information, realized that we had sent out bills to Jarrow Formulas for three months that included the old rates, not the new agreed-upon rates.

Q    Okay. What, if anything, did you do about that?

A    Well, I asked my billing coordinator, I sent her an e-mail indicating that she had sent the bills out for Attorney Grondahl and me at the wrong rates. And I asked her to correct the rates and reissue those bills.

Q    And did she do so?

A    She did do that.

Q    And what, if anything, did you do with respect to those

bills and Linda Lin's request for copies of all invoices?

THE COURT:  When you say "those bills," I'm confused.

MR. PEPE:  I'm sorry.

Q   (By Mr. Pepe) With respect to those three bills that you said went out at the incorrect rates --

A   Yeah.

Q   -- I heard you testify your billing coordinator corrected the rates and sent them out.

A   Yes.

Q   To whom?

A   They were sent out to Jarrow Formulas.

Q   Did you also send them to Liberty Mutual -- Liberty Insurance?

A   Yes.

Q   Okay.  Directing your attention to -- excuse me.

MR. PEPE:  I'm going to offer PTX 109 to which there's no objection, Your Honor.

THE COURT:  Okay.  PTX 109 is full.  You can publish.

(Plaintiff's Exhibit 109, received in evidence.)

Q   (By Mr. Pepe) Mr. Giarratana, I'm first going to direct your attention to page 1 and ask you:  What time period is covered by that bill that has the June 26, 2013, date on it?

A   I need to see the next page, if you don't mind, or down below, blown up.

Q   Mr. Wyzik, can you call up the next page, please?

A   Or just ...

Okay.  So this is for -- can you blow up the date?  I apologize.  I'm just having a little trouble.  I think it's May.  No.

MR. PEPE:  No, the date's in the right, left-hand column, Mr. Wyzik, if you could, under the heading "Date."

THE WITNESS:  Okay.  So this bill is for May services, May 2013.

Q   (By Mr. Pepe) All right.  And now I'm going to -- if you just put a pin there, please, and I'm going to ask Mr. Wyzik to call up another page in this bill, or in this document, which has in the lower right-hand corner number 00012.

And this bill is also, you'll see, dated June 26 in the upper right-hand corner?

A   Yes.

Q   I'm going to ask Mr. Wyzik to go to the next page and highlight the date column so you can see what time is covered here.

A   Yeah, so this -- this is for time in April.  So I had asked my billing coordinator to reissue the bill that went out at the wrong rates for Attorney Grondahl and me at the agreed-upon rates with the insurance company and Mr. Rogovin.  So this is the reissuance of that bill.  So we reissued the April bill in June.

Q    And there's two bills here in Exhibit PTX 109?

A    Yes.  I believe so.

Q    Yeah --

A    It's hard with the screen, but, yeah, I believe so.

Q    And both were rebilled and reissued?

A    I believe so, yeah.

          MR. PEPE:  Now I'm, if I may, Your Honor, call up PTX 110 to which there's no objection.

          THE COURT:  Yes, you may.  That may be full.  You may publish.

     (Plaintiff's Exhibit 110, received in evidence.)

Q    (By Mr. Pepe) Turning your attention to this bill, is this one of the bills you testified was issued at the incorrect rate, corrected and reissued?

A    Yeah.  So this is -- yes.

Q    And I direct your attention to the second page in the date column.  You can tell us what time -- what -- the month in which these services were rendered covered by this bill.

A    This was the rebill of the bill from March time at the corrected rates.  It didn't go out until July.

Q    Because?

A    I had asked my billing coordinator to do it.  She got to some of them before the July 4th holiday.  She got to this one after the July 4th holiday.

Q    To whom was this bill, PTX 110, dated July 11, for March

time, to whom was that sent?

A    Mr. Rogovin.

Q    And to Liberty?

A    It was also sent to Liberty.  Not until August, beginning of August.

Q    You mentioned the name of Shawn Smith a couple of times. Is that the associate you asked to do this?

A    Yes.

Q    And was doing this under your direction?

A    Yes.

        MR. PEPE:  I'm going to offer, if I may, Your Honor, as a full exhibit PTX 108, to which there is no objection.

        THE COURT:  All right.  That will be full.  You may publish.

    (Plaintiff's Exhibit 108, received in evidence.)

Q    (By Mr. Pepe) And this e-mail string, sir, you see starts with Shawn Smith e-mail to you on July 23?

A    Yes.

Q    And does this concern the rebilling process you just described?

A    Yes.

Q    All right.  Then I'm going to direct your attention -- let's see if we can wrap this up -- direct your attention to the second page, if Mr. Wyzik can blow this up, the e-mail from Mr. Giarratana to Shawn Smith.

And in that e-mail -- no, it should be -- I'm sorry. I misspoke. It's the third page in the document with the No. 33826 lower right-hand corner -- I apologize -- and begins with an e-mail or there's an e-mail in the middle of the page from Mr. Giarratana to Mr. Smith. Thank you.

Take a look at that, please.

A   Yes.

Q   Does that e-mail concern, the e-mail from you to Mr. Smith, concern the rebilling process you just described?

A   It does.

Q   It says, "On pages 11 and 23 can you make the numbers for Eric's and my hourly rates a little bigger so they don't look different than the other numbers?  Call me if you'd like to discuss," end quote.

What's going on there?

A   So we were tasked with giving the insurance company the billings at the rates they had agreed to.  The rate that we were charging Jarrow Formulas, the discounted rate that went back to 2009 or so, was client confidential information, not something that we're allowed to disclose to any third parties, including the insurance company.  The insurance company merely wanted to know what it was required to reimburse, so we were giving them the amount they were required to reimburse at the agreed-upon rates.

And so we didn't want to draw attention to the fact

that the number was different.  We wanted -- we didn't want to create an issue there with the insurance company and just simply wanted to give them the information that they needed to know to reimburse at the agreed-upon rates.

MR. PEPE:  And the page before that, because the e-mail string goes backwards obviously, on the page before that there's an e-mail at the bottom from Shawn Smith to Mr. Giarratana.  Could you call that out, Mr. Wyzik?

And the first paragraph.  Can you call out further or highlight that first sentence, please?  It begins, "As requested."

And the next sentence too, if you would, please.

Thank you.

Q   (By Mr. Pepe) Take a look at that, sir.

A   Yes.

Q   Is that Mr. Smith complying with your request?

A   Yes, yes.

Q   If I understand correctly now, the five invoices that we looked at, the redacted ones, two in number, the other three after the new matter number was opened and therefore contained no redactions, your testimony is you sent the redacted ones to JFI initially; correct?

A   Yes.

Q   But did not send the redacted ones back to him.

A   No.

Q    The other three without the redactions with the new matter number it's your testimony you sent both -- all of those to Linda Lin as well as the redacted ones, all five to Linda Lin.

A    Yes.

Q    Okay.  Did Liberty pay any of those five invoices?

A    No.

Q    Why not?

A    Following the Court's ruling on our partially successful motion to dismiss, we received a letter from Liberty indicating that they had read that, amongst other further investigations, concluded that there was no insurance coverage in part because of some of the findings in the opinion and that they were denying coverage.  I think we received that at the end of 2013.

Q    Did you advise Mr. Rogovin of that?

A    Yes.

Q    And what response, if any, did he give to you?

A    In short he said, do nothing.  He didn't want to further pursue it.

        MR. PEPE:  With the Court's permission, I offer 113, PTX 113 as a full exhibit.  There's no objection, Your Honor.

        THE COURT:  All right.  That can be full.  And that can be published.

    (Plaintiff's Exhibit 113, received in evidence.)

Q    (By Mr. Pepe) Exhibit 113, sir, is calling your attention

to -- that is a December 29, 2013, e-mail from Mr. Rogovin to Mr. Rechen and to you and to Mr. Grondahl.  Do you see that?

A   Yes.

Q   And he states -- and the subject is:  "Letter from Liberty's Duane Morris Counsel Re:  Non-coverage."  What was that referring to?

A   That's referring to the letter that was received from Liberty International's outside attorneys, Duane Morris, denying coverage.

Q   He states, quote, "It appears to be a dead issue."

It goes down further.  Instead -- and the next paragraph says, "This is basically what the matter is and certainly I do not see a court seeing it any other way," period, end quote.

Is that e-mail the -- reflect the decision you testified Mr. Rogovin made about not pursuing this further?

A   Yes.

Q   And did you follow his instructions and drop it?

A   We did.

Q   Those five invoices we just looked at, you testified earlier you said to Mr. Rogovin, as the client, "If the insurance company ultimately doesn't pay, you're responsible for this."  Was that --

A   That's correct.

Q   Did I hear your testimony correct?

A    Yes.

Q    Did JFI pay those five invoices?

A    Yes.

Q    At what rate?

A    The rates on the invoices.

Q    535 an hour for you?

A    Yes.

Q    And 485 for Mr. Grondahl?

A    Yes.

Q    Any objection?

A    No.

Q    Any challenge?

A    No.

Q    You testified it was your policy for clients like Jarrow Rogovin in litigation matters that go typically several years to hold the partner rates constant.  Do you remember that?

A    Yes.

Q    Not change them during the course of the litigation.

A    Yes.

Q    That applied, I think you said, just to partners; right?

A    Yes.

Q    Not associates.

A    Yes.

Q    Did you follow that policy with respect to the Kentucky -- did you follow with respect to the state court action against

Ashurst?

A    We did.

Q    And what were the rates then as you recollect?  You said, I think, it was 410 an hour for you.

A    Mine was 405.  The rates basically went back to 2009 or so, but we maintained those in the state court case until it terminated.

Q    Once these new rates were set in the Kentucky federal court litigation -- and I'm going to use the shorthand to say 535 per hour for you.

A    Yes.

Q    Please understand I mean the higher rate for Mr. Grondahl also.

A    Yes.

Q    Okay?  Once the new rates, higher rates, were set with Liberty and Mr. Rogovin at the same time --

A    Yes.

Q    -- did you hold those new rates constant for the Kentucky federal litigation?

A    Yes, throughout the entire litigation, until --

Q    Six years.

A    We did.

Q    Again, because of your policy?

A    Yes.

Q    During that time, 2013 to 2019, did your standard rate, as

you described that term, fixed every October 1 I think you said, usually every October 1; correct?

A    Yes.

Q    During that time of early 2013 through June of 2019, did your hourly billing rate, standard hourly billing rate, at McCarter & English increase?

A    It did.

          MR. RESSER:  Objection.

          THE COURT:  Grounds?

          MR. RESSER:  Sidebar.

          THE COURT:  No, I'm going to overrule the objection. He answered yes.  That's fine.  I'm going to overrule it.

Q    (By Mr. Pepe) Did the hourly standard billing rate for Mr. Grondahl change over that time period?

A    Yes.

          MR. RESSER:  Objection.

          THE COURT:  One second.  There's an objection.  All right.  I'll see you at sidebar real quickly.

     (At sidebar off the record.)

          THE COURT:  Give us a sec, Ladies and Gentlemen. Hopefully we'll get this resolved quickly.

     (Pause.)

          THE COURT:  Tell you what, Mr. Pepe, why don't we pursue a different line or the next line.  We'll come back to this in five minutes.  I assume whatever is being searched for

can be found by then. So let's skip that particular question and come back to it, Mr. Pepe.

MR. PEPE: Sure. I understand, Your Honor.

Q (By Mr. Pepe) When you testified that Jarrow Formulas, Inc., paid those five statements, did it pay full face value, or did it pay with a discount?

A It paid with a discount.

Q Why?

A My understanding -- well, every year at our fiscal year-end we would offer Jarrow Formulas a discount to pay its invoices that it otherwise would not pay by that date. If they would pay them by that date, we would offer them a discount. So it was a mutual benefit. We would receive the invoices by September 30th. They would receive a discount by paying them by September 30th.

As time evolved, Jarrow Formulas would sometimes let the bills pile up a bit. So instead of not paying just -- so the discount would include not just time for September and August but also time for July and June.

THE COURT: Let's get another question, Mr. Pepe.

Q (By Mr. Pepe) Okay. And how did those discounts -- how was that discount determined?

A So we would offer a discount in exchange for payment by the 30th. And Jarrow Formulas would come back and ask for a larger discount.

Q   Were you personally involved in those discount negotiations?

A   The negotiations, no, no.

Q   Was Jarrow Rogovin personally involved in those discount negotiations?

A   No.

Q   Who then was doing this and why?

A   The two persons conducting the negotiations were Cathy Adipietro on McCarter & English's side.  She was our accounts receivable specialist, meaning her job was to collect invoices. And on Jarrow Formulas' side it was a woman named Mary Grace Reyes, and she was an accounts payable clerk.  And the two of them would be the persons to communicate with one another in connection with this negotiation every fiscal year-end.

Q   Would Cathy Adipietro keep you advised?

A   She would.

Q   Okay.  And so did you know generally what was going on in those negotiations even though you were not personally involved?

A   Yes.

Q   Okay.  And was there some times -- question withdrawn.

Is there a structure -- was there then, in 2011, 2012, '13, '14, and is there now, a structure at the law firm of McCarter & English that regulates, that controls, that monitors the discount of outstanding bills?

A    Yes.

Q    What is that structure?

A    We have, as a general rule, if we're providing a discounted rate, if we're charging standard rates for that year, the partner is entitled to discount up to 10 percent without seeking approval.  If we're charging less than standard rates, we're supposed to get approval before we do so.

Q    Again, are you using the term "standard rate" the way you described it earlier?

A    I am.

Q    The rate that gets fixed every October 1 for each --

A    Yes.

Q    Okay.  And did sometimes, in these negotiations, of which you were kept advised, Jarrow Rogovin seek more of a discount than you were in a position to give?

A    Yes.

Q    And what would you do in that situation?

A    Uh, we would typically -- first of all, we had a committee, the Finance Committee.  It was generally a group of partners that were responsible for communicating with the partners that were obligated to collect outstanding invoices by fiscal year-end.  And so I was in regular communication with my representative on the Finance Committee every September.

They would say, Mark, where do we stand on collections?  How's it look?  Are you going to collect the

Jarrow money?

I would let them know where we were. We would communicate on that.

Q And how would that relate, if at all, to what was going on between Cathy Adipietro and Mary -- on the McCarter side -- and Mary Grace Reyes on the Jarrow Formulas side?

A So the two of them would sort of posture and negotiate. Cathy would typically indicate, "I don't know. Mark will go ask the Finance Committee. We'll see if we can get it. I'm not sure they're going to do it," that kind of thing.

Mary Grace would posture and say, you know, um, "If you," uh -- as one example, "If you, um, give us bigger discounts, Ben," meaning Ben Khowong, the CEO, "might think a little faster about paying you."

THE COURT: Let me stop you for a second, Mr. Pepe.

Mr. Resser, have you found or not found whatever --

MR. RESSER: Yes, Your Honor.

THE COURT: Can you just confer with Mr. Pepe and let him know the situation? I want Mr. Resser to confer with you so you can discuss what we were discussing at sidebar.

MR. PEPE: Mr. Resser advises me the objection is withdrawn.

THE COURT: Is that right, Mr. Resser?

MR. RESSER: Yes, Your Honor.

THE COURT: All right. So, Ladies and Gentlemen,

we're going to go back.

If you want to go back to those items, you can.

MR. PEPE:  Perhaps may I finish this line of questioning and then go back?

THE COURT:  Yes, you may, as you wish.

Q   (By Mr. Pepe) So -- and so when Cathy Adipietro, as you described it, said to Mary Grace Reyes, "Mark will go to the Executive Committee and see if he can get more," under some circumstances did you or did you not?  How did that work?

A   Well, we -- we -- we referred to the committee in part as a mechanism to avoid a direct conflict with Ben Khowong.  Ben was asking for a bigger discount than we were willing to give.  These were -- this was work that was done.  They owed the money.  From our perspective, they were not entitled to any discount.  I didn't want to be in a position of me saying, "No, Ben, I reject your request."

So what we would say was, "The Finance Committee won't let us do it," which was true.  The firm didn't want to offer a penny more than what we were willing to agree to.

Q   And so what would Mr. -- Ms. Adipietro, under this situation you just described, what would she say to Mary Grace Reyes?

A   She would convey that message to Mary Grace.

Q   And in some cases you had not gone back to the Executive Committee?

A   No, because it would have been pointless.  I knew I was beyond where I could be already.

Q   Now, if I may go back to the testimony you were giving before I asked you about discounts --

A   Yes.

Q   -- and holding, holding the rate standard -- excuse me -- the rates constant.  Do you remember that?

A   Yes.

Q   So your testimony is once those higher rates, 535 per hour for you, higher rate for Mr. Grondahl, higher than was being paid, once those were fixed, you said you held them constant for the six years of the litigation.

A   We did.

Q   As was your policy.

A   Yes.

Q   You also testified that during those six years of litigation, the beginning of 2013 to June of 2019, your standard rate fixed every -- typically fixed every October 1 beginning the fiscal year went up.

A   Every year it went up.

Q   Same with Mr. Grondahl?

A   Yes.

Q   Same with Mr. Rechen.

A   Yes.

Q   Did you hold Mr. Rechen's rate constant also?

A    Yes.

Q    How about the associates, the Mr. Cordani and Mr. Robinson, the names we've seen?  Did you hold those constant or --

A    Uh, we didn't -- at one point I believe we held them constant, did not increase them.

Q    Now, I'm going to ask -- I'm going to ask you about the three partners.  Have you worked with me to -- question withdrawn.

Does the billing system in McCarter & English store billing rates and related information to bills over a period of time?

A    It does.

Q    And could you, working through your CFO, have access to that information?

A    Yes.

Q    And did you and your CFO work with me to access the information relating to your standard rates over the six years of the Kentucky federal litigation?

A    Yes, we did.

Q    And were you able to work with me to prepare a demonstrative that illustrates the difference between the standard rates and the fixed rate at the beginning of the litigation over the course of those six years?

A    Yes.

Q    And would that demonstrative be helpful to you in

explaining that difference?

A    It would be.

MR. PEPE:  I believe there's no objection now, Your Honor, so I'm going to ask Mr. Wyzik first to call up Mr. Giarratana's rates, which would be Demonstrative Exhibit No. 7.

THE COURT:  All right.  That's fine.  You may publish.

Q    (By Mr. Pepe) Tell us, Mr. Giarratana, what is shown there.

A    So this shows the difference between my -- the rate that I was charging Jarrow Formulas during the Kentucky litigation as opposed to my standard rate each year.

Q    All right.  What is shown on the Y axis, at the risk of stating the obvious, let's establish that.  What is shown on the Y axis?

A    The Y, or the vertical axis, shows the dollar value; and the X, or the horizontal axis, shows the timeline.

Q    All right.

A    Go ahead, Mr. Pepe.  I apologize.

Q    And what does the red line labeled "535" show?

A    So the red line shows the time period during which we maintained the rate for me for Jarrow Formulas fixed at 535.

Q    And what does that step line above it show?

A    The step line shows the difference between my fixed rate that we had fixed for Jarrow Formulas and my standard rate during each respective year.  So as we can see, the rate goes up each year, so it shows the difference each year between my

standard rate and the rate that was being charged Jarrow Formulas.

Q   So in 2019 is the correct reading of this graphic to say that, in the Kentucky litigation, you were billing Jarrow Formulas at $535 per hour for your time; is that correct?

A   Yes.

Q   But that you were billing other clients $650 per hour.

A   Yes.

Q   How about other Jarrow Formula matters, not the Kentucky litigation?

A   I believe the Jarrow Formulas matters at that time we were also billing at 535.

Q   The other Jarrow matters.

A   Yes.

Q   Now, if Mr. Wyzik could call up Demonstrative Exhibit 5, please.

       What is shown -- obviously, that has the same format, the same appearance, as the one we just looked at.  May we draw the same conclusion as to the information shown except it's for Mr. Grondahl?

A   Yes.

Q   And so -- and the red line shows the hourly rates you say were agreed to by Liberty and by Jarrow, in this case for Mr. Grondahl, 485 an hour.

A   Yes.

Q   And does the step function, the step graph above that, show Mr. Grondahl's hourly increase?  I'm sorry.  Increase in his hourly rate at the start of each fiscal year?

A   It shows his standard rate during each time period indicated on that chart, and it shows how his standard rate increased from year to year and the amount.

Q   And, now, if Mr. Wyzik would call up Demonstrative Exhibit 6, please.  This one is labeled "Tom Rechen," but this looks different from yours and Mr. Grondahl's.  Am I reading it correctly?

A   Yes.

Q   And if I'm reading it correctly, I see Mr. Rechen's red line does not stay constant over six years.  It goes up.

A   Yes.

Q   Starts at 405 and goes up to 520.

A   Yes.

Q   What's happening there?

A   Our system had Tom Rechen in the case at his rate from, I think, 2008.  And it wasn't changed for Jarrow Formulas.

Q   Why not?

A   Go ahead.

Q   Why not?

A   Because our system had set the rate that way for him for Jarrow Formulas and not increased it year to year.  And I didn't notice it.

Tom was not as heavily involved in the beginning of the case. It was primarily Eric Grondahl and me. He started to get much more heavily involved in 2016. At that point I noticed that his rate was very old, hugely discounted. And so we adjusted his rate to be in between Eric Grondahl and mine in 2016.

Q   When you raised it to $520 per hour, did you hold it then constant for the rest of the Kentucky federal litigation?

A   We did.

Q   You mentioned earlier, when you described your review of the draft bills every month, take them home and review them, you mentioned one of the modifications you would typically make is a write-off or a write-down.

A   Yes.

Q   Did I hear that correctly?

And I think you related it to unfairness, associates spending too much time on an issue.

A   Yes. If I felt that, you know, an associate really missed the point, I didn't believe it was the client's obligation to pay for training, and so -- as a general matter. And so I would at times write down the associate time if I felt that it was unfair to the client.

Q   And did you do that with respect to the bills in the -- rendered to Jarrow Formulas in connection with the Kentucky Federal Court litigation?

A    Yes, I did.

Q    I don't mean every single bill.  But did you go through that write-down process for those bills?

A    Yes, every month.

Q    You described just a moment ago holding the hourly billing rate constant over the course of the litigation.  You have that in mind?

A    Yes.

Q    And then you described also the year-end discounts.

A    Yes.

Q    And the negotiation process that went on there.

A    Yes.

Q    Right?

       And you just described the write-downs.

A    Yes.

Q    Does the computer system and the software -- question withdrawn.

       Does McCarter & English have a computerized system for capturing the time spent by its lawyers and paralegals and others and using that to create the bills you've seen here?

A    It does.

Q    Was that computerized system in effect during the Kentucky federal litigation?

A    Yes, it was.

Q    What other information is captured in that computerized

system at McCarter & English relating to billing?  For example, would it reflect standard rates and so on?

A   Yeah.  It's a database system.  So it reflects all of the basic information.  So it shows -- it reflects the timekeeper, the amount of time billed by that timekeeper, every entry.  It shows the hourly rate that the firm billed, actually billed the client for that timekeeper for that entry.  And it also shows the standard rate if different from the hourly rate actually billed from that timekeeper.  And, of course, this database is able to -- and this may be going beyond my expertise.

THE COURT:  I tell you what.  Let's get another question.

Q   (By Mr. Pepe) Are you able to access that database to extract information --

A   Yes.

Q   -- concerning billing?

And did you and your CFO do that with respect to the billings in this case?

A   Yes.

Q   And more particularly, with respect to the effect of the discounts you've described?

A   Yes.

Q   And did you and your CFO, working with me, were you able to capture that information for the three categories of discounts you described just a moment ago that were applied in the

billings in this case?

A    Yes.

Q    And have we prepared a demonstrative that summarizes that information and presents it in a way that would aid your testimony in -- with respect to the total effect of those discounts?

A    Yes.

Q    And would it be an aid to the jury in understanding that?

A    I believe so.

         MR. PEPE:  I believe there's no longer an objection to this, Your Honor.

         THE COURT:  Okay.

         MR. PEPE:  I'd ask --

         THE COURT:  He'd like to see it.

         MR. PEPE:  Oh, I'm sorry.

         THE COURT:  Go ahead.

         You can bring it up.

         MR. PEPE:  I'm sorry, Mr. Wyzik.  This is Demonstrative Exhibit No. 8.  8.

Q    (By Mr. Pepe) All right.  Referring to this demonstrative, Mr. Giarratana, would you explain to the jury what's shown there in -- first of all, quite obviously on the left-hand axis is each year involved here in the litigation; correct?

A    Yes.

Q    The Kentucky litigation.

Explain to the jury what else is shown and how it relates, if it does, to your testimony about these three categories of discounts.

A   Okay, so this shows the fee discounts that were granted to Jarrow Formulas by our firm.  There are three categories.  Each category is a respective column.  The first column is the discount based on the standard rate versus the rate that Jarrow Formulas was billed at.

Q   Now I'm going to interrupt you.  Would that relate to the three graphics you showed in holding the rate constant for you, Mr. Grondahl, and Mr. Rechen?

A   Yes.

Q   Okay.  Go ahead.  So --

A   This --

Q   Go ahead.  Explain that.

A   This summarizes -- you remember the graph had a horizontal line showing the rate fixed, and then it had a step curve about that showing how the rate increased every year.  This column summarizes that delta, that difference, between the rate that was billed and the standard rate every year.  And as time went on, that discount became bigger as the step curve moved up.

Q   And what was the total dollar value of -- to Jarrow Rogovin, Jarrow Formulas, as a result of holding those hourly rates constant for the partners?

A   That's shown at the bottom of the first column.  It shows

that the total discount there over the six years of the matter was $919,694.10.

Q   In the second column it has the heading "Year-end Discounts for Payments," end quote.

A   Yes.

Q   What does that mean?

A   As I mentioned previously, at every -- at every fiscal year-end, we would offer a discount for early payment so that we received the money by fiscal year-end, but also at times Jarrow Formulas would hold off on paying earlier bills.  And so we would agree to a discount on whatever bills were outstanding every September 30th.  And so this reflects the discount off the amount actually billed and paid on September 30th of each year.

Q   And I notice a footnote on the last number in the second column, $26,768.  Do you see that?

A   Yes.

Q   And the Footnote 4 says, "Discount provided in May of 2019," end quote.  You said your fiscal year was September 30.

A   Yeah, so I wasn't completely accurate.  Would you like me to explain that?  I was not completely accurate in my description.  Shall I explain that?

Q   One of them is not September 30.

A   That's right.

Q   I'll come back to that.  Okay?

A    Okay.

Q    And then the third column is headed, "Write-downs of Recorded Time."  Is that simply what you just described a moment ago --

A    Yes.

Q    -- about correcting the associate wasted time?

A    These are -- this is time written off the bill before the bill is sent out.  Typically the client does not see.  So if an associate spent 10 hours or 15 hours doing the wrong thing that we decided to write off, we didn't feel it was fair to bill, this reflects that kind of a write-off before the bill goes out the door.

Q    And the total of those three categories, or buckets of discounts, if you will, over the course of the Kentucky federal court litigation for Jarrow -- for Jarrow Formulas is how much?

A    Yeah, the total was $1,507,788.15.

Q    Now I'll come back to that footnote, if you will.  This says that that discount was provided in May of 2019.  Did there come a time, in the course of the Kentucky litigation, where a discount was sought and granted not at the end of the fiscal year?

A    Yes.

Q    And was that in May of 2019?

A    Yes.

Q    Tell us again when the trial started.

A    May of 2019.

Q    Explain how that came about; that is, why was there a discount in May instead of September, the end of September?

A    We were heading into trial, and our bills were piling up. Jarrow Formulas, I believe, owed us roughly $1.5 million at that point in time, and we were getting concerned.  And so we asked Jarrow Formulas to pay the invoice, or the outstanding invoices, because we were going to be heading into trial. There was going to be a tremendous amount of work and outstanding disbursements during trial, and we didn't want to dig too deep of a hole.  We wanted them to pay the outstanding invoices at that time.

Q    Okay.  Who -- again, how was it handled?  The same way with the people you described before?  Even though we're not in September, was it a Cathy Adipietro, Mary Grace Reyes situation again?

A    In part.

Q    In part.  Did this also -- okay.  Go ahead.

        THE COURT:  No.  Ask another question.

Q    (By Mr. Pepe) Tell us the "in part."

A    Okay, so Cathy Adipietro was doing her job of trying to collect receivables that should have been paid and communicating with her counterpart, Mary Grace Reyes of Jarrow Formulas.  And Mary Grace had said, "Well, can you discount these bills by 15 percent?"  They owed 1.5 million.  It was

May.  They asked for a 15-percent discount.

I saw that, and so I felt I would step in and respond. And I did.

Q   Did you do so?

A   Yes.

Q   Okay.  What did you do when you saw that request for 15 percent?

A   Well, I was very concerned.  They owed a lot of money.

THE COURT:  Wait.  The question was, "What did you do?"  I don't need to know how concerned you were.  What did you do?

THE WITNESS:  Well, I called -- I called our controller or CFO slash controller, Jackie Bosma, that day.  I wanted to find out what discount Jarrow Formulas was receiving already, because I wanted to explain to them that they were already receiving a substantial discount and that we weren't in a position to give them a further discount on these bills that had already been rendered.

Q   (By Mr. Pepe) I want to interrupt you.  I'm sorry.

A   Yeah.

Q   When you're using the term "discount," already getting a substantial discount, substantial discount for what?  For the standard versus held frozen rates? year-end discounts? write-downs?  When you use that term now, I want you to tell me what it includes, if you can.

A    It was referring to the discount based on the difference between the rates that we were billing and the standard rates and also the write-downs that we were -- that we were giving them as we reviewed the bills every month.

Q    When -- did the system, the computerized system and its database you described a moment ago --

A    Yes.

Q    -- at McCarter & English, allow a knowledgeable person who knows the system to determine the answer to that question?

A    Yes.

Q    And did you -- did you discuss that with your controller/CFO Jackie Bosma I think you said?

A    Yeah, Jackie Bosma, our controller or CFO, she is such a knowledgeable person.  And I obtained the information I needed from her.

Q    And what did you do with that information?

A    I put it in an e-mail to Jarrow Formulas.

Q    And what -- were you able to advise Jarrow Formulas what the discount currently was from the categories you described?

A    I was.

Q    And what was that discount?

A    38 percent.

Q    To whom did you -- you said it went to Jarrow Formulas. Did it go to Jarrow Rogovin or someone else?

A    Uh, I was responding -- if I recall correctly, I was

responding to an e-mail from Mary Grace Reyes asking for a 15-percent discount on behalf of Ben Khowong, who was their CEO.

MR. PEPE: Your Honor, may I offer as a full exhibit PTX 120 to which there is no objection?

THE COURT: Yes. That will be full. You can publish. 120 is full.

(Plaintiff's Exhibit 120, received in evidence.)

Q   (By Mr. Pepe) This is an e-mail string, Mr. Giarratana. You could see it. At the top it ends on May 24. But I'm going to start earlier in the e-mail string. And I'm going to ask Mr. Wyzik to go to the third page that contains an e-mail from Mary Grace Reyes to Catherine Adipietro on May 13.

And I wonder if Mr. Wyzik could call up that.

Thank you so much.

Cathy Adipietro, on -- or excuse me. Mary Grace Reyes writes Cathy Adipietro on May 13 and says, quote, One more request. We have these old invoices of yours that we have not paid yet. Can we get a discount if we have to pay the balance of the January and February invoices in full, question mark, end quote.

Did you get -- did Catherine Adipietro send you a copy of this?

A   I believe so.

Q   And what did you understand Ms. Reyes was asking with

respect to those bills and that discount?

A   So these are very old bills at this point in time.  It's May 13th, and these are bills from January, which would be December work, and February, which would be January work.  So they were very much overdue.  Jarrow Formulas was asking for a discount to pay these long overdue bills.

Q   I want to just put a hold there for a moment, sir.  You said that outstanding amount was substantial and you were approaching trial.

Did you reach out to anyone, not Mr. Khowong, anyone else at Jarrow Formulas, at this time to see what could be done about getting those outstanding bills paid before the trial started?

A   Yeah.  In May we also reached out to Mr. Leventhal, Jonathan Leventhal, the general counsel of the company.  He was now, you know, a contact of ours in connection with the litigation.  So we reached out to him.  We felt that was appropriate and asked him to see if he could get our bills paid.

MR. PEPE:  Your Honor, may I offer -- I'm coming back to this exhibit, but may I offer at this time, Your Honor, PTX 119 as a full exhibit?  No objection.

THE COURT:  All right.  That's full.  119 is full.  It can be published.

(Plaintiff's Exhibit 119, received in evidence.)

MR. PEPE: Can you take down the other and put up that, Mr. Wyzik? Thank you so much.

Q   (By Mr. Pepe) And that should be on the front page, at the bottom, be an e-mail from Mr. Leventhal to Mr. Cordani with a copy to Mr. Giarratana, Mr. Rechen, and Mr. Grondahl.

And Mr. Leventhal says, quote, I am planning on talking to Ben today (per your request) about your invoices, period. Please get me a current statement ASAP, end quote.

Let's take the first sentence. Who did you understand "Ben" to be in that, in that sentence?

A   He was referring -- I understood him to be referring to Ben Khowong, the CEO slash CFO of Jarrow Formulas.

Q   And what is the reference to request about your invoices?

A   That was my request about paying the invoices. It's entitled -- it says to John Cordani, but he's just responding to another e-mail and hitting "Reply All." It was directed to me.

Q   Had you made that request to Mr. Leventhal before this e-mail?

A   Yes.

Q   If we go up in the e-mail chain, we see an e-mail that -- if Mr. Wyzik could call out that entire e-mail.

On that same day there's an e-mail from you to Mr. Leventhal. And it says, quote, "Attached is a spreadsheet listing our accounts receivable for Jarrow Formulas and the

aging thereof."

Did you, in fact, send that in response to Mr. Leventhal's request in the e-mail below?

A    Yes, I did.

Q    Okay.  And then it goes on to talk about how much is outstanding and how old it is.  All right?

A    Yes.

Q    All right.  Now, so Mr. Leventhal says he's going to talk to Ben Khowong.  You send him the e-mail saying, Here's our outstanding accounts; correct?

A    Yes.

Q    Now I'm going to ask Mr. Wyzik if he could go back to Exhibit PTX 120.

And the third page we were on the Reyes e-mail asking if JFI could, quote, get a discount if we have to pay the balance of the January and February invoices in full.  Have that?  I'm sorry.  It's on the third page of the document.

If we go forward in that e-mail chain to the page before we have a Cathy Adipietro's response on the next day, May 14.

A    Yes.

Q    And then to Mary Grace asking for the invoices and the requested discount.  Do you see that?

A    Yes, I did.  I see it now.  I did then.

Q    And then Mary Grace e-mail that very same day, later in the

day, if we could ask Mr. Wyzik to blow up that.

Here's what Mary Grace says:  Maybe if you can ask for 15 percent discount, quote, unquote.  Do you see that?

A    Yes.

Q    Is that the request you testified to a moment before that got you involved in the process?

A    Yes.

Q    Is -- if we go forward in that e-mail chain, one -- to your e-mail the ten days later, that May 24, and the subject is, Payment of Jarrow Formulas ARs, if Mr. Wyzik could find that. Take a moment to look at that.

MR. PEPE:  I'm wondering, sir, Mr. Wyzik, if you could drop down to the one at the bottom of the cover page.  It's also dated May 24 but earlier in the day.  It begins, "Dear Mary Grace."

Thank you.

Q    (By Mr. Pepe) Can you take a moment to look at that, please?  Can you read it all right, Mr. Giarratana?

A    Yes, I can.

Q    And I would note it goes on to the next, to the next page.

A    Yes.

Q    You tell me when you're ready to move on to the next page.

Okay, Mr. Wyzik, if you would continue.

And you can see where it continues?

A    Yes.

Q    Is that where you -- is this the e-mail where you advise JFI that it's already getting a 38-percent discount?

A    Yes.

Q    You say -- I'm sorry to do this, Mr. Wyzik.  It goes back and forth.  If you could go to the second page.

It says, quote, We have discussed the matter with our firm's chief financial officer, and the maximum additional discount we are permitted to offer is 5 percent, provided Jarrow Formulas pays its outstanding invoices and is current heading into the trial on June 3, end quote.

What did you mean by that?

A    So as I indicated previously, I called Jackie Bosma.  When I saw this request for 15 percent, it was not year-end, I called her, found out what we could give.  Neither of us was excited at all about the request.  We agreed that I could offer a maximum of 5 percent.  And, um, uh, I wanted them, and I made clear in the e-mail, that we wanted them to pay all of their outstanding invoices in exchange for giving them another further discount.  If you pay everything down, we'll give you the 5 percent.

Q    If we go up in the e-mail string now, we see it captures an e-mail that same day from Mary Grace Reyes to Ben Khowong.  That's the CFO?

A    Yes.

Q    And what is your understanding of Mary Grace Reyes's

reporting obligations, as you understood it?

A   Yeah, my understanding is that she reports to Ben Khowong.

Q   And she refers him to your e-mail below and particularly your statement that you can't offer more than 5 percent.  Do you see that?

A   Uh, I did see it, yes.

Q   Okay.  And there's another e-mail in that string from Mr. Khowong responding to her.  And if Mr. -- to her, Mary Grace Reyes.  And if Mr. Wyzik can blow that up, Mr. Khowong said, quote, "Sorry, forget the 5 percent for now.  How much did you ask them in discount?  15 percent?  Ask them for 10 percent and let me know."

     And Mary Grace Reyes responds that same day in the e-mail above.

     She says, quote, "Yes I asked for 15 percent.  I will try for 10."  Is that correct?

A   Yes.

Q   What did you do -- question withdrawn.

     Did Mary Grace Reyes tell Ben Khowong what she told him she would do and come back and ask for 10 instead of 5, if not 15, 10?

A   Yes, my recollection is she did.

Q   At this point in time were you personally involved?

A   Yes.

Q   What was your response?

A   I sent her an e-mail in response indicating, no, we cannot give you an extra 5 percent.  We'll give you 5 percent as we initially offered.

Q   And did there come a resolution and an agreement on what the discount would be and what would be paid?

A   We thought we reached an agreement, that they would pay -- that they would receive a 5-percent discount and that they would pay all of the outstanding invoices.  But, in fact, they only paid half of the outstanding invoices at a 5-percent discount.

Q   What was the total, approximate, approximate total outstanding?

A   It was -- it was I think -- I think it was around 1.3 million.  And I think they paid about 600, between 600 and 650,000.  So they paid roughly half at a 5-percent discount.

Q   You gave the 5-percent discount.

A   Yes.

Q   And your testimony was you conditioned it on full payment, everything outstanding.

A   Absolutely.

Q   But you did not get full payment.

A   That's right.

Q   Did you complain?

A   I did.  I don't -- I sent an e-mail.

MR. PEPE:  I'll offer, Your Honor, if I may, as a full exhibit PTX 121 to which there is no objection.

THE COURT:  All right.  PTX 1 [sic] is full.  It can be published.

(Plaintiff's Exhibit 121, received in evidence.)

MR. PEPE:  In the third page of that exhibit, Mr. Wyzik, in the lower right-hand corner is 3021.

Q   (By Mr. Pepe) We see it's now May 31.  We now see your e-mail to Mary Grace Reyes, if we could call that out.

Take a moment to look at that.

A   Yes.

Q   You made clear what you just testified to a moment ago, 5 percent and no more.  And then the e-mail, Mary Grace's response is immediately above that.

MR. PEPE:  Can we call that out, Mr. Wyzik?

There you go.  Thank you so much.

Q   (By Mr. Pepe) She says, quote, Ok.  We will cut the check later today and hopefully make it to FedEx overnight, end quote.

You did get a check.

A   Yes.

Q   But not for the amount --

A   No, not for the amount that we had agreed to.

MR. PEPE:  Going to the first page in that e-mail string, if you would, Mr. Wyzik, and if you can call out the

e-mail on the bottom of that page, if you would, please.

Q    (By Mr. Pepe) Is that your complaint, your protestation that you just described a moment ago?

A    Yeah, that's an e-mail I sent to Mary Grace Reyes on June 12th explaining that the check covered about half of the then outstanding AR.  Our understanding was that Jarrow Formulas would be paying down the entire AR and bringing the account current in exchange for the additional discount that we agreed to.

I went on to explain, you know, this understanding was particularly important to us as we continue to devote the significant resources required to defend this matter during trial.  Can you let us know when we can expect to receive the payment on the additional outstanding AR?  Thanks and best, Mark.

Q    This e-mail string captures another e-mail between Mary Grace Reyes and Ben Khowong, if Mr. Wyzik could call out the one immediately above that.

She sends your e-mail to Mr. Khowong and says, "How do you want me to respond to this?"  See that?

A    Yes.

Q    And then if we could -- did Mr. Khowong -- question withdrawn.

Did Mary Grace Reyes respond?  Did Mr. Khowong respond or neither?

A    Mr. Khowong responded.

Q    Okay.  And you testified earlier you typically did not, on these discount issues, did not interact with him; correct?

A    Yeah, we did not.

Q    You had Cathy Adipietro, and he had Mary Grace Reyes.

A    Yes.

Q    But this time you did.

A    Yes.

Q    And is that reflected in the e-mail in this string immediately above?

A    Yes.  This is an e-mail from Mr. Khowong to me and to Mary Grace Reyes on Wednesday, June 12th.

Q    He says, "In the future, please deal directly with me on the matter.  There was a misunderstanding on your offer, passed to me by Marry-Grace.  My understanding was we just need to bring the account current for the discount.  I went out of my way to pay you the check of close to 700,000 despite the fact Jarrow wanted me to send only 100,000 for now have the authority to send you" -- I think it means did not have the authority to send you -- "anymore at this time without Jarrow's instruction."

A    Yeah.

Q    And was there any more forthcoming other than that payment?

A    My recollection is no.

Q    At this point in time, and more particularly during this

exchange of e-mails, did Mr. Rogovin advise you of any steps he had taken regarding the holding or putting off of your payments?

A    No.

Q    None.

A    None.

Q    As you start the trial in June, was there still an outstanding -- a substantial outstanding amount for bills that had been issued and not paid by Jarrow Formulas in the Kentucky litigation?

A    Yeah.  The trial started on June 3rd, I believe, and, you know, we still had that roughly at least that $650,000 that was not paid that we had asked for in the last set of correspondence and that --

THE COURT:  Okay.  Next question.

Q    (By Mr. Pepe) Did you continue to pursue your collection efforts?

A    We did.

Q    Did you involve Mr. Leventhal?

A    We did.  At this point, yes, we did.

Q    Tell us what happened.

A    So at this point we're involved in trial, and our primary focus every day has to be the trial above all.  But during a couple of breaks, I would speak to Mr. Leventhal, Attorney Rechen spoke to Mr. Leventhal, and we said, "Jonathan, we're

getting concerned.  We need to get paid."

And he would tell us, "I'll work on it.  I'll talk to Ben."

Q   And did you, in fact, send him details, information on the outstanding statements?

A   My recollection is we did again.

MR. PEPE:  I'm going to offer as a full exhibit, Your Honor, PTX 127 to which there is no objection.

THE COURT:  Okay.  127 is full.  It can be published.

(Plaintiff's Exhibit 127, received in evidence.)

MR. PEPE:  Can we call up 127, please, Mr. Wyzik?  Thank you.  And can we call out the middle, middle e-mail there that begins "Jonathan"?

Q   (By Mr. Pepe) Does that, in fact, refer to what you just testified to, Mr. Giarratana?

A   Yes, it does.

Q   What is -- according to this e-mail, what is the total amount outstanding under 60 days and over 60 days?

A   Um, it's -- it's 336,000 plus 930,000.  So it's about 1.2 to $1.3 million.

Q   Did that include any billing for the work you were doing in the trial that started at the beginning of June?

A   No, because we're still in the month of June, and we don't bill for June until after we get back from trial in July.  And this is what I'm referring to there, that there's a lot of

money currently outstanding that we need to be paid for.  And, as you know, we're incurring a huge amount of expense while we're down here working very hard.

Q    And did Mr. Leventhal produce any success in response to your request?

A    No, he did not.

Q    What policy or procedure did Mr. Rogovin have, if any, in communicating with you and your trial team members during the trial?  How did he communicate to you?

A    He communicated verbally and by e-mail.  Verbally we would speak with him regularly during the trial, during breaks, at lunch, in the morning, after trial, during our meeting after trial.  We would have a meeting every day following the trial where the whole team and the client would get around the table.  We would talk about what happened that day, what we would plan to do the next day, and everybody would give input.  So we communicated with him during that period as well.

            THE COURT:  Okay.  Next question.

Q    (By Mr. Pepe) Is it your experience that Mr. Rogovin was also a very prolific e-mail writer?

A    Yes.  He would communicate -- yes.

Q    And did he use that vehicle for communicating with you and your trial team frequently and regularly during the course of the trial?

A    Yes.  He typically send us e-mails from the middle of the

night that we would have in the morning that we would wake up and see.

THE COURT:  Okay.

MR. PEPE:  I'm going to offer, Your Honor, as full exhibit PTX 263 to which there is no objection.

THE COURT:  263 will be full.  It can be published.

(Plaintiff's Exhibit 263, received in evidence.)

MR. PEPE:  If you could call out, Mr. Wyzik, the top part there on the "To" and "From" and the subject.

Q   (By Mr. Pepe) This e-mail is dated June 18, Mr. Giarratana. Where are we in the trial now on June 18?

A   June 18th I believe that Caudill Seed had rested its case-in-chief and we were transitioning over to presenting our defense.

Q   All right.  This e-mail to you and Mr. Rechen and Mr. Grondahl has the subject:  "The heroes in this legal saga."  I would ask Mr. Wyzik to call up the third paragraph down beginning "In contrast."

It says, quote, "In contrast to Caudill's numerous gangsters of character assassins" -- is that typical of how Mr. Rogovin referred to Caudill's lawyers?

A   Yes.  He didn't always use those exact words, but it's very typical of the sentiment.

Q   Did he express that sentiment to you and your trial team frequently?

A    Yes.

Q    Did he express his sentiment to you and your trial team concerning Caudill's company and Dan Caudill personally?

A    Yes, throughout the litigation.

Q    What was that sentiment?

A    Um, there was a tremendous amount of anger, I would say hatred, clear ill will towards -- from him towards Dan Caudill, the Caudill company, their lawyers, and the court.

Q    And was that expressed on more than one occasion?

A    Absolutely.

Q    It would be on many, many?

A    Absolutely.

Q    Orally and in e-mails?

A    Absolutely.

Q    It goes on in this e-mail to say, "McCarter & English has been scholarly, and with collaborative feedback but also periodic swift kicks from me ..."

        Did he give you periodic swift kicks, figuratively speaking, in these e-mails?

A    Not physically but figuratively speaking in his mind he gave us a swift kick.

Q    "...usually pretty thorough.  Tom's trial work deserves to be a made-for-tv movie."  Who's the "Tom" in that sentence?

A    He's referring to Tom Rechen.

Q    "He became courthouse buzz with law interns coming in to

watch him operate without anesthesia (I was accused of doing that in group therapy back in 1985.)"

Did, in fact, court personnel come in to watch Mr. Rechen do court examinations?

A   Yes.  His cross-examination, yes.

THE COURT:  Okay.  Next question.

Q   (By Mr. Pepe) And did Mr. -- and did Mr. Rogovin express that admiration to Mr. Rechen himself?

A   He did.

Q   On more than one occasion?

A   Absolutely.

MR. PEPE:  Go to the very last paragraph on the last page and call that out, if you would, sir.

Q   (By Mr. Pepe) It states, the first sentence, "So, on top of everything else, the system is evil and broken."

What did you understand?  What system was he referring to?

A   He was referring to the legal system.  That was a common theme of his.

Q   And did he express that to you on more than one occasion?

A   Yes.

Q   Did those expressions that you just described of his sentiment toward the court, the judge, the system, Caudill, and his -- Caudill's lawyers, cause you -- enter into your evaluation of how to handle this litigation?

A    Yes.

Q    Did he ever express to you his intention to make that known to the court if he testified?

A    Absolutely.

Q    You sure about that?

A    Absolutely.

THE COURT:  Can I see counsel for just a moment at sidebar.

(At sidebar off the record.)

MR. PEPE:  I wonder if -- PTX 094 has already been admitted as a full exhibit, Your Honor.

Mr. Wyzik, could you call that back up, PTX 094?

Q    (By Mr. Pepe) That's the verdict about -- verdict form about which you testified earlier, Mr. Giarratana.  And the date in the lower right-hand corner is 6/26/19.  Do you see that?

A    Yes.

Q    Is that consistent with your recollection of the jury returning its verdict on that day?

A    Yes.

Q    Okay.  Was Mr. Leventhal at the counsel table when the jury returned the verdict?  As you said, he sat at counsel table?

A    He was.

Q    Were you in the courtroom when the jury returned the verdict?

A    Yes.

Q    Mr. Rechen?

A    Yes.

Q    Mr. Grondahl?

A    Yes.

Q    What happened -- what did Mr. Rogovin do when the jury returned the verdict?

A    I never saw him.  He walked out.

Q    Did he say anything to you before he walked out?

A    No.

Q    Not a word.

A    No.

Q    When's the next time -- question withdrawn.

         Did you subsequently hear from him or hear of him or hear him make a statement, not to you but to others?

A    Yes.

Q    When did that happen?

A    That evening, the evening of the 26th, the evening of the verdict.

Q    And where were you when this happened?

A    The team had met for dinner.  And, uh, I had noticed that I had received a phone call while we were at dinner.  I didn't see it ring.  I saw the voicemail.

Q    Let me interrupt you.  This is after the jury returned the partially adverse verdict.

A    Yes.

Q    And you went to dinner that night.

A    Yes.

Q    Who was with you at that time?

A    Tom Rechen; Eric Grondahl; Joel Beres, our local counsel; Celeste and Danny O'Keefe, our consultants; Cortland Joyce, our paralegal.  I believe that was it.

Q    Go ahead.  Go ahead.

A    Well, I had noticed at some point --

THE COURT:  Sorry.  What's the question?  Let's get another question.

Q    (By Mr. Pepe) Those are the people at dinner.

A    Yes.

Q    And then you said you got a phone call.

A    Yes.

Q    And what did you do?

A    I noticed I had received a phone call.  I didn't hear it ring.  It was on my cell phone.  And there was a voicemail.

Q    And did you listen to it?

A    Yes.

Q    And could you tell who the speaker was?

A    I could.

Q    And who was the speaker?

A    It was Mr. Rogovin.

Q    Any other voices on that voicemail?

A   There were.

Q   Could you recognize any of them?

A   I recognized one of them as Kean Ashurst.  I couldn't recognize the other voice.  It was a woman's voice.

Q   Okay.  And did you save that recording?

A   It's on my phone today.

Q   And has it been produced to the other side in this litigation?

A   Yes.

        MR. PEPE:  I ask the Court's permission to play the recording, Your Honor.

        THE COURT:  Okay.  You may.  You may play it.

        MR. PEPE:  Mr. Wyzik, can you do that for us?  And, Your Honor, may I stop it and ask Mr. Giarratana to identify the parties?

        THE COURT:  Yes.

        MR. PEPE:  Thank you.

        Are you okay to do that, Mr. Wyzik?

Q   (By Mr. Pepe) Now, Mr. Giarratana, you've heard this before.

A   Yes.

Q   It's your testimony that what we're about to play is the voicemail message on your phone at Jarrow Rogovin -- on which you recognize Jarrow Rogovin?

A   Yes.

Q   Was the voicemail message for you?

A   I don't believe -- well, it was a call to my phone, but I believe it was unintended.

MR. PEPE:  Are you ready, Mr. Wyzik?

THE COURT:  We can't hear that.

MR. PEPE:  Is it possible, sir, to adjust the volume?

(Plays recording.)

Q   (By Mr. Pepe) Do you have it on your phone, sir?

A   I do.

Q   With the Court's permission, is it the same recording that we've offered into evidence?

A   That recording was taken from my phone.

Q   Can we see, with the Court's permission, if it might be easier to hear or better sound if you played it on your phone?

THE COURT:  That would be fine.

MR. PEPE:  Put it near the microphone.

THE COURT:  What's the exhibit number, so I know?

MR. PEPE:  I think that was the transcript, Your Honor.

MS. HANRAHAN:  360.

THE COURT:  360?  So 360 is the recording, and that's admitted as a full exhibit.

MR. PEPE:  With the Court's permission, may the witness try that?

THE COURT:  Yes, he can try.

(Plays recording.)

THE WITNESS:  Oh, geez, I hit the wrong one.  I apologize.  Here we go.

(Plays recording.)

Q   (By Mr. Pepe) Stop it right there, please.  Can you?

Do you recognize that voice?

A   Yes.

Q   Who is it?

A   Mr. Rogovin.

Q   What did he say?

A   It's a huge F'n blunder and they didn't clean it up.

Q   Can you please?

A   (Plays recording.)

Q   Stop it there, please.  Do you recognize that voice?

A   Mr. Rogovin.

Q   What'd he say?

A   "We don't spray dry."

Q   Say it again?

A   "Half the products we sell are spray dried."

Q   Go ahead.

A   (Plays recording.)

Q   Stop it there.  Do you recognize the female voice?

A   I don't.

Q   Okay.  Do you recognize the male voice?

A   It's Mr. Rogovin.

Q   And what did he say?

A   He says -- he was saying that, um, "We don't spray dry," meaning with respect to the product that was accused of misappropriation and also saying, "Half the products we do sell are spray dried."

Q   Did that relate to the technical issues?

A   It relates to the trade secret that he was accused of misappropriating.

Q   Go ahead.

A   (Plays recording.)

Q   Stop it there, please.  Do you recognize that voice?

A   It's Mr. Rogovin.

Q   And what did he say?

A   He was accusing us of committing malpractice because we did not put into evidence a letter that he had sent to the opposing lawyer eight years ago.  And he's claiming that he said certain things in that letter.

Q   Go ahead.

A   Play it?

Q   Please.

A   (Plays recording.)

Q   Stop it there.  Do you recognize that voice?

A   Yeah, Mr. Rogovin.

Q   What did he say?

A   Well, he started out by saying, "I think we'll win this

one, but" -- and then he said they committed malpractice.  And then he complained that we apparently did not put into evidence some information that Kean Ashurst had supposedly put together that supposedly showed that Caudill Seed's damages were less than what Caudill Seed claimed they were.

Q   Go ahead.

A   I'm sorry.  My phone, I'll have to ...

(Plays recording.)

     It went back to the beginning.  I apologize.

Q   Was that the end of it?

A   No.

(Plays recording.)

Q   Do you recognize that voice?

A   That's Mr. Rogovin.

Q   And --

A   (Plays recording.)

Q   Is that the end of it?

A   There's another two minutes left.  I just can't recall. It's a butt dial, so it's hard to tell if anything else was --

(Plays recording.)

     Okay that's it.  I apologize.  The last two minutes were just ...

Q   When you got -- when you heard that butt dial recording, which you've just played, in which Mr. Rogovin said you committed malpractice and you, McCarter law firm, can pay the

damages, did you try and reach out to Mr. Rogovin?

A   I had tried to call him that evening, and he wouldn't take my calls, and also tried to reach out to Jonathan Leventhal again, if I recall correctly.

Q   Mr. Rogovin did not take your call.  Did you ever speak with him again after this?

A   No.  That was the last I heard of him.

MR. PEPE:  I'm about to move on to another topic, Your Honor.  Is this a good time?  Or I can continue.

THE COURT:  Yeah, I think this is a good time.  Thank you.

So, folks, we'll end our day three minutes early, send you home.  We'll see you same time tomorrow morning in the jury room.  Appreciate your attention today.

As always, don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and everything that goes with that.  Thank you very much.  You can accompany Ms. Johnson out.

(The jury left the courtroom at 3:27 p.m.)

THE COURT:  You can be seated.

You can step down, Mr. Giarratana.  Thank you.  All right, same thing tomorrow, Mr. Giarratana.  We'll have you start there so you're there when the jury comes in at 9:00.

Okay, a couple things, folks:  First of all, that recording, in what format is it in?  The jury -- I've admitted

it, so it's going to go back with the jury. Mr. Giarratana's phone is not going to go back with the jury. So in what format is that in? Is it on a disk?

MS. HANRAHAN: Thumb drive.

THE COURT: So that means the jury will be needing a laptop, okay.

And then, Mr. Pepe, how much longer do you anticipate on the direct at this point, Your Honor?

MR. PEPE: I believe no more than two hours, Your Honor.

THE COURT: Okay. And then, Mr. Rogovin -- excuse me -- Mr. Resser, I assume that you will be fairly substantial examination at your end, probably lasting at least all tomorrow. Is that fair?

MR. RESSER: Good estimate, yes.

THE COURT: All right. So then I don't think -- if for some reason we got another witness tomorrow, who would it be, Mr. Pepe?

MR. PEPE: As I advised Mr. Resser, Jacqueline Bosma.

THE COURT: Okay.

MR. PEPE: Who is in town, Your Honor.

THE COURT: Very well. And just -- I think I told you before, just as a reminder, it sounds like you're doing this, but by close of business on the business day, by five o'clock, no later than five o'clock on the business day before the next

day, counsel for both sides need to advise which witnesses they're calling.

MR. PEPE: Yes. We understand, Your Honor.

THE COURT: I just couldn't remember if I told you that.

All right. I don't have anything else. Does counsel have anything to raises before we go?

MR. RESSER: Your Honor, I've raised this with counsel. We have duplicate exhibit numbers in this case.

THE COURT: Yup.

MR. RESSER: And I was hoping to avoid the confusion of that.

THE COURT: Me too.

MR. RESSER: I think -- I mean I wasn't in the case when exhibit numbers were assigned, but I assumed that defense exhibit started at 501 and it would go up from there, and now ours are numbered up to 713. But when plaintiff went over 499, 500, they then went 501, 502, and we have duplicates from 501 on.

THE COURT: Ah.

MR. RESSER: And --

THE COURT: Can we make yours A, 501A, 501 --

MR. RESSER: Well, there are some like 540A, B, C, D.

THE COURT: What if we used X or double X for yours, for yours that overlap? It doesn't really matter what we come

up with, but we have to come up with something to differentiate.

MR. RESSER: We'll think of something, maybe take it up in the morning.

THE COURT: That I thought you were going to get at the fact -- as I understand it, maybe I'm wrong, I believe the parties have both designated some of the same documents as exhibits. Am I wrong about that?

MR. RESSER: That's overlap.

THE COURT: There's no need to put in the same e-mails we saw for you, just so we're clear.

MR. RESSER: Right.

MR. GREEN: Your Honor, one quick point. I think the defendant's exhibits are already marked with a capital D. Would that be sufficient for your purposes?

THE COURT: So what does it say, D501?

MR. GREEN: Correct.

THE COURT: And yours says P?

MR. GREEN: Ours says PTX.

MR. RESSER: Not in every case, Your Honor.

THE COURT: What if we did that though? Look, I don't mind if you want to come up with something simpler. I'm not going to impose that on you if there's something more efficient. Just discuss it with counsel and let me know.

Okay. We'll call it a day. Thank you. We're in

recess.

(Proceedings concluded at 3:31 p.m.)

# **I N D E X**

| | Page |
|---|---|
| Opening Statement | |
| Mr. Pepe | 56 |
| | |
| Opening Statement | |
| Mr. Resser | 72 |

| **WITNESS NAME** | **Page** |
|---|---|
| Mark Giaratanna | |
| Direct By Mr. Pepe | 87 |

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)


I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937