UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x

                  No. 3:19-CV-1124 (MPS)

McCARTER & ENGLISH, LLP

                  JULY 7, 2023

vs.

                  8:45 A.M.

JARROW FORMULAS, INC.

                  JURY TRIAL

- - - - - - - - - - - - - - - - x


Volume III, pages 274 - 482


450 Main Street
Hartford, Connecticut



BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN


COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

       McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
           One State Street, 14th Floor
           Hartford, Connecticut 06103
      BY:  LOUIS R. PEPE, ESQUIRE
          JAMES G. GREEN, JR., ESQUIRE
          JAMES A. BUDINETZ, ESQUIRE
          DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

       BARTON LLP
           100 Wilshire Boulevard, Suite 1300
           Santa Monica, California 90401
      BY:  BERNARD M. RESSER, ESQUIRE

       BARTON LLP
           711 Third Avenue, 14th Floor
           New York, New York 10017
      BY:  JAMES E. HEAVEY, ESQUIRE
      BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:53 a.m.)

MR. PEPE: Morning, Your Honor. May it please the Court. Attorney Louis Pepe of McElroy Deutsch for plaintiff, McCarter & English LLP. With me are my partners, Attorney James Green, Attorney James Budinetz, and Attorney David Case.

MR. RESSER: Bernard Resser for Jarrow Formulas. With me is James Heavey and Michael Ward.

THE COURT: Good morning. Okay. To start out, I have a ruling for you with respect to the issue of whether the evidence pertaining to the discussions of discounts, negotiations about discounts, discussions of discounts within McCarter can come in, and I find that it can come in. I'm not just saying that because some of it already has come in. If I reached the opposite conclusion, we would have to discuss what to do about that.

But I looked at a long series of cases yesterday and last night. And I'll confess that they don't speak specifically to the question of the breadth of the obligation of a fiduciary to prove that a relationship or a series of transactions in a relationship are fair by clear and convincing evidence. But they do use broad language. For example, they use -- they say things like the fiduciary has the burden of proving a transaction is entirely fair, that any transfer or any benefit obtained by the fiduciary, which would be money I think, the fiduciary has the obligation of proving the

transaction contract or transfer is entirely fair.

So I think, in light of that language, I'm disinclined to try to parse the different transactions, financial transactions, between the parties in this case and say as to one that obligation would apply, as to another it wouldn't. In any event, I determined that the evidence at least has some probative value as to -- as to those issues. So I'm going to allow that evidence in. Again, I realize some of it has come in already, but I think that was -- I think it was properly admitted for that reason.

Okay. So unless counsel has anything in the next -- that we can dispose of quickly.

Mr. Pepe.

MR. PEPE: Yes, Your Honor. First, we apologize for the technical difficulty playing the voicemail recording yesterday.

THE COURT: Okay.

MR. PEPE: We've corrected it, and I wonder if it makes sense to play it. Now it is completely audible. I wonder if it makes sense to play it without comment, without interruption, just so the jury can hear it.

THE COURT: I think that would be fine. But if we have a problem with it, then we're not going to do it. So it's got to be perfect the first time. I'm serious.

We've -- the jury's listened. We had Mr. Giarratana

say what it said, so we're not going to play it again and again and again. So it's got to work. If it doesn't work -- you know, I mean, look, I'll give it 30 seconds or so, but then we got to move on.

MR. PEPE: I understand, Your Honor.

THE COURT: All right. Very well. Okay. Then unless there's anything else, we'll get the jurors.

MR. PEPE: Do you want Mr. Giarratana on the stand?

THE COURT: Yes, please, Mr. Giarratana. Thank you.

(The jury entered the courtroom at 8:57 a.m.)

THE COURT: So, Ladies and Gentlemen, we think we've fixed the audio. So I said that we could give it one more try. And we're going to do that in a moment.

Mr. Pepe, if you want to take the podium, we have our witness, who remains under oath, the same witness as yesterday, Mr. Giarratana.

Mr. Pepe, whenever you're ready, if you'd like to try to play the audio again, let's do it now.

MR. PEPE: Thank you, Your Honor.

(Plays recording.)

THE COURT: Mr. Pepe, is there anything else worth listening to here?

MR. PEPE: I think we're at the end now, Your Honor, so I'm happy to stop at this point.

THE COURT: Okay. That's great. Thanks. And that

was Exhibit 360; is that correct?

MR. PEPE:  Correct, Your Honor.

THE COURT:  Go ahead, Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.


M A R K   G I R R A T A N A,

resumed the stand and testified under oath as follows:

CONTINUED DIRECT EXAMINATION

BY MR. PEPE:

Q   Mr. Giarratana, yesterday when we researched -- just before we recessed, you testified that, following the verdict, you tried to reach Mr. Rogovin and he did not return your calls. Do you remember that?

A   I do.

Q   Did you speak at that time, shortly thereafter, with anyone else from Jarrow Formulas?

A   I did.

Q   With whom did you speak?

A   I spoke with Jonathan -- that day I spoke with Jonathan Leventhal.

Q   All right.  The day of the verdict?  When you say "that day," do you mean the day of the verdict?

A   I spoke with him, if I -- I recall speaking with him the day of the verdict and the day following the verdict.

Q   All right.  In person or by phone or --

A   Uh, well, I was at the courthouse with him when the verdict came down, but then I also spoke with him by phone.

Q   The first conversation that would have been June 26.  The evidence indicates the verdict was rendered on June 26.

A   Yeah.

Q   You had a conversation with Mr. Leventhal after the verdict.

A   Yes.

Q   What was said and by whom?

A   Well, we actually -- we actually discussed -- after leaving the courthouse, we were all going to meet for dinner.

THE COURT:  What was said and by whom, Mr. Giarratana?

THE WITNESS:  I'm trying -- I'm trying to recall the conversation.  There was two conversations.  There was one that day, and then there was one the following day.

Q   (By Mr. Pepe) Let's take the first one.  Then we'll come to the second.  Go ahead.

A   Yeah, so the first one was I had discussed with him -- there was first a discussion about going to meet for dinner and whether he was going to come and join us or not.  Ultimately he did not come.  And we also discussed the substance of the verdict and what the strategy would be with respect to that, including how we would approach that in a judgment as a matter of law.  And we discussed that I was going to be putting together a draft brief on the judgment as a matter of law.

Q    And when you use the term "judgment as a matter of law," is that sometimes shorthanded with JMOL?

A    Yes.

Q    We'll hear that from time to time perhaps in this testimony.

A    Yes.

Q    And, very briefly, is that a motion to challenge the verdict?

A    It is.  It's a motion where you file a motion with the court saying that no reasonable jury could have found for the plaintiff on certain of these counts and explain why the court should find as a matter of law, for example, why there was no trade secret or why there were no damages.  And so we discussed that strategy, which had been part of our strategy all along and that I would put together a draft brief for them to review so they could get a handle on what the issues were and what their strategy could be moving forward.

Q    You said there was a conversation the next day after the verdict with Mr. Leventhal; is that correct?

A    Yeah.  Actually, I covered both in what I just testified to.

Q    All right.  So what you just testified to covered the conversation you had with Mr. Leventhal right after the verdict and the next day.

A    Yes.

Q   Okay.  Now, did you speak with anyone else at about this time from Jarrow Formulas, Inc.?

A   Yes.  I spoke with Rory Lipsky.

MR. PEPE:  I'm going to interrupt you, and I'm going to ask if, Your Honor, this was a demonstrative used early.  Demonstrative No. 2 has already been used.

THE COURT:  All right.  That's fine.

MR. PEPE:  If I could ask that to be called up.

THE COURT:  It may, yup.

Q   (By Mr. Pepe) Remember this organizational chart, Mr. Giarratana, in the early part of your testimony?

A   Yes.

Q   And is Mr. Rory Lipsky shown on that chart?

A   He is.  He's -- at the time of the trial, Mr. Lipsky was the CEO of Jarrow Industries Inc., but he had also been a long-time employee of Jarrow Formulas.  So I had known him for a number of years, going back at least ten years.

Q   Was he at the trial in its final days?

A   I believe he was, yeah.  He was, um -- he was a witness in the case, uh, and, um, he was, uh -- I believe he was there when the verdict came down.

Q   The conversation -- excuse me.  Is the conversation you had with Mr. Lipsky in person or by phone?

A   By telephone.

Q   And who reached out to whom?

A    Mr. Lipsky called me.

Q    And was that the day of the verdict, the day after, or some other time?

A    It was on the Thursday following the verdict.

Q    Okay.  And the verdict was on a Wednesday?

A    I believe so, yeah.

Q    All right.  And he called you?

A    He did.

Q    And this is the conversation you referenced just a moment ago when you spoke --

A    It is.

Q    All right.  Tell us what was said and by whom to the best of your recollection.

A    Mr. Lipsky wanted to express his thanks to us for all of the hard work.  He had indicated to me that, um, they were trying to get over what they called -- he called the shock of the verdict.  Um, he had indicated that, um, I should be patient with Mr. Rogovin.  I don't think he used the word "patient" but let Mr. Rogovin work through this because I had indicated to him that I had tried to reach out to Mr. Rogovin, he did not take my calls, I hadn't spoken to him.

And his response was, "Let him work through this.  I'm going to be meeting with him on Sunday."  This was on a Thursday.  He said, "I'm going to be meeting with Mr. Rogovin on Sunday."

And I said, "Okay," and I let him know that I was working on this draft JMOL, this motion. And I said, "I'm going to be sending it to Jonathan, but it may be something that, um, you'll want to share with Mr. Rogovin so that he can understand what the issues are and what the approach would be to addressing, um, the verdict in the post-trial motions."

Q   Did -- following that now, so we're now in the day or so after the verdict, did Mr. Leventhal, in-house counsel, follow up that conversation with an e-mail to you?

A   He did.

MR. PEPE:  Your Honor, if I may offer as a full exhibit PTX 131.  There's no objection.

THE COURT:  All right.  PX 131 will be full.  You can publish.

MR. PEPE:  Thank you, Your Honor.

(Plaintiff's Exhibit 131, received in evidence.)

Q   (By Mr. Pepe) On the screen you should see, Mr. Giarratana, a June 27 e-mail.  This would be the day after the verdict?

A   Yes.

Q   And from Mr. Leventhal to you, "Subject:  The case."  And he says, "Hi Mark.  I just landed at LAX.  Please send me ASAP the time line of key filing deadlines," period, end quote.

What was your understanding of that request?

A   Yeah, my understanding was he was referring to the deadlines that Jarrow Formulas would face following the

verdict.  Once the jury issues a verdict, there are a number of deadlines that are very firm, and you need to first figure out what they are and then make sure that you meet them because, if you don't, the consequences can be substantial.

And so he wanted us to determine what all the deadlines were that were coming due and to inform the company.

Q   The next line he says, quote, Also, your analysis that we discussed about for an appeal, end quote.

What was your understanding of his request in that regard?

A   My understanding was he was referring to what we call the JMOL, the judgment as a matter of law.  It was -- the thinking was that, um, he refers to an appeal here, and my understanding was that --

THE COURT:  Mr. Giarratana, I'm going to stop you there.  Let's get another question.

Q   (By Mr. Pepe) In the next line he says, quote, "Also, your analysis" -- excuse me.  I'm sorry.

"I am trying to set up a senior management meeting for the first thing Monday morning," end quote.

Did that relate to what you said Mr. Lipsky told you about a meeting?

A   That's right.  And my understanding was that they wanted the analysis that he references there for an appeal for a

discussion during that meeting.

Q   You told Mr. Leventhal, you testified, that you would begin working on that motion.  Did you?

A   I did.

Q   When?

A   Uh, the day following the verdict.

Q   And did you continue to work on it as you came back to Connecticut?

A   I did.

Q   That weekend?

A   I did.  I worked on it Thursday.  I worked on it Friday. One of our associates, Alex Hornat, worked with me on it on Friday.  I worked on it most of the day on Saturday, and I sent them the draft brief with an extensive cover e-mail explaining what the issues were and what our strategy would be in that cover e-mail on Saturday so that they would have it in advance of the meeting with Mr. Rogovin on Sunday.

Q   So you said you sent it to them?

A   Well, I sent it to Mr. Rogovin and Mr. Leventhal.

Q   Did you get any response to that?

A   No.

Q   You also testified a moment ago about the -- Mr. Leventhal's request for filing deadlines.

A   Yes.

Q   Did you or any of your team members respond to that request

and provide the requested information?

A    We did.

Q    And was that sent to the JFI people?

A    It was.

MR. PEPE:  And, Your Honor, I would offer as a full exhibit PTX 135 to which there is no objection.

THE COURT:  Okay.  That's full, and it can be published.

(Plaintiff's Exhibit 135, received in evidence.)

Q    (By Mr. Pepe) On the screen now, Mr. Giarratana, is a two-page e-mail.

Let's, if I may, Mr. Wyzik, ask you to blow up or call out the top part so we can see who sent it and to whom it was sent.

We have this e-mail from Mr. Rechen to Mr. Rogovin. That's his e-mail.  You've already identified Mr. Leventhal. And Eva you said was his assistant; correct?

A    Mr. Rogovin's assistant, correct.

Q    Okay.  And this is on Monday, July 8, so about eight, nine days after the verdict?

A    Uh, yeah, a little more, roughly.

Q    Yeah.  Actually, about ten days.

A    Yeah.

Q    All right.  So if we can, Mr. Wyzik, can we call out the next paragraph?

Mr. Rechen says, "Jarrow and Jonathan, here is an analysis of the relevant timelines/deadlines related to the post-trial motions, including motions to stay execution and for a supersedeas bond," end quote.  There then follows a full page of text.

A    Yes.

Q    I'm not going to walk through that text, but you're familiar with this e-mail.  You were copied on it.

A    Yes.

Q    Were you aware Mr. Rechen was doing this?

A    Yes.  I conferred with him in advance and had some input on this.

Q    Summarize concisely, succinctly, and shortly what information was provided in this e-mail.

THE COURT:  Very succinctly because it's not all that important here.  Go ahead.

THE WITNESS:  This -- this detailed e-mail sets forth the deadlines that I referred to, what's involved with each deadline, and what each deadline is so the company would be aware of those deadlines and make sure that they were met.

Q    (By Mr. Pepe) Did you get any response to that?

A    I don't recall receiving one, no.

Q    Okay.  So this is July 8th.  What was the next thing you heard concerning this matter from JFI, Mr. Rogovin, Mr. Leventhal, or anyone acting on their behalf?

A    I believe the next communication I received was on July 12th.  I received a letter from another one of Jarrow Formulas' outside lawyers, from a firm, a big firm in California, Steptoe & Johnson.  An attorney named Carol Brophy had sent us a FedEx -- a letter by FedEx informing us that we had been terminated by Jarrow Formulas.

Q    Was that your first time you learned that JFI had terminated you as its counsel?

A    It was.

        MR. PEPE:  Your Honor, I offer the full exhibit PTX 099, no objection.

        THE COURT:  All right.  99 is full.  It can be published.

    (Plaintiff's Exhibit 99, received in evidence.)

Q    (By Mr. Pepe) Directing your attention to the letter on the screen, sir, is that, in fact, a letter you just referenced advising you of your termination?

A    It is.

Q    And you said this letter came from whom?

A    Carol Brophy.  She's an outside lawyer for Jarrow Formulas.

Q    Did you know Ms. Brophy?

A    I had -- I had spoken with her a number of times on the phone.

Q    If I can -- thank you, Mr. Wyzik.  If I can blow up the

"Re" line and the first paragraph.

It says, "We are writing on behalf of JFI to advise you and McCarter & English that effective immediately JFI hereby terminates McCarter & English's representation of Jarrow Formulas, Inc. its subsidiaries and related companies. You are hereby instructed to tender all JFI files, including hard copy, e-mail and electronically stored data intellectual as set forth below," end quote.

And then there appears the names and addresses where to send the files; correct?

A    Yes.

Q    If I can go to the second page and ask Mr. Wyzik to blow up the last paragraph, beginning with "Finally."

And that paragraph, sir, she says, "JFI hereby instructs McCarter & English and its attorneys, to cease all attempts at communication with any officer, employee of Jarrow Formulas, Inc., its subsidiaries and related companies. In the future, all communications" to -- "related to McCarter & English's representation of JFI and its subsidiaries, should be directed to JFI's new counsel for the relevant matters," end quote.

First, did you -- question withdrawn.

Did you respond to this letter?

A    I did.

Q    In writing?

A    I did.

MR. PEPE:  I offer as a full exhibit, Your Honor, PTX 100, no objection.

THE COURT:  All right.  Full exhibit, 100 is full.  It may be published.

(Plaintiff's Exhibit 100, received in evidence.)

MR. PEPE:  Mr. Wyzik, if you can blow up the first part, call out the first part of it so we can see who it's addressed to.

Okay, and then the next part, if you would, sir.

And the paragraph below that.

THE WITNESS:  Yes.

MR. PEPE:  Begins "Although."

Q    (By Mr. Pepe) In this paragraph, sir, you say, "Although your letter indicates that it was sent by e-mail, we did not receive a copy by e-mail.  We only received a copy by FedEx on July 15, 2019."

Was that, in fact, the case?

A    Yes, it was.

Q    You say in the next paragraph -- I'll ask Mr. Wyzik to call it out.

You ask for a confirmation from someone signed by a duly authorized representative of Jarrow Formulas, that it authorizes our firm to transfer its files as directed in your letter, that it is terminating our attorney-client

relationship, and that we should file motions to withdraw as counsel in the Caudill Seed litigation.

Why did you ask for that?

A   Because we believed it was necessary to have the client itself terminate the relationship.  We couldn't receive a letter from a third-party lawyer doing that.  We needed a direct communication from the client for us to terminate and to file motions withdrawing ourselves as counsel in the litigation.

Q   Was such a -- the requested confirmation from someone duly authorized by JFI forthcoming to you?

A   We did receive following communication directly from JFI.

Q   And who was the author of that letter?

A   I believe it was Mr. Leventhal.

MR. PEPE:  Your Honor, I offer as a full exhibit PTX 101, no objection.

THE COURT:  All right.  That, too, is full, can be published.

MR. PEPE:  Thank you, Your Honor.

(Plaintiff's Exhibit 101, received in evidence.)

Q   (By Mr. Pepe) Is this -- if you can read that, Mr. Giarratana, is this the letter you just described confirming your termination by Jonathan Leventhal's letter?

A   Yeah.  It was sent the next day by Mr. Leventhal, July 18th, to my attention.

MR. PEPE:  And I can blow up that first paragraph, please, Mr. Wyzik.

Q   (By Mr. Pepe) Mr. Giarratana, in Ms. Brophy's letter, Exhibit 99, and Mr. Leventhal's letter, Exhibit 101, there is a request for transfer of files and an index of all currently active or closed matters to be sent to the people indicated, Ms. Brophy or Stites & Harbison.  That would be Joel Beres's firm; correct?

A   Yes.

Q   Once you received the confirmation from Mr. Leventhal that you were terminated, did you and your people, your team, comply with that request?

A   We did.

Q   Tell us what you did briefly.

A   So as we had previously indicated, Jarrow Formulas has over 540 matters with our firm extending over 23 years, so there was a huge amount of information there.  What we needed to do was really sort of triage in a sense that we needed to identify where they had deadlines coming up in the immediate future and get them the files and the information they needed so that they could address those deadlines.  Um, and so we, um, we provided them with reports, which we keep in what we call our docketing system, showing them all of their patents and trademarks, what the status of each matter was, what the next deadline was, and we sent that to them.  Also we sent them cover e-mails

indicating to them what the upcoming deadlines were and what action they needed to take, also that we could ensure that there was an effective transition and Jarrow Formulas did not lose any rights to any of its intellectual property.

We also were in, I believe, fairly close communication with Joel Beres, who was our local counsel down in Louisville in connection with the Caudill Seed litigation, and we were providing him with whatever he needed in order to continue to represent Jarrow Formulas in connection with the Caudill Seed litigation. And so he would let us know what information he felt he was missing, uh, and we would respond by sending him that information. The transfers all largely occurred by what we call FTP file transfer.

THE COURT: All right. Let's get another question.

Q   (By Mr. Pepe) Did you complete the transfer of the files and the indexes as requested?

A   We did.

Q   At the time you received the notice of termination from Ms. Brophy and the confirmation of that termination by Mr. Leventhal, was there any amount of fees and disbursements due and owing and unpaid in the Kentucky litigation?

A   Yes.

Q   Neither letter appears to address that unpaid fees, did they?

A   These letters did not.

Q   Ms. Brophy's and Mr. Leventhal's letter did not speak to that?

A   They did not, no.

Q   Did you follow up on that issue?

A   Yes.

Q   And did you do it in -- by letter?

A   We did.

MR. PEPE:  I offer as a full exhibit, Your Honor, Exhibit 102, no objection.

THE COURT:  All right.  That's full.  It can be published.

(Plaintiff's Exhibit 102, received in evidence.)

Q   (By Mr. Pepe) If you can see that, Mr. Giarratana, is this the letter you just referenced following up on your fees?

A   It is.

Q   And it's addressed to Ms. Brophy.  Can we -- Attorney Brophy.  If we can ask Mr. Wyzik to blow up the first two paragraphs.

You say in that paragraph, beginning with "Neither your letter," does that address the fees that were outstanding at that time, sir?

A   Yeah, in the second paragraph, yes.

MR. PEPE:  If we can highlight, Mr. Wyzik, the sentence that begins with "The e-mail advised" halfway down. Has the dollar figures in it.

THE COURT:  You want him to read the sentence beginning, "The e-mail advised"?

MR. PEPE:  Yes.

Q   (By Mr. Pepe) Can you read that?

A   I can, yeah.  So if we look about halfway down -- well, it's highlighted now.  We stated, "The e-mail advised that there was an outstanding balance owed to our firm in the amount of $1,239,308.82 of which $1,201,366.45 related to the Caudill Seed litigation."

Q   Then if we could highlight the next sentence and read that, please?

A   Sure.  "The e-mail further forwarded our invoice in the amount of $760,780.80 for fees and disbursements incurred during the month of June in connection with the Caudill Seed litigation."

Q   And is that an accurate statement of what was due and owing in the Kentucky litigation at that time several days after you were terminated?

A   Yeah, the 1.2 plus the 760.  You sum those up, and that was the amount owed.

Q   Approximately a total of 1.9 million for fees and disbursements?

A   That is correct.

Q   And there's a reference to the e-mail.  Is the e-mail referenced in that sentence described in the preceding

sentence, which reads, "Indeed, on July 10, 2019, my partner, Thomas J. Rechen, sent an e-mail to Jarrow Rogovin, chairman of Jarrow Formulas, Ben Khowong, CEO/CFO, Jonathan Leventhal, general counsel, and Mary Grace Reyes."

Is that the e-mail in which those unpaid amounts were set forth?

A   It is.

Q   Did you receive any response to that?

A   My recollection is we received an e-mail from Mr. Rogovin around -- in -- later in July.

Q   And what was the substance of that?

A   The substance of the e-mail was that he indicated that he did not intend to pay the amounts owed in connection with the Caudill Seed litigation, uh, and that, um, he would pay, and agreed to pay, the amount owed outstanding on the various intellectual property matters that we worked on.  There was about $57,000 in work that was owed for the various intellectual property matters we were working on, and he agreed to pay that.

Q   Is the amount -- did he ever pay the $57,000 on unrelated matters?

A   He did not.

Q   Is the amount reflected in PTX 102, which is your letter to Ms. Brophy --

A   Yes.

Q    -- raising the issue of fees?

A    Yeah.  The 57,000 is included in those numbers.

Q    Is this -- is this the amount -- is this amount still outstanding due and owing today?

A    It is.

Q    And is that reflected, that amount, reflected in the monthly invoices you testified you sent every month, 75 in number, during the course of the litigation?

A    Yeah, it's set forth in detail in those invoices.

Q    And is the unpaid amount reflected in the last five of those monthly invoices which were never paid?

A    In connection with the Caudill Seed litigation.

Q    Yes.

A    Yeah, in connection with all matters.

Q    I'm just talking --

A    Oh, just the Caudill Seed?

Q    My question was unclear.

A    I apologize.

Q    1.2 -- 1.9 million due and owing in the Kentucky federal court litigation, is that amount reflected in the last five monthly invoices submitted in that litigation to JFI?

A    It is.

          MR. PEPE:  Your Honor, I would offer as a full exhibit PTX 001, no objection.

          THE COURT:  Okay.  That can come in, 001.

(Plaintiff's Exhibit 1, received in evidence.)

MR. PEPE:  If I can ask Mr. Wyzik to blow up the center of that page.

Q   (By Mr. Pepe) Mr. Giarratana, directing your attention to the upper right-hand corner, date of the bill is April 17, 2019.  You see that?

A   I do.

Q   That would cover the time committed during what time period?

A   In March, the preceding month of 2019.

Q   And I'm just going to ask, is this bill in the same format as the ones we previously examined in terms of its -- the information provided and the format in which it is provided?

A   It is.

Q   Just take a look at the second page so we can see that we recognize it, Mr. Wyzik.  Again, the same format we've seen in other bills?

A   That's correct.

Q   And if I can ask Mr. Wyzik to go to page 40 in the exhibit, numbered in the upper right-hand corner.

Does there appear there, sir, the hourly rate at which every single attorney or paralegal or IP specialist was billed?

A   Yes.

Q   And does it show for you and Mr. Grondahl and Mr. Rechen the hourly rates that were increased from the previous earlier

rates and applied in this litigation?

A    It does.

Q    535 per hour for you, 485 for Mr. Grondahl, and 520 for Mr. Rechen.

A    That's correct.

Q    Go back, if I may, to the first page.  And you see a notation there in handwriting "OK, 4/24/2019" and initials.  Do you recognize that handwriting and those initials?

A    Yeah.  The initials are JLR, Jarrow L. Rogovin, and that is Mr. Rogovin's handwriting.

        MR. PEPE:  I would offer, Your Honor, as a full exhibit PTX 002.  There's no objection.

        THE COURT:  All right.  PTX 2 can come in full.  It can be published.

    (Plaintiff's Exhibit 2, received in evidence.)

Q    (By Mr. Pepe) This is dated May 16, 2019, so it would cover the legal services rendered in the Kentucky litigation in what time period, sir?

A    For April of 2019.

Q    And is this the same format as the other bills?

A    It is.

Q    And the bill I just showed you before -- I'm sorry, 001, does that remain unpaid today?

A    It does.  It's unpaid.

Q    And this bill marked 002, is that unpaid today?

A    That is unpaid as well.

Q    And do you recognize the writing on the front of that bill?

A    Yes.  It's Mr. Rogovin's writing.

Q    It says, "OK, 5-25-19."  You recognize it as Mr. Rogovin's?

A    Yes.

Q    And if I go to page 41 and highlight the column rate, please, Mr. Wyzik.

Once again, do we see the hourly rates that you billed for your time, Mr. Grondahl's, and Mr. Rechen's as you previously testified?

A    Same rates, yes.

MR. PEPE:  I offer, Your Honor, Exhibit 003 as a full exhibit, no objection.

THE COURT:  Can I question, Mr. Pepe?  So is the plan to go 1 through 5 here, pretty much same thing?  Why don't we say 3 through 5 do you want to offer now?

MR. PEPE:  May I, Your Honor?

THE COURT:  And there's no objection to those, I take it?  All right.  And those can come in.  3, 4, and 5 will be full exhibits.  PTX 3 through 5.

MR. PEPE:  Actually, Your Honor, 4 has two monthly bills, so I need to offer 3 and 4.

THE COURT:  All right.  So PX 3 and 4 will be full exhibits and may be published.

MR. PEPE:  Thank you, Your Honor.

THE COURT:  You may proceed.

(Plaintiff's Exhibits 3 and 4, received in evidence.)

Q   (By Mr. Pepe) Direct your attention to Exhibit 3, Mr. Giarratana, June 21.  That would cover the time for services rendered during May in the Kentucky litigation?

A   That is correct.

Q   And this one is the same format?

A   It is.

Q   If I went to the page that shows the hourly rates, would it show exactly what we saw on the preceding ones?

A   The identical information on rates, yes, the identical format.

Q   This one does not appear to have any initials or writing on it.

A   It does not.

MR. PEPE:  Mr. Wyzik, would you call up page -- excuse me -- Exhibit 4.

Q   (By Mr. Pepe) And while we're doing that, Mr. Giarratana, Exhibit 3 covering data June 21 covering the services in May, does that remain unpaid?

A   That remains unpaid.

Q   Exhibit 4 has a cover e-mail, Mr. Giarratana, from Mr. Rechen to Jarrow Rogovin, Ben Khowong, and Ben -- and Jonathan Leventhal.  Is dated July 10.  Do you see that?

A   Yes.

Q   That was before Attorney Brophy's termination letter; correct?

A   That's correct.

Q   So Mr. Rechen says in the cover e-mail:  In addition, you are aware we have an outstanding receivable with Jarrow Formulas in the amount of $1.2 million of which 1.2 -- I'm sorry -- the amount of $1,239,306.82, of which $1,201,366.45 relates to the Caudill Seed litigation.  The receivable needs to be addressed immediately.  Accordingly please make arrangements for immediate payment, end quote.

And then there is attached, I believe, two bills.  I'd ask Mr. Wyzik to go to the next page of the exhibit.  It should be the cover page dated July 10, okay.

And do you see that, Mr. Giarratana?

A   I do.

Q   And that would cover the legal services rendered in the Kentucky litigation during the month of June.  That would be the trial itself.

A   That's correct.

Q   And does -- and that was in the amount of $760,780.80. Does that remain unpaid and outstanding to this day?

A   It remains unpaid, yes, and outstanding.

Q   Then was there one final bill, Mr. Giarratana, relating to services after you were terminated?

A   Yes.

MR. PEPE:  And, Your Honor, I would offer PTX 005 now.

THE COURT:  Okay.

MR. PEPE:  With no objection.

THE COURT:  All right.  5 is full.  It can be published.

(Plaintiff's Exhibit 5, received in evidence.)

Q   (By Mr. Pepe) And this bill is dated August 19.  Do you see that, sir?

A   Yes.

Q   Brophy letter was dated July 12.  You said received on July 15, if I recollect.

A   Yes.

Q   Okay.  And if I -- and this bill is for 18,250; correct?

A   I -- I believe so.  Yes.

Q   Now, this one, just take a moment.  Let's take a moment here.  If you go to the next page, Mr. Wyzik.

Next page after that, please.

We see the dates of the activities.  And this page run through 7/1, July 1 through July 8; correct?

A   Yes.

Q   That's before Brophy's termination letter.

A   Yeah, those are services performed prior to receiving the notice of termination.

Q   Then we go to the page after that, and we see entries for work from July 8 to July 11; correct?

A    Correct.

Q    But then the next entry is July 25, and that would be after the Brophy letter; correct?

A    Yes.

Q    And what is -- and, of course, the dates after that are all subsequent.  What was going on there?

A    We were intending to put together all of the information I previously indicated, their upcoming deadlines, their reports, the work that needed to occur, giving them the information they needed to make sure that they could continue on with the work we were doing.

Q    Does this bill remain unpaid and outstanding today?

A    It does.

Q    Were you able to prepare, sir, a summary of all the bills rendered in the Kentucky litigation, the date they were rendered, the date they were paid, the amount that was paid in chronological order?

A    Yes.

Q    It summarizes all the bills you testified to in this matter?

A    Yes.

Q    That were rendered in the Kentucky litigation matter to JFI?

A    Yes.

Q    And would it be an aid to your testimony in just

summarizing this?

A    Yes.

MR. PEPE:  There is no objection to Demonstrative 122, 123, and 124, Your Honor.

THE COURT:  You may publish.

MR. PEPE:  And I wonder if Mr. Wyzik can call that up or blow that up.  Thank you so much.

Q    (By Mr. Pepe) Tell us what's shown there, starting with the columns across the top, sir.

A    So the left column is just the exhibit number in this case. The second column from the left is the invoice number.  The next column is the invoice date.  The next column is the total amount that was invoiced in that invoice on that date.  And the next column indicates the total amount that was paid by Jarrow Formulas on that invoice.

Q    And when -- does the amount on the invoice include both legal fees and disbursements in this demonstrative?

A    It does.

Q    And then we have the last column that's headed "Rogovin invoice handwritten notes"?

A    That's correct.

Q    And that's what's extracted from the face of the invoice as we've seen on some of the exhibits.

A    Yes.

Q    And if we go on the second page, again the same

information, in the same format?

A    That's correct.

Q    And, again, the right-hand column notations extracted from the front of the page of the bill itself; correct?

A    Yeah.  Those are direct extractions from the front page of each bill.

Q    And the next page, the same information, same format; is that correct?  Same information, same format?

A    Yes.

Q    Now, go to the last page.  And if I could ask Mr. Wyzik to go to that page.

And we see there, sir, at the bottom of that page, are those the five invoices about which you've just testified as being unpaid due and owing?

THE COURT:  No.

MR. PEPE:  No.  Pull that down, please.  Pull that down.  The last page of exhibit -- of the demonstrative would be page 125.

Q    (By Mr. Pepe) And are those last five were -- in the column stated "Total Amount Paid," zero, are those the last five about which you just testified here this morning?  And maybe we can blow it up so you can see it.

Thank you.

A    Yeah, and those are -- if you look at the left-hand column, they're PTX 1 through 5.  And we can see that, um, they're all

zeros in the "Total Amount Paid" column.

Q   You testified, sir, that following the verdict, you ultimately -- and following your termination, you ultimately received an e-mail from Mr. Rogovin that said -- that related in part to unrelated matters that you and your firm were handling for JFI unrelated to the Kentucky litigation; correct?

A   Yes.

Q   And were there ongoing -- were there ongoing matters under your representation at that time?

A   There were.

Q   And were there -- was there any amount due and owing on those unrelated matters?

A   Yes.

Q   And are those the matters to which you understood Mr. Rogovin to be referring when he said he would pay them?

A   That's right.

Q   Have you -- has your accounting department prepared a summary of those matters showing each matter and the invoice amounts outstanding on each?

A   Yes.

        MR. PEPE:  I would offer as a full exhibit, Your Honor, PTX 006, no objection.

        THE COURT:  Okay.  6 will be full.  It can be published.

    (Plaintiff's Exhibit 6, received in evidence.)

MR. PEPE:  And maybe if we could blow up the first half.  That's great.  Thank you, Mr. Wyzik.

Q   (By Mr. Pepe) Can you just briefly describe the information that's shown there, Mr. Giarratana, please.

A   Yes.  This is what we call a Statement of Account, the heading at the top.

And we can see that, on the left-hand side in the left hand next to the margin, there's a client name and then a matter and that each matter is one of those matters that we referred to.  There were 540 of them for Jarrow Formulas.  And matter 1 is IP General Rep.  The next matter on this statement of account is Bone-up.  Bone-up is a trademark of the companies.

And so what this shows is it shows the outstanding voices that are unpaid and the matters on which those invoices remain unpaid.  And it shows the date of the invoice under the column invoice date, the number of the invoice out of the column invoice number, the amount of fees that are owed on that invoice.

So, for example, in the third column over under "IP General Rep" it shows $1,552.50 in fees.  The next column shows the disbursements that are wrote on that invoice.  If you recall, the disbursements are the out-of-pocket expenses we incur on behalf of the client.  And then the last column shows the balance due.  And then for each matter all the outstanding

invoices are totaled under the total for that matter.

And that's the same format that's followed for every one of the matters on every page of this exhibit.

Q   Let's take a look at the second page, if we could, Mr. Wyzik.

Same information, same format for the other matters that were then being handled by your firm on behalf of JFI?

A   That's correct.

Q   And does this document, this accounting report, summarize and total all of those matters to show the total amount due and owing?

A   It does.

Q   And is that shown on the last page of the exhibit?

Mr. Wyzik, if you would, please.

A   Yes.  It's shown on the -- next to the heading "Grand Total," which is bolded.  And it shows the grand total is $57,227.43.  That's the grand total for all of the invoices summarized on that sheet, or those sheets.

Q   On any of these matters, did Jarrow Rogovin or anyone acting on behalf of JFI ever dispute any one of these invoices as to its validity, its reasonableness, its -- and whether it was due and owing?

A   Never.

Q   Did Jarrow Rogovin or anyone on behalf of JFI ever dispute, argue with, or challenge the hourly rate that was being charged

for the lawyers giving rise to these invoices?

A    Absolutely not.

Q    Never?

A    Never.

Q    And is that, in fact, that $57,227, the amount due that you say Jarrow Rogovin said he would pay for these unrelated matters?

A    Yes.

Q    Mr. Giarratana, have you prepared a summary now of what you -- what McCarter & English claims is due and owing for services rendered in this matter less what has already been awarded by the Court?

A    Yes.

        MR. PEPE:  I'd like Demonstrative 128, Your Honor. There's no objection.

        THE COURT:  Okay.  That can be published.

Q    (By Mr. Pepe) The first line, Your Honor -- it's rather self-explanatory, Mr. Giarratana, but tell us what's set forth there, please.

A    Yeah.  So, um, the -- the first row is the unpaid invoices for fees and disbursements.  The first bullet is for the Kentucky litigation, which is the case we've been talking about.  And it shows that the outstanding amounts owed in connection with the Kentucky litigation are 1.98 million, roughly.  And then it shows in the next bullet the other

matters, and it shows the amounts owed on the other matters is approximately $57,000, which are the -- which is the number that was set forth in the statement of account that we just looked at. That's the amount owed on the matters other than the Kentucky litigation.

Q And what does the next line show?

A The next line shows the amount that the Court awarded in its decision granting partial summary judgment. So the Court awarded to McCarter & English $980,451 -- I'm sorry -- $980,451.44. The Court awarded that to McCarter & English. So the difference between the amount awarded and the amount that we claim is owed is shown on the total line, which is $1,057,173.93.

Q Is McCarter & English claiming interest on that sum?

A Yes.

Q Is that shown on the next line?

A It is. And it's labeled "TBD," which is "to be determined."

Q What is the entry about willful, wanton, malicious breach of contract, punitive damages? What does that represent?

A That represents McCarter's claim that Jarrow willfully and maliciously breached the contract by not paying these outstanding invoices and, if so, would be requesting a finding of attorney fees and costs incurred in having to bring this litigation. And there is no number there. That is, again, a

TBD, or to be determined.

MR. PEPE:  Your Honor, may I have a moment?

THE COURT:  Yes.

(Pause.)

MR. PEPE:  Your Honor, I have no further questions of this witness.

THE COURT:  All right.  So it's Mr. Resser's turn.

So, Ladies and Gentlemen, there are several witnesses in the case, including Mr. Giarratana, who have been listed as witnesses by both sides in the case.  So rather than have Mr. Resser just do a cross now, we're going to have him do both his cross and his direct of Mr. Giarratana on all issues related to these billing matters.

Now, later there's another part of the case you heard the lawyers talk about.  Mr. Giarratana may or may not be called as a witness in that part of the case later.  So he may come back.  But at least we'll get all of his testimony out at once on these billing-type issues.  Okay?  So -- and what that means is that the lawyers will go back and forth for a while with their examinations.  All right.

Go ahead, Mr. Resser, whenever you're ready.

MR. RESSER:  Thank you, Your Honor.

                      CROSS-EXAMINATION

BY MR. RESSER:

Q    Good morning, Mr. Giarratana.

A    Good morning.

Q    You are an equity partner at McCarter & English; is that right?

A    Yes.

Q    And that means you are part owner of the law firm; is that right?

A    Yes.

Q    And your compensation at the firm, the money you are paid each year, that depends on your share of the profits of the firm; is that right?

A    Yes.

Q    Am I correct in understanding that your share of the firm's profits depends in part on how much of your work is billed and paid for by clients?

A    That's fair, yeah.

Q    Is it also true that your share of the firm's profits depends in part on how much of the entire firm's lawyers -- withdrawn.

Isn't it true that part of your share of the firm's profits depends on fees billed by other lawyers at McCarter & English on your client's work?

A    It can depend on that, yes.

Q    So, for example, work that Mr. Grondahl did for Jarrow Formulas also adds to your compensation at the firm -- is that right? -- if it's paid for?

A   Our compensation scheme is complicated, but it can contribute.

Q   So you get credit towards your share of the profits based on work others do; correct?

A   Sometimes I do; sometimes I don't.

Q   And when you get credit for work other folks do on your clients' matters, is that referred to at your firm as origination credit, or is there a different name for it?

A   We use -- we have a label -- we have a term called "origination credit," and typically, uh, this varies from partner to partner, client to client, matter to matter.  But typically we share the origination credit between the partners that are working on the matter under the general principle that all ships rise and fall together.  We're all in this together as a team, and we share with one another the credit for the work on behalf of our clients.

Q   Just to be clear, you receive origination credit of some kind at McCarter & English for the fees billed and paid by Jarrow Formulas; right?

A   Part of it.

Q   In general, an attorney has certain legal and ethical duties and obligations to clients; correct?

A   Yes.

Q   And one of those duties is a fiduciary duty.  Isn't that right?

A    Yes.

Q    And that means you need to place your client's interests above your own.  True?

A    Yes.

Q    An attorney also has a duty to be truthful to his or her client; correct?

A    Yes.

Q    And the lawyer's duty in communicating with the client includes that a lawyer may not withhold information to serve the client's own interest.  Isn't that right?

A    The lawyer may not withhold information to serve the client's own interests?

Q    To serve the lawyer's own interest.

A    Well, to be clear, I believe that statement applies in the context of providing fiduciary services.  If you're providing fiduciary services, then I believe that statement is accurate. If you're not providing fiduciary services, then I believe that statement is not accurate.

Q    So you think there's an exception to the duty not to withhold information from a client when it's in the lawyer's own interest to withhold that information?

A    Sure.  There's a number of exceptions.

Q    Is one of those exceptions not telling the client about billing matters that may be material?

A    Well, I -- first of all, we -- we work for many different

clients on many different matters.

Q   Pardon to interrupt, but it was a yes-or-no question.

A   Could you repeat the question, please?

MR. RESSER:  Can the reporter read it back?

THE COURT:  I can read it.

"Is one of those exceptions not telling the client about billing matters that may be material?"

THE WITNESS:  You generally need to convey to your client billing matters that are material to that client.

Q   (By Mr. Resser) You referred to yourself in your testimony yesterday as a trusted counselor.  Did I hear that right?

A   I believe so.

Q   And that was your way of describing the higher duty a lawyer has to his or her client; right?

A   In part that's how I describe my relationship in providing legal services to Jarrow Formulas, a trusted advisor in connection with my role in providing legal services.

Q   So there are no circumstances when it's okay for a lawyer to lie to a client during the course of the representation; correct?

A   I don't believe so generally, yeah.

Q   If an attorney is not truthful to a client, the attorney has breached the fiduciary duty to a client; correct?

A   Maybe, maybe not.

Q   And the "maybe not" is if it is not material?

A    It's going to depend on the particular circumstance.

Q    When an attorney violates the duty of honesty with the client by withholding important information from the client, that is also a breach of the attorney's fiduciary duty, isn't it?

A    I don't know.  You mentioned a duty of honesty.  Can you say that again?

Q    When an attorney violates the duty of honesty by withholding important information from the client, that's also a breach of fiduciary duty, isn't it?

A    It may or may not be.

Q    More particularly, when an attorney is dishonest or withholds information from a client because they desire greater legal fees, that is a breach of the attorney's fiduciary duty, isn't it?

A    I -- it could -- it may or it may not be.  It's a very broad statement.

Q    McCarter & English expects its attorneys to perform with integrity, doesn't it?

A    Yes.

Q    And that's -- that's in order to solidify your client's trust; right?

A    It's for a number of reasons, but one of the things we strive to do is to solidify our clients' trusts.

Q    And one of the firm's policies is to never compromise on

ethics.  Isn't that right?

A    I believe so.

Q    And by ethics, M&E includes the rules applicable to attorneys by the bar association; correct?

A    As a general matter, yes.

Q    And you're subject to certain ethical rules as a result of your membership in the Connecticut Bar; is that right?

A    Yes.

Q    And billing is one of the most important correspondences to a client.  Isn't that true?

A    Billing can be an important -- an important communication to the client.  Yes, it can be important in the sense that the client, uh, can be -- you're almost certain the client's going to read it because it's something that the client will be reading and then paying.

Q    Weren't you taught that bills are probably the most important correspondence that you send to your client?

A    I believe that was something that was ingrained in me and something that I've tried to adhere to.

Q    And is your job, when billing a client, to make sure the billing is fair?

A    Yes.

Q    And you review a draft bill or pro forma each month for each client; correct?

A    I do.

Q   And it can take you as much as two days, an entire weekend, to review all of your bills for a given month; correct?

A   It has in the past, yes.

Q   When Jarrow Formulas was sued in federal court in Kentucky by Caudill Seed, M&E was asked to defend that case; right?

A   Yes.

Q   And M&E, as I think the jury now understands, but just to cover it in order, M&E was already defending a related case in which Caudill Seed had sued Kean Ashurst in Kentucky state court; right?

A   So, yeah, we were defending Mr. Ashurst in the state case. It wasn't technically a related case, as you normally consider a case to be related.  Uh, it did involve allegations of -- it did involve -- the claims arose out of the same basic conduct that was complained of.

Q   And M&E's representation of Jarrow Formulas in the federal court case filed in Kentucky by Caudill Seed began in January 2013; correct?

A   Yes.

Q   And when McCarter & English issued its first bill to Jarrow Formulas in the Caudill federal case in Kentucky, it was billing both the Caudill cases, the one against Mr. Ashurst and the one against Jarrow Formulas, under the same matter; correct?

A   In January and February of that year, correct.

Q   And those two cases involved the very same trade secrets;
correct?

A   Well, at that time the --

        THE COURT:  It's a yes-or-no question.

        THE WITNESS:  That's not correct.

        MR. RESSER:  Withdrawn.

Q   (By Mr. Resser) Ultimately it was determined that those two
cases involved the very same trade secrets.

A   There was no determination to that effect.  It evolved
different than what you're describing.

Q   But I thought you told the jury yesterday that the trade
secrets that Mr. Ashurst was accused of taking in the case
filed against him were also trade secrets that were the subject
of the federal case brought against Jarrow Formulas; correct?

A   Yeah, over a year later, yes.

        MR. RESSER:  I would like to mark and offer Exhibit
530, Defendant's Exhibit 530, and have that published to the
jury with no objection.

        THE COURT:  Okay.  Exhibit 530 can be a full exhibit.
It can be published.

    (Defendant's Exhibit 530, received in evidence.)

Q   (By Mr. Resser) Now, the Ashurst -- on that first line
under "Matter Number," Matter No. 427 is listed as Caudill Seed
slash Kean Ashurst.  And by listing it that way, you're
indicating that it is both the Ashurst and the federal court

litigation; is that right?

A    No.

Q    So that description was the original description for the Ashurst litigation?

A    Uh, I believe so.  Um, this is a shorthand on a bill.  I'm not sure it's completely the same as what our matter is in our matter system.  But what this indicates to me is it's referring to the lawsuit of Caudill Seed versus Kean Ashurst, which is the Ashurst litigation.

Q    Is it fair to say that these two cases were closely related?

A    We just covered that, I believe.  Um, they weren't related in the technical sense, but they were related to the extent that they both arose out of the same conduct between Mr. Ashurst and Jarrow Formulas.

Q    So doesn't that mean they were closely related?

A    They were related in that sense.

Q    The hourly rate you were charging Jarrow Formulas in January 2013 on both cases is reflected in Exhibit 530; correct?

A    Is this Exhibit 530 in front of me?

Q    Yes.

A    Thank you.  I believe it is.

Q    If we can go to page 12 of that bill.

        Your rate at that time was $405 an hour that was

billed for the January services in the Kentucky litigation; correct?

A    Correct.

Q    And $405 an hour, that's the unit price for an hour of your time; right?

A    On this particular bill at this particular time.

Q    And while you told us that you always had the same fee arrangement with Jarrow Formulas at all of your firms, you didn't always charge the same unit price, the same hourly rate, for an hour of your time throughout those 23 years, did you?

A    Periodically the rates would increase, that's correct.

Q    And $405 an hour, that's the billing rate that Judge Shea applied in the partial summary judgment that you just testified earlier in the amount of $980,000?

A    I believe it is.

Q    Likewise, Exhibit 530 shows the hourly billing rate M&E was charging Jarrow Formulas for Mr. Grondahl's time in 2013; correct?

A    Yes, correct.

Q    And so the initial rate charged for Mr. Grondahl's time in the Kentucky federal court case was 395 an hour; correct?

A    As reflected on this bill, yes.

Q    And that 395 an hour rate for Mr. Grondahl's services, in both the federal court case against Jarrow Formulas and the state court case against Kean Ashurst, that's the same rate;

correct?  Same rate was charged in both cases at that time.

A    Yeah, because they were both on this bill.

Q    And Exhibit 530 also shows the initial rates charged by M&E for three other timekeepers:  Shawn Smith, Abraham Robinson, and Alison Gaffey; correct?

A    Yes.

Q    So Ms. Gaffey's initial hourly rate was 195 an hour; is that right?

A    Yes.

Q    During your representation of Jarrow Formulas in 2013, M&E increased the hourly rates it was charging to Jarrow Formulas; correct?

A    I'm sorry.  Could you repeat that?

Q    During your representation of Jarrow Formulas in 2013, M&E increased the hourly rates it was charging to Jarrow Formulas; correct?

A    For some of the timekeepers but not all.

Q    And you charged Jarrow Formulas that increased rate after July of 2013 and reissued bills at the higher rates; right?

A    For some of the timekeepers, not all, that's correct. That's what I testified to.

Q    And some of those timekeepers included you and Mr. Grondahl; right?

A    That -- those were the two timekeepers that were changed, if I recall correctly, no others.

Q    And you and Mr. Grondahl were the two lawyers who spent the most time in the six years of that Kentucky case; correct?

A    I've never tallied up the hours, but we were both very actively involved that, you know, to the extent -- I can say that.  I can say we were both actively involved from start to finish.

          MR. RESSER:  I would offer and request to publish PTX 118.

          THE COURT:  Any objection to 118?

          MR. PEPE:  No objection, Your Honor.

          THE COURT:  All right.  118 will be full.  You can publish.

     (Plaintiff's Exhibit 118, received in evidence.)

Q    (By Mr. Resser) Mr. Giarratana, have you seen PTX 118 before today?

A    Yeah, I have seen this before, yes.

Q    This is a document created by McCarter & English, isn't it?

A    It's a -- it's a document I believe that was generated from our database that I've referred to previously.

Q    And that database is called Elite Billing software?

A    Um, I believe in part.  I believe the interface may be Elite, but there's other databases in there.  You know how software can get complicated.

Q    All right.  Now, in the summary information, the last four columns of Exhibit PTX 118 --

A   Yes.

Q   -- it shows hours, a summary of all the hours in column J. Do you see that?

A   Yes.

Q   And this -- this document shows all of the hours billed to the client throughout the Kentucky case; correct?

A   Can you -- can you just give me a minute to look at it, if you don't mind, sir?

Q   Take your time, sir.

A   There's a lot here. Yeah, I don't have the whole document, so it's a little bit difficult for me. But I believe the first column under "Summary Information" indicates the total hours that particular timekeeper billed to the Kentucky federal litigation over the life of the case.

Q   Would it help you, sir, if I handed you a hard copy of it and so you --

A   If you don't mind, that would be great.

     MR. RESSER: Your Honor, may I approach?

     THE COURT: You may.

     THE WITNESS: Thank you. Now I should have brought my reading glasses, but I think I can do it. Next break I'll make sure to get them.

     Okay. Thank you.

Q   (By Mr. Resser) Now, on the -- have you had sufficient time to familiarize yourself with it? Is there anything that you

didn't see on the document that, before I handed it to you, that would change any of the answers you gave me to my earlier questions?

A    I believe you asked me whether this shows the total hours, and it does.

Q    So on -- in looking at PTX 118, it shows your total hours billed on the Caudill Kentucky federal court litigation in column J, and that number is 3,364 hour -- 0.06 hours.  Do I have that right?

A    Yes.

Q    And for Mr. Grondahl it shows 4,537 hours 0.39.  Do I have that right?

A    Yes.

Q    And there are no other timekeepers at McCarter & English who had more time than you and Mr. Grondahl.  Isn't that right?

A    Yeah, there are no -- there are no -- those are the two highest total number of hours on this sheet.

MR. RESSER:  Mr. Campos, if you could scroll down to where it shows Mr. Rechen.

Q    (By Mr. Resser) Mr. Rechen I believe is the next in order of the most hours on the case at 2,504.28.  Do I have that right?

A    That number is correct.  Whether he's the third highest, I'm just taking a quick look.

And I believe that is accurate.

Q    And your time and Mr. Grondahl's time was the most time on the case far and away, more than any other person at McCarter & English; correct?

A    It was the most time.  I don't -- I don't know what you mean by "far and away."

Q    And Jarrow Formulas paid McCarter & English at the higher rates on 70 bills and invoices from 2013 to 2019; correct?

A    When you say the "higher rates" --

Q    The higher rates that went up, the 535 for you and 485 for Mr. Grondahl.

A    Back in 2013.

Q    Right.

A    Yes, it did.  It paid 70 bills at that rate over the life of the litigation.  I believe 70.

Q    That change in your rate, from 405 to 535, was not communicated to Jarrow Formulas in writing before the fees were actually billed at the higher rate; correct?

A    Well, it was during the life of the litigation.  They received the bill 70 times.  It showed the rate on the bill. And then we proceeded to continue to work at that rate during the following month and the following month and the following month.  And every month during that period, it received a preceding bill that had the rate on it.

        MR. RESSER:  I move to strike that answer as nonresponsive.

THE COURT: Yeah, sir, I don't think you really answered the question. Why don't you answer the question again. Or, if you would like, I'll read it back for you.

MR. RESSER: If you would, please.

THE COURT: So the question is, "That change in your rate, from 405 to 535, was not communicated to Jarrow Formulas in writing before the fees were actually billed at the higher rate; correct?"

THE WITNESS: It wasn't communicated before the first bill, but it was before the next bills.

Q   (By Mr. Resser) And so what you claim is that you told Mr. Rogovin verbally in 2013 that M&E's hourly rate for the Caudill case was being increased; correct?

A   Yes.

Q   And you told the jury yesterday that you verbally advised Mr. Rogovin that you were increasing the billing rate for you and Mr. Grondahl. Do you have that subject in mind?

A   Yes.

Q   And you told the jury possible dates that happened; right?

A   Yes.

Q   And you said it was most likely either April 4 or April 19, 2013.

A   Yes.

Q   You gave a deposition in this case in 2020; correct?

A   Yes.

Q   And at that deposition, you weren't sure when you supposedly told Mr. Rogovin your hourly billing rates were going up.  Isn't that true?

A   That's true.

Q   And that was about three years ago you gave your deposition when you weren't sure what the dates were; correct?

A   At that point in time I wasn't, that's correct.

Q   But yesterday you were sure what the dates were; correct?

A   Well, to the best of my recollection, having gone back and corroborated or looked at the materials and refreshed my recollection.

Q   And one of the materials that you looked at to refresh your recollection was your bills, your time entries on your bills?

A   Yes.

Q   You told the jury yesterday that you noted your supposed call with Mr. Rogovin regarding increased hourly rates in your time entries for April 4 and April 19; correct?

A   Could you -- I'm sorry.  Could you read that again?

Q   You told the jury yesterday that you noted your supposed call with Mr. Rogovin regarding increased hourly rates in your time entries for April 4 and April 19; correct?

A   Yes.

          MR. RESSER:  I would like Mr. Campos to bring up PTX 15, which I believe is in evidence.  If not, we offer it.

          THE COURT:  Any objection to 15?

MR. PEPE:  No objection, Your Honor.

THE COURT:  All right.  Very well.  That can be full, published.

(Plaintiff's Exhibit 15, received in evidence.)

Q   (By Mr. Resser) Mr. Campos, if you can take us to the page on PTX 15 that shows the entry for 4/4/13.  It's point 2 entry. It says, "Conference with Mr. Rogovin re:  the status of the case, next steps, and the strategy for proceeding."

Do I have that right --

A   You do.

Q   -- Mr. Giarratana?

Is that the time entry that you refreshed your recollection from that tells you that you had a conversation with Mr. Rogovin about billing rates that day?

A   That's right.

Q   Let's take a look at the time entry on that same bill for April 19, 2013.  It's a point 6 entry.

This entry says, "Conferences with Mr. Rogovin re: the motion to dismiss slash strike, Caudill's arguments, the likely rulings, the affirmative defenses available to JFI, the further action items to address in connection with such defenses, and the strategy for proceeding."

Did I have that right?

A   That's right.

Q   And this is the other time entry that refreshed your

recollection that you had a conversation that day with Mr. Rogovin about increasing your billing rates; is that correct?

A    That's correct.

Q    There's no mention in those time entries of a communication about billing rates, is there?

A    Yeah, I won't expect it to be there.  We don't bill for billing.

          MR. RESSER:  I'll move to strike everything after the answer "yeah."

          THE COURT:  Well, I'll allow it.  I got your point, Mr. Resser.  Keep going.

Q    (By Mr. Resser) It wouldn't have been hard to add the entry "And increased billing rates," would it?

A    It wouldn't have been hard, but I wouldn't have done it.

Q    You billed Jarrow Formulas for those conversations; correct?

A    I billed Jarrow Formulas for the conversations to the extent they related to the legal services.  To the extent we discussed billing, I did not bill Jarrow Formulas for that time, nor -- I would not do that.

Q    You also mentioned yesterday that March 21 may have been a date that you discussed increased hourly rates with Mr. Rogovin; correct?

A    I'm not sure I testified to that.  I know on March 21 I had a conversation with him and we discussed the insurance.  I'm

not sure I said that was the date that we had the conversation. I just -- I don't recall that specifically right now.

Q   Well, let's take a look at PTX 14, which is in evidence, I believe.  If not, we offer it.

THE COURT:  Any objection to 14?

MR. PEPE:  No objection, Your Honor.

THE COURT:  Okay.  That will be full.  It can be published.

(Plaintiff's Exhibit 14, received in evidence.)

Q   (By Mr. Resser) Let's take a look at the 3/21/13 entry on that bill.

This is the entry regarding your conference with Mr. Rogovin on that date; correct, sir?

A   It is.

Q   It says, "Conference with Mr. Rogovin re:  issues in case, counts in the amended complaint, deficiencies in the amended complaint, strategy for preparing motion to dismiss, and strategy for proceeding"; correct?

A   Yes.

Q   And you're saying that that doesn't remind you of a specific conversation you had with Mr. Rogovin about billing; correct?

A   I believe -- my recollection is that the conversation was more likely during one of the April phone calls rather than this phone call.  This day on the 21st was the date that I

first received the letter from the insurance company.

Q   And you're still not sure of the exact date then; right?

A   I believe it was either the 14th or the 19th of April -- or the 4th or the 19th.  I apologize.  But it's fair.  I don't recall the exact date.  I distinctly recall the conversation. I don't recall the exact date.

Q   Now, in your entries about conversations with Mr. Rogovin, you use the term "conference"; correct?

A   I do.

Q   And you use that term whether it's an in-person conversation or a telephone conversation; correct?

A   Um, I believe -- I believe that is correct in certain circumstances.  Sometimes I would say "meeting with Mr. Rogovin."  But I may have also described a personal meeting as a conference.

Q   A conference in this -- in these three instances that we've gone through were phone conferences though; correct?

A   Yes.

Q   And there's no way of -- well, withdrawn.

        There are dozens, if not hundreds, of calls with Mr. Rogovin during the six years of the Kentucky case; right?

A   I believe that's fair.

Q   And when you had a phone conversation with Mr. Rogovin about the Kentucky case, you would refer to it in your billing records as a conference with Mr. Rogovin as we've seen on these

three instances; correct?

A   Every time entry is unique.  But generally if I spoke to Mr. Rogovin on the phone, generally I would describe it as a conference concerning whatever we discussed or whatever -- you know, whatever the services were that were performed.

Q   And the communications you say you had with Mr. Rogovin on the phone about increased rates, those communications were not in writing; correct?

A   Correct.

Q   It isn't hard to confirm a conversation you had about the hourly billing rates, is it, in writing?

A   I don't believe so.

Q   If you had confirmed any of those conversations in writing, we would have that evidence today, aside from your memory alone; correct?

A   Presumably so.

Q   Had you confirmed that conversation about a billing rate increase in writing, we would know today the exact date of that supposed conversation; right?

A   It would all depend on the evidence, but presumably so.

Q   But you didn't do that, did you?

A   I think I answered, yeah, I did not record that conversation in writing.

Q   And had you added on your billing entries, and increased billing rates as one of the subjects of your conversation with

Mr. Rogovin, that would have been a simple way to document in writing that those conversations took place on those days; right?

A   It would not have been.  It's not -- that would not have been a simple resolution.  We don't bill clients for billing.  We don't bill clients for discussions about billing.  And so, no, it would not have been a simple solution.

Q   You reflect on your bills, though, time that you spend and not charged -- correct? -- as no charged time.

A   Very, very rarely.

Q   And in one of those rare situations you could have put on the bill "and increased billing rates, no charge"; correct?

A   It's not a simple matter at all.

Q   Now I want to go to the subject of reissuing the bills for January through June 2013.  Do you have that subject in mind?

A   I do.

Q   You never informed Jarrow Formulas in writing that it withdrew bills sent earlier in 2013 and reissued them at higher rates in the federal case; correct?

A   We sent them in writing the reissued bills.  We did not -- I don't recall there being a communication in advance of doing that in writing.

MR. RESSER:  Mr. Campos, can you bring up demonstrative page 122 that we just saw Mr. Pepe show Mr. Giarratana earlier this morning?

Q    (By Mr. Resser) Now, directing you to PTX 017, the reference to PTX 017, that's the invoice dated 7/11/13.

MR. RESSER:  Mr. Campos, can you highlight that for us, the line item PTX 017?

Thank you.

Q    (By Mr. Resser) Now, that's a reference to the rebilled bill issued to Jarrow Formulas on July 11th, 2013; correct?

A    Yeah.  That was the last one that went out.  I think I testified to that yesterday.

Q    And yesterday you were saying some got out before the July 4th holiday and some got out after.  And this is one that got out after.

A    Yes, yes.

Q    And in the column that says "Rogovin invoice handwritten notes," do you see where it says "rebill"?

A    Yes.

Q    Now let's put up PTX 17, please, Mr. Campos.

Sir, there's no notation from Mr. Rogovin on PTX 17 that says "rebill," is there?

A    No, it does not say "rebill" on there.

THE COURT:  I think it -- sorry.  PTX 17 is in evidence already; is that right, Mr. Resser?

MR. RESSER:  Is 17 in evidence?

THE COURT:  All right.  Did you want to offer 17?

MR. RESSER:  Yes, I'll offer 17.

MR. PEPE:  I don't think it's been offered, but there's no objection.

THE COURT:  All right.  17 will be full, just for the record.

MR. RESSER:  Thank you, Your Honor.

(Plaintiff's Exhibit 17, received in evidence.)

Q   (By Mr. Resser) So the part of Demonstrative 122 that showed that Mr. Rogovin had made a notation on this July bill "rebill," that doesn't show up anywhere on Exhibit 017, does it?

A   Could -- could you say that again?  I'm sorry.  I just didn't understand the question.  I apologize.

THE COURT:  I'll say it.  "So the part of Demonstrative 122 that showed that Mr. Rogovin had made a notation on this July bill 'rebill,' that doesn't show up anywhere on Exhibit 17, does it?"

THE WITNESS:  Oh.  Well, I don't believe that Exhibit 17 is indicating that he made that notation, "rebill."  This -- it's just indicating that that was a rebill.

Q   (By Mr. Resser) Well, let's go back to the demonstrative.  The demonstrative is in the column "Rogovin invoice handwritten note," and it says the word "rebill"; right?

A   Yeah.  I -- I --

Q   That's a yes-or-no question, sir.

A   Yes, it does say "rebill."

Q    And that column is intended to show what Mr. Rogovin wrote on the bills; correct?

A    Well, it's intended to reproduce his handwritten notes; and where it does, it puts them in quotes.  It does not put the word "rebill" in quotes, and I don't think it's intended to indicate that he wrote "rebill" on there because it's not in quotes.  If we look down further, we can see it says "reissued invoice" there on line PTX 028.  And it has what he wrote in quotes, but it's preceded by language not in quotes.

Q    Okay.  So maybe the heading on this demonstrative should have said "Rogovin invoice handwritten notes if shown in quotes."

A    I don't think that was necessary.  I think it's fairly obvious reading it that it's understood the way I just described it.

Q    All right, Mr. Campos, you can take that down.

      I just want to make sure so we're clear that the bill itself didn't say "rebill" on it either from Mr. Rogovin or anyone else; correct?

A    I didn't see it on that bill.

Q    And there's no document in existence that shows that McCarter & English informed Jarrow Formulas that it was rebilling the time that had already been billed in the Caudill case with that July 11 bill; correct?

A    I'm not sure if that's fair.

Q   Well, is there or isn't there a document that informs Jarrow Formulas:  Hey, we sent you this bill back in April. We're rebilling it now in July because we made an error in the billing rates.

Correct?

A   There's not a communication that says that.

Q   And, again, when you were originally billed for your time in the Caudill federal court case at the beginning of January, you billed Jarrow Formulas $405 an hour; correct?  That's Exhibit 530.

A   Those were the rates on that bill, yes.

Q   Then in June you sent out bills for your January time in the Caudill case applying the different hourly rate for your time; correct?

A   Well, no, not correct.

MR. RESSER:  Your Honor, I would like to play for the jury from Mr. Giarratana's deposition page 165, line 23, through page 167, line 14.

THE COURT:  Let's let counsel just take a look at it for a second.

Ladies and Gentlemen, just so you know, I know it's 10:30, but we're actually going to take our break at 10:45 this morning.  So we'll get our 15-minute break, but we'll do it at 10:45.

If you could just read off the lines again, Mr.

Resser, please.

MR. GREEN:  Your Honor, could we have the page?

THE COURT:  Just one more time.

MR. RESSER:  Page 165, line 23, to page 167, line 14.

THE COURT:  All right.  Let's go ahead.

(Plays video.)

Q   (By Mr. Resser) PTX 17, which we looked at earlier, that had the revised hourly rate on page 13; correct?

A   That's correct.

Q   And your testimony is that you sent out the January, February, March, and April bills at the wrong rate and then discovered in June that there was an error?

A   No.  You're restating my testimony, sir.  I didn't say I sent out January and February at the wrong rate.  If you listen to my deposition, we sent out March, April, and May at the incorrect rates, and we reissued those bills.  That's what I -- that's what I, I believe, clearly explained in my deposition.

Q   So the March bill that you sent out at the wrong rate, you reviewed that bill with the same process that you've described to this jury where you spend a day or two over the weekend after the pro forma, or the draft bill comes out, you review it, you look for fairness, you make any corrections for fairness, and then you approve the bill and it goes out to the client; right?

A   Yeah.  That one bill's not a whole day, but that's one of

many bills I review as part of that process.

Q   And as part of you reviewing your own bills, you missed the fact that your rate was supposedly an error on that bill; correct?

A   Yes.

Q   And the same thing happened for the April bill, which you reviewed in May; correct?

A   Yes.

Q   And you reviewed that bill.  You spent more than an hour, more than two hours reviewing that bill?

A   I don't recall.

Q   And you went through that bill, and you didn't notice that the rate was in error on that bill.  Isn't that correct?

A   That's correct.

Q   And then for the May bill that you went through in June, you went through that and you approved that bill again at the 405-an-hour rate for you and the 395-an-hour rate for Mr. Grondahl; correct?

A   I approved that bill, yes.

Q   And you didn't catch the error on that bill either at that point.

A   I didn't catch it until June.

Q   And that -- and when you reissued the March bill in July, PTX 17, that had your time at 535 an hour instead of 405 an hour; correct?

A    The July bill had 535.  That was the agreed rate, yes.

          MR. RESSER:  Move to strike.  I was just asking about the rate, not any agreement.

          THE COURT:  Well, I'm going to let it stand.  Go ahead.

Q    (By Mr. Resser) That increase from 405 an hour to 535 an hour, that increased your hourly rate more than 30 percent, sir, didn't it?

A    It increased the hourly rate I was charging Jarrow Formulas by that amount, yes.

Q    And then you billed Jarrow Formulas at 535 an hour for your time going back to January 2013 and throughout the representation of Mr. Jarrow Formulas in the Kentucky case through 2019; correct?

A    Incorrect.  I didn't bill --

Q    You didn't rebill January and February?

A    That's correct.

Q    But you did rebill March, April, and May at the higher rates; correct?

A    At the -- at the 535 agreed rate, yes.

Q    In addition, Mr. Grondahl was originally billed at the rate of 395 an hour in January 2013 in the Ashurst case.

A    I don't have it in front of me, but that sounds fair.

Q    You want to see Exhibit 530 again?  We'll put that up.

A    It's up to you.

Q    Mr. Campos, can we see Exhibit 530 again then?

On page I believe it's all the way in to page 12.  So your rate was 405.  Mr. Grondahl's rate was 395 on that bill; correct?

A    Correct.

Q    And, again, those are the rates that Judge Shea applied in awarding a partial judgment in this case; correct?

A    I believe I answered that, yes.

Q    Now, the change of Mr. Grondahl's rate from 395 an hour to 485 an hour, that's $90 an hour; correct?

A    That sounds fair.

Q    And that amounts to an increase of over 22 percent for Mr. Grondahl's time.

A    Yes.

Q    And you then billed at Mr. Grondahl's rate from March 2013 all the way until the last bill for the time incurred in July of 2019; correct?

A    Yeah.  Well, you say "until."  We -- just to be clear, it was until the end of the litigation, six years later.

Q    Yup.

A    Yeah.

Q    Now, for Mr. Rechen, M&E billed him at $405 an hour in 2013; correct?

A    That's correct.

Q    And that rate did not change until much later.  Isn't that

right?

A    That's correct.

Q    When you first testified, when Mr. Pepe was asking you about your policy not to raise the rates for any of the lawyers from the beginning to the end -- for any of the partners from the beginning to the end of the litigation, do you have that subject in mind?

A    I do.

Q    And Mr. Rechen's rate was $405 an hour in 2013; correct?

A    For Jarrow Formulas.

Q    For Jarrow Formulas.

A    Jarrow Formulas.  It was not his rate.  That was much lower than his rate.

Q    I'm sorry.  My question wasn't clear.

In the Caudill case, Mr. Rechen's rate was $405 an hour in 2013; correct?

A    That's correct.

Q    And in the Caudill federal court case, Mr. Rechen's rate was $405 an hour in 2014; correct?

A    Yes.

Q    And through part of 2016, his rate was $405 an hour; correct?

A    One month.

Q    And when you first told Mr. Pepe that you didn't raise the rates of any partners for the entire case, that wasn't true;

correct?

A   Well, that's not fair.  We increased Mr. Rechen in January or February of 2016 because we discovered that he was being billed at his rate from 2008.

Q   Right.

A   He was handling -- if you'd like me to explain, I will.  If not --

Q   No, go ahead.

A   Okay.  He was handling another matter for Jarrow Formulas at the time.  There was a lawsuit where Kean Ashurst, which I didn't explain to the jury yesterday, there was a lawsuit where Kean Ashurst had sued Caudill Seed on an employment basis.

Q   And that was a new case.

A   Well, it was -- it was a case that, um, I don't know when it was filed.  It was after the -- after the state case brought against Kean Ashurst.  Mr. Rechen's rate in that case -- anyway, I asked him in January -- in February of -- either January or February of 2016 to review the bill in that matter because it was -- he was handling it.

        And he discovered, in looking at it, that his rate was set was from 2008.  It was a huge discount.  Okay?  His rate at that time was over 535.  Um, and so at that point we said, "Oh, geez, we missed it.  We've got to fix that."

        We set his rate, um, at a similar discount that we were giving Jarrow Formulas for Attorney Grondahl and me.  So

by that time in 2016, Jarrow Formulas was receiving a discount on my rate and Attorney Grondahl's rate. We set Attorney Rechen's rate in between Attorney Grondahl and me so he had a similar discount off his standard rate for Jarrow Formulas.

The best I can recall in March, immediately following that bill, we had numerous discussions with Mr. Rogovin. We were conducting a settlement mediation down in Louisville. We had numerous discussions leading up to that settlement mediation, and we had spent two or three days with him in Louisville, lunch, dinner, numerous discussions.

My recollection --

Q   Sir, I only asked you about what you had told the jury about Mr. Rechen's rate, and I think when you were first asked by Mr. Pepe, you said, No rates of any partners were charged throughout the Caudill federal court case.

Then when Mr. Pepe put up the demonstrative that showed that Mr. Rechen's rate had gone up in 2016, you corrected that testimony; right?

A   I was answering your question where I said -- would you like me to explain?

THE COURT:  No, no, no.  Stop.  There's a new question now.

THE WITNESS:  The question was, did I correct my testimony?

THE COURT:  "Then when Mr. Pepe put up the

demonstrative that showed that Mr. Rechen's rate had gone up in 2016, you corrected that testimony; right?"  That's the question.

THE WITNESS:  Yesterday?

Q   (By Mr. Resser) Yes.

A   Yesterday I corrected my testimony?  I'm sorry.  I just don't understand the question.  I apologize.

THE COURT:  We're going to take this up after the break.

Ladies and Gentlemen, we've reached the morning break. Thank you for your attention this morning.  Don't discuss the case.  Don't let anyone discuss it with you.  If you would be so kind as to go to the jury room now.

(The jury left the courtroom at 10:46 a.m.)

THE COURT:  Okay.  Anything before we recess?  All right.  Thank you.  We'll be in recess.

(Recess from 10:46 a.m. to 10:59 a.m.)

MR. PEPE:  I have a question before the jury comes in --

THE COURT:  Sure.

MR. PEPE:  -- if I might.

THE COURT:  Yes.

MR. PEPE:  During the cross-examination of Mr. Giarratana, there was a question and answer about the rate that was applied in the amount of the breach of contract damages

already awarded by the Court.  And the question was:  The Court applied the lower rate 405.

And the inference could be drawn from that that that's the correct rate, that's the right rate, that's the binding rate.  But, of course, that was -- the Court's decision was based on the fact there was a material issue of fact on whether there was an agreement.  And that's as far as the Court, as I understood the opinion, could go.  And so I wonder if a very short limiting instruction would be appropriate on that issue.

THE COURT:  Well, I think I'm going to cover it in my final instructions in any event.  You're free to point out that I also said in my preliminary instructions, although it would be best if we didn't argue too much about instructions, that I said that was a question for them to decide and I had decided that was a question for them to decide.  So I'm not going to cover it now.

(The jury entered the courtroom at 11:00 a.m.)

THE COURT:  And, Mr. Resser, whenever you're ready to continue, you may do so.

MR. RESSER:  Thank you, Your Honor.

Jarrow Formulas offers trial Exhibit PTX 50 and ask that be published.

THE COURT:  Any objection?

MR. PEPE:  No objection, Your Honor.

THE COURT:  50 will be full.  It can be published.

(Plaintiff's Exhibit 50, received in evidence.)

Q   (By Mr. Resser) Mr. Giarratana, this is the invoice for January 2016 time issued on February 29, 2016; correct?

A   It's the invoice issued on February 29, 2016.  I'm not sure what time, however.

MR. RESSER:  Mr. Campos, if you can scroll down to the next pages?

THE WITNESS:  This is for February.

Q   (By Mr. Resser) I stand corrected.  February time. Normally the bill for the prior month would come out -- the bill for January would come out in February.  A bill for February would come out in March.  But since I guess there was an extra day in February that year, you got the bill out in February for your February time?

A   I don't recall, but it could be that, yeah.

MR. RESSER:  Mr. Campos, if you could go to the page for the billing rates.  I think it's several pages into the bill, page 4, correct.

Q   (By Mr. Resser) At the bottom there it shows Mr. Rechen's hourly rate now at 520 an hour; correct?

A   That's correct.

Q   And this is the first bill sent to Jarrow Formulas in the Kentucky case, Kentucky federal court case, where Mr. Rechen's time was increased, the hourly rate for Mr. Rechen's time was increased from $405 an hour to $520 an hour; correct?

A    I believe that's correct.

Q    And that increase of $115 an hour, that amounts to an over 28-percent increase in his hourly rate as charged to Jarrow Formulas in the Kentucky case; correct?

A    I believe that's fair.

Q    Now, M&E continued to defend -- withdrawn.

M&E continued to represent Mr. Ashurst through 2016; is that correct?

A    So the reason why I'm hesitating is there were -- I've mentioned two cases. Okay? There was the Ashurst state court litigation, where Caudill Seed had sued Mr. Ashurst, and then there was the Ashurst lawsuit against Caudill Seed, which evolved into a mediation, which Mr. Rechen was handling. And that case did extend into 2016, the latter case.

Q    So that was a new case that was started after 2013 for Mr. Ashurst.

A    I don't recall exactly when it was started, but I believe you are correct.

MR. RESSER:  We would like to offer Exhibit 529. There was an objection reserved by Your Honor.

THE COURT:  Can I -- I'm going to need to see the exhibit.  I don't have them all with me.

MR. RESSER:  Until we get it --

THE COURT:  Yeah, you want to cover something else?

MR. RESSER:  It's one of the bills in the Ashurst

matter in 2016.

May I approach, Your Honor?

THE COURT:  You may, please.  Just hand it up.  You can just give it to me.

This is Defendant's 529; is that right?

MR. RESSER:  Yes, Your Honor.

THE COURT:  Hold on one second, please.

Why don't you lay some foundation with the witness. Do you -- do you want me to give my hard copy to the witness so you can lay a little bit of foundation?  Because I'm looking at it.  I'm not quite sure what it is yet, other than it appears to be a bill.

I can give him mine if you'd like, Mr. Resser.

MR. RESSER:  I'm having trouble finding my copy.

THE COURT:  I'm going to give Mr. Giarratana my copy. Just lay some foundation.  Then we can decide.

I take it McCarter maintains its objection to the exhibit at this time?

MR. PEPE:  For the reasons stated, Your Honor.

MR. RESSER:  You know what?  I'll wait on this one, Your Honor, because my copy is in the work room.

THE COURT:  Okay.  That's fine.  You can hang on to it.

MR. RESSER:  My apologies to everyone on that.

Q   (By Mr. Resser) Now, before sending PTX 50, the bill with

Mr. Rechen's higher rate going up from 405 to 520, there was no rate change notification sent in writing to Jarrow Formulas on that rate change, was there?

A    I believe that's correct.

Q    And there were -- there wasn't a rate change notification sent to Jarrow Formulas in writing for any of the hourly rate increases throughout the Kentucky litigation.  Isn't that right?

A    Other than the preceding month's bill?  No.  In writing.

Q    So you're claiming that the written rate change notification came in the bills themselves; correct?

A    Yes.

Q    And those are the same bills that the first three months, March, April, May, that you reviewed and didn't find the error yourself; correct?

A    Well, I did find error in those bills.  I caught the error in June.

Q    You didn't find the error in April, you didn't find the error in May, and you didn't find the error in June until after the May bill went out; right?

A    Correct.  That error.

Q    Now, let's take a look at the bills that supposedly provided this notification to Jarrow Formulas.  For example, Mr. Pepe showed you yesterday PTX 084.  Do you have 084 ready?

         THE COURT:  So this is in already, I take it.

MR. RESSER:  This is in already.

THE COURT:  Thank you.

Q   (By Mr. Resser) Now, on the first page of Exhibit 084, it has the total fees and total disbursements, but nowhere on the first page of the bill does it show the billing rates; correct?

A   That's correct.

Q   Now, let's turn to the next page.  Now, these are the time entries for February 1.  There's one very lengthy one that's almost two-thirds of the page, something like that.  And then there's another, a second one, and then the beginning of a third entry.

And on those entries it gives the attorney number and initials.  And in the second to last column, and in the far right column, it gives the total number of hours billed on the services described in the description; correct?

A   Yeah.  In that respective description, yes.

Q   And nowhere in this section of the bill where all the descriptions are can anyone see what the hourly billing rate applied to those hours is; correct?

A   Yeah, not on this page.

Q   Now, on the Elite software, you could have the dollar value of those 9.3 hours reflected right there on the description, can't you?

A   I don't know.  Maybe.

Q   But that's not shown anywhere in the description section of

the bill, the amount -- the value of those hours; correct?

A    Well, on the page where we --

Q    I'm just asking about these descriptions.

A    It's not on this page.

MR. RESSER:  Mr. Campos, if you could then page through the bill one by one for the rest of the descriptions.

Q    (By Mr. Resser) That's true of all these descriptions. There's no dollar value assigned to the time in this portion of the bill; correct?

A    Yeah, that's right.  There's only a column -- there's no column for that here.

Q    Now if we can go to -- I think we have to go to page thirty -- all the way down to 31.  And that's -- and then 32, if you can bring up 32.

So 32 is where the end of the descriptions occur and then the total hours are totaled up after that last description; correct?  Near the top.  There we are.

A    Yeah, on the same page -- on the same page you have the last description.  You have the totals, the total dollar values.  And then below that, you have, you know --

Q    The total fees and the total disbursements and the bill total.

A    Yeah.

Q    And that's the same information, the total fees, total disbursements, and total invoice, that's the same information

that's on the front of the bill; right?

A    I believe it is, yeah.

Q    And then and only then on page 32 you have the billing rates; right?  The actual billing rates applied.

A    Yeah, these are the billing rates.  These show -- well, it shows the -- it shows the code.  It shows the attorney, the title, the hours, and the rate so that they can correspond to what's shown above, so they can interpret -- so they can understand that the code for the attorney up above, for example, where it shows up above EEG 3056, this shows that that's Eric Grondahl.  It shows the number of hours Eric Grondahl billed, and it shows his hourly rate and the value at that hourly rate.

Q    So it's not until this bill, it's not till page 32 of the bill there's a list of timekeepers, lawyers and paralegals with their hourly rates; correct?

A    Yeah.  There's a very long bill.  There was a lot of work that month.

Q    And in this section of the bill, there was never an indication on any of the bills sent to Jarrow Formulas about a rate increase from the rates that were charged in January of 2013; correct?

A    Yeah, this bill is 2019, so that's right.  There's no reference to a change in 2013.

Q    And there's no --

A    Seventy odd some bills later.

Q    And there's no reference to any of the bills sent in 2013 that show that there was a rate change on the bill.

A    Well, it shows the new rate.

Q    It shows the new rate.

A    That's right.

Q    We agree on that.

A    Yeah.

Q    But it doesn't show new rate.  Remember, this is a new rate.  The old rate was X; the new rate is Y.  Nothing like that.

A    It didn't say that.

Q    Now, the bills that were first changed to the higher hourly rate, that happened only after Liberty Underwriters asked you for your rates and the bills in the Caudill federal court case; correct?  In terms of the timing.

A    The timing was after the request received from Liberty, yeah.

Q    And at first you sent Liberty Underwriters a list of rates, and those rates were higher than those you were charging Jarrow Formulas at the time in the Kentucky case, both the Ashurst and the Caudill federal court case; correct?

A    Yeah.  They were our standard rates.

Q    And those rates were also higher than the rates originally charged on invoices to Jarrow Formulas in the Caudill federal

court case; correct?

A    Yes.

Q    Let's take a look again at PTX 107, which is in evidence, please.  Mr. Campos.

Now, this is your communication with Liberty Underwriters of the billing rates you planned to charge Caudill in the -- withdrawn.

This is the communication with Liberty Underwriters of the billing rates you planned to charge in the Caudill federal case in Kentucky; correct?

A    Among other information, yes.

Q    And that shows your rate at 535, not 405; correct?

A    Correct.

Q    And it shows Mr. Grondahl's rate at 485, not 395; correct?

A    Correct.  Excuse me, correct.

Q    And that was sent to Liberty Underwriters Company; correct?

A    Yeah, it was sent to Liberty.  I don't recall the exact name.  But it's Liberty.

Q    PTX 107 was never sent to Jarrow Formulas, Mr. Giarratana, was it?

A    I don't believe so.

Q    Now, you also sent Liberty Underwriters invoices for January through June of 2013 in the Caudill federal case; correct?

A    Correct.

MR. RESSER:  Your Honor, we'd like to offer Exhibit 636, to which I believe there's no objection.

THE COURT:  Okay.  Defendant's --

MR. RESSER:  And publish that to the jury, please.

THE COURT:  Okay.  Wait one second.  I haven't admitted yet.

MR. PEPE:  No objection.

THE COURT:  Okay.  636 is full.  It can be published.

(Defendant's Exhibit 636, received in evidence.)

Q   (By Mr. Resser) Now, the first page of Exhibit 636 is a -- it's an e-mail, but it looks very formal, almost looks like a letter.  And you're writing to Matthew Abreu, who's with Liberty; correct?

A   Yes.

Q   And let's go down a little bit more, Mr. Campos, to the e-mail Mr. Giarratana -- I'm sorry, doesn't have that here.

So in the first line of the e-mail, you write to Mr. Abreu, "I am writing to follow-up on your request for information concerning the fees to date and an estimated budget in connection with the above-referenced matter."

Do I have that right?

A   Yes.

Q   And the "above-referenced matter" is Caudill Seed versus Jarrow Formulas.  So we know that's the federal Kentucky case; correct?

A    Yes.

Q    Then, after that, in the second paragraph you wrote, "Attached please find copies of the below-mentioned invoices issued to Jarrow Formulas, Inc., in connection with this matter."

Do you see that?

A    Yes.

Q    And then behind that, if we can page down behind that to the bills that you sent, these are the redacted bills that Mr. Pepe took you through yesterday where anything to do with the Ashurst Kentucky case was redacted, the hours were adjusted in terms of the total hours, and that was done because they were just asking for the Kentucky federal case; correct?

A    Fair.

Q    So if we can page down now to each page of that bill.

Now, on page 12 of that bill, this shows the hourly rates from page 12 of that initial bill that was sent in both the Ashurst and the federal court case; correct?

A    I'm sorry.  Could you say that again?

Q    Page 12 of the bill shows the rates that were reflected for the January time, January 2013 time, in both the Ashurst and Caudill cases; correct?

A    Those are the -- those are the agreed rates with the insurance company.

Q    Right.

A   For the -- applied to the time that was billed in those months.

Q   But this was not the bills issued to Jarrow Formulas in January of 2013.  This bill that's been redacted, which is the bill that was issued to Jarrow Formulas, has been changed in that the billing rate for you and Mr. Giarratana has been changed from 405 to 535 for you and to 485 from 395 for Mr. Grondahl; correct?

A   It's been changed to reflect the agreed rates, yes.

Q   So this is not a copy of the bill issued to Jarrow Formulas, is it?

A   Well, it's -- it's -- it's evident that it's a changed -- it's a changed copy.  It's got a lot of changes on it.

Q   And the changes to your billing rate and Mr. Grondahl's billing rate were made by Attorney Shawn Smith -- correct? -- at your request.

A   Yes.

Q   And we saw the e-mail yesterday where you instructed him to change the size of the font of those billing rates so that it would look like the other rates on the bill; correct?

A   That's correct.

Q   And you did that, Mr. Giarratana, because you didn't want to draw attention, Liberty Underwriters' attention, to the fact that the bill -- the billing rates were different from the bill actually issued to Jarrow Formulas.  Isn't that right?

A    That's one of the reasons.

Q    And, in fact, when you sent these bills to Liberty Underwriters, one of the bills had already been paid by Jarrow Formulas at the initial January 2013 rates; correct?

A    I believe so.

Q    You're not sure?

A    I believe so.

Q    So the bills that you sent to Liberty were altered to show the increased rates for you and Mr. Grondahl that M&E had agreed to with Liberty; correct?

A    That was one of the changes.

Q    But you denied during your deposition in this case that you sent altered bills to Liberty Underwriters, but the copies you sent had different rates from the bills you sent to Jarrow Formulas for January 2013 time; correct?

A    I don't recall my testimony that you're characterizing.

Q    Well, I'd like to play for the jury Mr. Giarratana's deposition, page 183, line 2, to page 183, line 10.

        THE COURT:  All right.  You can do that.

    (Plays video.)

Q    (By Mr. Resser) Now, I want to take a look at the differences between the two bills that were sent, the ones to Jarrow Formulas and the ones to Liberty.

        MR. RESSER:  First we offer Exhibit 540A, Defendant's Exhibit 540A.

THE COURT:  All right.  There's no objection to that. It can be full.  540A is full.  And it can be published. Anything I say is full from now on, it can be published.  Okay, folks?

(Defendant's Exhibit 540A, received in evidence.)

Q   (By Mr. Resser) So this is the first bill sent.  We've already seen that as Exhibit 530, but I think this is a truncated version, if you can page through it, Mr. Campos, please.

This is page 12 of the bill.  And if you can pop out the billing rates.

These are the billing rates of the invoices issued to Jarrow Formula of the -- withdrawn.

These are the billing rates showed on the invoice issued to Jarrow Formulas in February 2013 for January 2013 time in the Kentucky federal case; correct?

A   For the work that was done in January at that time, yes.

MR. RESSER:  Mr. Campos -- well, we'll also offer Exhibit 540B.

THE COURT:  All right.  That can be full.

(Defendant's Exhibit 540B, received in evidence.)

Q   (By Mr. Resser) Now, this is page 12 from the bill, the copy of the February invoice for January time that was sent to Liberty; correct?

A   That's a copy of that page, yes, that was sent.

Q    And so this shows the change that was made to the billing rate column between the two documents that were sent.  540A was sent to Jarrow Formulas, and 540B was sent to Liberty Underwriters; correct?

A    Yes.

Q    And 540B is the one that you told Shawn Smith to change the font to make it bigger; right?

A    Yes.

Q    Let's take a look at PTX 108, which is already in evidence.

            THE COURT:  All right.

Q    (By Mr. Resser) And if we go to the second page, I think. On the second page you wrote to Mr. Smith, "I'm going to send this tomorrow morning.  But before I do, can you also change the other hourly rates on the redacted invoice so that the printing for all hourly rates on the same page look the same?"

            Do you see that?

A    Yeah, that's exactly what I described yesterday.

Q    And that's what we just talked about as making sure the fonts didn't look different; correct?

A    Yes.

Q    Now, on Exhibit 540B there's no redaction showing that that was a change to the bill issued to Jarrow Formulas, was there?

A    No, for a number of reasons.

Q    And I think you said yesterday that was because the insurance company didn't have a right to know what rates you

were charging Jarrow Formulas in January 2013; correct?

A    That's one of the reasons.

Q    But you do have -- they do have the right to know the billing rates you were going to charge them for Jarrow Formulas going forward; right?

A    Of course, because they were committing to reimburse at those agreed rates.

Q    And you didn't want to draw attention to the rate change on these bills, and that's why you asked Mr. Smith to change the font size; correct?

A    That's one of the reasons.

        MR. RESSER:  We offer Exhibit -- defendant Jarrow Formulas offers Exhibit Defendant's 540C.

        THE COURT:  Okay.  That can be full.  540C will be full.

    (Defendant's Exhibit 540C, received in evidence.)

Q    (By Mr. Resser) On page 4 of the bill -- first of all, this bill concerns a number of matters, a number of the matters that McCarter & English was billing Jarrow Formulas at the time, not just the Ashurst bill; right?

A    Yeah.  It's a group -- what we call a group bill.

Q    Now, were group bills issued to Jarrow Formulas every month?

A    My recollection is that Jarrow Formulas had two or three groups that they liked us to categorize the bills in.  They had

JLIT, which was Jarrow litigation.  This appears to be a JLIT group.

There was another group for patent and trademark matters, and there was another group for others called J -- I can't recall the exact acronyms, but there were two or three groups, I believe, that we would group the bills into depending on the general type of matter.  And these all look like litigation-type matters.

Q   And as of March of 2013, you were still billing your time on all of those matters at 405 an hour; correct?

A   I assume so.

Q   If we can scroll down to where the billing rates are shown. So here on page 19 of the bill, that's the first place on the bill that the actual hourly rates are shown; correct?

A   Yes.

Q   Page 19.

A   I don't -- I don't know if that's -- this page shows the actual hourly rates.  Whether it's the first one -- it's a group bill, so I don't know.  It probably has a number of pages in it that shows the hourly rates.

Q   Okay.  And this is the bill that you sent to Jarrow Formulas; correct?

A   Uh, presumably.

Q   This is the bill that you issued to Jarrow Formulas, to use the same term.

A    Presumably.

Q    Yeah, all right.

MR. RESSER:  We offer now Exhibit 540D.

THE COURT:  That will be full, 540D.

(Defendant's Exhibit 540D, received in evidence.)

MR. RESSER:  And, Mr. Campos, you can show the third page of that exhibit, which I think also reflects page 19 of the full bill.

Q    (By Mr. Resser) Again, this is the copy of the bill that was sent to Jarrow Formulas but altered to show the higher rates that Liberty Mutual had agreed to, 535 for you and 485 for Mr. Grondahl; correct?

A    I'm a little confused.  This looks like the same exhibit we were looking at before.  Is -- this -- I guess the reason why I say I'm confused, Mr. Resser --

Q    Okay.

A    -- you just showed me a group bill.

Q    Right.

A    I don't believe this is in what you just showed me.

Q    Right.  This is the next month, I believe.  But let's go back to the first page just so we can double-check, the first page of 540D, please, the second page.

So this is for February time, and on 540C I think it was also for February time.

Can we bring up 540C side to side?  The same pages?

Can you answer my question now?

A    Could you restate it or just say it again?

Q    540C is the bill for February time issued to Jarrow Formulas.  540D is the bill for February time that was sent to Liberty Underwriters; correct?

A    So there's no exhibit numbers on it in front of me.  The bill on the left is the page from the bill sent to Jarrow Formulas; the bill on the right with the red markings and the strikethroughs and the different hourly rates is the page of what was sent to Liberty.

Q    Isn't it true, Mr. Giarratana, that the redacted bills that you sent to Liberty were never sent to Jarrow Formulas?

A    I believe that's correct.  I don't believe we sent those redacted bills to Jarrow Formulas.

Q    And M&E never disclosed to Jarrow Formulas that it sought to have higher rates approved by Liberty than those that had already been billed for January and February.  Isn't that correct?

A    No, that's not correct, absolutely not.  We were always in communication with them about seeking reimbursement at the agreed rates.

Q    Isn't it true that M&E never disclosed to Jarrow Formula -- well, withdrawn.

I thought you said earlier that you never sent the e-mail to Jarrow Formulas that you had sent to Ms. Lin

regarding the rates that you intended to charge Liberty.

A    That's correct.  I never sent that specific e-mail, but it doesn't mean that I didn't have a number of conversations with Mr. Rogovin letting him know that we were seeking reimbursement from the insurance company.

Q    And that number of conversations were the conversations you testified about that was either the 4th or the 19th of April most likely; right?

A    That was the conversation where we discussed the agreed-upon rates.

Q    Besides not sending your communications, either of the two communications, to Liberty, the first one with your rates and the second one with the redacted bills, you never put in writing that you had sent -- put in writing to Jarrow Formulas -- that you had sent redacted bills to Liberty Underwriters; correct?  The only evidence of that is your testimony that you discussed it with Mr. Rogovin; right?

A    Yeah.  I don't -- I think, as I said, I don't recall forwarding an e-mail to Jarrow Formulas with the redacted bills.

Q    And Exhibit 636, the August 7 e-mail to Liberty Underwriters, in which you said, "Enclosed are the bills issued to Jarrow Formulas," you didn't BCC that e-mail to Jarrow Formulas either, did you?

A    No, I did not.  I just -- actually, Mr. Rogovin was just

visiting with me for a week before that. We discussed this, among other things.

Q And later Liberty Underwriters changed its position and said that it wouldn't pay those bills; right?

A Yeah, I believe that was after receiving -- after receiving the court's order on our motion to dismiss.

Q And Liberty Underwriters also said it would not pay any other bills in the Caudill federal case; correct?

A I don't recall exactly what was said, but the gist of it was -- excuse me -- that they were not going to provide a defense as previously indicated they would.

Q And then -- well, not "and then." At some point before that, M&E reissued the bills from March through June 2013 to Jarrow Formulas at the same rates that had been quoted to Liberty Insurance; correct?

A The -- just read that again. I apologize. I wasn't sure if you were including the -- I wasn't sure what bills you were including. I want to make sure I'm accurate here.

THE COURT: The question was, "At some point before that, M&E reissued the bills from March through June 2013 to Jarrow Formulas at the same rates that had been quoted to Liberty Insurance; correct?"

THE WITNESS: Yeah, we've discussed that earlier today.

Q (By Mr. Resser) And before those bills were reissued in

July, some before --

A    June and July.

Q    End of June, just before the holiday, and July, just after the holiday, only Liberty Underwriters at that point had been informed in writing of those higher hourly rates; correct?

A    In writing, yeah.

Q    And then M&E rebilled Jarrow Formulas at those new rates; correct?

A    Well, you say "and then."  In the context of your questioning, we had already billed them.

        MR. RESSER:  We'd like to offer Exhibit 526.

        THE COURT:  Hold on.  No objection, so that will be a full exhibit.  526 is full.

    (Defendant's Exhibit 526, received in evidence.)

Q    (By Mr. Resser) 526, Mr. Giarratana, that is the reissued bill; correct?

        And let me just make sure.  Is this the same as PTX 17 also?  Maybe we should use that one instead.

        MR. RESSER:  I'm sorry, Your Honor.  On the fly I'm trying to --

        THE COURT:  That's all right.

        MR. RESSER:  -- link them up.

        Can we see PTX 17?  Yes, this appears to be the same bill, okay.

        So I will withdraw the offer of 526 because we already

have 17 in evidence.

THE COURT: It's part of the record.

MR. RESSER: We'd like to offer 522, Defendant's Exhibit 522.

THE COURT: All right. There's no objection, so that will be full. 522 is full.

(Defendant's Exhibit 522, received in evidence.)

Q   (By Mr. Resser) So if we can take a look at the second page of 522 -- I'm sorry, the second page of the actual where it says page 2 on it and then also the second page of Plaintiff's PTX 17 and put them side by side.

There we go. So these two bills have identical descriptions between the two of them; correct?

A   Yeah, the two pages I'm looking --

Q   These bills are for the same --

A   I'm sorry for speaking over you.

Q   I'm sorry. You're still looking? I'll wait until you're done.

A   Yeah, I was trying to answer your question. These two pages appear to be the same. Except for -- I apologize, Mr. Resser -- except for the different invoice number.

Q   Right, okay.

A   Okay? One is --

Q   So the one on the left is the original one, and the one on the right is the reissued one; correct?

A    I'll take your word for that.

Q    Oh, based on the numbers.

A    I don't know.  The one on the left has a higher number.
I'll take your word for it.  I'm not going to dispute it.

Q    I'm confusing myself.  So let's go back to the front page
and make sure -- okay.  The reissued bill is the one on the
left.  Okay?

A    Okay.

Q    Is that right, Mr. Giarratana?  The reissued bill is the
one on the left.

A    Yeah.  That was sent out on July 11th.  The other was sent
out on April 15th, so yes.

Q    So we know that these are the same bills except for the
date -- and so far the differences are the date and the -- and
the invoice number; right?

A    Yeah.  I mean on this page, obviously this one shows it was
paid at a discount and, etc., on it, on the left.

Q    All right.

A    And it's got an entered stamp.  There are other changes on
here.

Q    Okay.  But as far as --

A    I should say differences.  I apologize to the court
reporter for speaking over you.  I just want to let -- there
are other differences.

Q    Right.

A    Thank you.

Q    Aside from -- but the portions of the bill that were prepared by McCarter & English, those are the two differences?

A    Yes.

Q    Okay.  Now if we can page down, Mr. Campos, to page 13 of both the page in the upper right-hand corner, page 13, yes.

         So those are the two -- this is the reissued bill on the left and the original bill on the right; correct?

A    Yes.

Q    And the billing rates are shown there on page 13, and the reissued bill shows the higher rates, 535 and 485 for you and Mr. Grondahl respectively.

A    Yeah.

Q    And the earlier bill shows the lower rates of 405 and 395. Do I have that right?

A    Yes.

Q    Now, there's nothing on Exhibit PTX 17 that shows that those rates, 535 and 485, are different from the rates shown on the bill that was issued in April; correct?

A    Other than that the rates are clearly different.

Q    Well, you'd have to have the two next to each other to see that they were different; right?

A    Maybe.

Q    And, again, there was nothing sent to Jarrow Formulas in writing explaining that these bills were reissued and why they

were reissued and what the differences were; correct?

A   I believe I answered that there was no writing to the effect of what you just said.

Q   And there was nothing sent to Jarrow Formulas about rescinding and rebilling a bill that had already been sent; correct?

A   Well, that's not fair.  If we look at this bill -- well, that's not fair.

MR. RESSER:  I'll ask to play Mr. Giarratana's deposition beginning at page 198, 19, to 199, 3.

THE COURT:  All right.  You can proceed with that.

(Plays video.)

Q   (By Mr. Resser) Do you think rebilling Jarrow Formulas at higher hourly rates without first notifying them in writing that you were doing that was entirely correct?

A   Yes.

Q   And you're telling this jury that rebilling Jarrow Formulas at higher hourly rates without informing them in writing was in line with your communications to the client?

A   Yes.

Q   Jarrow Formulas paid 68 invoices out of 70 at the higher hourly rates that you adjusted after Liberty Underwriters came into the picture; correct?

A   Yes, Jarrow Formulas paid all those invoices.

Q   And if the jury decides it was wrong for McCarter & English

to raise those rates without written notice and agreement of Jarrow Formulas, M&E will owe Jarrow Formulas a refund. Isn't that right?

A   Well, I disagree that there was no agreement of Jarrow Formulas, that's for sure. And whether the jury -- whether the jury decides there's a refund that Jarrow Formulas could be entitled to, I don't know. But I certainly disagree with the premise of your question.

Q   Well, if there was no agreement, then there would be a difference between the fees paid at the higher rates and the fees earned at the lower rates; right?

A   If there was no agreement as to the higher rates, which I believe there clearly was.

Q   Now, let's go back to Exhibit 5 -- PTX 118, please, Mr. Campos.

This, again, is the document from McCarter & English showing the total hours and so forth; correct? You're looking for your hard copy?

A   I had one. It's missing now.

THE COURT: You may approach.

THE WITNESS: Thank you.

MR. RESSER: Now I have my own copy. All right.

Q   (By Mr. Resser) Now, on this exhibit --

THE COURT: Which is exhibit number --?

Q   (By Mr. Resser) What's the number on yours?

A    It's 118.

Q    PTX 118.

THE COURT:  Thank you.

Q    (By Mr. Resser) This shows the initial rates and the standard rates under the Initial Information columns.  That's columns B, C, D, and E; correct?

A    Yeah.  It shows the initial rate and the standard rate at the initial date, I'm assuming.

Q    Okay.  Now, for --

A    Initial date -- I apologize, Mr. Resser, the initial date indicated.

Q    Right.  So for Ms. Gaffey, it shows an initial rate of $200 an hour.  Do I have that right?

A    Let me find her.

Yes.

MR. RESSER:  Mr. Campos, can you bring up Exhibit 530 again?  And go to page 12, I believe, of that one and show Ms. Gaffey's rate?

Q    (By Mr. Resser) Ms. Gaffey's rate on that initial bill from the January time in 2013 on the Caudill Kentucky federal case was actually 195, not 200; correct?

A    Let's see.  This states the initial date worked and the date billed as February 20th.

And what is the date of this bill that you're showing on the screen?

Q    This is the February 22, 2013, bill.

A    Would you mind -- I apologize.  Would you mind going to the first page?

Q    Not at all.

A    February 22.

Oh.  That's because -- this is, um -- the document I am looking at is for matter 464, which was the matter that was opened in March of 2013 for the federal litigation.  The invoice you're showing me on the screen is in matter 427.  So the matter 427 date is not going to be captured in PTX 118.

Q    Why?  Because a separate matter hadn't been opened yet?

A    No, because the bill you're showing me is for matter 427, and the summary exhibit you're showing me is from the matter 464.  They're two different matters, so the Exhibit 464 is not going to summarize information from 427 because it doesn't include the information from 427.

Q    So the fees billed in the Kentucky federal court case for time incurred in January and February of 2013 isn't reflected anywhere on PTX -- which one is it?

      THE COURT:  118.

Q    (By Mr. Resser) 118.

A    I have to look at it, but I think that may be the case.  I have to look at it.

      Can you give me a minute?

Q    Sure.

A    Yeah, I believe the information on PTX 118 starts in March of 2013, meaning it picks up the hours worked starting then, not -- it does not include, as far as I can tell, the hours worked in January and February of 2013, because those were -- as you've gone through today, we hadn't opened up matter 464 yet.  And because we hadn't done that and the time was billed on matter 427, the time from those months in the federal case would not be picked up in the matter 464 data summary.

         MR. RESSER:  Mr. Campos, can we show 540A again, please?

         That's the first -- I'm sorry.  540C.  I'm sorry.

         Can you page down on this one to the next page?  And then to the billing rate?

Q    (By Mr. Resser) Okay.  This one is still being billed under the earlier matter.  Is that it?

A    I believe it's for February time, isn't it?

Q    All right.

A    February 2013.

Q    So it wasn't until March that this was a separate matter?

A    I believe so.

Q    Okay.  Now, how long does it take to open a new matter?  How much time does it take you -- when you want to open a new matter for a client, you just have to make a call or send an e-mail to your accounting people; correct?

A    No, no.  There's a process that we go through to do that.

It may start by sending an e-mail, but, uh, depending upon --
it varies.  It varies with the circumstances of the case.
Okay?  It varies.

There's usually a conflict.  You know, as a law firm,
we need to run conflicts.  I would have already checked the
conflicts here, I believe.  We would have checked the
conflicts.  We probably already had conflicts because Caudill
Seed --

Q   Because you started doing work in January.

A   But we nevertheless would run -- our firm has a process in
place where we run -- we check for conflicts.

Q   You don't --

THE COURT:  You don't have to go through the whole
process.

Q   (By Mr. Resser) You --

THE COURT:  Excuse me.  It's more than just a phone
call.

THE WITNESS:  Yes, Your Honor, yeah.

Q   (By Mr. Resser) Now, going back to Exhibit PTX 118.  On the
line item for you, it shows an initial rate of 535 in column D;
correct?

A   It does.

Q   And that's the rate that you began charging in March on the
invoices for March time; correct?

A   Yeah.  It says that that was billed on July 11th, 2013,

which was the invoice you showed previously.

Q That was the reissued bill.

A Yes.

Q But in the original bill, not the reissued bill, the time, your time, was billed not at 535 but 405; correct?

A We've been through that, yeah.

Q So the initial rate really was 405; correct?

A No. I mean -- well, if you're -- I believe you're suggesting that this is not correct. It is correct. It shows that the rate was what the rate was as of that -- on that date and billed on that date indicated. This is entirely correct.

Q Setting aside what the document said --

A Okay.

Q -- the initial rate you billed Jarrow Formulas in the federal case in -- for your time in March of 2013 was $405 an hour, and then you reissued it at 535.

A That's correct. We've been through that.

Q Now with Mr. Grondahl. On Exhibit PTX 118, it shows his initial rate at 485; correct?

A Bear with me, please.

It does.

Q But, actually, the initial rate he was billed at originally before the bill was reissued in July, but in the April bill, his time was billed at 395 an hour; correct?

A Well, I have the same answer as I do to the last question.

This document is accurate and correct. But if we put this document aside, your statement is correct. If you're not speaking with reference to this document and we're talking about what rate he was billed at before we corrected that and reissued the bill, your statement's accurate.

Q   And if we go back and we look at Exhibit 530, which is the initial bill when the two matters were billed, the Ashurst and the federal case were both billed together. And we look at the initial rates on 530 on page 12, we see that your rate is 405, Mr. Grondahl's is 395, and Ms. Gaffey's is 195; correct?

A   Yes.

Q   So if I were to insert those rates into Exhibit PTX 118, that would show me the initial rates billed for that first two months and actually billed until the reissued bills were -- withdrawn.

A   It gets complicated.

Q   If I were to use the initial rate that was the rate that Judge Shea applied for his ruling in this case, that would be the 195 rate for Ms. Gaffey, the 405 rate for you, and the 395 rate for Mr. Grondahl; correct?

A   When you say "if I were to use" them, do you mean if you were to put them into PTX 118?

Q   Yes.

A   I mean, you have to change other things in the document as well, of course. Okay? That's not -- this document speaks to

when the first bill went out at that rate.  Okay?

Q    Um-hmm.

A    But if your statement is, Before we corrected the bills, were the rates what you say they are here on the screen? That's correct.  I don't dispute that.

Q    Okay.  Now let's move to the column on the right side of Exhibit PTX 118, Mr. Campos, if you can bring 118 up again.

And on the right side, column L is labeled "Blended Rate."  Now, for example, for you -- withdrawn.

For Ms. Gaffey, the blended rate is shown at 202.  Do you see that?

A    Yes.

Q    And that's because her rate went up at some point after the reissued bills from the amount shown as her initial rate to a higher rate, and then the average of the rate that was charged for all of her time in the case is shown here as a blended rate.  Do I have that right?

A    So I don't know.  I'm trying to follow you, but I can tell you what this says.

Q    Okay.

A    Okay?  This -- if we look at this for the line item for Ms. Gaffey, now, not the best example because she billed a total of 4.8 hours over a six-year case.  I don't know what she did, but it was very minor.

Q    Withdrawn.  Let's talk about Mr. Rechen.

A    Okay.

Q    So Mr. Rechen, this document actually shows his initial rate in the Caudill federal case at 405; correct?

A    Yes.

Q    And that's the rate we all agree was charged up until 2016 in the federal Kentucky case; correct?

A    Yes.

Q    And then it went up to 520, as shown in column H, Changed Rate.  Do you see that?

A    Yes.  That's what we discussed previously.

Q    Right.  And then in the Blended Rate column, it shows 504. Do I have that right?

A    It does, yes.

Q    So as I understand it -- and this is McCarter & English's own accounting, not mine.  As I understand it, the 505 is the average hourly rate if you take all the money billed to Jarrow Formulas as shown on this document and you divide it by the total number of hours billed, which you see in column J.  And the J is obliterated, so it's the one to the left of K.

A    So are you saying that the 504 is the fees billed divided by the hours billed so you divide column K by column J?

Q    Yes.

A    I'd have to do it on my phone, but I think that's probably fair.  I don't know for sure.

Q    Do you want to do it on your phone?

A    I could try.  Sometimes it takes me a few times with the touch screen.  Let's see.

Q    Let's just not play someone else's voicemail.

A    Yup.  It was mine.

THE COURT:  We don't need to narrate.  You can just do it on your phone.

THE WITNESS:  Let's see, so I'm going to divide the fees billed by the number of hours, and that's going to give me the dollar per hour.

Q    (By Mr. Resser) Yes, the blended rate.

A    Yeah.  You get -- if you divide -- for Attorney Rechen, if you divide the fees billed by the number of hours, you get 503.75, which the software rounds up to 504.

Q    Okay.  And that's for over 2,504 hours; correct?  And the total amount billed -- do I have an answer?

A    You said --

Q    For 2,504 hours and 0.28; right?

A    That is the number of hours, yes.

Q    And then the fees billed on that was $1,261,553; correct?

A    Yes.

Q    Okay.  Now, if I subtract the initial rate of 405 for Mr. Rechen from the blended rate of 504, that difference is $99; correct?

THE COURT:  It is.  Let's keep going.

Q    (By Mr. Resser) And if I multiply that $99 times the total

number of hours billed, I can get the difference between the amount Jarrow Formulas was billed at the increased rates versus the amount that would have been billed had the initial rates been held through the whole case; correct?

A   Um, if I'm following you correctly, if you're trying to determine what the -- what the amount would have been billed at his -- at his -- at the rate of 405, which is from 2008, you would multiply the hours times those -- times that rate.  And you would get the number.

Q   Right.  But the difference, in terms of the charge, the increased charges as a result of raising his rate from 405 to 520 would be that $99 difference because we're using the blended rate.  Over time the rate changed and the average is 504; correct?

A   His rate was 520 minus 405 is -- well, anyway, if you want to look at the difference between the amount that was billed at 405 versus if we had maintained 405 throughout the case --

Q   Right.

A   -- versus --

Q   What was actually billed.

A   -- what was actually billed at 520, you would take the number, the fees billed in this document, and you would subtract from it the number that we previously discussed, which was 405 times 2504.28.  That would give you the difference.

Q   Right.  But because of write-offs and the change of rates

over time, the average that was actually billed for all of his time is 504, not 520; right? I'm trying not to inflate the difference. Instead of 115, the difference is $99; right? $99 an hour.

A I -- we arrived at 504 based on -- I mean we went through that. I did the calculation on my phone. And the 504 is simply the fees billed divided by the hours.

Q Right. So that's what --

A That's it. I apologize, but you're talking about write-offs and things. Anyway, you're confusing me. I apologize.

Q So the 504 is what your firm's document refers to as a blended rate; right?

A Yes.

Q And another way of putting it is that's the average rate applied to all the hours billed whenever it was billed at whatever rate; right?

A It's simply column E, K, divided by column J.

Q Right.

A That's it. If you want to characterize it, fine, but it's that.

Q So if I wanted to figure out the difference between what Mr. Rechen would have been billed had his rate never changed, never gone up from 405 to 520, and the amounts actually billed to Jarrow Formulas, I would multiply his total hours of 2504

and a couple tenths times $99; correct?

A   I went through this.  What I would do is I would first determine the number that's -- I would take the number shown here, which is the total fees billed.  And instead -- and then I would take the hours, multiply that times 405, and I would subtract the second sum from the first sum.  And that's going to give you the difference.

Q   Okay.

A   If you want to characterize it a different way with the $99, I'm going to have to see it on paper I think.

Q   I think I've taken this long enough.

MR. RESSER:  I'd like to offer Exhibit Defendant's 551.

THE COURT:  Okay.  That's full.  551 is full.

(Defendant's Exhibit 551, received in evidence.)

Q   (By Mr. Resser) Now, if our eyes haven't crossed by this point, maybe this will make it even worse.  But do you recognize this document?

A   Yeah, I don't know.  Did I -- maybe -- do you have a paper copy of it?

Q   I do.

A   Thank you.

MR. RESSER:  May I?

THE COURT:  Yes.

THE WITNESS:  Thank you.

Okay.

Q   (By Mr. Resser) Do you recognize that exhibit?

A   I believe I've seen it.

Q   And what is Exhibit 551?

A   So I believe this is a summary of the invoices issued in Kentucky -- in connection with the Kentucky federal litigation, known internally by our firm as matter 00464, which isn't shown on the screen right now.  But if you go up -- there it is.  Thank you.  Jarrow hyphen the .00464 shows this is for matter 464, which is the federal litigation in Kentucky.

And this has six columns, and there are five label columns identifying the invoice number, the date of the invoice, the fees that were billed on that invoice, the costs or disbursements that were billed on that invoice, the total of that invoice.  Then it shows below that the amount that was paid on the invoice, and then it shows below that WOFF, which I believe stands for "write-off."

Q   So the column under "Fees" where it shows it in parentheses, those are either payments by Jarrow Formulas or credits to Jarrow Formulas for a write-off; is that right?

A   I think it's more accurate to simply look at the row and the label of the row.

Q   Okay.

A   So the second row is the amount paid by Jarrow Formulas. The third row is the amount of write-off, if any, at -- I

believe this is a write-off at the time of payment.  So if you like, I can explain.

Q   And so this reflects all of the payments made by Jarrow Formulas on the bills that were issued under Matter No. 464, which is the federal case, but after the matter was opened in March; correct?

A   Yeah, from the inception of the matter in March, yeah.

Q   But the date of the bill is shown as 626, which is the reissued bill amount; correct?

A   That's right.

Q   And we saw that one of the reissued bills we saw was the bill issued on 7/11/2013.  That's shown here in the third set -- the third bill that's shown here; right?

A   Yeah.  That's one of the reissued bills.

Q   Okay.

A   The other two -- the two above it I believe are reissued as well.  I'm assuming the first three are the three issued. Let's see.

Q   So like PTX 118, this document does not reflect the billing in January and February of 2013 because a new matter hadn't been opened yet; correct?

A   It does not include those invoices.

Q   And it also doesn't include the invoices that were reissued -- it doesn't include the original invoices for March, April, and May because they were reissued in June and July;

correct?

A   Yeah, I believe the first three columns -- I believe -- yeah, I believe the third row, the invoice dated July 11th, is the March 2013 time, and I believe the other two are -- the two above that I believe are the April and May 2013 time, the rebills.

Q   Okay.  You can set that aside.  I promise to stay away from those numbers for at least a little while.

A   Okay.

Q   Now, I want to talk about the original engagement agreement between your firms that you've been with since the time you were first retained by them in -- was it 1996?

A   I believe so.

Q   The original engagement agreement between your firm at the time and Jarrow Formulas was the one in 1996.  What firm was that?

A   McCormick, Paulding & Huber.

Q   Can we show again Exhibit PTX 95, which is in evidence, please.

        All right.  So this is the McCormick, Paulding & Huber engagement letter; correct?

A   Yes.

Q   One of the things this engagement letter states -- well, "The relationship will be better served if we begin with a clear understanding of the assignment and our methods of

operating, including fees and payments"; correct?

A    Yes.

Q    And you agree with that statement; right?

A    Yes.

Q    And you agree it is important for the client to have a clear understanding of the fees and payments; right?

A    Yes.

Q    And Exhibit 95 specifies the hourly billing rate that you would be charging Jarrow Formulas in the case referenced; correct?

A    At that time.

Q    And by signing the engagement letter in the space provided, the client, in this case Jarrow Formulas, evidenced its agreement to the hourly rates specified in the engagement letter; correct?

A    No.  I mean he agreed to -- the client agreed to those rates and also agreed to the statement in here that said that the rates will go up periodically from time to time.

Q    Does the agreement say that the firm can raise the rates unilaterally without the agreement of the client?

A    We should go to the agreement I think.

Q    Okay.  I believe that's on the second page, Mr. Campos.

      Where on the second page, Mr. Giarratana, do you see the language about raising the rates?

A    The first full paragraph.

Q    It says, "These rates may change from time to time."

A    Yeah.  Yes.

Q    Is it your understanding that this means that Jarrow Formulas agreed to any rate increase unilaterally whether you got their agreement or not?

A    I believe it means what it says.  I think we need to read this in context.  It says that our base hourly rates for attorneys, legal assistants, and certain staff vary depending on the experience and expertise of the person rendering services.  These base rates may change from time to time.

And so depending upon the level of experience of the timekeeper, the attorney and the paralegal, etc., and other factors, the rates may change from time to time.  It doesn't -- it means that.

Q    Is it your testimony that at no time did Jarrow Formulas have to be told of and agree to a rate increase for a rate increase to be effective?

A    I don't believe it was a requirement to send a notice in advance in writing of a rate change, if that's the question.

Q    You're not aware of any ethical rules that require that?

MR. PEPE:  Your Honor --

THE COURT:  You can answer yes or no.

THE WITNESS:  I'm aware of ethical rules that pertain to the issue.  I'm not aware of one that would be implicated here that would indicate we did anything unethical.

MR. RESSER:  Your Honor, may I impeach on that?

THE COURT:  Well, let me see counsel.

(At sidebar off the record.)

THE COURT:  So, Ladies and Gentlemen, I'm going to allow the witness to answer another few questions about ethical rules.  I want to be very clear about this.

We're not here to decide whether McCarter or Mr. Giarratana complied with ethical rules.  That's not what you're here for.  Okay?  But I'm going to allow this questioning for what we call impeachment only.

The witness made a statement about ethical compliance, and I'm going to allow Mr. Resser to explore that for what we call impeachment, which is for you to decide what -- for you to decide -- let's put it this way:  You can consider these questions only as -- only as to how you think these questions affect the witness's credibility.  You can consider these questions for no other purpose.

Once again, you're not here to decide, and the case is not about, whether McCarter or Mr. Giarratana complied with ethical rules, but I will allow some limited examination on this only for the purposes of your deciding what, if any, impact these questions have on the witness's credibility.

You can proceed.

MR. RESSER:  I'd like Mr. Campos to display Connecticut Rule of Professional Conduct 1.5.

THE COURT:  Well, that we're not going to do.  You can ask some questions.

MR. RESSER:  Okay.

Q   (By Mr. Resser) Mr. Giarratana, are you familiar with Connecticut Rule of Professional Conduct 1.5(b) which states, "Any changes in the basis or rate of the fee or expenses shall also be communicated to the client in writing before the fees or expenses to be billed at the higher rates are actually incurred"?

A   I'm familiar with that.  I'm also familiar with the commentary to the rule, which you're not reading.

THE COURT:  Okay.  So let's get another question then.

Q   (By Mr. Resser) And when you first sent bills to Jarrow Formulas at the higher rates, the fees had already -- withdrawn.

When you first sent bills to Jarrow Formulas at the higher rates, which you say Jarrow Formulas reviewed and approved and therefore agreed to --

A   Yes.

Q   -- those bills were sent after the rates were incurred; correct?  After the fees were incurred; correct?

A   For the first bill, yes.

Q   Does Exhibit 95 -- Exhibit 95 is the only written engagement agreement you or one of your law firms has ever

entered into with Jarrow Formulas; is that correct?

A   It's the first engagement letter.  We did have a letter that we introduced yesterday when there was a transition, I believe, maybe from Cummings & Lockwood to McCarter & English, which dealt with the continuing engagement of the company.

Q   And that was PTX 96 that we looked at?

A   I don't recall the number, but it's sent on Cummings & Lockwood letterhead.

MR. RESSER:  Let's put that up just to make sure that we're tracking, Mr. Campos.

THE WITNESS:  Yeah, this was the letter I was referring to.

Q   (By Mr. Resser) And there was nothing in that letter about fees or the terms of payment or hourly rates or anything like that; correct?

A   This doesn't -- this doesn't explicitly reference hourly rates.

Q   And so this isn't an engagement letter.

A   Well, it's not an engagement letter.  You were using the engagement letter in a loose way.  It's not an engagement letter like the first one which has all the terms, and it doesn't change the terms of engagement in that first letter.

Q   M&E has a form engagement letter that it uses when new clients come in; correct?

A   We have one, yes.

Q    And M&E has a policy, does it not, that the form engagement agreement should be obtained from every client; right?

A    Um, it does, but this situation was unique in that the firm went through a merger where we essentially merged the practice from Cummings & Lockwood into McCarter & English.  And so it was a continuation of that business.  So it was treated a little bit differently.

Q    Well, are you saying that you did abide by the policy that a form engagement agreement should be obtained with every client or you didn't?

A    I believe we abided by the policy of the firm in connection with that merger.

Q    Now I want to discuss with you the -- any discounts requested by and offered to Jarrow Formulas by M&E.  Do you have that subject in mind?

A    I do.

Q    During the course of your representation of Jarrow Formulas, discounts on legal fees to encourage payment was a regular part of the relationship; correct?

A    I'm sorry.  Is your question complete?

Q    Yes.

A    Yeah.  It was -- it regularly occurred at the fiscal year-end.  It was not otherwise a regular part of the relationship, as I explained yesterday.  It occurred once a year as we approached our fiscal year-end.  That's when it

would occur.

Q    But it also occurred in May of 2019 when you were trying to get old bills paid before the Kentucky trial; correct?

A    My recollection is that's the first time it ever occurred outside the context of a fiscal year-end.

Q    And there's -- there's nothing wrong with a client asking for a discount, is there, Mr. Giarratana?

A    There's nothing wrong with it.  The client's not entitled to it, but there's nothing wrong with it.

Q    And you have other clients who have asked for discounts other than Jarrow Formulas, have you?

A    I don't know if I've had a client ask for discounts in the manner Mr. Khowong has here.

Q    McCarter & English have other clients that ask for discounts; right?

A    I don't recall another client who's asked for a discount after the bill was sent out and the payments were owed.

Q    During the course of your representation of Jarrow Formulas, they typically paid their bill within 60 days of receipt; correct?

A    My understanding is that it was between 30 and 60 days was the typical time period within which they would pay.  Unless, unless, as time went on, we got closer to the fiscal year-end, as I indicated yesterday, Mr. Khowong would allow the bills to pile up such that he would -- such that they would not pay

bills that were otherwise due from June and July, presumably with an eye towards getting a discount on them as well.

MR. RESSER:  I'd like to play for the jury -- I'm sorry, Your Honor.  I have portions of the transcript of the PJR from page 141, 19, to 142, 25, that I'd like to read.  And we have copies of that if Your Honor needs it.

THE COURT:  This would be by way of impeachment I take it.

MR. RESSER:  Yes.

THE COURT:  Yes, you may do that.

Q   (By Mr. Resser) Mr. Giarratana, you testified during a pretrial hearing in this case under oath in court; correct?

A   I did.

Q   And that's commonly referred to as a PJR hearing?

A   A prejudgment remedy, yes.

Q   You were asked, and I will read the question and the answer.

"Question:  Now, you didn't -- I don't -- if you said it, I didn't hear it.  Was that something that happened regularly or periodically with respect to Jarrow Formulas in general?

"Answer:  Yes.  We had a pattern where, as indicated previously, Jarrow Formulas would typically pay within about 60 days."

I can read the rest of the answer, if necessary, but

that's all that I needed to read to the jury.

Continue?

THE COURT:  You may continue, yes.

Q   (By Mr. Resser) "But our fiscal year-end is on September 30th of each year, and at that time I think virtually during every year of the representation we would ask Jarrow Formulas to zero out its accounts receivable balance entirely.  In exchange for that, we would give them a further discount on those particular invoices.  Of course, we only gave a discount on the fees.  We did not apply the discount to disbursements because disbursements are out-of-pocket expenses that we had already incurred.

"So you can see here that Jarrow Formulas paid a number of invoices on the first page of September 30th of 2013, and you can see there's one, two, three, four, five, six invoices that were paid on September 30th in 2013 or at least portions of those invoices were paid.  And you can see the write-off that was given on each of those respective invoices or portions thereof that were paid on September 30th.

"My recollection of September 30th, 2013, we, quote, unquote, zeroed out the balance.  And, again, that was a benefit to our firm because we would get payment on some of the invoices earlier than we otherwise would, and we would have the money come in the door before our fiscal year-end and it was a benefit to Jarrow Formulas because they would get a further

discount on top of the discounts they were being given."

A    Yeah.

Q    That was also -- by getting the money in the door before the end of the fiscal year, that also meant that that money would be credited to your compensation formula, as complicated as it is at McCarter & English, and result in some benefit to you as well in terms of your compensation; right?

A    The best I can answer that is it's to the benefit of all the partners to collect outstanding receivables by the fiscal year-end because the money that's left in the accounts at the fiscal year-end is -- at least part of that is used to distribute profits to the partners.  And so it's in all of our interest to collect outstanding receivables.

Q    So at the end of a fiscal year, you would try to get outstanding balances paid; correct?

A    Yes.

Q    And that was in part to collect the fees to be included in your personal compensation; right?

A    There's an indirect relationship between the amount of money that's collected and what I'm paid, just like with any other partner.  It depends on a number of factors.  But, of course, we all have a duty to our firm to try to collect as much as we can by fiscal year-end, and I was doing my job, always.

Q    And when asked to bring the bill current each year, Jarrow

Formulas would typically ask for a discount, and M&E would sometimes grant it; correct?

A    Yes.

Q    And there were annual negotiations to bring in payments from Jarrow Formulas at the end of the fiscal year; correct?

A    Yes.

Q    At one point in that process, Jarrow Formulas was told you made request to the firm's Finance Committee to allow an additional discount, but you couldn't get more.  Isn't that right?

A    I'd have to see the communication, but I was in regular communication with the Finance Committee every September 30 -- every September.

Q    Well, when Jarrow Formulas was told McCarter & English was going to the Finance Committee to allow an additional discount, there were instances where that was told to Jarrow Formulas and it wasn't true.  Isn't that right?

A    I can't point to any particular instance.  I do know that I was in regular communication with the Finance Committee every September.  And when Jarrow Formulas would request an additional discount over and above what was offered, I would have to discuss that, or would generally discuss that, with the member of the Finance Committee that was assigned to me.

          MR. RESSER:  I would ask that Defendant's Exhibit 623 be admitted into evidence, Your Honor.  There has been no

objection to that.

THE COURT: All right. 623 is full then. Thank you.

(Defendant's Exhibit 623, received in evidence.)

Q   (By Mr. Resser) Now, on September 15th, 2014, there is an e-mail back and forth between Catherine Adipietro at McCarter & English and Mary Grace Reyes at Jarrow.

In the first e-mail in time, Mary Grace wrote, "Ben has not decided yet and is still thinking about it. Maybe you will offer more discounts that will make him act and think faster. Try asking your boss about it."

Did I have that right?

A   Yeah. This is part of the posturing that will go on.

Q   That was a yes-or-no question.

A   You have that right.

Q   Okay. The next e-mail is from Ms. Adipietro --

A   Yes.

Q   -- to you; right?

A   Yes.

Q   Same day, actually one minute later approximately. And she wrote to you.

"They do this every year. I'm going to pretend to ask you and then say no, the finance committee won't let you. Like I do every year."

Did I get that right?

A   You're reading it correctly. I would appreciate --

THE COURT: Wait. No, no, no. Next question.

Q (By Mr. Resser) And then in response you wrote to Ms. Adipietro -- oh, by the way, that e-mail is not copied to Mary Grace; correct?

A No.

Q Correct. Right? That was a double negative I think, so I just want to make sure the answer.

A My --

Q Is that true -- let me finish my question.

Isn't it true that Ms. Adipietro did not copy her e-mail to you of September 15th to anyone at Jarrow Formulas?

A That's correct.

Q And then, in response to her e-mail saying, "I'm going to pretend to ask you and then say no, the finance committee won't let you," you replied, "OK. Thanks." Right?

A That's what it says.

Q And isn't it true that you just think this is posturing and negotiating with the client?

A Well, it depends on what you're speaking to in this e-mail chain. The posturing and negotiating is between Cathy Adipietro and Mary Grace Reyes. Otherwise, it was absolutely clear the Finance Committee was not going to let me give them a penny more. If we go down in this e-mail and see what we offered initially and we look at the amount of invoices that were outstanding, it was futile to ask for more.

Now, I knew because --

THE COURT: Stop. Stop. Stop. Another question.

Q   (By Mr. Resser) So is it or isn't it posturing and negotiating?

A   Cathy Adipietro and Mary Grace Reyes were posturing with each other and negotiating.

Q   And isn't it true that you think Ms. Adipietro was doing her job by making up that you went to the Finance Committee and telling that to Jarrow Formulas?

A   I don't believe she made up that I went to the Finance Committee because, like I said, I was in regular communication with the Finance Committee every September.

Q   Even though she wrote to you, "I'm going to pretend to ask you and then say no, the finance committee won't let you"?

A   Well, by sending me the e-mail, she's effectively asking me, she's giving me an opportunity to say something one way or another.  She's effectively running this by me.  Okay?

She also knew that we weren't going to give any more based on what we had offered previously and the amounts that were outstanding.  Again, the client had no right to this. This was for a substantial amount of work that had already been performed at the agreed-upon rates.  And now they wanted us to cut it significantly more than we were willing to do and the firm was willing to do.

Q   So I take it, given your answer, that you didn't warn

Ms. Adipietro about misleading a client, about asking for discounts from management, but telling the client she was -- that she was -- but telling the client she did when she was pretending to have done so.

A    She wasn't pretending to communicate with me and ask me because she effectively did that by sending this e-mail to me. And as far as communicating with the Finance Committee, I was in regular communication with the Finance Committee every September.  They were very interested in whether we were collecting the Jarrow Formulas bills because I think, in 2014 especially, Mr. Khowong had allowed them to pile up and there was a large receivable.

Q    So you don't think this was misleading to tell the client and to pretend to the client that you had gone to the Finance Committee?

A    Well, the point I'm making is that's not pretending.  I was in regular communication with the Finance Committee.  She said "I'm going to pretend to ask you, by the way."  And effectively by sending me the e-mail, she was asking me.

        MR. RESSER:  I would like to offer Exhibit 543D at this time, Your Honor.

        THE COURT:  All right.  So I ruled on that objection, so that can come in as a full exhibit.  543D is full.

    (Defendant's Exhibit 543D, received in evidence.)

        MR. RESSER:  Can we go to the earliest e-mail in that

chain?

I think there might be one behind that.  Or is that the end of the exhibit?  Okay.

Q   (By Mr. Resser) The first e-mail is on September 8th, 2011. Again, this is getting near the end of the fiscal year in 2011.

And you write to Ms. Adipietro, "It's kind of hard to take a different approach this year.  Did we give 10 percent over the same months last year?"

Do I have that right?

A   That's what I said, yes.

Q   Okay.  Let's go to the next one above that, Mr. Campos.

And Ms. Adipietro writes back, same day:  "Yes, although we did a lot of back and forth where I had to ask the," quote, unquote, "'EC,' if you recall, we made Eric an honorary member."

Do you see that?

A   Yes.

Q   The "EC" is the Executive Committee of the firm; correct?

A   Yes.

Q   Is that different from the Finance Committee?

A   Yes.

Q   Let's go up to the next one in order to time.

You then wrote back to Ms. Adipietro with a copy or also to Mr. Grondahl, same day.

"Eric, are you good with giving Jarrow the same end of

year discount as last year (10 percent) on the outstanding balance (which covers the same months as last year)?"

A    Yes.

Q    And you asked Mr. Grondahl for his position because, I take it, he had some financial interest as a partner in whether his -- the fees collected on his time would be discounted; correct?

A    No, that's not the reason.  I, um -- look, Eric was always --

Q    You've answered my question, sir.

A    Okay.

Q    The next -- but Mr. Grondahl did get this e-mail saying he was going to be made an honorary member of the EC; correct?

A    Well, it refers to asking him.  The previous year he was practice group leader.  And I believe we went to him as practice group leader.

I'm not sure what she's saying about honorary member of the EC, but we did speak to him the prior year as practice group leader for --

THE COURT:  I'm sorry, sir.  The question was, Did he get the e-mail?  If you know.

THE WITNESS:  He's CCed on it.  Is he CCed on it?

Q    (By Mr. Resser) It's actually to him.

A    Well, it's from me to Cathy and him, but it's forwarding a very lengthy chain.  Did he read everything under that?  I

don't know.

MR. RESSER: Let's go to the next e-mail in order, please.

Q   (By Mr. Resser) And then Mr. Grondahl responded, "Yes."

A   He's okay with -- with offering them or agreeing to 10 percent.

THE COURT: All right. Mr. Resser, I'm going to interrupt you. We're going to take our lunch break.

Ladies and Gentlemen, I kept you 15 minutes later just like I did for the earlier one. That way the afternoon will be a little bit shorter.

Thank you again for your attention. Enjoy your lunch. Don't discuss the case. Don't let anyone discuss it with you. Keep an open mind. Thank you.

(The jury left the courtroom at 12:45 p.m.)

THE COURT: Just a couple of things: One, I'll just put on the record the colloquy I had with Mr. Pepe and Mr. Resser at sidebar with regard to the issue about the Rules of Professional Conduct.

As I've indicated, I think, I certainly indicated yesterday with regard to Mr. Resser's opening statement, I indicated to counsel I am concerned about getting into the Rules of Professional Conduct because I'm very concerned it's going to confuse the jury. And as I read the case law, the -- those rules don't provide a private cause of action and don't

ultimately inform the question of the collection of the bills in this case.

Nonetheless, because of the witness's answer, I did find that it was necessary to allow some limited questioning about that just for purposes of impeachment, and I told counsel that I would instruct the jury that the evidence was to be considered only for that purpose, which is why I gave the limiting instruction that I did.

All right. Mr. Pepe objected, so that's clear on the record. He objected to that.

So the other thing I wanted to just ask, Mr. Resser, do you have an estimate of how much longer you might be? I don't want to push you. If it's for the rest of the day --

MR. RESSER: It probably is, Your Honor, given the timing.

THE COURT: Fine.

MR. RESSER: Possibly not, but ...

THE COURT: Is there anything else we need to discuss before we recess?

MR. PEPE: Nothing from plaintiff, Your Honor.

THE COURT: Mr. Resser?

MR. RESSER: No, Your Honor.

THE COURT: All right. We'll be in recess. Thank you.

(Recess from 12:47 p.m. to 1:31 p.m.)

THE COURT:  Mr. Resser, you may continue whenever you're ready.

MR. RESSER:  Thank you, Your Honor.

Q   (By Mr. Resser) Mr. Giarratana, in the weeks leading up to the Kentucky trial in May of 2019, you asked Jarrow Formulas to pay old bills because they had fallen behind in making payments to M&E; correct?

A   I believe that's correct, yes.

Q   At that time you were aware that, during the first half of 2019, Jarrow Formulas was having cash flow issues.  Isn't that right?

A   I wasn't aware of their particular financial issues at all. I wasn't involved with the finances of the company, and I didn't know what the particular finances of the company were.

MR. RESSER:  All right.  I'll ask Mr. Campos to play Mr. Giarratana's deposition, page 50, line 5, through line -- through 50, line 8.

MR. PEPE:  Your Honor, before we do --

THE COURT:  Yes.

MR. PEPE:  -- I think the witness is entitled to have the transcript, and I think also not just the answer but the question needs to be played.  That wasn't done previously.

THE COURT:  All right.  Let's play the question and the answer.  That's fair.  You want him to see the transcript as well?

MR. RESSER:  This includes the question and answer pair, and I apologize for if we didn't include the question the last time.

MR. PEPE:  I just didn't want that to happen going forward.

THE COURT:  All right.  That's fine.  Do we have the transcript though?  I would like to get it to the witness if we do.

You can approach the witness, Mr. Resser.  I don't need to see it.

MR. RESSER:  May I proceed?

THE COURT:  You may.

MR. RESSER:  Mr. Campos.

THE WITNESS:  Would you let me know where we are?

MR. RESSER:  Sorry.  50, line 5 through 8.

THE WITNESS:  50, line 5?

THE COURT:  Yes, lines 5 through 8.

(Plays video.)

Q   (By Mr. Resser) Mr. Giarratana, at that point on May 13, 2019, Jarrow Formulas asked again for a discount on the old invoices; correct?

A   They did.

Q   And M&E wrote back asking Jarrow Formulas for the amount of the invoices and the requested discount; correct?

A   That sounds fair.

Q   I think it was PTX 120 that Mr. Pepe went over with you yesterday on that?  Can we put that up, please?

So in the middle of the second page -- actually, at the bottom of the second page of that exhibit, there's an e-mail from Ms. Adipietro, May 14th, to Mary Grace Reyes.

"Hi Mary Grace, can you kindly advise the amount of the invoices and the requested discount and I will ask?"

Does that refresh your recollection that that happened?

A   Yes, it does.  Thank you.

Q   Then Mary Grace wrote back that same day listing three invoices totaling something about $300,000, thereabouts?

A   Okay.

Q   Is that right?

A   I -- I haven't added them up, but I think that's a rough approximation of the total of those three invoices.

Q   Thank you.  And then that's when, in that same list of invoices, Ms. Reyes wrote back, "Maybe if you can ask for 15 percent" -- "15 percent discount."

A   Yes.

Q   That's when you stepped in and wrote your e-mail of May 24th; correct?  And that begins on the first page of PTX --

A   I have to see the chain.  I apologize for speaking over. It looks like -- if I see this correctly, it looks like my e-mail of May 24 immediately follows Mary Grace Reyes's e-mail;

is that correct?

Q   Yes, in time.

A   So, yeah, it looks like I responded to Mary Grace Reyes's e-mail.

Q   And that was ten days later?

A   If you can go back.

So Mary Grace Reyes's e-mail was on May 14.  She's asking for a 15-percent discount on the outstanding bills going back sometime.  And I respond on May 24, yeah.

Q   Okay.  All right.  And then in the second full paragraph of your response to Mary Grace Reyes, you wrote, "With respect to the requested discount, please note that Jarrow Formulas is already receiving a 38 percent discount off our standard" hourly rates."

Do you have that right?

A   You included the word "hourly" which does not appear there.

Q   Oh, "our standard rates."

A   Yes.

Q   By that, didn't you mean "standard hourly rates"?

A   I did.  I did, yeah.

Q   Now, at that time your rate had -- your standard rate, based on your testimony yesterday, had gone up to $650 an hour for new matters, new clients; right?

A   I believe that's correct.

Q   So at 535 an hour, 535 an hour was not a 38-percent discount off of 650, was it?

A   Well, that's not how this is calculated, and that's not what I'm saying.  I'm not saying my rate.  I'm saying the overall discount that was given to the client that it was receiving at that time was 38 percent.

Q   But on your rate at that time, your discount was about 17 and a half percent from your standard rate.

A   It's a -- I'm not sure what the difference between 650 and 535 is, um, but that's not what this was referring to.  This was referring to the discount that the client was receiving on everything overall, on all rates, on all billings.

Q   And then in that same e-mail you wrote back and you offered an additional 5 percent for a total of 43 percent; correct?

A   Yeah.  We didn't -- I didn't say 43 percent here, but I said the most we're permitted to offer was an additional 5 percent.  We didn't want to offer anything, but I received approval for 5 percent.

Q   All right.  Take a look at PTX -- is this PTX 120?

    MR. RESSER:  No, let's bring up PTX 120, please, Mr. Campos.  It's May 31, 2019.

Q   (By Mr. Resser) So then Mary Grace wrote back on the 24th, and she wrote to Ben Khowong.  This is an internal e-mail that was provided.

    "Hi Ben, please see below response about the discount

to pay McCarter invoices.

"We have discussed the matter with our firm's financial officer, and the maximum additional discount we are permitted to offer is 5 percent."

She's quoting you there; correct?

A    I believe so.

Q    And then above that is the next in time.

And Ben writes back to Mary Grace:  "Sorry, forget the 5 percent for now.  How much did you ask them in discount?  15 percent," question mark?  "Ask them for 10 percent and let me know.  Ben."

And then Mary Grace writes back, Yes, I asked for 10 percent.  I will try for 10 -- "I asked 15 percent.  I will try for 10."

MR. RESSER:  We offer Exhibit 613.  May that be published?

THE COURT:  In a moment.  Let me just see.  Is there any objection?  No, there's no objection.  613 is full.  It can be published.

(Defendant's Exhibit 613, received in evidence.)

Q    (By Mr. Resser) If you can scroll down to the May 31 e-mail from Mr. Giarratana.  Is that not this exhibit?  All right.  I must have the wrong reference here.  I'm sorry.

There it is, okay.  Is there one before that?  Okay. I'll move on.

After this exchange, M&E received nearly $500,000 in fees paid by Jarrow Formulas; correct?

A   I don't recall the exact number.  They paid half, roughly half the amount that we had asked for, at a 5-percent discount, which was not what we agreed to.

MR. RESSER:  Mr. Campos, can you bring up Exhibit 551 again that we looked at earlier, on the last page of that exhibit.

And if you could focus on the payments made, May 31, 2019, starting in the middle of the page.

You had it.

If you could pop out all those payments down to the one on 531, the next column.  There you go.

Q   (By Mr. Resser) So one payment was made, but it was applied to different invoices; correct, Mr. Giarratana?

A   That's my understanding.

Q   And these --

A   Actually, I strike that.  In all candor, Mr. Resser, I know a payment was made.  I don't know whether it was multiple checks, how it was applied.  I don't get involved in that.

Q   But this document reflects, as we discussed earlier, the payments made by Jarrow Formulas on the line that says "Pay," and on May 31st McCarter & English credited payments against three of the invoices listed here; correct?

A   It -- yeah.  Could we bring down the expanded portion just

a hair so I could see what the columns are?

Q   Sure.

A   Is that possible?  I apologize.  I can't remember -- oh, it doesn't have them there.

Q   We can go to the first page if you want.  There you go.

A   That's helping.  Thanks very much.  Yeah, it's okay.  You don't need to -- okay, thank you.

Okay.  So, yeah, on May 31 it paid -- on May 31 it paid the amounts indicated in the parentheses on those highlighted lines, that's correct.

Q   And in fees, I total that number at $495,314.84.  You can do the math if you want, but it's somewhere close to $500,000 -- right? -- in fees.

A   Somewhere close to how much?

Q   500,000?

A   It's probably, yeah, a hair under 500.

Q   Right.  Then in the Cost column, it looks to me like they paid around $76,000 in costs as well.

A   That's a rough approximation.  I agree with that, disbursements, yeah, reimbursing us for disbursements.

Q   And you knew that Jarrow Formulas thought this brought the old bills current; right?

A   No, I did not.  And this was not -- this was not what was requested in my e-mail.  But this is what they did.

Q   Mary Grace had listed three invoices that she had inquired

about earlier, and they came to less than $495,000. Do you need to go back and see that exhibit again?

A    If you want to, if you want to ask about those. That wasn't in my e-mail. I wasn't talking about though three. I was talking about all of the outstanding invoices.

Q    Okay. I think you would agree though, wouldn't you, that after you got the payment, you realized that you and Ben and you and Jarrow Formulas didn't have a meeting of the mind as to which bills were supposed to be paid to qualify for the discount?

A    All I can tell you is I understand what he did. If you look at my e-mail, I believe it is very clear what we were requesting. We were requesting that all of the bills be paid, not that they only pay half of the outstanding bills.

Q    If we can put up PTX 120 again, on the second page of that document.

So these are the invoices that Mary Grace first wrote about and was the subject, at least the beginning of the subject, of the discounts; right?

A    Can you -- could you take down that blowup? I can't read the e-mail.

MR. RESSER: We can take down 551, Mr. Campos.

THE WITNESS: If you don't mind, let's just look at the e-mail chain.

Q    (By Mr. Resser) Absolutely.

A    I think we need to go back.  I don't have the whole e-mail chain in front of me, so you're asking me how this started.  I need to see Cathy's e-mail and I guess preceding this page.

Q    Well, I think the earlier part of the e-mail chain was whether a particular disbursement would be paid by the client or not.  Then it switched to the discussion where Mary Grace brings up those three invoices -- brings up old bills.  She uses the expression "old bills."

A    Do you want to go to that?

Q    Yes.

A    So I can read it?

Q    This is -- I'm sorry, old invoices, the May 13th e-mail at 5:53 p.m. on the third page of PTX 120.

A    If you don't mind, don't do the blowup.  I just want to read it in the context of the e-mail chain.

Q    Okay.  She wrote, "One more request, we have these old invoices" -- I misspoke, old invoices, not old bills -- "of yours that we have not paid yet.  Can we get a discount if we have to pay the balance of the January and February invoices in full?"

        You see that?

A    Yes.

Q    And then Ms. Adipietro writes back the bottom of the second page of PTX 120:  "Hi Mary Grace.  Can you kindly advise the amount of the invoices and the requested discount and I will

ask?"  Right?

A    Okay.

Q    And then Mary Grace writes back and lists three invoices that come to less than the -- certainly less than the 495,000 that was paid on May 31st; right?

A    Uh, the total of what's shown there is less, yes.

Q    It's less than 300, in fact; right?  Or about 300?

A    Yeah, maybe a hair under 300,000.

Q    And we talked earlier about the fact that, and we heard your testimony in your deposition, that generally they paid within 60 days; right?

A    I believe it was 30 to 60 days, yes.

Q    Well, that's what you said on the witness stand, but we played the deposition testimony where you said 60 days.  So it was -- it seems -- well, isn't it -- isn't it true that it's your understanding that Jarrow Formulas thought that it would qualify for the additional 5-percent discount by paying the bills that Mary Grace listed and those that were more than 60 days old?

A    No, because you're not -- you're not reading the rest of the e-mail chain and particularly my e-mail chain where I tell them the terms upon which you're going to give them a discount. And also the fact that they paid more than these invoices, in my mind anyway, indicates to me that they also understood that we wanted payment on more than just these three.

Q   But isn't it true that once you got less than that, you figured out that there must have been a misunderstanding with what Jarrow Formulas understood was expected of them to qualify for the discount and what you expected of them?

A   I -- I don't call it a misunderstanding.  Well, at the very least there was a misunderstanding.  At the very least.

I believe -- I don't believe that my communication was unclear at all.  And so based upon my communication, I don't believe it could have been reasonably misunderstood.

I believe that Mr. Khowong paid what he wanted to pay at the discount he wanted to pay and ignored my request or the pertinent portion of my request, which was, We want you to pay all of the outstanding invoices.

Q   You also discuss the old invoices with Jonathan Leventhal, Jarrow Formulas's general counsel at the time, a few days before the Kentucky trial started; correct?

A   I want to be clear though.  When you say "the old invoices," I wasn't referring to those three.  I was referring to the outstanding balance that Jarrow Formulas owed our firm.

Q   And you had --

A   I don't want to mix those two up.  You appear to know the label.

Q   That's clear.  That's clear.  Just in general you had a conversation with Mr. Leventhal about outstanding bills;

correct?

A    Yeah, there were several.

Q    And that was a face-to-face conversation while you were both in Louisville; right?

A    Well, I recall having a conversation with him on the telephone when we were -- when I was asking about our bills. He was also complaining about other lawyers bills, not ours. And I recall speaking to him about our billings then.  And then I recall speaking to him about our bills in Kentucky after we had thought we were receiving payment of all the outstanding invoices at 5 percent and learned that we did not, that we received only about half.

Q    Okay.  Before that happened, you did have a conversation with Mr. Leventhal in Louisville in which the discount that had been offered was discussed; correct?

A    I can't -- you mean the 5-percent discount, that e-mail chain?

Q    The 38 then plus the 5, what was in your e-mail.

A    Well, that e-mail was sent before we went to Louisville. It was sent on the 24th.

Q    Okay.

A    I believe they then sent payment about a week into our -- they sent payment, I believe, on the 31st, which was just before the start of trial.

Q    Right.  Now, the e-mail from Mary Grace said -- on May 31st

the e-mail from Mary Grace, and we can show it to you if you want, said, "Accepted the 5-percent additional discount" and then said, "We'll FedEx these to you tomorrow" or "We'll FedEx these to you and you should get them tomorrow."

So my question to you is, the Exhibit 551, which we looked at a few minutes ago, shows the payments actually credited on May 31st, not June 1st; correct?

A   I'm confused.  Can you show me the e-mail you're referring to so I can follow you?  Thank you.

Q   Yeah.  Let's look at PTX 121.

A   Thanks.

Q   So the third page of Exhibit PXT -- PTX 121 starts with your May 31, 2019, e-mail, the bottom of the page:  Thank you for your follow-up e-mail.  We are not permitted to provide a further discount.  With the additional 5-percent discount, Jarrow Formulas is receiving a 43-percent discount which is both substantial and highly unusual.

Do I have that right?

A   You do.

Q   And then the next e-mail in order is Mary Grace's e-mail on May 31st saying, "Ok.  We will cut the check later today and hopefully it will make it to FedEx overnight."

Do I have that right?

A   I see that, yes.

Q   And then you respond that same day, "Thanks Mary Grace,

That's very much appreciated.  Best, Mark."

Do I have that right?

A   Yes.  I understood she was going to be paying everything at 5 percent.

Q   And then she wrote back May 31, "Whose attention should we send the check to?"

And I don't see a response to that e-mail.  But on the next -- the first page of the exhibit, June 21, you wrote back, Thank you for the check, but then indicating you expected to get all of the receivable paid.

A   Well, it was June 12th, not 21.

Q   Pardon me.  June 12th.

A   If you don't mind --

Q   Absolutely.

A   -- I just want to look at it.

Okay.

Q   And then Mary Grace sent your e-mail up the chain to Mr. Khowong, and then Mr. Khowong wrote back to you asking you to deal with him directly on the matter.  And he says, "There was a misunderstanding on your offer, passed to me by Marry-Grace.  My understanding was we would just need to bring the account current for the discount.  I went out of my way to pay you the check of close to $700,000 despite the fact Jarrow wanted me to send only 100,000 for now have the authority to send you any more at this time without Jarrow's instruction."

Do I have that right?

A   You read that correctly.

Q   So at that point you understood that there wasn't a meeting of the minds between you and Mr. Khowong; right?

A   Well, I understood what he did.  I don't know -- you know, I understood that he didn't pay me what we had clearly asked for.  That I understood.

Q   Now, before that payment was made, you had a conversation -- that payment was made, sent on May 31st.  It was probably received the next day or sometime between May 31st and June 12th when you wrote back; right?

A   Presumably, yeah, yeah.

Q   But it was credited on Exhibit 551 as of May 31st; correct?

A   That's my recollection, yeah.

Q   Now, before that, before May 31st, you had a conversation with Jonathan Leventhal in Louisville about the discount; correct?

A   Before May 31st?

Q   Yes, before there was a payment.

A   Could you go back to the correspondence, please?

Q   Sure.

A   When did Mary Grace Reyes respond to me and indicated that she was going to send payment?

Q   I'm sorry.  What was your question?

A   So when did Mary Grace Reyes respond to me and indicate

that she was going to make payment?

Q That was on the 31st.

A And then could we just go down below that?

Q Sure.

A Okay. I apologize.

Q We will send a check later today.

A Okay.

Q Okay?

A So before this date --

Q Yes.

A -- did I have a conversation with Mr. Leventhal in Louisville about the discount?

Q Let me try and refresh your recollection further.

A Okay.

Q Unless you can answer my question before.

A I would appreciate you refreshing my recollection further.

Q On a street corner outside on the same block as Mr. Beres' office, did you have a conversation with Mr. Leventhal there?

A I may have.

Q Was there a time -- wasn't there a time when you had a conversation with Mr. Leventhal in Louisville and told him about the offer of the 43-percent discount?

A It's certainly possible because I was in communication with him trying to make sure we get paid.

Q   And Mr. Leventhal reacted to your saying that discount was being offered and that Jarrow Formulas was already getting a 38-percent discount saying he was impressed and appreciated the discount; right?

A   I don't recall that specifically, but it wouldn't surprise me that, if he learned that he was receiving that kind of discount, he would appreciate that.

Q   And when you said they were receiving a 38-percent discount, that's irrespective of any additional 5-percent discount whether there was 500,000 paid or $700,000 paid; correct?

A   The 38-percent discount was the discount that our system had recorded for Jarrow Formulas as of the date that I sent that e-mail, because I called Jackie Bosma, our controller or CFO at the time, and she told me what the number was off of our system.  So it was the discount as of that date.

        MR. RESSER:  Okay.  I will offer Exhibit 514.  No objection.

        THE COURT:  There is no objection.  That will be a full exhibit.  514 is full.

   (Defendant's Exhibit 514, received in evidence.)

Q   (By Mr. Resser) Exhibit 514 is a Working Attorney Net-Net Collection Profitability Report.  This is a McCarter & English document, isn't it?

A   My understanding that it is, yes.

Q   And is it your understanding that this is the report that Ms. Bosma referred to in answer to your question about what the discounts were?

A   No, it's absolutely not.  And it can't be.

Q   Well, let's look at this.  So in the middle of the -- just to the left of the middle of the document, there's a column called "Discount Percentage"?

A   Yes.

Q   And it shows 24.88 percent discount in that column; right?

A   Right.

Q   And then at the top of the document it says, "Fiscal year-to-date through May '19."  You see that?

A   I do.

Q   Then in the very right column it says "Actual Profit Margin Percentage."  And that says 38 percent.

A   Yes.

Q   Isn't that where you understood Ms. Bosma got the 38 percent from?

A   No.  Actually, that's not correct.  If we look over, we can see that this document can't be the one that she was looking at on May 24 because the date that she was looking at it we had not yet received the additional $600,000 from Jarrow Formulas. So if we look over on the second column from the left where it says "Standard Value Collected and Written Off," it shows 1.445929.  I'm sorry.  We look over at the "Fees Collected"

where it shows -- in the middle it shows fees collected, 1086122. You see that?

Q   Yes.

A   So by the -- and this is fiscal year-to-date. Okay? So as of May -- when was my e-mail to Jackie Bosma? May 24? My e-mail that I sent following my phone call with Jackie Bosma where I said, You're receiving a 38-percent discount, was it May 24?

Q   You mean to Mary Grace?

A   I apologize, yeah, my e-mail to Mary Grace following my discussion with Jackie Bosma where I said, You're receiving a 38-percent discount, was that --

Q   There were two. There was a May 24th and a May 31st e-mail repeating that discount.

A   The May 24th was the first one.

Q   Yeah.

A   So as of May 24th we had not collected 1.086122. We had not collected $1,086,122. That fee collected number represents the number following the payment made by Jarrow Formulas that we recorded in our books on May 31.

So the profitability as calculated here is different than the profitability that Jackie Bosma was looking at on May 24th, because that was before receipt of those moneys from Jarrow Formulas. And you need to look how the profitability is determined in this document. Okay?

Q   One of the reasons that you told Jarrow Formulas that they were receiving, already receiving, a 38-percent discount, when you wrote on May 24th and May 31st, was to encourage them to make payment; correct?

A   Well, I -- I wanted to let them know -- they wanted a 15-percent discount.  And I wanted to let them know that they were already receiving a substantial discount and I couldn't give them anymore than the 5 percent that I had been given authority to give them because hay were already receiving a substantial discount.  And it was 38 percent.  You just don't have the right document here.

Q   Are you telling me you didn't tell them the 38 percent in order to encourage payment?

A   Well, ultimately, the goal of the e-mail, of course, was to encourage payment.  But the point of telling them 38 percent was to let them know that they were already receiving a substantial discount and I could not give them more than the extra 5 percent.

Q   Now I want to move to the point in time after the jury returned its verdict in the federal court case.

A   Okay.

Q   And that was on June 26, 2019; correct?

A   Yes.

Q   That same day after the jury verdict against Jarrow Formulas in the Kentucky case, you received the butt call from

Mr. Rogovin; correct?

A    Yeah, the butt dial.

Q    The butt dial.

And that voicemail was apparently not a message intended for you; correct?

A    I don't know if it was or wasn't, but I received it.

Q    Well, it's pretty logical to assume that that was an inadvertent call from Mr. Rogovin that went to your voicemail and recorded his conversation with Mr. Ashurst and someone else; correct?

A    That could be one assumption, yes.

Q    And the jury has heard that recording.  And in that message, one of the things Mr. Rogovin said is that he expressed his concern that M&E did not, quote, cut off my damages, end quote; correct?

A    I believe he said that.

Q    And he said, To cut off my damages, they did S-H-blank-blank, an expletive meaning "nothing"; right?

A    Well --

Q    That's what he said.

A    It's an expletive.  That's your interpretation of his expletive.

Q    Okay.  And you understood they meant McCarter & English; right?

A    Yes.

Q    And Mr. Rogovin then said in that recording -- it's recorded that he said, "As far as I'm concerned, they can pay the damages"; right?  He said that.

A    Yes.

Q    And you knew when he said "they" that that meant McCarter & English; right?

A    Yes.

Q    So as for the damages that he was referring to, you understood that to mean the damages awarded to Caudill Seed including the $2,023,000 that the jury awarded to Caudill Seed for research and development damages; correct?

A    That's one conclusion you could draw, yes.

Q    Now I want to talk about the communications you had with Mr. Rogovin leading up to -- during and leading up to the trial regarding the issue of Caudill's research and development damages.  Do you have that subject in mind?

A    I do.

Q    Isn't it true that M&E didn't have the documents to substantiate and verify the research and development damages claimed by Caudill in connection with their trade secrets?

A    That's not true.

        MR. RESSER:  I'd like to play for the jury Mr. Giarratana's deposition beginning at page 126, line 23, to 128, line 1.

        THE COURT:  Okay, as long as he has it.

THE WITNESS:  Bear with me, Your Honor.  126, line 23?

THE COURT:  To 128, line?  Mr. Resser?  128, line --

MR. RESSER:  126, 23, to 128, 1.

THE WITNESS:  Thank you.  Got it.

THE COURT:  You can proceed.

(Plays video.)

Q   (By Mr. Resser) Now to prove its R&D damages, Caudill used IRS tax forms and financial statements with total R&D expenses for each year; correct?

MR. PEPE:  Your Honor, this second part of the case, relevance.

THE COURT:  Well, I know what the response is going to be, so I'm going to overrule it because it goes to the -- one of the damages claims on the breach of contract, I believe. I'm going to allow some more limited examination along those lines.

MR. RESSER:  Just to make sure we understand what we're talking about, these are the R&D.

THE COURT:  Overrule the objection.

MR. RESSER:  Excuse me, Your Honor.

Q   (By Mr. Resser) These are the R&D damages that Mr. Rogovin's butt call referred to as the damages that weren't cut off and that he -- and that he was complaining about in that butt call; right?

A   And to be clear, my deposition testimony was about an

e-mail in October 2016, which was three years prior to trial. And so we had a different set of facts available to us in October 2016 versus when we were at trial.

Now, as far as what Mr. Rogovin's referring to, I don't know for sure, but go ahead.

Q   When you heard the butt call --

A   Yes.

Q   -- you understood he was referring specifically to the R&D damages; right?

A   Well, he said they -- if I recall correctly, he said, They didn't do expletive to cut off my damages.  And -- I believe.  Is that fair?

Q   Yes.  But he then said, "What should have been an exhibit on what out of pocket was on R&D.  They came up with $2 million out of their ass."

So you knew he was referring to the $2 million in R&D damages when he made that comment; right?

A   I apologize for speaking over.  The reason why I hesitate is if you recall the verdict form, there was two columns.  There was compensatory and there was unjust enrichment.  If he's -- one would logically assume, but I don't know in his state of mind at that time, but one would logically assume that he was referring to the compensatory number.

Q   Right.  Well, he mentions R&D, and he mentioned $2 million in that inadvertent call; correct?

A    Yes, that's correct.

Q    And that's why I asked you to prove the R&D damages what Caudill used were the IRS tax forms and the financial statements just with annual totals of those R&D expenses; correct?

A    Well, they -- they had some backup documentation.  They had -- we had, and they had, whatever backup documentation they possessed, because we moved to compel that information.  The court granted our motion to compel, and they had to certify they gave us everything that they had.  And so we had not only the IRS forms, but we also had what backup documentation they had as well.

So when you asked the general question, I have to clarify it.  We didn't only have the IRS forms.  We had information in addition to the IRS forms.

Q    They had some -- you had some backup, but Caudill did not provide all of the backup documents to the IRS forms; correct?

A    Well, they certified to the court that they provided all of the backup documentation that they possessed.

Q    And Caudill did not apportion the expenses claimed related to each trade secrets, did they?

A    We argued that.

Q    Well --

A    We argued that.

Q    But you testified in your deposition, didn't you, that

Caudill did not apportion the expenses to the respective trade secrets or deduct from the IRS forms those expenses that were not related to their trade secrets; correct?

A   Yeah.  But you're mixing things.  I apologize, Mr. Resser, but you're mixing things here.

There was the R&D, which was trade secret number one, okay.  Then they had five other trade secrets where the jury found zero damages.  I believe what I was saying was they didn't apportion the expenses between those different trade secrets.  In a sense that became a moot point because we effectively won on those other five.  They awarded zero damages.  Otherwise, their trade secret number one was, in effect, a claim for their entire R&D for 26 years to take two products from seed to shelf.  Okay?  And so --

THE COURT:  Let me stop you.  I think we are getting far afield from the purpose of this testimony, so let's get another question.

So, Ladies and Gentlemen, just one thing, what I was talking about with the lawyers, when Mr. Pepe objected, was remember I told you there are going to be two buckets to the case, the billing stuff and then the other part of the case, which is the malpractice claim.  There may be some more of this, or there may not be, with regards to malpractice claim, but we're going to do that later.

MR. RESSER:  I do have some more questions about --

THE COURT: You can pursue as long as you can create that link.

Q (By Mr. Resser) Now, isn't it true, Mr. Giarratana, that Mr. Rogovin asked you to look deeper into the damages documents, the R&D damages documents?

A Do you have an e-mail you're referring to? I mean, the point is, we worked aggressively on defending against their damages claim for several years throughout trial. So if there's something specific you're pointing to, feel free to bring it to my attention. But we certainly aggressively addressed that issue.

Q Sure.

MR. RESSER: We'll offer, Your Honor, Defendant's Exhibit 617.

May that be published?

THE COURT: Yes, it may. 617 is full.

(Defendant's Exhibit 617, received in evidence.)

Q (By Mr. Resser) This is an e-mail from Mr. Rogovin dated March 27, 2016, in which Mr. Rogovin wrote, "I want discovery on Caudill's R&D" --

A I apologize. If you don't mind, Mr. Resser, I can't follow. You need to just let me know where you are. I'll go there. Thank you.

Q All right. Let me find it.

In the paragraph numbered 3, third line of that

paragraph, Mr. Rogovin wrote, "I want discovery on their R&D claim, which constitutes about 9.2 million of their trebled damages claim based on $3.2 million of 23 years of R&D off their tax returns."

Did I get that right?

A   You read it correctly, I believe.

Q   So you'll agree with me that Mr. Rogovin wanted discovery on Caudill's R&D claim; correct?

A   Yeah, and this was in March of 2016, and we very much did that.

Q   And you claim that that meant discovery just from Caudill, not from their accountants who prepared the tax return.

MR. PEPE:  Objection, Your Honor.  This is getting far afield.

THE COURT:  Yup, sustained.  We are getting far afield.

Q   (By Mr. Resser) Isn't it true that you claimed, Mr. Giarratana, that there was never a discussion with Mr. Rogovin about subpoenaing third parties to get R&D backup?

MR. PEPE:  Objection, same issue.

THE COURT:  Well, he changed the question a little bit, so I'll allow it, if I understood the question.

THE WITNESS:  Yeah, I just don't recall that.  I don't recall that one way or another right now.

We did have --

THE COURT:  No.  Stop.

THE WITNESS:  Okay.

MR. RESSER:  I'd like to play Mr. Giarratana's deposition, page 151, line 17, to 152, line 8.

THE COURT:  All right.  You can proceed.

(Plays video.)

MR. RESSER:  I'd like to offer PTX 240, Your Honor, and publish that to the jury, please.

THE COURT:  240?

MR. RESSER:  Yes.

THE COURT:  This is a plaintiff's exhibit?

MR. RESSER:  Yes.

THE COURT:  Is there any objection?

MR. PEPE:  No objection, Your Honor.

THE COURT:  All right.  240 is full.  That will come in full.

(Plaintiff's Exhibit 240, received in evidence.)

Q   (By Mr. Resser) On page 2, the fifth paragraph on page 2, I want to direct your attention to that.

A   Could you just speak a little louder?  Did you say the fifth?

Q   It's the paragraph that begins with, "If they want to depose Roy and even me (again), let them."  All right.  That's it.

Now, this is an e-mail from Mr. Rogovin to the trial

team, including you; correct?

A   You'll have to go up to the top so I can see.

Q   Okay.  Let's do that.

That's an e-mail of December 29, 2016, to you, Mr. Grondahl, and Mr. Rechen; correct?

A   Yeah.  It's preliminary thoughts on their motion.  I don't know what motion that is.

Q   You can read the document for context if you want.

A   Do you have a copy?

Q   I believe there was a motion about reopening discovery.

A   Do you have a copy?

MR. RESSER:  Mr. Pepe, do you have a copy of 240 that we can give the witness?  I apologize.

MR. PEPE:  240?  I wrote on it.  Is that okay?

MR. RESSER:  Yeah.

MR. PEPE:  I circled it.

MR. RESSER:  You can give him.

THE COURT:  You can approach.  Let's move this along.

MR. RESSER:  Thank you, Mr. Pepe.  I apologize.  I thought I had a copy here, but I don't.

THE WITNESS:  Okay.  Thank you.

It's --

THE COURT:  Let's get a question.

THE WITNESS:  There's a lot of pages here single spaced.  I apologize, Your Honor.

THE COURT: Mr. Resser, is there a part of the document?

Q    (By Mr. Resser) Yes.  It's on PTX 240, page 2, the paragraph that Mr. Campos had popped out, where it says, "If they want to depose Roy and even me (again), let them."

Do you see that?

A    Yes.  I just want to see what motion.  What the heck?

Okay.  So you're on -- I apologize, Mr. Resser. Which -- oh, okay.  I think I can see now.

Q    Second page of the document.

A    Correspond on my document to what's on the screen.  Thank you.  Let me read it.

Oh, it's down here, two-thirds of the way down.

Q    Yes.  Paragraph begins, "If they want to depose Roy and even me (again), let them."

Then Mr. Rogovin wrote to you and your colleagues, "I want a full throated depo on their R&D, including all records of their CPA, Joe Lyons, Dan Caudill, and yes, Kean again. With a forensic CPA present."

Do you see that?

A    I do.

Q    Later on, you refer to Mr. Rogovin's desire to disprove Caudill's R&D expenses as one of his pet issues, didn't you? Not in that document but later on in time.  And I can show you the document if you want.

A    Yeah, he says it here in this e-mail.  He says -- in the third line down, he says, "As long as they cried RICO, we'll pursue IRS fraud.  That was his pet issue.  He wanted to focus on their tax returns, and ultimately he wanted to somehow pursue them for IRS fraud.  And we persistently let him know, look, we can't do that.  You can't use discovery in this case to try to then go after Mr. Caudill for IRS fraud."

Q    But if you would have proved IRS fraud, you would also have proved that their damages claim was bogus; right?

A    Do you want to explain that for me?

Q    Well, I'll withdraw the question.

A    I mean --

THE COURT:  He's withdrawn the question.  He's withdrawn the question.

MR. RESSER:  We'd like to introduce Defense Exhibit 581 and publish that to the jury, please.

THE COURT:  Okay.  Hold on.

All right.  That can be introduced.  581 is full.

(Defendant's Exhibit 581, received in evidence.)

Q    (By Mr. Resser) 581 is an e-mail dated February 25, 2019, from you to Mr. Grondahl with a copy to Mr. Rechen; correct?

A    Yes.

Q    And it responds to Mr. Grondahl's e-mail of that same date.  And in that e-mail Mr. Grondahl wrote, "Kean called me this morning.  He needs to know your itinerary for the trip to

California next week.  Jarrow wants him to write down (from memory) what Caudill spent on research work that Kean did for the activated formula and spray dried myrosinase, and meet with you when you are in California to go over it."

Do you see that?

A   I do.

And then you responded that same day, the top of the exhibit, "Oh geez.  That's the last thing I want to fly to California to do.  The R&D is one of Jarrow's pet issues."

A   Yeah.

Q   And later you said, "Is there a way to quickly show from the documents produced that Caudill is lying about its 22 years of R&D?"

That's what you wrote; correct?

A   In part.  In part.

Q   But by then it was too late to do a full-throated depo of their CPA, wasn't it?

MR. PEPE:  Your Honor, objection.  This is --

THE COURT:  Sustained.  That's sustained.

Q   (By Mr. Resser) So when Mr. Rogovin's butt call complained about not cutting off Caudill's damages, the 2 million R&D, you knew he was referring to these e-mails that he had written you about his pet issue, the R&D, the CPA, and the tax returns; correct?

A   Absolutely not.  These e-mails you're pointing to, sir, are

not even related to one another.  The e-mail you showed me previously is unrelated to this e-mail.

This e-mail is one where -- first of all, we were to fly to California to, if I recall correctly, to prepare him for his testimony.  And he instead wanted us to sit down with Kean Ashurst and go through this information.

Kean Ashurst, we had spent a tremendous amount of time working with him, an extremely difficult witness.  Eric Grondahl addressed this issue in parallel, however.  We -- because we always pay attention to what we were asked to do.

And Eric Grondahl sat down with Kean Ashurst, and he went through the purported R&D expenses that Kean Ashurst could remember by memory.  And it was abundantly clear to Eric, and to us when I looked at Eric's analysis, that Kean Ashurst did not know what their R&D expenses were at all.  We had documents showing their R&D expenses because we did have some of their backup that showed that their R&D expenses were significantly greater than what Mr. Ashurst thought they were.

THE COURT:  All right.  I'm going to stop you because the question was whether you knew it was his pet issue.  I think that was the question, but ...

THE WITNESS:  Okay.  I apologize, Your Honor.

Q    (By Mr. Resser) Would you answer my question?  You knew it was his pet issue?

A    The IRS tax fraud was a pet issue, the tax fraud, not the

issue I just -- not the R&D issue.  That was a different one that I just explained our analysis of it.

MR. RESSER:  I'd like to offer PTX 134.

THE COURT:  Okay.  I assume there's no objection to that, so that's full.  PTX 134.

(Plaintiff's Exhibit 134, received in evidence.)

Q   (By Mr. Resser) PTX 134 starts with e-mail to you from Mr. Leventhal; correct?  It's July 3rd, 2019.  This is about a week, ten days after the -- I'm sorry.

A   Yeah.

Q   Almost exactly a week after the jury verdict against Jarrow Formulas.

THE COURT:  Just to be clear, I'm looking at an e-mail from Mr. Rechen to Mr. Leventhal.

MR. RESSER:  No, the first e-mail in the string, Your Honor --

THE COURT:  Okay.

MR. RESSER:  -- and for everyone is -- begins at the bottom of page 2 of the exhibit and continues on page 3 of the exhibit.

Q   (By Mr. Resser) And Mr. Leventhal is writing to Mr. Giarratana with copies to Mr. Grondahl and Mr. Rechen, "Subject:  Your call."

And he writes, "Mark, I am in a mega-disaster control meeting with the bank that will last the remainder of the day.

In addition to the bank, Ben and I are trying to figure out what we need to do in order to obtain a bond.

"This is in the middle of Jarrow Industries requiring millions of dollars for equipment and facilities."

Did I get that right?

A   You read that correctly.

Q   Then he asks:  How difficult would it have been to have a decent approximation of salaries?  Since there was zero evidence that we used the hopkinds seed that is irrelevance, but even so, it could have been broken and it would have been, what, 10 thousand?  30 thousand?  So what, and for the rest of Eric's counter, it appears that Eric had knowledge of what those expenses would have been at Wegner and Nateco.  So if Jarrow was right all along, our R&D evidence would have been about $200,000 and not an unverifiable $2 million.  The considerable difference in numbers might have even helped on the question of Caudill's credibility versus ours on the question of willful and malicious.  Even the basic compilation theory would have been undermined by the comparative trivial sum of $200,000.  We are racking our brains on the appeals issues considering how razor thin the defendants evidentiary record was kept.

Did I get that right?

A   Well, you -- largely right.  You corrected some of the typos.

Q   Okay.  Now, Mr. -- Mr. Rechen wrote back.  Even though the e-mail was to you, Mr. Rechen wrote back.

Okay.  On the second page of that e-mail, Mr. Rechen wrote, the last three lines of the paragraph that begins at the top of page 2, "So as a result, we were unable to attack these numbers" --

A   I apologize.  You have to -- thank you.  Thank you.

Q   I'm sorry.

Ready?

A   Yes.

Q   "So as a result we were unable to attack these numbers with any specifics except with the limited information we had in our cross-examination of Wingate."

Wingate was the damages expert for Caudill Seed; correct?

A   Yes.

Q   And then Mr. Rechen goes on to say, "which everyone thought went very well.  In fact, Joel Beres told his partners that the cross-examination was a master class on how to cross-examine a damages expert."

Do I have that right?

A   Yeah, Joel's -- that's correct.  Joel said that.

Q   And then after the verdict, Mr. Rogovin made the inadvertent call saying M&E didn't do S-H-blank-blank to cut off damages; right?

A    He did -- he made the statement.

Q    And you knew at that time that Jarrow Formulas was unhappy about the way M&E handled the damages defense; correct?

A    Obviously, after the verdict, Mr. Rogovin expressed his -- turned his anger on us and expressed his anger.

Q    And you knew that that was one of the reasons he didn't pay the bill.  Isn't that right?

A    No.

Q    Now, Mr. Rogovin also complained in the butt call that M&E didn't put in the O'Brien letter; correct?

A    Yes.

Q    In fact, he said in the butt call, "Lawyer called O'Brien. We have no intention of modeling any trade secrets, and if you tell them what I should avoid, I will.  Because they didn't put that in, they found willful and malicious.  Okay?  You know what that's called?  Malpractice."

     You heard that on the butt call; right?

A    Yes, I did.

Q    So you knew that another reason Mr. Rogovin was unhappy with McCarter & English and didn't want to pay the bill was because the O'Brien letter never got into evidence in the Kentucky trial; correct?

A    Well, I know that he expressed that after the verdict and that's something he came up with after the verdict.

Q    And the O'Brien letter never got into evidence in Kentucky.

Isn't that right?

A    Absolutely not.

Q    It did get into evidence?

A    Absolutely not, it did not go into evidence.  It absolutely did not go into evidence.

Q    And you had told Mr. Rogovin that the O'Brien letter was a critical piece of evidence in the Kentucky case, didn't you?

A    I believe Mr. Rogovin thought it was critical.

Q    Are you denying that you told him it was critical?

A    I don't -- I believe -- I recall him thinking it was critical because in that e-mail he had said that he had asked them -- well, first of all, there were several e-mails.  So it's hard to tell.  It was a chain of e-mails he had sent throughout the hours of the evening.  And there was a part of the e-mail that he liked because it said, "Tell me what your trade secrets are."  "There are none."  Sort of a rhetorical question.

          We had real concerns about that e-mail --

          THE COURT:  Wait one second.

          So, Ladies and Gentlemen, I just want to be clear as to why you're hearing this testimony now about this O'Brien letter, about the damages.  Okay?  The only reason I'm permitting you to hear this testimony, and the only purpose for which you may consider it, is to try and gain an understanding of Mr. Rogovin's reasons as expressed in that call, the

so-called butt call.  That's the only purpose of this evidence, which will ultimately go to the question of whether the alleged refusal to pay, or failure to pay, was willful and malicious. That's the only purpose for which you may consider this evidence.  You may not consider it for any other purpose.

All right.  Let's get another question, Mr. Resser.

Q   (By Mr. Resser) Mr. Rogovin felt that that letter showed Jarrow Formulas wanted to avoid taking any trade secrets from Caudill; correct?

A   He may have felt that, but we had serious concerns about that e-mail from a number of reasons.

THE COURT:  Stop.  Next question.

THE WITNESS:  Serious concerns.

Q   (By Mr. Resser) But as of the day of the jury's verdict, and particularly after you received the voicemail, the inadvertent butt call, you figured that Mr. Rogovin blamed M&E for losing the trial; correct?

A   Yeah, I think he -- I think that was the clear essence of his message.  He -- he suddenly came up with malpractice obligations and said, "They can pay the damages."

Q   And I take it you assumed at that point that Mr. Rogovin was going to dispute M&E's bills in the Kentucky trial as well. Do I assume correctly?

A   No, not necessarily.  I -- when I got the -- when I got the butt dial, I was certainly -- you know, it was certainly a kick

in the gut. We certainly commiserated about it after five weeks or three months of working 24/7 to hear that. But in all candor, at that point I continued to do my job, and I continued to try to protect the company's interests. And we continued to work for the client, and the client asked us to continue to work.

I didn't know what Mr. Rogovin was going to do. Okay? But my job was to continue to protect the company, and we did that.

Q   But Mr. Rogovin said, "As far as I'm concerned, they can pay the damages," and "they" meaning M&E.

A   He did say that, and that was very concerning to me. Of course it was.

Q   Isn't it fair to assume from that that you were concerned also about getting paid?

A   That didn't cross my mind yet. I was -- there certainly after --

Q   I think you've answered the question.

A   -- a five-week trial --

THE COURT:  Stop.  Stop.  Next question.

Q   (By Mr. Resser) You never told Mr. Rogovin that you received the inadvertent butt call until after M&E sued Jarrow Formulas on its alleged claim for unpaid fees; correct?

A   I never spoke to Mr. Rogovin again.

Q   Well, you didn't e-mail and say -- you didn't e-mail him

either and say, I got an inadvertent call from you so I know what you said about me, or anything like that.

A    That's not true.  I called him.  I called him the afternoon of the verdict.  I called him the evening of the verdict.  I attempted to reach out and communicate with him.

Q    None of those communications mentioned the butt call; correct?

A    No.

Q    You never told him that he inadvertently called you and you have him recorded as to what his state of mind was the night of the verdict, did you?

A    I -- I -- it's fair to say that I did not, in those attempted communications, let him know that I have a copy of his butt dial to me.  No, I didn't.

Q    And after the verdict against Jarrow Formulas, you did speak with Mr. Leventhal; correct?

A    Yeah, I testified I spoke to Mr. Leventhal and Mr. Lipsky.

Q    And he asked about -- you spoke about possible issues for appeal of the verdict; correct?

A    Well --

Q    It's a yes-or-no question, sir.

A    We spoke about JMOL law.  I think he called it an appeal, but I think he was referring to the JMOL.

Q    Well, he wrote you what he was asking about after the call;

right?  He followed up with an e-mail.

A    He did.

Q    Let's take a look at PTX 131, which is that e-mail.

A    Sure.

Q    And let's see what it actually says.

MR. RESSER:  I believe that's in evidence already.  If not, we offer PTX 131.

THE COURT:  Yeah, it's in evidence, yeah.

Q    (By Mr. Resser) Again, the day after the verdict, Mr. Leventhal writes to you, "Hi Mark, I just landed at LAX. Please send me ASAP the time line of key filing deadlines."

Do I have that right?

A    You do.

Q    "Also, your analysis that we discussed about for an appeal."

Right?  That's what it says?

A    That's what it says.

Q    And the analysis is something that you and he spoke about on the phone; correct?  Before that e-mail.

A    Yeah, and the analysis was about the JMOL.

Q    It doesn't say anything about a JMOL in the e-mail, does it?

A    Well, it does because it says the "analysis that we discussed."  Sometimes when you read Mr. Leventhal's writing, you have to interpret it.  It's not always crystal clear, as

you've noticed today.  When he was talking about an appeal, he was referring to our discussion yesterday.  Our discussion yesterday was about the JMOL.

Q    Nowhere in this e-mail does it say "JMOL," sir, does it?

A    No.  It says the "analysis that we discussed."  I know that was the JMOL.

Q    And two days later you wrote back with the deadlines; right?

A    Um, I -- I don't recall exactly.  We sent -- I think it may have come into evidence earlier today.  We sent an e-mail showing -- it was about a one-page e-mail.  I believe it was written by Attorney Rechen showing, in great detail, all the upcoming deadlines.  And I testified to that.

I don't recall if that was two days after this though.

MR. RESSER:  We'd like to mark as new Exhibit 714 for impeachment an e-mail that Mr. Giarratana wrote to Mr. Leventhal dated Saturday, June 29.  It was Leventhal 35 in his deposition.

THE COURT:  I don't have that document, but let me ask ...

I don't have it.

MR. PEPE:  It's not listed as an exhibit, Your Honor.

THE COURT:  Well, he's using it for impeachment.  I'm going to need to see it, and he'll need to show it to you.

Why don't you show it to Mr. Pepe first.

May I see it, please?  Thank you.

MR. PEPE:  There's no objection.

THE COURT:  There's no objection?

MR. PEPE:  There's not now that I've seen it.

THE COURT:  Very well.  You can proceed.

MR. PEPE:  Is that going to have a Defendant's Exhibit number now, Your Honor?

MR. RESSER:  Yes, 714.

THE COURT:  Okay.  So why don't we --

MR. RESSER:  Next in order is 714.

(Defendant's Exhibit 714, received in evidence.)

THE COURT:  You can proceed.  If you've got it on the screen, you can bring it up if you'd like.

Q   (By Mr. Resser) So this is the e-mail that you wrote to Mr. Leventhal and to Mr. Rogovin on June 29, Saturday.  And it says, "As discussed with Jonathan, attached is a preliminary draft of the brief in support of the motion for JMOL."

Do I have that right?

A   You do.

Q   And then at the top of the document, it shows attachments. And included in the attachments are Jarrow Formulas's memo and ISO, which I assume means "in support of"?

A   Yes.

Q   Renewed motion for JMOL.

A    Yes.

Q    Now, you testified earlier that Jonathan asked you for that; right?

A    Yes.  This is what he was referring to when we talked about the analysis that we had discussed.  He mistakenly called it an appeal, but it was about the JMOL.

Q    Now, he wrote you on Thursday, late at night, and this motion comes to him Saturday, a complete draft of a motion.

Now, I take it you had started working on this motion before Jonathan's e-mail asking for the analysis; correct?

A    I -- if I recall correctly, it's on the bills, by the way, that you have.  I think I spent some time on Thursday on the flight, and then I largely worked on Friday.  And as you can see, I worked all day Saturday and I didn't get it out till 8:51.

Q    And you also provided three deadlines in that e-mail; correct?

A    I'd have to see it.

Q    E-mail is there.

A    I did.

Q    And instead of an analysis that you had discussed with Mr. Leventhal about an appeal, you sent a draft of a renewed JMOL motion; correct?

A    I sent him what we discussed.  I sent him what we discussed.

Q   Well, that's what you say but not what the e-mail says; right?

A   Well, I disagree with that as well.  His e-mail says "your analysis that we discussed."

Q   And M&E is seeking payment of the bill for the JMOL; correct?

A   Yes.

Q   And, in addition, M&E is claiming that it was bad faith for Mr. Leventhal to ask for that work after the jury verdict came in, given what Mr. Rogovin had said in his butt call; right?

A   In part.

Q   And when you sent that e-mail on June 27, you had already received Mr. Rogovin's inadvertent voicemail; correct?

A   You're talking about the butt dial.

Q   Yes.

A   I explained that.  Yes, of course, I did.  This was on Saturday evening, and I received that on the evening of the verdict.

Q   And -- but you are asking us to believe that you had no worries at that point about not getting paid; is that right?

A   It's irrelevant.  It's irrelevant.  I have to do my job.

            MR. RESSER:  No further questions, Your Honor.

            THE COURT:  All right.  Mr. Pepe?

                       REDIRECT EXAMINATION

BY MR. PEPE:

Q You said you have to do your job, Mr. Giarratana?

A Yes.

Q What do you mean?

A As an attorney, I have an obligation to defend my client unless and until I'm terminated. I have to defend the company regardless of what kind of conduct I'm faced with by a particular employee of that company. My job is to defend the company.

Q Until and unless you're terminated?

A Exactly.

Q And you got that termination notice when?

A July 15th, I believe.

Q From Carol Brophy?

A Yes.

Q And did you work for the company from the night of the verdict until -- or July 15th?

A Absolutely.

Q And did you do everything that you were asked to do by Mr. Leventhal or anyone else from the night of the verdict until July 15?

A Absolutely.

Q And did you only stop working for Jarrow Rogovin the night -- the day you got the termination notice?

A Yes.

Q And by that time had you provided to them, Jarrow Formulas,

Inc., everything they had asked for?

A    Yes.

Q    Mr. Leventhal said he asked you about an appeal, Mr. Giarratana.  You understand you can't appeal until there's a final judgment?

A    Yes, absolutely.

Q    And was there a final judgment at the time you had that discussion with Jonathan Leventhal in the Kentucky litigation?

A    No.  It was abundantly clear to me that he was referring to our discussion the other day, the discussion that he referred to, which was about the JMOL.

Q    You're not -- question withdrawn.

As a result of your representation of Jarrow Formulas, Inc., over many years, did you become familiar with the fact that that company retained other lawyers besides you in your firm?

A    Yes.

Q    And I'm talking now, if you would focus on the years of the -- of the Kentucky litigation, 2013 through 2019.  Do you have that in mind?

A    Yes.

Q    During that time, were you aware that Jarrow Rogovin or Jarrow Formulas, Inc., was using on a regular basis other law firms?

A    Absolutely.

Q    And are you familiar with some of the law firms they used on a regular basis?

A    Yes, I am.

Q    And could you identify some of them and tell us, for example, whether they're national firms or not?

A    Yeah.  I mean we were just one of the several firms that the company had retained over the years.

As an example, Jarrow Formulas regularly worked with a firm named Steptoe & Johnson, which is an international firm that's based in California, much larger than our firm.

One of Jarrow Formulas' other attorneys works for a fairly large firm based out of Arizona by the name of Ryley Carlock, another fairly large firm.

Also in the past Jarrow Formulas has worked with Greenberg Traurig, which is, I believe, an international firm, much larger than our firm.

And there are a number of other firms that Jarrow Formulas has regularly engaged and worked with over the years.

Q    Now I'd like to direct your attention, if I may, to the examination concerning the May 2019 negotiations for a discount just prior to the start of trial.  Do you have that in mind?

A    Yes.

Q    Okay.  You were shown a series of e-mails and examined about that between you and Mary Grace Reyes and Cathy Adipietro

and Mary Grace Reyes.  Do you remember that?

A   Yes.

Q   Let's see if I can find the right e-mails here now.  Give me a second, please.

MR. PEPE:  I'd ask Mr. Wyzik if he could call up Exhibit, already in evidence, 121, please, Mr. Wyzik.

This is an e-mail string ending with an exchange between Mr. Khowong and Mr. Giarratana.  Do you have 121?

THE COURT:  I guess he seems to be indicating that there needs to be something on the screen.

MR. PEPE:  I think it's already in evidence.

THE COURT:  I have no doubt.

THE CLERK:  I'm sorry.

Q   (By Mr. Pepe) You saw that before, Mr. Giarratana?

A   Yes.

Q   Your testimony was that you made very clear to Mary Grace Reyes that the additional 5-percent discount, in addition to the 38 percent already being granted, was in consideration and exchange for payment of all the outstanding invoices.  That was your testimony; correct?

A   Yes.

Q   You stand by that.

A   I do.

Q   No doubt in your mind?

A   Not at all.

Q    You thought you set that forth in the e-mail exchange too?

A    Yes.

Q    Okay.  Let's take a look at page 3 of Exhibit 121, lower right-hand corner.  That's it.  Thank you.  If we can call out, please, Mr. Wyzik, the e-mail at the very bottom from Mr. Giarratana to Ms. Reyes on May 31.

A    It's actually, I believe, Mr. Pepe, the earlier e-mail.

Q    You have that in front of you, sir?

A    I do.

Q    It says, "As indicated below, we are agreeable to provide such a discount because of the substantial expense of this matter, the impact on Jarrow Formulas and our long-standing relationship with Jarrow Formulas.  However, we are not permitted to go any further.  Please let me know if this is acceptable.  As indicated, it is important that we bring the AR current as we head into trial on June 3."

A    Yes.

Q    What was the approximate amount of the AR outstanding at that time, the best of your recollection?

A    At that point I believe it was approximately 1.3.

Q    1.3 million?

A    Yeah, I believe so.  And if we go down to the other e-mail, we reinforce that.

Q    Where are you now, sir?

A    The earlier e-mail.  May 24.

Q    The page number at the bottom.  24 did you say?

A    The May 24 e-mail.

Q    I'm sorry.

A    It's just earlier in that e-mail chain.

Q    Yup.  I understand.

          THE COURT:  Can we bring that up, please?

          MR. PEPE:  Can I have 124 -- excuse me -- 120, Mr. Wyzik?

Q    (By Mr. Pepe) Do you have that, sir?  120?

          THE COURT:  Not yet.

Q    (By Mr. Pepe) You have 120, sir?

A    I believe it's -- he's got the May 24 e-mail up now.

          MR. PEPE:  Going to the May 24 e-mail string, PTX 120, Mr. Wyzik.

          THE COURT:  Mr. Giarratana, is this what you wanted to be asked about?

          THE WITNESS:  Yeah, I was referring --

          THE COURT:  Mr. Pepe, he's got the document on the screen.  Why don't you ask him about.

Q    (By Mr. Pepe) I didn't realize that.  I'm sorry, Mr. Giarratana.

A    It just came up.

Q    Did PTX 120 -- can you identify in the e-mail where you made that clear?

A    Yeah.  We --

Q    Direct your attention to the bottom of that page, but go ahead.

A    If we look at the blowup, which is slightly above it, in the first line -- this is on May 24 -- I state, "Dear Mary Grace, thanks for your below e-mail.  Attached is a current listing of our firm's outstanding invoices to Jarrow Formulas."

We had attached the invoices.  We say, "The Caudill Seed trial will start on June 3 in Louisville, Kentucky.  We have been very busy devoting the resources necessary to prepare the Caudill Seed case for trial.  We request and would appreciate payment of the outstanding invoices in advance of that date so that Jarrow Formulas will be current heading into trial."

So we were very clear to them that we wanted paid the outstanding invoices that were attached to the e-mail.

Q    In that same e-mail, right above that, is Mary Grace Reyes's e-mail to Ben Khowong.  Do you see that?

A    Yeah.

Q    And she quotes you to Ben Khowong.

A    It's not shown here, but she quotes, I believe, that statement.  I can't see it right now on the screen.

Q    I'll ask.  There is the e-mail from Mary Grace to Ben Khowong.  She notes -- the one immediately above the one we just had, Mr. Wyzik.  On Exhibit 120, first page.

120, first page, middle of the page.  Can we pull up

120, please.

All right. Middle of the page, from Mary Grace Reyes to Ben Khowong.

You see that? Can you read -- can you blow that up, Mr. Wyzik? Thank you. No the one below that, please.

Thank you.

She quotes that to Mr. Khowong?

A  Yeah, provided -- she states right there, "We will give the discount provided Jarrow Formulas pays its outstanding invoices."

Q  Half of the outstanding invoices, that's not what you said or she said to him, is it?

A  Yeah, I didn't say pay half of them. I said pay the outstanding invoices.

Q  Now, can I go back, if you would, Mr. Wyzik, to 121.

We see there, Mr. Giarratana, your complaint that only half was paid at the bottom of the page?

A  Yes.

Q  And then we see up above Mr. Khowong's response to you?

A  Yes.

Q  He says, "There was a misunderstanding on your offer, passed to me by Mary-Grace."

We saw earlier Mary Grace just quoted your language; correct?

A  Yeah, and she forwarded my e-mail as well.

Q    When he paid only half of the outstanding invoices instead of the entire amount, as you had made clear, did you and your team continue to work in preparation for the trial?

A    Absolutely.  We -- we, of course, wanted to get paid, but we couldn't let this overshadow our work in any way, and we did not.  It didn't affect in any way the fact that we continued to work 24/7 for the client and do the best job that we can.  We assumed we would get paid.  That didn't happen.

Q    You were asked on cross-examination about -- about, yeah, before I leave that subject.  Thank you.  Before we leave that, going back to 121, again Mr. Wyzik, if you could blow up that top one again, please, from Mr. Khowong.

     Mr. Khowong said he went out of his way to pay you a check of 700,000 despite the fact Jarrow wanted me to send only 100,000 for now.  And I think he means, I do not have the authority to send you any more at this time without Jarrow's instruction, end quote.

     Did Mr. Rogovin tell you at any time, from May 24 to June 12, that he had -- that he didn't want Mr. Khowong to pay what you had agreed, that is, all the outstanding invoices?  Did he ever tell you --

A    No.

Q    -- that he had put a limit on Mr. Khowong?

A    No, absolutely not.  And my clear take-away from this is this is all they're going to pay for now.  The clear

implication was:  You're going to get paid.  Don't worry.  This is all we're going to give you for now.

Q   Mr. Rogovin had never told you that he had put any restrictions on Mr. Khowong?

A   He did not.

Q   You were examined on cross-examination about Mr. Rogovin's claim on the butt dial after the verdict --

A   Yes.

Q   -- after the verdict that you had failed to limit the damages.  Recall that?

A   Yes.

Q   Their damage expert, Caudill Seed's damage expert in the Kentucky litigation, was one Mr. Wingate?

A   Yes.

Q   Mr. Wingate testified as to their damages?

A   He did.

Q   And Mr. Rechen cross-examined him?

A   He did.

Q   What did Mr. Rogovin have to say when Mr. Rechen was through with the examination of their damage expert, Caudill Seed's damage expert?

A   He was extremely laudatory.  If I remember, he hugged Mr. Rechen.  And I think he said in an e-mail it was like watching something to the effect of performing surgery without anesthesia, if I remember correctly.

Q    Did he have any complaints to you before the verdict about the way you had handled the damages?

A    Absolutely not.

Q    Was it a long road with respect to Caudill's claimed damages over those six years of litigation?

A    Yes.  We -- we -- we spent a tremendous amount of time dealing with that damages issue, taking discovery on the damages issue and preparing that issue for trial, all in very close consultation with Mr. Rogovin.

Q    And as you approached the end of the trial, approached the end of the trial, did Mr. Rogovin -- I'm talking now just before, just before the verdict, the evidence ended, did Mr. Rogovin have anything to say to you and your trial team about your performance in that trial?

A    Yeah.  I mean, if I recall, he sent an e-mail -- that may be the "heroes in the saga" e-mail, if I remember correctly, but he was very laudatory, very laudatory, seemingly, you know, very satisfied with -- with the defense of the case.

Q    And did that state of mind change after the verdict came in?

A    Obviously, it changed quite dramatically.

Q    I'd like to go back to the original retention letter in December of 1996, if Mr. Wyzik could call up PTX 095.

         You remember that, of course, is the first engagement letter when Mr. Rogovin came to you in 1996.  You recall that,

of course.

A    I do.

Q    And if we could go to the second page, Mr. Wyzik, if you would, please.  We've seen this before, of course, but it was raised on your cross.  Second paragraph that begins, "Charges and disbursements," if you could call that out, please.

And could you highlight the sentence that begins, "These base rates may change from time to time."

You testified, Mr. Giarratana, over the 23 years of this relationship, you and your colleagues at the three different firms you were at over those 23 years handled more than 540 legal matters for Jarrow Formulas, Inc.,; correct?

A    That's correct.

Q    And you testified everyone was on a time-devoted basis; correct?

A    That's correct.

Q    Everyone had monthly invoices; correct?

A    Correct.

Q    An estimate of the invoices that were sent to Mr. Jarrow Rogovin over 23 years and 540 matters would be many, many hundreds, if not thousands.  Is that a fair statement?

A    It is fair.

Q    Many matters, a monthly invoice in every matter; correct?

A    Yes.

Q    And over those 23 years, did, in fact, the base rates you

quoted and charged in 1996 change for you and the lawyers working for you?

A   Yes.  As we -- we could tell that here the base rates were -- I was $200 an hour.  By 2008, 2009, I was roughly twice that at 405.

Q   And each -- and you testified typically and usually the rates would be reviewed and typically increased at the end of the -- at the beginning of the new fiscal year on October 1; correct?

A   Yes.

Q   And that was generally the pattern over those -- certainly over the years at McCarter & English and likewise at your previous firms?

A   That's correct.

Q   Okay.  Did you -- and as the billing partner and the responsible partner, when those rates went up for you and the other lawyers working on the matter, did you send a letter to Jarrow Rogovin saying, Look, Jarrow, I'm increasing my rates effective October 1 and going forward?

A   No.

Q   Ever?

A   No.

Q   Did you show the new rate change in the bills effective after October 1 using that as the beginning of the fiscal year?

A   Yes.

Q    Did you ever receive a complaint from Jarrow Rogovin that he was unaware of or did not get notice about the rate changes that occurred typically every year?

A    No.

Q    Never a complaint?

A    Not once.  Not once.

Q    Did anyone else at JFI, Ben Khowong or anyone else, ever complain?

A    Never, absolutely never.

Q    And until this litigation and until the last five bills, did they pay those invoices month after month, year after year, for the services you rendered?  Did they pay them without objection and without complaint subject to a requested discount?

A    Absolutely.

          MR. PEPE:  May I have just a moment, Your Honor?

          THE COURT:  Yes.

     (Pause.)

          MR. PEPE:  No further questions, Your Honor.

          THE COURT:  All right.  Very well.  Mr. Resser, some redirect?  Would you like some redirect, Mr. Resser?

          MR. RESSER:  Yes, Your Honor.

          THE COURT:  All right.  Ladies and Gentlemen, I ordinarily don't allow four examinations, but because what I told you before about not wanting to call the witness again for

billing issues, we decided to consolidate.

So, Mr. Resser, go ahead.

MR. RESSER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. RESSER:

Q   Mr. Pepe talked with you about your e-mail saying you wanted the bills current -- correct? -- on the May, the May negotiation of an additional discount in 2019; right?

A   There were the e-mails asking them to pay the outstanding invoices in order to bring the account current.  The clear message was to pay the outstanding invoices.

Q   But you knew that, based on the course of conduct with Jarrow Formulas, that they thought "current" meant paid within 60 days; correct?

A   I don't know.  All I know is what we asked for I think is abundantly clear.  You can't read current -- you can't pull it out of context of the very clear message that was in the e-mail to him.  It was very clear that they needed to pay the outstanding invoices that were attached, and if they did so, it would bring the account current.

Q   I don't think you answered my question.  Because earlier in my testimony I played your deposition testimony where you said typically they paid within 60 days, and that was -- that was the course of conduct between McCarter & English and Jarrow Formulas where they viewed current anything 60 days or more

would be paid.  And that would be current; correct?

A   I'm going to respond to the whole question, which is they were also asking for a discount.  And the course of conduct was such that every time they asked for a discount, it was an exchange for paying all of the outstanding invoices, not half or some other portion of them.

Every time they asked for a discount, it was an exchange for all, payment of all.  That was the course of conduct.  This was different in that it was not at the end of a fiscal year.  And I think I said it's the first time they asked for a discount other than at the end of the fiscal year.

Q   Now, PTX 121 mentions that there were invoices attached to your e-mail, but unfortunately they're not attached to PTX 121.

The invoices mentioned, however, by our calculation, totaled $362,000 -- $362,052.50 in fees.  We already established Jarrow Formulas paid nearly $500,000 in fees.  So didn't they actually pay more than what you had asked in your e-mail?

A   I don't have the e-mail in front of me.  I don't have the invoices in front of me.  My understanding at the time was they were to pay all of the outstanding invoices and they did not. They paid half.

MR. RESSER:  Do we have those e-mails on the system for impeachment?

Let's put up the attachments referenced in the e-mail.

This will be Defendant's 715, 716, and 717.

THE COURT:  Okay.  So we'll have to have them marked, but that's fine.

MR. PEPE:  We don't have copies, Your Honor.

MR. RESSER:  We'll give you the Bates numbers.

MR. PEPE:  These are not on the exhibit list.

THE COURT:  Yes, I'm aware.

MR. RESSER:  This is for impeachment.

THE COURT:  But let's show it to Mr. Pepe first.

MR. RESSER:  We're having difficulty, Your Honor, in locating the invoices that are referenced in Mr. Giarratana's e-mail.

THE COURT:  Okay.

MR. RESSER:  We do have the invoices referenced in Ms. Reyes's e-mail.

THE COURT:  That wouldn't impeach his statement.

MR. RESSER:  Correct.  Withdrawn.

THE COURT:  All right.

Q   (By Mr. Resser) Mr. Giarratana, any of the rate changes that you just spoke with Mr. Pepe about during the 23-year relationship, were any of those rate changes the subject of a written notification before time was incurred at the new higher rates?

A   Not before the first time.  Not before the first bill.

Q   So the answer's no.

A    Yes.

MR. RESSER:  Thank you.

THE COURT:  All right.  So, Mr. Giarratana, you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right, Ladies and Gentlemen, we have six minutes left.  The weekend lies ahead of us.  I'm not going to have them call another witness.  By the time they're sworn in, it will be time to send you home.

So enjoy your weekend.  Don't discuss the case.  Don't let anyone discuss it with you and all that goes with it.

I know you're home on the weekend.  If you get bored on a Sunday, don't Google the case.  Don't have anything to do with the case.  Think about something else this weekend. Enjoy your weekend.  We'll see you Monday morning at 8:45 in the jury room.  Thank you very much for your attention this week.

(The jury left the courtroom at 3:25 p.m.)

THE COURT:  Please be seated.  A couple things I wanted to go over.  First of all, you noticed from my rulings on exhibit that there were some things I couldn't find.  What I would request is that someone e-mail -- I think there were seven exhibits I found to be missing.  Of course, I have all the exhibits, but, folks, I have about six boxes of binders in my office.  I really don't want to go on a treasure hunt for

these. So if you could just e-mail my law clerk the seven exhibits I indicated as missing in the rulings on exhibits, I would greatly appreciate it. I'd also greatly appreciate it if that could be done by 4:30 today, which is an hour away, if that's at all possible.

MR. PEPE: Excuse me, Your Honor. Those would be identified in an order that you made?

THE COURT: Correct. I believe I posted either one or two orders making my rulings on exhibits, and I said these exhibits were missing. I think it was about seven times, if I could get those documents just e-mailed.

MR. RESSER: I believe that on the ones that we did not submit we were withdrawing them, and I should have mentioned that in a slip page or something. And so we'll notify the Court of that.

THE COURT: If you would please notify Mr. -- my law clerk about that.

MR. RESSER: Will do.

THE COURT: All right. Thank you. Just with the exhibit numbers.

MR. RESSER: In some cases there were duplicates objected to and then there was a duplicate that wasn't objected to and we just went -- like 636 is an example.

THE COURT: That's fine.

All right. Now, I have the designations as to

Ms. Adipietro. I expect to put a ruling up on that probably this weekend, in any event, no later than early Monday morning. So I just wanted you to know that.

I believe once I've completed hers, I believe I will have completed all the designations as to witnesses who are not being called live. Am I incorrect about that?

MR. RESSER: Only because of Mr. Khowong, we're still not sure he's going to be able to testify given the situation with his father's death and so on. We are fairly certain that we will just proffer his deposition at this point.

THE COURT: Ah.

MR. RESSER: So we would ask that the Court rule on those, and then we can go forward and let counsel know what our plans are.

THE COURT: Well, you know, I don't mind doing the work. I think I've shown that. But I really don't want to do designations and then find out he's coming.

So when do you think you'll know?

MR. RESSER: Well, Your Honor, if there's an objection to an important question that is sustained, I may need to do something about that. And I wouldn't do it unless there's a sustained objection.

THE COURT: All right. I'll give you rulings on Mr. Khowong.

MR. RESSER: Thank you, Your Honor.

THE COURT:  I think that covers -- so it's Khowong and Adipietro.  Those are the designations I have to do.

Let's talk about the witness lineup for Monday.

Mr. Pepe, who do we got?

MR. PEPE:  Yes, Your Honor.  We're going to call as our next witness Ms. Jacqueline Bosma.

THE COURT:  And then who do we think?  If you had time on Monday after her, who do you think would be next?

MR. PEPE:  We don't have any others, and I'm going to -- I don't want to use the word "rest," Your Honor, but I'm going to end the presentation of our evidence on the first part of the case concerning billing issues, subject to the evidence that might come in that's relevant to billing in the second part of the case.

THE COURT:  Okay.  That's fine.  All right.

And so then, Mr. Resser, if you had to start the -- effectively start the malpractice case on Monday, late Monday morning, Monday afternoon, who would be your first witness?

MR. RESSER:  Mr. Rogovin.

THE COURT:  Okay.  Very well.  I imagine he'll be quite some time.  So, fine.  That's all fine.  Okay.  I did want to see Mr. Pepe and Mr. Resser at sidebar for just a moment, please.

(At sidebar off the record.)

THE COURT:  So I think that's all I had to cover by

way of housekeeping issues.  Did counsel want to raise anything?

MR. PEPE:  Nothing from plaintiff, Your Honor.

THE COURT:  Mr. Resser?

MR. RESSER:  No, Your Honor.

THE COURT:  Very well.  Have a nice weekend.  We'll be in recess.

(Proceedings concluded at 3:30 p.m.)

**I N D E X**

| WITNESS NAME | Page |
|---|---|
| Mark Giarratana | |
| Continued Direct By Mr. Pepe | 279 |
| Cross By Mr. Resser | 313 |
| Redirect By Mr. Pepe | 458 |
| Redirect By Mr. Resser | 473 |

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937