UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

    No. 3:19-CV-1124 (MPS)

McCARTER & ENGLISH, LLP

    JULY 10, 2023

vs.

    8:55 A.M.

JARROW FORMULAS, INC.

    JURY TRIAL

- - - - - - - - - - - - - - - - x

Volume IV, pages 483 - 729

450 Main Street
Hartford, Connecticut

BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:   Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

       McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
          One State Street, 14th Floor
          Hartford, Connecticut 06103
     BY:  LOUIS R. PEPE, ESQUIRE
        JAMES G. GREEN, JR., ESQUIRE
        JAMES A. BUDINETZ, ESQUIRE
        DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

     BARTON LLP
        100 Wilshire Boulevard, Suite 1300
        Santa Monica, California 90401
     BY:  BERNARD M. RESSER, ESQUIRE

     BARTON LLP
        711 Third Avenue, 14th Floor
        New York, New York 10017
     BY:  JAMES E. HEAVEY, ESQUIRE
     BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:55 a.m.)

THE COURT: Let's have appearances starting with plaintiffs.

MR. PEPE: Good morning, Your Honor. May it please the Court, Attorney Louis Pepe for the plaintiff, McCarter & English. With me is Attorney James Green, Attorney James Budinetz, and Attorney David Case.

THE COURT: Good morning.

MR. HEAVEY: Good morning, Your Honor. May it please the Court, James Heavey on behalf of Barton LLP and the defendants and counterclaimants Jarrow Formulas. With me is Attorney Resser, Bernie Resser, and Attorney Michael Ward.

THE COURT: Good morning.

All right. Mr. Pepe, I did want to follow up on something you said on Friday before we bring the jurors in. You had said that -- I asked about future witnesses, and you mentioned that we'd have Ms. Bosma this morning. And then you'd said that at that point you wouldn't have any more witnesses but you didn't want to use the word "rest." I just want to make sure we're on the same page.

So as we discussed, you're going to put on the entire billing case initially and then that -- when you're done with that, though, I would think, in fact, you would be in a position to rest; right? Because you, of course, don't have the malpractice claim, and that is what would be left. Am I

right so far?

MR. PEPE: Here's where I might respectfully disagree with Your Honor.

THE COURT: Oh.

MR. PEPE: When we talked about the order of proof --

THE COURT: Yes.

MR. PEPE: -- at several status conferences, one part that came up was that there might be evidence that came in in the malpractice case that would be relevant to and related to the billing issues.

THE COURT: Oh, I see.

MR. PEPE: And so I would not want to be precluded from using that.

THE COURT: I see what you're saying.

MR. PEPE: So that's why I used the term "rest the case" in quotes. That was my thinking.

THE COURT: I don't have a problem with that, but I guess what I want to understand, though, is your plan is to put on all your evidence that you believe -- apart from, shall we say, inextricably intertwined evidence that primarily relates to the malpractice case, apart from that evidence, your plan is to put on all your affirmative evidence related to billing issues before we get to the defendant's case; is that right?

MR. PEPE: I think that's a fair statement, Your Honor, and again subject to the Court's willingness to allow us

to offer rebuttal if that seems appropriate.

THE COURT: Well, we'll have to see about that when we get there.

MR. PEPE: Yes.

THE COURT: But I just want to make sure I understand the full contours of that statement.

So, for example, if you designated testimony, you're going to put that on -- excuse me. If you designated testimony that relates to the billing case, you're going to put that on before you hand off the reins to Mr. Resser and his team to call the witness first; is that right?

MR. PEPE: I don't want to make this more complicated than it is, Your Honor, but I can think of one exception. For example, there was testimony from Mr. Khowong in his deposition --

THE COURT: Right.

MR. PEPE: -- that relates to the billing issues.

THE COURT: Yes.

MR. PEPE: And again --

THE COURT: That would be most of his testimony relates to the billing issues. I had just reviewed it this weekend. That was my impression.

MR. PEPE: Well, because he's the CFO, Your Honor.

THE COURT: Right. No surprise there. But your plan is to either have that read in or, whatever, played, if you're

going to play it by video, before you hand off the reins to the other side.

MR. PEPE:  I thought because Mr. Khowong's presence by deposition or in person is still an open issue --

THE COURT:  Oh, okay.

MR. PEPE:  -- Your Honor, my thought was that if he does testify by --

THE COURT:  Live, yeah.

MR. PEPE:  Well, if he testifies live --

THE COURT:  Yes, okay.  Let's put him aside.  I understand your point with regard to him because there's uncertainty.  I'm going to ask Mr. Resser about that in a moment.  But let's talk about the other designations.

Your plan is to put them on before you hand the reins over; right?

MR. PEPE:  I don't have any other.

THE COURT:  Didn't you do some designations?

MR. PEPE:  No, no, I do have designations, of course.

THE COURT:  But they all relate to the malpractice case.

MR. PEPE:  I don't see them coming into this part of the case, yes.

THE COURT:  Ah, okay.

MR. PEPE:  I don't mean to confuse the Court, but --

THE COURT:  No, no, that's fine.  That's fine.

MR. PEPE:  We listed all of them.

THE COURT:  Yeah.

MR. PEPE:  And as you might expect.

THE COURT:  That's okay.

I don't know which of you two wants to address this, Mr. Resser, Mr. Heavey, but Mr. Khowong, do we know what his status is?

MR. RESSER:  Based upon the Court's ruling, my best estimate is that he will need to come live.

THE COURT:  Okay.

MR. RESSER:  And that he will -- because of the memorial service for his father in two days from today, I believe --

THE COURT:  Okay.

MR. RESSER:  -- I don't think he can make it here until Monday morning.

THE COURT:  Okay.  I would think, based on the schedule I've been given, that we'll still have a trial going on on Monday morning.  I mean, that's not going to require us to delay anything.

MR. RESSER:  I don't think so.

THE COURT:  Okay.  That's my anticipation as well. Well, I think we're on the same page.

MR. PEPE:  Yeah, I hope I didn't confuse it.  I hope I made myself clear.

But just by way of illustration again, Your Honor, going back to Your Honor's use of the term "inextricably intertwined," so Mr. Rechen will testify in the malpractice of the case.

THE COURT: Right, one would expect.

MR. PEPE: But he will testify as to conversations he had with Mr. Leventhal.

THE COURT: Sure.

MR. PEPE: And those would relate to billing.

THE COURT: No, that -- that's a good example. I would -- I mean I don't know what Mr. Rechen's going to say, but I would imagine, given what I know so far, that the bulk of his testimony is going to relate to how the case was tried, etc.

MR. PEPE: Exactly. And based on the Court's comments in the several status conferences, it didn't appear to me to be appropriate to put Mr. Rechen on for those conversations.

THE COURT: I agree. I agree. That makes sense.

MR. PEPE: Okay. So I think -- I think we're aligned, Your Honor.

THE COURT: That's fine. Very well. All right. In that case, let's get the jurors.

Why don't we have the witness come up now.

MR. PEPE: And, Your Honor, with the Court's permission, Attorney Green is going to conduct this

examination.

THE COURT: That's fine. He's allowed to, absolutely. He's conducted examinations in my courtroom before. It's been a while. But we can have the witness come and step into the box for us, please.

Welcome, ma'am.

THE WITNESS: Thank you. Sit yet?

THE COURT: You can sit, yeah, for now. When the jury comes in, you should stand.

(The jury entered the courtroom at 9:02 a.m.)

THE COURT: All right, folks, I hope you had a nice weekend. We have a new witness for you. So we're now going to ask her to stand and face our courtroom deputy, raise her right hand, please.


J A C Q U E L I N E   B O S M A,

having been duly sworn by the Clerk, testified

under oath as follows:


THE CLERK: Please be seated, state your name, city and state you live or work and spell your last name for the record.

THE WITNESS: Jacqueline Bosma. I live in Ringwood, New Jersey. I work in Newark, New Jersey. The spelling of my last name is B-O-S-M-A.

THE COURT: Thank you. Mr. Green, whenever you're ready, sir.

MR. GREEN: Thank you, Your Honor.

Good morning, Members of the Jury.

DIRECT EXAMINATION

BY MR. GREEN:

Q  Good morning, Ms. Bosma.

A  Morning.

Q  Will you tell us where you're employed?

A  McCarter & English.

Q  And what is your title there?

A  My current title is chief financial officer.

Q  Okay. And when were you hired?

A  I was hired in April of 2016.

Q  And what was your position then?

A  Controller.

Q  Okay. And when were you promoted to CFO?

A  About two years ago in 2021.

Q  Okay. So through 2019, the time relevant to this -- these events, you were the controller.

A  That's correct.

Q  Okay. And what were the controller's duties at that time?

A  Oversee the financial operations of the firm.

Q  Okay. And to whom did you report?

A  To John Brefach, who is the chief operating officer.

Q    And did you have people reporting to you?

A    Yes.  At that time I had five direct reports.

Q    Okay.  And what were their roles?

A    They were all managers of different areas of the finance function.

Q    Okay.  And, Ms. Bosma, did you train for the performance of your duty in prior employment?

A    Yes.

Q    Okay.  And what was that?

A    My prior employment before McCarter was at Deloitte & Touche.  I was a financial statement auditor for almost 11 years.

Q    Okay.  And as part of your education, did you perform -- were you trained to perform your role as an auditor?

A    Yes.  I obtained my bachelor's of business administration from the University of Michigan Business School.  I also am a certified public accountant as well.

Q    And in what year did you get your CPA license?

A    2007 or 2008, around about there.

        MR. GREEN:  Okay.  Mr. Wyzik, will you bring up Exhibit 116, please.

        THE COURT:  This is full, Mr. --

        MR. GREEN:  Yeah.  No objection to that.

        THE COURT:  All right.  So 116 are be a full exhibit.

    (Plaintiff's Exhibit 116, received in evidence.)

Q    (By Mr. Green) Ms. Bosma, are you able to read it on the screen?

A    Yes, I am.

Q    Excellent.  Ms. Bosma, what is PTX 116?

A    So this is an excerpt from what we call a ledger history in our financial accounting system, and it shows the history of matter 464 for Jarrow Formulas.

Q    Okay.  And does it address the reversal and reissuance of the three bills that Mr. Giarratana described?

A    It does.

Q    Okay.  And in connection with any of the reversals of those three bills, was there a payment reversed?

A    Yup.  You can see here it looks like the 58740, I'm going to try to explain it the best I can.

        MR. GREEN:  Will you see if you can call out the first five lines?

        THE WITNESS:  So this payment came in on June 24th, which is purple there.  And, um, when we did have to reverse the bill, we also had to reverse that payment.  And what we do in those situations is we hold that on account for the client matter.  So basically that yellow line shows that it went into something we called "unallocated," and it just sits there being tagged to the client matter just so we know it's their money.

Q    (By Mr. Green) Meaning it was reserved for application for this matter 464.

A    Correct.

Q    Okay.  And was it, in fact, allocated to fees in matter 464?

A    Yes, at a later date.

MR. GREEN:  Okay.  And, Mr. Wyzik, if you could call out the area around the lower yellow line on the first page.

THE WITNESS:  Yup, so you can see here that it was applied on January 17th to -- let's see, the payment of October bill, the original proceeds from the April bill.  So that was for September time.  And it was -- there was more that was applied to the November bill for October time.

Q    (By Mr. Green)  Okay.  And so JFI received the benefit of the --

A    Of course.

Q    -- funds on credit and reversed and applied to their account.

A    Yes.

MR. GREEN:  Okay.  Now, Mr. Wyzik, would you call up Exhibit PTX 118, which, Your Honor, is already in evidence.

THE COURT:  All right.

Q    (By Mr. Green) Ms. Bosma, what is this?

A    So this is a schedule that I prepared, um, from the financial data in our system, and it shows the timekeeper information, the rates charged, and the fees billed to the client.

Q   Okay.  And would you describe for the jury what the entries in columns B through E are?

A   Sure.

Q   Initial Information.

A   So that was the Initial Information.  So the column B is --

MR. GREEN:  Mr. Wyzik, could you blow up the top five lines.

THE WITNESS:  I'll wait for him to do that.

So column B, which says "Initial Date" "Worked," that's the first time the timekeeper entered a time entry into the system.  So that date is the first time they worked on the matter.  And then column C shows when that time was billed, and column D is the initial rate that was on the bill, um, and the standard rate at that time, which sometimes equals the initial rate and sometimes doesn't.

Q   (By Mr. Green) Now, under the billed column, column C, does that --

A   Okay.

Q   -- state the date of the bill on which this information was disclosed to the client?

A   Yes.  That's when the client would have received the bill that had the agreed-upon rate that they were to pay for the services performed.

Q   Okay.  And, Ms. Bosma, would you explain to the jury what the columns F through I are.

A    Sure.  Whenever there was a rate change, um, that's what I've indicated there.  So for some timekeepers, those happen. For some timekeepers, those did not over the course of the matter, which was about six years.

And, similarly, the columns "Worked" shows the first time that a time card at that rate billed the date of the invoice that it appeared on.  Um, the changed rate was different from the initial, and then the Standard Rate shows what the standard rate was at the time of the change.

Q    Okay.  And does the column, again, the Date Billed column, does that indicate the date of the bill upon which the client received this new information?

A    That's right.  That was the day that the bill was issued to the client at that agreed rate.

Q    Okay.  And would you describe for the jury what is set forth in columns J through M, which is the Summary Information.

A    Sure.  So column J shows the hours that each timekeeper -- that we billed to the client over the life of the matter.  Um, the Fees Billed is the total value that would have appeared on all of those bills.  And keep in mind there was about 70, 75 of them over the life of the matter where the fees billed did not appear at that rate.

The Blended Rate is a weighted average, so it shows over the life of the matter, if there were rate changes, what that blended average works out to be.  And then column M, the

Value at Standard, if we were to charge the standard rate at that time of the work, what the value would have been, which if we're charging a lower rate is higher than the amount in the Fees Billed column.

Q   Okay.  And in this Summary Information, did you summarize all 75 invoices that were received by JFI after the reversal and reissuance of the bills?

A   In is everything that was billed.  So any bill that was reversed would not be included in here.

Q   So you're summarizing the date over the six years the bills were delivered to JFI.

A   Correct.

Q   Okay.  And would you explain to us in the Fees Billed column, how did you get to that?

A   So that's the hours multiplied by the rate at the time that the client was billed for it.

Q   Okay.  And does the Fees Billed column have anything to do at all with payment of the bills?

A   No.  This is just everything that we billed.  Um, there are still invoices that are outstanding that are included in here.

Q   Okay.  Okay.  Mr. Wyzik, would you call up the row for Mr. Giarratana.

Are you able to see it, Ms. Bosma?

A   Yes.

Q    Okay.  And, Ms. Bosma, describe to the jury what is set forth in Mr. Giarratana's role.

A    Okay.  So column B, he initially worked on matter 464 on March 8th.  Um, that amount was billed on an invoice issued July 11th at a rate of 535, which was his standard rate at the time.  You can see the same in column D and E.

And there were no rate changes at all whatsoever over the course of the matter, so he was continually charged at this rate that was agreed upon early on in the matter.

And column J shows all the hours that he worked on the matter over six years, 3,364.06.  And those are -- I'm sorry, those were amounts that were billed.

Column K is the value of those billings 1,799,774.  And the blended rate in this case, because there were no rate changes, is 535.

Q    Okay.  And Mr. Giarratana froze his rate for the six years of the litigation.

A    That's correct.

Q    Okay.  And how much would he have billed if he had billed at the firm's standard?

A    Yup, so if he had increased his rate every time we increased the standard rates, which was traditionally every year, he would have ended up billing about -- he would have ended up billing exactly $2,023,658.

Q    A little over $223,000 more than he, in fact, billed.

A    Yes, that appears right.

Q    And is that a savings to JFI?

A    Of course, yes.

Q    Okay.  And, similarly, Ms. Bosma, Mr. Grondahl -- Mr. Wyzik, would you call up the row for Mr. Grondahl.

And, Ms. Bosma, are you able to see it?

A    Yup.

Q    Okay.  Would you explain to the jury the significance of the rows --

A    Sure.

Q    -- with respect to Mr. Grondahl.

A    So column B, again, is the first time card that he entered on March 21st, 2013.  That time card was billed to the client on July 11th, 2013, at a rate of 485, which equaled his standard rate at that time.  And there were no rate changes at all throughout the course of the matter.  We held his rate consistent.

Column J shows the number of hours that he charged over the life of the matter, 4,537.39.  Um, the amount that we billed the client for those hours was 2.2 million.  And the blended rate, again, because we never raised his rate, is also 485.  And if we had increased -- if we had charged his standard rate at the time of all the work performed, 2,484,980.

Q    Again, Mr. Grondahl's rate was frozen for all six years of the litigation.

A    Yes.

Q    Okay.  And he would have been billed about an extra 285,000 had he followed firm standard.

A    Yes, approximately.

Q    Okay.  And was that a savings to JFI?

A    Of course.

Q    Yes.  And Mr. Rechen.

        Mr. Wyzik, would you call out Mr. Rechen's row.

        And are you able to read it, Ms. Bosma?

A    Um-hmm.

Q    And describe for the jury the entries with respect to Mr. Rechen.

A    Sure.  So Mr. Rechen first recorded time on March 8, 2013, to matter 464.  Um, that time was billed on July 11th at a rate of 405.  Um, his standard rate at that time was 525 so --

Q    Let me interrupt for just a moment there.

A    Oh, sure.

Q    So there's a significant differential between Mr. Rechen's standard rate and his matter rate at the time the file started?

A    Yes, $125.

Q    And is that a savings to JFI?

A    Yes.

Q    Okay.  And what happened next with respect to Mr. Rechen?

A    So, um, in February of 2016 his rate was increased to $520.

You can see that in columns F through I, which was $25 less than the standard rate at that time.  And that was billed on February 29th of 2016.

Q   Okay.  And, again, with respect to Mr. Rechen, his rate was frozen at 405 for two and a half years?

A   Almost three years it looks like, yup.

Q   All right.  And then it was raised once during the course of the case?

A   Correct.

Q   And frozen again from 2016, early 2016, to the end of the case.

A   Correct.

Q   All right.  And what about his Fees Billed summary?

A   So he recorded 2,504.28 hours that were billed to the client.  Um, the value of those billings was 1,261,553.  His blended rate, because there was a weight change, was 504.  And that's a weighted average over the course of the matter.  And column M shows what we would have billed the client if we had increased his rate every time we increased standard rates.  And that's 1,457,304.

Q   Again, and in Mr. Rechen's case, he would have been billed about 200,000, a little less than 200,000 more if he referred to standard?

A   Yes.

Q   Again, a savings to JFI.

A    Yes.

Q    And do you call the savings with respect to the rate a "rate discount"?

A    That's correct.

Q    Now, did you do the same analysis for each and every timekeeper who had time on this file from the moment the bills were corrected and reissued until the end of the case?

A    Yes, I did.

Q    Okay.  A period of six years plus.

A    Yes.

Q    Okay.  Now, we won't go through each one, but let's go to the summary.  The fees billed, have you totaled that on the second page of the exhibit?

A    Yes, at the bottom of page 2.

Q    Okay.  And what are the total of fees billed, would you explain to the jury?

A    Sure.  So the total amount of fees billed to the client was 6,902,842, and that's at the bottom of column K.

Q    Okay.  Now, were all those fees paid?

A    Not that, but ... no.

Q    Okay.  And you're aware of unpaid fees in the case?

A    Yes.  I believe there's about 1.6 million outstanding, so what was billed was just over 5 million.

Q    Okay.

A    Sorry.  What was paid was just over 5 million.  6.9 was

billed.

MR. GREEN:  And, Mr. Wyzik, would you call out the bottom of the chart below the line with the summaries, the totals.

THE WITNESS:  Yeah, if you could do everything below Wishman on the right.

MR. GREEN:  And can you expand the box just a little bit so she can -- we can see all the way down to the last entry.

Q   (By Mr. Green) Okay.  Now, Ms. Bosma, the 205,155 underneath the "Fees Billed," what does that represent?

A   So we've labeled it -- I've labeled it here as "Write-offs from Accounts Receivable."  Basically what it is, after we've already issued the bills to the client, if we negotiate additional discounts, that's what that number represents.

Q   Okay.  And over the life of the case, write-offs after the bill, you know, really from receivables --

A   Um-hmm.

Q   -- totaled over $200,000?

A   That's correct, 205,155.

Q   And was that a savings to JFI?

A   Yes.

Q   Okay.  And when you deduct the 205 from the 6 million 902 to get the 6 million 997 [sic], tell us what that represents.

A   So the 6,697,687 would be the total fees billed after you

take into account the rates discount and the write-offs from accounts receivable.

Q   And that figure of 6,697,687 has not been paid; correct?

A   No.  There's approximately 1.6 outstanding.

Q   All right.  What was your last figure?

A   There's approximately 1.6 million still outstanding in fees billed.

Q   Okay.  So, Ms. Bosma, the fees billed in PTX 118 does not bear upon the amount of fees actually paid; correct?

A   It does not, no.  It shows everything billed regardless of whether it's been paid or not.

Q   All right.  So if a -- if another witness used PTX 118 to calculate the difference between the original rates and the new rates, would PTX 118 help him in any way?

A   Well, you'd have to take into account the fact that some of it is not paid, so yeah.

Q   Right.  You'd have to adjust for unpaid hours?

A   Right.

Q   And you'd have to unjust for unpaid dollars.

A   Correct.

Q   For five invoices?

A   Yup, and the related rates for those time.

Q   Now, dropping down further, what does the 86 percent realizations mean?

A   Sure.  So that is if you were to look at, um, the 7.8

million on the right, which we talked about was the value at standard, um, the 86 percent shows that because we billed at rates less than that, we were only realizing 86 percent, so 14 percent.

Q That's for the life of the case?

A Correct. That's from the entire start to finish.

Q A 14-percent rate discount?

A Yes.

Q And what does the 97 percent represent, Ms. Bosma?

A So that is the amount. So if we only assume the matter rates, forget about the standard rates, we gave an additional 3 percent, and that's that $205,000.

MR. GREEN: Okay. Now, Ms. Bosma -- excuse me. Mr. Wyzik, would you call up, bring up Defendant's 551, which was offered the other day, Your Honor.

THE COURT: Yes.

Q (By Mr. Green) Are you able to see it adequately, Ms. Bosma?

A Yes.

Q Okay. What is this?

A So this is an export from my financial system. It is -- we call it the open invoices. But what it shows is all invoices that were, um -- all invoices that were paid or written off and the history of them. It really just shows you what happened with each invoice.

Q    Okay.

Mr. Wyzik, could you blow up the top block, including the headings, you know, the headings and the first four lines.

Okay.  Now, Ms. Bosma, does Defendant's Exhibit 551 identify every single bill issued during the course of the case?

A    It shows -- so it does not show reverse bills because -- it does not show reverse bills because once they're reversed, they're no longer bills.

Q    Okay.  But once the reversal and reissuance was accomplished, does this document each and every bill sent to JFI?

A    Yes, yes.

Q    Okay.  And that would be in the bill line?

A    Correct.

Q    And it gives the invoice number, the date and the amounts.

A    Correct.

Q    Okay.  And what does the pay line represent?

A    The pay line shows payments against those bills.

Q    Okay.  And what does the write-off line signify?

A    If we -- if we write off or provide discounts, in other words, that's also shown there to get to the total, which is the amount outstanding.

Q    Okay.  And on the bottom line, the dashes, does that mean that particular invoice has been paid in full?

A    It wasn't paid in full.  It received a discount, but there's no longer a balance outstanding.

Q    Exactly.  Thank you.

A    Um-hmm.

Q    And you did that for each and every invoice issued to the client?

A    Well, the system does it.  Yeah, I just pulled the information out, yeah.

Q    And, now, Mr. Wyzik, could you call up the bottom five or six lines on the last page of PTX 113 -- excuse me -- Defendant's 551.

All right, Ms. Bosma, would you explain to the jury what this represents.

A    Yup.  These are the unpaid invoices.  You can tell because there's not those pay or off lines.  So these amounts are still due and owing to McCarter & English.

Q    And does it document the amount of the unpaid fees in this matter?

A    It does.  That looks like --

THE COURT:  Wait.  One at a time.  Slow down a little bit, ma'am.  Why don't you start your answer again.

THE WITNESS:  So I believe you're asking about the fees billed?

Q    (By Mr. Green) Yes.  What does the grand total of the five invoices represent?  What are the unpaid fees?

A    $1,633,902.50.

Q    Okay, and what are the unpaid disbursements?

A    $346,495.44.

Q    And the total outstanding?

A    $1,980,397.94.

Q    Okay.  So the McCarter firm is unpaid to the extent of almost $2 million.

A    That's correct.

Q    Just from the last five invoices.

A    That's correct.

Q    Now, the time on every one of those five invoices is summarized on PTX 118; correct?

A    Yes.

Q    And that's true whether it was paid or not.

A    Correct.

Q    Okay?  And the dollar value billed on each and every one of those five invoices was also summarized on PTX 118, was it not?

A    Yes.

Q    Okay.  And that's despite the fact that it was unpaid.

A    Yes.

Q    All right.  And so the fees billed total from PTX 118 is completely independent of fees that were paid; is that right?

A    Correct.  It shows everything billed without consideration of whether it was paid or not.

Q    Okay.  Again, so if a witness took the stand and used PTX

118 to try to document amounts of a differential between original rates in the case and the new rates in the case, would PTX 118 assist them?

A   That would be for billed, not paid.

Q   Okay.  And would each and every one of those five invoices, timekeeper by timekeeper, need to be backed out of PTX 118 to make that calculation?

A   Yes, because they haven't paid these last five bills yet.

Q   And same with respect to the dollars associated with each of those timekeepers?

A   Yes.

Q   Thank you.

     All right.  Mr. Wyzik, would you call up Defendant's Exhibit 514, please.

     Okay.  Now, Ms. Bosma, did you have a conversation with Mr. Giarratana in May 2019 about this account?

A   Yes.

Q   Okay.  And what was the subject matter of the discussion?

A   Whether we should give an additional discount to Jarrow Formulas to prompt payment.

Q   To --

A   Whether we should give an additional discount to Jarrow Formulas to prompt payment of their outstanding bills.

Q   Okay.  And at the time of this discussion, were you aware of the amount of the unpaid fees?

A    Yes.  They owed over a million dollars.

Q    Okay.  And was that on matter 464 or all matters?

A    Have to go back to look at the numbers, but I believe --
they owed on various matters, not just 464.

Q    Okay.  And when we get to Defendant's 514, would you just
tell us what that is first.

A    Sure.  So this is an export from what we call our
profitability system.  It's an internal reporting tool that we
use to evaluate, um -- to evaluate clients' matters, etc.

Q    Okay.  And is that by -- is that for all Jarrow Formulas
matters?

A    This export is for Jarrow Formulas as a client in total,
all matters.

Q    And for what period of time?

A    Fiscal year 2019, so from October 1st, 2019, through
whatever this report was run, which was the end of May.

Q    Okay.  So this is just a snapshot in time of what Jarrow
had paid or not paid for fiscal year 2019; correct?

A    It does show what they paid for fiscal 2019 through May.

Q    Okay.  And, now, you told the jury that at the time of the
discussion between you and Mr. Giarratana, over a million
dollars was due on the account.  And did you take a position on
what Mr. Giarratana asked of you?

A    When we discussed the discount, because they already were
receiving a substantial fee discount, I did not want to give an

additional discount.

Q   Okay.  And at the time, what did you tell Mr. Giarratana the discount was?

A   38 percent.

Q   And do you believe that's correct information at the time you gave it?

A   Yes.

Q   Okay.  And did you authorize any further discount for purposes of Mr. Giarratana's --

A   Yes.

Q   -- request?

A   In hopes of prompting payment, I did authorize 5 percent.

Q   And did you advise your boss of that?

A   I did, in an e-mail after that conversation.

Q   Okay.  And focusing your attention on Defendant's 551 -- excuse me -- Defendant's 514, you explained that it was a profitability module dated in May 2019?

A   Um-hmm.

Q   Pertaining to whom?

A   Jarrow Formulas.

Q   And pertaining to which year?

A   Fiscal '19 through May.

Q   Okay.  And when you spoke with Mr. Giarratana in May of 2019, were you viewing anything?

A   I was viewing profitability information on my screen at the

time.

Q   Okay.  And the profitability -- is information like this set forth in Exhibit 514 called a profitability report?

A   Like this but different month.

Q   Okay.  And, now, Ms. Bosma, were you looking at the information set forth in Exhibit Defendant's 514?

A   No.

Q   And how do you know that, Ms. Bosma?

A   So in preparing for my testimony, I went back to review this information in more detail, um, and I identified that the payment that we were discussing in May trying to get in was included in this.  So in the Fees Collected column, that 1 million --

Q   Let me stop you right there.

A   Sure.

        MR. GREEN:  Mr. Wyzik, will you blow up the fees?  Okay.  Thank you.

Q   (By Mr. Green) Is that the information you're describing, Ms. Bosma?

A   Yes.

Q   All right.  And what did you conclude after you looked at this?

A   That the payment that came in at the end of May was included.  So this couldn't have been what I was looking at during the conversation in May.

Q    Because you were describing a negotiation --

A    We were discussing receiving that payment.  And if the payment was included here, therefore, this couldn't have been what I was looking at.

THE COURT:  Folks, let's slow down the cadence a little bit for the court reporter, please, both of you, please.

Q    (By Mr. Green) And, Ms. Bosma, what did you do to determine what you had been looking at at the time of the conversation?

A    So I reviewed the months around this.  This one's May.  I looked at June and saw that the fees collected number didn't change.  So that's what -- that's how I was able to identify that the May 31st payment was included in here.  So then what I did next was I looked at the April output and saw that the discount was 38 percent.  So it was obviously that's where that number came from that I informed Mark of.

Q    Okay.

A    Mr. Giarratana.

Q    And is the confusion with respect to Defendant's 514 in part because the document is undated?

A    Yes.

Q    And how did that confuse you?

A    Well, if it says -- can we take the little excerpt down so I can --

MR. GREEN:  Take the blowup down and blow up the top

line showing just the name of the report and the dating.

THE WITNESS:  So the third row shows fiscal YTD through May '19.  I know now this was the end of May report. But if I run it in the middle of May, it would have also said that.  It doesn't have a date when it was run.

Q   (By Mr. Green) Okay.  And so did you produce both the April and the June profitability reports for purposes of your cross-examination?

A   Yes, I provided them to you.

Q   Now, prior to preparing to testify, Ms. Bosma, did you believe you had been looking at Exhibit 514?

A   Yes.  During my deposition, this was put in front of me, and I incorrectly assumed that this is what I was looking at.

Q   So you were mistaken.

A   I was.

Q   And in preparing for your testimony, you corrected the mistake.

A   When I identified it, yes.

Q   Okay.  And, Ms. Bosma, whether the discount was 38 percent, as you described, or the 25 percent set forth in Defendant's 514, would that difference have affected your advice to Mr. Giarratana?

A   No.  Those are both significant discounts that we were already providing, so the client asking for an additional discount, not something we'd want to do.

Q   All right.  And as you sit here today, are you certain that you were not looking at Exhibit 514 during your call?

A   Could not have been.

Q   All right.  And you believe that you were looking at the month before.

A   The April 2019 output.

MR. GREEN:  Okay.  Okay, thank you, Ms. Bosma.

THE WITNESS:  Sure.

THE COURT:  All right.  Cross-examination.  Mr. Heavey.

MR. HEAVEY:  Thank you, Your Honor.

THE COURT:  I should say actually that the witness was listed by both sides, so Mr. Heavey's also allowed to do a direct examination if he wants as well.  It's up to him.  All right, Mr. Heavey, whenever you're ready, sir.

MR. HEAVEY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HEAVEY:

Q   Good morning, Ms. Bosma.

A   Morning.

Q   You testified you're currently employed as the chief financial officer since 2021 at McCarter & English?

A   That's correct.

Q   And prior to that, your testimony was that your title was the controller?

A    Yes.

Q    And how did your change in position roles change with your -- how did your responsibilities change with your position or role?

A    They didn't change that much.  I mean I'm primarily still overseeing the finance function, trying to be more involved with the Executive Committee, but for the most part I'm doing a lot of the same things in both roles.

Q    I believe you testified previously that you're responsible for the financial function of McCarter & English.  Is that a fair statement?

A    Yes.

Q    And does that financial function include any responsibility over the billing department?

A    Yes.

Q    And any of the professionals involved in the billing department?

A    Yes.

Q    And that include non-attorney professionals at McCarter & English?

A    Yes.

Q    Do you have any management responsibility or supervisory role over the attorney --

A    No.

Q    -- at McCarter & English?  Thank you.

And does the collections department, or collections, have any -- do you have any responsibility or authority over the collections of the firm?

A    Yes, I do.

Q    And are you involved regularly with collections disputes?

A    Yes.

Q    And with respect to this collections dispute, you provided sworn testimony in the form of a deposition to the Court regarding your role in researching some of the underlying values that are outstanding in this matter?

A    Yes.

Q    And you did so in support of McCarter & English's position that there's outstanding fees owed to them as a result of my client's nonpayments?

A    Yes.

Q    And with respect to your role as the controller or the CFO, did you have any management memberships -- management committee memberships at McCarter & English?

A    Yes.  I'm on several committees.

Q    And are you on the Finance Committee?

A    Yes, I am.

Q    And are you on any other committees?

A    Yes.  I'm on the 401(k) Committee.  I'm also on the Accounts Receivable Committee.

Q    And the Finance Committee, in part you're responsible for

approving discounts or other amendments to the standard billing rates of your attorneys?

A    In my role I'm responsible for that, yes.

Q    I'm sorry, ma'am?

A    In my role I'm responsible for that.

Q    Is that one of your roles on the Executive Committee?

A    I'm not on the Executive Committee.

Q    I'm sorry.  On the Finance Committee?

A    Yes, I guess you could say that.

Q    And you are a CPA you stated?

A    I am.

Q    And you stated that you have experience as a financial auditor?

A    Yes.

Q    And have you conducted financial audits in the past in your previous --

A    In my previous role, yes.

Q    And you're not an attorney, are you?

A    No, I'm not.

Q    You would agree with me, though, that by nature of working for McCarter & English, you have some of the same obligations as attorneys do with respect to, for example, the firm's billing?

            MR. GREEN:  Objection.

            THE COURT:  Maybe we could make the question a little

more precise.  I'm not sure what it means.

Q   (By Mr. Heavey) Sure.  You would agree that McCarter & English, you as a non-attorney, with responsibilities in billing, still have to comply to some of the obligations that pertain to attorneys in the firm with respect to those bills.

A   I think you would have to be specific about what obligations you're referring to.

Q   Well, do you know of any obligations that require engagement agreements be provided to clients, new clients in the state of Connecticut?

MR. GREEN:  Objection, Your Honor, irrelevant.

THE WITNESS:  Yeah.

THE COURT:  Why don't I see counsel at sidebar for a minute.

(At sidebar off the record.)

THE COURT:  All right, Ladies and Gentlemen, I sustained the objection to that question.

Go ahead, Mr. Heavey.

Q   (Mr. Heavey) You've heard testimony that McCarter & English has offices in nine, nine offices.  Is that accurate?

A   I believe we have more than that now.

Q   And how many do you think you have?

A   Twelve?

Q   And approximately 300 or 400 attorneys that are working for McCarter & English?

A    Yup, that sounds right.

Q    And as the CFO in charge of billing, or at least with billing responsibilities, you agree with me that McCarter & English's bills need to comply with the local jurisdictions that those offices and attorneys are working in; correct?

A    Yes.

Q    And how does McCarter & English actually comply with those local jurisdictional obligations from a billing perspective?

MR. GREEN:  Objection.

THE COURT:  I'll allow it if she knows.

THE WITNESS:  I mean the billing partners take a lot of responsibility over their billing, though I do oversee the processing of those bills.  So I think the responsibility to determine those obligations lies with the attorneys.

Q    (By Mr. Green) And as a CFO of McCarter & English, ultimately does that responsibility fall on you to make sure that the firm is complying with those billing obligations?

A    I think it's a shared obligation with the billing attorneys.

Q    So you agree that you have some responsibility in the --

A    I'm responsible for billing.

Q    And while conducting, you personally, or any of your non-attorneys underneath you in the chain of command, when they're conducting business with clients on behalf of McCarter & English, you'd agree with me that they have an obligation to

be truthful to those clients about billing?

MR. GREEN: Objection, Your Honor.

THE COURT: I'll allow it.

THE WITNESS: Yes.

Q (By Mr. Heavey) And you would agree with me also that those non-attorney employees at McCarter & English cannot materially misrepresent or omit information about bills to the clients?

MR. GREEN: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: No, they should not do so materially.

Q (By Mr. Heavey) And you wouldn't do that as the controller or the CFO of McCarter & English, would you?

A No.

Q Now, in preparation for your testimony, did you come to learn -- withdrawn.

In preparation for the reports that you generated and testified to in support of litigation here, did you ever come to learn that Jarrow Formulas, in the federal matter -- and I'm going to refer to the federal matter as opposed to the Kean Ashurst matter, which is the state matter in Kentucky. Did you ever learn that there was two different pieces of litigation that McCarter & English was billing Jarrow Formulas for in 2013?

A Um, I'm sorry. Would you repeat the question?

Q Certainly. During the course of your preparation for those

reports that you generated in support of this litigation, did you ever come to learn in 2013 that there were two pieces of litigation that McCarter & English was representing Jarrow Formulas in?

A   So when I was preparing PTX 118, the schedule that has the timekeeper rates, was I aware of that?  No, I don't -- no, I was not.

Q   And were you aware at the beginning of 2013 that with respect to the federal matter, the one at issue in this case, that Jarrow Formulas was paying rates lower than the ones that you reported to the Court?

A   Was I aware of that in 2013?

Q   Were you aware of that, at any point in preparing the reports for the Court, that they were paying a lower rate than you established on these reports?

A   So when I reviewed the financial records, I did see the bill reversal and reissuance at a different rate, yes.

Q   And what was your understanding of what that rate was?

A   The dollar number of the rate or --

Q   Do you recall it?

A   Yes.  I believe it was initially billed at -- if we're talking about Mark Giarratana, I think it was 405.  And then we billed it at 535, but we should look at it if ...

Q   And do you recall any other timekeepers originally in 2013 that were being billed at a lower rate to Jarrow Formulas on

litigation in the Kentucky matter?

A    Eric Grondahl also.

Q    And do you recall his rates that were being billed in the beginning of 2013 for the federal litigation matter to Jarrow Formulas?

A    So on the reverse bill, I believe his bill was -- his rate was 395.

Q    And when you say the "reverse bill" --

A    Yeah.

Q    -- we're talking about bills that were issued at Jarrow Formula for the federal matter, for services provided in the federal matter, that was at a lower rate than you reported to the Court; correct?

A    So matter 464, my report showed what was, you know, final bills.  I did not include reverse bills.

Q    And you didn't include the lower rates on the matters that were being provided by McCarter & English in the federal, the federal matter for January or February, did you?

A    When you say the "federal matter," matter 464?  Because that's what I analyzed in Exhibit 118.

Q    Yes, ma'am, that's 464.

A    Yup.

Q    But as an auditor you didn't go in and determine that there are other bills that were related to that litigation that you failed to disclose to the Court?

A   Well, the reverse bill is no longer a bill.  And so I believe I did put an asterisk to show that the bills weren't reversed, but because they're no longer bills, it would be improper to include them because it would inflate the matter billed.

Q   Well, ma'am, bills are issued for the first three months at a lower rate to Jarrow Formulas in 2013; correct?

A   And reversed.

Q   That's not what I asked you, ma'am.  So the record's clear, they were issued in 2013 for three months to Jarrow Formulas at a lower rate; correct?

A   Yes, and then reversed.

Q   And Jarrow Formulas paid those lower rates for the services that were provided during that period in the federal litigation; correct?

          MR. GREEN:  Objection.

          THE COURT:  Um, grounds?

          MR. GREEN:  Misstates the evidence, Your Honor.

          THE COURT:  Well, all right.  The witness knows she can answer or you can always follow up on redirect.  So if you know, you can answer.  I'll overrule the objection.

          THE WITNESS:  Can you repeat the question, please?

Q   (By Mr. Heavey) Sure.

          THE COURT:  I'll do it.  "And Jarrow Formulas paid those lower rates for the services that were provided during

that period in the federal litigation; correct?"  That's the question.

THE WITNESS:  They paid the first bill, which was later reversed.

Q   (By Mr. Heavey) That's what you understand from your audit of the bills is that they only paid one that was reversed during that period?

A   Yes.  But could we look at PTX 116?  I think, or ...

Q   Would that help refresh your recollection?

A   It would.

Q   And what do you want to look at, PTX 116?

A   I think so.  The larger history that shows all the activity.  Yeah.

So the first five lines are related to that, the April bill that was reversed and the payment that was made and then reversed.

Q   Ms. Bosma, are you trying to tell me that you didn't look at any of the bills or payments for the federal matter before the April 15th, 2013, bill?

A   I don't understand the question.

Q   When was the first --

A   This is everything that happened on matter 464.  This is the larger history for that.

Q   But I'm asking you, there was services provided on the federal matter before that client matter was opened.

A    I only analyzed matter 464.

Q    And why is that?  Because you were told only to analyze 464?

MR. GREEN:  Objection.

THE COURT:  Well, there's two questions, so I'll sustain the objection.  You can ask again.

Q    (By Mr. Heavey) Why did you limit yourself to 464 when there were services provided on that federal litigation on other bills?

A    Because I didn't know that at the time.

Q    Did you conduct an independent audit of the bills to determine what was provided, what services were provided, in the federal matter so that you could accurately report that to the Court in your reports?

A    I only looked at matter 464.  I didn't look at other matters for the client.

Q    So you didn't rely on your audit experience to go back and do an independent review of the information on the federal litigation invoices that were provided?

A    I did not go back and review every invoice for this client, no.

Q    And if you did, you would have learned that there was lower rates applied to the services and litigation concerning the federal matter in January, February, and March of 2013; correct?

MR. GREEN: Objection, misstates the evidence.

THE COURT: Well, again, if the witness knows, she can answer.

THE WITNESS: I'm not sure how I would have discerned that.

Q   (By Mr. Heavey) Well, you would have looked at a bill that was related to the federal matter?

A   That would require me interpreting the narrative, which that's not what I would do.

Q   Well, you didn't do anything to independently ascertain what was -- what fees were provided to Jarrow Formulas during this time, did you?

A   I analyzed matter 464, which was the matter in question.

Q   Did anyone in your preparation to provide this information to the Court identify the fact that they were charging and billing for the federal matter at a lower rate and that you should go look to that?

A   No.

Q   No? Do you believe it would have been more accurate to reflect to the Court that there was actual fees billed on a lower rate and paid during that time in your reports to the Court?

A   If someone had advised me that that was the case, I could see including them. But I was unaware.

Q   Now, you made some -- you testified regarding standard

rates -- excuse me.

And more specifically, you testified twice about your agreed-upon rates with Jarrow Formulas and McCarter & English. Do you recall that testimony?

A   Today, correct.

Q   Yes, ma'am.

A   Yes.

Q   What evidence do you have that Jarrow Formulas agreed to any of the increased rates in this matter?

A   Payment of all the bills.

Q   There's no written notification in compliance with jurisdictional obligations that that increased rate was in writing before the increase occurred, was there?

MR. GREEN:  Objection.

THE COURT:  Sustained.

Q   (By Mr. Heavey) You have no written evidence that Jarrow Formulas was provided notice of an increased rate, the increased rate that you referenced in your reports in writing, before it happened, do you?

A   I have the bills.

Q   No, no.  I'm being very specific in my question, ma'am. You have no evidence that Jarrow Formulas was provided notice of the increased rate in writing before any bills were issued to them?

MR. GREEN:  Objection, Your Honor, relevance.

THE COURT:  It's overruled.

THE WITNESS:  Other than the bills themselves, no.

Q   (By Mr. Heavey) Ma'am, I'm being very specific, and you're parsing words here.  So I want to be clear here.  And I think you know where I'm going.

THE COURT:  Wait.  One at a time.  Let's get a question now.  Let's get a question.

Go ahead, Mr. Heavey.

Q   (By Mr. Heavey) The question's very specific.

A   Go ahead.

Q   McCarter & English never provided written notice of a rate increase to Jarrow Formulas in writing before the rate increase happened, did it?

A   Not that I'm aware of, but I heard Mr. Giarratana testify to the fact that the bill preceding each month --

MR. HEAVEY:  I'm going to ask that we strike the rest of that as unresponsive.

THE COURT:  Don't usually strike things.  Go ahead. Why don't you move on.  I got your point.

Q   (Mr. Heavey) Directing your attention to Plaintiff's Exhibit 118 that you had testimony on this morning, you stated this was a snapshot of all hours worked by attorneys on the Jarrow Formulas matter?

A   Matter 464, yes.  I don't know if I called it a snapshot. It's something I created of the data underlying that matter.

Q    And once again when you testified to the various columns, in the first one you stated that columns B, as in Bravo, through E, as in Echo, that that was the initial information on the matter as far as the billing goes?

A    The final bills, yes.

Q    And when we go down to Mr. Giarratana's rate -- and again, to be specific, when you referenced 464, and I know you've referenced that client matter, I'm referencing the federal litigation matter; right?  So any involvement, any work involved in that matter.

A    This only contemplates matter 464 though, just to be clear.

Q    Well, thank you.  What you're saying is, once again, when you compiled this information to the Court, you omitted the fact that there were hourly rates on services provided to Jarrow Formulas in the federal matter that aren't reflected in this document; correct?

A    I was unaware of that fact.

Q    Right.  Because if you -- if you were aware of that fact, then the standard rate and the initial rate for Mr. Giarratana or Mr. Grondahl in this exhibit would be different, would it not?

A    I feel like if Mr. Giarratana had confirmed to me that that was in fact the case, but that was not the case at the time.

Q    Well, would you have liked Mr. Giarratana to have done that

before you got on the stand today?

A    I don't know.

Q    And the standard rate for Alison Gaffey, if we go down -- sorry -- if we go up two timekeepers above Mr. Giarratana is reflected at $200 an hour; correct?

          THE COURT:  Bring that up, Alison Gaffey.

          THE WITNESS:  Yes.

Q    (By Mr. Heavey) And you'll see Mr. Grondahl's rate at 485 an hour; correct?

A    Yes.

Q    And we've established that, at least with respect to the discussions, those were the inflated rates that you utilized, or the higher rates -- I'm sorry -- not inflated, that you utilized in this exhibit; correct?

A    I'm sorry.  Can you repeat that?

Q    I'm sorry.  We've established that at least with respect to Mark Giarratana and Eric Grondahl, those were the higher rates that you utilized in this exhibit for the Court.

A    These were agreed-upon rates that were issued on the bills, yes.

Q    Well, again, I'm going to take issue.  You said "agreed-upon rates," but you have no evidence that my client affirmatively agreed upon the rates that you list here.

A    They paid the bills.

Q    That's your understanding of it.

A    It is my understanding of it.

Q    And with respect to Ms, gaffey you have her listed at $200 an hour as her initial rate in this matter; correct?

A    Yes.

Q    And were those numbers of these three timekeepers provided to you by Mr. Giarratana so you could do this document?

A    No.  No they were from the data in the system.

Q    And, once again, you didn't independently verify, for example, that Ms. Gaffey didn't perform any services at a lower rate on the federal matter to Jarrow Formulas prior to this, prior to the dates reflected in your document.

A    No.  I've already confirmed that I looked at matter 464 to prepare this.

Q    You had discussions regarding -- I'm sorry, withdrawn.

There was testimony regarding standard rates in this matter.  And ultimately a standard rate is what, an average between the rate of an individual attorney reflected in as an overall standard or an overall medium of that rate?

A    No, that's not what a standard rate is.

Q    You would agree with me that standard rates, though, don't apply -- a standard rate doesn't apply to one attorney's -- all one attorney's clients; correct?

A    Well, the standard rate is what we would expect an attorney to charge to his clients.  Now, do they charge different rates to different clients?  Yes.  But a standard rate is just that,

the standard rate we would expect them to charge.

Q   And the difference in rates may come with the volume of matters that an individual attorney is getting from that client?

A   It could.

Q   Could reflect the level of time or commitment that would go into a particular matter?

A   I'm sorry.  Would the --

Q   For example, a standard rate may be different for litigation than it would be for --

A   No.

Q   -- potentially IP?

A   We have one standard rate for each timekeeper.

Q   And a client ultimately determines what its rate is with the -- with the attorney by agreeing on whatever rate it is that's proposed; correct?

A   I would say the billing attorney and the client agree on the rates, yes.

Q   And so when you say a "standard rate," that's not a standard rate for Jarrow Formulas because a standard rate for Jarrow Formulas would be the one that they agreed to during the course of the relationship.

A   The definition of "standard rate," as we use it at our firm, and I believe in the industry, is that there's a standard rate for a timekeeper, and I've described what that is.  But,

no, there's not standard rates for different clients.  That's not correct.

Q   And McCarter & English and its attorneys don't get to dictate its standard rate unilaterally to the client.  The client has to agree to and accept a higher rate.

MR. GREEN:  Object to the form.

THE COURT:  Well, strictly speaking, maybe you can make it a question.

MR. HEAVEY:  I'll make it a little more.

Q   (By Mr. Heavey) McCarter & English cannot tell a client that they're going to raise their rates unilaterally without that client's consent.

A   Such as putting it in the engagement letter?

Q   I'm sorry.  My question's a yes-or-no question.

A   Okay, I'm sorry.  Can you repeat it?

Q   Because there was no engagement agreement in this matter, was there?

MR. GREEN:  Objection, Your Honor.

THE COURT:  No.  That I'll allow.  It's overruled.

THE WITNESS:  Yes, I believe we reviewed an engagement letter last week.  Well, I was in the courtroom.  Sorry.

Q   (By Mr. Heavey) Is it your testimony that you believe that the terms and conditions of the engagement between Jarrow Formulas and McCarter & English was somehow documented in an engagement agreement from your firm?

A    Can you repeat the question?

Q    Sure.  Is it your testimony that the terms and conditions of the legal services provided to Jarrow Formulas from McCarter & English was reduced to an engagement agreement from McCarter & English?

A    It wasn't a McCarter & English engagement letter, I guess.

Q    There was no engagement agreement ever from McCarter & English to Jarrow Formulas, was there?

A    Not a McCarter letterhead, no.

Q    Excuse me?

A    Not a McCarter letterhead.

Q    Does McCarter & English put out engagement agreements on other attorney's letterheads, other firm's letterheads?

A    No.

Q    And notwithstanding some of the firm's own policies regarding new matters with preexisting clients with engagement agreements, there was never one generated from McCarter & English to Jarrow Formulas?

          MR. GREEN:  Objection, Your Honor.

          THE COURT:  Sustained.

          MR. HEAVEY:  One minute, Your Honor.

          THE COURT:  Sure.

     (Pause.)

          MR. HEAVEY:  I'd like to bring up Defendant's Exhibit

540A.  I believe that it was admitted already.

THE COURT:  Okay.  540A can be brought up.

MR. HEAVEY:  I'm sorry.  I was just referred to 530 is the one being the version that is admitted.

THE COURT:  I'm sorry.  So what we're looking at is 530?

MR. HEAVEY:  Could you pull up 530, please?

THE COURT:  I believe we are looking at 530 now.  And this has been admitted into evidence?

MR. HEAVEY:  Yes, that's admitted.  I misread my exhibit number.

THE COURT:  So it's 530 we're looking at.  Thank you.

Q   (Mr. Heavey) Now, Ms. Bosma, you've testified that you captured all of the billing in your exhibits here for the Court that pertain to the federal matter in order to show the Court the outstanding fees and outstanding position that McCarter & English has in this matter.  I'm going to direct your attention to the exhibit in front of you.

Did you review this exhibit at all while preparing any of the reports for the Court?

A   I did not review this prior to preparing my exhibits, no.

Q   And on the first page you will see that this invoice is dated February 22, 2013; correct?

A   I do see that, yes.

Q   And if you turn to page 7 on the exhibit, the second

paragraph down stating -- starting on January 28th, 2013.  Do you see that in the line item?

A    I do see it.

Q    You'd agree with me that that line item pertained to matters in the federal court case against Jarrow Formulas, Inc., and Caudill Seed that's the underlying issue in this litigation; correct?

A    I wouldn't feel comfortable concluding that.  The narrative is outside my purview of expertise.  I would say the billing attorneys document that.  And if one of them was to say that it relates, I would understand that.  But that's not something that I would be able to conclude on my own.

Q    All right.  Well, if it did relate --

A    Yeah.

Q    -- this information wasn't captured on any of your exhibits provided to the Court, was it?

        MR. GREEN:  Objection, Your Honor, hypothetical.

        THE COURT:  Overruled.

        THE WITNESS:  This is an invoice for matter 427.  So, no, it would not be captured in the analysis for matter 464.

Q    (By Mr. Heaven) Notwithstanding where it was applied to, it had to do with the underlying billing and fees charged at the federal matter at issue in this case; correct?

A    I can't conclude that.

Q    And if you go to the next line item down, notwithstanding

the reference to the federal complaint, your answer would be the same with that line item?

A   Yeah.

Q   And if this did pertain to the federal matter, you didn't capture this information in any of your reports to the Court, did you?

A   No.

Q   And not to belabor the point, but the next three line items in this matter, in this document, notwithstanding the federal references in the descriptions of these things, your testimony would be the same, that you didn't consider this when you were putting together the information to provide to this Court in support of McCarter & English's position; correct?

A   No.  I just analyzed the one matter.

Q   Did you ever coordinate with any of the attorneys when you were preparing this material -- when I say "attorneys," I don't mean your attorneys.  I mean Mr. Giarratana, Mr. Rechen, any of the members of McCarter & English.  Did you ever consult with them because -- or to determine exactly the scope of the information you were attempting to capture?

A   Yes, I confirmed with some of the attorneys.

Q   And none of them pointed out that we were missing information regarding the federal matter in your exhibit?

A   No.

Q   I'm going to direct your attention to Exhibit --

Defendant's Exhibit 522.

THE COURT: 522 you said?

MR. HEAVEY: Yes, sir.

THE COURT: This has been admitted?

MR. HEAVEY: 522, oh, has not been admitted.

THE COURT: Would you like to offer it?

MR. HEAVEY: I would like to proffer. Let me get a copy.

THE COURT: Wait, wait, wait. Take it down, please. All right. So that can go up, 522. We have it as full, Mr. Heavey, so that's fine.

MR. HEAVEY: My apologies, Your Honor.

THE COURT: That's all right.

MR. HEAVEY: We've had some mix-ups.

THE COURT: No problem. No problem.

MR. HEAVEY: Can we go back to 530, please, at the end.

And would you go to page I believe it's second to the last, 12.

Q   (Mr. Heavey) Now, before we leave this exhibit, ma'am, I understand you didn't review the line items. But you would agree with me that the hourly rates for Mr. Giarratana in this bill that references the federal matter in February of 2013 was $405 an hour; correct?

A   I didn't want to conclude on whether it references the

federal matter based on the narratives, but I can see that the rates are 405 or 395.

Q   Well, any reference to the federal matter was in this bill, and the rates that were applied to this bill were $405 an hour for Mr. Giarratana; correct

A   It does show 405 for Giarratana.

Q   And with respect to Mr. Grondahl, it shows his hourly rate at $395 an hour; correct?

A   It does.

Q   And with respect to Ms. Gaffey, who is listed on your other exhibit at $200 an hour, it shows her hourly rate at 195 an hour here; correct?

A   It does.

        MR. HEAVEY:  Now, could we go back to that other exhibit where it shows the inception of the fees and the rates.

        I'm sorry.  I believe it's what I referred to as a snapshot, 118.  Thank you.

Q   (By Mr. Heavey) Now, coming back to this exhibit, ma'am, I notice that with respect to Ms. Gaffey, this document also states that Ms. Gaffey's initial work on this matter started at January 14th, 2014; is that correct?

A   Yes, for matter 464.  For accounting record purposes, I mean, we look at a matter number.  So that's the date I analyzed and recorded here.

Q   I understand that you look at the matter number, but

looking at the matter number clearly missed material that pertains to the federal matter in this case; correct?

A    If the attorneys confirm that.

Q    I'm sorry?

A    I can't confirm that.  Mr. Giarratana --

Q    Well, you said on the stand you didn't capture any of this information in any of the reports you provided to the Court; correct?

MR. GREEN:  Objection, Your Honor.

THE COURT:  Sustained.  Sustained.  Slow down.

Q    (Mr. Heavey) And so here's another piece of information that doesn't truly capture the fact that Ms. Gaffey started working on the federal matter, at least as far back as February 2013; correct?

A    This does not capture that.

Q    And with respect to Mr. Giarratana, it states here that his initial date worked on this matter is 3/18/2013; correct?

A    Yes.

Q    And we've just established in the other bill that Mr. Giarratana billed on things referencing the federal matter well before 3/18/2013 in the February bill; correct?

A    If that's what those narratives meant, yes, but I don't feel comfortable interpreting the narrative not being the attorney.

Q    I'm not asking you to interpret the narrative.

A    You are.

Q    I'm asking you to interpret the date which he started working on it.

A    But I would have to know what the narrative meant in order to confirm that; right?

Q    And you took the time to compile a report in support of McCarter & English's position to this Court reflecting the overall fees that were billed to this matter, and you didn't take this into consideration because you didn't independently verify this information.

A    I reviewed the matter in question, which is matter 464, which was opened for that litigation.  And my accounting records, which is what I was asked to review, that's what I presented here.

Q    It's an incomplete picture of what's been billed because it fails to take into consideration the three earlier bills; correct?

          MR. GREEN:  Objection, Your Honor.

          THE COURT:  Sustained.  It's argumentative.

Q    (By Mr. Heavey) Your information fails to calculate all of the values that were paid to the federal matter; correct?

A    I can't conclude that.

Q    Now, you talk about -- withdrawn.

          Directing your attention to Defendant's Exhibit 540A, which was admitted.

THE COURT: 540A can be shown to the jury. I believe it's in evidence.

Q (Mr. Heavey) Ms. Bosma, did you review this document in preparation for any of your reports that you provided to the Court here today?

A No.

Q You did not?

A No.

Q On page 12 -- sorry. On the third page of this -- sorry -- the next page, you'd agree with me that with respect to Mr. Giarratana and Mr. Grondahl and Ms. Gaffey's rates, those are all the rates that we just discussed at the lower rate?

A Those are the rates that were being charged on matter 427, which appears to be Caudill Seed, Kean Ashurst, based on this invoice.

Q And do you know if this bill was reversed and rebilled?

A I'm unaware.

Q Can we go to Exhibit 11-B?

THE COURT: Has this been admitted?

MR. HEAVEY: This has been admitted, Your Honor.

THE COURT: And this is a Plaintiff's exhibit.

MR. HEAVEY: This is Defendant's Exhibit 540B as in Bravo.

THE COURT: I thought you just said 11-B.

MR. HEAVEY: 540B, yes.

THE COURT: 540B, yes, that can be shown to the jury.

Q (Mr. Heavey) Ms. Bosma, you'll see that the 540B is the same invoice number as 540A. It's 7836539 at the top right there; correct?

A I think so. I didn't take note of the last one.

MR. HEAVEY: If you want to split the screen for me. Thank you, Mr. Campos.

THE WITNESS: Yes, they're the same.

Q (Mr. Heavey) Now, do you have an understanding why there are red lines on the invoice to the right and nothing on the invoice to the left?

A I do at this time, yes.

Q And that's because this invoice was rebilled; correct?

A It was edited, yes.

Q It was edited, all right.

And do you know what was edited in this bill?

A It appears that the hours were redlined, that the rates are different, and the total, the resulting totals are different.

Q And with respect to the hours, you'll see that on the right-hand side that 15.9 hours we reduced to 8.9 hours. And that's because they were rebilling this 8.9 hours to the federal matter; correct?

A Can you ask the question again? I'm sorry.

Q Sure. The reduction in hours on the right in red to 8.9 is because McCarter & English was parsing out the state court

matter and the federal court matter that was contained in the same bill here; correct?

A    That's what Mr. Giarratana testified to last week, yes.

Q    And did Mr. Giarratana tell you that that had happened ahead of time so that you could input any of that information into your records for the Court to accurately reflect what was captured on these bills?

A    No.  No.  You mean prior to me creating 118?  Yeah.  No.

Q    And the rate changes on this as well from 405 to 535.  You see that?

A    I do see that.

Q    On the same invoice?

A    Same invoice number, yes.

Q    That predates any line items in March where you claim Mr. Giarratana started initially on the federal matter; correct?

A    I don't know if it's fair to say that I claimed that.  But my analysis only looks at matter 464, and this is matter 427.

         It's an accounting analysis --

         THE COURT:  One at a time.  One at a time.  Let's get another question.

Q    (By Mr. Heavey) Is the line item in red reflective of the state court or the federal court matter?  Because you say it was -- so --

A    I'd have to defer to Mr. Giarratana on that.  That's not something I can conclude.

Q   Directing your attention -- excuse me -- to Plaintiff's Exhibit 540C, as in Charlie, and then I'm going to be bringing up 540D immediately.

THE COURT:  I'm sorry.  540C?

MR. HEAVEY:  540C as in Charlie.

THE COURT:  Is a Defendant's exhibit.

MR. HEAVEY:  Yes.

THE COURT:  That's already in evidence.

MR. HEAVEY:  Yes, sir.

THE COURT:  All right.  As well as D?  Those can be presented to the jury then.

Q   (By Mr. Heavey) Ms. Bosma, directing your attention -- and I'm just going to put in Charlie first, 11-C first.  Directing your attention to Defendant's Exhibit with the invoice number 7839405, see that?

A   Yes, that's the invoice number.

Q   And agree with me that at least this invoice was issued on March 12 of 2013?

A   Yes.

Q   Reflecting February 28th, 2013, time to be billed to Jarrow Rogovin?

A   If we go to the next page, I may be able to confirm that. Yes, it appears to be for February time.

Q   And if you look at the first page again, there's no reference to the federal matter in this invoice, is there?

A    No.

Q    Nevertheless, if you -- nevertheless, if you turn to page -- going to say page 18 on the top there, you'd agree with me that the first full line item on February 25th, 2013, at least references a RICO claim, an amended complaint against JFI.  Do you see that?

A    I can read that, yes.

Q    Do you have any idea if that line item references the federal RICO claim against Jarrow Formulas?

A    No.

Q    And Mr. Giarratana -- in preparation for McCarter & English putting together exhibits in this matter, Mr. Giarratana never identified that for you for inclusion in any of your reports to the Court, did he?

A    No.

Q    And if you turn the page.  You will see at least in the February of 2013 group of invoices here that refer to multiple matters -- correct?  Because on the first page, if you go back to the first page -- I'm sorry, Mr. Campos -- you see multiple matter numbers listed there?

A    Yes, I do.

Q    At least with respect to the last page, page 19 here, Mr. Giarratana's rate on all of these were $405 an hour; correct?

          MR. GREEN:  Objection.  It's one matter.

          THE WITNESS:  I can --

THE COURT:  I tell you what.  If the witness knows, she can answer the question.  I'll overrule.

THE WITNESS:  Based on this screen that we're looking at, that rate appears to relate to matter 427.

Q   (By Mr. Heavey) And any of the line item descriptions that were connected with that, including the RICO reference; correct?

A   Can you -- I don't understand the question.

Q   Well, that rate applies to any of the line item descriptions?

A   That rate applies to all the line items under matter 427.

Q   Including the reference to RICO claim that we discussed previously.

A   If that was on matter 427, then yes.

Q   Now, looking at Plaintiff's 540D, we're going to go side by side now.  On the first page -- I'm sorry.  We don't have the first page.  I'm sorry.  On the last page.  Yup.

Now, Ms. Bosma, again we see revisions to the invoice as reflected on the right-hand side of the screen; correct?

A   Yes.

Q   And with respect to the 3.8 hours that -- sorry.  With respect to 7.4 hours that are crossed out and 3.8 to the left of it, do you know what that references?

A   I believe this was the entries that were -- based on Mr. Giarratana's testimony last week, I believe that those were the

entries that he was sending to the insurer; is that right?

Q   To Liberty Insurance, the insurance company; correct?

A   Based on his testimony last week.

Q   Do you have any information at this point whether Liberty Insurance had agreed to take over the defense costs of the Jarrow Formulas federal matter?

A   So this is from 2013.  So I just wanted to clarify.  I wasn't actually here at this time, but I did hear Mr. Giarratana's testimony last week relating to this topic.

Q   So is it your understanding that the 3.8 for Mr. Giarratana would be dedicated to the federal matter that was being paid for by Liberty Insurance?

A   I heard him testify that that's why he edited this bill.

Q   And I noticed that the hourly rate for Mr. Giarratana went up as well in this bill.

A   To the agreed-upon rate, yes.

Q   Well, you say the "agreed-upon rate."

A   Well, Liberty Mutual agreed.

        THE COURT:  One at a time.  Mr. Heavey, go ahead.

Q   (By Mr. Heavey) You keep referring to agreed-upon rate.

A   Yes.

Q   But that increase that's reflected here once again was never provided to the client in writing before the increase occurred; correct?

        MR. GREEN:  Objection.

THE COURT:  It's overruled.

THE WITNESS:  It was provided on the bills.

Q   (By Mr. Heavey) Ma'am, ma'am --

A   I know --

Q   -- let's not split hairs here.  You know I'm questioning very specifically.

Prior to this rate increase -- I know you testified the last time that there wasn't any, but prior to this rate increase reflected here, do you have any evidence that Jarrow Formulas received written notice of that rate increase before this occurred?

A   I don't think I have all the dates quite pinned down just from looking at this screen, no.

Q   Well, do you have any evidence of any written notices to Jarrow Formulas before the rate increase occurred?

MR. GREEN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Just the bills that were issued, so ...

Q   (By Mr. Heavey) Ma'am, if a bill is issued -- I want to be very clear here.

A   Yup.

Q   If a bill is issued, those services have already been provided; correct?

A   But all the following services haven't.

THE COURT:  Ma'am, ma'am.  That's a yes or no.  If you

know.

THE WITNESS: Go ahead. Sorry. Could you repeat the question?

THE COURT: I'm going to -- we're going to move this along. "If a bill is issued, those services have already been provided; correct?"

THE WITNESS: Correct.

Q   (By Mr. Heavey) And they've already been provided at the rate that's reflected on the bill that's the increase; correct?

A   They've already been provided --

Q   If in February I get a bill --

A   Yes.

Q   -- and it says for five hours I dedicated preparation for this trial but it's at the increased rate when I received the bill --

A   Yes.

Q   -- then that's already occurred; correct?

A   The time on that bill would have already been incurred, yes.

Q   Right.

A   But all subsequent time after that.

Q   So before that original rate increase, there's never been a written notice to the client that that rate increase was going to occur; correct?

A   For the very first bill, I guess.

Q    So my answer is yes.

A    That's your answer?  I mean --

Q    Your answer's yes; correct?

A    Please repeat the question and I'll try to answer it better.

Q    It's the same question we've been asking you.

A    I know.

Q    Prior to this rate increase, in writing, prior to it, in writing, before the client received this bill, did he get any notice that this rate increase was occurring?

A    Not in writing but I heard Mr. Giarratana --

Q    That's all I asked you.

          MR. GREEN:  Objection, Your Honor.  Cut off the answer.

          MR. HEAVEY:  That's all I asked, Your Honor.

          THE COURT:  No, I'm going to overrule.

          THE WITNESS:  You said communication --

          THE COURT:  I'm going to overrule the objection. Please don't talk over me.

          THE WITNESS:  I'm sorry.

          THE COURT:  Go ahead, Mr. Heavey.  Next question.

Q    (Mr. Heavey) Do you know, with respect to rebilling or reversing rebilling, as you testified to, some of the bills in this matter, that only occurred after Liberty Insurance agreed to take over the defense costs in this matter; correct?

A    I wasn't here at the time.  I could look at the dates in the ledger history to tell you when certain things happened but no knowledge of the Liberty Mutual.

Q    Directing your attention to what I believe is your Net-Net Collections Profitability Report, Defendant's Exhibit 514 was it?

THE COURT:  Want to bring up 514, Defendant's 514?

MR. HEAVEY:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

Q    (Mr. Heavey) Once again, Ms. Bosma, you provided this report in support of your testimony and McCarter & English's position here to the Court today; correct?

A    No, I didn't provide this report.

Q    How was this created?

A    This is a -- appears to be a screenshot from our profitability metrics system.

Q    And this is a aggregation and aggregate of the May 2019 or up until the May of 2019 matter for the federal matter; correct?

A    No.  This is for all of Jarrow Formulas as a client, so the client, the first column shows it's the entire client, all matters for that fiscal year.

Q    For that fiscal year.  Do you know how many matters Jarrow Formula was involved in with McCarter & English in the fiscal year 2019?

A    I don't.  I could check the records, but ...

Q    And I wanted to ask you the fourth column to the right, the Expected Profit Margin Percentage, do you see that?

A    Yes.

Q    What is that column?

A    So, um, the expected profit margin percentage, um, calculates what the margin would be if the attorneys working on the client were to all work their expected number of hours.  So we set expectations for each of the levels of attorney.  And then they -- we spread their fixed costs out over those number of hours to come up with this.  It's an internal reporting tool that we use to evaluate clients' matters.

Q    And that 27 percent --

A    Yup.

Q    -- as a margin, can you explain what that reflects?

A    Um, yeah.  So a profit margin percentage would be, you know, the amount of fees over the costs, so the difference between the fees and the costs divided by the fees.

Q    Now, I'm not an accountant.  To simplify this, is it easier to say that the expected profit out of every one dollar for anything that was billed and received from Jarrow Formulas would be 27 cents, roughly?

A    Yeah, I think that's fair.  Well, it's -- it's expected.  So it's not the actual hours.  So if I was to actually conclude that, I would more likely use the actual profit margin

percentage because that contemplates the actual hours that were worked by the timekeepers involved; whereas, this is more hypothetical.

Q   The actual profit margins involved here are considerably larger than their expected profit margins for Jarrow Formulas in this matter -- correct? -- or other matters; correct?

MR. GREEN:  Objection.

THE COURT:  The objection's overruled.  If you know, you can answer.

THE WITNESS:  Yes.  The actual percentage profit margin is larger.

Q   (By Mr. Heavey) In fact, it's almost 10, 11 percent larger than what the expected profit margin was for all of Jarrow Formulas in 2019; correct?

A   At this time, yes.

Q   Now, I'd like to direct your attention to some testimony that you provided regarding billing discounts in this matter.

A   Okay.

Q   Did you have any role in determining -- withdrawn.

You stated that you had involvement in incurring the additional 5-percent discount that Jarrow Formulas was requesting in 2019?

A   Yes.

Q   And you said that with respect to the discount at the time that you explained to Mr. Giarratana that you had made a

mistake in that you weren't actually providing a 38-percent discount to Jarrow Formulas at that time. Did I accurately --

MR. GREEN: Objection.

Q (By Mr. Heavey) -- summarize that?

THE COURT: I'm going to overrule it.

THE WITNESS: I would appreciate it if you could repeat that question.

Q (By Mr. Heavey) Sure. I believe that you testified in sum and substance that you provided Mark Giarratana with a value for the discount that Jarrow Formulas was receiving at the time, and that was 38 percent.

A Yes.

Q I believe you stated that you misread some of the reports of the programs that you were looking at when you conveyed that to him.

A No, that's not what I had testified.

Q Where did that 38-percent number come from?

A The 38 is the discount percentage that had been incurred during the fiscal year as of the end of April.

Q But it was not the overall discount that the firm was providing to Jarrow Formulas in the matter, was it?

A Through the end of April, yes, it was.

Q And so is it your testimony at that point that you authorized the 5-percent discount to bring the overall discount that Jarrow Formulas was receiving up to 42 percent?

A    That math isn't right, but, no, I did not.

Q    My math not right?

A    Um, so just because they're receiving a 38 percent, you'd have to look at the different payments that come in to come up with the total overall.  So, no, I don't think that's right.

Q    Did anyone ever accurately explain what you're attempting to explain out to Jarrow Formulas that you know of?

A    What -- do we explain to them how the profit metric works?

Q    No.  Did anyone you know explain what percentage discount Jarrow Formulas was actually receiving at the time that they were requesting the additional discount?

A    Like in detail, like that it was rates and write-downs, etc.?  I'm unaware of whether that conversation took place.

Q    And with respect to that discount, did you go to the Finance -- withdrawn.

As a member of the Finance Committee, did anyone come to you in your official capacity at the Finance Committee to determine an additional discount for Jarrow Formulas?

A    Yes.  In May of 2019 Mr. Giarratana and I had a conversation about the discount.

Q    Was it reduced to writing?

A    I'm sorry?

Q    Was it a written authorization from the Finance Committee to go above whatever the standard discount?

A    We had a conversation which he documented and e-mailed to

the client.

Q   Was the request -- withdrawn.

At McCarter & English individual partners have some discretionary authority on discounts that they can provide to clients; correct?

A   Yes.

Q   And typically that's a 10-percent discount before they have to go seek management or committee approval; correct?

A   The current policy says if you're charging your standard rates, you have discretion up to 10 percent, but, um, anything above that, you should really be consulting on.  But I would say, as a general rule of the firm, we try to have people consult with people like myself or the COO or a member of a committee before, you know, authorizing additional discounts.

Q   And so my question for you is, did Mr. Giarratana or anyone on the Jarrow Formulas matter request in writing from the Executive Committee authorization to go beneath the standard discount?

A   Not that I'm aware, but I don't know.

Q   Ms. Bosma, do you know if there were any communications to the clients where McCarter & English identified that it was going to be reversing the bills that were issued previously and paid by the client in rebilling them to Liberty Insurance?

A   Am I aware that we did do that or that it was communicated to them?  Sorry.

Q   Are you aware if it was ever communicated to them?

A   So based on my review of the ledger history, I can see that there was a payment made on the reverse bill, and then they also paid the reissued bill.  So the bills were -- that first bill at least was communicated.

Q   So you -- are you saying that they paid the original bill and then they paid for the reverse bill as well at the higher rate?

A   Well, we reversed the payment.

Q   Did that reversal -- was the client ever informed that he had that payment reversed?

A   I don't know.  I wasn't there at the time.

Q   Were you -- you're the CPA who was auditing this file.  Did you ever go back and determine that the client was provided information that those bills were reversed?

A   I did not go back to confirm that, no.

Q   And when you say they were reversed, you didn't refund that money to the client; correct?

A   We held it on an account and applied it to a future bill.

Q   And did you have any evidence that that was ever communicated to the client?

        MR. GREEN:  Objection, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I don't have evidence of that.

Q   (By Mr. Heavey) So how was he supposed to know, the

client -- I'm sorry -- Jarrow Formulas supposed to know that you negated the bill, you reversed it, and you're going to apply it to a future amount owed by Jarrow Formula if it wasn't communicated to the client?

A    It could have been communicated.  I was not here at that time.  I can't speak to that, unfortunately.

Q    And so if Mr. Rogovin testifies that it was not communicated to him, how would a client know that?

A    It would have to be communicated.

Q    And with respect to reissuing the bills at a higher rate -- let's stick with that.  Reissuing the bills at a higher rate, do you have any evidence during the course of your audit of this file, in preparation for trial, that that was conveyed to the client or communicated to the client in any way?

A    Well, I can see the -- I already mentioned, so maybe this doesn't answer the question.  But the initial bill that was issued was paid, and then that bill was paid.  The payment was -- I'm sorry.  The bill was reversed.  The payment was reversed, and the new agreed-upon rate was issued.  So that could have been a communication, but again, I can only infer from the financial records.

          MR. HEAVEY:  Mr. Campos, would you please pull up Ms. Bosma's deposition testimony, page 56, line 7 through 20.

          THE COURT:  Page 56, line 7 through 20?

          MR. HEAVEY:  20, Your Honor.

THE COURT: Do you have a copy for the witness?

MR. HEAVEY: May I approach the witness?

THE COURT: Yes.

MR. HEAVEY: Thank you, Your Honor. I'm just marking the section.

THE WITNESS: Thank you. Okay.

THE COURT: All right. Mr. Heavey, do you want to ask a question?

Q   (By Mr. Heavey) Notwithstanding your testimony here, you have no evidence whatsoever that the reissued bills -- withdrawn.

In previous testimony when asked whether or not there's any evidence of notification to the clients, what was your response?

A   I said that because I've seen e-mails indicating that they were discussing year-end discounts, that that was likely a communication about the reversal, the initial bills.

Q   And when asked, "Do you know whether there are any discussions with the client about the reversal of these bills and the reissuance of them?" your response was, "I don't know"; correct?

A   I'm not aware.

Q   And when the question was said, "Do you know whether there's ever been a discussion with the client about that?" your response was, "Yes, I'm sure there was."

A    Yes.

Q    And why were you sure there was?

A    Because I assumed that if they were discussing the bills to get them paid, that they knew which bills they were talking about, right.

Q    Yeah, and specifically with respect to reversing the bills, there was no evidence and no testimony that you'd seen any e-mails regarding notification of the client that McCarter & English was reversing those bills.

A    I have not seen those e-mails, no.

         MR. HEAVEY:  Your Honor, based on the time of your break, it may be nice right now and I could regroup.

         THE COURT:  That would be fine.

         Yeah, Ladies and Gentlemen, we'll take our break now. As always, don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that. Thank you for your attention this morning.  I'll ask you to accompany Ms. Johnson to the jury room.

    (The jury left the courtroom at 10:42 a.m.)

         THE COURT:  Everyone can be seated.  Is there anything before we recess that the Court needs to address?

         Mr. Green, anything to address before we recess?

         MR. GREEN:  No, Your Honor.

         THE COURT:  Mr. Heavey?

         MR. HEAVEY:  No, Your Honor.

THE COURT:  We'll be in recess.  Thank you.

(Recess from 10:43 a.m. to 10:58 a.m.)

(The jury entered the courtroom at 10:59 a.m.)

THE COURT:  All right, Mr. Heavey, you may continue.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) Ms. Bosma, I would like to direct your attention to Defendant's Exhibit 517.

MR. HEAVEY:  It's been previously admitted, Your Honor.

THE COURT:  All right.  517?  That can be brought up.

MR. HEAVEY:  I'm sorry.  I'm going to offer this for admission.  I believe it was previously admitted.  I'll have a copy.

THE COURT:  Is there any objection to Defendant's 517?

MR. HEAVEY:  I'm sorry, Your Honor.  It's 522.

THE COURT:  Okay.  So has it been admitted or not? 522 is already in.

MR. HEAVEY:  It has been admitted.  517 has not.

THE COURT:  You want 522 up.

MR. HEAVEY:  Yes, sir.

THE COURT:  Let's do that.

Q   (By Mr. Heavey) Ms. Bosma, directing your attention to Defendant's Exhibit 522, this is McCarter & English invoice dated April 15, 2013; correct?

A   I believe this is a reverse bill, but yes.

Q   Well, ma'am, this is an invoice issued from McCarter & English on April 15 of 2013, Invoice No. 7845851; correct?

A   Yes.

Q   Client Invoice No. 464, which is the number you keep referring to as the federal matter Caudill Seed versus JFI?

A   Yes.

Q   You'll see the total due on this invoice was $58,740.89; correct?

A   That's correct.

Q   This invoice, if you turn the next page, is for the professional services, legal services, McCarter & English rendered through March 31st of 2013; correct?

A   Yes.

Q   And there's no doubt now this is part of the federal matter as reflected in the matter number; correct?

A   Correct.

Q   And if you turn to page 13 of that invoice, and it's the second to last one, you will see that the total due on that invoice, $58,000, is reflected on the top.  And the hourly rates for the timekeepers that are working on the federal matter are reflected beneath that; correct?

A   Yes.

Q   And Mr. Giarratana's rate on the federal matter, as of March 31st, 2013, as reflected in McCarter & English's own invoice, is $405; correct?

A    That's what this shows.  But this bill was reversed.  I think that's important.

Q    Was it paid?

A    Yes.

Q    And what rate did my client pay that invoice as of April of 2013?

A    This rate.

Q    And when you say that the clients should have known what their attorney hourly rates were on these matters, that would be one place to identify Mr. Giarratana's rate as it was in the federal matter as of March of 2013; correct?

A    Yes, but they would have received a revised bill for the same time.

Q    At the same time that they received this bill, they received a revised bill?

A    No, not at the same time.

Q    No, it didn't.  They paid this bill before they received a revised bill; correct?

A    I couldn't speak to the timing of the receipt, but they paid this bill on June 24th.  And I believe there are, I believe -- could I look at the larger dates to answer that maybe?

Q    Sure.

        THE COURT:  Which exhibit is this?

        THE WITNESS:  I --

THE COURT:  No, ma'am.  Which exhibit is this, Mr. Heavey?

MR. GREEN:  PTX 116, Your Honor.

THE COURT:  PTX 116, can we bring that up, please?

THE WITNESS:  So this invoice -- or I'm sorry.  Did you wan to ask me a question?

Q    (By Mr. Heavey) You said you needed to refresh your recollection looking at this document.

A    Yup.

Q    Do you need me to restate my question?

A    Sure.

Q    I wish I could right now.

A    I could take you through what that shows.

THE COURT:  The question was, "They paid this bill before they received a revised bill."

THE WITNESS:  Ah, that's right.

MR. HEAVEY:  Thank you, Your Honor.

THE WITNESS:  Thank you.

So this invoice that we're looking at was issued on April 15th, 2013, but then reversed, let's see, reversed on 7/11.  Can I see my notes on the side too?  Sorry.  I just want to make sure I got this right.

Yup, okay.  So it was issued on April 15th, um, paid on June 24th, then reversed.  And the payment was reversed as well on July 11th.  Does that answer your question?

Q    (By Mr. Heavey) It does.  So based on the chronology, the invoice with Mark Giarratana's rate at $405 and Mr. Grondahl's rate at $395 and Mr. Rechen's rate at $405.  Those were paid by my client before they were ever reversed; correct?

A    Yes.

Q    And they were paid at that rate, not the higher rate that was billed to Liberty; correct?

A    Later on when the bill was reissued --

Q    This invoice, this invoice, I'm sorry.  Directing your attention at this invoice, at this time, you received a payment at some point after it was issued?

A    On June 24th.

Q    For the amount and the hours described here.

A    Yes.

Q    At these rates.

A    Yes.

Q    And as you previously testified, there was no notice of a written rate increase from this bill to any inflated rates that were submitted --

          MR. GREEN:  Objection.

          MR. HEAVEY:  -- to my client.

          MR. GREEN:  Objection.

          THE COURT:  I'll allow it.

          THE WITNESS:  Can you repeat the question?

Q    (By Mr. Heavey) There's no evidence of a written rate

increase or notice of the reversal prior to it happening that was provided to my client, was there?

A    I heard testimony to a verbal discussion about the rate change.

Q    And that's why I referenced the writing.  There is no written evidence; correct?

A    Not that I'm aware of.

        MR. HEAVEY:  All right.  Defendant's Exhibit 517 is not admitted yet.

        THE COURT:  All right.  Is there any objection?

        MR. HEAVEY:  May I appraoch the witness?

        THE COURT:  Do you want to lay a foundation?  Is that the plan?  Go ahead.

        MR. HEAVEY:  There's --

        THE COURT:  Mr. Green, let me ask, is there going to be an objection to 517?

        MR. GREEN:  No objection, Your Honor.

        THE COURT:  No objection?  All right.  517 can be admitted as a full exhibit.  It can be published, Mr. Heavey.

    (Defendant's Exhibit 517, received in evidence.)

        MR. HEAVEY:  Thank you.

Q    (By Mr. Heavey) Directing your attention, Ms. Bosma, to Exhibit 517.  This invoice was issued on July 11, 2013; correct?

A    Yes.

Q    It encompass the 464 client matter that references the federal litigation against Jarrow Formulas; correct?

A    Yes.

Q    Now, if you go to page 13, you will see on this page, ma'am, that Mr. Giarratana's rates went up to 535 in this invoice; correct?

A    Yes.

Q    And Mr. Grondahl's rate went up to 485 on this invoice; correct?  And if we look at page 13 of this exhibit, along with the corresponding page in the previous exhibit, Mr. Campos, Ms. Bosma, do you have any indication that the invoice on the left is the same invoice on the right yet simply rebilled at a higher rate?

A    Yes.  The time entries are the same.

Q    Time entries are the same?

        The invoice number at the top, 788 -- 7860852 is changed from the previous invoice as well; correct?

A    Yes.

Q    And is that typical on reissued and rebilled invoices?

A    It varies I would say.  I mean sometimes we would issue this under the same invoice number, sometimes not, yeah.

Q    And why is it that this one was issued under a different invoice number when the previous ones were simply revised and issued under the same?

A    So the previous ones that you were looking at weren't

actually issued in the system. They were issued outside of the system. That would be one reason.

Q   Nevertheless, you would agree with me that the invoice on the right pertains to the federal matter, and it identifies the decreased rates that Mr. -- that Jarrow Formulas was paying at that time in March of 2013 that they paid a subsequent date in April; correct?

A   I don't know what they were paying on all of their matters. On this matter they paid 405, but I have to review the records to confirm or deny that.

Q   Now, in light of your accounting and audit background, you never identified in any of the reports that you issued to the Court, in support of your position, that there were invoices out there that were billed and paid at the lower rate?

          MR. GREEN:  Objection.

          THE WITNESS:  Yes, I did.

          THE COURT:  The answer can stand. That's fine. Go ahead. Next question.

Q   (By Mr. Heavey) None of the reports that you issued reflected these decreased rates in the values that you summarize at the end, did they?

A   At PTX 118 indicates with an asterisk and identifies that it was rebilled.

Q   It was rebooked, but it doesn't identify it was rebooked at a higher rate.

A    Well, it shows the higher rate.

Q    And in all of your summaries for the Court, you never included any of the instances where my client was billed at a lower rate for the federal matter, as demonstrated in March, in this March invoice, and paid that lower rate, did you?

A    Those bills were reversed.  It would have been inappropriate to include them.  It would have inflated the number.

Q    It would have been inaccurate to include them?

A    I disagree.

Q    Because that's exactly what happened; correct?

          MR. GREEN:  Objection, Your Honor.

          THE COURT:  I'll let the witness answer.

          THE WITNESS:  I disagree that it would have been inaccurate to include them.

Q    (By Mr. Heavey) You didn't want anyone to know that my client billed hourly rate --

A    I put an asterisk.

Q    There's a question pending, ma'am.

          THE COURT:  Don't interrupt.  Let him finish his question.  Start again.

Q    (By Mr. Heavey) Nowhere in your summaries of all the amounts due that you've testified, due to McCarter & English that you've testified to, did you input any of the lower rates to reflect those payments made?

A    I believe that's correct.

Q    And the ultimate issue in this court that's standing right now is whether or not the increased rates are applicable to my client; correct?

A    I don't know all the issues involved in the case, but ...

Q    And, nevertheless, there is no number out there that reflects the overall amount that would have been paid by my client if those reduced rates, the ones that we see in the March invoice, were paid throughout the litigation; correct?

A    Why would there be if those weren't the rates that they agreed to?

Q    The question is a yes-or-no question, ma'am.

A    Okay.  Can you repeat it then, please?

Q    Nowhere in your summaries do you provide the alternative valuation of the lesser agreed-upon rates because the Court's decided that those rates --

A    I do not, yeah.

Q    And if you did, your numbers that you provided to the Court would be significantly less; correct?

A    They would be different, yeah.  Significance is relative, but ...

Q    Plaintiff's Exhibit 116, please.  This has been admitted.

     Is this what has been described in your testimony as an excerpt from the ledger history form?

A    It's an excerpt from the ledger history, yes.

Q   And if you scroll all the way to the right, in the furthest right-hand column, you will see some values listed there.

A   I should clarify.  This is an excerpt from the ledger history with my notations, the "Jackie's notes" column and the column that you're referring to.

Q   Right.  This is an original document that was downloaded off of your system.  This was a document that was downloaded that you included commentary on.

A   Correct, and sorted and analyzed.

Q   And none of your commentary or analysis has to do with any of the bills regarding the reduced rates here, do they?

A   The reverse bills are on here.  They're included in the ledger history.

Q   Right.  And the amounts that were paid that are indicated in those reversals that you indicate here under "Jackie's notes," those were never considered in any of your final documents or reports that were provided to the Court with the lower rates in it, were they?

A   No, 'cuz they would have inflated the number if I included reversed bills.

Q   And you have no understanding, as you sit here today, why -- withdrawn.

When you were deposed in this matter, you had no understanding as to why those reversals happened at the time, did you?

A    Not at the time, no.

Q    And that -- and you provided your notes, your commentary, on this document even though it wasn't in the original downloaded document that you received off of your system; correct?

A    Yes.

Q    And so in the entry for June 24th, 2013, that is evidence that Jarrow Formula paid 52,411 cents -- sorry -- $52,411 in fees for that bill; correct?

A    Yes.

Q    And they paid an additional 6,329 in expenses.

A    Yes.

Q    And then there's a line item in July 11th, 2013, that there's a reversal of a payment from Jarrow Formulas; correct?

A    Yes, the next line.

Q    And what was that reversal for?

A    I'm sorry.  The next line is the reversal of the bill, and the following line is the reversal of the payment.

Q    And why was that reversed?

A    'Cuz there is something wrong on the original bill.

Q    You don't know why it was reversed, do you?

A    We only reverse bills if there's something wrong on them, so I can conclude there's something wrong on the first one.

Q    You concluded there was something wrong on it, but no one ever told you why it was reversed?

A    No, not when I prepared this.

Q    And during the course of your audit, you didn't try to determine why it was reversed, did you?

A    No.

Q    Because that would have identified the fact that you'd been -- that my client had been paying those bills at a lower rate; right?

             MR. GREEN:  Objection, Your Honor.

             THE COURT:  Well, I'll allow the question.

             THE WITNESS:  Repeat it for me, please?  Sorry.

Q    (Mr. Heavey) You didn't bother to determine why those bills were reversed, did you?

A    I did not seek out why those bills were reversed, no.

Q    And it was because you would have had to identify the fact that my client was paying --

A    That's not why.

Q    Let me finish my question, ma'am, please.  Because it would have identified the fact that my client was paying a lower rate in this litigation matter; correct?

A    That is not why I didn't do it.

Q    But it would have identified that fact, would it have not?

A    Yes.

             MR. HEAVEY:  I have no further questions, Your Honor.

             THE COURT:  All right.  Redirect, Mr. Green.

             MR. GREEN:  Mr. Wyzik, please call up PT 116, PTX 116.

REDIRECT EXAMINATION

BY MR. GREEN:

Q   Ms. Bosma, Mr. Heavey was focusing you on the time billed for the months of March, April, and May 2013.  Does PTX 116 address each and every one of those bills?

A   Yes.

Q   Does it show the initial bill?

A   Yes.

Q   Does it show the reversal of the bill?

A   Yes, it does.

Q   Any payments that were received on the first three bills, are they allocated to this matter for the client?

A   Of course.

Q   Okay.  Now, does it also address the reissued bills?

A   It does.

Q   Okay.  And did the client pay the reissued bills?  Can you tell that from FT -- PTX 116?

A   Yes, they did.  You can see the payments, yeah.

Q   Okay.  And so focus first on the March reissued bill.  When was it paid?

A   Let me just find it on here.  So the -- okay.  The reissuance of the April bill, which would have been for March time, occurred on July 11th and was paid by the client on September 30th.

Q   And did the client pay it with a discount?

A   Yes, they did.  They were given a year-end discount.

Q   Did the client, in fact, pay less on the reissued bill than it had on the original bill in terms of fees?

A   Yes, it did.  Yes, they did.

Q   And when was the April bill reissued?

A   So the -- let's see, the May bill for April time was reissued on June 26th.

Q   Okay.  And when was it paid?

A   September 30th.

Q   All right.  And was it paid with a discount?

A   Yes, it was.

Q   Okay.  And the initial, the original bill for April time was not paid by --

A   It was not.

Q   Until the reissued bill was paid; correct?

A   Correct.

Q   All right.  Now, what about the third bill that Mr. Heavey talked to you about for May time?  When was that reversed?

A   So that was reversed on June 26.

Q   And when was it reissued?

A   Sorry.

        THE COURT:  I'm sorry.  Did you say it was reversed on May 26 or it was reissued on May 26?  I'm sorry.

        THE WITNESS:  Oh, I'm sorry.  Thank you.  It was reversed on June 26 and reissued that same day.

Q    (By Mr. Green) And when was it paid?

A    September 30th.

Q    Okay.  With a discount?

A    Yes.

Q    Are you able to tell the amount of the discount from your larger sheet?

A    Yes.

Q    Okay.  And is that -- what was the discount percentage in this case?

A    The discount on that June bill from May time was $3,149.35.

Q    And is that a certain percentage of the amount of the fees paid?

A    I could calculate that if you wanted me to, but ...

Q    In fact, were all three bills that Mr. Heavey discussed with you paid with a discount?

A    Yes.

Q    Okay.  At the end of the fiscal year.

A    Yes.

Q    Okay.  Now, I want to focus on, when was matter 464 opened?

A    I believe it was opened in March of 2013.

Q    Okay.  And when did Mr. Giarratana start issuing bills with respect to it?

A    In April for the March time.

Q    Okay.  And that is a reversed bill; correct?

A    Yes, the original April bill was reversed.

Q    When you first did this work back in 2019 with respect to PTX 118, did you have an understanding of what was incorrect about the bills?

A    Well, I saw that they were reissued at different rates, but I didn't know any of the reasoning.

Q    Okay.  And did you draw a conclusion based on your analysis?

A    I concluded that the original rates were incorrect.

Q    Okay.  And, in fact, were you in the courtroom when Mr. Giarratana described his -- his interaction with Liberty?

A    Yes, I heard that last week.

Q    And his interaction with JFI with respect to the new rates?

A    Yes.

Q    Okay.  And so what did you conclude based on your analysis and from listening to Mr. Giarratana as to why the three bills were reissued?

A    Because they were mistakenly issued at the lower rates, and then we issued them at the rates after they'd been agreed upon with Liberty Mutual and the client.

Q    Okay.  And, of course, to pay the bill, which all three reissued bills were paid, the client would have to have the bill; correct?

A    Yes.

Q    Okay.  And be aware that he was paying the bill with a

discount.

A   I'm sorry.

Q   And, of course, if a discount was taken, presumably the client knew he was paying a bill with a discount.

A   Yes.

Q   The discount is for his benefit; correct?

A   Correct.

Q   All right.  He gets the money benefit of each discount.

A   Yes.

Q   And we get early payment.

A   Well, I don't think it was early for some of them, but ...

Q   We get payment before the fiscal year-end?

A   We get payment, yes.

Q   All right.  Now, Mr. Heavey talked to you quite a bit about communications with the client.  Did you have any communications with Jarrow Formulas?

A   No.

Q   Okay.  Whose responsibility is it to discuss billing matters with Jarrow Formulas?

A   Primarily the billing partner.  However, the billing specialist or collections analyst may have some interactions.

Q   And the billing partner is?

A   Mr. Giarratana.

Q   Okay.  So you wouldn't be expected to have communication with Jarrow Formulas in the ordinary course of business?

A    Not unless the billing partner requested me to.

Q    And did he?

A    No.

Q    And, in fact, you had no communications at any time with Jarrow Formulas.

A    No.

Q    All right.  And you got to the firm in 2016?

A    I did.

Q    So when these transactions were booked in 2013, you weren't even there.

A    I was not.

Q    You looked at them from the firm's records?

A    Correct.

Q    Now, Mr. Heavey focused your attention on the January and February time in the Ashurst case.  All right?  Now, did you analyze the Ashurst matter?

A    No, I did not.

Q    Why not?

A    Because I was analyzing matter 464 which was the federal matter.

Q    All right.  And so the two bills that Mr. Heavey focused upon did not enter into your analysis.

A    No.  I wouldn't have thought to go and look at all of the invoices.  I just looked at the things for 464.

Q    And Jarrow Formulas has multiple matters?

A    Lots of matters.

Q    And you did one.

A    Correct.  I looked at one matter.

Q    Now, so Mr. Heavey focused on two bills issued in the Caudill Seed matter and three bills re -- reversed and reissued in this matter, total of five bills.

A    Um-hmm.

Q    And how many bills did Jarrow receive at the -- Jarrow Formulas receive at the new rate?

A    I think the number was like 70 or something.  It was five pages of them in the ...

Q    And you looked at Defendant's Exhibit 551 earlier.  Would that --

A    Which one was that?  Sorry.

          MR. GREEN:  Could you pull it up, please, Mr. Wyzik?

          THE WITNESS:  Yes.

Q    (By Mr. Green) So this PT -- excuse me -- Defendant's 551 indicates every bill issued in the case; correct?

A    Yes.

Q    So if we wanted to count them up --

A    It doesn't include the reverse bills.

Q    Yes.  We could count up how many bills Mr. -- excuse me -- Jarrow Formulas got at the new rates compared to how many it got at the old rates.

A    There's nine on this page, so if we looked at the pages,

yes.

Q   And he got -- or the company got many, many more bills at the new rate than it got at the old rate.

A   Yes.

Q   And it paid all but five of them.

A   That's correct.

Q   Now, in terms of the redacted bills that -- you called them the edited bills, the February and January bills, and do you have in mind the ones with the red lines?

A   Yes, I remember them.

Q   Do you understand to whom they were submitted?

A   My understanding, those were sent to Liberty Mutual.

Q   Right.  At any time were they, the edited bills, sent to Jarrow Formulas?

A   Not to my knowledge.

Q   Okay.  And, in fact, do you understand why Mr. Giarratana did edit the bills and submit them to Liberty at the new rates?

A   In hopes of getting the insured --

        MR. HEAVEY:  Objection.

        THE COURT:  Well, I'll sustain that, yes.

Q   (By Mr. Green) Okay.  Did you hear Mr. Giarratana testify last week as to why he submitted the bills that way to Liberty?

A   I did.

Q   Okay.  And was it to obtain payment of the bills at the new agreed-upon rates?

A   Yes.

MR. GREEN:  Nothing further, Your Honor.

THE COURT:  Limited redirect, Mr. Heavey?

MR. HEAVEY:  I do have very briefly, Your Honor.  I'll be brief.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. HEAVEY:

Q   Ms. Bosma, you talked about your testimony regarding the March bill that was paid by Jarrow Formulas and then reversed?

A   Yes.

Q   And then rebilled to Jarrow Formulas and paid; correct?

A   Yes.

Q   That was your testimony?

A   Yes.

Q   So with respect to the March bill, Jarrow Formulas paid it twice?

A   No, because when the bill was reversed, the payment was reversed and held on account for their benefit.

Q   So they gave you the money for the March bill.  Then they paid you more money for the increased March bill, and you kept both of those; correct?

A   Well, we applied the --

Q   That's a yes-or-no question.

A   We did not keep it indefinitely, no.

Q   You retained -- you never provided a refund to my client for the bills that he paid for at the lower rate that was subsequently rebilled to him at the higher rate and paid; correct?

MR. GREEN:  Objection, relevance.

THE COURT:  Yes or no, ma'am.

THE WITNESS:  We did not provide a refund.

Q   (By Mr. Heavey) Thank you, ma'am.

And there was some testimony regarding Liberty Insurance and the bills provided to Liberty that you just testified to?

A   I testified as to what I heard Mr. Giarratana say in court last week.

Q   And you agreed that Mr. Giarratana was -- or at least you agreed just now that Mr. Giarratana was billing that to Liberty at the new agreed-upon rates; correct?

THE COURT:  Sorry.  What was the answer?

THE WITNESS:  Yes.

Q   (By Mr. Heavey) You didn't see any evidence at that time from anyone at McCarter & English that they had identified the fact that they were billing the client at a lower rate than the ones that they had suggested to Liberty; correct?

MR. GREEN:  Objection, relevance.

THE COURT:  I'll overrule that.

THE WITNESS:  I'm sorry.  Could you repeat it for me,

please?

Q   (By Mr. Heavey) You didn't see any evidence, in preparation for your testimony here at trial today, that anyone from McCarter & English identified the fact that they were billing Liberty Insurance at an increased rate than what they had already billed the client, have you?

A   No.

Q   And directing your attention ...

MR. HEAVEY:  One minute, Your Honor.

THE COURT:  Okay.

MR. HEAVEY:  I'd like to direct the witness's attention to Defendant's Exhibit 523, which is not admitted at this time, Your Honor.

THE COURT:  DX 523.  Mr. Green, is there --

MR. GREEN:  We've got to see it, Your Honor.

THE COURT:  Hold on a second, please.

MR. GREEN:  No objection, Your Honor.

THE COURT:  All right.  523 can be published full.

(Defendant's Exhibit 523, received in evidence.)

Q   (By Mr. Heavey) Ms. Bosma, do you know who Michelle Shaw is?

A   Michelle Shaw, I believe she is a paralegal in our Hartford office.

Q   All right.  Then disregard that question.  I understand what that was.

Do you see the communication string between Mr. Giarratana and Ms. Linda Lin from LibertyIU.com?

A    I do.

Q    And with respect to your testimony on the Liberty Insurance billing, you would agree with me that Mr. Giarratana provides only the higher rates with respect to the valuations that he puts into the e-mail where he identifies the fees and costs incurred in connection with this action in March.  Do you see that paragraph through the end of March there?

MR. GREEN:  Objection, Your Honor.  You've had prior rulings on this very issue.

THE COURT:  Well, hold on one second.  Why don't you ask the question again.

MR. HEAVEY:  Sure.

Q    (By Mr. Heavey) You see where Mr. Giarratana provided Linda Lin of New York LIU with the attorneys' fees and costs that had been occurred in connection with this action through March; right?  And that's two paragraphs down from there.

THE COURT:  You're asking about the paragraph that begins, "Through the end of March"?

MR. HEAVEY:  Yes, sir.

THE COURT:  The question is, Do you see that paragraph?

THE WITNESS:  I do see that paragraph.

Q    (By Mr. Heavey) Now, with respect to the values that were

being provided by Mr. Giarratana with respect to the fees and costs incurred by the end of March, those fees weren't the values that my client paid on the original March invoice, were they?

A    No.

Q    Let's take a look at the original March invoice again at Defendant's Exhibit 522, if we could put them side by side. And we're looking at the -- and if you go to the last page on fees and disbursements on it.

Thank you, Mr. Campos.

You agree with me that the invoice on the left once again is the invoice that was originally billed to my client and originally paid at the 405 rate for Mr. Giarratana, the 395 for Mr. Grondahl, and the 405 for Mr. Rechen; correct?

A    Yes, that's what this invoice says.

Q    And those values are not provided anywhere in Mr. Giarratana's e-mail to the right with respect to the fees to date that have been incurred by my client for March of 2013, are they?

A    Is the 405 rate mentioned?  No, it's not.

Q    And as far as the overall fees and costs incurred with this action being $74,000 for March, through the end of March, based on your review and accounting and auditing of the 466 number, that wouldn't be accurate either based on the reduced rates; correct?

MR. GREEN:  Objection, Your Honor.  You've made a prior ruling in connection with Liberty.

THE COURT:  It's overruled.  She can answer if she knows the answer.

THE WITNESS:  Can you do the question again?  I'm sorry.

Q   (By Mr. Heavey) The numbers that are provided by Liberty for Mr. Giarratana are not the numbers that are reflected at the lower rates that were paid by my client; correct, Ms. Bosma?

A   I believe they're at the rates he mentions in his e-mail.  I would have to recalculate it.

Q   That's a yes-or-no question.

THE COURT:  I think she answered it.  You can ask your next question.

Q   (By Mr. Heavey) Nowhere in the Liberty communications were the original rates referenced from anyone from McCarter & English; correct?

MR. GREEN:  Objection, Your Honor, relevance.

THE COURT:  It's overruled.

THE WITNESS:  No.

MR. HEAVEY:  Thank you, Ms. Bosma.

MR. GREEN:  Your Honor, may I have two questions to clarify?

THE COURT:  No, you may not.

You may step down.  Thank you so much.

All right.  So, Mr. Green, Mr. Pepe, my understanding is that you've now presented the witnesses that at least are the -- whose evidence primarily relates to the billing issues that you -- that you are going to present.

MR. PEPE:  Subject to two issues, if I may, Your Honor.

THE COURT:  Okay.

MR. PEPE:  At this point the plaintiff McCarter & English would move the admission to full exhibits all the invoices rendered by McCarter & English and paid by JFI through the course of the Kentucky litigation.

THE COURT:  Maybe you could --

MR. PEPE:  There is no objection.  Some are already in evidence.

THE COURT:  Can you give us the numbers?

MR. PEPE:  And I can identify the numbers that are not in evidence, which are being moved, to which there is no objection.

THE COURT:  Let's do that right now.

MR. PEPE:  Okay.  Your Honor, PTX 016.

THE COURT:  Okay.  That will be full.  16 is full.

(Plaintiff's Exhibit 16, received in evidence.)

MR. PEPE:  PTX 018 through PTX 083 inclusive.

THE COURT:  Yes, those will all be full.  There's no

objection to those.

(Plaintiff's Exhibits 18 to 83, received in evidence.)

THE COURT: You did not want 84 as well?

MR. PEPE: Your Honor, that was already in evidence.

THE COURT: Okay, fine. Thank you.

MR. PEPE: And 00125 are in evidence.

THE COURT: All right. Very well.

Was there a second issue you wanted to raise?

MR. PEPE: The second issue, Your Honor, concerns the witness Mr. Khowong.

THE COURT: Wait. Actually, give me one second. Just if you could give me those numbers one more time. I neglected to write them down.

MR. PEPE: PTX 016.

THE COURT: Yup.

MR. PEPE: PTX 018 through --

THE COURT: 83; right?

MR. PEPE: Inclusive.

THE COURT: Full. Very well. Those are all full.

Go ahead. Next question.

MR. PEPE: So with respect to Mr. Khowong, Your Honor.

THE COURT: Yes.

MR. PEPE: Your Honor, rendered some rulings on the deposition --

THE COURT: Yes, I did.

MR. PEPE: -- today. And I understand Mr. Resser has not made his position clear. If he's being called live, then we will address that issue when he's called live.

THE COURT: That's fine.

MR. PEPE: If he's not, then we would offer our deposition designations.

THE COURT: My understanding, Mr. Resser, is the current plan is to call him live; is that correct?

MR. RESSER: Yes, Your Honor, if he can make it here.

THE COURT: We'll deal with that at the time.

MR. PEPE: Then we have no issue at this point.

THE COURT: Very well.

MR. PEPE: The answer to Your Honor's question is we have done that. We have submitted the evidence relating to the billing issues.

THE COURT: Thank you so much.

All right. Mr. Resser, did you want to pick things up from here or Mr. Heavey?

MR. RESSER: Mr. Heavey.

At this time we would like to offer for admission Defendant's Exhibits 703 through 711.

THE COURT: 703 through 711.

MR. RESSER: By the way, every one that I'll be listing show no remaining objection to Your Honor.

MR. GREEN: We're checking the list, Your Honor.

THE COURT: I'm checking it too. All right. Those can be admitted as full exhibits. Any objections that were made to those documents were overruled by me. So 703 to 711, Mr. Resser?

MR. RESSER: Yes, inclusive.

THE COURT: Those will be all full exhibits, 703 through 711.

(Defendant's Exhibits 703 to 711, received in evidence.)

MR. RESSER: Next, Your Honor, Defendant's Exhibit 526.

THE COURT: 526. All right. That's full. 526 is full.

(Defendant's Exhibit 526, received in evidence.)

MR. RESSER: Next is PTX 51.

THE COURT: I think that just got in anyway.

MR. RESSER: Okay.

THE COURT: Yes. So that's already in.

MR. RESSER: Defendant's Exhibit 542.

THE COURT: 42. Okay, that's a full exhibit. 542 is full.

(Defendant's Exhibit 42, received in evidence.)

MR. RESSER: Defendant's Exhibit 579. There was a reserved objection.

THE COURT: All right. Hold on.

All right. I think I need to see it.

MR. RESSER:  Okay.

THE COURT:  Why don't we do that at a break.  We'll come back to that.

MR. RESSER:  Subject to Mr. Rogovin's testimony, I think let me withdraw that request.

THE COURT:  Okay.

MR. RESSER:  58 -- Defendant 589.

THE COURT:  Okay, that's a full exhibit.  589 is full.

(Defendant's Exhibit 589, received in evidence.)

MR. RESSER:  Exhibit 634.

THE COURT:  634 is full.

(Defendant's Exhibits 634, received in evidence.)

MR. RESSER:  Exhibit 615.

THE COURT:  615?

MR. RESSER:  Defendant's 615, Your Honor.

THE COURT:  Yes, that's full.

(Defendant's Exhibit 615, received in evidence.)

MR. RESSER:  Defendant's 616.

THE COURT:  Also full.

(Defendant's Exhibit 616, received in evidence.)

MR. RESSER:  Defendant's 650.

THE COURT:  All right.  That will be a full exhibit, 650.

(Defendant's Exhibit 650, received in evidence.)

MR. RESSER:  PTX 230.

THE COURT: All right. That's full. PTX 230 is full.

(Plaintiff's Exhibit 230, received in evidence.)

MR. RESSER: Thank you, Your Honor. Exhibit PTX 239.

THE COURT: 239 is full.

(Plaintiff's Exhibit 239, received in evidence.)

MR. RESSER: Defendant's Exhibit 516.

THE COURT: Okay. That's full. Defendant's Exhibit 516.

(Defendant's Exhibit 516, received in evidence.)

MR. RESSER: Defendant's Exhibit 54F as in Frank -- 540F as in Frank.

THE COURT: 540F. All right. That will be full.

(Defendant's Exhibit 540F, received in evidence.)

MR. RESSER: And the last one for now, Your Honor, is Defendant's Exhibit 593.

THE COURT: Defendant's 593. Okay. 593 is admitted as a full exhibit.

(Defendant's Exhibit 593, received in evidence.)

MR. RESSER: Thank you, Your Honor.

THE COURT: Okay. Do we have a witness then, Mr. Heavey?

MR. HEAVEY: We most certainly do, Your Honor. We call Jarrow Rogovin to the stand.

THE COURT: Okay. Very well.

Good morning, sir. Please face our courtroom deputy.

Raise your right hand.

J A R R O W   R O G O V I N,

having been duly sworn by the Clerk, testified

under oath as follows:

THE CLERK:  Please be seated.  State your name, city, and state you live or work.  Spell your last name for the record, please.

THE WITNESS:  My name is Jarrow Rogovin, J-A-R-R-O-W, Rogovin, R-O-G-O-V-I-N.  I live in Los Angeles, California.

THE COURT:  All right, Mr. Heavey, whenever you're ready, sir.

MR. HEAVEY:  Thank you.

DIRECT EXAMINATION

BY MR. HEAVEY:

Q   Good morning, Mr. Rogovin.  Have some water if you have something in your throat.  When you have an opportunity, please tell the jury where you're from.

A   I grew up mostly in Long Beach, and I moved to Los Angeles when I was 19 in 1969 to start attending school at UCLA.

Q   And can you give a little bit about your educational background to the jury?

A   I did a year at Long Beach City College and then about two years at UCLA.  And I, um, pulled out and started working.

Q   And with respect to your work, can you just give a brief professional background of your history?

A   Um, various jobs, include initially worked for Mazda and then started actually legal secretarial work when I was 25 in Beverly Hills, executive legal secretary to the, um, late partner of a small law firm.

After two years, I bought a -- I bought a secretarial service on the same floor and did legal secretarial and paralegal work and started my company in September of '77. It was part time. Actually, for ten years. When it could support me, then -- oh. In '82, um, started a health food store as a platform for selling the little line, and by '84 I realized that I'm a wholesaler, not a retailer, and worked two more years part time in the company, full time back at a law firm. And then in '87 I was able to be full time with Jarrow Formulas.

Q   Thank you, Mr. Rogovin.

A   Excuse me.

Q   And you said you started your company. To be specific, are you referencing the company involved in this litigation here?

A   Yes.

Q   And when did you start that?

A   Um, September of '77.

Q   And what exactly were you doing in September of '77 with respect to starting the company?

A   Um, it actually started off very briefly as a partnership. We didn't need each other.  We had different markets, and we were friends.  Um, he did his company; I did mine.  Um, and instead of selling to gyms, which my partner did, I sold to health food stores.

Q   And when you say you sold, more specifically, what exactly did Jarrow Formulas do?

A   We -- I started with three products:  um, protein powder, liver and yeast tablets, and a vitamin packet.  So it had about nine pills and capsules and tablets, capsules, tablets and soft gels.

Q   And were you manufacturing product back then?

A   Um, I was buying through a broker.  Um, it was -- the products were manufactured actually at a company called VitaTech in Tustin, California, in Orange County and packeted in Torrance.  And there was an agglomerator you might say, a broker, who would sell to very small private labels like mine. In a sense you would call it a private label at that point.

Q   So were you manufacturing your own proprietary materials at that point?

A   Initially, no.  By '84, yes, I was contracting directly then with the production houses.

Q   And when I use the term "proprietary," what I really mean is, were you producing anything that was unique and secret to Jarrow Formulas at that time?

A    What would be secret?  I'd need that explained.  By '84 we had a number of formulas.  And I'd say we were starting to really become unique by '86.

Um, I was the first company in the industry to introduce high-potency, multi-strain probiotics to the industry.  Prior to that, it was all single-strain only and generally not true.  We were also the first company to test, back at the producer's house in Montreal, Canada, at the microbiology producer.  We tested before we released, and we were the first company to do that as well.

Q    Did there come a time when your company grew and you became the manufacturer of your own products?

A    Yes.  In 2000 we had two things, two or three things.  We had become big enough where we needed to have control of our own production calendar, couldn't afford the delays by contracting out.  Also, there was a big quality control issue.  Kept catching mistakes by contract houses.  So in order to ensure quality, we built our own production facility with its own quite substantial lab, analytical lab.

And I named the lab after a friend of mine who was a top professor in biochemistry.  It was Professor Lester Packer at UC Berkeley who had sort of what you might call the Vitamin E chair.  And he was one of the world's experts on what's called redox regulation, meaning simply the antioxidant/pro-oxidant balance in the body, how we make our

energy and stay healthy.

Q   Could you put in a time frame when you started manufacturing your own products?

A   Broke ground in 2000, opened the facility in early 2002 for production.  So it was built from the ground up.

Q   Now, you've been in court last week and throughout the proceedings and witnessed Mr. Giarratana's testimony?

A   Yes, sir.

Q   For the entire period?  For the entire period of his testimony?

A   Yes.

Q   And did you hear testimony from Mr. Giarratana regarding the various law firms that Jarrow Formulas engaged to provide legal services to them?

A   Yes.

Q   And including McCarter & English, approximately 2012 to 2013, in that time period, can you recall how many law firms that you engaged to provide legal services for Jarrow Formulas, Inc.,?

A   About five.

Q   And that's including McCarter & English.

A   Correct.

Q   And with respect to the five law firms, how did those law firms bill Jarrow Formulas?

A   Um, the lawyers billed on a per-hour basis, issued monthly,

keeping track of each matter.

Q   And does that description of the other law firms' billing process comport with what you heard McCarter & English testify how they bill you?

A   Yes.

Q   In 2013, directing your attention to the beginning of 2013, who was responsible for reviewing legal invoices at Jarrow Formulas?

A   I was.

Q   And can you describe to the jury the process by which you went about reviewing the legal invoices that were provided Jarrow Formulas from all of the law firms?

A   Looked at the matter and the sum and signed off on it.

Q   When you say you looked at the matter and the sum and you signed off on it, can you be more specific for the jury?

A   Um, well, for instance, there were two food and drug lawyers, two firms, but they partnered together.  So if we were working on addressing a regulation, um, you know, see what regulation it was.  For instance, I lobbied to have the Serious Adverse Event Reporting bill passed.  So they would do work for me to bring up to create materials to give to the industry and to mail to congressmen.  And so I would say, Okay, that's the matter and how much they billed for it.  OK, J.R.

Q   And so to be specific, you were the only employee at Jarrow Formulas that was tasked with reviewing the legal invoices.

A    Yes.  The only time Ben might take a look at it would be on real estate matters.

Q    And, sir, you reference Ben.  Can you please?

A    I'm sorry.  Ben Khowong, my business partner since '89, '90.  '90 I would say.

Q    When you reviewed the bills, the legal invoices from the various firms, did you do that collectively along with McCarter & English's, or did you review them individually by law firm?

A    Well, each -- each law firm would send its own bill.

Q    My question for you is, sir:  When you reviewed your legal invoices --

A    Yeah.

Q    -- did you do that in one setting with all the bills from the various law firms, or did you do that --

A    It depends when they came in or if I came back from a trip.  If I came back from a trip, they were piled up.  Otherwise, my secretary would hand me the bill after mail distribution.

Q    And directing your attention to the beginning of 2013, do you recall how many matters McCarter & English was representing Jarrow Formulas in at that time?

A    Um, 2013?

Q    Yes, sir, the beginning of it.

A    Um, I believe at that point there were three:  um, if Caroline Insurance Company was still pending; the Caudill Seed versus Kean Ashurst, we were paying the bill on that; and then

Caudill -- oh, Soft Gel Technologies, Inc., we bought a patent action there; and, um, and the underlying matter Caudill Seed.

Q   I'm no accountant, but I think you counted four?

A   Yes.

Q   And when I asked you how many matters that they were handling and you identified the four, were those specific to litigation?

A   Yes.

Q   Was there any IP work being done -- I use the term "IP work," but was there any IP work being done by McCarter & English that wasn't litigation at this tame?

A   Yes.  Trademarks and patents.

Q   And you're not including them in the overall amount of the -- you're not including those matters in the amounts that you identified as four matters?

A   Oh, no, no, no.  That would be completely different.  I mean they'd be additional, you know, matters.

Q   Is that your understanding of what the term "client matter" means with respect to McCarter & English, or is that McCarter & English's version that they explained to you?

A   Well, I mean one can use a term "matters," but it can be a teeny tiny matter, like 50 bucks for something, or it could be $250,000, as happened for Caudill alone in a single month.  So a matter could be anywhere from $50 to $250,000.  So they

aggregated the word "matters" in an interesting way.

Q   Well, Mr. Rogovin, I'm just trying to get to the point of how many matters or issues -- and I'm going to use the word "matter," whether it be IP or litigation, as McCarter & English uses it.  How many matters in 2013 were they representing you in?

A   Um, I guess there's no way for me to know without the huge review of the bills because, I mean, each bill there would be -- for instance, on trademarks and patents, there would be sort of a tickler system.  It would come up calendar.  So renewals would have to be paid, things like that.  It's just little automatic, knickknack, managerial things.  So I wouldn't know how many in any one particular month.  It would vary.

Q   Can you estimate, give an estimate of how many items McCarter & English was handling in 2013 the beginning of the year for you?

A   Okay.  For the whole year, many dozens, yeah, many dozens on the smaller matters, yes.

Q   And with respect to McCarter & English's invoicing --

A   Yeah.

Q   -- how did they provide bills to Jarrow Formulas?

A   Um, it was mailed to me once a month and all matters for each month in the single bill.

Q   And with respect to your review of those bills, did you do a line-by-line item review of them?

A    No.

Q    Mr. Rogovin, you've heard testimony in this matter regarding a correction that you identified in one of McCarter & English's bills.  Do you recall that testimony?

A    Yes.

Q    And when I ask you if you didn't do a line-by-line item review of the bill, did you consider that correction when you answered?

A    Uh, no.

Q    So considering it now, did you do a line-by-line item review of your bills?

A    Still I would say no.

Q    Why not?

A    Um, that was a one-off I caught.  As a matter of fact, it speaks for itself.  In 75 bills, one item caught.  That's, obviously, not item by item.  That's 23 years of bills, one item caught.

Q    The inception -- the beginning --

A    Actually, there were two.  I'm sorry.  There was one other.

Q    The beginning of 2013 --

A    And it was caught for a different reason, not because I did item by item but because it was on the front page, which was the page I always reviewed.  So that took me into the middle of the bill.  So, in other words, going into the middle of the

bill, only one time in 75 bills otherwise.

Q   Why is it that you're looking at the front page of your bills?

A   Um, that's the total.  It would state each matter or each category and the subtotal of how much for each one and then the total.

Q   Directing your attention to 2013, in January, I think you described there were four pieces of litigation that McCarter & English was representing you on.  There was the Caudill Seed versus Ashurst state matter; correct?

A   Yes.

Q   There was the Jarrow Formulas -- sorry.  There was the Caudill Seed versus Jarrow Formulas federal matter that was filed in the beginning of 2013; correct?

A   Yes.

Q   There were two other matters.  One a soft gel matter that you referenced.

A   Yes.

Q   What is that?

A   Um, we had a patent for very high bioavailability to enhance the bioavailability of CoQ10.  The other product out there is -- uses polysorbate 80.  It's detergent like using hair shampoo, and that's not something I would ever do.  So I wanted to use hopefully -- you know the word "lecithin."  You see it on food labels all the time.  It's a food emulsifier.

And it was that and a -- what's called an essential oil.

Q   Mr. Rogovin, is it fair to say that you were involved in a patent matter?

A   Yes, we had a patent on this, and a company was using that method also.  And we brought an action.

Q   And, Mr. Rogovin, there was a fourth litigation matter that you had stated or identified in the beginning of 2013?

A   Actually, thinking about it, there may have been Mr. Ashurst's employment matter we were funding.  I don't know if that was 2013 or not.

Q   At the beginning of 2013 --

A   By employment, he was suing for wrongful termination.

Q   Do you know what Mr. Giarratana's litigation rates that you were paying at the beginning of 2013 in those matters were?

A   At the time, no.

Q   Did you ever come to learn what you were paying originally on a rate of Mr. Giarratana in those litigation matters in the beginning of 2013?

A   When it came to litigation, yes.  I mean, I probably had some sort of vague idea.  I'm not that kind of numbers person.  You know, mostly I dealt with formulation, marketing, and litigation.

Q   Now, Mr. Rogovin, as you sit on that stand here today, do you know what the original litigation rate for Mr. Giarratana was?

A    Yes.

Q    What was that?

A    405.

Q    And do you know what the original litigation rate for Mr. Grondahl was?

A    395.

Q    And what about Mr. Rechen?

A    Trying to remember.

Q    If you don't recall --

A    Something like five --

Q    If you don't recall, I understand.

In 2013, you've heard testimony from Mr. Giarratana that your rate, and the rate -- that his rate and Mr. Grondahl's rate changed.  Do you recall that testimony?

A    Yes.

Q    And specifically that they went up considerably, one almost 30 percent and one in excess of 27 percent, and that they informed you of that rate increase -- I'm sorry -- Mr. Giarratana specifically said that he informed you of that rate increase and provided three potential dates that he believed he may have informed you of that.  Do you recall that testimony?

A    Yes, I recall the testimony.

Q    Mr. Giarratana [sic], did those conversations with you ever occur?

A    No, and it's marked that he would claim three times.

Q    And why can you be so sure about the fact that Mr. Giarratana never told you about a 30-percent rate increase?

A    For one, if it were three times and it would be -- what's the point of bringing it up to me three times?  If it were three times, I would certainly remember it.

Q    Did Mr. Giarratana ever tell you that Mr. Grondahl's rate was going to be increasing on the same matters as well?

A    No, and it's come out that Mr. Grondahl didn't even know his rate came up -- went up.

Q    Mr. Rogovin, you heard testimony regarding standard rates and the rate increases that McCarter & English seek at the beginning of the fiscal year.  Did you ever have any conversations with Mr. Giarratana about his standard rates or rate increases that he would be seeking at the beginning of fiscal years?

A    The term "standard rate" in the 26 years was never used once.  Nor was "discount."

Q    If Mr. Giarratana in fact had a conversation with you in 2013 that his litigation rates would go up over 30 percent, would you have agreed to it?

A    No.

Q    Why not?

A    It's a huge raise at once, and this was at the start of what was going to be a large litigation.  And, as a matter of fact, I would have gone immediately after a call like that to

Ben Khowong.  Ben owned a third of the company.  He's my partner.  We talk all the time.  There's just no way.

Q   Now, Mark Giarratana, Mr. Giarratana, had testified that they typically ask for a rate increase at the beginning of the fiscal year.  Do you have any recollection as when the beginning of the fiscal year for McCarter & English was that they would be seeking these rate increases?

A   Well, I know the start of their fiscal year was October 1.

Q   Why do you know that?

A   Um, from this litigation, um, but they would, um -- because I said I'm -- well, they would ask Jarrow Formulas to pay all pending bills.  Um, others before normally do.  And Mr. Khowong and his -- and Mary Grace Reyes, R-E-Y-E-S, who was accounts payable clerk, would negotiate this.  Because if we're going to pay early, a discount was requested.  But, again, I was never once involved in that.

That's why Ben was my financial partner.  That was his end.

Q   With respect to this alleged rate increase that you were informed about in 2013 regarding the federal matter, I believe Mr. Giarratana testified his standard rates were -- they -- your current rates were below the standard rates.  Do you know what the rates were for any other litigation matters that Mark Giarratana or McCarter & English were representing you besides

the federal rate at 2013?

A    Um, it was all billed at the same rate.

Q    When you say "the same rate," you mean the original rate --

A    Right, 405.

Q    And when you say 405, specifically --

A    Per hour.

Q    -- referencing Mr. Giarratana's rate.

A    Yes.

Q    And the corresponding rates to -- from Mr. Grondahl was -- would have been at the lower rates as well.

A    Yes.

Q    And do you have any opinion as to why McCarter & English was raising your litigation rates in one of the four matters that they were representing you in?

         MR. PEPE:  Objection, relevance.

         THE COURT:  Sustained.

Q    (Mr. Heavey) Is there anything unique about the Jarrow Formulas federal matter that -- with respect to the bills that didn't apply to any other litigation at this time?

A    No.

         MR. PEPE:  Vague, ambiguous.

         THE COURT:  It's overruled.  That will stand.

         Go ahead.

Q    (By Mr. Heavey) Who did Liberty Insurance -- which matter did Liberty Insurance agree to defend you on?

A    It was Caudill versus Jarrow Formulas.

Q    And that's the only litigation -- withdrawn.

Do you recall when, approximately, in the time frame of 2013 that Liberty Insurance agreed to indemnify or pay for your defense costs?

A    I think it may have been February.  I'm not certain.  It's been a decade.

Q    And so the only matter, the only litigation matter, that McCarter & English was raising its rates on in 2013 at this time was the one that Liberty Insurance agreed to pay for; correct?

A    Correct.

Q    Now, did you ever have a conversation about the Liberty Insurance funding of your defense costs in the federal matter with anyone from McCarter & English?

A    Um, in principle, yeah, we turned the claim over to our insurance broker.  He turned it into the insurance company.  Mr. Giarratana was aware of that.  Um, he informed me that Liberty initially took the case with what's called a reservation of rights, and I was later informed that they declined coverage.

Q    And what was your understanding of the term a "reservation of rights" with respect to Liberty's paying for your defense costs?

A    Um, I think it means that if there's a -- punitive damages

found, that the company would not be responsible for that and also that the company could decline coverage at a later rate.

Q   I'm sorry.  Did you say the company could decline coverage at a later "rate" or "date"?

A   Date, date.

Q   Thank you.

When you had this conversation with Mr. Giarratana, do you recall when it was?

A   There was several conversations starting in January.

Q   In January.  And at any time in any of the conversations in January, were you made aware of the fact that Mr. Giarratana was going to be raising the rates that you were currently paying in the federal matter to bill them to Liberty Insurance?

A   No.

Q   You never had any agreement, whether it be in writing or verbally, whereby you consented to the higher rates being billed to Liberty Insurance, did you?

A   No.

Q   Was there ever a communication or conversation, whether it be in writing or verbally, with Mr. Giarratana whereby you agreed that if Liberty Insurance did not pay for the invoices under the reservation of rights, that Jarrow Formulas would agree to pay to the higher rates that they were billing Liberty Insurance at that time?

A   No.  Matter -- I just want to say, if Mr. Giarratana had

told me that Liberty was being billed at a higher rate, I would have been actually shocked, and I would have been very disapproving.  It's not ethical.

Q   Why do you believe that?

A   Because we had already been billed 405 --

MR. PEPE:  Your Honor.

THE COURT:  Yeah, I'll sustain that.

Q   (Mr. Heavey) Now, the March invoice that we've heard testimony on here today at the lower rate, Jarrow Formulas paid that; correct?

A   Yes.

Q   And how do you know that?

A   Um, because at this point in the litigation, it's -- I mean it's known.  It's established.

Q   That's a fair point, Mr. Rogovin.

At that time, after paying it at the lower rates, did you ever become aware of the fact that that increased rate that was being billed to Liberty, that you would have some benefit from that increased rate?  Meaning the difference in the rate that you paid, did Mr. Giarratana or anyone from McCarter & English suggest that you would benefit from an increased rate that they were going to be billing to Liberty?

A   No.

Q   And with respect to the invoices that you paid, do you believe it's proper that they revoked those invoices and billed

them to Liberty at a higher rate?

A   No.

Q   And there's testimony in the March invoice that you paid at the lower rate and was reversed.  Ms. Bosma testified that it was reversed in the system.  Do you recall ever being informed by anybody at McCarter & English that any of your invoices that were paid were being reversed?

A   Not as far as reversed and never received a credit, not that I'm aware of.

Q   And Ms. Bosma testified that you were credited months later for those payments on other bills.

Was there ever a correspondence about any of those credits to you?

A   No.  And the only way to credit it --

MR. PEPE:  Objection, Your Honor.  He's answered.

THE COURT:  Sustained.

Q   (By Mr. Heavey) Was there ever an accounting provided to you whereby your bills that were previously paid at the lower rate were being reallocated so that you could identify where your fees were being distributed?

A   No.

Q   Now, I'd like to direct your attention to that time period in or about 2013 with respect to Jarrow Formulas' financial condition.  What condition was Jarrow Formulas in in 2013?

A   It was good.

Q    When you say it was good, can you be more specific for the jury, please?

A    We had been growing at double digits and adding products and doing well.  We were increasing the capacity, a little bit increasing the capacity at the factory at that time also.

Q    So with respect to 2013, as I heard you, you already had Jarrow Formulas manufacturing facility?

A    Yes.

Q    And can you estimate sort of revenues Jarrow Formulas was generating at that point?

A    At that point it may have been between the two companies. I think it was maybe $175 million.

Q    And, I'm sorry, Mr. Rogovin.  But for the purposes of clarification to the jury, when you said "the two companies," can you elaborate on that?

A    Well, Jarrow Industries manufacture for Jarrow Formulas. But instead of paying outside companies, like I did before I had Jarrow Industries to manufacture, it was paid to Jarrow Industries.  So that would be considered revenue to Jarrow Industries, albeit from Jarrow Formulas, because both companies are paying taxes.

          And so aggregated together, it would be about $175 million, um, of Jarrow Formulas would have been -- this is really a question for Ben.  Um --

          THE COURT:  All right.  Let's get another question.

Q    (By Mr. Heavey) Very good.

A    How to break it down, I leave it to Ben, Mr. Khowong.

Q    Very good.  The purpose of the question, though, is to identify the fact there were two companies involved at this point.

A    Yes.

Q    From the manufacturing standpoint and the Jarrow Formulas, Inc.

A    Yes.

Q    The manufacturing side of the house, Jarrow International. Is that accurate?

            THE COURT:  I think --

A    No, Jarrow Industries.

Q    (By Mr. Heavey) Jarrow Industries.

A    It would manufacture and it would also do R&D on new products, research and development.

Q    That company's not a party to this case; correct?

A    Well --

            THE COURT:  No, it's not.  Next question, Mr. Heavey. I think we should know the parties to the case.  Go ahead, Mr. Heavey.

Q    (By Mr. Heavey) During the course of this litigation -- and I'm sorry to take a step back.  In 2013 can you estimate how many products were on the market for Jarrow Formulas at that time?

A    Over 300.  They're called SKUs, shelf-keeping units.  The way it's designated that way, if you have a 30 count and a 60 count, it's two products even if it's the same.  But it was over 300.

Q    And how many employees, roughly, in the Jarrow Formulas, Inc.,?

A    In 2013, it would have been over -- between the two companies, over 300 for Jarrow Formulas, a little over a hundred, 120, 130 range I think.

Q    And I'm going to direct your attention to the federal matter in 2013, the litigation that's underlying the claims here in this case.

When was that filed, specifically?

A    Um, the Caudill matter was filed January 2013.

Q    And when is it -- sorry.  How did you become -- how did you become aware of the fact that you'd become a defendant in this matter?  When I say "you," Jarrow Formulas, Inc., had become a defendant in this matter.

THE COURT:  You mean in the Kentucky.

MR. HEAVEY:  In the Kentucky matter.  I'm sorry for that clarification.

A    As I remember, I was called by Mark Giarratana because there's some sort of computer system that can globally keep track of the -- of various activities, whether it's legal or commercial or trademark type thing.  And Jarrow is a registered

trademark, so it would pop up.

And so when the suit was filed, um, it popped up with McCarter & English, the system that they have. And I was called by Mr. Giarratana that we had been sued.

Q And you agree with me that the underlying facts and allegations surrounding your lawsuit -- when I say "your lawsuit," the federal lawsuit -- and the Caudill Seed versus Kean Ashurst lawsuit that was ongoing at the same time in 2013 were based on the same set of facts; correct?

A Essentially, yes.

Q And that was the transition of Mr. Ashurst's employment from Caudill Seed to an affiliation as an independent advisor with Jarrow Formulas, Inc.,; correct?

A Correct.

Q And during the course of the federal litigation where Jarrow Formulas was named in, research and development became an issue, for lack of a better term, an issue for you in that case; correct?

A Very much, yes.

Q And can you explain to the jury what your theory is with respect to the research and development that you wanted to explore?

A Um, in the lawsuit the plaintiff claimed $5 million in R&D had been expended. I knew this was impossible. It's just de-oiling broccoli seed. I mean de-oiling is a very standard

food process.  Everybody buys oil.

Um, so I, from the outset, kept saying -- and, of course, real danger to in the lawsuit was this phenomenal amount of money being claimed, and I wanted discovery done on what Caudill Seed had actually spent on research and development and what R&D it had actually done.  And -- I answered it.

Q   And as the litigation in Kentucky evolved, did your concerns about R&D change?

MR. PEPE:  Objection, Your Honor.  This is going into the areas Your Honor's ruled on.

THE COURT:  I think you need to tie it up a little bit more.  So I'll sustain the objection.  So if you'd like to try to link it so what we understand to be the billing case, that would be all right.

MR. HEAVEY:  Sure.  I can.

THE COURT:  So the objection's sustained.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) When the ultimate decision was made not to pay the remaining outstanding bills from Jarrow -- from McCarter & English, did the R&D issue have any impact on that decision?

A   Yes.

Q   How so?

A   Their failure to do that, to do the R&D, caused Jarrow

Formulas to lose the suit, caused me to lose my company --

MR. PEPE:  Objection, Your Honor.  It's far outside the --

THE COURT:  Right.  So --

MR. PEPE:  This is a motion in limine, Your Honor.

THE COURT:  Yes, that's true, Mr. Heavey.

So, Ladies and Gentlemen, ignore the last comment.

But why don't you ask the question again or maybe make it a little bit more specific.  You can get at this.

MR. HEAVEY:  Thank you, Your Honor.

MR. PEPE:  Is that last comment stricken, Your Honor?

THE COURT:  Sorry.

MR. PEPE:  Is that last comment stricken?

THE COURT:  Yes, it will be stricken.

Q    (By Mr. Heavey) What effect did your concerns about R&D have with your decision not to pay the outstanding invoices with McCarter & English?

A    They didn't do their job.

Q    And how so?

A    Because if they had gotten down to the bottom of R&D to begin with, that case would have been settled the first six months, and I wouldn't be sitting here ten years later.

Q    And why do you believe that with respect to the R&D?

A    Because it was de minimis compared to what was claimed.  It couldn't have been more than a quarter of a million dollars.

And that's generous.

Q   And, specifically, what was your understanding of the amount of the R&D that they were claiming, the duration of that R&D that they were claiming in their damages?

A   In their complaint they claimed 23 years.

Q   And you wanted McCarter & English to challenge that.

A   Yes, because they hadn't even been in the product for eight years.

Q   And what specifically did you want them to do that they did not do?

A   Among other things --

MR. PEPE:  Objection, Your Honor.  This is opening up an entire area which Your Honor has ruled.

THE COURT:  Well --

MR. PEPE:  Because it goes to the alternative damage issue Your Honor's ruled on.

THE COURT:  We are getting a bit into those details.

MR. HEAVEY:  But I think the details are --

THE COURT:  Well, again, it has to be related -- Ladies and Gentlemen, let me just be clear what we're talking about here.  Okay?  As I told you before, to the extent you hear evidence about R&D and the like, the only relevance of that, and the only purpose for which you may consider it, is in assessing Mr. Rogovin's and his company's state of mind at the time they -- instructions were allegedly given not to pay

certain bills.  That's the only purpose for which this is relevant.

I tell you what, Mr. Heavey.  I'll let you re-ask that question.  I'll let the witness answer it.  Go ahead.

MR. HEAVEY:  Could I have --

THE COURT:  The answer stays within the scope of the question.

MR. HEAVEY:  Can I have the answer read back?

THE COURT:  "What specifically did you want them to do that they did not do?"

Go ahead, sir.

THE WITNESS:  They did not take the deposition of Dan Caudill himself.  There was exculpatory evidence that Caudill hid for an entire year.  I spent over $200,000 obtaining that document, because I insisted -- it was real back-and-forth insistence that -- how do I make this short? -- that McCarter & English compel Caudill to produce documentary proof of its claim that they had experimented with our supercritical carbon dioxide extraction methods -- parameters, heat and temperature.  And they had not.  And it turned out there was a document from their --

MR. PEPE:  Objection.

THE COURT:  Sustained.

THE WITNESS:  It wasn't produced.

THE COURT:  Ignore the last answer.

When I say "sustained," do not answer.

THE WITNESS:  I apologize.

THE COURT:  Go ahead, Mr. Heavey.

Q   (Mr. Heavey) And what effect did that have in the end on your decision to pay the bills?

A   Not to pay it.  It caused me -- these things caused us to lose the suit.

Q   So is it fair to say that you believe that the failure of the R&D discovery led to higher or led to more legal expenses for McCarter & English?

A   Yes, including failure to subpoena the CPA.

Q   And when you say the failure to subpoena the CPA --

MR. PEPE:  Objection, Your Honor.  This goes --

THE COURT:  Sustained.

Q   (By Mr. Heavey) Is there any other what you believe to be failures on the part of McCarter & English in the R&D world that led to you not paying the outstanding five invoices in this matter?

MR. PEPE:  Objection.  It's going to invite the same answer.

THE COURT:  Well, I'll let the witness answer briefly.

THE WITNESS:  Failure to subpoena the CPA; failure to get in the exculpatory evidence from the Caudill's CO2 extraction plant; failure to subpoena bank records to get

checks, proof of payments; subpoena to -- failure to subpoena vendors to get costs and what was done, which subpoena vendors would go to --

THE COURT:  Okay.

THE WITNESS:  -- trade secret.

THE COURT:  Go ahead.

Q   (By Mr. Heavey) And all of these concerns directly affected your decision on the final invoices and payments to McCarter & English?

A   Yes, sir.

Q   Had you conveyed those concerns about research and development to Mark Giarratana during the course of the litigation?

A   Repeatedly by written and verbally.

Q   And did you hear testimony from Mr. Giarratana to the contrary in that last week?

A   Yes, I did, sir.

Q   And, in fact, directing your attention to 2016, how long was the litigation ongoing at that point?

A   Um, that would have been the fourth year.

Q   And you believed at that point that research and development discovery would limit your overall legal expenses?

MR. PEPE:  Objection.  Calls for speculation, outside the ruling Your Honor made.

THE COURT:  Well, I'll sustain it because that's I

don't think what you meant to ask, Mr. Heavey.

Q   (Mr. Heavey) Did Mr. Giarratana follow your instructions with respect to subpoenaing the CPA in the underlying matter?

MR. PEPE:  Objection.

THE WITNESS:  No.

THE COURT:  Sustained.

Q   (Mr. Heavey) Did the lack of evidence from third parties have any effect on your decision to pay the outstanding invoices from McCarter & English?

A   Yes.

Q   Why?

A   They didn't do their job.  They committed malpractice.

MR. PEPE:  Objection, Your Honor, Move to strike.

THE COURT:  Well, Ladies and Gentlemen, so, obviously, you're going to hear later in the case more about these allegations of malpractice.  It's important for you to understand that the only -- in order to prove malpractice, the party saying that there's malpractice has to produce an expert, somebody who's expert in the field.  This witness is not.  And so if this witness expresses an opinion or if anybody else expresses an opinion that somebody committed malpractice, you're to ignore that.

Q   (Mr. Heavey) I'd like to direct -- before I do that, in 2016, what was the financial condition of Jarrow Formulas, Inc.,?

A    That's a Ben question, but I think that by 2016 it was becoming tighter.

Q    Any particular reason?

A    Um, the legal bills in particular.  It was sapping the company.

Q    And when you said they were becoming tighter, can you be more specific?

A    Um, well, profit, profitability was down; um, expenses, the money was going to litigation.

Q    And did Mr. Giarratana -- did you ever have any communications in 2016 with Mr. Giarratana regarding the financial impact of your litigation expenses in this matter?

A    Um, yes, I did.

Q    I'd like to direct your attention to Defendant's Exhibit 617, which is admitted, Your Honor.

        THE COURT:  Okay.  617 can be brought up.

Q    (Mr. Heavey) Mr. Rogovin, do you recall the testimony regarding this exhibit from last week?

A    Um, yes.

Q    More importantly, can you identify this document for me?

A    This is an e-mail from me to McCarter & English and Joel Beres of the local law firm and then to executives in my company at that time.

        MR. HEAVEY:  And if we could highlight the first entire sections -- first entire paragraph starting, "First, I

never got a copy."

Q    (Mr. Heavey) Mr. Rogovin, you would agree with me that, at least with respect to this first paragraph, you were identifying some of the financial implications of the litigation, the online litigation, in the federal matter to your attorneys; correct?

A    Yes.

Q    What was it that you were conveying to them back in 2016?

A    Um, it says, "I can't afford all this stuff to keep piling up."

Q    And when you say you can't afford all this stuff to keep piling up, what were you referencing?

A    The bills, the legal work.

Q    And you go on to talk about, "The only surprise is the audacity to claim 13 million" and the rest of that sentence, what were you referring to there?

A    Um, there was a -- what's called a mandatory mediation in Louisville, Kentucky, presided over by the magistrate judge, Judge Lindsay.

Q    And the reference to $13 million, what does that reference?

A    Um, Dan Caudill demanded $13 million.

Q    And the reference to compromise to offer a mere 9.5 million, what are you referring to there?

A    Um, I'm sorry.  Again?

Q    I'm sorry.  It says -- the following reference after $13

million says, quote, "And I compromise to offer a mere 9.5 million and go down to 8.5."

What's that reference?

A   He came down to 8.5.  It turned out that Mr. Caudill and his lawyers knew more walking into that mediation than I did. I didn't know that.

MR. PEPE:  Objection, Your Honor.

THE COURT:  Sustained.  Mr. Heavey, you have another question?  Go ahead.

MR. HEAVEY:  Yes, sir.

Q   (By Mr. Heavey) Mr. Rogovin what were you discussing in the third paragraph, paragraph No. 3?

A   I wanted discovery on their R&D claim, um, that here I'm stating also that they never did the claimed amount of years in the broccoli research.  But, again, they would have to have done discovery to nail that down.

Q   So at least with respect to 2016 and this communication to your counsel, you identified the fact that there was financial implications to the company regarding this ongoing litigation, and R&D was an issue for you; correct?

A   Yes.

Q   And was the R&D issues that you identified in 2016, were they resolved to your -- to which you believe to be appropriate?

A   No.

Q   Directing your attention to Defendant's Exhibit 589.

THE COURT:  It's in evidence too, Mr. Heavey?

MR. HEAVEY:  This is not in evidence, but there's no objection, Your Honor.

THE COURT:  All right.  589 will be full.  You can publish.

(Defendant's Exhibit 589, received in evidence.)

THE WITNESS:  Directing me to what?

Q    (By Mr. Heavey) With respect to this communication, Mr. Rogovin, you've sent this communication August 30th, 2016, to your legal team at McCarter & English; correct?

A   Yes.

Q   And you CCed Eva@Jarrow.com.  Who's that?

A   Yes.

Q   Who is that?

A   My secretary.

Q   And, again, as of August 30th, 2016, you go down, one, two, three, four, five lines to "They claim R&D."

A   Yes.

Q   There's no question this issue was still on your mind in 2016 at that point; correct?

A   Correct.

Q   And you heard testimony from Mr. Giarratana, or at least a document that was put in front of him, that the R&D was a pet peeve for you during the course of this litigation.

A   Yes, sir.

Q   And was it a pet peeve for you?

A   It was.  Well, it's the linchpin of --

MR. PEPE:  Objection, Your Honor.  He answered a yes.

THE WITNESS:  Yes, yes.

Q   (By Mr. Heavey) Directing your attention to Plaintiff's Exhibit 582A, Alpha.

MR. HEAVEY:  This is not admitted, Your Honor, and there's no objection.

THE COURT:  All right.  582 will be full.  Thank you.

MR. PEPE:  May I have a moment, Your Honor?

THE COURT:  All right.  Just wait a second, please.

MR. PEPE:  We have an objection to that, Your Honor. The Court reserved on it.

THE COURT:  Hold on a second.

MR. PEPE:  According to our --

THE COURT:  This is true, Mr. Heavey.  Okay.  Can I see the exhibit, sir?

MR. HEAVEY:  May I approach?

THE COURT:  Yes.

Okay.  I have the exhibit.  Do you want to have it back, Mr. Heavey?

MR. HEAVEY:  Yes, Your Honor.  Thank you.

MR. PEPE:  May I be heard on the objection, Your Honor?

THE COURT:  Why don't we wait to see if he wants to lay a foundation or anything he'd like to do with that.

But there's an objection.  So if you want to try to lay a foundation, you can.

Q   (Mr. Heavey) Mr. Giarratana -- sorry.  Mr. Rogovin --

A   Yes.

Q   -- can you identify this document?

A   Um, it's not up yet.

THE COURT:  Does he have it?

MR. HEAVEY:  Actually, you know what, Your Honor?  I'm going to withdraw.

THE COURT:  Okay.

Q   (Mr. Heavey) Directing your attention to Plaintiff's Exhibit 240.

THE COURT:  And this is in evidence?

MR. PEPE:  May we have a moment, Your Honor?

THE COURT:  All right.  240 there's no objection.  So that will be a full exhibit.  That can be published.

MR. HEAVEY:  Thank you, Your Honor.

(Plaintiff's Exhibit 240, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin, can you identify the document PTX Plaintiff's Exhibit 240?

A   It's an e-mail I wrote to McCarter & English December 29, 2016.

Q   And you agree with me that the research and development

issue was addressed in this communication as well?

A   Um, the first paragraph I see trade secrets, no trade secrets.  Um --

THE COURT:  Maybe you could direct.

Q   (By Mr. Heavey) The fifth paragraph on page 2.

Thank you.  That's it.

A   "I want a full throated depo on their R&D, including all records of their CPA Joe Lyons, Dan Caudill, and yes, Kean again.  With a forensic CPA present."

Q   Mr. Rogovin, does the request for a deposition of the CPA have anything to do with your decision not to pay the last five invoices from McCarter & English?

A   Yes.

THE COURT:  Sorry?

MR. PEPE:  Objection.

THE COURT:  Well, I'll allow that answer to stand.

Go ahead, Mr. Heavey.

Q   (Mr. Heavey) Directing your attention to Defendant's Exhibit 634.

THE COURT:  I tell you what, Mr. Heavey.  We're going to take our lunch break now.

MR. HEAVEY:  All right.

THE COURT:  So, Ladies and Gentlemen, enjoy your lunch.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that.

Thank you very much.  You can accompany Ms. Johnson to the jury room.

(The jury left the courtroom at 12:44 p.m.)

THE COURT:  Mr. Heavey, in the future if I ask you if an exhibit is in evidence, if you're not sure, please say "I don't know."  I don't expect you to have a photographic memory. I can look it up.  It takes me a little bit time.  But if you tell me something's in evidence, I'm going to take your representation on that.

MR. HEAVEY:  Be it noted, Your Honor, and that was a mistake on my part.

THE COURT:  Very well.  Is there anything else we need to take up before lunch?

MR. PEPE:  Yes.  I'm afraid I must impose on the Court's time.

THE COURT:  All right, Mr. Pepe.

MR. PEPE:  Very, very, very concerned about what evidence is going in before this jury, notwithstanding Your Honor's limiting instruction on that.  Because what the witness is doing is just laying out his grievances during the course of the litigation on this issue, which really has its roots in the alternative damage issue that was an allegation in the case about malpractice and has been stricken because they could not prove damages.

Now having not been able to prove damages, the theory

is, well, let's just put it in as his state of mind.  When the jury hears this, they don't know whether that CPA should have been subpoenaed or that there should have been this deposition taken.  They just hear that this witness thinks that.  And then he's let -- that's left to stand in the air with the jury, no obligation to show why, in fact, that was a legitimate claim.

Now that forces us to put on evidence in the contract part of the case as to why we didn't do that.  Otherwise, the jury thinks those grievances were legitimate.

THE COURT:  All right.

MR. PEPE:  And they weren't.

THE COURT:  I hear you.  So here's what I think:  I think that the questions related to the state of mind do allow some inquiry into this subject because he did say, for example, during the butt call that they didn't do jack, or whatever it was, with the -- on the discovery or on the R&D, some reference like that.  And so I do think the witness is entitled to amplify that a little bit.

Having said that, I don't think the specifics of what was done or what was not done, more than what the witness has said -- I did allow him to identify some failures, which I think is fair.  But I don't think that the fact that he raised it in 2015, the fact that he raised it in 2016, the fact that he raised it in 2017 is relevant.

I didn't get quite the right objections at those

times, with all due respect.  But just to be clear, moving forward, the only time at which his state of mind is relevant is the time of that call.  It's the only time, or the time he refused to pay, which is around the time of the call; right?  I mean, okay, maybe a few months thereafter, a few months before, so 2019.  That's the only time that it's relevant.

So you've gotten a lot of background in about that.

MR. HEAVEY:  Yup.

THE COURT:  So, you know, it's true that, going forward, I'm likely to be sustaining these objections across the board because I think you've covered it, frankly.  So that's my view of it.  Okay?

MR. HEAVEY:  Thank you, Your Honor.

THE COURT:  We'll be in recess.  Thank you.

(Recess from 12:48 p.m. to 1:26 p.m.)

THE COURT:  Please take your seats, folks.

(The jury entered the courtroom at 1:30 p.m.)

THE COURT:  All right, Mr. Heavey, you may proceed.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) Mr. Rogovin, directing your attention to 2019, what financial condition was Jarrow Formulas, Inc., in in 2019?

A   It was in bad shape.  Um, it could barely pay its bills. It was paying like ...

Q   And why was that?

A    We'd been drained very seriously by, um, the legal bills. My attention was drawn away from the company. And we had too many out-of-stocks. And, um, we needed to expand the factory capacity in order to meet production requirements. And, I mean, cash had to go to that, not to legal bills. And it was just, um -- you know, it was first and foremost was to expand the factory so we could have products. And then with the legal bills coming on --

          MR. PEPE:  Objection, Your Honor.

          THE WITNESS:  -- it just killed us.

          MR. PEPE:  He answered it.

          THE COURT:  Yes, I agree.

          Okay, Mr. Heavey, another question.

          MR. HEAVEY:  Thank you.

Q    (By Mr. Heavey) Did you ever communicate the financial concerns or the financial condition of Jarrow Formulas to Mr. Giarratana or any of the McCarter & English attorneys in 2019?

A    Yes.

Q    And why?

A    Um, because --

          MR. PEPE:  Objection, Your Honor.

          THE COURT:  Sustained.

          MR. PEPE:  Relevant.

Q    (By Mr. Heavey) How did you convey the financial condition of Jarrow Formulas to Mr. Giarratana?

A    Um, verbally and in writing and by e-mail.  And there was one very strong e-mail in particular about it.

MR. PEPE:  Your Honor, he answered.

THE COURT:  All right.

Q   (By Mr. Heavey) Directing your attention to Defendant's Exhibit 615.  This is not admitted, Your Honor, and I do not believe there is an objection.

THE COURT:  I'll check.  Hold on.

Okay, 615 is a full exhibit and can be published.  DX 615.

(Defendant's Exhibit 615, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin, can you -- I'm sorry.  Is there a delay?  Do you have it, Gentlemen?

THE COURT:  Mr. Pepe, can you see the exhibit?  Mr. Pepe, can you see the exhibit, sir?  Can you see the exhibit?

MR. PEPE:  I can see the exhibit, Your Honor.  Thank you.

THE COURT:  Go ahead.

Q   (By Mr. Heavey) Mr. Rogovin, can you identify this document?

A    Yes.  It's from Kean Ashurst to Attorney Eric Grondahl, covering vendors business cards.

Q   And were you ever given a copy of this document at the time?

A    No.

Q    Subsequently or after this e-mail was sent, did you ever see a copy of this?

A    Yes.

Q    And on March 1, 2019, where, in relation to the final trial in the federal matter, did that date fall?

A    Um, three months and a couple days before the trial.

Q    And what is your understanding of -- withdrawn.

     You see there's an attachment at the bottom of this e-mail, Recap of capital R.docx?

A    Yes.

Q    And if you turn the page --

     MR. PEPE:  Objection, Your Honor.  This is exactly what Your Honor ruled out.

     THE COURT:  Well, the exhibit's in, but you can ask a question, and then there can be an objection.  So let's ask a question.

     MR. PEPE:  May I be heard, Your Honor?

     THE COURT:  Not now.  I'm going to let him ask a question.  Then you can object, Mr. Pepe.

     MR. PEPE:  I understand, but --

     THE COURT:  Go ahead, Mr. Heavey.

Q    (By Mr. Heavey) What's your understanding of the purpose of this document?

     MR. PEPE:  Objection, Your Honor.

     THE COURT:  Sustained.

Q   (By Mr. Heavey) Did this document ever see evidence at the Kentucky matter?

MR. PEPE:  Objection, Your Honor.

THE COURT:  Sustained.

Q   (By Mr. Heavey) Moving on to Defendant's Exhibit 634.

MR. HEAVEY:  This is not admitted, Your Honor, and there's been no objection to it, Your Honor.

THE COURT:  All right.  That can be admitted as a full exhibit.

MR. PEPE:  Before Your Honor rules on this, this was not objected to because it was marked before Your Honor ruled on this issue.

THE COURT:  Well, I mean, if no objection was stated to the exhibit, Mr. Pepe, in the --

MR. PEPE:  All right.  I understand, Your Honor.

THE COURT:  Okay.  So that's a full exhibit.  634 is a full exhibit.  It can be published.

(Defendant's Exhibit 634, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin, can you identify this exhibit?

A   Yeah.  That's close to two weeks into the trial.

Q   And at least with respect to your concerns with the research and development, were those concerns still outstanding within a couple weeks of the final trial?

A   Yes.

Q   And directing your attention now to the Defendant's Exhibit

650, it's not admitted, and there is no objection.

THE COURT:  That can be full.

MR. HEAVEY:  And, I'm sorry, Your Honor, this may be a duplicative exhibit because I believe --

THE COURT:  Well, it is or it isn't.

MR. HEAVEY:  Withdrawn.  Defendant's 650.

THE COURT:  So that exhibit's been withdrawn.

MR. HEAVEY:  I didn't withdraw it.  That's Plaintiff's Exhibit 650.

THE COURT:  I thought you just said it was duplicative and you were withdrawing.

MR. HEAVEY:  No, no, no.  I'm going to use Defendant's Exhibit 650.  I don't think now it's duplicative.

THE COURT:  Okay, fine.  So that will be full, 650.

(Defendant's Exhibit 650, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin, when did the final hearing on the Kentucky federal matter occur?

A   June 26.

Q   And when was this e-mail drafted?

A   June 17.

Q   And at this point what instructions are you -- or guidance -- are you giving to your attorneys regarding the final trial?

MR. PEPE:  Objection, Your Honor.  Failure to consult is ruled out.

THE COURT:  So kind of a relevance objection.  I'm going to sustain it.

THE WITNESS:  Well, in --

THE COURT:  No, sir, I just sustained the objection.

THE WITNESS:  I didn't understand.

Q   (By Mr. Heavey) Well, leading into the trial, is there any discussions regarding your outstanding bills with McCarter & English that you were involved with?

A   With me?  No.

Q   I'm sorry?

A   Any discussion about standing bills with me, no.

Q   And did you have an idea as to, just prior to the start of the trial, whether or not there was any outstanding invoices?

A   Um, I was told only by Jonathan Leventhal.  And it was something like 700,000.  I called the office to tell them to pay it.

Q   You called what office, informed them --

A   My -- my office.  You know, I called Mr. Khowong.

Q   And to put in perspective, at the time of the trial, when is it that you instructed him to pay the outstanding invoices?

A   It -- what -- which invoice?  I'm not understanding the time frame.

Q   I'm sorry.  You reference a communication that you had with Ben Khowong regarding $700,000 in outstanding invoices that you instructed him to pay?

A    Right.

Q    And when did that occur in relation to the final trial?

A    Um, I think it was the first day of the trial.  I called Mr. Khowong to do it, and he said he'd have to put off vendors.

Q    Directing your attention to testimony regarding -- actually, withdrawn.

     To complete that train of thought, did Ben remit payment to McCarter & English based on your authorization before the trial started?

A    Yes.

Q    Now, I'm directing your attention to the day the verdict was issued.  Do you recall that day?

A    26.

Q    June 26, 2019?

A    Yes.

Q    And do you recall testimony regarding a butt dial that you had caused to be sent to Mr. Giarratana?

A    Yes.

Q    Did you intend for that voicemail message to be left on Mr. Giarratana's telephone?

A    No.

Q    And, specifically, who are you speaking to during that voicemail?

A    Uh, Ms. or Mrs. Ashurst.

Q    Mr. and Mrs. Ashurst --

A    Yes.

Q    -- is your testimony?

A    Yes.

Q    You used some colorful language during that conversation with the Ashursts, did you not?

A    Yes.

Q    What did that reflect?

A    Rage.  And I was extremely distraught because I knew my company had been destroyed, my life's work --

        MR. PEPE:  Objection, Your Honor.

        THE WITNESS:  -- vanished.

        THE COURT:  Yeah, Ladies and Gentlemen, ignore the last comment.

        Go ahead, Mr. Heavey.

Q    (By Mr. Heavey) And you based some of that rage toward McCarter & English's attorneys on your trial team?

A    Yes.

Q    Why?

        MR. PEPE:  Objection, relevance.

        THE WITNESS:  Malpractice.

        THE COURT:  So, Ladies and Gentlemen, remember my instruction about that before.

        Go ahead Mr. Heavey.

Q    (By Mr. Heavey) So specifically in that voicemail, you

stated, "To cut off my damages, they did shit." What did you mean by that?

A   Um, they didn't do any work on what the damages being claimed by Caudill were.  I mean --

Q   And you mean they didn't --

A   McCarter & English didn't do any work on, didn't do any discovery on.

Q   And when you say "discovery," be specific.  Did any of that have to do with the research and development concerns that you had?

        MR. PEPE:  Objection, Your Honor.  This was covered before.  This is repetitive.

        THE COURT:  Mr. Heavey, I think we've been through this, so I'll sustain it.

        THE WITNESS:  Yes.

Q   (By Mr. Heavey) And when you refer to O'Brien in the butt dial call, who are you referring to?

A   He was the first -- he was the -- one of the first -- well, with my company, he was the first attorney, the lead attorney, for Caudill.

Q   When you say the lead attorney for Caudill Seed --

A   Yeah.

Q   -- to be clear, Mr. O'Brien represented Caudill Seed in one of the litigations, the underlying litigations, in this matter?

A   Um, yes.  He was representing Caudill Seed at the time,

actually in 2011 in Caudill Seed against Kean Ashurst.

Q   So Mr. O'Brien was not the attorney that ended up suing Jarrow Formulas in the federal matter.  He was the attorney in the underlying Kean Ashurst state court matter; correct?

A   Well, actually, he didn't do the complaint, but he took over that -- the Caudill suit as well until he was replaced by another firm.

Q   And when you say in the butt dial voicemail that "we have no intention of modeling any trade secrets.  If you tell them what I should avoid, I will," what are you referencing?

A   I wrote Mr. O'Brien.  He wrote me on August 20 expressing concerns that Jarrow Formulas should not -- I'm sorry -- he wrote me on July 20.

          MR. PEPE:  Objection, hearsay.

          THE COURT:  I'm sorry?

          MR. PEPE:  Objection, hearsay.  He's testifying Mr. O'Brien's statement.

          THE COURT:  Okay.  He said he wrote him on July 20, so that gets him in.

Q   (By Mr. Heavey) And that letter --

          THE COURT:  Excuse me.  Don't talk while I'm talking. Next question, Mr. Heavey.

Q   (By Mr. Heavey) That letter that you referred to, was it a response to Mr. O'Brien's letter to you?

A   Yes.

Q    And when you said --

         MR. PEPE:  Objection.  He's reading from a document not in evidence, Your Honor.

         THE COURT:  Well, I haven't really heard the question yet, Mr. Pepe.

         Go ahead, Mr. --

Q    (By Mr. Heavey) When you state in the voicemail to the Ashursts, quote, "Because they didn't put in, they found willful and malicious," what were you referring to as they didn't put that in?

A    McCarter English didn't put in my response written to Tom O'Brien 21 days after O'Brien had written me.

Q    And you thought that was a critical piece of evidence that he put in in the underlying Kentucky matter?

A    Yes.

Q    Why?

A    Among other things, the letter said that I had no intention of taking anything from Caudill Seed, and if he could give me some guidance on what I should stay away from, we would.  And I said -- and I also cited various patents, issued patents and patents that had been denied, and stated very clearly that the field was very well published, very well understood.  It was impossible to imagine there would be a trade secret concerning broccoli.

         THE COURT:  Okay.

Q    (By Mr. Heavey) Mr. Rogovin, thank you.  To the extent that you stated in that voicemail "because they didn't put that in," who are you referring to?

A    McCarter English.

Q    And when you go on to say, quote, "They found willful and malicious," what did you mean by "They found willful and malicious" in that communication?

A    That the jury found it because there was no evidence to the contrary ever put in to my intention to cause no harm to Caudill.

Q    And at that point were the statements that you're making to the Ashursts, you're angry; correct?

A    Yes.

Q    And when you state, "As far as I'm concerned, they can pay the damages," who were you referring to?

A    McCarter English.

Q    And what damages were you referring to?

A    The verdict and what would be the award in the lawsuit.

Q    And why would they have to be paying that on your behalf?

A    As far as I was concerned, they committed malpractice, and that word is in the call.

Q    You refer to malpractice during that same butt dial call; correct?

A    I said, quote, It's called malpractice, closed quote.

Q    Now, at that time that you had this communication with the

Ashursts, how many hours after you received the verdict was it?

A    About five hours.

Q    And there was testimony regarding the post-verdict or lack thereof communications with Mr. Giarratana.  Do you recall Mr. Giarratana's testimony on that subject matter?

A    I'm sorry.  Lack of communications on?  Oh, yes.  I'm sorry, yes.  Yes, I do.

Q    Let me rephrase it.  Do you recall Mr. Giarratana's testimony with respect to immediately following the verdict and not communicating with you?

A    Yes.

Q    All right.  Could you describe to the jury what happened after you learned of the verdict with respect to any communications with Mr. Giarratana?

MR. PEPE:  Objection, relevance, Your Honor.

THE COURT:  Well, we had some of it from the other side, so I'll overrule it.

THE WITNESS:  Okay.  Mr. Giarratana said I just walked out.  Actually, I walked up to the rail.  And I stood there for many, many, many minutes.  None of the three attorneys even looked at me.  They were congratulating the attorney -- other attorneys.  They were packing up, and they weren't looking at me.  And I kept standing there and standing there.

And then Mr. Leventhal started to come up to me.  And I said, "No.  Them."

And he kept coming up because, I mean, he really looked sympathetic. I said, "No. Them."

They didn't look once. After quite a few minutes, I went to the attorney room, which in that courthouse is outside and, um, around the corridor. And I waited there some minutes more.

Um, Scott Polisky, who's one of my food and drug lawyers with me, he had flown out to support me. And I sat in the attorney room for a while. Mr. Leventhal joined us. And after 45 minutes, um, I said, "That's enough" and "Let's leave."

So Mr. Polisky and I were walking out of the courthouse.

Should I get into the call?

Q   No, sir. That's fine.

So with respect to the testimony that Mr. Giarratana stated that you left the courtroom without speaking to him, that's not as accurate as you portray it as, is it?

A   It's not at all. Not remotely.

Q   Now, did you want to speak to your attorneys once the verdict was rendered?

A   Yes. I stood at the rail. I waited in the attorney room. It was 45 minutes I was still there.

Q   Did you ever speak to any of your legal counsel --
withdrawn.

Did you ever speak to any of the attorneys from McCarter & English on the date that the verdict was rendered?

A   You mean after the verdict?

Q   Yes, sir.

A   No.

Q   Thank you for that clarification, no.

Directing your attention to Plaintiff's Exhibit 103 -- actually, I'm sorry.

I'm going to direct your attention to Defendant's Exhibit 590 first.

MR. HEAVEY:  There's -- it's not admitted, and there are no objections to it, Your Honor.

THE COURT:  In that case, that can be a full exhibit, 590.

(Defendant's Exhibit 590, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin --

THE COURT:  You want to bring it up?

MR. HEAVEY:  Yes.

Q   (By Mr. Heavey) Mr. Rogovin, the bottom of Defendant's Exhibit 590 reflects a communication or at least a statement from Ben Khowong to Mary Grace Reyes and a Mr. L-O-T Ramos.  Do you see that?

A   Yes, sir.

Q   You were not a recipient of this e-mail or CCed on it, were you?

A    No.

Q    Nevertheless, on July 2nd of 2019, or leading up to July 2nd of 2019, did you ever have a conversation with Mr. Khowong where you stated to him that you did not want to send any more checks to McCarter & English at that time?

A    Yes.

Q    And what, in relation to the verdict, was July 2nd, 2019?

A    Six days later.

Q    And at this point in time, did you make a decision as to whether or not you would be paying McCarter & English for any of the outstanding invoices that were still due?

A    Um, I had decided that I was not going to pay them on the Caudill matter.  The answer's yes.  Sorry.

Q    And you decided this as of July 2nd, 2019?

A    On the Caudill matter, yes.

Q    With respect to Caudill matter, you determined that you were not going to pay them.

A    Yes, sir.

Q    Did that apply to all the outstanding invoices?

A    No.

Q    Directing your attention to Plaintiff's Exhibit 103 now --

        THE COURT:  Which is?

        MR. HEAVEY:  This is admitted, sir.

        THE COURT:  That's fine.  It can be brought up.

        MR. HEAVEY:  Wait a minute.  I'm sorry, Your Honor,

not admitted, not objected.  My apologies.

THE COURT:  Hold on a second, please.

Okay, that can be admitted as a full exhibit.  It can be published.

(Plaintiff's Exhibit 103, received in evidence.)

Q   (By Mr. Heavey) Mr. Rogovin, do you recognize this document put in front of you, Plaintiff's Exhibit 103?

A   Yes.

Q   Now, you would agree with me this is 20 days after the prior e-mail where you testified that you told Ben Khowong not to send any more checks to McCarter & English until further notice?

A   Yes.

Q   And, specifically, with respect to your testimony that you agreed to pay certain matters of McCarter & English at this time, is that reflected in the first paragraph in your e-mail to Mr. Giarratana?

A   Yes.

Q   And what exactly were you agreeing to pay at that time?

A   The intellectual property bills.

Q   And what specifically were you not agreeing to pay at that time?

A   The Caudill suit -- Caudill lawsuit bills.

Q   And in the second paragraph of that communication, do you give your rationale as far as why you will not be paying

McCarter & English on the invoices of the Caudill matter?

A   As it states, "Due to the verdict in the matter and its finding of willful and malicious, Jarrow Formulas is incurring extremely substantial further legal costs, the possibility of an exorbitant appeal bond that will need to be fully collateralized with disastrous financial results for the company, not to mention the harm done by the verdict alone.  We anticipate that very high litigation expenses are apt to burden the company for more than a year.  Worse, we have at present no way to collateralize the appeal bond.  I warned you repeatedly that, quote, I am trying to save my companies, closed quote."

Q   Is that a true statement there, that you warned --

MR. PEPE:  Objection, Your Honor.

THE COURT:  Sorry?

MR. PEPE:  Objection.

THE COURT:  No, that's overruled.  You can answer.  Go ahead.

Q   (By Mr. Heavey) Is that a true statement that you warned them repeatedly that you were trying to save your company?

A   Yes, it is.

Q   And in the following paragraph starting "Total, willful failure to put a cap on the R&D," do you see that?

A   Yes.

Q   And did that have any -- did that issue have any factor in your decision not to pay them on the Caudill Seed matter?

A    Very much.

Q    And that's the same issue that we had been discussing in your testimony that dated back to at least some of the e-mails in 2016?

A    Yes, sir.

Q    And I believe your testimony was it was an issue that you had from the beginning with the litigation, the underlying litigation with Caudill Seed, the R&D issues?

A    Yes.

Q    Now, as of July 22nd, 2019, you had agreed to pay the outstanding IP bills, and you had provided McCarter & English notice that you did not believe that you were going to be paying the Caudill Seed bill, the litigation bill in the federal matter; correct?

A    Um, I'm sorry.  Could you say that again?  The last paragraph caught my eye on the screen.

Q    I said, as of July 22nd --

A    Yes, sir.

Q    -- you would agree with me that you conveyed to McCarter & English, or at least to Mr. Giarratana, Grondahl, and Rechen, that you would be paying the IP portion of the outstanding invoices.

A    Yes.

Q    And after July 22nd, 2019, did there come a time when that decision to pay the outstanding IP invoices changed?

A    Yes.

Q    And do you recall when it changed?

A    Um, after talking to Mr. Tinley, our attorney at that point in this matter.

Q    And who was Mr. Tinley?

A    Um, the late Mr. Tinley was our attorney to -- to represent us with regards to McCarter & English.

Q    So to be specific, after the July 22nd, 2019, e-mail where you agreed to pay the IP --

A    Yeah.

Q    -- outstanding invoices, Jarrow Formulas retained counsel --

A    Yes.

Q    -- to investigate what occurred here with McCarter & English?

A    Yes.

Q    And that attorney's name was Mr. Tinley?

A    Jeff, Jeff Tinley, yes.

Q    And where was he located?

A    Um, Connecticut.

Q    And after --

A    I think he was in New Haven.

Q    Excuse me for cutting you off, sir.

After retaining Mr. Tinley, what exactly did Jarrow Formulas undertake with respect to the review of the McCarter &

English matter?

MR. PEPE:  Objection.

THE COURT:  Yeah, I'll sustain that.

Q   (By Mr. Heavey) After retaining Mr. Tinley, there came a time when you determined that you would not pay any of the outstanding invoices for McCarter & English at that point; correct?

A   Well, it was on Mr. Tinley's advice, yes.

Q   And why?

THE COURT:  No, no.  No, no.  Next question.  Unless you can rephrase that.  You can't ask it that way.

Q   (By Mr. Heavey) Was there any indication as to why it is you determined, after speaking to Mr. Tinley, that you weren't going to pay all the bills?

THE COURT:  That's sustained.

MR. PEPE:  Objection.

Q   (By Mr. Heavey) Why is it that you didn't pay the bills?

MR. PEPE:  Objection.

THE COURT:  Well, you can't refer to counsel's advice, but otherwise you can answer the question.

THE WITNESS:  I considered what they did malpractice. Came to that very firm conclusion.

MR. HEAVEY:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Sir, you need to stay there because the other lawyer's going to question you.

THE WITNESS:  Fair enough.

CROSS-EXAMINATION

BY MR. PEPE:

Q   Good afternoon, Mr. Rogovin.

A   Afternoon.

Q   1996, 27 years ago, you first retained Mark Giarratana to represent your company in litigation here in Connecticut. True?

A   Yes.

Q   And at that time you executed a retention letter setting forth the terms and conditions of that engagement.  True?

A   Yes.

Q   You read the letter before you signed it.  True?

A   Yes.

Q   You understood it before you signed it.  True?

A   Yes.

Q   And you agreed to be bound by the terms of those conditions in that letter.  True?

A   Yes.

MR. PEPE:  Could I have Exhibit PTX 095 called up, please.

Q   (By Mr. Pepe) Do you recognize that as, in fact, the retention letter?  And I'll show you the second and third page

also after you've had a chance to look at the first.

A    Yes.

Q    If you look at the second page and then the third.

A    Yes.

Q    That is, in fact, your signature in the lower left-hand corner?

A    Yes.

Q    If we go back, please, to the second page, Mr. Wyzik.  And if you could call out the paragraph beginning with "Charges and disbursements."

That letter states, in the middle of the paragraph, beginning with the words, "Our base hourly rates," quote, Our base hourly rates for attorneys, legal assistants, and certain staff members vary depending upon the experience and expertise of the person rendering services.  The base rates may change from time to time, period, end quote.

You understood that, did you not?

A    Yes.

Q    And you agreed to it, did you not?

A    Yes.

Q    All right.  It goes on to say, "Joseph Kentoffio and I will be primarily handling this matter for you.  My current hourly rate is $200 per hour, and Mr. Kentoffio's hourly rate is currently 210 per hour, period, end quote.

You read and understood that also.

A    Yes.

Q    And then there ensued 23 years of representation of Jarrow Formulas, Inc., by Mark Giarratana and colleagues in the various firms in which he was a partner.  True?

A    Yes.

Q    Over those 23 years, 540 different legal matters.  True?

A    According -- well, according to McCarter & English.

Q    You have no reason to dispute that, do you?

A    I think that the term "matters" is vague.

Q    Well, I'll use "matters" or "cases."  You have no reason to dispute that, do you?

A    Yes.

          MR. PEPE:  Your Honor, there's a stipulation on this. May I call up the stipulation?

          THE WITNESS:  I think it begs definition, that's all.

          THE COURT:  You may call up the stipulation.

          MR. PEPE:  We call up PJR Stipulation Document No. 38, PJR stipulation paragraph 5.  That is highlighted, if you would, the last sentence of that.

          We have another -- and that's for the attorney-client -- excuse me -- attorney matters at the McCarter firm.

Q    (By Mr. Pepe) Before that, before that, there were two firms in which Mr. Giarratana was a partner, and he represented you; correct?

A    Yes.

Q    And that was in the McCormick firm we just looked at; correct?

A    Yes.

Q    And then he moved to the Cummings & Lockwood firm; correct?

A    Yes.

Q    And you followed him and gave him the business of Jarrow Formulas, Inc., as it related to the intellectual property matters of Jarrow Formulas, Inc.  True?

A    Yes.

Q    And all those matters, at all those firms, were handled on a so-called time-devoted basis.  True?

A    Yes.

Q    During which, within which, the attorney or paralegal or other staff member would record his or her time, and that time was billed at the then agreed-upon rate; correct?

A    Yes.

Q    And over the course of 23 years and some 540 matters, we could, I think, agree that there must have been many hundreds and hundreds of monthly invoices, if not a thousand.  True? Over 23 years.

A    Um, well, 12 times 23 would be --

Q    Five hundred --

A    -- something over 270 or something.

Q    We don't need to be precise, but we can agree on some rough

math.  540 matters, all monthly invoices; correct?

A    Yes.

Q    And those monthly -- those 540 matters --

A    I think you said thousands.  That's why I was --

Q    All right.  Many hundreds of monthly invoices --
correct? -- if not a thousand?

A    Not many hundreds.  12 times 23.  286 -- 276 off the top of
my head, if you go a full year on the last year.

Q    Each matter had a separate invoice you've already
testified; correct?

A    No.

Q    No?

A    Each matter had a separate invoice?

Q    Yes.  Yes, Mr. Rogovin.  Each matter had a separate
invoice.  True?

A    Not that I'm aware of.

Q    I see.  So when we look at the invoices that were submitted
in the Kentucky litigation and we see that it is just the
Kentucky litigation described therein, that would be a separate
invoice, would it not?

A    I would receive one invoice a month.

Q    For each matter.

A    No.  It was one bill or invoice.

Q    All right.  We'll take a look at that, sir.

          Over the course of 23 years, Mr. Giarratana's hourly

rates did, in fact, go up as set forth in this letter, Exhibit 095; correct?

A    Yes.

Q    And, in fact, from 1996 to the beginning of the Kentucky litigation, which was some 8 -- or 19 years, it doubled from $200 dollars an hour to $405 an hour at the beginning of the Kentucky litigation; correct?

A    Yes.

Q    And those increases were reflected in the invoices that were submitted to you; correct?

A    Yes.

Q    And each invoice showed the hourly rate; correct?

A    Yes.

Q    And you paid every single one of those invoices except for the last five in the Kentucky litigation.  True?

A    Yes.

Q    And you did it without dispute or challenge.  True?

A    Um, no.  There's one actually I challenged.

Q    Well, we'll come --

A    It was ignored.  It was for $25,000.

Q    All right.  And you made an inquiry of that and asked them to review the bill; correct?

A    No.  That was separate.

Q    I'm sorry?

A    No.  The -- my -- that was the one out of 70 my eye

happened to catch in the middle that a Soft Gel Technology bill was put in the middle of a Caudill invoice.

Q   We're going to get to that, sir.

A   Okay.  No, the other one was that I had asked a question about a patent that they had previously reviewed for an extremely high cost of $25,000.  I asked a mere question about it, maybe a year later, and I was billed $25,000 again.  And I asked about it.  And I was never responded to.  And I picked -- that was easy to pick up because it was on the face.

Q   You answered the question.  Thank you.

Two questions in 23 years, over 540 different matters; correct?

A   Yes.

Q   Okay.  Now, sir, you were responsible for the review of all legal bills to JFI up until after the Kentucky litigation. True?

A   Yes.

Q   Then you delegated that authority to Jonathan Leventhal. True?

A   Um, at what point in time actually?

Q   After the Kentucky litigation.  True?

A   At some point after the Kentucky litigation.  It was probably --

Q   But up until that point --

A   That makes sense.

Q   Until that point, you reviewed all legal bills for all the lawyers that were rendering service to JFI.  True?

A   I signed off on the bills.

Q   You reviewed and approved every lawyer bill from every law firm coming into JFI; correct?

A   The question is what "review" means, but --

Q   I'm sorry?

A   I signed off on them.

Q   I'm sorry.  I didn't hear you.

A   It depends upon what "review" means, but I signed off on them.

Q   You don't understand the word "review"?

A   Um, because I think you're trying to imply something more than what occurred.

Q   Do you understand the word "review"?

A   I do.

Q   Okay.  And what does it mean to you?

A   Um, there can be -- it's a question of whether I reviewed in-depth --

Q   No.

A   -- or cursorily.

Q   My question was, you understood the word "review."  What does it mean to you?

A   It's a word that spans everything from fine detail to glossing, if it's a glossing review, it's a detailed review.

Q   It's signed -- so if I understand correctly, the word "review" means everything from detail to blind review.  Did I hear you correctly?

A   I used the word "glossing."

Q   Glossing?

A   G-L-O-I-S-S-I-N-G [sic].

Q   So when I use the term, whether you reviewed the bills, you say yes, but you have a broad definition of "review"?

A   I don't think it's a personal definition of "review."  I think it's -- one can have a parade, three people, hundred thousand people.

Q   The bills didn't get paid by your CFO Ben Khowong until you approved them and sent them to him.  True?

A   Yes.

Q   He relied on your approval to process the legal bill for payment.  True?

A   Yes.

Q   You were reviewing the bills with the best interests of your company in mind.  True?

A   Um, actually, I was derelict --

Q   Yes or no?

A   No.

Q   No, you did not have the best interest of your company in mind when you reviewed the legal bills.

A   I didn't do a good job.

Q    Well, my question was, you're the president; correct?

A    Yes.

Q    You have other owners of the business; correct?

A    Yes.

Q    As the president, you owe them an obligation, do you not, to protect their interests?

A    Yes.

Q    And one of the ways you did that is to make sure that bills that were not proper and due and owing didn't get paid.  That would be your duty; correct?

A    Yes.

Q    All right.  And if it was due and owing, then you approved it and sent it to accounting for payment; correct?

A    No.  Say that again.

Q    If the bill was due and owing, then you approved it and sent it to accounting for payment.

A    Yes.

Q    The answer was "yes."  Did I hear that correctly?  Yes?

A    If the bill was due and owing, I sent it on, yes.

Q    Yeah, okay.  And that's exactly what you did for the first 70 monthly invoices in the Kentucky litigation submitted to JFI by McCarter.  True?

A    Yes.

Q    Without any question on any of them except for the one where you found an error; correct?

A    Yes.

Q    Okay.

        MR. PEPE:  May I have, Mr. Wyzik, Exhibit PTX 16, please.

Q    (By Mr. Pepe) You recognize that as one of the invoices submitted to JFI in the Kentucky litigation.  True?

A    Yes.

Q    And see on the front page it's dated June 26.  True?

A    Yes.

Q    And it was paid on September 27 after a discount was taken. True?

A    Yes.

Q    All right.  And on that one, we don't see your initials, but on most of them you did initial an "OK, JR"; correct?

A    Yes.

Q    This one got paid, nonetheless, with the discount; correct?

A    Yes.

Q    And so it just didn't have your initials on this one?  Is that true?

A    My initials are not there.

Q    I'm sorry?

A    My initials are not there.  It may have been approved telephonically, which means I didn't review it, but I could have been called.  And they said, "This bill came in.  Can it be paid?"

Q   Would you keep your voice up?  I'm sorry, sir.

A   I said I could very well have been out of town, and they called me to say, you know, "The bill has to be paid.  Can it be paid?"  And I would have approved it telephonically.

Q   You don't know.  It didn't get paid until -- excuse me.

A   No, but it's not unreasonable since it's not signed.  Why would it be paid without my initial?

Q   It won't be paid unless you approved and sent it to Ben Khowong for processing for payment.  True?

A   Could have been done telephonically, yes.

Q   Let's take a look, if we can, at page -- at the Exhibit PTX 021, Mr. Wyzik, if you would.

          That one, sir, does -- that's an invoice dated November 13, 2013, and it's for the Caudill Seed case; correct?

A   Yes.

Q   Just like the previous one; correct?

A   Excuse me?  The last one?

Q   Just as the previous one was for Caudill Seed; correct?

A   Yes.

Q   That's the Kentucky litigation; correct?

A   Yes.

Q   And it has your initials on it, does it not?

A   Yes.

Q   And that means it's approved for payment; correct?

A   Yes.

Q    And it shows on the front page the amount that is due and owing; correct?

A    Correct.

Q    And then if you go to the subsequent pages, you find the detail that makes up that amount; correct?

A    Yes.

Q    As the president, you would want to know why you're being billed $23,991 for that month's efforts, would you not?

A    Well, it states it on the front.  It's Caudill.

Q    I'm sorry?

A    It states it on the front, "Caudill," so I know why.  It says it right on the front.

Q    Oh, you know it's that matter -- correct? -- the Caudill Seed --

A    Yes.

Q    And a matter, this is one invoice for one matter; correct?

A    Yes.

Q    So each matter has its own invoice; correct?

A    Yes.

Q    All right.

A    Not only IP.  They were collective.  I mean they were conglomerated.

Q    Each matter has its own -- we're looking at the Kentucky litigation bill, and it's only for the Kentucky litigation's Caudill Seed case, Exhibit 21.  True?

A    Yes, because we -- actually, we asked for that to be
separately billed so we could keep track of it because it was
so huge.

Q    Because you wanted to keep track of it as the president;
that was your duty.

A    Actually, it was Ben Khowong.

Q    Excuse me.

A    No, sir.  It was Ben Khowong, who was the financial
officer, who would want that.

Q    And you, as the president, have a duty to keep track of the
costs that are being incurred on legal matters and all other
matters.  True?

A    Um, that's Mr. Khowong's job.

Q    Oh, so as the president, you have no duty, no obligation to
your co-owners, to control the costs?  Is that your testimony?
I'll accept it.

A    Keeping -- those are different questions.  And in terms of
controlling costs, I agree.  I tried to get them to do
discovery on damages, to cut the thing off.  Thank you for
opening the door.  They made sure that I got $6 million just
for those three alone on top of Stites, on top of the costs and
then on top of all the subsequent.  And I lost my company.
Yes, it was my responsibility, and I begged them to do the --
to control the damages and so on.  Yes, I did.

          MR. PEPE:  Move to strike, Your Honor.

THE COURT: Well, again, why don't you ask another question.

Q (By Mr. Pepe) I will go back, sir, to the bills that you were reviewing and approving before they get paid. When you get the bill on the Kentucky litigation, you can see from this exhibit -- is 021 up still? You can see the total that the total fees and total disbursements are shown on the next page; correct? Excuse me, on the first page. Go back, please.

Do you see that, the first page, cover page? The total fees, total disbursements; correct?

A Yes.

Q And it shows the total amount, but in order to find out what comprises that total amount, you have to go further into the bill; correct?

A Yes.

Q And it would be important to you, as the president, to know that the -- that the services you were being billed for are fairly represented by the amount being charged, that the bill is fair; correct?

A That's two questions.

Q Isn't that important to you as president?

A Yes.

Q And the way you find that out is by going into the next page and the page after where there's a detailed description of all of the activities that are -- in fact make up that total

dollar amount; correct?

A    Yes.

Q    And those -- the next page, if we could, Mr. Wyzik, you see the activities are set forth there in very great detail.  You would agree?

A    Yes.

Q    And the hours spent by that attorney or timekeeper is shown in the right-hand column; correct?

A    Yes.

Q    And all that detail for the entire month is shown in page by page, if we go through the exhibit, the invoice; correct?

A    Yes.

Q    And then at the -- if we work our way through that exhibit and we go to page 9 of the exhibit in the upper right-hand corner, we see there's some again that matches the front page; correct?

A    Yes.

Q    The total fees and total disbursements.

         And then for each attorney working on the matter, during that month, his name or her name is shown below.  Do you see that?

A    Yes.

Q    And it tells you the title of that, whether it was a partner or associate or paralegal; correct?

A    Yes.

Q    And then it shows the total hours that were worked, and you could take those total hours and go back through the bill to confirm they're accurate by totaling up all the entries for Mr. Rechen, for example; correct?

A    Yes.

Q    And then the next column shows the hourly billing rate for that attorney; correct?

A    Yes.

Q    So right there it shows for that month the total hours worked by the attorney and the hourly rate at which it was billed; correct?

A    Yes.

Q    And then, of course, by doing the multiplication, you get the dollar value for each attorney; correct?

A    Yes.

Q    And then, if you total up the total dollars for each attorney, you get the total fees, which are shown on the front page and shown right above; correct?

A    Yes.

Q    Every single bill that was submitted by McCarter in the Kentucky litigation followed that same format; correct?

A    Yes.

Q    And so in this bill, which is dated November 13, 2013, we see that Mr. Rechen's billing his time at $405 an hour; correct?

We'll go back to page 9, please, Mr. Wyzik.

Correct?

A    Yes.

Q    And then Mr. Grondahl is billing his time at 485 an hour; correct?

A    Yes.

Q    And then Mr. Giarratana is billing his time at 535; correct?

A    Yes.

Q    So you testified earlier that Mr. Giarratana never told you that he was raising his rates when he submitted them to Liberty Insurance.  True?

A    Yes.

Q    That's your testimony; correct?

A    Yes.

Q    Mr. Giarratana raised his rates over the 23 years from at least $200 an hour in 1996, when you first met, to 4 -- or to -- excuse me -- $535 per hour in this bill; correct?

A    Yes.

Q    And during those 23 years, Mr. Giarratana and you never discussed a change in hourly rate?

A    No.  One time.

Q    Not one time in twenty years?

A    One time.  It was in writing.  Well, when he wet to Cummings & Lockwood, he informed me his rate would go up.  That

was the one time.

Q   Yeah.  That --

A   Didn't say how much.  He just informed me it would go up.

Q   Yes.  Let's be clear so we don't confuse the record.

When he moved his practice from the McCormick firm to the Cummings & Lockwood firm, he sent a letter advising you that he was moving the practice; correct?

A   Correct.

Q   And advised you you had the choice to keep your work with him or go elsewhere; correct?

A   Yes.

Q   But the letter didn't say anything about hourly rates, did it?

A   No.

Q   Okay.  So now I'm going back to my question.

In the 23 years that he represented you, during which time his rates increased as he said they would in that first letter, during those 23 years, is it your testimony that you never once had a conversation with him about an increase in the hourly rates?  Yes or no?

A   No conversation, no.

Q   Not once.

A   No.

Q   But we know the rates were increased from 200 in 1996 to 535 in 2013; correct?

A    Conversations never got into rates.  We talked --

THE COURT:  Wait a minute.  Wait for a question.  Go ahead, Mr. Pepe.

THE WITNESS:  I'm sorry.

Q    (By Mr. Pepe) So no conversations in 23 years even though the rate increased from 200 in 1996 to $535 per hour in 2013. That's your testimony; correct?

A    Again, no.

Q    So there were conversations?

A    I said no.

Q    No conversation.  So the rate -- the rate increases you relied on to be informed by looking at the bill, because the bill would show the rate increases.  True?

A    Um, yes.

Q    Okay.  All right.

A    If I looked, yes.

Q    That was the pattern and practice.  He wouldn't discuss it with you, but you would be informed and -- by the bill itself and would rely on that, okay.  We understand that.

Now, if we go to the next month bill, which is Exhibit 022, please, 022.

That's an invoice now one month later, December 17, 2013.  You have that in front of you?  See that?  You see that bill, sir?

A    Yes.

Q   And that's your "OK" and the date and your initials on it in the center top; correct?

A   Yes.

Q   And then we have the JFI page stamp, shows when it was paid; correct?

A   Yes.

Q   That bill is for 22,321 and was the same -- excuse me -- it was the same format as the previous one we looked at; correct?

A   Yes.

Q   We go to the next page, we say it looks exactly the same, in format.  I don't mean in content, but in format; correct? We see the date the work was done, the narrative description of the work, the attorney or paralegal who did it, and the total hours that it took to do that work; correct?

A   Yes.

Q   So, as the president of the company, if you wanted to assure yourself that you were getting value for the $22,321.50, you could read what was done that made up that dollar sum; correct?

A   It's kind of a hypothetical.

Q   I'm sorry?

A   It's kind of a hypothetical if I wanted to.  Actually, it sickened me to read any of it, so I didn't.

Q   You're sick, Mr. Rogovin?

A   I said it sickened me to read any of it, so I didn't.  You

said if I wanted to know.  Actually, I didn't.  It sickened me.

Q   I see.

A   I looked at the front, the amount of money, and I was sick to my stomach over what was going on.

Q   I see.  Sick to your stomach in the first year of the litigation.  Is that what your testimony is, sir?  Sick to your stomach?

A   Are you belittling it?

Q   Were you sick?

A   Yes.

Q   So you did not read the bill.  Is that your testimony?

A   Yes.

Q   If you had --

A   Also, you know, we had conversation --

          THE COURT:  Sir.

          THE WITNESS:  I'm sorry.

          THE COURT:  Let's get a question, Mr. Pepe.

          THE WITNESS:  Sorry, Your Honor.

Q   (By Mr. Pepe) I do.  If you had, if we go to page 8 of the bill, which is for December, the date of December 17, 2013, Exhibit 22, we would -- you would have seen again the hourly rates being charged by Mr. Grondahl, Mr. Giarratana, and the other lawyers; correct?

A   Yes.

Q   But your testimony is you did not read the bill.  Is that your testimony?

A   Yes.

Q   You approved it for payment without reading it.  That's your testimony.

A   I read the front.  I saw what it was, and I signed off.

Q   Off we go to the next bill, sir.  That would be January of 2014.  That would be Exhibit 023.

And that bill is for $16,182 in fees plus disbursements.  And, again, that's your initials and the date with the designation "OK"; correct?

A   Yes.  One of the smaller ones.

Q   I'm sorry?

A   One of the smaller ones, yes.  16,000's a lot of money, but that's one of the smaller ones.

Q   And your testimony is you did not read this bill.  You just initialed it "OK" and sent it to Mr. Khowong.  True?

A   Yes.

Q   If you had read it, sir, and you read it through to page 8, you would see there on page 8, once again, the hourly rate's shown; correct?

A   Yes.

Q   But you didn't read that far.

A   No.

Q   But you testified to this jury that you did not know that

Mr. Giarratana increased his rates.

A    I didn't know what he increased them to.

Q    I'm sorry, sir?

A    I didn't know what they would be increased to or when.

Q    But if you had read the bill, you would have known that; correct?

A    Yes.

Q    Now you told this jury that you went through this entire litigation, six years, 75 monthly invoices, and never knew that Mr. Giarratana had increased his hourly rate.  That's your testimony to this jury?

A    Um, yes, but also --

Q    Yes or no, sir?

A    Yes.

Q    Okay.

        MR. PEPE:  Mr. Wyzik, may I ask you to call up Demonstrative No. 122 through 125?  This has previously been used, Your Honor.

        THE COURT:  Okay.

Q    (By Mr. Pepe) You were in the courtroom when this was used with Mr. Giarratana's testimony; correct?

        THE COURT:  There's a question pending.  It's, Were you in the courtroom when this was used with respect to Mr. Giarratana's testimony?

        THE WITNESS:  Oh, sorry.

Um, yes.

Q   (By Mr. Pepe) And you understand the format.  You have the exhibit number on the left; the invoice number that we just looked at on some of these bills; the next column, the invoice date, the total amount invoiced; and the next column, total amount paid, when it was paid.  And then in the left -- in the right-hand column is a heading "Rogovin invoice handwritten notes."  And it shows in quotes the initials -- each bill that you initialed.  Do you have any reason to doubt the accuracy of this?

A   No.

Q   Because we could look at every one of those 75 bills and see your initials if we had to.  But you would agree that this appears to you to be accurate?

A   Yes.

Q   So if -- so on the first page, you OKed and approved for payment every bill.  Your initials appear on every one except about five; correct?

A   You said about five?

Q   About five or six.  I don't see your initials on five or six; correct?

A   Oh.  Um, yes.

Q   All right.  And your testimony is you -- every time you initialed "OK," you did it without reading the bill.  True?

A   Without reading the whole bill, yes.

Q    Anything beyond the first page.

A    Correct.

Q    Okay.  If we go to the next page of the demonstrative, again, every single monthly invoice shown there has your initials OK, the date, and JR, except two of the bills; correct?

A    Correct.

Q    And your testimony is that every one of those bills you approved as the president of the company and sent it forward for payment without reading it beyond the first page; correct?

A    Correct.

Q    If we go to the third page, we see that every bill, monthly invoice there, bears your initials and the OK and the date except three on that page; correct?

A    Correct.

Q    And your testimony is you OKed and approved each bill for payment and sent it forward to your CFO for payment without reading it beyond the first page; correct?

A    Yes.

Q    Then if we go to the last page of the demonstrative, we see that your initials do not appear on PTX 74, which was March of 2018; correct?

A    Correct.

Q    That was about a year and three months before the trial started; correct?

A    Correct.

Q    And your initials do not appear on PTX 081, which was March of 2019.  I'm sorry.  Forgive me.  I don't want to misstate that.  PTX 81 was submitted in December of '18, paid in March of 2019 without your initials; correct?

A    Correct.

Q    And the same with the next one; correct?

A    Correct.

Q    Then the next one does have your initials?

A    Correct.

Q    And then there are three without your initials?

A    Correct.

Q    And then there's two more with your initials, so about five again without your initials.  All the others have your initials, the "OK," and the date you OKed it; correct?

A    Correct.

Q    And your testimony there is that each one of those you approved and OKed for payment and sent on for payment without reading the bill beyond the first page.

A    Correct.

Q    And then the last five on those -- on that list, sir, PTX 1, 2, 3, 4, and 5, do you see that in the left-hand corner? Left column, I'm sorry, left column.

A    Yes.

Q    Those are the five final bills you did not pay; correct?

A    Correct.

Q    But even two of those, the bill that was issued in April of 2019 you initialed "OK"; correct?

A    Yes.

Q    So you approved it for payment.  You approved it for payment on April 24th, 2019, which would be a little less than about five weeks, six weeks before the trial started; correct?

A    Correct.

Q    But it never got paid; correct?

A    Correct.

Q    And then the next bill was issued on May 16, 2019, just before the trial started, and you approved that "OK" on May 25, 2019; correct?

A    Correct.

Q    But you never paid it.

A    Correct.

          MR. PEPE:  Can we call up, Mr. Wyzik, please, PTX 027?

Q    (By Mr. Pepe) You recognize this bill, don't you, sir?

A    Yes.

Q    And this bill is dated April 30, 2014, about a year, a year and a half into the litigation in Kentucky; correct?

A    Yes.

Q    And this bill is for $41,409; correct?

A    Correct.

Q    In fees plus disbursements; correct?

A    Correct.

Q    Disbursements are out-of-pocket costs that McCarter & English paid on your behalf, and you're reimbursing them at cost; correct?

A    I couldn't understand you.

Q    This bill has notation on it, "OK, 5/26/2014 JR."  That's your writing; correct?

A    Yes.

Q    But it also has a further notation, does it not?

A    Yes.

Q    And it says, quote, But see page 5.  4/19 -- 5.5 hours of Soft Gel billed to Caudill.  Needs to be rebilled, end quote.
       Did I read that correctly?

A    Yes.

Q    Soft Gel was a completely unrelated matter that Mr. Giarratana and his firm were handling for you; correct?

A    Correct.

Q    And they were billing that on a monthly basis, time-devoted basis, just like all the other matters; correct?

A    Yes.

Q    And if I read this correctly, sir, what you're saying to Mr. Khowong, who received these bills, there's an error in the bill; correct?

A    Yes.

Q    What you're telling Mr. Khowong is that time devoted to the

Soft Gel matter by McCarter got misbilled to the Caudill Seed Kentucky litigation.  True?

A    True.

Q    Not that the time was wrong or the service was invalid.  It just got misbilled from the Soft Gel matter to the Kentucky litigation matter; correct?

A    Correct.

Q    And so if we go to page 5 where you direct Mr. Khowong, we see a handwritten --

            THE COURT:  Can we get page 5, please?

Q    (By Mr. Pepe) We see a handwritten box drawn around the entry for April 19, 2014; correct?

A    Yes.

Q    And you drew that box.

A    Yes.

Q    And on the front page you referred Mr. Khowong to page 5 and the entry at 4/19; correct?

A    Yes.

Q    And you pointed out that it was 5.50 hours, which is shown; correct?

A    Yes.

Q    And you say, "5.5 hours of Soft Gel billed to Caudill needs to be rebilled," end quote.

            And then there's a void stamp.  That would have been put on by Mr. Khowong.

THE COURT: Did you want him to look at page 1 again?

MR. PEPE: Yes. I'm sorry. Thank you, Your Honor.

Go back to page 1, and then I'm going to go back to page 5.

Q (By Mr. Pepe) On the front page there's a void stamp. That would have been Mr. Khowong or one of his staff voiding the bill because you said it had to be rebilled?

A I'm not familiar with the procedure actually.

Q I'm sorry?

A I'm not familiar with the procedure actually but sounds reasonable.

Q Now, sir, the only way you could have found that erroneous entry on page 5 --

MR. PEPE: Can we go back to page 5, Mr. Wyzik?

Q (By Mr. Pepe) In order to find that entry, you had to read the bill through to find it. True?

A No.

Q No?

A No. It's just bizarre --

Q You answered "no," sir.

A Okay.

Q Your answer is "no." Did you ever testify under oath to the contrary?

A I don't think so. This is also what I remember --

THE COURT: Sir, there's no question pending right

now.

THE WITNESS:  Okay.

MR. PEPE:  May I have a moment, please, Your Honor?

May I approach the witness to hand him his deposition transcript?

THE COURT:  You may.  Did you want to give counsel a page and line number at some point?

MR. PEPE:  I'm sorry?

THE COURT:  Did you want to give counsel a page and line number?

MR. PEPE:  Yes, as soon as I get back to the podium.

THE COURT:  Very well.  Thank you.

MR. PEPE:  It would be the deposition on 5/12/2020 at page 22 on to page 23.  And it starts at line 9 on page 22 and goes to line 10 on page 23.

THE COURT:  Okay.  Thank you.

Q   (By Mr. Pepe) Do you remember you gave your deposition by Zoom in May of 2020, sir?

A   Mm.  Yes.

Q   And I was questioning you?  Do you recall that?

A   Yeah, I recall that.

Q   And we did it on two days because of the time difference, half of it on one day, half of it the next day?  Do you remember that?

A   Um, can you say that again?  Because I was reading.  I'm

sorry.

Q   That's okay.  I'm going to give you plenty of time to read it.

        But remember we took the deposition on two days because of the time difference, half on one day and half on the next?  You were in California; I was in Connecticut?

A   Yes.

Q   And so I'm now directing your attention to the deposition on May 12th.  And there's a divider there, so it should be easy for you to find that.

        And I'm going to further direct your attention, if I may, please, to page 22.

A   Yes.

Q   Okay.  And if you go to line 9 on page 22, there's a question that begins "And the bill."  Do you see that, May 12, page 22.

A   Which line?

Q   Do you have that?

A   No.  Which line?

Q   Line 9, starts with a question.  It says, Question:  "And the bill is dated"?

A   Correct.

Q   You have that?

A   Yes.

Q   Okay.  So we're on the same page here.

And I asked you -- I asked you, "And the bill" --

"Question: And the bill is dated April 30." And that's your notation in the center of the top page, top center of the page 'OK 5/26/2014' and your initials below; correct? End quote.

Now, to make sure we're talking about the right exhibit, I'm going to ask Mr. Wyzik to put back up Exhibit 027, front page.

So now we're looking again at that bill where you found the error; correct?

A    Yes.

Q    All right. And I read from your notation at 5/26/2014 and your initials below, and your answer was "Correct." Do you see that?

A    Yes.

Q    So we can agree you're looking at this bill with a different exhibit number on it in your deposition; correct?

A    Yes.

Q    All right. Then we go on and I say:

"Question: There are then -- then there appears a notation by you that says, quote, but see page 5, 4/19, 5.5 hours of Soft Gel billed to Caudill. Needs to be rebilled," end quote.

So I read to you that handwritten notation that you put on this bill; correct?

A    Yes.

Q    And I question:

"Do you see that?  That's your handwriting, isn't it?"

"Answer:  Yes" was your answer; correct?

A    Yes.

Q    And I go on:

"Question:  If we go to page 5 of that same exhibit, about halfway down the page, we see a time entry there, and the narrative reads, quote, Draft section of brief refuting Soft Gel's arguments on harmless error or standard," etc.

Do you see that?  And your answer was "Yes."

So we're going to ask Mr. Wyzik to go to page 5.

I just read from that time entry from the same bill in your deposition, and you said I read it correctly; correct?

A    Yes.

Q    Then I go on and I say:

"Question:  So you identified that as an entry that was misbilled.  It should have been billed to a different matter, the Soft Gel matter, not the Caudill Seed matter; correct?"

And what was your answer?

A    "Yes."

Q    Then the question was -- and then the question was:

"And in order to do that, you had to read the bill through to find that misentry, did you not?"

And your answer was?

A   Um, "yes."  And it's actually --

Q   Your answer was "yes," sir.

So now do you want to correct your previous testimony to this jury that you did not have to read it through to find it?

A   I would read the rest of my testimony.

Q   All right.  Thank you.

A   "Question:  So at least" --

THE COURT:  Sir, sir.  You have to wait for a question.

THE WITNESS:  I thought he said "thank you" for me to read, sir.  I'm sorry.

THE COURT:  That's all right.

Go ahead, Mr. Pepe.

Q   (By Mr. Pepe) Now, the last five bills on that demonstrative I had up that were not paid, you have those in mind?

A   I'm sorry.  What?

Q   I'll put the demonstrative up again.  I'm referring now to the last five bills rendered by McCarter in the Kentucky litigation in April, May, June, July, and August.  Those are the five bills that are unpaid.  Do you have that in mind?

A   I see it.  I see it.

Q   And they were not paid because you put a hold on the lawyer

bills, did you not?

A    Yes.

Q    And you did that by sending an e-mail to Mr. Khowong, your CFO; correct?

A    Correct.

MR. PEPE:  Okay.  Now, excuse me if I may have a moment, Your Honor.

THE COURT:  Yes.

(Pause.)

Q    (By Mr. Pepe) See, I tried to write down your testimony on this in your direct testimony.  I think I got it right, when you were asked by Attorney Heavey.  You said you put a hold on the lawyer bills the first day of the trial.  Remember that testimony?

A    Yes.

Q    Okay.  That's not accurate, is it?

A    I don't know -- well, by the "lawyer bills," it was all law firms.  It wasn't just McCarter & English.

Q    That's not my question, sir.  You said -- you testified on direct that you put a hold on the lawyer bills on the first day of the trial, meaning the first day of the trial in the Caudill Seed case; correct?

A    Are you saying is it correct I said it or is it correct I did it?  I'm not following the question.

Q    I said I tried to write it down when you said it, and I

wrote down your testimony that you gave the directive to hold off the lawyer bills, put off the lawyer bills, the first day of the trial.  I got that correct; right?

THE COURT:  Let's try it like this:  Was that your testimony?

THE WITNESS:  I guess, yes.

Q   (By Mr. Pepe) Okay.  It's not accurate, is it?

A   In what sense?

Q   It's not accurate, is it?

A   I don't know.

Q   Well, let's see.  Can we have PTX 129 called up, please.

THE COURT:  And that's?

MR. PEPE:  That's a full exhibit.  Excuse me, Your Honor.  Excuse me.

THE COURT:  129, there's no objection to 129, so that may be admitted as a full exhibit.

MR. PEPE:  Thank you, Your Honor.  I'm sorry.

(Plaintiff's Exhibit 129, received in evidence.)

MR. PEPE:  Okay, Mr. Wyzik, now can you pull that up.

You have here, sir, at the -- I'm going to ask Mr. Wyzik to blow up the first paragraph in the "To" and "From" section.  Everything down to "Put off" -- everything down to the line below "Put off the lawyer bills," where it says "Trial starts Monday."  Please call all that out from the top down to. Next line too, please.

The next line too, please.  Thank you.

Q   (By Mr. Pepe) This is your e-mail to Mr. Khowong on June 1; correct?

A   Yes.

Q   And if you drop down below the asterisk, I'm going to ask Mr. Wyzik to highlight that, "Put off the lawyer bills."

A   Yes.

Q   Here's your instruction to Mr. Khowong to put off the lawyer bills; correct?

A   Yes.

Q   And that's on Saturday, June 1; correct?

A   Yes.

Q   And the trial didn't start till the following Monday, June 3; correct?

A   Yes.

Q   In fact, you pointed out to Mr. Khowong in the next line: Trial starts Monday.  The judge is a expletive expletive.  I wish him dead dead dead.  His rulings are sick, stupid, evil, crap, end quote.

That was, in fact, your attitude about the judge going into this trial, wasn't it?

A   Um, yes, um --

Q   You answered it.  Thank you, sir.

A   Yes.

Q   So when you said you told Mr. Khowong to pay $700,000 on

June 3, that was not true, was it, because you put the hold on the bills June 1.

A   Um, that's not a yes or no.  It's nonsensical.

Q   My question is nonsensical?

A   Yes.

Q   Let's see if I can do better.

A   Well, if you want an explanation, I can give it.

Q   Your testimony was you told Mr. -- on direct that you told Mr. Khowong to pay $700,000; correct?  On June 3.

A   Yes.

Q   The day the trial started.  But that's false because you had put a hold on it, we know now, on June 1.  True?

A   Um, yes.  But the first statement it was not false.

Q   You put a hold on the bills, all lawyer bills, that includes McCarter's; correct?

A   On Saturday.

Q   On Saturday, June 1.  And then your testimony was that on Monday you told him to pay $700,000; correct?

A   Obviously, the hold got removed.

Q   I'm sorry?

A   Obviously, the hold got removed.

Q   The whole time --

A   The -- obviously, the hold, H-O-L-D, was removed.

Q   Oh, is that right.  You removed --

A   Yes, that is right.  So you're accusing me of saying

something false was false.

Q   You removed -- you put the hold on on June 1.

A   Yes.

Q   Is that correct?  And then removed it on June 3?

A   Yes.

Q   I see.  And your testimony is that you removed it so that $750,000 could be paid; is that correct?

A   Yes.

Q   Okay.  In fact, that amount was paid, sir, before you put the hold on on May 31.  Isn't that correct?

A   I don't know.

Q   Well, you should know because you just told the jury the hold was removed so it could be repaid.

A   I know that $700,000 was paid.  Your question implies that that $700,000 that was paid was ordered paid on June 3.

Q   What happened, sir, is that --

A   Yes, we're trying to figure that out here, what did happen.

Q   Your CFO paid about 1 --

A   Before simply calling me a liar, lay out the chronology of what happened.

Q   I'll try to do that, sir.  But I don't remember using the word "liar," and I've never used it in this courtroom or any other.

A   It was implied.

THE COURT:  Let's stop the argument.

Go ahead, Mr. Pepe.

THE WITNESS:  I apologize, Your Honor.

Q   (By Mr. Pepe) Now, sir, what happened was there were negotiations in May of 2019 regarding the payment of the outstanding amounts then due and owing by JFI to McCarter, and those negotiations were between Mr. Khowong and Mr. Giarratana to some extent.  True?

A   I don't know.

Q   You were not involved.

A   No.

Q   Okay.  They reached an agreement that Mr. -- that Mr. Khowong could take an additional 5-percent discount on top of the 38-percent discount that was then being in place on all JFI matters; correct?

A   Um, we dispute the 38-percent discount.

Q   I'm sorry?

A   We dispute the 38-percent discount.

Q   The agreement was that --

A   And there was no mention -- yeah, yeah, disputed.

Q   The agreement was Mr. Khowong would take an additional 5-percent discount on the 38-percent discount that was then in place on JFI matters, as testified to by Mr. Giarratana and Ms. Bosma; correct?

A   If you're saying those were what was discussed back and

forth between those parties, yes.

Q   And then Mr. Khowong, having taken the 5-percent discount, paid only half the outstanding amount around 700,000; correct?

A   He paid what Mr. Leventhal told me had to be paid.

Q   No.  My question is --

A   But that's what happened.

Q   My question is:  Mr. Khowong then paid about 700,000 of the total amount outstanding of about twice that amount; correct?

A   Yes.

Q   Okay.  And he made that payment on May 31, 2019; correct?

A   I was completely uninformed and uninvolved in any of that other than Mr. Leventhal telling me that, "They're threatening to quit.  You got to pay 700,000."

I said, "We can't pay vendors if we do that."

He said, "You have to do it.  They're threatening to quit."  So I contacted Mr. Khowong.

MR. PEPE:  Move to strike, Your Honor.

THE COURT:  Well, so the question was, "And he made the payment on May 31st, 2019; correct?"

THE WITNESS:  Yes, Your Honor.

THE COURT:  And your answer wasn't responsive to that.  So the answer's "yes" to that?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Pepe, you can ask your next question.

MR. PEPE:  Forgive me, Your Honor.  I didn't mean to

turn around.

THE COURT:  The question was answered, and the answer is "yes."

Q   (By Mr. Pepe) And then your hold came the next day, June 1; correct?

A   The next day from when?  Because I'm uninvolved in any of those conversations.  But on June 1, I -- knowing there was a serious financial crunch, I said, "Hold all legal bills."

Q   Mr. Rogovin, if you don't understand my question, you tell me, and I'll try and make it clearer.  Would you do that?  The answer is "yes"?

A   Yes.

MR. PEPE:  We can have PTX 121, which is a full exhibit, I believe.

Full exhibit, Your Honor.

THE COURT:  All right.  Thank you.

Q   (By Mr. Pepe) PTX is an e-mail string, and I'm going to ask Mr. Wyzik to go to the second page of that with the Bates number 3021 on the lower right-hand corner.  I'm going to ask him to call up or call out the e-mail from Mr. Giarratana on Friday, May 31, at the bottom of the page.

Mr. Giarratana says to Mary Grace Reyes -- that is Mr. Khowong's billing coordinator or accounts receivable manager; correct?

A   Um, yes.

Q   And he says, "Dear Mary Grace, We are not permitted to provide a further discount beyond the additional 5 percent. With the additional 5-percent discount, Jarrow Formulas is receiving a 43-percent discount, which is both substantial and highly unusual," end quote.

I'll end there.  There's more, but I'll go to the next e-mail in the interest of time, right above that, Mary Grace Reyes's response, that very same day, some two hours later.

Mary Grace Reyes says on May 31, "Ok.  We will cut the check later today and hopefully make it to FedEx overnight."

So the check went out on May 31.  We can agree on that; correct?

A   Yes.

Q   And then if we go forward on this e-mail string, we say, in the next page, in the lower right -- first page of the exhibit, if we can go there, Mr. Wyzik, and blow up the last e-mail or call out the last e-mail at the bottom of that page.

Mr. Giarratana responds and says, "Thanks for sending the below check.  It was very much appreciated."

It goes on to say, "The check covered about half of the then-outstanding AR."

And we go further up in the e-mail chain to the next one, we see an e-mail from Mary Grace Reyes to Ben Khowong. That's her boss; correct?  That's Mary Grace reports to Mr. Khowong?

A   Yes.

Q   And she says, "How do you want me to respond to this?"

And Mr. Khowong in the next e-mail up responds himself.  And I'll give you a chance to look at that.

Mr. Khowong says, Hi Mark, how are you?  In the future, please deal directly with me on the matter.  There was a misunderstanding on your offer, passed to me by Marry-Grace [sic].  My understanding was we just need too [sic] bring the account current for the discount.  I went out of my way to pay you the check of close to 700,000 despite the fact Jarrow wanted me to send only $100,000 for now."  I think it says:  I do not "have the authority to send you any more at this time without Jarrow's instruction, end quote.

So Mr. Khowong's advising Mr. Giarratana that you had limited the payment to a hundred thousand dollars, not 700.

A   Well, that's inaccurate.  English is Mr. Khowong's second language.

Q   Excuse me.  Mr. Khowong's e-mail is inaccurate?

A   It's, um, incomplete actually.  The term is "incomplete." And 43-percent discount would be 950 an hour.

Q   The part he says "Jarrow wanted me to send only 100,000 for now," that's accurate, isn't it?

A   Um, before I approved 700.  And that's why it's incomplete. It didn't give the chronology.

Q   The verdict came back from the Kentucky jury on Wednesday,

June 26, 2019; correct?

A    Yes.

Q    You were in the courtroom; correct?

A    Yes.

Q    Testified earlier that no one would pay attention to you after the verdict came in, no one from McCarter; correct? Correct?

A    Correct.

Q    You were aware --

A    I just wanted your wording to sink in.

Q    I'm sorry?

A    I just wanted your wording to sink in.

Q    You're aware there were proceedings going on after the verdict was returned by the jury?

A    Um, the proceedings were over.

Q    Are you aware there were proceedings the judge was conducting, the judge in the Kentucky case was conducting, after the jury returned the verdict?

A    Yes.

Q    There were motions made by the attorney, including a motion to seal the exhibits; correct?

A    Yes.

Q    There was also a question from the lawyers as to whether they could speak with the jurors; correct?

A    Yes.

Q    And the judge had already excused the jurors; correct?

A    Yes.

Q    And the judge asked the marshal to go get the jurors and bring them back so he could ask them about whether they'd be willing to speak to the attorneys; correct?

A    Yes.

Q    And you understand that when the judge is on the bench conducting proceedings, lawyers are obligated to address the court.

A    Yes.  And I was seated in the back --

Q    You answered the question, sir.  Thank you.

     When this suit was brought in the early part of 2013 by Caudill against JFI, the complaint was seeking $12 million in compensatory damages tripled for punitive damages, plus attorney's fees; correct?

A    Yes.

Q    At the time it got to trial, Caudill Seed was claiming $9.7 million tripled for punitive damages; correct?

A    Yes.

Q    Plus attorney's fees; correct?

A    Yes.

Q    And so you had, from the very beginning, substantial exposure in the suit brought by Caudill Seed against JFI for stealing its trade secrets; correct?

A    Yes.

Q   And that caused you to direct McCarter & English to over-engineer the defense, to use your words; correct?

A   Yes.  Please read the rest of it.

Q   And to protect the record for the appeal; correct?

A   That came later.

Q   I'm sorry?

A   That came later after over-engineer.

Q   And you knew --

A   There was some details about over-engineer.

Q   Now, when the verdict came back, the jury awarded less than the 9.75 that was sought; correct?

A   Yes.

Q   Let's take a look at the jury verdict.  You've seen that many times; correct?

A   I'm sorry.  What?

Q   Let's look at the jury verdict, please, if I can ask Mr. Wyzik to call up PTX 094.

        You've seen that many times before, have you not?

A   Yes.

Q   The jury found that Caudill Seed possessed one or more trade secrets, as had been identified in the court's instructions; correct?

A   Yes.

Q   McCarter took the position that the information that Kean Ashurst passed on to you secretly before and after you employed

him did not constitute a trade secret; correct?

A    Yes.

Q    And they took that position in your defense with your input, your collaboration, your cooperation, and your approval; correct?

A    Start that again.

Q    Yes.  McCarter put forward, in defense of JFI, that the information, the proprietary and confidential documents that Mr. Ashurst transmitted to you secretly before and after hiring him, did not constitute a trade secret; correct?

A    Correct.

Q    And they took that position in JFI's defense with your knowledge; correct?

A    Yes.

Q    Your consent; correct?

A    Yes.

Q    Your input; correct?

A    Yes.

Q    Your collaboration; correct?

A    Yes.

Q    And your approval; correct?

A    Yes.

Q    The jury found, nonetheless, that the information that Mr. Ashurst had sent to you, before and after you employed him, and which you kept, did in fact constitute some trade secrets;

correct?

A    Yes.

Q    They found that research and development was a trade secret, because they checked that box; correct?

A    Um, yes.

Q    But they did not find that the general process was a trade secret; correct?  Did not.

A    Yes.

Q    They found that specific process was a trade secret; correct?

A    Yes.

Q    And that vendor information, customer information, and laboratory notebook were all trade secrets; correct?

A    Yes.

Q    All right.  So of the six that were claimed, the jury found that five were trade secrets; correct?

A    Yes.

Q    And then on the next page, they were asked if the evidence supported a finding that Jarrow Formulas, Inc., misappropriated Caudill Seed and Warehouse Company's trade secrets.  I asked Mr. Wyzik to, if he could, call out that fourth -- the line that begins with "yes."

        And they found that some of those trade secrets had been misappropriated by JFI; correct?

A    Yes.

Q For example, they found research and development was; correct?

A Yes.

Q But not the general process; correct?

A Yes.

Q Not -- they did find you mis -- or JFI misappropriated the specific process; correct?

A Yes.

Q The vendor information; correct?

A Yes.

Q And the customer information; correct?

A Yes.

Q But not the laboratory; correct?

A Yes.

Q And on the next page, they were asked to award damages on those trade secrets that had been misappropriated; correct?

A Yes.

Q And so all -- only the research and development trade secret did the jury award damages; correct?

A Yes.

Q They could -- the damages they could have awarded were not to exceed $9,716,705, which we know from the lower right-hand corner -- can you highlight that, Mr. Wyzik? Thank you.

That's the most they could award based on the evidence; correct? I highlighted it for you in the lower

right-hand corner, sir.

A    Well, based on the claims, if the evidence were there.

Q    Based on --

A    If they found -- if they supposedly found the evidence.

Q    Based on the evidence that went to the jury, the most they could find was 9.7 million; correct?

Is that correct?

A    If the evidence were there, yes.

Q    And what they did find was not 9.7 million but 2.4 million; correct?

A    Yes.

Q    So the defense was successful in reducing the potential damages from 9.7 to 2.4; correct?

A    Yes.

Q    And also successful in finding that none of the other misappropriated trade secrets were -- gave rise to any damages at all; correct?

A    Yes.

Q    And we go to the next page, they were asked if they found that Jarrow Formulas, Inc., willfully and maliciously misappropriated Caudill Seed and Warehouse Company; correct?

A    Yes.

Q    Trade secrets.  And that is what gives rise under the trade secret law, as you came to know it in this case, to punitive damages.  That's where the judge could triple the compensatory

damages; correct?

A    Could, yes.

Q    Yup.

A    Plus attorney fees.

Q    And then upon hearing that verdict rendered on Wednesday, June 26, 2019, you decided that night that you -- that McCarter had committed malpractice, that you weren't going to pay the bills, and you were going to fire them.  True?

A    Yes.

Q    And you told that day, that very day, you told some people about that decision; correct?

A    Yes.

Q    Attorney Scott Polisky is one of your other attorneys from one of the other -- the five law firms representing you; correct?

A    He's a sole practitioner, food and drug law.

Q    One of the lawyers represented you.  And did he do the drug and food work?

A    He and Susan Brienza, who were long-standing duo for Jarrow Formulas on food and drug law, did the work on Caudill illegally irradiating material and falsifying their certificate of nonirradiation, yes.

Q    And he was with you that night; correct?

A    He was with me for a couple days.

Q    And you told him the decision that you had made that night.

You told him that very night; correct?

A   Yes.

Q   Then you went with Kean Ashurst and Mrs. Ashurst; correct? That night.

A   I was visiting their home.

Q   And you told them the decision you had made:  They committed malpractice.  I'm not paying the bills.  And they can pay the damages, and I'm going to fire them.

You told Mr. and Mrs. Ashurst that same thing; correct?

A   Mm, incorrect.

Q   Incorrect?

A   Well, I don't -- I don't remember my saying I'm not going to pay the bills, but I did indicate that I was going to sue for malpractice.

Q   Well, you said --

A   I said they could pay the damages.

Q   Well, you weren't going to pay the bill if you expected them to pay the damages; correct?

A   Um, yeah.  But you're asking me what I said.  I said, "They can pay the damages."

Q   And you told -- you told them your decision to fire them and they could pay the damages.

And then at that time, or very shortly thereafter, probably that -- that same day of the verdict, you told Mr.

Khowong of your decision that you were going to terminate McCarter.

A    Yes.

Q    And you told Mr. Leventhal a day or two later, when you got back to Los Angeles, you told him of your decision to terminate McCarter.

A    Yes.

Q    So you told Mr. Polisky, you told Mrs. Ashurst, you told Mr. Ashurst, you told Ben Khowong, and you told Jonathan Leventhal, but you did not tell anyone at McCarter.

A    Um, I --

Q    It's just yes or no, sir.

A    I had no intention of speaking to them ever again, particularly after the way they treated me after the verdict came in.

THE COURT:  Sir, did you tell them?  Yes or no?

THE WITNESS:  No, sir.

Q    (By Mr. Pepe) You did not tell them.

A    I reciprocated.  And I told them I wouldn't talk to them.

Q    No, you answered the question, sir.

A    Texted.

Q    Thank you very much.

So we have the verdict on Wednesday, June 26, and your meeting with Mr. and Mrs. Ashurst at night and the unintentional dial.  Now I want to go back in time, before the

verdict, back in time before the verdict.

During the course of this six years of litigation, you were a very prolific e-mail writer. True?

A   I wrote e-mails, yes.

Q   Very, very frequently about issues in the case to the McCarter team. True?

A   Yes.

Q   Very long and detailed e-mails. True?

A   Some of them, yes.

Q   Very specific e-mails about your theory of the litigation, among other things. True?

A   Yes.

Q   And very often you commented on their work, what they were doing in the litigation, and what they were not doing; correct?

A   Yes.

Q   So if we look at PTX 306 -- I believe there's no objection to this.

THE COURT:  306?

MR. PEPE:  It may be a full exhibit.  I believe there's no objection.

THE COURT:  Hold on one second.

306, no objection.  That will be a full exhibit.

(Plaintiff's Exhibit 306, received in evidence.)

MR. PEPE:  Mr. Wyzik, will you call out that exhibit. Will you call out the top part so the witness can see the date

and time.

Q   (By Mr. Pepe) Here we have an e-mail from you to Mr. Giarratana, Mr. Rechen, Mr. Grondahl, and another lawyer, Mr. Hornat at McCarter; correct?

A   Yes.

Q   And that's in January 21, 2018.  So we're five years into the litigation, about a year and a half before the trial starts in June of 2019; correct?

A   Yes.

Q   So we drop down to the bottom.  There's an e-mail from Mr. Giarratana on the day before, January 20.  Can we go down and call that out?

        Thank you so much.

        Do you see the day before Mr. Giarratana writes you and says, "Attached" -- the subject is "Revised draft and redline of sanctions brief."

        Mark was seeking sanctions against the Caudill plaintiff in this litigation.  True?

A   I don't remember what -- actually, I don't remember it.

Q   Okay.  But you remember at some point they sought sanctions because you asked them to do it because Caudill was not revealing its research and development information; correct?

A   Um, yes.  Oh, yeah.

Q   All right.

A   Okay.

Q   So here is Mr. Giarratana saying, "Dear Jarrow:  Attached please find a revised draft and redline of the sanctions brief incorporating your feedback," end quote.

So you had given your information, or your input, for inclusion in the brief they were writing for sanctions; correct?

A   Yes.

Q   And then they were giving what the brief -- they want you to review the brief before it's filed; correct?

A   Yes.

Q   Go back up to the top now.  Here's what you have to say about McCarter's work product.

Go back and call up the top part, please, Mr. Wyzik.

I think it was page 20 of the redline, Footnote 2.

"The intro is awesome.  The effect of paragraph blocking the litany of brief quotes is god smacking.  Perfect language in intro to convey their endless venom," referring to the Caudill lawyers; correct?

A   Yes.

Q   "And the paragraphing the examples was like a dramatic photograph.  It hits back hard with perfect form and execution."

That's what you wrote; correct?

A   Yes.

Q   Drop down two paragraphs to "I think."  Go back down to the

last paragraph, begins "So, I reluctantly give it an A plus."
Please go there.

You graded the brief.  Quote, "So, I reluctantly give
it an A plus.  Grade inflation, you know."  Go on to say, "A
victory, a really, really big trick industry they won't be
expecting it.  It will be so devastating but they deserve it
but not as much as we do because we are not sick of winning
yet."

Drop down to the next line.  "He," meaning Caudill;
correct?  "He has the worst lawyers"?  That's Caudill you're
referring to?

A    Yeah.

Q    "He," Caudill, "has the worst lawyers in the world.
Terrible lawyers.  Terrible lawyers.  You guys are terrific.
Aren't you terrific?  Sure, you're terrific.  They must be
terrified with how terrific you are," end quote.

That's what you wrote to Mr. Giarratana and his team;
correct?

A    Yes.

Q    And you meant it.

A    Actually, it turned out to be too little too late.  The
discovery was closed, and the whole thing blew up.  It failed
miserably.  I was dead wrong.

Q    You meant it when you wrote it, sir?

A    Yes, naively.  The fact is discovery was closed --

Q   You answered it, Mr. Rogovin.  Thank you so much.

A   They ran out the clock.

THE COURT:  Sir, sir, don't keep commenting.

THE WITNESS:  Sorry.

MR. PEPE:  This would be a good time to break.

THE COURT:  Ladies and Gentlemen, we reached another end of a trial day.  Thank you so much for your attention today.  We'll see you in the jury room 8:45 tomorrow.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  Thank you again.

(The jury left the courtroom at 3:28 p.m.)

THE COURT:  So just a couple of housekeeping matters.  Mr. Pepe, how much longer would you estimate you would be with Mr. Rogovin?

MR. PEPE:  I'm sorry, Your Honor?

THE COURT:  How much longer do you expect you would be with Mr. Rogovin?

MR. PEPE:  Oh, I think I could finish in an hour or so, Your Honor.

THE COURT:  Okay.  All right.  That's fine.

And then, Mr. Heavey, you'll have some examination, I take it, at that point?

MR. HEAVEY:  Yes, sir, Your Honor, some limited examination.

THE COURT:  Very well.

And then who would your team be calling after Mr. Rogovin?

MR. RESSER:  Mr. Leventhal, Your Honor.

THE COURT:  All right.  Very well.  And assuming we got to someone after Mr. Leventhal tomorrow, who would that be?

MR. RESSER:  Live witness, the next live witness would be Mr. Grondahl.

THE COURT:  Okay.  Do you -- is that a suggestion that you intend to put on some video deposition tomorrow as well? It's fine if you do.

MR. RESSER:  Yes.

THE COURT:  Okay.

MR. RESSER:  And we've informed counsel of all of the next witnesses in the defense side of the billing case.

THE COURT:  Okay.  Very well.  And you've cut the video already?  You've done all that?

MR. RESSER:  Yes.  With respect to Mr. Paige, Your Honor, he won't be available until Wednesday morning.  So --

THE COURT:  This Wednesday morning?

MR. RESSER:  This Wednesday morning.  Perhaps first thing at nine o'clock, if it's all right with Your Honor.

THE COURT:  Remind me.  He's just going to testify on that one exhibit, essentially the arithmetic.

MR. RESSER:  Yes.

THE COURT:  That's fine.  You can do that.

Now, I guess you should -- the question is how we're going to do that with the Zoom. That shouldn't be a problem; right?

LAW CLERK: I think I can do that.

THE COURT: Why don't you test it out.

MR. RESSER: If he can also speak to Mr. Campos about that.

THE COURT: That would be helpful. Why don't you do that, Josh. That would be great.

Is there anything else we need to discuss now?

MR. PEPE: Yes, Your Honor. With respect to Mr. Grondahl --

THE COURT: Yes.

MR. PEPE: -- he's retired and lives in New Hampshire.

THE COURT: Okay.

MR. PEPE: He was here for the first couple days of testimony. He's back in New Hampshire now. Can I represent that he has absolutely nothing to do with billing in this matter. There's just nothing in the record that he was involved in the billing issues whatsoever. So I'm wondering the relevance of bringing Mr. -- or the propriety of bringing Mr. Grondahl down from New Hampshire in the billing part of the case. He will be here for the malpractice case.

THE COURT: Mr. Resser?

MR. RESSER: He specifically testified in this case,

Your Honor, that he was not aware that his rates were raised. I think that goes directly to the fundamental issue in this case as to whether the client understood the rates were raised as well.

THE COURT: Well, could you stipulate to that?

MR. PEPE: We would bring him down for that one question and answer?

THE COURT: I mean, that's the question. Would you stipulate to it? Because otherwise, I mean -- I mean what we could do -- I tell you what. If that's all there is --

MR. RESSER: We could just show the video for Mr. Grondahl.

THE COURT: What we could do instead is just allow that to do when they bring him down for the malpractice. You're going to bring him down.

MR. PEPE: I won't object to it coming in in the malpractice.

THE COURT: Why don't we do it then just for the jury's sake. They aren't resting anyway.

MR. RESSER: They heard me promise them those are the facts of the case.

THE COURT: It's going to come in. It's just going to come in a little later.

MR. RESSER: Okay.

THE COURT: Anything else we need to discuss?

MR. RESSER: Yes, Your Honor. With respect to the advice of counsel defense, we briefed that issue. We cited two cases in which the argument was made that it had to be raised in an affirmative defense. Both cases indicate clearly it does not have to be raised as an affirmative defense, and the testimony was allowed in the cases.

THE COURT: Well, let's talk about that. So the advice of counsel, at least as I understand it, is a recognized affirmative defense. There are certain elements, for example, all the facts have to be disclosed to the lawyer. And there are certain other requirements to meet that.

Now, the notion that something short of a full-blown advice of counsel defense might go to someone's state of mind is a different idea. And if what you're suggesting is, "Judge, that's all we're getting at," then fine.

But what I would say is, though, the way the question was asked today, it called for hearsay. And so that's why I told the witness he couldn't answer it that way. So I think a -- some foundation has to be laid with regard to that. And -- although I do want to understand something.

So the testimony, at least as I understand it so far, has been the decision was made not to pay the bill, you know, more or less the night of the verdict. And so that was, I take it, before Mr. Tinley was consulted.

MR. RESSER: Right.

THE COURT: By a few months at least; right? Mr. Tinley was consulted after your client got sued.

MR. RESSER: After July 22nd when they were sued, right.

THE COURT: So then why is that relevant to your client's state of mind at the time he decided not to pay the bill?

MR. RESSER: It's relevant to the client's state of mind not to pay the bill after and for the next several years and their seeking interest based on all those years that it wasn't paid.

Also, it's relevant to the decision Mr. Rogovin made not to pay the intellectual property bill that was about $58,000 that in that e-mail we saw today he said he wasn't disputing that.

THE COURT: I see. All right. Let me hear from this side. Mr. Pepe or Mr. Green?

MR. PEPE: May Mr. Case take this?

THE COURT: Sure.

MR. CASE: So the affirmative -- advice of counsel was not pleaded as an affirmative defense.

THE COURT: I think that's pretty much clear.

MR. CASE: And so I think what I've heard is that the -- there haven't been facts in evidence gone into the record to establish that it could go to the state of mind for

not paying the --

THE COURT: Well, not yet. But that doesn't mean they wouldn't be able to try to do that through Mr. Rogovin. I sustained the objection earlier; but, I mean, why can't they try to put that in through either Mr. Rogovin or Mr. Leventhal or as being part of the basis for the decision not to pay, as I take it, it's the unrelated -- the non-Kentucky litigation bills?

MR. CASE: So there were questions asked at depositions about the advice of counsel.

THE COURT: Okay.

MR. CASE: And they were shut down repeatedly as privileged. And the witnesses wouldn't answer, wouldn't provide the information about what was told to Mr. Tinley. And the, um, the elements of the advice of counsel defense requires a full and fair disclosure.

THE COURT: True. Again, I don't think there's any dispute about that. I also don't think there's any dispute about the fact the defense hasn't been pled.

MR. RESSER: Your Honor?

THE COURT: Let me just finish. But I take it that the depositions in question were being defended by Mr. Tinley when he was alive.

MR. CASE: I believe that's correct.

THE COURT: Of course it makes sense that he would

726

assert a privilege objection at the time, I suppose.

So, Mr. Resser, let me hear from you about that.

MR. RESSER: I --

THE COURT: Let me just finish. As I understand it, the issue being raised is really one of fairness or disclosure, which is, "Look, this is effectively being sprung on us because when we asked at depositions" -- I certainly understand how the circumstances have changed. But, nonetheless, what do I do with the fact that they were blocked from, at least as Mr. Case tells me, from getting into that information in discovery? What do I do with that?

MR. RESSER: My understanding was that Mr. Leventhal was asked about it, and he was allowed to answer. But I'll need to double-check that.

THE COURT: All right. Maybe someone can send us the relevant pages from the relevant depositions this evening so that we can see that.

MR. CASE: We can, Your Honor. And our point is that you can't use the privilege as a shield --

THE COURT: Yup. I got your point.

MR. CASE: -- and then show up in court and use it as a sword.

THE COURT: Yes, I got that.

MR. RESSER: I do not disagree with what was just said. And if, in fact, there was a privilege and a prevention

of testifying about that, we stand corrected.

THE COURT:  Okay.

MR. RESSER:  But I was under the impression that it was gone into in Mr. Leventhal's deposition.

THE COURT:  Let's find out the answer to that.  If you can send us the transcripts -- I don't want the whole transcripts, just the relevant pages whenever you can.

MR. RESSER:  Got it.

MR. HEAVEY:  There's one other thing, Your Honor.

MR. RESSER:  Oh, yeah.  Mr. Heavey offered Exhibit 590, but I'm not sure we offered it for admission.  We did show it to the jury.  I'm assuming it's on your list of admitted exhibits, but I just want to be sure.  590.

THE COURT:  Give me one second.

Yes, that can be admitted as a full exhibit.  I'll let Ms. Johnson know.  DX 590 is full.

(Defendant's Exhibit 590, received in evidence.)

THE COURT:  All right.  Thank you.  We'll be in recess.

(Proceedings concluded at 3:38 p.m.)

# I N D E X

**WITNESS NAME**                                                           **Page**

Jacqueline Bosma

   Direct By Mr. Green ......................................... 492

   Cross By Mr. Heavey ........................................ 516

   Redirect By Mr. Green ...................................... 577

   Redirect By Mr. Heavey..................................... 585

Jarrow Rogovin

   Direct By Mr. Heavey ....................................... 597

   Cross By Mr. Pepe.......................................... 659

C E R T I F I C A T E


MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)


I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937