UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

        No. 3:19-CV-1124 (MPS)

McCARTER & ENGLISH, LLP

        JULY 11, 2023

vs.

        8:55 A.M.

JARROW FORMULAS, INC.

        JURY TRIAL

- - - - - - - - - - - - - - - - x

Volume V, pages 730 - 928

450 Main Street
Hartford, Connecticut

BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
            One State Street, 14th Floor
            Hartford, Connecticut 06103
      BY:  LOUIS R. PEPE, ESQUIRE
          JAMES G. GREEN, JR., ESQUIRE
          JAMES A. BUDINETZ, ESQUIRE
          DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

        BARTON LLP
            100 Wilshire Boulevard, Suite 1300
            Santa Monica, California 90401
      BY:  BERNARD M. RESSER, ESQUIRE

        BARTON LLP
            711 Third Avenue, 14th Floor
            New York, New York 10017
      BY:  JAMES E. HEAVEY, ESQUIRE
      BY:  MICHAEL C. WARD, ESQUIRE

(Call to Order, 8:49 A.M.)

THE COURT: All right. So with regard to the advice of counsel issue, I did receive the deposition experts' excerpts that I requested. So thank you for that. Let me actually just pull them up here.

Right. So let me just clarify a couple of things first. Mr. Pepe -- or Mr. Case is it? Okay. So your side is not claiming, then, that the failure to pay the invoices unrelated to the Kentucky litigation was willful and malicious?

MR. CASE: I think that's a part of the claim but a small part of the claim.

THE COURT: Well, wait a minute. So, so I had the impression from something you said yesterday, or filing your e-mail I guess, that the claim of willful and malicious breach, the claim for punitive damages being sought only relates to the alleged breach of the agreement to pay fees for the Kentucky litigation and not for the 60 grand or so in unrelated IP invoices.

Now, am I wrong to think that? It's a clear question. It's really a yes-or-no question.

MR. CASE: I believe -- I believe the reneging on the promise to pay that 57,000 is part of the bad faith.

THE COURT: Okay. Well, if that's the case then, I don't really see why they -- Mr. Rogovin can't simply say, "Well," just like he said in the deposition, "I relied on

advice of counsel."

And then you didn't get the substance of that advice, but so what? As a practical matter, it's not an advice of counsel defense. We discussed that yesterday. It's simply something that goes to his -- whether he acted willfully and maliciously. He may have done it for a thousand reasons. He may have done it because he woke up on the wrong side of the bed that day. He may have done it for lots of reasons. All of them are relevant; right? Because the issue raised by a willful and malicious claim is, what's his motive?

If he says, "One reason is because I got some advice, can't tell you what it was, but I got some advice from a guy that's a lawyer," what's wrong with that? Why isn't that something he should be allowed to put out to the jury?

MR. CASE: Perhaps with an instruction to the jury that it's limited to that 57,000 because, if it's not, then the advice of counsel isn't relevant to the breach that occurred in June of 2019. By their own claim, the advice was given to Mr. Tinley months later. And so if -- if the --

THE COURT: Right.

MR. CASE: -- if the claim is that it goes to his state of mind on why he reneged on the promise to pay the 57,000 and it's limited to that, perhaps the jury gets an instruction that to the extent they're claiming advice of counsel, it relates only to that very small piece.

THE COURT: Okay. What's your response to that?

MR. RESSER: Your Honor, again it goes to his state of mind in continuing not to pay the full amount.

THE COURT: Well, but the jury's heard when he made the decision. You know, most people, when they start litigation, don't just pay bills all of a sudden. So I don't really want to get into, well, he didn't pay -- you know, he hasn't paid today.

So the jury's heard when he made the decision. The issue is -- I mean my understanding is the claim of willful and malicious breach with respect to the Kentucky litigation is based on the butt call. That's my understanding. I don't think it was based --

MR. RESSER: But as I said, they're also seeking interest for four more years. And the -- Mr. Rogovin had his own opinions and feelings about how he was represented. Mr. Tinley's advice confirmed those concerns and, therefore, confirmed his earlier decision. And it wasn't months. It was within a short time after they sued, less than a month after the trial, after the verdict. They sued July 22nd. The verdict was June 26. And they went to see Mr. Tinley in, I believe, August.

THE COURT: So it's not relevant to the willful and malicious issue. It's relevant to wrongful retention? In the case of the Kentucky litigation?

MR. RESSER: I think it's -- I don't understand what you mean by "wrongful retention." Of the money?

THE COURT: Yes, the basis for prejudgment interest.

MR. RESSER: Yes, but it's also relevant to his reasons for continuing not to pay. It solidified his own personal impression that something had gone wrong at the trial.

THE COURT: What's your response to that, Mr. Case?

MR. CASE: The only -- the only possible relationship that state of mind has is to the malicious breach. There's no authority that there's a state of mind element to statutory interest. And so --

THE COURT: Well, but isn't it -- isn't the standard whether, under all the circumstances, it's unjust to retain the money and, well, if a lawyer advises you that, "No, no, you have a solid basis to retain this money," why then isn't that something the jury could consider as to whether it's unjust?

MR. CASE: Well, I think this goes back -- our position on this is really twofold. If it's being offered as an affirmative defense, it hasn't been --

THE COURT: So let me be very clear. It's not because you've told me it's not pled. I haven't checked the answer. I assume it's not been pled; is that correct?

MR. RESSER: Correct, Your Honor, but the cases we cited --

THE COURT: Yes, I'm aware.

MR. CASE: And so the extent --

THE COURT: It hasn't been pled. Basically I have discretion at that point. So the issue is, it's not pled, so I'm not instructing the jury on the advice of counsel defense here. That's what it means that it's not an affirmative defense as a practical matter. I'm not going to give an instruction they have asserted an advice of counsel defense, these are the elements of -- I'm not doing that.

The issue is, under a general denial of, "No, I did not act willfully and maliciously, these are the reasons I acted," why can't one of those reasons be, you know, I got some advice?

MR. CASE: Well, the primary purpose of the pleading is to put the plaintiff on notice of which issues are going to be tried.

THE COURT: That's true. But once you plead that there's a willful and malicious breach, you're putting out there that the motive is X. And he's saying it's not X, and he's also saying it's Y, Z, C, and D. And he doesn't have to tell you that, does he? Because he's just denying that it's X, and part of the denial is, no, it was these other reasons.

MR. CASE: Well, I think he would have to tell us if those questions are asked at a deposition. And when the basis for his refusing to pay, the decision that was made in June of 2019, when there were questions put to him about that, both the

general counsel of JFI and Mr. Rogovin himself relied on the privilege to block the inquiry into that.

THE COURT: I mean, he said that they didn't pay on the advice of counsel, and they then said, "Well, I can't get into the details of that advice because it's privileged."

And I guess your position is, it's not enough for them to say that it's on advice of counsel as a reason they didn't pay. They have to tell us what counsel told them about that. That's your view?

MR. CASE: Yes, and that answer that Your Honor's referring to was limited to the $57,000, not the initial breach. And there has been no claim made until now that it relates to the prejudgment interest, the wrongful detention of money. There's been nothing pleaded that the advice of counsel is a defense to the statutory interests claim, nor was that identified during discovery.

The only --

THE COURT: Well, did they have to though? I mean, again, I guess it will be your burden to show to the jury there was somehow a wrongful retention, that it was unjust under all the circumstances for them to retain the money. And do they have to tell you why they think in the pleadings or in a deposition -- I didn't see that question asked in a deposition. You know, why do you think you could retain the money? I didn't see that question asked.

And do they have to tell you otherwise that, Well, we didn't -- we retained the money. By the way, we retained the money because we got some advice from a lawyer.

MR. CASE: Your Honor, I do believe a question was asked about why Mr. Rogovin wasn't paying the disbursements. And his response was, "I can't tell you. It's privileged."

And Attorney Tinley objected and said, "He doesn't have to answer that. It's privileged."

THE COURT: All right. So, Mr. Resser, what do I do with that then?

MR. RESSER: Your Honor, the only questions that were objected to on the basis of privilege were with respect to communications with a Mr. Schiller, a separate lawyer for Mr. Tinley. They never followed up on the questions with respect to Mr. Tinley's advice. There were no questions on it, and there was no instruction on it.

The portion that we sent to Your Honor where the privilege was asserted had to do with a consultation with a Los Angeles-based lawyer named Mr. Schiller.

THE COURT: Right. But there was some other -- in the ones that -- hold on a second. Let me just get that.

MR. CASE: Your Honor, I was referring to page 317 of Mr. Rogovin's --

THE COURT: Hold on. And that's something you submitted; right? 317?

Okay, here we go.

MR. RESSER: I don't believe that was submitted last night, Your Honor.

THE COURT: Yes, I've got it here, so it was submitted. I wouldn't have it otherwise. Page 317, 318, whoever is questioning Mr. Rogovin. I assume it was Mr. Pepe. I was going to ask a question and then go back to that, but that's okay I'll do it your way, etc.

MR. CASE: My apologies. It was page 89 of Mr. Rogovin's deposition.

THE COURT: Well, actually, there's something here as far as can I see.

It says: Who told you that the fees you are incurring in the post-verdict motions would be offsets to McCarter's bills?

Objection.

The witness should not disclose any communications with counsel.

You answer that, My attorney has asserted attorney-client privilege. I can't reveal attorney-client discussions.

That seems to -- is that what you were getting at?

MR. CASE: And there's an additional one at page 89 too.

THE COURT: Let me look at that too.

Okay. So I just want to get this straight. You haven't paid the disbursements, etc.

First of all, I don't have the billing in front of me. I understand that the summary ... and the summary's part --

Well, then you get a summary answer, respectfully, as part of the dispute. Upon instruction of counsel, it was not paid, and the rest is attorney-client privilege.

That's what you were getting at there?

MR. CASE: It is, Your Honor.

THE COURT: All right, Mr. Resser, what's your response to that?

MR. RESSER: I believe Mr. Rogovin went ahead and answered the question. "You know, on those bills, I don't know what was in them. I don't know if the work was necessary" and so on.

THE COURT: But he's asking about disbursements here though. So the work isn't the issue; right?

MR. RESSER: That's what it appears in context, yes.

THE COURT: Well, wait a minute. I thought the question was about disbursements. I just want to get this straight.

You haven't paid the disbursements that McCarter & English paid out of pocket for you because your attorneys instructed you not to.

I object to form, etc.

Well, then you get a summary answer. Instruction of counsel -- upon instruction of counsel, I was not paid -- it was not paid, and the rest is attorney-client privilege. There are thousands of dollars paid by McCarter & English to your local counsel, Joel Beres, who now works for you in this litigation. Why would you not reimburse McCarter & English for the thousands they paid to him?

You know, as to those bills I don't know what was in them. I don't know if the work was necessary. It was not work -- I see. It was not work that was directly authorized by me. At this point this is my lawyer's work to examine those questions.

Okay. So he answers that question, but he doesn't assert the privilege, or the advice of counsel, so he can't assert advice of counsel as to that. So how does that help you here? How does that help you, Mr. Resser? Because it does appear that he's -- on the other part, he's's sort of blocking the inquiry by citing the privilege. And here he doesn't invoke the privilege, but he also doesn't invoke the advice of counsel. So how does he get to invoke advice of counsel now as to why he didn't pay the disbursements?

In other words, he gave an answer. And now he's going to give another one? Is that what you're suggesting, a different one?

MR. RESSER: If there wasn't a follow-up question, "Is

there any other reason?" yes.

THE COURT: And so what exactly would you propose by way of testimony? He didn't -- he didn't pay because of advice of counsel, but we can't tell you more than that, Ladies and Gentlemen? Is that the theory?

Can't tell you what the advice was. He didn't pay because he got some advice. That's going to be the testimony --

MR. RESSER: I'm not --

THE COURT: -- to the jury?

MR. RESSER: I think he should be able to tell what the advice of counsel was.

THE COURT: No, no, he can't do that because he didn't do that in his depositions. That's a sword and shield right there. Can't do that.

MR. RESSER: He wasn't asked.

THE COURT: Oh, but he -- no, but Mr. Tinley asserted the privilege -- I mean, really, it's not reasonable to suggest that a lawyer, when somebody's asserting a privilege in a deposition, that the lawyer -- and Mr. Tinley did that six ways to Sunday, that the lawyer should somehow say, Yeah, but, nonetheless, I still want to get at this.

No.

MR. RESSER: On page 78, beginning at line 9 --

THE COURT: All right. Let me find it. This is in

your submission, I assume.

MR. RESSER: Yes, Your Honor.

THE COURT: Okay. This is Mr. Rogovin; right?

MR. RESSER: Right.

THE COURT: 78, line 9?

MR. RESSER: Line 9 through 16, and there's no follow-up after that.

THE COURT: All right. Hold on.

But doesn't this relate to the other bills?

MR. RESSER: This says, "You're not going to pay the Caudill Seed bills." It's the entire bills.

THE COURT: Let me go back.

MR. RESSER: Disbursements, fees, everything, line 13, because of the malpractice.

THE COURT: Right. And he says on advice of counsel. But elsewhere in the deposition I see where Mr. Tinley instructs him not to answer as to what the advice was. So the lawyer's supposed to pursue it at this time thinking Mr. Tinley -- oh, Mr. Tinley this time is going to let him answer?

MR. RESSER: Again --

THE COURT: Am I hallucinating or did I not see several times in the deposition that Mr. Tinley instructed him not to answer on the basis of privilege? You're right, I don't see it on this page. I agree with you. But didn't he instruct him elsewhere when they were getting at essentially the same

744

topic and Mr. Tinley instructed him not to answer, or am I wrong?

MR. RESSER: As I understand it, this testimony here concerned the entire bill, the fees and the disbursements, everything. The question with respect to those disbursements, yes, there was an objection.

THE COURT: Right. But -- okay. Am I right that elsewhere -- I thought I read -- I thought I read excerpts, Mr. Case. Am I right about this?

MR. CASE: I believe you are.

THE COURT: Can you point out to me why I'm right or if I'm right? Because I thought I read -- it was late at night. I thought I read excerpts where Mr. Tinley instructed him not to answer when we got into, "I didn't pay on the advice of counsel." And then, "No, you can't go any further."

MR. RESSER: That's the same one with the answer.

MR. CASE: Those were the two examples for Mr. Rogovin that Your Honor was looking at this morning, one at 317 and one at 89. There are also examples -- and Mr. Rogovin's deposition was subsequent --

THE COURT: Do you want to find me one that deals with the Caudill Seed bill, the Kentucky litigation bill?

MR. CASE: The -- what I was going to say, Your Honor, is that it was subsequent to Mr. Leventhal's deposition. And at Mr. Leventhal's deposition, when the inquiry was made into

why Mr. Rogovin made the decision in June 2019 on behalf of the company, Mr. Leventhal said that it was privileged.

THE COURT: Was the privilege ever asserted with respect to that question in Mr. Rogovin's deposition?

MR. CASE: If it was, Your Honor, I would be unable to point you to it at the moment.

THE COURT: All right. So then what do you say then in response to Mr. Resser's point with regard to that testimony? What page was it, Mr. Resser?

MR. RESSER: 78, lines 9 through 16, no follow-up.

THE COURT: So the question is:

Here you are on July 22nd. It's three weeks after, more than three weeks after the verdict, almost four weeks, and you've concluded you're not going to pay the Caudill Seed bill -- bills because of the malpractice committed by McCarter according to you; correct?

On advice of counsel.

Question: Wait a minute. No, I haven't come to that part yet. You've already testified you decided the night of June 26 that you weren't going to pay the McCarter bills because of your belief that they committed malpractice. You remember that testimony, don't you?

Answer: Well, the context of June 26 was the trial bills. I didn't have in mind the IP bills.

I understand that, sir.

See, this is why, Mr. Resser, I thought this related -- that question related to the IP bills, or at least that was the way I understood the lead-up and the follow-up. But I agree with you that's not the way the question is phrased.

MR. RESSER: Mr. Pepe chose not to follow up on the broader answer, just on the IP bills.

MR. CASE: Your Honor, if I could --

THE COURT: One second.

(Pause.)

THE COURT: Well, but, Mr. Resser, how could he have relied on advice of counsel back in June?

MR. RESSER: Pardon?

THE COURT: How could he have relied on the advice of counsel back in June?

MR. RESSER: He isn't saying that.

THE COURT: Okay.

MR. RESSER: And the part about the IP bills actually starts on the prior page at 77, line 15.

THE COURT: Right. I see that.

MR. RESSER: And then he's asked: In fact, there are unrelated, outstanding e-mails -- this is beginning on line 24 of 77.

In fact, there are unrelated, outstanding e-mails due and owing to McCarter that had nothing to do with the Caudill

Seed; correct?

Yes.

Okay, and those invoices totaled 57,243; correct?

Correct.

And you said they would be paid within a month, but they never were; correct?

Answer: On advice of counsel.

Then is the follow-up question regarding all of the bills, and Mr. Rogovin then says again, in his answer, "On advice of counsel." There is then no follow-up on that answer and no instruction.

THE COURT: Mr. Case?

MR. CASE: So, Your Honor, I found on page 318 of Mr. Rogovin's deposition -- that was one of the excerpts we sent last night -- Mr. Pepe was asking, "Who told you that the fees you are incurring in the post-verdict motions would be offset by the McCarter bills?"

THE COURT: Wait one second, please. 318? Mr. Rogovin's deposition, page 318; right?

Right, okay. That's what I thought. That's what I thought.

So, Mr. Resser, that's what I was thinking of. Mr. Tinley does assert the privilege there. That does relate to the Kentucky litigation. There's an instruction. So what do I do about that?

MR. RESSER: It seems to me, Your Honor, that there was a waiver. By allowing the witness to answer the advice of counsel question in the first place, that Mr. Tinley then maybe blew hot and cold on that, was an opportunity, I think, for McCarter to claim that there had been a waiver and seek those answers through a meet-and-confer and, if necessary, a motion to compel.

THE COURT: No. Sorry. I think the earlier testimony you're referring to -- you make -- you've gone over the transcripts carefully, and that's good lawyering. But I found that testimony to be a little confusing because they're going back and forth between the two different types of bills. I agree with you, if you read that question in isolation, it supports your point.

But as I said, my impression was, when I read this last night, and I think this excerpt that Mr. Case just pointed me to, page 317 to 318, confirms it. There's an instruction not to answer. So, as you know, when there's an instruction not to answer, that's it.

Now, you're right. Could you pursue it? But -- because the witness says the words "on advice of counsel" once and there's no follow up? No. I don't agree with that. I wouldn't find a waiver if those papers were submitted to me.

So the privilege is important. It's not so easily waived. So I'm not going to let him testify, then, with regard

to advice of counsel as to the Kentucky litigation as to why he didn't pay the bill in the Kentucky litigation.

It also, candidly, doesn't fit with the evidence. He testified that he made the decision not to pay with regard to the Kentucky litigation the night of the verdict. He hadn't consulted any lawyers.

MR. RESSER: Undisputed. But, again, this reaffirmed his personal beliefs with the advice of an attorney, saying, yes, there was malpractice.

THE COURT: Right. But as I said --

MR. RESSER: I understand the Court's ruling.

THE COURT: Okay. Very well. All right, so that's that.

But I think that there is a basis to allow him to testify -- well, let's talk about that though.

With regard to the other bills. So he clearly says, "I did it on advice of counsel." Now I'm talking about those 60,000.

MR. RESSER: Right.

THE COURT: Clearly says that. But does he ever -- is he ever asked what the advice of counsel was? And is he permitted to answer that question?

MR. RESSER: Not that I'm aware of. He wasn't asked, and so --

THE COURT: He wasn't asked?

MR. RESSER: I don't -- I don't believe so.

THE COURT: Mr. Case?

MR. CASE: So I don't -- I can't point Your Honor to a point in the transcript where he's asked about specifically the 57,000. But the passage we just looked at at 317, 318, broadly includes a set-off of all outstanding amounts, again, supposedly --

THE COURT: No, that was concerning the post-verdict motions.

MR. CASE: That's -- the claim there was that Mr. Rogovin is saying, The money I'm expending on post-verdict motions in Kentucky I should be able to offset with the outstanding amounts to McCarter. That is not broken down between the 57,000 and the larger amount.

THE COURT: Say that again. Sorry.

MR. CASE: What's going on at page 317 and 318 is that Mr. Rogovin is claiming that the attorney's fees he's expending post verdict in Kentucky should be offset by the outstanding amounts to McCarter. And he's asked why -- and he's asked --

THE COURT: He doesn't say that much, does he? Did he go that far?

MR. CASE: "Who told you that the fees you are incurring in the post-verdict motions would be offsets to the McCarter bills?"

He's being asked a question about --

THE COURT: Right. But, at the end of the day, that's asking about the fees and the post-verdict motions; right?

MR. CASE: No. He's being -- he's suggesting that the outstanding amounts to McCarter should be used to offset any further fees that he has in Kentucky post verdict. And he's not distinguishing there between the 57,000 outstanding on the IP bills and the much larger amount.

THE COURT: Well, but he's asked about the fees related to the -- incurring in the post-verdict motions. So I don't think I agree with you on that.

The one thing is I am a little concerned about, getting back to the issue of the defense, I mean, for me to allow him to testify at length about what Mr. Tinley told him now, how is that different at the end of the day from asserting an advice of counsel defense? I'm talking, of course, with regard to the 60,000.

MR. RESSER: Right. Your Honor is -- what's happened in this trial is that the jury has heard that on July 22nd, and seen the e-mail, Mr. Rogovin said, "I'm disputing the Caudill Seed bill, but I'm going to pay the almost $60,000 IP bill."

THE COURT: That's true.

MR. RESSER: And then at his deposition he was asked, "Why did you change your mind about what you said on July 22nd?" And he said, "Advice of counsel." No follow-up question. No instruction.

THE COURT: So why shouldn't I limit him to that answer?

MR. RESSER: I think that's the result of the Court's ruling, or tentative ruling.

With respect to affirmative defense and instructing the jury, the *Lomas* case, which is cited on page 13 of our trial brief, in that case the defendant requested to amend its special defenses to include the advice of counsel. The trial court denied that request but allowed the defendant to present evidence if they acted on the advice of counsel. The trial court, quote, instructed the jury that they could consider such evidence with regard to the jury's work in determining the state of mind of the defendant insofar as it related to the conduct and the elements of the claims they would be deciding.

THE COURT: Yes. And, I mean, that's exactly the basis on which I would be doing it here. But the -- in other words, what I'm getting at is it goes to -- it goes to willful and malicious breach. That case is asserted that the failure to pay the 60,000 is willful and malicious. So I agree with you. They can consider it.

But why shouldn't I limit him to the answer of "I relied on advice of counsel" and then basically require it to be left at that, without getting into the substance of the advice?

MR. RESSER: I don't have a problem with that. But

where I differ with Your Honor is that it is appropriate to give the jury an instruction on that.

THE COURT: Well, we haven't hit the jury instructions yet, so we can cross that bridge when we come to it.

Mr. Case, I'll give you the last word.

MR. CASE: Yeah. If the Court is inclined to allow the witness to testify that it was advice of counsel related to just that 57,000 piece, we would respectfully request an instruction to the jury that it's limited to that portion of the breach only and not -- doesn't apply to the much larger --

THE COURT: I would give that instruction.

MR. CASE: Thank you.

THE COURT: Okay. All right. Let's bring the jury in.

MR. PEPE: Your Honor, I do have another issue during the recess, if I may. Your Honor's already called the jury.

THE COURT: We'll do it during recess.

(The jury entered the courtroom at 9:22 a.m.)

THE COURT: Ladies and Gentlemen, I apologize for the delay. We were doing well. Three out of four days we started right on time, but we're about 23 minutes late today. My apologies.

All right. So, Mr. Pepe, whenever you're ready to continue with the witness, who remains under oath.

MR. PEPE: Thank you, Your Honor.

J A R R O W   R O G O V I N,

resumed the stand and testified under oath as follows:

CONTINUED CROSS-EXAMINATION

BY MR. PEPE:

Q   Good morning, Mr. Rogovin.

A   Good morning.

Q   When we adjourned yesterday, you were testifying with respect to an e-mail you wrote in January of 2018, just about a year and a half before the trial started.  That was PTX 306.

MR. PEPE:  Can we have that called up, please?

Q   (By Mr. Pepe) And this is the --

THE COURT:  Did you say 306?

MR. PEPE:  306.  I'm sorry, 306.

Q   (By Mr. Pepe) This is the e-mail in which you told Mr. Giarratana and his team that they were terrific.  "Aren't you terrific?  Sure you're terrific.  They must be terrified with how terrific you are."

Remember that?  It's in -- Mr. Wyzik can highlight that last sentence.

A   Yes.

Q   All right.  Those are the same lawyers that, on the night of the verdict, you concluded had committed malpractice.  True?

A   I'm sorry.  Repeat the question.

Q   Yes.  Those lawyers you are advising in January of 2018, "Aren't you terrific?  Sure, you're terrific.  They must be

terrified with how terrific you are," those are the same lawyers you concluded the night of the verdict had committed malpractice. True?

A   Yes.

Q   You were present for the opening statement to the jury in the trial in Kentucky in June; correct?

A   Yes.

Q   You heard Mr. Rechen make that opening statement; correct?

A   Yes.

Q   After that opening statement, you went to him and hugged him and told him he did an outstanding job; correct?

A   That was not all, but yes.

Q   The answer is yes?

A   That was not all, but yes.

Q   And that's the same Mr. Rechen that you concluded the night of the verdict had committed malpractice. True?

A   Yes.

Q   You were there during the cross-examination of Dan Caudill in the Kentucky trial; correct?

A   Yes.

Q   Dan Caudill was the president of Caudill Seed, the company that brought the case against Jarrow Formulas; correct?

A   Yes.

Q   You saw Mr. Rechen. You watched Mr. Rechen conduct that cross-examination of Mr. Caudill, did you not?

A    Yes.

Q    And when it was over, you told Mr. Rechen, in sum and substance, "You, Tom, are a very talented man," did you not?

A    Yes.  That was not all.

Q    I'm sorry?

A    Yes, but that was not all.

Q    And you testified previously that you believe he is a talented man, did you not?

A    Yes.

Q    That's the same Tom Rechen who the night of the verdict you concluded had committed malpractice.  True?

A    Yes.

Q    You were there present in the Kentucky trial when Mr. Giarratana, your lawyer and friend of 23 years, argued the motion for judgment as a matter of law, sometimes referred to as JMOL, judgment matter of law; correct?

A    Yes.

Q    And when the end of that argument came, you went up to him, and you complimented him on the quality of his argument; correct?

A    I don't remember.

Q    You don't remember?

A    No.

        MR. PEPE:  Can we have Mr. Rogovin's PJR testimony of October 11, 2019.  PJR testimony October 11, 2019, at page 78.

If we can blow up the top question and answer, please, Mr. Wyzik, if you could call that out.

Q   (By Mr. Pepe) "Question:  And when Mr. Giarratana, your lawyer and friend of 23 years, argued the motion for judgment as a matter of law, you complimented him on the argument he made; true?

"Answer:  Yes."

That was your testimony under oath in the PJR proceedings in October of 2019; correct?

A   Yes.

Q   During the course of the trial itself, you from time to time sent e-mails to your friends, your staff members back in Los Angeles, and to the trial team itself commenting on the status of the trial; correct?

A   Yes.

MR. PEPE:  Can we have, Mr. Wyzik, please, PTX 087.

THE COURT:  Is that in, Mr. Pepe?  Is that in evidence?

MR. PEPE:  I apologize, Your Honor.  It's not in, but there's no objection.  May it be admitted as a full exhibit, and may I publish it?

THE COURT:  Yes, you may and yes, it may.

(Plaintiff's Exhibit 87, received in evidence.)

MR. PEPE:  Mr. Wyzik, please, PTX 087.

Q   (By Mr. Pepe) I'm going to give you a chance to look at

this, sir. You recognize this, and I'm going to ask Mr. Wyzik to blow up the part in the middle that starts with your e-mail on Monday, June 10.

And that's your e-mail to many, many, many people back at Jarrow Formulas in Los Angeles; correct?

A   Yes.

Q   And on June 10 we're one week into the trial, which started on June 3, 2019; correct?

A   I'm sorry. Repeat that.

Q   Yes. That's June 10. We're one week into the Kentucky trial, which started on June 3; correct?

A   Yes.

Q   Now, we ask Mr. Wyzik to go down and call out, if he would, please, the first paragraph that begins, "All in all," the first sentence there, the first two lines, if that's easier.

You state in that e-mail to your staff back at Los Angeles, quote, All in all, the trial is going in our favor. The judge, though, is very bad. He has committed serious reversible error several times if we lose, which I don't think we will, end quote.

That is what you reported to your staff one week into the trial; correct?

A   Yes.

Q   After watching McCarter & English represent you for one week; correct?

A    Yes.

Q    If we could drop down to the last sentence that begins "Fortunately."

A    Yes.

Q    It says, quote, Fortunately, they keep underestimating me -- and our lawyers and jury consultants, end quote.

That's what you wrote to your staff; correct?

A    Yes.

Q    Those are the same lawyers that you accused of malpractice after the verdict came in in the Kentucky trial; correct?

A    Yes.

Q    Now, if we could go to PTX 263, please, which is in evidence, Your Honor.

This is another one of your e-mails, is it not, dated June 18?

I'll ask Mr. Wyzik to call out that top part that shows the sender and the date.

Do you see that?

A    Yes.

Q    Here we are now June 18th.  We're almost two weeks into the trial; correct?

A    Yes.

Q    And you write this to the trial team, Mr. Giarratana, Mr. Grondahl, to your lawyer Jonathan Leventhal; correct?

A    Yes.

Q    And to the jury consultants at Dancel; correct?

A    Yes.

Q    And I'll ask Mr. Wyzik to call out the paragraph that begins with "In contrast to Caudill's."  That entire paragraph if you would, please.

You state to the trial team and to your own general counsel, Mr. Leventhal:  Quote, "In contrast to Caudill's numerous gangsters of character assassins, McCarter & English has been scholarly and, with collaborative feedback but also periodic swift kicks from me, usually pretty thorough."

Referring to McCarter & English; correct?

A    Yes.

Q    It goes on to say, "Tom's trial work" -- that's Tom Rechen again, is it not?

A    Yes.

Q    You say, "Tom's trial work deserves to be a made-for-TV movie.  He became courthouse buzz with law interns coming in to watch him operate without anesthesia," end quote.

I'll stop there.  In fact, that's true.  Courthouse staff came in to watch Mr. Rechen cross-examine some of the witnesses.  True?

A    Yes.

Q    That's the same Tom Rechen that you decided, after the verdict came in, had committed malpractice.  True?

A    Yes.

MR. PEPE: Your Honor, PTX 090 is not yet a full exhibit. I would move it as a full exhibit. There is no objection.

THE COURT: All right. 90 can be marked as a full exhibit, and it can be published.

MR. PEPE: Thank you.

(Plaintiff's Exhibit 90, received in evidence.)

Q   (By Mr. Pepe) This is an e-mail now June 18th, the same -- the same date as the previous ones. So, again, we're about two weeks into the trial; correct?

A   Yes.

Q   And this is to Helmut Essl, who is a friend and business colleague; correct?

A   Yes.

Q   And so you are reporting to your friend and business colleague on June 18th. And I'll ask Mr. Wyzik to blow up the first "Dear Helmut" and the line below that, please, call out.

You say, "Dear Helmut, thank you. We are winning so don't worry about that, but it's been terribly hard."

That's what you reported to Mr. Essl in June 18th, that we were winning; correct?

A   Yes.

MR. PEPE: Right now, Your Honor, I'm going to move the admission of PTX 091. There is no objection.

THE COURT: All right. That will be full. 91 is

full.

MR. PEPE:  Thank you, Your Honor.

(Plaintiff's Exhibit 91, received in evidence.)

Q   (By Mr. Pepe) Directing your attention to an e-mail the next day, June 19th of 2019, from you to Mr. DuBose.  Do you see that?

A   Yes.

Q   All right.  I'm going to ask Mr. Wyzik to blow up the first sentence where it says "Subject" and the next caption blow up.

Mr. DuBose is your vice president -- was your vice president of sales at the time; correct?

A   Yes.

Q   You report to your vice president of sales about the trial, and you say:  Quote, A good day in court today.  It only went 3 hours because the judge had a personal appointment but they got their butts kicked pretty hard today and one of the other lawyers is alienating the jury, end quote.

You're referring to the Caudill team and the Caudill lawyers when you say "they got their butts kicked pretty hard today"; correct?

A   Yes.

Q   And then you go on to say, "Recovered from yesterday's problems"; correct?

A   Yes.

Q   Now I'd ask Mr. Wyzik to blow up or call out the two

paragraphs below that begins with "I think."

You report to your vice president of sales on June 19, 2019, "I think we're winning"; correct?

A    Yes.

Q    McCarter you thought was winning at that time on your behalf; correct?

A    Yes.

Q    Same McCarter lawyers that you concluded at the night of the verdict had committed malpractice; correct?

A    Yes.

MR. PEPE:  Your Honor, I would next move as a full exhibit PTX 092.  There is no objection.

THE COURT:  All right.  That's full.  92 is full.

(Plaintiff's Exhibit 92, received in evidence.)

Q    (By Mr. Pepe) We have here, sir, a transcription of your voicemail left for Mr. Giarratana on June 21, 2019.  So this is the weekend before the trial ended and you went back to Los Angeles for the weekend.

Do you remember that?

A    Um --

Q    You state in the first sentence, "Hi, I just wanted to let you know that it was fantastic getting home, slept well, everyone here glad to see me, who did see me."

So you had gone back to Los Angeles; correct?

Question withdrawn.  That's okay, Mr. Rogovin.

So here's your voicemail left for Mr. Giarratana on June twenty --

THE COURT:  Wait one second.

THE WITNESS:  I'm not understanding.

THE COURT:  Wait a minute, sir.  He hasn't finished his question.

Go ahead, Mr. Pepe.

Q   (By Mr. Pepe) Here's your voicemail left for Mr. Giarratana on June 21, would be five days before the verdict -- correct? -- on June 26?

A   Okay.  I'm sorry.  I completely misunderstood.  I've seen the September 3 date, so that's the date of the memorandum.  That just completely threw me.

Q   I'm sorry.  I should have made that clear.  I apologize, sir.  The September 3, 2019, date is the date it was printed.  I am very sorry.

The date of the voicemail is below that, June 21.  Do you see that?

A   Yes.

Q   Okay.  I apologize for the confusion.  So now we know we're talking about June 21, 2019, five days before the verdict came back; correct?

A   I'm reading it.

Q   I'm sorry?

A   I'm reading it.

Q    Okay.  Of course.

A    Yes.

Q    Okay.  And the voicemail message from Mr. Giarratana, if Mr. Wyzik could call out the last sentence beginning with "Anyway"; correct?

A    Yes.

Q    You state, "Anyway, you guys are doing a fantastic job. Thank you.  Big hugs.  Bye."

     Those "guys" are the McCarter lawyers; correct?

A    Yes.

Q    And those are the same McCarter lawyers you concluded five days later on the night of the verdict had committed malpractice; correct?

A    Yes.

     MR. PEPE:  May I move, Your Honor, for full -- as a full exhibit PTX 093 to which there is no objection?

     THE COURT:  Yes.  That will be full.

     (Plaintiff's Exhibit 93, received in evidence.)

Q    (By Mr. Pepe) We have here, sir, another one of your e-mails.  This one -- I'd ask Mr. Wyzik to blow up the heading there so we can see the date.  This is Tuesday, June 25, 2019, the day before the verdict; correct?

A    Yes.

Q    And you're reporting to Rory Lipsky, your president of JII; correct?

A    Yes.

Q    And then there's other people there, including your banker; correct?

A    Yes.

Q    And including Ben Khowong, your CFO; correct?

A    Yes.

Q    And you report to Eva, your assistant; correct?

A    Yes.

Q    And here is what you say about the trial the day before the verdict.  Quote -- Mr. Wyzik, can you call up those first two lines?  Call it all out, please, sir.

You state, quote, "Evidentiary phase ended today."

That means the evidence was all in and the case is about to go to the jury, as you understood it; correct?

A    Yes.

Q    "The judge is pretty bad but our lawyers are totally dominating the courtroom," end quote.

That's what you said; correct?

A    Yes.

Q    Those are the same lawyers, one day later, after the verdict came in, you concluded had committed malpractice; correct?

A    Yes.

Q    Now, sir, as we looked at all these reports you made to the trial team, to your staff back in Los Angeles, to your friend

and colleague Mr. Essl, we look at those and your comments on the performance with McCarter, and then we look at the inadvertent dial, inadvertently dialed phone call that Mr. Giarratana's phone picked up in which you conclude that McCarter committed malpractice, they can pay the damages, and that you decided then you would fire them but did not tell them, the only thing that changed between those e-mails we just looked at, in which you evaluated their performance and put praise on them, and your condemnation of them the night of the verdict is the verdict came in.  That's the only thing that changed; correct?

A   No, it's not correct.

Q   Okay.  We have here on Tuesday, June 25, you're saying "our lawyers are totally dominating the courtroom"; correct?

A   Yes.

Q   And then the next day, the verdict came in.  And that's when you decided they committed malpractice; correct?

A   Yes.

Q   All right.  And that's because the verdict that was returned on Thursday -- excuse me -- on Wednesday afternoon, the verdict finding that JFI had stolen trade secrets from Caudill Seed and had done so willfully and maliciously, is the verdict you could not accept; correct?  Yes or no?

A   Phrased that way, correct.

Q   You could not accept it, and so you blame McCarter;

correct?

A    Correct.

Q    The testimony is you decided that night to fire, that night of June 26, to fire McCarter, but you did not tell the McCarter team.  You did, however, have your lawyer, in-house lawyer Jonathan Leventhal, request information from them, did you not?

A    No.

Q    Okay.  Let's take a look at PTX 131, which is already in evidence, Your Honor.

          THE COURT:  Okay.

Q    (By Mr. Pepe) You've seen this before, have you not?  This is the e-mail from Mr. Leventhal to Mr. Giarratana the next day, June 27.

A    Yes.

Q    And he says, "Hi Mark, I just landed at lax," L-A-X.  That's the Los Angeles Airport; correct?

A    Yes.

Q    He says, "Please send me ASAP the time line of key filing deadlines.  Also, your analysis that we discussed about for an appeal," end quote.

          You've seen that before, and that's what Mr. Leventhal requested; correct?

A    Yes.

Q    All right.  And then you note that, in fact, Mr. Giarratana complied with that request and provided what Mr. Leventhal

asked for; correct?

A    Yes.

Q    If we look at Defendant's Exhibit 714, which is in evidence, Your Honor, 714.

THE COURT:  Sure.

Q    (By Mr. Pepe) And if I could ask, this would be Saturday, June 29th.  So the verdict was Wednesday, June 26.  On Thursday, Friday, Saturday --

THE COURT:  Mr. Pepe, you're sure this is already admitted?

MR. PEPE:  I thought it was, Your Honor.

MR. RESSER:  Yes, it is.

THE COURT:  All right.  Fair enough.

Q    (By Mr. Pepe) This is Mr. Giarratana's e-mail back to Mr. Leventhal on that Saturday and to you.  It was actually addressed to both of you.

And he says, Quote, Dear Jarrow and Jonathan:  As discussed with Jonathan, attached is a preliminary draft of the brief in support of the motion for JMOL.  In sum, if we can knock out trade secret 1, we can set aside the jury verdict. Trade secret 1 is the only trade secret with respect to which the jury awarded damages.  The jury has found zero damages for any other misappropriated trade secret.  In addition, the jury found willful and malicious misappropriation only with respect to trade secret 1, end quote.

So you knew that Saturday that Mr. Giarratana had prepared a draft brief to set aside the verdict; correct?

A   No.

Q   Okay.  This e-mail is to you, is it not, sir?

A   Yes.

Q   Okay.  Are you saying you didn't read it?

A   Correct.

Q   Okay.  I see.  So your testimony is that this e-mail, which is response to Mr. Leventhal's request, came to you and Mr. Leventhal, but you did not read it.

A   Correct.

Q   Okay.  But we know now from the e-mail that it was sent to you and to Mr. Leventhal; correct?

A   Yes.

Q   Okay.  And at this time you still had not told McCarter & English that they were fired, did you?

A   Not directly.  Indirectly.

MR. PEPE:  And if we could have PTX 135, please.  Already in evidence, Your Honor.

THE COURT:  Okay.

MR. PEPE:  PTX 135.  You can blow up the top part so we can see that, the "From" and the "To."

Q   (By Mr. Pepe) So here we have an e-mail on July 8.  So that would be one week after Mr. Giarratana's e-mail from Mr. Rechen to you; correct?

A    Yes.

Q    To Mr. Leventhal; correct?

A    Yes.

Q    And Eva, your assistant; correct?

A    Yes.

Q    And to the members of the trial team and Joel Beres, the local attorney; correct?

A    Yes.

Q    And he says, quote, "Jarrow and Jonathan, Here is an analysis" -- if we could have that first sentence highlighted. "Here is an analysis of relevant timelines/deadlines related to post trial motions, including motions to stay execution and for a supersedeas bond," end quote.

So you know on July 8th that Mr. Rechen has set forth all the timelines that have to be satisfied in order to preserve your rights for an appeal and to set aside the verdict; correct?

A    Yes.

Q    Did you read this when you received it?

A    Um, on or about.

Q    Okay.  So you know then on July 8th that Mr. Rechen has sent you his work product.  You didn't tell McCarter that they had been fired, did you?

A    Not directly.

Q    What you did do, what you did do before telling McCarter

that they were fired is to hire away part of the trial team, did you not?

A    No.

Q    Your answer is no, sir?  Is that your answer?

A    Well, define "part of the trial team."

Q    We have Demonstrative No. 3 put up, please.  And I'd ask it to go to the second page.  It would be page 4 of the demonstrative.

THE COURT:  We've seen this already, I take it?

MR. PEPE:  Yeah.  This has already been used, Your Honor.

THE COURT:  Okay.

Q    (By Mr. Pepe) We have here the demonstrative, the organizational chart or the illustration of the Kentucky trial team.  You saw that earlier in this trial.  Remember that, Mr. Rogovin?

A    Yes.

Q    All right.  And so we have the McCarter & English team.  We have Mr. Rechen, Mr. Giarratana, and Mr. Grondahl and John Cordani.  He was an associate at McCarter & English; correct?

A    Yes.

Q    And during the trial -- excuse me.  Question withdrawn.

He was present at least during the first half of the trial; correct?

A    Not that much.  He quit cold and without notice, and I

wasn't told for a day or two after he'd quit that he'd even quit.

Q   All right.  So Mr. Cordani left the firm of McCarter & English, joined another law firm, while the trial was in progress; correct?

A   Yes, because he had some personal conflict with one of the named parties in the case.  Didn't like him.

Q   And then Mr. Beres, to the right of that, under the heading "Stites & Harbison" -- that was Mr. Beres' law firm; correct?

A   Yes.

Q   And he was the local counsel involved throughout much of the pretrial litigation and the trial itself; correct?

A   Yes.

Q   And so while Mr. Leventhal was requesting the information from McCarter & English that we just saw in that earlier e-mail the day -- the next day when he landed at LAX, while he was sending an e-mail requesting McCarter & English to do some work, you were negotiating with Joel Beres, the local counsel, to take over the case after you would notify McCarter that they were fired; correct?

A   Yes.

Q   And you did that negotiation before you told McCarter that they were fired; correct?

A   That I don't remember, but probably so.

Q   Probably so?

A    It would make sense.  As far as being part of the trial team goes, he said, "They don't let me talk.  I'm a potted plant."

Q    All right, Mr. Rogovin, so let's get this established.  We can go to your deposition testimony if we have to.

But before you told McCarter that they were fired and while McCarter was responding to Mr. Leventhal's request for information, you were negotiating with Joel Beres to take over the case in the post-verdict proceedings.  True?

A    Yes.

Q    Again, before you -- before you told McCarter they were fired, you reached out and negotiated with John Cordani to come to work on the case also; correct?

A    Um, well, I didn't, but yes.

Q    Mr. Leventhal --

A    My company did, yes.

Q    Mr. Leventhal did so at your request; correct?

A    Um, Mr. Leventhal suggested Mr. Cordani to me.

Q    And then you authorized him to negotiate with Mr. Cordani to come back and help in the post-verdict proceedings; correct?

A    Yes.

Q    And that was before you told McCarter they were fired.

A    Yes.

Q    It was only after you had McCarter's work product, as we've just looked at, and after you had hired away members of their

trial team, then and only then did you notify them they had been terminated; correct?

A   Um, in terms of timeline, yes.  Not what's implied.

Q   Okay.  So if we could have PTX 099, which is already in evidence, Your Honor.

THE COURT:  Okay.

Q   (By Mr. Pepe) And before we go to that, there was one last point.

When you hired Mr. Beres to take over the case in the pre -- post-verdict proceedings, you hired him at an hourly rate higher than Mr. Giarratana's.  True?

A   Yes.

Q   You hired him at an hourly rate of $545 per hour.  True?

A   Yes.  I didn't handle those talks.

MR. PEPE:  Now, I'm sorry, Mr. Wyzik, can we go back to PTX 099?

Q   (By Mr. Pepe) 099 is the July 12 letter from Carol Brophy to Mark Giarratana.  Do you see that, sir?

A   Yes.

Q   Carol Brophy was one of your other lawyers from the Steptoe & Johnson law firm; correct?

A   Correct.

Q   So you had Ms. Brophy send a notice of termination letter to Mr. Giarratana; correct?

A   Correct.

Q    But not until July 12; correct?

A    That's when she did the letter.

Q    And in that letter, you had her advise McCarter & English that, effective immediately, JFI hereby terminates McCarter & English's representation of Jarrow Formulas, Inc., its subsidiaries and related companies.  True?

A    Yes.

Q    And then you instructed or you had Ms. Brophy instruct Mr. Giarratana to transfer all the files to her firm or to Mr. Beres' firm; correct?

A    Yes.

Q    And then if we go to the last page and the last paragraph, you say, quote, "Finally, JFI hereby instructs McCarter & English, and its attorneys, to cease all attempts at communication with any officer, employee or Jarrow Formulas, Inc., its subsidiaries and related companies."

     That was your instruction to Ms. Brophy to pass on to Mr. Giarratana; correct?

A    Yes, and we paid all costs of the transfers.

Q    I'm sorry?

A    And we paid all costs of the transfers.  It is five figures.

Q    Mr. Giarratana took the position that any termination would have to come from Jarrow Formulas, signed by a duly authorized representative of Jarrow Formulas, not from another lawyer;

correct?

A    I don't remember.

Q    All right.  Let's take a look at PTX 100.

            MR. PEPE:  It's already a full exhibit, Your Honor.

            THE COURT:  All right.

Q    (By Mr. Pepe) Here we have Mr. Giarratana's letter, July 17, back to Ms. Brophy.  And I'll ask Mr. Wyzik to call out the second and third paragraphs, if he would, beginning with "Although."

            Mr. Giarratana makes clear that he did not get the letter until July 15, and then he goes on to say, quote, "Our firm requires that the client, Jarrow Formulas, confirm in a writing signed by a duly authorized representative of Jarrow Formulas that it authorizes our firm to transfer its files as directed by your letter, that it is terminating our attorney-client relationship, and that we should file motions to withdraw as counsel."

            When you received that letter, then you told Mr. Leventhal, as the duly authorized representative, to confirm the termination, did you not?

A    Um, I'd have to see it.

Q    Sure.  May we have PTX 101, which is a full exhibit, Your Honor.

            THE COURT:  All right.

Q    (By Mr. Pepe) So on July 18th Mr. Leventhal writes back to

Mr. Giarratana.  And if I could ask Mr. Wyzik to call out that first paragraph beginning, "The letter."

He provides that confirmation that McCarter is fired; correct?

A    Yes.

Q    And he further confirms that they are -- McCarter's instructed to transfer all the files either to the Steptoe & Johnson firm or to Joel Beres' firm; correct?

A    Correct.  Ms. Brophy then --

THE COURT:  Sir, sir, don't add to your answer, please.

Go ahead, Mr. Pepe.

Q    (By Mr. Pepe) Then and only then did you yourself communicate to the McCarter team that had represented you in this matter and to Mr. Giarratana, who had represented you for 23 years; correct?

A    Yes.

MR. PEPE:  And we see that communication in PTX 103, Your Honor.  I believe this is in evidence.  It's a full exhibit.

THE COURT:  Okay.  Fine.

Q    (By Mr. Pepe) And this is now Monday, July 22, so almost a month after the verdict, which was June 26.

And you write to Mr. Giarratana, Mr. Grondahl, and Mr. Rechen.  And you say in the first paragraph, if Mr. Wyzik can

call that out, quote:  "Jarrow Formulas considers the miscellaneous IP bills" -- that would be the outstanding bills due and owing for legal matters unrelated to Caudill Seed; correct?

A    Yes.

Q    Which totaled at that time approximately $57,000; correct?

A    Yes.

Q    Jarrow Formulas considers the miscellaneous IP bills to be separate from the billings related to Caudill Seed and its inexcusably disastrous outcome.  The miscellaneous IP bills will be paid within a month.

That's what you stated in that letter; correct?

A    Yes.

Q    But then you reneged and never paid those bills; correct?

A    Yes.

Q    And that was the last communication you had with your counselor and friend of 23 years; correct?

A    Yes.

Q    Yesterday in your direct testimony, Mr. Seavey -- Mr. Heavey -- I'm sorry.

MR. HEAVEY:  That's quite all right.

MR. PEPE:  I apologize.

MR. HEAVEY:  That's quite all right, Mr. Pepe.

Q    (By Mr. Pepe) -- testified if McCarter had done what you wanted them to do with respect to the so-called R&D expenses

claimed by Caudill, the case would have been settled the first six months; correct?

A    Yes.

Q    You remember that.

A    Yes.

Q    In fact, sir, you gave very clear instructions to your counsel, McCarter & English, throughout this litigation regarding your settlement position, did you not?

A    No.

Q    Never did that.

A    You said "throughout," so I'm saying no, not --

Q    I'll rephrase it.  I'll rephrase it.

A    Okay.  Please do.

Q    You repeatedly advised and instructed McCarter & English on your settlement position in this case during the course of litigation; correct?

A    Yes.

Q    And that settlement position was you won't pay a dime; correct?

A    Yes.

Q    In fact, not only would you not pay a dime, you wanted to win and recover your attorney's fees from Caudill; correct?

A    Yes.

Q    And the only way under the trade secret laws, as you understood it, to do that was to win and show that the trade

secret claim brought by Caudill was wrongful or without basis; correct?

A   Yes, an exceptional case.

Q   So-called exceptional case; correct?

A   Yes.

Q   And you gave that instruction not only orally at various times in the litigation but in writing also; correct?

A   Yes.

Q   Let's look at some examples of that.

MR. PEPE:  I do not believe PTX is yet a full exhibit, so I would move it, its admission as a full exhibit, PTX 142, Your Honor.  I believe there's no objection.

THE COURT:  That's correct.  That will be full.  PTX 142 is full.

MR. PEPE:  May I publish it, Your Honor?

THE COURT:  Yes, you may.

(Plaintiff's Exhibit 142, received in evidence.)

MR. PEPE:  I need 142.  Thank you so much.  And can we call out the top part so we can see from, to whom, and the date.

Q   (By Mr. Pepe) Here we have your e-mail to Ben -- to several people in your company:  Mr. Khowong, Mr. DuBose, Mr. Lipsky and others and also to Mr. Giarratana, your counselor. Correct?

A   Yes.

Q   And this is August 24, 2016, so we're approximately three and a half years into the litigation, which started in January 2013; correct?

A   Yes.

Q   Okay.  And the first paragraph, if we can call that out.

A   Sorry.  Which paragraph?

Q   First paragraph.  It begins, "You can read."

It states, "You can read the index to Leslie West's expert supplemental report."

Mr. West was the expert on trade secrets or on these claimed trade secrets, the science behind the claimed trade secrets that Caudill said had been misappropriated; correct?

A   Yes.

Q   He was JFI's expert.

A   Yes.

Q   And you say, "You can read the index to Leslie West's supplemental report and get the gist of how bad their case and how stupid Judge Simpson is."

And then you -- if we could go down to the second from the bottom paragraph, it begins "Unlikely," and call that out.

You state, quote, Unlikely with this judge, but I want to try to have a finding that this is an exceptional case and we can get our attorney fees, end quote.

That's exactly what you said a moment ago, that if you prevail and show it was an exceptional case, then you can

recover your attorney's fees; correct?

A   Yes.

Q   But first you have to go through the trial, get a verdict, and then demonstrate that it falls in the category of an exceptional case; correct?

A   Yes.

MR. PEPE:  If we can take a look at another example, PTX 145, which is a full exhibit, Your Honor.

THE COURT:  Okay.

MR. PEPE:  And we can call out the top part.

Q   (By Mr. Pepe) You see that's -- now we're in November 26 of 2018, which is about seven months before the trial starts; correct?

A   Yes.

Q   All right.  And you write to Mr. Giarratana, Mr. Grondahl, and Mr. Rechen?

MR. PEPE:  And if I can ask Mr. Wyzik to call out that first paragraph, No. 1.

Q   (By Mr. Pepe) You say, "November 30 - Settlement conference," referring to a settlement conference the court had scheduled; correct?

A   Yes.

Q   You say "pimp deadbrain."  That's the judge, is it not?

A   Yes.

Q   "With his whoring for them," meaning whoring for Caudill

Seed?

A    Um-hmm, yes.

Q    "Including holding over my head sanctions for the counterclaim, and incredibly mindless comments and rulings has made any sort of settlement attempt pointless.  Caudill quite rightly sees huge numbers.  This can be explained in any manner that gets the point across but Simpson has made any such attempt pointless."

Then you go on to say, further:  "I would pay that piece of" expletive "a dime," meaning I would not pay that piece of expletive a dime; correct?

A    Correct.

Q    You go on to say, "The only thing I'd agree to is a walk away, that I won't go after him for fees, but I think he feels immune and would have no doubt that even after a verdict for JFI, that piece of crap" -- meaning Mr. Caudill or Caudill Seed; correct?

A    Yes.

Q    -- "would order JFI to pay for the counterclaim."

That was your position on settlement; correct?

A    Yes.

Q    And at the bottom of that paragraph you state -- if we can highlight that beginning with "But."

A    Yes.

Q    "But because I am so seething with rage that there is no

way I'll do anything except a walk away or take this to trial.

Simpson" -- that's the judge; correct?

A   Yes.

Q   -- "can drop dead.  Please!"

That's what you told your attorneys concerning settlement six months before trial; correct?

A   Yes.

Q   Do you have a recollection, sir, of a conversation with Attorney Rechen at or about this time, November of 2018, about six months before the trial, in which he reported to you a conversation he had with Caudill Seed's lawyer regarding possible settlement?

A   No.

Q   Okay.  No recollection that Mr. Rechen reported to you after a conversation with the attorney for Caudill Seed?  His name was Attorney Ben Lewis; correct?

A   One of them, yes.

Q   And no recollection of Mr. Rechen reporting to you after an attorney -- after a conversation with Attorney Ben Lewis that there might be an attorney to settle this case before the trial started?

A   No clear memory.

Q   No clear memory or no memory at all?

A   Well, hearing this, I'm trying to think could this be, you know -- I don't want to have a false memory.

Q    Of course not.  And if you don't remember, I'll move on.

A    It seems possible.

Q    It's possible?

A    Was there a number put on it?

Q    Well, that's why I'm trying to explore your memory, sir.

A    Yeah.

Q    So by pinpointing the time as best I could, right about this time November of 2018 after Mr. Rechen had gone down to watch a trial in Judge Simpson's courtroom --

A    Yes.

Q    -- had a conversation with Ben Lewis and then came back and reported to you that conversation concerned settlement.  Does that refresh your recollection?

A    I can't be certain.

Q    Okay.  All right.  Remember yesterday on your direct examination you testified that one of the failures of McCarter & English with respect to the R&D, expenses claimed by Caudill, was their failure to take the deposition of Dan Caudill himself.  Do you remember that?

A    Yes.

Q    Dan Caudill again is the principal or owner of Caudill Seed, the company that brought the suit; correct?

A    Yes.

Q    And you testified that they failed to take the deposition of Dan Caudill during the course of that Kentucky litigation;

correct?

A   Yes.

Q   Okay.  That's not true, is it, sir?

A   I'm pretty certain that Dan Caudill's deposition was not taken during Caudill Seed versus Jarrow Formulas.

Q   It would have been important to take it because he's the principal of the company; correct?

A   Correct.

Q   You told the jury yesterday they failed to do that.

A   That's my -- that's my memory.  That's what I've been told by my lawyers.

Q   In fact, they did take the deposition of Dan Caudill, one of the first depositions taken in the case; correct?

A   In the Caudill Seed Jarrow case?

Q   In the case -- in the case known as Caudill Seed and Warehouse, plaintiff, versus Jarrow Formulas, Inc., United States District Court for the Western District of Kentucky, this Kentucky litigation.

A   That's news to me.

Q   I'm sorry?

A   That's actually news to me.  I was aware of it being taken on different issues in the Kean Ashurst case.

Q   I'm talking now about -- I'm talking about the federal court litigation, Caudill Seed versus Jarrow Formulas.  You testified yesterday on direct they did not take the deposition

of Dan Caudill himself.  That's not true, is it?

A    From what you say, no.

MR. PEPE:  All right.  Your Honor, I'm going to move as a full exhibit an excerpt from the deposition of Dan Caudill in the Kentucky litigation.  I am saying "excerpt" because I do not believe the deposition is subject to the sealing orders, but there may be testimony in the deposition itself that might be subject to a sealing order, and I don't want to raise that issue.  So I am offering -- and I am going to hand counsel a copy, if I may.

THE COURT:  You may.  Okay, while he's doing that, folks, just remember the only reason I'm allowing this testimony, the only purpose for which you should consider this evidence about whether Mr. Caudill was deposed, etc., is to assess Mr. Rogovin's state of mind, the company's thinking at the time they instructed that the bills not be paid.  That's the only purpose for which you may consider this testimony, this evidence.

All right.  Mr. Pepe.

MR. PEPE:  And the offer, so the record's clear, Your Honor, is just page 1, 2, and 3.

THE COURT:  Is there an exhibit number I could look at?

MR. PEPE:  Well, it would be, if it's admitted, Your Honor, PTX 168.

THE COURT:  Okay.  Is there going to be objection to PTX 168?

MR. HEAVEY:  No objection, Your Honor.

THE COURT:  All right.  PTX 168 may be marked as a full exhibit and may be published.

MR. PEPE:  Thank you, Your Honor.  And just for the record so this issue doesn't come up with respect to the sealing order, it's only page 1, 2, 3, which is the cover page and the index, page 4 the appearances.  Page 5 is simply the introduction of counsel and the witness.

THE COURT:  Does it say on the cover page "Deposition of Dan Caudill"?

MR. PEPE:  That's it.

THE COURT:  All right.  Well, do you want to show the jury that?  You can if you want.

MR. PEPE:  May I show that?

THE COURT:  Go ahead.

(Plaintiff's Exhibit 168, received in evidence.)

MR. PEPE:  I'm sorry, Mr. Wyzik.  May I approach the witness?

THE COURT:  You may.  You may approach the witness.

Q   (By Mr. Pepe) I've handed you what we've marked now PTX 168, and you can see now from the cover page that is the deposition of Dan Caudill in the Kentucky federal court litigation.  True?

A    Yes.

Q    January 21, 2014, about a year after the suit was started; correct?

A    Yes.

Q    And it was taken by the defendant, Jarrow Formulas; correct?

A    Yes.

Q    And if you go to page 5 of that exhibit, you have Mr. Giarratana saying to Mr. Caudill, "Good morning, Mr. Caudill. Could you please state and spell your name for the record"; right?

A    Yes.

Q    So there's no question in your mind that, in fact, Mr. Giarratana did take the deposition of Dan Caudill in the Kentucky federal court litigation; correct?

A    Yes.

Q    Do you wish to correct your testimony in that regard?

A    Yes.

Q    Yesterday you testified on direct examination one of the reasons -- one of the reasons affecting your state of mind about not paying the bills was that McCarter didn't put in your response -- excuse me.  I'm sorry -- didn't put in your response to the Tom O'Brien letter, and that Tom O'Brien, I think you said, was one of the early attorneys representing Caudill Seed; correct?

A    Yes.

Q    And you said -- and I'm reading now from the uncertified transcript at page 163, line 9:

"McCarter English didn't put in my response written to Tom O'Brien 21 days after O'Brien had written me.

"Question:  And you thought that was a critical piece of evidence that he put in the underlying matter?

"Answer:  Yes.

"Question:  Why?

"Among other things, the letter said that I had no intention of taking anything from Caudill Seed, and if he would give me some guidance on what I should stay away from, we would."

By the time you got Attorney Pence's letter, you had already taken material from Caudill Seed; correct?

A    Yes.

Q    Material that Caudill Seed claimed was confidential and proprietary; correct?

A    Yes.

Q    Material that Caudill Seed claimed contained information, claimed contained information, relating to their broccoli-based food supplement; correct?

A    Yes.

Q    Which Caudill Seed claimed was a trade secret?

A    Yes.

Q   And you had already taken that by receiving information from Kean Ashurst, who was employed by Caudill Seed when he sent you the information; correct?

A   Yes.

Q   And he sent it to you secretly from his own personal home address; correct?  E-mail address; correct?

A   Yes.

Q   And one of those documents he sent to you is PTX 575?

        MR. PEPE:  I believe that's a full exhibit, Your Honor.

        THE COURT:  I'm sorry.  What was the number again?

        MR. PEPE:  PTX 575.

        THE COURT:  Thank you.

        MR. PEPE:  We can call that up, sir.

        MR. BUDINETZ:  It's a sealed document.

        THE COURT:  Just one second, Mr. Pepe.

        THE CLERK:  Can you see it?

        THE COURT:  Can you see it, Mr. Pepe?  I think the witness can see it now.

        MR. PEPE:  I have it, Your Honor.

        THE COURT:  All right.  We're all set.

        MR. PEPE:  Thank you.  I should have made that clear.

        THE COURT:  That's all right.

Q   (By Mr. Pepe) PTX 575 is one of the e-mails he sent to you containing what Caudill claimed was proprietary confidential

information; correct?

A   Yes.  Hold on a second.

Q   Yup.  Of course.

A   No, not at all.  I mean according to the attachment, that's a scientific publication.

Q   I'm sorry.  I can't hear.

A   That's a scientific publication.

Q   Yeah.  But I'm not -- I'm not suggesting it -- that it meets the definition of a trade secret.  It's what Caudill claimed was proprietary and confidential; correct?

A   Yes.

Q   Not that it met the trade secret.  I'm not trying that case.  Okay.  So and all my questions would mean what Caudill claimed.  I'm not asking you for a moment to admit that they were trade secrets, because you hotly contested that issue -- correct? -- in the Kentucky litigation.

A   Yes.

MR. PEPE:  Okay.  The next one is also subject to the sealing order, Your Honor, but it's a full exhibit.

THE COURT:  All right.  So same procedure.

And what's the number again?

MR. PEPE:  PTX 438.

THE COURT:  438?  Okay.  I think we've got that.  Thank you.

Q   (By Mr. Pepe) And this is another -- the last one we saw

was May 1.  That's the date that you retained him, you

officially retained Kean Ashurst as your consultant, May 1,

2016; correct?

A    Yes.

Q    This is May 16.  So now he's your consultant.  And he sends

an e-mail on May 16 to Dallas Clouatre.  Did I mispronounce

that name?  C-L-O-U-A-T-R-E, Dallas Clouatre?

A    Clouatre.

Q    That was one of your consultants.

A    Yes.

Q    And he sends this on May 16, and he sends the timeline

relating to the production of the broccoli-based food

supplement; correct?

A    Yes.

         MR. PEPE:  And then the next one, Your Honor, is a

sealed document also or subject to the sealing order.

         THE COURT:  What's the number?

         MR. PEPE:  Full exhibit PTX 148.

         THE COURT:  All right.  We'll follow the same

procedure then.  Just one second.  Okay.

Q    (By Mr. Pepe) And this one here we are on April 10.  So

this is -- this is about three weeks before he's even employed

by you, he's still an employee of Caudill Seed; correct?

A    Yes.

Q    And he sends you information there, a provisional patent

that Caudill Seed had; correct?

A    Yes.

Q    Which you came to learn is considered confidential --
correct? -- while it's a provisional patent?

A    Yes.

Q    And he says in there:  Quote, "The attached information
reflects the court case between BPP and Caudill and the new
license agreement.  Eva, Jarrow may want these printed out
also.  Please consult with him.  The next e-mail will contain
confident information as well."  Correct?

A    Correct.

          MR. PEPE:  Yeah.  And then this next exhibit is
subject to the sealing order, Your Honor, but there's -- it's
not a full exhibit yet, but there's no objection.

          THE COURT:  And which number is that?

          MR. PEPE:  PTX 424.

          THE COURT:  Okay.  So as long as there's no objection,
then that can be admitted as a full exhibit and we'll follow
the same procedure.  424; correct?

          MR. PEPE:  424, Your Honor.

     (Plaintiff's Exhibit 424, received in evidence.)

Q    (By Mr. Pepe) And we see here, Mr. Rogovin, yet another
e-mail from Kean Ashurst to you on May 1, the day he becomes
your consultant, and he's submitting the customer list from
Caudill Seed; correct?

A    Yes.

Q    And he says he's doing it pursuant to your request; correct?

A    Yes.

Q    And you know that customer lists in the industry typically are considered trade secrets; correct?

A    Sometimes; sometimes not.

Q    And there's about approximately, approximately, ten more of these transmittals by Kean Ashurst to you or your staff or your consultant also considered confidential and proprietary by Caudill Seed which we have not yet moved into evidence; correct?  About ten more you recall?

A    I don't know how many, but I'll take your word for it, yes.

Q    And it's the transmittal of these documents by Kean Ashurst that you characterized later on in the litigation, after you were sued, after Jarrow Formulas was sued by Caudill, that's what you characterized as the, quote, horrible narrative, end quote; correct?

A    Yes.

Q    You testified that not watching him or stopping him was the worst mistake of your life.  Do you remember that?

A    Yes.

Q    You testified yesterday about the R&D expenses being claimed by Caudill Seed were grossly overstated and McCarter

should have done more to demonstrate that to the jury, words to that effect; correct?

A   Yes.

Q   More particularly, reading from the uncertified transcript of yesterday's testimony at page 137, question by counsel, your counsel:

"What effect did your concerns about R&D have with your decision not to pay the outstanding invoices with McCarter & English?

"Answer:  They didn't do their job.

"Question:  And how so?

"Answer:  Because if they had gotten down to the bottom of R&D to begin with, that case would have been settled the first six months and I wouldn't be sitting here ten years later.

"Question:  And why do you believe that with respect to R&D?

"Answer:  Because it was de minimis," meaning minimal; correct?

A   Yes.

Q   "De minimis compared to what was claimed.  $9.75 million claimed to the jury."

You answered, "Because it was de minimis compared to what was claimed."  It goes on to say, quote, It couldn't have been more than a quarter of a million dollars, end quote.

Do you remember that?

A    Yes.

Q    You told the jury that yesterday it couldn't have been more than a quarter of a million dollars.  You had in mind Kean Ashurst's computation of the R&D expenses actually incurred by Caudill; correct?

A    That and my at that point 35 years of experience.

Q    Kean Ashurst is the one who came up with the 200,000, $250,000, and that's what you had in mind there; correct?

A    Yes.  Mr. Ashurst ran the program.

Q    And you wanted your attorneys McCarter & English to use Kean Ashurst's computation to show that the real R&D expenses incurred by Caudill could not be more than $250,000.

          THE COURT:  Wait.  Wait.  Can I see counsel for a minute?

     (At sidebar off the record.)

          THE COURT:  All right, Mr. Pepe's going to ask another question.

          MR. PEPE:  If I may have a moment, Your Honor.

          THE COURT:  Sure.

     (Pause.)

          MR. PEPE:  That's all I have with this witness, Your Honor.

          THE COURT:  All right.  Very well.  Mr. Heavey.

          MR. HEAVEY:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. HEAVEY:

Q   Good morning, Mr. Rogovin.

THE COURT:  Can we take that down?

Q   (By Mr. Heavey) Morning, Mr. Rogovin.

A   Morning, Mr. Heavey.

Q   I'd like to direct you back to your testimony from yesterday regarding your review of the bills in my redirect here.

A   Yes.

Q   I believe your testimony was that you received multiple bills and multiple cases from McCarter & English and your other legal counsel back in 2013 that you reviewed.

A   Yes.

Q   At some point with respect to McCarter & English's bills, you testified that you had received the McCarter & English bills in a consolidated format; correct?

A   Yes.

Q   And I'd like to direct your attention to Plaintiff's Exhibit 706.

THE COURT:  And that's in evidence, Mr. Heavey?

MR. HEAVEY:  That is in evidence.

MR. RESSER:  Defendant's?

MR. HEAVEY:  I'm sorry.  Defendant's Exhibit 706.

THE COURT:  Very well.  That can be put up.

Q    (Mr. Heavey) The first page of that exhibit, Mr. Rogovin --

A    Yes.

Q    -- you'll see that there are multiple matter numbers assigned to the first page; correct?

A    Yes, multiple matters.

Q    And under the matter number and names, how many matters were consolidated into this billing, this billing invoice?

A    Four.

Q    And if you travel -- if you -- sorry.

     With respect to this 706, do you know when this bill was issued?

A    Um, June 19, 2013.

Q    And this is the same year as your litigation in the underlying federal matter here?

A    No.

Q    This is during -- I'm sorry.  This is during the same time as the ongoing litigation, litigation meaning it was filed in the Kentucky federal matter against JFI.

A    Correct.

Q    And do you see the JFI matter number on the first page?

A    Yes.

Q    You see the JFI federal matter number on the first page?

A    Um, there's no JFI federal matter on the first page.

Q    I'm sorry.  Your testimony is there is none; correct?

A    There is none, no.

Q   Nonetheless, if you go to page 13 of this bill --

A   Yes, sir.

Q   -- you will see Mr. Giarratana and Mr. Grondahl's hourly rates there?

A   Yes.

Q   And what are those hourly rates as of the June 19, 2013, bill?

A   Six months into the litigation, um, it's 405 an hour.

Q   You would agree with me that the litigation from the federal matter isn't referenced on this bill though; correct?

A   It is not referenced, no.

Q   There is litigation referenced on the first page of this bill though -- correct? -- in 2013?

A   Yes.

Q   And which litigation was that?

A   Um, there were two:  um, Mr. Ashurst's, um, employment claim and the state case of Caudill versus Ashurst.

Q   Nevertheless, in 2013 did you ever look at the page 13 on this matter to determine what the litigation rates were for those individual attorneys at that time?

A   No.

Q   Directing your attention to Plaintiff's Exhibit 710.

        THE COURT:  You mean --

        MR. HEAVEY:  Sorry.  Defendant's Exhibit 710.  I'm so sorry, Your Honor.

THE COURT:  That's okay.  And that's --

MR. HEAVEY:  That is admitted, Your Honor.

THE COURT:  Okay, fine.

Q   (Mr. Heavey) Now, Mr. Rogovin, we just looked at the June 19th, 2013, bill where litigation was -- litigation was referenced on the front page and it was a consolidated bill. Directing your attention to October 15th, 2013, invoice there, is this another example of the type of billing you'd be receiving in 2013 from McCarter & English?

A   Yes.

Q   And how many matters are referenced in this bill?

A   Um, six.

Q   And is there any litigation in any of those matter numbers that's referenced in this bill?

A   No, sir.

Q   And directing your attention to page 15 of this invoice of October 15th, 2013, with respect to Mr. Giarratana's rate, what was -- what was the rate at that time?

A   Ten months into the underlying litigation, the rate for these matters is $405.

Q   And with respect to Mr. Grondahl's?

A   395 an hour.

Q   And at the time that you received this -- and going back to the first page in this invoice, is there any indication that this invoice was paid by you?

A    Um, yes.

Q    And when was it approved for payment?

A    November 25.

Q    At the time of this consolidated billing with multiple matters, did you ever turn to the page where the hourly rates were referenced and determine what the hourly rates of Mr. Giarratana and Mr. Rechen were charging you at that point in 2013?

A    No.

Q    And why not?

A    I trusted my attorneys.

Q    Did there come a time when you directed Mr. Khowong or anyone else from McCarter & English to separate or a request for the separation of the bills from McCarter & English? Withdrawn.  Let me ask that a little more clearer.

        Was there ever a time anyone from Jarrow Formulas requested the Caudill litigation bill to be broken out from the rest of the McCarter & English bills?

A    Yes.

Q    And do you recall when that was?

A    Um, yes.

Q    When was that?

A    That I don't remember.  I don't remember when.  But it was early in the litigation.

Q    And your testimony with respect to identifying --

withdrawn.

You had testimony regarding Mr. Giarratana's statements to you regarding potential rate changes when he went to Cummings & Lockwood. Do you recall that testimony yesterday?

A   Yes.

Q   And with respect to that conversation of a rate change, what do you recall about that conversation?

A   Um, simply that the rates would go up, that he would be at a higher rate when he transferred law firms.

Q   And do you recall if that was at the point that he was joining Cummings & Lockwood or joining McCarter & English?

A   From McCormick, Paulding & Huber to Cummings & Lockwood.

Q   Did those conversations, were they ever reduced to writing in any form regarding the rate changes?

A   Um, there was a letter regarding -- on Cummings & Lockwood that asking me if I -- you know, whether I opted to stay with the attorney. I don't remember what was in the letter specifically about fees.

MR. HEAVEY:  Excuse me one minute.

One minute, Your Honor. I'm looking for an exhibit.

THE COURT:  Sure. Fine. Actually, I tell you what, Mr. Heavey. We're about a minute before our break, so why don't we take the break now.

Ladies and Gentlemen, thank you for your attention

this morning.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  You can go with Ms. Johnson to the jury room.

(The jury left the courtroom at 10:44 a.m.)

THE COURT:  Anything before we recess, Counsel?

MR. PEPE:  Yes.

THE COURT:  Go ahead, Mr. Pepe.  You can speak.

MR. PEPE:  Yes, Your Honor.  I had alerted the Court there's --

THE COURT:  All right.  Everybody else can take their seats.  You can step down, sir.

Go ahead, Mr. Pepe.

MR. PEPE:  So there was a lot of back-and-forth late into the night, Your Honor, very late into the night, about the depositions that are going to be offered perhaps today.  As I understand it, Mr. Leventhal will testify live next, but then there's offer of depositions.

I'm not sure it's completely sorted out.  I would like to address one issue.  My partner, Mr. Budinetz, will address the others.

But the one I would like to address is what appears to be a proffer of the deposition of Joseph Lyons, L-Y-O-N-S.

THE COURT:  Okay.  I don't remember getting designations for somebody named Joseph Lyons.

MR. PEPE:  Well, probably because Mr. Lyons was never

listed as a witness in the JTM or as a witness when Your Honor directed the disclosure of live witnesses to about two weeks ago, ten days ago.  And he wasn't disclosed as a witness because he's not a percipient witness.

He was a witness in the Kentucky litigation.  He was an employee, I believe, of Caudill Seed.  So -- so I don't see the basis for offering a deposition in the Caudill Seed litigation in this case.  And we would object to that in any form, designations or counter-designations or otherwise.

THE COURT:  Mr. Resser.

MR. RESSER:  Mr. Lyons' deposition was listed as Exhibit 677 in defense -- defendant's exhibit list.

THE COURT:  But we don't list depositions as exhibits. I mean you can list it, but that's not what the Court's instructions are.  The Court's instructions are to provide designations and to list witnesses.  He hasn't been listed as a witness, and there's been no designations with regard to him. So I'm not sure why I should let him testify.

MR. RESSER:  Your Honor, it was my understanding that Mr. Tinley made very clear which sections of the deposition in the exhibit list that he intended to present at trial.

THE COURT:  Which number is this?

MR. RESSER:  677.  There was an objection made.

THE COURT:  Rule 30(b)(6) depositions, Depo Exhibit 2, Depo Exhibit 3, Depo Exhibit 4, Depo Exhibit 5.  Talked about

some exhibits, but it doesn't specify any portions of the deposition.

MR. RESSER:  It says "Video of Rule 30(b)(6) deposition."

THE COURT:  Right.

MR. RESSER:  And then on the next page of the exhibit list, in response to the objection that the entire video deposition shouldn't be included, Mr. Tinley then indicated the exact time, time stamp of the --

THE COURT:  Why wasn't that brought to my attention in a timely way?  No one's brought that to my attention until now. I mean --

MR. RESSER:  I had understood it was before the Court in connection with the objection to the exhibit.

THE COURT:  Well, again, there's rules with regard to designating testimony so that the Court can rule on each question.  I didn't get any objections because I didn't get any designations.  He wasn't listed as a witness.

So I don't -- I've never allowed -- I actually don't think I've ever had counsel list a -- or provide a deposition transcript as an exhibit.  I mean, for impeachment, sure, to refresh recollection, but it doesn't have to be listed in either of those cases, yeah.

But there's a procedure for doing this.  I would have ruled on any designations, as I did.  No one said to me:

Judge, you forgot to rule on the Lyons designations.  We talked about this the other day, and you pointed out that you wanted me to rule on Mr. Khowong's -- I'm not sure how to pronounce his name -- designations.  But let me be very clear.  No, I'm not going to allow this.

What else have you got?

MR. PEPE:  Mr. Budinetz.

MR. BUDINETZ:  Yes.  Good morning, Your Honor.  Jim Budinetz.  I think the parties both need clarification with respect to the playing of the excerpts from depositions for after Your Honor's rulings.

THE COURT:  Okay.

MR. BUDINETZ:  That's one area, and I'll just briefly describe that.  And the second area that I'll describe is I think there's a difference of opinion between counsel as to whether the Court's order with respect to identifying witnesses by 5:00 p.m. the evening before who's going to be presented the next day extend to witnesses who will be played by deposition as well.

THE COURT:  Well, why would it matter for deposition witnesses?  I mean the purpose of that practice that I have is so I don't have another lawyer come and say, Judge, I left my cross-examination notes at home.

Why does it matter?

MR. BUDINETZ:  I think it matters because of the first

issue.  And that is if the difference that the parties have with respect to the first issue is whether the party presenting the video in the first instance to the jury has to also present simultaneously the counter-designations as opposed to, "Here are our designations," hard stop.  "Okay, your witness."  And then we come in with counter-designations.

THE COURT:  Well, I think the video should be played in sequence.  So if the counter-designation -- let's say, you know -- let's say JFI designates testimony on page 17, line 1 through 7, and McCarter counter-designates lines 8 through 11.  The jury should -- they should hear 1 through 11 together.  So I don't know if that helps, but that's the way I view it.

MR. BUDINETZ:  It does, Your Honor, because without knowing, last night we didn't learn till 9:30 who they intended to proffer by deposition today.  And we didn't have -- we kind of had just dispersed, and we didn't have the opportunity to say, What are they designating?  And now we have to get our counter-designations ready, just those portions --

THE COURT:  These are counter-designations I've seen and ruled on; is that correct?

MR. BUDINETZ:  Absolutely.  That's not the issue, Your Honor.  It's just they may choose not to put in certain aspects of what the Court has permitted them to put in, and so we have to match up our counter-designations to what they're going to put in if they don't do it.

And then I suppose, separate and apart from that, is if it's a witness that they're going to be putting on and the Court's suggesting that they also present our counter-designations, it may make sense for our designations and their counter-designations to go in at the same time so you have that witness is complete, done, over with, as opposed to --

THE COURT:  I think that's what I just said.  In other words, I mean how is that different from what I just said?

MR. BUDINETZ:  I think it's different only inasmuch as if Attorney Resser wants to put in a witness that we have affirmative designations on, they counter, they have affirmative designations on, we counter, I understand that they want to put in just their affirmative designations and the counter and --

THE COURT:  Yeah, I don't follow you.  Are you saying -- let's say with regard to Mr. Khowong, for example.  I think he's going to testify live, but let's just use him as an example.  Are you saying where both sides have affirmative designations?  That's the issue?

MR. BUDINETZ:  Yes.  That's one of them.

THE COURT:  Obviously, I feel less strongly about that.  I think it makes more sense to have them all at once, to be honest, but if people feel strongly, "No, no, no, that's going to dilute our case," I don't really feel strongly about

that.  I do feel strongly about counter-designations given the purpose of counter-designation, which is completeness.  So that has to be done in sequence.

But I'll be candid with you, all of you.  I think it looks silly for all of you not to present the witnesses together, but that's up to you.  If you folks are like, "No, I want my affirmative designations only and then the other side does affirmative designations," I'm not going to -- I'm not going to get into sort of micromanaging that.  If that's what you want to go ahead and do, go ahead and do it.

MR. BUDINETZ:  We'll confer on that issue.

But the last issue is we learned last night that it appears that Mr. Khowong will be present only by deposition.  We have --

THE COURT:  Oh, so that's changed.  He's not going to come live?

MR. RESSER:  I didn't -- I said that we were leaning towards live.

THE COURT:  Which is it now?  Let's make a decision.  What have we got?

MR. RESSER:  We sent an e-mail last night to counsel that we intend to call Mr. Khowong only by deposition.

THE COURT:  Fine.  What's the issue then?

MR. BUDINETZ:  That if they're going to play and affirmatively present the deposition testimony, then Mr.

Khowong is once and for all will not be here live.

THE COURT:  Yeah.  No, you can't do both.  I made that very clear.

All right.  We'll be in recess.  Thank you.  We'll probably start at 11:05.

(Recess from 10:54 a.m. to 11:05 a.m.)

(The jury entered the courtroom at 11:05 a.m.)

THE COURT:  You can continue whenever you're ready.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) Mr. Rogovin, directing your attention back to Exhibit 706 and 710, which were the two invoices that you just testified to in June and August of 2013, do you recall your testimony on that?

A   Yes.

Q   Do you recall testifying that, notwithstanding that Mr. Giarratana and Mr. Grondahl were at the reduced rates in those invoices, that you did not turn to the last -- to the page where they were reflected to determine what those rates were?

A   Yes.

Q   Now, directing your attention to 2013, yesterday you previously testified that you don't -- that there was no communications regarding that rate increase when Mr. Grondahl's and Mr. Giarratana's rate increased from the rate that you just saw to the increased rates that were billed to liberty insurance.  Do you recall that testimony?

A    Correct.

Q    And in any of invoices where those rates were increased, did you ever turn to the page where the hourly rate for the attorneys were listed and review those rates?

A    No.

Q    And did there come a time at any point in June -- at any point in 2013 that you identified or noticed that change in the rates of Mr. Grondahl and Mr. Giarratana by looking at the bills?

A    No.

Q    Did you identify that rate change in any way during 2013 during the course of the representation of the matters for McCarter & English?

A    No.

Q    Did you ever identify at any point in 2013 that there are any rate differences by any of the attorneys that were representing you from McCarter & English as demonstrated through the invoices?

A    No.

Q    Now, directing your attention to your testimony yesterday, I'd like to walk through some of that regarding your -- the timeline of your decisions to make the payments to McCarter & English in 2019.  Do you have that subject matter in mind?

A    Yes.

Q    And, Mr. Rogovin, what was McCarter -- sorry.  What was

Jarrow Formulas' typical pay period upon receiving an invoice from McCarter & English?

A    At that time net 60.

Q    And when you say "net 60," what does that refer to?

A    Um, the 60 days after the date of invoice, pay the net, the balance on the bill.

MR. HEAVEY:  And I'd like to briefly bring up Demonstrative Exhibit 124, please.  This has been admitted, Your Honor.

THE COURT:  Very well.  That's 124; right?

MR. HEAVEY:  Yes, sir.  I'm sorry, page 125.

Q    (By Mr. Heavey) Now, Mr. Rogovin, we heard testimony from Ms. Bosma and I believe from Mr. Giarratana regarding the demonstrative, Exhibit 124, and more specifically, the PTX numbers and invoices at the bottom of the page starting with reference PTX 001 all the way down to PTX 005 and across, across it.  Thank you.

Now, Mr. Rogovin, you'll see on the right-hand column, with respect to PTX 001 and PTX 002, that that's a column that's identified as "Rogovin invoice handwritten notes."  Do you see that column?

A    Yes.

Q    And what is your understanding with respect to your approval of PTX 001 and PTX 002 as demonstrated in McCarter & English's demonstrative invoice?

A    Well, they were OKed on April 24th, 2019, and May 25, 2019.

Q    Thank you, Mr. Rogovin.  I'd like to direct your attention to Plaintiff's Exhibit 001.

        MR. HEAVEY:  It is admitted, Your Honor.

Q    (By Mr. Heavey) Now, Mr. Rogovin, keeping in your mind your testimony regarding your approval of PTX 001 and PTX 002 from the demonstrative evidence, you see in the upper right-hand corner this invoice is listed as PTX 001; correct?

A    Correct.

Q    And, Mr. Rogovin, can you tell me when that invoice was issued?

A    I'm sorry.

Q    I'll repeat my question.  Can you tell me when that invoice was issued?

A    April 17, 2019.

Q    And do you have any indication as to when the time entries were referenced -- well, let's turn the page.  Can you tell me when that work was performed?

A    March.

Q    And so with respect to the March invoice remitted to you on April 17th of 2019, from the first page can you tell whether or not you approved that invoice?

A    Yes, on April 24.

Q    As demonstrated by the highlighted section on the invoice

here?

A    Yes.

Q    And you would agree with me that that corresponds with the demonstrative evidence stating that you OKed the bill at 4/24/2019?

A    Yes.

Q    And, Mr. Rogovin, after you approved the bill, what occurs with respect to Jarrow Formulas and the payment of it?

A    Um, I gave it to Eva Alejandrino, my secretary at the time, who would then turn it over to Mary Grace Reyes, who would cut the check -- actually, it would go to Ben first, and then it would go to Mary Grace Reyes, Ben Khowong, the CFO, and then to Mary Grace Reyes to cut the check.  And then Mr. Khowong would sign it.

Q    Now, do you have any understanding whether that check that you approved on 4/24/2019 was cut or -- sorry -- was issued -- let me be more specific -- on 4/24 of 2019?

A    Um, no.

Q    When would it typically be cut from McCarter & English or issued to McCarter & English?  I apologize again.

A    It should be net 60.

Q    Directing your attention to Plaintiff's Exhibit 002.  Same line of questioning, Mr. Rogovin.  Do you know when this invoice was issued?

A    Um, May 16, 2019.

Q   And that corresponds with McCarter & English's Demonstrative Exhibit 125?

A   Yes.  It's PTX --

Q   I'm sorry.  PTX 002.  Thank you.  I appreciate that.

And with respect to your approval on 5/25/2019 you see it reflected in the demonstrative highlighted to the left?

A   Yes.

Q   Do you have any indication from this invoice and your notations on it whether the Jarrow Formulas check was remitted to McCarter & English at this time?

A   I'm sorry.  Whether --

Q   Whether the check for this invoice of $375,000 was issued to McCarter & English at this time on 5/25/2019?

A   No.  It was approved on 5/25.

Q   To be issued at a later date?

A   To be issued, yes.

Q   Thank you.  Directing your attention to Plaintiff's Exhibit -- withdrawn.

To the extent that the 60-day -- and I'll get back to that in a minute.  To the extent that the 60-day pay period, your testimony was the approval date wouldn't reflect the date that the check was issued to McCarter & English; correct?

A   Correct.

Q   Was there any other reasons why there would be a delay in any of the issuance of McCarter & English's bills at this point

in 2019?

A    Only cash flow.

Q    When you say "only cash flow," what do you mean by that?

A    Um, the company was having financial distress.

Q    As a result of what?

A    Um, huge litigation bills.

Q    Were there any other issues that were affecting the company's performance in or about April of 2019?

A    Yes.

Q    What was that?

A    Um, third-party contract manufacturers were slow in getting finished product back in to us.

Q    And how does that affect cash flow for Jarrow Formulas?

A    If we didn't have product to sell, we weren't going to be able to sell and bring in revenue.

Q    I want to be clear.  Did you ever have any communications with Mr. Giarratana about the cash flow issues that Jarrow Formulas were involved with in or about April of 2019?

A    Yes.

Q    Directing your attention to Plaintiff's Exhibit 122, which is admitted, Your Honor.

        THE COURT:  Okay.

Q    (Mr. Heavey) Now, we've heard your testimony from Plaintiff's Exhibit 001 and 002 regarding the April and May bills of 2019 and specifically your approval of those bills.

Do you have any indication as to whether or not, from this e-mail, whether or not those invoices were paid?

A    It would indicate it was.

Q    And why would the e-mail from Mary Grace Reyes to Mr. Giarratana indicate that?  What is she referencing?

A    Well, she says, "Yes, that's the address we have for sending out the check.  We will send to Jackie's attention."

Q    And, in fact, was a check remitted to McCarter & English on or about May 31st of 2019?

A    Yes.

Q    Now, I'd like to show you Defendant's Exhibit 551, which has been admitted, Your Honor.

            THE COURT:  I'm sorry.  Say the number again.  551?

            MR. HEAVEY:  551, yes, sir.

            THE COURT:  Okay.  That's fine.

Q    (Mr. Heavey) Now, directing your attention, Mr. Rogovin, to the last page of this document, and Mr. Rogovin, you heard testimony yesterday from Ms. Bosma, the CFO of McCarter & English, regarding the total summary of billing for McCarter & English on this matter?

A    Yes.

Q    And she referenced this document to reflect some of the analysis of what occurred on the payment cycles at McCarter & English?

A    Yes.

Q   And with respect to -- with respect to Ms. Reyes's e-mail on May 31st, 2019, regarding a payment to McCarter & English, you testified you believed that occurred?

A   I'm sorry.  Repeat that.

Q   You testified that on May 31st you believe a payment was transmitted from Mary Grace to McCarter & English; correct?

A   Yes, yes.

Q   And if you look at halfway down the page, almost in the middle of the page, you will see a delineation at the left that says "Pay" on it.  It's three down at 5/31/2019 and gives a value to that payment at 5/31.  Do you see that?

A   Yes.

Q   And if you continue down, there's another one.  Yup, you've got it.  Thank you, sir.

A   Yes.

Q   And, finally, a third one.

A   Yes.

Q   Does that give you any indication as to whether or not the payment that you authorized for the April and May 2019 bills that was referenced in Mary Grace Reyes' e-mail on May 31st, 2019, does that give you any indication whether or not those bills were actually paid by Jarrow Formulas to McCarter & English?

A   Yes.

Q   Now, do you have any involvement in the value of what was

being paid to McCarter & English, determining that value at that time?

A    I'm not understanding by determining value.

Q    Did you authorize any specific value to be paid to McCarter & English, or did you authorize the payment of McCarter & English's invoices?

A    Um, $700,000 was the approved amount.

Q    I would like to direct your attention to Plaintiff's Exhibit 129.

          THE COURT:  What's the status of that?

          MR. HEAVEY:  That has been admitted, Your Honor.

          THE COURT:  Okay.

Q    (Mr. Heavey) Now, continuing on in the chronology, Mr. Rogovin, because I want to be very clear about the chronology on the decisions that were made starting at June 1st, 2019. You would agree with me that this is one day later essentially from remitting that payment to McCarter & English for the $700,000 that you just testified to; correct?

A    Um, yes.

Q    And, specifically, with respect to your communications here at the top to Ben Khowong, underneath the three stars, it says, "Put off the lawyer bills."

          Do you see that reference highlighted?

A    Yes.

Q    Underneath it it says, "The trial starts Monday."

A    Yes.

Q    Does that put it in any perspective as far as when, in relation to the trial was, you sent this e-mail?

A    Yes.

Q    And you stated, after remitting $700,000 to McCarter & English roughly the day before to Mr. Khowong, that you wanted to put off the lawyer bills; correct?

A    Correct.

Q    Now, what did you mean by "put off the lawyer bills"?

A    Delay, delay the bills until we had money.

Q    I want to be very specific too.  When you reference the lawyer bills, what lawyer bills are you referencing?

A    All of them, any firm.  It was just every law firm that we used.

Q    We heard testimony yesterday regarding the law firms you used on or about 2013.  I believe you identified five law firms, including McCarter & English.

A    Yes.

Q    Now, 2019, at this point on June 1, 2019, can you recall how many law firms Jarrow Formulas had engaged in for legal services?

A    Um, that I recall how many?  Yeah.  And two of them were for the -- well, four of them total were involved throughout the period.  But ongoing there were two of them, the -- McCarter & English and Stites.

Q   I'm sorry.  So when you reference "put off the lawyer

bills" --

A   Yeah.

Q   -- were you referencing just the lawyers involved in the

Caudill Seed matter?

A   No.  It was all firms.

Q   All right.

A   All lawyers.

Q   And notwithstanding your last answer, I'm asking you

generally in 2019, not on this matter but generally in 2019,

how many law firms --

A   Five.

Q   -- was Jarrow Formulas engaged with?

A   Five.

Q   Five.  I'm sorry.  I didn't mean to step on your answer

there.

        And when you say "put off the lawyer bills," are you

stating to Mr. Khowong, your CFO, that you're not going to pay

any more lawyers any more money at any point?

A   No.

        MR. PEPE:  Objection.  That's leading here.

        THE COURT:  Well, I'll allow it.

Q   (By Mr. Heavey) What exactly were you putting off and when?

A   I had heard what exactly was I putting off and the rest of

the sentence?

Q    And when were you putting it off till?

A    Oh.  Until we had money.

Q    So the first part of that question is, What exactly were you putting off and when?

A    We were putting off the label -- the lawyer bills until we had money to pay them again.

Q    And that's June 1, 2019.  I'd like to direct your attention now to Plaintiff's Exhibit 121.

        MR. HEAVEY:  That is admitted, Your Honor.

        THE COURT:  Okay.

Q    (By Mr. Heavey) You'd agree with me that this is now 11 days after your e-mail to Ben Khowong putting off all the lawyer bills as you instructed?

A    Yes.

Q    And the $700,000 reference in the first paragraph there --

A    Yes.

Q    -- what is that a reference to?

A    Um, the 700,000 was the money that was paid to McCarter just before the start of the trial and Ben's understanding that that would bring the account current.

Q    And that's a $700,000 payment that you just previously testified that was remitted pursuant to the two outstanding invoices that you approved; correct?

A    Yes, that was the amount told to me by Mr. Leventhal.

Q    And at any point during your communications with Mr.

Khowong did you relay to him the fact that you only wanted to provide a hundred thousand dollars for now, quote?  Did you relay that or convey that to Mr. Khowong?

A    Yes.

Q    And, ultimately, what was the decision with respect to the outstanding McCarter & English invoices before the trial started?

A    Um, well, the 700,000 was sent, which was the money I was told to send.  And it brought the account current.

Q    Did you approve that?

A    Yes.

Q    And that's on June 12th, 2019.  I would like to direct your attention now to the subject matter in your testimony regarding the butt dial.  Do you recall that?

A    Um, regarding the?

Q    The butt dial, the inadvertent voicemail message.

A    Oh, the butt dial, yes, yes, yes.

Q    And for the purposes of chronology, when was that?

A    The evening of June 26.

Q    And that's the evening of the verdict; correct?

A    Correct.

Q    We've heard your testimony regarding why you were upset and some of the allegations as to why you believed that McCarter & English committed malpractice in that communication.  Do you recall that testimony?

A    Yes.

Q    Now, to the extent it relates to the nonpayment or the decision not to pay McCarter & English invoices, was there a decision on June 26 made by you regarding those invoices?

A    Yes.

Q    And to be specific, what was your decision?

A    Um, not to pay the Caudill Seed invoices.  It did not pertain at the time to the IP invoices.

Q    So on the day of the verdict, you decided not to pay the Caudill Seed invoice for the reasons that you communicated to Mr. and Mrs. Ashurst regarding the research and development expenses, Mr. O'Brien, and your claim of malpractice; correct?

A    Yes.

Q    On June 26 did you convey that decision to anybody?

            THE COURT:  Other than what he just testified to?

Q    (By Mr. Heavey) I'm sorry.  With that qualifier, notwithstanding your communication to the Ashursts and the inadvertent message that was left on a voicemail, did you convey that decision to anybody?

A    Not at that time, no.

Q    And following the jury, there was testimony regarding requests from Jonathan Leventhal to Mr. Giarratana and McCarter & English regarding an appeal issue; correct?

A    Yes.

Q    Do you specifically know what Jonathan Leventhal was

requesting?

A   Um, simply the deadlines for filing the notices, that's it, not for issues, not for any work to be done on it, just what do the Federal Rules of Civil Procedure require.

Q   Did you have any communications with Mr. Leventhal regarding those requests to McCarter & English at the time?

A   None.

Q   How do you know that?

A   I wasn't talking to anybody except I was with Kean Ashurst. Um, that was it.  I made some calls saying we lost the case, and that was it.  I wasn't talking.

Q   I want to be clear.  After the verdict came in and you had your communications with Mr. Ashurst regarding the butt dial --

A   And Scott Polisky, who was standing with me, yes.

Q   Where did you go the following day after the trial?

A   Alabama.

Q   And did you communicate with anybody from Jarrow Formulas regarding the trial when you left for Alabama?

A   Um, I just called Ben, maybe a couple of other people, told them that we had lost.

Q   Did you convey your decision regarding any of the invoices and payment to them for McCarter & English's services at that time?

A   No.

Q   From June 26, the night of the verdict, how long -- you

left the following day on the 27th.  How long were you in Alabama?

A    Um, two days.

Q    I'd like to direct your attention to Defendant's Exhibit 590, which is admitted, Your Honor.

THE COURT:  Okay.

Q    (Mr. Heavey) Before we get to this exhibit, do you recall if there was a meeting with Jarrow Formulas management that was to be conducted in early July after the verdict came in from the trial?

A    Yes.

Q    And do you recall when that meeting was scheduled for?

A    No.

Q    Do you recall who was supposed to be attending that meeting?

A    Um, it would be management and Mr. Leventhal.

Q    Do you recall what the purpose of the meeting was?

A    To discuss the impact of the verdict, the coming award, what the bank would do.

Q    I'm sorry.  Was that "what the bank would do"?

A    Yeah.

Q    And what do you mean by that?

MR. PEPE:  Objection, Your Honor.

THE COURT:  Grounds?

MR. PEPE:  Relevance.  It's outside the Court's prior

rulings.

THE COURT: Well, he can indicate what he --

MR. PEPE: Court's already addressed this, Your Honor.

THE COURT: Let me see counsel for a minute.

(At sidebar off the record.)

THE COURT: All right, Ladies and Gentlemen, I sustained the objection.

Q    (Mr. Heavey) I'd like to go back to Defendant's Exhibit 551, just briefly.

MR. HEAVEY: This is admitted, Your Honor.

THE COURT: Okay.

Q    (By Mr. Heavey) With respect to -- one moment.

Directing your attention -- I'm sorry, and I'm jumping around here.

Getting back to the July 1, 2019, executive meeting, did that meeting ever occur?

A    Um, yes.

Q    Were you present for it?

A    But -- yes.

Q    On July 1, 2019 --

A    Oh, oh, that one? No, I'm sorry. I thought you meant, did a meeting occur? Yes. I don't remember the date. And I think the first one was postponed, if I remember right.

Q    I want to direct your attention to July 1st, 2019, meeting --

A    Okay.

Q    -- that you were testifying about.

A    Okay.

Q    First it's a Monday after the verdict.  Did you attend a meeting with the executive members of Jarrow Formulas at that time regarding the verdict?

A    Well, I don't remember what -- I was at a meeting.  If it was a Monday, I don't remember if it was a Monday or Tuesday. I would suspect Monday because it was Monday.  I was back in town.

Q    Did you provide any information to Ben Khowong regarding payments or decision on payments with McCarter & English at that point?

A    Um, the best I recall, I told him not to pay them until further notice.

Q    Directing your attention to Defendant's Exhibit 590, please.

        July 2nd, Tuesday, 2019.  The e-mail starting Ben Khowong to Lot Ramos and Mary Grace Reyes at 3:06 a.m.

A    Yes.

Q    Does that reflect your recollection of what instructions you gave to Mr. Khowong at the executive meeting on July 1st?

A    Yes.

Q    And notwithstanding the typo in it, it states:  In the e-mail from Ben to your employees of Jarrow Formulas that

Jarrow does not want to send any checks to them until further notice. And in the re: subject, it's McCarter & English.

Is that an indication of your specific instructions to Mr. Khowong at the time?

A    Yes.

Q    And when you stated to him that you didn't want any checks to them until further notice, what did that mean?

A    Not until further notice that, um, there was going to have to be some legal investigation, legal discussion, and decide what to do from there. But at that point it was suspended.

Q    And your testimony -- withdrawn.

And did, in fact, you start exploring those legal issues from July 2nd on with respect to McCarter & English's performance at the trial?

A    Yes. The whole case, yes.

Q    And at this point you already made the decision not to pay the Caudill Seed litigation bill, as per your butt dial testimony; correct?

A    Yes.

Q    On July 2nd, 2019, you would agree with me there's still outstanding intellectual property invoices for McCarter & English; correct?

A    Yes.

Q    And does this e-mail indicate that you had made a decision at this time with respect to whether or not you were going to

pay those IP invoices, aside from the Caudill Seed litigation?

A    No.

Q    And at this point, July 2nd, 2019, did you make a decision whether or not you were going to be paying the intellectual property invoices that were outstanding at McCarter & English?

A    No.

Q    I'd like to direct your attention, if I may, to Plaintiff's Exhibit 103.

THE COURT:  Which is?

MR. HEAVEY:  Which is admitted, Your Honor.

THE COURT:  Okay.

Q    (By Mr. Heavey) Now, you testified regarding this e-mail yesterday.  Do you recall that testimony, Mr. Rogovin?

A    Yes.

Q    And specifically on July 22nd now, 20 days after the decision to review McCarter & English's performance and consult with counsel, did you come to a decision -- actually, withdrawn, Your Honor.

On July 22, 20 days after instructing Mr. Khowong to hold up on the transmission of any of the outstanding fees, did you make a determination with respect to the outstanding IP invoices for McCarter & English?

A    Yes.

Q    Now, at this point was there any -- no, withdrawn.

What was the decision with respect to the

miscellaneous IP bills that were outstanding for McCarter & English?

A    Pardon me?

Q    What was your decision with respect to the payments --

A    Oh.  As of July 20, to pay them.

Q    Was anything significant on July 22nd besides your decision and the e-mail conveyed to Mr. Giarratana to remit payment on the outstanding IP matters?

A    I'm sorry.  Was anything significant?

Q    Was anything significant on that day that you recall besides --

A    Oh, yes.

Q    -- the decision?

        What's that?

A    McCarter & English filed suit against Jarrow Formulas.

Q    Did you actually know that on July 22nd at 4:11 a.m. when you responded to Mr. Giarratana that you'd be agreeing to pay the IP bills?

A    No.  It's 4:00 in the morning, so no.

Q    And with respect to that decision, we heard testimony regarding it, after July 22nd, 2019, what occurred that changed your mind with respect to the outstanding IP invoices and the payments that you agreed to make?

A    We -- I had discussions with the late Jeff Tinley, who was our attorney at the time.

Q   And as a result of those discussions, what decision did you make?

A   Um, after discussing it back and forth with him, and it was a real discussion, I took Mr. Tinley's advice not to pay it.

Q   Now, Mr. Rogovin, there was testimony that I elicited today regarding your review of the bills -- withdrawn.

You testified --

THE COURT:  I'm sorry, Mr. Heavey.  Let me interrupt for a second.  So, Ladies and Gentlemen, the witness just testified that he didn't pay the IP bills based on advice he received from a lawyer.  So you may consider that testimony as to whether any failure by Mr. Rogovin or his company to pay those bills was willful and malicious.  That's the only purpose for which you may consider that testimony.  And so that's it. Thank you.

Go ahead, Mr. Heavey.

MR. HEAVEY:  Thank you, Your Honor.

Q   (By Mr. Heavey) Now, I want to be clear regarding your review and your lack of knowledge of the rate increase.  In 2013 I asked you if you ever compared any of the singular line items that delineate what the hourly rate was for Mr. Grondahl and Mr. Giarratana on the one page that's listed in the invoices for McCarter & English.  Do you recall that testimony?

A   Yes.

Q   And do you recall you testified that you never compared

them in 2013 to notice -- any of the invoices to notice that there was a rate increase; correct?

A    Correct.

Q    Taking out the limitation of 2013.  At any point, at any time during the representation in the federal matter, did you ever compare invoices at the singular line item that shows the hourly rate and determine that Mr. Giarratana's or Mr. Grondahl's rate went up?

A    No.

Q    Did you ever compare any of the invoices, any of the invoices during any part of the litigation, to identify the fact that Mr. Rechen's hourly rate went up during the course of the litigation?

A    No.

Q    There was testimony regarding your authorization of the $700,000 to be paid in 2019 just prior to the testimony in satisfaction -- what Mr. Khowong believed was satisfaction of the outstanding receivables.  Do you recall that testimony?

A    Yes.

Q    Do you actually know whether $700,000 was remitted and paid towards Caudill's case in that matter or some other value was attributed to the Caudill Seed case?

A    It was 700,000 as far as I know.  I mean that's what was approved.  That's the number I was told to approve.  I approved it.  And I have to assume that, after talking to Ben, that was

what was sent.  Ben's e-mail confirmed 700.

Q   Without assuming, do you have any role in the transmission of those payments after you approved them?

A   Um, not beyond that.

Q   Not beyond the approval?

A   No.

MR. HEAVEY:  Your Honor, I'd like to take just two minutes, if I may.

(Pause.)

MR. HEAVEY:  Your Honor, I have no further questions for this witness.

THE COURT:  All right.  I do notice that he was cross-listed by deposition by your team, Mr. Pepe.  So I would allow some further limited examination if you wanted at this time.

MR. PEPE:  He covered a lot of ground on redirect, Your Honor.

THE COURT:  Right.  Okay.  I mean, we'll have to take it question by question.

MR. PEPE:  Thank you, Your Honor.

REDIRECT-EXAMINATION

BY MR. PEPE:

Q   Mr. Rogovin, did you just testify that, when you made the decision to fire McCarter the night of the verdict and that they could pay the damages and you weren't going to pay the

bills, you didn't tell anyone other than Mr. Ashurst and Mrs. Ashurst? Is that what I just heard or did I mishear?

A I -- I didn't -- you're mixing two things that I said they can pay the damages and not going to pay the bills? I didn't say anything about the bills.

Q Reading from the transcript yesterday, sir, here's the question:

"And then upon hearing that verdict rendered on Wednesday, June 26, 2019, you decided that night that you -- that McCarter has committed malpractice, that you weren't going to pay the bills, and that you were going to fire them. True?

"Answer: Yes."

That was your testimony under oath less than 24 hours ago. You stand by that?

A Um, I decided certainly that --

Q Just tell me -- sir, just tell me --

A Okay, yes or no.

Q -- if you stand by that testimony or not.

A I misspoke.

Q When? Today or yesterday?

A Yesterday. I fired them.

Q That's not what your testimony was, sir.

"Question: And then upon hearing that verdict rendered on Wednesday, June 26, 2019, you decided that night that you -- that McCarter had committed malpractice, that you

weren't going to pay the bills, and you were going to fire them.  True?

"Answer:  Yes."

That was your testimony under oath yesterday.

A   I should have listened more carefully to the question.  I fired them.  That was really what was going on in my mind at the time, and that's really what I was responding to in the question.

Q   Except it's not what you told the jury yesterday, is it?

A   No.  I just said that's what was going on in my mind both times.

Q   You also --

A   I would say there's an implication you're fired.  There's a question of the bills.  Whether it occurred to me or not, there's obviously a question.

Q   You've answered it.  You've answered it.  Thank you very much.

You've also testified you didn't tell -- I think I heard you testify you didn't tell anyone other than Mr. and Mrs. Ashurst.  Was that your testimony today of that decision I just read?

MR. HEAVEY:  Objection, Your Honor.

THE COURT:  Wait a minute.

MR. HEAVEY:  Objection, Your Honor, vague.

THE COURT:  I'm sorry.  One second, please.

Vague?  Well, I'm going to overrule the objection.

Q   (By Mr. Pepe) Do you remember the question, sir?

A   Um, Mr. Polisky was with me, um.  He knew they were going to be fired.  Then the Ashursts and Ben would have gotten a call and been told.

Q   A little while ago when you said you didn't tell anyone else, you misspoke that time, today, because you did tell Mr. Polisky; correct?

A   He was with me.

Q   Question yesterday from the transcript, sir, at page 226, line 15:

        "Question:  And you told that day, that very day, you told some people about that decision, which I just read.

        "Answer:  Yes.

        "Question:  Attorney Scott Polisky is one of your other attorneys from one of the other five law firms representing you; correct?

        "Answer:  He's a sole practitioner, food and drug law," so on.

        "And he was with you that night; correct?

        "Answer:  He was with me for a couple of days.

        "Question:  And you told him that decision that you had made that night, you told him that very night; correct?

        "Yes."

        That was your testimony yesterday.  Was that accurate?

A    We're reviewing --

Q    No.

A    -- a very traumatic period.

Q    The question, sir --

        THE COURT:  Sir, sir.

Q    (By Mr. Pepe) Excuse me, sir.

        THE COURT:  Excuse me, sir.

        THE WITNESS:  That was my testimony.  I'm very sorry, Your Honor.

        THE COURT:  Answer it.

Q    (By Mr. Pepe) Was -- that testimony under oath to the jury, was it accurate yesterday?

A    Not completely.

Q    So you misspoke yesterday again?

A    Yes.

Q    But today you spoke accurately?

A    Yeah, going through it step by step.

Q    I'm sorry?

A    Going through a very traumatic, horrible event step by step, extremely traumatic.

Q    And so your testimony, sir, so we understand what the record is, yesterday you testified that you told Scott Polisky, another lawyer, of your decision to terminate them and not pay the bills and they could pay the damages.  Today your testimony --

A    No, I didn't say "don't pay the bills."

Q    Today your testimony is you did not tell Scott Polisky. Which should we believe?

A    Did you just say today I said I did not tell Scott Polisky?

Q    That's what I thought, sir.

A    No, I didn't say that.  I said Mr. Polisky was with me and I told him.  It was clear they were going to be sued.  They were fired.  They were going to be fired.

Q    I was asking about your direct examination now.  So now we can agree you did tell Mr. Scott Polisky?

A    Let's make it clear.  I didn't tell about the bills.

Q    That day you told Mr. --

        Question, on page 226, line 10:

        "Question:  And then upon hearing that verdict rendered on Wednesday, June 26, 2019, you decided that night that you -- that McCarter had committed malpractice, that you weren't going to pay the bills and you were going to fire them. True?

        "Answer:  Yes."

        It goes on.  Line 18:

        "Attorney Scott Polisky is one of your other attorneys, one of the other of the five law firms representing you; correct?

        "Answer:  He's a sole practitioner."

        Page 227, line 2:  "And he" --

"Question:  And he was with you that night; correct?

"He was with me a couple of days.

"Question:  And you told him the decision that you had made that night, you told him that very night; correct?

"Answer:  Yes."

Was that testimony that you rendered yesterday true?

A   You read it quickly.  Um, from what I hear, yes.

Q   I'm sorry?

A   Well, it's not in front of me.  You read it quickly.  From what I hear, yes.  But I'm not reading it.  And you read it quickly.  It sounds correct.

MR. PEPE:  May I approach the bench, Your Honor?

THE COURT:  You may.

THE WITNESS:  Okay.

Q   (By Mr. Pepe) I read it correctly, did I not?

A   Yes.

Q   And your answer yesterday was the truth?

A   Yes.

MR. PEPE:  May I approach, Your Honor?

THE COURT:  You may.

THE WITNESS:  Yes, I decided to fire them, that's correct.

Q   (By Mr. Pepe) I want to go back to the May 20 -- the end of the May 2019, all that testimony concerning Mr. Giarratana's request for the accounts to be brought current, which were

approximately 1.5 million outstanding then and the payment of about half of that at the end of May. Do you have that in mind?

A    Yes.

Q    All right. You testified about it just a moment ago, did you not?

A    Yes.

Q    And you testified that you, you personally, authorized the payment of the $700,000 or approximately half the outstanding amount; correct?

A    Yes.

Q    You were shown Exhibit -- Defendant's Exhibit 551, if we could have that called, please. That's the account statement.

Go to the last page. You remember testifying about that a moment ago; correct?

A    Yes.

Q    If we go to the last page, this shows all the payments made over the entire course of the Kentucky litigation by Jarrow Formulas, Inc., to McCarter & English. And if we go down to the -- let me see if I can identify where it says Bill No. 8, about halfway down, Bill No. 8220357, if we could highlight that? Actually, the one below it, Bill No. 8227636. Highlight that whole block. Can you do that for me, Mr. Wyzik?

Highlight that whole block across, if you would.

We see there, do we not, that the payment in question,

one of the payments in question on the outstanding amounts,

$1.5 million, approximately, on May 31, McCarter received a

payment of $205,462; correct?

A   Yes.

Q   And then we go down to the next block.  Can you highlight

that too, please, sir?

A   Actually, I don't know if that's a credit out of a larger

sum or the exact sum of the check.  But that's being shown as

credited.

Q   And on May 31 there was another payment, 262,411; correct?

A   I'm sorry.  Repeat the date.

Q   Yes, of course.

A   It appears to be crediting -- it appears to be crediting

invoices against a larger amount since the date is the same.

Q   You just testified a moment ago, sir, that you understood

this.  And you testified that those are the payments that you

authorized.  Do you see that?

          MR. HEAVEY:  I'm going to object.  It misstates the

testimony.

          THE COURT:  It will be up for the ladies and gentlemen

of the jury, the lady and gentlemen of the jury, what the

testimony was.  So the objection's overruled.

          Go ahead, Mr. Pepe.

Q   (By Mr. Pepe) Do you understand and did you not understand

a moment ago that these are, in fact, the payments that were

received by McCarter & English and booked on those dates, 5/31;
correct?

A    I'm not aware of a payment that is -- was $205,462.94
precisely per se, no.  I'm not aware of any such payment.

Q    It's your testimony a moment, wasn't it -- maybe I didn't
hear it correctly -- that you authorized the payments that are
shown here on 5/31; correct?

A    No.  I authorized 700,000.

Q    So you authorized more than this.  Those adds up to
about --

A    I authorized 700,000.  I don't understand what's not
understood here.  I didn't have these in front of me.

Q    Yeah.  In fact --

A    I'm not being argumentative.  I authorized 700,000.

Q    In fact --

A    I don't --

Q    I thought you were finished.  I'm sorry.  I'll let you
finish.

A    I just don't understand.  I authorized 700,000.

Q    That's not what Mr. Khowong told Mr. Giarratana, is it?

A    I don't know what Mr. Khowong told Mr. Giarratana.  I do
know that Mr. Khowong, in an e-mail, referenced 700,000.

Q    Yes, let's take a look at that e-mail, PTX 121, please.
        That's the e-mail you had in mind, is it not?

A    Yes.

Q    Blow up that first part please, if you would, Mr. Wyzik.

That's Mr. Khowong writing to Mary Grace Reyes and Mark Giarratana; correct?

A    Yes.

Q    Okay.  And he's responding to Mr. Giarratana below -- we can show you that too in case you don't remember -- where Mr. Giarratana said, I got the payment, but it was only half of the amount.  And you were supposed to pay the full amount.  That's at the bottom.  We can highlight that so you'll have that in mind.

Can we do that, sir, blow it up, call it out?

See where Mr. Giarratana says, "Thank you for the check, but it was supposed to be for the full amount"?  You see that?

A    Yes.

Q    All right.  Now, we go back to Mr. Khowong's e-mail to Mr. Giarratana in response to that.  And he says, "In the future, please deal directly with me on this matter.  There was a misunderstanding on your offer, passed to me by Mary-Grace."  It doesn't say anything about you giving him direction, does he?  He says he misunderstood what the agreement was based on what Mary Grace told him; correct?

A    Um, there was something about what Mary Grace said, and then you said -- this is very -- and you're saying that I had -- it sounded to me like you said I didn't say anything,

that it was Mary Grace -- I mean these are two different communications. I'm not understanding the question. I don't know where you're going with this.

Q This is a communication from your CFO concerning the payments we just testified about; correct?

A Yes.

Q Your CFO to your attorney, Mark Giarratana; correct?

A Yes.

Q And he says, "There was a misunderstanding on your offer, passed to me by Mary-Grace."

A Yes. And I had nothing to do with that.

Q Okay. He goes on to say, "My understanding was we need to bring the account current for the discount. I went out of my way to pay you the check of close to 700,000 despite the fact that Jarrow wanted me to send only 100,000 for now."

I read that correctly, did I not, sir?

A Yes, you did.

Q And he's saying to Mark Giarratana, Despite, notwithstanding your instructions to send only 100,000, he sent 700,000. Is that not what he's saying there?

A Um, yeah, I know where you're going with this.

Q Never mind where I'm going, sir.

A Yeah. I gave --

THE COURT: Wait.

A -- Ben instruction to pay 700.

THE COURT: Stop. Okay. The question was: "Is that not what he's saying there?" The answer is "yes," "no," or "I don't know."

THE WITNESS: Yes.

Q (By Mr. Pepe) And then he goes on to say, "For now I do not have the authority to send you any more at this time without Jarrow's instruction."

That's what he told your attorney on May -- on June 12; correct?

A Yes.

Q And then if we go to Exhibit 129 to get the chronology right, we have the payments -- I'll put up 129. Thank you.

We looked at the payments on May 31 in the door to McCarter & English. Now we go to 129. That's June 1 e-mail.

Would you call that out, please, the whole top part?

That's your e-mail to Ben Khowong on June 1, the next day after the payments were received; correct?

A Um, yes.

Q And we go down below the stars. There's your instruction.

Can you highlight that, Mr. Wyzik?

"Put off the lawyer bills"; correct?

A Yes.

Q So the payments were made, according to Mr. Khowong, notwithstanding your instructions. On May 31 you put the hold on the lawyer bills the next day after the payments were made.

You missed by one day holding those payments, did you not?

A    I missed?  I missed?  I missed?

Q    Yes.

A    No, sir.  After I approved 700 going out and Ben told me we had no money to pay vendors now, I said, "Put off the bills."

MR. PEPE:  Can we have 001.

THE WITNESS:  That was not I missed.

MR. PEPE:  PTX 001, please, one of the unpaid bills. Front page.

Q    (By Mr. Pepe) Here's one of the unpaid bills with your initials on it.  Do you see that, sir?

A    Yes.

Q    And right below in the middle of the page where it lists the total fees and then the disbursements and then the total due --

A    Yes.

Q    -- what does it say right below that, sir?

A    You mean the total?

Q    No.  Right below the highlighted part.

A    Oh, "Payment due upon receipt."

Q    It doesn't say "net 60."  It says, "Payment due upon receipt"; correct?

A    Yes.

Q    And every one of the 75 bills issued in this matter said exactly that, "Payment due upon receipt," on the first page;

correct?

A    Um, pro forma, yes.

Q    You testified to this jury several times about the financial distress your company was having; correct?

A    Yes.

Q    And part of that financial distress you attributed to the legal bills that were being rendered in this matter; correct?

A    Yes.

Q    The other part of it was your failure to have product; correct?

A    Yes.

Q    Okay.  Looking at the part of your financial distress attributed to the legal bills, you said at different times they were crushing you; correct?

A    Yes.

Q    You said they were -- they were coming in in huge numbers in the case that you had refused to settle.  They were coming in every month in huge numbers; correct?

A    Yes.

Q    And contributing to your financial distress.

A    Yes.

Q    And as the president of the company, you did not bother to read any of those bills.  You just looked at the front page and then initialed it.  That's your testimony to this jury?

A    Yes.

MR. PEPE:  No further questions, Your Honor.

THE COURT:  All right, sir, you may step down.  Thank you.

Mr. Heavey or Mr. Resser, do we have any other witnesses?

MR. RESSER:  Yes.  Jonathan Leventhal.

THE COURT:  All right.  Mr. Leventhal.

Good afternoon, sir, if you would please raise your right hand, face our courtroom deputy.

J O N A T H A N   L E V E N T H A L,

having been duly sworn by the Clerk, testified

under oath as follows:

THE CLERK:  Please be seated.  State your name, city and state you live or work.  Spell your last name for the record.

THE WITNESS:  Jonathan Leventhal, West Hills, California, L-E-V-E-N-T-H-A-L.

THE COURT:  All right, Mr. Resser, you may proceed.

DIRECT EXAMINATION

BY MR. RESSER:

Q   Good afternoon, Mr. Leventhal.

A   Good afternoon.

Q   What is your occupation, sir?

A    I'm an attorney.

Q    How long have you been an attorney?

A    Uh, a little over 14 years.

Q    So I take it you haven't been an attorney your entire adult working life.

A    No.  This was a second career.

Q    Who is your current employer?

A    I'm employed by Vytalogy Wellness, LLC.

Q    What is your title with Vytalogy Wellness?

A    Assistant general counsel.

Q    What does Vytalogy have to do with Jarrow Formulas, Inc.?

A    It's like a holding company way to put it.  It represents the brand of Jarrow Formulas and Natrol LLC, N-A-T-R-O-L.  They're both supplement companies.

Q    Were you employed by Jarrow Formulas, Inc., at any time?

A    Yes.

Q    When did you begin employment at Jarrow Formulas, Inc.?

A    February 18th, 2019.

Q    And when did that employment with Jarrow Formulas, Inc., end?

A    Uh, around December 2021 is when we converted over to Vytalogy.

Q    You need to take some water for a second there?

A    Yeah.

Q    I'll wait to ask the next question so we're not hearing the

water pitcher.

          Okay.

A    Perfect.  Thank you.

Q    What was your position with Jarrow Formulas in 2019?

A    General counsel.

Q    What were your duties at Jarrow Formulas when you joined as general counsel in February of 2019?

A    Um, I reviewed contracts.  I, um, looked over, um, employment records, procedures.  Um, I worked a lot on the employment handbook and dealt with outside counsel.

Q    Did Jarrow Formulas have an in-house attorney at the time you joined that company?

A    No.

Q    Did your duties, therefore, include setting up the in-house legal department at Jarrow Formulas?

A    Yes.

Q    Before that, what did Jarrow Formulas do for its legal services?

A    They relied strictly on outside counsel.

Q    Was McCarter & English one of those firms?

A    Yes.

Q    Did Jarrow Formulas stop using outside law firms when you joined as general counsel?

A    No.

Q    Why not?

A    Um, well, I'm not a litigator, you know, for big litigation, and there are some specialty subjects that we deal with as a supplement company.

Q    Was there anything else that was handled routinely by outside counsel besides litigation?

A    Yeah.  Um, IP, intellectual property, and things for the FDA, Federal Drug Administration.  They regulate supplements, things of that nature.

Q    When and if outside counsel was used, what was your role?

A    I would oversee the outside counsel, be a liaison sometimes between outside counsel and Mr. Rogovin.

Q    Did you come to understand who was doing that role of overseeing outside counsel before you joined the company?

A    Yeah.  About 2018 there was another attorney; but from my understanding, she worked primarily with the manufacturing company.

Q    And immediately before you joined, do you have an understanding of who at the company, since the other attorney was no longer there, who at the company was overseeing outside company?

A    Oh, yeah, Mr. Rogovin, totally.

Q    And what was his title at the time?

A    Um, I believe he was chairman of the board.

Q    Now, did they -- did Mr. Rogovin hand off to you the oversight of outside counsel when you joined in February of

2019?

A    Yes and no.

Q    Can you explain what you mean by yes and no?

A    Um, because of -- there was some litigation that was going on for quite a while.  This Kentucky litigation had been going on around, I think, six years.  It just wasn't practical to hand it off to me because trial was six months, less, five months away from when I was hired.

Q    How, if at all, did that affect your level of involvement in the Caudill Kentucky litigation?

A    For the first several months, I had no involvement.

Q    Have you done any intellectual property litigation before coming to Jarrow Formulas?

A    None.

Q    Did you do any trade secret litigation before coming to Jarrow Formulas?

A    No.

Q    Now, you said you're not a litigator.  Was there any time in your career when you did litigation?

A    Yeah.  For the company that I worked for right before joining Jarrow Formulas, I worked for a company that did automotive finance.  Um, basically if you didn't pay your automotive payments, I was the guy that would sue you.  But most of those would go into default, and very few went to trial.  And it was a completely different animal than this,

than what we're experiencing here.

Q   Had you ever done a jury trial before coming to Jarrow
Formulas?

A   Yeah, once.

Q   And how long did that jury trial last?

A   Less than a day.

Q   And what was the amount of money involved in that jury
trial?

A   It was, if I recall, just under 25.

Q   Twenty-five what?

A   Thousand.

Q   Do you -- do you have any experience relative to the
Caudill case at the time you -- it went to trial in Kentucky?

A   None, you know, that pertained to it.

Q   Tell us how you spent your time at Jarrow Formulas from
February 2019 until you attended the trial in Kentucky in --
beginning in June 2019.

A   Well, for the first -- February, March, April -- the first
couple of months, three, four months or so, I primarily did a
lot of employment, setting up procedures, again, going over the
handbook, setting up the employment handbook, setting up
policies, reviewing contracts, getting to know the officers of
the company, the way things are done.  Pharmaceutical --
nurtriceuticals, let's call it what it is, dietary supplements
were completely new to me.  I knew nothing about it.  So I had

to learn the industry, get to know the people there, things like that.

Q   How much of your time in the first few months, in the first two to three months you were at Jarrow Formulas, did you spend on the Caudill case?

A   Zero.

Q   After you joined Jarrow Formulas, did you then have any involvement in the Caudill case after that?

A   Yes.

Q   When did that begin relative to the start of trial?

A   I believe trial started -- I think June 3rd was the first day of trial.  Sometime in May Mr. Rogovin asked me to attend the deposition with him in Kentucky.

Q   And that was your first involvement with the case?

A   Yes.

Q   We'll get to that later in the trial.  But now I need to focus on the billing issues.

A   Yes.

Q   Do you have that subject in mind?

A   Yes.

Q   While the Caudill case was pending, were you responsible for reviewing the bills at the time they were sent to Jarrow Formulas by McCarter & English?

A   No.

Q   Who was?

A    Mr. Rogovin.

Q    Anyone else to your knowledge?

A    Not that I'm aware of.

Q    Did you ever observe Mr. Rogovin reviewing any of McCarter's bills?

A    Yes, twice.

Q    What did you observe Mr. Rogovin do on those two occasions?

A    Um, other than the expletives he said when he saw the amount, he flipped it.  It was -- uh, I think the bill he showed me was like 30 some odd pages.  And he would just flip through it, look at the top, go through the pages, initial it and hand it back to his -- excuse me -- his assistant.

Q    And that's Eve?

A    Yes, Eva.

Q    Did he make any comment while you were observing him review the bills?

A    Yeah.  He complained about that the billing and the cost of the trial was killing him.  And then he showed me the amount. And it was the biggest bill I've ever seen in my life.

Q    The biggest lawyer bill?

A    Biggest bill, period, I've ever seen in my life.

Q    Are you aware of any instances when Mr. Rogovin objected to any of McCarter & English's bills in the Caudill case?

A    Um, through this litigation, I understand there was one that he objected to or had an issue with.

Q   I want to discuss your communications about McCarter & English's bills in the Caudill matter.  Do you have that subject in mind?

A   Yes.

Q   Did you communicate with anyone at M&E about their bills before the start of the trial?

A   Can you give that back to me again, please?

Q   Did you communicate with anyone from M&E about their bills before the start of the Caudill federal court trial?

A   Yes.

Q   We already heard testimony and saw e-mails in 2019 when Mr. Giarratana wrote to Mary Grace Reyes that Giarratana was receiving a 38-percent discount off of the standard hourly rates.  Do you have that subject in mind?

A   Yes.

Q   Are you aware of any other instance besides those e-mails when anyone from M&E made that statement?

A   Yes.

Q   What was that?

A   Uh, Mark Giarratana made a statement to me, um, not 38, but it was 43 percent.

Q   And what did Mr. Giarratana say to you?

A   Yeah, 43.

    Um, this was a day or two before trial.  You said when; right?

Q   I said, what did Mr. Giarratana say to you?

A   Oh.  He said that McCarter & English -- McCarter & English -- that McCarter & English was giving a 43-percent discount to Jarrow Formulas.

Q   And when was this -- well, you've seen the testimony about a payment made on or about May 31, 2019?

A   Yes.

Q   Of something over 500,000, maybe less than 700,000, somewhere in between there?

A   Yes.

Q   Relative to that payment was your conversation with Mr. Giarratana before or after?

A   Before.

Q   And do you recall where that conversation took place?

A   Yes.

Q   Where was it?

A   Um, it was just outside of Joel Beres's Stites & Harbison, our local counsel's offices.  If you're facing the building, to the left on the corner.  We're literally on the corner of the street there.

Q   Did Mr. Giarratana make reference to a 38-percent discount plus a 5-percent discount if the bills were brought current?

A   No.  He just said 43-percent discount total to me.  He didn't say anything about current or anything like that.

Q   What was your reaction, if any?

A    That's a hell of a discount.  I was very impressed.

Q    As a result of Mr. Giarratana -- well, did Mr. Giarratana say anything else to you about the bills and getting them paid?

A    Well, they were concerned that they want to make sure that the bills get paid, you know, because they're starting a big trial and they were going to incur a lot of fees.

Q    Did you do anything as a result of Mr. Giarratana telling you about the discount and telling you he wanted to get the bills paid?

A    Yes.

Q    What did you do?

A    I contacted Mr. Khowong, our CFO.

Q    What did you tell Mr. Khowong?

A    That, you know, we're getting an outrageous payment; they're expecting payment; and, you know, we need to get them paid.

Q    And did -- was a payment made after that?

A    Yes.

Q    Did you have any later conversation with Mr. Giarratana about that payment?

A    Yes.  I spoke with him and other members of the McCarter & English staff about the payment.

Q    And was that before or after the date the trial actually started?

A    I -- I don't remember exactly.  It could have been, you

know, at the start of it or -- I just don't remember.  It was very close to the start or it had just started.

Q   And what was the substance of the conversation?  Had the May 31 payment already been received?

A   Yes.

Q   What was the substance of the conversation with Mr. Giarratana after the May 31st payment had been received?

A   They had expected a payment to bring the bill to zero, and I said I'd check into it.

Q   What did do you at that point?

A   I contacted Mr. Khowong, and he said, "No, the arrangement" --

MR. PEPE:  Hearsay, Your Honor.

THE COURT:  Yeah, that's sustained.

THE WITNESS:  I'm sorry?

THE COURT:  I sustained the objection to --

THE WITNESS:  Oh.

THE COURT:  -- as to what Mr. Khowong told you.

THE WITNESS:  Okay.

Q   (By Mr. Resser) Did you write any e-mail to anyone at Jarrow Formulas as a result of your conversation with Mr. Giarratana?

A   Yes.

MR. RESSER:  Your Honor, I'd like to display PTX 123, which has been admitted.

THE COURT: Yeah, that's fine.

Q (By Mr. Resser) Now, the first e-mail in the string is on the second page of the exhibit. It's a e-mail from No Reply at Jarrow Formulas to Ben, and the subject is "Ageing." Do you see that?

A Yes.

Q And the next e-mail in the chain is an e-mail from Ben to you, same subject. And it says, "This is the ageing Mary Grace showed to me when she brought up the conversation on 5/13/19."

Do you see that?

A Yes.

Q And the subject, as you understand it, that was brought up to Ben was the outstanding bills that McCarter & English was trying to get paid at that point. Yes?

A Correct.

Q And the next e-mail in the chain is from you to Mary Grace with a copy to Ben on June 6, 2019; correct?

A Correct.

Q And in that e-mail, you wrote, "Their aging is terrible and does not reflect any payments we have made."

Do I have that right?

A Yes.

Q So at that point, you were looking to see how they handled the payment that was made on May 31?

A That's correct.

Q    But apparently from the context of the earlier e-mails, Ben had sent you aging as of 5/13/19.  Is that your understanding now?

            MR. PEPE:  Objection, leading.

            THE COURT:  Well, that's sustained.  You can get at it.

Q    (By Mr. Resser) Do you have any understanding of why the aging didn't reflect the payments, the aging that McCarter & English had sent?

A    No.

Q    You then wrote, "Can you break this down for me as to 30 / 60 / 90 120 days?"

            Why did you write that?

A    Because I wanted to show my understanding is we were on a 60-day pay.  So I wanted to be able to show, um, Tom and Mark at McCarter & English that we were current after the payment was made, because I had seen a statement that they provided me, and it didn't break it down by 30, 60, 90.  So that was my reference that their thing was terrible.

Q    The source of your understanding that Jarrow Formulas was on a 60-day pay, was Mr. Giarratana the source of that understanding in part?

A    No.

Q    You then wrote, "I would (hopefully) be able to tell them that we paid everything bring the account current.  Or at least

to point x and we will pay Y on this date."  Do you see that?

A    Yes.

Q    And the "them" in that part of your e-mail is who?

A    McCarter & English.

Q    You then wrote, "This is an extremely critical time at the moment in the trial.  Many many millions of dollars are on the line.  I certainly do not want the lawyers worried about us paying them."

        Did you write that?

A    Yes.

Q    Why did you write that?

A    Because I -- just that.  I didn't want the attorneys to be concerned.  I want them to be focused on doing their jobs at trial.

Q    The next e-mail is from Mary Grace Reyes to you on the same date, June 6th.  And she writes, "Please see attached our aging with McCarter & English before the payment and after the payments we have made."

        Do you see that?

A    Yes.

Q    And then the third page of the exhibit, can we see that?

A    Can we flip it?  Are we able to flip the -- thank you.

        Yes, that's -- that's the aging that Mary Grace provided me.

Q    In Exhibit 123 -- oh, pardon me.

When you gave your deposition in this case, did you recall that e-mail that we just went through?

A    No.

Q    Before Mr. Pepe showed you this e-mail during your deposition, he asked you if you said the words, "This is an extremely critical time at the moment in the trial.  Many millions of dollars are on the line.  I certainly do not want the lawyers to worry about paying them."

Did you recall having used those words?

A    No.

Q    After the trial was lost, did you ask McCarter & English to do any work?

A    Yes.

Q    What did you ask them to do?

A    I asked for, um, some of the ideas that were given to me about an appeal, and I asked for some critical timelines, dates and so forth.

Q    How did you communicate that request to McCarter & English?

A    Um, initially it was in a phone call with Mark, and then I backed it up with an e-mail.

Q    When you say "Mark," you mean Mr. Giarratana.

A    Yes.

Q    The e-mail in which you confirmed that conversation, is that Defense Exhibit 600?  And can we please publish that? It's been admitted.

THE COURT: Okay.

Q (By Mr. Resser) Is Exhibit 600 the e-mail you wrote to Mr. Giarratana confirming your conversation, your phone conversation, with him after the trial?

A Yes.

Q And in it you wrote, "I just landed at lax." Again, that's the airport in Los Angeles; correct?

A Yes.

Q "Please send me ASAP the time line of key filing deadlines."

Those are the deadlines you asked for in the conversation; right?

A Yes.

Q "Also, your analysis that we discussed about for an appeal."

Do I have that right?

A Yes.

Q How much time did you expect the response to your request would take Mr. Giarratana or others at McCarter & English?

MR. PEPE: Objection, relevance, Your Honor.

THE COURT: What is the relevance?

MR. RESSER: McCarter & English did hours and hours of work that they've billed for. I think Mr. Leventhal can explain what he, in fact, asked for and expected.

THE COURT: Right. All right. I'll allow it.

Q   (By Mr. Resser) How much time did you expect the response to your inquiry to take on the part of McCarter & English?

A   Ten, 15 minutes.

Q   Why?

A   Well, for one, the issues on the appeal, they were mentioned to me previously.  So it was just a matter of -- when they were told to me, I didn't write them down.  So I just wanted them jotted down.

    And on the dates, most litigators, dates like this are set, hard dates.  So expert litigators should know this stuff off the top of their head or they look it up in, you know, books that we have that take two minutes to look it up, a few minutes at best.  Experienced litigators know exactly what they're looking for.

Q   Were you in court on Friday when Mr. Giarratana testified about your conversation with him after the verdict?

A   Yes.

Q   And you heard him say that you and he discussed a JMOL motion.  Do you recall that?

A   Yes.

Q   Did you discuss a JMOL motion with Mr. Giarratana during your post-trial conversation with him?

A   No.

Q   Did Mr. Giarratana mention a JMOL motion to you at that time?

A    No.

Q    At that time did you know the difference between an appeal and a JMOL motion?

A    Yes.  That's -- I mean that's tort in the first year of law school, the basics, what an appeal is.  It's the same thing the judge went over with the jury.

Q    Did you discuss with Mr. Giarratana anything other than the subject matters stated in your e-mail of June 27?

A    There may have been, you know, some cordial things about -- you know, I'm sure he asked how Jarrow was doing or something like that.  But other than that, nothing of any substance.

Q    And in your e-mail of June 27, you asked Mr. Giarratana on a late Thursday, so it's actually a minute before June 28th that you sent this e-mail, you asked him to respond by first thing Monday.  And in the final, in the final sentence there, "I'm trying to set up a senior management meeting for first thing Monday morning."

      So you were asking him to respond by then.  Do I have that right?

A    Yes.

Q    Do you think that was sufficient time, late Thursday night to first thing Monday morning, for Mr. Giarratana to respond to your request?

A    Yes.  Again, I thought it was something that should just be able to be rattled off.

Q   At the time you asked for the summary and the timeline for the appeal, did you know that Mr. Rogovin or Jarrow Formulas had decided to terminate the services of M&E?

A   No.

Q   At the time you asked for the summary and timeline for the appeal, did you know that Mr. Rogovin had decided not to pay the remaining Caudill Seed litigation bills?

A   No.

Q   Did you tell McCarter & English that Jarrow Formulas was letting them go at that time?

A   No.  I didn't know myself.

Q   Please take a look at Defense Exhibit 714, which is in evidence.

I'm sorry, PTX 134.

THE COURT:  Also in evidence, I take it.  Yes?

MR. RESSER:  Also in evidence.

Q   (By Mr. Resser) So at the bottom of the second page of the exhibit is the first e-mail in the string.  It's from you to Mr. Giarratana.  And then if you go to the third page of the document where it shows the CC to Mr. Rechen and Mr. Grondahl as well, "Subject:  Your call."

You wrote, "Mark, I am in a mega-disaster control meeting with the bank that will last the reminder of the day. In addition to the bank, Ben and I are trying to figure out what we need to do in order to obtain a bond."  And it goes on

to discuss the issues with dollars for equipment and facilities.

The third paragraph discusses some of the details of the litigation in Kentucky.

Were these your words?

A   I wrote them.

Q   Did you come up with these words yourself?

A   No.

Q   Who did?

A   They were dictated to me by Mr. Rogovin.

Q   Was he present within the room with you when you --

A   No.

Q   -- wrote these words?

A   No.  It was via phone.

Q   In the third paragraph it's written, "How difficult would it have been to have a decent approximation of the salaries? Since there was zero evidence that we had used the hopkinds seed that is irrelevance, but even so, it could have been broken and it would have been, what, 10,000?  30,000?  So what, and for the rest of Eric's counter, it appears that Eric had knowledge of what those expenses would have been at Wenger and Nateco.  So if Jarrow was right, all along, our R&D evidence would have been about $200,000 and not an unverifiable $2 million.  The considerable difference in numbers might have even helped on the question of Caudill's credibility versus

ours and the question of willful and malicious."

Do I have that right?

A    Yes.

Q    So then written in the e-mail, "Even the basic compilation theory would have been undermined by the comparatively trivial sum of $200,000."

Do you see that?

A    Yes.

Q    And then the e-mail finishes with the question, "We are racking our brains on the appeals issue, considering how razor thin the defendants' evidentiary trial record was kept."

Do I have that right?

A    Yes.

Q    Then Mr. Rechen, not Mr. Giarratana, wrote you back on July 5th, three days later; right?

MR. PEPE:  Objection.  Relevance, Your Honor.  Billing part of the case.  There's no a word in there about billing.

THE COURT:  Well, I'm going to overrule that.

Q    (By Mr. Resser) On the second page of the e-mail, beginning six lines down, Mr. Rechen wrote, "If we had actual backup figures, these strategies might have worked.  But in fact we did not have evidence of the expenses on the IRS forms that Wingate used to arrive at his R&D compensatory damages numbers."

Do you see that?

A    Yes.

Q    Who was Wingate?

A    Wingate was, uh, Caudill's expert for damages.

Q    Four lines below that, three lines up from the bottom of the paragraph, Mr. Rechen also wrote, "So as a result, we were unable to attack these numbers with any specifics except with the limited information we had in our cross examination of Wingate."

Do I have that right?

A    Yes.

THE COURT:  Ladies and Gentlemen, remember, the sole purpose for which this testimony -- you may consider this testimony is what -- how it relates, if at all, to the decision not to pay the bills.

Q    (By Mr. Resser) Now, Ms. -- the letter Ms. Brophy wrote terminating the services of M&E went out on July 12th; is that right?

A    Yes.

Q    Do you remember how long before that you learned of the decision to terminate the services of McCarter & English?

A    I just simply don't remember.  Obviously, it was before that.  Whether it was a day, two, three days before that, I just -- I just simply don't remember the day he told me it was, you know, a few years ago.

Q    When you wrote to Mr. Giarratana the words of Mr. Rogovin

questioning the issues we just discussed, did you know that Mr. Rogovin had made the decision to terminate McCarter & English?

A No.

Q Did he tell you that during the phone conversation where he dictated the e-mail to you?

A No.

Q How long after the jury verdict in Kentucky did McCarter & English sue Jarrow Formulas in this case?

A Verdict came in on the 26. I think it was towards the end of July. So, you know, less than a month.

Q Now, you -- did Jarrow Formulas hire an attorney to defend it in this case at that time?

A You're talking this case we're in now. Yes.

Q And who did Jarrow Formulas hire?

A Jeff Tinley.

Q Is Mr. Tinley still Jarrow Formulas' lawyer?

A No. Unfortunately, he passed away.

Q After Mr. Tinley was hired, did he give any advice to Jarrow Formulas regarding the payment of the outstanding IP bill that Mr. Rogovin had had the same morning that the lawsuit was filed, told Mr. Giarratana would be paid?

THE COURT: Wait.

MR. PEPE: Objection, Your Honor.

THE COURT: Wait. Ladies and Gentlemen, we're going to take our lunch, luncheon recess now. We're right at about

the lunch break. So don't discuss the case. Don't let anyone discuss it with you. Keep an open mind. Thank you for your attention. We'll see you back here about 1:30.

(The jury left the courtroom at 12:43 p.m.)

THE COURT: Mr. Resser, if you'd like, you can stay. Wherever you want to go is fine.

Mr. Pepe, you wanted to state an objection to the question, which was, "After Mr. Tinley was hired, did he give any advice to Jarrow Formulas regarding the payment of the outstanding IP bill that Mr. Rogovin had had the same morning that the lawsuit was filed, told Mr. Giarratana would be paid?"

All right. In any event, I think the first part was, did he give any advice to Jarrow Formulas regarding the payment of the outstanding IP bill?

MR. PEPE: We're back at the advice of counsel issue it appears. And Your Honor did allow that for limited purposes.

THE COURT: Yes.

MR. PEPE: And particularly, and only I understand, with respect to the decision maker. This witness did not make the decision not to pay the bills, so the advice of counsel is irrelevant to his testimony.

THE COURT: Okay.

MR. PEPE: There's only one decision maker here on that.

THE COURT: Mr. Resser.

MR. RESSER: I believe the testimony of Mr. Leventhal corroborates Mr. Rogovin's testimony. I believe it took place in the same communication.

THE COURT: What took place in the same communication? I'm sorry.

MR. RESSER: The advice of Mr. Tinley was to both Mr. Rogovin and Mr. Leventhal.

THE COURT: But at the end of the day, Mr. Rogovin's the decision maker; right?

MR. RESSER: Indeed.

THE COURT: And the issue is whether the testimony pertains to his decision as to why he did not pay the bills.

I tell you what, I think it can be answered yes or no simply to corroborate that, in fact, he received advice on this subject. But it would have to end there.

MR. RESSER: The only follow-up question was the timing of that advice being after July 22nd.

THE COURT: I think that's fine. You can get a date for the timing of the advice or you can say, Was it after July 22nd? Yes.

MR. RESSER: Yes, thank you, Your Honor.

MR. PEPE: I assume Your Honor will give the same limiting instruction that is in consideration for bad faith.

THE COURT: I will.

MR. PEPE: There is another issue. I don't want to protract it. But once again, we're back to the $200,000 R&D again through the back door, again the Kean Ashurst's number, this time because it was supposedly dictated by Mr. Rogovin. That was the issue I was trying to get at earlier when we had Mr. Rogovin on the stand. And we had the sidebar and Your Honor --

THE COURT: What's your proffer with regard to that? In other words, what was -- what were you hoping to -- I mean I don't want to make you give things away, but I -- as we've discussed many times now, the -- I've been trying to draw a line. I'm not sure if it's even visible anymore, but I've been trying to draw a line and to maintain it to, on the one hand, issues relevant to Mr. Rogovin's intent, that is to say, whether or not he was malicious and willful in deciding not to pay the bills, and the issue of the -- well, I think it boils down to the underlying malpractice claim with regard to was enough done on the damages.

I think, putting that aside, I did rule earlier, as you both know, that the Ashurst testimony would not come in with regard to this $250,000 number. That was really in connection with the discussion of the malpractice claim, whether this portion of the claim could be reduced to damages provable to reasonable certainty, etc.

And I'm just very concerned that the -- that as we

get, delve into the details of those numbers, what they're comprised of, whether they were reasonable, I can keep instructing the jury until I'm blue in the face, but they're just going to be like: I don't know what he's talking about. This is all about malpractice.

And so I'm just very concerned about that. And so I -- when we were at sidebar, we had this discussion about along these lines, and I said I didn't want you to go any further on this.

You said that you would -- you were hoping to, in effect, ask questions related to Mr. Ashurst's credibility. And I didn't know quite what you meant by that. I mean, was he convicted of a felony or something like that? I mean, what are we talking about here?

MR. PEPE: I'll try and explain it, Your Honor. First of all, I understand the Court's ruling on the state of mind and how that comes in.

THE COURT: Yes.

MR. PEPE: And I'm not intending to reargue that.

THE COURT: Yeah.

MR. PEPE: I think it's one thing for the witness to say: In my state of mind, they failed to reduce my exposure on the R&D damages.

And he did say that, and he went on several times.

THE COURT: He can put a little flesh on those bones;

right?  In other words, 'cuz otherwise you're going to argue in closing that, well, he kept talking about R&D but he wasn't specific.  He had some vague concerns about R&D.

So I think what I've tried to let him do, let Mr. Resser do, and his team, Mr. Heavey, to put on some, some flesh on those bones.  What were you talking about when you said in the butt dial?

This is where it gets hard because at some point the flesh turns into a monster and goes, you know, in a direction of its own.  And so -- but go ahead.  I cut you off.  Go ahead.

MR. PEPE:  No, no.  I understand.  I get that, Your Honor.  But now, several times, several times, in the previous witness and this one, and at least two documents, I think three, the testimony is the numbers should have been no more than $200,000.  There's only one source for that.  Your Honor knows it because Your Honor read Kean Ashurst's deposition or his -- I'm sorry -- his PJR testimony when Your Honor was confronted with the decision of whether that claim for malpractice would come in.  There's only one source for that, and Your Honor ruled it out.  But yet it comes in the back door.

So the jury's heard from this witness, who is still on the stand, and the previous witness, Mr. Rogovin, that it should have been no more than $200,000.  That's all the jury heard.

THE COURT: But let me ask, Mr. Pepe, at the end of the day, isn't the issue what Mr. Rogovin believed? In other words, his belief may not have been well founded. It may well be that it's not. I don't know. But isn't that the issue? In other words, his subjective intent is what we're talking about.

And, I mean, he seemed, you know, pretty angry in that butt dial. I mean I'm not on the jury, so it's up to them to decide whether, in fact, he was acting willfully and maliciously out of pique or whatever or this wasn't delved into or it was malpractice and as a result he shouldn't have to pay the bills. And, you know, so isn't really the 200,000 best understood as, yeah, that's why I felt so strongly about this. And at the end of the day, that's pertinent. That's relevant.

MR. PEPE: I don't take issue with the first part. I do strongly with the second, Your Honor. It's one thing for him to say they should have done something to minimize the evidence on research and development, damages for Caudill. It's quite another, quite another, to say that should have been no more than $200,000 and then we don't have the opportunity to attack that.

When I said earlier Kean -- that was when we had the sidebar and my proposal, my proffer was to show that what Mr. Rogovin was asking his lawyers to do was to put on evidence from Kean Ashurst when he told his lawyers Kean has no credibility and is a liar, in writing. That's my proffer.

He's saying to his lawyers --

THE COURT: I'm sorry. Say that again. He -- Kean -- "when he told his lawyers Kean Ashurst has no credibility and is a liar, in writing" -- ah. You got a document where he said that?

MR. PEPE: I have a document that says -- I have three, Your Honor. And, in fact, he's saying to his lawyers: You must prove it's no more than $200,000 because that's what Kean Ashurst told you it was because he worked there.

And then he tells them in writing, Kean Ashurst is a weirdo. He's not to be believed. He's a liar. He has no credibility.

THE COURT: All right. Mr. Resser, let me hear you on why I shouldn't let Mr. Pepe put in those e-mails, if necessary, recall Mr. Rogovin for that purpose? I mean that sounds fairly neat and clean, fairly simple. We wouldn't have to get into, what does the $200,000 consist of? It sounds like it's a fairly neat and clean piece of evidence. You may disagree with it, and you would at least be allowed to pursue that. But why not?

MR. RESSER: Your Honor is correct that the issue here is Mr. Rogovin's state of mind. Also, Mr. Ashurst's proffered testimony was about $250,000.

THE COURT: Okay.

MR. RESSER: This e-mail refers to 200,000. Mr.

Rogovin also believed that he should have been put on the witness stand, that his 30 plus years of background and experience in the industry would have allowed him to testify it should have been no more than $200,000.

So I can't speak for Mr. Rogovin here, but I think he was also referring here to his own testimony that was not given at trial, which is part of the malpractice case, as well as part of the state of mind on the billing issues and that that is what is being referred to here. He was -- he was one of those witnesses.

In addition, Mr. Ashurst's credibility doesn't go to whether McCarter & English failed to take the list of vendors that Ashurst was able to provide in 2019. They never asked him for that list of vendors. They never got that list of vendors. And then they never did third-party discovery from those vendors.

THE COURT: I hear you. But let me ask you this question: If it's true that Mr. Rogovin made a statement, I guess in an e-mail, I'm not sure, that Kean Ashurst was a liar, then why shouldn't the jury hear that in assessing whether -- because there was some evidence -- there was a reference to 250 earlier, as I recall, during Mr. Rogovin's testimony. Why shouldn't the jury hear that the person who was saying that they should have put on Ashurst to show it was 250 and no more than 250, the same person considered Mr. Ashurst to be a liar?

Because that would go to Mr. Rogovin's credibility ultimately.

In other words, if the jury hears that Mr. Rogovin thinks that what they should have done is put on Kean Ashurst to prove it was no more than 250, and I think I recall the number 250 either yesterday or earlier today during Mr. Rogovin's testimony, then why shouldn't the jury -- and the jury's just trying to decide, well, was that his real reason or was he lying? Was he being willful and malicious? Because, again, that's the purpose. Why shouldn't they also hear: The same person who said that also said, "The person who would have produced that evidence was a liar"?

MR. RESSER: Again, I don't think we've presented the Ashurst exhibits or any references to Mr. Ashurst for the purposes of saying Ashurst himself should have been put on the witness stand alone. It shows -- it shows the reason for Mr. Rogovin's belief that McCarter & English didn't thoroughly discover the possible evidence that could have cut off his damages.

THE COURT: Right. But am I right or not that Mr. Rogovin testified, either today or yesterday, that he thought the damages were no more than 250?

MR. RESSER: I don't recall whether he said 200.

THE COURT: I may have to check the transcripts over lunch then, because that's my recollection. If I'm wrong, then fine. I agree with you, what we're talking about now doesn't

884

say 250. It says 200. But it occurs to me -- it didn't occur to me when I was over at sidebar with Mr. Heavey and Mr. Pepe. But it occurs to me that -- and if what you're talking about is an e-mail and it says he's a liar?

MR. PEPE: Couple of e-mails.

THE COURT: And it's that simple. It says he's a liar.

MR. PEPE: He's a liar, he has no credibility, he's a wack job and he tells his lawyers to prove that up. Really it isn't a question of Ashurst's credibility, although that's going to come out. It goes to Mr. Rogovin's state of mind. And that was what the proffered cross-examination was.

Here he is saying to -- my state of mind was that they should have followed up with that and while he's telling his lawyers, his trial lawyers -- who, by the way, we all know have an ethical obligation not to put a witness on the stand who may lie -- quote, to the trial lawyers, in October of 2018, eight months before the trial started, quote, Kean Ashurst has enormous credibility problems and he presents extremely weirdly. Then down below: Credibility, these are our problems. We have a narrative problem, and Kean is a wack job. Kean is a mess. Kean is a horror show. He's a mess.

THE COURT: Hopefully these e-mails were brought to Judge Merriam's attention during the prejudgment remedy hearing? Anyway, I don't want to get sidetracked.

MR. PEPE: And he goes on to say in the same e-mail: He, Kean Ashurst, is lying about Henningsen -- that was one of the laboratories involved -- is typical of what a total jackass he can be.

Now, that goes to the legitimacy of Rogovin's state of mind.

THE COURT: The whole point I was making.

Mr. Resser, go ahead.

MR. RESSER: The e-mail that prompted Mr. Pepe's renewed effort to go beyond what Your Honor has allowed so far is the language that clearly refers to Mr. Rogovin's own view of the R&D expenses. So if Jarrow was right all along, our R&D evidence would have been about 200,000 and not an unverifiable 2 million.

THE COURT: That may be, but Mr. Pepe's pointing out it appears I made a mistake earlier in not allowing him to cross-examine with regard to the e-mail he just read me. I didn't know where it was going. And as I said now several times, I was concerned we were going to get lost. But, I mean, I think I am now convinced it does go to Mr. Rogovin's credibility for him to say "no more than 250." I do need to check that over lunch. And then to say -- and then to say about the same person who was going to testify about the 250, you know, that person's a liar.

I think if I were on the jury, I would want to know

that if the reason the person gave about refusing to pay, I would want to explore whether that reason was credible. And if that reason was stated that the damages were no more than 250, my understanding is there's only one source of the 250 and that's Mr. Ashurst, then -- I thought it was more than that to be honest with you. But I'm going to check the testimony over lunch.

Then if I were on the jury, I would want to know. Well, this is same person had called Mr. Ashurst a liar and told his lawyers that.

Am I right that's what the e-mail said?

MR. PEPE: E-mail to his lawyers, Your Honor.

MR. RESSER: And the only reason that I think Mr. Rogovin was -- felt that possibly Mr. Ashurst should have testified is because it was too late to do the other discovery that had they spoken to Mr. Ashurst in 2013 and 2014 and gotten the vendors' names, they could have gone --

THE COURT: We had some of that though, Mr. Resser. I heard a fair amount of testimony on that subject, more than I would have preferred to allow, because I do think it's confusing. But you've persuaded to me that some of it had to come in, but there's been a fair amount of it. We've heard about R&D. We've heard about vendors and third parties and things like that. But I don't know that that has anything to do with what we're talking about right now, which is whether I

should allow ultimately Mr. Pepe to either recall this witness or do it through Mr. Rechen or somebody else about to whom the e-mail was sent about the 250.

But I do need to review that testimony over lunch. So go ahead, Mr. Resser. I'll give you the last word. Go ahead.

MR. RESSER: Again, if -- if Mr. Rogovin is going to be recalled, he should also be given an opportunity to explain, did he want Kean on the witness stand or was he complaining about the fact that discovery wasn't done?

THE COURT: Right. I mean -- yes, if that came out.

MR. RESSER: If there had been a conversation.

THE COURT: Yup.

MR. RESSER: The other option is to just allow the exhibit to come in.

THE COURT: So to be clear, I wouldn't just have Mr. Pepe ask the question. I would give Mr. Heavey a chance to follow up. And, yeah, I do think that that follow-up would be appropriate.

MR. PEPE: Your Honor, and this is not argument. It goes to the point of the 250. First of all, Kean's all over the place, 200, 250. It's not just 250.

But the question and answer just before the sidebar was that the source of that $200,000, Mr. Rogovin, was Kean Ashurst. The answer, my recollection: Mr. Ashurst and my own years of experience in the industry.

THE COURT: I do remember something like that, but I need to look at the transcript.

MR. PEPE: He identified Ashurst as a source of that.

THE COURT: We're going to go to lunch. Be in recess. Why don't we plan to restart the trial at 1:35, but you guys should be here at 1:30.

(Recess from 1:03 p.m. to 1:30 p.m.)

THE COURT: All right. So I was able to get the testimony from earlier today, at least some of it.

Question -- this is Mr. Pepe on cross-examination.

"Question: You told the jury that yesterday it couldn't have been more than a quarter of a million dollars. You had in mind Kean Ashurst's computation of the R&D expenses actually incurred by Caudill; correct?

"Answer: That and my at that point 35 years of experience.

"Question: Kean Ashurst is the one who came up with the 200,000, 250,000, and that's what you had in mind there; correct?

"Answer: Yes. Mr. Ashurst ran the program."

And then Mr. Pepe asked:

"And you wanted your attorneys, McCarter & English, to use Kean Ashurst's computation to show that the real R&D expenses incurred by Caudill could not be more than $250,000."

At that point I interrupted Mr. Pepe and held a

sidebar.

So in light of that, I am inclined to allow McCarter to recall Mr. Rogovin for the purpose of asking that question and/or putting in those e-mails and then allowing some limited further examination by -- by JFI.

Go ahead, Mr. Resser.

MR. RESSER: My only remaining concern about that, Your Honor, which I didn't mention earlier, is we're now talking the credibility of a witness who's never going to be in front of this jury to defend his own credibility.

THE COURT: Well, that happens all the time. That's right in the hearsay rules that you can do that. So you can actually attack the credibility of a witness or of hearsay statements that come in under the hearsay rule. So there's no problem with that.

So I'm going to allow that. And I think we should do that right now. So I'm going to ask Mr. Leventhal to step off the stand for a little while. I'll explain to the jury we're interrupting his testimony for the limited purpose of some further examination that the Court reconsidered.

Let's have Mr. Rogovin retake the stand.

MR. RESSER: Your Honor, I just have one or two questions left for Mr. Leventhal.

THE COURT: Well, why don't we do this because Mr. Leventhal's going to stay on the stand after that anyway.

MR. RESSER:  I'm sorry.  You're right.

(The jury entered the courtroom at 1:34 p.m.)

THE COURT:  Everyone can take their seats.

So, folks, over lunch I reconsidered one of my rulings regarding -- made during the examination of Mr. Rogovin, and I decided to allow some limited further testimony.  That's why Mr. Rogovin is now on the witness stand.  I've interrupted Mr. Leventhal's testimony, which is not over yet.  So we're going to have some limited further testimony from Mr. Rogovin.

Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.


J A R R O W   R O G O V I N,

resumed the stand and testified under oath as follows:

FURTHER REDIRECT EXAMINATION

BY MR. PEPE:

Q   Mr. Rogovin, yesterday you testified that you thought the R&D damages claimed by Caudill in the Kentucky litigation should have been shown to be no more than 200 or $250,000.  Do you recall that?

A   Yes.

Q   When I asked you today the source of that number was Kean Ashurst, and your answer was, "Kean Ashurst and my own experience of years in the industry"; correct?

A   Yes.

Q   Now I'm going to focus on the Kean Ashurst's source of that information, that is, that the damages should not have been more than 200 or $250,000.

Kean Ashurst told you that was most that it could have been for Caudill's R&D; correct?

A   Yes.

Q   And you wanted your attorneys to pick up on that and pursue Kean Ashurst's report to you and to them that it could be no more than 200 or $250,000; correct?

A   Yes.

Q   And you wanted your attorneys to pursue that based on Mr. Ashurst's report that he was there and it was no more than 200 or 250,000; correct?

A   Yes.

MR. PEPE:  Can we have PTX 199?

THE COURT:  Is that in already?

MR. PEPE:  No, Your Honor.  I'm moving that as a full exhibit.  There's no objection.  I'm sorry.

THE COURT:  Okay.  PTX 199 will be a full exhibit.  It can be published.

(Plaintiff's Exhibit 199, received in evidence.)

Q   (By Mr. Pepe) And we can -- Mr. Wyzik, can you blow up the top part there so we can see the "To" and the "From" and the date?

This is from you to the McCarter trial team:

Giarratana, Mr. Grondahl, and Mr. Rechen; correct?

A    Yes.

Q    On October 16, 2018, about five or six months before the trial started; correct?

A    Yes.

Q    And the subject is "Witness prep -- a-c/p."  What does that stand for, if you recall?

A    I'm sorry.  What?

Q    The "a-c/p," do you remember what that stands for?

A    Attorney-client privilege.

Q    So you -- in this e-mail to your counsel, you express your opinion on Mr. Ashurst's credibility, do you not?

A    Yes.

Q    Okay.  And let's go down to the first full, second full paragraph, begins "Kean."

        This is the same Kean Ashurst that was the source of that 200 or $250,000 maximum R&D expenses; correct?

A    Yes.

Q    It says, quote, "Kean has enormous credibility problems and he presents extremely weirdly.  He gets something in his head as if that is reality and he can't be readily shaken out of it, and he's variously off-putting and confusing at best and has a whiff of deception at worst."

        That's what you told your attorneys about Kean Ashurst; correct?

A     Yes.

Q     It goes on to say, "His lying about Hennisen."  Hennisen was one of the laboratories involved in the Kentucky litigation?

A     Production house.

Q     Yeah.  He goes on to say, quote, His lying about Hennisen is typical of what a total jackass he can be, end quote.

See that?  That's what you told your attorneys; correct?

A     Yes.

Q     Now if you drop down, if you would please, Mr. Wyzik, to the middle of the page where it says, "Yes, I would have spent the money."

A     Um, could --

THE COURT:  Wait one second.  Let's get there first.

THE WITNESS:  Yeah.

THE COURT:  Excuse me.  He can ask a question when we get there.

MR. PEPE:  Can we drop down, please, where it says, middle of the page, "Yes, I would have spent the money"?

Q     (By Mr. Pepe) Okay.  "Yes, I would have spent the money. This case has the following components."  And then you list one, two, three, four components in your opinion; correct.

Show those.  Can we call that out, please, sir?

A     Yes, yes.

Q   All right.  The first component it says, "Narrative.  Very bad for us on its face."  That's the horrible narrative you've testified to before; correct?

A   I'm sorry.  I didn't hear the first part.

Q   Your first component that you identify for your lawyers, in your opinion, is the "Narrative.  Very bad for us on its face."  Do you see where I read that?

A   Yes.

Q   And that's the horrible narrative you've described about receiving the confidential and proprietary documents from Ashurst; correct?

A   Yes.

Q   The second component you say is "Technical."  Goes on to talk about, quote, "Good for us but the devil is in the details -- such as deposing NATECO and blowing up their" expletive "about R&D," end quote.

Then the third one, we can highlight that, Mr. Wyzik.

"Credibility:  We have a narrative problem and Kean is a wack job," end quote.  That's Kean Ashurst; right?

A   Yes.

Q   "A lot of poking holes on them depends on detailed narratives and technical issues."

Then we go down to number 4.  This is the fourth component in the case as you see it.  You state, quote, "Sympathy:  Kean is a mess.  I come off as a prickly SOB at

first.  It takes a while to warm up to me as what happened with Lindsay."

So you're telling your lawyers, in your opinion, Kean is a mess; correct?

A    Yes.

Q    Drop down, please, to the next full paragraph that begins "Kean," if you could call that out, Mr. Wyzik.  Highlight it.

In the same memorandum on October 16th, six months before trial, you tell your lawyers, quote, "Kean is a horror show"; correct?

A    Yes.

Q    And if you drop down to the last paragraph, Mr. Wyzik, and call that out, begins "As far."

"As far as the mock jury is concerned, Kean has to testify before he goes before the real jury cold and it will be a disaster.  He's a mess."

Referring to Kean Ashurst; correct?

A    Yes.

Q    You express those same opinions in other e-mails to your lawyers, did you not?

A    Yes.

MR. PEPE:  Go to -- if we might, Your Honor, offer as a full exhibit PTX 202.  There is no objection.

THE COURT:  Okay.  202 is full.

(Plaintiff's Exhibit 202, received in evidence.)

MR. PEPE: And can we call out the top part so we can get the date on this e-mail, Mr. Wyzik?

Q (By Mr. Pepe) Now, this is about one month later, November 18th, 2018. Do you see that?

A Yes.

Q Again, an e-mail from you to your lawyers on that date; correct?

A Yes.

Q If you go down to -- it's a long e-mail. I'm just going to ask Mr. Wyzik to call out paragraph 3 and highlight the first sentence. The paragraphs are numbered.

In this memorandum to your lawyers on November 18, you state, quote, In the meantime, Kean has little credibility, end quote.

That's Kean Ashurst; correct?

A Yes.

Q And then if we could drop down to paragraph 7 in that same memorandum to your lawyers on November 18 and highlight that, could you do that, Mr. Wyzik, please.

You end that part of the memorandum by telling your lawyers, "Kean is not very reliable or credible"; correct? Paragraph 7.

A Oh, okay, at the top. Yes, I was reading the bottom. At the top.

Q That's what you told your lawyers; correct?

A    Yes.

Q    And that's Kean Ashurst of course; correct?

A    Yes.

MR. PEPE:  No further questions, Your Honor.

THE COURT:  Okay.  I'll allow some counter-examination.

Ladies and Gentlemen, while we're doing that, just while we're switching lawyers, just one point just to keep in mind.  Again, you may consider this testimony for the limited purpose of deciding the reasons Mr. Rogovin decided not to pay the bills.  Was it willful and malicious, as McCarter alleges?  Or was it truly for the reasons that Mr. Rogovin and JFI allege?  That's the only purpose for which you may consider this testimony.

Go ahead, Mr. Heavey.

MR. HEAVEY:  Thank you, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. HEAVEY:

Q    Mr. Rogovin, directing your attention to Plaintiff's Exhibit 199.

You agree with me that October 16, 2018, was approximately six months before the start of any of the trial in this matter; correct?

A    Yes.

Q    And if you go down to the bottom of the page, it says at

the very last paragraph, "As far" -- starting with "As far as the mock jury is concerned."

A    Yes.

Q    You go on to discuss Kean's testimony.

A    Yeah.

Q    The very last sentence, approximately six months before trial you request McCarter & English to start working with him early, meaning Kean Ashurst; correct?

A    Yes.  "He's a mess.  Start working with him early."

Q    When you mean "start working with him early," what did you mean by that?

A    Starting after that e-mail.

Q    Specifically when you're saying start to work with him early, what do you mean by the term "work"?

A    Um, determining what the real R&D numbers was as well as his testimony, both.

Q    You wanted McCarter & English to prepare him for testimony?

A    I wanted them to prepare him for testimony and on testimony also on what the real research and development numbers of Caudill were.

Q    And if you go to the top of that document, you reference specifically in this document, at the top, "It is not wise to rely so heavily on Kean to debunk the idea that there was no R&D at Nateco."

Do you see that reference to Nateco specifically?

A    Yes.

Q    Was there any third-party discovery or subpoenas that were issued to Nateco during this period when discovery was still in force or still in the process in this litigation?

A    No.  They refused to do it repeatedly, and I urged them repeatedly.

Q    Directing your attention to Plaintiff's Exhibit 202, please.

          Now, a month later, approximately five or six months to the beginning of trial, in November 16th, 2018, you go on to send another e-mail from you to your lead counsel regarding specifically the R&D issues and Nateco here; correct?

A    Yes.

Q    And, again, at this point in the chronology, discovery was closed, so there could be no third-party research and development discovery to be issued to Nateco at this point; correct?

A    No.  It was barred.

Q    Notwithstanding that fact, and notwithstanding your opinions that you expressed in these e-mails regarding Kean Ashurst's credibility and testimony, why is it that you wanted McCarter & English to still call him to testify regarding the R&D at trial?

A    Because the vendors used and what they charge, charge and charged, would have been completely, totally verifiable and

transparent.

Q   When you say "verifiable and transparent," what do you mean by that?

A   Um, the vendors could have been contacted.  Um, there's no reason why they wouldn't cooperate.  It's what do you charge for an R&D? for an R&D run? for a pilot run?  Two thousand? Five thousand?  Ten thousand?  Nowhere near millions.  And how many runs does it take?  One?  Two?

Q   Mr. Rogovin, did you have this information in your possession before the close of discovery leading up to trial?

A   No.

Q   So if you didn't have this information, what was the purpose of putting Kean Ashurst onto the stand?

A   He was the main source left other than asking Dan Caudill or Joe Lyons on the stand, which they didn't.

Q   And you believe that information could have been corroborated by any other testimony at trial?

A   Um, Lyon -- excuse me.  Kean Ashurst's testimony could have been collaborated by Joe Lyons and Dan Caudill.  And then -- in terms of the trial.

Q   And did Mr. Ashurst's testimony ever make it to the underlying trial here in Kentucky?

A   Yeah.  He was on the stand for three days.

Q   And did he address the research and development costs during that testimony?

A    Um, McCarter continued to fail and refuse to ask him about the R&D costs.

Q    Was Mr. Lyons' testimony ever invoked at trial to corroborate anything that Mr. Ashurst testified to regarding R&D?

A    Um, he was referred to by the damages expert Wingate 40 times as the source of his figures, which were just tax return numbers, um, for six consolidated divisions.  And Mr. Rechen represented to Judge Simpson that he would be calling Joe Lyons to the stand --

        MR. PEPE:  Objection, Your Honor.  Objection, relevance, outside the scope.

        THE COURT:  Well, it's not responsive to the question, so I'll sustain it.

        THE WITNESS:  I apologize.

        THE COURT:  Go ahead, Mr. Heavey.

Q    (By Mr. Heavey) I think my question was, did any corroborating testimony from Mr. -- or did Mr. Lyons provide any corroborating testimony to support Kean Ashurst's testimony with respect to R&D at the Kentucky trial?

A    No.

Q    Why not?

A    Um, he was never called to the stand on it, despite promising he would be.

        MR. HEAVEY:  I have no further questions, Your Honor.

THE COURT: Okay.

MR. PEPE: No questions, Your Honor.

THE COURT: All right. Very well. You can step down, sir.

All right. Why don't we now have Mr. Leventhal return to the stand.

All right. Mr. Resser, you may proceed.

MR. RESSER: Thank you, Your Honor.

J O N A T H A N   L E V E N T H A L,

resumed the stand and testified under oath as follows:

CONTINUED DIRECT EXAMINATION

BY MR. RESSER:

Q   Mr. Leventhal, before the lunch break, we were talking about the discussions with Mr. Tinley about the -- we were talking about the discussions with Mr. Tinley about the bill for the intellectual property fees that were still due to McCarter & English. Do you have that subject in mind?

A   Yes.

Q   Did you have discussion with Mr. Tinley -- well, first of all, you saw the e-mail of July 22nd that Mr. Rogovin wrote to Mr. Giarratana saying that, while he disputed the Caudill Seed litigation bills, he had planned to pay the almost $60,000 in intellectual property bills that were still outstanding. Do

you recall that testimony --

A    Yes.

Q    -- and that e-mail?

Did you speak with Mr. Tinley about the intellectual property bills after that date, after July 22nd, 2019?

A    Yes.

Q    Did Mr. Tinley give any advice to you, as a representative of Jarrow Formulas, about whether or not Jarrow Formulas should pay that bill?

A    Yes, he did.

Q    And what did Mr. Tinley say to you?

MR. PEPE:  Objection, Your Honor.

THE COURT:  Yeah, so we discussed that we wouldn't get into the substance but we could pursue.  So I'll sustain that.

Q    (By Mr. Resser) Did -- did Mr. Tinley give you any advice with regard to that?

A    Yes.

Q    What was that advice?

MR. PEPE:  Objection, Your Honor.

THE COURT:  Same.  Same thing.  I think you can get at this but in a different way that we talked about earlier.

Q    (By Mr. Resser) Did Mr. Tinley give any advice with respect to whether or not to pay those bills?

A    Yes, he did.

MR. PEPE:  I think he answered.  Objection, Your Honor.

THE COURT:  He did answer, but we've got it again. That's fine.

Q   (By Mr. Resser) Did you convey to Mr. Rogovin what Mr. Tinley had told you?

A   Yes.

MR. RESSER:  No further questions.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. PEPE:

Q   Good afternoon, Mr. Leventhal.

A   Good afternoon.

MR. PEPE:  May we have PTX 123, Your Honor, moved as a full exhibit?  There's no objection.

THE COURT:  Okay.  That can be full.  PTX 123 is full.

MR. PEPE:  I should also point out it is also a defendant exhibit.

THE COURT:  Another duplicate.

MR. PEPE:  I just can't put my hands on the defendant's exhibit.

(Plaintiff's Exhibit 123, received in evidence.)

MR. PEPE:  It may be published, Your Honor?

THE COURT:  Yes, it may.  Whenever I say it's full, it

can be published.

MR. PEPE: And I ask Mr. Wyzik to call out the second half, please.

Q   (By Mr. Pepe) This you saw on your direct examination?

A   Yes.

Q   This is where you -- you write to Mary Grace Reyes about the outstanding bills; correct?

A   Yes.

MR. PEPE: And in the last sentence of that e-mail, it begins, "This is extremely critical," you can put that in -- highlight that, please, Mr. Wyzik. The whole paragraph.

Q   (By Mr. Pepe) This e-mail to Mary Grace Reyes is in response to Mr. Giarratana's calling to your attention that there was a substantial amount outstanding; correct?

A   Yes.

Q   I'm sorry?

A   Yes.

Q   And you thought, as you state right here, it would be important to make sure that the outstanding amount is brought current so that there's not -- so that the lawyers are not worrying about that; correct?

A   Yes.

Q   You thought that was the appropriate thing to do; correct?

A   Yes.

Q   And Mr. Giarratana brought that to your attention. He

never said anything about quitting, did he?

A    No.

Q    No.  And you never told Jarrow Rogovin that he said that because he didn't say it; correct?

A    Correct.

Q    He just asked you, Could you help bring this current?  And you did; correct?

A    Correct.

Q    No threats; correct?

A    No.

Q    No.

And if we could have PTX 128.  I believe that's a full exhibit already, Your Honor.

THE COURT:  Okay.  That can be put up then.  128.

MR. PEPE:  PTX 128.

Q    (By Mr. Pepe) The one we just looked at was June 6.  That was three -- I'm sorry, if I could ask you to look up for a moment, Mr. Leventhal.  I'm going to try to put the timing on this.

A    Putting my eyes on.

Q    Take your time.  Take your time.

This one, this exhibit, is June -- June 23.  So we're coming to the end of the trial; correct?

A    Correct.

Q    And the previous one we looked at was June 6 at the very

beginning of the trial; correct?

A    Correct.

Q    And so here on June 23, Mr. Giarratana's telling you that there is still an outstanding -- substantial amount outstanding, and the bill for the trial has not yet been rendered; correct?

          THE COURT:  I'm sorry.  Did you ask the witness "Mr. Giarratana's telling you"?  The e-mail appears to be from the witness to Mr. Khowong.

          MR. PEPE:  I should have made that clear, Your Honor.

Q    (By Mr. Pepe) This e-mail from you to Mr. Khowong, the CFO, was prompted by Mr. Giarratana bringing to your attention that there was still a substantial amount outstanding at the end of June; correct?

A    Is this part of the same string that I'm seeing?

Q    Yeah.

A    Yeah, if that's the case, yes.

Q    That's Mr. Giarratana to you on Sunday, June 23.  Do you see that?

A    Yes.

Q    Okay.  And then in response to that, he says, "Attached is a current listing of Jarrow Formulas AR.  As you can see, there is about $336,131 over 60 days.  Please let us know if we can get that paid that amount right away.  This is particularly important in light of the amount of additional AR" and so on.

And in response to that, you went to Mr. Khowong again and asked him if he could take care of that. And we see that in the front page of this exhibit; correct?

A   Can I see the front page again?

Q   Of course. Of course.

A   That's correct.

Q   Okay. Again, trying to accommodate Mr. Giarratana during the trial; correct?

A   Yes.

Q   No threats.

A   No.

Q   No.

You were at the trial every day in Kentucky.

A   That's correct.

Q   And sat at counsel table.

A   That's correct.

Q   And then you saw how hard they were working; correct?

A   Yes.

MR. PEPE: Now, if we could have PTX 131, which is a full exhibit, Your Honor.

THE COURT: Okay.

Q   (By Mr. Pepe) You saw this on your direct examination. Do you recall this e-mail to Mr. Giarratana would be the day after the jury verdict?

A   Yes.

Q    You left Kentucky, Louisville, flew back to Los Angeles; correct?

A    Correct.

Q    And you said you talked with him before you left about what you needed from him; correct?

A    Yes.  I believe I spoke from the airport.

Q    And then when you landed, you confirmed it in an e-mail?

A    Correct.

Q    And PTX 131 is that e-mail.

A    Correct.

Q    Okay.  And you say, "Please" -- and this is what you had already told him orally by phone or in person before you flew back, just before you flew back.

A    Correct.

Q    Okay.  And you say in the e-mail, after you land at LAX, "Please send me ASAP the time line of key filing deadlines," end quote.

         What were those deadlines, key filing deadlines, you were asking him for?

A    When, um, the appeal bond, when we need to send notice of an appeal, when we need -- mainly thinking about staying the judgment, um, to prevent any type of collection action.

Q    Okay.  And you wanted to make sure that you knew the time deadlines for that so they would not be missed.

A    Correct.

Q   Okay.  And then you also -- and then Mr. Rechen subsequently provided all of that, did he not?  We saw his e-mail earlier.

A   Yes, that's correct.

Q   And then you say in this same e-mail, quote, Although -- "Also, your analysis that we discussed about for an appeal," end quote.

Now, I'm not sure I understood your explanation for that in your direct testimony.  If the first request was for deadlines, time deadlines, what was the second request?

A   During towards the end of the trial and throughout the trial, um, Mark had made a couple of statements to me that they thought the judge made an error that was appealable.  I was referencing that.  So just things that he had noted to me over the course of the trial.

Q   So your testimony is that there was never a discussion with Mr. Giarratana about his preparation of a -- of a motion for judgment as a matter of law, so-called JMOL.  Is that your testimony?

A   That's correct.

Q   I see.  And your understanding, then, is that Mr. Giarratana took it upon himself to do that; correct?  Is that your --

A   Apparently so.

Q   But you understand -- you're not a trial lawyer, and you

don't claim to be.  And you made it very clear; correct?

A   Correct.

Q   But you understood, from working on this matter and sitting through a four-week trial, that there's no appeal before there's a final judgment.  You learned that much, did you not?

A   Yes.  And I also knew that the likelihood of a JMOL being successful is remote, so I was thinking ahead towards the appeal.

Q   So you knew that -- even though you're not a trial lawyer, you knew from this intense exposure over four weeks that the next step in challenging the jury verdict, under the Rules of Procedure, was a motion for judgment as a matter of law, a JMOL.  You knew that; correct?

A   That's correct.

Q   And so you knew that had to be submitted by the party challenging the verdict, in this case Jarrow Formulas; correct?

A   Correct.

Q   And then you knew that the other side would get a chance to reply; correct?

A   Correct.

Q   You knew there were briefings; correct?

A   Correct.

Q   And you knew that the judge would have to rule on that motion before even the next step could be taken for an appeal; correct?

A    Correct.  You got to do one before the other.

Q    And then the judge would have to enter a final judgment; correct?

A    Correct.

Q    And in this case, that didn't happen for about two years after the jury verdict; correct?

A    Yeah.  It turned out we had lots of time.

Q    So you understood all along that the JMOL was the first step; correct?

A    Yes.

Q    And, in fact, Mr. Giarratana sent you that JMOL the following Saturday.  The jury verdict was on Wednesday.  He went home on Thursday.  He testified he worked on the plane Friday.  Saturday he submitted to you and Mr. Rogovin his work on that JMOL; correct?

A    Yes, he did.

Q    Okay.  And we see that, if we could call up Defendant's Exhibit 714, Defendant's Exhibit 714, which you, I think, saw on your direct examination, if we could blow up the "To" and the "From" and the first full paragraph, "As discussed."

       So we see that Saturday there's Mr. Giarratana's e-mail to you and Mr. Rogovin.  Do you see that?

A    Yes.

Q    Now, Mr. Rogovin testified he never read it, but you did when you received the e-mail and the attachments; correct?

A   Yes.

Q   Okay.  And he says, "As discussed with Jonathan, attached is" -- so he's referring to a discussion he had with you about the JMOL.  You say you don't remember that; correct?

A   No.  I'm saying it did not take place.

Q   It did not take place.  He's misunderstanding here, misstating it?

A   Apparently so or -- I can't explain what he did.

Q   Any reason for him to misstate that you can think of?

A   I can only explain what conversation we had.

Q   Yeah.

A   And what took place.

Q   Okay.  "As discussed with Jonathan, attached is a preliminary draft of the brief in support of the motion for JMOL."

        And there was attached just what's described there; correct?

A   Um, I don't recall; but, you know, from this, it's saying that clearly there were documents attached.

Q   You didn't send it back and say, "I don't know what this is, Mark.  I never asked you for this," did you?

A   No.  By that time I was under instructions to no longer communicate.

Q   Yeah.  So the answer is you did not send it back and say, "Mark, I don't know why you sent this.  I never asked";

correct?

Is that correct?

A   That's correct.

Q   And your explanation is you were under instructions not to communicate.  From Jarrow Rogovin those instructions came?

A   Yeah, but this is the 29th.

Q   Yes.

A   I don't know if I received the instructions yet.

THE COURT:  Hold on one second.  Broke my own rule. I'm supposed to keep my phone off during court.  Sorry.

THE WITNESS:  Have to sanction yourself.

THE COURT:  Go ahead, Mr. Pepe.  My apologies.

MR. PEPE:  Not at all, Your Honor.

Q   (By Mr. Pepe) So your testimony is that you did not send it back, did not tell him you didn't ask for it because you were under instructions not to communicate.  Is that your testimony?

A   I'm just taking a moment to think.

Q   Take all the time you need, sir.

A   May I have a moment.

That's the only reason why I could think that I didn't communicate back.

Q   And so you knew, then, that by that time that Jarrow Rogovin had decided to terminate McCarter; correct?

A   No, that is not correct.

Q   I see.  So you didn't -- you were under instructions not to

communicate. That came from Jarrow Rogovin?

A   That's correct.

Q   Okay. And he told you, Do not communicate with McCarter?

A   That's correct.

Q   And he didn't tell you why.

A   Well, I figured -- you know, it didn't take a rocket scientist to figure out he was unhappy from the trial results. But, you know, that's all I was told, not to communicate.

Q   And you didn't ask any further.

A   It wasn't my place to.

Q   And what you did do was take Mr. Jarrow's motion and brief and give to it Joel Beres, whom you had hired to take over the case.

A   Um, well, looks like he was copied here on this.

Q   And Mr. --

A   I didn't give it to him. Mr. Giarratana gave it to him.

Q   Okay. And you had -- by this time, had you hired Joel Beres to take over the case, or were you still negotiating with him?

A   The 29th, no, we had not -- I don't believe we had retained him yet.

Q   But you were still negotiating for him to take over the case; correct?

          MR. RESSER: Objection, lacks foundation.

          THE COURT: Well --

MR. PEPE: I'll withdraw, Your Honor. I'll withdraw it.

Q   (By Mr. Pepe) Mr. Beres then used this brief and motion to submit to the court after doing some additional work perhaps?

A   I don't know to be honest with you. You'd have to ask Mr. Beres.

Q   You didn't read -- as a general counsel, you didn't read the JMOL motion when it was submitted?

A   No.

Q   I see. Now, sir, your testimony is --

A   Well --

Q   I'm sorry.

A   If I can amend, I read what was submitted. I did not recall reading this.

Q   I thought you said you did read it -- Mr. Rogovin testified he did not. You testified you did read it. Did I misunderstand?

MR. RESSER: Objection, mischaracterizes his testimony. It was about the e-mail.

THE COURT: So, Ladies and Gentlemen, it will be your recollection, no one else's, of the testimony that matters. The only one that matters is what you think.

Go ahead. I'll overrule the objection. You can answer.

Q   (By Mr. Pepe) Did you or did you not read the trial motion

and brief when it came in?

A   I'm sure I skimmed it because it's something I would do. But sitting here, I can't say with a hundred percent.  So I just -- I'm going to say I don't remember.

Q   Now, sir, your testimony is on June 29th you did not know of Mr. Rogovin's decision to terminate McCarter & English; correct?

A   Correct.

Q   If you had known, if you had, you would have told Mr. Giarratana, when you received it, that he was terminated, would you not?

A   Not necessarily so.

Q   I'm sorry?

A   I may have not have told him depending on the instructions I was told from my client.

Q   That's not my question, sir.

       My question is, If you had known that McCarter & English had been terminated, that Mr. Rogovin had decided to terminate them, when you got that, this, when you received this information, you would have told Mr. Giarratana that he'd been terminated; correct?

A   And I answered you, sir.  Unless I had counter-instructions not to communicate with McCarter & English.  If I did not have those instructions, I would have told him.

Q   In fact, sir, you would have told him because that would

have been the appropriate thing to do; correct?

A    It would have been the natural thing to do.

Q    The appropriate thing to do; correct?

A    No.  You're putting words in my mouth.

Q    Well, I'm -- let's see if I am, sir.

MR. PEPE:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q    (By Mr. Pepe) I've handed you a copy of your deposition given in this matter on April 27, 2020.  You remember that deposition?  It was done by Zoom.  You were in California; I was in Connecticut.

A    Yeah.  I obviously don't remember the whole thing; but, yeah, obviously I remember we did it.

Q    But you read the deposition transcript after that; correct?

A    Yes.

Q    All right.  And you remember, of course, in a deposition, just as you are here, you're under oath; correct?

A    Correct.

Q    All right.  And if I can direct your attention in the deposition transcript to page 116, on April 27, 116.

A    Line number?

Q    You could look at page 115 just to get the context so you know what we're talking about.

You can tell from the context that we were examining on this very same exhibit --

A    Yes.

Q    -- Mr. Giarratana's e-mail; correct?

A    I'm just trying not to break your thing apart.

Q    Take it apart if it's easier.  You can do it.

     Question and answer --

A    "It would have been the appropriate thing to do."  That's how I answered.

Q    So you can see those pages we're talking about the same exhibit, Mr. Giarratana's June 29 e-mail to you sending the e-mail.  You better hang on to it.  I think you need to hang on to that, sir.

     And now -- now you've got the context, could you go to page 116, please?

A    I'm sorry.  116 again?

Q    116.  Starts at the top question and then down below.  Do you see that?

     Page 116, sir.

A    Yeah, I'm there.

Q    All right.

     "Question:  And then down below in that same e-mail," referring to Mr. Giarratana's e-mail we just looked at, the question goes on, quote, "he gives you the deadlines relating to the post-verdict motions and the like; correct?"

     Your answer:  "Yes."

     "Question:  Now, on this day, June 29, you had not

been informed that McCarter was being terminated.

"Answer:  Correct."

Did I read that properly?

A    Yes.

Q    "Question:  If you had, would you have been told Mr. Giarratana -- would you have told Mr. Giarratana that he's been terminated?

"Answer:  Yes.

"Question:  You think that would have been the appropriate thing -- that would have been appropriate to tell him, would you not?

"Answer:  Yes."

That was your testimony, was it not?

A    That is.

Q    I didn't put the words in your mouth.

A    No, you did not.

Q    You believed it was appropriate --

A    Yes.

Q    -- if you were to tell him so that he wouldn't be doing work not knowing that he had been terminated; correct?

A    Correct.

MR. PEPE:  Yeah.  No further questions, Your Honor.

THE COURT:  All right.  Is there any --

MR. PEPE:  May I retrieve the --

THE COURT:  You may.

Mr. Resser.

MR. RESSER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. RESSER:

Q    Mr. Leventhal, during the earlier part of your examination, we looked at an e-mail dated July 3, which you testified Mr. Rogovin had dictated the words to you.

Do you have that subject in mind?

A    Yes.

Q    I think you testified that Mr. Rogovin had dictated those words to you over a phone call.

A    That's correct.

Q    Had you seen Mr. Rogovin between the time he left the courtroom in Kentucky and the time of the phone call on July 3rd where he dictated the e-mail to you?

A    No.  He was kind of MIA.

Q    Had you spoken to him during that period?

A    Once or twice.  Well, twice, spoke to him twice.

Q    During either of those conversations, do you recall if Mr. Rogovin told you not to communicate with McCarter & English?

A    It was on the second phone call.

Q    And that was the phone call in which he dictated the e-mail to you?

A    That's correct.

Q    So the date on which you were instructed not to communicate

further was July 3rd, 2019.  Is that your recollection?

A    That's correct.

MR. RESSER:  No further questions.

THE COURT:  All right.  Mr. Pepe, anything?

MR. PEPE:  No questions, Your Honor.

THE COURT:  Okay, sir.  You can step down.

All right.  What's next?

MR. RESSER:  At this point, Your Honor, we will present the deposition testimony of Mr. Khowong.

THE COURT:  Yes, sir.

MR. BUDINETZ:  Your Honor, just the issue we discussed this morning, if I could just have a moment to perhaps confer with Attorney --

THE COURT:  Sure.  Go ahead.

Are we all set?

MR. BUDINETZ:  Yes.  I think we are, Your Honor.  Yes, thank you.

THE COURT:  Okay.  Very well.

So, Ladies and Gentlemen, you're about to see some video deposition testimony.  You've seen a little bit already. Just a reminder, this testimony was given under oath just the same way every witness who came into the court and took an oath before you.  You're to treat the testimony in the same way you would the testimony of any other witness who came and took the oath before you.  All right?

Go ahead, Mr. Resser.

MR. RESSER:  Mr. Campos.

(Plays video.)

MR. RESSER:  Your Honor, sidebar?  I'm sorry.

THE COURT:  Sure.

(Sidebar off the record.)

THE COURT:  Folks, there may be a couple of interruptions while we deal with some technical issues.  Just be patient.

I could continue my civics lesson, Ladies and Gentlemen, which is not what you want right now.

MR. RESSER:  Your Honor, I'm told maybe about three to five minutes.

THE COURT:  Okay, that's fine.

MR. RESSER:  Thank you, Your Honor.

(Pause.)

(Plays video.)

THE COURT:  Can I ask you to stop it now?  Thank you so much.  All right, Ladies and Gentlemen, it's 3:30.  Time to go home.  Thank you for your attention today.  Don't discuss the case.  Don't discuss it with anyone else.  Keep an open mind.  We'll see you in the jury room at 8:45 tomorrow.  Thank you so much.

(The jury left the courtroom at 3:29 p.m.)

THE COURT:  All right.  So, Mr. Resser, what's --

first of all, how much longer do we have on this do we think?

MR. RESSER:  Approximately 12 minutes, Your Honor.

THE COURT:  Twelve minutes.  And then we'll be done with Mr. Khowong?

MR. RESSER:  Yes.

MR. BUDINETZ:  Your Honor, we have some affirmative designations and we would propose to -- it's not very long, and we think we can get it down even shorter tonight but some that are in the JTM.  We have about 14 minutes of affirmative designations.

THE COURT:  For Mr. Khowong?

MR. BUDINETZ:  Yes.

THE COURT:  Any objection to doing that now after your 12 minutes?

MR. RESSER:  No, other than Mr. Paige will be ready at nine o'clock.

THE COURT:  Okay.  Does he -- his testimony should be short; right?

MR. RESSER:  It should be.

THE COURT:  Can he hang on --

MR. RESSER:  I think can hang on.  I plan to talk to him this evening.

THE COURT:  Very well.  So why don't we plan on that.  We'll have the 12 minutes and then the 14 minutes, and then we'll have Mr. Paige by Zoom.  And then what do we have after

that?

MR. RESSER: Mr. Lipsky by depo, Ms. Adipietro by depo, and also, Your Honor, I had subpoenaed Mr. Grondahl. We had him on 24-hour call. And I only found out yesterday that counsel was not going to produce him.

THE COURT: Okay. We talked about maybe doing Mr. Grondahl when he comes down for the rest of the case; is that right?

MR. PEPE: That was resolved yesterday, Your Honor.

THE COURT: Okay. So are we saying we don't have anything to do after we have Lipsky and Adipietro? Is that what you're saying or --

MR. RESSER: Well, then, Your Honor, I believe the second part of the trial will --

THE COURT: Start.

MR. RESSER: Will start. And we would have Mr. Berman as our first witness.

THE COURT: Fine.

MR. RESSER: And Mr. Rogovin as our next witness.

THE COURT: Fine. Let's plan on that, then, if we get that far. And so that's all fine.

MR. PEPE: Your Honor, would you consider rebuttal on the first part of the case?

THE COURT: No, no, no, no. We'll deal with rebuttal at the end of everything. We'll deal with rebuttal at the end,

Mr. Pepe.

Okay.  Right.  So sounds like a plan.  Anything else to discuss before we recess?

MR. GREEN:  One thought, Your Honor.  Since Mr. Paige is not being qualified as an expert --

THE COURT:  Correct.

MR. GREEN:  -- may I assume that counsel won't seek to qualify him?

THE COURT:  Well, I don't qualify witnesses as experts anyway, so you might as well know that now.  My view is other than, you know, a *Daubert* motion going to qualifications, after that, the witness's qualifications is for the jury to decide.  So there's no need to petition the Court to have somebody considered as an expert because I'm not going to designate somebody as an expert.

MR. GREEN:  No, but what I meant --

THE COURT:  He's not going to ask if I'm telling him that, A, he's not testifying as an expert tomorrow; and, B, I don't qualify witnesses as experts anyway.

MR. GREEN:  Fair enough.

THE COURT:  Great.  We'll be in recess.  Thank you.

(Proceedings concluded at 3:33 p.m.)

# **I N D E X**

**WITNESS NAME**                                        **Page**


Jarrow Rogovin

  Continued Cross By Mr. Pepe ............................... 754

  Redirect By Mr. Heavey...................................... 799

  Redirect By Mr. Pepe ....................................... 836

  Further Redirect By Mr. Pepe................................ 890

  Further Redirect By Mr. Heavey ............................. 897


Jonathan Leventhal

  Direct By Mr. Resser ....................................... 851

  Continued Direct By Mr. Resser ............................. 902

  Cross By Mr. Pepe........................................... 904

  Redirect By Mr. Resser...................................... 921


Ben Khowong

   Video deposition .......................................... 923

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937