UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP

vs.

JARROW FORMULAS, INC.

- - - - - - - - - - - - - - - - x

No. 3:19-CV-1124 (MPS)

JULY 12, 2023

8:55 A.M.

JURY TRIAL

Volume VI, pages 929 - 1089

450 Main Street
Hartford, Connecticut

BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:   Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

       McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
           One State Street, 14th Floor
           Hartford, Connecticut 06103
      BY:  LOUIS R. PEPE, ESQUIRE
          JAMES G. GREEN, JR., ESQUIRE
          JAMES A. BUDINETZ, ESQUIRE
          DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

      BARTON LLP
          100 Wilshire Boulevard, Suite 1300
          Santa Monica, California 90401
      BY:  BERNARD M. RESSER, ESQUIRE

      BARTON LLP
          711 Third Avenue, 14th Floor
          New York, New York 10017
      BY:  JAMES E. HEAVEY, ESQUIRE
      BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:55 a.m.)

THE COURT: All right. So a couple of things before we -- before we bring the jury in: One, my understanding is we're going to have Mr. Paige join the Zoom shortly. He'll listen in while these depositions get completed, and then we'll start with him I guess around 9:30, whenever the deposition testimony is done.

Mr. Resser, do you have a copy of that document you're going to review with him for me?

MR. RESSER: Yes. There's actually an issue with Exhibit 534 in light of Ms. Bosma's testimony that the source document, which is PTX 118, reported all billings whether paid or unpaid.

THE COURT: Okay.

MR. RESSER: And from her testimony, we learned that -- and our exhibit is -- has the heading "Amounts paid by Jarrow Formulas at billed rates and fees at the contract rates." And we wish to substitute where the heading is "Difference between amounts billed to Jarrow Formulas" and "billed at the contract rates."

THE COURT: So, in other words, you just change the heading.

MR. RESSER: Just change the heading.

And then in order to back out the amounts of PTX 1 through PTX 5, which are the unpaid invoices, we've prepared a

like document that we would offer as Exhibit 715, Defense 715. It was shared last week with plaintiff's counsel.  I have both of those.

THE COURT:  All right.  And these are two documents you would like to review with Mr. Paige?

MR. RESSER:  Yes, Your Honor.

THE COURT:  Mr. Green, before I hear from you, can I have the document?

MR. RESSER:  Absolutely.

We'll lay a foundation for both, Your Honor.

THE COURT:  So 534 is "Difference between amounts billed to Jarrow Formulas at billed rates and fees at contract"?

MR. RESSER:  Right.

THE COURT:  And then the other one is "Difference between amounts at billed rates and contract rates," so including things that were -- wait.  Can you explain to me the difference again?  Sorry.

MR. RESSER:  Yeah, the second one, 715, takes the data from Exhibit 530, which is that initial February 22, 2013, bill, which showed the 405 for Mr. Giarratana and the 395 for Mr. Grondahl, and it used those initial -- those numbers as the initial rate.  And then the 2019 rates shown are from PTX -- PTX 001 through PTX 005.  And then we show the rate difference multiplied by the hours shown on those five bills to show the

difference.

THE COURT: All right. So what I've got -- so that is -- that would be Defendant's Exhibit 751?

MR. RESSER: 715 I believe is the next in order.

THE COURT: And then the earlier one is DX 534?

MR. RESSER: Yes, Your Honor.

THE COURT: Okay, Mr. Green. What have you got for me?

MR. GREEN: Your Honor, we think that 534A should be corrected during the exam. It was mistaken. And we haven't seen the corrected 534A. Mr. Resser said he sent it to us last week, but none of us recall seeing it.

THE COURT: Okay. Hold on. I thought what I was holding in my left hand entitled "Difference between amounts billed to Jarrow Formulas at billed rates and fees at contract," I thought that was DX 534, not 534A.

MR. GREEN: 534, Your Honor, is Jeff Tinley's office's exhibit.

THE COURT: All right. Hold on a second.

Mr. Resser, what I'm holding then in my left hand, "Difference between amounts billed to Jarrow Formulas at billed rates and fees at contract," that's actually DX 534A, capital A?

MR. RESSER: We never submitted it with a sub -- we called it revised Exhibit 534. If we want to label it 534A, we

can do that.

THE COURT: I think we should. DX 534A, okay. And then the other one is 715.

All right, Mr. Green, go ahead.

MR. GREEN: Your Honor, we had a major argument over 534A. You may remember it.

THE COURT: Yes. Earlier in the week; right?

MR. GREEN: Yes. Mr. Paige corrected the work of Mr. Tinley's office, and we described it as 534A during those discussions.

THE COURT: Okay.

MR. GREEN: It's been fixed again to reflect a defect that we pointed out that originally it was labeled "Fees paid," Your Honor, and that's incorrect. I agree that the new version, which states "Fees billed at the new rates versus the contract rates" is an accurate depiction of the exhibit, but we're just seeing it for the first time. Mr. Resser said he sent it, but none of us recalls receiving it.

THE COURT: Well, what's changed from the original document?

MR. GREEN: The change is Mr. Paige mistakenly labeled it "Fees paid." And we made the point through Ms. Bosma that the source document is "Fees billed." So they've changed the document, and we haven't seen that change. Mr. Resser says that it was sent over last week but that he did it in reliance

on Ms. Bosma's testimony. She testified Monday. We haven't seen it.

THE COURT: Well, so you haven't seen the document that I'm holding in my hand?

MR. GREEN: I haven't. I haven't seen the corrected document, the second corrected document that relabels it "Fees billed."

THE COURT: Mr. Resser, Mr. Green doesn't have a copy of what I'm holding in my hand.

MR. RESSER: What I referred to as sending last week is what we've now labeled 715. If I failed to send him the one that just changed the word "paid" to "billed," then I take his representation. I just e-mailed it to him this moment.

THE COURT: So -- okay.

MR. RESSER: The only change is the word "paid" to "billed."

THE COURT: And just so I'm clear, it used to say "Difference between amounts paid to Jarrow Formulas at billed rates and fees at contract"?

MR. RESSER: "Paid by Jarrow Formulas."

MR. GREEN: Your Honor, I think --

THE COURT: "Paid by Jarrow Formulas," not "Billed to Jarrow Formulas."

MR. RESSER: Right.

MR. GREEN: I think that should be corrected on the

record. Mr. Paige should acknowledge his error.

THE COURT: Well, okay.

MR. GREEN: And, Your Honor, we haven't seen it.

THE COURT: I mean you can examine him about the fact that he made a change in an exhibit and this is, in fact, an exhibit that was changed just whenever it was changed, last night. You can certainly ask him those questions. So, in effect, you're going to cross-examine him, I take it.

MR. GREEN: Yes.

THE COURT: So, I take it, yes, I'm certainly not going to preclude you from asking him about the genesis of this exhibit, including all its considerations.

MR. GREEN: Well, you may recall, Your Honor, you agreed some foundation should be laid for this document.

THE COURT: Yes.

MR. GREEN: And I think that should include --

THE COURT: Well, I'm not going to dictate to Mr. Resser how he should conduct his direct examination. Again, you will be free to explore this document and its genesis. That's the whole point, I think; right?

So nothing prevents you from saying: Now, Mr. Paige, you just made a change. And what was that change? And, in fact, you had it -- provided it to Mr. Resser previously. Were you aware that he provided it to me?

You can do all of that. So I think you can bring all

of this out.

What else?

MR. GREEN:  I don't have 715, which is the new calculation.  We've never seen it.

THE COURT:  Okay.

MR. GREEN:  And I still haven't seen it.  I don't have it yet.

THE COURT:  Mr. Resser, what about that?  715?

MR. RESSER:  715 was sent to Mr. Green last week.

THE COURT:  Folks, come on.  Folks, I got to be honest with you.  You guys are good lawyers, but you're driving me crazy.  I mean this kind of thing I should not have to deal with, whether it was sent, whether it was not sent, whether it was received.  You're trial lawyers.  You're supposed to work together at a minimum level.  In spite of what your clients may think of each other, I expect more from you.  So what's going on?  I don't really want to be resolving these disputes.  This is silly.

MR. RESSER:  I understand.  I understand, Your Honor.

THE COURT:  It's a waste of my time.

MR. RESSER:  I understand, Your Honor.  We did send it to them.  We said we will use it as a demonstrative unless the Court allows us to add it to the exhibits.  That's what we did a week ago or so.

THE COURT:  All right.  So what do you say to that,

Mr. Green?

MR. GREEN: I don't recall receiving it.

THE COURT: Let me ask you this: Do you have it now?

MR. GREEN: I still don't, Your Honor.

THE COURT: So let's give him a copy. Why don't you take a look at it for a minute, a couple minutes if you like.

Folks, I don't want these kinds of disputes anymore. Things about sharing exhibits, alerting people to witnesses, that's -- that's minor league, guys. You guys are supposed to be pros. I don't expect that from you. I don't want it anymore.

What else, Mr. Green?

MR. GREEN: I'm reading it, Your Honor.

THE COURT: Take your time. I'm not going to rush you on that.

MR. GREEN: So, Mr. Resser, this figure used to be a million 205.

THE COURT: The figure in?

MR. GREEN: Excuse me, Your Honor. The figure on 534A, the delta was 1,205,000.

THE COURT: That's what I have on 534.

MR. RESSER: On both 534s the number is the same. It's just the heading that's changed.

THE COURT: Right. I have on 534A, 1205137 and 78 cents.

MR. GREEN: So does this 274 represent a deduction from the million 205? Is that what you're indicating?

MR. RESSER: Yes.

THE COURT: I was hoping the witness could explain it to me, frankly, because I don't understand it, but ...

MR. RESSER: We're prepared to do that, Your Honor.

THE COURT: That's fine.

MR. GREEN: All right, Your Honor. I understand the calculation, but I do think it can be corrected on the record.

THE COURT: And, again, you'll have an opportunity to do that. But I'm not going to dictate to Mr. Resser how he conducts his direct examination.

MR. RESSER: Your Honor, we sent that document to Mr. Pepe and Mr. Green on Thursday the 6th at 8:39 a.m.

THE COURT: All right.

MR. RESSER: 715.

THE COURT: Very well. Mr. Pepe, you wanted to raise something with the Court?

MR. PEPE: Only if Your Honor's through with that issue.

THE COURT: I hope I am. What else do I need to do on that issue, Mr. Green? Because I'd like to bring the jury in soon.

MR. GREEN: I just want to get a copy of the new exhibit. I don't have that.

THE COURT: Let's make sure he gets a copy of the new exhibit right now, please.

Mr. Pepe, go ahead.

MR. PEPE: Your Honor, I raise this issue with trepidation given Your Honor's last admonition, which we appreciate.

THE COURT: Yes.

MR. PEPE: This goes to the order of witnesses.

THE COURT: Okay.

MR. PEPE: Your Honor, we recall after the jury was excused yesterday there was a conversation yesterday off the record which Your Honor inquired about the remaining witnesses.

THE COURT: Yes, I did. Yup.

MR. PEPE: And at that time, at that time Attorney Resser indicated that for the malpractice case, which was scheduled to start today after the end of the depositions of Mr. Paige, he would be calling Mr. Berman, the expert, first and Mr. Rogovin second.

THE COURT: Right, he did.

MR. PEPE: And then after that, Mr. Rechen and Mr. Giarratana. And so I discharged and sent home Mr. Rechen and Mr. Giarratana and went back to the office and prepared for those two witnesses and then at 5:25 received an e-mail indicating, from Mr. Resser, indicating that the order of witnesses would change and it would be Mr. Berman and then Mr.

Rechen. And the Court's order previously issued indicated the order of witnesses before six o'clock. So there's a technical compliance with that order.

Here's the problem, and I apologize for bringing it to the Court's attention. And I recognize that in the intensity of a trial adjustments have to be made. And when those adjustments are made, we have to try and accommodate each other. I appreciate that.

This time I could not because I had already sent home Mr. Rechen and Mr. Giarratana, quite frankly, to get them out of my hair so I could prepare for Mr. --

THE COURT: Sounds familiar.

MR. PEPE: Indeed, yes. It does have echoes of previous occasions.

And so I could not accommodate Mr. Resser. And so I just said we'd have to let the judge decide. And I'm sorry that we have to bring this.

THE COURT: Mr. Resser, what have you got for me on this? We're calling Mr. Berman first.

MR. RESSER: Yes.

THE COURT: That we've established. What else have you got done? And yesterday you did tell me it would be Mr. Berman and Mr. Rogovin. And then I said, Well, what about after that? And I think you said Rechen.

MR. RESSER: Mr. Rechen and Mr. Grondahl -- Mr.

Giarratana.

We then conferred, my team and I, our clients conferred right here in the courtroom. And within less than two hours, and before six o'clock, we sent an e-mail to Mr. Pepe and his team indicating our understanding that we needed to provide this information by six o'clock and we were providing it by six o'clock, that I was not aware of any requirement that we provide the order, just who we planned to call the next day.

THE COURT: Well, but in fairness, though, if you think about it, if you think about it, Mr. Resser, that doesn't really make sense because the reality is we're not going to get through all those witnesses today. And there was never an expectation that we would, based on what was said yesterday. And so it does affect what they can prepare for if you change the order. There's no question about that.

MR. RESSER: Your Honor, I understand. And that's why, as soon as I was able to send the e-mail, as counsel said, it was 5:25 in the afternoon, um, we sent the e-mail saying we were adjusting the order and we were very clear on that --

THE COURT: Well, here's the thing, okay, you have a lawyer who's representing to me that -- I take it, Mr. Pepe, you're telling me you're not prepared to deal with those witnesses today.

MR. PEPE: I prepared for Mr. Berman and Mr. Rogovin.

THE COURT: That's what we're going to have to do today.

MR. RESSER: Can we do Mr. Giarratana as long as -- instead of Mr. Rechen and do Berman?

THE COURT: Are you ready on Mr. Giarratana?

MR. PEPE: I went back -- reliance on the representation, I went back and prepared for what I understood to be the next two witnesses, Mr. Berman and Mr. Rogovin.

MR. RESSER: It was less than two hours, Your Honor.

THE COURT: All right. You're going to have to call Mr. Rogovin as your second witness in the malpractice.

MR. RESSER: Thank you, Your Honor.

MR. GREEN: Your Honor, may I just --

THE COURT: No, nothing further. We're bringing in the jury. I've had it. We have to do better, folks. This is unprofessional, frankly. We have to do better.

(The jury entered the courtroom at 9:12 a.m.)

THE COURT: Sorry for the slight delay. I assure you I am doing everything I can to make the trains move. Got to trust me on that. All right? Folks, you can take your seats.

We're going to hear some more of the deposition testimony. It's been estimated another 30 minutes or so. And then we'll have another witness, which we'll talk about later.

All right. I'll ask the nice gentleman to start the testimony again, Mr. Khowong, I believe.

(Plays video.)

THE COURT: All right. Are we all set then for our other witness this morning?

MR. BUDINETZ: Yes, Your Honor. Before Mr. Paige, we have some designations, affirmative designations, about ten minutes of Mr. Khowong.

THE COURT: Oh, yeah, proceed with those. Oh, you're going to run it from your side. Fine. That's fine.

(Plays video.)

THE COURT: All set then?

MR. BUDINETZ: Yes, thank you, Your Honor.

THE COURT: So, Ladies and Gentlemen, with regard to our next witness, so this witness is going to testify via Zoom. And we don't ordinarily allow that, but because of some unique circumstances in this case, having to do with the schedule and his availability, I've decided to allow it in this case.

Now, the witness is going to be placed under oath just like any other witness, and you're to treat this witness -- you're to evaluate this witness's testimony in the same way that you would evaluate the testimony of any other witness. All right. Let's bring him up on the screen.

All right, sir, good morning. I'm going to ask our courtroom deputy to -- I'll tell you what. I think he can see me but not you. I'll swear him in.

Sir, why don't you raise your right hand.

D A V I D   P A I G E,

having been duly sworn by the Judge, testified via video

under oath as follows:

THE COURT:  All right, sir, if you could just give us your name and tell us the town where you work and if you could spell your last name for the record.

THE WITNESS:  Yes.  My name is David Paige, and my last name is spelled P, like Peter, A-I-G-E.  I work in New York City.

THE COURT:  Great.  Mr. Resser.

DIRECT EXAMINATION

BY MR. RESSER:

Q   Hello, Mr. Paige.  Can you tell us what your occupation is?

A   Uh, yes.  I'm the managing director of a legal fee consulting firm called Legal Fee Advisors.

Q   And do you have experience in reviewing legal billing?

A   Yes, I do.

Q   In connection with your testimony today, what were you asked to do?

A    I was asked to perform a calculation to take a look at what had been called the initial rates, meaning the rates charged by the law firm here prior to when they were increased, I believe, in 2013, compare those rates to the increased rates,

multiply the number of hours and thereby determine the amount charged over the initial rate. In other words, the amount charged in addition to what would have been charged if only the initial rate had been charged.

Q   What were the source documents that you reviewed?

A   The source documents, the primary document, was a document that is, I believe, referred to as PTX 118, and that is a -- my understanding is that this is an accounting report that was generated by the software at the law firm. That's one document.

Another document that I looked at was the -- I believe was the first bill in -- rendered by the firm to Jarrow Formulas in the Kentucky litigation, and I think that is referred to as Exhibit 530. It's a bill of February 22nd, 2013.

Those two documents are what I utilized.

Q   Do you have copies of those documents in front of you today?

A   I have copies of those two documents in front of me, yes. It's -- it's easier for me to see them in a printed version, I think, then on the screen.

Q   Do you have any other documents in front of you today?

A   Um, I have several exhibits that I -- I'll just call demonstrative exhibits, meaning that, in my -- my understanding, these exhibits are charts that were prepared

that show the results of the calculations.

Q   Let's show Mr. Paige Exhibit D -- Defendant's 530, please.

Mr. Paige, is this -- is this the document you referred to earlier in your testimony?

A   It is.

Q   How did you use this document in your analysis of the difference between the total fees billed by McCarter & English at the increased rates and the fees billed by McCarter & English at the initial rates?

A   Um, the reason for taking a look at this document is that, as the first bill rendered by the firm, I wanted to see the initial rates that were charged by the legal professionals here.

On page 12 of the bill, those rates are set forth.  I took a look at the rates for the -- for the attorneys and for the paralegal here and used those rates as the initial rate, which means the rate for these professionals before there was an increase.

Q   So for Mr. Giarratana, what billing rate did you use?

A   $405 per hour.

Q   Same question for Mr. Grondahl.

A   That would have been $395 per hour.

Q   And for the paralegal, Ms. Gaffey?

A   $195 per hour.

Q   Okay.  Thank you.

Next I would like to show Mr. Paige PTX 118.

You've seen this document before.  Yes, sir?

A    Yes.

Q    How did you utilize this document in your analysis of the difference between the fees billed at the increased rates and the fees billed at the initial rates?

A    This document, um, was supplied to me and represented to me as a document that was prepared by the law firm as a report that showed information that was important for the calculation. The -- you can see the timekeepers on the left-hand column under the letter capital A.  For each timekeeper, it also showed an initial rate under the column labeled D.  That initial rate I had assumed would be the rate that was charged by the law firm before there was a rate change, meaning an increase for most, if not all, the timekeepers.

The initial rate -- I did find, however, that the initial rate for certain timekeepers was not reflective of the initial rate on Exhibit 530.  So where 530 differed, I substituted the initial rate from 530.  So that was one piece of information that I needed from this document, which were these initial rates, meaning the rates before they were changed.

Another piece of information -- excuse me -- would be the changed rates.  The changed rates are under column H.  So where the rate had been changed, that would be shown in H.  And

those rates are set forth there.

So going back, you have a timekeeper, you have an initial rate, you have a changed rate, where there was a change made.

Then another piece of information would be in column J.  That column showed the number of hours worked in the case.  So for various -- for the various professionals, it shows the number of hours charged and my understanding is billed, meaning these hours were billed.

The next piece of information that was important was under column L, which is the blended rate.  I understood the blended rate to be the average rate charged by each timekeeper in the case.  And I understand that from testimony of one of the witnesses in the case and accepted that as true.

These -- these columns of information is what was used by me to verify the calculations that were requested.

Q   What is your understanding of blended rate in this document?

A   My understanding of blended rate in this document -- and my experience is the term "blended rate" can mean different things in different settings.  But my understanding is here blended rate refers to as an average rate for each of these individuals.

Q   Why did you focus on the blended, or average rate, and not the changed rate shown on PTX 118?

A    In certain circumstances, the changed rate would be higher than the blended rate.  The average would take in account the time that would have been charged prior to the increase at a lower rate and, therefore, would have been more accurate -- a more accurate number to use.  In other words, it would yield a lower difference than using the changed rate but would be more accurate.

Q    So by using the blended rate, you avoided overstating your totals.

A    That's true.

Q    Can you give us an example of where the blended rate was used and how that affected your calculation?

A    Yes.  If we go down to Thomas Rechen and we take a look at with his situation, if we go to his initial rate, it was $405 per hour.  And that would be under column D.  There we go.

And if we look at the changed rate, which is under column H, that's $520 per hour.  So the information that I understood from this document is that the initial rate, meaning the rate before there was the increase, was $405 for Mr. Rechen.  Then his hourly rate was changed and increased to $520 per hour.

If we take a look at the blended rate for Mr. Rechen, that's $504 per hour.  My understanding is that the $504 per hour was an average that was calculated by the software utilized to create this document by the firm.  And so that $504

average rate would have averaged out what was charged by Mr. Rechen over the course of the litigation.

Q   What does PTX 118 say about when Mr. Rechen's rate was increased to $520 an hour?

A   It shows the date of change under columns F and G.  The date of change shows that it was changed in February of 2016.

Q   So going back to the question of comparing the initial rates shown on PTX 118 and the rates charged as shown on Exhibit 530, what did you find?

A   What I found is for three timekeepers, that the initial rate was different than what is indicated on PTX 118.  Would you like me to explain?

Q   Yes, please.

A   Okay.  So for -- if we look at page 12 of Exhibit 530, we can see that on this document the initial rate for Mr. Giarratana was $405 per hour.  If we look at PTX 118, the initial rate indicated there for Mr. Gia -- excuse me -- Giarratana is $535 per hour.  That appears -- so the $535 per hour appears to be incorrect as to the initial rate.

If we look at Mr. Grondahl on page 12 of Exhibit 530, his rate there is $395 per hour.  However, if we look at Mr. Grondahl on Exhibit PTX 118, the initial rate appears to be $485 per hour.  In that -- so I, in reliance on Exhibit 530, the initial rate for Mr. Grondahl would be lower than is indicated on 118.

And, last, if we take a look at the paralegal, Alison Gaffey, it shows a rate of $195 per hour as the initial rate and we look at PTX 118, her initial rate is $200 per hour. Therefore, for those three timekeepers, in reviewing the calculations, I relied upon the rates in Exhibit 530.

Q   Did you then make calculations for each timekeeper on the difference between the fees billed at the initial rates and the fees billed at the increased rates?

A   Yes.  I -- I reviewed those calculations.

Q   So can you give us an example of your calculation, for example, for Mr. Rechen.

A   Yes.  So if -- let's see.  If we take a look at Mr. Rechen, we have an initial rate of $405.  We have a blended rate of $504.  That is a $99 difference per hour.  In other words, the blended rate is $99 higher than the initial rate.  That was then multiplied by the number of hours he charged in the case, which is under column J.  And that's 205 -- excuse me -- 2,504 dot 28 hours.  And if you multiply those out, you get a difference, a dollar difference.

Q   Did you do that for each timekeeper on PTX 118 other than the three you identified where the initial rate is not shown on that document?

A   Yes.  I reviewed those calculations, and the differences -- the dollar differences were then verified.

Q   Is there a document that shows the results of your

calculations?

A    Yes.

MR. RESSER:  Without publishing to the jury, can we show Mr. Paige Defense Exhibit 534A, please?

THE COURT:  Just for the witness.  Is there a way to do that, Josh?  Just for the witness.

Q    (By Mr. Resser) Mr. Paige, what is the source of the data on Exhibit 534A?

A    Exhibit 534A, all of the data was derived from PTX 118 and Exhibit 530.

Q    Now, on this version of the exhibit, 534A, it doesn't reference PTX 118.  It referenced Defense Exhibit 531.  And I think counsel will stipulate that 531 Defense and PTX 118 are the same.

MR. GREEN:  That's correct.

THE COURT:  All right.  Very well.  Thank you.

Q    (By Mr. Resser) So the -- and the exceptions in terms of the initial rates on 534A are the exceptions you just described earlier for Mr. Giarratana, Mr. Grondahl, and Ms. Gaffey to reflect the initial rates from Exhibit 530 as opposed to from PTX 118.  Do I have that right?

A    Yes.

Q    The total on Exhibit 534A, what does that number represent?

A    That number represents the dollar difference that is derived from multiplying the hours billed by each timekeeper by

the difference between the initial rate and the blended rate.

Q   So this is nothing more than an arithmetic calculation from the documents that you referenced.

A   Yes.

MR. RESSER:  Your Honor, Jarrow Formulas offers and moves admission of Exhibit 534A into evidence.

MR. GREEN:  No objection, Your Honor.

THE COURT:  All right.  534A will be admitted as a full exhibit.  It can be published to the jury.

(Defendant's Exhibit 534A, received in evidence.)

Q   (By Mr. Resser) Mr. Paige, now that we can show this exhibit to the jury, can you please take us through the table and describe what it shows.

A   For the first column shows each timekeeper's name in alphabetical order.  The next column under "Rate Differential" shows the initial rate, the initial rate being the rate charged per hour by each timekeeper at the beginning of the Kentucky litigation, the blended rate utilizing the blended rate from PTX 118, which is the rate indicated by the firm on their document as the average rate.  Then the difference between the initial rate and the blended rate was calculated, just mathematically.  That rate difference was then multiplied by the hours charged.  And the difference in the last column is the dollar difference.  And then that was summed at the bottom of the page.  I'm sorry, at the bottom of the table.  Excuse

me.

Q   And that figure is the $1,205,137.78?

A   Yes.

Q   Now, the heading of Exhibit 534A says, "Amounts paid by Jarrow Formulas."  And you just told us the amount billed.  Why that discrepancy?

A   Um, I was informed, um, sometime last week, that the label "Paid by Jarrow Formulas" was not entirely correct because my understanding is that Jarrow Formulas did not pay all of the bills, that there were still some bills unpaid.  Therefore, my understanding is that this chart represents the amounts billed by the firm to Jarrow Formulas.

        MR. RESSER:  I would now ask that Exhibit 534B be shown to Mr. Paige but not published to the jury yet.

        THE COURT:  Okay.

Q   (By Mr. Resser) Mr. Paige, what is Exhibit 534B?

A   It's -- as far as I know, it is identical to the first exhibit, with the exception that it has been corrected to show that it is the difference between the amounts billed at the initial rates versus the increased rates and that the only other difference I can see here is that it shows PTX 118 on it as a source document.  I don't believe that was true on the other exhibit.  I think the table itself is the same.

        MR. RESSER:  Your Honor, Jarrow Formulas moves admission of Exhibit 534B.

MR. GREEN:  No objection.

THE COURT:  Okay.  That will be full.  It can be published.

(Defendant's Exhibit 534B, received in evidence.)

Q   (By Mr. Resser) Mr. Paige, after we learned that 534 shows billed charges and not paid charges, what -- did you make any -- or did you make any other calculations with respect to the billed but unpaid portions of that 1,205,000 figure?

A   Um, I reviewed the calculations that were made that show the same information as is set forth in 534B except it has isolated the unpaid portion.

Q   And the --

A   Meaning that --

Q   I'm sorry.

A   No, I'm sorry.  In other words, it carved out the portion of the total of $1,205,137.38 that was unpaid.  It just carved it out into a new chart.

Q   Was any document prepared to illustrate that calculation?

A   Yes.  There was a document prepared to illustrate that calculation.

MR. RESSER:  I would ask that we provide Mr. Paige display of Defendant's offered Exhibit 715 at this time without publishing to the jury.

THE COURT:  Sure.

Q   (By Mr. Resser) Mr. Paige, can you see that?

A    Yes, I can.

Q    What was the source of the information on the document used to prepare Defendant's Exhibit 715?

A    This would have been trial Exhibit 530, which was the first bill.  PTX 1 through 5 are the unpaid bills, and any other information that was needed would have been taken from PTX 118.

Q    Does this document illustrate the fees billed but not paid by Jarrow Formulas?

A    Yes.

Q    And the same calculations that you describe for Exhibit 534A and 534B, were those done for those -- just those five bills?

A    Yes.

          MR. RESSER:  Your Honor, Jarrow Formulas moves admission of Exhibit 715.

          MR. GREEN:  No objection, Your Honor.

          THE COURT:  That will be a full exhibit.  It can be published.

     (Defendant's Exhibit 715, received in evidence.)

Q    (By Mr. Resser) Mr. Paige, can you describe now to the jury and go through and explain to the jury what Exhibit 715 shows.

A    Yes.  This exhibit, it's a subset of Exhibit 534B.  It shows the same calculation except for the fact that it is only illustrating the unpaid bills, PTX 1 through 5.

Q    Now --

A    So -- I'm sorry?

Q    I'm sorry.  I thought you were done.  I interrupted you.
Continue.

A    No, that's okay.  I was just going to say it has the same
columns.  The same calculations were done, and that's all.

Q    I do see that on the rate difference section of that
document, it doesn't show blended rate.  It shows 2019 rate.
Why is that?

A    The 2019 rate is the rate that was used there because all
of the bills were 2019 bills.

Q    And all of the rates on the 2019 bills were at the
increased rates; correct?

A    Yes, that's right.

Q    And the arithmetic calculations are -- this document is the
result of arithmetic calculations on the difference between the
initial rate and the 2019 rates multiplied by the hours shown
on those five unpaid bills; is that right?

A    That's correct.

Q    And then in the far right column, it's the difference for
each timekeeper?

A    It's the dollar difference, yes.

Q    And then the last number at the bottom right corner, what
is that?

A    That is the sum of the dollar difference for each

timekeeper.

Q   From Exhibit 534B and this document, Exhibit 715, can we now calculate the amount Jarrow Formulas has already paid McCarter & English because of the increased rates versus the initial rates?

A   Yes.  That would be the difference between the total, the total at the bottom of the chart, bottom of the table, on Exhibit 715 and Exhibit 534B.  So basically just doing some mathematical calculations there, subtraction, and the amount -- the difference the amount paid can be calculated at that point.

Q   And what is that difference?

A   Uh, $931,086 is the difference between those two numbers, meaning the total at the bottom of one -- of the first document versus the second document.

Q   Mr. Paige, to produce these calculations, was there any information used that is not from McCarter & English's own documents?

A   Um, no.  It all came from their documents.

Q   And, again, to summarize for the jury, those documents are what?

A   Those documents are PTX 118, which is the accounting report, Defendant's Exhibit 530, which is the initial bill in the Kentucky litigation, and PTX -- let me see, PTX 1 through 5, which are the unpaid bills.

MR. RESSER:  Thank you, Mr. Paige.  No further questions.

THE COURT:  Okay.  Cross-examination.

MR. GREEN:  Morning, Members of the Jury.

Good morning, Mr. Paige.

THE WITNESS:  Good morning.

MR. GREEN:  Mr. Wyzik, will you call up Exhibit 530, please.

CROSS-EXAMINATION

BY MR. GREEN:

Q   Mr. Wyzik, you said -- or, excuse me, Mr. Paige, you said you relied on Exhibit 530 for several of your calculations; correct?

A   Uh, yes, one portion of it.

Q   You relied on it for Mr. Grondahl; correct?

A   For his initial rate.

Q   And you relied on it for the initial rate of Mr. Giarratana?

A   Yes.

Q   And for Ms. Gaffey; correct?

A   That's true.

MR. GREEN:  Mr. Wyzik, will you blow up the matter number and name?

Q   (By Mr. Green) So, Mr. Paige, Exhibit 530 is a bill rendered in the Ashurst matter.  Isn't that true?

A    That's what it indicates.

Q    Okay.  And you relied on it for setting the initial rate in the Kentucky litigation.  Isn't that true?

A    Yes.

Q    All right.

MR. GREEN:  Now, Mr. Wyzik, will you call up PTX 118. And would you blow up the column K, please.

Q    (By Mr. Green) Now, Mr. Paige, when you created Exhibit 534A, which was labeled "Paid," you read "fees billed" in the case as "fees paid."  Isn't that so?

A    Part of what you said is not true.  I did not create these demonstrative exhibits.

Q    All right.  Well, 534A is not a demonstrative exhibit. It's in evidence, Mr. Paige.  Did you do the calculations?

A    I -- I checked the calculations.  I did not create the original versions of these.

Q    Who did the calculations, Mr. Paige?

A    They -- my understanding is it was done by someone at Mr. Resser's firm.

Q    Okay.  And when did you first see Exhibit 534A, Mr. Paige?

A    Probably two weeks ago.

Q    So the calculations were done by Mr. Resser's firm and not by you.  Isn't that so, Mr. Paige?

A    I checked them.

Q    And how did you check them, Mr. Paige?  Did you check them

by doing all of the calculations that they did yourself?

A    The calculations -- I checked the mathematics.  The source of the information that was given to me I assumed to be correct.

Q    So all you did, Mr. Paige, is the arithmetic of multiplying the hours by the rate difference.  That's all you did.  Everything else came from another source, not you; correct?

A    I did the -- I checked the calculations on the documents that were given to me.  That's what I did.

Q    Okay.  Now, Mr. Paige, Exhibit 534A was itself a correction of a prior exhibit.  Are you aware of that?

A    That -- the heading was corrected.  That's my understanding.

Q    No, corrections were made to some of the rate differentials.  Isn't that so?

A    I'm sorry.  I'm not understanding your question.  Are you talking about the difference between 534A and 534B or some other document?

Q    No.  I'm referring to when you -- when you first checked the calculations in 534A, the rate differential for Mr. Giarratana was $130 an hour.  Isn't that so?

A    When I first -- I'm sorry.  I don't understand your question.

Q    You said you checked the arithmetic on Exhibit 534A; correct?

A    Yes.

Q    And that would include you checked the arithmetic on Mr. Giarratana's line item, and the rate difference there is $130 per hour; correct?

A    That's what it says, yes.

Q    And are you aware that that was a correction of a prior version of the exhibit?

A    A prior version of 534A?

Q    That's correct.  Were you shown a prior version of 534A that you purported to correct?

A    There was a version of this document that was prepared, I believe, by Jarrow Formulas' former counsel, who is now deceased.

Q    Okay.

A    If that's what you're referring to.

Q    All right.  Now, you didn't list that as a source document. Was that provided to you?

A    Yes.  I didn't use it for calculation purposes.

Q    So to the extent that the 534A was an update of a prior exhibit, you didn't make any of the calculations.  You merely checked the calculations performed by Mr. Resser's law firm.

A    I believe that's what I stated.

Q    And, Mr. Paige, who put the label -- the label "Paid by Jarrow" on it?  Was that you or was that Mr. Resser's law firm?

A    It was not me.  I don't know who did it.

Q    Okay.  So it was submitted to you with the incorrect label; correct?

A    Whether it's correct or not, I can only say based on what I've been told.  I was not present for what -- in other words, I'm not a witness as to whether these amounts are paid or not paid.  So all I can say is that I was told that the indication of paid by was not correct.  I was given that information.

Q    But you testified, Mr. Paige, that you checked the arithmetic on the document relative to PTX 118, and I think you'll agree with me that PTX 118 rather clearly states that these are fees billed.  It doesn't say anything about fees paid.  Isn't that true?

A    Well, I'm not sure that it talks about whether they were paid or not on that document.

Q    Mr. Paige, it says "Fees billed on it."  Isn't that a fact?

A    Yes.  It's silent as to whether they were paid.

Q    And you've got a substitute exhibit that you testified to that you reviewed the calculations again, and this time they're labeled "Fees Billed" to Jarrow Formulas, Inc.  Isn't that true?

A    Yes.  Those words are different.  "Billed" and "paid" are different words.

Q    Right.  And it states rather clearly that 534A is mistaken.  Isn't that true?

A    Only the label.

Q    Yes.  But you didn't catch the error in your review of the document.  Isn't that so?

A    There would be no way for me to catch that error.  I had no information as to what was paid.

Q    Well, column K indicates rather clearly that these are fees billed, and you made the assumption that they were fees paid.  Isn't that so?

A    No, that is not so.  I did not -- excuse me.  I did not apply the label "Paid."  That was applied by Mr. Resser's firm.

Q    I know.  But --

A    I --

Q    I understand what you're saying, Mr. Paige, but you're the one sponsoring the exhibit, not the law firm.  You did the calculations that enabled this document to come before the jury, and you're telling us that you did not appreciate the difference between fees billed and fees paid.  Isn't that true?

A    No, that is not true.  I testified that the numbers were correct.  As to whether they were billed or paid, I relied upon others for that information.  It had nothing to do with my appreciation.

Q    All right.  Now, 534B, you said you reviewed those calculations as well.  Do you have that in front of you?  That's the one with the label that says "Billed" this time,

doesn't say "Paid."

A    Yes, I have that in front of me.

Q    And when did you do those calculations, Mr. Paige?

A    I checked these calculations.  I did not --

Q    Okay.

A    I'm sorry.

Q    Excuse me.  I'm sorry.  When did you check the calculations?

A    I'm sorry to speak over you.  I'm sorry.  I can't hear what you're saying.  You're speaking over me.

Q    I apologize, Mr. Paige.  I think I spoke too quickly.

Mr. Paige, when did you check the calculations in 534B?

A    That would have been over the last week.  I -- it's my understanding that the calculations are not any different from 534A and B.

Q    All right.  And what was told to you in connection with the changed exhibit that is put into evidence through you?

A    My understanding, and what was told to me, was that Mr. Resser's firm discovered last week that not all of the bills had been paid and that, therefore, it should be labeled "Billed."

Q    The case is about unpaid fees.  Isn't that so, Mr. Paige, in part?

A    Um, I have not examined what the case is about.  I'm here

only to offer these calculations.

Q   So, Mr. Paige, you're disavowing any responsibility for the label "Paid."  Isn't that so?

A   Responsibility?  I -- I assumed that what I was being told was correct.

Q   All right.  And it was incorrect.  Isn't that so?

A   I don't know if it's correct or incorrect.  I don't know if -- if the label is correct or incorrect because I am taking the word of counsel that this other label is more accurate.

Q   So, Mr. Paige, you can't make the calculations in either 534A or 534B.  Isn't that so?

A   I checked the calculations.

Q   All right.  And now let's go to Defendant's 715, Mr. Paige.

A   Yes.

Q   You didn't make those calculations either, did you?

A   No.  I checked them.

Q   Okay.  And when did you check them?

A   Uh, the first time I saw this.  Probably last weekend.

Q   Last weekend?  Did you say last weekend?

A   That would have been Saturday or Sunday at the end of last week.

Q   Again, so all of the calculations that you walked through with Mr. Resser on your direct exam were not made by you.  Isn't that so?

A   Yes, they were checked by me.

THE COURT: Excuse me one second. Can we make his image larger on the screen? Unless you have another exhibit to put up.

MR. GREEN: Your Honor, I don't have Exhibit 715 as you know. Could we have the defendants display it?

THE COURT: Would you mind if we brought up 715?

Go ahead, Mr. Green.

Q   (By Mr. Green) It's your testimony, Mr. Paige, that you did not make these calculations either; correct?

A   I checked them.

Q   Somebody else did all the work, and you came forward to explain that work, work that you didn't do; correct?

A   Work that I checked, yes.

Q   And when you say you corrected it, all you did was checked the math on Defendant's 715; correct?

A   I think you said when -- I never said I corrected it.

Q   Did you go to the source documents, PTX 1 through 5, and actually add up the hours yourself?

A   Yes, I checked those hours.

Q   You said you checked them. How did you check them, Mr. Paige? Did you --

A   By adding them.

Q   -- sit down with each exhibit and add them up?

A   Yes.

Q   Or did you assume that the exhibits presented to you,

Defendant's Exhibit 715, was correct, as you assumed other exhibits were correct, Mr. Paige?

A    I checked mathematics.

Q    Did you understand, Mr. Paige, that the purpose of Exhibit 534A was to document a claimed refund from McCarter & English by Jarrow Formulas, Inc.?  Is that your understanding of the purpose of the document?

A    No.

Q    Okay.  Now, Mr. Paige, you can't claim a refund for fees that were not paid.  Isn't that so?

A    I never thought about it.

Q    So, again, all you did was checked the arithmetic, and you never thought about the purpose of any of these exhibits that were being submitted to the jury; correct?

A    I was not asked to do so.

Q    And there are exhibits that were not prepared by you but were prepared by Mr. --

MR. RESSER:  He was continuing to answer the question.

MR. GREEN:  Sorry.  I apologize, Mr. Paige.

THE COURT:  Yeah, go ahead, sir.  If you need to say something else in response to the last question, you can do that.

THE WITNESS:  Yeah, I just wanted to finish.  I -- I was asked to check the accuracy of the calculations and the

numbers against the source data.  That's all.  As for the purpose of these documents, I leave that to the lawyers in the case and the Court.

MR. GREEN:  Nothing further, Your Honor.

THE COURT:  All right.  Anything, Mr. Resser?

MR. RESSER:  Yes, Your Honor.

I would ask, Mr. Campos, can you show Mr. Paige Exhibit 522, which is in evidence in this case?

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. RESSER:

Q   Mr. Paige, Exhibit 522 is an invoice dated April 15th, 2013.  And you will note that this matter reflected on Exhibit 522 is matter 464, which is the matter that Mr. Green told you was not the matter on Exhibit 530.  Do you have that subject in mind?

A   I have the subject in mind, yes.

Q   Now, scrolling down, Mr. Campos, to the descriptions of services.

The descriptions of services on Exhibit 522 is for entries during the month of March 2013.  Do you see that?

A   I do.

MR. RESSER:  Then, Mr. Campos, if you can scroll to the page I believe it's the fourteenth page of the exhibit out of sixteen.

Q   (By Mr. Resser) Do you see there on the bill, Mr. Paige, where the rates of Mr. Giarratana, Mr. -- and Mr. Grondahl are reflected?

A   I do.

Q   Are those the same initial rates that you used for the bill dated February 22 -- withdrawn.

Are those the same initial rates that you used in doing -- in checking the calculations shown on Exhibit 534A and 534B?

A   I'm sorry.  For some reason I lost the last part of your sentence.  My apologies.

Q   Let me break it down.

Is the rate shown on Exhibit 522 the same initial rate for Mr. Giarratana that was shown on Exhibit 530?

MR. RESSER:  And, Mr. Campos, if you can put up both.

THE COURT:  I think we may have lost him for a minute.

Q   (By Mr. Resser) Can you hear us?

A   I can't tell if you can hear me.

Q   We can hear you now.

A   Okay.  Thank you.

Q   So the page on the left is page 13 from Exhibit 522.  And the page on the right is Exhibit 12 from Exhibit 530.  Do you see those?

A   Yes, I do.

Q   Can you tell us if the rates shown on Exhibit 522, which is in matter 464, are the same as the initial rates shown for Messrs. Giarratana and Grondahl on Exhibit 530?

A   Yes, they're the same rates.

Q   And that's for the different matter No. 427 on Exhibit 530 that Mr. Green made a point of cross-examining you about; correct?

A   Yes.

Q   Now, as far as the information that we provided with respect to Exhibit PTX 118, it was my mistake where I thought PTX 118 showed amounts billed and paid; correct?

            MR. GREEN:  Object to the --

            THE COURT:  I'll sustain that.  I'll sustain that.

Q   (By Mr. Resser) What is your understanding of the -- what is your understanding now of what PTX 118 shows?

A   My understanding is that PTX 118 concerns itself with the work billed, although the second page does talk about realization rates, which sometimes involves payment.  But this is a report -- as far as I can tell, this is a report that was run off of the firm's billing software for a specific purpose and --

            THE COURT:  I'm going to cut the witness off there.  I think we're getting well beyond the --

            MR. RESSER:  Okay.

            THE COURT:  -- the cross.

MR. RESSER: Mr. Paige, thank you.

THE WITNESS: You're welcome.

THE COURT: All right. So he was not cross-listed, Mr. Green, so I'm not going to allow any recross. Nothing new came up. That's why I stopped him. Thank you very much, sir. We appreciate you Zooming in this morning. Thanks very much.

THE WITNESS: I appreciate it too.

THE COURT: All right. Very well.

So, Mr. Resser.

MR. RESSER: Next we have the designations for Mr. Rory Lipsky.

THE COURT: Very well. We can play those.

(Plays video.)

THE COURT: Okay. What's next?

MR. RESSER: I expected Your Honor to take our morning break.

THE COURT: Yes, my goodness. I held you five minutes over. I was so enthralled. So, folks, my bad. My apologies. We'll give you another five minutes, so we won't be back till 11:05.

Don't discuss the case. Don't let anyone discuss it with you and everything that goes with that. Thank you for paying attention this morning.

(The jury left the courtroom at 10:51 a.m.)

THE COURT: Anything before we recess? All right.

We'll be in recess. Thank you.

(Recess from 10:51 a.m. to 11:03 a.m.)

THE COURT: Do we have more of Mr. Lipsky to play?

MR. RESSER: I think that was it.

THE COURT: We have a couple other witnesses?

MR. RESSER: We have one video. That was Mrs. Adipietro. But before that, Your Honor, I have some stipulations of fact that I want to show and read the jury from the Joint Trial Memorandum.

THE COURT: Sure, that's fine.

So with regard to the stipulation of facts being read to the jury, I think there were one or two earlier, if I'm not mistaken, or there was some cross-examination about that. If counsel want that to be presented to the jury in a court exhibit, you need to type it up, you need to present a court exhibit that shows it's a stipulation that was read to the jury. In other words, if you want some document reflecting stipulations to go back to the jury, it's your job to prepare the document. I'm not going to do the work. I'm not going to carve it out from the JTM. And the stipulations would have had to have been read at some point during the case.

MR. RESSER: Very well, Your Honor.

THE COURT: Yeah, we're ready, Devorah.

(The jury entered the courtroom at 11:05 a.m.)

THE COURT: All right. At this time -- wait one

second.

Welcome back. Mr. Resser is going to read some stipulations to you. Stipulations are facts that the lawyers have agreed upon. And you can accept those stipulations as true.

All right, Mr. Resser, did you want to read some stipulations?

MR. RESSER: Yes, Your Honor.

The first stipulation is Stipulation 32. McCarter retained a damages expert, although he was not called as a witness at trial.

No. 34, please. In early 2015, McCarter moved for summary judgment in the Kentucky litigation on the grounds that there was no credible damages testimony on which the verdict could be predicated by any reasonable jury.

Next is 36. McCarter filed a motion in limine to exclude the testimony of Caudill's damages expert, William Wingate, which the court denied.

THE COURT: That's 37 it looks like?

MR. RESSER: I'm sorry, 37.

And next is No. 38. After Wingate's examination, McCarter moved to strike Wingate's testimony, which the court denied.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Resser.

MR. RESSER: Next we have the videotaped deposition designations for Catherine Adipietro, the billing clerk at McCarter & English.

THE COURT: All right. Let's present those.

(Plays video.)

THE COURT: All right. So who's next?

MR. RESSER: Your Honor, just as a cleanup, Jarrow Formulas had offered Defendant's Exhibit 622, and the Court had reserved ruling on that admission.

THE COURT: All right. Take a look at that.

MR. RESSER: Does Your Honor need a copy of that?

THE COURT: Yes, that would be great.

MR. RESSER: May I approach?

THE COURT: Yes. Thank you. 622, right?

MR. RESSER: Yes, Your Honor.

THE COURT: Seems to be offered for truth. No?

MR. RESSER: Yes.

THE COURT: So why isn't it hearsay if it's not offered for truth? If it is -- excuse me. If it's offered for truth, why isn't it hearsay?

MR. RESSER: It's a business record, Your Honor.

THE COURT: That hasn't been established.

MR. RESSER: Okay. Thank you, Your Honor.

THE COURT: So I'll sustain the objection.

MR. RESSER: Thank you.

THE COURT: Okay.

MR. RESSER: Jarrow Formulas calls Michael Berman to the witness stand.

THE COURT: Okay. Very well. Come on up, Mr. Berman.

So, Ladies and Gentlemen, before we start with this witness, remember I told you at the beginning of the case there were essentially two kind of parts of the case: one was billing; one was malpractice? Now we're going to get more into the malpractice case.

Now, I will say that that comment to you that I've been making just is really for convenience. At the end of the case, you're going to have to evaluate all of the evidence that's been introduced at the trial as to all the claims and counterclaims in the case, as I will instruct you further in my instructions. So don't read into too much about those two parts of the case because, frankly, there's some evidence that we've heard already that may touch upon the malpractice case, and in the malpractice case we may hear some evidence that may touch upon the billing case. That's fine. You can consider it as -- as I'll direct you to in the instructions. I really did this just for convenience.

But now we're going to get into kind of more directly, more primarily into the malpractice case.

So at this time I will ask the witness to stand, raise his right hand and face our courtroom deputy.

M I C H A E L   P.   B E R M A N,

having been duly sworn by the Clerk, testified

under oath as follows:

THE CLERK:  Please be seated.  State your name, city, and state you work or live.

THE WITNESS:  My name is Michael P. Berman.

THE CLERK:  Spell your last name.

THE WITNESS:  My business address is 100 Pearl Street, Hartford, Connecticut.

THE COURT:  All right, Mr. Berman, if you could spell your last name for the record, please.

Mr. Berman, if you could spell your last name for the record, please.

THE WITNESS:  B-E-R-M-A-N, please.

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MR. RESSER:

Q   I guess as a lawyer you're used to standing when you speak; is that right?

A   Yes, that's a very appropriate comment.

Q   Were you retained to provide expert testimony in this case, Mr. Berman?

A   Yes, I was.

Q   By whom were you retained?

A    I was retained by Attorney Jeffrey Tinley, whose main practice was in Waterbury, Connecticut.

Q    Who is Mr. Tinley?

A    Uh, I must say I heard his voice on a replay, and it kind of threw a little chill in me.  But at any rate, Mr. Tinley represented Jarrow Formulas in the case, in this case.  Um, Mr. Tinley passed away in September of 2021 after this case had been started.  But he -- he's the attorney who retained me to be an expert witness in the potential malpractice claim, and he wanted to know whether, upon reviewing information, I could offer my opinion or conclusions regarding whether there was -- McCarter & English actually conducted legal malpractice.

Q    How do you know Mr. Tinley?

A    I know Jeff -- excuse me -- Jeff, Mr. Tinley, for well over 20 years, maybe even more.  He and I practiced law in a similar area of commercial and business litigation.  There were times that we were on opposite sides of cases, and there were times that we were on the same side of cases.

        And in a recent malpractice case that I handled for plaintiffs that wound up in the Hartford Superior Court complex, complex litigation docket, I had -- I had retained or I had asked Mr. Tinley to be an expert witness as to whether in that case he could opine, or conclude, that in that case the law firm that was being sued, which has nothing to do with this case, whether he could be the -- an expert witness to determine

whether that law firm committed malpractice.

Q   Does your friendship and regard for Mr. Tinley, did that affect the conclusions you've reached in this case?

A   Not at all.  We were not social friends by any means.  We were just colleagues in the profession of -- mostly focused on commercial and business litigation.

Q   As a result -- well, let me back up.  Withdrawn.

So you've handled -- you've handled malpractice cases as the attorney for the plaintiff yourself; is that right?

A   Yes, I have.  My -- I've been practicing law in Connecticut for 53 years.  In September it will be 54 years.  The focus of my practice for all that time has been commercial and business litigation, mostly in Connecticut.  I'm also admitted to practice in the state of New York and in the state of Massachusetts in the state courts.

My practice over those 53 years, as I said, has been in the area of commercial and business litigation.  I've handled cases on information technology, on, um, on legal malpractice, failed merger and acquisition, intellectual property.  I've had cases involving litigation with insurance companies over actuarial disputes.  There's been a whole range of business and commercial litigation.  It's been a busy 53 years.  Let me say that much.

Q   Have you handled a case involving trade secrets?

A   Many years ago, I handled a case involving trade secrets

which had to do with a claim against my client of theft of a customer list, which is one area of a trade secret.

Q    When did you receive your law degree?

A    I received my law degree in 1969 as a graduate of the University of Connecticut School of Law.

Q    Where did you receive your undergraduate education?

A    I received my undergraduate degree from what was then Carnegie Institute of Technology.  It was a Bachelor of Science degree in mechanical engineering.  That was my undergraduate degree.  After that, I went on for a Master of Science degree in applied mathematics at the University of Cincinnati.  And I was awarded a Master of Science degree in 1964.

Q    Mr. Berman, did you work in that field before you went to law school?

A    Can you say that again, please?

Q    Did you work in the field in which you received your Bachelor of Science and your Master's of Science before you went to law school?

A    That's what brought me to Connecticut from New York.  I was hired by Pratt & Whitney in the engineering department in East Hartford and worked in a department connected with jet engines and jet engine flow.

Q    Now, you mentioned that you were admitted to the bars of Connecticut, Massachusetts, and New York.  Are you also admitted to practice before this court, the United States

District Court for the District of Connecticut?

A    I'm admitted to practice in the federal court in Connecticut, which would include this district court.  I'm admitted to practice in the federal court in Massachusetts. I'm admitted to practice in the federal court in the Southern District and the Eastern District of New York.  The Southern District is comprised of New York City, and the Eastern District is comprised of Brooklyn, Queens, Long Island, and Westchester County.  I'm also admitted to practice before the Second Circuit Court of Appeals.

Q    And does the Second Circuit Court of Appeals also cover the Connecticut District Court jurisdiction?

A    It covers Connecticut, Vermont, and New York, yes.

Q    Have you received any rating by the attorney rating service, Martindale-Hubbell?

A    This chair doesn't move.

          Yes.  I have received what's called an AV rating from Martindale-Hubbell, which is a national lawyer rating service. Those were the highest ratings that the -- that are given out for integrity and competence.

Q    Now, when you mentioned bar admissions, that means that you're licensed to practice in the state where you're admitted to the bar?

A    Yes, I'm admitted to practice in, as I said, the state of New York, the entire state, in state courts; Massachusetts, the

state court; and in Connecticut, the state court.  I have on occasion been admitted on a case-by-case basis in South Carolina, more recently in North Carolina on cases that I handled, and in New Jersey.  But that's a case-by-case basis.  Thank you.

Q   Now, when you became a lawyer, were you given an oath that you had to agree to?

A   Was I given an?

Q   Oath.

A   Oath, yes.  I took the standard oath to be admitted to practice in Connecticut and in Massachusetts separately, which came much later than 1969.  Connecticut was 1969.  Massachusetts was, I want to say, early 200s -- 2000s, and New York was very early 2000.  And when you're admitted to practice in that state, you do take an oath to -- of integrity and to abide by the laws and the ethics of that particular jurisdiction.

Q   Now, the laws and the ethics in Connecticut, those are referred to as the Rules of Professional Conduct?

A   Yes.  I think in 1969 it was not called the Rules of Professional Conduct.  I think it was called the Code of Professional Responsibility.  And that's gotten changed over the years and is now called the Rules of Professional Conduct, which is pretty much promulgated or, I should say -- I wouldn't say authorized, but it originates from the American Bar

Association and, to my knowledge -- each step -- each state has the opportunity to accept the Rules of Professional Conduct. And some states do make slight modifications to the rules. And I believe not every state has accepted it in its form that is recommended by the American Bar Association. Connecticut has. New York has more recently. And Massachusetts has as well.

Q   When you say "has," has accepted the rules from the American Bar Association?

A   That's correct, yes.

Q   Do you serve on any committees of the State Bar of Connecticut?

A   Yes. I'm a member of the Connecticut Bar Association, the New York Bar Association, the Massachusetts Bar Association. Insofar as the Connecticut Bar Association, I'm the past chairman of the Commercial Law and Bankruptcy Section of the Connecticut Bar Association. I presently serve on the Executive Committee of the Litigation Section of the Connecticut Bar Association.

Q   For how long have you served on the Executive Committee of the Litigation Section of the Connecticut Bar?

A   I would have thought it was five or six years, but I think on recollection it's been longer than that. Years pass faster as you go on in years. So I would think it may be as much as nine or ten years.

Q   Do you know anyone from McCarter & English who is also on

the Executive Committee of the Litigation Section of the Connecticut Bar?

A   Yes.  I believe Attorney Tom Rechen, who was the lead trial lawyer in the Connecticut case for Jarrow Formulas.  I believe he's past chairman of the Litigation Section.  And I believe he's still on the Executive Committee.

Did you say just at McCarter & English?

Q   Yes.

A   Okay.  I don't know -- I don't know whether Mr. Pepe is on that, so I won't comment.

Q   In addition to having handled a malpractice as the attorney for the plaintiff, have you, before this case, been retained as an expert -- as an expert in any earlier malpractice case?

A   Uh, there was one more credential I'd like to mention before I answer that question.  May I?

Q   Of course.

A   I volunteer and serve as the judge and judge evaluator at the National Moot Court Competition that's held at Yale University twice a year.  I've been asked to serve again at the competition that's going to be held this November at Yale University.

In answer to the question that you asked, Mr. Resser, I have served -- prior to this case, I have been designated as a legal expert in two other cases.

Q   So that's not a major part of your practice, I take it?

A    No, it's not a major part.  It's not -- definitely not a major part of my practice.

Q    When you were hired -- after you were hired with -- withdrawn.

After you were retained by Mr. Tinley, did you review any materials in preparation for rendering your conclusions in this case?

A    Yes.  The answer is yes.

Q    And what were those materials?

A    The scope of the materials that I reviewed had mostly to do with the Kentucky litigation case.  It was extensive.  I have a room in my office devoted entirely to documentation, transcripts, deposition transcripts, court deposition -- court transcripts, documents filed in that case and in this case. The review was extensive.

I reviewed every word of every transcript of every day of the Kentucky trial, which lasted for three and a half weeks starting on June 3, 2019, and the verdict came in on June 26 of 2019, thousands of pages of transcript.  I reviewed what I think are thousands of pages of court documents filed in that case consisting of motions, orders, objections, and everything that was relevant to my rendering an opinion in that case.

I also have reviewed about, I want to say, 50 to 60 exhibits that were entered that I thought were relevant to my decision in this case, or my retention in this case.  I also

reviewed depositions in this case of just about everybody except one financial expert that was not in the area I was asked to opine on.

Q   In preparing to render an opinion and conclusions in this case --

A   Could you repeat that?

Q   In preparing for your testimony in this case, did you speak to any witnesses from the Kentucky litigation?

A   No, I did not speak to any witnesses.

Q   And why is that?

A   Well, I've hired many experts in my practice in cases that I handle.  I've come to the conclusion that the best way to be fair and open in deciding whether you could render an opinion is not to get a bias by talking to only one side of the case. To me, that distorts the integrity of trying to be fair, impartial, and get a true picture of what occurred.

        To me, the best source in rendering an opinion in a case such as this as an expert witness in legal malpractice is to read what the testimony is under oath by the witnesses in Kentucky case and in this case, including the preliminary matter, which has been referred to from time to time of prejudgment remedy, which had the witnesses of the members of McCarter & English testify under oath in this courthouse and to get an idea what happened in the Kentucky case.  Because in a case like this, we who practice in this area, this is called

analyzing a case within a case. In other words, you have to know what happened in the Kentucky case in order to determine what your opinion would be as to whether malpractice was committed in that case. So I think that answers your question.

Q   Now, are you being paid for your services in connection with your services as expert witness here?

A   I'm being compensated on an hourly basis, starting when I was retained back on January 2 or 3 of the year 2020. My compensation is $375 an hour. It has never changed over the past three and a half years. I have an associate lawyer in my office who's been with me for over 20 years, and her billing rate is $290 an hour. I have been paid, fully paid, for all my billings. And, in fact, I have received a retainer for any advanced billings as a result of my participating in the trial aspects of this case, including attendance at this trial and my testimony that I'm giving today.

Q   Sir, is any part of your compensation based upon the ultimate outcome of this case?

A   No, absolutely not.

Q   Are you being paid to express any particular conclusions in this matter?

A   Uh, yes. Upon all my review of the documents in the Kentucky case, the transcripts of the Kentucky case, I have an opinion, and I've come to the conclusion that the failure of

McCarter & English to call Jarrow Rogovin as a witness in that Kentucky case was malpractice.

Q   Now, were you retained specifically to come to that conclusion, or is that your own independent conclusion?

A   No.  That was not -- I was not retained to come to that conclusion.  I was retained to examine the transcripts and to find out, or to conclude, whether in any aspect there was -- McCarter & English committed malpractice in the handling of the Kentucky case.  And I concluded there was an area regarding damages.  But I also concluded there was an area of malpractice in failing to call Jarrow Rogovin as a witness.

I concluded that that failure was a substantial factor in likely causing the jury in the Kentucky case to find that Jarrow Formulas engaged in willful and malicious conduct.

MR. RESSER:  Your Honor, at this time, I would like to read to the jury Stipulated Fact No. 17.

THE COURT:  Okay.  Fine.  That would be fine.

MR. RESSER:  On July 12, 2019, JFI fired McCarter. Thereafter, JFI's local Louisville counsel, Attorney Joel Beres, and his firm, Stites & Harbison, became lead counsel in the Kentucky litigation.  They filed certain post-trial motions with the Kentucky Federal Court.  The court ruled on those motions and awarded Caudill Seed an additional $1 million for JFI's willful and malicious misappropriation of Caudill's trade secrets plus $3,254,303.50 in attorneys' fees.  The total

judgment against JFI stands at $6,681,908.50.

Mr. Berman, the conclusion that the willful and malicious finding occurred because of the failure to call Mr. Rogovin as a witness, are the damages that were referred to as the $1 million, that the jury's just heard, and the $3,254,303.50 in attorneys' fees, are those the damages that Jarrow Formulas suffered as a result of that willful and malicious finding?

A    Yes.  May I just elaborate a little bit, please?

Q    Yes.

A    The jury on June 26 returned a verdict that one of the claimed trade secrets by Caudill -- Caudill Seed and Warehouse was the plaintiff that sued Jarrow Formulas in Kentucky.  And they found that one of the claimed trade secrets was, in fact, misappropriated by Jarrow Formulas.

Under Kentucky uniform trade secret law -- which is very similar to here in Connecticut, we've adopted almost the same statute -- the jury is then asked, if it did find at least one misappropriation, whether that misappropriation was conducted willfully and maliciously.

The jury on the verdict form, where they write out their opinion or their results of their verdict and how much damages they would assess, assessed $2.4 million just for the misappropriation.  They then turned on their verdict form to a box, a square little box, and they were instructed by the

judge, Judge Simpson in Kentucky, who stated to the jury as part of the jury instructions at the end of the case, after all the evidence was in, that if you find, after you found at least one misappropriation, if you find by clear and convincing evidence that Jarrow Formulas' misappropriation was willful and malicious, you check the box. If you don't, you don't check the box.

The jury in Kentucky checked the box. The jury doesn't award the damages for checking the box. But under Kentucky law, as is similar here in Connecticut, the judge then evaluates and adds to the verdict, in this case his, Judge Simpson's, opinion of punitive damages. He added a million dollars in punitive damages. Also, similarly in Connecticut, under Kentucky law, if you find -- if you've checked the box of willful and malicious, the judge can award the fees, the legal fees and expenses incurred by the plaintiff who won the case, he can award all those fees as additional amounts that Jarrow Formulas would have to pay.

Judge Simpson conducted in 2021 -- he conducted a writing and argument and memos submitted, and he found that Caudill's plaintiff's legal fees were over $3.2 million, and he added that to Jarrow Formulas judgment so that the 2.4 million, the 1 million, and the 3.2 million all came up to the number you saw stipulated on the screen.

MR. RESSER: Mr. Campos, could you please display for

Mr. Berman and the jury PTX 94, which is the verdict that Mr. Berman just referred to?

Q   (By Mr. Resser) And going to the last page of that exhibit, is this the box that you just referred to that was checked on willful and malicious?

A   I think the box is on the next page?  Or this page?

Q   Take a moment to read it.

A   Oh, I see.  Yeah.  It's -- that's correct.  It wasn't the box.  It was described as a box, but it's actually the check mark.  To the upper left it says, "We find Jarrow Formulas willfully and maliciously misappropriated."

Q   And you said earlier that that was with respect to one trade secret, and that's the trade secret listed just below that?

A   That's the research and development trade secret, that's correct.

Q   Now, taking a look at the first page of the verdict, there were six alleged trade secrets in that case.  Is that your understanding?

A   That's correct, yes.

Q   And the jury found, based on this verdict, that five of those six -- that Caudill possessed five of those six as actual trade secrets.

A   That's correct.  They -- they found that five of those claimed trade secrets by Caudill were, in fact, trade secrets.

The second one called "General process for spray-drying myrosinase" they found was not a trade secret. So this first page of the verdict form the jury was asked, Did you find any of the six to be trade secrets of Caudill? And the jury found five of them to be trade secrets of Caudill at the end -- this is part of their verdict at the end of the case.

Q   Now, Mr. Berman, on the next page, the jury was asked if they found that any of those trade secrets that they found were possessed by Caudill were misappropriated. Do you see that?

A   Yes.

Q   And what does this portion of the jury verdict show?

A   Uh, this is all part of the jury verdict's deliberation, and they found that four of the trade secrets claimed by Caudill were misappropriated by Jarrow Formulas.

Q   Now, on the next page of the document, we have some damages figures of actual losses and unjust enrichment. Do you see that?

A   Yes.

Q   And you'll also note that on -- that the losses are listed just for the research and development line item; is that right?

A   That's correct.

Q   Although the jury found that three other trade secrets were misappropriated. Is that your understanding?

A   Uh, that's correct. That's correct, yes.

Q   Now, in the Kentucky case, was the jury asked to apportion

the damages between the four trade secrets that they found had been misappropriated?

MR. PEPE:  Objection, foundation, Your Honor.

THE COURT:  Sustained.

Q   (By Mr. Resser) Now, you've told the jury the conclusion you reached on whether McCarter & English -- excuse me.  You told the jury your conclusion on why -- withdrawn.

You told the jury your conclusion on whether McCarter & English performed legal services below the standard of care in representing Jarrow Formulas in the Kentucky jury trial.

A   Yes, that's correct.

Q   On what is the basis for your conclusion?

A   Well, let me make it clear.  Legal malpractice is the same as concluding that the professional services fell below the standard of care ascribed to attorneys in the performance of their legal services.

The -- Jarrow -- Jarrow Rogovin was at the time, and maybe still is to some extent, he was the chairman of the board.  There's testimony that he was at the time chief executive officer, president of Jarrow Formulas.  He was the main figure.

Mr. Giarratana testified in the prehearing, the PJR, that Mr. Rogovin was his main contact.  He was the one that he -- that Mr. Giarratana made sure was aware of what was going on in various litigation matters that were being handled by Mr.

Giarratana over the years.

He was -- as my reading and my seeing of depositions and reading of documents, he was the voice, image, and face of Jarrow Formulas, which bore his name, Jarrow.

He was aware of every major event that was happening at Jarrow Formulas, according to my reading of the documents and the depositions, including Mr. Rogovin's deposition, which was taken in this case, and including Mr. Rogovin's testimony in the prehearing, prejudgment remedy phase of this case.

That he was not permitted to testify was quite -- quite surprising to me for somebody who had practiced all these years and had situations where we represented companies or represented entities and there was one figure that was the main figure of that case.

When Mr. Rogovin learned in 2011 that Caudill Seed had attained a temporary restraining order against Kean Ashurst -- let me just make sure in case it hasn't come out, Kean Ashurst worked for Caudill, the plaintiff, for nine years. And he was in charge of research and I think research and development at Caudill and worked on those products at Caudill.

In May, May 1 or 2 of 2011, after some -- he was disgruntled with his position at Caudill, he started talking about joining Jarrow Formulas. Jarrow Formulas had been a customer of Caudill for the kind of product in broccoli seed extract that Caudill was marketing. And so in May 1 or May 2

of 2011, Jarrow Formulas agreed to hire Kean Ashurst as a consultant for Jarrow Formulas. And at that point Kean Ashurst left Caudill.

In 2011 the -- Caudill obtained, through its attorney, a restraining order against Kean Ashurst from disclosing any confidential information that he acquired while he was at Caudill. On June -- July 20 of 2011, the attorney for Caudill wrote or e-mailed to Jarrow Formulas, and it came to Jarrow Rogovin, that there was a restraining order against Kean Ashurst disclosing or using any confidential information that he acquired at Caudill.

Jarrow Rogovin read it. He read that letter. He underlined it. He studied it. And he wrote back. He authored himself a letter on August 11 of 2011 to the attorney for Caudill. Attorney Tom O'Brien was the attorney.

MR. RESSER: Mr. Berman, let me stop you just for a moment and ask that we move admission of Exhibit 511 for which there's no objection.

THE COURT: All right. 5 --

MR. RESSER: So it can be published to the jury while Mr. Berman testifies about it.

THE COURT: 511 will be a full exhibit.

(Defendant's Exhibit 511, received in evidence.)

THE COURT: Defendant's Exhibit 511.

Q   (By Mr. Resser) Okay, Mr. Berman, this is the letter that

you're referring to from Mr. Rogovin to Mr. O'Brien.

A   That's correct.

Q   All right.  Proceed.  I'm sorry I interrupted you, but I thought it would be helpful.

A   I need my reading glasses.

Q   I do too.

A   This is the letter.  And if you go -- first of all, it was a very impressive letter because it wasn't written by a lawyer. It was written by Jarrow Rogovin.  And it was a very appropriate, good, complete letter.

And in it Mr. Rogovin described what -- that Jarrow Formulas, what kind of business it was.  And on the next page, if you go to the second page, you will see in the paragraph that begins with the word "Again," "Since Jarrow obeys the law and has at no time had any intention of infringing on any trade secrets of Caudill, the company finds your repetition of the Court's order unnecessary if not gratuitous.  Please be advised, I am somewhat skeptical of the underlying assumption that your client even possesses any actual trade secrets."

And so that letter was intended to confirm the integrity of Jarrow Formulas to obey any orders, certainly court orders, but it also was intended to impart to Attorney O'Brien that Jarrow Formulas didn't know that there was a trade secret that Caudill was trying to protect or that it even owned any trade secrets.  And you could get that from reading the

entire letter.

And then if you go down two more paragraphs that begins with "Obviously," he says -- he says, "Obviously, Caudill's claimed trade secrets are beyond the scope of what Jarrow would be expected to know."

If you go down a few more sentences, it says, beginning with "Further, given the gratuitous nature of this litigation" brought -- "bought" -- it should be "brought" -- "by your client, I am concerned that Caudill may be inclined to claim trade secrets that are not truly trade secrets of Caudill and foist an unjustified litigation on Jarrow solely as a business tactic."

He goes on to say what the business tactic was on the next page. But before I go there, he says to Mr. O'Brien, "If at all possible, your client should give specific guidance through your office to Jarrow; otherwise, I hope that Caudill is not brandishing an unwarranted threat of litigation in an illegal attempt to limit the scope of Jarrow's legal business activities."

I concluded -- I considered this letter and I concluded this was clearly an attempt by Jarrow Formulas, authored by Jarrow Rogovin himself, to show that Jarrow Formulas is not engaging in any willful or malicious conduct. Tell me what the trade secret is so we'll be guided not to misappropriate it. That's the letter from Jarrow Rogovin.

That's the first thing he did once he found out about this temporary restraining order.

He has testified that, when he hired Kean Ashurst, he told Kean Ashurst, Do not bring anything that you worked on at Caudill to Jarrow Formulas. He was very explicit about that. And even Kean Ashurst, who testified at the Kentucky trial, he -- I believe he reiterated he was told by Jarrow Rogovin not to bring anything from Caudill to Jarrow Formulas. Not any vendors, not any confidential information.

At one point, when Jarrow Rogovin found out that Kean Ashurst had been invited to go to a vendor that he used at Caudill, a company called Hensington which was used by Caudill as part of their process, Jarrow Rogovin admonished Kean Ashurst and told him he is not to go there. He's not to be there. He shouldn't be there. It's a Caudill vendor. We don't use Caudill -- Caudill vendors.

Jarrow Rogovin admits -- and I think you saw it in the testimony, in deposition or -- he made a mistake. He asked Kean Ashurst, after Kean Ashurst came to work as a consultant, for the customer list of Caudill. His motivation, which he testified to in depositions and -- his motivation was that if and when Jarrow Formulas develops a product that is in competition with Caudill's product regarding broccoli seed extract and activating it, he wanted to make sure that Jarrow Formulas did not market that product to any of the customers of

Caudill.  And, in fact, he claims in his depositions that he never -- in his testimony -- that he never did.

However, he did come to realize that that was bad optics.  And I think he testified that was one of the worst mistakes he could have made.  But, anyway, it certainly shows his good faith attempt to avoid misappropriating any of Caudill's customers.  Unfortunately, because he was denied by his own lawyers the opportunity to testify, he never got a chance to testify and state -- and testify what his state of mind was and his efforts were made.

The situation was compounded.  The situation was compounded at the start of the Kentucky trial, which I said started on June 3 of 2019.  As in jury cases, each side makes an opening statement to the jury of what the case is, what they -- what their position is, and what they intend to show.

After Caudill's attorney made his opening statement, Tom Rechen of McCarter & English represented Jarrow Formulas in Kentucky.  He was the lead trial counsel for McCarter -- for Jarrow Formulas.  He made the opening statement on behalf of Jarrow Formulas to the Kentucky jury.  And what he said in that opening statement -- and I don't know if I could recite it all by memory.  If I can, I would like to refer to it.  If not, I have a hard copy that I would like to refresh my memory from.

MR. RESSER:  Your Honor, Exhibit 565 is the transcript that includes the opening statement.  The portion that I think

Mr. Berman is referring to begins on page 53 and continues on page 54 of that transcript.  It is being offered not for the truth of Mr. Rechen's statements but for the fact that these were the statements Mr. Rechen made to the jury on that day.

THE COURT:  All right.  And just so I'm clear, the exhibit itself is the -- says "Kentucky Trial Transcript, Volume 1B, Defendant Opening."  It's the entirety of Mr. Rechen's opening statement or not?

MR. RESSER:  Yes, Your Honor, the entirety.

THE COURT:  And it's nothing else?  It's just that?

MR. RESSER:  That exhibit is, I believe, just that.

THE COURT:  Okay.

MR. RESSER:  Let me double-check.

Yes, it is just that, although there are some comments by the court after Mr. Rechen finished his opening.

THE COURT:  Mr. Pepe.

MR. PEPE:  May I have a moment to check, Your Honor?

(Pause.)

MR. PEPE:  If it's the entire opening statement, Your Honor, then there's no objection.

THE COURT:  Okay.  Very well.  That will be marked as a full exhibit.  565 is full.

(Defendant's Exhibit 565, received in evidence.)

MR. RESSER:  Mr. Campos, if you can display the first page, and then we can go on to the portion of the transcript

that includes -- that starts on page 53, line 13.

THE WITNESS:  I think you'll have to go backwards to -- oh, you're there.  Correct.  Okay.

This is the opening statement given by Attorney Rechen to the Kentucky jury.  "Ladies and gentlemen" -- no, I think you'll have to go back to the introduction by Mr. Rechen at the beginning of his -- at the beginning of his opening statement.

I could state from memory what it was.

Q   (By Mr. Resser) Go ahead.

A   He introduced himself, Tom Rechen, as being an attorney for McCarter & English.  And together he and the other attorneys, Mr. Grondahl, Mr. Giarratana, were with him as part of the staff representing Jarrow Formulas in the case.  Also sitting in the courtroom was Jarrow Rogovin.  And he pointed out to the jury, "That's Jarrow Rogovin sitting next to Attorney Cordani, who is also a member of the McCarter & English litigation team."

Q   Mr. Berman, is that what's up on the screen now?  I think we found it.

A   There you are, okay.  Also from Jarrow Formulas are the general counsel, Jonathan Leventhal, and Mr. Jarrow Rogovin sitting next to Mr. Cordani.

Mr. Cordani, you've heard, at the time was part of the McCarter & English litigation team.

Now --

Q    Now we can go to page 53 of the transcript?

A    Yes.

Q    Okay.

A    Thank you for blowing it up.  It helps.

Tom Rechen said this to the jury:  "Ladies and gentlemen, you're going to hear from several witnesses on behalf of Jarrow Formulas in this case.  Mr. Jarrow Rogovin will testify.  He is the president and he's the chairman of the board of Jarrow Formulas.  A company he formed in his apartment in 1977 where he mail-ordered ingredients, put them into nutritional supplement capsules in his garage and sold them to the local health food stores in the area where he lived."

"The evidence will show that since those very early days and over the following 42 years, Mr. Rogovin has built two related companies, Jarrow Formulas and Jarrow Industries; its manufacturing arm.  Two plants with more than 300 employees and more than 350 products sold all over the world."

"The success of Jarrow Formulas is grounded in science and it is widely recognized -- Jarrow Formulas -- as a leader in the field of nutritional supplemental -- supplement research, formulation, and distribution.  Mr. Rogovin will testify as to why he contracted with Kean Ashurst as a consultant, what he instructed him to do, and what he instructed him not to do."

Remember, this is the beginning of the trial for

misappropriation of Caudill's trade secrets.

"He will testify as to the analyses that he himself made when he learned of Caudill Seed's claims and why he concluded that his company was not using any trade secret of Caudill Seed and could proceed in good faith with commercial development of an activated formula."

Mr. Rechen continues with his opening statement: "Ladies and gentlemen, Mr. Rogovin and his companies are an American success story.  He is very proud, passionate, and protective of the companies he has built.  He has no children of his own.  This company is his baby.  And as a result you will see that he has taken this litigation and the claims made against his company very personally.  He feels reputationally and financially abused by this litigation.  It has made him angry and at times uncooperative which you may see if the plaintiff plays his deposition in this courtroom even though Mr. Rogovin is available to testify live."

Mr. Rogovin sat in that courtroom three and a half weeks, day in and day out, except one day I think he went to California for a business matter, in clear view of that jury, every moment of every day.  He was never called to testify by his own lawyers.  His own lawyers muted him.  He never got to testify on what it was represented he was going to testify about.

What did the jury hear?

MR. PEPE: Your Honor, is there a question pending?

THE COURT: Let's get another question, Mr. Resser.

Q (By Mr. Resser) You mentioned, Mr. Berman, that the failure to call Mr. Rogovin was compounded. Is this what you were referring to, the promise that he would testify?

A Well, that's what was going to lead into my next part of the testimony is what the jury did see and what the jury did hear and what it seemed to me was the impression left upon the jury.

THE COURT: Well, let's get a question then.

Q (By Mr. Resser) What was the --

A May I?

Q In your opinion, what was the impression that left with the jury?

MR. PEPE: Objection, speculative.

THE COURT: Yeah, I'll sustain that.

Q (By Mr. Resser) What impact did what you just read from the opening statement, how did that impact the conclusions you've reached in this case?

A Yes. I concluded that, as a result of Mr. Rogovin not being called to testify on behalf of the company, not being called to testify in support of what Mr. Rechen -- sorry -- Mr. Rechen said he would testify, the jury was left to question, Why? Why didn't he testify? We were told he was going to testify.

They must have -- they apparently concluded he must have something to hide.

MR. PEPE:  Objection, Your Honor, speculative.

THE COURT:  I'll sustain that.  The jury can ignore the last remark.  Go ahead.

THE WITNESS:  And finally --

MR. PEPE:  Objection.  There's not a question pending.

THE COURT:  Yes, let's get another question, Mr. Resser.

Q   (By Mr. Resser) Again, what did Mr. Rechen's statements to the jury, how did those impact the conclusions you've reached in this case?

A   My conclusion is that it was a substantial factor which likely caused the jury to find that the misappropriation was willful and malicious.

Q   Now, you mentioned in your testimony that Mr. Rogovin -- you had understanding of some of what Mr. Rogovin did from deposition testimony.  Were you referring to deposition testimony in this case, the McCarter versus Jarrow Formulas case?

A   The deposition in, yes, in this case.

Q   Okay.

A   I'm not sure I answered your question.  Could you ask it again, please?  In other words, he gave a deposition which was shown --

Q   Well, first I wanted to clarify because you've mentioned a few depositions.  So there were some depositions in the underlying Kentucky litigation; correct?

A   He gave -- that's correct, yes.

Q   And he gave a deposition in that case, portions of which were shown at the Kentucky trial; is that right?

A   That's correct.  That's correct, right.

Q   He also gave a deposition, or more than one deposition, in this case; is that right?  In this case McCarter versus Jarrow Formulas.

A   I believe he gave one deposition in addition to his testimony at the prejudgment remedy hearing.

Q   Okay.  And some of the testimony you were referring to that explained Mr. Rogovin's state of mind you -- that you referred to was in this case, either the deposition in this case or the PJR hearing; is that right?

A   That's exactly correct, that's correct.

Q   Now, the deposition that was given in the Kentucky case, you've read that deposition as well?

A   I have read -- yes, I've read that deposition.  An excerpt was played at the trial.  I have read the excerpt.  And I've read the entire deposition, including what was not played at the trial.

Q   And did you view the video of the deposition that was played at the trial?

A    Yes, I did.

Q    During the deposition in the underlying Kentucky case, was Mr. Rogovin questioned by anyone from McCarter & English?

A    The -- I have to elaborate a little bit.  There was an excerpt of the deposition that Mr. Rogovin gave in the Kentucky case.  That deposition was five years before the trial.  The plaintiff, Caudill, played an excerpt of that deposition, which is what I think you're referring to, Mr. Resser.

Q    Yes.

A    So it was not played by Jarrow Formulas, but it was played by Caudill because it had potentially damaging -- there was a potentially damaging excerpt.

        MR. PEPE:  Your Honor.

        THE COURT:  I'll sustain it.  I think the question was, Did the --

        THE WITNESS:  I'm sorry.

        THE COURT:  -- McCarter lawyers do any of the questioning of Mr. Rogovin at the deposition?

        Was that the question, Mr. Resser?

        MR. RESSER:  Yes, that's the question.

Q    (By Mr. Resser) Do you have that in mind?

A    Excuse me.  Sometimes I forget I'm testifying.  Lawyers tend to talk a lot.

        But, anyway, that deposition never concluded.  So there was -- from what the excerpt that was played in court,

there was no questioning by Jarrow Formulas, as shown in that excerpt.

Q   You mean no questioning by McCarter & English?

A   No questioning by McCarter & English in that excerpt.

THE COURT:  Next question.

Q   (By Mr. Resser) Now, you also mentioned a restraining order in the Kentucky Ashurst litigation.  Do you have that subject in mind?

A   Yes, that's correct.

Q   Do you have an understanding of whether that restraining order remained in effect or was lifted?

A   Eventually that case was dismissed.  So I assume by the time, at the time it was dismissed, that there was no longer a restraining order in effect.

Q   Now, we talked about the willful and malicious finding resulting in million dollars in punitive damages, $3,245,303.50 in attorney's fees totaling $4,245,303.50.  Do you have that subject in mind?

A   That's correct.

Q   Are you aware of any additional damage that the willful and malicious finding could result as to Jarrow Formulas?

THE COURT:  Could result?

MR. RESSER:  Could result.

MR. PEPE:  I didn't hear that.

THE COURT:  The question is, "Are you aware of any

additional damages that the finding" -- you know what?  I tell you what.  We've reached our lunch break.  We'll pick this up after lunch.

MR. RESSER:  Thank you, Your Honor.

THE COURT:  Don't discuss the case.  Don't let anyone discuss it with you. Keep an open mind and all that goes with that.  We'll have you back in the courtroom at 1:30 today.

(The jury left the courtroom at 12:45 p.m.)

THE COURT:  All right, sir, you may step down. Anything before we recess, gentlemen?

MR. RESSER:  Not from us.

MR. PEPE:  If I understand the question, were there any more damages in which the witness was aware that flowed from the willful and malicious.

THE COURT:  I thought the question said "could result."

MR. GREEN:  It did say "could."

THE COURT:  Why don't we do this.  We'll get another question when he comes back.  Okay?  We'll be in recess.  Thank you very much.

MR. RESSER:  Thank you, Your Honor.

(Recess from 12:45 p.m. to 1:27 p.m.)

(The jury entered the courtroom at 1:30 p.m.)

THE COURT:  Mr. Resser, whenever you're ready to proceed.

MR. RESSER: Thank you, Your Honor.

Q (By Mr. Resser) Mr. Berman, I wanted to ask you another question about Exhibit 511, which we showed to the jury earlier today, which is the letter Mr. Rogovin wrote to Attorney O'Brien. Do you have that subject in mind?

A Yes.

Q Was Exhibit 511 in this case ever shown to the jury in the Kentucky trial?

A No.

Q It was not admitted into evidence; is that right?

A It was not an exhibit. It was not -- not marked, and it was not shown to the jury.

Q Now, does an attorney have to intend to fall below the standard of care in order to conclude there was malpractice?

A No. Intent --

THE COURT: Mr. Pepe, go ahead, sir.

MR. PEPE: Did the attorney have to intend?

THE COURT: Yeah, that was the question.

MR. PEPE: Irrelevant, Your Honor. He met the standard or he didn't.

THE COURT: Well, I'll allow the witness to answer briefly.

THE WITNESS: No. That's the brief answer. That's a -- malpractice is a matter of negligence, not intent.

Q (By Mr. Resser) Now, your conclusion that the willful and

malicious damages for misappropriation likely resulted from the failure of Mr. Rogovin to testify, have you told us all of the reasons that support your conclusion?

A   Um, there were -- well, I'm trying to recall all the reasons that I gave.  But there was a summation by Caudill's lawyer in the Kentucky case.  At the end of all the evidence, the lawyers give summation of their position and what they think they've proven.  And the absence of Jarrow Rogovin as a witness in the Kentucky case was brought out by Caudill's lawyer in his summation to the jury of the case.

Q   Mr. --

MR. RESSER:  Oh, we offer Exhibit 550, Your Honor, which is the closing by Mr. Grundy in the underlying litigation, particularly the portion beginning at line -- at page 32 and 33.

THE COURT:  All right.  So the -- my Exhibit 550 is labeled "Kentucky Trial Transcript F Circ. Volume B."  Just to be clear, that's limited to the closing argument of the attorney referencing --

MR. RESSER:  Yes.

THE COURT:  Okay.  Then that's fine.  That may be admitted.

(Defendant's Exhibit 550, received in evidence.)

So, Ladies and Gentlemen, I admitted both the opening statement of Mr. Rechen and now you're going to see the

closing, part of the closing argument of the opposing lawyer in the Kentucky litigation. These statements are not admitted for the truth of what's being said in the statement. These are being admitted for a different purpose as to what was told to the jury about whether Mr. Rogovin would testify and -- well, I'll let Mr. Berman, after Mr. Resser asks a question, explain what the significance of the closing argument is.

MR. RESSER: Okay, Mr. Campos, can you please show the first page of Exhibit 550?

And then if you could go to page 32 of the transcript beginning at line 15.

Q   (By Mr. Resser) Mr. Berman, is this what you were referring to in your testimony a moment ago?

A   Yes. This is part of the summation or oral argument provided by Caudill's lawyer to the jury at the end of the case. It did not fall on deaf ears for him, and he said, "This whole line about Mr. Rogovin put the fire out. What was the fire? Why did he use the word 'fire'? The fire was what they stole. The fire was it was -- they were using it. Every witness they put on the stand was implicated. Every one of them is on those e-mails, but they're saying the head guy then comes in after they're doing -- the fire's going and he puts it out. Okay? That doesn't add up with -- over here he's saying out of this side of his mouth, 'Oh, we didn't use any of that.' Which is it?

"It doesn't make any sense that Mr. Rogovin just put the fire out. Yeah. He said I'm going to mention this to you. And I'm darn well going to mention it to you. They didn't put him on the stand and he didn't tell you that. It's just the lawyer talking. You heard the judge tell you, you got to look at the evidence."

"The evidence" -- and he went on with his summation after that.

Q   Now, in that summation where Caudill's lawyer refers to, "they didn't put him on," do you have an understanding of who "he" is?

A   They picked up exactly on that. And they were permitted to comment to the jury in summation as to the missing testimony of an important witness.

Q   And is this an example of when an attorney promises a witness in the opening and he doesn't deliver what, in your experience, is a likely consequence?

A   You have to ask that again, please.

Q   In your experience, when an attorney promises a witness in the opening statement and doesn't put that witness on, is this the likely consequence where the other lawyer comments upon that?

        MR. PEPE:  Objection.  Speculative.

        THE COURT:  Well, I think that's an objective question.  I'll allow the answer.

THE WITNESS:  If I understand the question, the question is, Is it the likely result of what happened here the finding of malpractice?  And the answer is that it's not good practice to promise something in an opening statement as to what a person is going to appear and testify to and make those representations to the jury and then not call that witness at all.

Q    (By Mr. Resser) In your experience, what impact, if any, does that have on the lawyer's credibility?

A    Yeah.  That -- in my experience, that affects the jury's questioning why?  What happened?  And questions, What else are we being misrepresented about by this lawyer?  And it affects the credibility of the lawyer in the jury's mind.

Q    Now, Mr. Berman, if Mr. Rechen weren't sure whether Mr. Rogovin would testify at trial -- and the jury here will hear about concerns leading up to the trial about Mr. Rogovin as a witness and there was some uncertainty perhaps about whether or not he would testify.  If Mr. Rechen wasn't sure Mr. Rogovin would testify live, in your opinion, what is the way a lawyer should handle that situation?

A    Well, most importantly, you don't name a person that's going to testify and what that person testifies -- was called upon to testify was going to say.  If you want to make an opening argument to the jury and you want to stress what you expect the evidence is going to provide, you say it in

objective language to the jury.  You're going to hear testimony, or you'll likely hear testimony, about this or that. And you don't mention Mr. So-and-so is going to testify X, Y, and Z unless you're positive about it.

Q   Mr. Berman, are you familiar with a practice guide used here in Connecticut entitled *Connecticut Practice Guide*?

A   Uh, yes, I am.  I am.

Q   Is that an authoritative text regarding trial practice in Connecticut?

A   If you're referring to the practice series which I think has been continued by Bob -- Attorney Robert Yules, yes, that practice guide is something that we, litigation lawyers and practicing lawyers, refer to and try to keep update, yes.  It's a multi -- it's a multi-volume series of Connecticut, in *Connecticut Practice Guide*, started by Attorney William Muller years ago.

Q   Now, in the Connecticut trial did you see anything in the record, in the communications between Mr. Rogovin and his lawyers on the trial team in the Kentucky trial, where he was told whether he would be a witness at the trial?

A   I think what you're referring to is -- well, first of all, on May 29 of 2019, it was three days before the trial started, Mr. Rogovin was given a multi-page outline by either Mr. Leventhal or somebody on the trial team, McCarter & English, as to what his testimony would be.  It was quite an elaborate

multi-page document including exhibits that would be referred to for Mr. Rogovin to testify to when he was called to trial.

As the case progressed, on June 10 of 2019, while the trial was going on, there was an e-mail from Attorney Beres, who was the local Kentucky lawyer for the McCarter & English trial team.  He was not a member of McCarter & English.  He was a member of a Kentucky law firm.  And he sent an e-mail to Jonathan Leventhal to please prep Attorney -- please prep Julia -- excuse me.  Getting late.  To please prep Mr. Rogovin on testifying because his testimony is critical and he'll be the first one out of the box.  That's almost a literal reading of what the e-mail was from Mr. Beres, Attorney Beres, to Attorney Leventhal.

Q    The box refers to what, in your understanding?

A    The box refers to where I'm sitting right now, the witness stand.

MR. RESSER:  Your Honor, we move admission of PTX 212 to publish to the jury, please.

THE COURT:  Okay.  Just one second, please.

All right that can be published.  212 is full.  No objection.

(Plaintiff's Exhibit 212, received in evidence.)

Q    (By Mr. Resser) So 212 starts with an e-mail from Mr. Giarratana dated May 25 to Mr. Rogovin, Mr. Leventhal, with copies to Mr. Rechen, Mr. Grondahl, Mr. Cordani, and Mr.

Hornat.

It then says, "Dear Jarrow:  Attached please find a document summarizing the facts relating to your efforts in July and August 2011 to ensure that Jarrow Formulas did not use any alleged trade secrets of Caudill Seed, and otherwise to ensure that you had a good faith basis for moving forward with the new BroccoMax product and the process of making it."

Do you see that?

A    Yes, I see that.

Q    Is this the -- withdrawn.

Mr. Campos, if you can go on to the next page, please?

Then there's a listing of some of the exhibits that were included with this e-mail, as I understand it.  Is that your understanding, sir?

A    Yes, yes.

Q    And then if we can go to the next page.

This is the e-mail -- I'm sorry.  This is the original letter from Mr. O'Brien to Mr. Rogovin to which Mr. Rogovin responded with Exhibit 511; correct?

A    That's my understanding, correct, yes.  This is -- if you bring it down, I think you'll see it's -- maybe the next page -- signed by Attorney Tom O'Brien for Caudill's law firm of Frost Brown and Todd.

THE COURT:  I'm sorry.  I missed something.  This is an attachment to the exhibit we just submitted?

MR. RESSER:  Yes.

THE COURT:  Okay.  I got it.

MR. RESSER:  Then if we can go to the next page, Mr. Campos.

Q   (By Mr. Resser) This is what, Mr. Berman?

A   This appears to be the prep outline that was given to Jarrow Rogovin to familiarize himself with in preparation for his trial -- for his testimony at the trial.

Q   And if you can page through it, you've reviewed this before your testimony today; is that right, sir?

A   Yes, I did.

Q   And this document contains the subject areas that the lawyers at McCarter & English expected to come out through Mr. Rogovin at the trial.  Is that your understanding?

A   That's my understanding, correct.

Q   Now, I would next like to move admission of Defense Exhibit 601.  I believe there's no objection.

THE COURT:  Okay.  If there's no objection, it can be marked as a full exhibit, published to the jury.

(Defendant's Exhibit 601, received in evidence.)

Q   (By Mr. Resser) Mr. Berman, do you see Exhibit 601 on the screen?

A   I have to correct my testimony.

Q   Okay.

A   I did not see the previous one.  I saw this one.  This one

is dated May 29.  That's why I was slow in answering your first question.  It certainly looks the same, but I do recognize that this was May 29, three days before the trial, so when I was referring to in my testimony.

Q   Okay.  And the outline attached to PTX 212 was 12 pages in length.  This one, I think, is a little longer.

MR. RESSER:  Can we page through it, Mr. Campos, please?

Q   (By Mr. Resser) Mr. Berman, is this the document that you reviewed by which McCarter & English planned to put this -- all of this testimony in through Mr. Rogovin?

A   Yes, that's the document I have reviewed as is outlined, the outline to Jarrow Rogovin as to the areas he can be expected to testify to.  There were some highlighting indicating that maybe Kean Ashurst would testify to those areas.

Q   What does Mr. Rechen's promise to the jury and this outline, this 19-page outline, indicate to you, if anything, about what McCarter & English was thinking about Mr. Rogovin's testimony?

A   Well, my impression is that Mr. Rechen obviously thought Jarrow Rogovin's testimony was very important to the case, perhaps critical, as mentioned in Attorney Beres's e-mail and that he should have -- he expected to have him testify.

Q   Now, I believe the jury has heard or will hear in this case

Mr. Rechen's explanation that everything in this outline was covered either by Mr. Rogovin's deposition excerpts at the trial in Kentucky, not his live testimony, and the testimony of other witnesses other than Mr. Rogovin. What is your opinion about that explanation?

A    Well, my understanding in reading Mr. Rechen's deposition and his testimony I think at the prejudgment hearing is that he didn't necessarily refer to this particular document, but he did feel, did -- the testimony was that at various -- a meeting to decide whether Mr. Rogovin would testify, he did make the claim that there was no need to because everything that he would have wanted to cover was already covered either by the portion of the transcript they played -- portion of the deposition they played or by Kean Ashurst's -- Kean Ashurst's testimony.

Q    So besides Mr. Rogovin's letter to Mr. O'Brien and the subject matters covered in the outline in Exhibit 601, is there anything else that you found would have been covered by Mr. Rogovin that wasn't covered during the Kentucky trial?

A    The answer is yes. He never got to express his state of mind as to what his intentions were, what his analysis was of the so-called trade secret and what he -- it's his opinion that it was okay to proceed with the fabrication of the broccoli seed product that was underway at Jarrow Formulas.

Q    Now --

A    He also never got to talk about how he took all his steps to avoid any misappropriation and certainly his efforts in -- excuse me -- in good faith to avoid any finding of willful and malicious.

Q    Now, you've read and heard testimony in pretrial proceedings in this case, depositions in this case, about McCarter & English's fear that Mr. Rogovin would, as they say, go off the rails and talk about things that they didn't want him to talk about.  Do you have an opinion about that?

A    Yes, I do.

Q    What is that?

A    In the Kentucky case, prior to trial, prior to the actual trial, the Caudill's lawyers, the plaintiff, filed what's called a motion in limine, which was to preclude evidence from coming in at the trial.  One -- they had an omnibus, referred to a lot of issues.  One in particular was that Jarrow Rogovin would be precluded from saying his opinion or anything, I guess, derogatory about Caudill.  And that was one of their motions.

        McCarter & English went along with it as long as it was understood that that was a mutual exclusion.  Document No. 341 in the Kentucky case, Judge Simpson, his order was that there would not be any -- any derogatory remarks made during the trial.  He also added that they were irrelevant anyway.

Q    So how does that relate to my question, which is McCarter &

English's fear that Mr. Rogovin would go off the rails?

A    Well, it was -- in my mind, it was not justified.

Q    Because of the judge's order?

A    Because of the judge's order, correct.

Q    And you referred to a document number.  That's not an exhibit number in this case?

A    That's correct.  That's in the Kentucky Document No. DN 341.

Q    Sir, do you have an understanding of whether Mr. Rogovin wanted to testify in the Kentucky jury trial?

A    The answer is yes.

Q    And what is your understanding?

A    Well, his testimony --

          MR. PEPE:  Objection, foundation, Your Honor.

          THE COURT:  Well, okay.  You can lay some foundation. I'll sustain it.  But you can lay some foundation.

Q    (By Mr. Resser) Mr. Berman, you've read the testimony Mr. Rogovin gave at the PJR hearing here in Connecticut in this court; correct?

A    That's correct, yes.

Q    Based on that testimony, do you have an understanding of whether Mr. Rogovin wanted to testify during the Kentucky jury trial?

A    Yes, I do.

Q    And what is your understanding in that regards, sir?

A    Mr. Rogovin testified at both that prejudgment remedy hearing and in his deposition that he wanted to testify at the Kentucky trial.  He said -- he made that clear.  He also made it clear at the Kentucky trial at a private session after -- outside of the court with McCarter & English that he wanted to testify at the trial.

Q    Now, on the eve of when Jarrow Formulas was going to be given the opportunity to present its defense in Kentucky, do you have an understanding that there was a meeting held in which a decision was made that Mr. Rogovin would not testify?

A    I'm aware of one meeting in particular, which I believe took place on June 17 of 2019.  And it was a meeting of the McCarter & English team.  There was some people from Jarrow Formulas at this meeting.  I think Mr. Leventhal was at that meeting.

Jarrow Rogovin was not at the meeting.  Jarrow Rogovin was in a separate room with Attorney Beres.  And my understanding at that meeting it was decided -- and there's conflicting testimony that I've read as to whether to call Jarrow Rogovin as a witness or not.  The decision was ultimately made not to call him.

Q    Are you sure it was Mr. Rogovin in a separate room with Mr. Beres, or was it the jury consultant?

MR. PEPE:  Objection, leading.

THE COURT:  Yeah, that is leading.  I'll sustain it.

Q   (By Mr. Resser) Are you sure that it was Mr. Beres in the next room?

A   I thought so.  I could be mistaken, but I know that Mr. Rogovin was not at this meeting.

Q   Okay.  Did Mr. Rogovin give his informed consent not to testify in your opinion?

A   Say that again, please.

Q   Did Mr. Rogovin ever give informed consent to not testifying at the Kentucky trial?

MR. PEPE:  Objection, foundation.

THE COURT:  Yeah, sustained.

Q   (By Mr. Resser) Have you read all of the testimony in the pretrial proceedings in this case about the matters that were discussed at the meeting when it was decided Mr. Rogovin wouldn't be called live at the Kentucky trial?

A   The answer is yes, I've read three days of transcript that were October 11, October 10, and a late date in September of 2019.  Those are the three days of the transcript of the hearing at the prejudgment remedy phase of this case.

Q   In any of the testimony, including by the lawyers at McCarter & English and Mr. Beres, who were present, or any of the representatives of Jarrow Formulas who were present at that meeting on June 17th, did any of them mention in that meeting the likely consequences of failing to call Mr. Rogovin live given the promise Mr. Rechen made in his opening statement?

A    In my reading of the testimony and depositions, nobody told Jarrow Rogovin of the repercussions of him not testifying at the trial.

Q    Did anyone express an opinion about what might happen if Mr. Rogovin did testify at trial and how that would impact the outcome of the case?

A    I didn't read in all the transcripts and depositions that anybody did inform Jarrow Rogovin of those consequences.

Q    Did Mr. Rogovin get a chance to explain at the Kentucky trial why he asked Mr. Ashurst for the customer list?

          MR. PEPE:  Objection.

          THE COURT:  Well, no, he can answer.  It's overruled. The question is, Did he get a chance to explain at the Kentucky trial why he asked for the customer list?

          THE WITNESS:  I'm just trying to remember whether that was displayed in the Caudill excerpt.  And I also don't recall -- Kean Ashurst testified for three days in the Kentucky trial, and I don't recall whether he -- whether that subject of why Jarrow Rogovin wanted the customer list was testified to by Kean Ashurst.  But I could certainly -- I'm confident in saying that --

          THE COURT:  Yeah, yeah, I'll stop the testimony there. Let's get another question.

          MR. RESSER:  All right.  Thank you.

Q    (By Mr. Resser) The finding of willful and malicious

misappropriation, given that the jury found that there was misappropriation, wasn't it a logical conclusion by the jury, based on that finding, that it was also willful and malicious?

MR. PEPE:  Objection.

THE COURT:  Sustained.

Q   (By Mr. Resser) The finding of willful and malicious misappropriation, in your understanding of the instructions given to the jury in the Kentucky case, what was the standard that the jury was instructed on in determining whether the misappropriation was willful and malicious?

A   Are you asking me whether there was an instruction or what was the instruction?

Q   First, was there instruction?

A   Yes, there was.

MR. RESSER:  Your Honor, we would like to move admission of Exhibit 614, which are the charging instructions to the jury in the Kentucky trial.

THE COURT:  All of them?

MR. RESSER:  Well, in particular page 13, which is the instruction on willful and malicious.

THE COURT:  Well, let's make sure it is in particular, because I don't want the jury to have to read all of the instructions in the Kentucky trial.

MR. RESSER:  If we don't have to, we won't.  Thank you, Your Honor.  It is just page 13 then.

THE COURT:  All right.

MR. RESSER:  13 out of 18, move admission.

THE COURT:  That's fine.  That will be -- just that page will be a full exhibit.

613 or 614?  I'm sorry.

MR. RESSER:  614.  I misspoke.  It's page 13 of 614.

THE COURT:  Page 13 of 614.  Thank you.

(Defendant's Exhibit 614, received in evidence.)

Q   (By Mr. Resser) Mr. Berman, is this the charging instruction that the jury was given on willful and malicious conduct?

A   Uh, yes.

Q   Is this --

A   The docket number appears at the top.

Q   Does this require a different level of proof than the proof required for the finding of misappropriation alone?

MR. PEPE:  Objection.

THE COURT:  Grounds?

MR. PEPE:  He's not qualified -- he hasn't been qualified as an expert in Kentucky trade secret law on willful and malicious.

THE COURT:  Okay.  I mean --

MR. RESSER:  I'll rephrase.

THE COURT:  Yeah.

Q   (By Mr. Resser) Based upon your review of the instructions

and the entire trial transcript in Kentucky, was the jury instructed in Kentucky that willful -- that willful and malicious misappropriation required a higher standard of proof than was required simply to find misappropriation alone?

A   This instruction, if you see this second paragraph, you must determine from the evidence whether Caudill Seed has proven by clear and convincing evidence that Jarrow Formulas misappropriated one or more of Caudill Seed's trade secrets in a willful and malicious way.  Clear and convincing is a higher standard.

MR. PEPE:  Objection, Your Honor.  No question pending.

THE COURT:  No, he's still comparing.  You can go ahead, Mr. Berman, briefly.

THE WITNESS:  May I?

THE COURT:  You may.

THE WITNESS:  Thank you.

Clear and convincing evidence is a higher standard of proof requiring more certainty, almost absolute certainty --

THE COURT:  Well, now we're getting into areas we shouldn't.

THE WITNESS:  I'm sorry.

THE COURT:  Ladies and Gentlemen, disregard.  It's a different standard for preponderance of the evidence.  Ask your next question.

MR. RESSER:  That's my last question.

THE WITNESS:  Well --

THE COURT:  Okay, Mr. Resser, are we done?

MR. RESSER:  Yes.

THE COURT:  Great.  Let's have cross-examination.

MR. PEPE:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. PEPE:

Q   Good afternoon, Mr. Berman.

A   Good afternoon, Mr. Pepe.

Q   One trade secret case in 53 and a half years; is that correct, that you've handled?

A   I'm sorry.  Could you ask it again, please?

Q   One trade secret case you've handled in 53 and a half years of practice; is that correct?

A   Yes, that's correct.

Q   And that did not go to trial, did it?

A   No, it did not go to trial.

Q   So you've never tried a trade secret case, and you're here to give an opinion on alleged malpractice in the trial of a trade secret case; correct?

A    I never tried to verdict or to judgment a trade secret case, that's correct.

Q   Never written any papers on trade secret law, trade secret litigation; correct?

A   Could you repeat that, please?

Q   Sure.  You've never published any papers on trade secret law, trade secret litigation; correct?

A   That's correct.

Q   Never given any seminars on trade secret litigation; correct?

A   That's correct, yes.

Q   You'd agree with me that in handling litigation, trial lawyers are called upon to make many, many professional judgment calls; correct?

A   Yes.

Q   And the more protracted, the more difficult the litigation, the more judgment calls the trial lawyer has to make; correct?

A   I would say that's probably true, yes.

Q   And the trial lawyer has to make those judgment calls in the context of the circumstances of the case as they are developed; correct?

A   Yes.

Q   And every trial is a fluid situation changing every day; correct?

A   I didn't -- I missed a word.  It was a what situation?

Q   Every trial is a fluid situation; correct?

A   Within bounds, yes.  Not totally, but within bounds, yes.

Q   Evidence comes in or doesn't come in, depending on the rulings of the court; correct?

A   Well, that's true, yes.

Q   And every trial lawyer every day at the end of the day has to evaluate the status of the case that he has tried to present; correct?

A   I would agree with that, yes.

Q   And he has to evaluate that case against the trial plan that was developed going into the trial; correct?

A   Against the trial what?

Q   The trial plan.

A   Plan.  Um, yes, of course.

Q   And he has to decide whether he has to make adjustments to the trial plan based on what has developed in that trial; correct?

A   In broad language, that's true.

Q   And that's something that the trial lawyer does every hour of every day during a trial; correct?

A   I wouldn't put it quite as specifically assertly every day. Maybe in segments during the trial.  I don't know if I'm answering your question.  I would not agree that it's done at every hour of every day.

Q   And when he makes those judgment calls, he has to take into account the circumstances as they then exist; correct?

A   That's correct, yes.

Q   And he has to bring to bear his best professional judgment in making that determination; correct?

A    That's correct, yes.

Q    And he has to do it in consultation with his co-counsel; correct?

A    If there's co-counsel.  I don't find that that is necessarily always a factor.

Q    And he has to do it in consultation with the client; correct?

A    That's too broad a question.  I couldn't answer -- I couldn't agree with that.  There are certain situations where I don't think that is necessary.

Q    Where he doesn't have to consult with the client?

A    Certainly there are parts, such as maybe an exhibit or another exhibit that he, or she, thinks it's a good idea to put into the evidence.

Q    I overstated it.  You wouldn't consult with a client on every exhibit but on significant matters he the trial lawyer, or she the trial lawyer, has to take into account all the circumstances and consult with the client; correct?

A    That's too broad a question for me to answer.  I mean, I just cannot answer that correct or not correct.

Q    You would agree one of the professional judgments a trial lawyer has to make is what witness to call; correct?

A    I would agree with that, yes.

Q    And in making that determination, the trial lawyer has to evaluate what kind of a witness that person would make;

correct?

A   Uh, the reason I'm having difficulty is it depends on who the witness is and, um, what that evaluation is.  So I can't agree automatically to your question.

Q   So you don't agree that, in evaluating whether to call a witness, the lawyer doesn't consider what kind of a witness he would make.  Let me ask it this way if you don't agree with that:  He has to make an evaluation of whether that witness will be credible to the trier of fact, the jury; correct?

A   Would be what?  I'm sorry.

Q   Credible to the trier of fact, the jury.

A   Yes.  That's certainly a factor, of course.

Q   To consider whether that witness would be likable to the jury; correct?

A   Not necessarily.

Q   He has to make a determination of whether that witness will make a favorable impression on the jury; correct?

A   That could be a factor but not a deciding factor.

Q   And he has to determine whether that witness is essential or whether evidence could be introduced through other witnesses or documents, exhibits; correct?

A   I don't agree with that.  If the witness is essential, every effort should be made to make sure that witness testifies.

Q   That's not my question, sir.

A    I'm sorry.

Q    That's not my question.  My question was:  He has to decide whether the witness is essential or whether the evidence could be introduced through other witnesses or documents; correct?

A    I would agree with that statement, yes.

Q    He has to consider cross-examination of that witness; correct?

A    Uh, yes, certainly.

Q    He has to -- he or she has to consider what damage might be done on cross-examination; correct?

A    Uh, when you say "consider," I don't know where that leads. It has to be -- it has to be considered.  Whether it's a deciding factor or not, it depends.

Q    Did I say any one was a deciding factor?

A    The word "consider" is too broad for me to give you an absolute answer.

Q    Which word should I use?

A    Sorry?

Q    What word should I use?

A    Well, in the context of what, of whether they would be cross-examined?

Q    No, in the context -- in the context of my question, in deciding what witnesses to call.  He or she, the trial lawyer, has to consider what damage might be done to the credibility of the case; correct?

A    In broad terms consider, yes.

Q    In determining what witnesses to call, the trial lawyer has to consider what evidence is already in and how it might be undermined by cross-examination; correct?

A    I can't answer that in a broad sense.  Obviously, the Court is not going to allow cumulative evidence, but it's too -- too broad a question for me to just blindly agree with you, sir.

Q    My question wasn't whether the Court will allow it.  I'm asking, the trial lawyer has to consider the evidence already on the record and whether it could be damaged by the witness testifying; correct?

A    I'd have to know the circumstances.

Q    I'm sorry?

A    I have to know the circumstances.  I can't just blindly agree with the statement.

Q    Well, I'm talking generally, sir.  I didn't get to the specifics yet.

A    I'm sorry.  I didn't hear that.

Q    I'm talking generally.  I did not get to the specifics yet. I'm asking you to bring to bear your 52 and a half years experience and tell us whether that's one of the considerations you make in deciding what witness to call.

A    Well, you've injected the word "generally," and I would agree with you then.

Q    And in making all those judgment calls, including what

witnesses to call to the stand and not, the lawyer uses his best professional judgment; correct?

A    Absolutely.

Q    He doesn't guarantee the outcome, does he?

A    No, he does not.

Q    Otherwise, in every trial the lawyer who lost would be guilty of malpractice; correct?

A    We should not be guaranteeing a result, that's correct.

Q    No lawyer does that; correct?

A    I didn't hear you.

Q    No lawyer does that.

A    I don't know that.  I would say no -- no prudent, respectable lawyer does that.

Q    Now, you were retained as an expert witness in this matter on January 3, 2020; correct?

A    That's my recollection, yes.  I wouldn't say I was retained on that date.  That's when I was broached.  I may not have been retained till the 3rd of January.

Q    The 3rd of January, Attorney Tinley retained you as an expert to render an opinion on the malpractice allegations against McCarter & English; correct?

A    You'd have to repeat the question, please.

Q    On January 3, 2020, Attorney Tinley retained you as an expert witness; correct?

A    No, I don't believe that that's accurate.

Q    What was the date, sir?

A    I think it was sometime subsequent to that, maybe a day or two, because I was given material to review to see if I could opine that way.

Q    All right.  So on January 3, 4, or 5 you were retained as an expert witness to see if you could render an opinion, and you did; correct?

A    I was retained sometime in that time span, yes.

Q    Yeah.  And then, as an expert witness, you filed a report under Federal Rule 26; correct?

A    Yes.

Q    And you're familiar with Federal Rule 26 before you filed that report; correct?

A    I have read it a number of times.

Q    And in that report, the rules require that you state your opinions as an expert and the basis for them; correct?

A    I didn't hear the last part.

Q    In that rule, you are required to file your report which states your expert opinion; correct?

A    That's correct.

Q    And the basis for your expert opinion.

A    That's correct.

Q    Correct?

A    Yes.

Q    And you did that; correct?

A    Yes, I did.

Q    And you did it on January 8th; correct?

A    Correct.

Q    Five days after the 3rd or four days after the 4th or only three days after the 5th; correct?

A    Saying after I was retained or after I reviewed the materials?  I didn't hear you.

Q    Could have been no more than five days, assuming you reviewed the materials on January 3; correct?

A    I started reviewing the materials, correct.

Q    And you filed your report under Rule 26 in which you rendered your expert witness opinions; correct?

A    It was a limited report.  That's what I filed, yes.

Q    You did, in fact, call it a preliminary limited report; correct?

A    That's correct.

Q    Rule 26 makes no provision for limited preliminary reports, does it?

A    Neither does --

Q    Yes or no, if you know the rule.

A    I can't answer that question.  Doesn't preclude it.  That's why.

Q    In that report, sir, you rendered an opinion on McCarter's -- or the malpractice allegations against McCarter; correct?

A    Yes, sir.

Q    And the opinion was that it was malpractice not to call Jarrow Rogovin to testify; correct?

A    Yes.

Q    And you did that in no more than five days, maybe less depending on the materials; correct?

A    That's correct, yes.

Q    You were asked on direct examination to explain what materials you reviewed in reaching your opinion on malpractice. Do you remember that?

A    Yes.

Q    And you listed those materials; correct?  Remember that?

A    I outlined those materials in a broad sense what they were, not each individual document.

Q    You said -- and I wrote it down -- most of the materials in the Kentucky litigation; correct?

A    I don't recall that, if that's what I said.

Q    You said the materials were so extensive you devoted a room in your office to contain them; correct?

A    That's correct.

Q    You said you reviewed every day's transcript in the Kentucky litigation.  True?

A    True.

Q    You said you reviewed thousands of motions and orders filed in the Kentucky litigation.

MR. RESSER: Objection.

Q (By Mr. Pepe) True?

THE WITNESS: I reviewed --

THE COURT: Wait a second.

MR. RESSER: Objection.

THE COURT: Grounds?

MR. RESSER: Lacks foundation. He said thousands of documents.

THE COURT: All right.

MR. RESSER: I believe the testimony was pages.

THE COURT: Ladies and Gentlemen, it will be your recollection of the testimony that matters. So I'll overrule the objection.

Go ahead, Mr. Pepe.

Q (By Mr. Pepe) You said thousands of motions and orders. Did I get it wrong?

A Did you say motions? Court documents.

Q Thousands.

A No. It was thousands of pages, not documents. I believe there were thousands of pages. If I said documents, I meant pages of documents.

Q Fifty to sixty exhibits in the Kentucky litigation; correct?

A That's correct.

Q And all the depositions rendered in this case, the case

brought against Jarrow Formulas; correct?

A    Except one that I recall, had to do with the billing.

Q    Did you want the jury to understand you did all of that review and study before reaching your opinion on malpractice? Was that what you wanted the jury to understand?

A    No.  That's absolutely not the case.

Q    So let's explore that, sir.

A    I'm sorry?

Q    Let's look at that.  Because when you were asked, "What did you review to reach your opinion?" you listed or you stated just what I said paraphrasing you, just what I said; correct? But that's not what you reviewed in reaching your opinion and the report you filed on January 8th, 2020, is it?

A    No, that is a correct statement.

Q    Yeah.  What I said is a correct statement, not what you said; correct, sir?

A    Well, I don't know what I said, but I didn't review all of that information in the four days between -- five days between January 3 and January 8.  That was for a limited report.

Q    You reviewed none of that information before you filed your expert witness report in this case; correct?

A    That's not true.  I'm sorry, I didn't mean to interrupt you.  That's not true.  I did review materials before I filed my limited report.

Q    That's not what I asked, sir.

You reviewed none of the materials in the Kentucky case before you filed your report.  True?

A   I don't recall exactly.  It may be correct.  I believe you may -- that may be correct.

Q   The only thing you reviewed before you rendered your opinion of malpractice was the transcripts from the PJR hearing and three exhibits from those hearings.  True?

A   No.

Q   That's not true.

A   No.

Q   Do you remember giving your deposition in this case?

A   Yes, on two occasions, correct.

Q   In fact, you gave it twice because the Court allowed you to file a supplemental opinion after your preliminary opinion; correct?

A   I believe so, that's correct.

Q   You gave your deposition on the preliminary opinion, and then when the Court allowed you to file a supplemental report, you gave your deposition again; correct?

A   I gave a deposition in February 2020 and then later in April of 2021.

Q   The first one was on your preliminary limited opinion?

A   February of 2020.

Q   And then the Court allowed you to give a second report, and you were deposed on the second report; correct?

A    Please say that again.

Q    The Court permitted you to file a supplemental report.  You did; correct?

A    That's correct, yes.

Q    And then you were deposed on that; correct?

A    That's correct.

        MR. PEPE:  May I approach the witness, Your Honor?

        THE COURT:  You may.

Q    (By Mr. Pepe) I handed you the transcript from both depositions.  I handed you both your reports, sir.

A    Yes, I have that transcript.

Q    Go to your first report, sir, page 2.

A    What page, please?

Q    Page 2, your January 8, 2020, report.

        You list there the documents you reviewed --

A    What page are you reading from, please?

Q    Your January 8, 2020, limited preliminary report.

A    Oh, okay.

Q    Page 2.  You list there what you reviewed in preparing this report in the five days between the time you were retained and the time you filed your report; correct?

A    That's correct.

Q    You list there pleadings in this case, the Hartford case brought by McCarter against Jarrow and the counterclaims therein; correct?

A    That's correct.

Q    You listed an expert opinion of another expert; correct?

A    That's correct.

Q    You listed the transcripts of the PJR, or prejudgment remedy hearing; correct?

A    Yes, that's correct.

Q    And you listed three exhibits from the PJR hearing; correct?

A    That's correct.

Q    Nothing else in your review other than the Connecticut case law; correct?

A    Nothing else did I review in connection with the limited preliminary expert opinion.  Is that what you're asking?

Q    That was all you reviewed before you gave your opinion, nothing from the Kentucky case; correct?

A    Nothing from the Kentucky case, thank you.  Well, other than Elisabeth Gray opinion --

Q    Yes, we said there's another expert opinion.  You said that.  I listed that.

        So based on that documentation alone, you concluded and wrote a report in which you stated it was malpractice for McCarter not to call Rogovin as a witness.  True?

A    I also reviewed --

Q    Sir, is that true or not?

A    It's not a complete question.  I also -- I reviewed some

research.

Q   I said Connecticut case law.  Did you not hear me say that?

A   I didn't hear that part.  I'm sorry.

Q   Now we know everything you reviewed before you gave your opinion; correct?

A   That's correct.

Q   And based on that material, you rendered an opinion that McCarter committed malpractice by not calling Jarrow Rogovin as a witness; correct?

A   That's correct.

Q   In fact, you said it was absolutely unfathomable that McCarter did not call Jarrow Rogovin as a witness; correct?

A   I know I used the word "fathomable."  I'm just looking whether I used the word "absolutely."

Q   Would it make a lot of difference, sir?

A   So ...

        Can you cite me to the particular -- oh, I see it, yes.  Okay, I did see that, Mr. Rogovin's assistance in such -- it is absolutely unfathomable that M&E never called Mr. Rogovin to testify, correct.

Q   You testified to this jury a moment ago -- and I got this quote right I think -- You have to know what happened in the Kentucky case in order to know if malpractice was committed, end quote.  I got that right, didn't I?

A   Are you citing to a deposition?

Q   No.  I'm citing to your testimony about the -- just before the luncheon recess.  Quote, You have to know what happened in the Kentucky case in order to know if malpractice was committed, end quote; correct?

A   That's correct.

Q   That was your testimony to the jury.

A   That's correct.

Q   But when you rendered your opinion on malpractice, you knew nothing about what happened in the Kentucky case except what you got from the pleadings in this case and the PJR hearing transcripts and the three exhibits you looked there and Gray's report; correct?

A   And the Elisabeth Gray report, did you include that?

Q   That's all you had; right, sir?

A   That's correct, yes.

Q   You had not looked at one pleading in the Kentucky case; correct?

A   Other than Elisabeth --

Q   I can't hear you, sir.

A   I guess we're having a hearing problem.

Q   No, I'm not.  Go ahead.

A   I said, other than Elisabeth Gray, the PJR testimony.  So are you asking me I knew nothing what happened in the Kentucky case?  Is that your question?  Because that's not so.

Q   My question is, that's the sum of all you knew.  You did

not look at one pleading in the Kentucky case.

A    That's correct.

Q    You did not look at one day of testimony in the Kentucky case.

A    That's correct.

Q    You did not look at one exhibit in the Kentucky case.

It's not on your list of documents, sir.  We already went through it.  So the answer has to be, no, you didn't look at one deposition.  That has to be your answer because you didn't list it in your report; correct?

A    Well, I thought there was a list of a couple of exhibits I did look at.  So I thought I had that list.

Q    Sir, the report --

A    All right.  Well, I guess I don't -- I don't see that list attached.  So what I reviewed is everything, I guess, on page 2.

Q    Yes.  I directed you to page 2.  That's where you list everything you reviewed, and there's nothing there from the Kentucky case, no pleadings; correct?

A    No Kentucky pleadings, correct.

Q    No depositions; correct?

A    Kentucky depositions?

Q    Yes.

A    No, there were no Kentucky depositions.

Q    No transcripts of the testimony; correct?

A    That's correct, yes.

Q    When you made that opinion that it was absolutely unfathomable that McCarter would not call Jarrow Rogovin as a witness, you did so without even knowing -- do you still want to look, sir, to see if it's there?  Are you still looking to see what you reviewed or --

A    Without even knowing what?  I didn't hear the last part.

Q    Because you were reading.  I wanted to wait until you were through.

A    Oh, I'm sorry.  Go ahead.

Q    Are you through now?

A    Yeah.

Q    You rendered that opinion in five days that McCarter had committed malpractice by not calling Rogovin without not -- without knowing what the circumstances were that McCarter considered in making that decision; correct?

A    That's correct, yes.

Q    That was not important to you?

A    The question is if it came to Jarrow Rogovin, that was -- it was unbelievable that they didn't call him as a witness, that's correct.

Q    And, therefore, you stopped there and did not even know or care what the circumstances were that McCarter considered in making that decision.  True?

A    It was unfathomable.  That's what I put.

Q   And my question is, sir:  Therefore, you did not know or care what the circumstances were that McCarter considered in making that decision.  True?

A   Uh, no.  I believe in the --

Q   Sir --

A   The answer is -- it's not true.

Q   It's not true.

A   No.

    All right.  You have your deposition in front of you?  You've taken some depositions in your 53 and a half years?

A   Yes, I have.  53 and eleven twelfths.

Q   You understand the witness, of course, is under oath and it's just as if he or she were in court; correct?

A   I didn't hear that.

Q   You understand, of course, the witness in a deposition is under oath just as if he or she were in court; correct?

A   Of course, yes.

Q   If you would go to the first deposition, page 141.  Line 10.

A   Are you saying page 41?

Q   First deposition, February 4, 2020, page 141.

A   Are you saying 41 or 141?

Q   141.

A   I'm on page 141.

Q   Line 10?  You there, sir?

A    Yeah, I'm there.

Q    Are you there now, sir?

A    I'm sorry?  I'm there.

Q    141, line 10:

          "Question:  What were the circumstances McCarter &
English considered in deciding not to call Jarrow Rogovin?

          "Answer:  I don't know."

          That was your testimony; right, sir?

A    That's my testimony then; that's my testimony today.

Q    You didn't even know, when you made that -- when you
rendered that opinion, who made the final decision.  True?

A    Uh, I think I understand your question, that I didn't know
the circumstances.  The answer is true.

Q    You did not know, when you made -- when you rendered that
opinion, when the final decision was made.  True?

A    When -- not on June -- not at February at this time in the
deposition.

Q    Or when you filed your report rendering your opinion.
True?

A    The January 8 report?

Q    Yes.

A    That's true.

Q    You know who Joel Beres is now, don't you?

A    Say it again, please.

Q    You know who Joel Beres is now.

A    I know who Joel Beres is.

Q    You didn't know who he was then, did you?

A    That's -- uh, unless his name came up in the prejudgment remedy hearing, so I couldn't say yes or no.  If it came up -- we'd have to look at the transcript of the prejudgment remedy hearing to see whether I was aware of Joel Beres at the time.

Q    But you don't know -- you didn't know when you rendered that opinion if Joel Beres, the co-counsel, was involved in the situation.  True?

A    Again, I'd have to look at the transcript of the prejudgment remedy hearing to find out whether and what his involvement was.

Q    When you rendered your opinion, you did not know that Joel Beres -- whether Joel Beres was involved in making that decision.  True?

A    I told you I can't answer that without looking back at the transcript of the prejudgment remedy.

Q    You don't know when -- whether the decision was made after the plaintiff rested or before the plaintiff rested.  True?

A    That's probably true.

Q    None of that impeded you from opining that it was unfathomable that McCarter did not call Jarrow Rogovin; correct?

A    That's correct.

Q    And when you rendered that opinion, you had not conducted

any interviews of anyone involved in the Kentucky litigation; correct?

A   I didn't get the whole question.  I did not what, sir?

Q   When you rendered that opinion, you did not conduct interviews with anyone involved in the Kentucky litigation; correct?

A   That's correct.

Q   You did not interview any Jarrow Formulas personnel; correct?

A   That's correct.

Q   You did not interview Jarrow Formulas in-house counsel Jonathan Leventhal; correct?

A   That's correct.

Q   You did not interview Jarrow Formulas' co-counsel Joel Beres; correct?

A   That's correct.

Q   You did not even interview Mr. Rogovin himself; correct?

A   That's correct.

Q   You did not even speak to Mr. Rogovin; correct?

A   That's correct.

Q   You had never met Mr. Rogovin; correct?

A   That's correct.

Q   But you still rendered the opinion that it was malpractice not to call him as a witness; correct?

A   That's correct.

Q   You didn't even watch his video deposition before you rendered that opinion; correct?

A   That's correct.

Q   You filed a second report on March 3, 2020; correct?

A   Let me just clear my lap, please.  That sounds correct.

Q   And then you were deposed on that on April 16, 2021.  Do you recall that?

A   I believe that's correct, yes.

Q   Your opinion was still the same, that is, malpractice; correct?

A   Say it again, please.

Q   By that time you had read some of the transcripts in the Kentucky litigation; correct?

A   I read all the transcripts of the Kentucky litigation, correct.  Did you use the word "all"?

Q   I said "some."

A   No, I read every single one of them.

Q   And all the depositions; correct?

A   Say it again, please.

Q   I'm sorry?

THE COURT:  He asked if you had read all the depositions.

THE WITNESS:  All the depositions?  All the depositions in this case?

Q   (By Mr. Pepe) In the Kentucky case.

A   No, I didn't read all the depositions in the Kentucky case.

Q   All the pleadings; correct?

A   All the what?

Q   All the pleadings.

A   I did read all the relative pleadings, not by -- no -- well, by April of 2021 I had -- I did, if that's your question. By the time you took the second deposition, my second deposition, I had read all the pleadings that I considered relevant.

Q   I thought you said you read all the pleadings in the Kentucky case.

A   Say it again, please.

Q   I thought you said you read all the pleadings in the Kentucky case, not just what you considered relevant.

A   My testimony is I read the motions, orders, pleadings, objections, anything in the Kentucky case that I thought was -- pertained to my opinion.

Q   When you gave -- when you rendered the first opinion in your first report, you had -- you didn't even know what claims had been made in the Kentucky litigation, did you?

A   No, I don't think that's accurate.

Q   You had not even -- you didn't even know what the applicable law was when you rendered that opinion; right?

A   I'm sorry.  I didn't hear that question.

Q   You did not know what the applicable law was when you rendered that opinion?

A   I did not know.

Q   The law governing the Kentucky litigation.  You did not know the law governing the Connecticut litigation when you rendered the opinion in your first report.

A   At which point in time?  I'm sorry.

Q   The first report.

A   On January 8?

Q   Yes.

A   Yes, sir.

Q   You can't know; right?

A   I didn't know what, sir?

Q   That what the controlling law was or what the claims were.

A   Did I not know about the Uniform Trade Secret Act?

Q   Right.

A   I know there was a Uniform Trade Secret Act.

Q   You knew it by the time of the second deposition, but you didn't know it at the time you rendered your first opinion; correct?

A   I had not read it, that's correct.

Q   At the time of the second deposition, you still hadn't read it; correct?

A   I had still not studied the Kentucky Uniform Trade Secret Act, that's correct.

Q   So even by one year later, you had a year, what, a year and a half to do this, and you still haven't read the Kentucky Uniform Trade Secret Act; correct?

A   Not the actual literal act, that's correct.

Q   You still hadn't conducted any interviews with any of the people involved; correct?

A   Please ask that again.

Q   You still, by the time of the second report, March of 2020 --

A   Yes.

Q   Have that in mind?

A   March 3 of 2020, yes.

Q   Still hadn't conducted any interviews with the people involved in the Kentucky litigation; correct?

A   Hadn't conducted any what?  Please.  I don't know why I'm having difficulty.

          THE COURT:  The word was "interviews."

Q   (By Mr. Pepe) Let me try -- I'll try and be -- speak more clearly.

          The time of the second report --

A   Yes.

Q   -- you still had not conducted any interviews with any of the parties involved in the Kentucky litigation; correct?

A   Yes.

Q   You hadn't interviewed Joel Beres, who was the co-counsel.

You knew him by that time; correct?

A    That's correct.

Q    You thought that unimportant; correct?

A    Say again, please.

Q    You thought that unimportant; correct?

A    Uh, not to my decision.  I thought it was not -- it was not something I should consider in rendering my opinion, that's correct.

Q    Even though he was co-counsel and was involved in the decision, you thought you should not consider that.

A    Yes, that's correct.

Q    You should not -- and you didn't interview Jonathan Leventhal, who was also involved in the decision not to call Jarrow Rogovin; correct?

A    That's correct.

Q    And you also failed to interview the jury consultants who were there at the time the decision was made; correct?

A    I had not interviewed them, that's correct.

Q    You also failed to interview the Jarrow Formulas executives in the room at the time the decision was made; correct?

A    Yeah, I did not conduct any person-to-person interviews, that's correct.

Q    You did not even speak by this time to Mr. Rogovin.

A    That's correct.

Q    Had not met him.

A   I'm sorry?

Q   Had never met him.

A   I never met him.

Q   Had never spoken with him.

A   I didn't meet him until about a week ago Thursday.

Q   But yet you had the -- you rendered the opinion that a person you had never spoken with and never talked to should have been called as a witness regardless; correct?  Is that your testimony?

A   The answer is yes.

Q   At the time you rendered the second opinion, you had finally viewed parts of the video deposition that Mr. Rogovin had given in the Kentucky litigation; correct?

A   At the time of my second deposition did you say?

Q   Yes.

A   Yeah, I had viewed parts of that video deposition that was played in the court in Kentucky, correct.

Q   In fact, the only parts you viewed were the parts that were played in the court during the trial of the litigation; correct?

A   That's correct.  But I have to elaborate on a matter which I think is important.

Q   Yeah, what you --

A   May I?  It has to do with that deposition.

Q   I'm going to give you a chance.

A    All right.

Q    But your testimony was you never even looked at it for the first opinion.  You gave the same opinion in the second report.  And then you only viewed those parts that had been played in court -- correct? -- during the trial.

A    I'm not sure I understand the question because I had the first report on January 8 of 2020, the second report on March 3 of 2020.  I didn't review those parts of the video of Jarrow Rogovin's deposition that was played in court until the summer of 2020.

Q    So even by your second report, you still hadn't viewed it.

A    The second report I had not, that's correct.

Q    And then when you did review it, you didn't view the whole deposition.  You viewed just the parts that had been played in court.

A    Well, that's what I need clarification about because --

Q    At that time you didn't.  Go ahead.  You go ahead and clarify.  I'm going to let you do that, sir.

A    I had asked for the video from Attorney Tinley's office.  He had a paralegal named Laura, who was quite helpful.  And I asked for the video of Jarrow Rogovin.  I had read the transcript because that was part of the court dockets earlier, a year earlier.

          I had reviewed or viewed that video.  And at -- it was about 30, 35 minutes.  And I thought I had seen the whole

video.  Come to find out, I did not get that whole video, and I didn't read the last -- I didn't see the last part of that video until much later.

Q   But that didn't stop you from making the same opinion in the second report; correct?

A   Well, that's correct.

Q   Okay.  So in the first report, just so we understand, sir, when you say you -- what you based your opinion on in your direct testimony and listed everything you reviewed, just so we understand, when you gave this opinion the first time after being involved no more than five days in the case and you opined that it was malpractice for McCarter not to call Jarrow Rogovin as a live witness, you did that, you rendered that opinion, without knowing the circumstances under which McCarter -- McCarter considered in making the decision; correct?  Talking about the first report now.  We'll get to the second.

A   Yeah.

Q   You made that opinion without knowing when McCarter made the final decision; correct?

A   I believe that's so, yes.

Q   You made that opinion, rendered that opinion, without knowing if the decision was made before or after the plaintiff rested; correct?

A   That's probably correct.

Q    You made that decision without knowing who made the decision not to call Jarrow Rogovin; correct?

A    No, I assumed it was McCarter & English.

Q    Without knowing who made the decision, who participated; correct?

A    Uh, I'm trying to remember because I -- by that time I had read the transcripts in the prejudgment remedy, and it revealed to me a lot of information.  So I don't know if I recall or if it was testified to as to who was at that meeting that decided that he would not testify, without reading again the prejudgment remedy transcripts.

Q    And by the second report in March of 2020, in which you rendered the same opinion, you adhered to that opinion again with no interview of co-counsel; correct?

A    With no?

Q    Joel Beres.

A    No, I didn't talk to him.

Q    No interview of Jonathan Leventhal; correct?

A    That's correct.

Q    No interview of any JFI personnel; correct?

A    No personal interview with anybody.

Q    And never speaking with Jarrow Rogovin.

A    That's correct.

Q    And never even knowing if Jarrow Rogovin agreed that he should not testify, without knowing that Jarrow Rogovin agreed;

correct?

A   At which time, sir?  By March 3 I certainly knew.  In fact, by January 8 I knew he did not agree, because his testimony at the prejudgment remedy hearing was very clear.

Q   Page 149 of your deposition, sir.

A   Page?

MR. RESSER:  Page?

THE COURT:  Page 149.

Q   (By Mr. Pepe) It actually starts at 148.

A   Is that February?

Q   It's the first deposition, February 4, 2020.

A   I'm on page 148.

Q   Okay.  Question at line 147, line 19.

"Question:  Do you think it was important to know whether he was involved in the decision to call Rogovin?

"Answer:  Do I think it was important?  The decision has been made, so the answer is no.

"Question:  But you don't know if he participated in it?  We're talking about Beres now.

"That's correct.

"Question:  Did Jarrow Rogovin agree with the decision that he would not be called as a live witness?  Yes or no?

"Answer:  Knowledge from reading the transcripts," meaning the PJR transcripts; correct?

That's the PJR transcripts?

A   Yes, that's correct.

Q   That he did not agree.

"Question:  And that he protested?

"Answer:  And that he protested it.

"Right up until the end?

"Answer:  And probably today.

"Question:  Now, when that decision was conveyed to him that he would not be a witness, you testified that he protested and insisted that he be called?

"Answer:  He testified that he had sent e-mails how to lose a case.  He testified that the emphasis should have been on the damages, more so than Mr. Ashurst's was knowledgeable.

"And so the answer to the question is, I don't -- yes, he protested.

"Answer:  Okay.  I don't think he really -- well, I'll leave my answer at that point.

"Question:  You don't know if he protested or agreed, do you, sir?

"Answer:  Oh.

"Question:  When the final decision was made, you don't know if he protested or agreed, do you?

"Answer:  Final decision?

"Question:  Yes.

"Answer:  No."

Did I read that correctly?

A   Yes, you read it correctly, Mr. Pepe.

Q   And if, in fact, he agreed, sir, that would eliminate any question of malpractice, would it not?

A   He certainly testified that he did not willingly agree.

Q   My question, sir, is:  If, in fact, Jarrow Rogovin, when he was informed that the consensus was that he should not testify live and that they would use his deposition instead, if he agreed, that would eliminate any question of malpractice, would it not?

A   No.  He never --

Q   The answer is no?

A   The answer is no.

Q   One of the reasons you gave that he should have testified is that he would have had the O'Brien letter in evidence in which he claimed that he wasn't using trade secrets; correct?

A   I may have missed a word.  That he claimed that he what?

Q   Said you were impressed by the letter to O'Brien in which Jarrow Rogovin --

A   Oh.

Q   -- sent to O'Brien the lawyer; correct?

A   Okay, yes.

Q   You understand who O'Brien was, and you thought that should go into evidence; correct?

A   That letter?

Q   Yes.

A    Yes, yes, I did.

Q    And you understand O'Brien was the attorney in the Ashurst case; correct?

A    He was the attorney in the Ashurst case.

Q    Yeah.  That was a state court case that preceded the federal court case; correct?

A    It preceded, yes.

Q    And you reviewed all the pleadings in --

A    Please repeat that.

Q    When you reviewed all the pleadings in the Kentucky case, you came across a motion in limine excluding any reference to the Ashurst case?

A    No, that's not what I said.

Q    No, no.  I didn't say.  I said my question is:  You have came across such a pleading?

A    I did not come across that letter, if that's what you're asking.

Q    That's not my question either, sir.

A    I'm sorry?

Q    That's not my question.

        The letter you never saw until recently; correct?

A    The letter of August 11?

Q    O'Brien letter.  You never saw it until recently.

A    We're talking over each other, so I guess I'm missing something.

Q    Talking about the O'Brien letter.

A    The O'Brien letter.

Q    Exhibit 511.

A    The O'Brien letter was dated -- that he sent was July 20 of 2011.  That was O'Brien letter, certified mail.

Q    You only saw that recently; correct?

A    Yes, I think that's correct.

Q    You were using it here to support the opinion you gave back in 2020; correct?

         MR. RESSER:  Objection.

         THE COURT:  I'll allow it.

         THE WITNESS:  I'm sorry?  Did I use that letter?  No. I used the letter --

Q    (By Mr. Pepe) The answer is just yes or no, sir.  If you used it just recently shown to you and you used it here to support an opinion you gave back in 2020 when you had never seen that letter or any other -- anything else in the Kentucky case; correct?

A    Which letter are we talking about?  I saw the April 11 -- the August 11 letter early on.  It was an exhibit in the prejudgment remedy case.

Q    Can we call up the Exhibit 511, please?  That's the O'Brien letter.

         That's the one you testified to just a moment --

A    Yes.

Q   On direct; correct?

A   Yes.

Q   And you only saw that recently; correct?

A   No.

Q   Where'd you see it?

A   It's Exhibit 501.  You see it at the lower right?  It was an exhibit in the prejudgment remedy case.

Q   Actually, sir, that's not -- all right.

In that letter you're saying or your testimony is that Mr. Rogovin should have been allowed to testify so that he could use that letter to explain what he had sent to Mr. O'Brien; correct?

A   I'd agree with that, yes.

Q   That's your testimony.

A   That's correct.

Q   Now, in reviewing the pleadings in the Kentucky case, did you find a motion -- you know what a motion in limine is?

A   Motion in limine did not deal with this letter.

Q   Did you find one that dealt with the Ashurst proceedings when you reviewed the pleadings in the Kentucky case?

A   What -- not the Ashurst proceedings, but there was certainly a reference to it.

Q   You testified you reviewed all the pleadings in the Kentucky case.  They filled the room; correct?

A   I testified that I read the pleadings in -- yes, I believe

I read all the relevant pleadings in the Kentucky case.

Q   And one of those pleadings was an order of the court relating to the Ashurst case, the state litigation; correct?

A   I believe that's true.  Certainly there was an order to that effect, that's correct.

Q   And that order determined that the prior listing between Ashurst and Caudill was irrelevant to the issues in the Kentucky case, and therefore any evidence relating to that would be excluded; correct?

A   Uh, I believe that that's accurate, yes.

Q   And that would include the O'Brien letter because that relates to the Ashurst case; correct?

A   No.  He was being threatened.  No, I don't agree with that.

Q   Sir, you just admitted that the court entered an order making anything related to the Ashurst case excluded from the Kentucky trial; correct?

A   If that's what the order said.  I didn't memorize it, but it sounds familiar.

Q   All right.  And you testified a moment ago that Mr. O'Brien was the lawyer for Caudill in the Ashurst case; correct?

A   Well, he certainly represented Caudill, that's correct.

Q   And Exhibit 511 is the O'Brien letter before you; correct?

A   And 511 is what?

Q   Is the letter, the O'Brien letter, which you were

referencing; correct?

A    Yes, that's correct.

Q    And the O'Brien letter speaks -- the letter from Mr. Rogovin to Mr. O'Brien speaks to the Ashurst litigation, does it not?

A    That's correct.

Q    And it speaks to the temporary restraining order.

A    That's correct.

Q    And, therefore, it would be covered by the court's exclusion order and not get into evidence whether or not Jarrow Rogovin testified.  True?

A    No, I don't agree.

Q    It would get in in violation of the court's order, sir?  Is that what you're testifying?

A    It was a violation of the court's order?  No.

Q    The court's order excluded anything relating to the Ashurst litigation; correct?

A    That is correct.

Q    The O'Brien letter, the letter from Rogovin to O'Brien, relates to the Ashurst litigation; correct?

A    Uh, not totally, no.  I don't agree with that.

            MR. PEPE:  Can we have that part up on the screen again?

Q    (By Mr. Pepe) You have that in front of you, sir?

A    The exhibit is on my screen, if that's what you're

asking.

Q   Can you read it?

A   511?

Q   Can you read it?

A   Can I read it?

Q   Can you see it on your screen?

A   Yes, I said I can.

Q   Okay.  Third paragraph down Mr. Rogovin says, "In reviewing the TRO, I am concerned that your letter" and so on.  That's TRO in the Ashurst litigation; correct?

A   That's correct.

Q   That's correct?

A   Yes, a TRO in the Ashurst case, correct.

Q   It goes on, "To the extent that your letter intends to convey the Court's order" -- that's the court in the Ashurst litigation; correct?

A   The order was issued in the -- I'm not sure if I'm following you.  But the order was issued in the Ashurst case, but this letter went beyond the Ashurst case.

Q   Sir, stay with me, please.

        Bottom paragraph.  Quote, "To the extent that your letter intends to convey the Court's Order" -- referring to the Court's order in the Ashurst case; correct?

A   "To the extent that your letter intends to convey the Court's order" is in the Ashurst case, correct.

Q   And next page.

He quotes -- on the next page, he quotes Mr. O'Brien's letter at the top of the page; correct?

A   Yup.

Q   And Mr. O'Brien is referring to the litigation in the Ashurst case; correct?

A   That's correct.

Q   Next page.

It goes on.  Mr. Rogovin gives his theory on the trade secret in question.

Last page.

It says, "In reviewing the Court's TRO," referring to the Ashurst case; correct?

A   Wait a minute.

Q   Last page, top paragraph.

A   Yeah, I see that, uh-huh.

Q   It goes down further, halfway down that paragraph, Mr. Rogovin states in the letter, quote, "If anything, your office has a duty to inform the court that the pending or provisional patent referred to in the TRO is a moot issue."

That's in the Ashurst case; correct?

A   Yes.

Q   Goes down further he says, quote, "The court's memorandum refers to a pending patent involving," and so on.

That's in the Ashurst case; correct?

A    Yes.

Q    And it is the -- anything related to the Ashurst case was ruled out in the Kentucky litigation; correct?

A    You'd have to show me that says anything related.

Q    I thought you said you read the order, sir.  I thought you testified a moment ago --

A    I did not memorize them.  What I remember about the Ashurst case is the judge said, You can't attribute anything that Ashurst did or said to -- to Jarrow Formulas.  You got to find the liability on Jarrow Formulas on its own.  That's what I remember the court in the Jarrow case said.

MR. PEPE:  May I approach, Your Honor?

THE COURT:  You may.  Let Mr. Resser know what you're showing to the witness, please.

Q    (By Mr. Pepe) Showing you, sir, Document No. 341 in the Kentucky litigation, memorandum opinion and order issued by Judge Simpson and directing your attention to page 4.

MR. RESSER:  Is that an exhibit in this case, sir?

MR. PEPE:  No.  I'm not going to offer it.  It's not an exhibit yet.

MR. RESSER:  Has it been marked?

MR. PEPE:  It's not an exhibit.

THE WITNESS:  All right.  I've read it, yes.

Q    (By Mr. Pepe) Does that refresh your recollection that the judge issued an order saying anything related to the Ashurst

litigation was irrelevant?

A    Literally it says, The prior litigation --

Q    No, don't read from it.  Just tell me if it refreshes your recollection.

A    Could you ask the question again, please?

Q    If it refreshes your recollection that the judge issued an order in the Kentucky litigation that anything related to the Ashurst litigation was irrelevant.

A    It refreshes my memory that the judge issued an order relative to what happened in the Ashurst case, correct.

Q    Now, sir, you understand that the -- parts of the video deposition of Jarrow Rogovin taken in the Kentucky litigation were played to the jury.

A    Are you asking about the excerpt that was played to the jury?

Q    I said, you understand that parts of the video deposition of Jarrow Rogovin taken in the Kentucky litigation were played to the jury in the trial; correct?

A    That's correct.

Q    And you understand that such video deposition testimony, or deposition testimony, has the same -- the same value as evidence as live testimony; correct?  Under the rules of the court.

A    Yeah, that's correct.

Q    And you understand that it was -- there were designations

made by Caudill's lawyers as to what parts they wanted to play; correct?

A   Yes, correct.

Q   And then there were designations of that video deposition that McCarter decided they wanted played; correct?

A   I don't know of that at all.

Q   You don't know that?

A   No, I don't know that.

Q   Wouldn't that be important for you to know, sir?

A   No, I --

Q   Before you evaluated that video deposition testimony?

A   The deposition -- no.  The answer is I don't know that those designations were made.  I didn't see a court record that indicated those designations were made.  So all I know is the video I saw was the video that was designated by Caudill.

Q   So you're not even aware that McCarter then had the opportunity to designate parts of that video deposition and have it played to the jury.  You're not even aware of that?

A   You said "had the opportunity."

Q   I'm going to ask --

A   Sure, they did have the opportunity.  I'm just not aware that they designated other portions of that -- of that deposition.

Q   So you know, under the rules, that they would have the opportunity --

A    I --

Q    Let me finish the question.

A    Sorry.

Q    -- to designate parts of the deposition after Caudill designated parts; correct?

A    Yes, they would have the opportunity to do that.

Q    And your testimony is you don't know whether they did that.

A    That's correct.

Q    You assumed they did not.

A    Uh, I think that's a good assumption.

Q    And, in fact, sir, the records show that there was -- the record you say you read every page, that record reflected a lengthy argument before the court on what parts of the deposition would be played.  Did you miss that?

A    No, I don't think so.  I missed it.  I don't recall it.

Q    Wouldn't it be important, sir, for you to know, in deciding the adequacy of that video deposition, whether McCarter fought to have its important parts included and played to the jury? Would that not be important to you?

A    It would be important, that's correct.

Q    Yet you reached your opinion assuming that McCarter did not have that opportunity, or did not exercise that opportunity; correct?

A    I think that that's correct.

Q    And you also then, because you've testified you don't know

what considerations McCarter made or what circumstances it considered in making its decision, you don't know what effort they put in to determining what parts of Jarrow Rogovin's deposition would be played to the jury, because you assumed they did none at all; correct?

A    Mr. Pepe, I will tell you it's hard for me to answer because I read the whole deposition.  I saw a video of the whole deposition, and there were parts that I would have thought would be designated that were not.  And I was quite surprised.

Q    You assumed, sir, that McCarter did not make the designations.  That's your testimony.  And so you don't know what parts they designated and were played to the jury and what parts were not; correct?

A    Or if they designated, that's correct.

Q    And so you don't know that they designated the part of Mr. Rogovin's deposition where he testified that he had instructed Kean Ashurst not to use any of the information that was brought with him to Jarrow Formulas.  You -- you didn't know that.

A    No, I didn't know that.

Q    But that would be critical, would it not, sir?

A    It certainly would.

Q    Indeed.  And now -- but you reached your opinion without knowing that.

A    Sorry?

Q    You reached your opinion without knowing that.

A    I -- no.  I was of the opinion that, in fact, he did tell Kean Ashurst what he could and could not do.

Q    And it would be important to get that before the jury in Kentucky.

A    But I don't know that it came before the jury.

Q    You don't know that that was part of the video deposition?

A    No.  The video deposition came before the jury.  Correct.

Q    And that part of the video deposition in which Mr. Rogovin testified that he had instructed Kean Ashurst not to use information obtained from Caudill Seed, that would be critical testimony; correct?

A    That would be important testimony.

Q    Critical testimony to the issue of misappropriation of trade secrets; correct?

A    Yeah, I'm dealing with willful and malicious.

Q    Sir, I understand.  This would be -- it would be important to willful and malicious too for the jury to hear that Jarrow Rogovin instructed Kean Ashurst not to use anything he brought with him.  That would be important to the willful and malicious issue too, would it not?

A    That's correct.

Q    And you reached your opinion not knowing that McCarter fought and won to get that excerpt before the jury.  You didn't know that.

A    True.

Q    You didn't know it, Mr. Berman, did you?

A    I would say I did not know that, correct.

Q    You testified earlier that it's important, when you're deciding whether to call a witness or not, to consider what's going to happen on cross-examination; correct?

A    That's part of -- yeah, that's part of the appropriation, correct.

Q    And what damage could be done on cross-examination; correct?

A    Please say that again.

Q    What damage might be done on cross-examination; correct?

A    That's part of -- that's part of your witness preparation, correct.

Q    Mr. O'Brien was the attorney for Caudill in the state Ashurst case.  Who was the attorney for Caudill in the federal court litigation?

A    Well, I think at first Frost Brown was the attorney.  And I think they were replaced by the Lewis Grundy firm.  I don't know the name.

Q    Steve Pence.

A    Steve Pence.

Q    The name's familiar to you?

A    He was in the new firm.

Q    I'm sorry?

A   He was in the firm that represented Caudill.  I don't -- I think that firm was replaced.

Q   And you must have, in all the documents you reviewed, seen the letters that Mr. Rogovin sent to Steve Pence just as he did to Mr. O'Brien; correct?

A   He sent letters to Steve Pence, that's correct.

Q   And expressing his opinion about the lawsuit, about the lawyer, Steve Pence, and about Caudill Seed; correct?

A   That's correct.

Q   And those letters you read; correct?

A   That's correct.

Q   And you understand that those letters never came into evidence; correct?

A   That's correct.

Q   And if Mr. Rogovin had testified, then they could have been used in his cross-examination; correct?

A   Not correct.

Q   That's not correct?

A   That's not correct.

Q   Letters that Mr. Rogovin wrote to the lawyer commenting on the lawsuit and the client could not go into evidence.

A   No.  They would not have been because --

Q   I'm sorry?

A   They would not have come into evidence.

Q   Let's take a look at it.

MR. PEPE:  May I have a moment, Your Honor?

THE COURT:  Sure.

(Pause.)

MR. PEPE:  I'm going to move for full admission, Your Honor, PTX 194.  I believe there's no objection to that.

THE COURT:  PTX 194.  Hold on one sec.  All right.  So that can be admitted as a full exhibit.  194 is full.

(Plaintiff's Exhibit 194, received in evidence.)

MR. PEPE:  Can we publish that, please, Your Honor?

THE COURT:  Yes, you may publish that.

MR. PEPE:  194.

THE COURT:  Just a second, Mr. Pepe.  Having some technical difficulties.

Mr. Wyzik, everything okay on your end?

MR. BUDINETZ:  Your Honor, I think the control just needs to come from over there to --

THE CLERK:  You want it over here?  Okay.  I had it over there the first time.

THE COURT:  Mr. Campos, do you have the exhibit?  PTX 194?  Is he able to bring it up?  I just want to use the last five minutes of the day.

There it is.  There we go.  Go ahead, Mr. Pepe.

MR. PEPE:  Sorry for the delay.

THE COURT:  That's no problem.  It's our fault.

Q  (By Mr. Pepe) Okay, so here we have Exhibit 194.  Mr.

Berman, do you see this as an e-mail from Mr. Rogovin to Steve Pence who represented Caudill Seed; correct?

A    That's correct.

Q    And your statement is that, when testifying live, Mr. Rogovin could not be confronted with this on cross-examination.

A    That's correct.

Q    Is that a rule of evidence that would prevent that, Mr. Berman?

A    I didn't know that -- I thought you asked a question.  I'm sorry.

Q    Is there a rule of evidence that would prevent that?

A    Are you asking --

Q    Well, you opined he could not be confronted with this on cross.

A    On cross, that's correct.

Q    Is there a rule of evidence that prevents that?

A    Did I what?

        THE COURT:  He asked if there was a rule of evidence that would prevent that.

        THE WITNESS:  I think it was the order, the intent of the order in Document No. 341, Judge Simpson would absolutely find that irrelevant and would not allow that to come in to testimony.

Q    (By Mr. Pepe) Judge Simpson's order we just looked at related to the Ashurst litigation.  You understand that?

A   No.  I'm talking about Item No. J.

Q   That's not in evidence.  Don't read from it.  Are you reading from the document I showed you?

A   Say it again, please.

Q   Are you reading from the document I showed you a moment ago to refresh your recollection?

A   That's correct.

Q   The court's order.

A   That's the document I'm looking at.

Q   All right.  Let's assume for the time being, sir -- we'll come back to that, okay? -- that this would come into evidence through Mr. Rogovin.  All right?  You're saying now the motion in limine, item J, would preclude it; correct?

A   Item J was -- it's in the judge's order, correct.

Q   Okay.  So let's come back to that.  Let's assume now we have this -- this is in January 31 of 2013, shortly after Mr. Rogovin's company, JFI, was sued.  Do you have that in mind?

A   Yes.

Q   And this is what he writes to Mr. Pence; correct?

A   Yes.

Q   You've seen this before; correct?

A   Yes.

Q   And in there he expresses his opinion about the lawsuit and Mr. Pence and his client; correct?

A   I didn't hear the question.  I'm sorry.

Q   In this e-mail, he expresses his opinion about Dan Caudill, Dan Caudill's lawyer, and Dan Caudill's lawsuit; correct?

A   I don't recall it, but I will take -- I will assume you're right.

Q   Well, he says in the first paragraph after there, after the numbered items, quote, "After considering whether to get rid of you two annoyances in federal or state court, it seems that given the provisions of FRCP," meaning Federal Rules of Civil Procedure?  Do you understand that?

A   Yeah, I would assume so.

Q   "It will be easier in a federal forum to go through the exercise of pointing out how ridiculous your client and his counsel's complaint are."

     That's what he says about the lawsuit; correct?

A   That's what it says, yes.

Q   Then he goes on to say, "A man is sometimes known by the company he keeps.  Considering your client's contaminated products have made the news, do not be surprised if the local reporters are going to want to report that a new local lawyer is so desperate for business that he's filing a ginned up (moonshine again) lawsuit."

     That's what he says about Caudill and the lawyer Steve Pence; correct?

A   Yes, that's what it says.

Q   He goes on to say --

THE COURT:  I tell you what, Mr. Pepe, we're going to call it a day here.

Thanks very much for your attention today, Ladies and Gentlemen -- Lady and Gentleman, and we'll see you in the room 8:45 tomorrow.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that.  Thank you very much again.  You can go to the jury room with Ms. Johnson now.  Thank you.

(The jury left the courtroom at 3:30 p.m.)

THE COURT:  All right, so you may return to your seats.  Thank you.  And everybody else may be seated.

Just by way of housekeeping, Mr. Pepe, do you have an estimate of how much longer you might expect to be on the cross?  Just an estimate.

MR. PEPE:  I think less than an hour, Your Honor.

THE COURT:  Less than an hour?

And then, Mr. Resser, do you expect there might be some redirect or not?

MR. RESSER:  Yes, Your Honor.

THE COURT:  Okay.  Very well.  And then let me ask this, Mr. Pepe.  In light of the fact that we didn't need to get to Mr. Rogovin today, I want to be fair.  Is there any reason that Mr. Resser shouldn't be able to call the witnesses in the order that he --

MR. PEPE:  Well, yes, Your Honor, because I'm still

preparing for Mr. Rogovin.

THE COURT: Well, but, I mean, you know, yesterday he told you at 5:30 that he was going to call -- he wanted to call these other two witnesses, and now it's 3:30. You know, I don't think it's unfair to allow him to proceed -- I mean I wasn't crazy about making him call the witnesses outside the order he wanted to, to be frank. I did that because I didn't want to have a lawyer who wouldn't have a chance to prepare.

But I think, in fairness, if he wants to do that I have to let him do that. I mean I can't freeze the -- freeze sort of an order I gave this morning based on circumstances that I thought would involve getting to those witnesses today. So I think, in fairness, I have to allow him to proceed in the order that he's indicated.

But, Mr. Resser, you need to be clear what that order is. What is that order? What sequence would you like to pursue? Who would you like to call after Mr. Berman tomorrow and who after that?

MR. RESSER: Mr. Rechen and then Mr. Giarratana.

THE COURT: All right. So that's what's going to happen.

MR. RESSER: Thank you, Your Honor.

THE COURT: And after that, you would call Mr. Rogovin? Would that be your plan?

MR. RESSER: Yes, Your Honor.

THE COURT:  Okay.  Very well.  Is there anything else we need to take up today?  All right.  Thank you.  We'll be in recess.

(Proceedings concluded at 3:32 p.m.)

**I N D E X**

**WITNESS NAME**                                          **Page**


Ben Khowong

  Video deposition.............................................. 944


David Paige

   Direct By Mr. Resser ....................................... 945

   Cross By Mr. Green......................................... 960

   Redirect By Mr. Resser..................................... 970


Rory Lipsky

  Video deposition.............................................. 973


Catherine Adipietro

  Video deposition.............................................. 976


Michael P. Berman

   Direct By Mr. Resser ....................................... 978

   Cross By Mr. Pepe.......................................... 1030

C E R T I F I C A T E


MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)



            I, Julie L. Monette, RDR, CRR, CRC, Official

Court Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the foregoing

pages are a true and accurate transcription of my shorthand

notes taken in the aforementioned matter to the best of my

skill and ability.




                    /S/ JULIE L. MONETTE
            _____
              Julie L. Monette, RDR, CRR, CRC
                  Official Court Reporter
            450 Main Street - Clerk's Office
              Hartford, Connecticut 06103
                    (860) 212-6937