UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x

McCARTER & ENGLISH, LLP

vs.

JARROW FORMULAS, INC.

- - - - - - - - - - - - - - - - x

No. 3:19-CV-1124 (MPS)

JULY 13, 2023

8:53 A.M.

JURY TRIAL

Volume VII, pages 1090 - 1312


450 Main Street
Hartford, Connecticut


BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN


COURT REPORTER:   Julie L. Monette, RDR, CRR, CRC
(860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

          McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
                 One State Street, 14th Floor
                 Hartford, Connecticut 06103
          BY:  LOUIS R. PEPE, ESQUIRE
               JAMES G. GREEN, JR., ESQUIRE
               JAMES A. BUDINETZ, ESQUIRE
               DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

          BARTON LLP
                 100 Wilshire Boulevard, Suite 1300
                 Santa Monica, California 90401
          BY:  BERNARD M. RESSER, ESQUIRE

          BARTON LLP
                 711 Third Avenue, 14th Floor
                 New York, New York 10017
          BY:  JAMES E. HEAVEY, ESQUIRE
          BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:53 a.m.)

THE COURT: We received a request from the jury to start on time today, so that's what we're going to do. And, Mr. Pepe, you can set up and we'll get the jurors.

MR. PEPE: Do you want appearances on the record today?

THE COURT: Sure, that would be fine. Why don't we have appearances first.

MR. PEPE: Good morning, Your Honor. May it please the Court. Attorney Louis Pepe of McElroy Deutsch for the plaintiff, McCarter & English LLP. With me is Attorney James Green, Attorney James Budinetz, Attorney David Case.

MR. RESSER: Good morning. Bernard Resser of Barton LLP. With me are Attorney James Heavey and Attorney Michael Ward.

THE COURT: Good morning.

(The jury entered the courtroom at 8:55 a.m.)

THE COURT: We did receive your communication that you'd like to start on time this morning. We aim to please in the District Court, so we're getting started a little early.

Mr. Pepe, whenever you're ready, sir.

MR. PEPE: Thank you, Your Honor.

THE COURT: The witness remains under oath.

M I C H A E L   P.   B E R M A N,

resumed the stand and testified under oath as follows:

CONTINUED CROSS-EXAMINATION

BY MR. PEPE:

Q   Good morning, Mr. Berman.

A   Good morning, Mr. Pepe.  With permission of the Court, I'd like to make a correction of a piece of my testimony yesterday, if I may.

MR. PEPE:  Your Honor?

THE COURT:  It's up to you, Mr. Pepe.  You can ask him to do it now.  There's going to be a chance for redirect.

MR. PEPE:  No.  If the witness wants to correct it, Your Honor, with the Court's permission?

THE COURT:  Sure, that's fine.

Q   (By Mr. Pepe) Go ahead, Mr. Berman.

A   Yesterday you questioned me about whether I was aware of any designations or counter-designations made by the parties in the Kentucky trial as to deposition transcripts which would be played at the trial.  I went back to my office and saw that I had, in fact, over three years ago, noted that in documents, in Kentucky documents 316, 317, 338 and 339, there were many pages of designations and counter-designations.  And in 338, on page 4, there were a whole -- columns of counter-designations in the deposition that was going to be played of Mr. Jarrow Rogovin. As I said, I had not seen that document for over three years.

And I did not recall. When I looked at it, I saw that there was just a yellow tab on each front page of that document indicating that they were designations.

THE COURT: Mr. Pepe?

Q   (By Mr. Pepe) Anything else you want to correct, Mr. Berman?

A   Well, I could go on, you know, but --

Q   Well, if you're going to go on and correct, Mr. Berman, now's the time.

A   Nothing else I want to correct. Thank you.

Q   Okay. Yesterday -- We'll come back to that designation that you realized last night after your testimony actually did occur. Because yesterday you testified that would have been very important. Do you recall that?

A   Designations that made it into the -- I don't know if I clarified, but designations --

Q   Mr. Berman, thank you. If you don't recall it, that's fine.

Yesterday when we adjourned, you were testifying with respect to the letters Jarrow Rogovin wrote to Attorney Phelps. Remember that?

A   Yes, I do.

Q   And Attorney Phelps was the attorney for Caudill Seed in the federal court litigation; correct?

A   Yes.

Q   And --

A   He was one of them initially.

Q   He was one of those that represented -- I'm sorry.  I said "Phelps."  I meant "Pence."  Attorney Pence represented -- Steve Pence represented Caudill Seed in the federal court litigation; correct?

A   Yes, he did.

Q   All right.  And when that suit was brought by Attorney Pence, Jarrow Rogovin wrote numerous letters directly to Attorney Pence expressing his opinion on -- about Attorney Pence and his client, Caudill Seed.  True?

A   I don't think it was numerous.  There were two or three letters, if I recall.

Q   And in those letters, he expressed his opinion strongly about the attorney himself and his client; correct?

A   They were --

Q   That's a yes or no, Mr. Berman.  I didn't ask you to explain the letters.  It's a yes or no.

A   Well, it's hard to answer that question.  That's why I'm trying to explain.  But there were some criticisms -- there were criticisms and other negative comments in those letters, correct.

Q   And you were asked, on your direct examination, whether it was -- and I'm paraphrasing in sum and substance, whether it was appropriate for McCarter & English to consider those

letters being introduced into evidence if Jarrow Rogovin took the stand.  Do you recall that?

A   Yeah.  I think -- at what time?  At what time during the proceeding?  So the answer is it certainly should be considered, yes.

Q   I'm sorry?

A   Yes, those -- whether those letters would come in as evidence in cross-examination should be considered at some point.

Q   Yesterday you testified that that consideration was unwarranted.  It was unjustified because they would never come into evidence.  Do you recall that?

A   That's why I said it depends on what time you're talking about.  If you're talking about after the motions in limine or -- then I didn't think that they should be considered.

Q   I'm talking about --

A   You didn't ask me why, so I didn't comment.

Q   I'm talking about any time it was appropriate for McCarter to be concerned about those letters coming into evidence if Jarrow Rogovin took the stand.  Yesterday you said that was not a concern; correct?

A   There was a concern up to a point.  I think I was clear about that.

Q   All right.  So it was a concern up to a point, and that point was when the court in Kentucky issued its order on the

motion in limine that had been filed by Caudill Seed's attorneys; correct?

A   That's correct.

Q   And it was your testimony that when that happened, those Pence letters were no longer a concern in considering Jarrow Rogovin taking the stand.  True?

A   That's correct.

Q   Because you testified that order would exclude those letters; correct?

A   That was one of the considerations.  You asked me a direct question, and that was just one of them.

Q   And that order you testified would preclude those letters from ever coming into evidence; correct?

A   Well, that order was part of -- the answer is I cannot answer that directly because that order was part of what Judge Simpson thought of letters that were derogatory.  And he made that clear in his order that it was irrelevant.

Q   Yeah.  So the order you had in mind was the order of Judge Simpson on the motion in limine that was referred to you and entered into Kentucky litigation in March of 2019; correct?

A   That's when the order was issued, that's correct.

Q   And your testimony was that order would preclude the Pence letters sent by Jarrow Rogovin; correct?

A   No, that's not correct.

Q   What's your testimony, sir?

A   My testimony is, it illustrated Judge Simpson's belief that derogatory exchanges were irrelevant to the case.

Q   Okay.

A   Also -- well, that's the short answer.

Q   Okay.  Well, let's look at the order that you, "you," relied on in your testimony and you cited.  That order does not, in fact, preclude all derogatory letters, does it?

A   I believe it was opinions.  I don't have it in front of me.  But I believe it was opinions that either party, certainly that -- either party expressed to the other that were -- I forgot the wording of the order.  I don't have it in front of me.  The motion, the Caudill --

Q   No, no, we're talking about the order, sir.  We're talking about the order Judge Simpson entered that you told the jury yesterday would keep these Phelps letters -- these Pence letters out of evidence.  Didn't say anything about the Pence letters, did it, the order by Judge Simpson?  True?

A   It did say -- it did not say anything about the Pence letters, that's correct.

Q   What it did say, and what it did limit, was Jarrow Rogovin's personal opinion of Dan Caudill, the principal of Caudill Seed and Warehouse Company, the plaintiff; correct?

A   I'm trying to remember.  I believe it was specific.  That's what it said, correct.

Q   Yeah, let's take a look at it.  So there's no question, Mr.

Berman.

MR. PEPE:  Your Honor, may I move as a full exhibit what would be numbered the next Plaintiff's Exhibit, PTX 619, which is the memorandum and order of Judge Simpson to which the witness has testified.  No, I don't believe there's an objection.

THE COURT:  No objection?

MR. RESSER:  No objection.

THE COURT:  Okay.  PTX 619?

MR. PEPE:  619.

THE COURT:  That is Plaintiff's 619.  That can be full.

(Plaintiff's Exhibit 619, received in evidence.)

Q   (By Mr. Pepe) You have up on the screen now, sir, the order from Judge Simpson you had in mind.

A   Let me take a look.

Q   Sure.  Tell us when you want the page turned.  I want to give you a chance to look at the entire order.  And you tell me if this is the one you --

A   That looks like it, but that's not the page that dealt with this.

Q   Okay.  Well, you can -- no, I'm going to -- I'm going to let you look at anything.  But I'm going to go to the back so you can see the date and get that in your mind.  Okay?

A   I can see the date at the top of the document, March 29,

2019.

Q   All right.  So this is the order you had in mind; correct?

A   That was definitely an order I had in mind, yes.

Q   Okay.  So now let's look, if we can, at page 4 of Exhibit 619.  And here is where the judge lists some of his orders; correct?

A   Yes.

Q   And you referenced paragraph F yesterday.  That was the order about no reference to the state court Ashurst litigations; right?

A   Actually, you referenced that.  I was referencing J, the letter J.

Q   The judge says that the prior litigation between Ashurst and Caudill is irrelevant.  And then we got dropped down that page, we go to item J, and it's headed "Jarrow Rogovin's personal opinion of Dan Caudill"; correct?

A   That's what it says, yes.

Q   And then the judge goes on to say that "Jarrow has indicated it does not seek to assert Rogovin's personal opinions about Dan Caudill.  Regardless, such information would likely be irrelevant, improper opinion testimony" -- it goes on the next page.  Can I have the next page up, please?

          THE COURT:  That doesn't look right.

          MR. PEPE:  If we can have the top of page 5, please, Mr. Wyzik.

Q    (By Mr. Pepe) "And unfairly prejudicial.  Therefore, without objection, the motion will be granted as to this evidence," end quote.

That's what you had in mind when you testified yesterday, "The letters that Jarrow Rogovin wrote to Attorney Pence, Steve Pence, would be excluded and should not be concerned -- or considered by McCarter & English."  True?

A    No, not true.

Q    That's not the order you had in mind?

A    That was a factor, and it explains what Judge Simpson, what his -- what he had in mind about negative comments from either side.

Q    Okay.

A    I thought he was very -- very astute about the irrelevancy.

Q    My question was not what you thought Judge Simpson had in mind, sir.  My question is the order you cited yesterday is limited to Jarrow Rogovin's personal opinions of Dan Caudill.  True?

A    That particular order says what you say.

Q    It does not say anything about Jarrow Rogovin's personal opinions about Steve Pence.  True?

A    Of course.  It does not say that.

Q    It does not say anything about Jarrow Rogovin's personal opinions about Caudill Seed and Warehouse, Steve Pence's

client.  True?

A    Could you ask that question again?

Q    Sure.  The order I just cited says nothing about Jarrow Rogovin's personal opinions about Caudill Seed and Warehouse Company.  True?

A    Not literally, that's correct.

Q    Now, sir, let's take a look at the letters that you said would be no concern to McCarter & English.

MR. PEPE:  Can we have, if I may, Your Honor, move as a full exhibit PTX 193?  There's no objection, 193.

THE COURT:  All right.  If there's no objection, then that will be a full exhibit.  PTX 193 can be published.

(Plaintiff's Exhibit 193, received in evidence.)

Q    (By Mr. Pepe) You recognize this as one of the letters Jarrow Rogovin sent to Steve Pence; correct?

MR. PEPE:  Can we blow up the top half, Mr. Wyzik?  The entire top half and then we'll move down the page.

Q    (By Mr. Pepe) You recognize that as one of the letters Jarrow Rogovin wrote to Steve Pence.  I'm going to use the shorthand "the Pence letters."  Do you have that?

A    I have to see more text.

Q    Of course.

A    But it looks like a letter he wrote to Pence.

Q    Of course.  Of course.

Now you recognize this as one of the letters you said

should be of no concern to McCarter & English.  True?

A   Yes, I believe so.

Q   All right.  Let's take a look at what Mr. Rogovin had to say about, not Dan Caudill, but about Steve Pence and his client, Caudill Seed.  The first -- second paragraph begins, "There is no question."

A   Yes, I see it.

Q   It says, "There is no question that your client" -- that would be Caudill Seed and Warehouse; correct?

A   Yes.

Q   "Has filed a malicious complaint for improper purposes and Jarrow Formulas will hold Caudill Seed accountable to the full extent of the law.  Your client is a serial litigant."

Did I read that correctly?

A   That's what it says, yes.

Q   Then we drop down to the next paragraph.  And in that complaint, are you aware that it had a RICO count when it was first brought by Caudill Seed?

A   I didn't hear the question.  I was reading.  I'm sorry.

Q   My fault.  You go ahead and read it.  Going to the second paragraph.

A   Are you directing me to a particular paragraph?

Q   The paragraph begins "RICO."

A   Yes, I see that.

Q   You're aware there was a RICO count in the complaint when

it was initially brought by Jarrow Formulas; correct?

A    Yes, I am.

Q    Here's what Mr. Rogovin has to say about that:

"RICO?  Are you serious?  Racketeering Influenced and Corrupt Organization Act?  Sir, you are literally a child out of its mind.  Not only do federal courts not countenance civil RICO -- which demonstrates your naivete -- but the idea of trying to charge Jarrow with RICO given the pathetic excuses for facts you allege, you are truly an utter, laughable, incompetent fool."

That's what Mr. Rogovin said about Steve Pence.  It didn't say anything in that paragraph about Dan Caudill, did he?

A    No.

Q    He was talking about Steve Pence, the lawyer; correct?

A    That's correct, yes.

Q    Drop down to the very last paragraph, begins "Criminal."

Highlight that, please.  Last paragraph on the page.

"Criminal or not, contrary to the puffery of your complaint, Caudill puts out crap product.  It has repeatedly failed" -- and can we go on to the next page? -- "HACCP and GMP."

A    Wait, I'm not seeing -- oh, I see.  Thank you.

Q    And it goes on to say, "It," meaning Caudill Seed, "sent product laced with potentially lethal pathogenic bacteria to

Jarrow."

Do you see that?

A   I see the writing, yes.

Q   That's what he says about Caudill Seed in this letter; correct?  Now, if you drop down, sir.

Can we highlight, Mr. Wyzik, the paragraph that begins with "As for your District Federal Court," and highlight the last sentence in there, please.  It begins with, "You are cruising."  It begins the line above, "You are cruising."

"You are cruising for a complaint to the Kentucky State Bar by Jarrow against you -- starting with venue shopping so you can maximize economic injury to the parties.  You are fabricating allegations out of whole cloth and Jarrow is not going to countenance this sort of folderol," end quote.

He's threatening Attorney Pence with a grievance complaint as you read it; correct?

A   The words are what they are, sir.

Q   Well, don't they mean that?

A   Well, he says here he's cruising for a complaint to the Kentucky State Bar.  I don't know Kentucky State procedures insofar as conduct and grievance procedures.

Q   Drop down to the next paragraph, please, beginning "Another falsification."

Highlight that first sentence if you would, please, and the second.

"Another falsification is that your client has no proprietary intellectual property in the field of isothiocyanates."

So he's accusing the lawyer of making false allegations; correct?

A    That's what it says.

Q    That's serious?

A    You're reading it correctly.

Q    That's serious, isn't it, Mr. Berman?

A    I'm sorry?

Q    That's a serious allegation to make about a lawyer, isn't it?

A    Nothing more than --

Q    I'm sorry?

A    I'm not sure I know what you're asking me.  "Your client is nothing more than an ex-con business huckster."  Is that what you're reading?

Q    I was reading the sentence before, but let's go to that one which you say is of no concern to McCarter & English.

Quote, "Your client is nothing more than an ex-con business huckster with an uncontrollable temper and an untempered desire for control and revenge.  Your client is a hazard to do business with."

That's what he's saying to Attorney Pence; correct?

A    That's what the letter says, yes.

Q    The letter that you say is of no concern to McCarter if it got into evidence; correct?

A    That's a misstatement of my testimony.

Q    I'll restate it.  "Of no concern" -- McCarter should not have been concerned about this getting into evidence; correct?

A    At a certain point in time I said, yeah.

Q    After the order we just looked at?

A    Sorry?

Q    After the order of Judge Simpson we just examined?

A    Well, if they -- no.  If you want me to elaborate, they should have made that motion earlier so that they would be convinced it wouldn't come in and that they could rely on Mr. Rogovin's testimony live.

Q    Who should have made that motion, sir?  McCarter?

A    McCarter & English, yes.

Q    In fact, Caudill made that motion; right?

A    They did make that motion to preclude Caudill from having these letters entered into as evidence in the case.  I don't recall the specific motion.

Q    And you don't know --

A    You'd have to point it out to me.

Q    You don't recall the motion, you don't know who made it, and you don't know when it was made.

A    I'm sorry.  I didn't hear that.

Q    You don't recall the motion in limine, when it was made,

and you don't know who made it.

A   No, I know there were motions in limine on both sides that were made at the end of 2018 and early 2019, correct.

Q   Let's drop down to the paragraph that begins "Alleging that Jarrow."

A   Where are you, sir?

Q   Paragraph that begins, "Alleging that Jarrow received lab notes."

Can we highlight that first sentence, Mr. Wyzik?

"Alleging that Jarrow received lab notes or a computer thumb drive having to do with Caudill is as an untruth as vilely filthy as your client's crapper of a facility -- Listeria, Salmonella, irradiation and all."

That's what he's saying about his adversary Caudill Seed; correct?

A   That's what the letter says, that's correct.

Q   Do you think, sir, that that might be an indication of ill will and malice so as to give rise to a willful and malicious misappropriation finding by the jury?

A   No.  This was written after the case was started.  That's a difference from a motivation.

Q   That would be based on your understanding of the Kentucky Unfair Trade Secrets Act, sir?

A   Yes.

Q   Which you never even read until your second opinion in this

matter?

A   Is that the whole question, Mr. Pepe?

Q   You never read the Unfair Trade Practices Act on which this complaint was based until after you filed your second opinion; correct?

A   That's correct.

MR. PEPE:  May I move as a full exhibit, Your Honor, PTX 194, for which there is no objection?

THE COURT:  Yes, that's full.  194 is full.

(Plaintiff's Exhibit 194, received in evidence.)

Q   (By Mr. Pepe) Another one of Jarrow Rogovin's letters to Caudill Seed's attorney; correct?

A   It's an e-mail from, yes, from Jarrow Rogovin's e-mail address.

Q   Can't hear you, sir.  Please speak up.

A   I'm sorry.  I apologize.

Q   Do you recognize this as another one of Jarrow Rogovin's letters to Caudill Seed's attorney, which you say would be no concern to McCarter after the motion in limine order?

A   That's not my testimony.  It is -- it is a letter, an e-mail, from Jarrow Rogovin's e-mail to Steve Pence, that is correct.

Q   And if you drop down to the paragraph and call out the paragraph, "A man is sometimes known?"

A   I'm sorry.  I didn't hear that.

Q    We're going to show it on the screen, sir, so you can see it.

He says, "A man is sometimes known by the company he keeps.  Considering that your client's contaminated products have made the news, do not be surprised if the local reporters are going to want to report that a now local lawyer is so desperate for business that he's filing a ginned up lawsuit."

That's what he says about Steve Pence and his client Caudill in this letter; correct?

A    That's what the letter says, that's correct.

Q    And that would not be evidence of willful and malicious conduct, would it?  That would not be evidence --

A    My testimony is that the suit had already begun and the willful and malicious has to be a motivated -- motivation. This is after the case began.

Q    Yesterday you were shown the jury charge that Judge Simpson gave to the jury in the Kentucky litigation; correct?

A    I believe yes, that's correct.

Q    And you remember what that jury charge said about how they should consider what willful and malicious would be?

A    That's correct, yes.

Q    Yeah.  And it said nothing about the timing, did it?  It said, "whether the actions or the words of the defendant would show ill will;" correct?

A    I believe so.  I'm going by memory, but I believe that's

correct.

Q   Well, you testified yesterday you knew it.

A   No, I testified yesterday on the portion on the clear and convincing is my recollection.

Q   I'm asking you about the jury charge on willful and malicious.  You were shown that, and you said, yes, that's what McCarter should be concerned about.  Do you remember that?

A   No.

MR. PEPE:  May I move the admission, Your Honor, of PTX 195.  There's no objection.

THE COURT:  Okay.  PTX 195 will be a full exhibit.

(Plaintiff's Exhibit 195, received in evidence.)

Q   (By Mr. Pepe) This is another letter from Jarrow Rogovin to Steve Pence.  And in the first paragraph, Mr. Berman, he says -- blow that up please, Mr. Wyzik, so the witness can see it clearly.

He says, "Mr. Pence:  Who's the lying SOB?  Your client?  You?  Or both?"

That's what he says about Pence and his client Caudill Seed; correct?

A   That's what the letter says, correct.

Q   And then he goes down in the two paragraphs below that, begins "But."

It says, "But your insanity-inanity goes further."  And then later in that paragraph he says, "Contrary to your

crackpot complaint." That's what he's putting on the record in his letter to Pence; correct?

A   That's what the letter says, correct.

Q   Yes, now we go to the next page.

He says at the top of the page, if we can call that out, sir.

"What I find most incredulous is that you would take this case when it is so clear that your client is a nutter."

And down below he says, "Have you been evaluated by a neurologist lately?"

Then he says, "Now, go away, kid.  You bother me. That's not a good idea especially when you have" --

THE COURT:  We can't see that, Mr. Pepe.

THE WITNESS:  I can't see that.

MR. PEPE:  I'm sorry.  That was unfair.

Let's call out the next paragraph.  It begins "Now go away."  I was going too fast there.  I apologize, sir.

Q   (By Mr. Pepe) "Now, go away, kid.  You bother me.  And that's not a good idea, especially when you have a pathological liar for a client and you're beginning to look like his Charlie McCarthy -- with half the brains."

That's not evidence of ill will that Jarrow Rogovin had for Caudill Seed?

A   But that doesn't -- the answer is, yes, it certainly is, but it's when it's generated is the factor.  It was not a

motivation for Jarrow Formulas to misappropriate Caudill's secrets.

This was, obviously -- and Mr. Rechen, in his opening statement, indicated exactly that, yes, Jarrow Rogovin felt personally attacked by the allegations. So, again, this is after the pleadings, the case was brought.

Q   But these letters that you indicate -- that you agree show ill will did not get into evidence because Jarrow Rogovin did not testify live. He testified through the deposition testimony; correct?

A   Your question is -- could you rephrase it? I understand your question to say, these letters didn't make it in because Jarrow Rogovin didn't testify.

Q   These letters never made it into evidence; correct?

A   They were never in evidence, that's correct.

Q   If he had testified live, he would be confronted with these letters; correct?

A   Say it again, please.

Q   If he testified live, he would be confronted with these letters.

A   No.

Q   You know what an exhibit list is, don't you, filed in federal court?

A   An exhibit list did you say?

Q   Yes.

A    Yes, of course.

Q    Filed by the attorneys on each side to give notice of the documents they intend to offer as exhibits; correct?

A    Uh, yes.

Q    And just like we had an exhibit list in this case; correct?

A    That's correct.

Q    And there was an exhibit list filed by Caudill Seed in the Kentucky litigation; correct?

A    I assume so.

Q    You assume so?

A    Yeah.  I didn't see it.

Q    It was --

A    Well, if I did see it, it was over three years ago.

Q    Okay.  It would be in that room that you dedicated to those thousands of pages of documents.

A    Please, again.  I'm sorry.

Q    The case list was among those thousands of pages of documents you have in your office?

A    Uh, I believe so.  If it was -- I believe it probably was, yes.

Q    Go ahead.

A    I saw a witness list.  I recall seeing the witness list.  I don't remember clearly seeing the documents, proposed exhibit list.

Q    Would it surprise you to know that Caudill's lawyers'

witness list had on that witness list the letters I've just shown to you?

A   If you can show me that that's true, then it wouldn't surprise me.

Q   And if it's on the witness list, that's an indication that Caudill Seed lawyers intend to offer it into evidence; correct?

A   Not the witness list.  You mean --

Q   The exhibit list, I'm sorry.

A   Yes, I understand that.

Q   If it's on the exhibit list, that would indicate Caudill's lawyers intended to offer it into evidence; correct?

A   That's correct.

Q   Now I'd like to redirect your attention, if I may, to your testimony concerning the decision as to whether Jarrow Rogovin would testify live or through his deposition testimony.  Do you have that in mind?

A   Yes, sir.

Q   You testified that you had some recollection of a meeting held during the time of trial to address that question; correct?

A   Uh, I'm aware of testimony and deposition that there was a meeting regarding -- regarding whether Jarrow Rogovin would testify live, yes.

Q   You didn't know about that meeting when you rendered your first opinion or your second opinion; correct?

A    I didn't know -- say it again, please.

Q    You didn't know about that meeting when you rendered your first opinion.

A    I'm not prepared to say that because I do believe it came out at the prejudgment remedy hearing.  In fact, Mr. Rogovin testified, and so did the others.  So I wouldn't -- I'm not prepared to say I didn't know about that meeting before the initial report.

Q    Yeah.  You didn't know that Joel Beres was at that meeting because you didn't even know who Joel Beres was when you rendered your opinion; correct?

A    Uh, I don't think that's correct.  Unless I testified otherwise, I don't believe -- I believe I knew that he was local counsel for Jarrow Formulas in Kentucky.

Q    You knew it when you rendered your first opinion five days after being retained?

A    I'm sorry.  I didn't hear that question.

Q    You knew Joel Beres was local counsel for Jarrow Rogovin's company when you rendered your first opinion.

A    Yeah, I knew he was local counsel for Jarrow Formulas in the Kentucky litigation, correct.

Q    So now you know from reading the prejudgment remedy transcripts that there was a meeting, and you knew that Joel Beres was local counsel.  What you did not know was whether he was at that meeting to consider whether Jarrow Rogovin would

testify live or by deposition; correct?

A    I'm trying to get my memory.  I know he played a part. Whether he was at that meeting or whether he was separate with Mr. Rogovin, I don't recall.

Q    Okay.  You do --

A    I don't recall that testimony.  Again, I read it over three years ago.

Q    But, Mr. Berman, surely you went back and looked at your room full of documents before you came here to testify before this jury.

A    I didn't examine every one or every transcript, no.

Q    Just selective ones?

A    Selected, correct.  It would have taken me another three years.

Q    So -- but let's see what we can understand what you knew when you rendered your opinion.

      Even assuming you knew that Jarrow -- that Joel Beres was at a meeting -- I'm sorry, withdrawn.

      Even though you knew that Joel Beres was local counsel when you rendered that first opinion in January of 2020, even assuming that, you never interviewed Joel Beres; correct?

A    That's correct.

Q    Okay.  And so you don't know if he was at the meeting or what role he played; correct?

A    I may have at one time because it would have been his --

I'm trying to remember whether he testified at the PJR hearing. I cannot recall. I cannot recall that he was at the meeting, as I said, or whether he was with Jarrow Rogovin in a separate room at the local Louisville law firm.

Q   Okay. What we can agree on is you did not consider it important enough to know what position Jarrow Rogovin's own lawyer took on the question of him testifying. You did not consider it important enough because you did not interview Joel Beres; correct?

A   That's a bunch of questions. I did not interview Joel Beres.

Q   Because you did not consider his position and his involvement on that decision to be important enough for you to make that effort.

A   That's not true.

Q   You just didn't want to interview him.

A   As I said yesterday, I avoid speaking directly to the parties because I'm -- I don't like to get a bias from one side and not be able to get a counter-input from the other side. So it's my policy, and it's the policy I ask of lawyers when I'm handling such a case, not to interview the individuals in the case.

Q   That doesn't limit your ability to render a full and complete opinion based on all the facts?

A   I'm sorry. I didn't -- re-ask the question.

Q   I'll rephrase it.  If you can't hear me, tell me.

Yesterday you testified, and I wrote it down, "You have to know what happened in Kentucky case in order to know if malpractice was committed," end quote.

Do you remember that?

A   That's true, yes, I do.

Q   And one source of knowing what happened in the Kentucky case would be Jarrow Formulas' own lawyers' actions and words; correct?

A   Uh, if I could interview both sides, but I was not interviewing McCarter & English's --

Q   That wasn't my question.

A   -- people.

Q   One source of knowing what happened in the Kentucky case, in order to know if malpractice was committed, would be Jarrow Formulas' own lawyer; correct?

A   It would be their version.  That's the answer I'd have to give.

Q   And you know that Joel Beres was local counsel, retained by McCarter & English for the litigation and the trial in Kentucky; correct?

A   That I did know, correct.

Q   What was his role after McCarter & English was terminated?

A   Uh, my understanding is that he was hired by Jarrow

Formulas to handle post-judgment matters.

Q   Yes.  So he continued on as Jarrow Formulas' lawyer after McCarter was terminated; correct?

A   Uh, apparently, yes.

Q   So even if you followed your policy of not interviewing anyone involved in the case, you could still find out what he said or did if he gave a deposition; correct?

A   Because he gave a deposition, correct.

Q   Yeah.  Because then you would know his position because he would have testified under oath in a deposition; correct?

A   That's correct.

Q   Yeah.  And that's exactly what Joel Beres did in this case, isn't it?

A   That's correct.

Q   And you said to the jury that you read every single deposition in this case, except one, the financial expert; correct?

A   That is correct, yes.

Q   Okay.  And so you must have read Joel Beres' deposition in this case; correct?

A   Yes, I did.

Q   Yes.  And so you did know, even though you did not interview him, what his position was with respect to Jarrow Rogovin testifying live versus testifying by deposition; correct?

A    Uh, it would be in his deposition.  If that was -- I believe it was in his deposition.

Q    Yes.

A    So I would know that as a result of reviewing his deposition, correct.

Q    But you didn't tell us that yesterday.  You didn't tell us -- when I asked you about Joel Beres, you said, and I quote from your testimony:

"Question:  When you rendered your opinion, did you know that Joel Beres -- whether Joel Beres was involved in making that decision?  True?

"Answer:  I told you I can't answer that without looking back at the transcript of the prejudgment remedy," end quote.

But, actually, actually, you didn't have to look at the prejudgment remedy.  You had to just read his deposition; correct?

A    Yes, but it hadn't been given in the prejudgment remedy phase.  It was afterwards in connection with this case, after the prejudgment remedy phase was finished.

Q    And the deposition transcript was in your file in that room of documents.

A    That's correct.

Q    And so you knew, because you read the deposition, what Jarrow Rogovin's own lawyers' position was on him testifying

live versus by deposition.  True?

A   Uh, I learned, yes, but his deposition was given, I believe, was taken rather, in this case, I want to say, either February, March of 2020.

Q   So you knew yesterday, and you know today, what Jarrow Rogovin's own lawyer had to say about him testifying live and how that decision was made; correct?

A   I'm recalling the particulars of the deposition.  And, yes, he testified in his deposition what occurred at this meeting. I don't recall that he voted, uh, because I don't recall that he -- he must have been at the meeting because he testified in his deposition what he believes occurred.  But I don't recall in his deposition transcript, which I haven't read for over three years, whether he voted at that meeting.  If you have a copy of that, it would refresh my recollection.

Q   Why didn't you tell us that yesterday?

A   I'm sorry?

Q   Why didn't you tell us that yesterday?

A   I was trying to answer your question.  If I had a copy of the transcript, I would be able to know what his testimony was. I wasn't able to answer yesterday, and I'm probably not able to answer today.

          MR. PEPE:  Can we have the deposition testimony of Joel Beres on February 6, 2020, beginning at page 183 for the witness to see on the screen, please.

Q   (By Mr. Pepe) Apparently it's loaded on the thing, so I'll have to read it to you, sir.

This is Joel Beres' testimony in his deposition, which you said you read on February 6, 2020.

MR. RESSER:  Page and line, sir?

MR. PEPE:  Yes.  Line 23.

THE COURT:  Page?  Sorry?

MR. PEPE:  Page 183 and subsequent pages.

Q   (By Mr. Pepe) This is Joel Beres giving his deposition in this case while he's still representing Jarrow Formulas, Inc., after McCarter was fired.  Do you have that in mind?

A   Yes.

Q   "Question:  So is it -- is it fair to assume that at some time prior to Monday, June 17, evening, that decision had not been made to call Rogovin?

"Answer:  The decision had been made prior to that, yes.

"Question:  And when was that to the best of your recollection?

"Answer:  Probably the night before.

"Question:  And that would have been Sunday of the weekend after the plaintiff had rested?

"Answer:  I believe that is the case.  It was Saturday or Sunday.

"Question:  Yes.  Were you present when that final

decision was made?

"Answer:  I doubt I was present when the final decision was made, but through many of the discussions leading up to it, yes.

"Question:  Okay.  So if you'd go back to that Saturday --

"Answer:  Sunday.

"Saturday or Sunday, June 16, 17, and help me understand the discussions that led to the decision and who was present?"

A    Could you read that last part again please.

Q    "Saturday or Sunday, June 16, 17" -- you'll remember that's the middle of the trial?

A    It may be up on the screen now.

MR. PEPE:  Thank you.

Q    (By Mr. Pepe) It says, "I believe that is the case.  It was Saturday or Sunday."  Then go on.

"Question:  Were you present when that final decision was made?

"Answer:  I doubt I was present when the final decision was made.  But to many of the discussions leading up to it, yes.

"Question:  Okay, so you go back to that Saturday --

"Answer:  Sunday.

"Question:  Saturday, Sunday, June 16, 17 and help me

understand the discussions that led to the decision and who was present?

"Answer:  Multiple discussions, again, over this three-week period culminating.  It was -- I believe it was in the evening.  There had been a meeting in the large conference room with lots of people present talking about it."

MR. PEPE:  Can I have the next page, please?

Q   (By Mr. Pepe) "Question:  Including Jarrow Rogovin?

"Answer:  No, no.  Jarrow was in another conference room, I believe, with Eric preparing testimony.

"Question:  His own or --

"Answer:  Yes.

"Question:  So it --

"Answer:  Yes.

"Question:  Literally we're going on parallel paths?  He was getting --

"Answer:  Correct.

"Question:  -- prepared to testify literally up to the last minute when the decision was made not to call?

"Answer:  When you say the decision you made, I think there were lots of discussions going on.

"Question:  Yes."

A   Please slow up a little bit.

Okay.

Q   Let's go on.  Now we're talking about that night when the

decision was made, and the question and answer goes on.

"Question:  Yes.

"Answer:  I was privy to some of them, not all of them.

"Question:  Was Rogovin present for some of them?

"Answer:  Some of them, yes.

"Okay.

"Answer:  Some of them, yes.  When it was coming down to, I think a time to make a decision, he was not.  He was with Eric continuing to prep for the testimony.  Multiple people were having input on" -- can I have the next page, please -- "that.  I think I recall everyone on the trial team being asked.

"Question:  Mr. Rechen going around saying okay --

"Answer:  Yes.

"Question:  -- this is decision time?

"Answer:  Yeah.  It was an important -- it was an important strategy decision, and he was getting input from everybody."

"He" is Mr. Rechen you understand there, Mr. Berman?

A   I don't know that.  I assume.  I don't know that.

Q   We'll go back to the next -- the previous question and answer, if I may.  Thank you so much.

"Mr. Rechen was going around saying" --

A   Correct, so I'll accept that, that "he," H-E, is Mr.

Rechen.

Q    "And he was getting input from everybody.

     "Question:  Yes.

     "Answer:  Including the jury consultants.

     "Question:  You were present?

     "Answer:  I was present.  He asked me.

     "Question:  What did you say?

     "Answer:  I think it was the same concerns I talked about before.  He spoke with, I believe, both Clay and Rory" -- I'll interrupt the Q and A.  You understand "Clay" is Clay DuBose, the vice president?

A    Yes, I do.

Q    Of Jarrow Formulas?  You understand that?

A    I know that they were officers at -- I think they were officers at Jarrow Formulas.  I'm trying to recall whether they were not officers -- Rory was an officer of Jarrow Industries.

Q    "Both Clay" -- I'm back in the question and answer now.

     "Both Clay and Rory, other members of Jarrow.

     "Question:  The officers of Jarrow Formulas?

     "Answer:  Yes.  I think -- you know, he had made a decision at that time that he wanted to approach Jarrow.  Both he and, I believe, Mark went in to where he was being prepared to discuss -- to discuss witness order and whether or not he was going to testify."

You understand the "he" is Jarrow Rogovin?

A    Yes.

Q    "Question:  And before that meeting you just described, probably Sunday night" --

A    Just one second.  It says "to discuss witness order and whether or not he was going to testify."  Okay.  Go ahead.

Q    "Question:  And before that meeting you just described, probably Sunday night in the conference room that you just described, going around the table asking everyone present for their input, their thoughts, their concerns, their recommendations, suggestions --

"Answer:  Uh-huh.

"Question:  -- did a consensus emerge that Jarrow Rogovin should not be called live?

"Answer:  I think that's a fair statement.  I don't recall -- I don't recall at that time anybody, including myself, advocating for Jarrow to go on the stand on Tuesday.

"Question:  Okay.  So then Mr. Giarratana and Mr. Rechen leave that room, go into the other room where Mr. Rogovin was -- with Mr. Grondahl, as best you recollect.

"Answer:  As best I recollect, yeah.

"Question:  And you didn't go along?

"Answer:  No.  I was not asked.

"Question:  And you understand their purpose was to go to discuss with Mr. Rogovin the decision that apparently

emerged that he would not be called live.

"Answer:  I think they were meeting with him to see if he would allow that.

"Question:  I see.  I see.

"Answer:  As Tom as lead counsel was going to say -- as I understand it, he was going to say I think this is in the best interest of Jarrow Formulas that you don't do it.  And Mark was there as somebody who has known Jarrow for two decades.

"Question:  And you weren't present at the meeting. Did you learn what happened as a result of that meeting?

"Answer:  Yes, afterwards --

"Question:  Yes.

"Answer:  -- Tom and Mark reported that Jarrow acquiesced and said yes, he would not appear.  And I think later that night I probably took Jarrow home to the hotel and --

"Question:  What did he say to you then?"

The "he" in that question is Jarrow Rogovin.  You understand that, Mr. Berman?  "What did he say to you then?" The "he" is Jarrow Rogovin?

A    Oh, you're asking me, yes.

Q    "What did he say to you then?"

"Answer:  About that?

"Question:  Yes.

"Answer:  Nothing that I recall.

"Question:  About the trial in general?

"Answer:  Oh, there's always stuff about the trial. But I don't recall him talking anything about that.  I mean, I think he did say I'm not going to testify.  But --

"Question:  But no complaint or protest to you?

"Answer:  No.  And I had heard many, many complaints before that.

"Question:  If there were one" -- meaning the complaint; correct?  "If there were one, you would have heard it?"

"Mr. Tinley:  Objection.

"Answer:  He didn't express it that night.

"Question:  And then if we look -- if we look at Exhibit 9, we see Exhibit 9 where Mr. Giarratana and the top lists the order of witnesses."  I'll stop there.

If you had read the deposition as you claim you did, you would have known that Jarrow Rogovin's lawyer was present at the meeting when all the executives were present to discuss the pros and cons of Jarrow Rogovin testifying live versus deposition testimony; correct?

A   He stated he was not there at the final decision.

Q   In that large conference room you would have known that he was present when Mr. Rechen went around the table to get everyone's input, if you read --

A He was not present -- he was not present when Mr. Rechen and Mr. Grondahl -- Giarratana, I'm sorry, went in the room with Jarrow Rogovin.

Q I'll try it again. I'll try again -- my question's not clear. I'm sorry.

A I'm sorry.

Q My question's apparently not clear. Let me try again.

Talking about the first meeting in the large conference room where everybody was around the table and Mr. Rechen went around to get input. You have that in mind?

A Yes, I do.

Q If you had read his deposition, you would have known that Joel Beres was present in that room for that meeting; correct?

A I don't know. I don't get that from his deposition testimony, and I didn't at the time I read it because he said he was not there when the final decision was made. So, um, he -- he was aware -- it was in his law office, in his law firm's office in a big conference room. And he may be there for part of the meeting. I didn't get the feeling -- and, by the way, he changed a lot of his testimony by an affidavit filed after this deposition was taken. And, um --

THE COURT: Mr. Berman, I think you've answered the question.

Go ahead, Mr. Pepe.

THE WITNESS: I'm sorry.

Q   (By Mr. Pepe) We just read the deposition testimony together on the screen, and everybody saw it.  And you saw Joel Beres testified under oath that he was present in the large conference room when Mr. Rechen went around the table and the consensus was reached.  Did we not just read that testimony under oath?

A   That's what he said.  He was in the conference room, but he wasn't -- I believe he was not there for the whole meeting.

Q   And then he testified under oath that Mr. Giarratana and Mr. Rechen went to go the next room to talk to Mr. Rogovin and tell him what the consensus was and see if he agreed; correct?

A   And he was not at that meeting either.  So he only relied on afterwards what he was told.

Q   And then when he took Jarrow Rogovin back to the hotel that night, Jarrow Rogovin told him he wasn't going to testify and he made no complaint about that.  Isn't that what Joel Beres just testified under oath?

A   That's what he testified to, correct.

Q   You didn't tell the jury that yesterday.

A   I'm sorry?

Q   You didn't tell the jury that yesterday.

A   I wasn't asked.

Q   Did you take that testimony of Jarrow Rogovin's own lawyer under oath into consideration when you made your opinion that it was malpractice not to call Jarrow Rogovin live?  Did you

take that testimony into consideration?

I'll rephrase it. You never took that testimony into consideration when you made your opinion five days after being retained because you did not have this testimony; correct?

A   That's correct.

Q   And you did have it subsequently after you filed your second opinion; correct?

A   Yes, I did.

Q   Yeah. Did you take it into consideration then?

A   Yes. And I issued a supplemental or an amended report, correct.

Q   And when you rendered that first opinion five days after being retained -- five days after being retained in which you opined it was absolutely unfathomable that Jarrow Rogovin was not called live, you did it in five days because it had a filing deadline. The Court's scheduling order had a filing deadline; correct?

A   Yes, that's correct.

Q   And you were hired only five days before that --

A   I'm sorry. I didn't hear that part.

Q   You were hired only five days before that filing deadline?

A   Roughly. I was brought into the case, that's correct.

Q   And you were leaving for Florida that weekend; correct?

A   That's correct.

Q   So you opined in five days it was malpractice and then left

for Florida.

A    I was leaving for Florida for my grandson's birthday, that's correct.

Q    And so you filed a report within five days saying it was utterly unfathomable not to call Jarrow Rogovin live, it was malpractice, and left for Florida.

A    It was a very busy five days reviewing transcripts and other opinion.

Q    Mr. Tinley hired you as his legal expert for malpractice. You have previously hired Mr. Tinley as your legal malpractice expert in the cases you bring for legal malpractice; correct?

A    Uh, you said "cases."  I know -- I -- definitely one case.

Q    He hired you; you hired him as an expert.

A    Say it again, please.

Q    He hired you as an expert in his legal malpractice case; you hired him as an expert in your legal malpractice case?

A    It happened the other way around.  I hired him in a malpractice case I brought I believe in 2017, uh, against another law firm.  And I hired him and another attorney from Rogin Nassau firm as both as legal experts to malpractice.

Q    Mr. Berman, you know there was a mock jury focus group done to prepare Mr. Rogovin for his testimony, don't you?

A    I'm sorry.  I didn't follow -- I didn't hear it.

Q    During the run-up to the trial in the Kentucky litigation,

you are aware that McCarter & English conducted a mock jury focus group in preparing Jarrow Rogovin to testify; correct?

A   Yes.

Q   And you know that that mock jury focus group was able to see video deposition -- video testimony from Jarrow Rogovin to evaluate him as a witness; correct?

A   That's correct.

Q   And did you read the results of that mock jury focus group?

A   I did many years ago, that's correct.

Q   Did you view the video testimony the mock jury examined?

A   More recently, the answer is yes.

Q   But years ago.

A   I'm sorry?

Q   Years ago?  A while ago or more recently?

A   More recently, yes.

Q   So you're familiar with the jury's reaction to Mr. Rogovin in that focus group; correct?

A   Well, I was familiar with the reaction before I saw the video.

Q   And then you -- I'm sorry.  I interrupted you.  Forgive me.

A   The reaction I saw, I believe it was part of the -- my recollection it was part of the prejudgment remedy proposed exhibits.  I remember seeing the voting.  But I had not seen the mock trial that was presented, the mock video I should say, that was presented until about within the last month.

Q   So you never --

A   Maybe a little more.

Q   -- saw it in your first opinion, and you never saw it before your second opinion?

A   I saw -- for the first opinion, I saw the mock trial voting or the results.

Q   Let's be clear.  I don't want to waste a lot of time on this.

You know there was video testimony of Jarrow Rogovin presented to the mock jury.

A   Yes, I do.

Q   You never saw that when you rendered your first opinion in five days.

A   That's correct.

Q   And you didn't even see it before your second opinion a year later; correct?

A   That's correct.

Q   Now, let's go back, see if we can address the issue that you said was important yesterday as it relates to deposition designations.

We have -- question withdrawn.

Let's try and see if we can set the stage here.

Your testimony was it was important -- it would have been important for Jarrow Rogovin to be able to explain to the jury in Kentucky that he asked for the customer list from Kean

Ashurst.  But that was a mistake, and he did not solicit those customers.  Did I get that right?

A   I believe that's correct, yes.

Q   Okay.  Because then that would be evidence of an absence of willful and malicious conduct; correct?

A   No.  More directly, it would be evidence of a misappropriation of a trade secret.

Q   In order for a jury to find willful and malicious misappropriation, the jury first has to find that there was misappropriation; correct?

A   That's correct.

Q   All right.  So first they find there was misappropriation; then they decided if it was willful or malicious.

A   That's correct, sir.

Q   So let's see exactly what you said.

        Can we have Mr. Berman's direct examination from yesterday on the screen?  Page 22 of the transcript.

        MR. RESSER:  Is this certified, Your Honor?

        MR. PEPE:  No.  This is the --

        THE COURT:  Why don't you show it to the witness.  It might move faster that way.

Q   (By Mr. Pepe) You said yesterday, "However, he did come to realize" -- I'm talking now about your testimony, sir.

        Jarrow Rogovin admits, and I think you saw in the testimony and deposition, he made a mistake.  And then -- then

you go on to say, "However, he did come to realize that that was bad optics. I think he testified that was one of the worst mistakes he could have made." That would have been referring to the request for the customer list from Kean Ashurst; correct?

A   Yeah, if you're reading it correctly, then I agree that that's what my testimony is.

Q   Then you go on to say, "But anyway, it certainly shows his good faith attempt to avoid misappropriating any of Caudill's customers. Unfortunately, because he was denied by his own lawyers the opportunity to testify, he never got a chance to testify and state -- and state what his state of mind was and his efforts were made," end quote.

That was your testimony yesterday; correct?

A   Thank you. I'll take your word for it, yes.

Q   Now you know, in fact, he did testify by deposition on exactly that point; correct?

A   No, I don't know that.

MR. PEPE: Your Honor, may I move as a full exhibit PTX 347? There's no objection.

THE COURT: Okay. PTX 347 will be full.

MR. PEPE: May I approach the witness?

THE COURT: You may.

(Plaintiff's Exhibit 347, received in evidence.)

Q   (By Mr. Pepe) I've handed you what we've marked as PTX 347.

You recognize that, sir, as a Notice of Filing of Deposition Testimony?

A   Yes, that's what it's titled, yes.

Q   And you've seen that before, have you not?

A   Likely I did, yes.  It's Document No. 428, and I'm trying to recall whether I saw this particular document.

Q   That's a pleading in the Kentucky case, and you said you read all the pleadings in the Kentucky case; correct?  You see the docket number up at the top that says it's a pleading in the Kentucky case; correct?

A   Yeah.  I'm not sure I regarded this as a pleading or rather a notice.  But it's fair to say June 25, 2019.  I'd have to check.  I'd have to check my records to see if I included this document.

Q   And what it is, let's make it clear what we're talking about.  When a party is going to designate parts of the deposition testimony to play to the jury -- and you were here -- by the way, let's give it some context.  You were here yesterday when various deposition testimony was played for the jury; right?

A   Whose deposition?

Q   Various witnesses' deposition testimony was played for the jury.  You were here, weren't you?

A   I'm not getting the name.  I'm sorry.

            THE COURT:  Various different witnesses, Mr. Berman.

THE WITNESS: Oh, different witness, yes, of course.

Q (By Mr. Pepe) You were here when that was done.

A Yes.

Q And so you understand the parties give notice. "I'm going to play this part of the witness's deposition," and the other lawyer says, "I'm going to play this part"; correct?

A That's correct.

Q And that transcript gets filed with the court so it's clear what was played to the jury; correct?

A No.

Q Okay. This is a document filed with the court on June 25; correct?

A That's correct, 2019, correct.

Q And it designates the parts of the deposition that are going to be played; correct?

A That they want to have played, correct.

Q If we go to page 20 of PTX --

A Page 20 are you saying?

Q Page 20 of the -- of the exhibit marked PTX 347.

Down at the bottom of that page -- if we can blow up beginning with the question and answer, please.

Now, this is what's played to the jury -- as much as we saw yesterday on the video depositions, here's what's played to the jury. This is Mr. Rogovin's testimony.

"Question: The e-mail reads, 'Mr. Rogovin: Question

[sic], I am working the customer list and timeline this afternoon as per your request.'"  Did I read that correctly?

Mr. Rogovin answers, "Yes."  Correct?

A   Could you designate the line, please?  It sounds familiar, but I'm not following it.

THE COURT:  It's up on the screen, Mr. Berman.  It might help.

THE WITNESS:  Thank you.  Thank you.

Q   (By Mr. Pepe) Page 20.

A   I see it.

Q   This is being played to the jury from Mr. Rogovin's deposition.

"Question" -- this would be the lawyer questioning Mr. Rogovin in his deposition.  You understand that?

A   Yes, sir.

Q   That's being played to the jury just like we saw yesterday; correct?

A   That's correct.

Q   "Question:  The e-mail reads, 'Mr. Rogovin:  Quote, I am working the customer list and timeline this afternoon as per your request, end quote."

So the lawyer was reading from Kean Ashurst's e-mail saying he's going to send the customer list; correct?

A   That's correct, yes.

Q   And then the lawyer says, "Did I read that correctly?"

Mr. Rogovin answers, "Yes."

"Question: Do you know what customer list Mr. Ashurst is referring to in this e-mail?"

Mr. Rogovin answers, "Yeah, the Caudill customer list."

"Question: And so when he says he's working the Caudill customer list, what is your understanding of what he meant, if you had one?"

A   What --

Q   And Mr. Rogovin answers, "It meant it would be a list of people that if I decided to sell the products, I would not contact."

The lawyer continues, "Question" --

THE COURT:  Wait.  There we go.

MR. PEPE:  Sorry.

Q   (By Mr. Pepe) "Question" -- this is the lawyer now being played to the jury.

"Question: Didn't you tell me earlier today, sir, that you don't consider Caudill Seed to be a competitor of Jarrow Formulas?

"Answer:  Yes.

"Question: So if Caudill Seed wasn't a competitor of Jarrow Formulas, why would you need to worry about contacting their customers?"

"Answer" -- this is Mr. Rogovin now, testimony to the

jury.

"Answer: If we were to start selling the material. We never did. So that's -- that's why ultimately we're not a competitor, because we never even sold it out."

Question by the lawyer: "And did you believe there was anything improper about asking Mr. Ashurst to send you a customer list from Caudill Seed, regardless of your intent to receive it?"

"Answer: Yes. And I apologize for that. I shouldn't have done it. The perception is worse than the reality. I understand that. Mea culpa. But what -- but no harm, no damages."

The lawyer continues: "Then why did you have to ask Mr. Ashurst to send it to you?"

A    Could you put that up on the screen, please? Thank you.

Q    The lawyer goes on:

"Question: Then why did you have to ask Mr. Ashurst to send it to you?

"Answer: It was really kinda dumb. I admit it. Usually I'm reasonably intelligent. That was dumb, lazy and dumb. But it was also because I wanted to make sure if I was going to sell, that I didn't contact them. I didn't want any question that I was --"

The lawyer interrupts.

"Question: So at a minimum --"

Mr. Rogovin answers: "I didn't want my argument that I was going after his customers," end quote.

That was Mr. Rogovin's testimony in his deposition that got played to the jury in Kentucky; correct?

A    Yes, I believe so, yes.

Q    And so when you said yesterday he was denied by his own lawyers the opportunity to testify because he never got a chance to testify and testify what his state of mind was and his efforts were made with respect to the customer list, you were wrong.

A    No.  This is -- this is a segment of what his state of mind was, Mr. Pepe.  This is only dealing with this.  And you asked me yesterday, Didn't Mr. Rogovin testify in the deposition that he told Mr. Ashurst not to bring or do anything that he did at Caudill?  That was the question I was answering.

This I did allude to because it was what -- it was an expression of his but on that very narrow issue of customer lists, not all the other things that he contemplated in his mind to avoid a finding of willful and malicious.

Q    I didn't read from my question, sir.  I read from your examination to your own -- to Attorney Resser.  You testified to Attorney Resser, not to me.

"He was denied by his own lawyers the opportunity to testify about the customer list.  He never got a chance to testify and testify what his state of mind was and in his

efforts was made."  He just did that in what we just read, did he not?

A   This was not his whole state of mind, Mr. Pepe, please.  He had a lot more to testify about than just the customer list.

Q   Had you read that before -- did you read that deposition designation, Exhibit PTX 347, which we just looked at, did you read that before you came to the jury yesterday and told him -- told the jury that Jarrow Rogovin was kept by his own lawyers from testifying about the customer list?  Did you read this before you gave that testimony?

A   Did I read it yesterday?  No.  Did I read it during the past couple weeks or see it?  Yes.

Q   Do you want to correct that testimony yesterday?

A   I'm sorry?

Q   Do you want to correct the testimony on this issue you gave yesterday?

A   No.

Q   Okay.

Yesterday you also testified that because Jarrow Rogovin did not take the stand, he was precluded from explaining to the Kentucky jury that he had told Kean Ashurst not to use any of the proprietary information from Caudill.  Do you remember that?

A   I remember discussing that subject.  I don't remember if I said "because he was precluded."  But, obviously, he would not

have testified about that.  He did not testify because he didn't testify; so the answer is, I guess, you're right.  He was precluded from -- from testifying about that live at the Kentucky trial.

Q    That's not what you said yesterday, sir.

A    I'll add that today then.

Q    Okay.  Well, let's make it clear for the jury.

       Yesterday you told the jury that Jarrow Rogovin was precluded from explaining to the Kentucky jury that he had told Kean Ashurst he is not to use any information from Caudill.  That was your testimony yesterday; correct?

A    If you say so.  I believe that's true.

Q    You didn't say, because -- that was your testimony.  And, in fact, that testimony from Jarrow Rogovin is exactly what the jury heard in Kentucky; correct?

A    Exactly what?  I didn't hear the last part.

Q    That Jarrow Rogovin told Kean Ashurst he was not to use Caudill's confidential and proprietary information.  The jury did hear that from Jarrow Rogovin's mouth.  True?

A    Well, I don't know.  If you show me where that is, I'll be able to answer your question.

Q    And didn't that correct your testimony?

A    Sorry?

       MR. PEPE:  May I move as a full exhibit, Your Honor, PTX 347.  There's no objection.

THE COURT: I think 347 is already admitted. We just admitted it in a last request. Was there a different number you wanted to use?

MR. PEPE: I'm sorry. I thought there was two exhibits.

THE COURT: Okay. So it's one exhibit?

MR. PEPE: Yes.

THE COURT: PTX 347 is already in.

Q   (By Mr. Pepe) So we're talking about the same exhibit, Mr. Berman. We looked at again, so everybody's the same page, what the lawyer files with the court so there's a record of what deposition testimony was played during the trial. You agree? You have that in mind?

A   I'm sorry. I was reading. So --

Q   When we look at 347 --

A   Yeah.

Q   -- we see a document the lawyers file with the court listing the testimony, the deposition testimony, that was played to the jury so there's a record of what testimony the jury heard by deposition; correct?

A   Those are two questions. This was filed with the court of the portion of the deposition that Caudill's lawyers propose to play for the jury. I'm assuming -- I don't know that -- that this, in fact, was the entire transcript played before the jury.

Q   Because the lawyer proposing the deposition identifies pieces, and then the opposing lawyer identifies pieces.  And the pieces are put together and played to the jury; correct?

A   Not the second part.  The court doesn't automatically allow just because you submit designations to be played to the jury.

Q   Let's look at the front page of Exhibit 347, please.

THE COURT:  It's on your screen, Mr. Berman.

Q   (By Mr. Pepe) PTX 347 on the cover page.  You have that?

A   Yes.

Q   The document filed with the court says, "Plaintiff Caudill Seed and Warehouse Company, by counsel, hereby provides notice of the filing of the transcript of the deposition testimony of Jarrow Rogovin, which was presented at trial on June 14, 2019."

So this is a record --

A   Right.

Q   -- not what "might" be played to the jury but what "was" played to the jury.

A   Yeah.  I was responding to your general question.  I agree this was a transcript of what was played to the jury, correct.

Q   So that's my fault.  My question was unclear.

A   It's not your fault, sir.

Q   All right.  But now we know, so there's no question.  It was not what was proposed.  This is what the jury heard, or

saw, if it was a video deposition.

A    We agree this is what the jury saw.

Q    Okay.  Now if you go to page 14.  This is Jarrow Rogovin's deposition, page 14 of the exhibit, the very bottom of that page.  Here's his testimony.

"Did you make the independent decision that Mr. Ashurst possesses none of Caudill Seed's confidential information when he joined you?"

"Answer" -- this is Mr. Rogovin to the jury.

THE COURT:  Can we get the next page?

MR. PEPE:  Can we have that?

Q    (By Mr. Pepe) I'll start it again.

Did you make the independent decision that Mr. Ashurst possesses none of Caudill Seed's confidential information when he joined you?

And here is Mr. Rogovin's answer:  "I -- let it be known that anything that was proprietary manufacturing to Caudill was not to be duplicated.  I did state that, yes," end quote.

Did I read that correctly, sir?

A    Yes, you read it correctly, yes.

Q    And now we agree that was shown to if it was a video deposition or read to the jury in Kentucky; correct?

A    I believe it was a video deposition.

Q    All right, sir.  If it was a video deposition, it was

played.  So the jury saw and heard Mr. Rogovin give that

testimony; correct?

A    In the deposition, correct.

Q    And you testified yesterday that in a proceeding just like

this, deposition testimony that the court may allow is given

the same value as evidence as if the witness testified live;

correct?

A    The same weight I believe I said, yes.

Q    So, now, sir, do you want to correct your testimony that

Jarrow Rogovin was not allowed to testify to the jury that he

told Kean Ashurst not to use the Caudill information?

A    Mr. Pepe --

Q    Do you want to correct it or not?

A    That's a question -- that is live because Mr. Rechen kept

saying that Mr. -- Jarrow Rogovin will testify live.  He'll

testify live what he told Kean Ashurst what he could do and

what -- and what he couldn't do.  That was the opening

statement.

Q    Mr. Berman --

A    This is a deposition.

Q    Mr. Berman, do you want to correct your testimony or not?

A    I'm sorry?

Q    Do you want to correct your testimony on this subject or

not?

A    No, no.  I don't change my deposition.

Q   All right.  You answered it.

One more question, sir.

A   Yes.

Q   You just said again that Mr. Rechen promised the jury in Kentucky in his opening statement that Jarrow Formula [sic] would testify live.

A   Yes, on four occasions, yes.

Q   In his opening statement.  And, in fact, sir, you were shown that opening statement yesterday; correct?

A   Yes, yes.

Q   And there's not one time that Mr. Rechen ever says that Jarrow Rogovin will testify live.  True?  Yes or no?

A   Uh, the answer is that's not accurate.  At the end of the -- one of his presentations, when he mentioned how Jarrow Rogovin was so upset what was going on, that he's here to testify live.

MR. PEPE:  May I have a moment, Your Honor?

THE COURT:  All right.

(Pause.)

MR. PEPE:  Can we get Exhibit 565 called up, please?

Q   (By Mr. Pepe) That's the exhibit you were shown yesterday; correct?  Opening statement?

A   Yes.

Q   And that's where you said Mr. Rechen promised to call Jarrow Rogovin live; correct?

A    He represented to call to the jury.

Q    No, no, sir.  You said a moment ago Mr. Rechen in his opening statement promised to call Jarrow Rogovin live, gave you three times opportunity to say it, and you said he called him live.  Is that --

A    I don't know if I used the word "promised."  If I did, I meant he represented to the jury.

Q    You testified he promised and that affected his credibility.  Do you remember that?

A    I don't know if I used -- if I used the word "promised," I shouldn't use the word "promised."  He represented to the jury.

Q    Because no lawyer makes promises in an opening statement.  They represent what they think the evidence will show; correct?

A    Yeah, it wouldn't promise --

Q    Okay, but you did say --

A    He would make a representation, correct.

Q    But you did say that representation was that Jarrow Rogovin would testify live.

A    Can we just turn to that, please?

Q    No, no.  We are, of course.  But I need to put a stake in the ground here.

        You testified --

A    Yeah.

Q    -- just a moment ago that he said he would call Jarrow

Rogovin live; correct?

A   Can we just turn to the page, please?

THE COURT:  You need to answer that question, Mr. Berman.  Did he or did he not?

THE WITNESS:  My recollection is that he did testify -- he did represent to the jury that Jarrow Rogovin is available to testify live.

Q   (By Mr. Pepe) Go to page 25, sir.  Page 25 of Exhibit 565, please.

We can highlight the bottom of that page 25.

THE WITNESS:  This is not the page.

THE COURT:  I don't think --

MR. PEPE:  We don't have the right page yet.  We're getting it for you, sir.

Q   (By Mr. Pepe) You have the opening statement on the screen now.  Now I'm going to shorten this up, Mr. Berman, so we don't take any more time.

A   I'm sorry?  What's on the --

THE COURT:  Mr. Pepe, go ahead, sir.

MR. PEPE:  Yeah.

THE WITNESS:  Okay.

Q   (By Mr. Pepe) You agree that the lawyer represents what he believes, in his opening statement, what he believes the evidence will be; correct?

A   I'm sorry.  I didn't quite hear.

Q   Yes.  In an opening statement, including the ones given in this case, in the Kentucky case, the lawyer tells the jury what he believes the evidence will be as it develops in the trial; correct?

A   Yes, that's correct.

Q   Correct, okay.  He doesn't make a promise; correct?

A   No, he don't make promises.

MR. PEPE:  That's all I have, Your Honor.

THE COURT:  All right.  Very well.  Mr. Resser, any redirect?

MR. RESSER:  Yes, Your Honor.  Thank you.

Mr. Campos, can you bring up Mr. Rechen's opening statement, which is Exhibit 565?  And let's show Mr. Berman on page 54, beginning at line 18, what Mr. Rechen said.

REDIRECT EXAMINATION

BY MR. RESSER:

Q   "It has made him angry and at times uncooperative which you may see if the plaintiff plays his deposition in this courtroom even though Mr. Rogovin is available to testify live."

Do you see that?

A   Yes, sir.

Q   Is that the portion of Mr. Rechen's opening statement that you were referring to regarding live testimony from Mr. Rogovin?

A   The -- I just would -- I thought he may have said it

earlier, but he certainly said it there.  And the clear implication was that he's going to testify live the way I read it.

Q   Let's take a look at the page just before that.

I'm sorry.  Let's go back to 54, beginning at the top.

It says, "The success of Jarrow Formulas is grounded in science and is widely recognized as a leader in the field of nutritional supplement research, formulation and distribution. Mr. Rogovin will testify as to why he contracted with Kean Ashurst as a consultant, what he instructed him to do, and what he instructed him not to do."

Is that one of the times that Mr. Rechen referred to the fact that Mr. Rogovin would testify at trial?

A   That's -- that's correct.

Q   And I think you said there are two other instances.  The next line, line 7, "He will also testify as to the analyses that he himself made when he learned of Caudill Seed's claims and why he concluded that his company was not using any trade secret of Caudill and could proceed in good faith with commercial development of an activated formula."

A   Yeah, that's another one.  Actually, there were four.  I think there was one before the one you just -- the first one you just did.

Q   Okay.  The jury has already seen it.  I won't belabor that point.

A    Yes.

Q    Now, with regard to your testimony about the motion in limine and why you concluded that the Pence e-mails would not likely come into evidence at trial -- do you have that subject in mind?

A    Yes, I do.

Q    Do you still have PTX 619 in front of you?  Or do you need a copy of that?

A    No, I don't.

MR. RESSER:  May I, Your Honor?

THE COURT:  You may approach.

MR. RESSER:  And, Mr. Campos, if you can bring up PTX 619 and in particular paragraph I on page 4.

THE WITNESS:  Which paragraph, sir?

Q    (By Mr. Resser) Paragraph I, and it's also on the screen in front of you.

A    Oh.  I'm looking at it now, sir.

Yes, I've read it, thank you.

Q    So in addition to the prohibition of expressing negative statements about Dan Caudill, Mr. Rogovin's legal opinions were also excluded from the Kentucky trial.  Is that your understanding?

A    Yes, sir.

MR. RESSER:  Mr. Campos, can you bring up PTX 193, which is one of the Pence e-mails.

Q   (By Mr. Resser) And the portion that was shown regarding RICO, the third full paragraph of Mr. Rogovin's e-mail.

A   I see it.  I see it.

Q   Do you have an understanding of whether these statements that Mr. Rogovin was writing express Mr. Rogovin's legal opinions about the claims being made against him?

A   Yes, I do.

Q   Is that --

A   That would be such a so-called legal opinion that was precluded by the judge's order on the motions in limine.

Q   And the other e-mails that you were shown, PTX 194, PTX 195, those e-mails also contained Mr. Rogovin's legal opinions about the claims being made against him --

          MR. PEPE:  Objection, leading, Your Honor.

          MR. RESSER:  -- by Mr. Pence.

          THE COURT:  That's sustained.  You can rephrase and get at it.

Q   (By Mr. Resser) Mr. Berman --

A   Yes.

Q   -- in reading the other Pence e-mails that have been shown to you today, did you see in there any other legal opinions by Mr. Rogovin?

A   I did.  I'm trying to remember what they were.  They were Mr. Rogovin's expression regarding his opinions on the laws. In addition to RICO, there were other aspects of Mr. Rogovin's

letters that certainly appeared to be his legal opinions.

Q   Now, PTX 195 referred to Mr. Pence's lying client.  Do you remember that portion of PTX 195?

A   You're saying "lying"?

Q   Lying client.

A   I can't get the last.

THE COURT:  "Lying client."

THE WITNESS:  Oh, yes, okay.  Thank you.

Q   (By Mr. Resser) And Mr. Pepe indicated that the lying client was Caudill Seed.  Do you recall that?

A   Yes, I do.

Q   Can a corporation lie other than through the people who speak for the corporation?

A   Uh, the answer is the individuals do the lying.  The corporation may bear the burden, the result of it, but it's the individuals that do the lying.

Q   Do you have an understanding of who Mr. Rogovin was referring to, if anyone, when he referenced a lying client?

A   Uh, yes.  He was referring to Caudill.

Q   Mr. Caudill?

A   Mr. Caudill, right.

Q   When you told Mr. Pepe that if Mr. Rogovin testified live in the Kentucky trial you did not believe that he would be confronted -- withdrawn.

You testified under cross-examination by Mr. Pepe that

you did not think Mr. Rogovin would be confronted with the Pence e-mails.  Do you recall that testimony?

A    Yes, I do.

Q    Why is it your conclusion that Mr. Rogovin would not have been confronted with those e-mails?

A    I hope I don't make it too long an answer, but it's clear to me by these orders of Judge Simpson in the Kentucky trial case that he was not about to allow testimony of any kind of derogatory remarks or opinion one way or the other.  In fact, McCarter & English, in agreeing to what led to the judge's opinion in J, stipulated that the preclusion of negative comments had to be mutual so that the -- any Caudill's negative comments about Jarrow would likewise be excluded.  It was very clear to me the judge was very concerned with keeping the proprietary of the case and not allowing what he considered irrelevant comments made between the parties or their counsel.

Q    And did that include Mr. Rogovin's legal opinions as well?

A    Yes.  Specifically, in addition, Mr. Rogovin's legal opinions.

Q    Now, before Mr. Rechen gave his opening statement in the Kentucky trial, is it your understanding one way or the other whether McCarter & English knew of the Pence letters at that time?

A    Yes.

Q    So when Mr. --

A    The answer is I did understand that, yes.

Q    And so when Mr. Rechen gave his opening statement, pointed to Mr. Rogovin where he was in the courtroom and that he was available to testify live, Mr. Rechen -- it's your understanding that Mr. Rechen knew of the Pence e-mails; is that right?

A    That's correct, yes.

Q    Now let me ask you about the focus group reaction to Mr. Rogovin.

        Did that predate Mr. Rechen's opening statement to the jury in the Kentucky trial?

A    I didn't get the beginning part of the question.

Q    I want to talk about the mock jury or focus group reaction to Mr. Rogovin.

A    Yes.

Q    Do you have an understanding of whether that was known to Mr. Rechen and McCarter before Mr. Rechen's opening statement to the jury?

A    Yes, it was.

Q    Now I want to talk to you about the subject of the designations of deposition testimony that were submitted in the Kentucky trial.  Do you have that subject in mind?

A    Yes, I do.

        MR. RESSER:  I'd like to hand the witness Document No.

316 from the Kentucky case and ask him some questions about that.

THE COURT:  You can do that.

MR. RESSER:  Your Honor, do you need a copy?

THE COURT:  Probably, yeah.  Thanks.

THE WITNESS:  Thank you.

MR. PEPE:  Can I have the exhibit number, Your Honor?

THE COURT:  Well, it hasn't been offered, so ...

MR. PEPE:  I'm sorry.  I got ahead of it.

MR. RESSER:  We'll offer this as -- what's the next in order?  716.

THE COURT:  Any objection?

MR. PEPE:  No objection.

THE COURT:  This will be marked as 716.  Let's just make sure, Mr. Resser, the original copy in Mr. Berman's hands gets to Ms. Johnson and is marked with a sticker.

MR. RESSER:  Absolutely, Your Honor.

(Defendant's Exhibit 716, received in evidence.)

MR. RESSER:  Can you put this up, Mr. Campos, please.

Q   (By Mr. Resser) Mr. Berman, you've seen this before?  Yes?

A   Yes, I saw it three years ago and again this morning.

Q   And I think you testified earlier that you did not recall in your testimony yesterday that you had seen it before, but now you're quite certain you have.

A   That's correct, yes.

Q   Now, these are the designations submitted by McCarter & English on behalf of Jarrow Formulas of deposition testimony that they wanted read or played at the trial.  And if you go to the last page of this exhibit, Mr. Berman and Mr. Campos, you'll see it's signed by Mr. Rechen.

A   Yeah, you said -- I think you said these are the deposition designations by Caudill.

Q   No.

A   They're by Jarrow Formulas.

Q   Right.  And they're -- this is what -- the document filed by Mr. Giarratana, Mr. Grondahl, and Mr. Rechen; correct?

A   That's correct, yes.

Q   Is there anywhere on this document where deposition testimony of Mr. Rogovin is designated -- and I'm not saying counter-designated -- but deposition of Mr. Rogovin, is there any such testimony designated in this document?

A   The answer is no.

Q   Now, Mr. Pepe also showed you counter-designations that did include Mr. Rogovin's deposition testimony.  Do you recall that?  I can show you the document if you want to see it.

A   Yeah, I don't remember that he showed it to me.

Q   Okay.  Let me show it to you now.

         MR. RESSER:  May I approach?

         THE COURT:  Sure.  Thank you.

         THE WITNESS:  Thank you.

Q   (By Mr. Resser) Now, these are the counter-designations submitted by McCarter & English, the lawyers for Jarrow Formulas, in the Kentucky case.  This document is dated March 18, 2019; correct?

MR. PEPE:  Offer it before it's read from.

THE COURT:  Do you want to offer this, Mr. Resser?

MR. RESSER:  I'm not going to offer this.  I don't think so.

Q   (By Mr. Resser) This is March 18th, 2019; correct?

A   I see that, yes.

Q   And this is also filed before Mr. Rechen's opening statement in June of 2019; is that right?

MR. PEPE:  He is reading from a document not in evidence, Your Honor.

MR. RESSER:  Well, then I'll move it into evidence --

THE COURT:  All right.

MR. RESSER:  -- as 717.

THE COURT:  Okay.  So this will be 717.  It will be marked as a full exhibit.  It can be shown to the jury.

MR. RESSER:  I thought we could save some time, but we'll mark it and admit it.  Thank you, Your Honor.

THE COURT:  Sure.

(Defendant's Exhibit 717, received in evidence.)

Q   (By Mr. Resser) So the date of this document is March 18, 2019; is that right?

A    That's correct.

Q    And the day of Mr. Rechen's opening statement was on June 2nd or 3rd; is that right?

A    June 3rd, yes.

Q    June 3rd, 2019.  So this also was filed before -- withdrawn.

The meeting when the final decision was made that Mr. Rogovin wouldn't testify, that was the weekend before the last week of the trial.  The trial had already gone on for a week or two.

A    It was -- that was the evening of June 17.  The jury verdict was June 26.  So you'd have to count the days of 2019.

Q    So, again, this document, Exhibit 717, was filed two and a half months before the Kentucky trial even started.  Do I have that right?

A    That's correct, yes.

Q    And that meeting that you testified about and that Mr. Pepe was asking you about, whether Mr. Beres was there and what part of the meeting he was there and whether he was in the room with Mr. Rogovin, or someone else was in the meeting with Mr. Rogovin, that hadn't taken place yet when these counter-designations were submitted; is that right?

A    That is correct, yes.

Q    And, again, it's your understanding that Mr. Rogovin wasn't

even in the meeting when the vote was taken as to whether he should testify.

A    That's my understanding, correct.

THE COURT:  Mr. Resser, I'm going to stop you there.

Ladies and Gentlemen, we're going to take our morning break.  Thank you for your attention.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  Thank you very much.  You can proceed to the jury room at this time.

(The jury left the courtroom at 10:44 a.m.)

THE COURT:  I think what we'll do is we'll recess now -- let me ask this, is there anything to discuss before we recess?

MR. PEPE:  Not for the plaintiff Your Honor.

THE COURT:  Very well.  We'll be in recess.  We'll see you just before 11:00.

(Recess from 10:45 a.m. to 10:58 a.m.)

(The jury entered the courtroom at 10:59 a.m.)

THE COURT:  Go ahead, Mr. Resser.

MR. RESSER:  Thank you, Your Honor.

Q    (By Mr. Resser) Mr. Berman, during Mr. Pepe's cross-examination, he showed you several of the Pence e-mails from Mr. Rogovin.  Do you have that subject in mind?

A    Yes, I do.  Thank you.

Q    And then he asked you whether you thought those e-mails

showed that Mr. Rogovin had ill will towards Caudill in connection with the trade secrets case. And I believe you testified that you didn't think it showed ill will by Mr. Rogovin towards Caudill in connection with the trade secrets. Do I have that right?

A   They were directed towards Mr. Pence. There were some that were directed towards Caudill.

Q   And those Pence e-mails were from 2013 after the lawsuit was filed claiming Mr. Rogovin and -- withdrawn.

Those Pence e-mails were written in 2013 after the lawsuit was filed by Caudill. Is that your understanding?

A   That's correct, yes.

Q   And the e-mails concerned, among other things, Mr. Rogovin's upset and perhaps ill will because he was being accused of RICO -- which is racketeering organized crime?

MR. PEPE: Objection, leading.

THE COURT: Sustained.

Q   (By Mr. Resser) Is it -- what is your understanding of why Mr. Rogovin was expressing ill will towards Mr. Pence and Mr. Caudill in those e-mails?

A   It was very clear from his testimony and some of his internal e-mails that he was extremely upset that he was being accused, in his mind, in a criminal context of racketeering under the Racketeering Influence and Corrupt Organization Act in this country. And he -- in fact, Mr. Rechen even referred

to part of that, his being upset, in his opening statement, "he" meaning Mr. Rogovin being upset about being accused of being a criminal.

Q   And that didn't happen until when?  2013?

A   2013, late 2013, maybe even early 2014.

Q   What is your understanding of when Mr. Ashurst was retained as a consultant to Jarrow Formulas?

A   Uh, either May 1 or May 2 of 2011.

Q   And is that the time frame in the -- that was alleged in the Kentucky case when Jarrow Formulas supposedly took the trade secrets willfully and maliciously?

A   Uh, that was the time that, in my opinion, Jarrow Formulas was a target and was going to be accused of taking trade secrets of Caudill.

Q   Now --

A   I'm not sure I answered your whole question.

Q   Now, you have given the opinion that you think Judge Simpson would have kept the Pence e-mails out of the Kentucky trial for the reasons you've described.  And I'm not going to ask you for that again.  But you also were asked by Mr. Pepe whether you thought the Pence e-mails, if they did ultimately get into evidence in the Kentucky trial, why you didn't think that was evidence of willful and malicious intent to take trade secrets.

Do you recall that testimony?

A    Yes, I did.

Q    Why don't you think the 2013 e-mails to Mr. Pence show willful and malicious intent to take trade secrets?

A    Those e-mails were directed to Attorney Steve Pence, and it was apparent and he still testified -- "he" meaning Jarrow Rogovin -- in deposition that he was extremely upset.  But the e-mails themselves to Mr. Pence don't refer to misappropriation or worse by Jarrow Formulas of taking, misappropriating trade secrets of Caudill.  That was not the message in those -- in those e-mails.

Q    Do you have an opinion as to whether the sentiments that Mr. Rogovin expressed to Mr. Pence, whether those are relevant to the question of willful and malicious intent to take trade secrets?

            MR. PEPE:  Objection, Your Honor.

            THE COURT:  Yes?

            MR. PEPE:  Objection, relevance.

            THE COURT:  Yeah, that's sustained.

Q    (By Mr. Resser) Is there any other reason, other than you've already described either to me or Mr. Pepe, why, if the Pence e-mails had come into evidence in Kentucky, you did not think that they were related to the trade secrets claims?

A    The Pence -- the e-mails to Mr. Pence, Mr. Rogovin was expressing his -- not only his frustration but his anger at Mr. Pence for, um, basically accusing him of being a criminal, a

theft -- a thief and not so much directed, if at all, to the trade secrets themselves.

Q   Okay.  Now I want to move on to a different topic, Mr. Berman, regarding your experience in handling cases involving willful misconduct.

Have you litigated cases involving willful misconduct?

MR. PEPE:  Objection, relevance, Your Honor.  The test is under the Kentucky Uniform Trade Secrets Act, not other cases.

THE COURT:  Well, I'll allow the testimony.

THE WITNESS:  I have litigated cases involving willful misconduct and cases that are closely related and measured by the same standard as a finding for willful and misconduct, standard meaning standard of proof, standard required to be shown in order to prevail.

Q   (By Mr. Resser) How many cases have you litigated involving willful misconduct in your career?

A   Well, I'm more comfortable testifying, if I may, about cases that had the same degree of proof required to prevail, such as breach of the implied covenant of good will and cases involving intentional misrepresentation.  Those cases are intentional bad faith cases that have the same standard as willfulness.  And I've litigated many cases involving breach of the implied covenant of good faith and fair dealing and intentional misrepresentation.

Q    How many such cases?

A    Too many to count I'm afraid, Mr. Resser.

Q    When intentional misrepresentation is involved, what is the standard of proof?

A    Intentional misrepresentation is tantamount to fraud in Connecticut.  And the standard of proof is that it has to be shown by the plaintiff by clear and convincing evidence.

Q    And when bad faith is involved, what is the standard of proof?

        MR. PEPE:  Objection, Your Honor, relevance.

        THE COURT:  Well, let me put it this way:  This is going beyond the cross, and so I'm going to allow a little bit of recross on this.

        MR. RESSER:  Sidebar, Your Honor?

        THE COURT:  Sure.

    (At sidebar off the record.)

Q    (By Mr. Resser) The standard of proof that you just referenced for willful or intentional misrepresentation.

A    I was about to answer about bad faith.

Q    Okay.

A    That's what I was asked.

Q    I'll withdraw that question.

        Is the standard that you spoke about with respect to intentional misrepresentation, is that clear and convincing evidence standard unique to intentional misrepresentation

cases?

MR. PEPE: Objection, Your Honor, outside the scope of cross and also --

MR. RESSER: I'll withdraw.

THE COURT: Okay.

Q (By Mr. Resser) Is the willful -- withdrawn.

Is the clear and convincing evidence of willful misappropriation unique to trade secret cases under Kentucky law?

A No.

Q Now I want to talk about your limited preliminary report, which Mr. Pepe discussed with you. Do you have that subject in mind?

A Yes, I do.

Q Why were you -- why was your first report a limited preliminary report?

A Uh, it was a limited preliminary report because of the time crunch for me to review all the materials that I ultimately did, because I was retained early in January 2, 3, I think it was, or 4. And under the orders in this case, an opinion was -- had to be rendered, I believe, sometime during the week of January 11 or thereabouts. And so I had to get my report in in time, but because I hadn't fully reviewed all the documents and transcripts that I ultimately did, because I was -- I had a plane reservation to go to Florida, I did what I could in

devoting all the time over those five days to reading what I could and issued my preliminary report with the hope, or the idea, that later I would issue a more complete report.

Q   And did you say that to Mr. Pepe at your first deposition?

A   Yes, I did say that to Mr. Pepe at the first deposition.

Q   Did you and Mr. Tinley discuss any further work that he or you wanted to do after your limited preliminary report?

A   Yes, we did.

Q   And what was discussed?

A   We were --

MR. PEPE:  Hearsay, Your Honor.

THE COURT:  Well, that's sustained.

Q   (By Mr. Resser) What did you have in mind that you wanted to do after your limited preliminary report had to be submitted?

A   I wanted to more fully explore what transpired in the Kentucky case by reading the transcripts of all the testimony. Looking at many -- I think 60 -- exhibits that were entered in that case so that I could find out objectively whether my initial opinions in the limited report in January 8 could be supported or not supported.

Q   Were the conclusions that you expressed in court yesterday based only on the information that you relied on for your limited preliminary report?

A   Oh, no, no.

Q    And what were those conclusions based on?

A    Those conclusions were based on my entire review of everything that happened in the Kentucky case and in reading the deposition of some of the principals here, the lawyers of McCarter & English, reading the depositions of some of the -- of the officers that took place in this case, of Mr. Rogovin which took place in this case, of -- and a person who was designated by McCarter & English to be an expert witness on legal malpractice in this case.  There is -- I have boxes, three or four boxes, of transcripts, Mr. Leventhal's deposition, and all the documents that I did refer to in the Kentucky case, which I believe at the time, or now, measure close to 500 by the numbering and those thousands of pages that those documents represent.

Q    And by the time you made your second report that had to be filed as part of the pretrial disclosures, you had prepared a list of what you had reviewed?

A    Uh, yes, I did.

Q    And has that been submitted to Mr. Pepe and his team?

A    Uh, it was -- the answer is yes.  It was -- it was dated March 3, 2020, and it was annexed to that report of what I had reviewed up to that point.

Q    Now, you made a limited preliminary report concluding it was malpractice to fail to call Mr. Rogovin.  Did that mean that if you later saw information that conflicted with that

conclusion you would still tell this jury the same conclusion?

A   No, I would not be able to do that.

Q   Why not?

A   Um, first of all, I think it would be unethical.  But, particularly, I can't advocate a position in which the evidence shows that my position initially taken is an incorrect position.  I would resign from that position.

Q   What did you do to make sure you did not simply confirm your own first impressions?

A   Well, as I stated, I reviewed the daily transcripts of the testimony and arguments.  There was considerable sidebar, which was recorded, and I reviewed that, basically every -- as I said, every word of every transcript of every day of the Kentucky trial going through June 26.

I also reviewed, as I said, exhibits that were filed in the case, and I reviewed the complete transcripts of the proceeding that took place in this case before this trial began.

Q   At the time you gave your limited preliminary report, had you yet learned that what Mr. Rechen had represented to the jury in his opening statement about Mr. Rogovin being in the courtroom and that he would testify in the Kentucky case?

A   No, I had not read that before my preliminary or limited preliminary report on January 8 of 2020.

Q   And how did that information affect your conclusions one

way or the other?

A   I knew I didn't have to resign from this case.  It supported and, in fact, enhanced my belief in what I've testified here yesterday and today, that the failure to call Jarrow Rogovin to the stand likely caused the jury in Kentucky to find that Jarrow Formulas engaged in willful and malicious conduct.

Q   At the time you presented your limited preliminary report, Mr. Berman, did you know what Caudill's attorney stated in his closing about the failure of McCarter and Jarrow Formulas to present the testimony of Mr. Rogovin at the trial?

A   No, I did not.

Q   And how did that affect your conclusions one way or the other?

A   Again, it enhanced my initial opinion about the adverse results of not having Jarrow Rogovin testify.  And the fact that it was brought to the jury's attention in summation by the opposing lawyer to me was also very damaging.

Q   Let me ask you now about Mr. Rogovin's letter to Attorney O'Brien, which is in evidence as Exhibit 511, 511 in this case. Do you have that subject in mind?

A   Yes, I do.

Q   Now, you testified yesterday that, in your opinion, that letter would have come into evidence in the Kentucky trial even though there was an order of the court that the Ashurst

litigation was irrelevant.  Do I have that right?

A    I believe so, yes.

Q    So why do you think it would have come into evidence even though evidence of the Ashurst litigation was excluded?

A    I don't have the letter in front of me, but my memory is --

Q    Well, we can put it up if you want.  So we can do that.

MR. RESSER:  Mr. Campos, 511, please.

THE WITNESS:  The import and obvious intent to me of this letter, which was authored by Jarrow Rogovin, was that this notification that came from Attorney O'Brien, on behalf of Caudill, was an attempt to, basically, to tell Jarrow Rogovin and Jarrow Formulas that they are going to be a target for a trade secret misappropriation case because of their relationship with Kean Ashurst.  And this to me -- and I think it was taken that way by Mr. Rogovin.  This is notice to Jarrow Formulas:  We're going to come after you as well.

And what Mr. Rogovin wrote in this letter is, What can we do?  Please advise us.  Give us guidance as to what we would have to do in order to not to be considered as violating a trade secret of Caudill, although, as he said, I don't believe that we have or that Caudill has a relevant trade secret.  It definitely was directed to -- as a protection of any further litigation or any litigation against Jarrow Formulas.

Q    (By Mr. Resser) Now, if McCarter & English had offered this exhibit in the Kentucky trial, do you have an opinion as to

whether it would have been allowed?

MR. PEPE:  Objection, Your Honor.

THE COURT:  I'll sustain that.

Q   (By Mr. Resser) Assuming, for the purposes of this case, that Judge Simpson would not have allowed the references to the Ashurst litigation contained in this letter to Mr. O'Brien to come into evidence, in your experience, is there a way to still get a letter like this into evidence?

MR. PEPE:  Objection, relevance, Your Honor.

THE COURT:  Well, that -- I think that's fair.  He's not asking him to predict what the judge would do.  He can just talk about -- you can answer the question.

THE WITNESS:  Yes.  There is a recognized procedure involving documents that are introduced as exhibits if they contain material that is either not relevant or prohibited or precluded.

Q   (By Mr. Resser) And what is that procedure?

A   Uh, what typically happens is you redact those portions of the document that should not be seen by the fact-finder because they should not be part of the deliberations.

Q   And although probably most of us know what that means, now having seen hearings in Congress and so on, can you explain to the jury what redacting is?

A   "Redacted" means there's a black mark over the portions that are not to be considered as admitted as evidence in the

case.  A lot of that has been shown on television lately.

Q   And are redacted exhibits routinely entered into evidence in lawsuits in your experience?

A   Yes, they are.

Q   Now, let's take another hypothetical.  Let's say a judge doesn't want to allow the redacted O'Brien response letter from Mr. Rogovin into evidence.  In your experience, might a judge let Mr. Rogovin testify about the letter without the letter coming in so as to avoid the material that was not to get before the jury?

MR. PEPE:  Objection, calls for speculation.

THE COURT:  I think that does, but you might be able to get at it a different way.  So I'll sustain that.

Q   (By Mr. Resser) Hypothetically, if a judge does not allow a document to come in that may have relevant and irrelevant information on it because of the irrelevant information, in your experience, can a witness still testify to the relevant portions of that document?

A   The answer is that -- the answer is yes.  He would be allowed to testify as to what his state of mind was when he authored -- excuse me -- when he authored such a letter.  So the answer is yes, he would testify in that regard.

Q   Now, now I want to talk about the decision not to have Mr. Rogovin testify at trial and the contention that Mr. Rogovin agreed with that recommendation that M&E gave that he should

not testify.

And you told Mr. Pepe yesterday that you did not think that would eliminate your conclusion of malpractice in this case. Do you have that subject in mind?

A   Yes, I do.

Q   Why is it that you said that? Why is it you don't think that would eliminate the malpractice in this case?

A   I can point to a number of reasons.

Q   Please do.

A   One, most particularly, Mr. Jarrow Rogovin wanted to testify in the Kentucky case. And he so notified his counsel, McCarter & English, even after the decision was made that he would not.

He testified that he wanted to in the proceeding which took place in this case before this trial.

He testified to the same effect in his own deposition, which took place in this trial. He felt that he was bullied. I believe he felt that expression, that he felt that he was bullied into this decision because he was told by a member of the McCarter English trial team that if he testified, they would lose the case.

What he was not told was that, if you don't testify, given the buildup that was given about your position and your testimony, that that could be construed in an -- and especially in view of what the opposing attorney can say in summation,

that that would be construed in a very negative way about the integrity of Jarrow Formulas.

MR. RESSER:  No further questions.  Thank you.

THE COURT:  All right.  Can I see counsel for a second at sidebar?

(At sidebar off the record.)

THE COURT:  So, Ladies and Gentlemen, I don't ordinarily allow what's called recross.  But I made an exception in this case for a very limited area.

RECROSS-EXAMINATION

BY MR. PEPE:

Q   You testified on redirect that you were familiar with the standard of proof with respect to bad faith cases and intentional misrepresentation cases; correct?

A   I think I heard your question.  I was familiar with the standard in bad faith and what else?

THE COURT:  Intentional misrepresentation cases.

THE WITNESS:  Yes.

Q   (By Mr. Pepe) And were you suggesting to the jury that your knowledge of the standard of proof in those cases was the same as the standard of proof for willful and malicious under the Uniform Trade Secrets Act?

A   I believe that that is true, correct.

Q   But your testimony here yesterday was that, when you rendered the first opinion, you did not even know that it was

the Kentucky Uniform Trade Secret Act that applied in the case; correct?

A   I didn't -- I don't believe that I said that.

Q   And when you rendered your second opinion, you still had not even read the Kentucky Uniform Trade Secrets Act; correct?

A   It's a different question.  The answer is I had not yet read the Kentucky Uniform Trade Secret Act, that's correct.

Q   When you did the first opinion or the second one; correct?

A   That's correct.

Q   Or any cases construing the willful and malicious burden of proof; correct?  Under that statute.  Under that statute.

A   I'm sorry.  The question?

Q   You had not read any case law construing the burden of proof on willful and malicious under the Uniform Trade Secrets Act when you rendered your first opinion.  True?

A   I had not --

Q   Yes or no, sir?  We don't want to go through it again.  You had not read -- you had not read the statute or any case law construing the burden of proof on willful and malicious when you rendered your first opinion.  True?

A   I did not read any case law in Kentucky on construing willful and malicious.

Q   And when you rendered your second opinion, you still had not read the Kentucky Uniform Trade Secrets Act or any case law construing the burden of proof for willful and malicious.

True?

A    Kentucky case law, that's correct.

MR. PEPE:  No further questions, Your Honor.

THE COURT:  Very well.  You may step down, sir.

Mr. Resser.

MR. RESSER:  We would ask that Mr. Thomas Rechen take the witness stand.

THE COURT:  All right.  Mr. Rechen.  Come on up.

Morning, sir, if you would please raise your right hand, face our courtroom deputy.


T H O M A S   R E C H E N,

having been duly sworn by the Clerk, testified

under oath as follows:


THE CLERK:  Please be seated.  State your name, city, and state you live or work.  Spell your last name for the record, please.

THE WITNESS:  I'm not sure I heard all of that, but my name is Thomas Rechen, R-E-C-H-E-N.  I'm a partner at McCarter & English LLP here in Hartford, and our business address is CityPlace 1, 185 Asylum Street, Hartford, Connecticut.

THE COURT:  Very well.  Go ahead, Mr. Resser.

DIRECT EXAMINATION

BY MR. RESSER:

Q    Good morning, Mr. Rechen.

A    Good morning, Mr. Resser.

        MR. RESSER:  And good morning, Ladies and Gentlemen.

Q    (By Mr. Resser) Mr. Rechen, you were here yesterday when Mr. Pepe showed the jury several e-mails to Mr. Rogovin from yourself and the McCarter & English trial team that praised your work; correct?

A    Actually, I was not in the courtroom when those e-mails were presented.  I don't believe.

Q    Okay.

A    I have seen the e-mails previously.  I'm aware of probably every single one of them, having received them, but I don't believe I was in the courtroom when that evidence was presented, sir.

Q    Okay.  I'm sorry.  You were here several days and I assumed otherwise.  But you're familiar with those effusive e-mails; right?

A    I am familiar with them.

Q    But Mr. Rogovin was wavering between extremes of effusively praising the trial team and berating the trial team for its misjudgments and strategic miscues as he perceived them; correct?

A    As he perceived them.

Q    And those berating e-mails actually outnumbered the effusive e-mails.  Is that fair?

A    I haven't counted them.

Q    Now, before Mr. Rogovin -- before the decision was made not to have Mr. Rogovin testify in the Kentucky trial, you asked Joel Beres to communicate with Jonathan Leventhal to reinforce the importance of Mr. Rogovin's testimony and to request that Attorney Leventhal work with Mr. Rogovin to prepare him to testify.  Is that true?

A    That is true.

Q    And in the -- in your opening statement in the Kentucky jury trial, you told the jury, quote, Mr. Rogovin will testify, end quote.  Isn't that right?

A    I think we've seen what I -- what I said.  It's a matter of record.  I believe those words were included, yes.

Q    And you also told the jury in the Kentucky jury trial, quote, "Mr. Rogovin will testify as to why he contracted with Kean Ashurst"; correct?

A    So, I mean, I think, in fairness we should look at precisely what I said.

Q    Okay.

A    I don't deny, but I'm not prepared to accept that I said exactly what you just said.

Q    Okay.  So let's take a look at Exhibits 565 again, beginning on page 54 of the transcript of the trial in Kentucky.

          MR. RESSER:  Mr. Campos.

THE WITNESS: So, yes. What is -- what is transcribed here is what was included in my opening statement.

Q (By Mr. Resser) And that includes the statement beginning on page 40 where -- and then continuing on page 41 of the transcript where you pointed out where Mr. Rogovin was sitting in the courtroom; correct? That's at the top of page 41?

A I'm looking at page 54.

Q We'll show you that, sir.

Do I have that right?

A Mr. Rogovin was sitting next to Mr. Cordani in the courtroom. That is correct, and I did say that, tell that to the jury. He was introduced.

Q Now, beginning on page 54, line 4, you told the jury: "Mr. Rogovin will testify as to why he contracted with Kean Ashurst as a consultant, and he -- and what he instructed him to do, and what he instructed him not to do."

Those were your words; right?

A Yes, sir.

Q Then on line 7, you said, "He will also testify as to the analyses that he himself made when he learned of Caudill Seed's claims and why he concluded his company was not using any trade secret of Caudill and could proceed in good faith with commercial development of an activated formula."

You said that to the jury as well; right?

A Yes, I did.

Q   You also told the jury on line 15, "This company is his baby;" correct?

A   I said that.

Q   And then you said, "And as a result, you will see that he has taken this litigation and the claims made against his company very personally."

And you were referring there to some of the e-mails that he wrote to attorneys and to others that might come into evidence; right?

A   I was referring to that in part, yes.

Q   And then you said, "He feels reputationally and financially abused by this litigation."

That also was referring to some of those e-mails; correct?

A   Yes.

Q   And then you said, "It has made him angry and at times uncooperative which you may see."

You said that; right?

A   "If the plaintiff plays his deposition in this courtroom," plaintiff being Caudill Seed, yes.

Q   And then you said, "If the plaintiff plays his deposition in this courtroom, even though Mr. Rogovin is available to testify live."

Those were your words; right, sir?

A   Yes, they were.

Q    And the trial plan included showing Mr. Rogovin's good faith in his approach to the technology that was at the center of the lawsuit; correct?

A    It definitely included that, yes.

Q    But Mr. Rogovin did not testify during the Kentucky jury trial; correct?

A    He testified, yes, he did.  He did testify.

MR. RESSER:  Your Honor, I'd like to read and show to the jury Stipulation of Fact No. 27 agreed to in this lawsuit.

THE COURT:  Well, I guess so.  What are we really arguing over?

MR. RESSER:  It says, "Jarrow Rogovin did not testify during the Kentucky jury trial."

THE COURT:  All right.  Fine.

Q    (By Mr. Resser) You also believe, Mr. Rechen, that you fully explained to the jury in closing why Mr. Rogovin did not testify at the trial by telling them Mr. Rogovin had testified by deposition; right?

A    Can you show me that?

Q    Exhibit 577 is a -- an affidavit that you gave under oath and was filed in this case; is that right, sir?

A    I did give --

MR. RESSER:  Can I show it to the witness?

THE WITNESS:  I did give an affidavit, yeah.

THE COURT:  You can show it to the witness, yes.

MR. RESSER:  I believe there's no objection, so we move admission of Exhibit 577.

THE COURT:  Mr. Pepe?

MR. PEPE:  No, no objection, Your Honor.

THE COURT:  All right.  577.  This is Defendant's Exhibit Mr. Resser?

MR. RESSER:  Yes.

THE COURT:  DX 577 is full.

(Defendant's Exhibit 577, received in evidence.)

MR. RESSER:  And, Mr. Campos, if you can turn to paragraph 29.

Q   (By Mr. Resser) Now, this affidavit is something you signed under oath; is that right, Mr. Rechen?

A   Yes, it is.

Q   Are these your words or someone else's words?

A   No.  I wrote this.

Q   And you wrote in paragraph 29, "As for the conclusion that, quote, the jury would likely be confused, end quote, as a result of Mr. Rogovin's failure to testify live, this was fully explained to the jury in my closing argument.  I told the jury that in fact he had testified through his deposition and there was no reason for Jarrow to call Mr. Rogovin to the witness stand because Caudill Seed had the burden of proof and the evidence before the jury was sufficient for the jury to find a trade secret or misappropriation by Jarrow."

THE COURT: Did you mean to say "insufficient"?

MR. RESSER: "Insufficient." Thank you, Your Honor.

Q (By Mr. Resser) "Accordingly, there was no need for his testimony. The conclusion that Mr. Rogovin was, quote, inexplicably not called as a witness, end quote, is not true. It was explicable. And I explained it to the jury."

That's what you wrote, sir, right?

A The last sentence says, "And it was explained to the jury." But, yes, that is what I wrote. I thought what you were going to show me was my actual closing argument statements. But this is what I wrote in my affidavit, yes.

Q And Mr. Rogovin's deposition, the portion that were shown at trial, that's the same deposition that the expert witness, who the jury hasn't yet seen, for McCarter & English, Mr. Shearin, testified in his deposition was the worst deposition he has ever seen; is that right?

A So ask me that question again, if you would, please.

Q The deposition that was played in the Kentucky trial that you say means that Mr. Rogovin testified in the Kentucky trial, that deposition is the same deposition that Mr. Shearin, your law firm's expert witness in this case, said was the worst deposition he's ever seen; is that right?

A So I actually think the fair answer to that, sir, is no. And I can explain that if you wish.

Q Mr. Shearin testified in his deposition that he's either

taken or defended hundreds of depositions; right?

A   I have not read Mr. Shearin's deposition.

Q   And you think, sitting here today, still today, that the jury thought that you meant video deposition clips when you told them, quote, "Mr. Rogovin will testify."

A   No, I didn't say that.  I've never said that.  I don't know what the jury thought by what I said.  I can say this:  It was our plan to call Mr. Rogovin live.

Q   Didn't you also, in your opening statement, say to the jury that Caudill's lawyer will play deposition clips, quote, even though he is here to testify live?  We read that a few minutes ago.

A   I did not say that Caudill Seed's -- Caudill Seed will play Mr. Rogovin's deposition.  I believe that was your question. That's not what I said.

Q   I'm sorry.  Let's get the exact language, if we can put up 565 again and take a look at that on page 54, Mr. Campos.

A   Yeah, so I said, "If the plaintiff plays his deposition."

Q   I stand corrected.

A   Not "The plaintiff will play his deposition."

Q   So you were laying in the minds of the jury that if Caudill's lawyer played only video clips, then that would -- if Caudill's lawyer only played video clips, you were saying to the jury, they don't have to do that.  They could call him live; right?

A    Yes, that's -- that's the essence of what I was saying there.

Q    And so you were criticizing Caudill's lawyer for playing video clips, if they decided to, even though he was in court live; right?

A    I was not criticizing anyone.  I was making a statement of fact.

Q    Well, you were -- you were laying in the minds of the jury that if only video clips were played and they didn't have him testify live, that that would be something that they should consider in how to approach their evaluation of the evidence; correct?

A    No, I don't think that's what I was saying at all.

Q    And you actually think that playing the video clips was a perfect substitute for having Mr. Rogovin testify live, don't you?

A    A perfect substitute?

Q    Yes.

A    I don't know that I would agree with that.

          MR. RESSER:  I'd like to show the jury Mr. Rechen's deposition testimony beginning at page 103, line 25, through page 104, line 24.

          THE COURT:  Sure.

          THE WITNESS:  Could I see it first?

          THE COURT:  Fine.  Yeah, you can show it to the

witness first.

THE WITNESS:  Thank you, Counsel.  Do you have a page and line?

THE COURT:  It was page 103, line 25, to page 104, line 24, Mr. Resser?

MR. RESSER:  Yes.

THE WITNESS:  May I have a moment?

THE COURT:  Yes.

THE WITNESS:  I'm sorry.  What line again?

MR. RESSER:  It was page 103, 25, through 104, 24.

THE WITNESS:  I don't think I said it was a perfect substitute, no.

Q   (By Mr. Resser) But you did say, "There was no reason for Jarrow Formulas, for Jarrow Rogovin, to be called as a witness."  Isn't that right?

A   Where did I say that?

Q   Lines 21 and 22.

A   I'm sorry.  I lost the page number.

Q   104, lines 21 and 22.

A   Yes, I did say that.

MR. RESSER:  I'd like to play for the jury the entire question and answer beginning at line 103, line 25, through 104, line 24.

THE COURT:  All right.  You can do that.

(Plays video.)

Q   (By Mr. Resser) So, Mr. Rechen, you did say that it was a perfect substitute to his testifying live, didn't you?

A   Well, what I was doing, I was characterizing Judge Simpson's instruction.  But I did use those words, yes.

Q   Now, Mr. Rechen, at the start of the trial in Kentucky, you also told Judge Simpson, quote, "My intent to call" -- sorry.  "My intent is to call Mr. Rogovin in our case-in-chief"; correct?

A   Where did I say that?

Q   In the Kentucky trial, in a pretrial discussion with the judge where you and Mr. Lewis were talking about the testimony of Mr. Rogovin by deposition and live.  Do you recall that?

A   I don't recall that.  I'm not denying that I said it, but I don't recall it.

                MR. RESSER:  Let me get the exhibit number.

                PTX 264, Your Honor.

                MR. HEAVEY:  3, Mr. Resser, 364.

                MR. RESSER:  364.

                THE COURT:  Okay.  That can be presented to the jury.  Is that in already or not?

                MR. RESSER:  We move it for admission.  And it has been proffered by plaintiff.

                THE COURT:  Okay.  PTX 364 is shown.  It can be shown to the jury.

                (Plaintiff's Exhibit 364, received in evidence.)

MR. RESSER: Mr. Campos, if we can go to page 22, beginning at line 24.

Q   (By Mr. Resser) Mr. Rechen, you said to the judge, "So, Your Honor, on that subject counsel's representation is correct." There you're referring to Mr. Lewis Caudill's lawyer as counsel; correct?

MR. PEPE: Excuse me. I apologize for interrupting, Mr. Resser, very much. But could we just have -- this is apparently part of the court transcript? And could we have a date on that? Would that be appropriate, Your Honor?

THE COURT: Sure, that's fine. We can get the date of the hearing.

MR. RESSER: June 3rd, Your Honor.

THE COURT: June 3rd?

MR. PEPE: Apologize for the interruption.

MR. RESSER: No problem. I should have had the date in my notes.

THE COURT: Want to repeat the question?

Q   (By Mr. Resser) Yes. So where you're referring to counsel's representation on line 25 of page 22 of the transcript, "counsel's representation," you're referring to Mr. Lewis, Caudill's lawyer?

A   Well, I -- that's an assumption. Could I see counsel's representation?

Q   You want us to scroll earlier in the transcript?

A    Well, I assume so.

Q    Yeah.

A    It appears there's a representation that appears --

Q    Go up a little bit.

A    -- someplace earlier in the transcript.

Q    Okay.  Let me know when you're ready, sir.

A    Next page, please.  Yes.

Q    Okay.  You can now answer my question?

A    I think so, yeah.

Q    So counsel you were referring to in your comments to the court on line 25 is Mr. Lewis, counsel for Caudill?

A    That's correct.

Q    Okay.  So you said, "So, Your Honor, on that subject, counsel's representation is correct with respect to everyone except for Mr. Jarrow Rogovin himself, who is here in the courtroom and who will be available to testify live in lieu of the presentation of his deposition."

     "Now, of course, if they choose in their case-in-chief to play his deposition, in lieu of having him testify live, then I reserve my right and it is my intent to call Mr. Rogovin live in our case-in-chief."

     Those were your words to the court the first day of trial; correct, sir?

A    Those were my words to Judge Simpson, yes.

     MR. RESSER:  We're done with this exhibit, Mr. Campos.

Thank you.

Q   (By Mr. Resser) Now I want to discuss with you the process of designating deposition testimony for use at trial.  Do you have that subject in mind?

A   I do, yes.

Q   And you've done that in dozens or more cases; correct?

A   Many, many times, yes.

Q   Now, under the Federal Rules of Civil Procedure, McCarter & English could not designate Mr. Rogovin's deposition a affirmative designation because he was chairman of the company and he was in the courtroom; correct?

A   Yeah, as an available witness on our side of the case, I don't think we could affirmatively designate deposition testimony, that's correct.

Q   And, in fact, in McCarter & English's deposition designations filed almost three months exactly before the trial, there is no designation of testimony for Mr. Rogovin's deposition.  And that's in Exhibit -- what was it that we put in this morning?  716.  Do you want to see that again?

A   You showed that earlier?

Q   Yes.

A   I don't need to see that again.

Q   So you're sure of that; right?

A   Yes.

Q   And then what happened is on that same date Caudill

designated Mr. Rogovin's deposition testimony; correct? Because they have the right to do that, whether the witness is in court or not.

A   That's correct.

Q   And that's under Federal Rule 32(b); correct?

A   I don't have the rule number memorized, but I'll take your word for it.

Q   It's always good to check the rule even if your memory serves.

But you do -- whatever rule it is, you do know that they can do that without calling the witness to the witness stand even -- even if he's in court; right?  They can just play his deposition testimony.

A   I think some judges take a different view of that, but generally I would agree with you, yes.

Q   Then that is the reason McCarter & English and your team were allowed to counter-designate some of Mr. Rogovin's deposition testimony, and you did that about a week later; right?

A   Yes.  That afforded us an opportunity to make what we call counter-designations.  So they opened the door for us there, yes.

Q   Would you agree with me, though, that a counter-designation did not allow you to use just any part of the deposition, only those that would put in context what Caudill has submitted?

A   No, I would not agree with that.  I think -- I think the rule reads that you can certainly counter-designate to do what you just described, and I think there's language in the rule that speaks about designating any other parts of the deposition.  Again, I don't have the rule number in mind, but if -- that's my recollection.

MR. RESSER:  Ms. Prabhu, can you hand me the M&E document Bates No. 403677 for impeachment?  We'll mark this as the next in order, Your Honor.

THE COURT:  Okay.

MR. RESSER:  What is the next in order?  718?  718.

You know what?  I'll hand you this.  I think I have a copy of it in my notes.

Q   (By Mr. Resser) Now, the document I've just handed you is an e-mail exchange between members of your team at McCarter & English.  And, in particular, it's an e-mail from John Cordani to Mark Giarratana dated May 23, 2019.  Above that and later in time is Mr. Cordani's reply to one of Mark's -- well, withdrawn.

Mr. Cordani's e-mail -- the first e-mail in the string is Mr. Giarratana's e-mail to Mr. Cordani saying, "Did you get an answer on whether we can call Jarrow live on cross to Caudill's playing of his deposition testimony?  Thanks."

Do you see that?

A   That's the first e-mail at 6:35 p.m.?

Q   Yes.   That's the first in time, last on the document because the way e-mails display; right?

A   Yes.

Q   And then Mr. Cordani's response, just to Mr. Giarratana, then there's Mr. Giarratana's response to Mr. Cordani with a copy to you and Mr. Grondahl.   Then there's another response from Mr. Cordani and then a reply from you and then a response from Mr. Cordani.   So you've seen all these e-mails even though the first e-mail from Mr. Cordani, the one that begins at the bottom of the page, was just to Mr. Giarratana.   Do I have that right?

A   Yes.

Q   And in that e-mail, Mr. Cordani wrote:   Caudill is entitled to the use -- to use the deposition testimony in their case-in-chief even if Jarrow is available and willing to testify.   The Court actually does not even have discretion to force Caudill to call Jarrow.

And he cites the case of *Aetna Casualty Insurance* [sic] *Company vs. Guynes*, 713 F.2d 1187 at page 1194.   It's a Fifth Circuit case from 1983.   Quote, "The Court erred in not allowing the plaintiff to read portions of the defendant's deposition directly into evidence regardless of the defendant's availability at trial."

That's the cite that Mr. Cordani wrote to Mr. Giarratana; correct?

A    He wrote that, yes.

Q    And then he wrote, "I could not find a case one way or the other on whether we can do a cross-examination of Jarrow in their case-in-chief rather than just relying on cross-designations of deposition testimony.  However, I think it is unlikely the Court will allow it.  The only reason we are allowed to cross-designate deposition testimony is because Fed. R. Civ. P." -- that's Federal Rules of Civil Procedure; right?

A    Yes, it is.

Q    -- "32 says that we can as a matter of the rule of completeness, FRCP 32(a)(6)."  And then he quotes it.  He says, "If a party offers in evidence only part of a deposition, an adverse party may require the offerer to introduce other parts that in fairness should be considered with the part introduced," end quote.

         Then Mr. Cordani goes on to say, "The idea is that we can cross-designate to prevent the deposition testimony from being taken out of context.  But I do not think we would be able to go beyond the context of the deposition transcript itself and do a cross of Jarrow in their case-in-chief.  In other words, the rule sees the cross-designation not as a cross-examination but a result of contextualization."

         Did I read that correctly?

A    You read it correctly, yes.

Q    You don't agree with Mr. Cordani that the

counter-designation is limited by the rule of completeness and fairness?

A   Well --

Q   Allows anything to come in?

A   No, I didn't say that.  And I would be guided by the rule here.  I would also -- I mean, I think the key language is what may be -- "introduce other parts that in fairness should be considered with the part introduced."  That's the quotation from the rule.  Whether that goes outside of purely contextual counter-designations or not, I guess I'm not prepared to say that it is so limiting.

Q   Now, we looked earlier today at the counter-designations that you and your team submitted in the Kentucky case on March 18th, 2019.  Do you recall that?

A   Yes.

Q   And there were quite a few counter-designations of Mr. Rogovin's testimony; correct?

A   I think that's right.

Q   Now, not all of those counter-designations were allowed. Isn't that right?

A   I think ultimately we did not even seek to put in all of those counter-designations.

Q   But you didn't answer my question.  Were any of the counter-designations that were sought not allowed by the court because of the rule of completeness and contextual --

A    I can't answer that.  I don't know.

Q    But you'll agree with me that all of the counter-designations that were submitted by the McCarter & English team with your signature on it, not all of those were shown at trial even though at one point you were thinking that maybe you would; is that right?

A    So, you know, sitting here now, I don't know whether all of those counter-designations actually went before the jury or not.  My -- so I don't know.  But I would guess --

THE COURT:  No, don't do that.

THE WITNESS:  I won't do that.

THE COURT:  Go ahead, Mr. Resser.

Q    (By Mr. Resser) We can compare the two exhibits at some point.  We won't do that now.  But the jury has the two exhibits, the counter-designations, as well as the actual testimony that Mr. Pepe showed Mr. Berman.  And I believe it was PTX 364.

Now, at one point in your testimony in this case, you refer to Jarrow Formulas and Jarrow Rogovin as one in the same, didn't you?

A    I'm sorry.  Say that again.

Q    In this case, in your testimony, in particular at your deposition, you refer to Jarrow Formulas and Jarrow Rogovin as one in the same.

A    You'd have to give me the context for that.

Q   Let me ask Mr. Campos to play for the jury page 103, line 25, to page 104, line 24, where you said, "There was no reason for Jarrow Formulas, for Jarrow Rogovin, to be called as a witness except to cover what had already been presented through his deposition testimony."

THE COURT:  This is the portion we previously played; is that right?  Same?  Same page and line number; is that right?

MR. RESSER:  I'm sorry.  Did we already play this?

THE COURT:  I thought this is what you put up.

MR. RESSER:  I'm sorry.  You're right, Your Honor. We've already shown this.  Withdrawn.

THE COURT:  Okay.

Q   (By Mr. Resser) But in that testimony -- and you have that in front of you -- you kind of misspoke.  You first referred to Jarrow Formulas.  Then you refer to Jarrow Rogovin.  And that's because, in your own mind, and particularly in this trial, in the Kentucky trial, Mr. Rogovin's state of mind was going to be important to the jury's decision on Jarrow Formulas' liability; correct?

A   I'm not sure.  And I'm not sure I have in front of me what you say I have in front of me because I have a lot of pages here.

Q   If you look at line -- line 21 and 22 is where you --

THE COURT:  On page?

Q    (By Mr. Resser) On page 104.

A    104?

Q    104, line 21 and 22.

A    And your question, sir?  So I see that.

Q    And you said, "There's no reason for Jarrow Formulas" --
and then you corrected yourself -- "for Jarrow Rogovin to be
called as a witness except to cover what had already been
presented through his deposition."

      So that was a bit of a Freudian slip where you meant
to refer to Jarrow Rogovin but you first said Jarrow Formulas;
right?

A    I disagree with the characterization.  I mean it says what
it says.

Q    Okay.  After telling the jury in your opening statement
that Mr. Rogovin was in the courtroom, that Mr. Rogovin would
testify, wasn't it logical in your mind for the jury to
conclude that Mr. Rogovin was afraid to testify?

A    No.

Q    After making your opening statement, wasn't it logical for
the jury to conclude Mr. Rogovin was hiding something when he
didn't testify?

A    No.

Q    That's not what you said in your deposition.  So let me
show the jury your deposition testimony beginning on page 101,
lines 2 through 18.

A    May I have a moment to review it?

Q    Okay.

MR. RESSER:  While he's doing that, Your Honor, we'll move admission of Exhibit 718, if we haven't done that already.

THE COURT:  Okay.  Is there any objection to 718, Mr. Pepe?

MR. PEPE:  May I ask -- oh, offering as a full exhibit?  No objection.

THE COURT:  Okay.  So 718 will be marked as a full exhibit.  718 will be full.

(Defendant's Exhibit 718, received in evidence.)

THE WITNESS:  So in response to your question, sir, no that's not what I said.  I said I couldn't answer that question.

Q    (By Mr. Resser) Well, but you did answer that question here.  And you said that you thought that the jury wouldn't conclude that he was hiding something because he didn't testify.

A    I think they're two different questions.  The question you asked me here in the courtroom I did answer.  The question that was asked at page 101 of my deposition is a little different.  And that I said I could not answer.

Q    Okay.  Well, let's see what you said in your deposition.

MR. RESSER:  Can you play that now, Mr. Campos?

(Plays video.)

Q   (By Mr. Resser) After making your opening statement, Mr. Rechen, wasn't it logical for the jury to conclude that Mr. Rogovin was not credible?

A   No, I don't think so.

Q   After making your opening statement, Mr. Rechen, wasn't it logical for the jury to conclude that his company was not proceeding in good faith regarding any trade secrets of Caudill?

A   No, I don't think so.

Q   Do you agree with me that a trial practitioner should carefully avoid overstating his client's position in an opening statement?

A   Yes, I would agree with that.

Q   Do you agree that juries have a tendency to accept statements made during the opening statement as a promise from the lawyer that he would prove what he claims?

A   No, I don't agree with that.

Q   Are you familiar with a publication called *Connecticut Trial Practice*, *Second Edition*, by Robert B. Yules?

A   I am familiar with it.

Q   Do you have that book in the library at your law firm?

A   I don't know.

Q   In *Connecticut Trial Practice* -- and you consider that an authoritative text on trial practice?

A   I don't know that -- I'm familiar with it.  I don't know

that I'm familiar with it enough to say that it's authoritative. There are a number of very good publications on trial practice.

Q   Well, you heard -- were you here when Mr. Berman said he considered it an authoritative publication?

A   I did hear him say that.

MR. RESSER:  May I approach, Your Honor?

THE COURT:  You may.

MR. RESSER:  Your Honor.

THE COURT:  Yes, sir.  Thank you.

Q   (By Mr. Resser) In Section 2.20 on opening statement, *Connecticut Trial Practice*, *Second Edition*, by Robert B. Yules says, "A trial practitioner should carefully avoid overstating his client's position in the opening. The jury has a tendency to accept statements made during the opening statement as a promise from the lawyer that he would prove what he claims. If the evidence fails to fulfill that promise, the lawyer may lose stature in the eyes of the jury and, consequently, his client's position is damaged."

Do you see that?

A   I do see that.

Q   Do you disagree with that statement?

A   I don't altogether agree with it. I think that, in fact, is a little bit of an overstatement. But that's one -- that's one commentator's view.

Q   Do you agree that an opening statement creates expectations among the juries about the evidence they will be hearing during the party's case-in-chief?  And when important facts or witnesses are highlighted in the opening statement, a healthy suspense may be created, and the jury looks forward to hearing the witness or evidence foreshadowed by counsel's remarks?  And I'm not reading from this text.

A   So, I mean, there's a lot in that question, Mr. Resser.

Q   Well, what about -- let's take it sentence by sentence.
          The opening statement creates expectations among the jurors about the evidence they will be hearing during the party's case-in-chief.  Do you agree with that?

A   So I would say that an opening statement --

Q   I just asked you if you agreed with that.

A   I mean, I don't -- I agree with it in part.  I don't -- I don't -- I don't disagree with it as a matter of principle.

Q   Okay.  Do you agree that when important facts or witnesses are highlighted in the opening statement, a healthy suspense may be created?

A   I don't know what a "healthy suspense" means.

Q   Do you agree that the jury looks forward to hearing the witnesses or evidence foreshadowed by counsel's remarks in an opening statement?

A   I mean I would think that the jury would understand what the evidence referenced by counsel will likely be and will also

have an understanding of the expected sources of that information.

Q   Do you agree, Mr. Rechen, that should a witness or evidentiary fact ultimately not be presented at trial, the jury may be disappointed or even disillusioned?

A   I think that depends on context.

Q   Do you agree that the jury may believe that the party's counsel was misleading in the opening statement?

A   Ask that again.

Q   Do you believe that when a witness or evidentiary fact is not presented at trial, although mentioned in the opening statement, that the jury may believe that the party's counsel was misleading in the opening statement?

A   Again, I think it depends on the context.

Q   Do you agree if that happens in a trial, in any opening statement, opposing counsel will point to the unfulfilled promise in his closing argument?

A   So you're using the word "promise."  I don't agree that it's a promise.  But it's not uncommon when a party says something in an opening for opposing counsel to try to use it in a closing argument.  That's not an uncommon tactic.

Q   And if the jury is told that a particular witness will testify at trial, if that doesn't happen, the jury may draw an inference that the witness's testimony or evidence would actually have been against the party who proffered it during

the opening statement.  Do you agree with that?

A   So, no, I don't agree with that.  I think juries follow the instructions given by the court, which is that opening statements and closing arguments are not evidence and, therefore, inferences cannot be drawn.  And so I tend to believe that juries follow the instructions on the law given by the court.

Q   There's been testimony that you're on the Executive Committee of the Connecticut Bar Association Section on Litigation?

A   I am.

Q   Are you a member of the American Bar Association Section of Litigation?

A   I am.

Q   Are you familiar with a publication of the American Bar Association Section of Litigation entitled *Business and Commercial Litigation in Federal Courts*, *5th Edition*?

A   No, I'm not familiar with that.

Q   So you wouldn't be able to tell me whether that's an authoritative publication on the subject of opening statements, could you?

A   No, I couldn't tell you that.

Q   Now, with respect to the comment of opposing counsel on witnesses who are referenced in an opening statement and there's a representation that that witness will testify at

trial that the opposing attorney is likely to comment on that in closing, that's exactly what happened in the Kentucky case, isn't it?

A   Opposing counsel did comment on that, yes, as did I.

Q   We'll take a look at Exhibit 550, which is Mr. Grundy's closing statement for Caudill Seed, pages 32 at line 15 through 33, line 4.  Mr. Campos.

THE COURT:  Do you want to offer it?

MR. RESSER:  It's been offered.

THE COURT:  It's in already?

MR. RESSER:  It's in already.  Just those portions, Your Honor.

THE COURT:  Thank you.

Q   (By Mr. Resser) So, Mr. Rechen, you can review that, beginning at line 15 on page 32, through line 5 on line 33, but in particular, beginning at line 24, Mr. Grundy said:  It doesn't make any sense that Mr. Rogovin just put out the fire -- put the fire out.  Yeah.  He said I'm going to mention this to you.

Now, you understood Mr. Grundy, when he said, "He said I'm going to mention this to you," "he's" referring to you, Mr. Rechen?

A   I think that's right.

Q   "And I'm darn well going to mention it to you.  They didn't put him on the stand and he didn't tell you that.  It's just

the lawyer talking.  You heard the judge tell you, you got to look at the evidence."

That's what Mr. Grundy said about your failure to put Mr. Rogovin on the witness stand live in the Kentucky trial; correct, sir?

A   He said that, yes, I agree.

Q   Do you agree, sir, that if, at the time of an opening statement, a lawyer has not yet decided whether to call the defendant as a witness or to present a defense case, you should not commit yourself to a defense that you may later not want to use?

A   I think if a decision has been made on that, yeah, I think that -- I think you should be honest with the jury, yes.

Q   Well, maybe you didn't hear my question clearly.

If you may not have yet decided one way or the other to call a particular witness at the trial, it's not a good idea to tell the jury the witness will be called at the trial, is it?

A   I wouldn't disagree with that.

Q   You agree that, in giving an opening statement, a lawyer should only promise what you know you can deliver?

A   I don't know that I can answer that yes or no.  The problem is that when you're in the defense posture and the plaintiff has the burden of proof, the plaintiff has the burden of proof. And so you find yourself in the position of telling the jury in

your opening what you expect to do --

Q   But if you --

A   -- not knowing yet what the plaintiff is actually going to do.  And because you're in the defensive posture, you're reacting to what the plaintiff actually does as opposed to what the plaintiff says they're going to do in the opening.  And so that makes it a very much, I think I heard the word yesterday, which I agree with, Mr. Pepe used it, a fluid situation.

Q   Right.  But you knew, before you made that opening statement, that mock jurors had some doubts about Mr. Rogovin as a witness.

(Court reporter asks for clarification.)

THE COURT:  Just to get the question and answer, You knew before you made the opening statement that mock jurors had some questions -- why don't you restate the question again.

Q   (By Mr. Resser) You knew before you made the opening statement in Kentucky that a focus group with mock jurors had been conducted and there were concerns about Mr. Rogovin how he -- how he was perceived by that focus group; correct?

A   Absolutely, yes.

Q   And you weren't sure -- you weren't sure, as a result of that, whether you were going to actually have Mr. Rogovin testify at the trial; correct?

A   I don't think that's really correct.  Our intention, at the time of my opening statement, was to call Mr. Rogovin.

Q    Okay.

A    That changed because of the fluid nature of the situation, as I described.

Q    Isn't it better practice, if you're not absolutely sure that you're going to call a witness, that you shouldn't tell the jury you're going to call the witness?  Isn't that right?

A    I'm not sure I agree with -- I'm not sure -- if you're certain you're not going to call a witness, you shouldn't tell the jury you're going to call the witness.  If there is significant doubt in your mind as to whether you're going to call the witness, you should be careful about how you present it.

If it is your honest belief that you're going to call the witness at the time of the opening, I see no problem with telling the jury what your intentions are and that's -- it was that latter situation we found ourselves in.

Q    Have you done any criminal cases in your career?

A    I've been involved in one criminal case in 35 years, and that was a pro bono matter.

Q    Okay.  In those cases, the defendant doesn't have to take the witness stand.  It's the burden of proof of the prosecutor to prove the case, and so that's the kind of fluid situation where the defense attorney decides, only after the evidence is in from the prosecution, whether to call the defendant.

Do you agree with that?

A   Well, since I really don't practice in that area, I'm not sure I have a view on that.

Q   Have you read any cases, sir, that discuss the effect of promising a jury a witness in opening, particularly the defendant, and not delivering on that promise?

A   I mean there's no cases that come to mind.  I can't -- I won't say categorically that I've never reviewed cases involving that subject matter.

Q   I want to talk now about the meeting in Mr. Beres' office in which the decision whether to have Mr. Rogovin testify at trial was discussed.  Do you have that subject in mind?

A   I do.

Q   Now, I have a timeline of the trial that lays out when the first day of trial, when Caudill's case-in-chief was presented with citation to the transcripts, and so on, and the days of the week and the days of the month involved.  Do you think that would help you in going through the sequence of events?

A   It might.  I have a timeline in my mind already, but if you have something you want me to look at, I'm happy to look at it.

MR. RESSER:  Your Honor, with your permission, I would like to put a timeline up as a demonstrative.

THE COURT:  Sure.  That's fine.

Q   (By Mr. Resser) All right.  So Monday, June 3rd, this is when you gave your opening after Mr. Grundy's opening in the

afternoon; correct?

A    Yes.

Q    And then for the next two weeks, that was entirely Caudill's case-in-chief; correct?

A    Yeah.  My recollection is that Caudill rested on Friday, June 14th.

Q    Okay.  And that's what it says at the top of the second page of this timeline; correct?

A    So I don't see that.

        THE COURT:  Can't see that.  There we go.

        THE WITNESS:  Now I do, yes.  Yes, that's -- well, give me a minute.

        That's consistent with my recollection.

Q    (By Mr. Resser) Okay.  And then you had Saturday and Sunday of the weekend.  And then it just so happened that Monday, the 17th, it says "dark."  That's lawyers' way of saying the courtroom -- you weren't required to be in court that day; right?

A    That's correct.

Q    So it was during the weekend, between Friday the 14th and Tuesday the 18th, when the meeting was held in Mr. Beres' office; correct?

A    No, that's not correct.

Q    When do you recall the meeting was in Mr. Beres' office?

A    The meeting took place Thursday evening on June the 13th.

Q   Okay.  Well, I'm glad we had this, because that could pinpoint it.

At that meeting, Mr. Rogovin was not present in the room when there was a full discussion of whether or not he should testify; is that correct?

A   He was not present at the big meeting, no.

Q   Do you recall who -- where he was and who he was with at that time?

A   Yes, I do.

Q   Where was he?

A   He was in the immediately adjacent conference room.  So you walk into Stites & Harbison's offices on their -- where their reception is is where they have all of their conference space.  There was a big conference room where we were gathered, and we gathered every evening after trial.  And immediately next door to that conference room was a smaller conference room.  He was in that room.

Q   And who was he with in that room?

A   He was with Danny O'Keefe.

Q   So he was with not with Mr. Beres as was suggested earlier during Mr. Berman's testimony; is that right?

A   No, he was not.

Q   And in the room with you, while Mr. Rogovin wasn't there, other executives of Jarrow Formulas were there, including Mr. Leventhal, Mr. DuBose, and Mr. Lipsky.  Do I have that right?

A    They were in the room.  That's not all that was in the room.

Q    Right.  Other people in the room included yourself, Mr. Beres, Mr. Giarratana, and Mr. Grondahl; correct?

A    And others.

Q    And Celeste O'Keefe?

A    Yes.

Q    Did I miss anyone else?

A    Cortland Joyce.

Q    And that's someone from Mr. Beres's office; correct?

A    That was a paralegal from Stites & Harbison, yes.  Oh, and one other, Jimmy Thompson.

Q    Jimmy Thompson is also with the O'Keefe group, the trial jury consultants.

A    Correct.

Q    And is it your understanding that Danny O'Keefe was in the next room working with Mr. Rogovin running through his anticipated testimony or some other purpose?

A    No, that was the purpose.

Q    And at your deposition in this case, you gave a fairly full explanation of the process of the decision making on Mr. Rogovin not testifying.  Do I have that right?

A    Um, I'm sure I did.

Q    During that meeting, you told the Jarrow Formulas executives and the others in the room that you were the

quarterback of the trial.

A   No, I did not do that.  And I did not say that in my deposition.

Q   Was there any time during the trial where you referred to yourself as the quarterback?

A   Not that I recall.

Q   And during that meeting, did you say that if Mr. Rogovin testified, Jarrow Formulas would lose the case?

A   No, I definitely did not say that.

Q   In that meeting, you never advised the Jarrow Formulas executives, did you, of the risks of representing to the jury that a witness would testify and not delivering on that representation, did you?

A   So I don't have a specific recollection of having said that, but I'm not prepared to say that that was not discussed.

Q   But sitting here today, you don't remember saying that; right?

A   I don't.

Q   And then after that meeting, when Mr. Rogovin was told of the decision -- and it was your recommendation that he not testify; correct?

A   By the time we had reached that meeting, I was of the view that there were pros and cons surrounding that decision.  On balance, I thought we were better off not putting him on the

stand.

Q   And so that was your recommendation; right?

A   After everyone had had an opportunity to weigh in -- so the answer is, I did -- I did put my view on the table at the end of that meeting before the final, I'll call it the final decision for that evening.  Because even that was not the final decision.  I did put my view on the table for everyone's consideration, yes.

Q   And when you -- you mentioned pros and cons.  So the cons were discussed, including the Pence e-mails?

A   Yes.

Q   And other e-mails that might come out or any other e-mails -- were any other e-mails discussed?

A   Yes.

Q   The e-mails to Attorney O'Brien?

A   Yes.

Q   But you don't recall whether one of the pros that was discussed was the importance of keeping the representation to the jury that Mr. Rogovin would testify at trial; correct? I don't think I was focused so much on what was said in the opening statement.  But I know that we certainly discussed as a pro of putting him on the stand that, you know, he was -- he was -- his name was on the company and -- and he was very much involved in the bad narrative.

Q   Didn't you think it was important for the majority owner

and chairman of Jarrow Formulas to look the jury in the eye and say "I didn't do it" and to explain what his intent was?

A   That was a consideration, balanced against other considerations.

Q   So you're saying it wasn't important?

A   I didn't say that.

Q   So you agree it was important?

A   It was a consideration.

Q   And because Mr. Rogovin didn't testify in front of the jury, the jury never had the chance to assess his credibility in person.  Isn't that correct?

A   I don't know that that's correct.

Q   And that was in contrast, wasn't it, to Mr. Dan Caudill, who did testify in person at the trial; correct?

A   He did testify in person.

Q   So both heads of both companies were at the trial, and only one of them testified.  Do I have that right?  In court?

A   No, you don't have that right.

Q   Dan Caudill didn't testify at trial?

A   He did testify at trial.  So did Mr. Rogovin through his deposition.

Q   Through his deposition, got it.

     Mr. Caudill's credibility was important to the case, wasn't it?

A   I think every witness's credibility is important.

Q    Well, the head of the plaintiff company's credibility was probably more important than any other witness.  Would you agree with that?

A    Not necessarily.

Q    Mr. Rogovin's credibility was critical to the case for Jarrow Formulas, wasn't it?

A    I wouldn't agree that it was critical.  I think what was critical was a focus on what was and was not a trade secret, what was or was not misappropriated, and the circumstances surrounding any misappropriation.

Q    Would you agree that when a jury is told that it will hear from the defendant, the defendant's story from the defendant's own lips, and the defendant doesn't testify at trial, common sense suggests that the course of trial may be profoundly altered?

A    I think that's a hypothetical.

THE COURT:  Okay, Mr. Resser, we're going to take our lunch break now.

Ladies and Gentlemen, we've reached lunch.  It's about 12:45.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  Thank you very much for your attention this morning.  We'll have you back here at 1:30.

(The jury left the courtroom at 12:44 p.m.)

THE COURT:  The rest of you can be seated.  I did want to discuss a couple things, really just one, which is timing.

First, Mr. Resser, can we get a sense of just an estimate of how much longer you'll be on the direct?

MR. RESSER:  Yes, Your Honor.  Let me see how far in I am.  I'm about two-thirds of my way through calling Mr. Rechen as an adverse witness, whatever we call that.

THE COURT:  I'll call it direct.

MR. RESSER:  Direct.

THE COURT:  And you're going to have both direct and cross; is that right, Mr. Pepe?

MR. PEPE:  That's what I wanted to be sure.

THE COURT:  Yes, absolutely.  We're not calling Mr. Rechen again later.  That's for sure.

MR. PEPE:  That's exactly what I wanted to know, and we're prepared to do it all.

THE COURT:  Absolutely.  You get direct and cross with Mr. Rechen.  And I take it that may take a while.  Is that fair to say?

MR. PEPE:  Yes, and that's what I wanted to be sure about before I started.

THE COURT:  That's the procedure.  So -- in spite of what the rules may say.

By the way, I think Mr. Cordani forgot about Rule 611 of the Federal Rules of Evidence.  He might want to look that one up.  That's just strike extra.

But more seriously, so then we're going to have Mr.

Giarratana; is that right, Mr. Resser, as your witness after Mr. --

MR. RESSER:  Mr. Giarratana will be next.

THE COURT:  And then finally -- well, not finally. Mr. Rogovin will be after that.

MR. RESSER:  Yes, Your Honor.

THE COURT:  And then my guess is that will take us into tomorrow, which is fine.  Do you have any other witnesses that you'll put on after Mr. Rogovin, Mr. Resser?

MR. RESSER:  Yes.  We have Mr. Leventhal.  We also have some video designations.

THE COURT:  Okay.  And these are things I've already ruled on.  Yes?

MR. RESSER:  Oh, and Mr. Grondahl on Monday as well.

THE COURT:  Ah, Mr. Grondahl also.  But the video depositions I've already ruled on.  Yes?

MR. RESSER:  Yes, Your Honor.

THE COURT:  Great.  Okay.  And then with regard to the malpractice case, other than Mr. Shearin, who I know is your expert, are there other -- currently you expect to call Mr. Shearin?  Yes?  No?  Maybe?

MR. PEPE:  Yes, I do, Your Honor.

THE COURT:  And are there other fact witnesses that you have on the malpractice case that were not identified just now by Mr. Resser?

MR. PEPE:  Well, I have them, but they have been identified.

THE COURT:  No, no.  Well, right.  In other words, do you have any additional fact witnesses beyond those just named by Mr. Resser?  I know you're going to do directs on them, absolutely.

MR. PEPE:  I understand.

THE COURT:  But are there other names that we just didn't hear from Mr. Resser who you're going to put on in the malpractice case?

MR. PEPE:  Yes, there are, Your Honor.

THE COURT:  Who are they?

MR. PEPE:  Celeste O'Keefe and Danny O'Keefe.

THE COURT:  Okay.  You're going to call them.

MR. RESSER:  Can I ask whether Mr. Beres will be called by the plaintiff and counterclaim defendant?

MR. PEPE:  No.  Those are the live witnesses.  They will testify live.  And Joel Beres by deposition.

THE COURT:  By deposition.

MR. RESSER:  Your Honor, we just wanted to foreshadow an issue there, and particularly given that Mr. Beres' deposition has already been shown to the jury in part, that for the purposes of impeachment, we would like to submit, as an exhibit, Mr. Beres' affidavit, one of the affidavits he filed in this case earlier.

THE COURT:  So let's kind of go through this.  To impeach his -- the designated testimony?

MR. RESSER:  The designated testimony, yes, Your Honor.

THE COURT:  Let me ask a question or two about that.

MR. RESSER:  We can argue that at some point if you'd like.

THE COURT:  Well --

MR. RESSER:  You don't have to do it now.

THE COURT:  We could.  Let me ask this question:  So was the affidavit rendered before or after his deposition was taken?

MR. RESSER:  It was rendered after.

THE COURT:  Okay.  And let me ask you this:  You didn't identify it as an exhibit because you want to use it for impeachment; is that right?

MR. RESSER:  Correct.

THE COURT:  Okay.

MR. RESSER:  Actually, I think maybe it was, and Your Honor sustained the objection because the witness is listed -- was listed on the witness list.  That's my recollection.

THE COURT:  Okay.

MR. RESSER:  But I would double-check that if I were me and you.

THE COURT:  Can you just give me the exhibit number?

MR. RESSER:  I don't have that handy.

THE COURT:  All right.  While you're looking for that, Mr. Pepe, was there something other -- else you wanted to discuss besides this issue of whether he can put the affidavit in?

MR. PEPE:  No, Your Honor.  We've identified our witnesses.

THE COURT:  Okay.  Very well.  Then, Mr. Pepe, did you -- did you want to give me the exhibit number?

MR. RESSER:  You know, there were two Beres' affidavits, and I believe the one that was listed as an exhibit went to the issue of overcharges and overbilling, which Your Honor ruled was not part of the case.

THE COURT:  Okay.

MR. RESSER:  So it has not yet been marked as an exhibit, and we can provide Your Honor with a copy of that.

THE COURT:  Well, if I've ruled it out --

MR. RESSER:  No, it's a different one.

THE COURT:  Oh, so there's a separate affidavit.

MR. RESSER:  A separate one that hasn't been marked.

THE COURT:  Okay.  And you're suggesting it would impeach certain of his testimony.  Ah, this is what Mr. Berman was getting at.

MR. RESSER:  Yes, Your Honor.

THE COURT:  I gotcha.  I gotcha.

Mr. Pepe, do you want to be heard?

MR. PEPE:  We would strenuously object to that, Your Honor.  The deposition was taken of Joel Beres, and he was represented by counsel.  And that counsel had the opportunity to cross-examine at that deposition.  I think he asked a couple of questions and then stopped.  And then the next day, or shortly thereafter, an affidavit appears from Joel Beres purporting to supplement or correct or change his deposition testimony.  I was astounded.  I've never seen that before, that a party thinks that, after the deposition is complete --

THE COURT:  Well, let me ask this question:  Was he asked the questions about the topics that he addressed in the affidavit?

MR. PEPE:  Yes, yes.

THE COURT:  And so he testified on that subject?

MR. PEPE:  Yes.  And the testimony, quite candidly --

THE COURT:  In the Second Circuit -- now, this is in a different context, admittedly.  Let me explain the context.  In the Second Circuit we have a rule called -- you may have it in the Ninth Circuit too -- the sham affidavit rule.  It comes up in the context of summary judgment.  So let me first acknowledge it's a different context.

MR. RESSER:  Yeah.

THE COURT:  But the general idea is, well, if you take somebody's deposition, they can't create a genuine dispute of

material fact for summary judgment purposes by then turning around and submitting an affidavit that contradicts their position.

MR. RESSER:  We have the same.

THE COURT:  I'm kind of wondering, admittedly not summary judgment, but admittedly it does kind of reduce -- and I believe one of those opinions on the sham affidavit rule says one of -- the idea is the deposition is supposed to get at all the testimony, if they're asked the right questions; right? And it kind of reduces the utility of a deposition to then have the witness turn around and submit an affidavit that says, when the witness said the light was green, that now the witness in the affidavit says the light was red.

So the Second Circuit says, again on summary judgment, you know, we don't allow consideration of those sham affidavits.  They can't create a genuine dispute of material fact.

MR. RESSER:  Right.

THE COURT:  I'm kind of wondering though -- it's not the same -- it's not the same rule.  Freely -- I fully concede. I'm kind of wondering though why the broader principle of, if he's asked the questions in the deposition and he says, you know, for example, "Yeah, I was at the meeting and I concurred in the decision" -- I don't know if this was the testimony at the deposition -- but "I concurred in the deposition that, you

know, Mr. Rogovin shouldn't be called as a witness" or "I didn't object" or something like that. But then he comes back in the affidavit and says, "Actually, I did object, there were very good reasons to call him as a witness."

So there's no opportunity, then, at the deposition to question him about this changed viewpoint. So I'm kind of wondering why it's fair at some level to let in an affidavit in light of that. What's your response to that?

MR. RESSER: Well, first, I think Your Honor should look at the affidavit.

THE COURT: I will. Definitely.

MR. RESSER: And, also, it goes to Mr. Beres' credibility. And his credibility has been put in issue by McCarter & English, and the fact that he gave a countermanding affidavit the day after his deposition shows he's not a reliable witness probably in either instance.

We also have some case law that we can submit maybe in a two-page brief.

THE COURT: All right, I tell you what then. Let's do this: By close of business tomorrow -- because this isn't going to happen --

MR. RESSER: Right.

THE COURT: -- tomorrow; right? Close of business tomorrow -- five o'clock, to be clear, is close of business. It's not when we stop working, but from my standpoint it's

close of business so I have a chance to bring it home with me. So I want the affidavit. I want the -- just the pages from his deposition that the affidavit would purport to impeach. And if you'd like to submit a two-page brief with authority, that's fine. All I really need are the cases, honestly.

MR. RESSER: Okay.

THE COURT: And just e-mail a few cases to Mr. -- to my law clerk, Josh Britt. And then the -- McCarter will have the same opportunity to e-mail any authority to Mr. Britt on that subject, rules, cases, whatever. And I will decide the issue.

MR. PEPE: Same time, simultaneously?

THE COURT: Yes, five o'clock please, five o'clock tomorrow.

MR. PEPE: Your Honor, just so we have some context here, if that's allowed, every witness can change his testimony by affidavit. There's no chance to cross-examine. And then the affidavit, when it's offered, is clear hearsay. I mean it's out-of-court statement.

THE COURT: Well, if it's impeachment, strictly speaking, it's just offered for impeachment, so it's not hearsay. But that's what Mr. Resser would argue, and strictly speaking, that's correct. But I hear what you're saying. I sort of made the same point to Mr. Resser about the fairness of it. So, anyway, I'll decide the issue after.

MR. PEPE:  Five o'clock tomorrow.

THE COURT:  Thank you.  We'll be in recess.

(Recess from 12:56 p.m. to 1:28 p.m.)

(The jury entered the courtroom at 1:28 p.m.)

THE COURT:  All right, Mr. Resser, whenever you're ready.

MR. RESSER:  Thank you, Your Honor.  Good afternoon everyone.

Q    (By Mr. Resser) Before the break we were talking about the credibility of Mr. Dan Caudill as the head of the Caudill Seed Company and the credibility of Mr. Rogovin as, at that time, the chairman of Jarrow Formulas.  Do you have that subject in mind?

A    Yes.

Q    Would you agree with me that Mr. Rogovin's credibility was critical to this case, to the Kentucky case?  Yes?

A    I don't know that his credibility was critical.  I think it was -- I started to say I think in my answer before the break, I think what was critical was the focus on whether or not there were trade secrets.  That was the theme and strategy of the defense.  So, you know -- but having said that, you know, every witness, regardless of how their testimony is presented, does present a credibility issue, sure.

Q    And one of the questions that was discussed relative to the focus group mock jury was whether Mr. Rogovin was deemed

credible.  Wasn't that one of the issues?

A    I believe that was one of the issues, yes.

Q    And you didn't really care whether he was telling the truth or not, just whether it was credible; right?

A    No, that's false.  I did care whether he was telling the truth.

Q    You didn't care -- let me put it a different way.  You didn't care whether you believed him or not, just whether the jury would believe him; right?

A    It was important for me to believe him too, I think, in order to be able to effectively present his case.

MR. RESSER:  I'd like to show the jury from your deposition page 149, line 22, through page 150, line 7.  And it's now in front of you.  Oops, your deposition is still in front of you.

THE WITNESS:  Can I have a moment?

THE COURT:  You can have a moment.

MR. RESSER:  Yes.

THE WITNESS:  149 through?

MR. RESSER:  Line 22.  And your answer begins on line 2 of page 150.

THE WITNESS:  Okay.

MR. RESSER:  Can we play that, Mr. Campos, please?

(Plays video.)

THE WITNESS:  So that was -- that was specific to the

e-mails that he received from Kean Ashurst.  That's a little different from your question, sir, to me.

MR. RESSER:  Well, the jury heard it, so I'll move on.

Q   (By Mr. Resser) Mr. Rechen, you yourself considered the Kentucky jury trial a morality play.  Those are your words; right?

A   So I think every trial involves an element of a morality play, yeah.

Q   And that means that Mr. Rogovin's morality, or his good faith, would be on trial; correct?

A   Well, I don't think that's what I was referring to specifically when I used those words.  When I use the word "morality play," there's a story behind every dispute.  And there's a party that's right and that's wrong.  And regardless of what the law might be that ultimately gets applied and what the legal issues are in the case, there is a -- there is a dispute between the parties that a lay jury will evaluate.  And there's always, um, you know, the opportunity for them to apply their own sense of right and wrong, ethics and morality.  And I think that runs through almost every case that gets tried, in my view.

Q   And that morality play affected the ability to win or lose the case; right?

A   It always does.

Q   And you strongly felt that Jarrow Formulas deserved to win

the Kentucky case; right?

A   I did.

Q   And you still think that.

A   I do.

Q   Now, one of the things you said to the jury in your opening was about how Mr. Rogovin, quote, "Formed Jarrow Formulas in his apartment in 1977 where he mail-ordered ingredients and put them in nutritional supplement capsules in his garage."

Do you remember that or do we need to show you that?

A   No, I remember that.

Q   Mr. Rogovin never told you that, did he?

A   Did Mr. Rogovin tell me that?

Q   My question was:  He never told you that.  Isn't that right?

A   I think he's the only person I would have gotten that from.

Q   Well, in fact --

A   I may have gotten it -- I may have gotten it from Clay DuBose, I suppose, but my recollection is I got that from Mr. Rogovin.

Q   Do you not recall that Mr. Rogovin came up to you after the opening and complained to you about that at trial?

A   Mr. Rogovin hugged me after the opening.  He was so effusive in his praise.  No, I do not remember that, sir.

Q   Okay.  You don't remember Mr. Rogovin saying he would never

put supplement capsules together in a garage?

A    No, I don't remember that.

Q    And that he was offended by that statement because of his concern about the purity and quality of the product?  You don't remember that?

A    I deny that that happened.

Q    Okay.  And Mr. Rogovin nor -- did not get a chance to tell his origin story, did he?

A    Unless it was included in deposition clips that were played, I would agree.  And I don't remember whether it was included in the deposition clips or not.  I also think the origin story really, while it was interesting, is not -- not determinative in this case -- in that case.

Q    One point less than a year before the trial started, in response to one of Mr. Rogovin's rants about what he wanted the trial team to do regarding discovery and motions and sanctions and so on, you wrote:  "I am right, win or lose, didn't you?"

A    I don't -- you'll have to show that to me.

Q    You don't remember saying that?

A    I don't remember the context -- I don't remember saying that, and I certainly don't remember the circumstances surrounding any statement like that that I might make.

         Thank you.

         MR. RESSER:  Mr. Pepe, this is M&E document Bates No. 0147642 through 7645.

MR. PEPE:  May I have a copy, Your Honor?

THE COURT:  Sure.

MR. RESSER:  Do we have a copy?

THE COURT:  The Bates numbers are 147642 through 45?

MR. RESSER:  42 through 45.

MR. PEPE:  So may I ask, Your Honor --

THE COURT:  The question, Mr. Pepe, was, "You don't remember saying that?" and then --

MR. PEPE:  No, my comment was to the proffered document.  It has not been marked as an exhibit.  May I inquire?

THE COURT:  It has not been offered at this time.

MR. PEPE:  And not previously marked, if I may inquire.

MR. RESSER:  Correct, it's for impeachment.

MR. PEPE:  If it's being -- I understand what it is now.  I'll wait for the proffer then.

THE COURT:  Okay.  Thank you.

Q    (By Mr. Resser) Have you had a chance to look at this?

A    I have, yeah.

Q    Now, this is an e-mail on the subject of Caudill's motion for a status conference of August 8th, 2018; is that right?

A    It appears, yes.  But you have not included their motion.

Q    Right.  And Mr. Giarratana wrote to you and Mr. Grondahl, "Should we draft a response disagreeing" --

MR. PEPE:  Your Honor, he's reading from a document not in evidence.  Is it going to be offered?

THE COURT:  That's sustained.

MR. RESSER:  We'll move admission of this as Exhibit 719.

MR. PEPE:  No objection, Your Honor.

THE COURT:  No objection?  All right.  719 is admitted as a full exhibit.

(Plaintiff's Exhibit 719, received in evidence.)

MR. RESSER:  Mr. Campos, if you can bring up the middle of the second page.

THE COURT:  I'm sorry to interrupt, but just be sure this is shown to Ms. Johnson and provided to Ms. Johnson so she has a sticker on it.

MR. RESSER:  Of course.

Q   (By Mr. Resser) So in the e-mail, one of the e-mails in this string, Mr. Giarratana wrote to you and Mr. Grondahl, "Should we draft a response disagreeing with their characterizations but not objecting to a status conference, or do we suggest that the court decide the motions before a status conference?  Jarrow will not be of the mind to do nothing unless we can convince him otherwise."

Did I have that right?

A   That is what my partner, Mark Giarratana, wrote, if that's the question.

Sir, I don't remember this. And I think it's out of context. There is a request or a motion for status conference that accompanied this that you've not included.

Q   And then you responded to the e-mail about what Jarrow would want and what Mark was suggesting, starting with "Let's discuss."

Do you see that part?

A   I do see it, yes.

Q   And you wrote, "I feel strongly we should not respond and that we should convince Jarrow this is the right course. In their motion they are yelling at the court -- because their irrational client has demanded that they do so and they have no client control. They are accusing the court of doing nothing and for being complicit in accommodating our frivolous motions. It's pure hyperbole and the court will recognize it and be offended by it. If our motions had no merit then the status conference scheduled for January would not have been taken off calendar. They have done themselves a disservice and the court will disagree with their characterizations and will appreciate our silence. If I am wrong about that, then the court is going to rule against us anyway on the underlying motion, but a response from us to Caudill's self-inflicted wound won't help our position. It will come across exactly what it will be -- that we responded because we did not know enough to shut up. That can only hurt. This is one of those situations where less

is more, and saying nothing will be saying even more."

Then you wrote, "Every instinct I have gained over 30 years, including much of my recent reading on brief writing and argument, tells me I am right, win or lose."

That's what you wrote, isn't it?

A    That is what I wrote.

Q    So it's more important to you to be right than if your client wins or loses; is that right, Mr. Rechen?

A    No, that's -- that's wrong.  And that's not even remotely suggested by this e-mail exchange, which is out of context.

Q    And it's your belief, sir, that everything Mr. Rogovin would have testified had he been called as a witness in the Kentucky trial was covered either by his deposition excerpts or by the testimony of other witnesses.  That's your position; right?

A    I think everything that was material that he would have testified to that was critical to the theory of the defense was in the case, yes.

Q    But the letter Mr. Rogovin wrote to Attorney O'Brien, Exhibit 511 in this case, that never got before the jury in any form, did it?

A    It did not.  And it likely would not.  We would not have put it in had we called Mr. Rogovin live.

Q    And he was not called to testify about the content of his letter to Mr. O'Brien; correct?

A    No, he was not.  Yes, you're correct.

Q    And the content of that letter, whether through Mr. Rogovin's testimony or through the letter itself regarding how he wanted to avoid trade secrets, never got before the Kentucky jury; correct?

A    I'm sorry.  You'll have to ask that again.

Q    Let me break it up.

So we're clear that the content, the letter never got in front of the jury in Kentucky, Exhibit 511 in this case, Mr. Rogovin's letter to Mr. O'Brien; correct?

A    I think that's well established, yeah.

Q    And we talked -- you were here when we talked with Mr. Berman about the ways that letter might have come in, but even if it didn't come in, it's possible that Mr. Rogovin could have been allowed to testify about the content of that letter.  Do you agree with that?

A    Subject to the best evidence rule, perhaps.

Q    And so the content of the letter, the purpose of the letter, the letter itself never got before the Kentucky jury.  Am I right about that?

A    The content of the letter never got before the Kentucky jury, yes.  I don't remember what the second part of your question was.  The last part was the purpose of the letter.  And, yes, I agree the purpose of the letter, to the extent anyone can determine what the true purpose of that letter was,

did not get before the jury.  And we did not want it before the jury.

Q   Now, I think we talked earlier about your direction to Mr. Beres to write to Mr. Leventhal, who was then to talk to Mr. Rogovin to tell him his testimony was critical and that he would be the first witness in the box.  Do you remember that subject?

A   Generally.

Q   And that was started with your direction to Mr. Beres, to talk to Mr. Leventhal, who was then to talk to Mr. Rogovin; right?

A   So I don't remember all the stopping points along there, you know, but I recall generally what you're referring to, yes.

Q   But it turns out that because Mr. Rogovin was never called as a witness in the Kentucky trial, the first witness in the case that Jarrow Formulas put on its case-in-chief was Clay DuBose.  Do I have that right?

A   Uh, I think you -- I wouldn't dispute it.

          MR. RESSER:  Can I see the timeline again?  Just for purpose of looking at the timeline.

Q   (By Mr. Resser) The top --

A   Next page.

Q   At the top of the second page of the timeline, it's the Friday the 14th; then Monday courtroom is dark.  And then

Tuesday, direct examination of Clay DuBose by Mr. Rechen.

A   So our side didn't prepare this demonstrative, I don't believe.

Q   I don't believe so.

A   I accept that what you've represented in it.

Q   Okay.  You can have it double-checked, and if we got it wrong, I'm sure Mr. Pepe will let us know.

A   I'm sure he will.

Q   All right.  Now, during Mr. DuBose's testimony, he made a huge mistake, didn't he?

A   He made a mistake.  I would not characterize it as a huge mistake, no.

Q   In fact, he testified that Kean Ashurst used a vendor called Nateco.  Am I right about that?

A   He did.

Q   And that happened to be the same vendor that Caudill Seed had used for supercritical extraction, whatever that is.

A   That -- that is the vendor that Caudill Seed used for supercritical fluid extraction, yes.

Q   And that was one of the trade secrets that Caudill claimed in the Kentucky case, the supercritical extraction at Nateco.  Am I right about that?

A   That was not a trade secret the way you put it, no, that they claimed.

Q   Well, certainly Caudill claimed it was; right?

A    No, not by itself, no, sir.

Q    Not by itself.  But it was part of their claim of trade secret misappropriation; correct?

A    It may have been.  It may have been.

Q    You're not denying that it was; right?

A    Caudill's claim, with respect to their trade secret No. 1, was everything they had done over a 17- to 23-year period to take two products from seed to shelf.  And along that very -- along that 17- to 23-year continuum, they did their supercritical fluid extraction work at a company called Nateco in Germany.  So to that extent, you know, it was arguably a component of that 17 to 23 years.

Q    And the entire Nateco issue was something that Mr. Rogovin wrote at least a half dozen, if not a dozen, e-mails to the McCarter trial team about; right?

A    I -- I don't know how many e-mails Mr. Rogovin wrote.  He certainly wrote e-mails because he had, um, a focus on Nateco, yes.

Q    And Mr. Rogovin was probably the most knowledgeable person at Jarrow Formulas about the processes involving supercritical extraction.  Is that a fair statement?

A    I -- I'm not prepared to agree to that, no.

Q    Well, compared to Clay DuBose, he certainly had a lot more experience and background in that subject matter; correct?

A    I mean, I could only guess.

Q   Well, Mr. DuBose, his position was a sales position, wasn't it?

A   It was.

Q   And it was not a manufacturing or formulation position at all; correct?

A   No, it was not, but neither was Mr. Rogovin's.

Q   Well, Mr. Rogovin was in charge of all of the aspects of Jarrow Formulas' business, including formulation and manufacturing, as well as sales; right?

A   He was -- he was the chairman of the board, as I understood it.

Q   Right.  So that made him responsible for all of those matters; right, sir?

A   I mean as the chairman of the board, I suppose you could say, yeah, he had oversight, managerial oversight, some level of supervisory oversight with respect to every aspect of the business.  I would not dispute that.

Q   And he was also president of the company, Mr. Rogovin; correct?

A   I think that's right.

Q   And when Mr. DuBose testified at trial that Jarrow Formulas and Kean Ashurst, while he was consulting with Jarrow Formulas, went to Nateco for supercritical extraction, you were no doubt surprised.

A   I don't remember Kean Ashurst being in that.

Q    Okay.

A    I remember Mr. DuBose misspeaking, despite his preparation on this very subject.  I remember Mr. DuBose misspeaking with respect to Nateco while he was on the witness stand.

Q    And because he misspoke, you asked him again, Are you sure of that? or words to that effect; correct?

A    I do recall my being, one, surprised by his testimony; and, two, following up with him immediately in order to correct it.

Q    And he didn't correct it after you asked him once if he was sure; is that right?

A    My recollection is he didn't correct it immediately. Ultimately, I believe it was corrected.

Q    But you agree with me that after he said it, you asked him, Are you sure? or words to that effect.

A    Yes.

Q    And he said he was sure.

A    Let's look at the transcript.

Q    Okay.

A    Because I don't have photographic memory here.

        MR. RESSER:  Do we have that available?

Q    (By Mr. Resser) But you do remember that back-and-forth. Do you remember that you asked him a second time if he was sure?  Are you sure you're sure? or words to that effect?

A    I don't remember what I -- how I framed my questions to

him.  Here's what I remember:  I remember that he misspoke.  I remember that we attempted to correct it.  And I recall that ultimately we did correct it.  But, you know, as to the specifics as to how we got there and the steps along the way, I can't say.

Q   But you knew it was wrong at the time he first testified that Jarrow Formulas had gone to Nateco for supercritical extraction of their broccoli supplement.

A   Ask that again.

Q   You knew that Mr. DuBose was wrong when he testified, in response to your questions, that Jarrow Formulas had gone to Nateco for supercritical extraction; right?

A   I don't recall the details, sir.  I'd have to see the exchange on that and be refreshed.

Q   And you knew -- you knew that testimony was potentially damaging to Jarrow Formulas.  That's why you tried to get him to correct himself.

A   Well, I knew he misspoke certainly immediately, as soon as he said it.  And I attempted to correct him, yes.

Q   And that's why you tried to get it corrected, because you knew it was damaging to Jarrow Formulas if that went in without being corrected; right?

A   I -- I think it's fair to say, uh, I knew that it confused whether Jarrow Formulas, in connection with the broccoli product that was on trial, whether Jarrow Formulas' broccoli

product used a supercritical fluid extraction process at Nateco, which, by the way, all of the other evidence in the case established it did not.

Q   Well, let's talk about that.  Mr. Rogovin, on several occasions, asked you and your trial team at McCarter & English to subpoena Nateco and take Nateco's deposition; correct?

A   He did.

Q   And that did not happen, did it?

A   It did not.

Q   And, in fact, one of the reasons Mr. Grondahl gave at his deposition in this case as to why that didn't happen was because it would be expensive; right?

A   I can't speak for Mr. Grondahl's testimony.  I can tell you that that was not the driving reason that it was not taken. That deposition was taken because it was unneeded and because the times, temperatures, and pressures run at Nateco with respect to Caudill's process, um, were never used by Jarrow Formulas.  We established that clearly in discovery.  And, ultimately, because we did, Caudill Seed completely abandoned the theory that Jarrow Formulas was using the same times, temperatures, and pressures in connection with its supercritical fluid extraction process, and they never pursued it at trial.  And we never heard another word about it at trial.

        So it was -- we disproved it in discovery.  It became

irrelevant during the trial, and that was the end of it.

Q    It was irrelevant at the trial, but you asked Mr. DuBose about it.  And he got it wrong; correct?

A    Mr. DuBose was speaking about something else is my recollection, which is why I'd like you to show me the exchange.  Because my recollection is he was -- he was talking about Nateco.  He was talking about supercritical fluid extraction.  Unfortunately, the way this came about is because of a discussion that Mr. Rogovin had with Mr. DuBose after we had prepared him three times on the -- DuBose that is -- prepared him three times on the fact that Nateco was never used by Jarrow Formulas in connection with his broccoli product.

Q    So you're blaming Mr. Rogovin for what went wrong at trial with respect to Mr. DuBose's testimony?

          MR. PEPE:  Objection.  This is not part of the malpractice case.

          THE COURT:  I'll allow the witness to answer this question because of the last answer.

          THE WITNESS:  Clay DuBose blamed Mr. Rogovin.

Q    (By Mr. Resser) If Mr. Rogovin had been the witness on the witness stand and was asked about the subject matter that Mr. DuBose testified about, he wouldn't have made that same mistake, would he?

A    How do I know the answer?  How could I speculate on that?

Q    Because you knew Mr. Rogovin could, quote, chapter and

verse about what Jarrow Formulas did to develop its broccoli product.  Isn't that right?

A   No, that's not right.

Q   After the Kentucky jury trial and the jury found willful and malicious misappropriation, Caudill itemized the evidence of willful and malicious in requesting that the court set the amount of punitive damages and awarded attorney's fees; right?

A   I don't know.  I was -- we were no longer counsel to Jarrow Formulas.

Q   You never found out what happened?

A   I probably looked at it at one point.  I did not view it as pertinent to my testimony here today, sir.

Q   Now, during the six weeks or so leading up to the trial, isn't it true that you, Mr. Giarratana, and Mr. Grondahl, neither of the three of you did a run-through of Mr. Rogovin's anticipated testimony with him during that period?

A   No.

Q   Your testimony is there was a run-through with Mr. Rogovin by one of the three of you during that six-week period?

A   There was a run-through of a part of his testimony at one point during that six-week period.  Otherwise, our efforts to prepare Mr. Rogovin during that period were frustrated, in fact canceled, by Mr. Rogovin.

Q   And at one point Mr. Leventhal was tasked with running through Mr. Rogovin's testimony with him.  Were you aware of

that?

A   Yes.

Q   And there was a meeting at Mr. Beres' office where Mr. Leventhal had a notebook with him that had also been prepared to familiarize Mr. Rogovin with the exhibits he might be shown during his testimony at the Kentucky trial; correct?

A   Are you suggesting I was at that meeting with Mr. Rogovin and Mr. Leventhal?

Q   Yes.

A   I don't recall that.

Q   Do you recall that Mr. Leventhal was at a meeting -- was with you.  He got up from that meeting, carrying a notebook, and you asked him, "Where are you going?"  And Mr. Leventhal responded, "I'm going to work with Jarrow."

        And then you said, "With what?"

        He told you what.  You asked him for the notebook. You looked at the notebook.  And you then told him, "Don't bother.  We'll take care of that."

        Do you recall that?

A   No, I don't.

Q   So if you don't, we'll hear from Mr. Leventhal what he recalls about that.

        But regarding whether anyone at M&E worked with Mr. Rogovin during the six weeks leading up to the trial, I want to show to the jury Mr. Giarratana's deposition, page 73, line 18,

through page 75, line 17.

MR. PEPE:  Objection, Your Honor.  Mr. Giarratana's deposition can't be used with Mr. Rechen except to refresh his recollection.

MR. RESSER:  Under Rule 32(b), Your Honor, we offer it, also as impeachment of this witness.

THE COURT:  Well, under Rule 611 I'm not going to allow it for that purpose.

MR. RESSER:  All right.  We'll get to it later.

THE COURT:  But if you would like to pursue it with Mr. Giarratana at some point, you may.

MR. RESSER:  Will do.  Thank you, Your Honor.

Q   (By Mr. Resser) Now, Mr. Rechen, you assisted in the preparation of an outline for Mr. Rogovin's anticipated testimony at trial; correct?

A   I'm hesitating only because of the word "assisted."  I was certainly involved, and I think I may have done much more than assist.

Q   Okay.  I just didn't want to overstate it.  I think in your deposition you were asked, "Did you write it?"  And you said, "I didn't do it all."  And I think that's exactly how high your level was.  I wasn't sure.

Let's display for the jury and the witness Exhibit 601, which is in evidence, please.

Now -- is Exhibit 601 -- and we can give you the whole

exhibit by hand if you want.  Would that help you?

A    I would appreciate that, yes.  Thank you.

MR. RESSER:  Do you have a copy of that, Mr. Pepe?  Because my paralegal says we gave it to you.

MR. PEPE:  No, no, I do.  I have it.

MR. RESSER:  We got it.  I'm sorry.

MR. PEPE:  No problem.

MR. RESSER:  May I approach, Your Honor?

THE COURT:  You may approach.

THE WITNESS:  Thank you.

Q    (By Mr. Resser) Mr. Rechen, this is a 19-page outline of the anticipated lines of inquiry for trial for Mr. Rogovin's testimony; correct?

A    Yes.

Q    And it not only has the questions or the subject matters of the questions, but it also has the anticipated answers to those questions; correct?

A    Um, in some places.  I mean, you know, most of this is simply an outline of topics without questions -- well, without answers anyway.

Q    Well, let's -- let's first talk about the questions.

The subject matters of the questions you intended to ask Mr. Rogovin at trial are listed here in the outline; correct?

A    I would say the subject matter -- well, I think it's fair

to describe this as an outline to guide me in my questioning during examination.  I think it's also in part designed to highlight potential areas of cross-examination.

Q   Did you intend to do a further outline and actually write out the questions, or is this the kind of outline that you use at trial and you form the questions based upon the outline while you're standing in front of the court?

A   Much more the latter.  I mean -- so where there are -- you know, if we're questioning in a very sensitive area, I may script questions.  Generally speaking, it is my practice not to do a canned examination.

Q   Did you intend -- well, in the line of this document on the first page, just below the Case number of Civil Action No. 3-13 CV 82-H, it says, "Jarrow L. Rogovin -- Lines of Inquiry for trial."  And then it says "TJR final."  Do you see that?

A   I do.

Q   TJR are your initials; correct?

A   They are.

Q   And did you place or cause to be placed on this document the words "TJR final"?

A   I may have.  I don't recall.  I suspect I did.  Um, you know, that could be a little bit of a misnomer, however.  In other words, the idea that this is, in fact, final because in reality it was not final.

Q   You might have tweaked it some more before you actually put

Mr. Rogovin on the stand.  But this is what you were going to work with him on before he testified; correct?

A    I -- I would say that when we left Hartford to fly to Louisville, this was the state of the outline at that time, subject to revisions that would be made as we continued to prepare Mr. Rogovin, as we -- as the plaintiff's case-in-chief was presented, we understood specifically what we needed to address, how we might adjust this in reaction to the testimony, evidence, that was presented in the case, plaintiff's case-in-chief, and final decisions about what evidence we did want to elicit from Mr. Rogovin, what exhibits we would use with Mr. Rogovin, and what subject matter we would not cover with Mr. Rogovin either because it was covered by someone else elsewhere or we concluded we didn't need it at all.

Q    Now, there's some highlights, not the ones that Mr. Campos just put on -- on the video screen, but if we page through the documents, there's some highlights of some of the areas of testimony, if you could keep going, Mr. Campos, particularly, this one here.

As I understand it, the highlights were the areas of inquiry where you had another witness potentially available to testify on this; correct?

A    Uh, that could be one reason for highlights, yes.

Q    Well, I didn't put the highlights on this document.  You did; right?

A    Well, I would have done that, yes.  But I highlighted, for example, exhibit numbers as well.

Q    Okay.  This particular section here that we're looking at, this is one that you had determined you didn't necessarily need Mr. Rogovin for?

A    It looks to me like this is subject matter we expected we might cover with Kean Ashurst.

Q    Okay.

A    Or, as it appears on page 6, I suppose in part even Rory Lipsky, although I think Kean Ashurst was the most likely and ultimately, as it turned out, the individual who did address this.

Q    And Mr. Ashurst was on the witness stand for close to three days; right?

A    He was, called by Caudill Seed.

Q    Now, Exhibit 601, this document does show the evidence, not just the questions or the subject matters of the questions but some of the evidence that you and McCarter & English had intended to present at trial through Mr. Rogovin; correct?

A    Well, you're going to have to direct me specifically to what you're referring to, because I'm not sure I agree with that.

Q    Well, I'm not going to take you through every page of a 19-page outline.  You prepared it or assisted in the preparation of it or maybe did most of it.

Isn't it a fact that this outline contains listing of evidence that you intended to elicit through Mr. Rogovin at trial except where otherwise indicated in the outline?

A   No, not necessarily.

Q   Not necessarily.  So that means some of it was; correct?

A   Some of it was, yes.

Q   And Mr. Rogovin was also going to testify at trial about a detailed outline that was prepared for him to review with the jury.  Isn't that right?

A   I'm sorry.  That was prepared for him?

Q   For him to review with the jury.

A   Outside of this?

Q   The timeline that was prepared, outside of that, although the timeline is mentioned in the outline, Mr. Rogovin was going to testify about a timeline; correct?

A   He may have.  That's possible.

Q   All right.  Let's show the jury from your deposition page 187, line 1, to line 9.

A   Could I have a moment just to review this, please?

THE COURT:  Sure.

THE WITNESS:  Yeah, okay.  Thank you.

(Plays video.)

MR. RESSER:  I next want to present to the jury line 106, line 20, through 107, line 4.

THE COURT:  106, line 20, through 107, line 4.

MR. RESSER:  4, yeah.

THE COURT:  Thank you.

THE WITNESS:  Okay.  Thank you.

MR. RESSER:  Go ahead.

(Plays video.)

MR. RESSER:  Mr. Campos, could you -- and we offer PTX 210, which is the timeline.  Let me first offer that.

THE COURT:  This is the timeline we've seen?  Sorry.  Which timeline?

MR. RESSER:  The timeline that Mr. Rechen was just asked about by Mr. Tinley on the deposition.

THE COURT:  Objection to 210?

MR. PEPE:  No objection, Your Honor.

THE COURT:  210 can be marked as a full exhibit.

(Plaintiff's Exhibit 210, received in evidence.)

MR. RESSER:  Next page.  And next page.  And next page.

Q   (By Mr. Resser) Do you need a hard copy of this, Mr. Rechen, or is that sufficient?

A   No, I think this is sufficient.  Although can we go back -- can I see page 1, please?

Q   The first page is the e-mail?

A   Is this the e-mail?  Maybe I should see a hard copy.

Q   Okay.

MR. RESSER:  May I approach?

THE COURT:  Yes.

THE WITNESS:  Thank you.  Yeah, okay, thank you.

Q   (By Mr. Resser) Okay.  So this is the graphic representation timeline that you refer to in your deposition testimony, and that is referred to starting on page 4 of Exhibit 601; correct?

A   Page 4 of Exhibit 601.

Q   That's the lengthy 19-page outline.

A   Um, so, no as to page 4 of the outline.  This, the demonstrative that's on the screen, is much more detailed than what was anticipated by this particular outline.  I think we have two different things going on here.

Q   Okay.  But the timeline, you worked on that timeline as well, didn't you?

A   I believe I did, although on this -- on the timeline my recollection is Attorney Giarratana was probably more heavily involved in the preparation of that than I was.  So to go back to your word "assistance" before, this is one where, you know, I would have assisted.

Q   And this timeline was never used at trial with any witness, the graphic timeline; correct?

A   Correct.

Q   And, obviously, since Mr. Rogovin never testified, this timeline was not used with him; correct?

A   Well, if he didn't testify, it couldn't be used with him.

Q    And the testimony Mr. Rogovin was to give about that timeline was not presented to the Kentucky jury by any other means, was it?

A    No, I think this in part was covered by Kean Ashurst.

Q    But the timeline wasn't used with Mr. Ashurst; correct? Because he couldn't testify to all these facts.

A    No, it was not used -- the timeline was not used with Mr. Ashurst.  The demonstrative that's on the screen was not used with Mr. Ashurst.

Q    Now, didn't you think that if you had covered the lines of inquiry that you helped create in Exhibit 601 with Mr. Rogovin at trial, it would have been beneficial to the case?

A    We would not have prepared the outline if we did not think it had the potential to be beneficial to the case.  And by the outline, I'm referring to my lines of inquiry.  But I would say the same with respect to the demonstrative.

Q    Thank you.

         MR. RESSER:  Your witness.

         THE COURT:  All right.  Mr. Pepe.

         THE WITNESS:  I've got a stack of papers that are piling up here.

         MR. RESSER:  May I retrieve them, Your Honor?

         THE COURT:  Sure, you may.

         MR. RESSER:  Mr. Pepe, are you going to need the deposition?

MR. PEPE:  I don't believe so, Your Honor.

THE COURT:  Mr. Pepe, whenever you're ready.

MR. PEPE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PEPE:

Q   Good afternoon, Mr. Rechen.

A   Good afternoon, Mr. Pepe.

Q   Let's find out a little bit about yourself.  You live in the area?  Are you married?  Have children?

A   Yes, I live in West Hartford.  I am married to my wife Amy. I have three grown children, all out of the house.

Q   Before you went to law school and became a lawyer, what was your undergraduate education?

A   So I attended the State University of New York at Buffalo. I started out in an engineering program, migrated over into political science, and obtained my Bachelor of Arts in political science.

Q   And following that degree, did you attend law school in the area?

A   I attended law school at the Boston University School of Law, graduated in 1988.

Q   And did you take the bar exam after that?

A   I did.

Q   And where in -- where were you admitted?

A   I was admitted here in the state of Connecticut and

admitted also to practice before this court.

Q   Did you enter private practice thereafter?

A   I did.

Q   And here in Hartford, Connecticut?

A   I did.  I went to a firm called Pepe & Hazard in 1988, and I was there for 20 years.

Q   And when you left Pepe & Hazard, how did you become employed?

A   I didn't --

Q   When you left Pepe & Hazard, where did you go?

A   Yes, I went to the firm that I'm at now.  That was in 2008 where I've been for the past 15 years, the law firm of McCarter & English LLP.

Q   When you were a lawyer at Pepe & Hazard, did you, as the years went on, concentrate your practice in any particular area?

A   Yes.  Um, when I started with the firm, um, I started in what was called the commercial litigation area.  Um, commercial litigation is essentially business litigation.  That was my focus then and now, although increasingly over the years I concentrated more heavily in the intellectual property area, including trademark litigation, trade secret litigation, and ultimately patent infringement litigation.  Although with respect to the patent infringement litigation, because I am not a patent-barred lawyer, I worked more closely with the patent

lawyers in our firm.  And that really didn't occur until I was at McCarter & English.

Q   Tell us a little bit about some of the cases you handled in your litigation practice, which you say concentrates in the area of intellectual property.  May I use that term?

A   Yes, yes.  So I mean, first, I do have a general business litigation practice:  contract claims between businesses, business disputes of all kinds, unfair trade practices claims tort claims, negligence claims.  And I've always handled cases in those areas, here in Connecticut and around the country.

In addition to that, I have been involved in many trade secret cases.  I've tried probably between 12 and 15 trade secret cases, whether either at a final trial on the merits or in a preliminary proceeding such as a preliminary injunction or temporary restraining order.  And I -- and I have been involved in patent infringement claims and have tried those claims as well.

I've also been involved in trademark claims, and I have tried one or two trademark cases as well over the course of my career.

Q   Okay.  You said you were admitted to the bar of the state of Connecticut.  Have you been admitted in any other courts besides the State of Connecticut Supreme Court?

A   So no other state courts, although I have practiced in state courts around the country on a visiting lawyer or what we

call a pro hac vice basis, where a local lawyer sponsors my admission for a particular case.  In addition to that, I am admitted to practice before the Second Circuit Court of Appeals, which is, as you heard Attorney Berman describe, is the circuit that covers this jurisdiction.  I'm admitted as well in the Ninth Circuit Court of Appeals.  I'm admitted in the Fifth Circuit Court of Appeals, the Federal Circuit Court of Appeals, where, as Attorney Giarratana described, a lot of patent infringement litigation goes when it goes on appeal, and I am also admitted to practice before the United States Supreme Court.

Q   In your years at the bar, have you been active in the organized bar?

A   Very much --

Q   State bar in --

A   Yes, very much so.

Q   Explain to us what your activities have been with respect to the organized bar.

A   So I am a member of the American Bar Association; and, as you heard a little while ago, I am a member of the Litigation Section of the American Bar Association, although it's fair to say that I am not all that involved outside of my membership and some of the periodical literature that the bar association publishes, which I read.

But I have been very significantly involved here in

our state bar association, the Connecticut Bar.  I am a past chair of the Litigation Section and for many years have been a member of the Executive Committee.  I am a member of the Executive Committee of the Federal Practice Section, which is the section that relates to practice before the federal courts in this state, in this jurisdiction, or this district, like this one.  And I am also a member of the Executive Committee of the Intellectual Property Practice Section, a member of the Executive Committee.

Q   And those were all sections or committees of the Connecticut State Bar Association.

A   That is correct.

Q   Okay.  Have you also been active in the Hartford County Bar Association?

A   I am.  So I've been involved in the Hartford County Bar Association for many years.  Of course, that's the most local of the bar associations.  Um, I'm a past president of the Hartford County Bar Association.  I was president in 2020 and 2021.  Um, and, um, and I continue to provide various services to the Hartford County Bar Association.

Q   Are you affiliated with or involved in the Connecticut Bar Foundation?  And if so, please explain that.

A   Yeah, so the Connecticut Bar Foundation, the James W. Cooper Connecticut Bar Foundation, is an organization that is by invitation, and I am a fellow of the Connecticut Bar

Foundation, yes.

Q   Is there an organization entitled Complex Commercial Litigation Institute?

A   Yeah, so that's a part of the Litigation Counsel of America.  So I'm also a fellow of the Litigation Counsel of America.

Q   Is that by invitation?

A   That is by invitation.  And a sub-group, of which I am a founding member, is the Complex Commercial Litigation Institute, and that is, again, a subset of the Litigation Counsel of America.

Q   And what is that organization's objectives or --

A   That organization's objective -- well, the Litigation Counsel of America organization's objective is to advance trial advocacy and trial skills and practice at a very high -- at a high level I would say.  And, um, and so fellows are invited, based upon peer recognition.  And so I was fortunate enough to be invited to join that organization, I don't know, probably 13 or 14 years ago.

The Complex Commercial Litigation Institute is, as its name suggests, a subset of the organization that really focuses on the trial and the trial skills associated with presenting business disputes.

Q   Before we leave the organized bar, you testified you were a member of the Connecticut Bar Association and served on various

sections and committees.  And I don't remember if you testified about your service on the Professionalism Committee.  Did I miss that, or did you not say it?

A    Well, I think I missed it.  So I have for a number of years served as a member of the Professionalism and Civility Committee and within that the Mentoring Committee, which involves --

Q    What's involved in the Mentoring Committee of the Professionalism Committee?

A    So what's involved there is the mentoring of young lawyers, um, providing role model example and teaching them, assisting them with respect to the various ethical issues that are encountered by lawyers in their day-to-day practice to make sure that we get young lawyers coming out of law school in the early years of their practice on the right path within the profession.  And that's the goal of that committee.

Q    Has your work there been limited to the lawyers in your own firm, or have you mentored and counseled lawyers outside your firm?

A    So both.  As a partner at McCarter & English and formerly at Pepe & Hazard, it was, of course, part of my practice in being a partner in the organization, I had a vested interest in making sure that the young lawyers we were bringing along were developing properly, developing their skills, and understanding the ethical rules that pertain to the practice of law.

But beyond that, as a member of the Mentoring Subcommittee of the Civility and Professionalism Committee, and also as a member of the Mentoring Committee of the Hartford County Bar Association, I have had the occasion to mentor many young lawyers outside of my firm in other firms.

Q   Getting back to peer recognition, you're familiar with an organization known as the American Board of Trial Advocates or ABOTA?

A   Yes.

Q   And you're a member of that organization?

A   Yes, I am.  Several years ago, I was invited to join the American Board of Trial Advocates.  That is, one of the requirements is a minimum number, a certain number, of jury trials, um, completed.  I met the criteria and was nominated by my peers to join the American Board of Trial Advocates, an organization again focused very much on the advancement of trial advocacy.

Q   Sir, you have been recognized by your peers with various awards and honors, have you not?

A   I have received --

Q   Let us hear about that.  Let us hear about that, please.

A   So most recently I received the Hartford County Bar Association's President's Award for Excellence.  That award, I believe, is intended to recognize excellence in the practice of law, service to the profession, and service to the community.

I've also received, through the Litigation Counsel of America, the Peter Public Service Award.

Q   You're familiar with the publication *Best Lawyers in America*?

A   I am.

Q   And are you recognized in that publication?

A   So, actually, there are several organizations that I've been fortunate enough to be recognized.  *Best Lawyers* is one, and I've been recognized in *Best Lawyers* for -- I don't know -- a number of years now.

Q   What categories or classifications?

A   In *Best Lawyers* I believe it is business litigation, intellectual property litigation, and real estate related litigation.  And I think it was two years ago I was Lawyer of The Year with respect to real estate related litigation.

I've also been recognized by an organization for many years called Super Lawyers, generally in the same field.  And I have been named for a number of years now as a leader in the field in commercial litigation by *Chambers USA*.

Q   What is *Chambers USA*?

A   *Chambers USA* is a publication, a national publication, generally regarded as referred to by businesses and general counsels in corporate organizations when they are looking for litigation -- well, counsel, and in my case litigation, business litigation counsel, in a particular jurisdiction.  So

if you went to *Chambers USA* and you went to the section on the state of Connecticut, you would find there that McCarter & English is named, certain partners, lawyers at McCarter & English are named as leaders in the field, and I am so named.

Q   And have you also, sir, shared your knowledge and experience by providing seminars or courses to other members of the bar?

A   Yes.

Q   Explain about that, if you would, please.

A   So continuing legal education is something that lawyers are required to participate in, in this state and in most jurisdictions, perhaps not all, but in most.

And continuing legal education programs are generally put on by experienced practitioners in a particular area of the law where they have that experience.  And so I have lectured and at times written in the area of trial advocacy, appellate advocacy, and with respect to various legal issues that come up in business litigation and in intellectual property litigation.

Q   Mr. Rechen, have you been active -- outside the legal profession and the organized bar, have you been active in the community?

A   Yes.

Q   And have you served -- have you rendered public service in the community?

A    Yes.

Q    Explain that, please.

A    So I serve on the boards of a number of nonprofits, including the Metropolitan -- The Greater Hartford YMCA.  I've also served as the chairman of the Public Defender Services Commission, a state commission, where I was appointed by the governor to lead that organization, which I did for about ten years.

I'm active in my church and on the various boards there and also involved in an organization, a private academy and science center, called the Talcott Mountain Science Center, which is based on Avon Mountain.

I'm also involved on the board and on the Executive Committee of the World Affairs Council of Connecticut.

Q    Thank you, sir.

Now may I direct your attention to your practice once again at McCarter & English and, more particularly, the years you have been there.  Have you had the opportunity to work for and represent Jarrow Formulas, Inc., separate and apart from the Kentucky litigation that brings us here?

A    Yes, absolutely.

Q    Prior to getting involved in the Kentucky litigation?

A    Yes.

Q    Could you explain to the jury what your involvement was on Jarrow Formulas' legal matters before, or separate and apart

from, the Kentucky litigation.

A   Yes.  So when I joined the firm in 2008, um, I immediately, almost immediately, was introduced to the client Jarrow Formulas, Inc., and to its chairman, Mr. Rogovin.

Q   Who brought about that introduction, sir?

A   Mark Giarratana and Eric Grondahl, both of whom had been working for Jarrow Formulas for quite some number of years before my arrival at McCarter & English.  So there was a litigation matter that Jarrow Formulas was sued by a company in connection with a trade, primarily a trademark and trade dress dispute.  And I immediately was involved in that and then had the opportunity to work on a number of other litigation matters, some of which related to trademarks, one of which -- two of which, I think, related to patents, and then as well two or three insurance coverage disputes as well.

Q   In the course of handling those legal matters, did you have the opportunity to come to know and work with Jarrow Rogovin?

A   Yes.

Q   Was he involved in all the cases you described you were handling for Jarrow Formulas, Inc., to one extent or another?

A   He was involved to a very significant extent in, to my recollection, every matter I was involved in.

Q   And is it fair to say that in some or most of those cases your colleagues on the case, or your teammates on the case, were Mr. Giarratana and Mr. Grondahl?

A   Yes, yes.  Mark Giarratana was certainly involved in every single one of the matters.  Eric, I think, was involved in -- I don't know if most of the matters is the right word but certainly a number of them.  And that was generally -- those were generally the lawyers I worked with.

Q   Now I'd like to take your testimony to the particulars of the Kentucky litigation.  But first I'm going to start with the -- what we've heard about in this case and is called the Ashurst litigation or the state court litigation.  Do you have that in mind?

A   I do.

Q   Which preceded the Caudill lawsuit in federal court in Kentucky; correct?

A   Yes.

Q   Did you have any involvement in, or responsibility for, the Ashurst state court litigation?

Very minimally.  I think my involvement there involved primarily consulting with Eric Grondahl from time to time.  I was aware that there were proceedings taking place in the Kentucky state court.  Mark and Eric, and I think for -- you know, in terms of appearing in court, Eric was primarily involved at that time.  And he would consult with me and keep me up to date generally on what was going on.

But outside of that, I had -- I had no hands-on involvement in that matter.

Q   Okay.  There's also been testimony here that when the federal court action was instituted by Caudill Seed, an issue arose as to insurance coverage that might fund the defense costs in that action.  You're familiar with that?

A   Yes, very much.

Q   Liberty Insurance was the insurer that originally provided coverage under a reservation of rights.  You're familiar with that?

A   Yes.

Q   Did you have any involvement in Liberty Mutual when it assumed the coverage or when it later denied coverage, either or both?

A   Both.  So, um, I was involved at the outset with Mark Giarratana in reviewing the policy, the insurance policy that had been issued by Liberty in favor of Jarrow Formulas, evaluating the coverage language and whether the federal litigation, as we have referred to it, or the Kentucky federal litigation, was -- involved claims that were covered by that policy.  I wrote the letters to Liberty advising them of Jarrow Formulas' claim for defense and indemnity and resulting, ultimately, in the coverage letter that we received, that Jarrow Formulas received, back from Liberty under a reservation of rights.

My involvement was then, um, minimal.  During the period that Mark Giarratana and Shawn Smith, our associate,

were involved in meeting Liberty's requirements, identifying our rates, identifying the lawyers, etc., I was not involved in that.

When Liberty then decided that they were going to deny defense and indemnity under their reservation of rights, I was involved again in reviewing the policy, reviewing the letter declining to provide defense and indemnity, and discussing that with the client.

Q   And with respect to the discussions with the client following the letter withdrawing coverage, were you involved with Jarrow Rogovin in the analysis of what, if anything, to do upon denial?

A   Yes.  I was involved in that discussion with Mr. Rogovin, and, um, he -- he concluded, I think for the most part on his own, but there was discussion with me related to, you know, how strong we thought our coverage position was or how strong we thought it wasn't.  And then he made the decision he did not want to pursue the matter further with Liberty.

Q   There's testimony here that while that insurance issue was raised and then concluded, the federal court litigation was ongoing.

A   Yes.

Q   Are you aware of that?

A   Yes.

Q   Were you then involved in the ongoing federal court

litigation which the evidence, I believe, shows started in January of 2013?

A    So I was aware that the litigation was filed in 2013.  I was aware of the claims that were made in the litigation at that time.  Like the Ashurst state court litigation, I really didn't have hands-on involvement.  I consulted with Attorneys Giarratana and Grondahl as necessary during that early part of the litigation, which really was from the filing of the lawsuit probably until August or September of 2014.  And then --

Q    If I can interrupt you --

A    I'm sorry.  Let me --

Q    Yup.

A    The lawsuit was brought in January of 2013.  So there's really maybe a year and a half that I did not have significant involvement.  It was sometime in August or September of 2014 that I became more significantly involved.

Q    And in that year or year and a half, did you understand who at McCarter was working on the case before -- before you got involved?  Did you know --

A    Yes.

Q    And what was your understanding of who was handling that federal court litigation before you got involved?

A    So it was primarily Attorney Mark Giarratana, Attorney Eric Grondahl, Attorney Shawn Smith.  There were other associates that were in and out of the case, I think, as needed in order

to supplement Shawn Smith and, you know, his role in the matter, and there were paralegals that were involved as well.

Q   All right.  So now I heard you say it was probably the middle of 2014 before you got involved.  Why?  Why then did you get involved in the case then pending in Louisville, Kentucky Federal Court?

A   So by the time I got involved, some of the other claims, indeed all of the other claims that you've heard about, the RICO claim, there was a Hobbs Act claim, there were a number -- there was a conversion claim, there were a number of other claims, those claims had been eliminated by the good work of Attorney Giarratana and Attorney Grondahl.

Q   But the case didn't go away.

A   It did not go away.  A trade secrets claim was asserted as all of those other claims were cleared, if you will, from the table.  And in mid/late 2014 there was a very significant period of discovery in the case.  And I got involved at the end of that period to help close out that initial phase of discovery.

Q   When you became more significantly involved, as you said, did you undertake to understand the status of the case, the claims still pending, and the underlying facts giving rise to those claims?

A   Absolutely.

Q   Tell us, please, what you learned then when you became

involved in the second half of 2014.

A    Yup.  So what I learned at that time -- first this was now a trade secrets case.  And, um, I was very interested in that. I had done a lot of work in the trade secret area in my -- in my -- in my past professional life.  So, um, you've heard about the so-called bad narrative that -- the horrible narrative, as Mr. Rogovin referred to it in certain of the e-mails.  I became familiar with that horrible narrative.

Q    What did you learn about that?

A    Well, what I learned was that in 2011, before Mr. Ashurst was hired as a consultant for Jarrow Formulas, he had been transmitting information that he should not have been transmitting to Jarrow Formulas, setting aside whether it was a trade secret or any of it was a trade secret.  Certain of it certainly was confidential.  Certain of it certainly was attorney-client privilege.  And, arguably, certain of it could be claimed as trade secret material.

And this information was being transferred by Mr. Ashurst to Jarrow Formulas before he was even hired.  And it continued during the period of his negotiations with Jarrow Formulas, resulting in his consulting agreement, and then it continued after he was hired.  And that was troubling enough, troubling evidence for us to have to contend with, but there was, together with that, no communication from Mr. Rogovin to Mr. Ashurst telling him to stop.  The information kept coming.

In addition to that, there was on at least one occasion a request by Mr. Rogovin for information, the customer list that Caudill Seed had been using. And so this horrible narrative really revolved around, at least initially, all of those facts. And then there were other facts and details related to the processes that Mr. Ashurst undertook once he was under the Jarrow Formulas' umbrella, and I learned more about that as time went on.

Q   Okay. We're going to get to that. When Mr. Ashurst was sending this confidential, proprietary information, what, if anything, did you learn about contractual restrictions on Kean Ashurst, that is, between Caudill Seed as the employer and Kean Ashurst as the employee? What, if anything, did you learn about any restrictions in that regard?

A   So I learned that there was a confidentiality agreement that Mr. Ashurst had with Caudill Seed. There was a secrecy agreement. One might wonder how that was any different from the confidentiality agreement. I don't think it really was, but he had a separate secrecy agreement. He had a non-compete with Caudill Seed. And he had a non-disclosure agreement requiring that he not disclose information and property of Caudill Seed to third parties.

Q   Confronted with that horrible narrative, did you, Mr. Giarratana, and Mr. Grondahl devise and develop a strategy to defend Jarrow Formulas in the face of that horrible narrative?

A    Yes.  Although I guess I would say that that -- the development of that strategy was very much underway by the time I got involved in the case.  Because I came into the case --

Q    I'm going to interrupt you.  You learned it was underway.

A    Yup.

Q    What, if anything, did you learn about Jarrow Rogovin's involvement in the development of that strategy, which was underway when you got into the case?

A    He was involved in every part of it.  Um, I think it's fair to say -- and this is not just true for the Caudill Seed litigation but for all the matters that I'm involved in -- Mr. Rogovin is very much a hands-on client, very much involved in every aspect of the case, very much involved in the development of the strategy.  And that was the case with respect to the Caudill Seed litigation.  He worked hand in hand with the lawyers, communicating regularly via e-mail and telephone, very lengthy telephone calls often, often several times a week, involved in the development of the strategy, understanding the facts, even understanding the legal theories that were involved and that governed the case.

Q    What did you learn, as you got involved, about the strategy that was already underway, and tell us what you -- whether you continued to participate in its development.  Do you understand the question?

A    I do.  I do.

Q    Please tell us.

A    Well, so you heard in Mr. Resser's examination of me a little bit about this concept of a morality play, and because of the horrible narrative, the morality play was a difficult part of the case for the defendant, for Jarrow Formulas.

We devised, Mark Giarratana and Eric Grondahl devised, a strategy, which I thought was a very viable strategy, to win the case or to defend the case at least on the grounds that what was claimed as trade secrets did not meet the legal definition of a trade secret.  So this was a trade secrets case.  Therefore, Jarrow -- or the plaintiff, Caudill Seed, needed to establish that what it alleged as its trade secrets, in fact, met that definition.

"Trade secret" I think is fairly defined as information, including a pattern or a device, which is not generally known and derives value from the fact that it is not generally known but is, nonetheless, useful and has value to others who may not have access to it.

And so --

Q    Wouldn't a patent be the same thing?

A    Well, a patent could be -- a patent could cover information that was at one time a trade secret, but I think as you heard Attorney Giarratana describe, there's a significant difference between patented information and trade secret information. Patented information you take your trade secret and you tell

the government and you enter into a contract with the government in return for a monopoly that prohibits anyone else from using it. And your monopoly is only good for that 20-year period. And then that technology is available for the world to use.

With respect to a trade secret, I mean a trade secret is -- is as good for as long as you can keep it secret. That could be one day. That could be a hundred years. And -- and there is no publication of it because to publish it, the way one would in a patent application, eliminates the trade secret. And so this was a trade secret case.

Caudill Seed claimed, ultimately, six trade secrets, as you saw on the jury verdict form. And with respect to those trade secrets, our goal was to show that those items did not qualify for the protection afforded under trade secret law. And if Caudill Seed couldn't prove that, then it couldn't win a trade secrets case.

Further, even if it qualified as a trade secret, they would need to show that it was misappropriated. That did present some challenges.

Misappropriation includes disclosure, use, and there's a third one, and it's escaping me at the moment. Acquisition. So improper acquisition, disclosure, or use.

Well, Jarrow Formulas clearly acquired it. The information was sent over, you know, through e-mail to --

Q    And there was nothing you could do about those facts?

A    There was nothing we could do about that.  We were going to lose that part of the case if that became a critical part of the case.  But we did, um, develop, I think, a very strong theory that it was never used.  And then we come to the question of damages, which was the third part of the strategy. If you think of the defense strategy as being the three legs of a stool, there's no trade secret, there's no misappropriation, at least in the sense that it wasn't used or disclosed by Jarrow Formulas, and the third leg was damages.

We felt that we could show that Caudill Seed could not prove that it suffered any harm, because there was no use by Jarrow Formulas.  And that became the essence of the tripartite strategy for defending the case.

Q    Subject to any polishing, tweaking, slight modifications, was that strategy, that you described was under development when you became involved and in which you -- on which you worked, was that the strategy you employed throughout the six years of the litigation or, in your case, four and a half years of litigation?

A    It was.

Q    With Mr. Rogovin's knowledge and consent?

A    Every step of the way.

Q    Was he, in fact, involved in the development of that strategy as you observed it?

A    Yes, he was.

Q    And did he approve that strategy?

A    Yes, he did.

Q    And did he remain involved in the implementation of that strategy over the next four and a half years of the litigation?

A    He did.  He was.

Q    Describe how closely.  You said he was closely involved, hands on.

A    I don't know that I've ever had another client as heavily involved in every aspect the way Mr. Rogovin was involved in this case, indeed in all of the matters that he was involved in.  So we had -- Mr. Rogovin consulted with us via over the telephone, lengthy telephone calls I've already referred to; e-mails, we received very lengthy e-mails from Mr. Rogovin on a regular basis.  And we would e-mail him, and there would be back-and-forth.  And it would be a very constructive dialogue, although it would be a very time-consuming dialogue, both as a result of the e-mail communications and the -- and the telephone communications.

     But more than that even, I mean, Mr. Rogovin was involved in -- he would edit and rewrite letters that we wrote. He would edit and rewrite the briefs and motions that we wrote. And we would have to review all of that, and some of it was extensive, and decide -- because ultimately as counsel, it is our job to determine the means of the representation.  Mr.

Rogovin, of course, had the right within certain boundaries to determine the goals of the representation, but in terms of the means of the representation, how we would communicate with the court, how we would communicate with the other side, that was for us as lawyers.

Mr. Rogovin always weighed in. We always took his thoughts, his wishes into account. And we incorporated as much of it as we could, in the manner that we thought was most appropriate and consistent with our own obligations, to the court and to the bar. And we proceeded on that basis. But Mr. Rogovin was very much involved.

MR. PEPE: Your Honor, may I move as a full exhibit the admission of PTX 275, to which there is no objection?

THE COURT: Okay, if there's no objection, that can be a full exhibit. It can be published.

MR. PEPE: Thank you, Your Honor. May I ask that --

(Plaintiff's Exhibit 275, received in evidence.)

Q   (By Mr. Pepe) I'm going to show you what we marked as PTX 275, Mr. Rechen. And if you can't see any part of it, you please ask me to blow it up. We're showing you the cover e-mail from Eva, who we know now is Mr. Rogovin's assistant.

A   Yes.

Q   And then if I go to the next page, can you see enough of that? It is not a very impressive copy, but can you see enough of that?

A   Yes, I can see it.  So this is a table of contents for a brief that was written by our firm, by -- probably by Mark Giarratana and myself and probably Eric Grondahl as well.  And you can see the handwriting there.

Q   Whose is that?

A   I believe that's Mr. Rogovin's.

Q   And I'm going to flip the page, if I may, and show you the next page and the page after that just so you can get an idea.

A   Yup, Mr. Rogovin.

Q   Mr. Rogovin's write-ups or comments?

A   Yes indeed.

Q   On the next page?

A   Yes, sir.  Same.

Q   And the next page?  Wasn't happy with that page, was he?

A   This is not -- so this page and the heavy editing of it is a good exemplar of, you know, the kind of involvement that Mr. Rogovin had.

Q   You said he would also make known his input in e-mails and phone calls; correct?

A   Absolutely.

        MR. PEPE:  May I move the full admission of PTX 287 to which there is no objection?

        THE COURT:  Yes, you may.  That will be full.  287 is full.

    (Plaintiff's Exhibit 287, received in evidence.)

Q    (By Mr. Pepe) This you can see, Mr. Rechen, is an e-mail from Mr. Rogovin.  You see his e-mail address in the upper left-hand corner?

A    I do.

Q    To you and the other members of the team, as well as to his own staff; correct?

A    Well, so the e-mail in the far upper left is to Dallas Clouatre, a consultant, and to Eric Grondahl.  But the e-mail below that is directed to me and Mark Giarratana and Eric Grondahl.

Q    Can you tell from that -- the subject matter you say, "Most recent draft of Motion to Compel."  Do you see that?

A    I do.

Q    Can you tell us what's happening there and -- as you understood this e-mail from Mr. Rogovin.

A    So this is late 2016.

Q    We're three years, almost four years into the litigation?

A    So this is almost four years into the litigation.

Q    Okay.

A    And what's going on here and perhaps -- and perhaps you'll ask me about this.  But at this point we were in what I would refer to as the -- really the third phase of the case.  And this motion to compel was directed to getting from Caudill Seed, through an order of the court, the research and development information and related economic information that

Caudill Seed was claiming as its trade secrets and its damages.

Q   And what is the -- what is the, as you understood it, the objective, the purpose of Mr. Rogovin's e-mail on that subject?

A   Well, I'd have to --

Q   Yeah, take a moment to look at it.  Is he, in fact, commenting on your motion to compel?

A   It looks like that's exactly what he is doing, yes, yes.

Q   So he would get -- and I'll go to the next page to show you, if I could, Mr. Wyzik.

     Continued comments on your motion?

A   Yes.

Q   And is that also an example of what you described as very, very significant involvement in the day-to-day development of the case?

A   Yeah, this e-mail, again like the handwritten edits we saw earlier, this is a good example of Mr. Rogovin's heavy and routine involvement in the work that we were doing on behalf of Jarrow Formulas.

Q   You've been in the courtroom for some of the time of this trial, Mr. Rechen.

A   I think I've been here with the exception of yesterday morning before the break and either the day before that or two days before that.  Again, I missed the morning session before

the break.  Other than that, I've been here throughout.

Q   You heard testimony of the very strong reaction Mr. Rogovin had to the suit brought by Caudill Seed.

A   Yes.

Q   And you've heard testimony how he took it very personally, was affronted, outraged, and so on; correct?

A   Yes.

Q   Was that consistent with what you observed when you became involved in this case in the second half of 2014?

A   Yes.  Mr. Rogovin -- I mean, he was offended by the claims as they were originally drafted and brought.

Q   But you were successful in knocking those out, including the RICO count.

A   Well, I won't take credit for that.

Q   No, when I meant "you" --

A   McCarter & English.

Q   McCarter & English knocked those out.

A   Yes.

Q   Did that assuage his anger?

A   It really did not.  I mean the RICO claim really truly offended him, but the continuation of the lawsuit under the guise or the claim of trade secrets violations did not have the effect of diminishing his hostility and his anger over the fact that his company was being sued and that it was incurring the costs of defending the suit.

Q    Did he make that known to you and others involved in the litigation on a regular basis?

A    That was never lost on us.

Q    Did that anger, frustration extend to just Caudill Seed or to any others -- parties on the other side?

A    It extended to everyone that was involved in the litigation, really without regard to their role.  So, for example, um, he felt -- he was very angry at, of course, Caudill Seed, the plaintiff.  It extended to Dan Caudill, the principal owner.  It extended to every single one of the lawyers.  And there were -- there were three different firms that had been involved at different points in time.  You've heard of Steve Pence and his firm, followed by Frost Brown and Todd, and the -- Tom O'Brien and Corey Skolnick and Tommy Gleason, who were involved at that firm, and then ultimately Bingham Greenebaum Doll, Ben Lewis, Mr. Grundy.  Mr. Rogovin had disdain for every single one of them in the roles that they played.

        And then it ultimately also extended to the court, not initially, because initially the case was presided over by a Judge Heyburn in Kentucky.  And Judge Heyburn passed midway -- in August, right around August of 2014, as I recall, maybe a little -- maybe a little bit after that.  But in any event, Judge Heyburn passed away.  Mr. Rogovin did not have any ill feelings towards Judge Heyburn.  In fact, I think he very much

liked Judge Heyburn, based on Judge Heyburn's granting of the various motions that resulted in the dismissal of all of those other claims.

But then Judge Simpson came into the case. And Judge Simpson came into the case, and really his first act of involvement was ruling on a motion for summary judgment that we had filed and that Caudill Seed had filed against Jarrow Formulas in January of 2015. And that ruling and some of the language in that ruling really set Mr. Rogovin off. And that resulted in the unfortunate language that you see in a lot of the e-mails regarding his descriptions and characterizations of Judge Simpson.

MR. PEPE: May I move the admission, Your Honor, of PTX 156, to which there is no objection.

THE COURT: Yes, you may. That will be full. 156 is full.

(Plaintiff's Exhibit 156, received in evidence.)

Q   (By Mr. Pepe) This is an e-mail by Jarrow Rogovin on March of 2017. So we're about three and a half years into the litigation?

A   Yes.

Q   And --

A   Four and a half. Four.

MR. PEPE: I'm going to ask Mr. Wyzik to call out the first -- the second paragraph, beginning with "The pieces."

Can you do that Mr. Wyzik?

Q   (By Mr. Pepe) "FBT" was the Frost Brown Taylor law firm?

A   Frost Brown Todd, yes.

Q   I'm sorry.  All right.  That was -- is that typical of his -- question withdrawn.

Does that fairly express his attitude towards Caudill's lawyers, as you came to hear it time and time again over the course of the litigation?

A   Yes.

Q   Second paragraph, can you call that out, please?  It begins "As I told you."

He says in this second -- well, the second paragraph he speaks to Caudill.

A   Yes.

Q   Ends up saying, "Caudill" -- in the third sentence -- "Caudill is sick psycho, screwed."  Is that typical of his -- does that fairly reflect the attitude he had towards Caudill during the course of this litigation?

A   We saw these kinds of communications fairly regularly.

Q   And then I'd ask Mr. Wyzik to blow up, call out the second paragraph from the bottom, begins "The system."

Did, in fact, his anger and frustration ultimately become focused on the entire legal system?

A   Yes.

Q   And is that paragraph there, "The system is totally broken"

and so on, is that a fair indication of his attitude towards the system as the case developed? And by "system" -- question withdrawn.

What did you understand "the system" to be as he used it in this e-mail?

A   Well, I think he took a dim view, to put it kindly, as to the entire judicial system in this country. Um, his company had faced a number of lawsuits over the years. And I don't mean to suggest, by the way, that they were justified. I think a lot of them were not. But with respect to -- but it spilled over, of course, into this lawsuit too. And, um, you see here the kind of communication we would receive from him where the Caudill lawsuit would spur his communication. The communication would refer to more than just his experience in the Caudill lawsuit. So when he says the system is totally broken, he's referring about the judicial system at large.

Q   Who -- was there an attorney representing Caudill on the Caudill legal team by the name of Attorney Skolnick?

A   Corey Skolnick. Corey Skolnick?

Q   Was there such an attorney?

A   Yes.

Q   And was he involved in the representation of Caudill against -- against the McCarter team?

A   He was at the Frost Brown Todd law firm. And, in fact, yes, he represented Caudill Seed. And he, in fact, took Mr.

Rogovin's deposition.

MR. PEPE:  Can I ask Mr. Wyzik to blow up the last paragraph in this PTX 156, first page, which runs over to the second page.  But may I get the part that's on the first page now, Mr. Wyzik, if I may?

THE WITNESS:  So that first paragraph there is directed at --

Q   (By Mr. Pepe) Is the Skolnick he's referring to there the Attorney Corey Skolnick you said represented Caudill and took Mr. Rogovin's deposition?

A   Yes.

Q   Is that, again, illustrative, indicative, of the animosity he felt and expressed for the lawyers?

A   I would say so, yes.

Q   All right.  There's many, many, many e-mails like this addressing what you -- what you just described as this anger and frustration; correct?  Many.  Many such e-mails?

A   Yes.

Q   I think I'm going to stop right here but ask you this question, without going through anymore:  Did that attitude, as expressed in the e-mails we've seen here or previously in this litigation, did that enter into your thinking -- by yours, now I mean the trial team's thinking, including you, did that enter into your thinking in terms of using Mr. Rogovin as a witness at the trial, if there was to be a trial, and his preparation

for that?

A   It had to, and it did.

Q   And I'm going to come back to that and ask you to explain that.  Okay?

Did you, when you came into the case, as part of coming up to speed, if I can use that term, become aware of the damage claims being made in the lawsuit by Caudill before or after the other claims were being excluded?

Let me make it -- that was a very inartful question. Let me make it more specific.

Did you become aware of the damage claims being made in the suit, after those other claims had been eliminated by McCarter before you got involved in the case when there was -- when you got involved, only the unfair trade secrets case, did you become aware of the damages being claimed?

A   Yes.

Q   And what were the damages being claimed by Caudill?

A   So they were -- as I recall, they were -- at that time, they had two primary categories of damages that they were seeking.

Q   And I'm talking about just the prayer for relief damages, that is, the total.

A   Oh, I see.  Yeah, they were claiming $12 million; plus they were claiming the right to treble that and obtain attorney's fees through a finding of willful and malicious

misappropriation of Caudill's trade secrets.

Q   There's been testimony here that the claim, the remaining claim of the lawsuit, was governed by the Kentucky Uniform Trade Secrets Act.  Were you here to hear that testimony?

A   Yes.

Q   Are you familiar with something called the Uniform Trade Secrets Act?

A   Yes.

Q   Had you known about it and worked with it before this case?

A   Yes, I had.  The Uniform Trade Secrets Act, I think as of today, is probably adopted by, um, 48 of the 50 states in the United States.  And there now exists something called the Defend Trade Secrets Act, which is a federal enactment that in many ways mirrors the Uniform Trade Secrets Act.

So I was familiar with the Uniform Trade Secrets Act because it's been adopted here in Connecticut, and I've litigated many cases here in Connecticut under Connecticut's adoption of the Uniform Trade Secrets Act.  The Kentucky Uniform Trade Secrets Act had some minor variations from the Connecticut version.  But I was very much familiar with it because it is a -- what we call a uniform, a uniform law.

Q   Did your testimony just a moment ago about trebling damages and attorney's fees, do you remember that?

A   Yes, I do.

Q   Is that related to the Uniform Trade Secrets Act or is it a

result of?

A    Yes.

Q    Can you explain that?

A    That is a provision within the Uniform Trade Secrets Act that allows, on the finding of willful or malicious misappropriation for damages to be trebled would be the ceiling.  So the -- in Kentucky, whether it's the judge or the jury, in this case it was the judge, can award punitive damages up to and including trebling.

Q    At the beginning of the litigation, did you or other members of the McCarter team make Mr. Rogovin available -- excuse me -- aware of that exposure, what the damages could be, as you said, a claim of 12 -- and I understand it was just a claim -- of 12 million but could be trebled and could be attorney's fees?

A    Yes.

Q    In the face of the horrible narrative you described and the exposure created by the damages claimed by Caudill that could be trebled, did that combination induce Mr. Rogovin to seek a settlement of the case?

A    Never.

Q    Never.

       What was his attitude regarding settlement?

       MR. RESSER:  Objection, Your Honor.

       THE COURT:  Well, I'll sustain that.  You can lay a

foundation potentially.

Q   (By Mr. Pepe) Did you have discussions from time to time with Mr. Rogovin concerning settlement of the case?

A   Yes.

Q   Okay.  Let me direct your attention, if I may, to a particular such discussion in November of 2018.  Do you have that in mind?

A   I do.

Q   Was there -- was there a series of events in November of 2018 that forced you and your client, Jarrow Formulas, and particularly Jarrow Rogovin, to consider settlement?

A   Yes.

Q   Please explain that series of events in November of 2018.

A   So in late 2018, Caudill Seed was pushing petitioning the court to set a trial date.  The judge, Judge Simpson, set a status conference down in Louisville, Kentucky, for November 8. This was the first time that we actually met Judge Simpson and physically appeared before him.  Everything prior to that time was on the -- on the papers.  We filed motions; he decided them.

       Mark Giarratana and I attended the status conference. At that status conference, the judge engaged the lawyers in a discussion on several topics, including the scheduling of the trial, which was scheduled shortly thereafter.  And in that discussion he asked -- and, in fact, he advised the lawyers --

that experienced counsel such as were involved in the case ought to be talking to their clients seriously about settlement. He advised if there had been recent settlement discussions.

There had not in quite some time. The last settlement discussion that had taken place took place at a mediation, I believe in April of 2016, before Magistrate Judge Lindsay, who presided over a mediation.

When Judge Simpson heard that and heard that there had been no discussions, he informed the parties that he wanted them, the lawyers, to discuss, between and amongst themselves, whether there would be any opportunity to settle the case and to report back to the court by November 30th. November 30th was after the Thanksgiving holiday.

Q   Did you -- excuse me, if I may. Did you undertake to comply with Judge Simpson's directives?

A   We did. And as it happened, I became aware that Judge Simpson was trying another trade secrets case before a jury the week after immediately following Thanksgiving. So Sunday of Thanksgiving week I got on a plane and flew to Louisville to observe what was happening in that courtroom, how Judge Simpson ran his courtroom.

Q   Do you do that from time to time, Mr. Rechen, in your trial practice?

A   Depending -- whenever I'm going to a jurisdiction I haven't

tried a case in before or before a judge, even in Connecticut, that I'm not familiar with how he or she may run their courtroom, I commonly do that.

Q   Go ahead.

A   In this particular case, I'm going to another jurisdiction, a judge that I just met for the first time a couple of weeks earlier.  And I want to get an idea -- he's trying a jury case that is going to be very similar to the one I expect to be trying.  And I want to see how it goes, not that I was going to sit through the whole trial.

So I arrive Sunday night.  Monday, Tuesday, and Wednesday I'm in his courtroom sitting in the back observing.  And Ben Lewis walks in.

Q   Who is Ben Lewis?

A   Opposing counsel for Caudill Seed.  He's right down the street, but he's coming in for the same reason that I flew in, and that's to watch Judge Simpson try a trade secrets case in front of a jury.

Ben and I had a conversation, as we were obligated to do as a result of Judge Simpson's November 8 order.  And, um, that conversation concerned, among other things, what we might, might not, be able to do in order to settle the case, whether there would be any opportunity to settle the case.  There were several telephone conversations while I was in Louisville.

Q   Between you and Ben Lewis?

A    Between me and Ben Lewis and between me and Attorney Giarratana and one or two with Mr. Rogovin as well.

THE COURT:  Mr. Rechen, I'll stop you there.  We've reached the end of our trial day.  We can pick this up tomorrow.

Ladies and Gentlemen, thank you for your attention today.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that. Thanks again, and you can go to the jury room at this time.

(The jury left the courtroom at 3:30 p.m.)

THE COURT:  Anything else we need to discuss today? Sorry, yes, doors closed.  Anything else we need to discuss today, Counsel?

MR. PEPE:  Nothing from the plaintiff.

MR. BUDINETZ:  Your Honor.

MR. PEPE:  There is one that will come up tomorrow, Your Honor.  We should foreshadow it?

THE COURT:  Yeah, let's foreshadow it.

MR. BUDINETZ:  By way of foreshadowing, Your Honor, it relates to PTX 162.  This is one of our exhibits that Your Honor ruled on because there was an objection.  Your Honor sustained the objection under 403 noting that -- and 162, I should mention, it's the mock cross-examination that was conducted in December 2018, so before trial.  And it was conducted by Attorney Rechen, where Attorney Rechen pretended

to be lawyer for Caudill Seed and he cross-examined Mr. Rogovin. It was videotaped. It's a little more than four hours in length.

THE COURT: Yeah.

MR. BUDINETZ: Your Honor --

THE COURT: That's why I ruled the way I did.

MR. BUDINETZ: Quite appropriately. We propose to show the jury, for purposes of establishing that this was -- I think the testimony will be that this was an important factor that Attorney Rechen considered in what could happen with putting Mr. Rogovin on live, we have it down to 26 minutes. Your Honor gave the other side an opportunity to designate, and I didn't now how Your Honor wanted to proceed.

THE COURT: So I -- it's funny you should say this because I've got my original notes from when I ruled on the objection before we started the trial. I wrote, "403. How long is it? Would allow five, ten, or maybe a few more minutes."

So that's what I wrote in my notes. So I think your instinct was correct. 26 minutes though? Has the other side been shown the 26 minutes?

MR. BUDINETZ: So we -- we sent over our designations last night and also a -- later in the evening, ten o'clock at night, the actual text of what we were proposing to.

THE COURT: All right. So let's -- I do think --

Yes, sir. Would you like to address me? What's your name?

MR. WARD: Michael Ward, Your Honor, may it please the Court. I'll take it in reverse order. With respect to the disclosure, I acknowledge around 8:00 p.m. last night we did receive what purports to be a 26-minute section of clip. The actual exhibit that was disclosed to us as PTX 162 is actually the wrong trial clip that they're referring to.

THE COURT: So it's not the clip --

MR. WARD: I think it's actually PTX 163. So once we figured that out during the pendency of today's proceedings, we'll take a look at it, I guess. But I will raise -- I'm sorry, Your Honor.

THE COURT: No. Well, actually I don't mean to interrupt you. But while we're on that topic, I note that, so as I understand it, the edited mock video, Jarrow Rogovin, January 8, 2019 -- sorry, sorry. There's a total of, as I understand it, five exhibits related to these mock videos, 162 through 166. And some -- they involve different dates. And let me ask -- I'm sorry. Is it Mr. Case; is that right?

MR. BUDINETZ: Mr. Budinetz.

THE COURT: Mr. Budinetz, I'm sorry. So which one is the one that you've got down to 26 minutes?

MR. BUDINETZ: Right. So it's 162.

THE COURT: Yes.

MR. BUDINETZ: And it's the only one of these that we currently intend to offer. It was conducted in December of 2018.

THE COURT: All right. So go ahead, Mr. Ward.

MR. WARD: Sure. So putting aside the disclosure and the designation issue, but we also object to this exhibit, Your Honor, for the -- on the same grounds that plaintiff's counsel objected to the showing of Mr. Lyons yesterday, that being that it is essentially testimony, first of all, per Your Honor's direction from a witness who is here live, has testified, will testify further. The jury is fully capable of assessing his credibility and his ability or inability, from whatever side of the v. you sit on, in terms of serving as a witness in the Caudill trial.

THE COURT: Well, let me stop you for a moment. I don't know much about Mr. Lyons. My understanding, I had a vague understanding he worked for Caudill Seed; is that right?

MR. WARD: Yes, Your Honor.

THE COURT: I don't know the designation had to do with testimony he gave either in a trial or in a deposition in the Kentucky federal litigation. Is that true?

MR. WARD: Yes, Your Honor.

THE COURT: I don't know really what the purpose of that was. I agree with you, I think you accurately described what I ruled for.

I guess I view this as a little bit different. First of all, it's plainly pertinent. Secondly, they -- they wanted to show originally the whole video. Now -- and they didn't designate anything. They just -- meaning they didn't designate portions. They just showed the whole video. It's not testimony really. I mean it isn't testimony. It's mock trial. I don't even know if the witness --

MR. WARD: Well, he -- I'm sorry, Your Honor.

THE COURT: Was he placed under oath? Probably not.

MR. WARD: He's pretending to testify.

THE COURT: I get it. But that's not testimony, strictly speaking.

MR. WARD: Understood.

THE COURT: So that's a couple things. It's plainly relevant to the decision whether or not to call him. Would you agree with that?

MR. WARD: I -- I think it can be -- it can serve a purpose related to that, Your Honor, but if I may.

THE COURT: Yes.

MR. WARD: Bringing in two jury consultants that, you know, in themselves are going to offer cumulative testimony, but putting that aside --

THE COURT: That's why -- I hear you on that. I don't want it to be cumulative. I hear you. It's a fair point. That's why I want it short. 26 is a little longer than I would

like, but I don't know what's there.  But go ahead.  What else do you want to say?  I keep cutting you off.

MR. WARD:  So I take Your Honor's point on it goes through the -- you know, is it relevant to the idea of him testifying?  Your Honor, he's -- Mr. Rogovin has sat up there for hours, and he's going to sit up there for more hours.

THE COURT:  Yes, he will.

MR. WARD:  So I think the jury is fully capable, within the space of five feet, to assess his credibility and his ability or inability as a witness, as opposed to seeing another 26 minutes --

THE COURT:  Right.  But to be fair -- I hear you, Mr. Ward.  But to be fair, what they can't do is see the -- what was known to or made available to McCarter at the time up -- leading up to the time it made its decision.  Certainly the fact of Mr. Rogovin's testimony is something, likely, the jury's going to consider.  No doubt about that, in deciding -- I mean I'm not going to instruct them on this, but I think it's natural that they would think about, Gee, well, he seemed like -- for example, he seemed like a pretty good witness to me, for example, they might conclude, which will certainly help you in this case.

But McCarter didn't see his testimony in this case when it made the decision whether or not to call him.  I presume there's going to be some foundation that would show,

Yes, we saw his testimony before the mock jury, and that was one of the considerations in our decision not to call him.

So it strikes me that the two stand on somewhat different footing in terms of their relevance to McCarter's decision. But go ahead. What else did you want to tell me?

MR. WARD: No, and just as a final point, Your Honor, with respect to the Court's timing and deadlines for disclosing this type of testimony, I mean we are -- you know, we're in trial now. It's past the eve of trial.

THE COURT: But, again, I guess I differ from you on the notion that it's testimony. So -- so your objection is, in stating the objection, other than to show -- in other words, the objections were supposed to be stated back in the JTM too. You didn't make that objection, which I think was appropriate because it's not testimony. You made the following objection: Other than to show the fact that exercise of mock video was undertaken, lacks probative value.

Now, I haven't seen the video yet. But it strikes me that if there's some foundation that would show, yeah, we looked at the video and we think that that was one of the bases for our decision, well, then it doesn't lack probative value. One can debate how much probative value it has, but it doesn't lack probative value. So I don't think that objection is well taken. But go ahead. What else?

MR. WARD: That's it, Your Honor.

THE COURT: All right. So let me -- let's do this: Let's have you take a look at the portions -- because I don't want them to cherry pick. That's why I'm giving you this opportunity. I want to give you an opportunity to show no more than 26 minutes of your own. Frankly, 52 minutes is a lot more than I want of this. I mean, I don't want to micromanage this too much. If you folks decide the jury needs to see 52 minutes, then we'll all get our popcorn and watch Mr. Rogovin testify for 52 minutes.

I would urge you not to do that. But I want to be fair. If you say, hey -- you know, it can be a negotiation, okay, back and forth. If we can get it down to 30 minutes total, this would be good. I'd like the case to keep moving. I think it's moving pretty well, but I do understand -- I'm not trying to cut off anybody's case.

So here's what I'm telling you to do: Take a look at their designations. Discuss it back and forth. See if you can narrow the whole thing some more. And tell me what you've got in the morning.

MR. WARD: Your Honor, just with respect to that last point.

THE COURT: Yes.

MR. WARD: Understood, and we will cooperate. But the tape is four hours long. I mean, now I have to watch a four hour -- I'm sorry. This is disclosed to us last night at eight

o'clock.

THE COURT: Okay. But has somebody watched it before in your team?

MR. WARD: Like a long time ago, yes, Your Honor.

THE COURT: Okay. Well, I mean it wasn't really a surprise, though, that they were going to try to get this in; right? I mean it was on the exhibit list for some time. In fact, it was apparently, according to this, it was a PJR exhibit. Was it played at the PJR hearing? Poor Judge Merriam.

MR. BUDINETZ: It was marked and not played.

THE COURT: Good.

MR. BUDINETZ: Part of the reason is -- part of the reason that this came up now is it was when Attorney Rechen -- he was called in their case as opposed to ours. So we had to react to that situation. And, again, it's not being offered for the truth of the matter --

THE COURT: No, I know that. Okay. All right. Look --

MR. WARD: I suspect we're going to hear from Celeste and Danny O'Keefe and they're going to pull out mock jury reports that are the reactions to this video from the mock jury --

THE COURT: Okay, okay, folks, folks, we're going to do what I said we're going to do. That's how it's going to be

handled.  So, everybody clear on what my instructions are?

MR. WARD:  Yes, Your Honor.

THE COURT:  We'll be in recess.

(Proceedings concluded at 3:42 p.m.)

# **I N D E X**

**WITNESS NAME**                                                    **Page**

Michael P. Berman

   Continued Cross By Mr. Pepe................................ 1093

   Redirect By Mr. Resser...................................... 1154

   Recross By Mr. Pepe ......................................... 1180


Thomas Rechen

   Direct By Mr. Resser ........................................ 1182

   Cross By Mr. Pepe............................................ 1261

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937