UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                    No. 3:19-CV-1124 (MPS)
McCARTER & ENGLISH, LLP
                                    JULY 14, 2023
vs.
                                    8:52 A.M.
JARROW FORMULAS, INC.
                                    JURY TRIAL
- - - - - - - - - - - - - - - - x


Volume VIII, pages 1313 - 1523


450 Main Street
Hartford, Connecticut


BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN


COURT REPORTER:   Julie L. Monette, RDR, CRR, CRC
                          (860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

    McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
        One State Street, 14th Floor
        Hartford, Connecticut 06103
    BY:  LOUIS R. PEPE, ESQUIRE
        JAMES G. GREEN, JR., ESQUIRE
        JAMES A. BUDINETZ, ESQUIRE
        DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

    BARTON LLP
        100 Wilshire Boulevard, Suite 1300
        Santa Monica, California 90401
    BY:  BERNARD M. RESSER, ESQUIRE

    BARTON LLP
        711 Third Avenue, 14th Floor
        New York, New York 10017
    BY:  JAMES E. HEAVEY, ESQUIRE
    BY:  MICHAEL C. WARD, ESQUIRE

(Call to order, 8:52 A.M.)

THE COURT: All right. A couple things: One, at the end of today we're going to have a discussion about timing, and I'd like to kind of drill down a little bit more on how much time we think -- how much more time is necessary to present the case, present the evidence in the case, because I think I have an idea, but I want to make sure that you folks are on the same page. And we'll obviously know better at the end of today than we know now.

I also at the end of the day want to have a discussion about some legal issues. So we're working hard on the charge, but there are a couple areas that would warrant -- would benefit from discussion with counsel. So that's, obviously, at the end of the day.

Is there -- I understand there was an issue with the video clips. Have we sorted those out? I think those can be marked for ID, but they have to be just the clips that were used for impeachment, just those clips.

MR. WARD: Yes, Your Honor, so we've come up about --

MR. RESSER: He's talking about my question of the video deposition.

THE COURT: Yes. Now we'll get to you. You can report in, Mr. Ward.

MR. WARD: So we've looked at what they submitted. We counter-designated, if you will, 12 minutes of clips.

THE COURT: All right. So what's the total?

MR. BUDINETZ: So, Your Honor, we cut a little bit last night. We have 23 minutes and 43 seconds. They have 12 minutes and some seconds.

THE COURT: We have 35 minutes or so? All right. Let's do it. Thank you.

MR. RESSER: Your Honor, one other matter. When I was showing Mr. Rechen paragraph 29 of his affidavit, I wanted to show that to the jury. It was part of Exhibit 577. And I then very quickly moved for admission of the entire document. I realize now it's a very lengthy document that includes all the jury instructions in the Kentucky case and so on. I don't think we want to burden the jury with another hundred pages of material. So would it be all right if I withdrew Exhibit 577 entirely or, to the extent the Court would allow it, to submit only the portion, paragraph 29, that was shown to the jury?

THE COURT: What's your view, Mr. Pepe?

MR. PEPE: I don't have in mind what that is, Your Honor, but I don't see any objection to that. It seems to me that would be --

THE COURT: To which proposal, the withdrawal or to the just showing the paragraph 29?

MR. PEPE: If I understood the proffer, it was to withdraw the exhibit that's now in and put into just one part of it.

MR. RESSER:  Yes.

THE COURT:  Okay.  You can do that then.

MR. RESSER:  Okay.  Thank you, Your Honor.

THE COURT:  Okay, great.  Are they here?

THE CLERK:  They're always here.

THE COURT:  They're a good jury.  Let's get them. Let's not disappoint.

(The jury entered the courtroom at 8:56 a.m.)

THE COURT:  And, Mr. Pepe, whenever you're ready, you may continue with Mr. Rechen's examination.

MR. PEPE:  Thank you, Your Honor.


T H O M A S   R E C H E N,

resumed the stand and testified under oath as follows:

CONTINUED CROSS-EXAMINATION

BY MR. PEPE:

Q   Good morning, Mr. Rechen.

A   Good morning, Mr. Pepe.

Q   When we adjourned yesterday afternoon, you were testifying with respect to a particular effort to settle the Kentucky litigation in November of 2018.  Do you have that in mind?

A   I do.

Q   And you described to the Court and the jury the directive by Judge Simpson for counsel, experienced counsel, to make an effort to settle the case; correct?

A    Yes.

Q    Would you pick up with your testimony at that point and explain -- I think you started to explain the steps that you took to -- to satisfy Judge Simpson's directive to make an effort to settle.

A    Yes.

Q    And I think you said part of that involved going down -- or I think part of it came about as a result of your trip to Louisville, Kentucky, to observe Judge Simpson in a trial; is that correct?

A    That is correct.

Q    Pick up there, please, and explain what happened.

A    Immediately after Thanksgiving, it was actually Sunday of Thanksgiving weekend, I flew to Louisville in order to observe the trial of a trade secrets case in Judge Simpson's courtroom.

While I was there, it turned out opposing counsel had a similar thought in mind, that as long as there's a trade secrets case being tried, he ought to step in and see how Judge Simpson runs the case.  He was surprised to see me there and as I was a little surprised to see him.

In any event, we discussed our upcoming trade secrets case, having in mind the directive from Judge Simpson from the November 8 status conference that we should at least explore whether a trial could be avoided and a settlement reached.

Attorney Lewis and I had a conversation either in or

immediately outside the courtroom. We had a couple of telephone calls as well while I was in Louisville in the evening of -- it was either Monday, Tuesday, or Wednesday or even all three of those days. I had conversations then with my partner, Mark Giarratana, relaying to him; and then ultimately I had a conversation, telephone conversation, with Mr. Rogovin.

Q   Let me stop you there, sir. Were those conversations -- did those conversations you just described with Attorney Ben Lewis -- who I understand represented Caudill Seed in the Kentucky litigation; correct?

A   Yes.

Q   Did those conversations you just described over several days in Louisville address the issue of possible settlement of the Kentucky litigation?

A   They did.

Q   Did your discussions with your partner, Mr. Giarratana, in fact include those discussions and further discussions concerning settlement?

A   They did.

Q   You just testified you then had a conversation with Mr. Rogovin?

A   Yes.

Q   Where were you and where was he when this conversation took place?

A   So I was -- I believe I was -- I was either in Louisville -- I may have been back in Hartford by that point. But I believe I had a conversation with him while we were in Louisville.  And I think I may have had a second conversation when I returned to Hartford on the 30th of November.

Q   Did those conversations you had with Mr. Rogovin relate to the settlement efforts Judge Simpson had directed in your conversations in that regard with Attorney Lewis?

A   Well, he was already aware as a result of earlier conversations about Judge Simpson's directive.  So those conversations were focused most especially on my meeting and telephone conversations with Attorney Lewis.

Q   Tell us what you said and Mr. Rogovin said to the best of your recollection in those telephone conversations that you had following your discussions with Attorney Lewis and your partner, Mr. Giarratana.

A   So, first, in my conversation with Attorney Lewis, I asked him what it would take, from his perspective, in order for his client to settle the matter.  Um, he did not give me a specific number, but he did signal to me a range that he thought his client would find acceptable.

Um, I reported to Mr. Rogovin that I thought it was going to take about a million dollars, maybe a little bit more, in order to resolve the matter.

Q   And what was Mr. Rogovin's response to that?

A    Mr. Rogovin was uninterested in it.  Mr. Rogovin demanded a sit-down, a face-to-face sit-down with Dan Caudill where he would explain to Mr. Caudill all that was wrong with Caudill Seed's case, and what he wanted was a walk-away by both parties with Jarrow Formulas foregoing, giving up, its right to pursue Caudill Seed for attorney's fees and costs incurred in defending the claim, which Mr. Rogovin regarded as frivolous.

Q    What, if anything, did you say in response to that?

A    Well, I mean, that was Mr. Rogovin's position.  Um, it was communicated very clearly.  And so I told Mr. Rogovin that we would report that back to Mr. Lewis, and so I did.

Q    And promptly after that phone call?

A    Quite promptly.  I called Ben Lewis, and I told him that we did not -- a million dollars or more or the signal, the range that he had signaled, was not in the cards.  It was -- Jarrow Formulas would not be paying any money in settlement of the claims, but Mr. Rogovin wanted a sit-down with Mr. Caudill to discuss the matter further.  And Ben Lewis indicated that that was not going to happen.

Q    Was that the end of that settlement discussion?

A    That was the end of that discussion.  Then I believe we got an e-mail from Mr. Rogovin.  Mark Giarratana and I, and probably Eric as well, received an e-mail from Mr. Rogovin summarizing his position with respect to settlement.

Q    Was that e-mail summarizing his position consistent with

what he told you on the phone?

A    It was.

MR. PEPE:  May I ask that PTX 145, which is already a full exhibit, Your Honor --

THE COURT:  Okay, sure.

MR. PEPE:  -- be called up.

And may I ask Mr. Wyzik, please, to call out the top paragraph.

Thank you very much.

Q    (By Mr. Pepe) In that -- is this the e-mail you had in mind, sir?  It's dated November 26 and addressed to Mr. Giarratana, Mr. Grondahl, and you.

A    Yes.

Q    He says in paragraph 1, "November 30 - Settlement Conference."  What does that reference?

A    So he's referring to a settlement conference.  I'm sure he's referring there to the discussions that I had had with Ben Lewis.  He may have been referring to his request for a meet-down -- with a sit-down with Dan Caudill.  Not entirely sure, but it all relates to what I just related to the jury.

Q    He said, "Pimp Deadbrain with his whoring for them, including holding over my head sanctions from the counterclaim."  What does that mean where he says "holding over my head sanctions from the counterclaim"?

A    So very early in the case Jarrow Formulas had asserted a

counterclaim under the Lanham Act, and the court had dismissed that. And Mr. Rogovin was always concerned that at some point at the end of the case there could be a motion for sanctions brought by Caudill Seed against Jarrow Formulas seeking their attorney's fees in connection with defending that claim.

Q   He goes on and said, "and incredibly mindless comments and rulings has made my sort of settlement attempt pointless. Caudill quite rightly sees huge numbers. This can be explained in any manner that gets the point across but Simpson," referring to the judge there?

A   Yes.

Q   "But Simpson has made any such attempt pointless." Further, I would not pay that piece of expletive a dime.

A   I think you read that wrong.

Q   I'm sorry. I'll go back. "This can be explained in any manner that gets the point across but Simpson has made any such attempt pointless." Did I read that correctly?

A   You did. It's the next one. You inserted a "not." Further, I would pay that piece of expletive a dime.

Q   Okay. Thank you.

A   It might be a subtle difference.

Q   Either way, the message to you is pretty clear?

A   It was clear. Mr. Rogovin did not intend to pay anything to Dan -- to Caudill Seed Company in connection with their trade secrets claim, zero.

Q   He goes on to say, "The only thing I'd agree to is a walk away, that I won't go after him for fees, but I think he feels immune."

Who is the "he" you understood -- who was the "he" in that sentence that Mr. Rogovin is referring to as you understood it?

A   He was referring to Dan Caudill.

Q   "I think he feels immune and I would have no doubt that even after a verdict for JFI, that piece of crap would order JFI to pay for the counterclaim," period, end quote.

Was that, in fact, sir, consistent with what Mr. Rogovin told you about settlement following your report to him of your conversation with Attorney Lewis?

A   Yes, precisely.

Q   Is that statement of his position on settlement -- question withdrawn.

Did that statement of his settlement position change over time?  This is November 18.  So we're about seven months away from trial, six and a half months away from trial.  Did that change at any point in time?

A   That did not change at any point in time, Mr. Pepe.  The only thing that changed in between the beginning of the case and these discussions at the end of November 2018 was Mr. Rogovin's willingness to -- to walk away from the case without a recovery of his own attorney's fees.

So although he says here, "The only thing I would agree to is a walk away" and "that I won't go after him for fees," if there was a softening of Mr. Rogovin's position, it was that he wouldn't go after Caudill Seed for fees. That was the only softening from the very beginning of the case.

Q   Did Attorney Lewis ever make another settlement approach to you after this November --

A   Not that I recall.

Q   Were you ever directed or authorized to make another settlement approach?

A   No.  And, Your Honor -- "Your Honor."  Mr. Pepe, I guess I would add just to conclude it, we reported back to Judge Simpson --

Q   I'm sorry.  I should have asked you that.  Because Judge Simpson still had his directive outstanding; correct?

A   Yes.  So we reported back to Judge Simpson that, um, settlement discussions would not be productive at this time.

Q   And just to conclude that, did Judge Simpson ever issue another directive to try settlement, or had he given up on you guys by that time?

A   I don't recall Judge Simpson ever raising the subject with us again.  We were destined for trial.

Q   I wanted you to finish the testimony you were giving when we adjourned yesterday.  Looking over my notes last night, I realized I had omitted two points I intended to cover before we

got to that.  So let me do that now, if I may, sir, because I think I want to clear up.

You testified in the very early part of your testimony that you had tried about 12 to 15 trade secret cases.  Do you recall that?

A    Yes.

Q    Is that the total number of cases you've tried or that's just the number of trade secret litigation?

A    Just trade secret cases.

Q    Total number of trials you've handled as counsel?

A    I've handled over -- between 50 and 60 trials over the course of my career as counsel, as lead counsel.

Q    The other thing I meant to cover is your -- it regards your testimony of coming into the case, the Kentucky litigation, in 2014, about a year and a half after it had commenced in early 2013.  Do you recall that, where you -- the case had been underway about a year and a half when you got involved?

A    Yes.

Q    Mr. Giarratana, Mr. Grondahl were handling it up until you got involved; correct?

A    Yes.

Q    And at that point in time of would be the second half of 2014, did you have a standard billing rate at the McCarter & English law firm?

A    I -- in 2014, yes, I did have a standard billing rate.

Q   And do you recall what that was?

A   I do not recall what the rate was at that time.

Q   Okay.  Do you recall that there came a time in the course of the litigation when your rate that was being charged for your work in the Kentucky litigation was increased?  Are you aware of that?

A   Yes, I am aware of that.

Q   Okay.

MR. PEPE:  And we had a demonstrative previously used in this, in this trial, so I would ask, Mr. Wyzik, if you would please to call up Demonstrative No. 6.

Q   (By Mr. Pepe) See here -- you've seen this before, Mr. Rechen?

A   I have, yes.

Q   In fact, did you help in its preparation?

A   Yes.

Q   Okay.  So we see there the case starting in 2013.  You see the red line at the bottom.  It says $405.  What is your understanding of what that indicates?

A   So that indicates the rate that I was charged to Jarrow Formulas from the time that I first came into the Kentucky case.

Q   Now, let's -- let's clear that up, because you said that was the middle of 2014, second half of 2014.  But this line starts at 2013.  You see that?

A   Yes.

Q   Does that refer to your testimony yesterday that you were involved to some extent in the Liberty Insurance issue in 2013?

A   So I think that reflects that, and it also reflects what I think I referred to was the periodic consultations that I would have with my partners Mark Giarratana and Eric Grondahl concerning the case even though my involvement during that period was quite minimal.

Q   Okay.

A   And --

Q   I'm sorry.  If you didn't finish?

A   Well, I was just going to say the 405 rate -- when I came to the firm -- so the jury will recall yesterday I testified that I joined McCarter & English in 2008, May of 2008.  When I came into the firm, my rate was set.  That was my standard rate, $405 an hour in May of 2008.

Q   So it was already five years old when the Kentucky litigation started?

A   It was.  I had started working for Jarrow Formulas shortly after I joined in May of 2008, and that was the rate I was being billed out to Jarrow Formulas.  And the way this evolved is sometime in 2016 Mark Giarratana asked me to take a look at a prebill or a pro forma, a draft bill, if you will, and I don't recall what the reason was.  But I recall looking through the bill, looking through the time entries, and getting to the

last page and seeing, oh, my gosh, I'm still being billed at a rate that is by that point eight years old. And so I immediately addressed that with Attorney Giarratana.

Q   And what did Mr. Giarratana do when you called that to his attention?

A   He -- first he recognized that it was an oversight, um, and he agreed that he would address that with the client and have the rate increased to something more appropriate and consistent with where the market was and where the firm was in 2016 in terms of standard rates. My rate was not increased, as this indicates, to my standard rate, which was at that time 545.

Q   That's shown on the upper blue line?

A   Yes. But it was increased to 520.

Q   Why? Why not to 545?

A   Well, Jarrow Formulas was never, I don't think ever, we ever billed Jarrow Formulas at our full standard rates because of the length of the relationship and the amount of work that we were doing. I don't think -- I don't think we ever billed at full standard rates. And it was appropriate for my rate to be set in between Attorney Giarratana's and Attorney Grondahl's.

Q   And that was what's reflected in the 520?

A   Yes.

Q   And was -- and what does the -- what does the graphic indicate as to whether that rate was changed again or held

constant?

A   It was held constant.

Q   Till the end of the litigation?

A   Till the very end.

MR. PEPE:  I think we're done with that.  Thank you so much, Mr. Wyzik.

Q   (By Mr. Pepe) We've seen now numerous e-mails in which Mr. Rogovin reflected his very strong feelings and attitudes, anger and frustration, about this litigation and the parties involved in it.  You have that in mind?

A   I do.

Q   Did Mr. Rogovin ever express to you whether that anger, frustration, strong feelings might manifest itself when he testified, if he testified?

A   On a number of occasions in I believe --

Q   More than once?

A   Yes.

Q   And what did he express to you in that regard in terms of what might manifest itself in his testimony?

A   Mr. Rogovin, I think both in writing and verbally to me and to Mark Giarratana and to Eric Grondahl, indicated that when he testified, he was going to take on the judge.  He was going to lecture the judge.  He was going to express his outrage.  He would do the same with the jury so that the jury understood his feelings about the litigation, about the opposing party, about

the judicial system.  He had expressed quite clearly that he would do all of that and at the same time give a good lecture to opposing counsel, that he would do it on the record, that he would do it in the courtroom.  And that was of grave concern to us.

Q   I'm going to get back to that.  But you said he did it orally and in writing.

MR. PEPE:  May I offer as a full exhibit, Your Honor, PTX 154?  There's no objection.

THE COURT:  Yes, you may.  That can be full.

(Plaintiff's Exhibit 154, received in evidence.)

MR. PEPE:  May I ask Mr. Wyzik to call it up.

Q   (By Mr. Pepe) This is an e-mail from Mr. Rogovin in October of 2016.  So we're about three and a half, three and three quarter years into the litigation?

MR. PEPE:  May I ask Mr. Wyzik to blow up or call out the very -- the last -- first of all, the first paragraph.  I'm sorry, Mr. Wyzik.  Unfair to you.  The first paragraph.  Thank you.

Q   (By Mr. Pepe) So we see here -- who's Dallas?

A   So Dallas is Dallas Clouatre.  Dallas was a science writer consultant for Jarrow Formulas.

Q   Okay.  And we've seen that expression before, so no need to go over that, if I can ask Mr. Wyzik now to call out the last paragraph that begins, "This case has to end."

Mr. Rogovin says there, quote, This case has to end. I laid out in the letter the field of how messed up this thing is. You guys have no idea how much I hate the judge. If this goes to trial, I'll end up charged with contempt. He's a moron. He's not going to put up -- I'm not going to put up with any crap from those expletive attorneys or that as-if judge -- as if he's a judge. No, he's splenetic, kneejerk shmuck, end quote.

Is that the kind of expression that was made to you time and time again during the course of this litigation?

A    Definitely.

Q    You said that concerned you, sir. Now, are you suggesting that if he did testify, you thought he would use exactly that kind of language?

A    So I don't -- I can't sit here and say I know what Mr. Rogovin would have done. I'd like to think, as I think any rational party or witness, would behave accordingly in a courtroom. But I knew what he had said to us. I knew what he had put in writing. I had heard what he had said to others, and I had to be concerned about that and had to be prepared to address it. I guess I would point out also that, of course, when these statements were made by Mr. Rogovin, they were responded to by us.

Q    Let's take a look at that, sir. Is it your testimony that you -- question withdrawn.

Did you ever encourage such action in Mr. Rogovin?

A    I think you know the answer to that.  I would -- of course not.

Q    Did you, in fact, you now and Mr. Giarratana, ever discourage it and try to restrain him?  By "it" I mean this kind of expression of vitriol.

A    So Mr. Rogovin had a habit of engaging in rants.  And when he would get on a rant, I mean he would just go.  And interrupting him, trying to interfere with that was at least unproductive, if not impossible to do.

And so the first thing I would do, and I think we would do, is we would listen.  We'd give him an opportunity, hopefully, to vent, to get whatever it was off of his chest. And then inevitably he would take a deep breath and we would try to interject, and then he would immediately roll right back into character.

And so these were long conversations where we would first and foremost listen and then have to, when we could, as we could, explain to him that that behavior would not be tolerated; that we, as counsel, would not tolerate that kind of behavior; that he could not behave that way; that, as he says here, he'll end up charged with contempt, at minimum.  And, um, that's how we attempted to deal with this.

We had dealt with Mr. Rogovin for many years.  Mark and Eric much longer than I had.  But I had dealt with him long

enough to know that this is how he reacted to things.  And this case brought out at least what I perceived as, you know, some of his, we would say, worst, worst tendencies.  And so we had to deal with those, and we did deal with them.  And I think for the most part, although we did not eliminate them from his communications with others or with us, we were generally able to manage him I think as best we could to a point.

Q   As the trial approached, however, did this process you just described, the venting and the listening and the remedial sessions, did it come to a head as the trial approached in February of 2019?

A   It got worse.

Q   Okay.  And was there an incident, in fact, that required you to take -- to have a very serious confrontation with Mr. Rogovin about this very issue?

A   I think you're referring to a -- an exchange that we had in February of 2019?

Q   I am.  Because now we're in February.  The trial's in June.  So we're about three, four months away from the trial.

A   So we're going to be talking, I think, in a little bit about our efforts to prepare Mr. Rogovin to testify at the trial, which followed, um, some focus group, mock jury focus group efforts that we had.  But following our second mock jury focus group, we had information from that effort as to how a jury of individuals, like yourselves, in Louisville evaluated

Mr. Rogovin: his testimonial capabilities, his credibility, his demeanor, his evasiveness or truthfulness.

And so we knew we had a significant amount -- we knew it anyway, but now we had third-party evidence that we could use in order to demonstrate to him how important it was for him to work with us significantly, carefully, and extensively to prepare his testimony.

We had a telephone call with him, because I had been trying to schedule a series of preparation sessions with him, in Hartford, in New York City, in Mississippi, where our jury consultant at the time was located, and in Los Angeles at his place of business. To the extent necessary, we were willing to fly out there in order to undertake this effort.

I was having difficulty scheduling dates with his assistant, Eva Alejandrino. This resulted in a telephone conversation that Mark Giarratana and I had had with Mr. Rogovin in February.

You -- at about that time, Mr. Rogovin was at the same time dealing with some of the issues at, in particular, JII, Jarrow Industries, relating to the out-of-stocks. You heard a little bit about that.

Our conversation with him was designed to press upon him that we understood his business issues and concerns to some extent. We were not aware of the financial stress that the company was under, but we were aware that there was a certain

amount of stress he was experiencing personally related to his business. But at the same time, we've got a very important trial where there is significant exposure coming up, and we have a lot of work to do with him.

That conversation ended with him screaming and yelling at us and hanging up on us. And then we received an e-mail from him that night.

Q Did you -- did you yourself respond in writing to Mr. Rogovin concerning that unfortunate incident you just described?

A Yeah. I believe he sent us an e-mail, and I believe I responded. And I was as candid with him as I could be.

MR. PEPE: May I offer as a full exhibit, Your Honor, PTX 167? No objection.

THE COURT: Okay. 167 can be marked as a full exhibit.

(Plaintiff's Exhibit 167, received in evidence.)

MR. PEPE: I'm going to ask Mr. Wyzik to call out first the where, the "To" and "From" and the first paragraph, if you could do that, sir.

THE WITNESS: Mr. Pepe, can I ask, is there an e-mail that precedes this?

Q (By Mr. Pepe) I don't have it, Mr. Rechen.

A Okay.

Q No, I'm sorry. I'm sorry. If I looked at the third page,

I would have seen it.

MR. PEPE:  May I ask Mr. Wyzik to go to the third page and call out the e-mail in the middle of the third page that is from Mr. Rogovin, to Mr. Giarratana.  Above that.  There it is.  Thank you.

THE WITNESS:  That's the e-mail that we received --

Q   (By Mr. Pepe) I'm sorry.  I should have looked at the third page, Mr. Rechen.

So here we have, in the same exhibit, an e-mail from Mr. Rogovin to you and Mr. Giarratana, Mr. Grondahl, February 27 at 5:36 a.m.  And when was your call?

A   It was on the 26th.

Q   Okay.  And Mr. Rogovin says in this e-mail:  Quote, When I say cut it out I mean it.  I have no time for BS.  I have no time for that expletive scummy case right now.  I'm working to save my companies.  As far as the case is concerned, my priority is the depo ruling.  We prove the RFA denials false, it is a new ballgame.  Caudill is in serious trouble.  Jarrow.

Is that the e-mail you had in mind?

A   It is the e-mail.

Q   Did you in fact respond to that?

A   I did.

Q   And if we go back now to the first page, is that in fact your response to the e-mail I just read?

A   It is.

Q   And you copy your partners, of course, Mr. Giarratana, Mr. Grondahl?

A   I did.

Q   Whose subject is:  "Follow-up to last night's call."  Is that in reference to the telephone you just described?

A   Uh, yes.  That may have been his subject line.  I'm not sure.  But in any event, yes.

Q   You say, "Dear Jarrow, we understand the frustrations expressed by you during our call last evening and in your below e-mail."

     That would refer to the one I just read?

A   Yes.

Q   "We would prefer not to distract you from the serious issues that you are addressing at JII."

     That's the related company, Jarrow Industries Inc.?

A   It is.

Q   "However, the issue raised during our call is extremely important to Jarrow Formulas' success at trial."

     What issue is that you were referring to?

A   His preparation, his demeanor, his willingness to work with us to be ready for trial.

Q   You go on to say, "This conclusion should not in any way be perceived as a slight against you or our high level of respect and admiration for you," period, end quote.

     Is that an accurate statement?

A    It is.

Q    "However, many of the qualities that contribute to your success as a businessman do not make for a good witness at trial.  Your demeanor in the courtroom" -- question withdrawn.

What did you mean by that sentence, "the qualities that contribute to your success as a businessman do not make for a good witness at trial"?

A    So let me take those two sentences together, the one that begins "This conclusion" and the one that talks about the qualities.  So you ask whether it was true that I had respect and admiration for Mr. Rogovin.  I did.  He was a very successful businessman.  He, um -- he had his weaknesses, to be sure.  And I did not admire those.  I did not admire his behavior.  I did not admire the way he communicated with people all the time.

On the other hand, he could be -- he was a very smart man.  I respected that.  He, um -- he was, um -- he could be very charming.  He could be very engaging, and he often was with us.  We had developed a certain level of friendship, I suppose, beyond just the attorney-client relationship.

But there were qualities in him that I could not respect and could not admire and did not.  And those were the qualities that are referred to in the next sentence.  "However, many of the qualities that contribute to your success as a businessman do not make for a good witness at trial."

In my observations of Mr. Rogovin, he could be a bully, and he would use, as you've seen, language that was offensive, extraordinarily offensive even. And perhaps those two traits served him well in his business. I don't know. But he was certainly a successful businessman. And I knew that those traits, even if they had contributed in some way to his business success, would not contribute to success in the courtroom. I knew that plainly, as plainly as I could know it.

Q   You go on to say, "Your demeanor in the courtroom and in the vicinity of the courthouse where jurors will have an opportunity to observe you, your interactions with us and opposing counsel, the Court and others, will impact their view of you as a witness and a party, and potentially the outcome of trial. We cannot risk that and therefore we need to put this issue on the table and address it in earnest now."

The issue being what you just described in the previous sentences.

A   Yes, sir.

Q   You go on to say, "Needless to say, you have very strong views on this case, including" --

THE COURT: We don't have that on the screen right now.

MR. PEPE: I'm sorry, Your Honor. Thank you. Could we have the second paragraph? My error. I'm sorry.

Q   (By Mr. Pepe) You go on to say, "Needless to say, you have very strong views on this case, including a disdain for the opposing counsel, its counsel and the Court," period.

You've already testified to that.  We've seen the e-mails.  That's what you're referring to there?

A   Yes.

Q   You go on to say, "You have repeatedly expressed to us how you intend to convey those views while on the stand and otherwise at trial," period.

Is that your reference to your testimony a moment ago about his --

A   Taking on the judge, taking on counsel, taking on -- you know, lecturing the jury.

Q   You go on to say, "Based on your attendance at your deposition, the deposition of Dallas Clouatre, and several mock video recordings" -- those are the recordings you referred to a moment ago about the jury focus group?

A   Yes, yes.

Q   "You have convinced us you are very likely to conduct yourself in the manner promised.  The recording we presented to the mock jury was tame by comparison to the unedited version, which was sedate by comparison to the taping we did in December in Los Angeles and concluded was unusable."

We're going to look at those, Mr. Rechen.  So just very briefly tell me, tell the jury, what you're referring to

there, because we're going to look at them in greater detail in just a little while.

A   So we, in preparation for the mock jury efforts, had videotaped mock examinations of testimony as if Mr. Rogovin was giving it in the courtroom.  And so we had his behavior on video.  This was the kind of behavior we might expect to receive from him in the courtroom.  And that's what we're referring to there.

We had it.  We had reviewed it.  We knew what we were dealing with.  And we were addressing with him right straight up that we've got this.

Um, the first version that we did is a disaster.  The second version that we did where we worked with you to try to make it better was indeed better but nowhere near where we needed to be if we were going to put you on the witness stand at trial.  And that's what's being referred to here.

Q   And that's set forth in the next sentence that begins, "Despite our efforts"?

A   Yes.

Q   And then the next sentence you state, "The jurors' reactions to your testimony, as reflected in responses to the questionnaire which I have carefully reviewed, was disastrous, and made clear that there must be a sea-change in your demeanor and comportment on the witness stand, in the courtroom" --

THE COURT:  Can we get that part up too?

MR. PEPE:  I'm sorry.

THE COURT:  Okay.

Q   (By Mr. Pepe) "Witness stand, in the courtroom, and anywhere in the vicinity of the courthouse."

Again, stating here straight up, to use your words, what you just explained to the jury.

A   Yes.

Q   And we're going to see that video testimony later on.

A   Yes.

Q   "You have specifically told us that you intend to, quote, take on, end quote, the judge at the trial."

That's again you reference here what you described to the jury a moment ago.

A   Correct.

Q   "You have been insistent about this and you have argued with us about it when we have told you that cannot happen.  You have further told us that you intend to say certain things during the trial to the jury, whether they are responsive to a question asked of you or not and whether precluded by the judge or not," period.

He actually told you he was going to do that?

A   I'm sorry.  Ask that question again.

Q   Mr. Rogovin actually told you he would say certain things whether it was responsive to the question or not?

A   Yes.  I would not have written that otherwise.

Q   "We have been clear that you have to limit your answers to the questions asked, regardless of the question or the examiner.  We have witnessed your deposition some of the behavior you say you intend to employ, and we certainly saw it in the mock jury recordings.  Theoretically, the mock jury recordings presented a controlled and friendly environment for us to get this right.  The courtroom will not be such an environment," period.

       Again referring to his performance in the mock jury exercise?

A   Yeah, and I would say, you know, these mock jury recordings were telling to us in part because Mr. Rogovin knew me.  I think Mr. Rogovin trusted me.  I played the role of Caudill's lawyers, and yet we got -- the product of that was still just a complete disaster.  So he was capable of doing this even with me doing the questioning.  I was in role, the role of Caudill Seed's lawyer, but it still produced very troublesome video of his behavior for us to have to consider and to confront if we were going to put him on the witness stand in a courtroom.

Q   You go on to say in the next paragraph, "I have explained to you that you must have respect for the trial process, the court, and every player in the courtroom -- judge, opposing counsel, opposing and adverse witnesses, everyone."

       Did you, in fact, tell him that?

A   I did.

Q    On more than one occasion?

A    On more than one occasion.

Q    Was it your duty to do that, sir?

A    Very much so.  Um, as a member of the bar, I'm also an officer of the court.

Q    What does that mean?

A    That means I have an obligation to be respectful.  Even though we are working within an adversarial process, there is a certain level of decorum and civility and professionalism and respect for all involved, including ensuring that all parties have confidence in the quality of the administration of justice.  I'm a player in that -- in that process.  And my obligation, as an officer of the court, is to ensure that I comport myself with those obligations; and to every extent that I am able to do it, those that I interact with and those that I control and those that I represent do the same.

Q    You go on to say, "If you have disdain or disrespect it will come through and will prejudice the defense.  If we take you at your word as to your intentions at trial, then we know we have a serious problem."  If we couple that -- "If we couple what you have told us with what we have personally witnessed, then we know we have a serious problem.  That is why we have explained our intention to limit your testimonial role to that which is necessary, and further, recommend that we limit your presence at trial to giving testimony," end quote.

What were you explaining there, sir?

A   So our intention was for him to testify at trial.  Our intention, however, also was to use him where he could help us win the case.  And that was our goal for him and -- I mean, let's face it.  I -- as a lawyer, I think we are programmed, operating within the bounds of the rules and the law and our ethical obligations, to win.  And it was our intention to win this case, if we could do it.

As part of that, we needed to harness the best qualities in our witnesses and present the testimony and the evidence in the best way we could.  And we had concluded, I think relatively early on:  first, that we were going to call Mr. Rogovin as a witness; second, that we were going to limit his testimony to the extent we could so as to not draw out or provide an opportunity for things to go wrong while he was on the witness stand.  And that's what I'm referring to here.

Q   And in the next sentence you say, "Quite frankly, this approach would work to Jarrow Formulas' advantage because it would allow us to control when you testify, and the order of your testimony."

Is that what you just explained?

A   Yes.

Q   "Further, we will keep you intimately informed of every development and you will have every opportunity to provide your insights outside the courtroom.  You will not miss any

developments at trial or any opportunity to address material issues simply because you are not in the courtroom," period, end quote.

Is that -- were you thinking he would not be in the courtroom at that time?

A    Well, we were suggesting to him that perhaps it would be better if he was not in the courtroom all the time.  We were having discussions about who our -- who our corporate representative would be at trial.

So whenever we try a business case, we like to have in the courtroom someone who is the face of the company, at least with respect to interacting with counsel and -- and be the individual who would be introduced to the jury at the outset of the case, not necessarily someone who would testify.

Our thought was that it might be Jonathan Leventhal. And, in fact, Jonathan Leventhal as the general counsel of the company sat with us ultimately at counsel's table.

What I'm referring to here is a discussion about who the corporate representative would be, because we were concerned about Mr. Rogovin being in the courtroom all the time.  Obviously, the jury is most focused on whoever is in the witness box, but the jury can see everyone else who's in the courtroom as well.  And during breaks, the jury sees, sees people in the hallway, sees people in the parking lot, sees people entering the courtroom, the courthouse, through the

metal detectors, how they interact with the marshals.  We were concerned about all of that with respect to Mr. Rogovin, because we knew how he interacted with people, and we were concerned how he might be perceived as a result of those observations people would make of him.

I'll give you one example.  He fell asleep in the courtroom during the trial and was snoring.  It was that kind of behavior that concerned us that we did not want people, jurors in particular, seeing.  And so we were concerned about that.  And we hoped we might be able to limit opportunities for those kinds of negative observations if he was not in court all of the time.

Q   But in the end, when the trial actually happened, was he, in fact, in court all the time?

A   He was.

Q   So that strategy evolved and changed.

A   Well, I mean, no one was going to bar Mr. Rogovin from the courtroom.  It's a public place, and he's entitled to come in. He did not take our advice on that when we were having these discussions in February.  And I think ultimately we decided to abandon that effort because it was becoming unproductive.

Q   Go on to the next paragraph, begins "our job," if I can ask you, Mr. Wyzik, to call that up.

You say, "Our job as your counsel is to give you" -- "is to give this to you unvarnished."

You did do that, did you not, sir?

A    I certainly tried.

Q    "Finally" -- in the next paragraph begins "Finally."

"Finally, we cannot assume that you are going to win this case -- as I heard you say last night."

What did you mean by that?

A    So in our discussions, Mr. Rogovin -- Mr. Rogovin had a view of the case.  He believed he was going to win.  He assumed that Jarrow Formulas was going to win.  And he had mentioned that in the telephone call that we had had with him on February 26th.

Our view, of course, always -- and you see this referred to in the next couple of sentences.  Our view was that was far from a foregone conclusion, particularly given what you heard me refer to earlier as the, I think on questioning by Attorney Resser, the morality play, the horrible narrative.

This was a trades secret case.  We felt we could win it because there was no trade secret.  Um, and so there was a path to victory, as we see it, um, although it was a narrow path, and it did not allow for error along the way.

And so our discussions with Mr. Rogovin informed him that the case may be winnable.  We think it is winnable.  Some would say on a legal technicality.  We think it's winnable, but we got to play our cards right in order to win it.  And we got to play them perfectly.

Q   You have testified at some length now about your concerns with both the horrible narrative that you've described and Mr. Rogovin as a witness.  Do you -- question withdrawn.

Did you take steps to address those issues in terms of preparing Mr. Rogovin to testify, because you said it was your intent to have him testify?

A   We did.

Q   In your years as a trial lawyer, have you developed a practice of preparing witnesses to testify?

A   Yes, I have.  So it is --

Q   Not just in this case now.  I'm talking generally you have --

A   Every case.  Every case.  I would not put -- and I believe it is malpractice perhaps, could be malpractice, to put a witness on the stand who I have the opportunity to prepare, to put them on the stand without preparing them.  That is something that I believe every professional practitioner trial lawyer does.  It is necessary to be respectful of the court's time, the jury's time, to provide an efficient presentation of the relevant facts, and to present them logically, effectively, and persuasively.

A witness does not take the witness stand and just spill their guts in whatever way they choose.  The lawyer understands what the law is, what the rules of evidence are. Of course, you know, the judge is making rulings that can

affect that, but the lawyer is able to identify what is germane to the case, what the fact-finder, judge or jury, needs to hear and understand in order to decide the case and hopefully to decide the case favorably. And so this is why we prepare a witness before we put them on the witness stand.

The only caveat to that is that there are certain circumstances where I can't prepare a witness. I subpoena a witness and they refuse to talk to me. I put them on the witness stand anyway. They refuse to be prepared. They're a hostile witness. They're an adverse witness. Those circumstances are exceptions to the rule.

But, otherwise, the client, representatives of the client, expert witnesses, they are all prepared, as they should be, before they take the witness stand, not to tell them what the truth is or what the facts are, but to help them in the best presentation of that information.

Q   Did you apply that practice in the Kentucky litigation with respect to Mr. Rogovin?

A   With respect to every witness.

Q   Including Mr. Rogovin.

A   Yes.

Q   You were asked on direct examination about the preparation efforts for Mr. Rogovin in the six weeks leading up to trial in June of 2019. Do you remember that?

A   I do.

Q   Is that when your preparation started, six weeks before trial?

A   No, sir.

Q   Much earlier than that?

A   Much, much earlier.  I would say it began in April of 2016 is when our first effort in earnest to prepare Mr. Rogovin began.

Q   Three years before the actual trial?

A   Yes, sir.

Q   Did those efforts continue on some regular basis after April of 2016 did I hear you say?

A   Initially -- so this probably requires a little bit of explanation.  Initially, intermittently, periodically, but more intensively as time went on.  In April of 2016, we recognized that the court, having not all that long ago ruled on summary judgment, this case could get scheduled -- "this case," the Kentucky case -- could get scheduled for trial quite quickly. It turned out it didn't.

But in April of 2016, we recognized we could be -- we could be on the docket, on the schedule for trial here, pretty quickly.  We need to start preparing for the trial and preparing our witnesses.  And so with that in mind, we made our first effort at preparing Mr. Rogovin.

Q   Did those efforts continue from time to time thereafter right up to the time of trial?

A   They did.  The efforts, the efforts did.  We were not, unfortunately, able to spend the time with Mr. Rogovin that we wanted to and very much needed to.

Q   Were you able, in preparation for your testimony, to go back into your records of this litigation and your time sheets and your billings and your file memos and your pleadings and everything else in your file to reconstruct that effort you made between April of 2016 and the time of trial to prepare Mr. Rogovin to testify as you explained you thought you had to do?

A   Yes.

Q   And were you able to work with us to prepare a graphic that would show those efforts over the course of some years?

A   Yes.

Q   And would that graphic, that demonstrative, be an aid to you in explaining to the jury what efforts were made to do the preparation you say is mandatory in all cases and this one?

A   Yes.

Q   And would it be an aid to the jury in understanding your testimony?

A   I believe it would.

        MR. PEPE:  Without objection, Your Honor, I would like to use the demonstrative, which has previously been provided.

        THE COURT:  That's fine.  That's fine.

        MR. PEPE:  And I can ask Mr. Wyzik to pull up demonstrative page 39, please.  Thank you very much.

Q   (By Mr. Pepe) We have here a graphic that is entitled "McCarter's efforts to prepare Rogovin to testify."  And the first entry we have on this, sir, is April 14, 2016, in New York City.

Is that the meeting you had in mind when you just said you believed the efforts started in April?

A   Yes, it is.  This is a meeting that took place in our Manhattan office.  Mr. Rogovin was flying to the East Coast. We were aware of that.  He wanted to meet with us.  We planned to have dinner, and we used this as an opportunity to begin the preparation of Mr. Rogovin by meeting in our office in Manhattan and beginning to cover with him the areas where we thought he could provide helpful testimony and to role play with him to elicit that testimony from him as if he was on the witness stand in the courtroom.

Q   Did the effort you just described continue thereafter?

A   It did, but there was a delay.  And what happened, I alluded to this earlier, it became apparent that although we thought the case could get scheduled quickly, it did not.  And so the next effort, the next real effort outside of all of the telephone calls and discussions that we had with him, which occurred routinely, the next real effort to prepare testimony didn't occur until November of the following year.

MR. PEPE:  All right.  Mr. Wyzik, can you call that up.

Q   (By Mr. Pepe) What happened in November, sir, with respect to the preparation?  And now I understand you're testifying about meetings or conferences designed to focus on his preparation as opposed to any other conferences, meetings, discussions about the case.  We're focusing solely on the preparation effort.  Is that a fair statement?

A   Yes.

Q   All right.  What happened in November of 2017?

A   So in November of 2017 Mr. Rogovin came to Hartford.  I don't remember if he came specifically to Hartford for us to work on his testimony or if he was in Hartford for other reasons.  Regardless, again, because we were going to be meeting with him personally and we had time with him, dedicated time, we used it productively, or it was our intention to use it productively.  And I would say these early sessions, although they were short and although they were not fully comprehensive of the testimony he would give, they were reasonably productive.

         I say "reasonably" for this reason:  Every one of these sessions would ultimately involve too much time with Mr. Rogovin complaining that we didn't know what the trade secret was that Caudill Seed was complaining, that the judge was not favorable to our case, that he was all of the things that you've seen in the e-mails that Mr. Rogovin thought about the judge and about opposing counsel.  At every one of these

meetings, all of this would resurface.

But we were able to use some time in November of 2017 in order to prepare part of Mr. Rogovin's testimony.

Q   You testified a moment -- not a moment -- a little while ago about mock jury focus groups.  Did there come a time in this preparation effort when the McCarter team proposed and recommended such a mock jury focus group exercise as part of Mr. Rogovin's preparation?

A   Yes.

Q   When I use the term -- when I use the term "mock jury focus group," do you have an understanding of that term?

A   I do.

Q   Please explain generally what that is, briefly, concisely, when we use that term, what is involved.

A   Okay.  So we -- this is something that we did on two separate occasions.  We did it in January of 2018.  We did it again in February of 2019.  Related to the trial of I suppose any case, but in particular jury cases, there is an industry that has developed, um, where consultants, professionals in psychology, in trial practice, in how people gather, retain, assume, understand information, has arisen.  And in connection with the trial of a jury case, this is very valuable assistance to a trial lawyer.

We did, as we said, two mock jury focus group exercises for the Kentucky trial.  The first one was what we

would call a low budget exercise. It involved Mark Giarratana playing the role of Jarrow Formulas' lawyer. I played always the role of Caudill Seed's lawyer. Mark -- you know, this is a one-day exercise.

Um, members of the community who are -- who understand that they are being hired and paid to actually help parties resolve a dispute are, as I say, retained, hired, by the jury consultant. And this panel is designed to be reflective of or a cross-section of the community from which the actual jury in the case will ultimately be selected.

Q   Is that -- the panel you just described, is that the mock jury? When we use that term, that's the mock jury you're referring to?

A   That would be the mock jury. It's a faux jury. It's not the real jury. It's not the real trial. It's not the real presentation of the evidence.

It is a much -- it's a simplified and shortened version initially in the first session to present themes, arguments. Help us understand: Will the jury understand the chemistry involved in this case, the alleged trade secrets in this case? Will they understand BroccoRaphanin, glucoraphanin, and myrosinase, sulforaphane? Will they understand the manufacturing process? What level of education do we need on our jury in order for them to understand these principles that are going to be at issue in the Kentucky trial, a complex case

with complex -- somewhat complex principles?

So that initial session Mark Giarratana did an opening statement; I did an opening statement.  Our jury consultant read a narrative advocating one side and then the other side.  And then Mark and I both did closing arguments, all in the span of a day with the jurors, the mock jurors, answering detailed questionnaires at every step of the process.

That information is then gathered, assimilated.  And the jury consultant helps us understand:  What did these mock jurors understand about the case?  What information resonated with them?  What did they find compelling?  What did they find useless, meaningless, not understandable?  And so the first session that was what was involved.  The second session was different.

Q   All right.  And the first session on the graphic, let me clear up one thing.  You see that on the graphic --

A   Yes.

Q   -- describing what you did.  There appears the terms "video depositions" in that graphic.  Is that accurate?

A   That's not accurate.  We did not -- to my recollection, we actually did not use video depositions in that first session.  It was what I just described.  It was a live opening by Mark, live opening by me, read narrative by the jury consultant, and the closing argument by both Mark and myself.

Q   The rest of the graphic on that page is accurate?

A    Yes.

Q    All right.  Why do you list it as a step in the preparation of Jarrow Rogovin?  What does that have to do with his preparation?

A    It's his case.  Well, "it's his case."  It's not his case. It's the company's case.  It is Jarrow Formulas, Inc.'s case. But Mr. Rogovin is our principal point of contact.  Mr. Rogovin has an understanding of the issues in the case.  We want Mr. Rogovin to understand what's at issue if we try this case, what the challenges are, where our strengths are, and how he can best assist us in capitalizing on our strengths and avoiding our weaknesses.

Q    Was he present at this mock jury?

A    He absolutely was.

Q    He saw the whole process unfold.

A    He did.

Q    You said you got reports from the jury consultants after the --

A    Yes.

Q    Did you discuss those with Mr. Rogovin?

A    Yes, we did.

Q    And did those reports provide information that you described you were hoping you would get about the jurors, the mock jurors' reaction to the elements of your case?

A    Yes, we did.

I suppose there's one other point that I maybe -- should be made here. I think it's one that is a natural one for anyone to be thinking about. And that is, do we use this to determine whether we will win or lose the case? And the answer, at least my view on that, is no, absolutely not. It is not designed to help us determine whether we will win or lose. It is designed to help us identify and evaluate the best path towards a win and the path to avoid, or paths to avoid, to avoid a loss.

Q   Did your efforts in preparation -- to prepare Mr. Rogovin continue thereafter?

A   They did.

Q   All right. May I ask Mr. Wyzik to call up -- we have an event here on November 7, 2018, so some ten months after the first mock jury effort; correct?

A   Yes.

Q   And what was involved there?

A   So Mr. Rogovin, again, was -- well, we were scheduling. We tried to schedule a prep session with Mr. Rogovin in Connecticut in November. We wanted to do a couple of things there. We were getting ready for the second mock jury exercise, which was different. In connection with that mock jury exercise, we were actually going to present testimony as opposed to having a narrative read by the jury consultant.

We scheduled for Mr. Rogovin to be in Hartford. We

were going to meet with him.  We were going to prepare the testimony that we would use for that mock jury exercise.  And we were also intending to actually prepare the actual testimony that we would elicit from him at the trial, which we knew was going to happen in 2019.

Q   Did that meeting go forward?

A   It did not.  He canceled it.

Q   And is that quote there a reference to the e-mail canceling it?

A   Yes.  So what we did is we -- he canceled his travel to Connecticut.  We decided, we're going to need to go out to Los Angeles, and we're going to have to meet with him there at his offices.  And so I think that's the next step.

Q   All right.  So now we're in November of 2018.  And that's the same time that you described a little while ago the settlement effort -- correct? -- and your trip to Kentucky.

A   Exactly.  And that's what's referred to here.  So I spent three days watching Judge Simpson's courtroom, watching Judge Simpson try at least the first three days of a trade secret case, and I come back and give a report to the trial team and to Mr. Rogovin on my observations in Judge Simpson's courtroom.

Q   Do you consider that part of the preparation effort?

A   Without question.

Q   The next --

A    And maybe I should expand on that just a little bit.

Q    Yeah, because what you're doing is you're reporting what you're observing in Judge Simpson's courtroom in a case somewhat like one you're about to try?

A    Well, even more than that.  Mr. Rogovin's going to testify in that courtroom.  He's going to testify before this judge. And I want him to understand the lay of the land in this judge's courtroom.

Q    Then you said you decided you, meaning you and your colleagues, to go to Los Angeles where Mr. Rogovin was to continue the effort that was canceled earlier in November; correct?

A    That's correct.

Q    And is that reflected in the next event on the demonstrative exhibit?

A    Well, this is an e-mail, I think, that is recording what we're planning to do when we arrive in Los Angeles, which was scheduled for the 14th of December.  So this is a November 30, 2018, e-mail.  But, in fact, what it's referring to is what our plan is when we arrive in Los Angeles in mid-December.  And I guess, you know -- because Mr. Rogovin had canceled the November date, now we're in a time crunch because we have -- we have dates on a calendar for our second mock jury exercise --

Q    That had already been planned.

A    That had already been planned.  We have dates on the

calendar. We've got to get our video examinations of our witnesses done, edited, and organized and then to our jury consultant, who is putting together all of this information for the mock jury exercise.

Q   So now we're at the end of November. We go into December. And what happens there, sir?

A   So before we fly -- I think this is immediately before we fly out, um, we sent Mr. Rogovin a draft of the lines of inquiry for that examination. This is for, I believe, the direct examination of Mr. Rogovin.

Now, so, if I can take just a time out to explain this second --

Q   Because it differs from the first one you described?

A   Because it differs from the first.

Q   The first one was low budget. This is bigger budget?

A   This is not low budget stuff now. Now we're not just testing themes and arguments. Now we're testing witnesses, credibility. And we knew we had issues. Kean Ashurst was an issue for us. Mr. Rogovin was an issue for us. We had what we thought, and turned out to be the case, an outstanding expert witness on the science in the case, but we wanted to make sure that he was understandable.

So we videotaped Mr. Rogovin, Mr. Ashurst, and our expert witness. And then we had --

Q   Videotaped them doing what?

A    Being examined by Mark as Jarrow Formulas' lawyer and me as Caudill Seed's lawyer as if they were actually giving testimony in a question-and-answer format with the witness in the witness box in the courtroom.  That's what we did.

Q    Okay, and so --

A    So in addition to those three individuals, we hired an actor to play Joe Lyons, and we -- we had someone -- and I don't remember who it was.  We had someone play Dan Caudill.

Q    Okay.  Dan Caudill we know.  Joe Lyons was?

A    Joe Lyons -- Joe Lyons was the, um -- he was effectively the CFO of Caudill Seed.

Q    Was he expected to testify in the --

A    At that time, we thought he would testify.  It turned out he didn't, but he was someone that Mr. Wingate, Caudill Seed's expert witness, relied upon in gathering certain of the financial information.

Q    So your testimony is you do this mock examination and videotape it of all those witnesses?

A    Yes.  Now, they were truncated versions.  Obviously, you know, this was a three-and-a-half-week trial in Louisville.  We did this in two days.  So we're doing basically half-hour video segments of Kean Ashurst, Dan Caudill, Joe Lyons.  And we did a mini trial over two days in February of 2019 before a group of individuals from the Louisville community who understood that they were -- who believed that they were actually -- they were

being paid to actually help parties resolve a dispute.

So they -- they are hired, retained, on the auspices of they are actually providing a service that is going to help these two parties resolve the dispute. And they're asked to evaluate the case and every witness in the case and every issue in the case as set forth on a series of questionnaires.

Q   We're in December now, sir, where the graphic says the first mock direct and cross-examination of Rogovin videotaped.

So in December here, do I understand you're preparing the videotape for presentation to the mock jury? Did I get that right?

A   Yes.

Q   Okay. And so how did that go?

A   First half of it went well once we finally got underway. The second half of it went horribly, horribly.

So what happened was we arrived there. We have a specific purpose, Mark and I do. We're there to do this work because now we're under a time crunch.

Mr. Rogovin, frankly, wasted a lot of our time. He was engaged -- he knew we were coming, but he was engaged in business meetings. He was doing a real estate deal. Then he had to go to his business's holiday party and make a presentation there.

And so I believe the 14th was a Friday evening. And we did not sit down with Mr. Rogovin in front of the camera my

recollection it was after five o'clock on a Friday evening in Los Angeles.  Mark and I are still on East Coast time, and we're just sitting down to go to work with Mr. Rogovin on this.

Mark did a direct examination.  It went pretty well, pretty well.

Q   Mark's playing now -- Mark's playing --

A   Jarrow Formulas' lawyer.

Q   Go ahead.

A   I played Caudill Seed's lawyer.  And that's when things went off the rails.  And the videotape of my cross-examination of Mr. Rogovin was -- it was unusable.  It was unusable.  We actually ended up ending the effort, my recollection is, around 9:30 or ten o'clock West Coast time because we concluded we needed to start over.  And so we ended the session.

We flew back to the East Coast with the intention of, we got to do this again.  And the reason was because -- and Mark said this specifically to Mr. Rogovin, "If you behave like that, you'll be in jail."  That's what Mark said to Mr. Rogovin.

Q   Was that --

A   And we --

Q   I'm sorry.

A   We concluded that we couldn't use this in our mock jury -- it was so bad that it would just completely distort any usable results from the mock jury exercise.  We had to do it over.

Q   But did it affect your plan for preparation and what you had to do to get Mr. Rogovin ready for trial and how he would testify at trial?  Did it affect that?

A   It absolutely affected that.

MR. PEPE:  Right.  Your Honor, we're prepared to show that now.  I hope it will be without any technical difficulties.

THE COURT:  That will be fine.

MR. PEPE:   Mr. --

THE COURT:  And this is Exhibit No.?

MR. BUDINETZ:  163, Your Honor.

THE COURT:  Exhibit 163.  I think we've discussed this previously.  That will be marked as a full exhibit.

(Plaintiff's Exhibit 163, received in evidence.)

Q   (By Mr. Pepe) Mr. Rechen, what the Court and the jury are about to see is the part of the cross-examination of Mr. Rogovin by you and for presentation to the mock jury at a later date.  Did I get that right?

A   That's correct.  That was the intention.

Q   Yes.  All right.  So that's what the jury will be seeing, part of that; correct?

A   Part -- only part.

MR. PEPE:  With the Court's permission.

THE COURT:  Yes.  Go ahead.

(Plays video.)

THE COURT:  All right, Mr. Pepe, does that conclude the video?

MR. PEPE:  It does, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, you may consider the video you just saw only for the limited purpose of deciding whether McCarter committed legal malpractice in not calling Mr. Rogan -- excuse me -- in not calling Mr. Rogovin as a live witness to testify in the Kentucky trial.

The video did not show prior testimony by Mr. Rogovin. He was not under oath.  He was not in a deposition, and he was not in a courtroom.  So you may not consider this testimony for any purpose other than the one I just described.  Thank you.

All right.  We got about five minutes before the break, so why don't we use it.

MR. PEPE:  Thank you.

MR. RESSER:  Your Honor, could we show the video that we --

THE COURT:  Yeah, that's what I thought.

MR. PEPE:  I thought it was included.  I'm sorry.

MR. RESSER:  It was not included.

THE COURT:  All right.  So why don't we do this -- that's going to take more than five minutes, Mr. Resser?

MR. RESSER:  About 10 to 12 minutes.

THE COURT:  Why don't we take our break now.  There's a little more of the video the other side wants to show.  I'm

going to allow them to do that before we have another question. We'll take our break now.

Don't discuss the case. Don't let anyone discuss it with you. Keep an open mind. And we'll pick up again in about 15 minutes. Thanks so much for your attention this morning.

(The jury left the courtroom at 10:41 a.m.)

THE COURT: Anything before we --

MR. RESSER: Yes, Your Honor.

THE COURT: Mr. Resser.

MR. RESSER: I think you indicated that that exhibit, PTX 163, would be admitted in full.

THE COURT: Yes.

MR. RESSER: My understanding is that only the portions that Your Honor has allowed shown would be admitted.

THE COURT: That's correct. I thought 163 had been edited down to just include those portions.

MR. BUDINETZ: It has, Your Honor, and we will provide -- with Attorney Resser's permission, we will provide Ms. Johnson with just the edited clip and find out how she wants it provided to her to go back with the jury, whether it's by thumb drive or by written transcript, however.

THE COURT: That's fine. Just to be very, very clear, the jury should not see any portion of that video other than the one that -- let me say this again. The jury should not have with them when they go in for deliberations any portion of

that video other than what they've just seen and other than what Mr. Resser's side shows.

MR. BUDINETZ:  Understood, Your Honor.

MR. RESSER:  Thank you.  And you'll send us a copy.

THE COURT:  We'll be in recess.  Thank you.

(Recess from 10:42 a.m. to 10:58 a.m.)

(The jury entered the courtroom at 10:58 a.m.)

THE COURT:  My understanding now is we're going to have other portions, the remaining portions of the same video shown to the jury at this time; is that right?

MR. RESSER:  Yes, Your Honor.

THE COURT:  All right, great.  Why don't we do that.  You can proceed.

MR. HEAVEY:  Your Honor, we may need to switch the feed.

THE COURT:  I'm sorry?

MR. HEAVEY:  We may need to switch the feed.

(Plays video.)

THE COURT:  All right.  Does that conclude?  Thank you.

Mr. Pepe, you can continue with your examination of the witness.

MR. PEPE:  Thank you, Your Honor.

THE COURT:  Ladies and Gentlemen, of course, the same instruction that I gave earlier applies.  You're only to

consider the mock jury video for the limited purpose of deciding whether McCarter committed malpractice in not calling Mr. Rogovin as a witness in the Kentucky trial.

Go ahead, Mr. Pepe.

MR. PEPE: Thank you, Your Honor.

Q (By Mr. Pepe) The clip we just saw, Mr. Rechen, who was asking the questions of Mr. Rogovin?

A That was Mark Giarratana. That was on the part of the examination that would have been the direct examination.

Q And the clip we saw before the recess, who was asking the questions there?

A That was -- that was me asking the questions as if I was doing a cross-examination of Mr. Rogovin.

Q By Caudill's lawyer.

A By Caudill's lawyer, correct. That was the difference between -- as I said earlier before the break, the direct examination was usable; and we used, in fact, what the jury just saw after the break in the mock jury exercise that we did. It was what was played before the break that we concluded was unusable and problematic.

Q Did you give any explanation to Mr. Rogovin about what was going to happen when he sat down to be videotaped? Did you explain how that is used and where it fit into the preparation effort?

A Absolutely. Absolutely.

Q    What did you tell him?

A    We had discussed it as early as November.  We discussed it November.  We discussed it in December.  Mark Giarratana, you saw on December 12th, sent lines of inquiry out to Mr. Rogovin.  He understood what we were doing here and why we were doing it; and he understand that, when I did my examination of him, it was as if it was a cross-examination in the courtroom to be used for a mock jury purpose.

Q    Now, of course, in the courtroom there would be a judge sitting up on the bench, and there was nobody playing the judge in that case; correct?

A    Of course.

Q    And the judge may have in the courtroom, in the face of that testimony, stepped in to regulate the exam, the cross-exam.  Fair enough?

A    I have no doubt that would have happened.

Q    Did you take that into account?

A    Absolutely.  In fact, that was a concern to us given the repeated statements from Mr. Rogovin that he intended to take on the judge.  I mean, if there's -- there is a confrontation on cross-examination necessarily between the lawyer doing the cross-exam and the witness, one of our concerns here is there could also be a confrontation between the witness and the judge.  We didn't need that.

Q    Now, in fairness, the allegations in the complaint charged

his company, his company, with misappropriating or stealing trade secrets; correct?

A   Yes.

Q   And you, as his lawyer, would expect him and did remind him to be concerned about that.

A   Yeah, well, you saw how he reacted to the notion that he had been called, labeled a thief.  I mean a misappropriation of trade secrets is referred to commonly as a theft of trade secrets.  It's the nature of the allegation.  That was a concern.  That was a concern.

Q   You said the cross-examination we saw before the break was not usable for your mock jury exercise that was coming up; correct?

A   Yes.

Q   Did you do something to correct that and address it?

A   Yeah.

Q   What did you do?

A   So recall that I said that we were under a time crunch when we went to Los Angeles in December because he had canceled November.  Well, now only half of what we've managed to accomplish in Los Angeles is usable.  Now we're really under a time crunch, and we have the holidays approaching and we have an early February mock trial date that we need to meet.  So we scheduled a new session with Mr. Rogovin; only this time we had him fly to our offices in Newark, New Jersey.  And we met him

there, and we redid the cross-examination of him.

MR. PEPE: Mr. Wyzik, would you pull up slide 47, please? I think that's shown on this next slide.

Q (By Mr. Pepe) In the reexamination to be used in a mock, did you explain again why you were doing this?

A I did. And I actually took a different approach although --

Q Well, excuse me. Did you again play Caudill's attorney?

A I did.

Q Okay. What was a different approach, and why did you take it?

A Well, so the first session cross-examination, um, I frankly think -- although I did play the role of a cross examiner, I was not, frankly, all that hostile in my examination of Mr. Rogovin. I was concerned Ben Lewis, who is a skilled examiner --

Q Who is Ben Lewis?

A -- and would be aggressive.

Q Who, again, is Ben Lewis? Who is Ben Lewis?

A Ben Lewis was the counsel for Caudill Seed.

Q Go ahead.

A And he tried the case together with his partners when we tried the Kentucky case.

But I needed something I could use. I mean, you know, we could have tried to use what we recorded in Los Angeles, but

I felt that the output from the mock jury exercise would be useless. That performance by Mr. Rogovin would ensure the case would be lost. What difference would it make how the other information we were testing got evaluated?

So in the redo that we did in Newark, New Jersey, that I did with Mr. Rogovin, I tried to even scale back my tone with Mr. Rogovin further in hopes that what I would get from him would be something more usable for our purposes. And we got something more usable. And we edited -- and then we had to edit that because, even though it was more usable, it was not what -- where I hoped we would get Mr. Rogovin to be when he testified in the courtroom.

Q   But you used it nonetheless with the mock jury?

A   Well, we edited it heavily and took the parts that we felt would most approximate where we could get Mr. Rogovin to be with extensive preparation, and we used that for the mock jury. And we edited out what we thought and hoped and expected would be behaviors we would not see in the courtroom.

Q   Having edited that and saved the direct examination, which we saw after the -- after the break, did you then use -- play that for the mock jury to get its reaction?

A   We did. We --

Q   Excuse me. Did you also -- you said you had video examinations, mock examinations, of your other witnesses.

A   And Caudill's.

Q   And an actor playing Caudill.

A   Correct.

Q   Did you use all of that with the mock jury?

A   We did.

Q   When was that?

A   That was in early -- I believe it was in the first week of February of 2019. We did a mock jury exercise in Louisville, a second mock jury exercise over two days.

Q   And were you directly involved in that, of course?

A   Yes.

Q   And was Mr. Rogovin present?

A   He was.

Q   How about the jury consultants? I think you referred to them earlier. In fact, you described the industry that has arisen around jury consultation; correct?

A   Yes, yes.

Q   And did you have jury consultants working with you in this process?

A   We did. So that was the Dancel group. I think there's been testimony about Danny O'Keefe and Celeste O'Keefe and their team from Mississippi. They worked with us when we did the initial mock jury exercise in 2018, and then they worked with us again when we did the follow on the deeper dive, higher budgeted exercise in February of 2019.

Q   Why do you go to Louisville to do it? You taped it, I

think you said.  You taped in Newark or -- why do you go down to Louisville and conduct a mock exercise, mock jury focus group exercise, there?

A   Because we wanted a cross-section of the community from which our actual jury pool would be tried.  Um, we wanted -- we wanted -- well, that's what we wanted.  We wanted people that were reflective of the morals and values of the Louisville, the greater Louisville community.  And so it was important to get the best results we could get to approximate what a Louisville jury would look like and think -- more importantly, think like in evaluating the case.

Q   You went through the exercise with your mock jury down in Louisville?

A   We did.

Q   You testified earlier that in the first low-budget mock jury exercise, the jurors complete questionnaires that are then received and compiled; is that correct?

A   That is correct.

Q   Did the same thing happen in the second mock jury exercise?

A   Yes, extensive questionnaires.  The jurors, mock jurors, filled out.

Q   And what is the nature of the questionnaires, and what is the purpose?

A   Well, the purpose is at various stages, after every witness testifies, after every, you know, argument and then asking

questions about the themes, give the mock jurors an opportunity to evaluate what they've just seen, what they've just heard, what they thought about it, what impressed them, what they found compelling, convincing, persuasive, what they found problematic. And the jurors rated a number of issues on a scale, I think, of one to ten and answered specific questions as well.

Q   Including evaluation of Mr. Rogovin's testimony in the second edited video?

A   His testimony, his credibility, his demeanor, his appearance, all of that.

Q   And were those questionnaires used by you in your preparation of Mr. Rogovin and in your preparation of the case to bring to trial?

A   They were.

        MR. PEPE:  Your Honor, I would respectfully move as a full exhibit PTX 171, which is the questionnaires relating to Jarrow Rogovin's testimony.  There's no objection.

        THE COURT:  Okay.  171 will be marked as a full exhibit.  Actually, I think I -- yeah, there was an objection but we took care of it.  So 171 will be full.

    (Plaintiff's Exhibit 171, received in evidence.)

Q   (By Mr. Pepe) And so, Mr. Rechen, I'm just going to show you -- I'm going to try and speed this up.  I'm going to show you one of these questionnaires so we get an idea.  And as I'm

doing that, I'm going to ask you, were you able to compile from this, these stack of questionnaires, a demonstrative that summarizes the information contained therein?

A   Yes.

Q   All right.  So let's get an idea, first of all, what the jurors are asking.  So if we look at the first page of PTX 171 entitled "Jarrow Rogovin testimony," heading says, quote, Please state your thoughts on his testimony, end quote.  What follows there, very generally, if you would, as you understood this data that was being presented to you.

THE COURT:  Let me interrupt for one moment.

Ladies and Gentlemen, again, the purpose of your consideration of this exhibit is limited to evaluating whether or not McCarter committed legal malpractice by not calling Mr. Rogovin as a witness.  That's the only purpose for which you may consider this exhibit.

Go ahead.

MR. PEPE:  Thank you, Your Honor.

THE COURT:  Mr. Rechen.  I'm sorry I interrupted.

Q   (By Mr. Pepe) So just tell us, what is the information being sought from the jurors in this questionnaire that was then utilized by you?

A   So you can see the written questionnaires that are put. What is your opinion as to the testimony given by Jarrow Rogovin?  Then, Does his testimony help in your understanding?

A series of questions.  This is -- I can't remember how many pages.  And the evaluation looks like it's on a scale of one to five, not one to ten.  But this is a multi-page questionnaire.

Q   You can go to the second page.  Do you want us to do that now so you can see it?

A   Yeah, let's go to the second page.  You know, so question 4, Did anything that Jarrow Rogovin say seem not credible?  This particular jury said no.  But there were a series of questions that went through this step by step by step.  And every juror filled one out for us to consider.

Q   And do you have an idea how many jurors there were in your mock panel?

A   I want to say there were about 20, but I don't -- that's -- that's an approximate.  I don't remember.

Q   Okay.  But you testified a moment ago that rather than go through each questionnaire and each question, you were able to compile the information into a summary and then take that summary and put it into a graphic.  Do I understand that?

A   That's correct.

Q   And is that graphic an accurate representation of the information contained in these questionnaires?

A   I believe it is.

Q   And would it aid you in your testimony explaining the information you received and how you used it as a result of

this mock jury focus group exercise?

A   Yes, it would.

Q   And would it be an aid to the jury in understanding your testimony in that regard?

A   I believe so.

MR. PEPE:  With the Court's permission, I'll call up our demonstrative, page 70, please.

THE COURT:  Yes, that would be fine.

MR. PEPE:  Seven three -- I'm sorry, seven zero.

Q   (By Mr. Pepe) This is the first page of that demonstrative, Mr. Rechen.  Do you recognize that?

A   I do, yes.

Q   Again, my question to you -- and I may interrupt you from time to time, but my question to you is:  Explain how this information elicited from the jurors, after seeing both the direct and cross-examination, the revised edited cross-examination -- correct?  They saw both?

A   They did, yes.

Q   They saw the direct examination from we saw after our break, and then they saw a revised and edited second cross-examination you did with a kinder, gentler Ben Lewis being played?

A   I think that's fair, Mr. Pepe.  Just to be clear, what the jury saw of my cross in December is not what was evaluated here.  This was -- as Mr. Pepe said, this was me playing --

what they evaluated was our edited version of my gentler,
kinder examination of Mr. Rogovin conducted in Newark in
January and the jury, the mock jury.  And there were two, as
you can see here, Group 1 and Group 2.  We had two separate
rooms, two juries, mock juries, one in one room, another in
another room, evaluating the evidence and filling out these
questionnaires.

Q   Oh, I see.  I didn't -- I didn't make that clear in my
questioning.

So if we see Group 1 and Group 2, are we to understand
what you just said, that there were two different mock jury
groups in two different rooms watching the video presentations
independently?

A   Correct.

Q   And then they -- both groups fill out questionnaires
individually, and you collect them.

A   Yes.

Q   And this represents the summary of both groups'
questionnaire conclusions; correct?

A   Yes.

Q   Okay.  I'm sorry.  Go ahead.

A   I'm not sure what the question is.

Q   That would help.

On page 70 of the graphic, the heading is, "After
Jarrow Rogovin testimony."  Questionnaire 6, Question 1:  Tell

us what information is shown -- is assembled there.

A   This is showing us a summary of the juror responses with respect to the jurors' opinions regarding the testimony by Mr. Rogovin.  And as you can see, both groups seem to have evaluated his testimony similarly with respect to credibility, you know, between not credible and somewhat credible, both groups.

Q   Okay.  And did the questionnaires also give the jurors, mock jurors, an opportunity to write down comments, narrative comments, besides just simply checking 1 through 5?

A   Yes, indeed.

       MR. PEPE:  And if can I ask Mr. Wyzik to call up 71, please.

Q   (By Mr. Pepe) Does that demonstrative show some of those comments that came back in questionnaires?

A   Yes, exactly.  So those are the comments.  And, again, this is on the redo of the testimony of Mr. Rogovin that they're evaluating.

Q   And what do the circle graphs on the left-hand side indicate there?  Can you tell us?

A   Well, this indicates the percentage of the group that had unfavorable opinions.  I mean those are not -- those are -- those are concerning numbers.

Q   So the first group had 74 percent had unfavorable opinions of his testimony.  Is that -- am I reading that correctly?

A    That's my understanding, yes, sir.

Q    And the second group had 86 percent had unfavorable?

A    Yes.

Q    And to the right, what is shown there?

A    Well, those are the -- those are some of the comments that came back:  Jarrow is a piece of work; not sure if one of his answers were answered directly; contrary, sarcastic, combative, ridiculously vague; he spoke in circles.

        Those are -- that's not my evaluation of Mr. Rogovin. Those are independent third parties seeing him on one occasion for the first time in the role of a witness related to the case brought against him.

        I keep saying "him."  I want to be very clear.  It wasn't against him, but he was -- he was a player in the -- in the saga here, even though the case was brought against the company.

Q    And still a witness you intended to call?

A    Absolutely.

Q    If you went to trial.

A    Absolutely.

        MR. PEPE:  If I can ask Mr. Wyzik to pull up the next one.

Q    (By Mr. Pepe) And here the question that is being summarized, as I understand it, at the top of that page:  Did his answers seem credible?

And what were the finding of the two different groups on this?

A   Yeah, so, again, a very similar.  Both groups, 87 percent and 86 percent unfavorability opinions with regard to the credibility of Mr. Rogovin.  And you see there the specific comments.  "I didn't believe a word he had to say" is the one that jumps out at me as something that -- you know, as trial counsel, we have to be concerned about and we have to prepare for.

Q   Okay.  And next, Mr. Wyzik, 73, it appears to be a further commentary on the question.  "Did his answers seem credible?" Do you see that at the top of the page?

A   Yes, I do.  And the same kinds of -- same kinds of responses here.

Q   Go to Demonstrative No. 74, Mr. Wyzik, if you would.

The question here being summarized is, quote, Did anything that Jarrow Rogovin seem -- said seem not credible, end quote?

And how do you understand those pie charts?  What do those pie charts tell you about that question?

A   Well, 75 and 86 percent, Groups 1 and 2 respectively answered yes to the question whether anything seemed not credible.

Q   We go to the next page and the demonstrative 75.  We see the same question, and here we have -- we have the narrative

filled out or provided by the mock jurors; is that correct?

A    Yes.

Q    These are the narratives in response to that question, Did Jarrow Rogovin -- anything Jarrow Rogovin say seem not credible?  Those are the narrative responses.  Do I understand that?

A    That is correct, yes.

Q    And if we go to page 76, it appears the same question and more narrative commends.

A    Yup.  Same comments.  "Makes you think he is lying about something."  "Majority of his testimony did not seem credible."

Q    And if we go to demonstrative page 7, the question addressed there is, Did his answers stay focused on the questions that were asked?  And what did the mock jurors' responses tell you as indicated in those pie charts?

A    So in Group 1, 87 percent said, no, he was not focused on the questions that were asked.

In Group 2, it was 86 percent.  This is concerning that these are the kind of results we are getting.  As between Groups 1 and Group 2, they evaluated Mr. Rogovin very similarly.

Q    If I go to the next page, No. 78, I see the same question, and here we have the narrative comments; is that correct?

A    Yes, yes.  So, I mean, again, if I've got one person on the actual jury evaluating Mr. Rogovin this way, I have a problem.

If I have so many of the jurors evaluating Mr. Rogovin this way, it's much more of a problem.  That's what we were confronted with.

Q   If I go to the next page of the demonstrative, page 79, Mr. Wyzik -- thank you -- the question being evaluated there is, at the top, "Did his answers provide:  Not enough information/answers on point/too much information?"  And if we look at the left, we see a summary to the answers of that question?

A   Yes.

Q   And what was the reaction of the mock jurors to that question?

A   Well, this is telling me that he was evasive:  He was hard to follow and confusing; trying to sidestep; he did not answer.
         That's -- that's -- I mean, that's telltale.

Q   And over the left-hand side, it says, "Percent of participants who thought Rogovin's answered [sic] provided either not enough or too much information."  What was the group response?

A   Yeah, 88 percent in Group 1, 100 percent in Group 2.

Q   And, Mr. Wyzik, page 80 of the demonstrative.
         The same question, again but now we have more narrative?

A   Yes.

Q   Response on the right?

A   Additional jurors, mock jurors, providing their commentary, very similar response, consistent.

Q   Did you and your partners at McCarter & English working on this case take this information coming out of the mock jury exercise into consideration in terms of Mr. Rogovin's value, potential value, as a witness in the trial then scheduled for six months later, I guess seven months later?

A   Well, we had to.  We had to take this into consideration. We had -- I mean we knew Mr. Rogovin was a potentially important witness.  He was an important witness.  Um, we knew that there was information that, if it could be presented from him, would best come from him.  But we had to recognize there was a significant downside to putting him on the stand and trying to put -- to elicit that information from him in light of -- in light of the evaluations we got back on these questionnaires.

So we had to take that into account, and we did take it into account.  And we did discuss it with him.  If we went back to the e-mail that I sent him following the telephone call when he hung up on me, that was after all of this.  Same month. February of 2019.

Q   Yes, yes.

A   But that was after all of this.

Q   But let's have in mind that was the e-mail where you said you had to give him the unvarnished truth?

A    That was the e-mail.

Q    That was February of two thousand --

A    -- nineteen.

Q    Nineteen.  So three and a half months before trial.  Go ahead.  I interrupted you.

A    So, you know, we addressed this with him when we got this information back.  We addressed this with Mr. Rogovin in that February 2019 e-mail.  And then I, in particular, took steps to schedule meetings in the three and a half months that remained, in-person meetings, with Mr. Rogovin in Los Angeles, in Mississippi, and in the East -- on the East Coast, ideally here in Hartford, but if it was more convenient for Mr. Rogovin to fly into New York or Newark to meet in either our Manhattan or our Newark, New Jersey, offices so we could continue in earnest and in greater detail his trial preparation, the preparation of his testimony.

        And I worked with his executive assistant, Eva Alejandrino, in order to try to schedule those dates.  There were a lot of back-and-forth e-mails on that subject, and Mr. Rogovin -- I think we got two of the three meetings I wanted to have before we want to Kentucky.  Two of the three meetings scheduled.  And then Mr. Rogovin canceled them.

        We did end up having a meeting in Louisville, because we went to Louisville to take a deposition --

Q    Okay.  Where are we now?  So the mock jury --

A    End of March.

Q    -- the unvarnished truth e-mail we're February.  And you testified you did not abandon your plan to call him as a witness.  Is that a fair conclusion?

A    Absolutely we did not abandon.

Q    But you're testifying, if I can say, you continued your efforts to prepare, and you --

A    Say that again.

Q    You continued your efforts to prepare him to improve his testimony.

A    Absolutely.

Q    And you described the efforts that went on.  And now -- and the cancellations.

Now, I think I heard you say you finally got a meeting for preparation purposes in Louisville?

A    We had a meeting in Louisville.  The reason we were in Louisville is because we were there to take a deposition of what's called a corporate representative deposition, which turned out to be a deposition of Joseph Lyons, a two-hour deposition.  Mr. Rogovin wanted to be in attendance at that deposition.  He appeared, and so we certainly used our time together to try to prepare his testimony.  And we did work on his testimony in that meeting.

We did not get another chance to meet with him until May 31st, by which time we had already arrived in Louisville in

connection with our final preparations for the trial.  The other meetings we had attempted to schedule in April and May, as I described in Los Angeles and Mississippi with our jury consultants and in someplace on the East Coast, Mr. Rogovin canceled.

Q   I want to focus your attention on the April time period.  All right?  So here we have the mock jury focus group in February and then your efforts to schedule a meeting in April.

Was there -- was there a conversation you had with Jonathan Leventhal after he viewed the video deposition of Jarrow Rogovin?

A   Uh, yes.

MR. PEPE:  I'm going to call up -- I'm trying to actually accelerate the process through this timeline and not do every page.  But I would ask Mr. Wyzik -- thank you so much -- to call up 58.

Q   (By Mr. Pepe) And direct your attention to the entry on page 58.  You can see I've skipped several.  But may I focus you on April 30?

A   Yes.

Q   And that says -- this is a quote from an e-mail, and it says, Leventhal, JFI's new counsel, in-house counsel, watches Rogovin's video deposition.  E-mails Giarratana, quote, Mark: Please give me a call in the morning (Tuesday).  I was watching Jarrow's depo and Jarrow walked in.  He started watching it

with me.  I will explain on the phone what transpired next, end quote.

Did you get a copy of that e-mail?

A   Yes, I believe I did.

Q   And were you involved in this with Mr. Giarratana discussing this issue?

A   So I don't know that I was actually involved in this discussion, but I was certainly aware of it.

Q   Okay.  And when -- what was your understanding of Mr. Leventhal when he says, "I was watching Jarrow's depo."  Now, is that what we saw here in the courtroom?

A   Uh, no, no.  This is --

Q   There's a lot of videos floating around here, Mr. Rechen. And if --

A   Yes, there are.  No, this is the actual deposition that was taken via video by Caudill Seed's lawyer, at that time a lawyer whose name was Corey Skolnick.  And it was excerpts from that deposition that we ultimately played in the courtroom.  And that is what Mr. Leventhal, as I understand it, was watching when Mr. Rogovin walked into his office in Los Angeles.

Q   All right.  Did Mr. Giarratana tell you what the conversation was that he had with Mr. Leventhal?

A   He did.

Q   What was it?

MR. RESSER:  Objection.

THE COURT: Sorry. The question was did Mr. Giarratana -- yeah, so that's sustained.

Q (By Mr. Pepe) Mr. Leventhal did have a discussion with Mr. Leventhal about this.

THE COURT: I'm sorry. You said Mr. Leventhal had a discussion with Mr. Leventhal.

MR. RESSER: Objection.

MR. PEPE: I'm sorry.

Q (By Mr. Pepe) Did Mr. Giarratana, to your knowledge, have a conversation with Mr. Leventhal in response to this e-mail?

THE COURT: That's just a yes or no.

THE WITNESS: Yes.

Q (By Mr. Pepe) Okay. I'll come back to that. Now you've testified about the events in March and April and May. And I think you testified that you did have a meeting, you were successful in getting a meeting in preparation in that time period. And when was that?

A May 31st.

Q Okay. So I'm going to ask Mr. Wyzik to skip all those pages and go to the last one on page 64.

And, Mr. Rechen, when that gets up, is that a summary of all the events that you have described took place between April of 2016 and May of 2019 regarding your efforts to get Mr. Rogovin prepared to testify?

A Yeah, except this says June 1 -- well, June 1 Leventhal

intends to work with Rogovin.  It doesn't have the May 31st date on it.  May 31st I believe was a Friday.  We had arrived in Louisville on Tuesday.  Mr. Rogovin, as I recall, arrived a little bit later in the week.  We worked with him for about a half a day on that Friday.  Danny O'Keefe -- when I say "we," myself and Danny O'Keefe worked with Mr. Rogovin on May 31st, and I confirmed that by going back and looking at my time records.  I knew it had occurred, and it turned out to be about a half-day session.

Q   You said you were all in Louisville.  And it's now what, several -- a week before the trial.  Did you -- is this when you went down to Louisville for the trial to get ready which was scheduled to start on June 3?

A   It is, yes.  So this was a Friday.  We got the weekend.  And on Monday, June 3rd, the trial begins.

Q   And what was your evaluation of Mr. -- question withdrawn.

Before we go there on this graphic, this last page, there's two entries.  One on May 25 says, "Giarratana sends partial outline of testimony."  And then another on May 29, "Final lines of inquiry sent."

Explains what those entries mean.

A   Sure.

Q   And that terminology.

A   So having in mind that Mr. Rogovin has canceled a number of sessions that we wanted and needed to have with him but we

still need somehow to get him focused and get him ready, we did something I typically don't do.  So we looked at yesterday in Mr. Resser's examination of me of the lines of inquiry that I had prepared, that the team had prepared, for Mr. Rogovin's examination.  I typically do not give that to my witnesses.  That's for me.  I don't want the witnesses wedded to a specific outline.  The outline is supposed to guide me.  I went genuine responses from the witnesses that are not scripted in any way.

But here I made an exception, although the outline didn't contain scripted responses.  We needed to get Mr. Rogovin focused.  And so we sent him the lines of inquiry that I had prepared.

Separately, Mark Giarratana, and I think we looked at this yesterday as well, had prepared a -- basically a study book, also an outline, of the history related to the focus that we wanted Mr. Rogovin to give to the subject of his good faith with respect to his intentions in developing this broccoli product and his hiring of Kean Ashurst in order to do so.  And we, Mark, sent that to Mr. Rogovin for him to review as well.

All of that happened in May.  Again, why?  Because we couldn't get the prep sessions that we wanted, and we needed a work-around.  This was our work-around.

Mr. Rogovin arrived in Louisville.  He had not reviewed anything that we sent him.  He was struggling very much with the history, with the chronology.  And that raised

its own set of concerns, because he had lived it to a certain extent. But he still seemed unable to have a consistent, accurate recollection and ability to recite what had happened the way we understood it.

And we had put together for him not only the outline but the backup correspondence that supported it, that planted for him the milestones, the various dates on which certain things had happened and the import of those things with respect to our theory of the case.

He arrived in Louisville. Unfortunately, he was ill. We were told that he was on a Z-Pak of antibiotics for some infection that he had. I don't know what the details were. And he was tired. He was not sleeping. We were getting e-mails from him to that effect. He was, I'll use the word, "cranky." That made him difficult to work with. He had not reviewed the materials.

I worked with him on May 31st, Friday. Danny O'Keefe and I, we worked with him for about a half a day. It reached a point where it simply became unproductive and we stopped and we encouraged him to go back to his hotel room and get some sleep and we would figure out a way to work with him during the trial as needed in order to finally get him ready for his testimony.

Q   So at that time, May 31, notwithstanding what you said, it's still your plan to work with him to get him ready to

testify.  Do I understand that?

A   It is.  It is.

Q   All right.  I want to turn your attention to a different issue now.  We'll come back to that before we get into the trial itself.  You say May 31 you're just a weekend away from starting the trial; correct?

A   Correct.

Q   I'll come back there.  Right now I want to direct your attention to the issue of the bad faith breach of contract claim McCarter has brought here.  You understand that?

A   To the claim McCarter has brought, yes.

Q   McCarter has brought against Jarrow Formulas, Inc.  The court has found the contract, it found it was breached.  McCarter has claimed the breach was bad faith, willful, malicious, reckless, disregard of McCarter & English's rights; correct?  You have that in mind?

A   I do.

Q   You also understand it is Jarrow Formula's position the breach was not in bad faith, that Jarrow Rogovin had a state of mind that justified his nonpayments that did not constitute bad faith.  Do you have that in mind?

A   I do.

Q   I'm directing your attention now to the butt dial, the inadvertent voicemail left for Mr. Giarratana about which there has been substantial testimony.  Do you have that in mind?

A   Yes, I am.

Q   You're familiar with that?

A   I am.

Q   Very familiar?

A   I heard it the night it was received.  Mark Giarratana played it for me, and I've heard it a number of times since then, including in preparation for this trial.

Q   All right.  In that butt dial of a conversation between Mr. Rogovin and Mr. and Mrs. Ashurst, at Dean Ashurst's home the night of the verdict, Mr. Rogovin accuses McCarter & English as follows:  About eight years ago I had that expletive lawyer called O'Brien.  We have no intention of modeling any trade secrets.  And if you tell them what I should avoid, I will. And they never blank that because they didn't put that in. They found willful and malicious.  Okay?  You know that's called malpractice, end quote.

Are you aware of the -- what Mr. Rogovin is saying when he says "they," meaning McCarter & English, "did not put that in"?  Are you aware of -- what is your understanding of what he meant?

A   He's complaining that the O'Brien letter that was discussed during Mr. Berman's testimony, and during Mr. Resser's examination of me, he's complaining that that wasn't put into evidence.

Q   That is, in fact, accurate, is it not?

A    It's very accurate.

Q    Okay.  Why wasn't it put into evidence by the McCarter & English trial team during the three and a half weeks of trial in Louisville, Kentucky?

A    So, first, I don't believe it was going to come in under any circumstances where -- whether we had put Mr. Rogovin on the stand or not.  And the reason is because of the Court's ruling on the motion in limine.

Q    If I can interrupt you there, sir, forgive me.  But may I ask Mr. Wyzik to call up Exhibit PTX 619, which is a full exhibit now.

         THE COURT:  Okay.

Q    (By Mr. Pepe) And is that -- when you refer to the order on the motion in limine -- and if you need me to turn the pages, please say so.  But is that the one you had in mind?

A    It is.  Let's go to page 4.

Q    Give me a second here, please.

         MR. PEPE:  Mr. Wyzik, can we go to page 4?

Q    (By Mr. Pepe) And which paragraph do you want us to look at first, sir?

A    Yes, paragraph F, State litigation and arbitration.

Q    At the top of the page.

A    Yes.

Q    Is that what you had in mind?

A    It is what I had in mind.

Q   I interrupted you, but I wanted to get that before the jury.

Go ahead.

A   Sure.  So what the court had prohibited, any reference to the state court litigation, the outcome of the state court litigation and the history of the state court litigation.

Q   What did that have --

A   In order to know that, you have to go back and look at the motion in limine that was filed by Caudill Seed.  But this is -- this order is granting their motion.

The O'Brien letter was replete with references to the state court litigation.  Mr. Berman --

Q   Excuse me.  Attorney O'Brien represent -- was Attorney O'Brien representing a party in the state court litigation?

A   He was representing Caudill Seed.

Q   And the state court litigation was, of course, Caudill against Kean Ashurst.

A   It was.

Q   Not Jarrow Formulas.

A   That's correct.

Q   So the Tom O'Brien we're talking about is Caudill's lawyer in the Ashurst state court litigation.

A   At that time, the Ashurst state court litigation.  He became counsel in connection with the Kentucky litigation as well, although he was ultimately replaced.

But what's referred to here is references -- any references to this collateral state court litigation involving Mr. Ashurst.  And that's what the court, in its ruling on the motion in limine, prohibited from coming into evidence.

Q   What does that have to do with the O'Brien letter?

A   Well, the O'Brien letter, first and foremost -- the initial O'Brien letter written by Tom O'Brien to Mr. Rogovin was putting Mr. Rogovin and Jarrow Formulas on notice of the temporary restraining order that it issued in the state court litigation.  It was actually the kind of outcome and procedural history that was prohibited by the court's -- by the Kentucky Court's Judge Simpson's ruling on the motion in limine.

In replying to Mr. O'Brien's letter, Mr. Rogovin referred extensively, of course, to that litigation.  He quoted from certain of the rulings, including the TRO.  And when you read Mr. Rogovin's letter, which we referred to here as the O'Brien letter that he wanted us to put in evidence, there's no way to separate that letter from all of the continual content and references to the state court litigation, which was precluded here.  That was our evaluation.  Now --

Q   Well -- Go ahead.  Let me ask you this:  That was your evaluation that the court's order would preclude it; correct?

A   Yes.

Q   All right.  Assume for a moment that the court order was -- did not get issued or assume you could get around the court

order.  Would you then have put into evidence the O'Brien letter?

And I want to be clear.  When I use the term "O'Brien letter," it's Mr. Rogovin's letter responding to Attorney O'Brien in which he says he exonerates himself or words to that effect.  It's Mr. Rogovin's letter to O'Brien.  We have that in mind?

A    Thank you, yes.  Absolutely.  And that is what I am referring to as the O'Brien letter as well.

So we did not want to put -- I mean the O'Brien letter was precluded by the order, but we didn't want to put the O'Brien letter into evidence.  The suggestion has been made here that the O'Brien letter was a request by Mr. Rogovin: Identify for me what I should stay away from.

Well, we didn't read the letter that way at all.  I mean you could potentially tease that out of that letter, but you would literally have to tease it out.  Because it doesn't make that request.

What it -- what it -- and, in fact, if that was the intent of the letter, it wouldn't be a four-page letter, which is what it was.  It was -- I mean a letter of that sort is a three- or four-sentence letter:  Thank you, Mr. O'Brien for your letter.  We have no intention of using any confidential technology of Caudill Seed.  Please be as specific as you can in identifying information you would like us to stay away from,

and we will plan to do so.

That's a very simple letter.  That letter I would have put into evidence if it was not precluded by the court's order.

But even that kind of request -- I mean, Caudill Seed claims it has trade secrets.  Is it really going to respond to a letter that asks it to reveal its trade secrets so that the competitive company can stay away from it?  I mean that's not realistic, and I don't think that's a realistic interpretation of what the so-called O'Brien letter written by Mr. Rogovin was trying to accomplish.

When I read that letter, when we read that letter, our interpretation of that letter was that it was threatening, it was intimidating, it was condescending, and it also purported to control and expound upon Mr. Ashurst's legal rights vis-a-vis Caudill Seed as if Jarrow Formulas had the right to -- to control Mr. Ashurst's legal rights.

Q   What's wrong with that?

A   Had the right to threaten Mr. Ashurst's legal rights.  And we evaluated that as a very bad optic for Jarrow Formulas.  And that was yet another reason for us not to put in the O'Brien letter.

And then --

Q   Well, let me ask you --

A   Go ahead.

Q   Let me ask you this:  The Jarrow Rogovin response to the

first O'Brien letter, was that the end of the communication between Jarrow Rogovin and Attorney O'Brien at that time period in August of 2011?

A    No.  So on the day of the O'Brien letter, written by Mr. Rogovin very early in the morning, over the ensuing nine or ten hours that same morning, he wrote four -- three additional letters to Mr. -- or e-mails -- to Mr. O'Brien.  And they got progressively worse.

Q    What does that have to do?  I mean, Mr. Rechen, let's assume the -- you did put into evidence the O'Brien letter, Mr. Rogovin's first response.  What did the subsequent e-mails have to do with that in terms of your trial strategy?

A    As trial counsel, I had to at least assess, if not assume, that if I put the first letter in, as Mr. Rogovin wanted us to do, the successor -- successive letters, four in all now, three additional ones, would follow.

Q    Why do you say that?  I understand you assess it that way.  But you have 35 years of experience.  Why would that naturally follow?

A    Well, there's -- first of all, there is a rule of completeness.  Secondly, Caudill Seed would view this -- I'm sure their lawyers would view putting in the first letter as what we call "opening the door" to the other letters.  And if the first letter did not, was not evaluated by the jury as evidence of malice and ill will, willfulness on the part of

Jarrow Formulas, our evaluation was that the letters that would follow would seal the deal.  We did not want that information in front of the jury.

MR. PEPE:  May I move, Your Honor, as a full exhibit the admission of PTX 190 to which there is no objection?

THE COURT:  Yes, that will be a full exhibit.

(Plaintiff's Exhibit 190, received in evidence.)

MR. PEPE:  Thank you, Mr. Wyzik.  Can you call that up and pull out the heading so we can see the date and the "To" and the "From."

And then can you drop down -- after Mr. Rechen has a chance to look at that, can you further expand below so he can see the addressee.

THE WITNESS:  Yeah, so this is one of the -- I think this is the second letter, same morning, in the span of nine or ten hours, 3:37 a.m.

MR. PEPE:  I'm going to ask Mr. Wyzik to call out the fourth paragraph beginning with the words "Your own first error" and highlight that first sentence.  Can you call out that paragraph and highlight the first sentence, sir.

Q   (By Mr. Pepe) Is that -- is that part -- is that part -- question withdrawn.

Does that indicate the basis for the concern about these e-mails you just explained to the jury?

A   Yeah.  So this is one of the concerns.  I mean, first,

"Your own first error is that you justify this asinine litigation by falsely insinuating that Jarrow is violating, or might violate, any trade secret of Caudill Seed."

Well, if the jury in Kentucky gets to the issue of willful and malicious misappropriation, they will have already decided that there was a violation by Mr. Rogovin. This is a problem.

MR. PEPE: Ask Mr. Wyzik to blow up or call out the first paragraph -- excuse me -- the third paragraph from the bottom beginning with the words, "Is your firm at all experienced?"

Q   (By Mr. Pepe) Another part of that that caused you the same concern, sir?

A   I mean here he is attacking Caudill Seed's lawyers with obviously rhetorical questions but questions that are, in our evaluation, were condescending, insulting, threatening.

MR. PEPE: And the last paragraph, Mr. Wyzik, can you call that out? It begins "Your client."

Q   (By Mr. Pepe) Now, here, sir, he's talking about your client, Mr. O'Brien's client, who is Caudill Seed; correct?

A   Well, he's referring to Caudill Seed and its former employee, Mr. Ashurst. And he's -- he's threatening a lawsuit brought by Mr. Ashurst.

MR. PEPE: With the Court's permission, may I move as a full exhibit PTX 191 to which there is no objection?

THE COURT: Yes, that will be full.

(Plaintiff's Exhibit 191, received in evidence.)

MR. PEPE: Mr. Wyzik, can you call that up? Thank you so much. And again can you call -- thank you, sir.

Q   (By Mr. Pepe) Is this another one of the e-mails that you said would follow the first so-called O'Brien letter from Mr. Rogovin and which you said, based on your experience, would come into evidence if the first one came in?

A   Well, so this one that we're looking is from Tom O'Brien.

Q   Yup. And if I direct you to the second page of that and ask Mr. Wyzik --

A   This is the e-mail that preceded it. So this would be the third letter written by Mr. Rogovin to Mr. O'Brien --

Q   I'm going to just show you --

A   -- within about a ten-hour span.

Q   Just going to show you the next page so we can establish that. Okay?

Can you call out the next page and show the signature at the bottom?

A   Yeah, I see it.

MR. PEPE: Okay. Now we go back to the preceding page, Mr. Wyzik, which is page 82485 in the lower right-hand corner. And can you call out that second paragraph beginning "It was."

Highlight the first four lines.

Q    (By Mr. Pepe) Is that what you had in mind when you said that could be evidence of unhelpful, harmful evidence of Jarrow Formulas or Jarrow Rogovin's state of mind?

A    Yes.  I mean here again he's attacking Caudill Seed's lawyers.  He's accusing them of lying.  This is an absolute lie.  He is threatening.  He says:  You have violated canons, the canons and ethics of your state bar.  You are hawking conjecture as fact while concealing your allegations from this corporation.  These are despicable tactics.

I mean I agree if those tactics he's complaining about are true, they're despicable.  But the point is this letter would come in and I believe would look -- would make Jarrow Formulas look very bad.

MR. PEPE:  And may I move as a full exhibit, Your Honor, PTX 192 to which there is no objection?

THE COURT:  Yes, that's full.

(Plaintiff's Exhibit 192, received in evidence.)

MR. PEPE:  And can you call out the first -- the top part of that, including the first and second paragraph, Mr. Wyzik.

THE WITNESS:  I believe this is -- this is the fourth letter that I --

Q    (By Mr. Pepe) We're still on August 12.  We're still on the same.

A    All in between the very early morning hours and the late

morning hours of August 12th.

Q    All right.  And is there anything there again that would concern you as the trial lawyer addressing the issue of -- or being concerned about the issue of willful and malicious misappropriation?

A    Well, I think this is -- I think this is more of the same.  This is, again, a communication that is threatening, is condescending, intimidating, and could be read by the fact-finder as evidence of Mr. Rogovin's state of mind at that time relative to Caudill Seed.

Q    And at that time, had the bad facts, the horrible narrative, already taken place?

A    Not entirely necessarily.

Q    What do you mean?

A    Well, when we talk about a misappropriation of trade secrets, recall that yesterday in my testimony I said there are three parts to misappropriation.  There's improper acquisition, disclosure, and use.  Jarrow Formulas may have received the information months before this letter.  But it was using the information at the very time that Mr. Rogovin was writing this letter.  And it continued to use the information -- set aside whether it was a trade secret or not.

          I mean, our job was to advocate that it was not.  But our concern here was that we don't just draw a bright line on the date that the information was received because

misappropriation incorporates more than simply receipt.  It includes use.  And this is a period of use by Jarrow Formulas, and that period of use continued.  It continued in the years that followed, and it continued with respect to communications we're going to see that Mr. Rogovin wrote directed to a lawyer whose name was Steve Pence as well.

Q   Continued use as alleged by Caudill Seed.

A   As alleged by Caudill Seed.

MR. PEPE:  Can I ask Mr. Wyzik to blow up the last paragraph on the first page, please, same exhibit, PTX 192.

It begins "This lawsuit."

Q   (By Mr. Pepe) And again, sir, he says here to Mr. O'Brien, "This lawsuit" -- referring to which lawsuit now?  The lawsuit against Kean Ashurst?

A   Yes.  And that last paragraph, I mean, Mr. Rogovin there is trying -- and this is the concern that I have as a trial lawyer presenting evidence.  He's actually trying to turn the tables on Caudill Seed.  And that's what I mean by bullying, threatening, intimidating, when he writes, "This lawsuit is not about protecting trade secrets.  It's about your client willfully, wantonly, deliberately, maliciously and oppressively seeking to harm Mr. Ashurst, particularly by preventing him from obtaining gainful new employment while wielding the resources of a much larger corporation to cause an older, middle class," referring to Mr. Ashurst's, I believe,

"technical worker to waste his life's savings on a malicious suit. There is no other explanation for your firm lying about my company and attempting to conceal from it statements being placed before the Court. In my view, it doesn't get sleazier."

So, I mean, that's what he wrote. Mr. Rogovin had a view, and he would continually refer to a publication called the *Art of War* written by Sun Tzu. And his belief was, at least in part, that the best defense is a very strong offense. He's not entirely wrong about that in the world of litigation. But that can go too far, and that's what's going on here. This is an attempt to turn the tables and to make -- to intimidate Caudill Seed with an offensive claim in order to scare it away from pursuing its trade secret claim against Mr. Ashurst and against Jarrow Formulas.

I say that not as someone who's advocating that that is what's going on here. I say that as Jarrow Formulas' advocate recognizing that that is how a fact-finder could easily perceive that. And as Jarrow Formulas' trial counsel, I needed to be concerned about that.

Q   And did you consider that in terms of the use of the O'Brien letter and the successive e-mails in the trial of the Kentucky case?

A   Yes.

Q   And what did you conclude was the appropriate strategy with respect to the O'Brien letter? And now I'm using that term to

mean the original response from Mr. Rogovin and his follow-up e-mails. What was your conclusion and the conclusion of McCarter & English with respect to the use of those letters?

A   Our conclusion was that those letters should not see the light of day in the courtroom if we could avoid it.

Q   For the reasons you've just explained to the jury?

A   Yes, sir.

Q   I want to go back now to the inadvertent voicemail left for Mr. Giarratana on the night of the verdict, June 26, 2019.

In that -- in that butt dial recording his conversation with Mr. and Mrs. Ashurst, he also accuses McCarter as follows:  To cut off my damages, they did expletive.  Because they didn't cut off my damages even -- and then he goes on to say that's malpractice.

Do you understand what damages -- question withdrawn.

What is your understanding of the damages to which he is referring in his accusation that you failed to cut off those damages?

A   He's referring to the damages that were claimed by Caudill Seed, began at $12 million, as alleged in the complaint, was ultimately, as we saw on the jury verdict form, reduced to 9 point something million dollars as the ceiling beyond which the jury in its award, if it awarded damages, could not go.  And more particularly he is referring to the research and development damages claimed by Caudill Seed, which, as you

heard Mr. Rogovin testify, based on what he was told by Mr. Ashurst and his many years of experience in the industry, they evaluated could not exceed 200 or $250,000.

Q   Is that accusation that you did blank to cut off the damages, is that in fact accurate?

A   Completely inaccurate.

Q   Did McCarter --

THE COURT:  Excuse me one second.

Remember, Ladies and Gentlemen, the purpose -- the only purpose for which you may consider this bit about research and development costs and damages is -- is as you find, or not, that it relates to Jarrow Formulas -- to whether Jarrow Formulas acted maliciously in making a decision not to pay certain bills.

Go ahead, Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.

Q   (By Mr. Pepe) In the Kentucky court litigation, did you and your team, in fact, address the issue of the damages being claimed by Caudill Seed?

A   That was a focal point of our efforts from the very beginning of the litigation.  And it continued through every phase of the case, including the discovery phase of the case, including -- I haven't discussed this yet but what I would refer to as the supplementation of the discovery phase of the case and ultimately the trial of the case.

Q   Is it your testimony that your efforts to address, limit, defend against, and rebut the damages claimed by Caudill Seed began in the very early stages of the litigation and continued through trial?  Is that your testimony?

A   That is my testimony.

Q   That's almost six -- that's some six years; right, Mr. Rechen?

A   Yes, it is.

Q   Is it possible for you to explain what those efforts were in some truncated form so that the jury can understand what you claim McCarter & English did to address and defend against Caudill Seed's claimed damages?

A   I believe so.

Q   All right.  I'm going to ask you now to explain -- start explaining to the jury, and I may have to interrupt you from time to time to ask you to explain something that may be apparent to you but not always to everyone else.

A   Okay.  Thank you.

Q   Start at the beginning, if you would, and I'm asking you now to give us in summary form.

A   So I think about this case and the Kentucky case in really, I think, four phases.  There's the initial phase of discovery, the beginning of the case, what I would call the first two years of the case.  There is then the -- that's -- I'll refer to that as the discovery phase.  Then there's the motion for

summary judgment phase.  Then there's the supplementation of discovery phase.  And then there's the trial.

Q   Let me ask you about the first one, the first one, discovery phase.  At the risk of stating the obvious, very generally, what does "discovery phase" mean, and what does "discovery" mean as you use that term and as it relates to this case?

A   Sure.  So in any case -- in this case, we're talking about a case brought in federal court, the Federal Rules of Civil Procedure govern.  And I'm not going to bore you with a whole lot of that.  But I will tell you this:  There are certain tools that are available to us in order to discover information from the other side, and the other side to discover information from Jarrow Formulas in any litigation.

Those tools are:  first, interrogatories, written questions that the other side -- that we serve, the other side has to answer under oath; second, requests for production of documents, a series of identification of categories of documentary information that we require them to produce to us so that we can evaluate the claims they're making, including their damages claims; third, what we call requests for admissions.  Requests for admissions are statements that we pose, present, or we say propound upon them requiring that they admit or deny the truth of the statement.  There's three of the tools.  And then depositions.  You've heard about depositions.

You know, these are opportunities for us to actually question witnesses and parties under oath in a question-and-answer format, much like in this courtroom.

So those are the four tools:  interrogatories, requests for admission, requests for production, and depositions.

Q   Did McCarter use all four tools to address, limit, rebut the damages being claimed by Caudill?

A   Every single one of those tools were employed, yes, absolutely.

Q   During what you call the discovery phase?

A   In the discovery phase, yes.

Q   What was your objective in using those tools in the discovery phase as it relates to Caudill's claimed damages?

A   Our primary objectives were -- and I think I referred to this when I talked about the three legs of the stool the other day -- tell us what your trade secrets are with specificity; tell us what your research and development was with specificity; identify for us the damages you claim, and, more particularly, the costs you incurred with respect to the research and development that is related to the trade secrets that you've identified.

In pursuing that, we served all of the aforementioned discovery.  We took 25 depositions.  And Mr. Rogovin testified the other day that he demanded we take the deposition of Dan

Caudill and that we failed to do it.  It was the very first deposition we took was of Dan Caudill.  And then 24 additional depositions followed.

We got from Caudill Seed all of the information that they would give us --

Q   And was it enough for you to answer the questions you just said was your objective:  tell us the trade secrets; tell us the damages; tell us how much you spent on R&D?  Were you successful?

A   It got us partway there.  We were not nearly satisfied, not nearly.

Q   Why not?

A   Because we felt they had not sufficiently identified their trade secrets because we were concerned that they had been very vague in their identification.  And that is something that every trade secret plaintiff wants to be is vague as possible about specifically identifying trade secrets.

THE COURT:  Excuse me one moment, Mr. Rechen.

THE WITNESS:  Yes.

THE COURT:  Let's see if we can focus the testimony on the R&D just so the jury doesn't lose sight of the purpose of this evidence, rather than go through all of the discovery in the Kentucky litigation?

MR. PEPE:  Exactly, of course, Your Honor.

THE COURT:  Maybe you can get another question?

MR. PEPE:  Sure, of course.

Q   (By Mr. Pepe) So what, if anything, did that discovery yield with respect to the R&D costs that were ultimately claimed by and awarded by the jury?

A   Well, we did not get all of the backup information that we expected to get.  They were claiming a big number in research and development damages.  Um, but we did not -- we got information, but we did not get as much information as would support 17 to 23 years of research and development, which is what they claimed as their trade secret number one.

Q   What, if anything, did you do in that phase or subsequent phases, as you've described the litigation?

A   Well, in that phase, my recollection, came to a close.  And we moved into the summary judgment phase.  We filed motions for summary judgment.  The motion was denied.  And then we -- after that motion was denied in late 2015, we then moved into the supplementation phase.

Q   What do you mean by that term, and how does it relate to your efforts to identify the research and development costs?

A   So the Federal Rules of Civil Procedure require a party to supplement its discovery in order to make it complete.  And that's what we were entitled to was fair and complete responses to all of our discovery requests.  And this is focused now primarily on interrogatories, requests for production, and requests for admission.  And we identified in that phase the

specific interrogatories, requests for production, and requests for admissions that we needed them to supplement and ultimately to certify that they had given everything that Jarrow Formulas was entitled to, that they had in either their possession and custody or in their control, which would include the CPA and any other professionals that were their agents. And so we required that.

Q   And did -- and did that supplementation demanded by you produce additional information regarding the R&D expenses that Caudill was claiming as its damages?

A   Well, some, but only after very considerable letter writing and motion practice before the court, including motions to compel, motions for sanctions. And ultimately we did receive, after going through that process, um, a certification that they had given us everything that they had.

Q   Well, did you -- once you got that certification, did you evaluate the information to which they claimed -- "they," Caudill -- claimed was everything they had on the issue of R&D costs claimed as damages?

A   Yes, we did. We evaluated it. We concluded that had not supported their research and development damages figures with the information that they had provided. We recognized that, because they were the plaintiff, they had the burden of proof. They had to prove their damages. They had to provide the support for their expert witness in order to be able to opine

on damages.  And our evaluation was that, although they had certified they had given us everything they had, it was insufficient for them to meet their burden of proof.  And so that was our analysis.

Q   Did you quantify, analyze and quantify, the information they did provide you?

A   We did.

Q   And what, if any, dollar value of research and development costs were evidenced from the information that Caudill did provide, which you said was certified as complete?

A   Well, so Mr. Ashurst, at Mr. Rogovin's urging, in March of 2019, had suggested this $250,000 number and that we needed to follow up on that.

Q   Was that consistent with the information that had been provided already or by that time by Caudill?

A   It -- not even close.

Q   Explain, please.

A   We had received -- so, again, Caudill Seed is claiming 17 to 23 years.  We have had some information for a much more narrow window of time.  That narrow window was 2007 until about 2013, if I recall, five or six years, not 17 to 23 years.

Q   Did you have financial information from Caudill during that window that was evidence of their R&D costs?

A   We had Caudill Seed ledger information for what they were claiming as their R&D as reflected on their tax returns and

certain financial statements that they had provided.

Q   And what did that information reveal?

A   That information, together with other information that we had, revealed that Caudill Seed did have backup for approximately $1.2 million in research and development damages for a very limited window of time.

Q   Okay.  And I'm not sure I understand it.  You said Caudill was claiming R&D expenses as its damages, research and development expenses, as its damages over a period of time.

A   Seventeen to 23 years.

Q   Okay.

A   We had five or six years of information that suggested that Mr. Ashurst's $250,000 number relied upon by Mr. Rogovin was not even close.  I mean, it was -- we were concerned that if we pursued further, we would end up proving for Caudill Seed its research and development damages.  We felt that they did not have the information they needed to support their claim over the period of time that they were claiming it and that, to the extent Mr. Ashurst was saying it couldn't be any more than 250,000, well, we had 90,000 or close to a hundred thousand in backup information for a Caudill Seed vendor called McCoy & McCoy Laboratories.

       We had salary information for three individuals:  Dan Caudill; Kean Ashurst, while he was employed there; and a gentleman whose name was Greg Rieder that they had claimed on

their tax returns as research and development costs.  And they were claiming it varied somewhat from year to year about 50 percent of the salaries of each of these individuals.

We had larger information and other information related to other of their vendor costs, and all of that information exceeded what Mr. Ashurst was telling us by a factor of four.

Q    But was not the entire 17 to 23 years.

A    Not even close.

THE COURT:  So, Mr. Pepe, I think you've covered this.

And, Ladies and Gentlemen, just remind you again, the limited purpose for which all of this R&D details, all the CPA tax return is for.  It's only to assess whether Jarrow Formulas acted maliciously in deciding not to pay or acted for other reasons that weren't malicious.

So go ahead, Mr. Pepe.

MR. PEPE:  Thank you, Your Honor.

Q    (By Mr. Pepe) Did you continue to attack the damages in the next phases of the case?  I think you talked about discovery, summary judgment, supplementation.  I think the fourth one was the trial itself.

A    Yes.

Q    Did you attack those damages claimed by Caudill for its costs for research and development in the trial itself?

A    Vigorously.  First, we moved in limine to exclude Mr.

Wingate's opinion on the ground that it was not supported. Then we conducted a --

Q    What happened with the motion in limine?

A    It was denied.  The court concluded that it would allow Mr. Wingate to testify.  It did express, I think, some reservations but that it was going to allow the jury to resolve whether Caudill Seed had a bona fide damages claim and it was going to allow, in the court's words, a vigorous cross-examination.  We did that vigorous cross-examination.  I did that examination.

Q    All right.  So the motion in limine is denied.  There is evidence offered on the research and development costs.

A    That's correct.

Q    And was there -- and is that the next step in your efforts during the trial phase?

A    It was.

Q    And you mentioned a Mr. Wingate.  Who was Mr. Wingate?

A    Mr. Wingate was Caudill Seed's expert witness on the subject of its damages.  He put forth its damages evidence.

Q    And did you -- you said you conducted the cross-examination?

A    I did.

Q    And did you attack the damages that were being claimed for research and development?

A    With everything we had.

Q    What were the damages being claimed -- the quantification

of them at the time of trial?  Do you understand my question?

A   The full amount claimed at that time was a little over -- well, it was a number between 9 and 10 million.  I can't give you the exact number.  It's on the jury verdict form, which the jury has seen.

Q   But that's what Mr. Wingate, the expert, is testifying to, somewhere between 9 and 10 million?

A   Correct.

Q   You conducted the cross-examination.

A   I did.

Q   All right.  What, if anything, did Mr. Rogovin say to you after the cross-examination of Wingate, the damage expert?

A   Well, so you heard me say in cross-examination, or the examination of me yesterday by Mr. Resser, that after the opening statement, Mr. Rogovin hugged me.  He hugged me three times during the trial.  And once was after the examination of Win -- Mr. Wingate.  He felt Mr. Wingate was, his words, "totally destroyed."

Q   You had working with you a local counsel, Joel Beres.

A   Correct.

Q   I'm going to come back to Mr. Beres, but was he with you at trial?

A   Every day.

Q   And I think your testimony has been he was also a lawyer specializing and concentrating his practice in intellectual

property law; correct?

A    Yes.

Q    Was he there during the cross-examination of Wingate?

A    He was.

Q    Did he subsequently make known his evaluation of that cross-examination?

A    He did.

        MR. PEPE:  I move, Your Honor, as a full exhibit PTX 088 to which there is no objection.

        THE COURT:  Okay.  There's no objection to 88.  That will be full.

    (Plaintiff's Exhibit 88, received in evidence.)

Q    (By Mr. Pepe) At the top, sir, we have Mr. Beres' e-mail to you of Sunday, June 16.  Can you place that date, June 16, in relationship to the, if you can, the cross-examination of Mr. Wingate you've just described.

A    Mr. Wingate was cross-examined.  He was direct examined by Caudill Seed's lawyers on Thursday the 13th, on Friday the 16th -- 14th.  My recollection is I cross-examined him in the morning.  I may have -- I may have begun my cross-examination the day before, but it was finished on Friday.  And then this e-mail was received on Sunday.

Q    He says, "What time are you getting back into town?  If your ears were burning a while ago, don't worry.  It was because I was saying nice things about you to some of my

colleagues here at Stites."

Q    Stites is the law firm?

A    Stites Harbison, yes.

Q    And then he attaches or sets forth below his e-mail to certain -- can you recognize the people in that list of addressees?

A    Um --

Q    Some of them at least?

A    I think the only one I recognize is David Nagle.  The others I don't know.

Q    But they all have the Stites e-mail address?

A    These are all, I believe, partners of Mr. -- Attorney Beres.

Q    Can you bring the microphone closer?

A    I'm sorry.

Q    Thank you.

He says in that, to his colleagues, quote, "After taking all ten days scheduled for trial prior to resting at 4:00 p.m. on Friday, Plaintiff's damages expert now says 6 to 10 million before trebling or attorney's fees."

Does the trebling attorney's fees relate to willful and malicious if the jury finds that?

A    Yes.

Q    It says, After the direct and cross-examination of Wingate, Caudill's damage expert; correct?

A    Correct.

Q    He goes on to say, quote, So potentially 18 million to 30 million, plus attorney's fees are at stake, end quote.

He continues, "Our lead counsel, Tom Rechen of McCarter & English, put on a master class on cross-examining a damages expert.  Wingate" -- that's their damage expert; correct?

A    That's correct.

Q    "-- was emasculated and eviscerated.  I (almost) felt sorry for the guy, but it was his own fault for not doing a better job, requesting appropriate back up, and asking the hard questions of his client.  Riley, or Bratic" -- do you know those names?

A    Well, actually Riley I do recognize as one of his partners.  Bratic I don't recognize.

Q    "Riley or Bratic would never have authored a damages report that subjected themselves to such a brutal cross examination.  It was Wingate's first time testifying as an expert on trade secret misappropriation damage -- and it may well be his last," end quote.

Did you, following that cross-examination, take additional steps to eliminate Caudill's damages claimed for research and development?

A    We moved to strike his testimony and his report.

Q    And, again, what does that mean?

A    So it means that we felt we had established in our cross-examination that he had not done the work required of an expert to be able to take this seat in a federal courtroom and give opinion testimony.  We felt that there is a certain level of completeness and analysis in his work that was missing, and that was the subject of our earlier motion in limine, which the court had denied.  But now the court had actually heard it from his own mouth, Mr. Wingate's on my cross-examination, and that we felt his testimony should not be able to stand in a federal courtroom.

Q    And go to the jury for consideration.

A    Correct.

Q    Persuade the judge that time?

A    We had little luck persuading Judge Simpson.  He decided he was going to let the jury evaluate just how effective the cross-examination was and whether Mr. Wingate's damages testimony was worth anything.  And I think, actually, those may even have been Judge Simpson's words in denying our motion.

Q    Was the in-house counsel for Jarrow Formulas, Jonathan Leventhal, in the courtroom on the day you conducted that examination, I think you said, on June 13?

A    Thirteen and 14.

Q    Was he, Mr. Leventhal, in the courtroom?

A    He was.

Q    And that day?  Every day?  Some days?

A    To my recollection, every day and at counsel's table.

Q    Did he have anything to say about your cross-examination?

A    He was laudatory to be sure.

MR. PEPE:  I move as a full exhibit, Your Honor, PTX 089, to which there's no objection.

THE COURT:  Yes, that's full.  89 is full.

(Plaintiff's Exhibit 89, received in evidence.)

MR. PEPE:  If I can ask Mr. Wyzik -- no, that's PTX 089, Mr. Wyzik.  I'm sorry.

THE COURT:  Let's take that one down, please.

I tell you what.  Let's take our lunch recess now.

Ladies and Gentlemen, thank you for your attention today -- this morning I should say.  Don't discuss the case. Don't let anyone discuss it with you and all that goes with that.  Thank you very much.  We'll see you after lunch, around 1:30.

(The jury left the courtroom at 12:42 p.m.)

THE COURT:  You can be seated.

You can step down, Mr. Rechen.  Thank you.

Is there anything before we recess?

MR. PEPE:  Nothing from plaintiff Your Honor.

THE COURT:  Mr. Resser?

MR. RESSER:  No, Your Honor.

THE COURT:  Thank you.  We'll be in recess.

(Recess from 12:43 p.m. to 1:28 p.m.)

(The jury entered the courtroom at 1:28 p.m.)

THE COURT: So, folks, I just wanted to, before we resume, just say a word about timing. So the good news is that the trains are running on time, in large part because of your diligence and punctuality. We very much appreciate that.

I've spoken with the lawyers. Our expectation is that we will definitely be done in all respects of this, with this trial by the 31st, which is the date I gave you. And there is a good chance we will be done significantly before then. I'm going to leave it at that for now, rather vague, but I can tell you I appreciate your being here on time, and it has helped. And it is helping. So thank you.

MR. PEPE: Mr. Pepe, you may proceed, sir.

Thank you, Your Honor.

Q   (By Mr. Pepe) Mr. Rechen, before the luncheon recess, you were testifying about the in-house counsel for Jarrow Formulas, Jonathan Leventhal. Do you have that in mind?

A   Yes, I do.

Q   And you said he was present every day at the trial sitting at counsel table?

A   He was.

Q   And present the date you did the Wingate Cross-examination on June 13; correct?

A   Yes, sir.

Q   And I think you testified that he extended his praise to

you in that regard also.

A    Yes.

MR. PEPE:  Mr. Wyzik, may I -- pull it down, please, Mr. Wyzik.

Your Honor, may I move as a full exhibit PTX 89 to which there is no objection?

THE COURT:  89 is already in.

MR. PEPE:  I'm sorry.

Q    (By Mr. Pepe) You have before you 089, Mr. Rechen?

A    I do.

Q    That's an e-mail to -- from Jonathan Leventhal to Mark Giarratana, and it's dated -- the first one is dated March -- excuse me -- June 17, 2019.  That would be four days after the examination?

A    Three days.

Q    Three days?

He says, to you, to Mr. Grondahl and to Mr. Giarratana, quote, "I know things have been turbulent this weekend with Jarrow."

Were they turbulent?

A    Monday in particular, yes.

Q    Okay.  It goes on to say, quote, However, I want you all to know that on behalf of the company, I think you are all doing a great job and it has truly been an honor to watch you all in action, end quote.

Is that the e-mail you had in mind?

A   Yes.

Q   You testified several times that your intention -- when I say the "intention," you and your trial team had, was to call Jarrow Rogovin as a witness live in the -- in the trial; correct?

A   That is correct.

Q   And you testified you had that intention still after that preparation session on May 31st, three days before the trial started?

A   And thus my opening on Monday, the 3rd.

Q   And including up to your opening on Monday.

A   Yes.

Q   Did there come a time when you and the trial team started to reevaluate that intention as to whether you would call Jarrow Rogovin live?

A   Yes.

Q   When did that evaluation first begin?

A   I think it really began the first weekend after the trial had started.  So we're a week into Caudill Seed's case.  The trial started on June 3rd.  And I would say June 8th and 9th, a Saturday and Sunday, is when we first began to think about it a little bit differently.

Q   What, if anything, caused you to start thinking about that issue differently?

A    All right.  So, first, let me say, you know, trial is, as you've heard the phrase, a fluid process.  Things are constantly changing.  Evidence is coming in.  Sometimes it's coming in better than you thought; sometimes it's not coming in as well as you thought it would come in.  Evidence is being kept out.  The judge is making rulings on various things.  So it's a fluid process, and things are changing.  And as trial counsel you have to be continually evaluating and reevaluating.  And we were certainly doing that.

We reached a point -- now we're in Caudill Seed's case-in-chief.  And we were from June 3rd, the opening day of the trial, until June 14th when they rested their case.  And so we're in their case-in-chief.  They're putting on evidence.

And that weekend, that weekend, right in the middle of their case-in-chief, they made a decision that was -- or they were in the process of making what appeared to be a decision that was a little surprising.

Q    What was that decision, and how was it communicated to you, if it was?

A    So it was communicated to us by e-mail when they decided that they were going to designate portions of Mr. Rogovin's deposition testimony and offer that in their case-in-chief in lieu of calling him as a live witness.

Q    Well, why did that -- you said you found it a little surprising.

A    I did.

Q    Explain briefly why that was surprising.

A    I had always thought that, if they were going to put in any evidence in their case-in-chief for Mr. Rogovin, that it was likely that they would call him.  And, frankly, I thought it was likely that they would call him.

Q    Did you so advise Mr. Rogovin that that was a possibility?

A    He was aware of that.  Now, we were receiving, and they were required to give us, 48 hours' notice of their witness lineup so we would have the opportunity, of course, to finalize his preparation.  But --

Q    Now, let me interrupt you.  Under the rules, if they decided to call Mr. Rogovin, your client, could you prevent that as long as they gave you the notice?

A    I mean we could object to that.  But that objection I have every reason to believe would have been overruled, and the reason is is because, generally speaking, a party can always put in deposition testimony, provided it's relevant and subject otherwise to the rules of evidence, can always put in evidence of an adverse party under what we call, you know, statement of a party opponent or admission.

Q    I meant if they had decided to call him live in their case-in-chief --

A    Oh.

Q    -- did they have the right to do that?

A    Yes, absolutely, yeah.

Q    So now there comes that weekend, and you receive notice that they, they Caudill's lawyers, are going to designate parts of Mr. Rogovin's video deposition.  Did I hear that correctly?

A    Well, I would say -- I wouldn't say it quite that strongly. I would say they are certainly considering that, and over that weekend they designated the testimony that they would offer if they decided to go in that direction.

Q    I see.  I see.  So they gave you notice that was under consideration.

A    Yes.

Q    Why, then, did that -- why was it -- question withdrawn.

What effect did that have on your strategy, if any?

A    Well, so Mr. -- that's -- so I think we got those designations either on Saturday or on Sunday.  And having received it, we reviewed it.  We assembled the trial team on a Sunday -- on Sunday night.  It was late in the day, into the evening.  And we had our technology queue up on the TV for all to see the video testimony of Mr. Rogovin.  And --

Q    Excuse me, the video deposition testimony that Caudill had cited or designated?

A    That's correct.

Q    Okay.  Go ahead.

A    And so we reviewed it, and that caused us to think differently about our case and whether it then opened up

opportunities for us that we otherwise didn't have, namely, counter-designating testimony from that same deposition and putting in Mr. Rogovin's testimony that way in lieu of us calling him live when we had the opportunity to do it.

Q   All right.  We've had testimony yesterday, the day before, about designations and counter-designations.  Is that what you're referring to here?

A   That is what I'm referring to.

Q   Did you pursue that possible strategy with ongoing discussions with your trial team, that is --

A   Well, we continued to have discussions.  So I think it's important to remember a couple of things:  first, what they were designating, which was from a deposition that, as you heard, our expert in this case has described as the worst deposition he's ever seen.  But what they had designated were clips.  And when we reviewed it, we concluded this isn't that bad.  In fact, we think we can live with this.

Further, we think we can neuter it further because some of it we thought was objectionable and the court would sustain those objections and take some of the testimony they had designated out of.

And then, further, we could counter-designate and thereby supplement with testimony that we knew was important to our case, we knew we had to get in one way or another, and we would have the opportunity to do it by counter-designating.

Q   Did you -- go ahead.  I'm sorry.

A   The decision was not made Sunday evening because they still had a whole other week ahead of them.  They could change the tactics; they could change their strategy; they could elect to call Mr. Rogovin; and there was still other evidence coming in. And my recollection is Kean Ashurst -- I don't recall exactly when Kean Ashurst testified, but we got a lot of information through him.

So before we could make any decision, we needed to know that their case was rested, which didn't happen until the following Friday, the 14th, and we needed to evaluate the entirety of the record that had been established to that point and then to evaluate whether putting in deposition testimony the way we were contemplating would meet our needs.

Q   When -- did the Caudill case-in-chief rest that following Friday after the Sunday evening you just described?

A   It did, on the 14th.

Q   Did you make your evaluation then?

A   We made our decision then.

Q   Okay.  And who was involved in that?

A   Well, so the final evaluation, if you will, actually occurred on Thursday evening.  Thursday evening, when we left the courthouse, we knew they were on the verge of resting their case.  And we -- they hadn't rested.  They were going to rest the next morning after I finished my cross-examination of Mr.

Wingate and some other -- and then they would play the deposition testimony that they were planning to play. So that's -- the final decision when it was rested. But the discussion amongst the trial team occurred Thursday night.

Q   Who was involved?

A   Myself, Attorney Giarratana, Attorney Grondahl, um, Attorney Beres, Celeste O'Keefe.

Q   Your jury consultant?

A   Exactly.

Q   Attorney Beres, your local counsel.

A   Yes.

Q   Go ahead.

A   Jimmy Thompson, who was our courtroom technician like Mr. Wyzik, who worked for Dancel; Cortland Joyce, who was our paralegal, had been in the courtroom virtually every day working closely with the team; Mr. Leventhal, the general counsel for the company; Rory Lipsky, the president of JII and a long-time employee of Jarrow Formulas; and Clay DuBose, the senior vice president of sales for JFI.

Q   Now, the question being discussed is whether to counter-designate the deposition parts to what already had been put in?

A   The question being discussed was the pros and cons surrounding whether to counter-designate deposition testimony and offer that in lieu of calling Mr. Rogovin live.

Q   Did you at that time have in mind the parts of the video deposition that you would counter-designate if you went down that path?

A   Absolutely.

Q   This meeting is on Thursday night, June 13?

A   Correct.

Q   And where is that meeting held?

A   It's held at Stites Harbison, Joel Beres's offices, in their large conference room.

Q   Have you worked with us to prepare a graphic, a demonstrative exhibit, that identifies the parties present at that meeting?

A   Yes, I have.

Q   Where in the offices of Stites Harbison was the meeting held that you just described?

A   It was in the large conference room in their -- right off their reception area.

        MR. PEPE:  All right.  Mr. Wyzik, may I have that demonstrative, please?

Q   (By Mr. Pepe) Does that demonstrative on the screen illustrate the parties present on the evening of June 13, 2019, in the conference room?

A   Yes.

Q   Of course, we know the three McCarter & English partners well by now.  Across from that is the Stites & Harbison team,

and you've already described who Mr. Beres is.  And I think you've described Mr. Joyce.  Is that Cortland Joyce?

A    Cortland Joyce, the paralegal.

Q    Paralegal for?

A    For Jarrow Formulas at Stites Harbison.  He worked very closely with the trial team throughout, was in the courtroom every day.

Q    Left-hand lower corner we have three individuals.  I think you mentioned their names.  Mr. DuBose is what relationship to Jarrow Formulas?

A    Senior vice president of sales.

Q    Okay.  Mr. Leventhal you've already described.  Mr. Lipsky we saw a deposition the other day.  What was his role?

A    I believe at the time he was either the president and/or CEO of Jarrow Industries.

Q    Now, you testified Jonathan Leventhal was present throughout the trial.  Also, Mr. DuBose and Mr. Lipsky every day?

A    No.

Q    Well, why were they here?

A    Clay DuBose and Rory Lipsky were witnesses who were going to testify.  We were intending to call them on behalf of Jarrow Formulas.  It turned out Caudill Seed called one of them.  And I can't remember which one Caudill Seed called.  And we ended up doing the cross-examination.

So they were -- they had arrived in Kentucky at the end of that week, or the middle of that week, and they had attended court with us on that Thursday.  And then they joined the meeting on Thursday evening.

Q   This is the conference room that's sometimes referred to as the war room that you went back to every night?

A   No.  That was on an upper floor at Stites Harbison.

Q   Different conference room.

A   Different conference room.

Q   All right.  And lower right-hand corner we have two photographs, Dancel Multimedia.  I think we've heard both names.  Tell us again.  Celeste O'Keefe was?

A   Celeste O'Keefe was our jury consultant, and Jimmy Thompson was our in-courtroom technician.  He put the exhibits on screen and assisted with other odds and ends.

Q    Mr. Rogovin's photo is not on this demonstrative; correct?

A   Is not.

Q   Where was he?

A   He was in the immediately adjacent small conference room with Danny O'Keefe, Celeste's husband and business partner.

Q   What were they doing in the immediate -- immediately adjacent conference room?

A   So Mr. O'Keefe was working -- well, as I understand it at least, what they were supposed to be doing was working on the preparation of Mr. Rogovin's testimony.

Q    To testify?

A    To testify.

Q    Live?

A    To testify live.

Q    So your testimony is -- while you were meeting in the big conference room, Mr. Rogovin is being prepared to testify live in the adjoining conference room.

A    We're still planning on calling him until we make a decision otherwise.

Q    All right.  Tell us, the best your recollection, what happened at that meeting with these people shown on that graphic.

A    So I put the issue on the table.

Q    What issue?

A    The issue was whether or not to call Jarrow Rogovin.  And I put on the table the facts as I understood them related to that decision, including the opportunity that was presented by Caudill Seed's decision to present his deposition testimony and the opportunity that that afforded us.

          And then we went around the table, and everyone in the room had the opportunity to express their views on whether we should seize the opportunity that was presented or stay the course and put Mr. Rogovin on the stand.  Everyone that you see on this screen had an opportunity to voice their view, ask questions of me or Mark or Eric or Joel about any concerns that

they may have had related to that strategy and to express their view.

Q   Including Mr. Joyce, the paralegal?

A   Everyone.  And, in fact, I would say Mr. Joyce, he was a, um -- he was quite astute in a lot of the observations that he had made during the course of the trial, particularly with respect to witnesses, although he was a paralegal.  I don't want to suggest for a moment that his judgment was not valued in any evaluation, least of all this one.

Q   Mr. Thompson also?

A   Absolutely.

Q   Did you, in fact, you and Mr. Giarratana, Mr. Grondahl, hear from everyone on the issue you had tabled?

A   We did.

Q   Did a -- question withdrawn.

What were some of the issues that were discussed at -- in terms of addressing that question?

A   Well, the primary issue was, what evidence do we need to have in front of the jury, and to what extent are we able to get that evidence before the jury by counter-designating testimony?  There was also concern expressed at that meeting regarding Mr. Rogovin's state of mind, his preparation.  But a primary consideration here, um, concerned the opportunity, if we called Mr. Rogovin live, for -- during our case-in-chief, for Caudill Seed to hijack the focus of the defense.

Q   What does that mean, "hijack the focus"?

A   So we knew -- well, "hijack the focus" means -- our case, as we've talked -- as I've testified previously, was focused really on three issues:  What are the trade secrets?  Are there any trade secrets?  What is the research and development related to those trade secrets?  What are the related damages?

A primary thrust of the defense was related to the first two stools -- legs of the stool.  The third stool we had already addressed primarily with Mr. Wingate.  But the first and second legs of that stool related to the trade secrets and what the research and development related to those trade secrets was that was very much in play.  And we wanted the focus of the defense case on that exclusively if we could make that happen.

But we know there's this horrible narrative.  Caudill Seed would have had the -- Caudill Seed had gone through the horrible narrative already when Kean Ashurst was on the stand.  They had called Kean Ashurst in their case-in-chief, and they spent three days with Mr. Ashurst.

Q   Then that should have been the end of the horrible narrative evidence, shouldn't it?

A   Not at all.

Q   Doesn't work that way?

A   There was one significant player in that horrible narrative who had not yet testified, and that was Mr. Rogovin.  If they

weren't calling Mr. Rogovin, they weren't going to be able to do that horrible narrative with Mr. Rogovin in their case-in-chief.  But if we called him in our case-in-chief, it would reopen it all up again as we were approaching the end of the case in our case-in-chief where we wanted the jury's focus entirely elsewhere, on our theme and theory of the defense, on our strength of the case.

And by calling Mr. Rogovin, if we had decided to do it, it was -- and there was a circumstance earlier where we concluded we would have to do it.  But now, given the vagaries of the trial and the changing circumstances, we concluded we don't have to do it.  We can do it, but we're not in a position now where we have to do it.

Q   Were there other considerations besides the one you described addressed in that round table, as you went around the table, other considerations, other pros and cons?

A   Mr. Rogovin's state of mind.

Q   Tell me yes or no on that.

A   I'm sorry?

Q   Were there other pros and cons considered?

A   I think those are the primary pros and cons.

Q   Okay.  And do you believe, at the end of the discussion, all the pros and cons had been considered?

A   I do.

Q   And have you prepared a graphic that lists the pros and

cons that you believe were aired, ventilated, discussed, and addressed at that meeting?

A    Yes.

Q    And would that be an aid to you in summarizing that?

A    Yes.

        MR. PEPE:  Mr. Wyzik, please, Demonstrative 81, if you would, please.

Q    (By Mr. Pepe) Is that, in fact, the demonstrative?

A    Yes.

Q    Okay.  And is that an accurate summation of the pros and cons?

A    I think it is.

Q    I don't see anything there about hijacking the case, though, that you just described.  Was that, in fact, discussed?

A    That was -- that was discussed, definitely.  That was a primary concern of the trial team.

Q    Now, there were, according to this, if I understand it correctly -- tell me if I don't -- there were arguments to call Mr. Rogovin live still up to that night; correct?

A    There were.

Q    And are those listed in the left-hand side?

A    They are.

Q    And were those discussed to a greater or lesser extent?

A    I mean some of these were obvious.  He was the founder of the company.  He was a primary actor in the relevant events.  I

mean that could have been listed as a con as well.  I mean, that does relate to the horrible narrative.  And all of what you see here, yes, all of that was discussed.

Q   And then there were, as you say, the cons; correct?

A   Yes.

Q   And those are listed on the right.

A   Yes.

Q   And you -- one of those is the every topic/issue addressed by other witnesses or evidence.  You've already explained that.

A   Yes.

Q   And then there's the significant vulnerabilities on cross-examination.  Has that already been addressed -- excuse me -- in your testimony?

A   Well, I mean, this is the horrible narrative right here.  I mean this is hijacking the defense case right in the middle of our case with the significant vulnerabilities on cross-examination.  That's what we were concerned about.

        I mean the last -- going back to Mr. Ashurst being on the stand for three days discussing that, the last thing we wanted, if we could avoid it, was for that to happen with Mr. Rogovin when we wanted the jury focused on what our -- what is the technology?  What are the products and processes of the two competing products at the two competing companies, and are there any trade secrets?

Q   Does the third one, the third con, probable negative jury

reaction, relate in any way to the mock jury focus groups you described earlier in your testimony?

A   Absolutely.  We had to consider that.

Q   And the last one is the lack of preparation.  What was going on there?

A   Well, we've discussed that fairly extensively.  But in the -- I mean I'll just go back to, you know, the failure even to review the outlines, the lines of inquiry and the outline put together by Attorney Giarratana that was sent to him I think in May before we arrived in Louisville and he arrives in Louisville and we attend a May 31 preparation and it's evident he hasn't reviewed any of it.

Q   I want to go back to this first con.  That is an argument against calling him.  Every topic/issue addressed by other witnesses or evidence.  You said you believe that was done?

A   Yes.

Q   Have you, in preparation for your testimony, gone back and reexamined that issue, that is, the issue of whether necessary evidence was or could be -- I assume "could be" meaning it could come in still through other witnesses; correct?

A   Yes.

Q   Had been or could be or would be covered by other witnesses or documentary evidence?

A   Yes.

Q   And how were you able to -- were you able to do that,

reconstruct all of that from your records?

A   We were.

Q   And have you prepared a summary of that, that very issue, illustrating what evidence had to come in and whether it was covered by another witness?

A   Yes.

Q   And have you prepared a demonstrative summarizing that and which would accelerate your testimony and make it easier for you to explain?

A   Yes, sir.

        MR. PEPE:  I would ask Mr. Wyzik to call up demonstrative page 68.

Q   (By Mr. Pepe) Tell us what's shown there, sir, if you would.

A   So on the left-hand column, topic to be covered by Mr. Rogovin in his deposition, these are the topics that we would cover if we called him.  These are topics that we thought were important to be covered and we needed to have in evidence.

        And then the right-hand column you see where we, in the -- where we -- where that evidence and testimony was put into the record through other sources.

Q   Same thing with item 2 and 3 and so on?

A   Yes, absolutely.  Every single one of those topics, 1, 2, 3, 4, and 5, and this is just the first of two pages, has a corresponding identification of the substitute evidence that

was put into the record for the jury's consideration.

MR. PEPE: I'd ask Mr. Wyzik to call up the very next page.

Q (By Mr. Pepe) And tell us if that's a continuation of exactly the same information?

A Exactly the same, yes.

Q After you went around the table to hear from everyone, after you say the pros and cons were discussed -- correct? -- including whether there would be voids in the evidence if Mr. Rogovin did not testify, as shown here in this demonstrative; correct?

A Yes.

Q Did a consensus emerge as to the correct course of action?

A Yes.

Q What was that consensus?

A The consensus was that the benefits to be obtained by putting Mr. Rogovin on the witness stand were outweighed, given the opportunity available to us, were outweighed by the significant risks putting him on the stand would create. And so the decision was if on the next day Caudill, after playing its deposition designations, supplemented by Jarrow Formulas' deposition designations, if it rested its case, our decision was we would not call Jarrow Rogovin, unless something else changed along the way, which we did not expect to happen at that point.

Q   You say that was the decision reached by the people in the room.

A   Yes.

Q   Did you speak when you went around the table to get everyone's opinion?

A   I spoke last.

Q   After everyone had been heard.

A   I put the issue on the table in order to, um, in order to tee it up for a discussion and so everyone understood what the issue was and what the relevant information was for them to consider.  Um, and everyone went around the table, and everyone spoke.  And I spoke last.

Q   Did anyone, as you went around the table -- question withdrawn.

        When the consensus was reached that the better course of action, subject to what happened the next day and subject to the unforeseen, was to use deposition testimony from Mr. Rogovin's video deposition in lieu of his live testimony, did anyone in that room disagree, differ, object?

A   No one.  No one.

Q   Is it your testimony it wasn't just a consensus; it was unanimous?

A   It was one hundred percent.

Q   There's no doubt in your mind?

A   Mr. Leventhal did not object.  Mr. Beres did not object.

No one in the room objected.  Everyone saw the risks.  Everyone understood how those risks weighed against the benefits.  And the consensus that emerged was that we should recommend to Mr. Rogovin in the next room that he not testify.

Q   You learned since from reading depositions in this case that you've been accused by Jarrow Formula personnel of bullying them into agreement?

A   I have heard that.

Q   Did you do that, sir?

A   Absolutely not, one hundred percent not.  It's not something I would do.  It's not the way I operate.  If I had, I'm certain my partners would have countermanded me or Attorney Beres would have or Mr. Leventhal would have or the senior executives from Jarrow Formulas and Jarrow Industries would have.  No one did, and I would not have done that, no, sir.

Q   You said the unanimous consensus was to recommend the course -- that course of action you described to Jarrow Rogovin.  He was not present during any of this.

A   He was not.

Q   Did he walk in -- excuse me.  He did not walk in at any time?

A   He did not.

Q   Okay.  Did you, in fact, make that recommendation to Jarrow Formulas?

A   Mark Giarratana --

Q   Jarrow Rogovin.  I'm sorry.

A   Mark Giarratana and I walked from the large conference room into the small conference room, closed the door.  Danny O'Keefe was in the room with Mr. Rogovin.  He remained.  And I presented to Mr. Rogovin --

Q   Just let me interrupt you there, sir.  Can I call up demonstrative 66, please.

Is that, in fact, the people, shown there on that demonstrative, present at the meeting, the session you're describing right this moment in the adjoining small conference room?

A   Yes.

Q   Just those four.

A   Just those four.

Q   No one else.

A   No one else.

Q   Did you, in fact, convey the recommendation that had been established in the large conference room next door?

A   We informed Mr. Rogovin --

Q   No, no.  Tell us what you said as best you recollect and what Mr. Rogovin said as best you recollect.

A   Well, we explained to Mr. Rogovin what the issue was that we had discussed.  We explained to him the pros and cons as we've already discussed them.  I shouldn't say "we."  I.  Mark supplemented, I'm sure, as necessary.

And I said to Mr. Rogovin, "Having taken into account all of this information, our recommendation, our strong recommendation, is that you should not testify, that we should present your evidence, your testimony via deposition. We have the opportunity to do that. We view it as a gift, frankly."

And his response was, "I'm fine with it."

And that was --

Q   Mr. Rechen, are you certain what you just testified to is what was said by you and by Mr. Rogovin to the absolute best of your recollection?

A   Absolutely. I have -- I actually did anticipate at least some push-back from Mr. Rogovin. There was none. His words, "I'm fine with it."

And then he continued to talk about what the next steps were in the trial and who would be testifying and issues of that sort. There was no protest whatsoever.

Q   Did the designations from Rogovin's video deposition made by Caudill and your counter-designations then subsequently get played to the jury by Caudill as you had anticipated?

A   On Friday, but not before, Eric Grondahl argued to the court the narrowing of Caudill Seed's designations to take what they had designated and made it even more acceptable to us. And not until after we added our counter-designations, then all of that was played in the courtroom.

Q   And when you say "played," was the video -- was the

deposition of Mr. Rogovin both transcribed and videotaped?

A   Well, I know it was videotaped.  I don't recall -- it may well have been transcribed, just as we've seen the typewritten transcription with the video in some of the depositions that have been played here.  But I honestly don't recall.

Q   The video that was played, as you just described, included, if I understand you correctly, the pieces of the video that Caudill Seed's attorneys wanted played and the pieces that you wanted played.

A   Correct.

       MR. PEPE:  May I ask Mr. Wyzik to call up, please, PTX 347, which is a full exhibit, Your Honor.

Q   (By Mr. Pepe) You've seen this before.  In fact, yesterday there was testimony concerning this so-called notice of filing of the deposition testimony of Jarrow Rogovin?

A   Yes.

Q   And it was described yesterday, I believe, as the report that's filed with the court so there's a record of what was played in the trial.

A   Yes.

Q   Is that an accurate statement?

A   That's exactly what this is.

Q   And so would this report to the court include both your -- both Caudill Seed's designations and yours?

A   As it indicates, this is what was presented at trial on

June 14, 2019, the entirety of it, theirs and ours.

Q   Mr. -- excuse me.  There was testimony about two issues that were important, not to suggest no others.  But there were two issues that were particularly important, one with respect to Mr. Rogovin's denial of using Caudill Seed's information, whether it was a trade secret or not.  Do you remember that?

A   Yes.

Q   And another about an explanation of why he asked for the customer list.

A   Yes.

Q   Did both get into that, the playing of the video?

A   Well, I think the first issue actually, Mr. Pepe, concerned his instructions to Kean Ashurst.  And then the second concerned the issue you identified, yes.

Q   Okay.  And did they both get in?

A   They both did.

        MR. PEPE:  I would ask Mr. Wyzik, please, to turn to page 14 of Exhibit 347 and the last line at the bottom of the page, highlight that.  It continues onto the next page.  Is it possible to show both, sir?

Q   (By Mr. Pepe) It says, Mr. Ashurst possesses none of Caudill Seed's confidential information when he joined you?

        Answer -- now this would be the answer of Mr. Rogovin?

A   It would be the answer of Mr. Rogovin in response to the question, "Did you make the independent decision that Mr.

Ashurst possessed none of Caudill Seed's confidential information when he joined you?"

Mr. Rogovin said, "I -- let it be known that anything that was proprietary manufacturing to Caudill was not to be duplicated. I did state that, yes."

Q  The other issue related to the customer list and Mr. Rogovin's request to Kean Ashurst is to send Caudill Seed's customer list?

A  Yes.

MR. PEPE:  I'd ask Mr. Wyzik to turn to page, if he would, to page 20 of Exhibit PTX 347 and highlight the paragraph beginning at the bottom of the page, which continues onto the next page.

Q  (By Mr. Pepe) And ask you to take a look at that, Mr. Rechen. Did that deposition testimony, which was played to the jury, relate to the customer list issue?

A  Yes.

Q  Question to -- to Mr. Rogovin would be -- the e-mail reads, "Mr. Rogovin:  I am working the customer list and timeline this afternoon as per your request."

That would be Mr. Ashurst's e-mail. He's telling Mr. Rogovin he's looking -- he's getting the customer list; correct?

A  That is correct.

Q  And question is:

"Do you know what customer list Mr. Ashurst is referring to in this e-mail?

"Answer:  Yeah, the Caudill customer list.

"And so when he says he's working the Caudill customer list, What is your understanding of what that meant, if you had one?"

Mr. Rogovin answers, "It meant it would be a list of people that if I decided to sell the products, I would not contact."

Is that the explanation Mr. Rogovin wanted to make?

A    Yes.

Q    Go on to the next page, question from his videotape.

"Didn't you tell me earlier, sir, that you didn't consider Caudill Seed to be a competitor of Jarrow Formulas?

"Answer:  Yes.

"So if Caudill Seed wasn't a competitor, why would you need to worry about contacting their customers?"

Mr. Rogovin's answer, "If we were to start selling the material.  We never did.  So that's -- that's why ultimately we're not a competitor, because we never even sold it out.

"Question:  Why did you believe there was anything improper about asking Mr. Ashurst to send you a customer list from Caudill Seed, regardless of your intent to receive it?"

His answer:  "Yes.  And I apologize for that.  I shouldn't have done it.  The perception is worse than reality.

I understand that.  Mea culpa.  But what -- but no harm, no damages.

          "Question:  Then why did you have to ask Mr. Ashurst to send it to you?

          "Answer:  It was really kinda dumb.  I admit it. Usually I'm reasonably intelligent.  That was dumb, lazy and dumb.  But it was also because I wanted to make sure if I was going to sell, I didn't contact them.  I don't want any question that I was --

          "Question:  So at a minimum --

          "Answer:  I don't want any arguments that I was going after his customers."

          Is that the explanation that you understood Mr. Rogovin wanted to make about the customer list?

A    Yes.

Q    Under the rules imposed by Judge Simpson in the trial was, I think you said earlier, there was an obligation to give notice to the other side of the witnesses you're going to call.

A    There was that requirement, yes.

Q    During the trial.

A    I don't remember if that was an order of Judge Simpson or simply an agreement between and among counsel or both, an order that, you know, entered the parties agreement.  I don't remember.  But as a practical matter, parties receive 48 hours' notice of what the witness lineup was.

Q    Okay.  You testified that, ultimately, the videotape was played --

A    Yes.

Q    -- in the Caudill case-in-chief.

Did Caudill thereafter rest?

A    Caudill -- yes, Caudill rested on that Friday after the video was played, June 14, 2019.

Q    Did you and your trial team and JFI decide then to put on your case in defense?

A    Well, the first thing that happened was argument on a motion we had filed for judgment as a matter of law.  That argument continued on -- it began on Friday.  It continued on Tuesday, 'cuz there was no court on Monday, the 17th.  And then after that motion was denied, on Tuesday, the 18th, we put on Jarrow Formulas' defense.

Q    I shouldn't have skipped over that.  The JMOL that we've all learned about is intended to have the court dismiss the case?

A    Yes.

Q    And if the court had granted it, you get to go home.

A    Correct.

Q    But the court did not grant it.

A    The court didn't grant it.

Q    So now you have to put on your defense.

A    Correct.

Q   Did you or your trial team follow the protocol, the procedure, the requirement to give notice of witnesses in advance?

A   Yes, we did, every day.

Q   Did you notify the other side, the Caudill side, of witnesses you were going to be calling?

A   I believe Mark Giarratana did it.

Q   Did Mark Giarratana also advise Mr. Rogovin of that?

A   He did.

Q   Intended witness list?

A   Yes, he did.

Q   And did he do so in writing?

A   Yes, he did.

        MR. PEPE:  And, Your Honor, I'd move the full -- move as a full exhibit the admission of PTX 261, to which there is no objection.

        THE COURT:  261 will be a full exhibit.

    (Plaintiff's Exhibit 261, received in evidence.)

Q   (By Mr. Pepe) I'm going to direct your attention to the top, the first page, sir, which is an e-mail from Mr. Giarratana to Mr. Rogovin with copies to you and others on the trial team.  Do you see that?

A   Yes.

Q   And what is Mr. Giarratana setting forth there?  Please explain.

A   He's setting forth our witness lineup.

Q   It says:  In accordance with the stipulation we have been operating throughout this trial, we communicated to opposing counsel this morning that we intend to follow -- introduce the following witnesses in the order indicated.

And then he sets forth five bullets; correct?  See that?

A   I didn't hear the last part.

Q   Then he sets forth five bullets?

A   Oh, bullets, yes.

Q   Do we read that to say the first witness in your case in defense would be Mr. DuBose?

A   That's correct.

Q   And that's the same Mr. DuBose that was in the graphic that showed who was at the meeting.

A   Yeah.  And so that tells me, just to clear up something I said earlier, that it was Rory Lipsky that was called by Caudill Seed in their case-in-chief.  We called Clay DuBose. They were both available.

I also have to believe, given the 48-hour notice, because this isn't 48 hours, we must have advised them of several of these the day before, orally probably.

Q   Martin Gallant, he was going to be your witness.  But what does that mean "by depo?"

A   That means we were presenting his deposition testimony.  He

was someone who was beyond our subpoena power.  He was, therefore, not available to testify live.  We had the right to present his deposition testimony, and we did it.

Q   Brian Cornblatt, who was he and why is he by depo?

A   So Brian Cornblatt, like Martin Gallant, they were representatives of two companies, Natural Product Solutions and a company called Nutramax.  And these were companies to which Jarrow Formulas claimed it would have made -- excuse me -- Caudill Seed claimed it would have made sales of product to but was unable to because of the alleged misappropriated trade secret.

We had really good testimony from them that established those sales never would have been made.  That's why they were testifying, and the jury awarded no damages in favor of Caudill Seed against Jarrow Formulas with respect to those claims.

Q   Next one is Lyons by depo.  And there's more language in parentheses after that.  Who was Lyons?

A   Joseph Lyons was an employee of Caudill Seed.  He was, I think, effectively their CFO.  And -- and he was the individual who had provided financial information to Mr. Wingate, their expert witness.  He was also the individual who had attempted to support the damages claims relative to Nutramax and NPS about which Martin Gallant and Brian Cornblatt were testifying.  And their testimony stood in stark, stark contrast to Mr.

Lyons, which is why we presented Mr. Lyons' testimony, so that the jury could see and evaluate what Mr. Lyons was saying against what these other two witnesses, who had no stake in the outcome, were testifying.

Q   Who -- you say, "We will conclude with Leslie West."  What role did he have?  And you identify him as your last witness.

A   So Dr. Leslie West, Les West, was our expert witness. Dr. West was the patentee, the owner of patents that had been issued in connection with technology that was at issue in this case related to broccoli seed.  And, um, he had worked for many years at Kraft Foods is my recollection.  And he was our expert witness.  And he was -- he was really -- with respect to the trade secret defense and research and development piece of our defense, he was our central witness.  He's who we wanted to end our case with.

Q   Did your local counsel, Joel Beres, was he involved in this -- you already testified he was at the meeting.  I understand.  But was he involved after that meeting in putting together the witness list that was involved here?

A   He was very much involved.  He was involved in every aspect of the execution of our strategy at trial.  And you see that he is copied on this e-mail.

Q   And did he agree with this witness list and the order?

A   Yes, he did, very much so.  In fact, he coined a phrase during our -- that final week, "West and rest," meaning put

your expert on and get this case to the jury for a decision. And he had a corresponding phrase which he coined, "Les is more," meaning Les West is the strength of our case. Put him on and leave it at that, and that will put our defense case in the best possible posture. Les is more. West and rest.

Q   Did he confirm his position on that to you in writing?

A   I don't recall.

Q   Well, let's --

MR. PEPE:  May I move as a full exhibit, Your Honor, PTX 253 to which there's no objection?

THE COURT:  Yes.  253 will be full.

(Plaintiff's Exhibit 253, received in evidence.)

Q   (By Mr. Pepe) I'm going to show on the screen, sir --

A   I do remember this.

Q   Let me identify it for the record, if I may.  Joel Beres' e-mail to you and Mr. Grondahl, Mr. Giarratana on Sunday, June 16.  So now -- now we're at the meeting you described in which the decision you described was Thursday.  So this is now three days later on Sunday, June 13; correct?

A   Yes.

Q   And he refers to the Lyons' deposition testimony.  And directing your attention, Mr. Wyzik, maybe you can blow up the third paragraph down about the potential benefits of calling Lyons.

Is this the Joe Lyons you referred to earlier?

A    Yes.

Q    Okay.  And, again, I don't want to take a lot of time on this, but does that reflect his agreement about how to address Lyons?  I'm sorry.

THE COURT:  Take your time there, Mr. Pepe.  Get some water.

MR. PEPE:  I apologize, Your Honor.

THE COURT:  No problem.

Q    (By Mr. Pepe) Does this reflect Mr. Beres' agreement with your proposed treatment of Joe Lyons as a witness?

A    Well, the e-mail does, this --

Q    I meant the e-mail.

A    Yeah.

Q    Last paragraph, excuse me, paragraph below that beginning with "potential downsides," if you could pull that up, Mr. Wyzik.  There we go.

Is that where we see his position on the defense case where he says, "Potential downsides of calling Lyons include: lengthening our case in front of the jury (as Court said today as a corollary to West then rest, Les is more."

That's the phrase you referred to before?

A    Yes.

Q    Fair to say you're aligned with your local counsel?

A    We were completely aligned.

Q    Now I'd like to go back, if I might, Mr. Wyzik, to PTX 261

that we had up earlier.

And we looked at the top part of the e-mail with Mr. Giarratana, setting forth the witness list to Mr. Rechen.  Do you see that, sir?

A   Yes.

Q   Mr. Rogovin with copies to you and others?

A   Yes.

Q   Below that, do you see Mr. Rechen's e-mail to Mr. Giarratana and --

A   You said "Mr. Rechen's e-mail."  I think you meant --

Q   Below that one from Mr. Rogovin to you and Mr. Giarratana and Mr. Beres.  You see that?

A   Yes.

Q   And Jonathan Leventhal, all of you; correct?  And the jury consultants and Clay.

A   Yes.

Q   He says, "I want Joe on the stand."

Who is the "Joe," as you understand it, in that sentence?

A   He's referring to Joe Lyons.

Q   He took a strong position on that?

A   He did at that time anyway, yes.

Q   What -- well, you already -- you already indicated that Lyons would be called by depo.  So why -- why is that -- is he protesting, as you understood it?

A    He wanted him called live.

Q    Okay.  He goes on to say, "I want him trembling like he was on the video but in front of the jury.  They cannot rehabilitate him.  There are too many exposed lies.  He will be following Clay.  The contrast will be stark!  You are not listening and I do not wish to discuss this," period.

And then if we go over to the next page, we just see his signature.  I want to make sure we see the end of this e-mail, if you could just go over to the top of the next page, sir, okay.

You want to go on to that page.

Is there any mention there of -- by Jarrow Rogovin of the absence of his name from the witness list?

A    None.

Q    Did he at this time orally protest to you that his name was not on the witness list and he wanted to testify live -- on this day, when this list was published, did he orally protest to you?

A    Mr. Pepe, not then, not ever.

Q    Not before this -- between the meeting you had in that room, that Thursday, June 13, and the publication of this list, is your testimony that he never protested to you or anyone else at McCarter that he wanted to testify live?

A    Never happened.

Q    Your testimony is, when he received this list, he never

protested that he was not on there.

A   He did not.

Q   At any time thereafter, did he tell you he wanted to testify, up until the time of the evidence closing?

A   No, sir.

Q   Did he tell you after the jury verdict was rendered that he wanted to testify and it was a mistake not to have let him testify?

A   He did not.

Q   Ever?

A   Ever.

Q   There's no doubt in your mind about that?

A   None.

Q   When is the first time you or anyone at McCarter, the first time, learned that you had committed malpractice by not calling him as a witness?

A   Well, I never learned that we committed malpractice by not calling him as a witness.  But I did learn.

Q   Let me rephrase that.  When's the first time you learned that it was alleged malpractice not to call him as a witness?

A   When this lawsuit was filed.

Q   That's the very first time.

A   Very first time.

Q   One other issue on that meeting on Thursday night.  Can I just bring you back there briefly?  You have it in mind, the

roundtable meeting in the large conference room?

A    Yes.

Q    Did you, in the course of that discussion, say that "If we call Jarrow Rogovin live, we will lose," or words to that effect?

A    Those words were said.  Not by me.

Q    Who said them?

A    Rory Lipsky.

Q    And when did he say them?

A    Immediately preceding that meeting, he and I had a conference in -- or a conversation in the reception area outside of the large conference room where we had the discussion.  And I told him about the discussion we were about to have in the large conference room.

         Mr. Lipsky can be a little theatrical, and he was in this conversation.  I told him that we were going to be evaluating whether we should call Mr. Rogovin live.

         His reaction:  "Oh, my God, no.  You'll lose the case."  Mr. Lipsky.

Q    No doubt in your mind those were his words, not yours.

A    I remember it vividly.

Q    Did the evidence in your defense case go in generally the way it was described in this exhibit that's on 261?  And I'm not going to walk you through the defense case.

A    It did.  There was a little bit of a hiccup with respect to

Clay DuBose, which was explored with me by Attorney Resser yesterday.  Other than that, yes, exactly according to plan.

Q   You made a final argument?

A   I did.

Q   And addressed, summarized the evidence as you wanted it presented to the jury.

A   Yes.

Q   Evidence is on June 26.  The jury came back with its verdict.

A   Yes.

Q   Were you in the courtroom when the jury returned?

A   Yes, I was.

Q   Was the rest of the McCarter trial team there?  And if not all of it, please tell us who was.

A   To my recollection, everyone was in the room.

Q   Mr. Giarratana?

A   Yes.

Q   Mr. Grondahl?

A   Yes.

Q   Mr. Leventhal?

A   Absolutely.

Q   Mr. Beres?

A   Sure.

Q   Was Jarrow Rogovin in the courtroom?

A   He was in the courtroom.

Q   Okay.  When the jury returned its verdict, where were you and Mr. Giarratana and Mr. Grondahl and Mr. Leventhal?

A   At counsel's table.

Q   Much like my colleagues here.

A   It was set up a little differently, but yes.

Q   After the jury verdict was read and accepted by the court, did the court adjourn, or was there further activity by Judge Simpson?

A   There were further proceedings on the record.

Q   And you were there.

A   I was there.

Q   Explain what happened.

A   So the verdict came in, was received by the court.  Um, the judge thanked the jury and gave final discharge instructions.  And the jury was discharged.

There were still further proceedings.  First, Judge Simpson asked, you know, whether there was anyone had anything else they needed to put on the record.  And then a discussion ensued because Caudill Seed raised the issue of sealing the entirety of the record, including the transcripts that --

Q   Very briefly, what does that mean?

A   So the court reporter, just as here, is keeping a record of everything that is said on the record.  And a transcript is available to be created from that.  And we did have daily transcripts every evening of that day's trial proceedings.  And

sealing the transcript means sealing it so that the public --
because these are public courtrooms, these are public
proceedings, unless the court orders otherwise, the public
would have access to the exhibits, to the transcripts, to
anything else that was used and would otherwise be in the
public record.

Q    Right.  So was there a colloquy between the counsel and the
court concerning that issue?

A    There was.  And part of that colloquy concerned the
logistics of sealing the entirety of the record as opposed to
just what was needed because the courts do have sensitivity
around sealing everything as opposed to that which is needed,
because this is intended to be a public process.  Judge Simpson
had that concern.

          THE COURT:  Can I see counsel for just a second at
sidebar?

     (At sidebar off the record.)

          THE COURT:  All right, Mr. Pepe, you can proceed.

Q    (By Mr. Pepe) After the sealing issue was discussed, was
that the end of the proceedings or was there more?

A    There was more.

Q    Tell us briefly, Mr. Rechen.

          THE COURT:  Briefly, please, Mr. Rechen.

A    I asked whether the court would permit counsel to interview
the jury, the jurors, something that trial lawyers like to do

because we learn from that.  And so I made that request of Judge Simpson, and that resulted in Judge Simpson calling back into the courtroom the jury that he had already discharged.  So the clerk had to go track down the jurors, bring them all back in, and then the judge informed the jury that they might be contacted.  And he explained his position with respect to that to the jurors, including advising them that if they had any concerns, they could raise it with the court.  So we had to deal with that issue.

Q   Was there anything else that went on after the judge dealt with that issue and discharged the jury for the second time or --

A   Not on the record that I recall.

Q   Okay.

A   But then the marshals wanted to lock up the courtroom, and we had boxes and boxes of all of the stuff that we had used during the course of the courtroom -- trial that we needed to box up and get out of the courtroom so the marshals could lock up.

Q   How long, in your best estimate, did all of what you described take?

A   Perhaps, perhaps 15, 20 minutes at most.  It might have been longer than that.  It was not 45 minutes, as has been suggested.

Q   During that time, however, when the court was conducting

proceedings, did you have an opportunity to go talk to Mr. Rogovin?

A    Unfortunately, I did not.

Q    Did you want to?

A    Very much so.

Q    Why?

A    Well, he was our client.

Q    Okay.

A    We had just received a verdict that, although partially successful, was partially unsuccessful.  And it was -- it was troubling to us as the lawyers who had tried the case.  We knew it would be troubling to Mr. Rogovin as well.  And as his counsel, it was, of course, our job to meet with him immediately and to discuss the verdict, what it meant, what next steps were, and how this, although unfortunate, was not unsurprising given what we had advised him throughout the course of the six years of this litigation.

Q    When you finished with the court proceedings, did you make an attempt to speak to Mr. Rogovin then, you or Mr. Giarratana or Mr. Grondahl, all of you?

A    Well, it was primarily through -- well, initially all of us went down to the room where we, our team, gathered.

Q    Well, excuse me.  When you were all done with the proceedings before Judge Simpson, was Mr. Rogovin still in the courtroom?

A    He was gone.

Q    Did you go look for him?

A    We did.

Q    Where?  Just tell us if you found him, that is all.

A    The first place we went was the room where we gathered every day outside of the courtroom, in the courthouse, outside of the courtroom where the trial team gathered.  And that's where Mr. Rogovin was during breaks.  That's where Mr. Rogovin was when there weren't active court proceedings and he was otherwise at the courthouse.  We went there looking for him. He was not there.

We learned shortly thereafter, I don't remember exactly how, that he had left the building.  The efforts then were by Mark Giarratana who reached out to him by telephone.

Q   Mr. Giarratana testified his calls were not returned.  Did you have any -- you as opposed to Mr. Giarratana -- have any direct communications with Mr. Rogovin after that jury verdict either by phone or in person?

A    No.

Q    There's evidence here that there were certain e-mails sending work product to Jarrow Formulas.  You're aware of that, after the verdict and after you came back to Connecticut.

A    Yes.

Q    Did there come a time -- question withdrawn.

There's also testimony here that termination letter

from Attorney Brophy was received -- was sent on July 12, received on July 15.  Are you aware of that?

A    I was.

Q    After that, did you receive a communication from Mr. Rogovin?

A    Uh, yes, I believe we received an e-mail from him that we refer to as the chutzpah letter.

MR. PEPE:  I ask if PTX 103 may be admitted as a full exhibit, Your Honor, no objection.

THE COURT:  All right.  103 will be full.

(Plaintiff's Exhibit 103, received in evidence.)

MR. PEPE:  Mr. Wyzik, will you pull it up.

Q    (By Mr. Pepe) We have here an e-mail from Mr. Rogovin to Mr. Giarratana, Mr. Grondahl, and you.  Do you see that?  That's dated July 22, so ten days after your termination notice.

A    Yes.

Q    Take a moment to look at that, sir.  This was seen before --

MR. PEPE:  I may have misspoken, Your Honor.  I think this was already a full exhibit.

THE COURT:  Okay.

Q    (By Mr. Pepe) Take a moment to look at that, sir.

A    I see it.  I'm familiar with it.

Q    In the second paragraph he states, "The miscellaneous IP

bills will be paid within a month, and your testimony is they never were."

But directing your attention now to the second paragraph?

A   I see it.

Q   He's complaining about the results of the verdict there, is he not?

A   Yes, he is.

Q   Paragraph down below that, the next one, total willful, once again we see his complaint that you failed to cap the R&D expenses claimed as damages; correct?

A   Yes.

Q   You testified at length about what you did do there; correct?

A   Yes.

Q   We're talking, again, about the same complaint because he says, "likely not more than $250,000"; correct?

A   That's correct.

Q   So, again, this is the same issue about which he complained earlier and about which you testified at length?

A   Yes.

Q   Then it says, "I consider Mr. Giarratana's July 19 letter concerning fees in the circumstances to be arch chutzpah."

And that was Mr. Giarratana's letter requesting payment for the outstanding fees?

A    Well, let me give Mr. Wyzik an opportunity to bring that sentence up.

Q    I'm sorry.  The paragraph beginning "I consider Mr. Giarratana."

A    "I consider Mr. Giarratana's July 19 letter concerning fees in the circumstances to be arch chutzpah."  That's why we refer to this as the "chutzpah letter."

Q    If you go down three paragraphs, Mr. Wyzik, beginning with "Accordingly," can you call that out?  Is that possible?

He says, "Accordingly, we will be represented in the future in this matter by counsel.  I suggest you consider what course this may take," end quote.

What did you understand what him to be saying to you there?

A    He was threatening us.

Q    Meaning what?

A    Meaning if we pursued our claim for fees, we should consider carefully that because this could take a turn we might not like.

Q    Again he complains about your -- the $250,000, which he says was the maximum R&D in the next paragraph, if you could call that out, Mr. Wyzik, the very next paragraph.

A    Yes.

Q    This e-mail, sir, was there anything in here complaining about the decision to use his video deposition in lieu of his

live testimony?  Any mention of that whatsoever?

A    None.

Q    Again, sir, your testimony is the first time you heard that complaint is when you were sued for malpractice?

A    So this is a month after the verdict.  No mention here.  It would not be until months later when the counterclaim was filed in this case that I would then, for the first time, see that he was actually claiming malpractice had been committed.

Q    In fact, you said that was the counterclaim.  So, sir, were you involved in the decision to bring this lawsuit that brings us to this courtroom this month?

A    I was.

Q    Who else was involved?

A    Attorney Giarratana, Attorney Grondahl, the general counsel of our firm.  And whether the Executive Committee was involved or not, I don't know.

Q    About when was that decision made?

A    My recollection it was made in July.

Q    Of two thousand and --

A    Nineteen, thereabouts.  The decision was made then that we would not --

Q    Let me interrupt you.  After or before you received this PTX 103, which is dated July 22?

A    I believe it was after.

Q    All right.  Go ahead.  I interrupted you.

A    So we decided that we would not -- we were not going to be threatened.  We were not going to be intimidated.  We had made a very substantial investment in this case.  We had spent a good five weeks of our lives away from our families trying this case, very difficult case, very difficult client, and had put our very best foot forward on behalf of this client and that we deserved to be paid the fees we had earned as we had agreed and that we were not going to let threats of malpractice, which we considered to be completely illegitimate, to dissuade us from taking that path.

MR. PEPE:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Resser?

MR. RESSER:  Thank you, Your Honor.

THE COURT:  So, Ladies and Gentlemen, Mr. Rechen was listed by both sides, so once again, there will be a total of four examinations here.  We're halfway through.

REDIRECT EXAMINATION

BY MR. RESSER:

Q    Good afternoon, Mr. Rechen.

A    Good afternoon.

MR. RESSER:  Ladies and Gentlemen.  Or Lady and Gentleman.

Q    (By Mr. Resser) Mr. Rechen, in your testimony yesterday and again today, you told Mr. Pepe and the jury there was a three-part trial plan.  Do I have that right?

A    Yeah, yes, you have that right.

Q    And I think you used the word "tripartite."  Do I have that right?

A    I think so.

Q    I think that means three-part; right?

A    Yeah.

Q    The three parts you identified were to show Caudill's six alleged trade secrets were not trade secrets; right?

A    Correct.

Q    If there were trade secrets, to show that Jarrow Formulas did not use any of them.  Do I have that right?

A    Misappropriate, yup.

Q    And then, third, if there were trade secrets and Jarrow Formulas used any of them, to show that Caudill could not prove damages.  Do I have that right?

A    You do.

Q    You left out an important one, didn't you?

A    I don't think so.  Well, willful and malicious, if that's what you're referring to.

Q    That's exactly what I'm referring to, sir.

A    Okay.  So I -- yes, I did leave that out.

Q    And you didn't mention Jarrow Formulas' good faith in its approach to the development of the technology that was the center of the Kentucky litigation yesterday or today, did you?

A    Actually, I did, but I didn't do it in the context of the

so-called tripartite defense.  I would add that part and parcel of proving or defending a willful and malicious claim is proving -- the first step is proving there's no trade secret.

Q   And you testified in this courthouse at the PJR hearing in 2019; correct?

A   Not at this courthouse, no.

Q   I'm sorry.  You testified in this case, under oath, at the PJR hearing; correct?

A   Yes.

Q   And in that testimony you went through the trial plan, didn't you?

A   I wouldn't dispute that.

Q   And when you went through your trial plan in that testimony, you told the court that your plan for the trial in Kentucky included showing that Mr. -- showing Mr. Jarrow Rogovin's good faith in his approach to the technology that was at the center of the Kentucky lawsuit; correct?

A   You're saying I testified to that in the --

Q   Yes.

A   -- prejudgment remedy hearing.

Q   Well, let me read from that, if I may, Your Honor, PJR --

        THE COURT:  Sure.

Q   (By Mr. Resser) -- testimony from October 11, 2019, beginning at page 206, line 11, through page 207, line 2.

        "Question:  Please describe" --

A   Can I see it, please?

THE COURT:  Mr. Resser, we may have it over here. Maybe these folks can help out.

You may approach, Mr. Pepe.

MR. PEPE:  I made notes on here, Your Honor.  This is my copy.  Do you want me to show it to, Mr. Resser?

MR. RESSER:  I don't have a problem.  I don't have a problem with your notes on there.  As long as Mr. Rechen gets to watch what I read, that's fine.

THE COURT:  Go ahead.

THE WITNESS:  Thank you.

THE COURT:  I'm sorry.

Q   (By Mr. Resser) So it's page 206, sir, beginning at line 11.

A   Give me a minute.

Q   Tell me when you're ready.

A   So line 11 through?

Q   Through the next line, page 2.

A   Yup, I have it.

Q   "Question:  Please describe, as concisely as you can, the trial plan that you and your colleagues developed and explain why.

"Answer:  So to put it simply, the trial plan was to focus on our strengths in this case.  This was a trade secret case, as the Court is well aware.  We felt that the strength of

the defense centered on whether there was a trade secret.  We believe that there was not and that the focus of our efforts should be on whether or not there was a trade secret.  Further, whether or not a trade secret had been misappropriated in any way by Jarrow Formulas.  Fourth" -- I think this was actually third -- "on whether there was any damages that Caudill Seed could prove and attach to a misappropriated trade secret that it proved and then, fourth and finally, Jarrow Formulas' lack of willful or malicious misappropriation of any kind or, put differently, Mr. Jarrow, Mr. Jarrow Formulas' good faith in its approach to the development of the technology that was at the center of the lawsuit."

Did I read that correctly?

A   You did.  That was my testimony.

Q   And again today, sir, you referred to it's his case, meaning Jarrow Rogovin; right?

A   Well --

Q   And then you again corrected yourself that you meant -- you meant to say Jarrow Formulas' case.  You did that today again; right?

A   Jarrow Formulas, Inc., was the defendant.  I think that's a matter of record.

Q   But in your testimony today and in your testimony at the PJR hearing, which you forgot to mention the fourth prong, not a three-legged chair but a four-legged -- not a three-legged

stool but a four-legged chair, the issue of Mr. Rogovin and Jarrow Formulas' good faith in the development of the technology at the center of the Kentucky lawsuit; right?

A   So I think, if I understand that question --

Q   It's a yes-or-no question, sir.

A   I'm going to answer it yes or no.  No.

Q   Now, I think in giving us your background yesterday, you mentioned that you worked for a firm called Pepe & Hazard?

A   Yes.

Q   Is that the same Mr. Pepe that's here representing you today?

A   Yes, it is, as a matter of fact.

Q   And you two were partners for 20 years; is that correct?

A   No.

Q   How long were you with Mr. Pepe's firm?

A   Twenty years.

Q   Oh, I'm sorry.  So you worked together for 20 years.

A   Yes.

Q   You weren't a partner the whole time.

A   I was hired out of law school.  I was an associate --

Q   That's a yes-or-no question.

A   -- for six and a half years, and I was a partner for the remainder.

Q   Now, question, when I asked you if you had done any criminal cases, you said you had only done one pro bono

criminal case.  Do I have that right?

A    Yes.

Q    I asked you about how defense lawyers in a criminal case handle the uncertainty about whether their client will testify when the defense lawyer is not sure.  Do you remember that question?

A    Yes.

Q    And then I withdrew that question in light of your statement that you really don't have much background in criminal cases.  Remember that?

A    Yes.

Q    But then I heard you tell Mr. Pepe, after that, that you are the chairman of the Public Defender's Services Commission appointed by the governor of Connecticut to lead that organization.  Did I hear that right?

A    Well, no, you did not.

Q    Or you were the chair of that commission; correct?

A    So I was the chair, and I was the chair of the lay commission, but I did not lead the organization.  I led the commission.  The organization was led by its -- by the chief public defender.  So I did not try cases.  I did not appear in court.  I did not represent defendants.

Q    But you were on a five-member commission called the Public Defender's Services Commission, and you were the chairperson of that commission for ten years; right, sir?

A    So I was on the commission for more --

Q    That's a yes-or-no question, sir.

A    Okay, no.

Q    The jury heard the testimony, so it can evaluate your answers.

          Does that commission sometimes deal with the question of ineffective assistance of counsel by public defenders?

A    Only in connection with approving expert witness expenses, and that's primarily what the commission did was helped manage the state-wide budget for the office and attend to other business-related issues.

Q    Let me ask you this about public defenders and what defense lawyers do in criminal cases.  The prosecution can't require the defendant to testify in a criminal case.  You know that; right?

A    Well, I know that from law school.

Q    And that's the Fifth Amendment right where in a criminal case, unlike a civil case, the defendant cannot be compelled to testify even in his or her own defense; is that right?

A    So I certainly understand that.

Q    And that's why the question of how to deal with the uncertainty of whether the defendant will testify comes -- is an issue in just about every criminal case as opposed to a civil case, like the Kentucky jury trial; right?

A    I'm sorry.  Ask me that again.

Q   And that's why the question of how to deal with the uncertainty of whether the defendant will testify comes up in just about every criminal case, unlike a civil case like the Kentucky jury trial; right?

A   So I think we're beyond -- we're beyond the scope of my expertise and even understanding.  I don't think I'm in a position to be able to give a categorical answer on that one.

Q   Sir, are you aware of cases that say that representing -- representing a defendant will testify in a criminal case and then not doing so can amount to the ineffective assistance of counsel?

A   Ask me that again.

Q   Are you aware of case law that says that representing to the jury in opening statement that the defendant will testify in a criminal case and then not having the defendant testify can amount to the ineffective assistance of counsel?

A   I don't know that I am aware of that.

Q   And are you aware that when there's a finding of ineffective assistance of counsel, a criminal conviction can be overturned?

A   I am aware that if there's ineffective assistance of counsel, there can be a reversal of a conviction.  That I'm aware of.  That's reported in the papers.

        MR. RESSER:  Your Honor, may I approach with a copy of the case of *United States ex Rel. Hampton versus Leibach*?

THE COURT:  You can approach the witness for that purpose.

THE WITNESS:  Thank you.

MR. RESSER:  I have a copy for Your Honor as well.

THE COURT:  I'm good.  Thanks.

MR. RESSER:  Thank you.

Counsel.

MR. PEPE:  Thank you.

Q   (By Mr. Resser) Sir, if you'll turn to page 28 of the opinion, at least of the copy of the opinion, the actual page of the opinion that I want to share with you is on page 257 of the Federal Reporter, 347 Federal Reporter, 3rd.  The case begins on page 219.  But I'm reading from page 257, beginning with paragraph number 2.

MR. PEPE:  Objection, Your Honor, relevance.  This is a criminal case in the Seventh Circuit.  It's about a rape case.  I don't see the relevance.

THE COURT:  I got it.  I'm going to sustain that.

Q   (By Mr. Resser) Would you agree with me, sir, that promising a particular type of testimony creates an expectation in the minds of jurors; and when defense counsel, without explanation, fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility?  In no sense does it serve the defendant's interests?

A    No.

          MR. RESSER:  I have a Connecticut case called *Siano vs. Warden, State Prison* that I would like to ask the witness about.  May I approach?

          THE COURT:  You can approach the witness.

Q    (By Mr. Resser) Do you agree with this statement, sir: There may be no quarrel with a counsel's decision to call or not to call as a strategic decision a particular witness had that stood alone?  Do you agree with that?

          MR. PEPE:  Objection, relevance, Your Honor.  He's reading from a criminal case, habeas case.

          THE COURT:  Okay.  Well, the question really wasn't about a criminal case.  It said, "Do you agree with this statement, sir:  There may be no quarrel with a counsel's decision to call or not to call as a strategic decision a particular witness had that stood alone"?

          He can answer that question.

          THE WITNESS:  So I'm sorry.

          THE COURT:  I'll read it one more time.  I'll read it one more time.

          "Do you agree with this statement, sir:  There may be no quarrel with a counsel's decision to call or not to call as a strategic decision a particular witness had that stood alone"?  And the question was, "Do you agree with that?"

          THE WITNESS:  I'm not sure whether I agree or disagree

with that.

Q   (By Mr. Resser) And you talked today at length about the strategic decision that was made whether or not to have Mr. Rogovin testify; correct?

A   Yes.

Q   And the weighing that was done back and forth as to whether that should happen; correct?

A   Yes.

Q   But in that conversation and in that discussion and in that meeting in Mr. Beres' office, no one mentioned the fact that you had already represented to the jury that Mr. Rogovin would testify in the Kentucky trial; correct?

A   I don't -- I don't think -- I don't know if that's -- I don't think that's correct, but I -- I'm not certain.

        MR. RESSER:  Mr. Campos, can you please display the demonstrative that Mr. Pepe had shown about the pros and cons of that decision?

Q   (By Mr. Resser) Now, the pros of Mr. Rogovin testifying, if, if there had been a discussion about your representation to the jury that Mr. Rogovin was in the courtroom and he would testify and you said he would testify three different times in your opening statement, that would have been a reason to have him testify; right?  That would have been in the pros column, had it been mentioned; correct?

A   I'm not sure I agree with that.  This was from an

evidentiary standpoint that we were looking at this.

Q   Well, I thought you testified you were looking at all of the pros and all of the cons.

A   Well, we were.  I'm talking about the exhibit that you have in front of me.

Q   Okay.  Well, if that had been an important consideration, the purpose of putting together this demonstrative for this jury was in order to show all the considerations that were made.  Isn't that right, sir?

A   Sir, I think that everyone in that room was in the courtroom when I gave my opening statement with the exception of two individuals, and I -- that was not our primary focus.  I was aware, certainly, of what was in the opening statement.  I was -- and that is the reason I addressed the issue in my closing argument to the jury, fully cognizant of the issue and aware that it was something that we should address, absolutely.

Q   And you knew, you knew, that Mr. Grundy, Caudill's lawyer, would probably comment on the fact that Mr. Rogovin didn't testify live because of what you had said in your opening statement.  Isn't that right?

A   That's why I addressed that very issue in my closing argument.

Q   But you did not address that issue in the meeting where the so-called consensus was reached not to have Mr. Rogovin

testify.  Isn't that true?

A   The real issue was, what was the --

Q   It's a yes-or-no question, sir.

A   Okay.  So the question is, did I address that in the meeting?  I don't -- I don't recall whether we specifically discussed that issue or not.

Q   And that isn't something that they would have already known from your opening statement, is it?  It's something a trial lawyer with the expertise and with the history and the record of the dozens of cases that you've tried to juries would have known; correct?

A   I can't -- I can't answer that.

Q   Well, you were the -- you were the most experienced trial lawyer in that room, aren't you?

A   I don't know.  Do you know Attorney --

Q   You don't know you were the --

A   How many cases has Attorney Beres tried?

Q   How many cases -- did you know that you were more experienced than Mr. Giarratana in how many trials you've done versus him?

A   I -- I've never -- I've never compared my trial experience to his.  I would not be surprised to learn that I've tried more cases than Attorney Giarratana as lead counsel.

Q   Let me now go on to your testimony for a moment about the -- your rates, the rate you were charging.

Now, you started working on both the Ashurst Kentucky case and the Caudill Seed case about Jarrow Formulas all the way back in 2013, didn't you?

A   I don't remember when I started working on the Ashurst case.  My guess is that I probably billed --

THE COURT:  Don't guess.  Next question.

Q   (By Mr. Resser) You were working on the Caudill Seed federal court case in 2013; correct, sir?

A   The federal court case.

Q   Yes.

A   Yes.

Q   And the Ashurst case dated two years earlier, but you were working on the Ashurst case in 2013 as well.  You know that; right?

A   I probably was.

Q   Yeah.  Well, you've gone back to look at some of your entries in order to refresh your memory.  You haven't done that with respect to when you started working on the Ashurst case in --

A   Not relative to the Ashurst case, no, I have not done that.

Q   But you testified that it was not until 2016 that you realized your rate being charged to Jarrow Formulas was still at 405, which was the same initial rate that Mr. Giarratana was charging in both the Ashurst case and the Kentucky federal

case; correct? In 2013.

A I'm sorry. I'm probably getting tired. Ask me that again.

THE COURT: I can read it if you want.

"But you testified that it was not until 2016 that you realized your rate being charged to Jarrow Formulas was still at 405, which was the same initial rate that Mr. Giarratana was charging in both the Ashurst case and the Kentucky federal case; correct?"

THE WITNESS: So the answer is yes insofar as 2016 is when I learned. I don't know. I could only guess -- and I'm not going to do that, but that I was being charged 405 with respect to the other matters.

Q (By Mr. Resser) And we can see that from the billing records that are in evidence in this case -- correct? -- whether you remember here or not?

A The billing records with respect to which matter?

Q Both matters.

A Well, they show what they show.

Q Right. That's my question.

And you, in 2016, discovered that you were still being billed out to Jarrow Formulas at $405 an hour; correct?

A Yes.

Q And then you went to Mr. Giarratana, and you told him that, Hey, I'm still being billed at a rate that's many years old; right?

A    That definitely happened, yes.

Q    And he didn't realize that until you told him.  Isn't that right?  Isn't that what he told you?

A    That is what he told me.

Q    And so it took Mr. Giarratana -- well, actually, Mr. Giarratana didn't discover that your billing rate was not raised until you brought it to his attention; correct?

A    I mean, I don't know if Mr. Giarratana discovered it earlier or not.  I suspect he did not.

Q    And at that point, three years of bills had already been sent to Jarrow Formulas in the Kentucky federal court case with your $405 an hour rate.  Isn't that right?

A    If that's what the documents show, that's what they show.

Q    Excuse me.  And over three years, that would mean at least 36 invoices in which Mr. Giarratana didn't notice that the billing rate had not changed; right?

A    I don't know the number of invoices.  I mean, the assumption in that question is there was an invoice every single month, and I can't say that.

Q    Well, there's been testimony in this trial -- maybe you weren't here those mornings.  I think you weren't here two mornings out of the nine days we've been here.  But there has been testimony in this case that a bill was sent to Jarrow Formulas every month and that somehow Mr. Rogovin should have seen the billing rates on those bills; and, therefore, we're

stuck with rates that were raised without notice, without prior notice because of that billing.  Do you recall that testimony?

A   Not the way you just presented it, no.

Q   Now, let's talk now about the mock jury exercises that were done.

A   Sure.

Q   First of all, I think you answered some of the questions I had under Mr. Pepe's questioning about the portions of Mr. Rogovin's mock testimony that were shown to the jury this morning in which you play acted the role of Caudill's lawyer cross-examining him.  Do you recall that?

A   Yes.

Q   And in that situation, there was no lawyer representing Jarrow Formulas in that mock exercise who could object to the questions or could ask for any kind of intervention when Mr. Rogovin was expressing himself in the way he was; correct?

A   Well, Mark Giarratana was there.  He was representing Jarrow Formulas.

Q   And he didn't raise any objections, and there was no judge there to rule on any objections or any mock judge.  Isn't that right?

A   There was no judge there.  There was no mock judge.  That part I agree with.

Q   And you agreed with Mr. Pepe that there -- that what we saw on that video is very unlikely to have actually gone on in a

trial court; right?  Because the judge would have controlled the situation.

A   I don't recall that Mr. Pepe suggested that.

Q   Well, isn't that the gist of what you were saying in response to Mr. Pepe's questions about what the role of the judge would have been in that situation?

A   I have no doubt -- I guess I do recall now what you're referring to.  I have no doubt that if that occurred in the courtroom, the judge would have intervened.  And what would have happened next, I don't know.

Q   Now, throughout the case, leading all the way up to the trial, Mr. Rogovin complained to you and others on the trial team that he felt he was not being listened to.  He did that; right?

A   No.

Q   He never complained that he wasn't being listened to?

A   That's a different question, sir.

Q   Okay.  You recall, though, that Mr. Rogovin complained many times to you that he felt he was not being listened to.  Do I have that right?

A   No.

Q   Did he ever complain to you about not being listened to?

A   Not being listened to by me?

Q   Yes.

A   Not that I recall.

Q   Are you aware that he complained to other attorneys at McCarter & English that he felt he was not being listened to?

A   I'm aware, particularly in maybe late 2018 and in 2019, that there were occasions, particularly when we were on trial, where he complained generally about the trial team not listening to him.  Whether those complaints were directed at a specific individual or not, I don't recall.  I don't recall him singling anyone out.

Q   And Mr. Rogovin complained in ways that you're aware of that he didn't think your McCarter & English trial team was presenting the defense on his behalf in the way that he wanted it presented with respect to telling his story.  Isn't that true?

A   I'm not sure that's true.

Q   Well, isn't that expression on the part of Mr. Rogovin part of the explanation for what we saw this morning on video as to how and why he kept trying to tell his story and talk over you when you were playing the part of Caudill's lawyer?

A   Ask me that again, please.

THE COURT:  The question was, "Well, isn't that expression on the part of Mr. Rogovin part of the explanation for what we saw this morning on video as to how and why he kept trying to tell his story and talk over you when you were playing the part of Caudill's lawyer?"

THE WITNESS:  I don't think I understand that

question.

MR. RESSER:  I'll withdraw it.

Q   (By Mr. Resser) Now, near the end of Mr. Pepe's examination of you today, you testified that the first time you heard an accusation of malpractice was when Mr. Rogovin made it in the chutzpah letter on July 22nd; right?

A   Well, he didn't make an accusation, at least not an express one, of malpractice in that letter, but I do think that was the implication.

Q   But I thought you also told the jury that you heard the recording on Mr. Giarratana's phone of the butt call the same night as the verdict on June 26th.  Didn't you say that to the jury?

A   I did say that to the jury.

Q   And you recall, sir, in the butt call, Mr. Rogovin talked about malpractice; right?

A   Yeah, that wasn't directed to us.  We received it.  But that was not directed to us.  No one on behalf of Jarrow Formulas communicated in express language to McCarter & English that we had committed malpractice until this lawsuit was filed.

Q   Well, this lawsuit was filed by McCarter & English, wasn't it?

A   Well, until the counterclaim was filed.

Q   And McCarter & English sued on July 22nd, which was the

same day as the chutzpah letter, wasn't it?

A   Okay.  If you say so.  I don't know what day McCarter & English brought its lawsuit.  I don't have that in mind.  I do know the chutzpah letter was July 22.

Q   Same day.

A   I just said I don't know what day the lawsuit was filed.

Q   Now, in the butt call, Mr. Rogovin said, They didn't do squat -- used a different word -- They didn't do squat to cut off my damages.

And you knew in that part of the call he was referring to McCarter & English as "they"; correct?

A   I knew "they" was McCarter & English.

Q   And he also mentioned that the O'Brien letter, or his letter to O'Brien, didn't come out in the trial; correct?  In the butt call.

A   Yeah, he mentioned that.

Q   And in that context, he also used the word "malpractice," didn't he?

A   He did.

Q   So at that point when you and Mr. Giarratana heard the butt call, you never -- well, withdrawn.

Mr. Giarratana's already testified that the fact that Mr. Rogovin had inadvertently called Mr. Giarratana's phone, which recorded his comments to Mr. Ashurst and Mrs. Ashurst, that Mr. Giarratana did not tell Mr. Rogovin that he had

received that call and received that message.  Do you recall that?

A   I think that testimony was given.  I'm not -- I don't have perfect memory on that.

Q   And you didn't call Mr. Rogovin or e-mail Mr. Rogovin and say, You know what?  You inadvertently called Mark's phone.  We have a recording of it.  We know you're unhappy, or anything like that; right?

A   I did not do -- I did not.

Q   And, in fact, that McCarter and you and Mr. Giarratana had that recording did not come out until the discovery in this case after you sued Jarrow Formulas; correct?

A   I have -- I have no basis to dispute that, but I don't know.

Q   Now, you heard the testimony -- withdrawn.

In the Kentucky trial, the jury found that no lab notebook and no hard drive had been misappropriated.  That was one of the six trade secrets where the jury -- where you were successful and the jury didn't find a trade secret was taken; correct?

A   That was -- there were two alleged trade secrets, alleged by Caudill, one of which was determined not to be a trade secret and the other of which the lab notebook and hard drive were determined not to have been misappropriated.

Q   Right.  So the jury found that the lab -- the hard drive

and the lab notebook were trade secrets; correct?

A    I think that's right.

Q    But they did not find Jarrow Formulas had received either of those two items; correct?  So it never even got to the damages part of it.  It had not been used.

A    The jury found no misappropriation --

Q    Right.

A    -- I think is the best way to put it.

Q    And that was the testimony that we also heard in the mock jury exercise, the focus group exercise, the part of that testimony that was shown where Mr. Giarratana was doing the questioning, Mr. Rogovin was asked about that.  Did you see that this morning?

A    Yes.

Q    And at the -- and in the long run, there was no finding of misappropriation of that trade secret; correct?

A    The jury found, when it returned its verdict, that there was no misappropriation of the lab notebook and hard drive.

Q    Now, I want to go back to the Rogovin letter to Mr. O'Brien.  Yesterday I asked you, if the O'Brien letter didn't come in because of the judge's order that the Ashurst litigation was not relevant, and there were some references to the Ashurst's litigation in those letters between Mr. Rogovin and Mr. O'Brien, I asked you, it's possible that Mr. Rogovin could have been allowed to testify about the content of that

letter even without the letter coming in.

Do you recall that?

A   I recall you asked me a question along those lines.

Q   And I asked if you agreed with what Mr. Berman had said that if the letter was excluded because of the judge's order in the Kentucky trial, that the content of the letter could have come in just through Mr. Rogovin's testimony.  Do you recall that?

A   I recall you asking a question along those lines.

Q   And I asked you if you agreed that it was possible that Mr. Rogovin could have been allowed to testify about the content of his letter to Mr. O'Brien without the letter coming in if that had been the judge's decision, had it been proffered and denied; correct?

A   I think you asked me about that.

Q   And then your answer was, "Perhaps, subject to the best evidence rule."

That was your answer, sir; right?

A   I think that was part of my answer, wasn't it?  Was there more?

Q   Not that I have here.

A   Well, I don't know what you're referring to.

Q   Well, the jury heard the evidence, and it's in the record. You answered, subject to the best evidence rule, perhaps.  That was your answer; right?

A    That was -- that, I think, was a part of my answer.  I'm not certain that's complete.

Q    Well, I'm looking here at the rough transcript.  I don't have the official transcript.  I'll have that for the closing.

Now, we looked today at a lot of data from the mock jury.  We looked at the -- some of the testimony that was prepared for the mock jury.  We looked at all of the data that you and Dancel assembled.

Doesn't this call out -- doesn't all that information call out for you being more prudent about what you represented to the jury in your opening statement that Mr. Rogovin will testify, telling the jury that three times and pointing out that he was in the courtroom?

A    No.

Q    We heard a lot today about all of your efforts to meet with Mr. Rogovin.  One of the e-mails that he sent you when canceling the meeting included an e-mail that talked about the financial stresses on his companies.  Do you recall that e-mail?

A    You want to show it to me?

Q    I have so many notes.  I'll get to it.

THE COURT:  Do you have another question you can ask?

MR. RESSER:  Yes.

Q    (By Mr. Resser) You talked about the efforts to go see Mr. Rogovin in Los Angeles, your efforts to get him either to New

Jersey or Manhattan or Hartford and the times -- the issues he had with taking the time to travel and so on.

Did you or Mr. Giarratana or anyone else for McCarter & English suggest, Well, maybe we can do this by Zoom?

A   So --

Q   Yes or no?

A   No, we did not.

THE COURT:  I tell you, Mr. Resser, we've hit 3:30.

MR. RESSER:  Thank you, Your Honor.

THE COURT:  We're going to call it a day.  We're going to call it a week, Ladies and Gentlemen.

Again, as always, thank you for your attention.  Now, just let me give a little bit longer version of my usual instructions because we're going away for the weekend.

Don't think about the case this weekend.  Don't look up the case this weekend.  Don't do any research this weekend.  Don't talk about the case this weekend.  The case will be waiting for you on Monday.  So we'll see you then.  Thank you.  Have a nice weekend.  And thank you very much again.  Usual time on Monday.  Thank you.

(The jury left the courtroom at 3:30 p.m.)

THE COURT:  Here's what I suggest.  Why don't we take five, take ten even, take ten minutes, return.  I don't -- in light of what we talked about, I wanted to talk more about timing.  But in light of our earlier discussion about timing, I

think our legal discussion will be a lot shorter than what I anticipated. I'll probably just have one issue to discuss with you, and I do want to talk about the schedule for next week. So we'll recess for now. I'll ask counsel to be back at 3:40 and then probably take us ten minutes.

(Recess from 3:31 p.m. to 3:40 p.m.)

THE COURT: So, first let's talk about witness lineup for Monday. Obviously, Mr. Resser will continue with Mr. Rechen.

Mr. Resser?

MR. RESSER: Then we have Mr. Giarratana.

THE COURT: Before we get to that, you have a rough sense of how much longer you'll be?

MR. RESSER: Well, Mr. Pepe had him for basically --

THE COURT: I agree. I'm not pushing you. I just want a rough sense. That's all.

MR. RESSER: I would think we'll be done in the morning with Mr. Rechen.

THE COURT: All right. And then Mr. Giarratana?

MR. RESSER: Mr. Giarratana. I don't expect that would take the entire afternoon. But, again, Mr. Pepe will have a chance to --

THE COURT: Yes, he will.

MR. RESSER: -- recross or cross. Then we'll have Mr. Rogovin. And the next live witness after that will be Mr.

Leventhal.

THE COURT: Okay.

MR. RESSER: We also have, I believe, some limited depo designation.

THE COURT: Okay. Very well. Thank you.

Were you planning to call Mr. Grondahl in your case?

MR. RESSER: Yes.

THE COURT: Okay. When would that be? That would be after the depo designations or --

MR. RESSER: Um, thank you for reminding me.

THE COURT: Yup.

MR. RESSER: I don't know the exact order yet, Your Honor.

THE COURT: That's fine. But in any event --

MR. RESSER: It would be Monday.

THE COURT: Oh, for Monday. Well, we do need to know.

MR. RESSER: If we have time.

THE COURT: Sorry?

MR. RESSER: If we have time, we would call Mr. Grondahl.

THE COURT: After Giarratana and Rogovin?

MR. RESSER: We might put Mr. Grondahl in after Mr. Giarratana?

MR. HEAVEY: Right.

THE COURT: So it could be Mr. Giarratana, Mr.

Grondahl, and then Mr. Rogovin? I mean we do need to know your witness order for Monday.

MR. RESSER: Okay.

THE COURT: So what is it?

MR. RESSER: Can I have until six o'clock?

THE COURT: Why don't we make it until five o'clock. If I said six before, I'm changing it to five. Because that's usually -- I think in my next trial I'm going to have a new rule which is it's done in the courtroom. But okay since I've told you.

Why don't we give you till five o'clock to designate your witness order on Monday, although I do want to have some idea.

MR. RESSER: Okay.

THE COURT: That's fine.

Now, as I recall -- Mr. Pepe, as I recall, there was -- with regard to Mr. Grondahl, there was some kind of a billing issue that you said, Judge, it would be okay to cover that one if he testifies? And I said, Yes, it would.

That's still your intent? Maybe I've got it wrong.

MR. PEPE: May I have a moment?

THE COURT: Sure.

(Pause.)

MR. PEPE: No, Your Honor. We don't --

THE COURT: Oh, maybe it was Mr. Resser who needed to

do that; is that right?

MR. RESSER: Yes, yes. And that's why I -- you know, he was under subpoena.

THE COURT: Okay.

MR. RESSER: They said he couldn't be here till Monday. He's been in the courtroom the last two days. But we'll take him Monday.

THE COURT: Oh, that's fine. And, Mr. Resser, you'll do both, whatever you need do on the malpractice and on the billing issues.

MR. RESSER: Yes, in one sitting, yes.

THE COURT: And then after he does that, Mr. Pepe, after he finishes with Mr. Grondahl, are you going to have any more evidence to present on the billing issues in this case?

MR. PEPE: On the billing issues, no, Your Honor.

THE COURT: So will you be prepared to rest at that point with regard to your breach of contract claim?

MR. PEPE: I believe so, Your Honor. There -- I did indicate some witnesses on the malpractice issue.

THE COURT: Yeah, yeah. No, we're not done.

MR. PEPE: You were asking about the billing issue.

THE COURT: Yeah, I'm really asking about your case, which is, you know, the breach of contract and other claims. So you'd be prepared, after the examination of Mr. Grondahl is complete, after all the examinations of Mr. Grondahl are

complete, at that point to rest with regard to your case?

MR. PEPE: But we might have information coming from Mr. -- well, no, I won't, because Mr. Rogovin and Mr. Leventhal will come after Mr. Grondahl.

THE COURT: I know. But I thought we had already elicited -- didn't they already testify with regard to the billing issues? So my question is we're talking about your claims, McCarter's claims in the case.

MR. PEPE: I understand, Your Honor. Yes, I think Your Honor's right.

THE COURT: After Mr. Grondahl testifies, you would be prepared to rest at that point.

MR. PEPE: I think Your Honor's right.

THE COURT: Got it. I just wanted to make sure that was clear.

Now, one or two other things. Then we'll discuss a legal issue.

So on Wednesday, the 19th -- nope, there's no real problem except I do have -- I have a commitment at 10:00, which will be in the courtroom just down the hall that I can't get out of. And so we'll start -- and I'll tell the jury this on Monday. If I don't, don't let me let the jury go on Monday without telling them. On Wednesday the 19th, we'll start at 11:00 a.m. That's my plan. So I realize that it's not ideal, but I don't really have a choice. So that's Wednesday.

Now, the only legal issue I wanted to discuss with you now -- oh, oh, we will not be having a charge conference on Monday. No charge conference Monday, so don't worry about that. We're not going to have a charge conference Monday.

And my -- in light of what you've told me about the schedule, just to be clear. Mr. Pepe, your estimate was probably evidence done on Thursday; is that right?

MR. PEPE: I think that's what we're both predicting, Your Honor.

THE COURT: Okay. Then, yeah, we will not have the charge conference on Monday then. We might have it -- we could tentatively look to it on Friday. But just pencil it in for now. We might do it a little sooner. But I like to do it near the close of evidence, if not at the close of the evidence.

And what I think we will do -- again, this is just tentative, but I just wanted to put it out there for you. I think what we would do, if you finished the evidence on Thursday, we'd probably give the jury Friday off and have us come back then on Monday, the 24th. I would read the charge, and you'd do the closing arguments. That would be -- again, I realize things can change. We're kind of in the middle. That's kind of how I'm thinking of things now.

Does anybody have a reason to say, Oh, that's not feasible, Judge? Not hearing anything, good.

MR. RESSER: No. I like that idea.

THE COURT: All right. Very well.

Okay. Now, let's talk about a legal issue. And the only one I really want to talk -- this is really addressing to your team, Mr. Pepe. This is the statute of limitations issue.

So, as you know, on summary judgment I found that there was a genuine dispute of material fact, if memory serves, with regard to whether there was a continuing course of conduct. So we've seen the charges on that, and certainly I have in other cases charged the jury on statute of limitations and charge of conduct issues, and I'll do that if I think it's appropriate.

But -- and isn't it the case that -- I mean I know this goes to other issues in the case, but we might as well start this discussion now. So I've looked long and hard for case law on the circumstances under which it's appropriate to have the jury decide whether there's a fiduciary relationship, which, for purposes of a continuing course of conduct claim, might be called a special relationship.

You'll recall that in the context of a continuing course of conduct, response to a statute of limitations defense, there are kind of two ways for the plaintiff to establish that there was a continuing course of conduct. In this case -- in this case the counterclaim plaintiff to establish that there was a continuing course of conduct. One is to establish that there was a special relationship, and the

other is to establish that there was conduct that fell within the statute of limitations period that effectively continued.

You know, with regard to the special relationship, otherwise known as the fiduciary relationship, I've looked long and hard on case law regarding whether that issue should be submitted to the jury. And I must tell you, I haven't found any case in which the court submitted to the jury or treated, other than as a legal issue, the question whether an attorney-client relationship was a fiduciary relationship.

More specifically, there is an opinion by Chief Justice Robinson -- Josh, do you have that? Could you e-mail it to me? I'll get it for you in a minute -- which essentially says that lawyers are fiduciaries per se. It doesn't just say lawyers. He gives a list. But I think he says lawyers, agents, partners, others on the list.

And you're both well aware of the cases that -- like the *DiFrancesco* case from way back in the forties that say when the lawyer enters into a transaction with the client while the attorney-client relationship is going on, well, that's a fiduciary relationship and the transaction is scrutinized, etc.

But putting that -- well, so I guess let me cut to the chase and say: I'm kind of wondering what the basis is for me at this point, or the time we get to the issue of charging the jury, of asking the jury to decide whether there's a special relationship.

It seems to me, based on those cases, that that's a legal question for the Court to decide. And if I decide that indeed there was a special relationship because there was an attorney-client relationship, then I shouldn't submit the statute of limitations defense to the jury at all because, as a matter of law, there was a continuing course of conduct.

So let me ask for your reaction to that, Mr. Pepe.

MR. PEPE: My reaction, Your Honor, is I'm grateful the Court has raised it so that we could give it full and fair consideration and respond intelligently to the Court's question. Right now, I have nothing intelligent further to say on that issue.

THE COURT: It's Friday afternoon. You'll be forgiven for that.

MR. PEPE: No, but it does raise another issue, Your Honor. We have -- in the course of attending to the more immediate business, we understand those legal questions are lurking. And we've set statute of limitations, and Your Honor addressed that in the summary judgment motion.

THE COURT: Right.

MR. PEPE: And I think that was the basis for denying summary judgment on that. And so we have been discussing it and how it should be raised. And, in fact, we talked about a judgment for a motion as a matter of law on that and one or two other issues. Not prepared to frame that now. But we -- but

we intended to ask Your Honor's intentions in that regard if we have this rough framework of a calendar, where might the Court entertain such a motion?

THE COURT: Sure. So, obviously, if Mr. Resser wants to make motions after you rest, what I would -- this is how I typically do this: What I would do is I would wait for a break. I would say -- Mr. Resser can stand up and at the appropriate time after Mr. Resser rests, you can stand up.

So let me give you that case though, before I forget.

MR. PEPE: Please. I appreciate it.

THE COURT: That's *Iacurci*, I-A-C-U-R-C-I, *vs. Sax*, S-A-X, 313 Connecticut 786, so yeah. Yeah, it's Chief Justice Robinson, 313 Conn. 786, 2014 decision by the Connecticut Supreme Court.

So the -- right. So I was telling you how typically I do the whole motion for judgment as a matter of law thing.

So typically what I would do is -- so, obviously, Mr. Resser would stand, say, "Your Honor, I have a motion." And then if there were further proceedings to be done before the jury -- or we hadn't hit a break yet, I would ask Mr. Pepe -- or excuse me -- I would ask Mr. Resser to start putting on his case, and I'd say, "You're preserved" so that we don't -- I don't have to send the jury out at that point.

Then at the next break, we would have, if it's only the 15-minute break, we might do it at the lunch break or

something or whenever we would do it at the end of the day. We'd have some argument on that.

You know, probably comes as no surprise to you, as experienced trial lawyers, that many, many, many times I reserve on those issues. So there are, I suppose if I look back since I've been doing this as a judge, maybe one or two times that I've actually said, yeah, I'm not going to submit that issue to the jury on that basis. But -- so it's not impossible, and I'll certainly entertain argument.

So when it's your turn, when Mr. Resser rests his case, then you can stand similarly and, you know, if we haven't reached a break or there are further things to be done, I'll say, "Okay, you're preserved." We'll do it the same way.

But, yes, there will be time to discuss the issues. You know, I don't typically have lengthy argument on those issues, but, you know, 15, 20 minutes, something like that.

MR. PEPE: I take away from that, Your Honor, that the Court's not asking for or requiring --

THE COURT: No, I don't want briefs. Please, no, I don't want briefs on that issue. I know that if, you know, things don't go one side's way that I'll get briefs eventually. I don't want briefs at that point. Please don't stay up late working on briefs.

MR. PEPE: Appreciate knowing that, Your Honor.

THE COURT: Sure. No problem.

Let's just see.  So I've talked about Wednesday.  It's likely to be an eleven o'clock start.  You have to stay flexible, but I'm pretty sure that's what's going to happen. We sort of sketched out the probable course of events for next week, which is helpful.

Mr. Resser, with regard to the video deposition portions that you've used for impeachment, I think we covered this, but I just want to be clear.  You may mark those for ID and make sure that Ms. Johnson has those.

MR. RESSER:  You know, we saw what was done in the Kentucky case today --

THE COURT:  Right.

MR. RESSER:  -- with an actual ECF filing with the testimony.

THE COURT:  That would be fine.  You can do that too. I have no problem.

MR. RESSER:  I figured that makes sense.

THE COURT:  I have no problem with that.  I was interested in that too, and it struck me as a good idea.  So that's no problem at all.  Please plan on that.  That's fine.

MR. RESSER:  Excellent.

THE COURT:  All right.  That's all I have for now.

MR. PEPE:  Your Honor, may I raise one point?  It doesn't require any Court action at this point in time.  But I think we should put counsel and the Court -- make counsel and

the Court aware of the situation. We have two witnesses listed, Celeste O'Keefe and Jimmy O'Keefe. They're in Louisiana.

THE COURT: Danny O'Keefe is it?

MR. PEPE: Sorry. I said Jimmy. Jimmy was the other. Danny O'Keefe. And they're in Louisiana. We learned last night Danny O'Keefe is ill with some contagious condition. That's all we learned. And, of course, that creates problems. So we haven't had a chance to discuss it with either of those two persons.

THE COURT: Okay.

MR. PEPE: And I just wanted to make the Court and counsel aware. And I will report as soon as we know more. And I may be in a position of having to ask for a Zoom testimony, but I'm not asking for that now until I know more.

THE COURT: All right. Let me ask you this question: How long do you anticipate, just a rough estimate, the direct examination of the O'Keefes will take?

MR. PEPE: Very, very short, Your Honor. I'm talking a matter of minutes.

THE COURT: For each of them.

MR. PEPE: Yes, exactly.

THE COURT: That's what I thought. Okay.

Anything else? Mr. Resser? Anything?

MR. RESSER: Your Honor, in light of the other things

we have to get done by five o'clock, including the Beres' testimony --

THE COURT: Yup.

MR. RESSER: We've got the papers ready. We're just putting the deposition pages behind the listing of the portions that we think the affidavit goes to.

THE COURT: Yes.

MR. RESSER: If we could have until six o'clock.

THE COURT: That would be all right. That would be okay. I'm going to be working on the case this weekend anyway.

MR. RESSER: Thank you, Your Honor.

THE COURT: Very well. Thank you, gentlemen. Have a nice weekend.

(Proceedings concluded at 3:58 p.m.)

# I N D E X

**WITNESS NAME**                                                         **Page**

Thomas Rechen

   Continued Cross By Mr. Pepe................................. 1317

   Redirect By Mr. Resser..................................... 1481

C E R T I F I C A T E


MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)



I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937