UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                    No. 3:19-CV-1124 (MPS)
McCARTER & ENGLISH, LLP
                                    JULY 17, 2023
vs.
                                    8:55 A.M.
JARROW FORMULAS, INC.
                                    JURY TRIAL
- - - - - - - - - - - - - - - - x

Volume IX, pages 1524 - 1761

450 Main Street
Hartford, Connecticut

BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

AND A JURY OF TEN

COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
                    (860) 212-6937

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:


FOR THE PLAINTIFF:

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
             One State Street, 14th Floor
             Hartford, Connecticut 06103
        BY:  LOUIS R. PEPE, ESQUIRE
             JAMES G. GREEN, JR., ESQUIRE
             JAMES A. BUDINETZ, ESQUIRE
             DAVID W. CASE, ESQUIRE


FOR THE DEFENDANT:

        BARTON LLP
             100 Wilshire Boulevard, Suite 1300
             Santa Monica, California 90401
        BY:  BERNARD M. RESSER, ESQUIRE

        BARTON LLP
             711 Third Avenue, 14th Floor
             New York, New York 10017
        BY:  JAMES E. HEAVEY, ESQUIRE
        BY:  MICHAEL C. WARD, ESQUIRE

(Call to Order, 8:55 a.m.)

THE COURT:  So let's have appearances of counsel then.

MR. PEPE:  Morning, Your Honor.  May it please the Court.  For the plaintiffs McCarter & English LLP, Attorney Louis Pepe of McElroy Deutsch.  With me is Attorney James Budinetz, Attorney James Green, and Attorney David Case.

THE COURT:  Good morning.

MR. RESSER:  Good morning, Your Honor.  Bernard Resser, Barton LLP, for plaintiff and -- I mean defendant and counterclaim plaintiff Jarrow Formulas.  With me are James Heavey and Michael Ward.

THE COURT:  Good morning.

So, folks, I did look at the papers submitted with regards to Mr. Beres's testimony and whether the Court would admit the affidavit.  I had a question or two.

Well, first, let me tell you my impression, which is I do think Mr. Resser's team is correct that, under Rule 806, portions of the affidavit that are inconsistent with Mr. Beres's deposition testimony are admissible for impeachment purposes.  The -- I read the rule.  I read the commentary rule, and I read some of the cases.  I read the commentary to the rule, and I read some of the cases.

And although there's been a debate on the subject among some judges, the judges who felt that allowing

impeachment by the use of later statements, statements made after the deposition testimony, for example, that allowing the use of that testimony to impeach was unfair because there was no opportunity for the party here in McCarter's position to cross-examine regarding the statement. The drafters acknowledged that but ultimately concluded that allowing use of the statement was -- provided more information to the jury about the declarant and so that it would allow that.

Of course, here I would also allow any testimony that would speak to the origins of the affidavit, for example, any testimony from Mr. Leventhal that McCarter wanted to elicit with regard to -- with regard to the origins of the affidavit.

I did begin looking at -- or I should say I looked at but I haven't yet finalized my review of which portions of the affidavit are, strictly speaking, impeaching and which are not. I should use the word "inconsistent" because that's the -- that's the language in the rule.

Mr. Resser, I did have a question in that regard. Is it that the -- I've got your sort of I guess I'll call it a designation of what I understand to be the portions of the affidavit you'd like to put into evidence. Am I reading that correct?

MR. RESSER: Yes, Your Honor.

THE COURT: All right. So I need to put the -- those designations with the affidavit and deposition testimony side

by side. I was able to read everything yesterday, but I haven't had the opportunity to really go through to determine what portions of the affidavit I view as inconsistent as opposed to explanatory. So I haven't yet done that.

When were we proposing that we would be putting on Mr. Beres's testimony?

MR. PEPE: We would put it on, Your Honor, after the -- after our witnesses have testified. Mr. -- as I understand it, Mr. Resser's going to call Mr. Grondahl, Mr. Giarratana.

THE COURT: Okay.

MR. PEPE: And we probably would do it after he -- after Mr. Resser completes his witnesses.

THE COURT: Okay. Fine. So --

MR. PEPE: And before Mr. Shearin.

THE COURT: I've got a little bit of time yet. All right. So I will work on that maybe over the lunch break today.

MR. PEPE: In regard to that task, Your Honor, we have further analyzed the deposition testimony in light of Your Honor's suggestion we move this along, and we've shortened the designations including the ones that survived Your Honor's rulings.

THE COURT: Sorry, shortened the designations of Mr. Beres?

MR. PEPE: Yes, because we had submitted the designations; counsel submitted counter-designations. Your Honor ruled. And we have gone back and shortened it further.

THE COURT: Okay.

MR. PEPE: And we are going to provide Mr. Resser with the shortened version.

THE COURT: Well, let me ask you this question: Does that mean that it's not going to be necessary for me to look at some of the portions of the deposition Mr. Resser has designated here? I mean I don't want to do work that I don't have to.

MR. PEPE: And that's exactly why I raised it, Your Honor.

THE COURT: Okay. Well, when am I going to get these designations then? I need to see them.

MR. PEPE: We can get it to Attorney Resser tonight and send it to Your Honor's clerk tonight. Will that be all right?

THE COURT: That will be all right. But that means he can't go on tomorrow because I'm going to need time.

MR. PEPE: I understand that.

THE COURT: Okay. That's fine. So I will put that off then.

Okay. Devorah, the jurors are ready?

MR. PEPE: Your Honor, before -- may I ask for a

sidebar with Attorney Resser?

THE COURT:  Sure.

(At sidebar off the record.)

(The jury entered the courtroom at 9:12 a.m.)

THE COURT:  I hope you had a nice weekend in tropical Connecticut.  You can please take your seats.  So, you know, folks, I don't want you to think we are sort of moseying in at 9:15.  We were here at that time and even before.  There was an issue that came up to discuss with the lawyers.  I know you're working hard to be here on time.  We are too.  This was unavoidable I'm afraid.

The witness remains under oath.  Mr. Resser is examining him.

Mr. Resser, you can proceed whenever you're ready.

MR. RESSER:  Thank you.  Good morning.

Good morning, Ladies and Gentlemen.


T H O M A S   R E C H E N,

resumed the stand and testified under oath as follows:

CONTINUED REDIRECT EXAMINATION

BY MR. RESSER:

Q   Good morning, Mr. Rechen.

A   Morning, Mr. Resser.

Q   Before we stopped on Friday, I was asking you about your testimony that you were not aware of Jarrow Formulas' financial

cash crunch in the months leading up to the Kentucky trial.  Do you recall that?

A   I don't think you actually got to that question with me.  I think the last question concerned Zoom.

Q   Right.  But I was looking for a particular exhibit on the issue of the financial cash crunch, and now I have that in front of me, so I want to move to that subject matter.

A   Okay.

Q   But you do recall your testimony that you were not aware of the financial distress and the cash crunch?

A   I was not aware of financial distress.

        MR. RESSER:  If we can ask Mr. Campos to display PTX 203, please.

        THE COURT:  Which is already in evidence I take it?

        MR. RESSER:  Which is already in evidence.

        I think we need to share.

        THE COURT:  There we go.

Q   (By Mr. Resser) So, Mr. Rechen, Exhibit 203 is an e-mail that Mr. Rogovin wrote on November 7, 2018.  It was introduced relative to your testimony about the efforts to schedule the mock and/or the prep of Mr. Rogovin.

        And in the second paragraph he wrote to you, "Mr. Giarratana, and Mr. Grondahl, I need to cancel next week.  It is not a good idea to fly across the country.  I can't stomach anymore Caudill right now.  There are serious issues at JII and

I need to be there, work with the new team and Ben.  Ben and I need to spend a much greater time together than usual right now.  As it is, we can hardly even get a new product out."

So do you recall receiving that e-mail?

A   I do.  I recall that there was an issue with respect to out-of-stocks at JII.

MR. RESSER:  Mr. Campos, can you display PTX 167 which is in evidence?

Q   (By Mr. Resser) And this is an e-mail early the next year, February 27, 2019.  Do you see that?

I think the top of the e-mail is just being forwarded after the trial to you by Ms. Wantek.  For some reason you may have asked her for this or something to see this again; is that right?

A   I'm sorry.  Did you say after --

Q   The very top of the -- very top e-mail is much later.  It's September 3, 2019, after the trial was over for a couple months; right?

A   Yes.

Q   And apparently you asked Ms. Wantek to forward this to you because there was some interest if that part, after this case, was brought by McCarter; correct?

A   That would appear to be correct, yes.

Q   And this is a reply that you made on February 27 to an e-mail from Mr. Rogovin.  And if Mr. Campos can go to the

preceding in time e-mail that Mr. Rogovin wrote.

Next page.  There it is.

So from -- from Mr. Rogovin -- that's his e-mail jlrjfi@aol; correct?

A    Yes.

Q    And he wrote you on February 27.  In the first line:  When I say cut it out I mean it.  I have no time for BS.  I have no time for that expletive scummy case right now.  I'm working to save my companies.

You received this e-mail, didn't you, sir?

A    I did.

Q    And you personally replied to that e-mail.

A    Yes, I did.

Q    And then in your reply, if we can go up to Mr. Rechen's reply where it begins "We understand."

You wrote, "We understand the frustration expressed by you during our call last evening and in your below e-mail.  We would prefer not to distract you from the serious issues that you are addressing at JII."

That refers, sir, doesn't it, to the financial and cash crunch issues that Mr. Rogovin had told you about, doesn't it?

A    That refers, in my mind, to the out-of-stocks issue with respect to Jarrow Industries, not Jarrow Formulas.

Q    And that exchange with -- that e-mail followed a very

difficult call with Mr. Rogovin; correct?

A    Followed a very difficult call?  Is that what you said?

Q    Yes.

A    Well, it was an angry call on his part.

Q    And you knew about the issues with out-of-stock items that affected not just JII but Jarrow Formulas.  Because unless it could get product from JII, it couldn't sell, couldn't bring in more cash; correct?

A    So I don't know that that's entirely correct.  I knew, obviously, from things Mr. Rogovin had said from time to time about that they were experiencing out-of-stock issues.  The extent of those issues I had no knowledge or familiarity with. To the extent that that resulted in financial difficulty, once again, that's not something that I would have had information about or focused on.

Q    Well, you discussed that with Mr. Rogovin and e-mailed him about it because of how it impacted the preparation for trial. Isn't that right?  That's what it says here.

A    I don't connect those two the way you do in your question.

Q    Well, you connected it in your e-mail when you wrote, "We would prefer not to distract you from the serious issues that you were addressing at JII."

A    Relative to out-of-stocks, yes.

Q    And, in fact, the financial issues that you and your

colleagues knew that Jarrow Formulas was experiencing before the trial, and then of course after the trial when there was a judgment against them, that was one of the reasons that McCarter & English rushed to the courthouse less than a month after the jury verdict -- the jury came in, isn't it?  Rushed to the courthouse to sue Jarrow Formulas for unpaid fees.

A   No, that's wrong.

Q   Now, you made -- I want to move now to the matter of not calling Mr. Rogovin in defense of Jarrow Formulas' case in the Kentucky trial.  Do you have that subject in mind?

A   I do.

Q   And you made a point earlier of saying lawyers don't make promises to a jury in opening statement.  They make representations.  Do I have that right?

A   I would say that's right.

Q   What is the difference between a representation and a promise?

A   In the context of an opening statement, it is a foreshadowing of what counsel believes the evidence will be and the sources of that evidence as counsel understands it before evidence has commenced.

Q   I think in your testimony earlier in this case last week, you said that you are a member of the Litigation Section of the ABA.  Do I have that right?  The American Bar Association.

A   Yes, yes.

Q    And you said that you routinely read the periodicals published by the section of litigation of the American Bar Association?

A    Well, they put out a lot of information.  There is one periodical in particular that I generally try to stay current with.

Q    And you find the publications of the Litigation Section of the American Bar Association authoritative, don't you?

A    Not always.  Sometimes yes; sometimes no.  They publish things that I agree with.  They publish things that I don't agree with.  They publish things that other members of the association contradict in their writings from time to time.

Q    Would you be surprised then that in a publication of the American Bar Association's section on litigation entitled *Business and Commercial Litigation in Federal Courts, 5th Edition*, it uses the word "promising" to describe when a lawyer represents to a jury that a particular witness will testify at trial?

A    Your question is, would I be surprised?

Q    Yes.

A    No, I would not be surprised.  I mean, I've seen that kind of commentary before.  I also heard your expert witness agree that it's not a promise.

Q    In fact, sir -- and I can hand you a copy -- Section 48:9 of the American Bar Association Section of Litigation

Publication called *Business and Commercial Litigation in Federal Courts, 5th Edition*, under the heading "Structure and Scope of Opening Statement, Ethical Limitations," it says, Though not -- "Though it is not specifically prohibited, promising in an opening statement that a witness will testify and then failing to call the witness can constitute grounds for an ineffective assistance of counsel claim in some jurisdictions, though such a claim will be granted only under limited circumstances."

So in that situation, the publication used the term "promise" in connection with a lawyer's representation to the jury that a particular witness would testify at trial. Would you agree with me?

A   Well, the answer to your question is no.

Q   Now, if this jury finds there was malpractice in connection with the failure to call Mr. Rogovin and have him testify as to his good faith and the processes that were used at Jarrow Formulas, they can't get a redo in Kentucky at this point. Isn't that true?

A   You're asking me a hypothetical, I think, and I didn't get the "if" part, the first part of that question.

Q   Well, we talked last week about the fact that when there's ineffective assistance of counsel in a criminal context, the defendant can get a new trial; right?

A   Your questions did suggest that.  I made clear that's

outside the scope of my area of practice.

Q   Well --

A   In the ineffective assistance of counsel context.

Q   Well, if a writ -- if a writ is granted to someone who's incarcerated and they get a finding from the federal court that there's been ineffective assistance of counsel, they get to go back and get a new trial on whether they're guilty or not, don't they, with a new lawyer?

A   I don't know the details on that, sir.  That's outside my area of practice.

Q   But if there's ineffective assistance of counsel in a civil case, you don't get a redo.  Isn't that right?  Your only recourse is to sue the lawyer for malpractice; correct?

A   I'm actually not familiar with the concept of ineffective assistance of counsel, at least as a term of art in the civil context.

Q   Now, during Mr. Pepe's questions to you, you testified that during trial Caudill decided to use only the designated portions of Mr. Rogovin's deposition testimony.  Do I have that right?

A   I think you have that right.

Q   Okay.  And you testified about PTX 347, which is in evidence, which is the testimony that ultimately got presented to the jury in the Kentucky trial from Mr. Rogovin's deposition; is that right?

A    Can I see it, please?

Q    Yes.

        MR. RESSER:  Mr. Campos, PTX 347.

Q    (By Mr. Resser) The first page of PTX Exhibit 347 it's entitled "Caudill Seed and Warehouse Company's notice of filing of the deposition testimony of Jarrow Rogovin."  Do you see that?

A    Yes.

Q    And then down below that, the lawyers for Caudill Seed wrote, "Plaintiff Caudill Seed and Warehouse Company, by counsel, hereby provides notice of the filing of the transcript of the deposition testimony of Jarrow Rogovin, which was presented at trial on June 14, 2019."

        Do you see that?

A    I do.

Q    So that was -- even though this document was filed on the 25th of June, it references testimony that was presented by Caudill Seed on June 14th, which was the Friday of the second to last week of the trial; correct?

A    That's correct.

Q    And the succeeding several pages -- I think there's a total of 26 pages -- are the portions of the transcript that were -- portions of the testimony that were played on video so that the court would have a written transcript of what was played; correct?

A    My understanding is that's correct.  That's Caudill's designations and Jarrow Formula's counter-designations.

Q    In fact, even though this was filed to document what was actually played at trial, Caudill Seed had made its original designations of what testimony it intended to use at trial for Mr. Rogovin's deposition much earlier, didn't it?

A    Both part, yes.

Q    In fact, in -- on March 4, 2019, almost three full months before trial, that's when Caudill Seed made its initial designations of the testimony they intended to use for Mr. -- from Mr. Rogovin's deposition; correct?

A    I can't speak to the date, sir.  I do know that it was several months earlier when both parties complied with the court's trial management order and made their then expected designations of deposition testimony, yes.

             MR. RESSER:  Okay.  I'd like to mark, Your Honor, and show the witness -- and approach the witness the Caudill Seed designations.

             THE COURT:  You can show those to the witness.

             MR. RESSER:  And we'll mark it for identification as 3 -- as 720.

        (Defendant's Exhibit 720, marked for identification.)

             MR. RESSER:  Would you like a copy, Your Honor?

             THE COURT:  No, I'm good.  Thank you.

             THE WITNESS:  Thank you.

MR. PEPE:  No objection, Your Honor.  May --

MR. RESSER:  We'll move admission of.

THE COURT:  Okay.  So 720 is a full exhibit.  It can be published.

(Defendant's Exhibit 720, received in evidence.)

MR. RESSER:  Mr. Campos, you can bring up the first page of that exhibit, please.  720.  It's Document No. 317 from the Kentucky case.

Q   (By Mr. Resser) Mr. Rechen, have you had a chance -- I'm not going to wait for Mr. Campos in case it takes a second because I don't want to take the time to wait.  But you have Exhibit 720 in front of you; correct?

A   I'm sorry.  The exhibit number is?

Q   720.

A   720, if that's what it is.

Q   And that's from Document No. 317 filed March 4, 2019, in the Kentucky case; correct?

A   That was the date this was filed, yes, just based on the legend across the top.

Q   This is the designation of all of the deposition testimony, including Mr. Rogovin's, that Caudill Seed gave notice that it might present at the Kentucky trial; correct?

A   I don't know that that's correct, but I don't have any reason to dispute it either.

Q   Okay.  And Mr. Rogovin's designated testimony begins on

page 13 and continues all the way until page 18; correct?

A    That is correct.

Q    And then McCarter & English had the opportunity to counter-designate some of Mr. Rogovin's testimony in order to make whatever Caudill was going to show complete and fair; correct?

A    We had an opportunity to counter-designate deposition testimony.

Q    And Exhibit 717, which is already in evidence, was that counter-designation; correct?  And we can --

A    Can I see that?

MR. RESSER:  No, I'm looking for Exhibit 717 in this case, which is Document No. 338 in the Caudill case.

There it is.

Q    (By Mr. Resser) All right.  Do you see that on your screen, Mr. Rechen?

A    I do.

Q    So these are the counter-designations that McCarter & English filed on behalf of Jarrow Formulas.  And if we scroll down, we'll see that's the page that includes the counter-designations that McCarter & English filed.  And that was filed on March 18, 2019, fully two and a half months before the trial started and about three months before the decision was made that Mr. Rogovin wouldn't testify; correct?

A    Can I see the next page before I answer your question?

Q   Sure.

A   Yeah.  Yes, the answer's yes.

Q   And the designations that were submitted at trial regarding the June 14 playing of the transcript -- playing of the video of Mr. Rogovin's deposition, that could not expand the designations by either side; correct?  Both sides were limited to the designations and counter-designations that were submitted in March of 2019.  Isn't that right?

A   I don't know the answer to that.

Q   You think that the judge allowed additional designations during trial of Mr. Rogovin's deposition testimony that had not been submitted in March by either side?

A   I'm not saying I think that that happened.  I'm saying I don't recall exactly whether we were limited by what was previously provided or not.  If I studied it and learned we were limited, I wouldn't be surprised by that, but I can't say that I have specific recollection of that.  And I know there was considerable back-and-forth between, in particular, Attorney Grondahl and counsel for Caudill Seed.  And how exactly that evolved and whether in their negotiations it resulted in some modifications to -- and some, in some respects, some expansion to what was designated in March, I just don't recall.

Q   The testimony that was submitted during trial, PTX 347, that contains all of the testimony of Mr. Rogovin that was

played by video at trial; correct?

A   347 being the document we looked at I think initially that was signed by Caudill Seed's lawyers, yes.

Q   Yes.

A   That's my understanding, yes.

Q   Okay.  So I'm not going to go through it now, but if we go through that document and we compare it to the designations 717 and 720 that are in evidence, we'll be able to see whether there was an expansion or not; correct?

A   Sure.

Q   Okay.  And the counter-designations, again, were limited -- that McCarter & English made on behalf of Jarrow Formulas, they were limited to the subject matters covered by Caudill's designations under the rule of completeness; correct?

A   Ask me that again, sir.

Q   The counter-designations submitted by McCarter & English on behalf of Jarrow Formulas, those were limited to the subject matters covered by Caudill Seed's designations of Mr. Rogovin's testimony under the rule of completeness; correct?

A   I don't know that.  I don't recall that that's necessarily so.

Q   I'm sorry.  I interrupted you.  Are you done?

A   Yeah.

Q   Okay.  Well, we looked at Mr. Cordani's e-mail, Exhibit 718, earlier.  Can we put that up again?

And in that e-mail, Mr. Cordani if you go -- if we go to page 2, this is where Mr. Cordani in the second full paragraph wrote to you about what degree of -- what the scope of counter-designations could be.  And he wrote:  The only reason we are allowed to cross-designate deposition testimony is because Fed. R. Civ. P., which is Federal Rule of Civil Procedure, 32 says that we can.  As a matter of rule of completeness, Rule 32(a)(6), which he quotes.  If a party offers in evidence only part of a deposition, an adverse party may require the offerer to introduce other parts that in fairness should be considered with the part introduced.

Do you recall that e-mail that we spoke about last week?

A    I do recall that we spoke about this last week.

Q    Now, I know this is kind of inside baseball on federal civil procedure, but you're a very experienced trial lawyer. You know that counter-designations are limited to what the other side wants to put in in order to explain it and make it fair; correct?

A    So I don't agree that that is always the case, sir.

Q    And isn't it true, sir, that at the time the big meeting, the big decision, which I think you testified was Thursday before the last week of trial -- I think that puts us on June 13th -- isn't it true that at the time that decision was made, it was too late to add any additional counter-designations

other than what had been submitted by McCarter back in March?

A   I don't necessarily agree with that either.

Q   Now, we talked last week about the difficulty you had getting together in person with Mr. Rogovin before trial, and you told me just before we finished on Friday that you didn't try to meet him using Zoom; is that correct?

A   So, you know --

Q   That's a yes or no, sir.

A   We did not try.  I don't believe Zoom was a medium that, if it was available, was commonly used.  This is pre-pandemic.

Q   I understand that, sir.  Did you ever conduct a web meeting via internet with any client or any other counsel before the pandemic?

A   You know, I don't think I ever had.

Q   Does your firm have an account with Webex for internet meetings?

A   I know we do today.

Q   And you don't recall whether you did before the pandemic?

A   I don't.

Q   What about Skype?  Have you ever used Skype before the pandemic?

A   I certainly didn't.

Q   But no one from McCarter & English suggested Zoom, Skype, or Webex.  Those technologies were available.  They just weren't as commonly used as after we were locked down; right?

A   That's -- that's my understanding, that some of those technologies may have been available.  How capable the technologies were I have no idea.  But they -- I do know they were not commonly used and we did not use them here.

Q   And you didn't even consider that as a way of minimizing time and money.  Isn't that right?

A   Well, I don't recall considering it.  I'm not sure it would have saved any time or money, simply because we had a difficult enough time getting Mr. Rogovin's attention when we were face to face with him.  I find it hard to believe it would have been an efficient, an even more efficient process if we were trying to do it through one of these mediums that none of us was proficient with at the time.

Q   You don't think doing a web-based meeting saves time from not having to fly across country or Mr. Rogovin not having to fly across country?

A   We are talking today or are we talking in 2018 and 2019?

Q   We're talking any time since this technology became available.

A   Well, first, I don't know when the technology became available.  I know when I started using it, which was in 2020.

Q   Let me now move on to the subject of the settlement discussion you had with Ben Lewis while you were in Kentucky for at least three days watching somebody else's trial before

Judge Simpson; is that right?

A    That's correct.

Q    Did you write to Mr. Rogovin any e-mail or any letter with the news that the case could be settled for a million dollars?

A    No, I did not.

Q    So you never put that in writing; is that right?

A    Well, first of all, I did not have a hard number from Mr. Lewis.  The answer --

Q    I'm sorry.  But you told us that you thought it was about a million; right?

A    What I said was Attorney Lewis had signaled to me the approximate range he thought his client would have to be in.  I interpreted that and related that to Mr. -- well, first to Attorney Giarratana and then to Mr. Rogovin via telephone.  And what I told him was I thought it was going to take a million dollars, maybe a little bit over a million dollars, to settle the case based upon the signal that I had gotten from Attorney Lewis.

Q    And let's get this straight.  You never confirmed this supposed phone conversation with Mr. Rogovin in an e-mail or a note to file or a reference on your time sheet.  Isn't that right?

A    I did not have a concrete offer or proposal.  I had a concept.  And the answer is I did not put that concept in writing.

Q   Isn't it standard operating procedure for lawyers to put things in writing of a serious nature like that?

A   There are certain things that lawyers typically and usually will put in writing.  If I had a concrete settlement offer, much more likely I would have communicated that in writing.  But we did not communicate everything in writing with Mr. Rogovin because we spoke with him so frequently.

Q   The demand that was made during prior settlement discussions with Caudill was substantially more than a million dollars, wasn't it?

A   Made by Caudill?

Q   Yes.

A   Substantial, yes.

Q   Do you recall how much?

A   My recollection it was in excess of $8 million.

Q   8.5 million; right?

A   That sounds correct.

Q   And you didn't think it was important enough to put in writing to Mr. Rogovin that the signal was the case could now be settled for one eighth of what they had demanded earlier?  Is that your testimony?

A   That's not my testimony.

Q   Now, you testified on Friday with Mr. Pepe that the first time Jarrow Formulas accused you and M&E of malpractice was in Mr. Rogovin's e-mail of July 22nd, which was PTX 103.  Do you

recall that?

A    That actually wasn't the question from Attorney Pepe.  I believe Attorney Pepe's question concerned when was the first time I learned that the failure to call Mr. Rogovin as a live witness in the courtroom was alleged to be malpractice.  That I think was Attorney Pepe's question.

Q    But you then agreed with me on redirect that -- that the butt call referred to malpractice both for the perceived failure to cut off Caudill's R&D damages and the failure to get the content of the O'Brien letter or Mr. Rogovin's letter to Mr. O'Brien before the Kentucky jury; correct?

A    The butt dial referred to both of those issues, yes.

Q    And you also testified about the risks of bringing out letters and e-mails to Mr. O'Brien because it would open the door to cross-examination and the other letters between Mr. Rogovin and Caudill's lawyers; correct?

A    Well, I testified to a whole host of issues surrounding the O'Brien letter.  That was one of them, yes.

Q    And, again, the concern was showing Mr. Rogovin's ill will towards Caudill and its lawyers; correct?

A    That was a concern, certainly.

Q    And you referred in your testimony to the O'Brien letters or the exchange with Attorney O'Brien coming several months, were your words, after the alleged misappropriation occurred; correct?

A    Say that again.

Q    You referred to the exchange with Attorney O'Brien as coming, quote, several months, end quote, after the alleged misappropriation occurred; correct?

A    No, I don't think so.  I think my testimony was it was several months after the hiring of Kean Ashurst.  The misappropriation, again, going back to improper acquisition, disclosure, or use, the use was continuing.  And I described that in my testimony.  It continued through those letters, and it continued into the years that followed.  So if the jury found a misappropriation by use, the letter was actually contemporaneous with at least a portion of that use.

Q    Well, I thought you said that Mr. Ashurst sent what Caudill considered confidential information to Jarrow Formulas in April 2011 and May 2011; right?

A    I think it actually started in March, but the most significant information was sent in April and May.  And then the use of that information and other information continued in the months that followed.

Q    Well, let's talk about the initial sending of what Caudill considered confidential information.  So that was in March, April, and May of 2011; correct?

A    Yes.

Q    And Mr. Rogovin's letter to Mr. -- to Attorney O'Brien was August 11, 2013; correct?

A    Well, Mr. O'Brien's letter, which initiated the correspondence, I believe was in July.

Q    Okay.  July of 2013.

A    No.  July of 20 -- wait a minute.  Now I'm getting confused.

Q    Well, let's bring up --

A    Yeah, let's take a look at it.

Q    -- Mr. O'Brien -- the letter to Mr. O'Brien, which is Exhibit 511.

A    Yeah, it was 2011.  I had it right.  Not 2013.

Q    Now, with respect to the point you made --

         MR. RESSER:  You can take that down.

Q    (By Mr. Resser) With respect to the point you made regarding the continued use of alleged confidential or trade secret information from Caudill, isn't it true that the Kentucky jury, while it was presented with 23 years of R&D expenses and to support a claim of $3 million in R&D damages, that the Kentucky jury limited what it awarded to the 2,023,000 figure because they awarded damages limited to the nine years of research and development that Caudill proved during the time Ashurst was at Caudill?  Isn't that right?

A    I don't know that.  One might infer that, but I don't think -- I certainly don't know that.

         MR. RESSER:  Your Honor, I'd like to present and move admission, but it is a sealed document, Exhibit PTX 483.  So if

it's displayed, it should not be displayed to the full courtroom, just the jury and the witness.

THE COURT: Sure. Understood. We will take care of that.

MR. RESSER: Thank you.

THE COURT: There we go. Thank you.

Q   (By Mr. Resser) So Exhibit 483 --

THE CLERK: You don't see it?

THE COURT: They don't have it yet.

THE CLERK: Now?

Q   (By Mr. Resser) What is Exhibit 483, Mr. Rechen?

A   This is 483?

THE COURT: I'm sorry. There was no objection to this Exhibit 483?

MR. PEPE: We don't have it on our screen, Your Honor.

THE COURT: Hold on a second.

MR. RESSER: I can hand you a copy, sir. It can't be displayed on your screen for reasons you know.

THE COURT: So let's give him a copy. He's going to give him a copy.

Is there objection to this?

MR. PEPE: We have a hard copy, Your Honor.

THE COURT: Any objection?

MR. PEPE: No.

THE COURT: PTX 483 will be a full exhibit. Go ahead,

Mr. Resser.

MR. RESSER:  We don't have a stamped copy, but we'll get to it Ms. Johnson.

THE COURT:  Thank you.

(Plaintiff's Exhibit 483, received in evidence.)

Q    (By Mr. Resser) What is Exhibit 483, sir?

A    This looks to be the expert witness report of Caudill Seed's damages expert, William E. Wingate III, submitted in June of 2014 in the Caudill Seed versus Jarrow Formulas case, the Kentucky case.

Q    Now, directing your attention to the tenth page of that document, which is Exhibit 1 to the report.  This is the -- what's been referred to as the tax forms.  The references to the source information are the tax forms that were submitted in support of Caudill's research and development expenses; correct?

A    Well, tax forms, if we look at the second column Information Source, it's both tax forms and financial statements.

Q    Okay.  And Mr. Ashurst joined Caudill Seed in 2002; correct?

A    That's my recollection.

Q    And he left on May 1st, 2011; correct?

A    That is my recollection, yes.

Q    Now, if you add up the total research and development costs

in the far-right column for those years, it comes to pretty much that $2 million figure that the jury awarded. Isn't that right?

A   So two things:  First, I never tabulated that, number one; but I know one of my partners did.  And it doesn't tie out perfectly, which leaves a question.

Q   Doesn't tie out to exactly 2,023,000 but pretty close.  It comes to a $2 million figure, give or take a few thousand dollars, doesn't it?

A   I don't know.  Again, I never did the calculation.  My testimony is based on what I was told by someone else.

Q   And that was Mr. Grondahl?

A   It was.

Q   Now, with respect to the lost profits claim, the lost profits claim by Caudill Seed, is part of Exhibit -- is Exhibit 4 and 5 to the Wingate report, Exhibit 483 in this case.

        MR. RESSER:  So, Mr. Campos, if you can please turn to the page labeled "Exhibit 4."

Q   (By Mr. Resser) That's the damage claim related to Nutramax Laboratories, because Caudill Seed claimed that it lost sales to that potential customer because of the alleged misappropriation of trade secrets; correct?

A   Caudill Seed made that claim.

Q   And in Exhibit 5 to Mr. Wingate's report, they show lost sales to a potential company called Natural Product Solutions,

LLC; correct?

A    Caudill Seed made that claim, yes.

Q    So total of nearly -- actually over $700,000 was sought by Caudill Seed based on those two customers; correct?  Alleged customers.

A    Yeah, Caudill Seed claimed over 700,000 with respect to those two, as I understood it, prospective alleged -- alleged prospective customers.

Q    Now, you testified on Friday that you had gotten some very good testimony from a gentleman named Mr. Gallant and a gentleman named Dr. Cornblatt.  Do I have that correct?

A    Well, their deposition testimony was presented.

Q    So you subpoenaed those two third parties, Mr. Gallant and Dr. Cornblatt, you took their depositions and you got very good testimony from them; correct?

A    So to be clear, I did not take those depositions.

Q    I'm sorry.  McCarter did?

A    One of my partners did.  But McCarter & English did; and, yes, we got very good testimony.

Q    And as a result of presenting that testimony at trial by third parties, Caudill Seed was presented damages on the lost profits claim.  Isn't that right?

A    That is correct.

Q    Now, you made a point of saying that the ill will issue continued past 2011 when the initial confidential information

was received, or alleged confidential information was received, from Caudill. But because there was continued use of trade secrets going beyond that time, the concerns you had about the ill will shown towards Caudill Seed and its lawyers by Mr. Rogovin would impact the issue of willful and malicious misappropriation. Do I have that right?

A   I don't think so.

THE COURT:  I'm sorry to interrupt.

Ladies and Gentlemen, I just -- while we were looking at the report for Mr. Wingate, I meant to give you this instruction, the same instruction I've given you before. All of the evidence regarding damages, Mr. Wingate's report, R&D and the like, you may consider only for the limited purpose of deciding whether or not JFI, Jarrow Formulas, Inc., was willful and malicious when it decided not to pay.

Go ahead, Mr. Resser.

Q   (By Mr. Resser) So what I'm trying to get clear is, as I recall your testimony last week, one of the reasons why the ill will Mr. Rogovin expressed towards Caudill Seed and its lawyers going into 2013, 2014 and after, that that, you felt, went to the issue of continued use and willful and malicious continued use of Caudill's technology. Do I have that right?

A   I don't think so.

Q   Well, that's -- I think you even said that this morning, that the continued use overlapped when the e-mails were written

to Caudill's lawyers by Mr. Rogovin; right?

A    Well, now we're getting a little closer, yes.

Q    Okay.

A    So what I said, I think last week and this morning, is that the notion that the misappropriation occurred at a point in time and these letters to Mr. O'Brien were written by Mr. Rogovin after that misappropriation had concluded, as testified to by Attorney Berman, Jarrow Formulas' expert in this courtroom, I think completely missed the mark because to the extent misappropriation includes use, which is one of the three components of misappropriation under the statute, the use was continuing and overlapped with the period that Mr. Rogovin wrote those concerning communications.  That's the testimony.

Q    Starting in August of 2011 and then again with Mr. Pence in 2013; correct?

A    I think so.

Q    But you knew, didn't you, that Jarrow Formulas got its own patent on its own unique broccoli-based supplement; correct?

A    I certainly knew that.  We did the patent work, I believe.

Q    And if they got the patent, that meant they were using their own process, not somebody else's; correct?

A    Well, that was certainly one of the arguments that we made that -- at trial.

Q    So at that point Jarrow Formulas was not using any of

Caudill's technology.  It was using its own patented technology; correct?

A   Well, that's an argument.  It's one we made.  And it's one that neither the judge accepted nor the jury.

Q   Now, you would agree that showing intent to take and use trade secrets is decided by a lower standard in Kentucky than the standard required for showing willful and malicious misappropriation; correct?

A   The standard of proof with respect to a trade secret and misappropriation thereof and the damages related are by a different standard of proof than proof of willful and malicious.  Is that the question you're asking me?

Q   Yes.

A   Yeah, I think that's right.

Q   And as such, it would have taken less evidence from Jarrow Formulas to have overcome a finding of willful and malicious misappropriation than was necessary to overcome a finding of simple misappropriation; correct?

A   Ask that question again, please.

Q   So it would have taken less evidence for Jarrow Formulas to overcome a willful and malicious finding than to overcome a finding simply of misappropriation of trade secrets; correct?

A   I don't know that that -- I don't think that that's correct or I don't understand the question.

Q   Well, if the standard is higher, then the other side bears

a higher burden, and Jarrow Formulas doesn't have to address it as a preponderance issue.  It has to address whether there was clear and convincing evidence of willful and malicious misappropriation; correct?

A    I think I understand your question now.  Thank you.

Q    So can you answer it?

A    In theory, in theory.

Q    Less difficult; correct?

A    In theory.

Q    Okay.  And you're proud that no damages were awarded on four out of five of the trade secrets that Jarrow Formulas was held to or found to have misappropriated; correct?

A    Did you say I'm proud?

Q    Well, you felt that that was a victory on the damages because it could have been much worse; right?

A    I did believe, and I believe as I sit here, that the damages could have been much, much worse, yes.

Q    And one of the points you made was the verdict showed only one of the five trade secrets resulted in the award of compensatory damages that's the research and development damages and the unfair, unjust enrichment piece also relating to the research and development costs; correct?

A    So, first, there were six alleged trade secrets.

Q    Right.

A    Not five.

Q    But -- but only five were held to have been received by Jarrow Formulas; correct?

A    Can we look at the verdict form --

Q    Sure.

A    -- so we're both on the same page?

        MR. RESSER:  I don't remember the exhibit number, do you?

        THE COURT:  I think we've got it up, Mr. Resser.

        MR. RESSER:  There we are.  Thank you.

        THE WITNESS:  So six trade secrets that were alleged. Five were found to be trade secrets.  Four were found to be misappropriated and damages both --

        MR. RESSER:  Mr. Campos, can you go to the next page?

Q    (By Mr. Resser) So this is the four that were held to be used; right?

A    Held to be misappropriated.

Q    Misappropriated, okay.  Next one.  And these are the damages.

A    Damages on one.

Q    So the only damages that were awarded, even though there were four trade secrets that were misappropriated and used, according to the jury, was on the research and development part of the case; correct?

A    The only damages were awarded were on the research and development, yes.

Q   But the jury had no way to apportion the damages between the trade secrets.  So the damages for one could have been the same damages for all; correct?

A   I only know what the verdict says, sir.

Q   Well, the jury wasn't presented with evidence of all the other products that Caudill Seed produced in their inability to allocate any dollar of research and development costs to any one of those products; correct?

A   The jury was presented with evidence of certain of Caudill Seed's other products.  The jury was presented with evidence that they had insufficient information to make a fair allocation.  And that was part of our overall presentation and argument as to why no damages could or should be awarded.

Q   Do you still have the deposition testimony that you gave in this case in front of you?

A   I do not.

          MR. RESSER:  I can give him my copy.

          May I approach?

          THE COURT:  You may.

          MR. RESSER:  I would like to play for the jury portions of Mr. Rechen's deposition.

          THE WITNESS:  Can I review it first?

          MR. RESSER:  Beginning at 173, 13 through 174, line 5.

          THE WITNESS:  Can I have a moment, please?

THE COURT:  Yes, you can have a moment.

THE WITNESS:  I'm ready, Your Honor.

THE COURT:  All right.  Mr. Resser, you can play that portion.

MR. RESSER:  Thank you.  Mr. Campos.

(Plays video.)

Q   (By Mr. Resser) So you agree, sir, then, that the jury had no way of apportioning the damages among the trade secrets that they found were misappropriated and used; correct?

A   I agree with what you just played to the jury.

Q   And in your testimony while being questioned by Mr. Pepe, you said, Mr. Rogovin's claim in the butt call that M&E didn't do enough to cut off Caudill's R&D damages, you responded that that was completely inaccurate.  Do I have that right?

A   Yes, I did.

Q   But it was accurate because you later wrote that you were unable to attack these numbers with any specifics except with the limited information that we -- information we had in our cross-examination of Wingate; correct?

A   So why don't you show me what -- that communication.  I think I know what you're referring to.

Q   This is your e-mail of June 5th to --

A   July 5th.

Q   I'm sorry, July 5th, after the case was over.

THE COURT:  Is it an exhibit?  Is that right?

MR. RESSER:  PTX 134, please.

THE COURT:  134?  That's already in; right?

MR. RESSER:  That's already in.  Here it is.  Okay.

Q   (By Mr. Resser) So this is the e-mail that started with the e-mail from Jonathan Leventhal, July 3, 2019.

A   July 5th; right?

Q   I'm sorry -- no.  This is Mr. Leventhal sending you --

A   Yes, yes.

Q   -- sending Mr. Giarratana, you, and Mr. Grondahl an e-mail that in the third paragraph starts, "How difficult would it have been to have a decent approximation of salaries?"  And then it goes on to talk about, "So if Jarrow was right, all along, our R&D evidence would have been about 200,000 and not an unverifiable 2 million.  The considerable difference in numbers might have even helped on the question of Caudill's credibility versus ours and the question of willful and malicious."  You see that?

A   I see that.

Q   And you heard or learned about the testimony at trial that Mr. Rogovin actually dictated this language for Mr. Leventhal to write to you and your colleagues; correct?

A   I did hear that.

Q   Then in your lengthy response on page 2 of your e-mail of July 5th, you wrote:  Caudill said and certified that it had produced everything it had.  We moved in limine to keep

Wingate's opinions out of evidence for this reason, among others, but the court let him testify subject to a, quote, rigorous cross, end quote, in the words of the court.  So as a result -- and these are your words -- we were unable to attack these numbers with any specifics except with the limited information we had in our cross-examination of Wingate, which you then went on to say that everyone said went very well and that Mr. Beres told his partners was a master class.

Do I have that right?

A   You do.

Q   This is, again, a situation of you were right, win or lose, isn't it?

A   Say that again.

Q   This is another situation where you were right, win or lose.

A   I don't know what the first situation was that you're referring to, but I disagree with the premise -- the entirety of your question, sir.

Q   Now, in March of 2016, three years before -- more than three years before this e-mail was written, Mr. Rogovin wrote to McCarter & English trial team, quote, "I want discovery on their R&D claim."  And that's in Exhibit 274, which is in evidence, March 17, 2016.  Do you want to see that?

A   I would like to see that.

Q   I believe that language is in the third -- in the paragraph

numbered 3, the third line. I want discovery on their R&D claim.

Do you recall that communication, sir?

A    I -- yes, I do.

Q    And then in December of that same year, PTX 240, Mr. Campos, which is in evidence, in fact, Mr. Rogovin wrote in that document -- and I believe it's on page 2. And it's in the paragraph that begins with -- if you can scroll down a little bit, "If they want to depose Rory." Can you show us that, Mr. Campos?

A    Not "Rory." "Roy."

Q    I'm sorry. "If they want to depose Roy and even me (again), let them. I want a full throated depo on their R&D, including all records of their CPA."

You understood that to mean Caudill's CPA, didn't you?

A    Yes.

Q    Joe Lyons -- that's the man working for Caudill who gave Mr. Wingate all of that data from the tax forms and the financial statements; correct?

A    Well, that's what -- that's what was claimed, I believe, by Dan Caudill.

Q    Right.

A    By someone. Someone claimed that on Caudill's part, yes.

Q    Right. And Mr. Rogovin said he want the records from the CPA. And then he goes on to say, "with a forensic CPA

present."  So he wanted you to have a forensic CPA, evaluate documents that he wanted obtained from Caudill's CPA.  And this is back in 2016; correct?

A   Can we go up to the top so I can see the date?

Q   Absolutely.

A   Yes.

Q   And that never happened, did it, a subpoena of the CPA of Caudill; correct?

A   Well, there's -- you're just asking me --

Q   Yes.

A   -- about a CPA.

Q   Yes.

A   You're just asking me about a CPA.

Q   Yes.

A   Excuse me, a subpoena of the CPA.

Q   Correct.

A   Yeah, no, that never happened.

Q   And you claim M&E pursued -- you claim that McCarter & English pursued damages documents aggressively from Caudill Seed; correct?

A   Yes.

Q   But you didn't aggressively pursue the same documents from Caudill's CPA or bank who might have also had documents you were seeking; correct?

        MR. PEPE:  Objection.  Calls for speculation, Your

Honor.

THE COURT:  No.  He can answer.  Well, the last part, no; but the rest of the question's fine.

MR. RESSER:  I'll rephrase.

Q   (By Mr. Resser) You didn't aggressively pursue the same documents you were seeking from Caudill from third parties such as Caudill's CPA or Caudill's bank, did you?

A   So let's separate the CPA from the bank.  If we start with the CPA, I disagree.  We did not pursue any banking information, that is correct.

MR. RESSER:  I'd like to play for the jury Mr. Rechen's deposition testimony beginning on page 40, line 7 through line 16.

THE WITNESS:  Can I have a moment to review, please?

THE COURT:  Yes, line 7 through 16, page 40.

THE WITNESS:  Okay.  Thank you.

MR. RESSER:  Please proceed, Mr. Campos.

   (Plays video.)

Q   (By Mr. Resser) Mr. Rechen, more discovery from third parties would have turned up more information to show that Caudill's R&D damages were unsupported; right?

A   You know that?

Q   It could have, couldn't it?

A   A lot of things could have happened.

Q   And now it's too late for Jarrow Formulas to show what the

true damages would have been; right?

MR. PEPE:  Objection.

THE WITNESS:  I'm not sure I agree with that.

THE COURT:  I'll allow that.  The answer can stand.

THE WITNESS:  Now it's too late for Jarrow Formulas to show what its true damages would have been?

Q   (By Mr. Resser) What Caudill's true R&D damages.

A   I can't say that the true damages weren't proved in the courtroom in Kentucky, sir, and I don't think you can either.

Q   Now, Mr. Ashurst was at Caudill from 2002 to 2011; correct? Nine years.

A   That's my understanding.

Q   And so the information about what R&D, research and development, was done while Mr. Ashurst was at Caudill, that information is now between 12 and 21 years old.  Isn't that right?

A   Ask that again.

Q   Given that Mr. Ashurst was at Caudill doing research and development from 2002 to 2011 and we saw the damages numbers for Mr. Wingate for those years, which add up to just about $2 million, isn't it true that that information on the backup for those tax forms and those financial statements would now be between 12 and 21 years old?

A   That's the math?  I would not dispute it.

Q   And after Mr. Rogovin wrote about wanting the R&D discovery

and wanting the CPA subpoenaed with a forensic accountant for Jarrow Formulas present, Mr. Giarratana later referred to Mr. Rogovin's desire to disprove Caudill's R&D expenses as, quote, one of his pet issues, didn't he?

A    Mr. -- Attorney Giarratana would have to speak to what he testified to; and the record, I'm sure, will reflect what he said.

Q    All right.  Well, let's take a look at Exhibit 581, which is in evidence.

Now, this is an e-mail -- let's go down and show the whole document just to make sure we have the context.

So Mr. Grondahl is writing to Mr. Giarratana and you about a call he had with Mr. Ashurst because at that point discovery is closed and Mr. Rogovin wants you guys to sit down with Mr. Ashurst and have him, from memory, write down what Caudill spent on research and development work.  Do you see that?

A    Yes.

Q    And then Mr. Grondahl wrote in the second paragraph, "Obviously, this is a huge waste of time and will be a distraction for you when you have a limited amount of time with Jarrow."

Do you see that?

A    I do see that.

Q    And then up above is Mr. Giarratana's response where he

writes, "Oh geez.  That's the last thing I want to fly to California to do.  The R&D is one of Jarrow's pet issues."

Do you see that?

A    I do see that.

Q    Does that refresh your memory about what went down here?

A    Well, it refreshes my memory that Attorney Giarratana used those words.

Q    Okay.  And then further down Mr. Giarratana wrote, "Is there a way to quickly show from the documents produced that Caudill is lying about" 22 years of R&D -- "about its 22 years of R&D?"  Do you see that?

A    I do see that.

Q    And the reason Mr. Giarratana's asking, Is there a quick way to show from the documents that you had that Caudill was lying; correct?

A    Well, that's what he wrote.

Q    And the need for a quick way is because you hadn't done the discovery of the CPA or other third parties that might have allowed you to attack those damages; correct?

A    No, that's not so at all, sir.

Q    And by then it was too late to do a full-throated deposition of their CPA on R&D.  Isn't that right?

A    You know, I don't know if it would have been too late at that point or not.  It may have been.  It was never part of the strategy, ever, that Mr. Rogovin was a part of developing and

consulting with us on, although he from time to time would suggest we take alternative routes and deviate from the settled-upon strategy.

Q   And the strategy and the plan was not to prove Caudill's damages, not to even give it any credence by not going to those third parties and seeing, well, what really was behind those tax forms; correct?

A   The strategy was not to take on Caudill Seed's burden of proof, to leave their burden of proof with respect to their damages with Caudill Seed and not to help them prove their damages, which we were quite certain, if we explored 22 years of research and development, would exceed by a wide margin what had been suggested by Mr. Ashurst to Mr. Rogovin and ultimately by Mr. Ashurst to Attorney Grondahl and, as it turned out, we believe would have exceeded the amount of damages actually awarded by the Kentucky jury.

Q   Well, we saw Mr. Wingate's report where the total R&D expenses on his report, for the 23 years, was 3 million; right?

A   That was one part, I believe.  Then there was another, if I recall correctly, 1.4 million that was involved in his R&D analysis.

Q   Wasn't that 1.4 on the unjust enrichment side of the R&D?

A   I don't think so.

Q   Well, we have that document in evidence, and we can look at it.  I won't take you through it again.

A   I think there's a schedule you didn't show me that shows that 1.4 million on top of the 3 something, if I recall correctly.

Q   But that's not the basis for the jury's award.  It was the schedule with the 23 years adding to 3 million.

A   I don't -- you draw that conclusion.  I don't know that I do.

Q   And Mr. Grondahl drew that same conclusion; correct?

A   You'll have to talk to Attorney Grondahl about that.  We did try to figure out what the jury did.  Whether we figured it out or not, I don't know.

Q   Well, Mr. --

A   I've never spoken with the jury.

Q   Mr. Grondahl told you he figured it out, didn't he, as best he could?

A   He may have said something like that.

Q   And Mr. Rogovin, he also wanted Joe Lyons on the witness stand because he was Mr. Wingate's source of the R&D numbers according to Caudill; correct?

A   I'm not sure that's entirely correct.

MR. RESSER:  I'd like to play the portion of Mr. Rechen's deposition beginning at page 55, line 5 through line 8.

THE COURT:  Lines 5 through 8, page 55.

THE WITNESS:  May I have a moment?

THE COURT:  Yes.

THE WITNESS:  Your Honor, I'd ask if they would play through line 10.

THE COURT:  Well, why don't we have Mr. Pepe assert anything like that for you.

MR. PEPE:  May I hear the page numbers again?

MR. RESSER:  55, line 5 through 8 was our request.

MR. PEPE:  Yes, Your Honor.  I think it would be appropriate to play --

MR. RESSER:  That's fine, Your Honor.

MR. PEPE:  -- to line 20.

THE COURT:  So it's going to be page 55, lines 5 through 20 then?  All right.  Let's play that then.

MR. PEPE:  That's correct, Your Honor.

MR. RESSER:  Are you able to do that, Mr. Campos?  Or we can just read it if you want.

What we can do is play the portion that's ready on video and then read the rest.

THE COURT:  Why don't you just read the whole thing now, Mr. Resser.  That would probably be faster.

MR. RESSER:  I gave the witness my copy of the depo.

THE COURT:  Mr. Pepe has.  All right.  So we're going to read page 55, lines 5 through 20, of Mr. Rechen's deposition.

Q   (By Mr. Resser) "Question:  Earlier you mentioned that you

believe that Wingate relied upon information provided by Joe Lyons and a second person; correct?

"Answer:  Yes.

"Who was that?

"Answer:  Joe O'Mahoney I believe.

"Question:  And was Mr. O'Mahoney's deposition taken?

"Answer:  I don't recall that it was.

"Question:  Do you recall why it wasn't taken?

"Answer:  I don't.

"Question:  And would you agree with me that if you make an argument with regard to damages that the Court concludes goes to the weight of the evidence, and then it's for the jury to decide what weight to give that evidence and what would be the appropriate damage award?"

THE COURT:  I think we need to see the answer to that as well.

MR. RESSER:  "Answer:  That strikes me as a hypothetical, and you're asking me for an opinion."

Q   (By Mr. Resser) Mr. Rechen, no one from McCarter & English asked Joe Lyons how much was spent on research and development for each product at Caudill.  Isn't that right?

A   For each product did you say?

Q   Yes.

A   I don't know.

Q   And you didn't know what Mr. Lyons would have said because

he wasn't asked that in a deposition or at trial; correct?

A   I can't say that he wasn't asked that at deposition.  I can say that he was not asked that at trial.

MR. RESSER:  I'd like to show the jury from Mr. Rechen's deposition beginning at page 172, line 13 through line 22, please.

THE WITNESS:  13 through 22?

MR. RESSER:  Yes.

THE WITNESS:  And the page number again?

THE COURT:  172.

Ladies and Gentlemen, remember same limiting instruction applies to the same type of material.

THE WITNESS:  Beginning with, "Did you consider" -- beginning with line 13?

MR. RESSER:  Yes.  Just one question, one answer.

THE WITNESS:  I'd ask if we would begin at line 4.

THE COURT:  Mr. Pepe?

MR. RESSER:  Your Honor --

THE COURT:  Did you want to --

MR. PEPE:  It seems to me, Your Honor, the line of questioning starts at line 24 on page 171 and goes through 172.  I think that's the complete line of questioning.

THE COURT:  It's about whether a question was asked at the Lyons' deposition, fellas?

MR. PEPE:  No.  I said starts at page 171, line 24 and

continues --

THE COURT: Is that what we're attempting to impeach, Mr. Resser?

MR. RESSER: Your Honor, it's just one question and answer. I don't know why they get to counter-designate on my question and answer.

THE COURT: It depends on whether it's impeaching or not. Why don't you read what you want to read; then if Mr. Pepe wants to put in what he wants to put in.

MR. RESSER: Thank you, Your Honor.

Q (By Mr. Resser) "Question: Did you consider trying to do that?

"Answer: We made very clear that the R&D expenses that Mr. Wingate relied on that he simply lifted off the 6765s and the 1120s were company-wide. That was -- that could not have been clearer. He claimed that he was told by Joe Lyons that all of those R&D expenses related to the trade secrets, but it was clear I think that given the number of divisions, number of products, however you have want to portray it, that just couldn't be."

Now, Mr. Lyons video --

MR. PEPE: Your Honor, that's fine.

THE COURT: All right. Fine.

Q (By Mr. Resser) Now, Mr. Lyons' video wasn't played either at the trial, was it, the video of his deposition?

A    His video was not.

Q    And Mr. Rogovin specifically asked you to call Mr. Lyons live at trial, didn't he?

MR. PEPE:  Your Honor, objection, relevance.  We're far into the --

THE COURT:  Well, that at least is a little closer to the purpose of the evidence, so I'll allow it.

THE WITNESS:  Mr. Rogovin did want us to call Joe Lyons live at trial.

Q    (By Mr. Resser) And Mr. Rogovin also wanted Mr. Lyons' deposition testimony played to the jury because Mr. Lyons was trembling during that testimony.  Isn't that right?

A    Well, it's true that he was trembling.  I took that deposition on subjects that were almost completely unrelated to the issues that were before the court in Kentucky by the time we got to trial.  That would have been a complete waste of the jury's time.

Q    But, again, Mr. Rogovin wanted it.  He asked for it.  And it didn't happen; correct?

A    We, as trial counsel, decided that made no sense.

Q    And you've heard Mr. Rogovin already testify here that that was one of the reasons for -- that he referred to in the butt call -- correct? -- his reason --

A    I don't think he said anything about Joe Lyons in the butt call, did he?

Q   Well, he talked about the R&D and not doing enough on the R&D.  And this was one of those issues:  Lyons, the CPA, third-party depositions; correct?

A   So Lyons' trembling had nothing to do with the R&D --

Q   It had to do --

A   -- that was claimed at trial.

Q   It had to do with Mr. Lyons' credibility, and all the source documents for the R&D came from Mr. Lyons; correct?

A   No.  So you've got a bunch of issues wrapped up in that question.  And my answer is no.

Q   You don't think a witness trembling during your questioning indicates some level of question about the witness's credibility?

A   On an issue that had been abandoned by Caudill Seed and that if we had presented it during our defense case would have distracted the jury from the core issue that the defense was focused on, I think that would have made no sense.

Q   And so if that's the case, if you felt that the deposition testimony itself wasn't going to be helpful, you didn't put him on live.

A   We did not put him on live.

Q   And isn't it true, sir, that McCarter & English never determined what percentage of Caudill's sales were attributable to its broccoli supplement that was the subject of the Kentucky case; correct?

A    What percentage of Caudill's sales were attributable to its broccoli supplement?

Q    Yes.

A    I don't recall whether we had information on that or not.

Q    So you never put before the jury how Caudill was claiming one hundred percent of its research and development costs for the entire company that went into a product that accounted for only a small percentage of its total sales, did you?

A    We certainly put that in front of the jury, yes.  That was made very clear to this jury.  The exact percentage I don't recall that we had that number, but the answer to your question is that was all before the jury very clearly.

Q    Let's take a look at your deposition beginning on page 217, line 2 through line 23.

A    If I can have a moment.

          THE COURT:  2 through 23, Mr. Resser?

          MR. RESSER:  2 through 23 on page 217, yes.

          THE COURT:  Thank you.

          THE WITNESS:  I'm ready.

          MR. RESSER:  Mr. Campos?

     (Plays video.)

Q    (By Mr. Resser) Now, Mr. Rechen, you felt that there should be reams of paper supporting Caudill's damages claim for research and development costs, didn't you?

A    I thought Caudill Seed, in order to support its damages

claim, which was its burden, should have reams of information covering the period, yes, that they claimed.

Q    And you argued that to the court, that Caudill Seed should have backup documentation for the research and development credits that they sought on their IRS tax forms; correct?

A    I believe we did argue that to the court, yes.

Q    And after making a motion to compel, Caudill claimed they had produced everything they had; is that right?

A    Ultimately, they gave us a certification to that effect, yes.

Q    So Jarrow Formulas was facing a multi-million dollar damages claim, and the facts suggested there must be reams of documents supporting those claims.  But you don't think you could have gone back to the court and had a good argument to get discovery outside of Caudill Seed from the CPA from the bank?

A    I thought we did have good arguments to go back to the court, and we went back to the court repeatedly and ultimately got what we -- what we got, additional documents from Caudill Seed, a certification that they didn't have any more, and the responses to the interviews that we were seeking.  I think the only thing they didn't give us was the response to the requests for admissions, and ultimately we pinned them down on that and eliminated that completely from the issues presented at trial.

Q   Well, I didn't ask you about getting them from Caudill Seed.  We heard that over and over again that you vigorously tried to get those from Caudill Seed.  No one's disputing that.

But you didn't vigorously try to get the backup information from others who may have possessed it, like the CPA who filed the tax returns; correct?

A   I think I've answered that.

Q   Okay.  So you agree with that; right?

A   I agree that we did not go to third parties directly because it was completely inconsistent with the strategy of the case.

Q   Well, the strategy of the case included Mr. Rogovin testifying live, and that changed, didn't it?

A   That did change, yes.

Q   And after making the motion to compel, Caudill -- we already established that.

And you didn't go back and get more information from third parties because you were so sure Caudill couldn't prove its case from its tax returns and financial statements alone.  Isn't that right?

A   No, that's not right.  What's right is we didn't go to third parties because the strategy of the case was to win it completely, have a verdict of zero damages, so that Jarrow Formulas could then claim and collect its own attorney's fees for a bad faith misappropriation of trade secrets claim brought

by Caudill.

Q   But you knew as early as January 2014, sir, more than five years before the trial started in Kentucky, that the judge disagreed with you and was inclined to let Caudill go to the jury with that damages proof, didn't you?

A   Well, first of all, I think your date is wrong.  January of -- well, it would have been October of 2015, not January of 2014.

Q   You're referring to the summary judgment motion?

A   I am.

Q   Okay.  But you learned long before trial that the court didn't agree with you and thought the question of damages would be a question for the jury to decide based upon the facts presented at trial; correct?

A   That's correct.

Q   And based on the court's ruling on the summary judgment motion in 2014, when the trial started in 2019, that that issue was likely to go to the jury; correct?

A   So I think you got the date wrong again.  It's 20 -- October of 2015 --

Q   Okay.

A   -- when the court ruled.

Q   I'm sorry, 2015.  So almost four years before trial; correct?

A   That ruling was four years -- well, three and a half years

before trial.

Q   And then later you made a motion in limine to try to exclude Caudill's R&D damages evidence.

A   Well, we made it earlier, and then we made it again later, yes.

Q   Okay.  But after that motion was denied, you knew that Mr. Wingate was going to be permitted to testify as to his opinion on damages based on the information that had been provided to him just from those tax returns reflected in his report; correct?

A   It's fair to say we knew Mr. Wingate was likely going to be permitted to testify.

Q   And, ultimately, McCarter & English's arguments aimed at keeping Caudill's research and development damages from going to the jury were unsuccessful, and Mr. Wingate was allowed to testify at trial and present those damages; correct?

A   That is correct.

Q   And the end result was that the arguments he made to keep those damages claims from the jury was unsuccessful; right?

A   The claims went to the jury.

Q   And you were quite interested in showing the numbers that Wingate relied on from Caudill's IRS forms and financial statements was unreliable; correct?

A   That was our strategy.

Q   And you tried to do that using the limited documentation

you got from Caudill in discovery after motions to compel and these other efforts we've talked about; correct?

A   Well, you say we "tried" to do it.  I would say we did it.

Q   But you didn't go to the third parties, the CPA or anyone else, to get that backup information; right?

A   I think we've covered that.  We did not go to third parties.

Q   And you were willing, sir, to take the risk, on behalf of Jarrow Formulas, that the jury would accept Caudill's damages and the risk of loss on damages because you thought Caudill couldn't meet its burden; correct?

A   Well, I would -- you say "you were willing."  I would say we were willing, and "we" includes the client.

THE COURT:  All right.  I'm going to interrupt, Mr. Resser.

We've reached our morning break, Ladies and Gentlemen.  Don't discuss -- thank you for your attention.  Don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind.  Thank you again.  You can go to the jury room at this time.

(The jury left the courtroom at 10:44 a.m.)

THE COURT:  Is there anything to talk about before we recess?

MR. RESSER:  No.  Thank you, Your Honor.

THE COURT:  Mr. Pepe, anything?

MR. PEPE:  Nothing for plaintiffs.

THE COURT:  Thank you.  We'll be in recess.

(Recess from 10:45 a.m. to 11:00 a.m.)

(The jury entered the courtroom at 11:01 a.m.)

THE COURT:  All right, Mr. Resser, whenever you're ready, sir.

MR. RESSER:  Thank you, Your Honor.

Q   (By Mr. Resser) Mr. Rechen, Judge Simpson's ruling on the motion for summary judgment, denying the motion for summary judgment that sought to exclude Mr. Wingate's damages testimony because there wasn't enough backup, you disagreed with that ruling; right?

A   Well, I don't think that was his ruling on summary judgment.

Q   Well --

A   We didn't seek to exclude evidence --

Q   I'm sorry.

A   -- on summary judgment.

Q   He ruled on summary judgment more than four years before trial, or about four years before trial, that he was inclined to let Caudill go to the jury with the damages proof.  Do I have that right?  From Wingate.

A   Well, so at the time the judge ruled on summary judgment, he also denied without prejudice to refiling at a later time

our motion in limine.  So at that time I would not draw the conclusion that you're suggesting.

Q   Okay.  But you thought -- you thought that Judge Simpson's ruling was wrong on the summary judgment motion in that regard; correct?

A   I did.  That happens.

Q   And you told that to Mr. Rogovin, didn't you?

A   I'm sure we had discussions along those lines.  If I said that expressly to him, I don't recall.

Q   And you also thought Judge Simpson was wrong about the ruling on the motion in limine to exclude Wingate's damages evidence; correct?

A   So that was much later.  Now we're in 2019 shortly before trial, and we had refiled our motion in limine, recalling, as I just said, the earlier one was tied without prejudice to refiling.  We refiled it.  The judge denied it; and, yes, I disagreed with that ruling.

Q   And you told Mr. Rogovin that as well; correct?

A   I'm sure I did.

Q   And as Judge Simpson denied the summary judgment motion, after that, Mr. Rogovin started writing the e-mails that criticized the judge; correct?

A   That's probably true, because I'm not even sure we knew who our judge was given that Judge Heyburn had passed away and we were waiting for the case to be assigned -- reassigned.  I

think that ruling was the first communication we may have had from Judge Simpson on anything.

Q   And while I'm not condoning the language used in the private e-mails between Mr. Rogovin and his lawyers about Judge Simpson, Mr. Rogovin's knowledge of what Judge Simpson was -- what you thought Judge Simpson had missed or ruled wrong was from you, wasn't it?

A   Say that again.

Q   Withdrawn.

Mr. Rogovin's information about Judge Simpson's rulings and the fact that you considered them wrong, that was the basis for Mr. Rogovin's intemperate e-mails to you about the judge; correct?

A   Well, I think it was Judge Simpson's ruling and perhaps our transmittal of it.

Q   Okay.  Now, in addition to the folks that we talked about, the CPA, Mr. Lyons, Mr. Rogovin also was asking you to subpoena documents from a company called Nateco.  Do I have that right?

A   He wanted us to take the Nateco deposition.

Q   And Nateco was one of the suppliers of Caudill Seed in its research and development efforts; correct?

A   Nateco was a vendor that provided their supercritical fluid extraction services.

Q   So that's a fancy way of answering my question yes; right?

A   No, I don't think so.  I stand by my answer.

Q   All right.  He wanted Nateco subpoenaed; correct?

A   He wanted us to depose Nateco.

Q   Right.  And Nateco -- payments to Nateco were presumably part of the R&D expenses that Caudill was seeking in the Kentucky case; right?

A   Sure.

Q   Now, as a result of your betting on Judge Simpson to keep out Caudill's damages proof, you gambled that the judge would keep it out when that didn't happen; right?

A   Well, I mean, you're using the metaphor of gambler and betting.  And, you know, I don't -- I don't wish to adopt that characterization.  It was -- we filed the motion because we believed the information should be excluded.

Q   And Jarrow Formulas was defenseless on damages because it had limited information, and you were unable to attack Caudill's R&D damages with any specifics; correct?

A   Wrong.

Q   Well, that's, again, what you said in Exhibit 134.  Let's bring that up again.

A   I'm quite certain that what I said in Exhibit 134 did not have the preface that was included in your question.

Q   Well, it was your words when you said, We were unable to attack Caudill's R&D damages with any specifics; correct?

        MR. RESSER:  On the second page, Mr. Campos.  Halfway down that first paragraph.

Q    (By Mr. Resser) "So as a result, we were unable to attack these numbers with any specifics."  Did I get that wrong, sir?

A    Give me a minute.

"Except with the limited information we had.  And we did have information, and we used that to cross-examine Mr. Wingate."  That's what I wrote.

Q    And those were your words; right?  Not mine.

A    Well, my words are everything that you see in this e-mail.

Q    And after trial, you replied to what you called "second guessing" in the e-mail from Mr. Leventhal.  That's the first part of Exhibit PTX 134; correct?  Down below at the third page.

A    I see it in the first sentence, yeah.  I said, "There's a lot of second guessing and finger pointing going on with respect to the trial strategy and apparently a need to find a scapegoat and assess blame."  Yes, that's what I wrote.

Q    And this really wasn't second-guessing, though, was it?

A    This was entirely second-guessing.

Q    Well, it wasn't second-guessing.  Mr. Leventhal's e-mail said, Jarrow was right all along.

If you'll turn, Mr. Campos, to the e-mail that Mr. Rechen was responding to --

A    So Mr. Leventhal did not say that.

Q    It says, in the middle of the third paragraph, "So if

Jarrow was right, all along, our R&D evidence would have been about 200,000 and not an unverifiable 2 million."

A   So he said "if Jarrow was right, all along."  And then what follows is -- is wrong and completely undermined by the information that we did have.

Q   But he was requesting, going all the way back three, four years before trial, requesting a better defense on the R&D damages, including discovery from Caudill's CPA; correct?

A   Mr. Rogovin at times --

Q   It's a yes-or-no question, sir.  I've allowed you to embellish --

A   We've gone through this already.  I can't answer it yes or no.

Q   I'm just asking you, it wasn't second-guessing because this had been communicated to you about the R&D years ago; correct?

A   Wrong.  Mr. -- Attorney Resser, this was entirely second-guessing.

Q   And all of this, all of this that we've talked about, Mr. Rogovin's requests dating back to 2014, 2015, 2016 for more discovery on the R&D, discovery from third parties, all of this was before the mock cross-examination that was shown to this jury during your examination of Mr. Pepe on Friday; correct?

A   There were -- I don't accept that it was 2014, 2015, as your question posits.  I do accept that there were e-mails where Mr. Rogovin demanded that -- or requested, one or the

other, that we do certain things, that we vetted those things with him at the time of those communications, that we elected, together with his input, to stick to the trial strategy that we had scripted but continued to pursue all of the information directly from Caudill, including from those who were within its custody and control, which would have included its CPA, and that all of that took place before the January 2019 -- or February 2019 final mock jury exercise.

I say all of it took place with the exception of the 30(b)(6) deposition that we took of Joseph Lyons and our continued pursuit of information relative to Nateco, the supercritical fluid extraction process and the times, temperatures, and pressures, which was the source -- which was the target of the information we were looking for from Nateco. That continued after the February mock trial exercise.

MR. RESSER:  Your Honor, I'll move to strike as nonresponsive.  That was not the question that I asked.  He went way beyond the question.

THE COURT:  Wait a second.  Don't make comments like that, please.

Well, I guess the question was, was the -- gave various dates, 2014.  Was -- all of this was before the mock cross-examination that was shown to the jury.

Q    (By Mr. Resser) Can you answer that question, sir?

A    Well, when you say "before," you mean presented to the mock

jury, or do you mean prior in time?

Q   Prior in time.

A   So I stand by my answer.

Q   And that answer is yes or no?

A   If the question is limited solely to whether this information -- well, why don't you re-ask the question.

Q   All of Mr. Rogovin's requests to do more discovery on research and development damages and the fact that the subpoena wasn't sent to the CPA, the subpoena wasn't sent to Nateco and Nateco's deposition wasn't taken, that happened in time before the mock cross-examination that you and Mr. Pepe showed to this jury last Friday; correct?

A   No, not all of it, no.

Q   Well, the mock cross-examination that you showed to the jury took place in 2018; correct?

A   No.

Q   2019?

A   Yes.

Q   And the e-mail about the CPA deposition was from 2016, December 2016; correct?

A   That piece, yes.

Q   And the one before that in March of 2016, that e-mail was 2016, March 2016, where he asked for more discovery on the R&D. We showed that to you earlier today; correct?

A   So if that e-mail that you're referring to was written in

2016, then obviously it preceded the mock jury exercise in February of 2019.

Q   And Mr. --

A   But the Nateco -- just to be clear and to finish, you also incorporated Nateco, and Nateco continued afterwards.

Q   Okay.  That's fine.

A   As did the deposition of Mr. Lyons.

Q   Okay.  But as of the time of the mock cross-examination that was shown to the jury, Mr. Rogovin had already expressed issues with the discovery on the R&D damages; correct?

A   We had many discussions with Mr. Rogovin about the R&D damages, and many of those -- in fact, most all of those -- discussions preceded the mock jury exercise in February of 2019.

Q   Now, Mr. Rogovin had other issues with the way the case was being prepared at the time of the mock jury exercise as well, didn't he?

A   You're going to have to be more specific than that.

Q   Well, I'm not excusing the way Mr. Rogovin behaved in that mock jury cross-examination video.  And you must have felt that he was yelling at you, didn't you?

A   He was yelling at me.  I mean I was in role as Caudill Seed's counsel, but he was yelling at me.

Q   Yeah.  And -- but it didn't occur to you that he was yelling as you because he was frustrated about the defense he

was getting?

A    That never occurred to me, no, sir.

Q    Wasn't there anger -- wasn't his anger in the context of the case being ready to go to trial before a jury against inflated damages, numbers that were not thoroughly investigated before trial?

A    No.

Q    And once the second-guessing occurred and you wrote back that you had performed vigorous -- rigorous cross in the words of the court, you still said, "So as result, we were unable to attack these numbers with any specifics."

A    Well, so when you say when I wrote these numbers, there is a significant period of time for which we did not have backup information from Caudill Seed, but there was a window of time with respect -- and that was, I believe, twenty-two thousand and seven [sic] to 2013 where we did have information and we did use that information in order to attack the credibility of Mr. Wingate's calculations and Caudill Seed's alleged damages, absolutely.  So --

Q    So that's the limited information we had in your cross-examination of Wingate, as you referred to in PTX 134; right?

A    I think that's right, yes.

Q    Okay.  And then you went on to say that your examination of Wingate went very well.  In fact, Joel Beres told his partners

that the cross-examination was a master class on how to cross-examine a damages expert; right?

A   I did write that, yes.

Q   And at trial you made a point of saying Mr. Rogovin hugged you after that cross-examination; right?

A   Mr. Rogovin hugged me.  Mr. Leventhal, the following --

Q   It's a yes-or-no question, sir.

A   Well, yes.  So --

Q   Okay.

A   -- he hugged me, and he was quite pleased and laudatory about what he observed of the cross-examination of Mr. Wingate, sir.

Q   But after the case was lost, we're now in July when you're reminding the client what a great job you did cross-examining their damages expert.  And so while Jarrow Formulas wrote it is in crisis mode with their bank, you wanted to remind them of what a master class your cross-examination of Wingate was. Isn't that right?

A   No, that's not right, sir.

Q   Well, that's what your e-mail said.

A   That e-mail -- let's read the whole e-mail because there's a lot in there than just about a master class, which were not my words.  That was Jarrow Formulas's lawyer who wrote that about --

Q   Right.  And you were reminding -- you were reminding Jarrow

Formulas of that in the face of them writing you that they were in crisis mode.  Now that's chutzpah, isn't it, sir?

A    No.  Chutzpah was to send --

Q    Yes-or-no question.

A    Answer's no.

Q    For the benefit of the jury, can you define "chutzpah"?

THE COURT:  No, no.  It's argumentative.  Keep going.

Q    (By Mr. Resser) By the time Mr. Ashurst was asking you to have Kean Ashurst testify about the R&D expenses, that was too late.  And having Mr. Ashurst do it was all that was possible at that point; right?

A    I'm sorry.  Ask that again.  By the time what?

Q    By the time Mr. Rogovin was asking you, during the trial, to have Mr. Ashurst testify about the R&D expenses, or just on the eve of trial, that was because the R&D discovery from third parties hadn't been done yet, so it was too late to subpoena the people Mr. Ashurst told you about.  Isn't that right?

A    That's not why we didn't do it, sir.

Q    He wasn't asking you just to ask Kean.  He wanted you to subpoena those people directly earlier, didn't he?

A    There are e-mails where Mr. Rogovin requested that we do that.  And as I indicated earlier, we discussed that with him, and we stuck with the strategy we had developed.  And he agreed.

MR. RESSER:  I'd like to offer Defense Exhibit 609.  I

believe there's no objection.

THE COURT:  Okay.  That can be marked as a full exhibit, no objection.

(Defendant's Exhibit 609, received in evidence.)

Q   (By Mr. Resser) Exhibit 609, sir, is an e-mail --

THE COURT:  Did you want to bring it up?

MR. RESSER:  Yes, please.

THE COURT:  There we go.

Q   (By Mr. Resser) Exhibit 609 is an e-mail from Mr. Rogovin to you, to Mr. Beres, Mr. Giarratana --

THE COURT:  Actually, can you take that down, please? I thought I reserved on that.

MR. RESSER:  I'm sorry, Your Honor.

THE COURT:  Can I see it?

MR. PEPE:  Your Honor, there was an objection on this.

THE COURT:  I reserved.  Can I see it, please?

MR. RESSER:  Yes.

THE COURT:  Some of it's not relevant.  You can try and lay a foundation for the parts that might be, but some of it's not.

MR. RESSER:  I'm sorry, Your Honor?

THE COURT:  I said some of it's not relevant.

MR. RESSER:  Well, the portion that I'm going to ask the witness about is the portions at the bottom of the page, the all caps, which I understand were written by Mr. Rogovin to

the trial team regarding some of the things he felt.

THE COURT: He did the designations?

MR. RESSER: Yes.

THE COURT: Let me read that.

MR. PEPE: Your Honor --

THE COURT: Excuse me one second. Let me just read it, please.

Objection sustained.

Q   (By Mr. Resser) Mr. Rechen, you're not being accused here of anything other than making a mistake in not presenting Mr. Rogovin on the witness stand live after telling the jury three times that he would testify and that he was present at trial. You're not being accused of not being worthy of your *Best Lawyers in America* list or *Chambers US* --

THE COURT: Mr. Resser, is there a question here?

Q   (By Mr. Resser) You understand you're not being accused, sir, of doing anything other than making an honest mistake; correct?

MR. PEPE: Can I have that -- I'm sorry, Your Honor.

THE COURT: The question is, "You understand you're not being accused, sir, of doing anything other than making an honest mistake." It's not relevant. Not relevant, no. Doesn't matter what he thinks he's being accused of.

Q   (By Mr. Resser) Sir, don't you wish today that you had done the damage discovery from the CPA and the bank that Mr. Rogovin

had asked for just as you did with Dr. Cornblatt and Mr. Gallant on the lost sales damages?

A    No, I do not.

Q    And don't you wish you had never promised the jury in the opening statement in Kentucky that Mr. Rogovin would testify live when he was there in court to do so?

A    So, first --

Q    That's a yes or no.

A    Your expert agreed no promises were made.  A representation was made as to what we thought the evidence would show.  We can always go back and review what we did and -- you know, but the reality is we had a set of circumstances at the time of the opening statement.  Those circumstances changed.  We adapted in response to those changing circumstances and at every step of the way put forth our very best case and effort on behalf of this client, every step of the way, sir.

Q    So you're saying you don't wish you had never represented to the jury in your opening statement that Mr. Rogovin would testify three times and that he was present in court.  Is that what you're saying?

A    I don't think what -- I don't think my evaluation of it today, looking backwards, is relevant to the issues that we're addressing in this courtroom.

Q    So you don't want to agree with my statement then.

A    I don't agree with your statement.

MR. RESSER:  Thank you.

THE COURT:  All right, Mr. Pepe, is there redirect on your original direct?

MR. PEPE:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PEPE:

Q   Let's go back, if we could, Mr. Rechen, to the issue that was raised or testified to you on direct and raised on cross and the settlement discussions you had with Ben Lewis in November of 2018.  Do you have that in mind?

A   I do.

Q   And you testified that you related to Mr. Rogovin, shortly after, I think, you said maybe the same day or the next day, the conversation you had with Mr. Ben Lewis and the settlement offer he signaled to you; is that correct?

A   Yes.

Q   Is there any doubt in your mind that you related that to Mr. Rogovin as you sit here today?

A   None whatsoever.

Q   And what was his response to you when you related that to him?

A   Well, ultimately, in writing he said, "I would not pay a dime."

MR. PEPE:  Can we have Exhibit PTX 145, please, which is a full exhibit.  And can I ask Mr. Wyzik to blow up that

first paragraph, which we've seen before.

Q   (By Mr. Pepe) Is that the paragraph you had in mind in that e-mail, PTX 145?

A   I think it begins at the end of the fourth line:  Further, I would pay that piece of expletive a dime.

I think what he meant there was he would not pay a dime.  You could read it either way.  He could pay a dime or not a dime.

Q   The message was he wasn't going to pay anything?

A   He wasn't going to pay a million or more to resolve this even if he had the opportunity.  That was our understanding, and our strategy was designed around that.

Q   And did he ever change his position on settlement throughout the litigation?

A   No, never wavered.

Q   You were asked just a moment ago, Don't you wish you took the deposition of the third parties as you did with Mr. Cornblatt and Mr. Gallant?

Do you remember that?

A   I do.

Q   Just so it's clear -- I'm sorry -- but Mr. Cornblatt and Mr. Gallant played what role in the Caudill Seed/JFI dispute?

A   So Mr. Cornblatt and Mr. Gallant were -- I don't recall whether they were the owners of NPS, Natural Product Solutions, and Nutramax or whether they were the high-level officers or

sales or purchasing individuals at those companies.  But these were companies to which Caudill Seed claimed it would have made sales of its broccoli product, which incorporated its trade secrets.  So this was very different considerations with respect to those individuals and those companies than the considerations we undertook with respect to the research and development damages, research and development lost profits.

Q   All right.  That's what I wanted to make clear.  Mr. -- the depositions of Mr. Cornblatt and Mr. Gallant went to, if I heard you correctly, Caudill's claim of lost profits; correct?

A   That is correct.

Q   And were you successful in challenging those?

A   One hundred percent.

Q   Okay.  But there was a different element of damages claimed by Caudill, which we have now heard about at length, and that was its R&D, or research and development, costs; correct?

A   Yes.

Q   And Mr. Wingate, their damage expert, testified to that; correct?

A   Yes, he did.

Q   And you testified on cross as to what you thought those damages were according to his testimony; correct?

A   That's correct.

Q   And you were shown the Wingate report, PTX 483, with respect to Mr. Wingate's report to the court and his testimony

as an expert; correct?

A    Yes.

Q    And I think you said you thought there were two line items of R&D damages claimed by Wingate; correct?

A    That's correct.

        MR. PEPE:  And if I can ask Mr. Wyzik to call up PTX 483.  And if we could go back to that first page, which is now a full exhibit.

        THE COURT:  I'm sorry.  So, Devorah, it needs to be put up just for the witness and the jury.

        MR. PEPE:  I should have made that clear.  I'm sorry, Your Honor.

Q    (By Mr. Pepe) Can you see it, Mr. --

A    Not at the moment I can't.

        THE COURT:  I tell you what.  Let me ask a question. Given the personnel in the courtroom, does it matter at this point?  If counsel could take a look for me.  Does it matter?

        MR. PEPE:  I don't think it does.  Everyone --

        THE COURT:  Mr. Resser?

        MR. RESSER:  No.  Mr. Rogovin's sister I don't think is.

        THE COURT:  All right.  Then so we should do it.

        THE CLERK:  Can you see it?

        THE COURT:  They can see it now.  We're good.  Go ahead, Mr. Pepe.

Q   (By Mr. Pepe) Can you see it now, Mr. Rechen?

A   I can.

Q   So you recognize that as the Wingate report?

A   I do indeed.

MR. PEPE:  And if I can ask Mr. Wyzik to go to Exhibit 6.  I'm very sorry.  The pages are not numbered, but it's about six pages from the back.  It's Exhibit 6.  Thank you, Mr. Wyzik.

Q   (By Mr. Pepe) And we have there an exhibit in the report entitled, "Summary of Costs and Lost Profits."  Do you see that?

A   Yes.

Q   Does that, in fact, set forth what Wingate testified to as the -- as the, just what it says, the R&D damages and the lost profits?

A   Yes.

Q   And the three -- the third, fourth, and fifth items are listed as lost profits.  Do you see that?

A   I do.

Q   And are those the damages you knocked out?

A   Correct.

Q   A hundred percent?

A   Well, those, among others, yes.

Q   And then -- but the first two lines, do those relate to the R&D costs that Wingate was claiming?

A    Yeah, both of those lines do, although the first says "Research and Development," and the second says "Overhead Expenses."  The "Overhead Expenses" was Wingate's analysis of the overhead expenses of the company related to the research and development undertaken by the company, including salaries, etc.

Q    And rough total of that looks like about $4.5 million those two line items?

A    Yes.

Q    And the total award of R&D damages by the jury compared to 4.5 was how much?

A    Well, there was 2 million -- I'm not sure I got your question.

Q    Because it was inartful.

Wingate testified to a total of 4.5 million in R&D damages according to this report?

A    Yes.

Q    And the jury awarded how much on R&D damages?

A    My recollection, 2,023,000, something like that.

THE COURT:  All right.  Ladies and Gentlemen, again, I need to keep reminding you of the limited purpose for which you may consider all of the testimony, all of the evidence about R&D, Wingate, Ashurst testimony, third-party discovery.  All right?  And that's the limited purpose of deciding whether the decision by JFI not to pay the bill at one point was willful

and malicious or not.

Go ahead, Mr. Pepe.

MR. PEPE: Thank you, Your Honor.

Q (By Mr. Pepe) The question of Joe Lyons being called live, as Mr. Rogovin requested or demanded, do you have that in mind?

A I do.

Q And was that a question that was considered by the McCarter team as it came time to present its case in defense in the Kentucky trial?

A Yes, it was.

Q At length?

A I would say.

Q And did you or other members of the McCarter team explain the reasoning and rationale for your decision not to call Mr. Lyons live?

A On a number of occasions, yes.

Q Okay. In sum and substance and very briefly, what was the analysis and the conclusion that led you to make that trial strategy decision?

A The analysis was Caudill Seed had the burden of proof. Mr. Wingate had testified. They had -- before his testimony, they had -- Caudill Seed had, in our view, not laid a proper foundation for the damages that it was claiming. We had established through our cross-examination of Mr. Wingate all of the various weaknesses, including the failure to apportion

damages amongst the various trade secrets and the fact that they had other products lines and research and development costs with respect to other products, all of which had to be included in the numbers that Mr. Wingate lifted from the tax returns and financial statements and that, by putting Joe Lyons on the stand, we would be giving him an opportunity to give an explanation to the jury, which the jury didn't have before it, justifying Mr. Wingate's reliance on the information.

And, furthermore, we were going to be putting a focus on a part of our case that was not really the strength of the case. The strength of the case and what we wanted the jury focused on at the time was the trade secrets and the lack of trade secrets. And that's what we wanted the focus on. And so we explained all of that.

Furthermore, we had concluded that the real reason Mr. Rogovin wanted Mr. Lyons on the witness stand was because he wanted to see him trembling on a video deposition. And he had been trembling in my questioning of him at a video deposition. But it was with respect to topics that Caudill Seed ultimately abandoned at trial related to Nateco and, as you've heard me say, the times, temperatures, and pressures that Caudill Seed ran its supercritical fluid extraction process at Nateco.

So we concluded, in the face of all that information and analysis, which was discussed amongst the trial team, including Attorneys Giarratana and Grondahl and Attorney Beres

and Mr. Leventhal, the general counsel, and Mr. Rogovin, we concluded that it did not make sense to put Mr. Lyons on the witness stand live.

Q   You just mentioned in your answer that Attorney Joel Beres was included in that decision; correct?

A   Yes.

Q   There's been testimony at length that he was the local counsel from Louisville, Kentucky, who also specialized in intellectual property law; correct?

A   Yes, that's correct.

Q   Was he typically and usually involved in these trial strategy decisions as the trial went forward from June 3 to June 26?

A   He was involved in every single one of them.

Q   Including this one you just described?

A   Absolutely.

Q   And did he, in fact, provide his input as you were going through the decisional process in writing?

A   He did.

        MR. PEPE:  May I ask Your Honor if PTX 253 can be published, which is a full exhibit?

        THE COURT:  It's already a full exhibit?

        MR. PEPE:  It is.

Q   (By Mr. Pepe) I show you PTX 253, a June 16 e-mail from Mr. Beres to you, Mr. Grondahl, Mr. Giarratana, and the jury

consultant.  Now, Sunday, June 16, is the weekend before you start putting on the JFI defense case; correct?

A   That's correct.  Caudill Seed rested on Friday, and so this is two days later.

Q   I direct your attention to the second paragraph, beginning "If we decide," if I can ask Mr. Wyzik to call that out, please.

Can you see that all right, Mr. Rechen?

A   Yes indeed.

Q   Does he speak to the question of Lyons being called live versus by deposition?

A   We do.  And he prefaces his opening sentence with, "If we decide to call Lyons."

Q   And then he goes on to propose an order of witnesses after that?

A   He does.

Q   And he goes on, in the next paragraph, Mr. Wyzik, if you could blow up that one.

Does he speak there to the potential benefits of calling Lyons live?

A   He -- he does, which were under discussion amongst the trial team at the time, as reflected here.

Q   They were considered by you.  Is that your testimony by the trial team?

A   Absolutely.

Q    Including Mr. Leventhal?

A    Yes indeed.

Q    Okay.  And then he goes on, does he not, to speak to the downsides?

A    Yes, next potential downsides of calling --

        MR. PEPE:  If I could ask Mr. Wyzik to call out that paragraph.

Q    (By Mr. Pepe) And, in fact, is that a fair statement of the considerations you made on the disadvantages?

A    Yeah.  I would say there's more to it than this, but this from certainly Attorney Beres's perspective, these were the most significant downsides.  And his last one, allowing Caudill Seed to elicit additional testimony to support its case in the middle of our defense, i.e., muck it up, that was a very significant concern that was weighed by the trial team.

Q    And after you were fired, McCarter & English was fired and Mr. Rogovin had another one of his lawyers, Brophy, Attorney Brophy, send you the termination letter, what happened to Mr. Beres?

A    He was hired by Jarrow Formulas to replace us as lead counsel in the continuing proceedings in the Kentucky case.

Q    You -- you brought this suit in 2019?

A    Yes, sir.

Q    Forgive me.  Forgive me.  McCarter & English brought its suit to collect its fees in 2019.

A    Yes.

Q    And you were involved in the discovery process conducted by Attorney Tinley representing JFI in the -- in this suit now pending in this court?

A    I was deposed, if that's what you're asking me.

Q    And confronted with many, many documents in your deposition?

A    Indeed.

Q    And deposed at length about what you did or did not do concerning limiting the R&D damage claim by Caudill?

A    Yes.

Q    In all the testimony -- in all the documents with which you were confronted in your deposition and any other documents you saw produced by JFI, did you -- could you identify one document that, if you had it and used it in the Kentucky litigation, it would have reduced Caudill's R&D damages?  Do you understand the question?

A    Yes, I do.  No.

Q    Not one?

A    Not one.

Q    You were shown your lengthy response to Jonathan Leventhal's e-mail to you on Wednesday, July 3.  Do you have that in mind?

A    Yes.

Q    And so now here we are about seven days after the verdict?

The verdict was June 26.  His e-mail is July 3; correct?

A    Nine days, yup.

Q    June 26 to July 3?

A    July 5th, wasn't it?

Q    No.  Well, let's call it up.

A    Oh, Mr. Leventhal's e-mail was July 3.  My response I think was July 5th.

Q    Okay.  So a week after the verdict for Mr. Leventhal.

A    Yes.

Q    And that was Exhibit 134.

MR. PEPE:  If I can ask Mr. Wyzik to call that up and if I could ask him to go to -- actually, if you go to the bottom of the second page is where I think Mr. Leventhal's e-mail starts, if I could ask Mr. Wyzik to blow that up so we have it in mind.

Thank you so much, Mr. Wyzik.

Q    (By Mr. Pepe) So about a week after the verdict, he says, quote, "I am in mega-disaster control meeting with the bank that will last the remainder of the day."

And then if you go down to the third paragraph, he raises the question of, "How difficult would it have been to have a decent approximation of salaries?"

Whose salaries did you understand he was referring to there?

A    The salaries of the Caudill Seed personnel who had worked

on the research and development.

Q   Were incorporated into the R&D damages?

A   Yes.

Q   Did you, in fact, have salary information in that regard?

A   Well, we did for, I think, the period 2007 to 2013.  We also knew from Mr. Ashurst what his salary was from the period -- from the time he was hired by Caudill Seed up through 2007.  If we had other salary information, I don't recollect it as I sit here.

Q   I'm going to drop down, if I can ask Mr. Wyzik to go down to the fourth line that reads -- starts with, quote, "So if Jarrow was right, all along."  Fourth line.  Thank you so much.

         We've seen that before.  And here's Mr. Leventhal suggesting that R&D damages could have been limited to 200,000; correct?

A   That's what he was suggesting.

Q   Yes.  And that, in fact, resulted in a rather long response from you; correct, Mr. Rechen?

A   I think so.

Q   If we go back to the beginning of that exhibit, PTX 134.

         Now, this is after the verdict but before you've been informed you're fired; correct?

A   Yes.

Q   You go on to say in the first sentence, quote, The question you raise is troubling because it is clear that there is a lot

of second guessing and finger pointing going on with respect to the trial strategy and, apparently, a need to find a scapegoat and assess blame, end quote.

Is that what you're responding to in this e-mail?

A    That's part, yes.

Q    Then you go on identifying numerous issues here.  But is it -- let's take a look at some of those that you claim is second-guessing after the verdict before you're notified you're fired.

Second paragraph begins, "The trial strategy," Mr. Wyzik.

"The trial strategy was to win."

You've said that time and time again, Mr. Rechen.  Did you believe it -- when you were going into this trial in 2019, June 2019, did you understand that to be the trial strategy Mr. Rogovin wanted?

A    Absolutely.

Q    And did you implement that to the best of your ability?

A    The very best.

Q    And did that, in fact, affect the way you treated the claim for damages by Caudill Seed in terms of not showing lower damages?

A    So that was the our intention all along was to undermine damages without proving a penny of damages on Caudill's -- for the benefit of Caudill Seed.

Q    The next paragraph, sir, I'm going to ask Mr. Wyzik to blow up the first sentence and ask you to explain that.  It reads, "At the same time everyone knew and the chairman" -- who's referred to there as the chairman?

A    That's Mr. Rogovin.

Q    "The chairman was told in light of the Court's pretrial rulings on summary judgment, discovery matters, motion for sanctions and motions in limine, that we might have to accept an adverse verdict and then go to the Sixth Circuit," period, end quote.

First, was that a true statement, accurate statement?

A    Yes.

Q    Explain what you meant concisely, please.

A    So we had explained to Mr. Rogovin time and again throughout the case that there was -- and I'll use his words again -- "a horrible narrative."  We had also, throughout the case, through our summary judgment motion, various pretrial discovery, our motions for sanctions and motions in limine, had sought to establish that there was no trade secret here, that all of the relevant information that was used by Jarrow Formulas was in the public domain and was available for fair public use by Jarrow Formulas and that, in fact, the process employed by Jarrow Formulas was different from the process employed by Caudill Seed in order to manufacture their product.

And so we felt there was no trade secret.  We felt we

could prove there was no trade secret.  We attempted to do that every step of the way through the pretrial proceedings.  And -- but the court -- and this happens in litigation.  We don't win everything.  The court disagreed with us.

We thought the court had made a ruling, particularly with respect to the trade secret issues and whether there were trade secrets, we thought the court had made a ruling, or more than one ruling, that was contrary to the law and that Jarrow Formulas might, in the face of the horrible narrative, have to accept a loss at the trial level, an adverse verdict, and take the case up on appeal.  And we advised the client of that, and the client was well aware of that.

Q   You go down, sir -- I'm going to ask Mr. Wyzik to drop down to the last paragraph on the first page and see if he can call that out.  It continues on the next page.  It begins, "To answer your questions."

And I'm going to have to ask you to look at that.  And then we're going to go to the next page, Mr. Rechen.

A   I see that.

Q   Go on, Mr. Wyzik, if you could, please.

Do you again, again, explain again in detail what the evidence was that was developed during discovery concerning Caudill's R&D damages?

A   I think we laid it all out right here.

Q   Again.

A    Again.

Q    And if we could stay in that paragraph, I think it's about six lines down on the second page, do you again address the Joe Lyons' deposition issue?  I'm going to ask --

A    Where is that?

Q    I don't know if Mr. Wyzik can find it.  It's about five lines down where he says, quote, "And we could have called Joe Lyons."

A    I do recall that, but I don't see it.  Oh, I see it, yeah, right in the middle there.  "And we could have called Joe Lyons."

        MR. PEPE:  Mr. Wyzik, highlight that, please.  Five lines down, and highlight everything after and the next several lines, please.

Q    (By Mr. Pepe) Do you again at that point, again, explain the decision on using the Joe Lyons' deposition versus calling Joe Lyons live?

A    Yes.

Q    Is that one of literally hundreds of decisions you made in terms of who -- what witnesses to call, when to call them, what questions to ask, what arguments to make from the beginning of that litigation to the time the jury came back?

A    That's the nature of preparing and trying a complex commercial case, which this certainly was, yes.

        MR. PEPE:  Ask Mr. Wyzik to drop down two paragraphs

and call out "I am available."  Call out that paragraph.

Q    (By Mr. Pepe) You state there, sir:  "I am available to discuss any and all of this by telephone" -- and you give your numbers -- "or in person.  If it will be helpful to management, Mark and I will fly to Los Angeles to meet with the management team."

Why did you say that?

A    Well, I knew -- this was a disappointing verdict for everyone.  It was disappointing for trial counsel.  It was disappointing for me personally.  I thought we had a path where we could win this case, notwithstanding the horrible narrative.  And we knew that the client -- we knew that Jarrow Formulas, Inc., and its chairman, Mr. Rogovin, was disappointed.  We knew that the executives at Jarrow Formulas were disappointed.  I wanted, I wanted, we wanted, the opportunity to sit down and discuss with the client what had happened, what this verdict meant, what the next steps were, and absolutely to address any and all questions that either Mr. Rogovin or any of his senior executives or his general counsel might have.

Unfortunately, he deprived us.  And he deprived himself of that opportunity by, first, refusing to meet with us the evening of the verdict with the rest of the trial team, by refusing to take our telephone calls, by refusing to respond to our e-mails, and by refusing to take us up on our offer to speak with him over the telephone after we had returned here to

Hartford and by refusing to take us up on our offer, which we were willing to do, to fly to Los Angeles and meet with him and his team and anyone on that team who had questions or concerns or misunderstandings about what had gone on in the Kentucky courtroom and what next steps were.

And so that's what we were relating to the client here and were hoping we would have the opportunity to do so that we could address all of these issues. That never happened.

Q He did not take you up on that offer. Mr. Rogovin did not take you up on that offer you testified. But you did hear from him some two weeks later on July 22. Do you remember that?

A Yes, I do remember that.

Q Yeah, you saw that exhibit, if I might ask Mr. Wyzik to call it up. It's a full exhibit, PTX 103. You saw that during your earlier testimony, Mr. Rogovin's e-mail to you and your partners on July 22. Do you remember that?

A I do remember it.

Q He sets forth his grievances once again, does he not, sir?

A Yes, he does.

Q And he does specifically mention your alleged failure to limit the R&D damages; correct?

A Yes, he does.

Q Does he say one word about the claim now being made that you did not call him to testify live?

A He did not.

MR. PEPE:  I have no further questions, Your Honor.

THE COURT:  All right.  Very well, sir.  You may step down.

THE WITNESS:  Thank you, Your Honor.

MR. RESSER:  Your Honor, I have a couple of follow-ups based on that, based on what he was just asked.  Three or four questions, Your Honor.

THE COURT:  Wait a minute.

No.

Okay, step down.

All right, next.

MR. WARD:  Your Honor, we call Eric Grondahl.

THE COURT:  All right.  Hello, sir, if you would face our courtroom deputy and raise your right hand.


E R I C   G R O N D A H L,

having been duly sworn by the Clerk, testified

under oath as follows:


THE CLERK:  Please be seated.  State your name, city and state you work or live.  Spell your last name for the record, please.

THE WITNESS:  My name is Eric Grondahl.  It's spelled G-R-O-N-D-A-H-L.  I retired from McCarter & English as of October 1st, 2021, and I now reside in Moultonborough, New

Hampshire.

THE COURT: All right, Mr. Ward, you may proceed.

DIRECT EXAMINATION

BY MR. WARD:

Q   Good morning, Mr. -- good afternoon, Mr. Grondahl.

A   Good afternoon.

MR. WARD: Ladies and Gentlemen -- Lady and Gentleman of the Jury, my name is Michael Ward. I'm one of the attorneys at counsel table for Jarrow Formulas.

Q   (By Mr. Ward) Mr. Grondahl, your deposition was taken in this matter on June 2nd and continued on June 12, 2020; is that correct?

A   Yes.

MR. WARD: Your Honor, may I approach with a copy of the transcript?

THE COURT: You may.

Q   (By Mr. Ward) Mr. Grondahl, you started with McCarter & English in 2003; correct?

A   Correct.

Q   And you said you no longer live in Connecticut; right?

A   That's correct.

Q   And you're retired from McCarter -- from the legal profession?

A   Yes, I am.

Q   And you no longer, obviously, work for McCarter & English;

right?

A    That's right, I don't.

Q    As to matters in this case, your initial work on the Kentucky litigations began with the Kean Ashurst dispute; correct?

A    That is correct.

Q    And then you came to work on the Kentucky federal case between Caudill Seed and Jarrow Formulas; right?

A    That's right.

Q    And prior to your work in Kentucky, you had only tried one other jury case to verdict; right?

A    Um, that's correct, one case to verdict.

Q    And the initial rate that you charged your work for in Kentucky was $395 an hour?

A    I believe that's correct.

          THE COURT:  Just one second, Mr. Ward.

          So, Ladies and Gentlemen, because of witness availability issues, you're going to hear now both about the billing case and there may also be some questions about the malpractice case with this witness.  So don't think we're not making progress.  We are.  But for this witness, we're going to cover both.

          Go ahead, Mr. Ward.

          MR. WARD:  Thank you, Your Honor.

Q    (By Mr. Ward) And at some point McMcCarter & English

increased your hourly rate in the Kentucky case from $395 an hour to $485 an hour; right?

A   When you say "the Kentucky case," which one?  There were two.

Q   The Kentucky federal litigation.

A   Yes.

Q   So your rate was increased at some point from 395 to 485 an hour; correct?

A   That sounds right.

Q   But you weren't aware of that rate increase when it occurred?

A   I don't recall being aware of that at the time, no.

Q   You are aware, however, that Jarrow Formulas regularly requested M&E for discounts to pay the bills for Jarrow Formulas around the end of M&E's fiscal year; right?

A   Yes, pretty much -- pretty much every year there was a request for a discount off of our bills.

Q   And M&E encouraged collection of that outstanding AR at the end of the year because it would increase the profit pool for the partners to be paid from.

A   Well, we tried to get all of our clients to pay and come up at the end of the fiscal year, sure.  I think most businesses do that.

Q   Right.  And the greater that pool, the greater profit share that you would be paid at McCarter & English; correct?

A   Like any business, the more money you bring in, the more money you get paid if you're the owner.

Q   And you're an owner of that business?

A   As a partner, you are an owner, yes.

MR. WARD:  If we could call up Defendant's Exhibit 543D.  And this is admitted, Your Honor.

THE COURT:  All right.  Very well.  Thank you.

Q   (By Mr. Ward) Mr. Grondahl, feel free to review this exhibit.  But if we look at the e-mail from Mr. Giarratana to Ms. Adipietro dated September 8, 2011, it's on page 3 of this exhibit.

A   Um-hmm.

Q   September 8, 2011, from Mr. Giarratana to Ms. Adipietro.

And if you see it, right above that, there's an e-mail from you at 4:38 to Mr. Giarratana; correct?

A   Correct.

Q   And you wrote that e-mail?

A   Yes.

Q   So I take it you also read the e-mails on this five forty -- Defendant's Exhibit 543D that preceded Mr. Giarratana's e-mail?

A   I can't say that.  I was asked -- I was asked a specific question at one point in this chain, and I answered the question I was asked.  I don't -- I don't know how much of this I reviewed otherwise.

Q    Okay.  You can see the e-mails on the screen in front of us.  They're about four inches apart; correct?

A    That's how it looks on this.  I don't know how it looked on my screen when I got it.

Q    So is it your testimony you don't read text that's four inches apart from another?

A    I didn't say that.  I don't know if I did or not.  I might have.  We're all very busy, and this is something Jarrow Formulas every year, We need 10 percent.

          Mark said, "Am I good giving him 10 percent?"  I said "Yes."  That was a pretty simple question, and I answered it.

Q    So you read the e-mail where it says, "It's kind of hard to take a different approach this" e-mail -- "this year," excuse me.  "Did we give 10 percent over the same months last year?"

A    Again, I don't know if I read that or not.  I answered the question I was asked.  Whether I read the rest of this e-mail or not, I have no recollection.  We're pretty busy.  If I get a question, I answer it and I move on.

Q    Are you in the habit of responding to e-mails without understanding the context which they're sent to you?

A    I absolutely understood the context.  Jarrow, as it did every year, was trying to get a discount off of our already discounted bills, and I was asked am I good with it, and I said yes.

Q    And you also read the e-mail after that where Ms. Adipietro

responded to Mr. Giarratana: Yes, although we did a lot of back and forth where I had to ask the, quote, unquote, EC if you recall. We made Eric Grondahl an honorary member.

A    There's no way I read that because that came later. And Mark, it looks like, copied my response in a subsequent e-mail. You'll see it. That's from Mark Giarratana to Cathy Adipietro I'm not copied on it.

Q    Mr. Giarratana asked Eric, "Are you good with giving Jarrow the same discount as last year, ten percent on the outstanding balance (which covers the same months as last year)?"

A    And I said yes.

Q    And you said yes; correct?

A    Yes.

Q    But you weren't on the EC, or Executive Committee, at McCarter & English in 2012 or 2013, were you?

A    Well, this is 2011. And I have had management positions at the firm but not on the Executive Committee.

Q    And you didn't question Ms. Adipietro or Mr. Giarratana about misleading a client about how you were on the EC as a negotiating tactic?

A    I -- I don't know that I ever saw that. I just said that.

Q    Okay. We established the e-mail -- you may not have read the e-mail that's four inches below and only two lines. You may not have read that?

A    I may not have.

Q    Okay.  You've been here in the courtroom intermittently over the course of this trial in this case; correct?

A    I have.

Q    And that was a couple days the first week of trial?

A    I leave to go back to New Hampshire.  I keep getting called, I think by your side, to keep coming back.  Then they reschedule it.  So I've been running back and forth.

Q    I see.  Well, on that point, you're aware that you were -- your counsel agreed to have you on 24 hours' notice to be called to the stand; right?

A    I don't know if he agreed to that.  I told him that, you know, I'm coming from well over 200 miles away.  And getting a call at six o'clock to be here the next morning at nine is difficult.

Q    Okay.

A    That's not 24 hours.

Q    But you were here today -- right? -- listening to Mr. Rechen's testimony?

A    Yes, I was.

Q    And to save the jury hopefully some of your time, you heard the testimony with respect to R&D issues.

A    Yes, I did.

Q    And so you're generally familiar with the research -- R&D issues, being the research and development discussions related

to Caudill Seed's damages that were claimed in the federal Kentucky litigation?

A    I am very familiar with the R&D damages that Caudill Seed claimed in the Kentucky litigation.

Q    And so calling your attention to the period in late 2014, M&E couldn't tell whether any item of Caudill's claimed expense tied to any one of their particular claims; correct?

A    That is correct.  We didn't have the information to do that, and we thought that was a deficiency in Caudill Seed's case at the time they were acquired to have sufficient information to tie their costs to a specific trade secret.  And we -- they didn't give us that information.  We thought that was a deficiency in their case.

Q    So you concluded by 2014 that what -- the information that you had with respect to expenses couldn't be tied to any particular claim.

A    Um, some -- some of the expenses we could probably --

Q    Excuse me, sir.  Yes or no?

A    Well, if I have to say yes or no, I'll say no.

Q    Okay.  So let's play Mr. Grondahl's deposition at page 36, lines 14, to page 37, line 1.

            THE COURT:  36, lines?

            MR. WARD:  14.

            THE COURT:  Yes.

            MR. WARD:  To 37, line 1.

THE COURT:  Okay.

(Plays video.)

Q   (By Mr. Ward) Mr. Grondahl, so Caudill Seed, in the discovery process, did not provide supporting documents for their tax returns for everything that they were claiming on their tax returns; right?

A   That is incorrect.

Q   They provided documents for every single item that they --

A   That's not correct either.  They provided us ledgers, their R&D subledgers, that showed what they put in their accounting books for the years 2007 through 2013.  Um, there was also something that Mr. Wingate called other development costs.  I forgot the exact title.  It was the second exhibit.  And we had all of the invoices and backup for the expenses that were in that exhibit.

Q   Okay.  That's not what you testified to at your deposition, is it, sir?

A   That's not true, sir.  I said that several times.

Q   Okay.  Let's take a look at page 34, lines 8 through 16.

THE COURT:  Okay.

(Plays video.)

THE WITNESS:  Right, they didn't give us everything for everything they were claiming.  I said that.

Q   (By Mr. Ward) And you knew that Caudill had their tax returns prepared by a third party; correct?

A    I don't know who prepared their tax returns.

Q    And you knew that Caudill Seed had financial statements prepared by a third party; right?

A    I assume they were, but I don't know who.

Q    But McCarter & English did nothing to pursue from Caudill Seed's accountants what records they might have with respect to those tax returns?

A    Well, we asked Caudill Seed for their records.  They were required under the federal rules to produce everything under their custody and control; and presumably if their accountants had those records, they would have asked for them and produced those.

Q    And you never tested those assertions by going to the person who prepared the tax returns?

A    Who do you mean?  The person who did Caudill Seed's tax returns?

Q    Prepared them.

A    Prepared them.  No, we didn't do that.

Q    Well, it's fair to assume that accountants, when they prepare tax return, they create and preserve work papers; right?

A    I don't know what they had.  I don't know if they had invoices.  I don't know if they just had the subledgers.  I have no idea what they had.  We had the subledgers for 2007 through 2013.

Q   Well, you never asked the accountant for those work papers; right?

A   No.

         MR. WARD:  If we could look at PTX 237.  I believe this is not admitted, but there is no objection, Your Honor.

         THE COURT:  Okay.  In that case, it can be marked as a full exhibit.

         (Plaintiff's Exhibit 237, received in evidence.)

         THE COURT:  It can be brought up.

Q   (By Mr. Ward) If we go to the second e-mail on the page that is from Mark Giarratana on October 5th, 2016, to Abraham Robinson, and you and Mr. Rechen are CCed; right, Mr. Grondahl?

A   Yes.

Q   Okay.  And if we look at the sentence, the first full paragraph of that e-mail, second sentence, it says in part, "We don't have the documents to substantiate and verify that the indicated expenses were, in fact, incurred in connection with the alleged trade secrets."  Do you see that?

A   Yes.

Q   And so by this time in October of 2016, you still couldn't tell which expenses were tied to any of the trade secrets based on the information you had at that time; correct?

A   As I said in the deposition you played earlier, we couldn't -- we didn't have everything.  We had some things but not everything.

MR. WARD:  And so if we could go to -- before we put it up on the screen, Your Honor, I'm going to offer Exhibit -- Defendant's Exhibit 579.  It is not admitted, but the Court has reserved.

THE COURT:  Okay.  Can I see it, please?

MR. PEPE:  May I get a moment to look at that, Your Honor?

MR. WARD:  May I approach, Your Honor?

THE COURT:  Thank you.  For my benefit, is Mr. Robinson an associate at the firm?

MR. WARD:  I believe that to be the case.

THE COURT:  Is that right?  Hold on one second, please.  This is what we just had on the screen?

MR. WARD:  It's a related but separate document.

MR. PEPE:  We do maintain the objection on relevance grounds, Your Honor.

MR. WARD:  And, Your Honor, the part I'm going to ask about the first -- the top e-mail, second paragraph, that begins "We want Caudill."

THE COURT:  Let me see counsel for a minute, Mr. Pepe.  Mr. Resser, you too, please.

(At sidebar off the record.)

THE COURT:  Ladies and Gentlemen, I sustained the objection.

Q    (By Mr. Ward) Mr. Grondahl, with respect to the pursuit --

you heard the testimony earlier today from Mr. Rechen with respect to M&E's efforts of trying to obtain third-party discovery related to research and development; correct?

A   I did hear him, yes.

Q   And one of the reasons that the McCarter team decided not to pursue that discovery was because you determined that it would be expensive; right?

A   Well, that's not what the determination was.  I think I know what you're referring to in my deposition.  I said it would be expensive to do that, and it would.  But that wasn't the primary reason we didn't go after it, and I said that in my deposition.

Q   It was one of the factors you considered in not pursuing --

A   I don't think that's right at all.  I know in my deposition I said it would be expensive, and it would be expensive.  But I listed the reasons.  I was probably asked three or four times the reasons, and expense was not mentioned those other three or four times.

Q   Right.  Because McCarter & English was paid -- or McCarter & English billed nearly $7 million worth of legal fees in the Kentucky litigation; right?

        MR. PEPE:  Objection, Your Honor.

        THE COURT:  Well, he can answer that.

        THE WITNESS:  Yes.

Q   (By Mr. Ward) And so the expense to the client was one of

the reasons still that you didn't pursue that third-party discovery?

A   I'll stand by my prior answer.

Q   That's not really what you said in your deposition, is it?

A   As I said, I acknowledged that I said in my deposition it would be expensive.  And my recollection is I was asked, Is that the reason?  And I said, no, there were other reasons, and I listed them.

MR. WARD:  I'm sorry, Your Honor.  I'm just mindful of the Court's comments.

THE COURT:  Sure.  Take your time.  I know you have to adjust.  Take your time.

Q   (By Mr. Ward) And so there -- Mr. Wingate in this case was Caudill Seed's damages expert; correct?

A   That is correct.

Q   And you were aware that he wasn't relying on the backup information for the figures in the tax returns and financial statements in regards to the research and development; correct?

A   Uh, again, I don't believe that's correct.  He did have -- as I said, he also had the subledgers.  That's how we got them.  He also had the backup documents on his Exhibit 2, which was his additional research and development.  So he had the same backup -- same backup that we had.  Wasn't complete for every entry in the taxes certainly, but it was for some of them.

Q   And we saw in your -- in the clips played earlier that

backup was not the complete set of documents; correct?

A   It was the complete set of documents that they gave us.  It did not verify every entry on all of the tax returns.

Q   And you knew for about four and a half years that Mr. Wingate was relying on an incomplete set of information?

A   Yes.

Q   And in the course of those four and a half years, the Court kept allowing Mr. Wingate to express his opinions, and ultimately he did so at trial; correct?

A   Um, well, I think, as Mr. Rechen testified, we did file a motion in limine to exclude his testimony on those and other grounds.  Um, Judge Simpson denied that at the time, which I want to say that was in probably 2015, but I'd have to see it to get the exact date.  But he denied that motion in limine with leave to refile when we approached trial.  So we filed that as we approached trial, and he ruled on that very shortly before trial.

Q   And so -- but the motion in limine was denied; right?

A   It was denied ultimately shortly before trial.

Q   And Mr. Wingate came in; right?

A   He testified, yes.

Q   And you had previously in 2015 moved for a summary judgment in part with respect to damages issues, and that motion was denied also; right?

A   Yes, that's correct.

Q   And so over the course of this four years, M&E never pivoted and thought, Well, what if the damages gets sustained? Maybe we should have an alternate plan?

A   Oh, well, that's a loaded question.  First of all, um, I'd have to go back to the state case.  In the state case with Mr. Ashurst --

Q   Excuse me, sir.  The question was, you guys never pivoted to an alternate strategy?

A   We never did, and Mr. Rogovin never wanted us to.

Q   And so you thought putting all of your eggs in the basket of the plaintiff not proving their case, that you were just waiting on someone else to fail.  You thought that that was a prudent and solitary strategy?

        MR. PEPE:  Objection.

        THE COURT:  Sustained.

Q   (By Mr. Ward) Okay.  If we look at PTX 134, which is in evidence, Your Honor.

        THE COURT:  Okay.

Q   (By Mr. Ward) And, Mr. Grondahl, I'll call your attention to the third full paragraph.  And there's a sentence that the start of that paragraph refers in part that it says in the second line, "We might have to accept an adverse verdict."

        An adverse verdict would be -- mean some level of liability in damages against Jarrow Formulas; correct?

A   Some level, yes.

Q    And by not pursuing the third-party research and development costs, you had no evidence to be able to put on or mitigate what that adverse verdict would be.

A    We didn't want to try to put on our alternative damages number, and neither did Mr. Rogovin.  He wanted us to win the case so that he could get his attorney's fees.

Q    Well, this sentence talks about how M&E thought about the possibility of an adverse verdict as the case moved along.  So Mr. Rogovin's desire for a complete victory was different than the reality that McCarter & English was evaluating an adverse verdict; correct?

A    Well, that's -- what this says was that Mr. Rogovin was informed and knew that we might get an adverse verdict at trial and would have to win the case on appeal given, first of all, the horrible facts that had been discussed, the horrible narrative, that we might have to get a ruling from the Sixth Circuit rather than win at trial.  That was a possibility, and Mr. Rogovin was informed of that.

Q    If we go a little further down in this e-mail to the paragraph that starts with "To answer your question" --

A    I don't have that on my screen.

Q    Yeah, we're going to pull it up.  Oh, okay, my copy's a bit different.

And about halfway down where it says, "If we" -- in the middle of that paragraph, "If we had actual backup figures,

these strategies might have worked."

A    Yes.

Q    And some of those backup figures would have came from Mr. Lyons; is that correct?

A    Um, they might have.  Um, might have.

Q    So in early 2019 you'll agree with me that the trial date -- I'm sorry.  Withdrawn.

In early 2019 you'll agree with me that the trial date is drawing closer; correct?

A    Yes.  If trial was in June, so it's drawing closer in early 2019.

Q    And McCarter & English had less and less time for Mr. Rogovin at that point?

MR. PEPE:  Objection, relevance, Your Honor.

THE COURT:  Well, no, that's allowed.

THE WITNESS:  I disagree with that.  We were in virtually constant communication with Mr. Rogovin, one of us.  Almost every day one of us would speak to him.

MR. WARD:  Let's take a look at Defendant's Exhibit 581, which I believe is admitted, Your Honor.  It is admitted, Your Honor.

THE COURT:  Okay.

Q    (By Mr. Ward) Is that on your screen, Mr. Grondahl?

A    It is.

Q    Okay.  And in the bottom e-mail from you, you write,

"Jarrow no doubt" -- I'm sorry.  "Jarrow no doubt wants to rebut Caudill's tax forms with whatever Kean remembers was spent to show that Caudill was committing fraud."

I read that right; correct?

A   You read it correctly.

Q   And then you said, obviously, this is a huge waste of time and it will -- and will be a distraction for you when you have a limited amount of time with Jarrow.

A   Yes.

Q   In this e-mail you're describing there being limited time with Jarrow in early 2019; correct?

A   Well, that was Mr. Giarratana was flying out to California to meet with Mr. Rogovin and had a limited amount of time in California to meet face to face with Mr. Rogovin.

Q   Right.  And so, in fact, if we look at that top e-mail, Mr. Giarratana responds, "Oh geez.  That's the last thing I want to fly to California to do.  The R&D is one of Jarrow's pet issues."

So -- but the pet issue that's referred to here ended up being a major issue in the case; correct?

A   No.  The pet issue that's being referred to here, as I recall, was that Mr. Rogovin wanted us to try to prove that Caudill Seed had committed tax fraud to undermine the credibility.  And trying to prove that they had committed tax fraud, if the Court would even allow it, would have been a

difficult thing to do in the context of that trial.

Q   Well, damages became such a major issue in the case that Mr. Rechen closed -- it was the first thing that Mr. Rechen talked about in his closing statement to the Kentucky jury; right?

A   Yup, correct, because of the cross-examination of Wingate had gone so well.

Q   With respect to Mr. Rogovin testifying at trial, the M&E team was generally responsible for those preparation efforts; correct?

A   I'm sorry.  I don't understand the question.

Q   Sure.  It was one of the responsibilities of the M&E team to prepare Mr. Rogovin for trial; right?

A   Uh, yes.

Q   Okay.

A   To try to, yes.

Q   But Celeste O'Keefe, who was a jury consultant that M&E had hired, was not involved in working with Jarrow Rogovin to prepare him to testify at trial; right?

A   I don't know about that.  I really was not much involved in any of the preparation work with Mr. Rogovin.  I was involved with Mr. Ashurst.

Q   Let's take a look at your deposition, page 117, lines 15 through 18.

A   117?  I'm sorry.

THE COURT: 117, lines 15 through 18.

THE WITNESS: Okay.

(Plays video.)

Q (By Mr. Ward) Mr. Grondahl, did you have any face-to-face meetings with Mr. Rogovin to prepare him for trial -- to testify at trial?

A Mm, not that I recall, no.

Q There's been testimony -- it may have been on a day, I acknowledge, that you were not here.

THE COURT: I'm sorry. Can I see counsel for a second, please?

(At sidebar off the record.)

THE COURT: Go ahead, Mr. Ward. Next question.

Q (By Mr. Ward) On -- during the trial on June 13th, which was a Thursday, do you recall a meeting among the lawyers and some of the clients in the Stites -- in the Stites office in Kentucky to discuss the issue of Mr. Rogovin testifying at trial?

A I do.

Q Okay. And Mr. Rogovin was not in that meeting; correct?

A He was not in the meeting, no.

Q And, indeed, Mr. Rogovin never testified at the Kentucky trial; correct?

A Well, his deposition testimony was played.

Q He was never presented as a witness at the trial?

A    He was presented as a witness.  He didn't testify live.

Q    And the clips that were played were in his deposition taken by Caudill's counsel; correct?

A    That's often how these things happen.  I think it happened in this case.

Q    So Mr. Rogovin's attorneys never questioned him in the Kentucky case; correct?

A    Never questioned him in the Kentucky case.  There were no questions as I recall in his deposition, and he did not testify live at the trial.  That's -- so ...

        MR. WARD:  Thank you, Mr. Grondahl.  No further questions.

        THE COURT:  All right.  Is there cross?  Go ahead, Mr. Pepe.  I believe Mr. Grondahl was cross-listed; is that right?

        MR. PEPE:  Yes.

        THE COURT:  By both sides?

        MR. PEPE:  All at once, Your Honor; right?

        THE COURT:  Yes, right.  So we'll have both the cross but also a direct that McCarter will put on.  Go ahead, Mr. Pepe.

        MR. PEPE:  Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. PEPE:

Q    So, Mr. Grondahl, you had a life as an engineer before you became a lawyer.

A    I did.  I graduated in 1981 from Tufts University with a bachelor degree in chemical engineering.  Then I went to work for a little over nine years as an engineer in the nuclear power industry, Combustion Engineering here in Connecticut and then what used to be Northeast Utilities at the Millstone and Connecticut Yankee facilities.

Q    And when did you decide to take a different turn in your professional life?

A    Towards the end of that.  After about six years, I decided I wanted to go to law school.  I had always been interested in it, so I went to law school at night at the University of Connecticut School of Law and graduated from there with high honors in 1991.

Q    And did you then go to work in private practice as a lawyer or --

A    I did.  I actually started working for a law firm during my last semester of law school, and that was the firm I first worked at Murtha, Cullina, Richter & Pinney in Hartford.  And I worked in their business and commercial litigation section.

Q    Okay.  And for how long and then what happened?

A    I was at, um -- I was there for almost five years.  Then I went to Cummings & Lockwood, which that would have happened in about 1995.  After almost two years at Cummings & Lockwood, I took a little bit of a turn.  I wanted to try something else, and I went and worked for what was Yankee Energy Services

Company.  It was a subsidiary of Yankee Gas.  I worked as in-house counsel and then had some executive positions as well. After --

Q   Let me interrupt you there.  Were you both -- in that position both worked as a lawyer in-house counsel and in a management position?

A   Yes.  I worked as an in-house counsel.  They moved me around a little bit, but basically I was vice president and general manager of one of the operating units of that business, which did commercial heating, ventilation, and air conditioning installations.  And then I was moved to vice president of administration which covered legal, accounting, and HR.

Q   Okay.  And did you stay there or decide to come back to the law?

A   No.  I decided to come back to private practice and went back to Cummings & Lockwood.  I believe it was in late '97, possibly early '98.

Q   In that position and in your previous -- I know there was a gap between the previous law firm and Cummings.  Did you concentrate your practice in any particular area of the law?

A   Up to that point it had been business, commercial and business litigation.

Q   And when you came back to Cummings & Lockwood from the -- your position in the -- in industry, did you then change your focus in terms of the area of law in which you would practice?

A   I did.  While I was away, um, at YESCO, Attorney Giarratana had joined the firm, had joined Cummings & Lockwood with a partner of his.  I -- when I was first there, there was no intellectual property practice at Cummings & Lockwood.  When I came back, Mr. Giarratana had some litigations, including a litigation for Jarrow Formulas.

And given my background, he needed some assistance.  I was still an associate at the time.  He needed some assistance with the litigation.  And given my background, I was asked, "Hey, would you mind helping Attorney Giarratana with this patent case?"  And I said "Sure" and worked on it with him.

Q   Your background being the chemical engineering degree.

A   Yes.

Q   Which you also pursued in industry.

A   Yes.

Q   So did you continue to work with Mr. Giarratana in his intellectual property practice after that?

A   Uh, for the next 22 years I think it was, yes.

Q   Okay.  And I think you said the case -- first case you worked on when you came back was for Jarrow Formulas.  Did I hear you say that?

A   The first intellectual property case I worked on.  They had to keep me busy.  They had me on some other cases.

Q   And did you -- as you continued working in conjunction with and side by side with Mr. Giarratana, did you have opportunity

to work on more Jarrow Formula cases?

A   Yes.  Eventually in 2000 I took the patent bar, the patent bar exam, so I could begin prosecuting patents at the Patent and Trademark Office.  I hadn't been interested in patent law before; but once I started working on it with Attorney Giarratana, I got very interested in it, took the patent bar. And from about 2000 forward, my practice was focused entirely on intellectual property law, particularly patents, prosecuting patents and patent litigation and trade secrets, trademarks, those things too.

Q   Did you -- did you take that engineering background, your patent bar admission, and your concentration in intellectual property law, did you take all of that and apply it to the cases you worked for when you were representing Jarrow Formulas?

A   Absolutely.  Jarrow Formulas, I think you've heard, is a nutritional supplement company.  And I would work on their patents for them because their patents involved a lot of chemistry or processes that a chemical engineer would be familiar with.  So I worked on patents for them and patent litigations and then some other general intellectual property counsel.

        And during those years of -- I think you said over 20 working with Cummings & Lockwood and Mark Giarratana and Jarrow Formulas, did you come to know and work with the principals and

executives at Jarrow Formulas?

A    Yes, worked very closely with them.

Q    Yeah.  Which ones?

A    Mr. Rogovin, of course.  I worked with him frequently, worked with Clay DuBose, Rory Lipsky.  There were others, people who had left Jarrow Formulas weren't there recently, but there were a number that I worked with.

Q    Okay.  And you came to know Mr. Rogovin well.  Is that a fair statement?

A    That's a fair statement.  Very well.

Q    How about now coming forward in that relationship up to the 2011 and the state court action brought about -- brought by Caudill Seed against Kean Ashurst?  Do you have that in mind?

A    I do.

Q    Okay.  And there's been testimony about that.  And I think the testimony was that you were involved in that case in state court.

A    Yes, I was heavily involved in that case.  In fact, Mr. Giarratana did a lot of the early work in the case; but as the case went along, he became busy with some other matters.  And I took more or less the laboring oar in that case, in the state case.

Q    And there was testimony that in that case where Caudill Seed was suing Kean Ashurst for breach of his agreements, his non-disclosure and non-compete agreements, that you ultimately

were successful.  Was that accurate testimony?

A   Uh, yes, ultimately we were successful.  The case was dismissed with prejudice.  That was probably about three years -- three years after it was filed.

Q   Okay.  And there was testimony also that while that state court case was pending against Kean Ashurst, Caudill Seed brought a separate lawsuit in federal court, Louisville, Kentucky, so that they overlapped to some extent.

A   Yes, they did.  They overlapped by about a year.

Q   Okay.  So here you are working on the state court case, and the federal court action is instituted.  Did you devote any of your energies and efforts to the federal court action while you were still working in the state court action?

A   Yes, yes.  I became involved almost immediately.  We looked at the complaint that was filed and recognized that we had a very good chance to get at least some of the claims that were in that complaint dismissed.  So we immediately began working.  And I worked along with Attorney Giarratana and some others on filing the necessary papers to get as many of those claims dismissed before anything was done as we could.

Q   All right.  Tell us, just by way of summary and overview, you continued -- question withdrawn.

Did you continue to work in the federal court action brought by Caudill Seed after you had gotten the state court action dismissed?

A   Yes.  I continued to work very heavily on the federal court case right up until and through trial.

Q   And were you, in fact, involved in the trial itself?

A   Yes, I was.

Q   In between June 3 and June 26 of 2019.

A   Yes.

THE COURT:  Mr. Pepe, I'm going to interrupt you there.

Ladies and Gentlemen, we've reached our lunch break.  Thank you for your attention this morning.  Don't discuss the case.  Don't let anyone discuss it with you.  Please keep an open mind.  We'll see you back in the courtroom around 1:30.  Thank you.

(The jury left the courtroom at 12:45 p.m.)

THE COURT:  All right, folks, take your seats.  One or two housekeeping issues.  First of all, so at the last sidebar or maybe two sidebars ago, I discussed with counsel the state of mind issue, the issue related to whether or not Jarrow had willfully and maliciously refused to pay the invoices and how -- to what extent that was expected with the voluminous evidence we've had about the damages issues in this case.

I'll be frank with you, and I told counsel this.  I think it's connected just a little bit.  And I would have sustained many objections to much of that evidence.  I felt like, given that Mr. Pepe went into it in detail with Mr.

Rechen, I had to allow Mr. Resser to go into it in fairness. But I don't have to do that with every witness, and I'm not going to, because it's a waste of time at this point. Really, it is a waste of time.

I get that JFI wanted it as part of the malpractice case. It's not part of the malpractice for reasons we've discussed. So at this point, you're on notice. I do not consider that -- unless it's tied specifically to the reasons that Mr. Rogovin refused to pay, it's not relevant. That's my ruling, period.

Now, there's another matter we need to discuss on the record with the court reporter over at sidebar. Is there anything else before we do that?

MR. PEPE: Nothing from plaintiff, Your Honor.

THE COURT: Mr. Resser?

MR. RESSER: No.

THE COURT: Okay. So let us do that. You folks can stay; otherwise, we're in recess, but I do need to have Mr. Resser and -- and, Mr. Ward, if you would like to come too, you can too.

(At sidebar on the record:)

THE COURT: So now everybody's gone. But all right. We're on the record. So I wanted to put the conversation that I had had regarding an offer of proof that the JFI team made this morning about testimony from Mr. Grondahl.

It was my understanding from the offer of proof that -- counsel can correct me if I'm wrong -- that in the Kentucky trial in 2019 there was a time in the middle of the trial during the evening after the court day ended that Mr. Grondahl went to either a restaurant or a bar, became intoxicated, and there was apparently a discussion, conversation, even altercation perhaps between Mr. Grondahl and Mr. Rogovin at that time.

Furthermore, Mr. Grondahl apparently either that evening -- or it was my understanding that evening fell on the ground and had to go to the emergency room. And thereafter, he was absent from court for -- apparently there was a day when there was no court, but there was apparently two or three days when trial was going on when he was absent. And counsel represented this was because of the appearance of his face, and folks didn't want the jury to see that.

So what I -- first of all, do I have that narrative correct?

MR. PEPE: Yes, I can -- pretty much, Your Honor. The night in question was Saturday, June 17. The incident occurred at a restaurant or a bar. And Mr. Grondahl did fall on his walk back to the hotel. And the next court day, Monday, there was no court. And -- but he was working in the office on Sunday, Monday and Tuesday and Wednesday.

THE COURT: Mr. Ward, Mr. Resser, do you want to add

to what I said or what Mr. Pepe said?

MR. RESSER:  I would only add that Mr. Rogovin had had this confrontation with him before the fall.  It's my understanding he fell twice and that he wasn't in court on Tuesday or Wednesday because of how his face looked.  And when he went back to court, he was wearing makeup to cover his injuries.

THE COURT:  Thank you.  All right.  So what I ruled was, in terms of whether I would allow -- I believe it was Mr. Ward to get into this on examination of Mr. Grondahl was that he could elicit questions showing that Mr. Grondahl was not in court on Tuesday or Wednesday or Thursday, whichever it was, but that we would not have evidence as to the intoxication, the discussion, because of what my understanding was that it pertained to and/or the fall or the emergency room or the reasons that he was not in court.  So that was my ruling.

MR. RESSER:  And that included the discussions with Mr. Rogovin that was confrontational?

THE COURT:  It was.  My understanding, though, was that that discussion -- well, why don't you tell me again what that discussion pertained to.

MR. RESSER:  Yeah.  Mr. Rogovin was attempting to get some time with Mr. Grondahl to discuss things he wanted addressed during the trial in the coming week.  And Mr. Grondahl objected to having any discussion with Mr. Rogovin at

that time.

And Mr. Rogovin -- the offer of proof is Mr. Rogovin's position is that he was -- that Mr. Grondahl put hands on him and that he felt assaulted by that and -- and that these discussions did go to some of the reasons why he did not feel that McCarter & English had done an adequate job leading to his decision not to pay.

THE COURT: Well, okay, I don't believe that last part was included when we discussed it this morning, but that's fine if that's your position. I would say that I -- from what I could see, there's been zero evidence presented that the altercation between Mr. Grondahl and Mr. Rogovin had anything to do with Mr. Rogovin's reasons for not paying. Mr. Rogovin has already testified in the billing case and has explained at some length his reasons for not paying. He did not mention that. It's not part of the evidence, and so I'm not going to allow it. All right.

MR. RESSER: Thank you, Your Honor.

THE COURT: Very well. We'll go to lunch.

(Recess from 12:53 p.m. to 1:27 p.m.)

(The jury entered the courtroom at 1:28 p.m.)

THE COURT: Ladies and Gentlemen, before we start, or restart, I should tell you that on Wednesday we'll have a late start. You will not need to be in the jury room until 10:45 a.m. We will start the evidence at 11:00 a.m. on Wednesday.

It's because of something I couldn't avoid.  It's not the lawyers' fault.  It's my fault.

But we will then have the regular day.  You won't stay later on anything like that.  You'll leave at 3:30.  I'll figure out the breaks later.  We might change the breaks a little bit.  We'll go from 11:00 a.m. to 3:30.  But you should be in the jury room at 10:45.  I don't think that's going to affect our ability to finish on time.  Okay?

Mr. Ward, are you ready to continue?

MR. PEPE:  I think --

THE COURT:  Mr. Pepe, my bad.  My bad.  Mr. Pepe, go ahead.

MR. PEPE:  Thank you, Your Honor.

Q   (By Mr. Pepe) Mr. Grondahl, you testified that you were involved in the trial throughout beginning to end in Kentucky in June of 2019; correct?

A   Yes, that's correct.

Q   I want to now direct your attention to the night of Thursday, June 13, 2019.

A   Yes.

Q   The evidence indicates the day before, Caudill Seed rested its case.

A   Yes.

Q   Do you have that in mind?

A   I do.

Q    There was testimony here from Mr. Rechen last week about two meetings on that evening of Thursday, June 13.  Were you in the courtroom when he was testifying?

A    I was not.  I had left to get back home for the weekend.

Q    Okay.  Testimony was there was a meeting in the large conference room at the offices of Stites & Harbison, Mr. Beres' law firm.  I think he said on the second floor.  And then there was a second meeting in an adjoining smaller conference room.  My question to you is:  Were you present at either of those meetings?

A    I was present at the meeting in the larger conference room.  I was not present at the meeting in the smaller conference room.

Q    I want to direct your attention now to that meeting in the large conference room.  Is the date and time I stated consistent with your memory, that is, Thursday, June 17, evening?

A    Yes, yes.

Q    Tell us first who you remember was -- question withdrawn.

         If I said June 17, I stand corrected.  Thursday, June 13.

         We have a demonstrative that has been used before that Mr. Rechen testified to illustrated the participants in that meeting.  I'm going to ask Mr. Wyzik to call that up, please.  That would be this one.

I still don't have the right one.  I'm sorry.  Take that down, Mr. Wyzik.

Who was present at that meeting, sir, as best you recollect?

A   In addition to myself, there was Tom Rechen, Mark Giarratana, Joel Beres, Jonathan Leventhal, Cortland Joyce, Jimmy Thompson, Celeste O'Keefe, Clay DuBose, and Rory Lipsky.

Q   You were familiar with Mr. DuBose and Mr. Lipsky?

A   Yes, very much so.

Q   And you knew Mr. Thompson and Celeste O'Keefe?

A   Yes.  We had been working with them on the trial for, by that time, probably three or four weeks.

Q   And, of course, you knew Jarrow Rogovin.

A   Yes.  Jarrow Rogovin was not in the big conference room.

Q   I understand.  I understand.

But why were Mr. DuBose and Mr. Lipsky at that meeting?

A   They were there -- they were going to testify.  My recollection is Rory Lipsky may have testified that day.  We were preparing him to testify in our case, but Caudill Seed ended up calling Mr. Lipsky in their case.  Mr. DuBose was there because we thought we might be starting our case-in-chief late that week, ended up starting the following week.  So he was there getting prepared because we thought we might need to

call him either that Thursday or Friday.

Q   Tell us what happened at that meeting.

A   Um, Mr. Rechen came into the room and said he wanted to put something on the table for everybody to discuss.  Um, and it had to do with whether or not we were going to call Jarrow Rogovin live at trial.  He pointed out that we had, you know -- most of us had looked at the deposition excerpts that were going to be played.  And he said he wanted to go around the table and get everybody's view on what they thought about the idea of not calling him live at trial.

Q   Did he, in fact -- "he," Mr. Rechen -- go around the table and solicit everyone's view?

A   Yes, he did.  I'm not -- Jimmy Thompson and Cortland Joyce, I don't recall whether they expressed a view, but everyone else certainly did.

Q   You said -- now we have the right graphic.  Mr. Thompson you're not sure expressed his opinion?

A   I'm not sure.  He might have.  I just don't recall.

Q   Please continue.  Tell us what happened when Mr. Rechen went around the table.

A   As he went around the table, each person gave their views of the pros and cons of the decision not to call Mr. Rogovin live, you know, what they thought were the problems if we did call him live and what the problems were if we didn't call him live.  And each person expressed their views and so everybody

could hear, you know, what everybody thought were the pros and cons of this decision.

Q    And did Mr. Rechen -- did you express your opinion?

A    Oh, absolutely I did.

Q    And what was it?

A    My opinion was that by that time I had -- I had watched the entirety of what would be played at trial.  I felt that we had, in the deposition designations that I had worked on actually with opposing counsel, that we had gotten some key facts that we needed to get in the case.  They were in there in the deposition transcript.  First of all, that the customer list, which Caudill claimed as a trade secret, was a do-not-call list and, in fact, nobody had been called on that list or solicited on that list.  That was a key fact that came in in that deposition testimony.

The other key fact that came in through that deposition testimony was Mr. Rogovin stating that he instructed Kean Ashurst not to use anything that he got from Caudill Seed, anything that was proprietary to Caudill Seed, which confirmed Mr. Ashurst's testimony that that had occurred.  We thought that was a key fact as well because it showed that Jarrow Formulas didn't want to use any trade secrets of Caudill Seed. And so those two key facts were in.

I thought that there were excerpts from his deposition that Caudill Seed chose not to play for some reason.  We were

very concerned -- I was certainly very concerned -- about some of the excerpts that might have been played that were not played or not designated by Caudill Seed; and I was concerned if Mr. Rogovin testified live, we were going to start seeing some of those excerpts in his live testimony and he was going to have to deal with them.

There was other correspondence that I thought showed Mr. Rogovin in a poor light, particularly some e-mails that were sent to opposing counsel. And I was concerned that if he testified, he was going to have to explain those.

And I also knew about the jury questionnaires and what had been done with the mock jury and what their views were, which gave me concern.

Mr. Rogovin, frankly, he wasn't -- he wasn't feeling well. He wasn't sleeping. So I was also just concerned about his state generally, whether he would hold up, because I felt it was going to be a withering cross-examination if he took the stand.

So, on balance, my own opinion was we should go with the deposition testimony rather than live.

Q   Did you express that opinion?

A   Yes, I did.

Q   Do you recall any particular comments from others at that meeting regarding whether or not to call Mr. Rogovin live or have him testify by deposition, if you remember?

A   I -- I mean I think my recollection is generally as we went around the table, people -- and I don't know if I went first, by the way.  I don't remember the order.  But I think pretty much everybody went around the table, expressed similar views.  Some maybe didn't include the mock jury because they hadn't seen it, but they expressed -- it was similar views overall around the table.

Q   Mr. Rechen, when you weren't here, testified as to the pros and cons that were discussed.  We have a demonstrative on that.

Do you have that on your screen, sir?

A   I do.

Q   Take a moment to look at that.

Can you tell us whether, as you observed it, as you heard it, those topics at one point or another in one form or another were discussed in this meeting you just described?

A   Yes.  Obviously, not everybody discussed every factor, but all of these factors came up at one point or another.

Q   Did Mr. Rechen express his opinion at this meeting?

A   Um, I know we spoke at the beginning.  He did express his opinion.  I had not remembered whether it was at the beginning or the end, but I think it may have been at the end.

Q   And when he spoke, did he bully anyone at that meeting?

A   Absolutely not, no.

Q   Did he give everyone a full and fair opportunity to be heard on their opinion?

A    Yes.

Q    Was anyone at any point in time in that meeting shut down?

A    No.

Q    Meaning their voice was not to be heard?

A    No.

Q    You're sure about that?

A    I'm certain about that.  Everybody got to state what they thought.  And when they were finished speaking, we went to the next person.

Q    Do you remember Mr. Lipsky saying anything in particular?  Mr. Lipsky being the president of JII.

A    Yes, I remember specifically, because we were obviously concerned about what they thought.  But I do remember specifically him saying that "We can't let Jarrow take the stand.  He's in no condition for it."

Q    At the end of that meeting, was a consensus reached on whether to use Mr. Rogovin's deposition in lieu of his testimony or to call him live?  Was a consensus reached?

A    Yes.  It was unanimous that we should not call him live and we should rely on the deposition testimony.

Q    No one at that meeting disagreed.

A    Nobody disagreed.

Q    How about Joel Beres, the local counsel subsequently hired by JFI when you were terminated?

A    He was in agreement with that, with that conclusion.

Q    No question in your mind about that?

A    None.

Q    What happened at the end of the meeting?

A    At the end of the meeting, Mr. Rechen and Mr. Giarratana said, "Okay, we're going to have to go talk to Jarrow. We need to see if he's okay with this." And they left and went to the other conference room where Mr. Rogovin was working with Danny O'Keefe to prepare for potentially testifying.

Q    Did you go into that room at all?

A    I did not.

Q    Meaning the adjoining conference room.

A    No, I did not.

Q    Did -- subsequent to that meeting where Mr. Rechen and Mr. Giarratana left the big meeting and went into the small meeting, small conference room, after that, did you ever discuss with Mr. Rechen and Mr. Giarratana what happened in that meeting and what Mr. Rogovin's response was?

A    I -- I did.

Q    And what was it?

A    They told me he said that he was fine with it, that he was okay not testifying live.

          MR. PEPE:  No further questions, Your Honor.

          THE COURT:  All right.  Mr. Ward.

          MR. WARD:  A few brief ones, Your Honor.

          THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. WARD

Q   Mr. Grondahl, with respect to your testimony on the meeting, I'll refer to it as, is that in your mind?

A   Yes.

Q   At that meeting, did any conversations occur amongst the group about conversations Mr. Rogovin had with Tony Talalay where Mr. Rogovin expressed an idea of a broccoli supplement, not Dan Caudill?

A   I don't remember anybody talking about Tony Talalay.  That would have been far afield of what we were talking about.

Q   Okay.  And in the pros column, was there any discussion at the meeting about Mr. Rechen's promising the jury three times that Mr. Rogovin would testify at the trial live?

A   Well, I disagree that he promised the jury Mr. Rogovin would testify live, first of all.  He pointed out that Mr. Rogovin was there and Caudill Seed could have called him and they would hear from Mr. Rogovin, which they did.

I don't have a specific recollection of somebody saying that.  Certainly all the lawyers in the room at the opening statement knew what was in the opening statement, including Mr. Leventhal.  So there were multiple people that knew about it.  I just can't place whether it came up.

Q   The subject of Mr. Rechen's opening was not discussed in that meeting?

A    I didn't say that.  I said I don't recall whether it came up.

Q    Do you recall any conversations with -- that you had with Mr. Leventhal where he said that Jarrow is the client and if he wants -- I'm sorry -- Mr. Rogovin is the client, and if he wants to testify, he should?

A    I don't recall a conversation like that that I had with Mr. Leventhal.

Q    If we look at Defendant's Exhibit 709 -- I'm not sure whether this has been admitted already.

          THE COURT:  Let me take a look at it.

          709 can be admitted as a full exhibit.

          Next time wait until I say that, please.  Okay?

     (Defendant's Exhibit 709, received in evidence.)

Q    (By Mr. Ward) Mr. Grondahl, is Defendant's Exhibit 709 in front of you?

A    Yes.

Q    And this is an invoice for McCarter & English services dated October 15, 2013; correct?

A    That's what it looks like, yes.

Q    If we flip to printed page 19 in the top right corner -- I'm sorry.  If we go back to the front, front page.

          In the matter number section, this refers to the Kean Ashurst litigation?

A    Yes.

Q   Thank you.  And if we flip to page 9, your billing rate still in October of 2013 --

THE COURT:  You mean page 19?  Are you asking about his rate?

MR. WARD:  Yes, page 19.  Oh, thank you, Your Honor.

Q   (By Mr. Ward) On page 19 this reflects your hourly rate at $395 in the Ashurst litigation, at least as of October 15th, 2013; is that correct?

A   That's what it says, yes.

MR. WARD:  No further questions.

THE COURT:  Okay.  Mr. Pepe, anything, sir?

MR. PEPE:  No, Your Honor.  Thank you.

THE COURT:  All right, sir, you may step down.

THE WITNESS:  Should I leave this here, Your Honor?

THE COURT:  You can take it with you.

THE WITNESS:  Oh, boy.

THE COURT:  Or just leave it with whoever gave it to you.

All right, Mr. Resser.

MR. RESSER:  Yes, Your Honor.  We request that Mr. Giarratana take the stand.

THE COURT:  All right.  Mr. Giarratana.

All right.  So, Ladies and Gentlemen, the witness remains under oath.  I'm not going to have him sworn in again. He was sworn in earlier.  You know that he remains under oath.

You can have a seat.

Mr. Resser, you can proceed.

MR. RESSER:  Yes, Your Honor.  Thank you.


M A R K   G I A R R A T A N A,

resumed the stand and testified under oath as follows:

DIRECT EXAMINATION

BY MR. RESSER:

Q   Good afternoon, Mr. Giarratana.

A   Good afternoon.

Q   Now, with respect to the meetings with Mr. Rogovin to run through his anticipated testimony at trial, do you have that subject in mind?

A   I do.

Q   Sir, you don't know or recall if a former sit-down preparation session like the ones you had before April of 2019 took place after March 2019 with any of the lawyers at McCarter & English?

A   After March of 2019?

Q   Yes.

A   I believe in my deposition I did not recall at that time, but I have since refreshed my recollection.  And it's my understanding that on the Friday just before trial, Attorney Rechen met with Mr. Rogovin.  I was not present during that preparation session, and that's why I did not recall it during

my deposition.

MR. RESSER:  Your Honor, I would still like to play what he said at his deposition, which begins at page 73, line 18, through line [sic] 75, line 17.

THE COURT:  That's fine.

THE WITNESS:  Could I have a copy of my transcript, please?

MR. RESSER:  May I approach?

THE COURT:  You may.

THE WITNESS:  Thank you.  I'm sorry.  The page?

THE COURT:  73, line 18, through 75, line -- Mr. Resser?

MR. RESSER:  75, line 17.

THE COURT:  Okay.  Let's proceed.

(Plays video.)

Q   (By Mr. Resser) And I think the testimony, Mr. Giarratana, that we've heard is that Mr. Leventhal was given a book to help prepare Mr. Rogovin?  Do you know if Mr. Leventhal actually started going through the anticipated testimony with Mr. Rogovin before they got to Kentucky?

A   So Mr. Leventhal's task --

Q   Yes-or-no question.  Do you know?

A   Well, then the answer's -- well, the answer's no.

Q   And after the end of March 2019, you now, having refreshed your recollection, understand that there was a meeting with one

of the jury consultants and Mr. Rechen with Mr. Rogovin to run through his testimony. Is that your understanding?

A   My understanding is there was such a meeting. It was a half-day meeting. It was the Friday before the start of trial.

Q   So other than that, no one from McCarter & English ran through the testimony with Mr. Rogovin before Mr. Rechen's opening statement to the jury; is that correct?

A   That's not correct. We had numerous meetings with Mr. Rogovin.

Q   No. In that period after March and before the opening statement -- I'm just focused on that. The only meeting at which anyone from McCarter & English met with Mr. Rogovin to run through his testimony was what you refer to as a half-day meeting with one of the jury consultants and Mr. Rechen; is that right?

A   My recollection is that --

Q   Yes-or-no question, sir.

A   My recollection --

Q   It's a yes-or-no question.

A   Would be April. I'm sorry. You'll have to restate the question to me if I'm to try to answer it that way.

Q   Mr. Giarratana, after March of 2019 and up until the moment Mr. Rechen represented to the jury that Mr. Rogovin would testify at trial, other than that one meeting that Mr. Rechen

testified about, which you didn't remember at the time of your deposition, other than that one meeting, that half-day meeting, no one from McCarter & English met with Mr. Rechen -- met with Mr. Rogovin to run through his testimony; correct?

A   I thought we met with him in April when we were down for the Joe Lyons' deposition.

MR. RESSER:  Your Honor, I'd like to play for the jury beginning at page 106, line 15, through 107, line 22, please.

THE COURT:  All right.  Let's go ahead and play it.

(Plays video.)

Q   (By Mr. Resser) And that decision was made after the opening statement though; correct?

A   Yes.

Q   And so there was no sit-down with him between the end of March and the opening statement other than that one time that Mr. Rechen testified to that you didn't remember during your deposition; correct?

A   No, not correct.

Q   Sir, isn't it true that the issue of whether Jarrow Formulas willfully and maliciously misappropriated trade secrets from Caudill Seed depended in part on Mr. Rogovin's state of mind in 2011?

A   It depended on the company's -- whether the company acted with malice or ill will, whether the company's behavior was, um, engaged in with malice or ill will.  And when I say the

"company's behavior," I'm referring to the company's alleged act of misappropriation.  So to the extent Mr. Rogovin was involved in the alleged acts of misappropriation, then, yes, his state of mind would be immaterial.  To the extent other members of the company were involved in the alleged acts of misappropriation, their state of mind would be relevant to the question as well.

Q   So the determination of willful and malicious misappropriation did depend in part on Mr. Rogovin's state of mind; correct?

A   Yeah, to the extent he was involved in alleged misappropriation, correct.

Q   Well, to what -- I mean there was testimony at trial that he was involved in the misappropriation; correct?  In Kentucky?

A   He received the alleged trade secrets from Mr. Ashurst, yes.

Q   And the determination of whether Jarrow Formulas willfully and maliciously misappropriated trade secrets from Caudill Seed depended in part on Mr. Rogovin's intentions back in 2011; correct?

A   I'm sorry.  You read that very quickly, and your words got a little bit mumbled.  Could you say it again, please?

Q   Isn't it true that the issue of whether Jarrow Formulas willfully and maliciously misappropriated trade secrets from Caudill Seed depended in part on Mr. Rogovin's intentions in

2011.

A   I think that's fair.

Q   And isn't it true that just days before the trial, Mr. Leventhal was told that Mr. Rogovin's testimony was critical?

A   You'll have to put that in context for me, if there's an e-mail or a something that I could look at.  Who said that? Who said that?

Q   Yes, Exhibit 558.

MR. RESSER:  We'll offer that, Your Honor.  It was reserved.

THE COURT:  This is a defense exhibit?

MR. RESSER:  Defense Exhibit 558, yes.

THE COURT:  Can I see it, please?

Actually, I sustained the objection to this.  558 is the offer?  Is that right?

MR. RESSER:  558?

THE COURT:  Yes.  I sustained the objection to that exhibit.

MR. RESSER:  I think I have the wrong number.

THE COURT:  558 is what you said; right?  Defendant's Exhibit 558.

MR. RESSER:  I think I have the citation wrong, Your Honor, so I'll withdraw the question.

THE COURT:  All right.

Q   (By Mr. Resser) Isn't it true, Mr. Giarratana, that Mr.

Beres was asked to tell Mr. Leventhal to tell Mr. Rogovin that he would be the first witness in the box?

A   You'll have to refresh me on that.  I don't recall the context.  I don't recall that specific statement or the context within it was made or who made it even, if it was made.

Q   Now, one of the reasons that Mr. Rogovin -- withdrawn.

One of the concerns about Mr. Rogovin testifying at trial was that the e-mails he exchanged with Attorney Steve Pence might show ill will towards Caudill and its lawyers.  Do I have that right?

A   Well, there was no exchange of e-mails.  It was a one-way transmission from Mr. Rogovin to Mr. Pence.  But, yes, those were highly problematic and of real concern to us with respect to the issue of willful and malicious behavior.

Q   Sir, don't the Pence e-mails show Mr. Rogovin's righteous indignation of being accused of being a racketeer?

A   Righteous -- I'm sorry.  Righteous --

Q   Indignation.

A   -- indignation?  I mean I don't see that as a reasonable person's interpretation of those documents as a whole.

Q   Well, Mr. Rogovin -- withdrawn.

Jarrow Formulas was accused of racketeering.  Isn't that right?

A   In the original complaint --

Q   Yes.

A    -- it was, and we got those claims dismissed.

Q    And the e-mails he wrote to Mr. Pence referred to that claim, did it not?

A    Well, it actually attached an article from -- about Pablo Guzman, who was accused --

Q    My question was whether -- my question was very limited. It's a yes-or-no question.

Didn't the e-mails to Mr. Pence refer to the racketeering claim that had been made against Jarrow Formulas? Yes or no?

A    I -- I'd have to look at the document.  I know he clearly referred to the claims against Pablo Guzman.  I don't recall whether he specifically referred to the claims against him. But he used that as a way to craft this e-mail, which was highly problematic.

Q    You can't point to anything in the e-mails to Mr. Pence that indicates an intention to take trade secrets from Caudill, can you?

A    I'd have to -- if you'd like to pull the e-mails up, I'd be happy to look at them.  I mean, there were literally -- there were two of them in 2014, and then there were I believe three or more in 2013.  I'd have to go through them.  The primary concern about them was I believe they clearly showed malice or ill will on the part of Mr. Rogovin towards Caudill Seed, which, of course, could be construed as his alleged trade

secret misappropriation being willful and malicious.

Q   Well, Mr. Pepe, through Mr. Rechen, introduced five such e-mails into evidence:  PTX 193, 194, 195, 196, and 197.  And you were here in court when those were presented; correct, sir?

A   I was here in court, yes.

Q   So I am not going to take the jury through those again. They are in evidence, and they can see whether those e-mails say anything about intent or ill will directed towards taking trade secrets.  Okay?

A   Is that a question?

Q   Well, you don't -- you're saying you don't recall whether there was anything in there about trade secrets; right?

A   There's pages of e-mails there.  I would need to read them to really answer your question, sir.  And I don't have them in front of me.

Q   Had Mr. Rogovin testified at trial, was it McCarter & English's intention to have him explain the Pence e-mails to the jury before Caudill's lawyers did?  Yes or no?

A   I don't recall.  I don't recall exactly how we planned to deal with those e-mails, if he did testify.

Q   Well, isn't one of the things that a good trial lawyer will do, if they anticipate damaging testimony coming out in cross, that you try to review that with the client in direct so that it comes out during the direct testimony rather than the cross-examination?

A    That is something that can be done, not always but can be done.

Q    But in this case Mr. Rogovin wasn't prepared on what he would say about the Pence e-mails during direct examination; correct?

A    I don't recall whether we prepared him on those yet.  I just don't recall.  We did work with him on establishing his good faith, the company's good faith.  I don't recall whether we had specifically addressed the Pence e-mails as part of his witness preparation.

Q    Now, the jury has already seen the orders of Judge Simpson on motions in limine that precluded testimony from either side about disparagement by one of the other, by in this case Mr. Rogovin of Caudill's lawyers.  Do I have that right?

A    I don't believe so.  I don't believe that's what the order said.

Q    Well --

A    You've got it wrong slightly.

Q    You think that the Pence e-mails could have come in, the e-mails to Mr. Pence could have come in, notwithstanding Judge Simpson's order that adverse and critical statements by either side would not come in?  Yes or no?

A    First of all, you're misstating the judge's order.  But the short answer is, yes, we believe that it was highly likely that those e-mails, particularly the e-mails from 2014, would come

in with respect to the issue of whether or not Jarrow Formulas'
alleged misappropriation was willful and malicious.

Q   Now, Mr. Rogovin's letter to Mr. O'Brien dated August 11th,
2011, we've already established that never came into evidence
in the Kentucky trial; correct?

A   Correct.

Q   Now, when that letter was written in August of 2011, you
were told of Mr. Rogovin's intention to write that letter, were
you not, beforehand?

A   I don't recall that, no.

Q   So you first saw this letter after it was sent; is that
right?

A   So there was a series of e-mails that showed up in my inbox
I believe the morning of the last one.

Q   Excuse me, sir.  My question was -- my question was:  You
first saw the letter after it was sent; correct?  I'm just
talking about the August 11, 2011, letter to Mr. O'Brien.

A   The e-mail.  I saw that after it was sent, yes.

Q   And after you saw it, you spoke to Mr. Rogovin about it;
correct?

A   I'm sure I did.  After I saw the series, I'm sure I spoke
with him.

Q   Well, after you saw the August 11, 2011, letter you told
Mr. Rogovin that it was a good letter, didn't you?

A   No, I didn't.  As a matter of fact, I counseled him

following that that he should not be communicating with opposing counsel directly, which was one of the problems we had when he sent the e-mails again to Mr. Pence a year later. Very uncomfortable for us, and we advised him against doing that.

Q   Well, you heard Mr. Rogovin testify in court here and in his deposition, didn't you, about that?

A   I was not present at his deposition, so I did not hear him testify at deposition. But I was here for his testimony in court.

Q   And the letter that was written to Mr. O'Brien August 2011, that was a year and a half before Caudill Seed sued Jarrow Formulas in January of 2013; correct?

A   Yes. That timing sounds right.

Q   And the letter he wrote to Mr. O'Brien on August 11, 2013 -- I'm sorry -- 2011, that was an effort by Mr. Rogovin to say he was not taking anything from Caudill Seed. Do you agree with that? Yes or no?

A   I don't think so.

Q   And the O'Brien letter, the letter to Mr. O'Brien of August 11, 2011, is an effort by Mr. Rogovin to say if there was anything Caudill claimed was a trade secret, to let him know and he would stay away from it. True?

A   No, he never said that in the letter. And if you pull the letter, you'll see. That was not said.

Q   The letter is before the jury, so they can see if it says

that or not.

A    Doesn't say that, sir.

Q    Mr. Rogovin's letter to Mr. O'Brien was never placed in front of the jury in Kentucky, either physically or by description; correct?

A    Correct, and we discussed that with him.  And that was a decision that was made in coordination with him.

Q    And Mr. -- okay.  So you agree it never came into evidence; correct?

A    I do, yes.

Q    And the O'Brien letter, at the point the decision was made that Mr. Rogovin wouldn't testify at trial, that decision on June 13th, that Thursday night meeting in the Stites office, that letter could not come into evidence at that point in the trial unless Mr. Rogovin did take the stand; correct?

A    You know, I don't know the answer to that, but I will say it was never our intention to have that letter to come into evidence.  We did not believe that letter would be at all beneficial to Jarrow Formulas, at all.  It was clearly discussed with Mr. Rogovin.

Q    Mr. O'Brien's letter to Mr. Rogovin, the one in July of 2011, you did intend to put into evidence; correct?

A    No.

Q    That wasn't mentioned on Exhibit 601, the lines of inquiry that Mr. Rechen finalized?

A    Yeah --

Q    Was it?  Yes or no?

A    I don't recall, but a key consideration here is that the purpose of the lines and the study guide we sent to Mr. Rogovin was to get him to look at the documents and refresh his recollection on the facts.

Q    Would you answer my question, sir?

A    It was a challenge we couldn't get him to do.

MR. RESSER:  Move to strike.  He's not answering the question.

THE COURT:  All right, Folks.  Let's see.

Honestly, it's not clear what the question was.  I apologize, Mr. Resser, but just from what I have here, it's not clear what the question was.

MR. RESSER:  I'll pick up.

Q    (By Mr. Resser) Isn't it true, sir, that Mr. O'Brien was not on Jarrow Formulas' witness list submitted in the Kentucky trial?

A    That's true.

Q    But Mr. Rogovin was listed on Jarrow Formulas' witness list which McCarter & English filed with the court as a live witness; correct?

A    I -- I just don't recall that.  It could be that I was not involved in that document.  It wouldn't surprise me, though, if that were the case.  I just don't recall.

Q   Okay.  So you're not denying that then; right?

A   I don't recall one way or another, the document or what specifically was in it.

Q   So the only way to place the O'Brien letter in front of the Kentucky jury was to have Mr. Rogovin testify that he sent it; correct?

A   I don't know if that's the only way.  All I can tell you, sir, is that we clearly did not want to put that letter in front of the jury, and I didn't think about the different ways you could do that because it wasn't something that we thought would be beneficial to the company at all.

Q   Now, the lines of inquiry, Exhibit 601 that we've already seen in this trial, the one dated May 27, 2019, that we spoke about with Mr. Rogovin, that was the final version of the lines of inquiry that had been prepared for Mr. Rogovin's anticipated direct examination; correct?

A   No, that's not correct.  They may have said -- as Mr. Rechen testified, the lines of inquiry, that was a then current outline of topics that may be addressed with the witness, may be.

Q   And the earlier versions of that outline, the earliest version of that outline in the record, was PTX 274.

          MR. RESSER:  Can we move admission of PTX 274, please?

          THE COURT:  Is there any objection to 274?

          MR. RESSER:  Proffered by plaintiff.

THE COURT: Yeah, I realize that.

MR. PEPE: No objection, Your Honor.

THE COURT: All right. 274 will be full. That can be published.

(Plaintiff's Exhibit 274, received in evidence.)

Q   (By Mr. Resser) On the second page of the exhibit I believe starts the outline -- or third page. Is that it?

Can we take a look -- move admission and take a look at PTX 276, please.

THE COURT: It's also a plaintiff's exhibit, so that will be full. Plaintiff's Exhibit 276 is full.

MR. RESSER: I think that e-mail is the cover to this one. It's the same date.

I'm sorry. PTX 212. Can we have that admitted and brought up?

THE COURT: All right. Do you want to withdraw PTX 276?

MR. RESSER: Yes, Your Honor.

THE COURT: That's withdrawn. And it's PTX 212; right?

MR. RESSER: Yes.

THE COURT: That will be a full exhibit.

MR. RESSER: If we can page through that.

THE WITNESS: I'm sorry. That's a little fast for me. Was that for me?

MR. RESSER:  I'm sorry.  I don't have the exhibit numbers right.  And as Your Honor knows, there's a lot of exhibit numbers.

THE COURT:  I do.  But I just want to be clear for the record.  Do you want PTX 212 in?

MR. RESSER:  We'll withdraw it.

THE COURT:  Okay.  So that's withdrawn as well.

Q   (By Mr. Resser) Mr. Giarratana, do you -- you recall, don't you, that the prior drafts of the outline of Mr. Rogovin's expected testimony was first sent to Mr. Rogovin on May 25th, 2019?

A   My recollection is that we had draft outlines going back to when we first started preparing him.

Q   I asked about what was given to Mr. Rogovin or Mr. Leventhal.  The first one was May 25th, 2019.

A   What was given to Mr. Rogovin versus -- well, I believe you're conflating two things.  What we gave to Mr. Leventhal was a study guide so that we could get Mr. Rogovin to review the relevant documents in the case, recall the facts accurately, and thus be able to testify accurately about what the facts were.  That was a challenge with him.

Mr. Leventhal's job was to sit down with him and make sure he reviewed the documents.  That's different than the lines of inquiry that were sent to him at some point.  I can't recall exactly right now.

Q   Okay.  Let's talk about the one -- the final version that was sent -- okay, I'm sorry.  My co-counsel tells me that PTX 212 does have the outline, but it doesn't come up until the fifth page.  So we now wish to --

THE COURT:  All right.  So that will be full.

MR. RESSER:  Proffer that.

THE COURT:  PTX 212 is full.  Let's publish it.

(Plaintiff's Exhibit 212, received in evidence.)

Q   (By Mr. Resser) This is an earlier version of the lines of inquiry, the final version of which was PTX -- I'm sorry -- Defense Exhibit 601.  Is this an earlier version of the same one; right?

A   I don't believe so, Mr. Resser.  Do you have an e-mail that accompanies this?

Q   Yeah.

A   This looks to me to be the study guide, but I can't remember.

Q   Okay.  Let's go to the first page.  I think it has a cover e-mail there.

Okay.  So the first page is an e-mail from you to Mr. Rogovin and Mr. Leventhal dated May 25, 2019, which was the date I asked you about earlier.

A   Yes.

Q   Does this refresh your memory that an outline was sent on that date to Mr. Leventhal and Mr. Rogovin including the study

outline?

A    That was a study outline, yes.  This is different from the lines of inquiry.  You remember I said you're conflating two things?  This is the study outline, which is different from the lines of inquiry.  And if you look at the first sentence, you can see why we sent this to him.

Q    Now, the outline that was prepared for his direct examination at trial, that's Exhibit 601; correct?

        MR. RESSER:  Can we bring that up, Mr. Campos, please?

Q    (By Mr. Resser) Now, this -- this outline covers Mr. Rogovin's background and the development of his company; correct?

A    It does.

Q    And the outline then covers Jarrow Formulas' research and development capability; correct?

A    Are you going to direct me to where it does that?

Q    I can hand you the entire exhibit so you can page through whatever portions you want.  How's that?

A    That might facilitate my ability to answer your questions.  Thank you.  I'm afraid I'm going to be playing 52 pickup in a minute here if I don't get a clip.

        THE COURT:  Let's see what I got here.  Try that for start.

        THE WITNESS:  Thank you.  I'm sorry.  The question?

Q    (By Mr. Resser) The outline covers Jarrow Formulas'

research and development capability; correct?

It begins on page 2, I believe, at the bottom.

A    Yeah, does Jarrow Formulas have an R&D capability?

Q    And Mr. Rogovin was perhaps the best person at Jarrow Formulas to testify about its research and development capability.  Isn't that right?

A    Maybe.  Maybe.

Q    And he could have also testified about what Jarrow Formulas spent in developing its broccoli supplement and how much that cost them; correct?

A    Geez, I don't -- I don't remember that kind of information being at his fingertips.

Q    And then on pages 4 to 6 of this outline, it contains a timeline McCarter & English intended Mr. Rogovin to testify about at trial to explain how Jarrow Formulas got its product to market without using Caudill's trade secrets; correct?

A    Yeah, that relates to the study outline.  I haven't read all that in detail, but that was the problem we were having was that he would not go back and look at the documents and refresh himself so that he could remember the facts accurately.  And this is why he would get very frustrated during our prep sessions and say --

THE COURT:  Stop.  Stop.  You're well beyond the question.

Go ahead, Mr. Resser.

MR. RESSER:  Thank you, Your Honor.

Q   (By Mr. Resser) Because Mr. Rogovin didn't testify at trial, this timeline testimony that you intended to present at trial was not presented; correct?

A   That's not fair.  We were able to get, um, the timeline in at least in large part through Mr. Ashurst, and then we were able to also get in through Dr. West the ability to demonstrate that Jarrow Formulas came out with a significantly different product that did not use any alleged confidential information from Caudill Seed.  So I believe a large part of the timeline did get into evidence.

MR. RESSER:  Mr. Campos, can we see PTX 210, please, which is in evidence.

Q   (By Mr. Resser) The next page is the demonstrative evidence with that timeline; correct?  And there's one more page of it.

A   Yeah, I don't know, sir, whether this corresponds exactly to what's in my hand.  As Mr. Rechen testified, this is a dynamic, fluid situation where things are changing.

Q   Sir, I'm just asking you about this document.  I'm not asking about anything else.

A   I apologize.  I thought you were connecting it to what's in my hand.  I apologize.  I misunderstood.

Q   Exhibit PTX 210 is a demonstrative exhibit that was prepared to take Mr. Rogovin through the timeline at trial; correct?

A   Mr. Rogovin at least could have testified --

THE COURT:  Wait, wait.

A   -- hopefully in part.

THE COURT:  No.  The question was, Was it a demonstrative exhibit prepared for the purpose of taking him through the timeline?  That was the question.

THE WITNESS:  I don't recall whether this was going to be limited to just him or whether it was something we were going to use with several witnesses.  I just don't recall that.

Q   (By Mr. Resser) Well, isn't it true, sir, it wasn't used with any witness at the Kentucky trial?

A   I don't believe we did, that's correct.

Q   And what you're saying today is that Mr. Rogovin was not going to be the witness on this timeline?  Is that what I'm hearing you say?

A   No, I didn't mean to suggest that.  I said that there could be several witnesses that could speak to this.

Q   The final -- the final May 29 outline, Exhibit 601, do you know whether anyone from McCarter & English went over that outline with Mr. Rogovin before the opening statement in the trial?

A   I know that -- I know now, since my deposition, that Mr. Rechen met with Mr. Rogovin on the Friday before trial. Whether Mr. Rechen worked from this outline during that

meeting, I can't tell you one way or another.

I also know that --

THE COURT:  I think you've answered.

Go ahead, Mr. Resser.

Q   (By Mr. Resser) And you and your colleagues decided that the video deposition of Mr. Rogovin explain his lack of intent to the jury; correct?

A   It demonstrated the good faith of the company in part, yes.

Q   And you concluded Mr. Rogovin would not be a good witness years before the trial started.  Isn't that right?

A   I didn't conclude that then.  I knew that he was going to be a challenge, but I never concluded that he was not going to be a good witness.  I thought with work and effort we could get him there.

Q   And you concluded that Mr. Rogovin might not be a good witness before Mr. Rechen gave the opening statement for Jarrow Formulas at the Kentucky trial; correct?

A   I concluded he would not have been a good witness before the opening statement?

Q   You concluded he might not be a good witness.

A   Well -- yeah, there was a high risk he would not be.

Q   And you --

A   That was always the case.

Q   And you knew that before an opening statement was given to

the jury.

A   Yes, we knew there was a risk there.

Q   And you thought using Mr. Rogovin's deposition was a better choice than putting him on the witness stand in the Kentucky trial; correct?

A   Ultimately, yes, following the meeting that's been testified to.

Q   And that's the same deposition, the McCarter & English's expert in this case, who has not yet testified, Mr. Shearin, said in his deposition was the worst he'd ever seen; correct?

A   That's not accurate.  It's not accurate what he said.  He's talking about the complete deposition, not what Mr. Grondahl testified to, which was the whittled-down portion that was ultimately presented to the jury.  And I believe Mr. Grondahl said there were portions there that we were concerned about which he was able to negotiate out or exclude from being presented to the jury.  So I don't believe it's a fair comparison, sir.

Q   All I asked you, sir, was whether the deposition that was used, wasn't that the same deposition that McCarter & English's expert in this case testified was the worst deposition he'd ever seen?  Yes or no?

A   For the reasons I just stated, no.

Q   And you agree, Mr. Giarratana, that with work, with practice, Mr. Rogovin could have been a better witness?

A    That was our hope and our strong desire.  And we worked at it very hard to try to get him there.

Q    Now I want to discuss with you the motion for judgment as a matter of law that McCarter & English made on behalf of Jarrow Formulas during the Kentucky trial.  Do you have that subject in mind?

A    I do.

Q    A judgment -- judgment as a matter of law is what lawyers sometimes refer to as a J-M-O-L or JMOL.  Do I have that right?

A    Do you.

Q    And the JMOL motion was heard on Friday June 14th, 2019; correct?

A    The first part of it was heard then.  The second part was heard the following Tuesday.

Q    And that motion hearing, the first motion hearing on the JMOL during trial on June 14 was the day after the decision, the decision that Mr. Rogovin would not testify; correct?

A    Well, yes, that's fine.  That's fine.

Q    The meeting at Mr. Beres's office.

A    The meeting, yes.

Q    We've now heard about that Thursday, June 15th, matter quite a few time from several witnesses; right?

A    Yeah.  That was the day after the meeting.

Q    Right.

A    The evening meeting where we discussed that issue.

Q   And during the hearing on the JMOL, you told Judge Simpson that it was your understanding that willful and malicious misappropriation was not something the jury would decide; correct?

MR. PEPE:  Objection, relevance.

THE COURT:  Let me see counsel.

(At sidebar off the record.)

THE COURT:  Folks, I overruled the objection.  You can proceed.

MR. RESSER:  Can we have the question read back?

THE COURT:  I'm going to have to ask the court reporter to do that.

(Record read by the court reporter.)

THE WITNESS:  I don't recall specifically what I said, but I do recall misspeaking on that issue at that moment and then correcting it later.

MR. RESSER:  Your Honor, we offer Defendant's Exhibit 566, which is the transcript of trial, Volume 10B in the Kentucky trial.

THE COURT:  Well, I mean --

MR. RESSER:  The pages in particular --

THE COURT:  But before we get to the offer, I don't really understand the purpose of the offer; right?  So it could be --

MR. RESSER:  Well, Mr. Giarratana said he doesn't

recall exactly what it said.  And this transcript is exactly what was said.

THE COURT:  All right.  Do you have the transcript, Mr. Pepe?

MR. RESSER:  Yes, Your Honor.

THE COURT:  No.  Does Mr. Pepe have the transcript?

MR. PEPE:  I don't have the transcript, Your Honor, but --

MR. RESSER:  It's Exhibit 566, Defense Exhibit 566, beginning on transcript page 83, line 23.

MR. PEPE:  I have it now, Your Honor, but I would still -- I would maintain the objection if it can be used to refresh his recollection, but it's not relevant.

THE COURT:  No, I'll allow it, okay.  It can be shown.  Show the relevant portions though.

MR. RESSER:  Yes.

THE COURT:  The exhibit again is what?  I'm sorry.

MR. RESSER:  566.  And the transcript page is 83, beginning at line 23, Mr. Campos?

THE COURT:  I'll allow 566 to be admitted as a full exhibit so it can be displayed to the jury.

MR. RESSER:  Page 83, beginning at line 23, please, and then the top of 84.

THE WITNESS:  Do you have a copy for me?

THE COURT:  Is there an issue with putting it on the

screen?  Oh, there we go, okay.

MR. RESSER:  There it is.

Q   (By Mr. Resser) You need a second to read it before I do?

A   I was hoping to read it in the context of the transcript, but if you don't have a copy for me --

Q   This is the transcript, sir.

A   I know.  But it's only a piece of it.

Thank you.  What page?

Q   58 of the transcript -- I'm sorry.  83 of the transcript, line 23.

"The Court:  Mr. Giarratana, do you care to address anything regarding the willful and malicious misappropriation claim?  Is there such a claim against your client?

"Mr. Giarratana:  My understanding, Your Honor, is that's not something that the jury's going to decide.  Well, let me address it.  I believe that's not an issue for the jury to decide."

A   Yeah, I misspoke there, and I believe I corrected it.

Q   And the judge then allowed you to file another brief addressing that issue a couple days later; correct?

A   Yes.  We filed the -- he allowed us to file the brief on willful and malicious misappropriation on Monday.  This was Friday afternoon.  We had asked for that.  He allowed us to do it.  Then we got to reargue the JMOL including willful and malicious the following Tuesday.

Q   And as a result of the opportunity Judge Simpson gave you to correct your mistake and submit an additional brief, you've suggested in this case that that was no harm, no foul; correct?

A   I don't believe there was any harm as a result.  I feel it actually worked to our benefit because we were able to submit a whole extra brief on it, and then we were able to argue the issue in either further detail the following Tuesday.

Q   So in case the jury didn't really get that answer because it was a yes-or-no question, you've suggested in this case that that was no harm, no foul; correct?

A   Those aren't my words.  Those are your words.

Q   But by the time the judge corrected you, that was day 10 of a 14-day trial; correct?

A   I don't recall what day that was.  And I don't recall the judge correcting me.  I recall me correcting myself.  But ...

Q   Well, we just read that the judge corrected you.  So the jury can decide --

A   The judge asked a question.

Q   And by the time you filed your additional legal brief, that was day 11 of the 14-day trial; correct?

A   See, this argument was on Friday, and we filed the brief on Monday when the court was closed, I believe, and the argument was Tuesday, I believe.  I'm not sure whether we filed it -- actually, sir, I don't know whether we filed the brief on Monday or Tuesday but probably not important.

Q   And that Tuesday was the day -- either the day of or the day before Jarrow Formulas put on its -- started putting on its case-in-chief; correct?

A   That's correct.

Q   So it was not until the eve of Jarrow Formulas putting on its side of the case that you corrected the mistake about that issue going to the jury.  Do I have that right?

A   No.  I mean, I misspoke.  We knew it was going to the jury. We prepared the jury instructions on it.

Q   You said no.  You've answered my question.

And that -- that happened after the decision on June 13th when it was decided Mr. Rogovin would not testify live at the trial; correct?  All of that.

A   Not all of it.  The argument happened.  We clearly recognized this issue was going to the jury well before that when I submitted the jury instructions to the court and the jury verdict, which included willful and malicious.  I simply misspoke during the argument.  I clearly knew it was an issue that was going to go to the jury because I prepared the jury verdict form and the jury instructions all addressing that at the outset of the case.

Q   And we know that was wrong because the verdict form shows that was up to the jury; correct?

A   Well, what I just said is not wrong.  We know they misspoke during the argument.

Q   Okay.

A   Yes.

Q   So what you said in the argument, you know that was wrong, and the jury verdict form shows that was a misstatement or a mistake; correct?

A   Correct.

Q   And the jury checked the blank and found willful and malicious misconduct, didn't they?

A   With respect to one trade secret, yes.

MR. RESSER:  Thank you.

THE COURT:  All right.  Mr. Pepe, anything else? Cross-examination is what I should say.

CROSS-EXAMINATION

BY MR. PEPE:

Q   Mr. Giarratana, let's pick up right there.  You were cut off.  You started to explain this process, the JMOL and the jury instructions --

A   Yes.

Q   -- where you did get it right.  Let's try and unravel that quickly.

You admit you misspoke when you were arguing the motion to Judge Simpson, as we just saw in the transcript; correct?

A   That's correct.

Q   Okay.  You were arguing -- we've all heard a judgment as a

matter of law after the Caudill case ended; correct?

A    That's correct.

Q    And you were asking the court in that motion for a judgment as a matter of law to throw out the Caudill case; correct?

A    Correct.

Q    Okay.  I'm going to let you just explain the part that got cut off and how you misspoke, corrected it, and what you knew before you made that misstatement.  Do you have all that in mind?

A    I do.

Q    Okay.  I'm going to let you explain it.  Go ahead.

A    So clearly we knew that the issue of willful and malicious misappropriation was going to go to the jury because, at the outset of the case before the trial started, we prepared jury instructions which would instruct the jury on that very issue. So we knew that question was going to go to the jury.

Q    Most of us -- not everybody spends their life doing jury instructions, okay.  Not everybody all knows that you submit proposed jury instructions before the trial starts.  So just back up a little bit; quickly explain that.

A    Sure.  Both -- ultimately, every jury is instructed on the law before it goes and decides the case.  And the parties submit what we call competing instructions about how the jury should be instructed.  One of the issues in the underlying federal case was whether or not the alleged misappropriation

was done willfully and maliciously.  So we submitted proposed jury instructions on that issue.  So clearly we recognized that it was an issue that was going to go to the jury.

Q   If we dug out your proposed jury instructions, submitted to Judge Simpson back in 2018 or '19 --

A   Yes.

Q   -- would we find in there a proposed instruction on willful and malicious you asked the judge to give to the jury?

A   We would.  We would.  And we also submitted a jury -- proposed jury verdict form.  Every jury gets a verdict form where the jury has to go through and decide -- answer certain questions on the form and decide what the verdict is and show what the verdict is.  We prepared the form which included within it the question of whether or not the alleged misappropriation was willful and malicious.  So we very much knew this was an issue that was going to the jury because we put it on the proposed jury verdict form.

Q   And when you realized you misspoke to -- in your argument to Judge Simpson on that day, what happened then?

A   So we asked the judge, um, in our opening brief for a judgment as a matter of law.  We focused on whether or not Caudill Seed had proved that it had a trade secret, whether the trade secret had been misappropriated, and whether they were entitled to claimed damages.  It did not include an argument on willful and malicious in part because, before you get to

willful and malicious, you need to first find there was an alleged misappropriation.

During the argument I asked the court if it would be acceptable for us to submit a supplemental brief on willful and malicious appropriation.  The judge said, "Yes, you may do that."  So we prepared a supplemental brief over the weekend, filed it I believe either on Monday night or Tuesday morning, and then we had another argument on Tuesday where we were able to reargue the motion for judgment as a matter of law and also argue the issue of whether or not Jarrow Formulas' alleged misappropriation was willful and malicious.  We argued, of course, it was not.

Q   I think I heard you say that that scenario ultimately worked to your benefit.  Did I hear that?

A   Yeah, I believe it did.

Q   Because?

A   Because we were allowed to submit a whole separate brief on the issue, and we were allowed to reargue the issue on Monday for the court's consideration -- or Tuesday.  I apologize. Tuesday.

Q   And did the judge agree with your arguments on either day?

A   He did not.

Q   All right.

A   He deliberated for a couple of hours at least, and we were hopeful.  We had our fingers crossed, but we got a full

rejection.

Q   Did the judge's -- did anything in the process you just described, including your preparation of your first brief, your argument, your misstatement, your second brief, and the judge's ruling, did any of that, any of it, cause you or the McCarter team to reevaluate the decision on whether Mr. Rogovin should testify live, which was made that preceding Thursday night?

A   Absolutely not.  Our whole position on the willful and malicious issue was that Caudill Seed had failed to introduce any evidence of willful and malicious misappropriation.  Of course, our concern with introducing Mr. Rogovin was that that would give them an opportunity to introduce such evidence that was not in the record.

Q   There's been much said about the O'Brien letter.  And when I use that term, I'm referring to the response Mr. Rogovin wrote to Attorney Thomas O'Brien then representing Caudill Seed in the state court litigation.  Do you have that in mind?

A   I do.

Q   One last time, sir, explain why you did not want the Rogovin letter to O'Brien to go into evidence.  How did that affect your strategy, and what was the reasoning behind your objective to keep that out?

A   Well, we -- we did not want Mr. Rogovin's response to Mr. O'Brien to come into evidence because, for the reasons Mr. Rechen testified, we believed that that could be construed as

ill will towards Caudill Seed.  And we did not believe that overall it would have at all a positive impact on our case.

We also believed that the introduction of those e-mails would open the door, if it wasn't already opened, to introduce Mr. Rogovin's e-mails to Attorney Pence, which came after that, and particularly in 2014, which were, quite frankly, worse than the e-mails to Mr. O'Brien.  And we were very concerned that, um, that if those got in front of a jury, it would be very difficult to defend against their claim of willful and malicious behavior on the part of Jarrow Formulas.

Q   Was there anything in there you thought -- when I say "you" now, you and the McCarter trial team, including Joel Beres. I'm going to include him in my use of that term.  Okay?

A   Yes.

Q   Was there anything in that O'Brien letter that you thought was advantageous, helpful, compelling, and supportive of your position in the case that would argue for its inclusion?

A   We really did not believe there was anything helpful in there.  And as a matter of fact, ultimately we counseled Mr. Rogovin, and he agreed with us that we were not going to try to introduce that letter into evidence because overall we felt that it was going to have a very much -- it was very much going to have a negative effect on the jury.  We thought that we could get in the good faith of the company in other ways by

demonstrating that the company -- that Mr. Rogovin instructed Mr. Ashurst not to take anything proprietary from Caudill and that the company developed, meaning Jarrow Formulas, a completely different product and process that did not use any confidential information of Caudill.  And our key witness on that was Dr. Leslie West, who I think did a great job on that.

Q   Now I ask you to come forward in time to the -- to 2013 and 2014 when the Kentucky litigation is well underway, the federal court litigation is well underway.

A   Yes.

Q   And now Caudill Seed is represented by Attorney Steve Pence.  Do you have that in mind?

A   I do.

Q   All right.  I think it was during Mr. Rechen's testimony, or at least sometime earlier in this matter, we -- three letters were admitted into evidence that Mr. Rogovin wrote to Attorney Pence in 2013.  And there's been testimony on them. I'm going to go to those in a minute.  But you were aware -- were you aware of those letters after they were written?

A   I was aware of them after, not before.

Q   Okay.  In fact, was some of them copied to you?

A   They were.

Q   What, if any, instruction did you give Mr. Rogovin about writing those letters or continuing to write letters, or

letters like it, to Caudill's counsel?

A   We advised Mr. Rogovin not to do that.  We advised him that --

Q   Why?

A   Because Caudill Seed is represented by counsel, and he needs to communicate through Caudill Seed through his counsel. Now, when he sent the first letters, we weren't -- didn't have appearances yet in the case.  But once we had appearances, we had advised him, "You cannot communicate directly with the lawyers from the other side.  If you want to communicate with their lawyers, you need to let us do it, and you need to do it through us."

Q   Did Mr. Rogovin follow your advice, your instructions to stop writing those kinds of letters to Caudill's lawyer?

A   Well, he did for about a year until he sent the second round of letters to Mr. Pence in January of 2014.

MR. PEPE:  I'd offer as a full exhibit, Your Honor, PTX 196, to which there is no objection.

THE COURT:  Okay, PTX Exhibit 196 will be admitted as a full exhibit.

(Plaintiff's Exhibit 196, received in evidence.)

MR. PEPE:  And I would ask Mr. Wyzik to call out the top parts so we can get the date fixed here.  And maybe he can call out all the way to the first paragraph.  Would that be feasible, please?

Q   (By Mr. Pepe) You can see that that's to Mr. Pence in February 2014; correct?

A   Yeah, I misspoke.  I said January, but it was actually February of 2014.

Q   Okay.  And I don't know.  You can't read -- the way it's blown up, you can't read the right-hand side of that.

Can we fix that, Mr. Wyzik?  Can we blow it up so it could be read in its entirety?

Thank you so much.

So he says:  This is -- "This, you fulminating putz, is what RICO is about.  And don't give my lawyers any of your sorry crap about us thinking you're some sort of hillybilly sticks klutz.  No.  You're an unethical scheming mamzer like your client but he's also a goniff."

"Mamzer" means "illegitimate," and "goniff" means thief; correct?

A   I'll take your word for it.  Those are not -- those are not part of my vocabulary, but I think I did look them up at one time.

MR. PEPE:  I'd offer as a full exhibit, Your Honor, PTX 197, which is -- to which there is no objection.

THE COURT:  Okay.  PTX Exhibit 197 will be full.

(Plaintiff's Exhibit 197, received in evidence.)

Q   (By Mr. Pepe) And here is in February another e-mail to Steve Pence, Attorney Steve Pence, representing Caudill from

Jarrow Rogovin in which he says, "Your borderline psychotic client -- certainly a sociopath -- knowingly sold contaminated seed to sprouters.  Your scofflaw client irridated, mislabeled and unlawfully placed into commerce product that had Listeria monocytes contamination.  Your criminally vicious slandering client stole his own lab notebook and USB chip in order to falsely accuse an innocent man, period," end quote.

Could you tell us your understanding of that?  There's some words there we've never seen before and some accusations we haven't seen before.  Please tell me your understanding of that when you received that copy in February 2014.

A   Well, what do you do when you get something like this?  I mean, he's viciously attacking the opposing lawyer, the opposing party.  And this was not good.

Q   Why not?  What was your -- explain to the jury as a trial lawyer --

A   It's not good.

Q   Let me finish my question.  Explain as a trial lawyer what your concern was in the trial if these came into evidence, how it would affect your trial strategy and the case you were presenting for Jarrow Formulas, Inc.

A   Yeah, it's very troublesome from a number of levels.  As far as trial goes, clearly these are the kinds of letters that are going to be used against a party.  One of the issues in the case was whether or not Jarrow Formulas acted with ill will or

malice towards Caudill Seed when it allegedly misappropriated the trade secrets.  A letter like this I believe clearly shows ill will or malice on the part of Mr. Rogovin, i.e., also Jarrow Formulas towards Caudill Seed.  And clearly this kind of thing would be used against him.

Also, we were very concerned about he should not be communicating directly with the other lawyers at all, much less in this manner.  We were worried about the impact this would have on the court, how the company and we would be perceived by the court.  And, you know, that was more secondary, but, nevertheless, that was a very important consideration, because it's part of our duty to try to manage our client and not let this kind of thing happen.

Q   You were asked about the limiting order or the -- Judge Simpson's order on the motion in limine excluding certain evidence in the Kentucky trial.  You have that in mind?

A   I do.

Q   And we've looked at this previously.  I'm not going to take the time to go through it there.

Did you consider that order in evaluating whether these letters, the Pence letters, the ones in 2013 and the ones in 2014, would be excluded by that order of Judge Simpson?

A   Yeah, we did not believe they would be excluded.

Q   Now, with that in mind, did you analyze the other side of that question, that is, if Mr. Rogovin took the stand live, how

did you evaluate the likelihood that these letters would be offered through him and admitted into evidence if he testified live?  Explain to us whether you evaluated that and, if so, how.

A    Yeah, we evaluated that very carefully as part of the considerations we made during the evening meeting on Thursday of June 13th.  And we were very concerned.  These documents were on our opposing party's witness list -- exhibit list.  And we were very concerned that Mr. Rogovin would be subjected to a lengthy cross-examination where, not only would Caudill Seed go through all of the horrible narrative again, meaning they would go through all of the facts relating to how Mr. Ashurst sent Mr. Rogovin the alleged trade secrets and how Mr. Rogovin never returned anything back to Caudill Seed, and then, of course, they would go into these letters which we believed could be very effectively used to demonstrate malice or ill will on the part of Mr. Rogovin and Jarrow Formulas towards Caudill Seed.

And as Mr. Rechen indicated, this was all during a time when we did not want the jury focusing on those issues. We wanted the jury to be focusing on what our theme of the case was, which is that Caudill Seed did not have an alleged trade secret and Jarrow Formulas did something completely different. And so there was a real concern there that they would -- what Mr. Rechen referred to as hijack our case with very bad evidence.  And so, you know, we believe that the right decision

at that moment in time was to try to prevent that from occurring.

Q   As a result of the decisions you made, including -- including but not limited to the decision not to put Mr. Rogovin on live, did the Pence letters, any one of the five in 2013 and 2014, did they ever come into evidence?

A   They did not.

Q   The jury never saw Mr. Rogovin calling Caudill Seed a borderline psychotic client?

A   They never saw those letters.

Q   Or any of the other --

A   Never saw any of his nasty letters or e-mails.

Q   Now I want to bring your attention to Thursday, June 13, 2019, and the meeting about which Mr. Rechen testified last week and Mr. Grondahl testified today.  I'm talking now about the first meeting in the large conference room.

Were you here when Mr. Rechen testified as to what transpired in that meeting?

A   I was.

Q   Were you here today when Mr. Grondahl just shortly -- a short moment ago testified at what transpired in that meeting in the large conference room?

A   I was.

Q   I'm going to make this easy on everyone, Mr. Giarratana. Do you -- did you find their testimony accurate and complete in

all respects as to what happened in that meeting, based on your presence in that meeting?

A    Absolutely.

Q    Is there anything you would correct to make it more accurate?

A    No.

Q    Is there anything you would add to make it more complete?

A    No.

Q    You were there through the entire meeting.

A    I was.

Q    And you heard their testimony.

A    I did.

Q    Nothing more to say about that?

A    I have nothing more to add.

Q    Now I would like to take you to the end of that meeting when the testimony is that you and Mr. Rechen left that conference room and went to the conference room next door.

A    Yes.

Q    Did you -- when you went into that conference room next door, who was present?

A    Mr. Rechen, myself, Mr. Rogovin, and Danny O'Keefe, who was a consultant.

Q    All right.  We have a demonstrative showing the participates in that meeting.

        Can you call that up, Mr. Wyzik.

A    Yes.

Q    Is that, in fact, the four people present in that meeting?

A    It is.

Q    And you've already -- there's been testimony that Mr. O'Keefe was one of the jury consultants working with your team; correct?

A    He was.

Q    You were present from the beginning to the end of that meeting?

A    I was.

Q    Please tell the jury and His Honor what was said and by whom as best you recollect.

A    So Mr. Rechen and I went into the conference room. Mr. Rogovin was working with Mr. O'Keefe, who was working with him on presenting himself as a witness. He had a process where he would videotape the witness and show the witness the videotape, and they would work on his presentation as a witness.

Mr. Rechen and I came in. We indicated that we had met with the team and it was our recommendation that Mr. Rogovin not testify live. And we explained to him in a summary fashion why we had reached that conclusion.

And he looked at us, and he said, "I'm fine with it." And in all candor, I sensed a sense of relief on his part.

Q    Did he say anything else? Did he request, require, demand more explanation?

A   No.  As a matter of fact, if I recall correctly, he moved on to some other issues and began asking us about other things relating to the trial.

Q   I'm sorry?

THE COURT:  "Other things relating to the trial" is what he said.

Q   (By Mr. Pepe) When you told him that, as you described it, was there any push-back, any disagreement whatsoever from Mr. Rogovin?

A   Absolutely not.

Q   You're sure?

A   I'm positive.  As I indicated, I feel there was a sense of relief on his part.

Q   And that was the discussion concerning his testifying live, just what you reported?  That's it?

A   That's it.

Q   That was Thursday night, June 13.  Thereafter, in the days that followed, did Mr. Rogovin make known to you his position on other aspects of the case that you were about to present?  So here -- there's the weekend, and then you testified the courtroom was dark on that following Monday or everyone has agreed it was dark.  And then you were to begin the presentation of your case on Tuesday; correct?

A   That's correct.

Q   Did Mr. Rogovin, before you began the presentation of your

case, make known his position on other issues regarding the intended presentation of evidence?

A   Yes, he did.

Q   And did he do so in writing?

A   He did.

Q   And did he do so in great detail in writing?

A   Yes, he did.

MR. PEPE:  I'd ask Mr. Wyzik to pull up PTX 261, which is already a full exhibit, Your Honor.

THE COURT:  Sure, 261, yes.

MR. PEPE:  And if you could, Mr. Wyzik, if you could go to the third page.  They're numbered at the bottom.

And if you could blow up the second -- the bottom half of that page.  Can you do that, please?

Q    (By Mr. Pepe) Now, sir, we have an e-mail from Mr. Rogovin to the trial team, including Mr. Beres and Mr. Jonathan Leventhal and the jury consultants.  And the subject is:  "The devil is in the details as well as Caudill."

And then he says in capital letters, "Unbelievably, I lost the second draft and there are errors and imprecise phrasing I am too exhausted to redo.  It was well over an hour of lost work and now I have to finally sleep.  I will send the updated one later.  There were a lot of fine points blipped out and I need to try to reconstruct."

Did he, in fact, send a revised version of this later,

sir?

A    I believe he did.

Q    All right.  Let's look at this one.

He starts out by saying, "To all, 4 hours sleep in 2 days."  Do you see that?

A    Yeah, I do.

Q    And was that consistent with what you observed?

A    Yes.  He was not sleeping well.

Q    So the day before he would have testified as the first witness out of the box in your case, if it had been decided for him to testify, he's saying he had four hours of sleep in two days; correct?

A    That's correct.

Q    I'm not going to walk through this line by line, but I would like Mr. Wyzik to go to the next page, and is there set forth there -- question withdrawn.

Mr. Giarratana, did you read this e-mail when you received it?

A    I did.

Q    How many times since then, and in preparation for this case, have you read this e-mail?

A    Probably a couple times.

Q    You're familiar with its content?

A    Yes.

Q    Okay.  I'm going to go to the next page and ask Mr. Wyzik

to show the next page.  And then the next one.  And then the next one.  That's four and a half pages.  I think there's an end.  Is there -- no.  Is there another?

A    It keeps going.

MR. PEPE:  And is there another, Mr. Wyzik?  Okay.

Q    (By Mr. Pepe) I counted five-and-a-half-single-spaced pages.  Does that sound right to you?

A    Yeah, that sounds right.

Q    Please tell us the thrust of Mr. Rogovin's five-and-a-half-page e-mail to the trial team and to the jury consultants on Monday, June 17.  Tell us in sum and substance what is contained there.

A    Well, I -- when I got this, I was preparing actually for the argument that I mentioned before the following day where we had to argue the judgment as a matter of law.  I was also trying to prepare a brief to file the next day.  I put that work down and read this lengthy e-mail and felt that I needed to respond to it right away because, in sum and substance, Mr. Rogovin was, you know, setting forth various complaints and demands on how he wanted us to proceed in the coming week, which was not consistent with what we had been discussing up to this point in time.

Q    Could you give us any examples?

A    Yeah, and I probably have to go to my responsive e-mail to him to be completely accurate.  But he wanted -- as one

example, he wanted to call Joe Lyons, who was an employee of Caudill Seed. He wanted to call him as a live witness. He also wanted to be able to demonstrate, if I can remember correctly, that he believed Caudill Seed was tampering with evidence concerning the testing of their products. And he believed that we could demonstrate somehow that they had tampered with the evidence; and if we can demonstrate they tampered with the evidence, we could get the case against the company dismissed. A couple of other points as well in here.

What I tried to do was read this five-and-a-half-plus pages and discern from it, because it was very lengthy and very detailed, what I thought the key issues were. And I tried to address those in my responsive e-mail, while nevertheless getting back to the other work we needed to do to prepare for the next day.

Q   Before we get to your response, I direct your attention if I could ask Mr. Wyzik to go to the fourth page of the document in the lower right-hand column, 1269, if I could ask him to do that.

And while he's doing that, Mr. Giarratana -- I'm going to ask him to blow it up, the first sentence in the first full paragraph, Mr. Wyzik. It begins, "If you don't." Can you do that for me, highlight that?

It says, "If you don't appreciate the tone of some of this, it's become exponential on my end."

Is it fair to describe he was setting forth criticism --

A   Yes.

Q   -- in this letter?

A   Yes.

Q   Is it fair to say that it was harsh criticism of you and the trial team?

A   I -- that's how I received it.

Q   You testified that you read it and tried to understand it; correct?

A   I did.

Q   Did you find anything in this five-and-a-half-page e-mail criticizing what the trial team was doing, any mention of the decision not to call him live which had been made the preceding Thursday evening?

A   Absolutely not.  As I indicated, I believe he was relieved that he was not going to be called.

Q   You said you responded?

A   I did.

MR. PEPE:  I'm going to ask Mr. Wyzik to go to the same document, same exhibit, second page, and to call out the top of that e-mail and the first paragraph.

Q   (By Mr. Pepe) Is this, in fact, the beginning of your e-mail in response that you said you took the time to prepare addressing some of the issues Mr. Rogovin raised in his

critical e-mail we just looked at?

A   Yeah.  This was sent about two hours after receiving the first e-mail.  So I spent about -- I spent a couple of hours going through it very carefully and drafting a response trying to address the concerns he had raised.

Q   All right.  And you say in the opening paragraph, "Forgive me if this e-mail does not address every point that you raise below, but I wanted to quickly address the more significant points without prejudicing our preparation for tomorrow."

Is that your reference to the fact that you were preparing for --

A   Yeah.  Of course, at the front of my mind was I was very concerned about making sure we were prepared for the argument the following day and getting the brief filed.  At the same time, I had a client who was extremely upset and sent me a very long e-mail, and I felt I needed to address it and I needed to address it right away.

Q   And, again, your e-mail is not quite as long, but it goes on for a page and a half.  I will ask Mr. Wyzik to go to the next page so we can see how long it is.

Okay.  So we can go back to the previous page, Mr. Wyzik.

Mr. Giarratana, again, without working our way through each paragraph, please explain to the jury what you tried to do in this letter by telling us in sum and substance what you said

to Mr. Rogovin.

A   So I identified what I felt were the key issues he raised in his letter to me, the key complaints.  And I wanted him to appreciate that we understood the issues, we were addressing them, and I wanted to let him know what our analysis was.

So as an example, the first one deals with -- I said, with respect to PX 267 and 268, Caudill's test results.  That dealt with his desire to try to demonstrate that Caudill had tampered with its evidence.  We told him that we're addressing that issue, we're subpoenaing Caudill's supplier, McCoy and McCoy, and we're going to evaluate what we receive in response to that subpoena -- we did it during trial -- and to see whether we can prove they tampered with the evidence.

Ultimately, we spent a fair amount of effort on that during the last week of trial.  We were unable to find any evidence tampering, and we couldn't make that point.  But we addressed it.  He raised the issue, we jumped on it, and we addressed that.

Q   I appreciate that.  And I'm going to ask you, in particular, did you address his complaints about Joe Lyons being called to testify live?

A   Yeah, and that's the fourth paragraph down.

Q   Maybe I could get Mr. Wyzik to blow that up.

Go ahead.  Can you read that okay?

A   Sure.  I'm summarizing here our rationale and analysis as

to why we believed it would not be appropriate to call Joe Lyons live at that time. And this is what I summarize here for him.

Q   Okay.  Thank you for that.

MR. PEPE:  I would ask Mr. Wyzik to blow up the final paragraph where it says, "I do take issue."

Q   (By Mr. Pepe) So you're preparing for trial.  You're preparing to argue the second day of the JMOL argument.  Is this -- are you trying to explain that to Mr. Rogovin here, sir?

A   Yes.  I -- at this point I'm getting a little concerned because now he's really kind of attacking us and complaining about how we're doing things and that we're not listening to him.

Q   Was that accurate complaint?

A   It's absolutely not accurate.  We were doing the best we could under the circumstances to listen to him and try the case at the same time.  And we were looking out for the best interests of the company.

And I wanted to let him know that, that, you know, we take issue with being accused of what you're accusing us of doing.  And contrary to what you're saying, we're listening to you very carefully, and we're doing our best to try to address everything you're saying.

I let him know, by the way, that, at the end, I said,

"Look, time management can be a struggle under these circumstances, but our highest priority is to be fully prepared for each day at trial and do our best to win."

Q   He responded, did he, Mr. Giarratana?

A   I recall that he did.

Q   We could come forward in the same exhibit, PTX 261, to the front page.  And I ask Mr. Wyzik to call out the bottom half of that page.

A   Yes, this is his response to me.

Q   And here he says, "I want Joe on the stand."

Your understanding of the reference to "Joe" in that sentence?

A   That's Joe Lyons.

Q   The same Joe Lyons.

A   Yeah.  My clear read of this is that he's disagreeing with our recommendation.  He's disagreeing --

Q   Your recommendation on Joe Lyons?

A   On Joe Lyons.

Q   Anything in here about complaining about your recommendation or the decision not to call him live?

A   Oh, absolutely not, no.  He wanted Joe Lyons on the stand. He said nothing about himself on the stand.

Q   Okay.  Now, Mr. Giarratana, there's been -- there's been testimony that the procedure and protocol in the Kentucky trial required the attorneys to identify the witnesses they would

call in their case and the order they would call them so obviously the other side could be prepared?

A   Yes.

Q   That may have come from you.  That testimony from you or from Mr. Rechen, is that consistent with your understanding?

A   It is consistent with my understanding, yes.

Q   And did do you that -- that is, did you extend that information to the opposing counsel -- before you started to put on your defense case?

A   We did.

Q   And then having done that, did you so advise Mr. Rogovin what you had done?

A   Yes, we did.

Q   Is that shown in this exhibit PTX 261?

A   I believe it is.  If we take down this blowup.

MR. PEPE:  If we could go to the front page and blow up the -- call out the top e-mail, if you would, Mr. Wyzik.  Thank you.

Q   (By Mr. Pepe) That is from you again the same day, Monday, June 17, from you to Mr. Rogovin; correct?

A   Yeah.

Q   With a copy to the trial team.

A   Yeah, we had to -- we had to send this information to the opposing party that morning.  And so I was advising him that, Jarrow, we've advised the other side, that this is our plan

that we had discussed all along, and this is the plan about who we're calling.

Q   Well, you say, "Jarrow, in accordance with the stipulation we have been operating under throughout this trial, we communicated to opposing counsel this morning that we intend to introduce the following witnesses in the order indicated."

And then we set forth names.  This is the same information, is it your testimony, you had given to Caudill's lawyers?

A   Correct.

Q   So you're telling him:  Mr. Rogovin, Clay DuBose will be the first witness; correct?

A   That's correct.

Q   And we know he's the vice president of Jarrow Formulas; correct?

A   Correct.

Q   Then Martin Gallant by depo.  Who is Martin Gallant?

A   Martin Gallant was either the owner or -- of a company called NPS, which is a prospective customer of Caudill Seed. Caudill Seed claimed that it was entitled to their lost profits on sales they said they would have made for NPS but for the alleged trade secrets misappropriation.

Q   Same thing with Mr. Cornblatt.  I think we heard those two names earlier.

A   Yes.  That was another alleged proposed customer of Caudill

Seed where they were claiming what they call lost profit damages for an alleged lost sale to Nutramax because of the alleged trade secret misappropriation.

Q   And those are by deposition, meaning what we've seen in this case where sometimes testimony is --

A   Exactly.

Q   And then Lyons, this is the same Joe Lyons?

A   It is.

Q   You say, "Lyons by depo.  We may not use Lyons' depo designations depending on the nature of Caudill's counter-designations."  What did you mean by that?

A   Well, at that moment, as Tom Rechen indicated, a trial is a dynamic, fluid situation.  You need to respond and adjust.  And at this point I wanted to let Mr. Rogovin know essentially, Look, we think we might put in parts of Mr. Lyons' deposition, but we're not sure.  We need to see how things play out.

Q   And then you say, quote, "We will conclude with Leslie West."

A   Yes.

Q   And Mr. West was?

A   He was our expert witness.  "West and rest" was the theme.

Q   Mr. Rogovin's name is not on the list of witnesses.

A   It is not.

Q   Did he, upon receiving this, raise any objection to the

list of witnesses you had sent to counsel and sent to him?

A   Absolutely not.

Q   Did he in any way or to any extent, upon receiving this, demand that his name be added to that list?

A   He never did.

Q   Did he, Jarrow Rogovin, at any time later in the trial demand that he'd be allowed to testify live?

A   Absolutely not.

Q   When is the first time you heard that Jarrow Rogovin and Jarrow Formulas, Inc., claimed it was wrong, it was malpractice, not to put him live on the stand?

A   In this lawsuit.

Q   When you received the counterclaim?

A   Yes.

Q   And not before then.

A   Never.

MR. PEPE:  No further questions, Your Honor.

THE COURT:  All right.  So I think we're going to just conduct a little other business before the jury before we continue with Mr. Resser.

Mr. Pepe, did -- did you have any further evidence to offer with regard to the billing case, namely, your breach of contract claim at this point?

MR. PEPE:  I think the answer is no.  May I consult?

THE COURT:  Yes.  Why don't you consult and let us

know.

MR. PEPE:  So, Your Honor, as I thought that would be the end of it, it is, the evidence on the billing case.  And so with respect to the billing case, the plaintiff McCarter & English rests.

THE COURT:  All right.  Very well.

Mr. Resser, do you want to take the last -- actually, why don't we start your examination tomorrow.

MR. RESSER:  Thank you, Your Honor.

THE COURT:  Ladies and Gentlemen, we're going to send you home five minutes early.  And don't discuss the case.  Don't let anyone discuss it with you.  Keep an open mind and all that goes with that.

Remember, tomorrow the usual time in the jury room, 8:45.  Wednesday, 10:45 in the jury room.  Thank you very much for your attention today.

(The jury left the courtroom at 3:25 p.m.)

THE COURT:  Mr. Giarratana, you can step down.

Folks, here's what I propose:  Let's recess until 3:40.  Then I would like to come back.  I would like to discuss the witness lineup.  I would like to discuss timing.  I would like to discuss the legal issue I discussed Friday, and then we'll recess.

(Recess from 3:26 p.m. to 3:38 p.m.)

THE COURT:  All right, folks, we'll go back on the

record.  The jury's not here.

Let's talk first about the witness lineup for tomorrow.  Obviously, we'll finish up with Mr. Giarratana. After that, Mr. Resser, who do we have?

MR. RESSER:  We have Clay DuBose by deposition.  We have about 15 minutes; but with the designations by plaintiff, it comes to about point nine hours.

THE COURT:  Okay, so point nine hours, that's the entirety of the Clay DuBose.

MR. RESSER:  Yeah.  It's a little over -- not quite an hour, a little over 50 minutes, 57 minutes.

THE COURT:  Okay.

MR. RESSER:  Then we'll have Mr. Rogovin.  Our estimate of his direct is about two, two and a half hours, three hours.

THE COURT:  Fine.

MR. RESSER:  Then whatever Mr. Pepe has.

THE COURT:  Yup.

MR. RESSER:  Then we have about 1.1 hours of Rory Lipsky on the malpractice side of the case.

THE COURT:  On deposition?

MR. RESSER:  By deposition only.

THE COURT:  Okay.

MR. RESSER:  And that puts us pretty close -- I mean depending on Mr. -- the cross of Mr. Rogovin, I would guess we

will not get to Mr. Leventhal by the end of the day, but he would be the next witness and our final witness.

THE COURT: All right. So Leventhal would be your final witness probably either end of the day tomorrow or first thing Wednesday.

MR. RESSER: Yes, Your Honor.

THE COURT: Okay. And then -- and while I have you, Mr. Resser, so I take it that, with regard to Mr. Giarratana obviously and Mr. Rogovin, those questions are going to concern the malpractice case at this point.

MR. RESSER: Yes, Your Honor.

THE COURT: And with regard to designations, they are what they are.

MR. RESSER: They're also just on the malpractice.

THE COURT: Malpractice? Okay. So at this point you don't have any further evidence on the billing case to present either; is that right?

MR. RESSER: There is some overlap with Mr. Rogovin's testimony, but other than that, yes.

THE COURT: When you say there's some overlap, what do you mean?

MR. HEAVEY: To the extent that he's testifying regarding his mindset on the willful and malicious.

THE COURT: Ah, yes.

MR. HEAVEY: There may be a little bit of testimony

that blends the billing, but we are not focused at all on his billing in his examination.

THE COURT: That's fine. That's fine. We'll get to that.

Fine. Thank you.

And so -- and then, of course, other than the witnesses he just identified, Mr. Pepe, you would still have Mr. Shearin to call with regard to the malpractice case. And did you were still thinking -- what's the status with the O'Keefes?

MR. PEPE: We just tried to find out, Your Honor. We tried to call during the recess and could not reach him. So it may -- we're going to try again when we get home, back to the office. It may be that I have to advise counsel and then seek relief from the Court in the form of Zoom testimony.

I don't think they'll be here -- we couldn't get them here tomorrow even if they were both available, but it appears that doesn't matter.

THE COURT: Yeah. That's okay. The issue is Wednesday really I think.

MR. PEPE: Wednesday.

THE COURT: So -- and your contemplation still is you're going to call both of them as witnesses and they will both be short.

MR. PEPE: Exactly.

THE COURT:  So beyond that, Shearin, O'Keefes, what else?

MR. PEPE:  We have the Joel Beres deposition.

THE COURT:  Right.

MR. PEPE:  And then we have Attorney Shearin.

THE COURT:  Right.  I mentioned that already, okay.

MR. RESSER:  Your Honor?

THE COURT:  Yes.

MR. RESSER:  One other matter.  And I don't think this will change what I said with respect to Mr. Leventhal, but I did want to inform the Court and everyone else that Mr. Leventhal's mother passed away --

THE COURT:  I'm sorry.

MR. RESSER:  -- just yesterday.  He has told me, despite my telling him he needs to do whatever he has to do, he says he's still going to stay in town until he testifies, and then he'll leave.  That's one of the reasons he wasn't in court today.

THE COURT:  I mean, I don't mind, in light of that, if you wanted to call him sooner and we could interrupt Mr. --

MR. RESSER:  So that's the one thing that's in flux, or if he decides he has to fly back tonight or something like that, then I will inform the Court and counsel and we can maybe make arrangements around that.  But he has told me he plans to stay in town.

THE COURT:  So, Mr. Pepe, just so we're clear, I think you should bring your notes to cross-examine Mr. Leventhal tomorrow.

MR. PEPE:  I -- Your Honor, I will, and we have no objection if he has to go out of order.  That won't be an issue.

THE COURT:  All right.  Now, now, so in light of all that, I do not still think we'll be having evidence on Thursday at this point.  It doesn't sound that way to me.  I know that Shearin will be a long witness.  And if it does go into a little bit of Thursday, that's okay.  It certainly doesn't sound to me like we're going to take up all of Thursday at this point.

MR. PEPE:  I think we agree with Your Honor's evaluation.

THE COURT:  All right.  Very well.

You too, Mr. Resser?

MR. RESSER:  Again it depends on how long Mr. Pepe has Mr. Rogovin.

THE COURT:  Okay.  All right.  That's fair.

MR. RESSER:  And Mr. Leventhal.

THE COURT:  Okay.  Fair enough.

So a couple other questions:  First of all, Mr. Pepe, let's get back to the issue of *Iacurci*.  This is the case I mentioned on Friday with regard to -- darn it -- with regard to

the special relationship issue in particular in connection with the statute of limitations.  As I mentioned, I believe that case -- I think it stands for the proposition that lawyers are fiduciaries, full stop.  And I think that case is -- there are other cases that suggest that the lawyer certainly is a fiduciary when it enters into a relationship with a client or into an agreement with the client while the attorney-client relationship is active.  That's certainly the 1940 case or *DiFrancesco* and other cases.

So in light of that, here's my question:  Isn't it the case as a matter of law that I shouldn't instruct on the statute of limitations here?

MR. PEPE:  We think not, Your Honor.  And with the Court's permission, Attorney Case will address that.

THE COURT:  Attorney Case, go ahead.  Go ahead, sir.

MR. CASE:  Your Honor, it is correct that *Iacurci* stands for the proposition that there are certain categories of per se fiduciaries.

THE COURT:  Yes.

MR. CASE:  And lawyers are listed among them, along with agents.  And the court says that they are per se fiduciaries by nature of the functions they perform.

THE COURT:  Yes.

MR. CASE:  And we're not disputing that, when a lawyer is representing a client in a legal capacity, that that is a

fiduciary relationship per se.

But there is another Connecticut Supreme Court case, and I know Your Honor has some familiarity with it, *Essex Insurance vs. William Kramer.*

THE COURT: I do indeed.

MR. CASE: For the record, that's a Connecticut Supreme Court decision on the certification from -- the certified question from the Second Circuit is at 331 Connecticut 493. And at Footnote 8 the Connecticut Supreme Court says, "Although we have stated that some actors are per se fiduciaries by nature of the functions they perform, including agents" -- in that case was an agent case --

THE COURT: Yup.

MR. CASE: -- "it is an open question as to whether every act undertaken by one's agent implicates fiduciary duties." And it cites to several authorities for that, another Connecticut Supreme Court case, *Konover Development v. Zeller*, noting that because relative sophistication of parties may impact fiduciary obligations, simply classifying a party as a fiduciary inadequately characterizes the nature of the relationship. It cites to the restatement of agency. Fiduciary duty does not necessarily extend to all elements of an agency relationship. And it cites to *Taylor v. Hamden Hall School, Inc.* An agent is a fiduciary with respect to matters within the scope of his agency.

And so in tandem with this qualification, there is a body of law in Connecticut that recognizes that the practice of law involves functions that are separable from representation in a legal capacity. Specifically, those are the commercial functions, the so-called entrepreneurial aspects of the practice of law. And this arises in the context of CUTPA where the courts have to determine: one, which are the functions of an attorney in which he or she is representing a client in a legal capacity because those functions are not subject to CUTPA and which functions are commercial in nature because the commercial functions are subject to CUTPA.

And as an example, there's a Second Circuit Court of Appeals case, *Gabriel vs. American Home Mortgage Servicing*, 503 F. App'x 89, citing to Connecticut Supreme Court authority. "Most, but not all of the practice of law is noncommercial in function and excluded from CUTPA." And, quote, "The Connecticut Supreme Court has held that the noncommercial aspects of lawyering, that is, the representation of a client in a legal capacity, should be excluded from CUTPA."

THE COURT: Right. I mean I guess what I would say to that, Mr. Case, is you said a bunch of things there I wanted to follow up on.

So the question of what aspects of the practice of law CUTPA applies to is a different question from whether the lawyer is a fiduciary at all times.

And you mentioned the *Konover* case. I would commend that case to all of you actually because there is, in fact, a jury instruction on the Connecticut civil jury instructions website that is based on *Konover* that my current intention is to use in this case with some -- with some, I think, minor modifications.

But *Konover* makes clear that a partner is a fiduciary but that where the parties are sophisticated that not all fiduciary relationships are the same. There is a spectrum and that where the parties are sophisticated, that should be taken into account. But it doesn't change the fact that a partner is a fiduciary. That's *Konover.*

So -- and I don't really think that the entrepreneurial functions under CUTPA, those -- I'm familiar with those cases. I don't think they help you on the fiduciary duty issue. *Essex*, of course, didn't involve a lawyer. But the footnote I don't take any issue with. But you also -- I mean it's not just -- *Iacurci* that makes that point.

*DiFrancesco* says -- in cases that have cited *DiFrancesco* say that when a lawyer enters into an agreement with a client during the pendency of the attorney-client relationship, that agreement is subject to the fiduciary duty. It didn't say "all agreements except billing agreements." It said "agreement." What do you say to that?

MR. CASE: Except that the Connecticut Supreme Court

is recognizing in that footnote that just because you're a fiduciary, it doesn't mean that all of your acts are performed as a fiduciary.

THE COURT:  Well, but you relied on *Konover* for that, and I'm telling you I'm very familiar with *Konover* because I read it about four times in connection with the jury instructions in this case.  And that case does not say that the partner was not a fiduciary.  To the contrary, it says just the opposite.

MR. CASE:  I mentioned *Konover* as one of the authorities cited by the Supreme Court in the *Essex* proposition.

THE COURT:  Let me ask you this:  Have you found a case in which the Court, Connecticut Supreme or appellate court, has stated that a lawyer is not a fiduciary for some purposes?

MR. CASE:  The body of law that's developed in connection with CUTPA, because --

THE COURT:  But wait a minute.  That doesn't use the word "fiduciary" though, does it?  It's just entrepreneurial aspects of the practice of law, which are subject to CUTPA.  That doesn't make those aspects of the practice of law not subject to fiduciary duties, does it?

MR. CASE:  It's fair that it doesn't use the term "fiduciary."  But what the courts are doing there is separating

the function of an attorney in representing a client in a legal capacity --

THE COURT: Yes, I agree.

MR. CASE: -- with functions that are commercial in nature.

THE COURT: I agree. For purposes of CUTPA, they're doing that. But here's my question. I'm going to ask it one more time: Have you found a case which the Connecticut Supreme or appellate court has said that a lawyer is not a fiduciary when acting in a particular way? That's the question.

MR. CASE: I cannot cite for the Court a case that -- except the Connecticut Supreme Court footnote that said it's an open issue as to whether or not --

THE COURT: You mean the Footnote 8 in --

MR. CASE: Footnote 8, that even when you're a fiduciary or when you're a fiduciary per se, it is an open question, the court acknowledged, as to whether or not that means you are a fiduciary in all respects for all conduct.

THE COURT: All right. So let's suppose that's correct. How do you get around *DiFrancesco*, which says, as I recall, when a lawyer and a client have a relationship -- there can't be any dispute here that McCarter had an attorney-client relationship with JFI at the time it started the McCarter litigation. You would agree with that.

MR. CASE: Yup.

THE COURT: So as I recall, *DiFrancesco* says that when the lawyer and the client have an attorney-client relationship and the lawyer enters into an agreement with the client, the lawyer's a fiduciary, and fiduciary duties apply and the court has to scrutinize, etc.

MR. CASE: And we would not deny that in a lawyer's capacity in performing the function of representing a client in a legal capacity.

THE COURT: But that's not what the case says. The case is talking about entering into agreements. Now, ordinarily, when a lawyer enters into an agreement with a client, it pertains to something to do with either how the lawyer's going to treat the client's property that the lawyer might hold or billing. I mean, I don't remember in practical law too many other agreements I entered into with clients outside of the billing context.

I mean, so I'm kind of wondering -- I agree with you that billing is not the practice of law, for example, as it's understood in the CUTPA cases. I agree with that. I agree CUTPA makes the separation you described. But I'm just not aware of any authority that would permit me to treat a lawyer as anything other than a fiduciary when it bills its client.

MR. CASE: I have to confess I haven't read *DiFrancesco* recently.

THE COURT: Okay.

MR. CASE:  But I don't believe that's an example where the court says expressly that billing is a function in which --

THE COURT:  I don't think it says that either.  I think it says when a lawyer enters into an agreement.  I mean I don't have it in front of me either.  But I think you're right.  I don't recall that it says billing, but I think it says when a lawyer enters into an agreement.  I don't remember whether *DiFrancesco* involved a billing dispute or not, but this was an agreement.  It was an agreement to represent the company in the Kentucky litigation.  So why doesn't *DiFrancesco* apply?

MR. CASE:  I'll say again, Your Honor, I --

THE COURT:  You want me to rely on Footnote 8.

MR. CASE:  I do, that it's an open question concerning whether or not even those categories of fiduciaries that are fiduciaries per se, that it means categorically for all functions that they perform they are fiduciaries.  And the body of law that has developed in the context of CUTPA has made an effort to try to separate what is separable from the function of representing a client in a legal capacity with what functions are commercial because it has to be one of the latter categories in order to be -- in order for CUTPA to be applicable.  And so the courts have made an effort -- admittedly, it's in the context of CUTPA, not in the context of fiduciary law, but they've had to make this effort and determination on what functions the lawyer performs that are

strictly commercial in nature, strictly entrepreneurial in nature, because only those functions can be subject to CUTPA.

And so we have -- we would have a situation here, Your Honor, where JFI seeks to have it both ways. They want the billing and collection functions to be categorized as commercial and entrepreneurial so that they can bring a CUTPA claim, but they want to say for their breach of fiduciary duty claim, well, then we're a fiduciary per se. And it's not a commercial function. It's a function of representation of the client providing legal advice.

THE COURT: All right. Let me hear from your side, Mr. Resser, or Mr. Heavey.

MR. HEAVEY: Thank you, Your Honor. I think the Court's guidance on this issue is very helpful. From our standpoint, we do agree *Iacurci* establishes a per se fiduciary relationship as an attorney with the clients. We do go on to hold to the holding in *DiFrancesco* that ultimately agreements involved from the legal billing aspect would fall under that fiduciary obligation, the fiduciary activity of the attorney.

I just want to very briefly say that the case law that was cited by McCarter & English counsel with respect to the agents do not apply to attorneys. Although an attorney can be an agent, we clearly agree that *Iacurci* holds that fiduciary relationship.

And with respect to the billing aspect of it --

THE COURT:  Okay.  And so your view is that I should charge out the statute of limitations issue?

MR. HEAVEY:  Yes, Your Honor.

THE COURT:  All right.  Let me ask another set of questions now.  And this time let me start with you.

MR. HEAVEY:  Yes, sir.

THE COURT:  So you pled fraud and negligent misrepresentation counterclaims in this case.  First of all, what are the -- what are the representations that were fraudulent or negligent as far as you claim?

MR. HEAVEY:  Well, the negligent misrepresentation would have been regarding the discounted -- the annual discounts and, more specifically, the ones that we've seen regarding their 43 percent and 38 percent, I believe.

THE COURT:  That's what I thought.  And the same is true of the fraudulent misrepresentation?

MR. HEAVEY:  Yes, sir.

THE COURT:  So it's my understanding that -- correct me if I'm wrong -- I know I made a ruling shortly before the trial with regard to the evidence of damages you would be able to introduce on that, and I found that it wasn't disclosed timely I believe was the finding.  And that meant that you couldn't present that particular theory with regard to the discounts.

So let me ask you this:  Can you prove damages for the

negligent misrepresentation and fraudulent misrepresentation claims to a reasonable certainty?

MR. HEAVEY:  I believe we could -- I believe we could.

THE COURT:  How would you do that here?

MR. HEAVEY:  Well, I believe we could prove at least nominal damages for those representations.  And obviously there would be a determination, at least an analysis of that if it was granted regarding the punitive aspect of that.

THE COURT:  So in Connecticut I believe it's the law -- Josh, am I right?  Correct me if I'm wrong -- that for fraud, intentional misrepresentations, nominal damages are not available.  Or was that negligent misrepresentation?

We're going to check on that.

My understanding was that proof of damages is an element of negligent misrepresentation, fraudulent misrepresentation, but let's not rely on my understanding. Let's see if we can get some case law on this, and I'll let you take a look at that just like I did the other side.

MR. HEAVEY:  Thank you, Your Honor.

THE COURT:  We're going to find this for you.

MR. HEAVEY:  Thank you, Your Honor.

THE COURT:  One case is *Kilduff vs. Adams*, 593 -- I have an Atlantic cite for you, 593 A.2d 478 at page 487.  This is a Connecticut Supreme Court writing in 1991, quote -- this is a fraud issue.

The plaintiff in an action for fraud must prove that he has been injured in order to recover.  A plaintiff who has not suffered damage or injury cannot pursue an action at law or in equity for nominal damages resulting from fraudulent actions.  Cites a case called *Beik vs. Thorsen*, B-E-I-K.  Thorsen is T-H-O-R-S-E-N.  The cite for that case is 169 Connecticut at pages 594 and 595.

It is clear that proof -- this is still quoting from *Kilduff*.  It is clear that proof of damages is an essential element of a fraud action.  The issue, therefore, is whether the plaintiff must prove damages by clear and satisfactory standard -- by the clear and satisfactory standard or the preponderance of the evidence standard.

So that's the reason I asked the question.  So we can talk about this tomorrow afternoon if you like.  Okay?

MR. HEAVEY:  Thank you, Your Honor.

THE COURT:  All right.  Fine.  All right.  Well, that's all I had.  Is there anything else we need to discuss now?

MR. RESSER:  Yes, Your Honor.  I think at this time we would make an oral motion under Rule 50 -- I know Your Honor doesn't want briefs on it.  The main issues that we think have not been established as a matter of law are that M&E has not established that Jarrow Formulas' agreement to increase rates above the initial rates that Your Honor used for the summary

judgment motion by clear and convincing evidence and establishing that the agreement was fair and equitable with full disclosure.

The cases we rely on are on pages 1 through 3 of our trial memorandum, our trial brief. In particular, the *Mahoney* case, which held that where the attorney unilaterally increased the hourly rate during the course of the engagement, the attorney claimed that he informed his client verbally of the increase and the client paid the bills. The court found as a matter of law this evidence is not sufficient to sustain the attorney's burden of proving by clear and convincing evidence that he dealt fairly with the client in unilaterally raising the billing rate.

That's not the only case that we've cited. I won't take more time of the Court other than to ask the Court to see those pages 1 through 3 of our legal memorandum.

THE COURT: Okay.

MR. RESSER: The second issue, Your Honor, is, with respect to the McCarter & English prayer for punitive damages on its breach of contract claim --

THE COURT: Yup.

MR. RESSER: -- McCarter & English presented in its responsive trial brief cases disputing that issue. However, those are all trial court cases. The last appellate decision on this issue from the Connecticut Appellate Court is that

Connecticut no longer recognizes bad faith breach of contract except when there is a strong public policy involved, as has been recognized in the insurance context and possibly the employment context.

This is neither.  And, therefore --

THE COURT:  That's after the Belick (phonetic) decision?

MR. RESSER:  It's after the *L.F. Pace* decision.  I believe it's *Barry vs. Posi-Seal Intern. Inc.*, 40 Conn. App. 577.  And that case is addressed on page 8 of our Trial Memorandum.  And this section of our brief is pages 7 through 12 of our Trial Memorandum, Your Honor.

THE COURT:  All right.  Thank you.  Was that it?

MR. RESSER:  That's it.  I mean I will take more time but I won't.

THE COURT:  No, I'm going to look at the cases.  Don't worry.

MR. RESSER:  Thank you, sir.

THE COURT:  Would anybody like to respond?

MR. PEPE:  Yes, Your Honor.  With respect to the increase in rates, the evidence shows that there's a 23-year course of dealing beginning with a written agreement in which Jarrow Rogovin acknowledged that the rates would increase from time to time, that in fact they did.  The evidence is uncontradicted that I think the first rate charged by Mr.

Giarratana was $200 an hour. And when -- and when the Kentucky litigation arose, it was over $400 an hour.

And so we have a pattern and practice of behavior between the parties that's uninterrupted and that the evidence shows that there was never anything more than an oral notice to the client and then, of course, in every single bill, a statement of what the hourly rate would be. So it's not simply this one case, this one relationship on which the -- on which McCarter & English rely.

With respect to the -- to the bad faith breach, we've set forth in our trial brief cases we believe still, in fact, acknowledge to this day that the law in Connecticut is to acknowledge a bad faith breach and it's not limited to the insurance context. And we stand by those cases.

THE COURT: All right. Very well.

So let me say this: I'm going to look at all these cases again. I did look at them briefly when you filed the trial briefs, but I will have some more, I think, final remarks for you tomorrow.

But I'll say this much: I guess my inclination is to reserve, but -- unless I find something else. I will say this though: So I don't think that -- well, let me start again.

My summary judgment ruling referred to the *DiFrancesco* case, I believe, and I think another case citing the case for the proposition that the court needs to scrutinize

relationships between counsel and clients for fairness.  I didn't get into any detail though on that, other than that one paragraph.  And, frankly, I probably should have, not so much on the -- in the area of the summary judgment ruling where I actually discussed it, which is the area where I ultimately found it was a genuine dispute of material fact for trial whether JFI had agreed to the higher rates, but I think I should have mentioned it in the earlier part of the ruling.

I think, now that I've heard the evidence in the billing issue, to the extent it's not clear in the summary judgment ruling, I think it's implicit.  But to the extent it's not clear, I do find that, having heard McCarter's evidence, that it has proven by clear and convincing evidence that the lower rates, the rates that I found in the summary judgment ruling, were not -- did not warrant a trial.

I think that -- I think it has proved by clear and convincing evidence that those rates were fairly arrived at, that they were the product of fair dealing, and so that given my at least current reading of the law, which is that McCarter does have to satisfy that burden, I do think it discharged that burden.  I do think that was present in the summary judgment papers, but I didn't say it maybe clearly enough in the first part of that ruling where I found -- the part where I found there was no genuine dispute of material fact.  But now I've listened to the evidence in the billing issue, and I do think

that as a matter of law McCarter has proved by clear and convincing evidence that the -- that it was fair to charge JFI the lower rates.

As to the higher rates, that's what you just argued. That's what I'm going to take under advisement.  Again, my inclination is to reserve, but I do want to look at the cases you cited before I do that.

Thank you.

MR. PEPE:  If I may.

THE COURT:  Yes.

MR. PEPE:  I think I heard Mr. Resser rest on the billing issue too.  Did I hear that correctly?

MR. RESSER:  I did indicate there was some overlap perhaps with Mr. Rogovin's testimony.

THE COURT:  Well, let's dig into that though.  What does it mean that there's overlap perhaps?

MR. RESSER:  State of mind.

MR. HEAVEY:  Again, there may be some testimony regarding his state of mind with respect --

THE COURT:  Ah, the damages stuff?

MR. HEAVEY:  Yes.

THE COURT:  All right.  I mean I think that's fair in light of how much we've had on it to do some of it.

MR. HEAVEY:  Believe me, Your Honor, we want to keep it limited in the Court's efficiencies.

THE COURT: But that's ultimately a damages issue. That's not as to the cause of action for breach of contract. I mean, that's at least the way I see it. So if you want to make -- I take it there's no more evidence with regard to whether the rates were agreed to, Mr. Heavey; is that right?

MR. HEAVEY: I'm sorry, Your Honor?

THE COURT: There's not going to be any more evidence as to whether the higher rates were agreed to?

MR. HEAVEY: No. That part of the case is closed.

THE COURT: So I do think it's fair to move -- make a motion if they want to because, as I say, I think the willful and malicious breach really goes to damages. So if you want to make the motion, you can.

MR. PEPE: Very briefly. I understand Your Honor just wants us to be brief on this.

THE COURT: Just lay out your reasons briefly, yeah. That's just so you have all the reasons in the record, but we don't need to really discuss them.

MR. PEPE: It is based on the Court's question as to what the acts of misrepresentation are.

THE COURT: Yeah.

MR. PEPE: And that, of course, would go to the breach of fiduciary duty because I think that's -- that's implicit in the allegations that are made.

And the two misrepresentations are: one, with respect

to the discount negotiations; and, two, with respect to the 38-percent discount. On the latter, there is no evidence, none, that the 38-percent discount represented by Mr. Giarratana was anything other than that. There was no testimony from any witness or any document that contradicted that his statement that it was a 38-percent discount, not on his fees but the overall discount, based on the fact that he's being charged less than standard rates and has also negotiated discounts, at that point in time, when asked, was 38 percent. There's no evidence contradicting that.

THE COURT: Wait. I'm sorry. Two things: One, so you're suggesting that you're making a motion for directed verdict targeting JFI's fiduciary claim? Is that right?

MR. PEPE: No, the misrepresentation claim. My point was to the extent that is alleged to be a breach of fiduciary duty, then the argument would apply.

THE COURT: Well, yeah, but the fiduciary -- the reason I'm raising this is I think the fiduciary duty claim is based on a lot more than that. I think it's based on kind of what we discussed a moment ago, which is, you know, it's sort of --

MR. PEPE: I understand. But to the extent that there is that allegation.

THE COURT: But now let me just, on the facts, let me just understand what you're saying.

MR. PEPE:  Yes.

THE COURT:  You're saying there's no evidence that a representation about a 38-percent discount was untrue?

MR. PEPE:  Exactly.

THE COURT:  All right.  But wasn't there also a representation that we saw at least in an e-mail that the discount was, in fact, 43 percent?

MR. PEPE:  No.  When you look at that -- here's where that comes from, Your Honor:  That e-mail says you're already getting a 38-percent discount.  I can't give you any more than 5 and that 5 plus the 38 would be 43.

THE COURT:  Right.

MR. PEPE:  So there's no contradiction of that evidence.

THE COURT:  But I thought that it was -- you tell me. I thought that it was -- well, doesn't 38 and 5 equal 43?

MR. PEPE:  Yes.

THE COURT:  Okay.  So then help me out.  I thought that there was some testimony -- although I could be wrong. You folks remember the testimony better than I do.  I thought there was some testimony that actually, no, that wasn't quite right.  It wasn't a 43-percent.

MR. PEPE:  There was that.  Because if you did the math --

THE COURT:  Yeah.

MR. PEPE: If you actually did the math, then you can't -- wouldn't be 5 plus 43. It would be 5 plus 38. It would be something else.

THE COURT: But if that's true, then isn't that a misstatement?

MR. PEPE: No. That's just bad math, Your Honor. That's a misunderstanding of the way you would calculate the discount.

THE COURT: Well, wait a minute. So I thought -- am I wrong? There's no e-mail that mentions the word -- the number 43?

MR. PEPE: No, no, there is.

THE COURT: Okay.

MR. PEPE: The e-mail says, if I give you 5 percent added to the 38 would be 43.

THE COURT: Right. But that wasn't correct.

MR. PEPE: The math is not correct.

THE COURT: Okay. So isn't that a misstatement?

MR. PEPE: I think that's just bad math. There wasn't --

THE COURT: But 38 plus 5 is 43. So where is the bad math? Sorry. Being thick.

MR. PEPE: No, Your Honor's quite right. That's where the 43 comes from.

THE COURT: Okay.

MR. PEPE:  What I think Ms. Bosma said was, If I gave another 5 percent, you have to go back and recalculate that. And it doesn't come out to 43.

THE COURT:  Yeah.  But was -- if the 43 or even the 38 plus 5 was transmitted to the client --

MR. PEPE:  Yes, it was.

THE COURT:  -- then that's the basis for the misrepresentation claim.  And I think you've kind of acknowledged, yeah, Ms. Bosma kind of acknowledged, yeah, that wasn't correct.  You had to go back and calculate it.  But how the heck were they supposed to know that?

MR. PEPE:  Well, at worst, Your Honor, it's negligent misrepresentation.

THE COURT:  All right.  So but, you know, you know, we usually let the jury decide issues of intent.  But okay, I hear you.  What else do you got for me?

MR. PEPE:  The other part is with respect to the negotiations on the discount --

THE COURT:  Yeah.

MR. PEPE:  -- the evidence there is uncontradicted there was no entitlement to any discount, none.  Mr. Khowong so testified in his deposition.  He said -- the question was, What are you entitled to in a discount?  He said, No entitlement. It's a matter of negotiation.

THE COURT:  Okay.

MR. PEPE:  So if there's no entitlement to it, then how could there be any damages resulting from it?  Whether they got 5 percent or 10 percent is -- can't be a breach of any obligation giving rise to damages because there was no entitlement to a discount or an obligation to give one.  So no damages flow.

THE COURT:  Well, so that's kind of interesting.  I've been wondering about that.  So suppose, you know, I owe -- I don't know -- some amount of money on some contractual obligation I have and, you know, I've not paid.  It's due.  It's overdue.  And the obligee, or the one to whom I owe the money, decides:  Well, we got to get Shea to pay.  So we're going to trick him into paying.  We're going to tell him that, in fact, we're setting up -- I don't know -- a lottery.  He could win some money or something like that.

I know this is a far-fetched hypothetical.  I fully concede it.  But I guess what I'm getting at, is it really the case that if they tricked me into doing something that I am required to do, that that's not actionable in any way, shape, or form?  I don't know the answer to that question.  I'm asking you.

MR. PEPE:  And I would argue it is not, Your Honor, because the starting point -- and I don't want to repeat myself.  But the starting point is there is no obligation owed either way, and Mr. Khowong admits that.

So if he asked for a 15-percent discount and he ends up getting the 5 or 10, then what are the damages that flow from that?  I mean he was not entitled to any to start with. So he ends up with 5 or 10.  So he's ahead of the game there. So he can't get any damages.

THE COURT:  All right.  Anything else?  Go ahead.

MR. PEPE:  No.  The obligation to the extent there was one, Your Honor, was right on the front of the bill, due upon receipt.  Now, I understand pattern and practice was it was 30 days or 60 days.  But that was the obligation.

THE COURT:  Okay.

MR. PEPE:  No other.

THE COURT:  All right.

MR. PEPE:  And -- and, Your Honor, there's also -- Your Honor addressed this in the summary judgment motion where we raised a defense of statute of limitations.  And Your Honor did not grant summary judgment on that basis because Your Honor thought there might be an issue of continuing course of conduct.  And although the Court could not find one in the legal context, the Court analogized to the medical profession --

THE COURT:  Right.

MR. PEPE:  -- and concluded that there might be, certainly for summary judgment, an issue of fact as to whether a continuing course of conduct tolled the statute.

THE COURT:  Right.

MR. PEPE:  And we've taken a look at that issue too, Your Honor.  And we think that the facts, now that the evidence is in, support the conclusion that the statute of limitations was not tolled.  And having said that, I've reached the limit of my knowledge, and I would ask if Mr. Case could pick up that argument at that point.

THE COURT:  I tell you what, though, I tell you what.  I don't mean to cut you off.  I have to make a phone call at 4:30.  I do want to give Mr. Resser a chance to respond.  I don't mind.  I'm going to have some remarks for you tomorrow before the evidence starts, and we can pick it up then as well.

So, Mr. Resser, do you want to respond, though, to what's been said so far?

MR. RESSER:  Very briefly.  In addition to what's already been discussed with respect to the discounts, Exhibit 514 is in evidence, Your Honor, and that's the document that shows a 24.88-percent discount through May of 2019 year-to-date.  I know there was testimony but no countermanding documentation that Ms. Bosma was looking at the wrong document or then didn't look at the right documentation or was looking at a different documentation when she advised Mr. Giarratana of the 38 percent.  But there is evidence of the record, 514, 24.88-percent discount, not 38, not 43.

THE COURT:  What do you do about the argument there's

no obligation?

MR. RESSER:  Well, again, putting aside even the relationship of attorney and client, I don't think a debt collector can lie to someone under the Fair Debt Collection Act in the way that was presented here.  But then on top of that, you have a fiduciary making that representation.  And the fiduciary rule of accrual would also apply to these causes of action with respect to the statute of limitations issue.  And I know I'm conflating some of these things, but I know Your Honor has to make a phone call so ...

THE COURT:  Let me ask you to follow up on one thing, and then we'll call it a day.

So putting aside fiduciary duty because, I don't think this argument, even if it was successful, would knock out the fiduciary claim for the reasons I stated --

MR. RESSER:  Right.

THE COURT:  -- what about the negligent and fraudulent misrepresentation claims?  As I understood it, I understood from the pleadings and from Mr. Heavey, the basis of those claims is indeed the discount statements.

MR. RESSER:  Yes.

THE COURT:  So what about Mr. Pepe's argument that, well, we didn't have an obligation to find any discounts?

MR. RESSER:  Well, again, when a debt collector is trying to get payments sooner than later, you can't lie --

THE COURT:  That's true because we have the FDCPA.  I don't know if it would be the law otherwise.

MR. RESSER:  Well, it would seem to me that it's even stronger when it comes to a lawyer lying to the client to get payment sooner than later.  And the evidence in the record is that Ms. Mary Grace Reyes identified three invoices that she wanted to catch up on, three invoices, but all came below the amount that was actually paid.  By May 31st, about a half million dollars was paid.  The amount of the three invoices that they asked her to identify that they were asking for the discounts on amounted to about 258,000 -- if I don't have that number exactly right, it's somewhere in the $300,000 range.  So they were able to obtain 200,000 more than was offered based upon the negotiation of discounts.

I know that there was testimony from Mr. Giarratana that he wanted everything brought current.  And, again, there's testimony that current for this client meant 60 days for newer, not later.

THE COURT:  All right.

MR. RESSER:  So there's plenty of evidence for there to be an issue of fact there, Your Honor.  However, we will look at the cases that Your Honor cited with respect to the nominal damages issue given Your Honor's ruling that we could not present the actual damages.

THE COURT:  Right.  Okay, very well.  So we'll

continue this tomorrow morning.  Thank you.  Be in recess.

(Proceedings concluded at 4:26 p.m.)

**I N D E X**

**WITNESS NAME**                                              **Page**

Thomas Rechen

   Continued Redirect By Mr. Resser........................... 1530

   Redirect By Mr. Pepe ...................................... 1601


Eric Grondahl

   Direct By Mr. Ward......................................... 1622

   Cross By Mr. Pepe......................................... 1643

   Redirect By Mr. Ward ..................................... 1664


Mark Giarratana

   Direct By Mr. Resser ..................................... 1667

   Cross By Mr. Pepe......................................... 1697

C E R T I F I C A T E

MCCARTER & ENGLISH, LLP VS. JARROW FORMULAS, INC.

NO. 3:19-CV-1124 (MPS)

I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ JULIE L. MONETTE

_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937