# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
| | )
McCARTER & ENGLISH, LLP, | )
| ) Case No. 3:19-cv-01124 (MPS)
*Plaintiff*, | )
| )
vs. | )
| )
JARROW FORMULAS, INC. | )
| ) NOVEMBER 7, 2023
*Defendant*. | )
_____ | )

## PLAINTIFF'S OMNIBUS REPLY BRIEF
## IN FURTHER SUPPORT OF ITS MOTIONS FOR PREJUDGMENT INTEREST, PUNITIVE DAMAGES, AND OFFER-OF-COMPROMISE INTEREST

Plaintiff McCarter & English, LLP ("McCarter") submits this Omnibus Reply Brief to Defendant Jarrow Formula Inc.'s ("JFI") Response (DN 477) to McCarter's Omnibus Memorandum of Law in Support of Its Motions for Prejudgment Interest, Punitive Damages, and Offer-of-Compromise Interest (DN 467).

## I.      INTRODUCTION

JFI's opposition brief is most remarkable for what it does *not* address.  With rare exception, JFI fails to address the issues for which this Court requested briefing: the components and calculation of interest and punitive damages awards.  Instead, JFI's submission is mostly an attempt to re-litigate facts and issues that—by stipulation of the parties—were already submitted to, and resolved by, the jury.

In doing so, JFI does not restrain its exceptional use of pejoratives.  In its brief, and the accompanying 10-page affidavit, JFI characterizes McCarter and its attorney-witnesses as "*liars*" or some derivative (5 times), "*schemers*" (2x), "*perjurious,*" "*incompetent,*" "*slanderous,*" "*melodramatic,*" and "*cons,*" who should be "*disbarred*."  JFI further describes McCarter's

evidence at trial as "*hornswoggle*;" a "*nonstop fusillade of falsehoods, exaggerations, distortions*;" and the "*excrement of their deceit*" (1 of 7 uses of "*deceit*" and its derivatives).

The barbs are not reserved for McCarter alone.  Counsel and expert witnesses are variously described as "*unprofessional,*" "*unethical,*" "*fraudster[s],*" "*rancorous,*" "*monstrous,*" and a "*travesty masqueraded as 'expert testimony.'*"  This Court (and its sister court in Kentucky) are not spared either.  The judicial proceedings were not just "*unfair*" and "*prejudicial,*" but "*heavily biased,*" "*illegitimate*" (2x), "*unseemly,*" and "*literally corrupt*."  JFI's approach is obviously unhelpful to a resolution of the issues now before the Court, and so McCarter's reply brief will focus instead on the record and the relevant authority.

This Court is not resolving McCarter's *entitlement* to awards of prejudgment interest, punitive damages, and offer-of-compromise interest.  That entitlement already has been resolved by the jury.  By stipulation of the parties, the Court is now calculating the *amount* of those awards.  The components of those calculations—to the extent JFI offers any challenge to McCarter's proposals—are addressed in turn below.

## II.  ARGUMENT

### A.  Prejudgment Interest

#### 1.  By Stipulation Of The Parties, The Issue Of Entitlement To Prejudgment Interest Already Was Resolved By The Jury

JFI spends the first *six pages* of its brief arguing that McCarter is not *entitled* to prejudgment interest.  *See, e.g.*, DN 477 ("JFI Br."), at p. 2 ("Jarrow Formulas did not detain monies in the manner characterized by Plaintiff…").  But that issue has already been resolved.

The parties stipulated that the issue of *entitlement* to prejudgment interest would go to the jury.  *See* Stipulation, DN 362, at ¶5 ("If the issue of prejudgment interest is permitted by the Court to go to the trier of fact on any claim, the jury will be the trier of fact on *whether* a party is

*entitled* to prejudgment interest on that claim.") (emphasis in original).  After the Court charged the jury on "what constitutes wrongful detention," Jury Instructions, DN 430, at pp. 38-39, the jury found McCarter was entitled to such an award.  *See* Jury Verdict, DN 433, at Question 7.

That is not the only stipulation of the parties.  The parties further stipulated to several compensatory-damages calculations that varied depending on the jury's findings about the evidence—for both McCarter's billing claims ***and*** JFI's counterclaims.  *See* Stipulation, DN 423. The reason the parties could agree to these sums was precisely because they are *liquidated*.  A liquidated sum does not mean the amount is not the subject of a dispute, as JFI wrongly suggests. *See* JFI Br. at p. 5.  Rather, it means the sum is computable from the terms of the contract.  *See Black's Law Dictionary* (7th ed. 2001) ("*liquidated amount*. A figure readily computed, based on an agreement's terms.'").  Here, the parties stipulated to those amounts, so the jury would not be burdened with the arithmetic.  And JFI *further* stipulated to the Jury Verdict form that made those compensatory-damages options subject to prejudgment interest, if the jury found wrongful detention.  *See* Stipulation, DN 423.

Having stipulated to send the issue of entitlement to the jury; having further stipulated to the Jury Verdict form and the liquidated sums; and having failed to object to the charge on prejudgment interest, JFI cannot raise any of those issues now.  *See, e.g.*, JFI Br. at p. 5 ("The amount in dispute in this case was not a liquidated sum and at all times remained in dispute.").

None of the cases JFI cites involve the scenario presented here: the parties stipulating to having the jury decide entitlement to prejudgment interest, and further stipulating to liquidated sums and the Jury Verdict form.  *See* JFI Br. at pp. 2-4, fn. 1.  Instead, in every case, the court was deciding both the issue of entitlement and the calculation of the amount.  *See id*.  None of

those cases, therefore, is apposite.  The Court is deciding now only the **_calculation_** of the amount of prejudgment interest.

### 2.    JFI Fails To Support The Use Of A 4% Or Lower Rate

To the extent JFI addresses the *calculation* of prejudgment interest, it argues that "it should be limited to a rate of no more than 4%. . . ."  JFI Br. at p. 10.  But, in making this argument, JFI largely ignores the relevant precedent and the full spectrum of economic metrics endorsed by the Connecticut Supreme Court.

JFI's principal citation is to *deGruchy v. Macchia*, 2022 Conn. Super. LEXIS 2174 (Conn. Super. Ct. Oct. 3, 2022).  *See* JFI Br. at p. 7.  But McCarter included *deGruchy* in its analysis.  *See* DN 467, at pp. 5-6.  As McCarter explained in its initial brief, *deGruchy* was the **_only_** decision in the last 12 months to make an award under § 37-3a as low as 4%—the **_only_** one. The majority of awards in the survey were between 8%–10%.  *See id*.  McCarter noted that *deGruchy* was unusual in that Judge Tierney fashioned a uniform interest rate to apply to a 15-year period, dating back to 2007, which was more heavily weighted by periods of long-outdated economic factors.  *See id*.  Of the many decisions in McCarter's analysis on prejudgment interest, JFI chose to address only this one, anomalous—and distinguishable—decision.

JFI cites only two decisions not already addressed by McCarter: *Coppola v. Palmer* and *Fih v. Barr*.  *See* JFI Br. at p. 7.  Notably, however, neither of these two cases concerns a § 37-3a prejudgment interest award, so they were not part of the survey of decisions in McCarter's initial brief.  *See Coppola*, 2023 Conn. Super. LEXIS 2315, at *7 (award of *post*-judgment interest); *Fih*, 2023 Conn. Super. LEXIS 2239, at *41 (award under Conn. Gen. Stat. § 36b-29).   In any event, each case involves an award of **_8% interest_**, which does not support JFI's request for a 4% rate, and instead is in line with McCarter's contention of a trend in the 8%–10% range.  *See* DN 467, at pp. 5-6.

The only other apparent justification for JFI's suggested use of a 4% rate is a calculation it performs, averaging the reported monthly rates of the Consumer Price Index from August 2019 to present. *See* JFI Br. at pp. 8-10. This appears to be in response to McCarter's citation to the CPI to show recent inflationary trends that peaked at 9.1%. *See* DN 467, at p. 15. McCarter cited to this data to show that, when courts had a pattern of using 4%–6% rates for prejudgment interest, inflationary pressures were nowhere near these more-recent levels. *See id.* All of this is *confirmed* by the chart and table JFI includes in its brief, *see* JFI Br. at pp. 8-10, and does not provide a basis for using a 4% interest rate for the relevant period here, which saw markedly higher inflationary metrics. By JFI's own calculation, the rates of inflation during the relevant period here have been significantly higher than during the period when courts were routinely applying 4%–6% rates for § 37-3a interest. *Compare* JFI Br. at p. 10 ("The average CPI Index for all relevant periods [August 2019 to present] is 4.37%."); *with* DN 467, at p. 15 ("for 10-year period from January 2009 to January 2019, CPI never exceeded high of 3.9% and was mostly at or near 1–2%, with some periods recording *negative* rates") (emphasis in original).

In addition to increased inflationary pressures, McCarter also cited to stock market metrics during the relevant period. *See* DN 467, at pp. 16-19. JFI largely ignores this analysis, and it misapprehends the argument to the extent it addresses it at all. McCarter did not argue for a return on investment from any specific or high-risk source. *Cf.* JFI Br. at p. 10. Rather, McCarter showed that stock ***indexes***, like the S&P 500, which are used as barometers for the performance of the stock market generally, had average annual increases during the relevant period almost uniformly ***above*** 10%. *See* DN 467, at pp. 16-19.

As McCarter also addressed in its initial brief, the Connecticut Supreme Court recognized that reasonably risked stock performance is an appropriate metric in determining interest awards.

*See DiLieto v. Cnty. Obstetrics & Gynecology Grp., P.C.*, 316 Conn. 790, 805 (2015) ("it makes sense for a court to consider a full spectrum of investments—both public and private—in determining an appropriate rate of interest"); *see also* DN 467, at pp. 17-19.  JFI simply ignores *DiLieto* and the guidance from the Connecticut Supreme Court on this subject.

JFI fails to justify the use of a 4% rate, which would be anomalous among similar decisions over the last year, and inconsistent with relevant economic metrics.

### 3.      JFI Is Not Entitled To A Credit For Interest From PJR Funds

Finally, in a single paragraph, JFI argues that it should be entitled to an "offset [of] a reasonable amount which would mimic an interest-bearing account," because McCarter "never requested that the bond for the Prejudgment remedy be held in an interest-accruing account." *See* JFI Br. at p. 6.  But JFI's argument is misguided in several respects.

First, the argument is simply wrong on the basic facts.  There was no "bond" in response to McCarter's PJR application.  In fact, JFI recently approved and consented to a motion, which explained the circumstances following the PJR award.  *See* DN 480.  Magistrate Judge Merriam, following an evidentiary hearing, awarded McCarter an attachment of $1.85 million.  *See* DN 124 (PJR award).  After that PJR award, McCarter garnished JFI's receivables due from one of its distributors.  *See* DN 480.  In response to that garnishment, the parties negotiated an agreement (the "Escrow Agreement"), whereby JFI deposited $1.85 million into escrow (the "PJR Escrow Funds") during the pendency of this litigation.  *See* Exhibit A to DN 480-1.  Those PJR Escrow Funds were only recently released to McCarter, on September 30, 2023.

Second, the parties specifically addressed in the Escrow Agreement the issue of savings interest.  JFI is also incorrect, therefore, when it asserts that "Mr. Rogovin requested an interest-bearing instrument be used, but his suggestion was ignored."  JFI Br. at p. 6.  Instead, the parties expressly agreed that, to the extent savings interest accrued on the PJR Escrow Funds while in

escrow, that interest belonged to McCarter, ***regardless of the outcome of the litigation***.  *See* Exhibit A to DN 480-1, at ¶9 ("Interest from this account shall accrue for the benefit of M&E.").

In other words, McCarter could have lost all of its claims at trial, and JFI could have prevailed on all of its claims at trial, including JFI's claim for § 37-3a interest, and ***still*** any savings interest from the PJR Escrow Funds belonged McCarter.  By design, the savings interest was unconnected to, and separate from, the litigants' competing claims for § 37-3a interest.  The parties thus specifically addressed the issue of savings interest of the PJR Escrow Funds and did ***not*** agree to apply it as an offset for prejudgment interest, as JFI now proposes.

Third, in addition to being inconsistent with the parties' express agreement, it would not make sense to have the savings interest connected to the award of § 37-3a interest, because McCarter did not have *use* of the funds while they were held in escrow.  Section 37-3a interest is intended to compensate a party for the loss of use of money wrongfully detained.  *See* Jury Instructions, DN 430, at pp. 38-39.  Until September 30, 2023, JFI refused to release those funds to McCarter; and McCarter did not enjoy the use of those wrongfully detained funds while they were held in escrow.  *See* DN 480.[1]

The savings interest from the PJR Escrow Funds, by agreement of the parties, had no relationship to the litigants' competing claims for prejudgment interest, and, in any event, is not an adequate substitute for McCarter's unrestricted use of the funds JFI wrongfully detained.

JFI does not contest any other component of the calculation of prejudgment interest, including the start date or end date.  Because JFI has failed to support the use of a 4% rate and an

---

[1] Furthermore, historically courts have not used savings interest rates as a substitute for § 37-3a interest awards.  Even in the lowest savings-rate environment of the recent past—and even when other economic factors like inflation were low—the courts, by their own assessment, routinely awarded in the range of 4%–6% prejudgment interest under § 37-3a—not a fraction of 1%, as savings accounts commonly returned during that period.

offset for savings interest from the PJR Escrow Funds, the Court should calculate and award § 37-3a prejudgment interest according to McCarter's well-supported application. *See* DN 467; *see also* DN 481 (revised calculation following release of PJR Escrow Funds).

**B.    Punitive Damages**

**1.    By Stipulation Of The Parties, The Issue Of Entitlement To Punitive Damages Already Was Resolved By The Jury**

Just as with the issue of entitlement to prejudgment interest, the parties stipulated that the jury would decide the issue of *entitlement* to punitive damages. *See* Stipulation, DN 362. The issue before the Court on McCarter's application for punitive damages is the calculation of the *amount*. *See id*. at ¶5 ("If entitlement to punitive damages is presented to and found by the jury on the Breach of Contract . . . claim[], the Court will determine the amount of punitive damages in post-trial proceedings."). JFI, however, devotes nearly the entire section of its brief on this topic to arguing that McCarter is not *entitled* to such damages. *See* JFI Br. at pp. 11-16.

**2.    JFI Does Not Challenge The Reasonableness Of McCarter's Fees And Expenses—JFI's Costs Were Higher**

The only challenge to the *amount* of the punitive damages is in the last two paragraphs of JFI's section on this subject. *See id.* at p. 16. Without any analysis or cited authority, JFI baldly criticizes the requested punitive damages (which it lumps together with the other post-verdict applications for prejudgment interest and offer-of-compromise interest) as "*absurd*," "*obscene*," a "*strident overreach*," and a "*shock [to] the conscience*." *Id.* It is curious that JFI describes McCarter's request for approximately $3 million in legal fees and an additional approximately $600,000 in expenses as a shock to the conscience when, ***in the very same paragraph***, JFI acknowledges that it has itself spent "approximately $4 million for this case." *Id.*

Significantly, JFI does not address any of the case law or evidence supporting McCarter's application for its legal fees and expenses. Perhaps because JFI admits to spending more itself, it

fails to offer any challenge to the components that make up the calculation of McCarter's punitive damages.  JFI does not challenge the reasonableness of the rates of any of McCarter's counsel.  It does not challenge the reasonableness of a single hour of counsel's time devoted to this litigation.  And it does not challenge a single dollar of McCarter's litigation expenses. McCarter's well-documented application establishes that these fees and expenses were all appropriate and reasonable—especially when compared against JFI's **greater** costs.[2]

McCarter is entitled to all of its well-supported and reasonable litigation fees and expenses as punitive damages.

### C.     Offer-of-Compromise Interest

In one, short paragraph of its brief addressing offer-of-compromise interest, JFI completely misapprehends even the concept of the award.  *See* JFI Br. at pp. 16-17.  JFI appears to confuse the offer-of-compromise award as a *present* offer to compromise McCarter's

---

[2] In the absence of any challenge to the reasonableness of the time McCarter's attorneys dedicated to this litigation, one could view the 15% courtesy discount applied to McCarter's legal fees alternatively as a reduction to the hourly *rates* charged by counsel—instead of a reduction to the time expended. *Compare* DN 467, at p. 15.

| Timekeeper | Rate | Effective Rate (after 15% discount) |
|---|---|---|
| Louis R. Pepe | $625 | **$531.25** |
| | $675 (1/1/22 rate change) | **$573.75** |
| James G. Green, Jr. | $475 | **$403.75** |
| | $525 (1/1/22 rate change) | **$446.25** |
| David W. Case | $465 | **$395.25** |
| James A. Budinetz | $460 | **$391.00** |
| Associates and Counsel | $200-$300 | **$170-$255** |
| Bruce Beckius | $260 | **$221.00** |
| | $300 (1/1/22 rate change) | **$255.00** |
| Cathy Ouellette | $175 | **$148.75** |
| | $200 (1/1/22 rate change) | **$170.00** |

prejudgment interest. *See id.* Of course, the offer-of-compromise award has no relationship to the present application for prejudgment interest, and instead is a statutory penalty for JFI's failure to accept a reasonable offer to settle the litigation long ago.

Again, JFI provides no challenge to any of the components of the calculation that McCarter proposed to this Court: the start date, the end date, or the statutorily mandated 8% rate of interest. Additionally, JFI does not challenge the application of the rate to the total recovery of damages, including compensatory damages, prejudgment interest, and punitive damages.

Accordingly, there is no basis to depart from the well-supported calculation of offer-of-compromise interest McCarter submitted.

## III.   **CONCLUSION**

The Court should award McCarter prejudgment interest, punitive damages, and offer-of-compromise interest according to the calculations in McCarter's Omnibus Memorandum (DN 467), as revised following the release of the PJR Escrow Funds (DN 481). JFI has failed to justify any alternative calculations.[3]

PLAINTIFF
McCARTER & ENGLISH, LLP

By: /s/ Louis R. Pepe
      Louis R. Pepe (ct04319)
      James G. Green, Jr. (ct05961)
      McElroy, Deutsch, Mulvaney & Carpenter, LLP
      One State Street - 14th Floor
      Hartford, CT 06103
      Tel. 860-522-5175
      Fax: 860-522-2796
      lpepe@mdmc-law.com
      jgreen@mdmc-law.com

---

[3] If JFI wished to contest whether there should be *any* award of prejudgment interest, it should have raised that issue in its Motion for Judgment as a Matter of Law (DN 470) or Motion for a New Trial (DN 468). It did not. To the extent JFI does raise in those motions the issue of McCarter's right to an award of punitive damages, McCarter refers to its opposition briefs for the law and evidence supporting such an award. *See* DN 478, DN 479.

<u>**CERTIFICATION**</u>

I hereby certify that on November 7, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electric filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/      Louis R. Pepe
<br>Louis R. Pepe