## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

McCARTER & ENGLISH, LLP,

*Plaintiff*,

v.

JARROW FORMULAS, INC,

*Defendant*.

No. 3:19-cv-01124 (MPS)

## RULING ON POST-VERDICT MOTIONS

### I.      Introduction

McCarter & English, LLP ("McCarter") represented Jarrow Formulas, Inc. ("Jarrow") in a contentious Kentucky lawsuit, which resulted in a multimillion dollar verdict against Jarrow. Shortly after the trial ended, McCarter sued Jarrow to recover outstanding legal fees, and Jarrow brought counterclaims alleging that McCarter overbilled it and engaged in malpractice. In March of 2021, I granted partial summary judgment for McCarter on its breach of contract claim and awarded $980,451.44 in compensatory damages. After a July 2023 trial, a jury returned a verdict for McCarter on all counts, awarding $1,057,173.93 in additional compensatory damages. The jury also found that McCarter was entitled to prejudgment interest, and that Jarrow's breach of contract was willful and malicious, warranting punitive damages. Now, McCarter has filed motions seeking prejudgment interest under Conn. Gen. Stat. § 37-3a(a), offer of compromise interest under Conn. Gen. Stat. § 52-192a, and punitive damages. Jarrow has filed a motion for judgment as a matter of law and a motion for a new trial or remittitur. For the reasons set forth below, I grant in part McCarter's motions for prejudgment interest and offer of compromise interest. I deny without prejudice McCarter's motion for punitive damages, as I will certify to the Connecticut Supreme Court the issue of whether punitive damages are available for willful and

1

malicious breach of contract. I deny Jarrow's motion for judgment as a matter of law, except as to one issue, as explained below, and deny Jarrow's motion for a new trial or remittitur.

## II.    Procedural History

McCarter represented Jarrow in a jury trial in the United States District Court for the Western District of Kentucky (the "Kentucky Litigation"), in which Caudill Seed & Warehouse Company ("Caudill") sued Jarrow for violations of the Kentucky Uniform Trade Secrets Act, among other claims. ECF No. 194 at 1-2. The jury returned a $2,427,605 verdict against Jarrow, finding willful and malicious misappropriation of trade secrets by Jarrow. *Id.* at 2. Shortly thereafter, Jarrow terminated its relationship with McCarter and refused to pay the remaining attorney's fees and costs that McCarter claimed it owed. *Id.*

McCarter brought this action for breach of contract, account stated, and unjust enrichment/quantum meruit to recover $2,044,686.77 in outstanding legal fees. *Id.*  McCarter filed a motion for prejudgment remedy and, after an evidentiary hearing, secured a prejudgment remedy in the amount of $1,850,000. *Id.* The parties agreed that Jarrow "would deposit $1.85 million into escrow during the pendency of this litigation." ECF No. 480 at 1.

In its Answer to the Complaint, Jarrow asserted eight counterclaims against McCarter, including breach of fiduciary duty, negligent/intentional misrepresentation, unfair trade practices, and legal malpractice. ECF No. 184. Jarrow alleged that McCarter misrepresented its "billing rates, billings, and discounts." *Id.* (quoting ECF No. 184 at 32). Jarrow also alleged that McCarter failed to meet the standard of care for an attorney in the Kentucky Litigation by (1) failing to call Jarrow Rogovin, Jarrow's Chairman and President, as a live witness, (2) failing to call a damages expert to rebut Caudill's damages evidence or present an alternative damages calculation, (3) failing to offer evidence that Jarrow did not act willfully and maliciously, and (4)

failing to "adequately consult and communicate with the client." *Id.* at 2-3 (quoting ECF No. 184 at 33).

A. <u>Motions for Summary Judgment</u>

On July 15, 2020, the parties cross-moved for summary judgment. ECF Nos. 161, 164. On March 22, 2021, I granted in part and denied in part McCarter's motion for summary judgment as to the breach of contract claim and the malpractice counterclaim, denied its motion as to all other claims, and denied Jarrow's motion for summary judgment. ECF No. 194. On the breach of contract claim, I held there was no dispute of material fact as to whether "Jarrow contracted with McCarter for representation in the Kentucky Litigation," based on evidence of "a twenty-three-year course of dealing." *Id.* at 16. This contract required Jarrow "*at a minimum …* to pay McCarter for the Kentucky Litigation at the hourly rates shown on the first invoice and … for expenses incurred by McCarter during the representation." *Id.* at 20. I concluded that Jarrow breached the contract by declining to pay five invoices and reimburse expenses. *Id.* at 23.

However, I found that there was an issue of material fact as to whether Jarrow "agreed to pay the higher rates at which McCarter began to bill shortly after the commencement of the Kentucky Litigation." *Id.* at 28.  Therefore, I granted summary judgment on the breach of contract claim only as to the lower rates in the first invoice and as to all expenses incurred, and awarded $980,451.44 in damages. *Id.* at 29-30. Since Jarrow's breach of fiduciary duty, misrepresentation, and unfair trade practices counterclaims were based on its allegations that McCarter did not alert Jarrow to the rate increases, I denied both parties' motions for summary judgment as to these counterclaims. *Id.* at 30-34.

I also granted in part and denied in part McCarter's motion for summary judgment as to Jarrow's malpractice counterclaim. *Id.* at 37. I held that the evidence raised a genuine issue of

material fact as to whether "McCarter committed legal malpractice by failing to call Rogovin to testify … failing to address damages issues, and failing to offer evidence that Jarrow did not act wilfully or maliciously." *Id.* However, I concluded that there was no evidence "from which a reasonable juror could infer that McCarter failed to consult with Jarrow adequately or that any such failure caused Jarrow any injury," and I granted summary judgment on that portion of the claim. *Id.*

B. <u>Preclusion of Damages Malpractice Theories</u>

Before trial, McCarter moved to exclude testimony from Jarrow's malpractice expert. ECF No. 273. It argued, in part, that Jarrow could not "put a number to its claim that it suffered damages as a result of McCarter's alleged malpractice." ECF No. 273 at 23 n.6, 28-33. On October 14, 2022, I directed Jarrow to demonstrate that it had disclosed sufficient evidence in discovery to prove the amount of damages allegedly resulting from McCarter's alleged failure to address damages issues in the Kentucky Litigation. ECF Nos. 316, 317. According to Jarrow, McCarter engaged in malpractice when it failed to conduct sufficient discovery on damages and/or to call an expert witness on research and development damages. Jarrow claimed that this failure inflated the Kentucky verdict. After discussing the issue at multiple pretrial conferences, ECF Nos. 318, 336, 351, I determined that Jarrow had failed to disclose in discovery the evidence it sought to offer to prove that any such failure had caused any particular quantity of damages to a reasonable certainty. ECF No. 336 at 4-5; ECF No. 355. I therefore excluded that evidence under Fed. R. Civ. P. 26 and 37. ECF No. 336 at 4-5; ECF No. 355. Since Jarrow could not establish damages with reasonable certainty without that evidence, and since damages are an element of a malpractice claim, *see Mayer v. Biafore, Florek O'Neill*, 245 Conn. 88, 92 (1998), Jarrow was precluded from raising this portion of its malpractice claim at all. ECF No. 366 at 21.

Thus, the case proceeded to trial on only one malpractice theory: that McCarter's decision not to call Rogovin as a witness amounted to malpractice. *Id.*

### C. Stipulations on Damages

Under Connecticut law, the award of prejudgment interest and, in most cases, punitive damages "is a factual question within the province of the jury." *Retepromaca Representaciones Tecnicas Proyectos y Sistemas, C.A. v. Ensign-Bickford Co.*, No. 3:98-CV-01857 (SRU), 2004 WL 722231, at *9 (D. Conn. Mar. 30, 2004) (prejudgment interest); *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 518 (1995) (punitive damages).[1] Before trial, however, the parties stipulated that "the jury [would] decide *whether* a party is *entitled* to" punitive damages and prejudgment interest, and the Court would determine the amount of damages. ECF No. 362 ¶ 5 (emphasis in original). However, "[b]oth parties reserve[d] their right to argue to the Court that the opposing party is not entitled to prejudgment interest and/or punitive damages for any reason, and [that] no issues related thereto should be submitted to the jury." *Id.* The Court instructed the jury to award prejudgment interest if it determined that "the other party wrongfully detained money that was due," and to award punitive damages if it determined that "the other party's conduct intended to violate — or showed reckless indifference to — the rights of the first party." ECF No. 430 at 38-39, 41.

### D. Trial and Verdict

During the trial, Jarrow made an oral motion for judgment as a matter of law. ECF No. 409. The motion made two arguments: (1) that McCarter had not proved by clear and convincing evidence that its rate increases were fair and equitable with full disclosure, and (2) that no

---

[1] In cases under the Connecticut Unfair Trade Practices Act, for example, it is up to the judge to decide whether to award punitive damages. *See* Conn. Gen. Stat. § 42-110g(a), (g).

punitive damages could be awarded because Connecticut law does not "recognize[] bad faith breach of contract except when there is a strong public policy involved."  ECF No. 452 at 220-22. The Court reserved judgment on those issues. *Id.* at 223-25.

The jury returned a verdict for McCarter on all issues, finding that Jarrow had agreed to all of McCarter's fee increases after the initial Kentucky Litigation invoice, and awarding $1,057,173.93 in compensatory damages. ECF No. 433 at 1-2. The jury also determined that McCarter was entitled to prejudgment interest and Jarrow's conduct was willful and malicious, *id.* at 2-3, and found for McCarter on all of Jarrow's counterclaims. *Id.* at 3-9.

### E.  Post-Trial Motions

After the trial concluded, McCarter filed motions for prejudgment interest, punitive damages, and offer-of-compromise interest. ECF Nos. 464, 465, 466. On September 29, 2023, Jarrow agreed to release to McCarter the $1.85 million in prejudgment remedy funds from escrow, ECF No. 480, and McCarter filed a revised calculation of prejudgment and offer of compromise interest, ECF No. 481. Jarrow filed a motion for new trial and remittitur, ECF No. 468, and a renewed motion for judgment as a matter of law, ECF No. 470.

### III.  **Punitive Damages**

First, I address an issue that is relevant to each of the pending motions: the availability of punitive damages for McCarter's breach of contract claim. Jarrow argues that McCarter cannot recover punitive damages under its breach of contract claim, because Connecticut law limits "the availability of tortious breach of contract, with the possibility of punitive damages, to insurance cases or [cases] where the breach involved the violation of an important public policy." ECF No. 471 at 23. McCarter offers a competing theory that, "[u]nder Connecticut law, punitive damages

are available in breach of contract cases, when the breach takes on a tortious element." ECF No. 478 at 15.[2] Because Connecticut law is unsettled on this question, resolving this question requires weighing competing public policy concerns, and other states have adopted several different rules, I will certify this question to the Connecticut Supreme Court.

A.  <u>Approaches to Punitive Damages for Breach of Contract</u>

Before diving into Connecticut precedent, I provide some background on the use of punitive damages in breach of contract suits. "Punitive damages are not ordinarily recoverable for breach of contract." *Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 127 (1966). Traditionally, the "purpose[] of awarding contract damages is to compensate the injured party …. not punishment, and punitive damages are not appropriate." Restatement (Second) of Contracts § 355 cmt. a.

Courts have offered several reasons why punitive damages are permitted for torts, but not for contracts. First, "breaches of contract do not cause the kind of resentment or other mental and physical discomfort as do the wrongs called torts and crimes, and no retributive purpose would be served by punitive damages." *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir. 1985) (internal quotation marks omitted). Second, damages in contract cases are more easily quantified, "in contrast to the law of torts, which compensates for injury to personal interests that are more difficult to value, thus justifying noncompensatory recoveries." *Id.* Finally, some

---

[2] In its Reply in Support of its Motion for Punitive Damages, McCarter also argues that Jarrow waived its argument that punitive damages are not available for willful and malicious breach of contract, since "the parties stipulated that the jury would decide the issue of *entitlement* to punitive damages." ECF No. 488 at 8 (quoting ECF No. 362 ¶ 5). But the stipulation also states that the parties "reserve their right to argue to the Court that the opposing party is not entitled to … punitive damages for any reason, and [that] no issues related thereto should be submitted to the jury." ECF No. 362 ¶ 5. The most reasonable reading of the stipulation, and my understanding based on discussions with the parties before trial and during the trial is that, unless I directed a verdict on the issue of willful and malicious breach, I would submit the issue to the jury; but this would not prevent Jarrow from arguing, in a motion for judgment as a matter of law, that punitive damages were not available under Connecticut law on McCarter's breach of contract claim.

intentional breaches of contract are "efficient and wealth-enhancing" because the breaching party's benefit from breaching exceeds the harm to the other party. *Id.* As such, awarding "punitive damages … would prevent many such [efficient breaches]." *Id.*

Building on the logic of these arguments, most states have permitted punitive damages for breach of contract only where the breach sufficiently resembles a tort. Under the narrowest version of this exception, punitive damages are recoverable for breach of contract only if "the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts § 355. Because states that adopt this approach require the plaintiff to allege and prove facts that amount to an independent tort, they do not permit punitive damages for willful and malicious breach of contract alone.[3]  However, many states have created

---

[3] *See, e.g.*, *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 **N.Y.**2d 603, 613 (1994) ("Punitive damages are available where the conduct ***343 **944 constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and …. Such conduct was part of a pattern of similar conduct directed at the public generally."); *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 454 (**Del.** 2013)  ("[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."); *Francis v. Lee Enterprises, Inc.*, 89 **Haw.** 234, 239, 244 (1999) (punitive damages are unavailable for breach of contact "in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract," and abrogating previous rule that "wilful, wanton, or reckless breach of any contract—including an employment contract—would support the award of traditional tort damages"); *White v. Nw. Bell Tel. Co.*, 514 N.W.2d 70, 77 (**Iowa** 1994) ("Punitive damages may be awarded for breach of contract … upon proof of two things: (1) that the breach also constitutes an intentional tort, and (2) that the breach was committed maliciously."); *Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 13 **Cal. App.** 4th 949, 960 (1993) ("An award of punitive damages is not supported by a verdict based on breach of contract, even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious."); *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 **Ill.** 2d 87, 98 (1986) ("[W]e decline to adopt plaintiffs' alternative argument that punitive damages should be awarded for certain wilful and wanton breaches of contract, even though the breach is not accompanied by an independent tort."); *L.L. Cole & Son, Inc. v. Hickman*, 282 **Ark.** 6, 10 (1984) ("[W]here on the facts either an action in contract or one in tort is possible, the plaintiff must specifically plead and prove his cause of action in tort in order to be awarded punitive damages."); *Kamlar Corp. v. Haley*, 224 **Va.** 699, 706-07 (1983) (observing that "some jurisdictions permit punitive damages [for breach of contract] where the intent of the breaching party is 'malicious,'" but following "most jurisdictions …. in requiring proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract … regardless of the motives underlying the breach"); *Gen. Motors Corp. v. Piskor*, 281 **Md.** 627, 638-39 (1977) ("[P]unitive damages may never be recovered in pure breach of contract suits …. There is, however, a class of actions that lies somewhere in the gray area separating pure torts from contract cases. These are the so-called 'torts arising out contractual relationships.'"); *Shore v. Farmer*, 351 **N.C.** 166, 170 (1999) "[P]unitive damages should not be awarded in a claim for breach of contract …. [W]hen the breach of contract also constitutes or is accompanied by an identifiable tortious act, the tort committed may be grounds for recovery of punitive damages." (citation and internal quotation marks omitted)). *See generally* 1 Punitive Damages § 7.3 (describing different approaches); Howard O. Hunter, *Modern Law of Contracts* Appendix 17.1, Examples of State Court Decisions (outlining additional states that have adopted the independent tort approach); William S. Dodge, *The Case for Punitive*

limited exceptions to this rule in specific circumstances, for instance, where the breach is willful and malicious and the breaching party is a public utility, an insurance company, or a fiduciary.[4] A handful of states have expanded the tort exception to the general rule, permitting punitive damages where the breach of contract was intentional, malicious, or has elements of fraud, even if the underlying conduct is not independently tortious.[5] The question, then, is whether

---

*Damages in Contracts*, 48 Duke L.J. 629, 644-651 (1999) (summarizing different state approaches and observing that "thirty-five American jurisdictions adhere to the traditional rule and require that a contract plaintiff plead and prove the existence of an independent tort in order to recover punitive damages").

[4] *See, e.g., Wagman v. Lee*, 457 A.2d 401, 404 (**D.C.** 1983) ("Although punitive damages generally are not recoverable for breach of contract … this rule is inapplicable if there exists an independent fiduciary relationship between the parties."); *Daniels v. Dean*, 253 **Mont.** 465, 473 (1992) ("Tort type damages may only be available in contracts where a 'special relationship' exists or for traditional contract related torts such as fraud, fraudulent inducement, and tortious interference with a contract."); *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 **N.J.** Super. 437, 449 (App. Div. 1976) ("Where the essence of a cause of action is limited to a breach of [a commercial] contract, punitive damages are not appropriate …. [S]everal exceptions have been carved out … where the unusual relationship between the parties reflects a breach of trust beyond the mere breach of a commercial contract."). *See generally* 11 Corbin on Contracts § 59.2 (2023) (observing that punitive damages are awarded "where the breach involves the malicious or wanton violation of a fiduciary duty even where the violation does not constitute an independent tort"). Many of the states that permit punitive damages for breach of contract in these limited circumstances recognize a specific cause of action for that purpose, which is often breach of the implied covenant of good faith and fair dealing. *See, e.g., Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 **Nev.** 346, 354, 934 P.2d 257, 263 (1997) (recognizing "*tort* action for breach of the implied covenant of good faith and fair dealing," but noting that it "requires a special element of reliance or fiduciary duty" as might exist in "relationships … formed by employment, bailment, insurance, partnership, and franchise agreements"); *Rawlings v. Apodaca*, 151 **Ariz.** 149, 160 (1986) ("[I]n special contractual relationships, when one party intentionally breaches the implied covenant of good faith and fair dealing, and when contract remedies serve only to encourage such conduct, it is appropriate to permit the damaged party to maintain an action in tort and to recover tort damages."). Such causes of action are essentially breach of contract claims with added requirements that (1) the breacher acts in bad faith, and (2) the parties have relationship of trust or reliance.

[5] *See, e.g. Birchwood Land Co. v. Ormond Bushey & Sons, Inc.*, 194 **Vt.** 478, 489 (2013) (permitting punitive damages "when the breach has the character of a willful and wanton or fraudulent tort, and when the evidence indicates that the breaching party acted with actual malice" (internal quotation marks omitted)); *Myers v. Workmen's Auto Ins. Co.*, 140 **Idaho** 495, 503 (2004) ("It is not the nature of the case, whether tort or contract, that controls the issue of punitive damages. The issue revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." (internal quotation marks omitted)); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (**Tenn**. 2012) ("Although as a general matter, punitive damages are not available in a breach of contract case, punitive damages may be awarded in such a case under certain circumstances. However, an award of punitive damages is limited to the most egregious cases and is proper only where there is clear and convincing proof that the defendant has acted either intentionally, fraudulently, maliciously, or recklessly." (internal citations and quotation marks omitted)); *Hurst v. Sw. Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (**Miss.** 1998) ("[P]unitive damages … are recoverable where the breach [of contract] results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort" (internal quotations omitted)); *Paiz v. State Farm Fire & Cas. Co.*, 118 **N.M.** 203, 210 (1994) ("[A]n award of punitive damages in a breach-of-contract case must be predicated on a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party."). *See generally* 11 Corbin on Contracts § 59.2 (2023) ("[S]ome jurisdictions have gone beyond the independent tort and fiduciary violation

Connecticut's Supreme Court is likely to adopt the minority approach, which would permit punitive damages based on a willful and malicious breach of an ordinary commercial contract.

B. <u>Connecticut Precedent</u>

I turn now to Connecticut law, which does not definitively resolve this issue. "A federal court faced with a question of unsettled state law must do its best to guess how the state court of last resort would decide the issue." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992). If the state's highest court has not decided the issue, "the best indicators of how it would decide are often the decisions of lower state courts." *Id.* Decisions from lower state courts are not binding, but "they do have great weight in informing the court's prediction on how the highest court of the state would resolve the question." *Id.* (citation and internal quotation marks omitted).

In *Triangle Sheet Metal Works, Inc. v. Silver*, the Connecticut Supreme Court appeared to recognize the availability of punitive damages for contractual claims in some circumstances. 154 Conn. 116 (1966). In that case, the plaintiffs accused two of their former employees of disclosing trade secrets in violation of an express agreement and their fiduciary duties. *Id.* at 118-19. The trial court found in the plaintiffs' favor on counts three and four of the complaint, which involved "the breach by [the employees] of their contract obligations, express or implied." *Id.* at 127. The court awarded punitive damages. *Id.*

In dicta, the Connecticut Supreme Court suggested that punitive damages might be available in any breach of contract case where "wanton and wilful injury is proved" or "malice is

---

cases and permitted an award of punitive damages where elements of fraud, malice, gross negligence or oppression 'mingle' with the breach."). South Carolina has also eschewed the independent tort approach; it permits punitive damages for "breach of contract accompanied by a fraudulent act," a cause of action that does not require the plaintiff "to allege the elements of common law fraud and deceit." *Harper v. Ethridge*, 290 **S.C.** 112, 118-19 (Ct. App. 1986).

established." *Id.* at 127-28. The court observed that "[p]unitive damages are not ordinarily recoverable for breach of contract" because "punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship." *Id.* at 127 (citing Restatement (First) of Contracts § 342; Corbin on Contracts § 1066; McCormick on Damages § 81). But the court added that punitive damages can be awarded for tort claims, and therefore punitive damages "ha[d] been allowed" in a "few classes of [contract] cases" that "contain elements which bring them within the field of tort."[6] *Id.* In tort cases, the court observed that "the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence." *Id.* at 128. The court found that the third and fourth count of the complaint did not contain "any allegation of a motivating intent or design … to harm the plaintiffs" and "the record does not disclose the existence of that 'malicious or wanton misconduct' which would justify an award of exemplary or punitive damages." *Id.* So the court reversed the trial court's decision to award punitive damages.

---

[6] The court's reference to a "class of cases [that] contain elements which bring them within the field of tort" seems to paraphrase Corbin's treatise on contracts. *See* 5 Corbin on Contracts § 1077 (1964) ("[A]s a general rule … punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been a tendency to instruct the jury that they may award damages … by way of punishment. These cases … contain elements that enable the court to regard them as falling within the field of tort or as closely analogous thereto."); *see also Triangle Sheet Metal Works*, 154 Conn. at 127 (citing Corbin's treatise favorably). The 1964 edition of Corbin's treatise provided examples to support this premise, which adopt several different approaches to punitive damages for breach of contract, although few would permit punitive damages for willful and malicious breach alone. The cited cases include (1) a D.C. Circuit case, which held that punitive damages were available for breaches of contract by people who "assume certain fiduciary responsibilities," because "a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust," *Brown v. Coates*, 253 F.2d 36, 39 (D.C. Cir. 1958), (2) a California case, which held that "[e]xemplary damages are proper in cases involving fraud and may be allowed even though the tort incidentally involves a contract," *S. California Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431 (1960), (3) a South Carolina case, which held that a plaintiff could recover punitive damages for breach of contract only if "the breach was accomplished with a fraudulent intention, and was accompanied by a fraudulent act," and "acts of willfulness, unless there is fraud also, will not support a claim for punitive damages," and (4) a Texas case, which held that "where a breach of contract is shown to have been accompanied by malicious and oppressive conduct, or to have occurred in such manner as to constitute a tort, the wrongdoer may be subjected not only to actual damages." *Etter v. Von Sternberg*, 244 S.W.2d 321, 324 (Tex. Civ. App. 1951).

To the extent the dicta in *Triangle Sheet* could be read to embrace a broad rule permitting punitive damages for any wanton or malicious breach of contract, however, a review of the underlying complaint undermines this interpretation. The third and fourth counts of the complaint, under which the trial court awarded punitive damages, arguably sounded in tort, not contract.[7] The third count alleged that the defendants, including some parties who did not have contracts with the plaintiffs, "wrongfully, intentionally, and maliciously induced" a salesman to leave the plaintiffs' employ. Substituted Complaint ¶¶ 21-24, *Triangle Sheet Metal Works,* 154 Conn. 116 (1965). It went on to allege that the salesman "act[ed] in concert" with the other defendants to "bid on jobs … at figures substantially below plaintiffs'." *Id.* The fourth count alleges that the defendants "wilfully and fraudulently misrepresented to actual and potential customers and to Plaintiffs' sales representatives" certain facts "to interfere with the contracts and business expectancies of the Plaintiffs." *Id.* ¶¶ 28-30.[8] Given that the underlying allegations likely sounded in tort, the court may have intended to adopt the independent tort approach. Alternately, since the complaint alleged that at least one of the defendants had a "confidential and fiduciary relationship" to the plaintiffs, *id.* ¶ 14, the court may have intended to follow states that have permitted punitive damages for willful and malicious breach of a fiduciary duty. *See*

---

[7] The Substituted Complaint is attached to this ruling as Exhibit A.

[8] The allegations in counts three and four may have been intended to meet Connecticut's requirements for tortious interference with a business expectancy or the common law tort of unfair competition. Tortious interference with a business expectancy "requires proof that the defendant was guilty of fraud, misrepresentation, intimidation, or molestation; or that the defendant acted maliciously" to interfere with a business expectancy, but does not require "that the tort have resulted in an actual breach of contract…." *Jones v. O'Connell*, 189 Conn. 648, 660 (1983) (citations and internal quotation marks omitted). Connecticut courts also recognized a common law tort for unfair competition at the time. *See Yale Co-op. Corp. v. Rogin*, 133 Conn. 563, 571 (1947). The notion that counts three and four may have sounded in tort is buoyed by a review of the issues the defendant presented on appeal, which included whether the defendant's actions "constitute a willful misrepresentation against a competitor sufficient to support an award of exemplary damages" or "constitute willful acts of unfair competition sufficient to support an award of exemplary damages." Brief of the Defendant-Appellant at 2, *Triangle Sheet Metal Works, Inc.*, 154 Conn. 116 (1965) (attached as Exhibit B). The defendant did not argue that punitive damages were unavailable because the cause of action was for breach of contract. *Id.* at 25-42. Instead, the defendant argued the evidence did not support a conclusion they acted "willfully and with intent to interfere with the plaintiffs' business expectancies." *Id.* at 31.

discussion *supra* at footnote 6 (citing *Brown v. Coates*, 253 F.2d 36, 39 (D.C. Cir. 1958)). In any event, the Connecticut Supreme Court did not need to determine the precise boundaries of its own rule, since the court found no evidence that the defendants acted maliciously.

In *L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.*, the Connecticut Appellate Court applied *Triangle Sheet* to affirm an award of punitive damages. 9 Conn. App. 30 (1986). The plaintiff alleged that the defendant, a surety company, had breached an "implied contract to act as surety on construction performance and payment bonds." *Id.* at 31. The court wrote that "[b]reach of contract founded on tortious conduct may allow the award of punitive damages," but "there must be an underlying tort or tortious conduct alleged and proved." *Id.* at 48. "Elements of tort such as wanton or malicious injury or reckless indifference to the interests of others giving a tortious overtone to a breach of contract action justify an award of punitive or exemplary damages." *Id.* Thus, the Appellate Court affirmed the trial court's decision to reject a proposed instruction "(1) that since this is a breach of contract action, punitive damages are not recoverable as a matter of law, and (2) that since there is no contract of insurance, any claim for bad faith must fail as a matter of law." *Id.* at 49.

Jarrow argues that *L.F. Pace's* "tortious breach of contract claim" is limited to the "insurance context," since the case involved a surety company. ECF No. 471 at 24. The *L.F. Pace* opinion cites two cases that permitted punitive damages "when [an] insurer unreasonably and in bad faith withholds payment of the claim of its insured." *L.F. Pace*, 9 Conn. App. at 46 (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973)); *see also id.* at 46-47 (discussing *Gruenberg* and *Grand Sheet Metal Products Co. v. Protection Mutual Ins. Co.*, 34 Conn. Sup. 46 (1977)). Still, the Appellate Court did not explicitly limit punitive damages to insurance cases. The section of the court's opinion that discusses *Grand Sheet* and *Gruenberg* is

13

summarizing the trial court's reasoning, and it is unclear whether the court intended to adopt that reasoning, including its focus on the obligations of insurers. *Id.* at 46-47. And *L.F. Pace* was not a traditional insurance case, since the plaintiff claimed that a surety company had breached an implied contract to issue surety bonds. *See Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 43-60 (1999) (distinguishing insurance companies from surety companies for purposes of punitive damages on breach of implied covenant of good faith and fair dealing claim and noting mixed state approaches to this issue). Indeed, the trial court acknowledged that it was expanding *Grand Sheet Metal* and *Gruenberg* by awarding damages in "a situation other than for the payment of a claim under a contract of insurance." *L.F. Pace & Sons*, 9 Conn. App. at 47 (citation omitted).

The Appellate Court considered whether *L.F. Pace* applied beyond insurance cases in *Barry v. Posi-Seal Int'l, Inc.*, 40 Conn. App. 577 (1996). There, a former employee sued his employer for wrongful termination, bringing claims for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligent misrepresentation. *Barry v. Posi-Seal Int'l, Inc.*, 36 Conn. App. 1, 3 (1994), *revised on reconsideration*, 40 Conn. App. 577 (1996) (setting out procedural history of case). The jury found for the plaintiff on all claims and awarded punitive damages, but the trial court set aside the verdict on all of the plaintiff's tort claims. *Id.* at 3-4.

The Appellate Court concluded that a "punitive damages award cannot stand in the absence of a verdict in the plaintiff's favor on a cause of action sounding in tort." *Barry*, 40 Conn. App. at 585. The court argued that "the principles announced in *Triangle Sheet Metal* have been followed only in regards to insurance" and pointed out that *L.F. Pace* involved surety bonds. *Id.* at 584, 588 n.12. The court reasoned that "quasi-public" insurance companies have a

14

"special relationship" with their insureds, as an insurer "sells protection," and "the interests of the insurer and insured are at odds, [because] payment of a claim benefits the insured and diminishes the resources of the insurer." *Id.* at 586-87. By contrast, the employer/employee relationship resembled an "ordinary commercial contract," and there was no direct conflict of interest. *Id.* at 586-87. Therefore, the court held that "where there is no allegation or proof that the termination of employment is violative of an important public policy, punitive damages cannot be recovered on a claim that a termination constituted a breach of the implied covenant of good faith and fair dealing contained in an employment contract." *Id.* at 587-88.

McCarter argues that *Barry*'s holding is limited to (1) wrongful termination cases with (2) good faith and fair dealing claims. I agree that part of the holding in *Barry*—the language regarding "public policy" concerns—is specific to good faith and fair dealing claims in wrongful termination suits. Under Connecticut law, if an at-will employee argues that her discharge breached the implied covenant of good faith and fair dealing, she must show the reason for discharge "involves … some important violation of public policy." *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 572 (1984) (quotation marks and internal alterations omitted). This requirement prevents litigants from "transform[ing] the requirement of good faith into an implied condition that an employee may be dismissed only for good cause." *Id.* at 571. Though the plaintiff in *Barry* was not an at-will employee, the Appellate Court cited *Magnan* to support its holding that punitive damages were not available "where there is no allegation or proof that the termination of employment is violative of an important public policy." 40 Conn. App. at 587-88 & n.11. Therefore, I do not believe the Appellate Court intended to apply its public policy requirement to claims for punitive damages outside the wrongful termination context.

Even so, the remainder of *Barry's* reasoning is not limited to good faith and fair dealing claims in wrongful termination cases. Although the plaintiff did not seek punitive damages for its breach of contract claim,[9] the arguments the Appellate Court makes about the distinctions between insurance agreements and employment contracts apply just as readily to breach of contract claims involving other "ordinary commercial contract[s]." 40 Conn. App. at 586. And the court considered and rejected an argument based on *Triangle Sheet*, stating that "the principles announced in *Triangle Sheet Metal* have been followed only in regards to insurance." *Id.* at 588 n.12.

Since *Barry*, however, the Connecticut Appellate Court and the Second Circuit have each applied the *L.F. Pace* standard to contract claims that were not brought against insurance companies, albeit in dicta. *See City of Hartford v. Int'l Ass'n of Firefighters*, 49 Conn. App. 805 (1998) (applying *L.F. Pace* to breach of collective bargaining agreement, which required City to provide health insurance to firefighters through Blue Cross/Blue Shield, but denying punitive damages because union "made no claim that [the City's breach] was malicious, wilful, or reckless"); *Edible Arrangements Int'l, Inc. v. Chinsammy*, 446 F. App'x 332 (2d Cir. 2011) (summary order) (applying *L.F. Pace* to commercial unjust enrichment claim, but denying punitive damages because plaintiff "failed to prove any underlying tortious conduct sufficient to warrant punitive damages"). But both courts found that punitive damages were not available because the plaintiff had either not alleged or not proven malicious conduct. *City of Hartford*, 49 Conn. App. at 816-17; *Edible Arrangements Int'l*, 446 F. App'x at 344.

State and federal trial courts have split on whether punitive damages are available for contract claims outside the insurance context. *Compare Indep. Ins. Serv. Corp. v. Hartford Life*

---

[9] *See* Amended Complaint, *Barry v. Posi-Seal Int'l, Inc.*, No. 513813 (Conn. Super. Ct. May 25, 1990) (attached as Exhibit B).

*Ins. Co.*, 472 F. Supp. 2d 183, 191 (D. Conn. 2007) (punitive damages unavailable for good faith and fair dealing claim involving "ordinary commercial contract"); *Tennant v. Innovative Concepts in Design, Inc.*, No. CV-12-6030584-S, 2015 WL 9242220, at *10 (Conn. Super. Ct. Nov. 18, 2015) (same for breach of construction contract claim); *Kulkin v. Engel*, No. FST-CV-08-5009226-S, 2013 WL 8213590, at *8 (Conn. Super. Ct. Dec. 31, 2013) (same for breach of contract between two neighbors); *and Day v. Yale Univ. Sch. of Drama*, No. CV-97-0400876-S, 2000 WL 295612, at *11 (Conn. Super. Ct. Mar. 7, 2000) (same for contract between school and student); *with Canaan Apothecary, LLC v. Salisbury Pharmacy Grp., LLC*, No. 3:12-CV-01571 (VLB), 2014 WL 788944 (D. Conn. Feb. 25, 2014) (in dicta, stating punitive damages *are* available for commercial breach of contract claim and citing *Edible Arrangements*); *Bohn v. Dorothea L. Denton, LLC*, No. DBD-CV-186024779-S, 2021 WL 4286568, at *29 (Conn. Super. Ct. Sept. 3, 2021) (citing *L.F. Pace* and awarding punitive damages for breach of LLC's operating agreement); *Makuch v. Stephen Pontiac-Cadillac, Inc.*, No. 3:12-CV-00866 (WWE), 2013 WL 45887, at *2 (D. Conn. Jan. 3, 2013) (citing *L.F. Pace*, and concluding "punitive damages are available for a claim of breach of warrant[y] if plaintiff alleges conduct that is 'done with a bad motive or with a reckless indifference to the interest of others'"); *and Esposito v. 2233-2247 Main St. LLC*, No. HHD-CV-20-6134687-S, 2023 WL 3193473, at *5 (Conn. Super. Ct. Apr. 25, 2023) (applying *L.F. Pace* to breach of loan agreement but declining to award punitive damages because of insufficient evidence of malicious breach).

C.  Certification to the Connecticut Supreme Court

Whether plaintiffs can seek punitive damages for willful and malicious breach of contract remains an unsettled area of Connecticut law. The sole Connecticut Supreme Court case discussing this issue, *Triangle Sheet*, does so only in dicta. And as shown, the relevant claims in

that case arguably sounded in tort, not contract, so I cannot determine whether the court intended to adopt the broad rule its dicta suggests. *L.F. Pace* also states that punitive damages are available for tortious breach of contract, although that case involved a surety company, and some states that do not permit punitive damages for willful and malicious breach have adopted a narrow exception for contract claims against insurance or surety companies. Finally, *Barry* held that punitive damages were not available for a good faith and fair dealing claim in a wrongful termination lawsuit unless the termination violated public policy. As I explained above, I do not think the Appellate Court intended to apply the public policy requirement outside the wrongful termination context. And since *Barry* was decided, the Appellate Court and Second Circuit have both applied *L.F. Pace* to breach of contract claims that did not involve traditional insurance claims. Nevertheless, "it is difficult to reconcile the holding and language contained within the *Barry* decision" with McCarter's claim that it is entitled to punitive damages for its client's breach of contract. *Kulkin*, 2013 WL 8213590, at *8.

The Connecticut Supreme Court might follow the Restatement on Contracts, and most states, in holding that punitive damages are unavailable for willful and wanton breach of contract, absent an independent tort. The court frequently "relie[s] on" the Restatements to "fill gaps in and support [Connecticut] common law." *Lestorti v. DeLeo*, 298 Conn. 466, 477 n.8 (2010) (collecting cases). Indeed, *Triangle Sheet Metal* cited the Restatement of Contracts and the Restatement of Torts. 154 Conn. at 127-28. Section 355 of the Restatement (Second) of Contracts states that "[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."[10] *See*

---

[10] *Triangle Sheet* did not cite Section 355, but the Restatement (Second) of Contracts was not published until after *Triangle Sheet* was decided. The First Restatement took the more absolutist position that "[p]unitive damages are not recoverable for breach of contract." Restatement (First) of Contracts § 342.

*also* Restatement (Second) of Torts § 908 cmt. b ("Punitive damages … are not permitted merely for a breach of contract. When, however, the plaintiff has a right in the alternative to sue for a breach of contract or for a tort, the fact that his act or omission amounts to a breach of contract does not preclude the award of punitive damages.").

On the other hand, Connecticut's unique approach to punitive damages might lead Connecticut's Supreme Court to reject the "independent tort" rule. In Connecticut, "common law punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to the plaintiff's litigation expenses less taxable costs." *Berry v. Loiseau*, 223 Conn. 786, 827 (1992). Connecticut is one of only "two jurisdictions" that awards punitive damages that "are truly compensatory in nature."[11] 1 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice § 4:3 (2d ed. 2023); *id.* § 4.4 (explaining that Michigan, the other jurisdiction, awards punitive damages for "intangible injuries or injuries to feelings, which are not quantifiable in monetary terms"). In many states, the fact-finder may consider attorney's fees and costs as one of multiple factors when awarding punitive damages, but the amount of punitive damages is not limited to attorney's fees and costs.[12]

---

[11] I note, however, that Connecticut's Supreme Court has acknowledged that common law punitive damages, "when viewed in the light of the increasing costs of litigation, also serve[] to punish and deter wrongful conduct." *Berry*, 223 Conn. at 827.

[12] *See Kunewa v. Joshua*, 83 **Haw.** 65, 74 (Ct. App. 1996) (noting that "[t]he majority of jurisdictions … regularly allow a jury to consider attorney fees in computing the amount of punitive damages" and collecting cases); *see, e.g.*, *Robinson v. Sarisky*, 535 A.2d 901, 907 (**D.C.** 1988) ("Deterrence and punishment are 'the basic purposes' of punitive damages which the jury may consider in computing the amount to be awarded …. The jury may also take into account certain other factors, including the duration and cost of the litigation and the relative wealth of the defendant." (internal citations omitted)); *Hazelwood v. Illinois Cent. Gulf R.R.*, 114 **Ill. App.** 3d 703, 711 (1983) ("The amount of punitive damages awarded a plaintiff is a matter for the discretion of the jury …. [P]laintiff's attorney's fees may be included in the amount of the award."); *Newton v. Hornblower, Inc.*, 224 **Kan.** 506, 526 (1978) ("[A]ttorney fees and costs of litigation may be taken into consideration in arriving at the amount of punitive damages in an appropriate case."); *see also* Restatement (Second) of Torts § 914 cmt.a ("In awarding punitive damages when they are otherwise allowable, the trier of fact may consider the actual or probable expense incurred by the plaintiff in bringing the action."

Since Connecticut limits punitive damages to attorney's fees and costs, Connecticut's Supreme Court might conclude that the arguments for denying punitive damages in breach of contract cases have considerably less force. As I have explained, courts have generally relied on three arguments to explain the policy against punitive damages for breach of contract. First, "[b]reaches of contract … do not in general cause as much resentment or other mental or physical discomfort as do the wrongs called torts and crimes," so contract damages are awarded for "compensation … not for punishment." 5 Corbin on Contracts § 1077 (1964); *see also Triangle Sheet Metal Works*, 154 Conn. at 127 ("Punitive damages are not ordinarily recoverable in breach of contract …. because, as lucidly reasoned by Professor Corbin … punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship."). But this argument assumes that punitive damages are designed for punishment, which is true in most states. In Connecticut, by contrast, "the purpose of awarding punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries," and punitive damages are therefore limited to attorney's fees and costs. *Bifolck v. Philip Morris, Inc.*, 324 Conn. 362, 464 (2016) (internal citations, quotations, and alterations omitted). And while a tort may cause more "resentment or physical discomfort" than a breach of contract, it will not necessarily cause greater attorney's fees. Thus, a distinction between tort and contract punitive damages is not justified on these grounds.

Similarly, courts have argued that punitive damages are necessary in tort cases, but not contract cases, because torts cause "injury to personal interests that are more difficult to value, thus justifying noncompensatory recoveries." *Thyssen*, 777 F.2d at 63. Again, this argument

---

Many states also have statutory caps on punitive damages. *See Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 956 (7th Cir. 2018) ("By our count (and with some simplifications), twenty-nine states impose a generally applicable cap on punitive damages").

assumes that punitive damages account for unquantifiable personal interests. Under Connecticut law, however, any dignitary or emotional harm to the wronged party plays no role in the amount of punitive damages awarded—punitive damages are limited to "litigation expenses." *Bifolck*, 324 Conn. at 464.

A third reason to limit punitive damages in breach of contract cases is to promote "efficient breaches." According to this argument, some "breaches of contract … are in fact efficient and wealth-enhancing," because the "breaching party will still profit after compensating the other party for its 'expectation interest.'" *Thyssen*, 777 F.2d at 63. If the breaching party knows they might have to pay "punitive damages" on top of "traditional damages," however, they might be deterred from taking "such beneficial action." *Id.*  Since Connecticut law limits punitive damages to attorney's fees and costs, the risk of deterring efficient breaches is lower. Indeed, such a policy might encourage efficient breachers to negotiate, rather than force the other party to resort to litigation to enforce its contractual rights.

Further, "[n]ot all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon cost, and exploits the inadequacies of purely compensatory remedies (the major inadequacies being that pre- and post-judgment interest rates are frequently below market levels when the risk of nonpayment is taken into account and that the winning party cannot recover his attorney's fees)." *Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 751 (7th Cir. 1988). In other words, an opportunistic party may breach a contract, even when doing so is inefficient, if they know the other party will not enforce the terms of the contract because the cost of enforcement exceeds the likely recovery. Permitting punitive damages—limited to attorney's fees and costs—could

21

prevent such opportunistic breaches, without deterring efficient ones.[13] *See Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-CV-399, 2015 WL 5636897, at *8 (S.D. Ohio Sept. 25, 2015) (quoting *Patton*, and finding "exception to the American Rule for attorneys' fees based on bad faith conduct giving rise to a breach of contract claim" under Ohio law); *see also Hylton v. Gunter,* 313 Conn. 472, 488 (2014) ("[T]he common purpose and effect of both statutory attorney's fees and common-law punitive damages … [is] to ensure the full compensation of plaintiffs in mitigation of the effects of the American rule.").

I decline to predict how the Connecticut Supreme Court might weigh these policy factors, and instead will certify this issue to the Connecticut Supreme Court. Under Connecticut law, I may certify a question to the Connecticut Supreme Court "'if the answer may be determinative of an issue' in a case before [me] and 'if there is no controlling appellate decision, constitutional provision or statute.'" *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 334 (2d Cir. 2015) (quoting Conn. Gen. Stat. § 51-199b(d)). "When deciding whether to certify a question to the Connecticut Supreme Court, a court should consider, among other factors: '(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation.'" *Bifolck v. Philip Morris, Inc.*, No. 3:06-CV-01768 (SRU), 2014 WL 585325, at *2 (D. Conn. Feb. 14, 2014) (quoting *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007)).

Here, all three factors suggest that I should defer to the Connecticut Supreme Court. "There is no controlling appellate decision, constitutional provision or statute" governing

---

[13] I also note that efficient breaches are rare in situations where the interests of the two parties "are at odds," as is frequently true in the insurance context. *Barry*, 40 Conn. App. at 587. An efficient breach is possible only if the benefits to the breaching party exceed the harms to the non-breaching party. Where an insurer refuses to pay a claim, every dollar that an insurer gains by refusing to pay comes out of the pocket of the insured. Such a breach can never be efficient; its benefits to the insurer never exceed its costs to the insured. Jarrow and McCarter's interests are similarly "at odds" in this case. *Id.* Jarrow refused to pay for legal work that McCarter had already completed. Cases involving a parties' refusal to pay its bills for services already rendered resemble insurance cases, in this regard.

punitive damages for willful and malicious breach of contract in Connecticut. Conn. Gen. Stat. § 51-199b(d). Second, Connecticut's Supreme Court "should be accorded the first opportunity to decide significant issues of state law through the certification process, … especially where the issues implicate the weighing of policy concerns." *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 329 (2d Cir. 2015) (citations, internal quotations, and alterations omitted). The rules governing punitive damages in breach of contract cases certainly "implicate the weighing of policy concerns." Indeed, this issue has divided other state supreme courts because of the competing policy considerations. Finally, certification will resolve a legal issue that is central to this case and that will determine McCarter's ability to recover more than three million dollars in punitive damages, along with offer-of-compromise interest on that amount. Thus, I find that certification to the Connecticut Supreme Court is warranted.

## IV.     Motion for Judgment as a Matter of Law and Motion for New Trial or Remittitur

Next, I consider Jarrow's motion for judgment as a matter of law, and motion for a new trial or remittitur. Since Jarrow makes several of the same arguments in both motions, I discuss them jointly.

A.     Legal Standard

Rule 50 Motion

Rule 50(a) of the Federal Rules of Civil Procedure permits the entry of judgment as a matter of law if a "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." If the court does not grant the motion made under Rule 50(a) during trial, "the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). A party who does not move for judgment as a matter of law under Rule 50(a) is barred from

challenging the verdict under Rule 50(b). *Lore v. City of Syracuse*, 670 F.3d 127, 152-53 (2d Cir. 2012). This procedural requirement "may not be waived by the parties or excused by the district court." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).

In deciding a motion for judgment as a matter of law, a court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "Such a motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

Rule 59 Motion

Rule 59 of the Federal Rules of Civil Procedure allows a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Second Circuit has held that a district court should grant a motion for a new trial when it finds that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (alterations omitted). "A new trial may be granted . . . when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). In assessing such a motion, the "trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337

F.3d 237, 244-45 (2d Cir. 2003). A court may grant such a motion "even if there is substantial evidence supporting the jury's verdict." *Id.* "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious." *DLC Mgmt. Corp.*, 163 F.3d at 134 (internal quotation marks omitted).

### B. Forfeiture of JMOL Arguments

As a preliminary matter, I must determine whether Jarrow has forfeited any of the arguments it raises in its renewed motion for judgment as a matter of law. "A party may only assert a renewed claim for judgment as a matter of law under Rule 50(b) if it previously raised that specific issue during trial in a Rule 50(a) motion." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 182 (D. Conn. 2014).

Jarrow's Rule 50(a) motion for judgment as a matter of law argued that: (1) McCarter had "not established [by clear and convincing evidence] that Jarrow Formula's agreement to increase rates above the initial rates … was fair and equitable with full disclosure", and (2) punitive damages are unavailable, because Connecticut law does not "recognize[] bad faith breach of contract except when there is a strong public policy involved." ECF No. 452 at 220-22. Its renewed motion for judgment as a matter of law makes both of those arguments, but also adds that (1) "there is no writing to satisfy the statute of frauds, and thus there was no enforceable contract that Jarrow Formulas could breach," ECF No. 471 at 9, (2) McCarter cannot seek punitive damages, because it "failed to plead willful and malicious conduct" in its amended complaint, *id.* at 29, (3) the first count of McCarter's complaint, which alleges breach of contract including willful and malicious breach, "fails under the economic loss doctrine," *id.* at 29-30, (4) there is insufficient evidence that Jarrow's actions were malicious, *id.* at 30-31, and (5) punitive damages would violate public policy or create a windfall for McCarter, *id.*

Jarrow did not raise these added arguments in its Rule 50(a) motion, and the "ensuing colloquy" was not "sufficiently specific to alert the opposing party to the supposed deficiencies in [its] proof." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir.1998); *see also Lore*, 670 F.3d at 152-53 ("A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter"). Therefore, Jarrow has forfeited these arguments.[14]

Of the arguments in Jarrow's renewed motion for judgment as a matter of law, I consider only whether the jury erred in finding that McCarter's rate increase was fair and equitable with full disclosure and whether punitive damages are available for tortious breach of contract under Connecticut law. Because "[a] party who has failed to comply with the procedural requirements of Rule 50 is not foreclosed from challenging the verdict by means of a Rule 59 [motion for a new trial]," however, I also consider the arguments Jarrow raises in its motion for a new trial. *Audet v. Fraser*, 605 F. Supp. 3d 372, 388 (D. Conn. 2022).

### C.  Willful and Malicious Breach

Jarrow's motion for a new trial argues that "the jury's verdict finding of willful and malicious breach is contrary to the clear weight of the evidence and should be set aside." ECF No. 469 at 19. I disagree, and find that, in the event the Connecticut Supreme Court determines that punitive damages are available for willful and malicious breach of contract, McCarter is entitled to punitive damages.

---

[14] Failure to raise a specific argument has been excused where the trial judge "intervened and on his own discussed the ... issue," which had already been raised on the "summary judgment motion and ... was the central issue at trial." *Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 n. 2 (2d Cir.1997). Alternately, failure to raise an argument can be excused if "that result is required to present manifest injustice." *Galdieri–Ambrosini*, 136 F.3d at 287 (2d Cir.1998) (citation and internal quotation marks omitted). Neither of these circumstances is present here.

Jarrow repeats the explanations for its failure to pay its legal bills that it offered at trial, all of which were aimed at rebutting the claim that it acted willfully and maliciously. ECF No. 469 at 11-19. At trial, Jarrow claimed that it initially did not pay because it "had a cash crunch," ECF No. 456 at 152, and after the Kentucky verdict, Rogovin had "the honest belief that he shouldn't have to pay because [McCarter] let him down," *id.* at 155. Jarrow also claimed it refused to pay IP bills on unrelated matters because it was following its counsel's advice not to pay. *Id.* at 156.

The jury reasonably rejected Jarrow's claim that it failed to pay its outstanding legal bills before the Kentucky trial began because of a "cash crunch." The jury heard evidence that in late May of 2019, shortly before the Kentucky trial began, McCarter offered Jarrow a 5 percent discount in "exchange for payment of all … outstanding invoices," which totaled approximately $1.3 million. ECF No. 446 at 189-90; ECF No. 477 at 220-21. Giarratana testified that Jarrow took the discount, but only "paid half" of the amount owed. ECF No. 446 at 144. On June 1, 2019, Rogovin emailed Jarrow's CFO, Ben Khowong, telling him to "[p]ut off the lawyer bills." ECF No. 448 at 119-20. Rogovin testified that he only meant to "delay the bills until [Jarrow] had money," *id.* at 93, and Jarrow presented some evidence that it experienced cash flow issues in the period leading up to the trial, *see* ECF No. 469 at 12-13 (summarizing this evidence). But the jury was not required to credit Rogovin's testimony. Nor is Jarrow's interpretation of the evidence—that Jarrow intended to pay as soon as cash flow issues were resolved—the only reasonable interpretation. The jury could have concluded that Jarrow was waiting to see the outcome of the trial, or never intended to pay, based on evidence that Jarrow accepted a discount without paying the full amount it owed, failed to notify McCarter that it needed time to resolve a cash crunch, and never ultimately paid McCarter.

27

A reasonable jury could also have rejected Jarrow's claim that it refused to pay McCarter because of a good faith belief that McCarter had engaged in malpractice. McCarter presented evidence that Rogovin was pleased with McCarter's work until he learned of the adverse jury verdict. *See, e.g.*, ECF No. 448 at 29 ("[T]he trial is going in our favor."); *id.* at 31 ("[McCarter attorney [Tom Rechen's] trial work deserves to be a made-for-TV movie. He became courthouse buzz with law interns coming in to watch him operate without anesthesia."); *id.* at 32 ("[W]e are winning…."); *id.* at 33 ("A good day in court today …. [Opposing counsel] got their butts kicked pretty hard today…."); *id.* at 36 ("[Y]ou [McCarter attorneys] are doing a fantastic job. Thank you. Big hugs."); *id.* at 37 ("[O]ur lawyers are totally dominating the courtroom.").

Further, a reasonable jury could have concluded that Jarrow acted willfully and maliciously based on Rogovin's other conduct.  The evening after the verdict, Rogovin "butt dial[ed]" Giarratana and accidentally left a profanity-laden voicemail where he criticized McCarter's work during the trial and accused it of malpractice. ECF No. 447 at 162-67. In that voicemail, Rogovin said, "As far as I'm concerned, [McCarter] can pay the damages." *Id.* at 167. The jury reasonably could have viewed the "butt dial" phone call as evidence that Rogovin decided that Jarrow would not fulfill its contractual obligation to pay McCarter for the services it had already rendered out of his own personal spite—that is, because the outcome of the Kentucky trial disappointed him—rather than because of any good-faith belief that McCarter had provided poor representation. There was ample evidence to support such a finding, including letters and emails in which Rogovin reacted with vituperation when there were adverse developments in the Kentucky Litigation, leveling epithet-laden insults against those he perceived as responsible. *See, e.g.*, ECF No. 448 at 54-56 (Rogovin calling the judge in the Kentucky Litigation "pimp deadbrain," accusing him of "whoring for [Caudill], and stating, "I

am so seething with rage that there is no way I'll do anything except a walk away or take this to trial. [Judge Simpson] … can drop dead. Please!"); ECF No. 449 at 156 (Rogovin calling Caudill's counsel "a new local lawyer … so desperate for business that he's filing a ginned up (moonshine again) lawsuit"); ECF No. 450 at 22-23 (Rogovin calling Dan Caudill a "lying SOB," a "nutter," and "a pathological liar," and asking Caudill's counsel if he had "been evaluated by a neurologist lately?"); ECF No. 445 at 218 (Giarratana testifying that "there was a tremendous amount of anger, I would say hatred … from [Rogovin] towards Dan Caudill, the Caudill company, their lawyers, and the court"). Further, Giarratana and Rogovin had worked together for more than two decades at the time of trial, ECF No. 445 at 20, but after the verdict was read, Giarratana testified that Rogovin "walked out" of the courtroom without saying a word and never spoke to him again, *id.* at 221, 228.

The jury also learned that Jarrow made the decision to fire McCarter the night the verdict came out, but did not notify McCarter right away, and continued to ask McCarter to do legal work. Rogovin testified that he told several people he was going to fire McCarter and sue for malpractice the night of the verdict, June 26, 2019. ECF No. 447 at 230-33. But Jarrow waited until July 12 inform McCarter—through new counsel—that it had been terminated.[15] ECF No. 446 at 16. Giarratana testified that when he spoke to Jonathan Leventhal, Jarrow's General Counsel, and Rory Lipsky, a Jarrow executive, after the verdict, they did not tell him that Rogovin planned to fire McCarter. *Id.* at 7-11. In those calls, Giarratana claims he discussed strategy and informed Leventhal and Lipsky that he was going to work on post-trial motions. *Id.*

---

[15] Jarrow argues that "McCarter knew full well Mr. Rogovin blamed McCarter for the verdict and was planning to have McCarter pay the judgment," because of the butt dial voicemail. ECF No. 469 at 7. The fact that McCarter overheard Rogovin's angry statements on the night of the verdict does not mean that McCarter had fair notice that it was about to be terminated and should cease working on the case. Nor does it suggest that Jarrow did not act willfully and maliciously. In addition, it is not relevant that the Rules of Professional conduct allow Jarrow to "discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services." *Id.* at 7 n.3 (quoting Conn Rules of Prof. Conduct, Rule 1.16). McCarter does not allege Jarrow breached its contract by terminating it; it alleges that Jarrow breached the contract by refusing to pay for McCarter's work.

One day after the verdict, Leventhal emailed Giarratana to ask for a "time line of key filing deadlines" and "your analysis that we discussed about for an appeal." *Id.* at 11-12. Leventhal testified that he was not aware that Rogovin intended to fire McCarter or refuse to pay any outstanding bills when he sent this email. ECF No. 448 at 141. The jury was not required to believe this testimony, however, and Rogovin told multiple people of his plans to fire McCarter the night of the verdict. And Jarrow did not formally terminate McCarter in the ensuing weeks, even as McCarter continued to work on the case. Giarratana prepared and sent Rogovin and Leventhal a draft motion for judgment as a matter of law on June 29, ECF No. 446 at 13, and Rechen sent Rogovin and Leventhal a detailed explanation of the post-trial deadlines on July 8, *id.* at 15. But Jarrow waited to fire McCarter until it had a replacement team in place. ECF No. 448 at 45-46. During this period, Jarrow hired two members of McCarter's trial team, local counsel Joel Beres and former McCarter associate John Cordani, to take over post-verdict proceedings. *Id.*

Finally, a reasonable jury could have rejected Jarrow's claim that it was acting on the advice of counsel by not paying certain bills. On July 22, 2019, Rogovin "conveyed to McCarter … that [he] would be paying the IP portion" of outstanding legal bills in an unrelated matter. ECF No. 447 at 174-75. Rogovin testified that he changed his mind about paying these bills after speaking to Jarrow's counsel, Jeff Tinley. *Id.* Again, the jury was not required to believe Rogovin's testimony. And assuming Rogovin's testimony was true, Tinley's advice came more than a month after the Kentucky verdict and Rogovin's initial decision not to pay McCarter. So the jury reasonably could have found that Jarrow's decision to refuse to pay was not primarily motivated by Tinley's advice.

Thus, the jury's verdict on willful and malicious breach was reasonable and supported by the weight of the evidence. As the jury's verdict was not "egregious," *DLC Mgmt. Corp.*, 163 F.3d at 134, a new trial is not warranted on these grounds.

D. Rate Increase

In its renewed motion for judgment as a matter of law, and its motion for a new trial, Jarrow argues that "McCarter failed to establish – by clear and convincing evidence – fair dealing, good faith, and full disclosure regarding its unilateral increase of the hourly rates it billed Jarrow Formulas beginning five months into the Kentucky litigation." ECF No. 469 at 19; ECF No. 471 at 12. I disagree.

I assume the parties' familiarity with the evidence presented at trial and summarize only the key evidence on this issue. The jury heard evidence that McCarter disclosed the rate increases to Jarrow. McCarter's lead counsel in the Kentucky Litigation, Mark Giarratana, testified that he notified Rogovin of the rate increases, and Rogovin agreed to them, during a phone call in April of 2013. ECF No. 445 at 160-61 ("I had indicated to [Rogovin] that Jarrow Formulas had been receiving a substantial discount …. We couldn't … keep our rates down at that low level, and we needed to increase them …. He indicated it was fine."). Rogovin denied that Giarratana ever discussed the rate increases with him, ECF No. 447 at 132, but the jury was free to credit Giarratana's testimony on this point over Rogovin's. The jury also learned that, during the ensuing six years, McCarter's bills listed the higher rates and Jarrow paid those increased rates on a total of 70 monthly bills. ECF No. 446 at 55. Rogovin wrote "ok" and his initials on most of the bills. ECF No. 447 at 187. Rogovin testified that he did not notice the increased rates, as he did not do a "line-by-line item review" of the bills, but rather "[l]ooked at the matter and sum and signed off on it." *Id.* at 120, 124. But the jury was free to disbelieve this

testimony and it had ample grounds to do so. During cross-examination, Rogovin was confronted with evidence that he had noticed an error on page five of one of the legal bills and had insisted that it be rebilled, suggesting that he did, in fact, read the bills before approving them for payment. *Id.* at 210-12. The jury also heard evidence that Rogovin was an experienced consumer of legal services and had worked with Giarratana for 23 years under the same billing arrangement and with occasional rate increases. ECF No. 447 at 179-82. So there was easily enough evidence to find by clear and convincing evidence that McCarter had disclosed the higher rates to Jarrow and that Jarrow agreed to them. There was also sufficient evidence to satisfy the clear and convincing standard that the rates themselves, and the overall compensation McCarter received, were fair and reasonable under the circumstances. The jury learned that, after the initial rate increase, McCarter kept its rates frozen for the rest of the six-year Kentucky Litigation, such that the rates it was charging Jarrow by the time of the trial represented a substantial discount from its standard rates. *Id.* at 18-20. And the jury heard evidence that McCarter gave Jarrow further discounts for its early payment, ECF No. 445 at 197-99, and that Jarrow paid its local counsel a higher rate after it ended its relationship with McCarter, ECF No. 448 at 46.

Jarrow introduced evidence that McCarter sent invoices to Jarrow's liability insurer, Liberty Underwriters, that listed higher rates than those listed on five bills McCarter sent to Jarrow at the outset of the Kentucky Litigation. *See* ECF No. 446 at 88-89. McCarter later reissued three of Jarrow's bills at the higher rates, and Jarrow paid those higher bills. Jarrow claims that this shows "McCarter engaged in deceptive conduct to achieve approval for its higher rates." ECF No. 471 at 16. Giarratana testified that issuing three bills to Jarrow at the lower rate was an honest mistake. ECF No. 445 at 170-71.

When the evidence is viewed in the "light most favorable to [McCarter]," Jarrow is not entitled to judgment as a matter of law. *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). Again, the jury was entitled to reject Jarrow's interpretation of the evidence and credit Giarratana's testimony. Far from being "the result of sheer surmise and conjecture," or contrary to "overwhelming" evidence, *Connelly*, 61 F.4th at 325, the jury's verdict was supported by the evidence.

Nor was the jury's verdict sufficiently "egregious" to warrant a new trial. *DLC Mgmt. Corp.*, 163 F.3d at 134. Instead, the weight of the evidence supports the jury's conclusion. This evidence was not, as Jarrow contends, limited to "Giarratana's testimony that he supposedly verbally informed Jarrow Rogovin of the rate increase, and that Jarrow Formulas paid the bills McCarter calculated at the higher rate." ECF No. 471 at 14-15. McCarter also submitted evidence that Rogovin read the bills, that he was an experienced consumer of Giarratana's legal services, that the two had been working together as lawyer and client in the same manner and under similar billing arrangements for over two decades, and that Jarrow received a reasonable price for McCarter's services. Therefore, Jarrow is not entitled to a new trial on these grounds.

E. Jury Instructions

Jarrow also argues that it is entitled to a new trial because (1) the court "incorrectly instructed [the jury] on McCarter's burden of proof to establish increased hourly rates" at the start of trial, and (2) the Court "failed to instruct the jury on advice of counsel as a defense to willful and malicious conduct and gave an unfair limiting instruction" on that issue. ECF No. 469 at 8-9. "A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir. 1993).

<u>Clear and Convincing Evidence Standard</u>

Jarrow argues that "the Court's preliminary instruction to the jury [on breach of contract] … erroneously left out any reference to the clear and convincing evidence standard applicable to the question of whether McCarter engaged in fair dealing with full disclosure in connection with its hourly rate increases." ECF No. 469 at 27. Jarrow acknowledges that the Court's closing instruction to the jury discussed the clear and convincing evidence standard, but claims that this instruction was "too little, too late." *Id.*

Jarrow's argument is unsupported by the record. My preliminary instructions—given immediately before opening statements—informed the jury that, "[w]ith respect to some issues in the case, the parties may have to satisfy a higher burden of proof than the preponderance of the evidence. Later, I will give you specific instructions about which issues require a higher burden of proof and what that burden of proof is." ECF No. 444 at 15. So the jury was on notice from the outset that it might need to apply a higher burden of proof to some issues. And because the issue of whether the clear and convincing evidence standard applied, and if so, to which issues it applied, was a hotly contested one on which there was no recent, clear guidance from the Connecticut Supreme Court, it was prudent to refrain from giving a more detailed instruction on that standard until after the charge conference.

I also made clear, in both my preliminary instruction and my final instructions, that the preliminary instructions were just that—preliminary—and that they would be superseded by the final instructions, which would be the governing source of law for the trial. ECF No. 444 at 7 (Preliminary instructions: "To begin, I will give you some preliminary instructions to guide you …. What I say now will not be a substitute for the instructions on the law that I will give to you at the conclusion of the case but is simply designed to give you an overview before you begin

hearing the case."); ECF No. 456 at 66 (Final instructions: "I gave you some preliminary instructions before trial began, but it is now—at the close of the evidence—that the final instructions governing your deliberations are given, so please be patient and listen closely. I believe that everything I am going to tell you is consistent with the preliminary instructions I gave you at the start of the trial, with one exception I will explain later; but if you have any doubt, you should not rely on anything different I may have said in my preliminary instructions. The instructions I am now giving you must guide your deliberations in this case."); *id.* at 90 (Final instructions: "In my preliminary instructions, I said to you that McCarter must prove its breach of contract claim by a preponderance of the evidence. This was correct in part and incorrect in part, and so you should ignore my preliminary instructions on this issue and focus on these instructions."). It was my final instructions, not the preliminary instructions, that were handed out to the jurors to keep during deliberations. My final instructions explained the clear and convincing evidence standard, ECF No. 456 at 76, and reminded the jury several times that McCarter was "required to prove fair dealing … by the heightened standard of clear and convincing evidence," *Id.* at 92, 108-109, 129, 142. "Thus, to the extent the preliminary instructions were erroneous, the Court corrected this error repeatedly in the final jury instructions, which the jury is presumed to have followed." *Fraser v. Wyeth*, Inc. 992 F. Supp. 2d 68, 93 (D. Conn. 2014); *see also United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) (explaining that courts "presume that a jury adheres to the curative instructions of the trial court" unless "there is an overwhelming probability that the jury will be unable to follow the court's instructions" (citation and internal quotation marks omitted)).

Advice of Counsel

Jarrow next argues that the Court erred in "refus[ing] to instruct the jury on the advice of counsel defense" and in giving a "limiting instruction regarding evidence of that advice being solely relevant to … IP bills" ECF No. 469 at 19. To rectify this supposed error, Jarrow asks that the court grant a "new trial … on will[ful] and malicious breach." *Id.* at 42. But my instructions to the jury on the advice of counsel defense were not in error.

During trial, Jarrow sought to introduce evidence that its recently-deceased counsel, Jeff Tinley, had advised it not to pay McCarter's outstanding legal fees. Jarrow never raised "advice of counsel" as an affirmative defense in its Answer, but "[c]ourts in the Second Circuit have allowed parties to raise advice of counsel to defeat an element of a claim without having to include it as an affirmative defense in their answer." *Nokaj v. N.E. Dental Mgmt., LLC*, No. 16-CV-03035, 2019 WL 634656, at *13 (S.D.N.Y. Feb. 14, 2019) (citation and internal quotation marks omitted). In Jarrow's view, evidence that it acted on the advice of counsel rebutted McCarter's claim that its breach of contract was willful and malicious. ECF No. 447 at 242. McCarter responded that it had attempted to depose several Jarrow employees about the legal advice they received, and Jarrow had asserted attorney-client privilege. *Id.* at 243. To prevent Jarrow from using attorney-client privilege as a shield during discovery and a sword at trial, McCarter argued that I should preclude Jarrow from raising advice of counsel. *Id.* at 244. I directed the parties to send excerpts from the relevant depositions, *id.*, which I reviewed and discussed at length with the parties, ECF No. 448 at 3-23. Those deposition excerpts established that Jarrow had invoked attorney-client privilege to prevent Jonathan Leventhal, who was Jarrow's General Counsel at the relevant time, and Rogovin from answering several questions

about the legal advice they received from Tinley, but Jarrow permitted Rogovin to testify that he did not pay the IP bills "on the advice of counsel." ECF No. 448 at 4-20.

Ultimately, I permitted Rogovin to testify that he relied on the advice of counsel when deciding not to pay the IP bills, but barred him—based on assertions of privilege and instructions not to answer in the depositions—from elaborating on the content of that advice or claiming that he had decided not to pay other bills based on the advice of counsel. *Id.* at 147. After Rogovin testified to this effect, I told the jury that "the witness just testified that he didn't pay the IP bills based on advice he received from a lawyer. So you may consider that testimony as to whether any failure by Mr. Rogovin or his company to pay those bills was willful and malicious. That is the only purpose for which you may consider that testimony." *Id.* at 105. In my closing instructions, I again advised the jury that it could consider evidence that "Rogovin decided not to pay the bills for the intellectual property work unrelated to the Kentucky litigation based on advice he received from a lawyer …. only for the limited purpose of deciding whether any failure to pay the bills for the unrelated intellectual property work was willful and malicious." ECF No. 456 at 72.

My decision to exclude further testimony about advice of counsel was proper. I could not permit Jarrow to introduce "testimony or evidentiary presentations …. at trial if that same testimony or evidence was withheld from [McCarter] during discovery based on attorney-client privilege." *Cary Oil Co. v. MG Refining & Marketing, Inc.*, 257 F. Supp. 2d 751, 761 (S.D.N.Y. 2003); *see also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (holding that defendant "waived any available advice of counsel defense by objecting, based on the attorney-client privilege, to [the plaintiff's] discovery requests"). Further, the limiting instruction was proper. Jarrow did not raise advice-of-counsel as an affirmative defense, so Rogovin's

testimony was only admissible to the extent it rebutted McCarter's claim that Jarrow acted willfully and maliciously. As such, I informed the jury that it should consider the advice-of-counsel testimony solely to determine Jarrow's state of mind. *See Lomas v. Partner Wealth Mgmt., LLC*, No. 08-FST-CV-15-5014808-S, 2018 WL 2208054, at *7 (Conn. Super. Ct. Apr. 23, 2018) (permitting advice of counsel evidence not raised as special defense and instructing jury that it was "free to consider it in determining whether or not the defendants acted in a reckless wilful or wanton manner" [sic]). And my charge was properly limited to the IP bills based on the evidence produced at trial. *See* ECF No. 447 at 174-76; ECF No. 448 at 174-74.[16]

Thus, my instructions did not give the jury "a misleading impression or inadequate understanding of the law," and Jarrow is not entitled to a new trial on these grounds. *BAII Banking Corp*, 985 F.2d at 696.

F.   Evidentiary Rulings

Next, Jarrow argues that it is entitled to a new trial because the court erroneously: (1) precluded evidence of Jarrow's damages malpractice theory, (2) precluded evidence that a McCarter attorney assaulted Rogovin, and (3) allowed prejudicial testimony from one of McCarter's experts.

"When a party moves for a new trial on the ground that the court erroneously excluded evidence, [Fed. R. Civ. P.] 59 is read in conjunction with [Fed. R. Civ. P.] 61." *Garnett v. Undercover Officer C0039*, No. 1:13-CV-07083, 2015 WL 1539044, at *10 (S.D.N.Y. Apr. 6, 2015), *aff'd*, 838 F.3d 265 (2d Cir. 2016). Under Rule 61, "no error in admitting or excluding

---

[16] Even if I misconstrued the deposition transcripts in finding that Jarrow had asserted the privilege as to the reasons for the refusal to pay with respect to the Kentucky Litigation, it is hard to see how Jarrow was prejudiced. Rogovin testified that he made the decision not to pay for the Kentucky Litigation on the evening after the verdict, which was consistent with his spiteful reactions to adverse developments throughout the Kentucky Litigation, and predated the advice he received from Attorney Tinley by about a month.

evidence … is ground for granting a new trial" "[u]nless … justice requires otherwise," and "the court must disregard … errors … that do not affect any party's substantial rights." An erroneous evidentiary ruling does not affect a substantial right and is therefore harmless, unless the party challenging the ruling demonstrates that "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Tesser v. Bd. of Educ.*, 370 F.3d 314, 319 (2d Cir. 2004).

Further, when a party seeks a new trial because the court admitted evidence that the party never objected to, "a new trial is warranted … only if its admission is plain error, meaning that the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Sharkey v. Lasmo*, 55 F. Supp. 2d 279, 290 (S.D.N.Y. 1999) (citation and internal quotation marks omitted).

<u>Preclusion of Evidence of Damages Malpractice Theory</u>

Jarrow argues that the Court erred in precluding its malpractice theory that McCarter failed to challenge adequately Caudill's compensatory damages in the Kentucky Litigation. ECF No. 469 at 8. At the summary judgment stage, I found an issue of material fact on this portion of Jarrow's malpractice claim, which alleged that McCarter failed "to retain a qualified expert and conduct expert testimony regarding the damages that Caudill claimed and to refute and challenge Caudill's damages presentation at trial." ECF No. 469 at 29. Before trial, however, McCarter argued that Jarrow did not have sufficient evidence to prove damages for this malpractice claim with reasonable certainty. ECF No. 273 at 23 n.6, 28-33; *see Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 69 (1998) ("[D]amages are recoverable [for legal malpractice] only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty."); *Braithwaite v. Lee*, 125 Conn. 10, 14 (1938)

("[D]amages are an essential element of the plaintiff's proof before he is entitled to recover. They must be proved with reasonable certainty." (internal citation omitted)).

Jarrow sought to prove its malpractice damages using two witnesses. First, Kean Ashurst, a former Caudill employee who was accused of helping Jarrow steal Caudill's trade secrets, would testify that Caudill's research and development costs were "no more than $250,000." ECF No. 336 at 4-5. Based on this testimony, Jarrow intended to argue that, due to McCarter's failure to contest damages, it suffered damages of $1,773,000, the difference between the $2.023 million the Kentucky jury awarded in research and development damages and $250,000. *Id*. Second, Jarrow contends that Attorney Michael Berman, its expert witness, would testify that "but for McCarter's alleged malpractice, no compensatory damages would have been awarded." ECF No. 355 at 9. I determined that Jarrow had not adequately disclosed either of these theories to McCarter during discovery. ECF No. 336 at 4-7; ECF No. 355. I ultimately precluded both witnesses from testifying as to these theories under Rule 37(c)(1), which provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) …, the party is not allowed to use that information or witness to supply evidence … at a trial, unless the failure was substantially justified or harmless."

My reasons for excluding the evidence are thoroughly explained in my rulings on this issue, ECF No. 336 at 4-7; ECF No. 355, and I need not repeat them here. I will, however, address Jarrow's new argument—one it has waived by not raising it before trial, *see* ECF No. 355 at 9 (noting that "Jarrow has not argued that any lack of disclosure was substantially justified or harmless")—that any failure to disclose was "substantially justified or harmless," ECF No. 469 at 34-38. First, Jarrow states the wrong standard for evaluating this issue: the Second Circuit has not required district courts to find "flagrant bad faith and callous disregard of the Federal

Rules of Civil Procedure" to preclude evidence under Rule 37(c)(1). *Id.* at 35; *see Design Strategy, Inc. v. Davis,* 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith … such a requirement should not be read into the Rule."). Instead, courts consider: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design Strategy*, 469 F.3d at 296 (citations and internal alterations omitted).

While one factor, the importance of the testimony, largely favored Jarrow,[17] the remaining factors all weighed against admitting the evidence. Jarrow has "not yet explained why it omitted [these damages theories] in its Initial Disclosure," *id.* at 297, nor has it explained why it failed to disclose the theories in multiple expert reports, depositions, or supplemental disclosures.[18] By the time Jarrow first introduced these two damages theories in October of 2022, discovery had been closed for more than two years. *See* ECF No. 119 (setting May 1, 2020 discovery deadline); ECF No. 145 (permitting parties to finish remote depositions by June 15, 2020). The Court had decided summary judgment motions, ECF No. 164, and scheduled jury selection for November 2, 2022. ECF No. 232.[19] *Cf. Design Strategy*, 455 F.3d at 297 (holding that failure to disclose was not harmless where "discovery had been closed for approximately one and a half years" and "at the time of the offer of expert testimony there was only a 'short time left before trial'"). So I see no reason to disturb my ruling on the ground that Jarrow's

---

[17] I note, however, that the vagueness of and lack of support for Kean Ashurst's proposed testimony substantially diminished its probative value. *See* ECF No. 336 at 5.

[18] The Court even declined to preclude a late-filed expert report from Berman, on the condition Jarrow make Berman available for a second deposition, at Jarrow's expense. ECF No. 173. That "supplemental report," and his second deposition, both failed to disclose a theory that Caudill's "compensatory award would have been $0 absent McCarter's malpractice." ECF No. 355 at 5, 8-9.

[19] The trial was delayed until July 2023 for other reasons. ECF No. 336 at 336-37.

failure to disclose was harmless, because McCarter was given no notice that it needed to retain a damages expert to rebut Ashurst's testimony and Berman's new damages opinions or prepare to cross-examine them on how they calculated their figures. ECF No. 355 at 9. McCarter's statement, during a status conference, that it was "fully prepared to attack" Ashurst's testimony, ECF No. 318 at 64, does not mean it was not prejudiced by its inability to conduct discovery on this issue.

Jarrow argues that "it sought to remedy the deficiencies caused by [its] terminally ill prior counsel to conduct the requisite discovery on Caudill's damages claims" when "[t]he trial was still nine months away." ECF No. 469 at 34.  Jarrow's counsel died unexpectedly on September 3, 2021. ECF No. 223. Jarrow's new counsel moved to conduct additional discovery, including on the damages portion of its malpractice claim, in April of 2022. ECF No. 244-1 at 8-9. But even as it moved to reopen discovery, Jarrow still failed to disclose Ashurst's testimony or Berman's theory as bases for its damages calculations. *Id.* And as the Court concluded in denying Jarrow's motion, Jarrow's prior counsel died "[l]ong after discovery closed in this case," Jarrow "had ample opportunity to conduct … discovery," and "the discovery process in this case was lengthy, onerous, and contentious for the parties and the Court." ECF No. 254.

So my rulings excluding Ashurst's and Berman's testimony were reasonable: Jarrow had no justification for its lengthy delay in disclosing its damages theories, the theories were disclosed years after discovery ended, reopening discovery would have been costly and unfair, and McCarter was prejudiced by its inability to conduct discovery or hire an expert to rebut Jarrow's claims.

<u>Preclusion of Evidence of Eric Grondahl's Assault of Rogovin</u>

Next, Jarrow argues that "[t]he Court erroneously excluded evidence of an assault by Mr. Grondahl of Mr. Rogovin." ECF No. 469 at 78. During trial, Jarrow sought to offer proof that Eric Grondahl, a McCarter attorney working on the Kentucky Litigation, became intoxicated, put his "hands on" Rogovin, and later fell on the ground and had to be hospitalized. ECF 452 at 129-131. Jarrow argued the evidence would "go to some of the reasons why [Rogovin] did not feel that McCarter & English had done an adequate job leading to his decision not to pay." *Id.* at 131. The Court excluded the evidence because "there's been zero evidence presented that the altercation between Mr. Grondahl and Mr. Rogovin had anything to do with Mr. Rogovin's reasons for not paying. Mr. Rogovin has already testified in the billing [portion of the trial] and has explained at some length his reasons for not paying. He did not mention that." *Id.* Now, however, Jarrow argues that the evidence could have supported Rogovin's testimony that he felt "broken" by the time McCarter decided not to call him as a witness, which, Jarrow contends, would explain why he "did not insist on testifying." ECF No. 469 at 30-31.

When it made its proffer, Jarrow never argued that the alleged assault would explain why Rogovin did not insist on being called as a witness, nor did it point to any evidence that would support such a claim. *See United States v. Malka*, 602 F. Supp. 3d 510, 526 (S.D.N.Y. 2022) ("The party introducing evidence carries the burden of establishing its relevance."). Even if it had, the evidence had minimal probative value,[20] and was unfairly prejudicial. In any event,

---

[20] As McCarter points out, it is unclear if the Grondahl incident even preceded the meeting where Rogovin claims he felt "broken." ECF No. 479 at 33. McCarter has offered different dates for the Grondahl incident. *See* ECF No. 452 at 129 ("Saturday, June 17"); ECF No. 469 at 38 ("Saturday, June 14, 2019"); *see also* ECF No. 479 at 33 (McCarter arguing the assault occurred on "Saturday, June 15, 2019," the only listed date that is actually a Saturday). And one of McCarter's attorneys testified that the decision not to call Rogovin as a witness was finalized on June 14, ECF No. 451 at 125-26, though other evidence suggests it occurred later, and McCarter may not have communicated the decision to Rogovin right away, *see* ECF No. 455 at 84. Either way, Jarrow does not cite any evidence that the interaction with Grondahl was actually "one of the core reasons" Rogovin felt too broken to protest McCarter's decision. ECF No. 469 at 39.

Jarrow has not demonstrated that "in some material respect … the [jury's] judgment was swayed" by the exclusion of the evidence regarding Grondahl. *Tesser*, 370 F.3d at 319.

Testimony of McCarter's Expert

Next, Jarrow argues that the testimony of James Shearin, McCarter's malpractice expert, "violat[ed] Federal Rules of Evidence 702, 703, and 705," and the "entire testimony should [have] been stricken from the record." ECF No. 469 at 40. As Jarrow concedes, it made "no objection" to this testimony during trial. *Id.* So a new trial is warranted on these grounds only if the error "was so serious and flagrant that it goes to the very integrity of the trial." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (citation and internal quotation marks omitted). Jarrow does not come close to satisfying that standard.

Jarrow claims that Shearin's testimony "amounted to no more than an incoherent tirade, comprised of a combination of false accusations, naked speculation and ad hominem attacks, staged as expert testimony and facts." ECF No. 469 at 40. This claim is entirely unsupported by Jarrow's citations to the record, which include Shearin's testimony about his credentials and the evidence he reviewed to form his opinion, ECF No. 455 at 89-109, and his opinion that "there was no malpractice," *id.* at 109.

To litigate a legal malpractice claim under Connecticut law, parties must use expert testimony "to establish the standard of proper professional skill or care." *Kalra v. Adler Pollock & Sheehan P.C.*, 3:18-CV-00260 (KAD), 2022 WL 280180, at *3 (D. Conn. Jan. 31, 2022) (citation and internal quotation marks omitted). This testimony "assist[s] … members of the jury … to understand the applicable standard of care and to evaluate the [attorney's] actions in light of that standard." *Id.* (citation and internal quotation marks omitted). Shearin's testimony helped the jury evaluate McCarter's decision not to call Rogovin as a witness. He appropriately testified

about the risks of calling Rogovin, including harmful evidence that Caudill might have used to cross-examine Rogovin during the Kentucky Trial. *See, e.g.*, ECF No. 455 at 111-19.   Even if this testimony might have led the jury to infer that Rogovin was "a thief and a liar" who "committed trade secret misappropriation," ECF No. 469 at 40, I did not err in permitting Shearin to testify about how he formed his opinions. Shearin's opinion that the evidence of trade secret theft in the Kentucky trial was compelling and thus posed a serious challenge to the McCarter trial team was supported by the evidence, including emails between Kean Ashurst and Jarrow Rogovin. His testimony was far from being "improper speculation" supported by "no … facts."   *Id.*   Shearin described the information he reviewed to form his opinion, including deposition transcripts, emails, and court filings. ECF No. 455 at 100-107. My decision to permit this testimony was not plain error.

### G.  Grant of Summary Judgment

Jarrow also claims a new trial is warranted because I should not have granted partial summary judgment on McCarter's breach of contract claim. ECF No. 469 at 44-46. Jarrow argues that a partial grant of summary judgment on the breach of contract claim was inconsistent with my determination that there was an issue of material fact as to some of Jarrow's malpractice claims. ECF No. 469 at 45. Since "[p]erformance is an element of McCarter's [breach of contract] claim," Jarrow asserts that malpractice constitutes a failure to perform. *Id.* Jarrow did not raise this argument in its summary judgment briefing. *See* ECF Nos. 164, 178, 185; *see also* ECF No. 318 at 15 (rejecting attempt to raise failure to perform argument in pre-trial hearing because "that's a new argument at this point …. [T]here was a place to make that argument, which was in the summary judgment papers.").

Jarrow cannot challenge a summary judgment ruling on grounds it failed to raise in its summary judgment briefing. *See Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order) ("[P]laintiff never raised these arguments in its opposition to defendants' motion for summary judgment. Accordingly, these arguments were waived."). Even if it could, a Rule 59 motion for a new trial is not the proper vehicle for Jarrow to relitigate the court's summary judgment decision. *See Young v. Cabrera*, No. 18-CV-03028, 2023 WL 1785526, at *6 (E.D.N.Y. Feb. 6, 2023) ("[W]hile plaintiff is free to challenge the partial grant of summary judgment on appeal, 'Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple,''" (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)); *SEC v. Westport Cap. Markets LLC*, No. 3:17-CV-02064 (JAM), 2020 WL 6270698, at *11 (D. Conn. Oct. 26, 2020) ("[I]n the absence of any intervening change in law or facts … post-trial Rule 50 and Rule 59 motions are not appropriate vehicles for [parties] to seek to relitigate issues long decided against them at the summary judgment stage of this action.").

Since none of the grounds on which Jarrow seeks a new trial has merit, I deny its motion for a new trial or remittitur in its entirety. I also reject all claims in Jarrow's motion for judgment as a matter of law, except its argument that punitive damages are unavailable in this case, which I have certified to the Connecticut Supreme Court.

## V.     Damages Motions

McCarter also moves for prejudgment interest, ECF No. 464, punitive damages, ECF No. 465, and offer of compromise interest, ECF No. 466. I deny without prejudice McCarter's motion for punitive damages, and grant in part its motions for prejudgment interest and offer of compromise interest.

A. <u>Prejudgment Interest</u>

McCarter moves for prejudgment interest of $854,122.50, plus $51.40 per day from September 30, 2023 until judgment enters. ECF No. 481 at 2. Federal courts sitting in diversity jurisdiction must apply Connecticut's prejudgment interest statute. *See Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 82 (D. Conn. 1994), *aff'd*, 66 F.3d 308 (2d Cir. 1995). Under Connecticut law, "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions ... as damages for the detention of money after it becomes payable." Conn. Gen. Stat. § 37-3a(a). "[A]n award of interest under § 37–3a … is discretionary with the trial court. Interest is awarded … when the court determines that such an award is appropriate to compensate the plaintiff for the loss of use of [its] money." *DiLieto v. Cnty. Obstetrics & Gynecology Grp., P.C.*, 310 Conn. 38, 54 (2013).

McCarter argues that it is entitled to prejudgment interest of 10 percent on the amount the Court awarded at summary judgment and the amount of compensatory damages the jury awarded, adjusted to account for release of the $1.85 million in escrow to McCarter. ECF No. 467 at 11-18; ECF No. 481 at 1-2. McCarter also contends that the interest began accruing on the date Rogovin notified McCarter that Jarrow would not make any more payments. *Id.* at 9-11, 18. Jarrow responds that McCarter is not entitled to prejudgment interest at all, since the money was never wrongfully detained. ECF No. 477 at 5-10. In the alternative, Jarrow maintains that the interest rate should be no more than 4 percent, *id.* at 11-14, and the amount of interest should be offset by a reasonable amount that "the bond for Prejudgment remedy" would have earned if it had been placed in an interest-bearing account, *id.* at 10.

<u>Entitlement to Prejudgment Interest</u>

Jarrow argues that McCarter is not entitled to prejudgment interest. Conn. Gen. Stat. §
37-3a permits parties in civil trials to recover "an award of interest on money from the time
money is wrongfully withheld." *Paulus v. Lasala*, 56 Conn. App. 139, 150 (1999). "When a case
is tried before a jury, … prejudgment interest, as an element of damages, is a factual question
within the province of the jury." *Retepromaca*, 2004 WL 722231, at *9. The parties agreed that
the jury would decide whether McCarter was entitled to prejudgment interest with respect to any
damages the jury awarded, and the Court would determine whether McCarter was entitled to
prejudgment interest "with respect to the amount awarded at summary judgment."[21] ECF No.
362 ¶ 5; ECF No. 423. The jury determined that Jarrow wrongfully withheld McCarter's legal
fees, and awarded prejudgment interest.

Jarrow argues that its detention of funds was not wrongful, as a matter of law, because it
had a "good faith dispute over [its] liability to pay … the amount allegedly owed." ECF No. 477
at 6. But in the last decade, Connecticut's Supreme Court has clarified that "the wrongful
detention standard of § 37-3a is satisfied by proof of the underlying legal claim, a requirement
that is met once the plaintiff obtains a judgment in [its] favor on that claim." *DiLieto*, 310 Conn.
at 52. Therefore, "[i]nterest may be awarded in the discretion of the [fact-finder] even when the

---

[21] As I discussed in footnote 1 with regard to punitive damages, McCarter claims that Jarrow waived any argument
that "McCarter is not *entitled* to prejudgment interest" because the parties "stipulated that the issue of *entitlement* to
prejudgment interest would go to the jury." ECF No. 488 at 2-3. The stipulation McCarter cites states that (1) "[i]f
the issue of prejudgment interest is permitted by the Court to go to the trier of fact on any claim, the jury will be the
trier of fact on *whether* a party is *entitled* to prejudgment interest," (2) "the Court will calculate the interest amount,
including start and end dates, interest rate, compounding, etc., in post-trial proceedings," and (3) "[b]oth parties
reserve their right to argue to the Court that the opposing party is not entitled to prejudgment interest and/or punitive
damages for any reason, and [that] no issues related thereto should be submitted to the jury." ECF No. 362 ¶ 5. The
most reasonable interpretation of the final portion of the stipulation is that Jarrow did not waive its right to argue
that the jury's prejudgment interest award should be set aside under Rule 50 or Rule 59, because McCarter was "not
entitled to prejudgment interest" as a matter of law. Jarrow does not raise the issue of McCarter's entitlement to
prejudgment interest in its motion for a new trial, or its motion for judgment as a matter of law. Still, I consider the
argument Jarrow raises in its response to McCarter's motion for prejudgment interest under the applicable Rule 50
and Rule 59 standards.

liable party's failure to pay the judgment was not blameworthy, unreasonable or in bad faith." *Id.* at 52 n.13. Instead, the "primary equitable factor that [the fact-finder] must consider when exercising its discretion to award interest is the policy of compensating parties that have been deprived of the use of their money." *Dish Network, LLC v. Comm'r of Revenue Servs.*, 330 Conn. 280, 315 (2018) (internal quotation marks, citations, and alterations omitted). In this case, I instructed the jury that, "to award prejudgment interest," it "must … determine whether, under all the circumstances, the party has proven that the other party wrongfully detained money that was due …. There is no hard and fast rule for what constitutes wrongful detention. The question is whether justice requires that the party be paid interest for the loss of use of money." ECF No. 430 at 38-39.

The jury's decision to award prejudgment interest according to this standard was reasonable. Under Connecticut law, the jury was entitled to award prejudgment interest "once [McCarter] obtain[ed] a judgment in its favor on [its breach of contract] claim." *DiLieto*, 310 Conn. at 51. Further, the jury determined that McCarter's breach of contract was willful and malicious, and, as I explained above, this portion of the verdict was supported by ample evidence. Thus, the jury's determination that Jarrow wrongfully withheld payment from McCarter was not in error.

I also award prejudgment interest on the amount I awarded at summary judgment. Prejudgment interest is reasonable to compensate McCarter for the loss of its use of its money. This litigation has taken several years and required McCarter to rack up considerable legal expenses. Jarrow has rejected at least one offer to settle the case. ECF No. 125. In the interim, as I explain below, interest rates have been unusually high. Further, declining to award prejudgment interest on the amount awarded at summary judgment would be inconsistent with the jury's

verdict. The jury concluded that (1) Jarrow's breach of contract was willful and malicious, and (2) Jarrow wrongfully withheld money from McCarter, warranting prejudgment interest. The damages the jury awarded, and the amount I awarded at summary judgment, involved the same five unpaid invoices. If Jarrow's decision to withhold payment on one portion of those invoices—the portion attributable to the rate increase—was willful and malicious, its decision to withhold payment on the remaining portion of those invoices must also have been.

Start and End Date

McCarter argues that the interest should start accruing on July 22, 2019, when "Jarrow Rogovin wrote to Mark Giraratana, Thomas Rechen, and Eric Grondahl, to notify them that JFI was not going to make any further payment on the McCarter fees and expenses from the Kentucky litigation." ECF No. 467 at 10 (citing PTX-103). July 22, 2019 is also the date when McCarter filed this action. ECF No. 1. I agree that the July 22, 2019 accurately reflects the date when the money was wrongfully withheld. *Hamann v. Carl*, 196 Conn. App. 583, 601 (2020). Under Section 37-3a, prejudgment interest continues accruing until the date of entry of judgment. *See Robert Haydon Jones & Assocs., LLC v. Cosmetique*, Inc., No. 3:04-CV-00417 (WWE), 2006 WL 8448195, at *2 (D. Conn. May 23, 2006). However, on September 29, 2023, Jarrow released from escrow $1.85 million in funds that were attached as a prejudgment remedy. ECF No. 480 at 2. Therefore, McCarter agreed that its "claim for prejudgment interest and offer of compromise interest would stop running on the [$1.85 million released from escrow]" on September 29, 2023. *Id.* Jarrow does not contest McCarter's proposed start and end dates.

Interest Rate

The parties disagree about the appropriate interest rate for McCarter's prejudgment interest. Section 37-3a provides that the court may award an "interest rate at ten percent a year,

and no more." But this provision merely "establishes a maximum rate above which a trial court should not venture," and trial courts have discretion to determine the appropriate amount of interest to award. *Sears Roebuck & Co. v. Bd. of Tax Rev.*, 241 Conn. 749, 765 (1997). The Connecticut Supreme Court has approved the use of "potential investment income in choosing a fair rate of interest…." *DiLieto v. Cnty. Obstetrics & Gynecology Grp., P.C.*, 316 Conn. 790, 805, 807 (2015).

I have reviewed the parties' submissions, including information on average investment yields and interest rates, and I find that a prejudgment interest rate of 8 percent is fair in this case. Interest rates and returns on investments during the period between 2019 and 2023 have been relatively high. This interest rate is within the range that other trial courts have awarded for a similar time period. *See, e.g.*, *Paniccia v. Success Vill. Apartments, Inc.*, No. CV-16-5031432-S, 2023 WL 5366466, at *8 (Conn. Super. Ct. Aug. 16, 2023) (awarding 6.5 percent interest); *Coppola v. Palmer*, No. DBD-CV-21-6039274-S, 2023 WL 6121048, at *3 (Conn. Super. Ct. Sept. 13, 2023) (awarding 8 percent interest); *Spearman v. Jhilal*, No. FBT-CV-18-5036543-S, 2023 WL 4575681, at *2 (Conn. Super. Ct. July 12, 2023) (awarding 10 percent interest). And the Connecticut Supreme Court has held that 8 percent interest is not an abuse of the trial court's discretion, since "the legislature has set [that rate] as fair compensation for loans and other agreements that contemplate interest but fail to set a rate." *DiLieto*, 316 Conn. at 806.

<u>Prejudgment Remedy</u>

Finally, Jarrow argues that any prejudgment interest award should be "offset as a result of [McCarter] not seeking [that] the [prejudgment remedy funds] be [placed] in an interest-bearing account." ECF No. 477 at 14. As I have explained, then-Magistrate Judge Merriam awarded an attachment of $1.85 million as a prejudgment remedy. ECF No. 124. "[T]he parties agreed that

[Jarrow] would deposit $1.85 million into escrow during the pendency of this litigation." ECF No. 480 at 1. Jarrow claims that Rogovin "requested an interest-bearing instrument be used, but his suggestion was ignored." *Id.* at 10; *see also* ECF No. 477-1 ¶ 2 (affidavit of Jarrow Rogovin stating that he "suggested that the funds be put in an interest bearing account. The suggestion was not followed as being supposedly … 'impractical' and too complicated").

I do not agree that the failure to place the funds in an interest-bearing account warrants a reduction in the prejudgment interest award. McCarter did not have use of the escrowed funds until September 29, 2023, when Jarrow agreed to release them. ECF No. 480 at 2. And the fact that Rogovin allegedly suggested that the funds be placed in an interest-bearing account is not relevant, since the Escrow Agent apparently did not follow that suggestion. Reducing McCarter's award based on interest that never accrued would not be equitable. Finally, if the funds had been placed in an interest-bearing account, it is McCarter, not Jarrow, that would have been entitled to any interest accrued. The parties' Escrow Agreement states that the Escrow Agent is "authorized and directed to open an interest-bearing account or sub-account," but any "[i]nterest … shall accrue for the benefit of [McCarter]." ECF No. 480-1 at 7.

For the reasons explained above, I grant in part McCarter's motion for prejudgment interest, ECF No. 464. I award 8 percent simple interest on the amount awarded in this Court's summary judgment ruling ($980,451.44), and the compensatory damages awarded in the jury's verdict ($1,057,173.93). This interest began accruing on July 22, 2019, and continued accruing through September 29, 2023, when McCarter released prejudgment remedy funds from escrow. Since the amount of compensatory damages ($2,037,625.37) exceeds the amount released from escrow ($1,850,000), I also award prejudgment interest on the difference between those amounts ($187,625.37) from September 29, 2023 through the date of entry of judgment. The interest

accrued through September 29, 2023 is $683,302.32. Because I will not be entering judgment with this ruling, I note for now only that interest has accrued from September 29, 2023, and that interest will continue to accrue at $41.12 per day until judgment is entered.

B. <u>Punitive Damages</u>

As I have explained, I will certify to the Connecticut Supreme Court the issue of whether punitive damages are available for willful and malicious breach of contract, and I therefore deny without prejudice McCarter's motion for punitive damages. If the Connecticut Supreme Court determines that punitive damages are available in this case, McCarter may renew its motion for punitive damages.

The parties stipulated that the Court should calculate the amount of the punitive damages award if the jury determined that McCarter was entitled to punitive damages. ECF No. 362 ¶ 5. In Connecticut, common law punitive damages are "limited to the plaintiff's litigation expenses less taxable costs." *Berry*, 223 Conn. at 827. Litigation expenses include both a "reasonable fee" and "reasonably necessary disbursements." *Markey v. Santangelo*, 195 Conn. 76, 80 (1985). McCarter seeks $3,602,462.99 in punitive damages, based on its litigation expenses. This amount includes $3,083,219.33 in fees, for 5,366.3 hours in partner time (charged at rates ranging from $460/hour to $675/hour), 497 hours of associate and counsel time (charged at rates ranging from $200/hour to $300/hour), and 1546.8 hours in e-discovery and paralegal time (charged at rates ranging from $175/hour to $300/hour). ECF No. 467 at 31. This amount also includes $519,243.66 in disbursements, including expenses incurred for experts and trial consultants. *Id.* at 32. To support its claims, McCarter provides affidavits from its partners attesting to their hourly rates and qualifications, ECF Nos. 467-1, 467-2, 467-3, 467-4, 467-5, an affidavit from its accountant, ECF No. 467-6, and contemporaneous time entries and records

establishing that it paid the fees and disbursements listed in its motion, ECF Nos. 467-7, 467-8, 467-9, 467-10, 467-11, 467-12, 467-13, 467-14, 467-15, 467-16. Jarrow's response argues that McCarter is not entitled to punitive damages under Connecticut law, but it does not contest the hourly rates, the time spent, or McCarter's description of the amounts McCarter expended on this litigation. ECF No. 477 at 15-20.

I have reviewed evidence McCarter has submitted, and considered the length and complexity of the litigation, my knowledge of reasonable attorney's fees in this market, the voluntary 15 percent courtesy discount that McCarter has applied, the results McCarter's attorneys achieved in this litigation, and the fact that McCarter—a law firm and a sophisticated consumer of legal services—agreed to and paid these amounts, among other factors. I find that McCarter reasonably incurred $3,602,462.99 in litigation expenses to date. If the Connecticut Supreme Court determines that McCarter is entitled to punitive damages for willful and malicious breach of contract, then I will award $3,602,462.99 in punitive damages upon a renewed motion by McCarter, after which I will enter judgment.

C.   Offer of Compromise Interest

Finally, McCarter moves for offer of compromise interest of $2,177,771.40, plus $1,017.90 per day in interest until judgment enters.[22] ECF No. 481 at 2; ECF No. 466. Federal courts sitting in diversity jurisdiction must apply Connecticut's offer of compromise statute, Conn. Gen. Stat. § 52-192a. *See Clayton Servs. LLC v. Sun W. Mortg. Co.*, Inc., No. 22-511, 2023 WL 2781294, at *4 (2d Cir. Apr. 5, 2023) ("[Conn. Gen. Stat.] § 52-192a(a) is substantive

---

[22] Jarrow misunderstood McCarter's motion for offer of compromise interest, apparently construing the $2,161,683.20 McCarter initially sought as a contemporaneous offer to settle the case for that amount. ECF No. 477 at 20-21 ("Plaintiff offers $2,161,683.20 as a 'compromise' amount, which amount is considerably higher than even 10% - so it constitutes no offer of compromise whatsoever.").

for *Erie* purposes and therefore applies in federal court."); *see also* Local R. Civ. P. 68. Connecticut's statute provides that:

> [A]fter commencement of any civil action based upon contract or seeking the recovery of money damages … the plaintiff may, not earlier than one hundred eighty days after service of process is made upon the defendant in such action but not later than thirty days before trial, file with the clerk of the court a written offer of compromise signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action for a sum certain …. The plaintiff shall give notice of the offer of compromise to the defendant's attorney or, if the defendant is not represented by an attorney, to the defendant himself or herself …. If the offer of compromise is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise shall be considered rejected and not subject to acceptance unless refiled.

Conn. Gen. Stat. § 52-192a(a). After trial, if "the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount." *Id.* § 52-192a(c). For an offer of compromise "filed not later than eighteen months from the filing of [the] complaint," the "interest shall be computed from the date the complaint … was filed." *Id.*

Less than 18 months after the complaint was filed, McCarter filed an offer of compromise, which offered to settle all claims for $1.8 million. ECF No. 125. Jarrow did not accept that offer within 30 days. Through this Court's partial grant of summary judgment, ECF No. 194, and the jury's verdict, ECF No. 433, McCarter has recovered $2,037,625.37 in compensatory damages. That amount is "equal to or greater than" the $1.8 million set forth in McCarter's offer of compromise. Conn. Gen. Stat. § 52-192a(a). McCarter has also recovered $683,302.32 in prejudgment interest, plus $41.12 per day until judgment is entered, and depending on how the Connecticut Supreme Court rules, it may recover $3,602,462.99 in punitive damages. Connecticut courts have held that "[offer of compromise] interest must be

awarded on the total amount recovered," including punitive damages and prejudgment interest. *Med. Device Sols., LLC v. Aferzon*, 207 Conn. App. 707, 789 (prejudgment interest); *Kregos v. Stone*, 88 Conn. App. 459, 466 (2005) (punitive damages). Therefore, McCarter is entitled to eight percent simple interest on its total recovery, including compensatory damages, prejudgment interest, and any punitive damages it may recover.[23] As the amount of prejudgment interest remains a moving target at this point, and I will certify the question of the availability of punitive damages to the Connecticut Supreme Court, I will calculate offer of compromise interest at the time I enter judgment in this case.

## VI.    CONCLUSION

For the reasons set forth above, I GRANT in part McCarter's motion for prejudgment interest, ECF No. 464, and award $683,302.32 in prejudgment interest, plus $41.12 per day until judgment is entered. I also GRANT in part McCarter's motion for offer of compromise interest, ECF No. 466, but reserve the calculation of such interest until judgment is entered.

I DENY without prejudice McCarter's motion for punitive damages, ECF No. 465, because I will certify to the Connecticut Supreme Court the question of whether punitive damages are available for willful and malicious breach of contract.  Under Connecticut law, a certification order must include: "(1) The question of law to be answered; (2) The facts relevant to the question, showing fully the nature of the controversy out of which the question arose; (3) That the receiving court may reformulate the question; and (4) The names and addresses of counsel of record and unrepresented parties." Conn. Gen. Stat. § 51-199b(f). "If the parties

---

[23] Under Conn. Gen. Stat. § 52-192a(c), this interest began accruing on July 22, 2019, the date the McCarter filed its complaint, and continues accruing until judgment is entered. But I note that on September 29, 2023, Jarrow released from escrow $1.85 million in funds that were attached as part of a prejudgment remedy, and McCarter agreed that its offer of compromise interest would stop running on the $1.85 million released from escrow on that date. ECF No. 480 at 2.

cannot agree upon a statement of facts, then the certifying court shall determine the relevant facts and shall state them as part of its certification order." *Id.* § 51-199b(g). The parties shall stipulate to a statement of facts within 14 days of this order, i.e., on or by February 22, 2024. If the parties are unable to agree as to all or some facts, they should file a notice indicating that they cannot agree on or by February 22, 2024. If that occurs, I will use the facts set out in this opinion in my final certification order.

I DENY Jarrow's motion for a new trial or remittitur, ECF No. 468, and Jarrow's motion for judgment as a matter of law, ECF No. 470, except I deny without prejudice the portion challenging the availability of punitive damages.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                February 8, 2024