**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
|---|
| McCARTER & ENGLISH, LLP, |
| *Plaintiff*, |
| v. |
| JARROW FORMULAS, INC, |
| *Defendant*. |

No. 3:19-cv-01124 (MPS)

**CERTIFICATION ORDER**

## I.    INTRODUCTION

McCarter & English, LLP ("McCarter") represented Jarrow Formulas, Inc. ("Jarrow") in a contentious Kentucky lawsuit, which resulted in a multimillion-dollar verdict against Jarrow. Shortly after the Kentucky trial ended, McCarter sued Jarrow in this action for breach of contract to recover outstanding legal fees. Before trial in this case, the parties agreed that the jury would determine whether any breach of contract was willful and malicious, and, if punitive damages were available under Connecticut law for willful and malicious breach of contract, the Court would determine the amount of punitive damages to award. After a July 2023 trial, a jury returned a verdict for McCarter and found that Jarrow's breach of contract was willful and malicious. McCarter then moved for punitive damages, and Jarrow moved for judgment as a matter of law, arguing, among other things, that punitive damages are unavailable for willful and malicious breach of contract. For the reasons explained below, I have determined that the most prudent course of action is to certify the question of whether punitive damages are available in this case to the Connecticut Supreme Court.

1

## II.     FACTS FOR CERTIFICATION

When certifying a question to the Connecticut Supreme Court, the certifying court must set forth "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose." Conn. Gen. Stat. § 51-199b(f)(2). "If the parties cannot agree upon a statement of facts, then the certifying court shall determine the relevant facts and shall state them as part of its certification order." *Id.* § 51-199(g). The parties have indicated that they are unable to agree as to the facts for certification. ECF No. 496. I therefore set forth the following facts, which are taken largely from my recent ruling on post-verdict motions, *McCarter & English, LLP v. Jarrow Formulas, Inc.*, No. 3:19-CV-01124 (MPS), 2024 WL 489328 (D. Conn. Feb. 8, 2024).

McCarter represented Jarrow in a jury trial in the United States District Court for the Western District of Kentucky (the "Kentucky Litigation"), in which Caudill Seed & Warehouse Company ("Caudill") sued Jarrow for violations of the Kentucky Uniform Trade Secrets Act, among other claims. ECF No. 194 at 1-2. The jury returned a $2,427,605 verdict against Jarrow. *Id.* at 2. Shortly thereafter, Jarrow terminated its relationship with McCarter and refused to pay the remaining attorney's fees and costs that McCarter claimed it owed. *Id.*

McCarter brought this action for breach of contract, account stated, and quantum meruit to recover outstanding legal fees. ECF No. 174. Jarrow asserted eight counterclaims, alleging that McCarter overbilled it and engaged in malpractice. ECF No. 184. Before trial, the parties stipulated that "the jury [would] decide *whether* a party is *entitled* to punitive damages" for any of McCarter's claims or Jarrow's counterclaims, and the Court would determine the amount of punitive damages. ECF No. 362 ¶ 5 (emphasis in original). However, "[b]oth parties reserve[d] their right to argue to the Court that the opposing party is not entitled to … punitive damages for any reason, and [that] no issues related thereto should be submitted to the jury." *Id.* The Court instructed the jury that

punitive damages could be awarded if "the other party's conduct intended to violate — or showed reckless indifference to — the rights of the first party." ECF No. 430 at 41.

The jury returned a verdict for McCarter all counts and awarded $1,057,173.93 in compensatory damages. ECF No. 433. The jury also determined that Jarrow's conduct in breaching its contract with McCarter was willful and malicious. *Id.* at 3.

During the trial, Jarrow made an oral motion for judgment as a matter of law. ECF No. 409. The motion argued that no punitive damages could be awarded for McCarter's breach of contract claim because Connecticut law does not "recognize[] bad faith breach of contract except when there is a strong public policy involved." ECF No. 452 at 220-22. The Court reserved judgment on that issue. *Id.* at 223-25.

After the trial concluded, McCarter filed motions for prejudgment interest, punitive damages, and offer-of-compromise interest. ECF Nos. 464, 465, 466. Jarrow filed a motion for new trial and remittitur, ECF No. 468, and a renewed motion for judgment as a matter of law, ECF No. 470. Jarrow's motions argued, among other things, that (1) the jury's determination that Jarrow's conduct was willful and malicious "was against the clear weight of the evidence," ECF No. 469 at 11-19, and (2) "[t]here is no legal basis to award punitive damages on McCarter's breach of contract claim" under Connecticut law, ECF No. 471 at 21-31.

I issued a ruling on all post-verdict motions on February 8, 2024. *See McCarter & English,* 2024 WL 489328 (ECF No. 493). In the ruling, I concluded that the jury's finding that Jarrow's breach of contract was willful and malicious was not contrary to the clear weight of the evidence. I found a reasonable jury could reject the explanations Jarrow offered for its conduct, including that (1) Jarrow "initially did not pay because it 'had a cash crunch,'" *id.* at *13 (quoting ECF No 456 at 152), (2) after the Kentucky Verdict, Jarrow did not pay because its Chairman and President

had "the honest belief that he shouldn't have to pay because [McCarter] let him down," *id.* (quoting ECF No. 456 at 155), and (3) Jarrow refused to pay certain bills "because it was following its counsel's advice not to pay," *id.* As I explained in that ruling:

> The jury reasonably rejected Jarrow's claim that it failed to pay its outstanding legal bills before the Kentucky trial began because of a "cash crunch." The jury heard evidence that in late May of 2019, shortly before the Kentucky trial began, McCarter offered Jarrow a 5 percent discount in "exchange for payment of all … outstanding invoices," which totaled approximately $1.3 million. ECF No. 446 at 189-90; ECF No. 477 at 220-21. [McCarter Attorney Mark] Giarratana testified that Jarrow took the discount, but only "paid half" of the amount owed. ECF No. 446 at 144. On June 1, 2019, [Jarrow Chairman and President Jarrow Rogovin] emailed Jarrow's CFO, Ben Khowong, telling him to "[p]ut off the lawyer bills." ECF No. 448 at 119-20. Rogovin testified that he only meant to "delay the bills until [Jarrow] had money," *id.* at 93, and Jarrow presented some evidence that it experienced cash flow issues in the period leading up to the trial, *see* ECF No. 469 at 12-13 (summarizing this evidence). But the jury was not required to credit Rogovin's testimony. Nor is Jarrow's interpretation of the evidence—that Jarrow intended to pay as soon as cash flow issues were resolved—the only reasonable interpretation. The jury could have concluded that Jarrow was waiting to see the outcome of the trial, or never intended to pay, based on evidence that Jarrow accepted a discount without paying the full amount it owed, failed to notify McCarter that it needed time to resolve a cash crunch, and never ultimately paid McCarter.
>
> A reasonable jury could also have rejected Jarrow's claim that it refused to pay McCarter because of a good faith belief that McCarter had engaged in malpractice. McCarter presented evidence that Rogovin was pleased with McCarter's work until he learned of the adverse jury verdict. *See, e.g.*, ECF No. 448 at 29 ("[T]he trial is going in our favor."); *id.* at 31 ("[McCarter attorney Tom Rechen's] trial work deserves to be a made-for-TV movie. He became courthouse buzz with law interns coming in to watch him operate without anesthesia."); *id.* at 32 ("[W]e are winning…."); *id.* at 33 ("A good day in court today …. [Opposing counsel] got their butts kicked pretty hard today…."); *id.* at 36 ("[Y]ou [McCarter attorneys] are doing a fantastic job. Thank you. Big hugs."); *id.* at 37 ("[O]ur lawyers are totally dominating the courtroom.").
>
> Further, a reasonable jury could have concluded that Jarrow acted willfully and maliciously based on Rogovin's other conduct. The evening after the verdict, Rogovin "butt dial[ed]" Giarratana and accidentally left a profanity-laden voicemail where he criticized McCarter's work during the trial and accused it of malpractice. ECF No. 447 at 162-67. In that voicemail, Rogovin said, "As far as I'm concerned, [McCarter] can pay the damages." *Id.* at 167. The jury reasonably could have viewed the "butt dial" phone call as evidence that Rogovin decided that Jarrow would not fulfill its contractual obligation to pay McCarter for the services it had already rendered out of his own personal spite—that is, because the outcome of the Kentucky trial disappointed him—rather than because of any good-faith belief that McCarter had provided poor representation. There was ample evidence to

4

support such a finding, including letters and emails in which Rogovin reacted with vituperation when there were adverse developments in the Kentucky Litigation, leveling epithet-laden insults against those he perceived as responsible. *See, e.g.*, ECF No. 448 at 54-56 (Rogovin calling the judge in the Kentucky Litigation "pimp deadbrain," accusing him of "whoring for [Caudill]," and stating, "I am so seething with rage that there is no way I'll do anything except a walk away or take this to trial. [Judge Simpson] … can drop dead. Please!"); ECF No. 449 at 156 (Rogovin calling Caudill's counsel "a new local lawyer … so desperate for business that he's filing a ginned up (moonshine again) lawsuit"); ECF No. 450 at 22-23 (Rogovin calling Dan Caudill a "lying SOB," a "nutter," and "a pathological liar," and asking Caudill's counsel if he had "been evaluated by a neurologist lately?"); ECF No. 445 at 218 (Giarratana testifying that "there was a tremendous amount of anger, I would say hatred … from [Rogovin] towards Dan Caudill, the Caudill company, their lawyers, and the court"). Further, Giarratana and Rogovin had worked together for more than two decades at the time of trial, ECF No. 445 at 20, but after the verdict was read, Giarratana testified that Rogovin "walked out" of the courtroom without saying a word and never spoke to him again, *id.* at 221, 228.

The jury also learned that Jarrow made the decision to fire McCarter the night the verdict came out, but did not notify McCarter right away, and continued to ask McCarter to do legal work. Rogovin testified that he told several people he was going to fire McCarter and sue for malpractice the night of the verdict, June 26, 2019. ECF No. 447 at 230-33. But Jarrow waited until July 12 inform McCarter—through new counsel—that it had been terminated. ECF No. 446 at 16. Giarratana testified that when he spoke to Jonathan Leventhal, Jarrow's General Counsel, and Rory Lipsky, a Jarrow executive, after the verdict, they did not tell him that Rogovin planned to fire McCarter. *Id.* at 7-11. In those calls, Giarratana claims he discussed strategy and informed Leventhal and Lipsky that he was going to work on post-trial motions. *Id.* One day after the verdict, Leventhal emailed Giarratana to ask for a "time line of key filing deadlines" and "your analysis that we discussed about for an appeal." *Id.* at 11-12. Leventhal testified that he was not aware that Rogovin intended to fire McCarter or refuse to pay any outstanding bills when he sent this email. ECF No. 448 at 141. The jury was not required to believe this testimony, however, [as] Rogovin told multiple people of his plans to fire McCarter the night of the verdict. And Jarrow did not formally terminate McCarter in the ensuing weeks, even as McCarter continued to work on the case. Giarratana prepared and sent Rogovin and Leventhal a draft motion for judgment as a matter of law on June 29, ECF No. 446 at 13, and Rechen sent Rogovin and Leventhal a detailed explanation of the post-trial deadlines on July 8, *id.* at 15. But Jarrow waited to fire McCarter until it had a replacement team in place. ECF No. 448 at 45-46. During this period, Jarrow hired two members of McCarter's trial team, local counsel Joel Beres and former McCarter associate John Cordani, to take over post-verdict proceedings. *Id.*

Finally, a reasonable jury could have rejected Jarrow's claim that it was acting on the advice of counsel by not paying certain bills. On July 22, 2019, Rogovin "conveyed to McCarter … that [he] would be paying the IP portion" of outstanding legal bills in an unrelated matter. ECF No. 447 at 174-75. Rogovin testified that he changed his mind about paying these bills after speaking to Jarrow's counsel, Jeff Tinley. *Id.* Again, the jury was

5

> not required to believe Rogovin's testimony. And assuming Rogovin's testimony was true, Tinley's advice came more than a month after the Kentucky verdict and Rogovin's initial decision not to pay McCarter. So the jury reasonably could have found that Jarrow's decision to refuse to pay was not primarily motivated by Tinley's advice.

*McCarter & English*, 2024 WL 489328, at *13-14. Based on this evidence, I concluded that "the jury's verdict on willful and malicious breach was reasonable and supported by the weight of the evidence," and "a new trial is not warranted on these grounds." *Id.* at *15.

However, I declined to decide the question of whether punitive damages were available for willful and malicious breach of contract under Connecticut law. I explained that "[b]ecause Connecticut law is unsettled on this question, resolving this question requires weighing competing public policy concerns, and other states have adopted several different rules, I will certify this question to the Connecticut Supreme Court." *Id.* at *3. I therefore denied without prejudice McCarter's motion for punitive damages. *Id.* at *25. I wrote that McCarter could "renew its motion for punitive damages" if the Connecticut Supreme Court determined that punitive damages were available for willful and malicious breach of contract. *Id.* In that event, I found that McCarter "reasonably incurred $3,602,462.99 in litigation expenses," and was entitled to that amount in punitive damages. *Id.*

I denied Jarrow's motion for a new trial or remittitur and its renewed motion for judgment as a matter of law on all other grounds. *Id.* at *27. I also granted in part McCarter's motions for prejudgment interest and offer-of-compromise interest. *Id.*

## III.   LEGAL STANDARD

Under Connecticut law, I may certify a question to the Connecticut Supreme Court "'if the answer may be determinative of an issue' in a case before [me] and 'if there is no controlling appellate decision, constitutional provision or statute.'" *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 334

(2d Cir. 2015) (quoting Conn. Gen. Stat. § 51-199b(d)). "When deciding whether to certify a question to the Connecticut Supreme Court, a court should consider, among other factors: '(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation.'" *Bifolck v. Philip Morris, Inc.*, No. 3:06-CV-01768 (SRU), 2014 WL 585325, at *2 (D. Conn. Feb. 14, 2014) (quoting *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007)).

## IV.    DISCUSSION

In this case, all three factors support certifying the issue of whether McCarter can recover punitive damages for Jarrow's willful and malicious breach of contract. First, there is an absence of authoritative state court decisions about this issue. Second, other state supreme courts have adopted several different approaches to this issue, based on competing policy considerations. Finally, this issue is central to the parties' post-verdict litigation and will determine whether McCarter can recover millions more in damages.

### A.  Connecticut Law

The Connecticut Supreme Court has considered whether punitive damages are available for willful and malicious breach of contract only in dicta. Without a binding ruling from the Connecticut Supreme Court—and with mixed guidance from the Connecticut Appellate Court— trial courts have split on when punitive damages are available for breach of contract. The need for resolution of this important issue weighs in favor of certification.

In *Triangle Sheet Metal Works, Inc. v. Silver*, the Connecticut Supreme Court appeared to recognize the availability of punitive damages for contractual claims in some circumstances. 154 Conn. 116 (1966). In that case, the plaintiffs accused two of their former employees of disclosing

trade secrets in violation of an express agreement and their fiduciary duties. *Id.* at 118-19. The trial court found in the plaintiffs' favor on counts three and four of the complaint, which involved "the breach by [the employees] of their contract obligations, express or implied." *Id.* at 127. The court awarded punitive damages. *Id.*

In dicta, the court suggested that punitive damages might be available in any breach of contract case where "wanton and wilful injury is proved" or "malice is established." *Id.* at 127-28. The court observed that "[p]unitive damages are not ordinarily recoverable for breach of contract" because "punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship." *Id.* at 127 (citing Restatement (First) of Contracts § 342; Corbin on Contracts § 1066; McCormick on Damages § 81). But the court added that punitive damages can be awarded for tort claims, and therefore punitive damages "ha[d] been allowed" in a "few classes of [contract] cases" that "contain elements which bring them within the field of tort."[1] *Id.* In tort cases, the court noted, "the basic requirement to justify an award of punitive or exemplary damages has been repeatedly

---

[1] The court's reference to a "class of cases [that] contain elements which bring them within the field of tort" seems to paraphrase Corbin's treatise on contracts. *See* 5 Corbin on Contracts § 1077 (1964) ("[A]s a general rule … punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been a tendency to instruct the jury that they may award damages … by way of punishment. These cases … contain elements that enable the court to regard them as falling within the field of tort or as closely analogous thereto."); *see also Triangle Sheet Metal Works*, 154 Conn. at 127 (citing Corbin's treatise favorably). The 1964 edition of Corbin's treatise provided examples to support this premise, which adopt several different approaches to punitive damages for breach of contract, although few would permit punitive damages for willful and malicious breach alone. The cited cases include (1) a D.C. Circuit case, which held that punitive damages were available for breaches of contract by people who "assume certain fiduciary responsibilities," because "a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust," *Brown v. Coates*, 253 F.2d 36, 39 (D.C. Cir. 1958), (2) a California case, which held that "[e]xemplary damages are proper in cases involving fraud and may be allowed even though the tort incidentally involves a contract," *S. California Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431 (1960), (3) a South Carolina case, which held that a plaintiff could recover punitive damages for breach of contract only if "the breach was accomplished with a fraudulent intention, and was accompanied by a fraudulent act," and "acts of wilfulness, unless there is fraud also, will not support a claim for punitive damages," and (4) a Texas case, which held that "where a breach of contract is shown to have been accompanied by malicious and oppressive conduct, or to have occurred in such manner as to constitute a tort, the wrongdoer may be subjected not only to actual damages," *Etter v. Von Sternberg*, 244 S.W.2d 321, 324 (Tex. Civ. App. 1951).

described in terms of wanton and malicious injury, evil motive and violence." *Id.* at 128. The court found that the third and fourth count of the complaint did not contain "any allegation of a motivating intent or design … to harm the plaintiffs" and "the record does not disclose the existence of that 'malicious or wanton misconduct' which would justify an award of exemplary or punitive damages." *Id.* So the court reversed the trial court's decision to award punitive damages.

To the extent the dicta in *Triangle Sheet* could be read to embrace a broad rule permitting punitive damages for any wanton or malicious breach of contract, however, a review of the underlying complaint undermines this interpretation. The third and fourth counts of the complaint, under which the trial court awarded punitive damages, arguably sounded in tort, not contract.[2] The third count alleged that the defendants, including some parties who did not have contracts with the plaintiffs, "wrongfully, intentionally, and maliciously induced" a salesman to leave the plaintiffs' employ. Substituted Complaint ¶¶ 21-24, *Triangle Sheet Metal Works,* 154 Conn. 116 (1965). It went on to allege that the salesman "act[ed] in concert" with the other defendants to "bid on jobs … at figures substantially below plaintiffs'." *Id.* The fourth count alleges that the defendants "wilfully and fraudulently misrepresented to actual and potential customers and to Plaintiffs' sales representatives" certain facts "to interfere with the contracts and business expectancies of the Plaintiffs." *Id.* ¶¶ 28-30.[3] Given that the underlying allegations likely sounded in tort, the court

---

[2] The Substituted Complaint is attached to this ruling as Exhibit A.

[3] The allegations in counts three and four may have been intended to meet Connecticut's requirements for tortious interference with a business expectancy or the common law tort of unfair competition. Tortious interference with a business expectancy "requires proof that the defendant was guilty of fraud, misrepresentation, intimidation, or molestation; or that the defendant acted maliciously" to interfere with a business expectancy, but does not require "that the tort have resulted in an actual breach of contract…." *Jones v. O'Connell*, 189 Conn. 648, 660 (1983) (citations and internal quotation marks omitted). Connecticut courts also recognized a common law tort for unfair competition at the time. *See Yale Co-op. Corp. v. Rogin*, 133 Conn. 563, 571 (1947). The notion that counts three and four may have sounded in tort is buoyed by a review of the issues the defendant presented on appeal, which included whether the defendant's actions "constitute a willful misrepresentation against a competitor sufficient to support an award of exemplary damages" or "constitute willful acts of unfair competition sufficient to support an award of exemplary damages." Brief of the Defendant-Appellant at 2, *Triangle Sheet Metal Works, Inc.*, 154 Conn. 116 (1965) (attached as Exhibit B). The defendant did not argue that punitive damages were unavailable because the

may have intended to permit punitive damages where the breach of contract is also an independent tort, an approach that many states supreme courts have taken. *See* discussion *infra*. Alternately, since the complaint alleged that at least one of the defendants had a "confidential and fiduciary relationship" to the plaintiffs, *id.* ¶ 14, the court may have intended to follow states that have permitted punitive damages for willful and malicious breach of a fiduciary duty. *See* discussion *supra* at footnote 1 (citing *Brown v. Coates*, 253 F.2d 36, 39 (D.C. Cir. 1958)). In any event, the Connecticut Supreme Court did not need to determine the precise boundaries of its own rule, since the court found no evidence that the defendants acted maliciously.

In *L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.*, the Connecticut Appellate Court applied *Triangle Sheet* to affirm an award of punitive damages. 9 Conn. App. 30 (1986). The plaintiff alleged that the defendant, a surety company, had breached an "implied contract to act as surety on construction performance and payment bonds." *Id.* at 31. The court wrote that "[b]reach of contract founded on tortious conduct may allow the award of punitive damages," but "there must be an underlying tort or tortious conduct alleged and proved." *Id.* at 48. And it added that "[e]lements of tort such as wanton or malicious injury or reckless indifference to the interests of others giving a tortious overtone to a breach of contract action justify an award of punitive or exemplary damages." *Id.* Thus, the Appellate Court affirmed the trial court's decision to reject a proposed jury instruction that, "(1) that since this is a breach of contract action, punitive damages are not recoverable as a matter of law, and (2) that since there is no contract of insurance, any claim for bad faith must fail as a matter of law." *Id.* at 49.

In its motion for judgment as a matter of law, Jarrow argued that *L.F. Pace's* holding is limited to the "insurance context," since the case involved a surety company. ECF No. 471 at 24.

---

cause of action was for breach of contract. *Id.* at 25-42. Instead, the defendant argued the evidence did not support a conclusion they acted "willfully and with intent to interfere with the plaintiffs' business expectancies." *Id.* at 31.

The *L.F. Pace* opinion cites two cases that permitted punitive damages "when [an] insurer unreasonably and in bad faith withholds payment of the claim of its insured." *L.F. Pace*, 9 Conn. App. at 46 (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973)); *see also id.* at 46-47 (discussing *Gruenberg* and *Grand Sheet Metal Products Co. v. Protection Mutual Ins. Co.*, 34 Conn. Sup. 46 (1977)). And as discussed in more detail in the next subsection, some other states have permitted punitive damages for willful and malicious breach of contract in cases involving insurance. Still, the Appellate Court did not explicitly limit punitive damages to insurance cases. The section of the court's opinion that discusses *Grand Sheet* and *Gruenberg* is summarizing the trial court's reasoning, and it is unclear whether the Appellate Court intended to adopt that reasoning, including its focus on the obligations of insurers. *Id.* at 46-47. And *L.F. Pace* was not a traditional insurance case, since the plaintiff claimed that a surety company had breached an implied contract to issue surety bonds. *See Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 43-60 (1999) (distinguishing insurance companies from surety companies for purposes of punitive damages on breach of implied covenant of good faith and fair dealing claim and noting mixed state approaches to this issue). Indeed, the trial court acknowledged that it was expanding *Grand Sheet Metal* and *Gruenberg* by awarding damages in "a situation other than for the payment of a claim under a contract of insurance." *L.F. Pace & Sons*, 9 Conn. App. at 47 (citation omitted).

The Appellate Court considered whether *L.F. Pace* applied beyond insurance cases in *Barry v. Posi-Seal Int'l, Inc.*, 40 Conn. App. 577 (1996). There, a former employee sued his employer for wrongful termination, bringing claims for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligent misrepresentation. *Barry v. Posi-Seal Int'l, Inc.*, 36 Conn. App. 1, 3 (1994), *revised on reconsideration*, 40 Conn. App. 577 (1996) (setting out procedural history of case). The jury found

for the plaintiff on all claims and awarded punitive damages, but the trial court set aside the verdict on all of the plaintiff's tort claims. *Id.* at 3-4.

The Appellate Court concluded that a "punitive damages award cannot stand in the absence of a verdict in the plaintiff's favor on a cause of action sounding in tort." *Barry*, 40 Conn. App. at 585. The court argued that "the principles announced in *Triangle Sheet Metal* have been followed only in regards to insurance" and pointed out that *L.F. Pace* involved surety bonds. *Id.* at 584, 588 n.12. The court reasoned that "quasi-public" insurance companies have a "special relationship" with their insureds, as an insurer "sells protection," and "the interests of the insurer and insured are at odds, [because] payment of a claim benefits the insured and diminishes the resources of the insurer." *Id.* at 586-87. By contrast, the employer/employee relationship resembled an "ordinary commercial contract," and there was no direct conflict of interest. *Id.* Therefore, the court held that "where there is no allegation or proof that the termination of employment is violative of an important public policy, punitive damages cannot be recovered on a claim that a termination constituted a breach of the implied covenant of good faith and fair dealing contained in an employment contract." *Id.* at 587-88.

McCarter argued that *Barry*'s holding is limited to (1) wrongful termination cases with (2) good faith and fair dealing claims. ECF No. 478 at 23. I agree that part of the holding in *Barry*— the language regarding "public policy" concerns—is specific to good faith and fair dealing claims in wrongful termination suits. Under Connecticut law, if an at-will employee argues that her discharge breached the implied covenant of good faith and fair dealing, she must show the reason for discharge "involves ... some important violation of public policy." *Magnan v. Anaconda Industries, Inc*., 193 Conn. 558, 572 (1984) (quotation marks and internal alterations omitted). This requirement prevents litigants from "transform[ing] the requirement of good faith into an

implied condition that an employee may be dismissed only for good cause." *Id.* at 571. Though the plaintiff in *Barry* was not an at-will employee, the Appellate Court cited *Magnan* to support its holding that punitive damages were not available "where there is no allegation or proof that the termination of employment is violative of an important public policy." 40 Conn. App. at 587-88 & n.11. Therefore, I do not believe the Appellate Court intended to apply its public policy requirement to claims for punitive damages outside the wrongful termination context.

Even so, the remainder of *Barry's* reasoning is not limited to good faith and fair dealing claims in wrongful termination cases. Although the plaintiff did not seek punitive damages for its breach of contract claim,[4] the arguments the Appellate Court makes about the distinctions between insurance agreements and employment contracts apply just as readily to breach of contract claims involving other "ordinary commercial contract[s]." 40 Conn. App. at 586. And the court considered and rejected an argument based on *Triangle Sheet*, stating that "the principles announced in *Triangle Sheet Metal* have been followed only in regards to insurance." *Id.* at 588 n.12.

Since *Barry*, however, the Connecticut Appellate Court and the Second Circuit have each applied the *L.F. Pace* standard to contract claims that were not brought against insurance companies, albeit in dicta. *See City of Hartford v. Int'l Ass'n of Firefighters*, 49 Conn. App. 805 (1998) (applying *L.F. Pace* to breach of collective bargaining agreement, which required City to provide health insurance to firefighters through Blue Cross/Blue Shield, but denying punitive damages because union "made no claim that [the City's breach] was malicious, wilful, or reckless"); *Edible Arrangements Int'l, Inc. v. Chinsammy*, 446 F. App'x 332 (2d Cir. 2011) (summary order) (applying *L.F. Pace* to commercial unjust enrichment claim, but denying punitive

---

[4] *See* Amended Complaint, *Barry v. Posi-Seal Int'l, Inc.*, No. 513813 (Conn. Super. Ct. May 25, 1990) (attached as Exhibit C).

damages because plaintiff "failed to prove any underlying tortious conduct sufficient to warrant punitive damages"). But both courts found that punitive damages were not available because the plaintiff had either not alleged or not proven malicious conduct. *City of Hartford*, 49 Conn. App. at 816-17; *Edible Arrangements Int'l*, 446 F. App'x at 344.

State and federal trial courts have reached mixed conclusions on whether punitive damages are available for contract claims outside the insurance context. *Compare Indep. Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp. 2d 183, 191 (D. Conn. 2007) (punitive damages unavailable for good faith and fair dealing claim involving "ordinary commercial contract"); *Tennant v. Innovative Concepts in Design, Inc.*, No. CV-12-6030584-S, 2015 WL 9242220, at *10 (Conn. Super. Ct. Nov. 18, 2015) (same for breach of construction contract claim); *Kulkin v. Engel*, No. FST-CV-08-5009226-S, 2013 WL 8213590, at *8 (Conn. Super. Ct. Dec. 31, 2013) (same for breach of contract between two neighbors); *and Day v. Yale Univ. Sch. of Drama*, No. CV-97-0400876-S, 2000 WL 295612, at *11 (Conn. Super. Ct. Mar. 7, 2000) (same for breach of contract between school and student); *with Canaan Apothecary, LLC v. Salisbury Pharmacy Grp., LLC*, No. 3:12-CV-01571 (VLB), 2014 WL 788944 (D. Conn. Feb. 25, 2014) (in dicta, stating punitive damages *are* available for commercial breach of contract claim and citing *Edible Arrangements*); *Bohn v. Dorothea L. Denton, LLC*, No. DBD-CV-186024779-S, 2021 WL 4286568, at *29 (Conn. Super. Ct. Sept. 3, 2021) (citing *L.F. Pace* and awarding punitive damages for breach of LLC's operating agreement); *Makuch v. Stephen Pontiac-Cadillac, Inc.*, No. 3:12-CV-00866 (WWE), 2013 WL 45887, at *2 (D. Conn. Jan. 3, 2013) (citing *L.F. Pace*, and concluding "punitive damages are available for a claim of breach of warrant[y] if plaintiff alleges conduct that is 'done with a bad motive or with a reckless indifference to the interest of others'"); *and Esposito v. 2233-2247 Main St. LLC*, No. HHD-CV-20-6134687-S, 2023 WL 3193473, at *5 (Conn. Super. Ct. Apr.

25, 2023) (applying *L.F. Pace* to breach of loan agreement but declining to award punitive damages because of insufficient evidence of malicious breach).

Whether plaintiffs can seek punitive damages for willful and malicious breach of contract remains an unsettled area of Connecticut law. The sole Connecticut Supreme Court case discussing this issue, *Triangle Sheet*, does so only in dicta. And as shown, the relevant claims in that case arguably sounded in tort, not contract, so I cannot determine whether the court intended to adopt the broad rule its dicta suggests. *L.F. Pace* also states that punitive damages are available for tortious breach of contract. But that case involved a surety company, and some states that do not permit punitive damages for willful and malicious breach have adopted a narrow exception for contract claims against insurance or surety companies. Finally, *Barry* held that punitive damages were not available for a good faith and fair dealing claim in a wrongful termination lawsuit unless the termination violated public policy. As I explained above, I do not think the Appellate Court intended to apply the public policy requirement outside the wrongful termination context. And since *Barry* was decided, the Appellate Court and Second Circuit have both applied *L.F. Pace* to breach of contract claims that did not involve traditional insurance claims. Nevertheless, "it is difficult to reconcile the holding and language contained within the *Barry* decision" with McCarter's claim that it is entitled to punitive damages for its client's breach of contract. *Kulkin*, 2013 WL 8213590, at *8.

Thus, "the absence of authoritative state court decisions" on the availability of punitive damages for willful and malicious breach of contract weighs in favor of certification. *Bifolck*, 2014 WL 585325, at *2.

## B.  Other State Approaches

"In the absence of controlling or persuasive Connecticut authority" on a legal issue, the Connecticut Supreme Court often "look[s] to the law of other jurisdictions." *Pease v. Charlotte Hungerford Hosp.*, 325 Conn. 363, 375 (Conn. 2017). But here, other jurisdictions have differing approaches to punitive damages for breach of contract claims, and it is difficult to predict which approach the Connecticut Supreme Court might adopt.

Most states have permitted punitive damages for breach of contract only where the breach sufficiently resembles a tort. Under the narrowest version of this exception, punitive damages are not recoverable for breach of contract unless "the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts § 355.[5] Because states that adopt this approach require the plaintiff to allege and prove facts that amount to an independent tort, they do not permit punitive damages for willful and malicious breach of contract alone.[6] However, many states have created exceptions to this rule in specific circumstances, for

---

[5] The Restatement's approach may also be persuasive to the Connecticut Supreme Court, which frequently "relie[s] on" the Restatements to "fill gaps in and support [Connecticut] common law." *Lestorti v. DeLeo*, 298 Conn. 466, 477 n.8 (2010) (collecting cases). Indeed, *Triangle Sheet* cited the Restatement of Contracts and the Restatement of Torts. 154 Conn. at 127-28. *Triangle Sheet* was decided before the Restatement of Contracts included Section 355, which offers the general rule that "[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts § 355; *see also* Restatement (Second) of Torts § 908 cmt. b ("Punitive damages … are not permitted merely for a breach of contract. When, however, the plaintiff has a right in the alternative to sue for a breach of contract or for a tort, the fact that his act or omission amounts to a breach of contract does not preclude the award of punitive damages.").

[6] *See, e.g.*, *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 **N.Y.**2d 603, 613 (1994) ("Punitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and …. such conduct was part of a pattern of similar conduct directed at the public generally."); *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 454 (**Del.** 2013) ("[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."); *Francis v. Lee Enterprises, Inc.*, 89 **Haw.** 234, 239, 244 (1999) (punitive damages are unavailable for breach of contact "in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract," abrogating previous rule that "wilful, wanton, or reckless breach of any contract—including an employment contract—would support the award of traditional tort damages"); *White v. Nw. Bell Tel. Co.*, 514 N.W.2d 70, 77 (**Iowa** 1994) ("Punitive damages may be awarded for breach of contract … upon proof of two things: (1) that the breach also constitutes an intentional tort, and (2) that the breach was committed maliciously."); *Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 13 **Cal. App.**

instance, where the breach is willful and malicious and the breaching party is a public utility, an

insurance company, or a fiduciary.[7] A handful of states have expanded the tort exception to the

---

4th 949, 960 (1993) ("An award of punitive damages is not supported by a verdict based on breach of contract, even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious."); *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 **Ill.** 2d 87, 98 (1986) ("[W]e decline to adopt plaintiffs' alternative argument that punitive damages should be awarded for certain wilful and wanton breaches of contract, even though the breach is not accompanied by an independent tort."); *L.L. Cole & Son, Inc. v. Hickman*, 282 **Ark.** 6, 10 (1984) ("[W]here on the facts either an action in contract or one in tort is possible, the plaintiff must specifically plead and prove his cause of action in tort in order to be awarded punitive damages."); *Kamlar Corp. v. Haley*, 224 **Va.** 699, 706-07 (1983) (observing that "some jurisdictions permit punitive damages [for breach of contract] where the intent of the breaching party is 'malicious,'" but following "most jurisdictions …. in requiring proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract … regardless of the motives underlying the breach"); *Gen. Motors Corp. v. Piskor*, 281 **Md.** 627, 638-39 (1977) ("[P]unitive damages may never be recovered in pure breach of contract suits …. There is, however, a class of actions that lies somewhere in the gray area separating pure torts from contract cases. These are the so-called 'torts arising out contractual relationships.'"); *Shore v. Farmer*, 351 **N.C.** 166, 170 (1999) "[P]unitive damages should not be awarded in a claim for breach of contract …. [W]hen the breach of contract also constitutes or is accompanied by an identifiable tortious act, the tort committed may be grounds for recovery of punitive damages." (citation and internal quotation marks omitted)). *See generally* 1 Punitive Damages § 7.3 (describing different approaches); Howard O. Hunter, Modern Law of Contracts Appendix 17.1, Examples of State Court Decisions (outlining additional states that have adopted the independent tort approach); William S. Dodge, *The Case for Punitive Damages in Contracts*, 48 Duke L.J. 629, 644-651 (1999) (summarizing different state approaches and observing that "thirty-five American jurisdictions adhere to the traditional rule and require that a contract plaintiff plead and prove the existence of an independent tort in order to recover punitive damages").

[7] *See, e.g., Wagman v. Lee*, 457 A.2d 401, 404 (**D.C.** 1983) ("Although punitive damages generally are not recoverable for breach of contract … this rule is inapplicable if there exists an independent fiduciary relationship between the parties."); *Daniels v. Dean*, 253 **Mont.** 465, 473 (1992) ("Tort type damages may only be available in contracts where a 'special relationship' exists or for traditional contract related torts such as fraud, fraudulent inducement, and tortious interference with a contract."); *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 **N.J.** Super. 437, 449 (App. Div. 1976) ("Where the essence of a cause of action is limited to a breach of [a commercial] contract, punitive damages are not appropriate …. [S]everal exceptions have been carved out … where the unusual relationship between the parties reflects a breach of trust beyond the mere breach of a commercial contract."). *See generally* 11 Corbin on Contracts § 59.2 (2023) (observing that punitive damages are awarded "where the breach involves the malicious or wanton violation of a fiduciary duty even where the violation does not constitute an independent tort"). Many of the states that permit punitive damages for breach of contract in these limited circumstances recognize a specific cause of action for that purpose, which is often breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 **Nev.** 346, 354, 934 P.2d 257, 263 (1997) (recognizing "*tort* action for breach of the implied covenant of good faith and fair dealing," but noting that it "requires a special element of reliance or fiduciary duty" as might exist in "relationships … formed by employment, bailment, insurance, partnership, and franchise agreements"); *Rawlings v. Apodaca*, 151 **Ariz.** 149, 160 (1986) ("[I]n special contractual relationships, when one party intentionally breaches the implied covenant of good faith and fair dealing, and when contract remedies serve only to encourage such conduct, it is appropriate to permit the damaged party to maintain an action in tort and to recover tort damages."). Such causes of action are essentially breach of contract claims with added requirements that (1) the breacher acted in bad faith, and (2) the parties have relationship of trust or reliance.

general rule further, permitting punitive damages where the breach of contract was intentional, malicious, or has elements of fraud, even if the underlying conduct is not independently tortious.[8]

Certification affords the Connecticut Supreme Court an opportunity to decide whether to adopt the minority approach, which would permit punitive damages for willful and malicious breach of an ordinary commercial contract, or the majority approach, which would not.

### C. Policy Considerations

Further, the law governing punitive damages for breach of contract has significant policy implications. The Connecticut Supreme Court is best positioned to decide "significant issues of state law" that "implicate the weighing of policy concerns." *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 329 (2d Cir. 2015) (citations, internal quotations, and alterations omitted). And this is particularly true in this case, because Connecticut has an unusual rule for determining the amount of punitive damages, which complicates any analysis of public policy considerations.

---

[8] *See, e.g. Birchwood Land Co. v. Ormond Bushey & Sons, Inc.*, 194 **Vt.** 478, 489 (2013) (permitting punitive damages "when the breach has the character of a willful and wanton or fraudulent tort, and when the evidence indicates that the breaching party acted with actual malice" (internal quotation marks omitted)); *Myers v. Workmen's Auto Ins. Co.*, 140 **Idaho** 495, 503 (2004) ("It is not the nature of the case, whether tort or contract, that controls the issue of punitive damages. The issue revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." (internal quotation marks omitted)); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (**Tenn**. 2012) ("Although as a general matter, punitive damages are not available in a breach of contract case, punitive damages may be awarded in such a case under certain circumstances. However, an award of punitive damages is limited to the most egregious cases and is proper only where there is clear and convincing proof that the defendant has acted either intentionally, fraudulently, maliciously, or recklessly." (internal citations and quotation marks omitted)); *Hurst v. Sw. Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (**Miss.** 1998) ("[P]unitive damages … are recoverable where the breach [of contract] results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort" (internal quotations omitted)); *Paiz v. State Farm Fire & Cas. Co.*, 118 **N.M.** 203, 210 (1994) ("[A]n award of punitive damages in a breach-of-contract case must be predicated on a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party."). *See generally* 11 Corbin on Contracts § 59.2 (2023) ("[S]ome jurisdictions have gone beyond the independent tort and fiduciary violation cases and permitted an award of punitive damages where elements of fraud, malice, gross negligence or oppression 'mingle' with the breach."). South Carolina has also eschewed the independent tort approach; it permits punitive damages for "breach of contract accompanied by a fraudulent act," a cause of action that does not require the plaintiff "to allege the elements of common law fraud and deceit." *Harper v. Ethridge*, 290 **S.C.** 112, 118-19 (Ct. App. 1986).

Courts in other jurisdictions have generally offered three policy justifications for why punitive damages are permitted for torts, but not for contracts. First, "breaches of contract do not cause the kind of resentment or other mental and physical discomfort as do the wrongs called torts and crimes, and no retributive purpose would be served by punitive damages." *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir. 1985) (internal quotation marks omitted). Second, damages in contract cases are more easily quantified, "in contrast to the law of torts, which compensates for injury to personal interests that are more difficult to value, thus justifying noncompensatory recoveries." *Id.* Finally, some intentional breaches of contract are "efficient and wealth-enhancing" because the breaching party's benefit from breaching exceeds the harm to the other party. *Id.* As such, awarding "punitive damages … would prevent many such [efficient breaches]." *Id.*

While these arguments have persuaded many state supreme courts to limit punitive damages for breach of contract, Connecticut has a unique approach to punitive damages. In Connecticut, "common law punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to the plaintiff's litigation expenses less taxable costs." *Berry v. Loiseau*, 223 Conn. 786, 827 (1992). Connecticut is one of only "two jurisdictions" that awards punitive damages that "are truly compensatory in nature."[9] 1 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice § 4:3 (2d ed. 2023); *id.* § 4.4 (explaining that Michigan, the other jurisdiction, awards punitive damages for "intangible injuries or injuries to feelings, which are not quantifiable in monetary terms"). In many states, the fact-finder may

---

[9] I note, however, that Connecticut's Supreme Court has acknowledged that common law punitive damages, "when viewed in the light of the increasing costs of litigation, also serve[] to punish and deter wrongful conduct." *Berry*, 223 Conn. at 827.

consider attorney's fees and costs as one of multiple factors when awarding punitive damages, but the amount of punitive damages is not limited to attorney's fees and costs.[10]

In light of Connecticut's policy limiting punitive damages to attorney's fees and costs, Connecticut's Supreme Court might conclude that the arguments for denying punitive damages in breach of contract cases have considerably less force. As noted, courts have argued that "[b]reaches of contract … do not in general cause as much resentment or other mental or physical discomfort as do the wrongs called torts and crimes," so contract damages are awarded for "compensation … not for punishment." 5 Corbin on Contracts § 1077 (1964); *see also Triangle Sheet Metal Works*, 154 Conn. at 127 ("Punitive damages are not ordinarily recoverable in breach of contract …. because, as lucidly reasoned by Professor Corbin … punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship."). But this argument assumes that punitive damages are designed for punishment, which is true in most states. In Connecticut, by contrast, "the purpose of awarding punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries," and punitive damages are therefore limited to attorney's fees and costs. *Bifolck v. Philip Morris, Inc.*, 324 Conn. 362, 464 (2016) (internal citations, quotations, and alterations

---

[10] *See Kunewa v. Joshua*, 83 **Haw.** 65, 74 (Ct. App. 1996) (noting that "[t]he majority of jurisdictions … regularly allow a jury to consider attorney fees in computing the amount of punitive damages" and collecting cases); *see, e.g.*, *Robinson v. Sarisky*, 535 A.2d 901, 907 (**D.C.** 1988) ("Deterrence and punishment are 'the basic purposes' of punitive damages which the jury may consider in computing the amount to be awarded …. The jury may also take into account certain other factors, including the duration and cost of the litigation and the relative wealth of the defendant." (internal citations omitted)); *Hazelwood v. Illinois Cent. Gulf R.R.*, 114 **Ill. App.** 3d 703, 711 (1983) ("The amount of punitive damages awarded a plaintiff is a matter for the discretion of the jury …. [P]laintiff's attorney's fees may be included in the amount of the award."); *Newton v. Hornblower, Inc.*, 224 **Kan.** 506, 526 (1978) ("[A]ttorney fees and costs of litigation may be taken into consideration in arriving at the amount of punitive damages in an appropriate case."); *see also* Restatement (Second) of Torts § 914 cmt.a ("In awarding punitive damages when they are otherwise allowable, the trier of fact may consider the actual or probable expense incurred by the plaintiff in bringing the action."

Many states also have statutory caps on punitive damages. *See Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 956 (7th Cir. 2018) ("By our count (and with some simplifications), twenty-nine states impose a generally applicable cap on punitive damages").

omitted). And while a tort may cause more "resentment or physical discomfort" than a breach of contract, it will not necessarily cause greater attorney's fees. Thus, the Connecticut Supreme Court might find that a distinction between tort and contract punitive damages is not justified on these grounds.

Similarly, courts have argued that punitive damages are necessary in tort cases, but not contract cases, because torts cause "injury to personal interests that are more difficult to value, thus justifying noncompensatory recoveries." *Thyssen*, 777 F.2d at 63. Again, this argument assumes that punitive damages account for unquantifiable personal interests. Under Connecticut law, however, any dignitary or emotional harm to the wronged party plays no role in the amount of punitive damages awarded—punitive damages are limited to "litigation expenses." *Bifolck,* 324 Conn. at 464.

A third reason to limit punitive damages in breach of contract cases is to promote "efficient breaches." According to this argument, some "breaches of contract … are in fact efficient and wealth-enhancing," because the "breaching party will still profit after compensating the other party for its 'expectation interest.'" *Thyssen*, 777 F.2d at 63. If the breaching party knows they might have to pay "punitive damages" on top of "traditional damages," however, they might be deterred from taking "such beneficial action." *Id.* Since Connecticut law limits punitive damages to attorney's fees and costs, the risk of deterring efficient breaches is lower. Indeed, such a policy might encourage efficient breachers to negotiate, rather than force the other party to resort to litigation to enforce its contractual rights.

Further, "[n]ot all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon cost, and exploits the inadequacies of purely compensatory remedies (the major inadequacies being that

pre- and post-judgment interest rates are frequently below market levels when the risk of nonpayment is taken into account and that the winning party cannot recover his attorney's fees)." *Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 751 (7th Cir. 1988). In other words, an opportunistic party may breach a contract, even when doing so is inefficient, if they know the other party will not enforce the terms of the contract because the cost of enforcement exceeds any likely recovery. Permitting punitive damages—limited to attorney's fees and costs—could prevent such opportunistic breaches, without deterring efficient ones.[11] *See Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-CV-399, 2015 WL 5636897, at *8 (S.D. Ohio Sept. 25, 2015) (quoting *Patton*, and finding an "exception to the American Rule for attorneys' fees based on bad faith conduct giving rise to a breach of contract claim" under Ohio law); *see also Hylton v. Gunter,* 313 Conn. 472, 488 (2014) ("[T]he common purpose and effect of both statutory attorney's fees and common-law punitive damages … [is] to ensure the full compensation of plaintiffs in mitigation of the effects of the American rule.").

I decline to predict how the Connecticut Supreme Court might weigh these policy factors, and instead certify this issue to the Connecticut Supreme Court.

### D. Capacity to Resolve the Litigation

Finally, certification will resolve a legal issue that is central to this case and that will determine McCarter's ability to recover more than three million dollars in punitive damages, along

---

[11] I also note that efficient breaches are rare in situations where the interests of the two parties "are at odds," as is frequently true in the insurance context. *Barry*, 40 Conn. App. at 587. An efficient breach is possible only if the benefits to the breaching party exceed the harms to the non-breaching party. Where an insurer refuses to pay a claim, every dollar that an insurer gains by refusing to pay comes out of the pocket of the insured. Such a breach can never be efficient; its benefits to the insurer never exceed its costs to the insured. Jarrow and McCarter's interests are similarly "at odds" in this case. *Id.* Jarrow refused to pay for legal work that McCarter had already completed. Cases involving a parties' refusal to pay its bills for services already rendered resemble insurance cases, in this regard.

On the other hand, the availability of offer-of-compromise interest in Connecticut, Conn. Gen. Stat. § 52-192a, may serve to deter inefficient breaches without a need for punitive damages.

with offer-of-compromise interest on any punitive damages awarded. *See Kregos v. Stone*, 88 Conn. App. 459, 466 (2005) (holding that a plaintiff may recover offer-of-compromise interest on punitive damages). Thus, the "capacity of certification to resolve the litigation" also weighs in favor of certification. *Bifolck*, 2014 WL 585325, at *2.

For the reasons explained above, I conclude that it is prudent to give the Connecticut Supreme Court an initial opportunity to decide whether punitive damages are available in this case.

## V.   QUESTION FOR CERTIFICATION

Because "the answer[s] may be determinative of an issue in pending litigation" in this Court and because "there [exists] no controlling appellate decision, constitutional provision or statute" of Connecticut, *see* Conn. Gen. Stat. § 51-199b(d), I certify the following issue to the Connecticut Supreme Court:

1.  Can a law firm recover common law punitive damages, i.e., litigation costs including attorneys' fees, for its client's willful and malicious breach of an agreement to compensate the law firm for legal services?

The Connecticut Supreme Court may reformulate this question. Conn. Gen. Stat § 51-199b(f)(3).

## VI.   NAMES AND ADDRESSES

Pursuant to Conn. Gen. Stat. § 51-199b(f)(4), the certifying court must provide "[t]he names and addresses of counsel of record and unrepresented parties." McCarter is represented by:

**David W. Case**
McElroy, Deutsch, Mulvaney & Carpenter, LLP
One State Street
14th Floor
Hartford, CT 06103
860-522-5175
Fax: 860-522-2796

Email: dcase@mdmc-law.com

**James A. Budinetz**
McElroy, Deutsch, Mulvaney & Carpenter, LLP
One State Street
14th Floor
Hartford, CT 06103
860-522-5175
Fax: 860-522-2796
Email: jbudinetz@mdmc-law.com

**James G. Green , Jr.**
McElroy, Deutsch, Mulvaney & Carpenter, LLP
One State Street
14th Floor
Hartford, CT 06103
860-522-5175
Fax: 860-522-2796
Email: jgreen@mdmc-law.com

**Louis R. Pepe**
McElroy, Deutsch, Mulvaney & Carpenter, LLP
One State Street
14th Floor
Hartford, CT 06103
860-522-5175
Fax: 860-522-2796
Email: lpepe@mdmc-law.com

Jarrow is represented by:

**John J. Radshaw, III**
John J. Radshaw III, Esquire
65 Trumbull Street, 2d Fl.
New Haven, CT 06510
203-654-9695
Fax: 203-721-6182
Email: jjr@jjr-esq.com

**Robert L Sirianni , Jr**
Brownstone, P.A.
P.O. Box 2047
Winter Park, FL 32790-2047
407-388-1900
Fax: 407-622-1511
Email: robertsirianni@brownstonelaw.com

## VII.   CONCLUSION

For the reasons set forth above, I certify the above question to the Connecticut Supreme Court.

Jarrow has filed motions urging the Court not to certify this question to the Connecticut Supreme Court, ECF No. 497, and asking the Court to certify an interlocutory appeal of its decision to certify this question to the Connecticut Supreme Court, ECF No. 498. I DENY those motions. Largely for the reasons already set forth in this opinion, I find that the issue of punitive damages for willful and malicious breach of contract is an unsettled issue under Connecticut law and satisfies the requirements for certification under Conn. Gen. Stat. § 51-199b(d). And the proposed certification of interlocutory appeal under 28 U.S.C. § 1292(b) would only serve to further delay the final resolution of this litigation.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              February 23, 2024